**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF OHIO, A. PHILIP RANDOLPH INSTITUTE OF OHIO, GEORGE W. MANGENI, and CAROLYN E. CAMPBELL,** | |
| **Plaintiffs,** | CASE NO. 20-cv-3843 |
| **v.** | |
| **FRANK LAROSE, in his official capacity as Secretary of State of Ohio,** | |
| **Defendant.** | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     Record numbers of Ohio voters will vote by mail in the November 2020 election as a result of the COVID-19 pandemic.  Yet thousands of those voters are at risk of disenfranchisement on account of Ohio's process for rejecting, notifying voters of, and allowing voters to cure absentee ballot applications and absentee ballots with signatures deemed to be non-matching.  Because the process of matching signatures is error prone and likely to result in erroneously labeling signatures as non-matching, it is imperative that voters are provided adequate notice and an opportunity to cure the rejection of their absentee ballot applications and their ballots.  With so many individuals expected to vote by mail for the first time in November, the potential for error is especially high.  In the 2016 General Election alone, over seven hundred absentee ballots were rejected for signature mismatch.  It is imperative that every voter be given the opportunity to have their vote count.  In order to make sure that happens, Defendant must provide uniform standards across the State for election officials' signature analysis process, as

1

well as notice and cure procedures, to ensure that no voters' absentee ballot applications or absentee ballots are erroneously rejected, depriving voters of their right to vote.

2.          Plaintiffs League of Women Voters of Ohio ("the League" or "LWVO") and A. Philip Randolph Institute of Ohio ("Ohio APRI") (collectively, "Plaintiff Organizations") and George W. Mangeni, and Carolyn E. Campbell ("Individual Plaintiffs") bring this action to stop Ohio from wrongfully disenfranchising voters based on supposed signature mismatches on absentee ballot applications and absentee ballots.

3.          Signature matching is a notoriously inaccurate method of verifying an individual's identity. Handwriting analysis requires controlled conditions and significant, rigorous training to be performed without excessive error. Election officials are not trained forensic scientists, and research suggests that election officials are prone to deciding in error that authentic voter signatures do not match signatures on file with local election boards. Worse, certain classes of voters—such as those for whom English is a second language, individuals with disabilities, and older voters—are more likely than others to have wider variations in their authentic signatures, and are therefore especially likely to be disenfranchised. For all of these reasons, voters must be given an adequate opportunity to cure rejections of their applications or absentee ballots based on alleged signature mismatches.

4.          Ohio law does not require the rejection of absentee ballot *applications* based on signature mismatches. But most, if not all, Ohio counties do reject such applications for that reason. Furthermore, there are no uniform statewide procedures governing the matching process. Ohio's 88 county boards of elections differ as to the standards they use to analyze signature matching, the procedures they follow to reject perceived mismatches, the timing, method and content of the notice they provide to voters whose applications are rejected, the

opportunity they give to cure absentee ballot applications that have been rejected on the basis of signature mismatch, and the record keeping they do to document this activity.

5.          Nor is there any standard or uniform procedure applicable to, or followed by, Ohio boards of elections when they reject absentee *ballots* themselves.  As is the case with absentee ballot applications, the process and the standards as to signature analysis and the rejection of ballots for perceived mismatches vary from county to county.

6.          As a result of this lack of statewide standards, and the differences in the handling of absentee ballot applications and absentee ballots for purposes of analysis of signatures, Ohio voters are subject to the whims of different county election officials when it comes to their fundamental right to vote.  Treating different voters differently in ways that affect whether they will be permitted to vote and whether their vote will be counted violates the Equal Protection Clause.

7.          Ohio law provides specific directions as to when boards of elections must give notice to voters whose mailed-in absentee ballots were rejected, but these notice periods, as a practical matter, do not provide an adequate opportunity for cure, particularly for voters who mail their ballots close to Election Day—as is permitted by law.  Ballots may be received up until the tenth day after Election Day, but the State stops notifying voters of signature mismatches on their ballots *six* days after Election Day, and voters have until only *seven* days after Election Day to cure a mismatched signature.  Ohio could improve its notice and cure procedures—ensuring that voters' ballots are not erroneously rejected, without impacting statutory election certification deadlines—yet the State does not do so.  The right to vote is personal, so any voter losing their right to vote by no fault of their own is travesty, but in Ohio the 2016 General Election over 700 voters had their ballots rejected for signature mismatch.

Ohio's failure to provide sufficient opportunity to cure absentee ballot rejections deprives Plaintiffs of procedural due process and their right to vote.

8.        With the certainty that absentee voting by mail in Ohio will be significantly higher in the November 2020 General Election than in past general elections because of the COVID-19 pandemic, these constitutional violations threaten to disenfranchise Ohio voters in significantly higher numbers than ever before.

9.        Plaintiffs thus ask the Court to issue preliminary and permanent injunctive relief, compelling Defendant Secretary of State Frank LaRose, Ohio's chief elections officer, to take the steps necessary to correct Ohio's constitutionally deficient signature matching procedures, specifically: (1) enjoining the rejection of any absentee ballot application or absentee ballot on the basis of signature mismatch, without having provided the voter with adequate notice and an opportunity to cure the rejection; and (2) ordering the adoption of uniform, statewide standards and procedures to govern the signature analysis process.  Such injunctive relief is necessary to ensure that large numbers of eligible Ohioans are not disenfranchised by Ohio's patchwork of highly subjective, inconsistent, and erratically administered, signature matching processes.

## JURISDICTION AND VENUE

10.        Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to seek redress for Defendant's violations of the First and Fourteenth Amendments to the U.S. Constitution.

11.        This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1357, because the matters in controversy arise under the Constitution and laws of the United States; Plaintiffs seek redress for their deprivation under color of law of rights

and privileges secured by the Constitution of the United States; and Plaintiffs seek to enforce the right of citizens of the United States to vote.

12.     The Court has personal jurisdiction over Defendant LaRose, who is sued in his official capacity as an officer of the State of Ohio.

13.     Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) and (2) because Defendant LaRose resides within this district and because a substantial part of the events giving rise to the claims occurred in this District.

14.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

## PARTIES

**League of Women Voters of Ohio**

15.     Plaintiff League of Women Voters of Ohio ("LWVO") is a nonpartisan political membership organization that encourages the active and informed participation of Ohioans in government.  LWVO's mission includes expanding participation in elections and providing Ohioans with access to voting.

16.     LWVO has thirty-three local chapters across Ohio.  LWVO has members who are registered to vote in Ohio and plan to vote in the November 2020 General Election.  Its members include those who plan to apply for and cast absentee ballots by mail in that election.

17.     A substantial part of LWVO's work includes providing voter services and education, including by conducting voter registration drives, publishing educational materials and voter information, and holding nonpartisan candidate and issue forums, among other activities.  In preparation for the November 2020 election, LWVO has devoted resources, including volunteer time to these efforts and plans to devote more.

18.     LWVO will divert resources from planned registration and engagement activities instead to educate voters concerning Ohio's signature match requirement.  During the April 2020 Primary Election and past election cycles, LWVO received reports from members and the public that their respective boards of elections rejected absentee ballot applications and/or ballots because of signature discrepancies.  LWVO anticipates that significantly more of its members and significantly more voters will vote by mail in November 2020.  LWVO must refocus its previous voter engagement to educating voters about the signature matching process and Ohio's failure to provide sufficient notice and opportunities to cure.  Similarly, LWVO has redirected and will continue to redirect resources to assist members impacted by the practice of some local Ohio election officials to conduct signature matching for absentee ballot applications, a practice not contemplated by state law.  For example, LWVO's online education site concerning COVID-19 and the 2020 elections describes the requirement that voters sign absentee ballot applications and encourages voters to contact county boards of elections within three to five days of mailing their applications and ballots to ensure that boards of elections received and processed them.

19.     The manner in which Ohio carries out its signature matching for applications and ballots forces LWVO to expend resources to educate voters and to field complaints on issues and problems relating to Ohio's signature match requirements.  These are resources that LWVO would otherwise use for voter registration and education.

20.     Ohio's inconsistent procedures for signature matching and its insufficient notice and cure provisions for signature mismatches will harm LWVO's members' ability to obtain and cast ballots and have them count in the November 2020 election.  These deficient procedures also harm LWVO's efforts to register voters and encourage them to participate in

6

elections, instead forcing the organization to divert resources to education regarding the signature mismatch issue.

**A. Philip Randolph Institute of Ohio**

21.         Plaintiff A. Philip Randolph Institute of Ohio ("Ohio APRI") is the Ohio chapter of an historic national organization of African-American trade unionists and community activists. A. Philip Randolph Institute was established in 1965 to forge an alliance between the civil rights and labor movements. Ohio APRI has members throughout the state, organized into ten chapters, including in Columbus, Cleveland, and Cincinnati; its activities are funded in part by membership dues. Ohio APRI includes members who are registered to vote, who intend to vote in the November 2020 election, and who intend to vote in that election by sending in applications for mail-in absentee ballots, and mailing in such ballots.

22.         Ohio APRI's work includes voter education, registration, and civic engagement and outreach. This work includes educating voters on absentee voting requirements and assisting voters with the absentee ballot application and mailing process. In preparation for the November 2020 election, Ohio APRI is again allocating resources, which in its case consist of volunteer hours, to efforts including its historic voter registration and education endeavors.

23.         But voters, including Ohio APRI's members, face disenfranchisement due to the State's failure to provide sufficient notice of signature mismatches or opportunities to cure rejected absentee applications and ballots. Due to the vagaries and infirmities of Ohio's signature matching processes, and the variations in the processes among Ohio counties, Ohio APRI will need to expend more volunteer resources on educating voters to track ballot applications and mailed-in ballots and to cure rejections, at the expense of the organization's other efforts. Ohio's signature match requirements force Ohio APRI to expend resources that it would otherwise use for other voter registration and education activities.

**Individual Plaintiffs**

24.         Plaintiff George W. Mangeni was born in Kenya and is a naturalized citizen of the United States.  Mr. Mangeni is registered to vote in Ohio.  He registered in 2015, shortly after he became a United States citizen, and has been a regular voter ever since.  Mr. Mangeni resides in Blacklick, Ohio, in Franklin County.  He is a Network Engineer.

25.         After the Ohio legislature ordered that only a narrowly defined group of voters could cast their ballots in person because of COVID-19, Plaintiff Mangeni applied to the Franklin County Board of Elections for an absentee ballot in the 2020 Primary Election.  It was Plaintiff Mangeni's first time voting absentee.  He received and filled out his ballot, affixed proper postage, and mailed it back to the Franklin County Board on April 22, 2020.  As someone who keeps meticulous records, Plaintiff Mangeni took a photo of his absentee ballot, in order to have a personal record of its transmission.  He ensured that he transmitted the ballot on time and indeed sent in his ballot well before April 27, the required postmark date, and nearly two weeks before the date that any needed cure would have to be effectuated.  Mr. Mangeni did not receive any notification from the Franklin County Board of Elections that there was a problem with his ballot, but his ballot was not counted due to a purported signature mismatch.

26.         Plaintiff Carolyn E. Campbell, who was born in Ohio, is a citizen of the United States.  Ms. Campbell resides in Mayfield Heights, Ohio, in Cuyahoga County.  She is a Production Planner Control Specialist.

27.         Plaintiff Campbell applied to the Cuyahoga County Board of Elections for an absentee ballot in the 2020 Primary Election.  She received and filled out her ballot, affixed proper postage, and mailed it back to the Cuyahoga County Board on or about March 12, well before April 27, the required postmark date.  On or about April 2, Ms. Campbell received a mailing from the Cuyahoga County Board of Elections that her ballot had a purported signature

mismatch. She filled out and mailed a signature correction form to the Cuyahoga County Board of Elections, which was processed on April 23. The Cuyahoga County Board mailed her a second ballot on April 24, which Ms. Campbell did not receive until late in the day on April 29. She mailed the ballot on April 30, but her vote was not counted in the 2020 Primary Election. Ms. Campbell was not informed that her vote was not counted, nor was she ever provided any further opportunity to cure any deficiency in her ballot

**Defendant**

28.        Defendant Frank LaRose is the Secretary of State of Ohio and is sued here in his official capacity. Pursuant to Ohio Rev. Code § 3501.04, the Secretary of State is the chief elections officer of the State. Among his duties, Defendant LaRose is responsible for issuing binding and advisory guidance to county officials regarding election procedures. Ohio Rev. Code § 3501.05. Ohio statute enumerates duties the Secretary of State "shall do," including "[a]ppoint all members of boards of election," "[i]ssue instructions by directives and advisories [. . .] to members of the boards as to the proper methods of conducting elections"; "[p]repare rules and instructions for the conduct of elections"; "[d]etermine and prescribe the forms of ballots"; and "[c]onduct voter education." *Id.* Secretary LaRose's authority to promulgate regulations and directives includes the authority to issue both permanent and temporary directives regarding elections. *Id.* § 3501.053; *see also* Ohio Admin. Code § 111:3-1-01.

## FACTUAL ALLEGATIONS

29.        Ohio allows "any qualified elector" to cast an absentee ballot through the mail for any reason. Ohio Rev. Code § 3509.02(A). Ohio voters frequently exercise their absentee ballot rights: According to the Secretary of State, 1,890,069 Ohioans (approximately one-third of the total voters in that election) cast an absentee ballot by mail or early in person in the 2016 presidential election. *See 2016 Official Elections Results for the November 8, 2016*

*Election*, Ohio Sec'y of State, https://www.ohiosos.gov/elections/election-results-and-data/2016-official-elections-results/. In the April 28, 2020 Primary Election, 1,831,640 Ohioans (about 98% of the total voters in that election) cast their ballots absentee by mail or early in person. *See 2020 Elections Results for the March 17, 2020 Primary Election*, Ohio Sec'y of State, https://www.sos.state.oh.us/elections/election-results-and-data/2020/.

30.     The right to vote absentee by mail, rather than in person, is all the more crucial for the upcoming November 2020 election in light of the COVID-19 pandemic, which makes casting a ballot in person dangerous for many Ohio voters—especially the elderly and those with pre-existing medical conditions. As early as January 2020 and continuing through the present, health experts and federal, state, and local government officials have issued an escalating series of warnings and emergency advisories, emphasizing the importance of protective measures including avoiding gatherings of people and "social distancing," defined as maintaining physical space from affected or potentially affected persons.

31.     Indeed, in recognizing this risk, for the April 28 primary, the Ohio legislature enacted COVID-19 omnibus legislation, House Bill 197 ("HB 197"). HB 197 allowed absentee ballots to be received up until April 28, 2020 and limited in-person voting to electors with disabilities who could not vote by mail and those who did not have mail deliverable at their address.

32.     As a result, Ohio saw a significant increase in absentee by-mail voting for the April 28 primary. Yet, thousands of voters who applied in time to vote by mail failed to receive their ballots in time to cast their ballots by mail and tried to vote in person. However, many of those voters risked getting COVID-19 only to have their ballots not counted. Cuyahoga County alone reported 754 ballots rejected because "[v]oter cast provisional ballot in-person on

April 28, 2020; did not claim to have a disability or inability to receive mail; and did not apply

for an absentee ballot by noon on April 25, 2020." *March 17, 2020 Primary Election (Extended)*

*Amended Official Canvass Certification Data*, Cuyahoga Cty. Bd. of Elections (June 8, 2020),

https://boe.cuyahogacounty.us/pdf_boe/en-

US/ElectionResults2020/amended/03172020OfficialCertificationReportAMENDED.pdf.

County officials, by arbitrarily requiring signature match on absentee ballot applications,

protracted and complicated a process that was already fraught with the potential for error, and

some voters were unable to vote as a result.

33.        Many voters were not able to mail in their ballots until the last few days

before the deadline because they did not receive their ballots earlier even though they timely

applied for such ballots.  News outlets reported that on April 28, Franklin County received

20,532 absentee ballots that day alone, more than double the number received on all but one

other day.  Each of these ballots had to be opened, the signatures of each voter reviewed against

the signature on file, and voters whose ballots were rejected for alleged signature mismatch were

supposed to be notified.

34.        The COVID-19 pandemic has made it necessary for many voters to vote

by mail, but it has also complicated the process of voting by mail by engendering mail delays.

Defendant LaRose reported that "we are finding that the delivery of the mail is taking far longer

than what is published by the United States Postal Service as expected delivery times.  Instead of

first-class mail taking 1-3 days for delivery, we had heard widespread reports of it taking as long

as 7-9 days." Letter from Frank LaRose, Ohio Sec'y of State, to Ohio Congressional Delegation

(Apr. 23 2020).

35.       For the November election, the continued risk of contracting COVID-19 is likely to cause a high proportion of Ohio voters to vote by mail.  Indeed, on June 15, 2020, Defendant LaRose announced that the Ohio Controlling Board had authorized the use of federal funds to permit him to send absentee ballot applications to all 7.8 million registered Ohio voters around Labor Day.

**Absentee Ballot Application Rejection**

36.       An Ohio voter who chooses to vote absentee must submit a new application for an absentee ballot before every election.  Ohio Rev. Code § 3509.03(A).  That completed application must be delivered, by mail or in person, to the county director of elections no earlier than ninety days before the election in question and no later than noon on the third day before the election, or 6 p.m. on the last Friday before the election if delivered in person.  *Id.*[1]

37.       An application for an absentee ballot must include the voter's signature as well as other identifying information, including the voter's address, date of birth, and either the voter's driver's license number, the last four digits of the voter's Social Security number, or a copy of the voter's photo ID or other document that shows his or her name and address.  *Id.* § 3509.03(B).

38.       If an application for an absentee ballot does not contain all of the required information, including a signature, the county director of elections "promptly shall notify the applicant of the additional information required to be provided."  *Id.* § 3509.04(A).

---

[1] Under House Bill 680 ("HB 680"), a set of proposed Ohio election law changes, voters would have only until noon on the *seventh* day before an election to request an absentee ballot (rather than until the third day under current law), reducing by four the number of days that Ohioans are able to cast a ballot.

39.     Neither Ohio statute nor any applicable regulation directs election officials to compare a voter's signature on an application for an absentee ballot to any other signature on file for that voter.  Upon information and belief, most, if not all, county elections boards in Ohio *do* compare voter signatures on absentee ballot applications to those in the boards' voter files and routinely disqualify absentee ballot applications based on a board employee's perception of a signature discrepancy.  At least 24 counties in Ohio reject absentee ballot applications for signature mismatch, including Cuyahoga County, the second largest county by population, and Butler County, the seventh largest county by population.  Adding to voter confusion, many counties do not track absentee ballot applications or rejections or reasons for rejections.

40.     Ohio statutes and regulations do not require any particular procedure by which local boards of elections might compare signatures on absentee ballot applications to those on file, nor does the Secretary of State issue directives or guidelines governing that process.  Likewise, no statewide statute or permanent regulation governs whether or when election officials must notify an applicant that his or her application for an absentee ballot has been rejected because of a signature mismatch.  Nor does any statute or permanent regulation govern how a voter may cure a signature mismatch on a ballot application.  Indeed, the Ohio Election Official Manual, issued by the Secretary of State, is silent on the process for signature matching, notice, and cure for absentee ballot applications.  *See* Ohio Sec'y of State, *Election Official Manual* (Dec. 18, 2019), at 5-1–4 [hereinafter Ohio Election Manual].

41.     While no permanent regulation governs the notice and cure for signature mismatches on absentee ballot applications, on July 6, 2020, Defendant LaRose issued a temporary directive for the November 2020 election that may provide some such guidance.  Defendant LaRose's Directive 2020-11 provides that, for the November 2020 election, "[i]f a

13

board of elections receives an absentee ballot application that does not contain *all of the required information*, the board must promptly notify the voter of the additional information required to be provided by the voter to complete the application."  Ohio Sec'y of State, Directive 2020-11 (July 6, 2020), at 12 (emphasis added).  The directive further requires that "[b]oards must utilize telephone and email addresses" to "promptly notify the voter of the additional information required to be provided by the voter to complete the application."  *Id.*  But the directive does not state whether signature matching—which is not required by statute—is part of the "the required information" governed by the directive, nor does the directive address the cure for a signature mismatch on an absentee ballot application.

42.         Absent state directives, some county boards have developed local ad hoc procedures for matching signatures, notifying voters of purported mismatches, and providing voters an opportunity to cure in past elections.  These procedures vary from county to county.

43.         For instance, Butler County's local procedures contemplate two rounds of signature matching; if the first election officials to review a signature deem it a mismatch, a second group reviews and can override the decision.  In Wyandot County, the Director, Deputy Director, and two clerks review mismatched signatures.  In Hardin County, a single election official may declare a mismatch but the application is rejected only when the entire election staff reaches a consensus or, failing that, the entire board of elections decides.  Delaware County requires that every mismatch be reviewed by a Republican election official and a Democratic election official but does not specify whether or when a second level of review is warranted.

44.         Some, but not all, counties attempt to notify voters whose absentee ballot applications have been rejected.  Depending on the county, a variety of methods have been used: letter, email, or phone call, or a combination of all three.  For example, Butler County has a form

letter it sends to voters whose applications it rejects. Knox County sends a letter and a copy of the rejected application. Erie County contacts voters by phone where the voter provided a phone number and, failing that, sends a letter. Richland County attempts to contact the voter by phone, mail, and email. While most county boards of elections provide an online tracking system that allows voters to track the status of their absentee ballot applications and ballots, upon information and belief, those tracking systems do not notify a voter that their ballot or application has been rejected unless the voter, on their own initiative, decides to affirmatively investigate by going online to the website and querying that system. Nor do the systems provide a voter with the reasons—such as signature mismatch—that a ballot is rejected. However, upon information and belief, most counties do not keep records of their efforts to notify voters of rejected absentee ballot applications at all.

45. The lack of State guidance on when voters must be notified that their absentee ballot applications are rejected increases the likelihood that Ohio voters will be disenfranchised due to signature mismatches on absentee ballot applications that are not cured before Election Day. For example, in December 2019, the Associated Press reported that "[t]housands of Ohio voters were held up or stymied in their efforts to get absentee ballots for [the 2018] general election because of missing or mismatched signatures on their ballot applications." Julie Carr Smyth, *AP Exclusive: Thousands of Ohio Absentee Applications Denied*, Associated Press (Dec. 16, 2019), https://apnews.com/ddfed70e98d79cf0bee49eb1d9fd85b9.

46. Even if a county board of elections notifies a voter of a signature mismatch on an absentee ballot application, there is no uniform procedure for voters to cure the mismatch. Upon information and belief, some county elections boards call voters by telephone

and permit them to cure the applications orally.  Others mail voters a notification letter and require the voter to submit a new application.  Hardin County advises voters to cast provisional ballots rather than to resubmit applications for normal ballots, a process nowhere authorized by Ohio law or regulation.

47.        Many, but not all, of the problems described above that Ohio voters routinely encounter with absentee ballot applications could be eliminated or mitigated if Ohio allowed voters to apply for absentee ballots online.  Such a system would eliminate the need for election officials to match signatures because voters would sign the form electronically and would still be required—as they are under current law—to provide more-reliable proof of identity such as a driver's license number or the last four digits of a Social Security number.  An online form would operate as a check against voters making certain routine mistakes—for example, by requiring that both the first and last name fields be filled out before voters could submit their applications.  An online application would also make it more likely that voters would receive absentee ballots in time for the election by eliminating the need for voters to send the form via U.S. Postal Service mail, a step that adds several days to the process.  Even Defendant LaRose has acknowledged that allowing Ohio voters to request absentee ballots online is "a modernization that we should have made a long time ago."  Rick Rouan, *Could Ohio Develop Online Absentee Ballot Requests in Time for November Election?*, Columbus Dispatch (June 10, 2020), https://www.dispatch.com/news/20200610/could-ohio-develop-online-absentee-ballot-requests-in-time-for-november-election.

**Failure to Provide Opportunity to Cure Absentee Ballot Rejections**

48.        Once a county board approves an application for a mail-in ballot, it sends the official ballot to the voter.  Ohio Rev. Code § 3509.04(B).  The voter must then mark the

ballot, seal it in an "identification envelope," complete and sign an affidavit on the identification

envelope, and then place and seal the identification envelope inside a larger "return envelope."

*Id.* § 3509.05(A).  A signature is not the only piece of personal identifying information required

to be included with a returned Ohio absentee ballot.  As at the application stage, voters must also

write their driver's license number or the last four digits of their Social Security number on the

identification envelope, or include a copy of a photo ID or other document that shows their name

and address.

49.     When the board of elections receives an absentee ballot, "election officials

shall compare the signature of the elector on the outside of the identification envelope with the

signature of that elector on the elector's registration form."  *Id.* § 3509.06(D)(1).

50.     As part of this signature-comparison process, Ohio gives broad authority

to election officials to challenge absentee ballots because of a mismatched signature but

prescribes no process for doing so.  According to statute, "[*a*]*ny* of the precinct officials may

challenge the right of the elector named on the identification envelope to vote the absent voter's

ballot upon the ground that the signature on the envelope is not the same as the signature on the

registration form."  *Id.* § 3509.06(D)(2)(a) (emphasis added).  Neither the Ohio Revised Code,

nor the Ohio Election Manual specifies the number of precinct officials who must or may review

any given ballot, nor does either source of law clearly explain what happens when a precinct

official "challenge[s]" a ballot on signature-mismatch grounds.  *See id.* § 3509.06(D); Ohio

Election Manual 5-33–35.  This lack of uniform process means that an Ohio voter might be

disenfranchised based on a handwriting analysis performed by a single precinct official, decided

according to that official's subjective opinion, and given no further review.

51.        Ohio law also provides no meaningful guidance on what it means for an official to "compare" the signatures on a ballot and registration form, Ohio Rev. Code § 3509.06(D)(1), or for those signatures to be "not the same," *id.* § 3509.06(D)(2). The statutes define a "signature" as a "person's written, cursive-style legal mark written in that person's own hand," *id.* § 3501.011(A), though individuals "who do not use a cursive-style legal mark during the course of their regular business" may sign with whatever mark they ordinarily use in the regular course of business, *id.* § 3501.011(B). No Ohio statute, regulation, or Secretary of State directive specifies how election officials should compare voters' signatures on their ballots to the signatures on voter registration forms. Upon information and belief, the Secretary of State does not regularly conduct or organize training for election officials in handwriting analysis or signature matching. Similarly, no Ohio law requires that election officials receive any training. In fact, upon information and belief, only a handful of Ohio boards of elections have provided their election officials with *any* training or certification in handwriting analysis or signature matching. The counties that do conduct training do so informally; for instance, in Delaware County, long-tenured election officials simply instruct new hires to match signatures in the same way that the experienced officials have done.

52.        The potential for improper rejection of absentee ballots caused by the lack of uniform standards is increased by the number of officials responsible for reviewing absentee ballots and making challenges. Under Ohio law, each election precinct must have at least four precinct officials supervising each election, meaning that in a large county like Cuyahoga County, over 3,800 precinct-level officials could be reviewing ballot signatures in each election, and even in the smallest counties like Vinton County, several dozen officials are doing so. *Id.* § 3501.22(A). Ohio's system for signature matching forces thousands of election officials to

make difficult determinations about signature matching that they are not qualified to make. Lay individuals are highly likely to make mistakes in signature-comparison determinations and are particularly prone to conclude that signatures do not match when they were in fact written by the same person. Deploying untrained election officials to conduct handwriting analyses increases the likelihood that Ohio voters will have their absentee ballot applications or their absentee ballots wrongly rejected.

53. The lack of clear statewide standards for signature matching results in different procedures across Ohio. For example, Brown County's clerks compare signatures by eye to all of a voter's prior signatures on file, referring any potential mismatches to the Director and Deputy Director for a determination. Only if the staff cannot decide do they refer the ballot to the full board of elections. In contrast, in Butler County, all signature mismatches go to the board of elections for review. Meanwhile in Carrol County, a clerk need only "see some similarities" between the ballot signature and the file signatures to accept the ballot, while in Hardin County, all board of elections staff members review the challenged signature and a "general consensus" is formed.

54. The risk of disenfranchisement through a false signature-mismatch determination is especially high for elderly, disabled, ill, and non-native English signatories, because those populations have higher signature variability, and Ohio's system requires election officials to compare the signature on a voter's absentee ballot to the *one* signature on the voter's registration form on file with the county board of elections. *Id.* § 3509.06(D)(1). Even trained handwriting analysts require *multiple* comparison samples to determine whether a signature is authentic. In addition, years—perhaps even decades—may have elapsed between when the voter

signed a registration form and when the voter signs an absentee ballot, over which time natural variations in the voter's signature may have emerged or increased.

55.        Especially in light of the risk of incorrect mismatch determinations, Ohio statutes, regulations, and procedures do not afford voters with sufficient notice of a mismatch or an opportunity to cure.

56.        Ohio law provides that "[e]very ballot not counted shall be endorsed on its back 'Not Counted' with the reasons the ballot was not counted, and shall be enclosed and returned to or retained by the board of elections along with the contested ballots." *Id.* § 3509.07.

57.        Once election officials have determined that a signature does not match, the process set by statute for notifying voters of the rejection of their absentee ballot is slow and relies on U.S. Postal Service mail, which takes days at least and is subject to delays.  The statute provides that a county board must notify voters by "written mail" if their absentee ballot is rejected because of a mismatched signature or any other defect with the voter's ballot identification envelope.  *Id.* § 3509.06(D)(3)(b).

58.        Secretary of State Directive 2020-11 addresses some of the notice issues but only with respect to the November 2020 election.  The directive provides that "[b]oards must utilize telephone and email addresses" to "notify voters that have a deficiency on their ID envelope [for a cast mail-in ballot] as quickly as possible."  Ohio Sec'y of State, Directive 2020-11 (July 6, 2020), at 13.  The directive does not alter the deadlines to cure a defective signature but notes that a forthcoming directive will, for the November 2020 election, "include additional information regarding the cure period for absentee and provisional ballots."  *Id.*

59.        While Ohio statutes do not set a deadline by which county boards must notify a voter of a purportedly deficient ballot, the Secretary of State has issued directives that

require county boards to notify voters more rapidly as the election approaches, and permits

voters to cure defects only until seven days after the election. In particular, according to the

Ohio Election Manual, county boards of elections must provide voters notice of defects in their

absentee ballots, including mismatched signatures, by mailing those voters Secretary of State

Form 11-S. Election officials must mail the form according to the following schedule: For

ballots received from the start of absentee voting up until three Saturdays before the election, two

business days after the board receives the ballot; for ballots received between the third Monday

and last Friday before an election, one calendar day after the board receives the ballot; for ballots

received between the Saturday before the election and through the sixth day following the

election, the same day the board receives the ballot. Ohio Election Manual, 5-31.

      60.      Boards of elections must "give the voter an opportunity to supplement the

voter's identification envelope" to cure a defect, including a signature mismatch. *Id.* To cure a

deficient ballot, a voter must provide the missing information "to the board of elections in

writing and on a form prescribed by the secretary of state not later than the seventh day after the

day of the election." Ohio Rev. Code § 3509.06(D)(3)(b).

      61.      However, Defendant's guidance on methods of cure have been

inconsistent and contradictory. According to the Election Manual, the method for curing a

mismatched signature is for the voter to return a signed Form 11-S to the board of elections in

person, by mail, or by a family member authorized by state law to return the voter's absentee

ballot. Ohio Election Manual, 5-31. In contrast, Defendant LaRose issued a directive on May 1,

2020 in response to the COVID-19 pandemic that implies that local boards of elections should

give voters other means to cure defective ballots. That directive mandated that boards of

elections in buildings closed to the public must "still enable voters to cure deficiencies via drop

21

box, appointment, or any other appropriate means identified by the board of elections." Ohio Sec'y of State, Directive 2020-09 (May 1, 2020), at 1. As noted above, Defendant LaRose's July 6, 2020 directive 2020-11 indicates some change to the cure procedure for the November 2020 election is forthcoming, but it does not specify that change. Ohio Sec'y of State, Directive 2020-11 (July 6, 2020), at 13.

62.     The various processes that Ohio uses to permit voters to cure mismatched signatures leaves many voters with no practical recourse. Absentee ballots can be received as late as the *tenth* day after the election and still be counted, provided they are postmarked no later than the day before election day. Ohio Rev. Code § 3509.05(B). But because voters have only *seven* days after the election to cure mismatched signatures or other defects with their absentee ballots, this means that boards of elections can continue to receive absentee ballots three days after the opportunity to cure has already passed. Voters who submit such ballots have no opportunity to cure a potentially mismatched signature.

63.     While voters have until only the seventh day after an election to cure a mismatched signature, county boards of elections are not required to begin canvassing election returns until the fifteenth day after the election. *Id.* § 3505.32(A). Boards must complete their canvass twenty-one days after the election, and may amend a canvass up to eighty-one days after the election. *Id.*

64.     Under the current system, the risk of disenfranchisement is especially high for Ohioans who live out of state, such as members of the military and others casting ballots from overseas. Each step of the current signature mismatch process, for most voters, requires a separate mailing with a potentially long lag time. While the Secretary of State provides that boards of elections must notify voters in the upcoming 2020 General Election via telephone or

email if there is a problem with their absentee ballot, those voters still must mail a completed copy of Form 11-S to cure the deficiency, and the form must be received before the statutory cure deadline.  Overseas voters who post their absentee ballots close to Election Day have little to no chance of curing a signature mismatch within the allotted time.

65.     With slow postal mailing times and an inundated postal system, even voters who live in Ohio face a high risk of disenfranchisement.  Before the April 2020 Primary Election, Defendant LaRose acknowledged that his office had received "'wide reports' of first-class mail, which normally takes 1-3 days, taking as long as a week or more," resulting in many Ohio voters not receiving a ballot in time for the election.  Andrew J. Tobias, *Ohio Elections Officials: Mail Delays Could Result in Some Voters Not Getting Ballots Before April 28 Primary*, Cleveland.com (Apr. 23, 2020), https://www.cleveland.com/open/2020/04/ohio-elections-officials-mail-delays-could-result-in-voters-not-getting-ballots-before-april-28-primary.html.

**Instances of and Statistics Related to Improper Ballot Rejections**

66.     Ohio reports statistics on election administration to the United States Election Assistance Commission.  Some of the election statistics are available to the public through the Election Administration and Voting Survey.  *See Election Administration and Voting Survey (EAVS) Comprehensive Repor*t, U.S. Election Assistance Comm'n (last visited July 29, 2020), https://www.eac.gov/research-and-data/studies-and-reports.  In the 2016 General Election, 708 absentee ballots were rejected because of signature mismatch, and in the 2018 midterm General Election, 225 ballots were rejected for signature mismatch.  The numbers for the 2020 Primary Election have not yet been reported, but Individual Plaintiffs are just several examples of voters who were disenfranchised in 2020 because of purported signature mismatches.

67.        Ohio does not report the number of absentee ballot applications rejected because of purported signature mismatches; however, based on data provided by the counties and data on absentee ballot rejections in general, it is likely that thousands of absentee ballot applications are rejected because of signature mismatch.

## CAUSES OF ACTION
### COUNT I

**Ohio's Signature Match Procedures Violate the Freedom of Association Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment**

68.        Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

69.        The right to vote is a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  It "rank[s] among our most precious" rights.  *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968). Since the right to vote is a fundamental right, before it "can be restricted," the Court must engage in "close constitutional scrutiny" of the restriction.  *Evans v. Cornman*, 398 U.S. 419, 422 (1970).  In order to show a burden on the right to vote, a voter does "not need to show that they were legally prohibited from voting."  *Obama for Am. v. Husted,* 697 F.3d 423, 431 (6th Cir. 2012); *see also Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663 (6th Cir. 2016)*.  All voters need show is that their exercise of the right to vote has been burdened.  *Obama for Am.*, 697 F.3d at 431.

70.        Courts considering a challenge to a state election law or process must carefully balance the magnitude of injury to the First and Fourteenth Amendment rights that Plaintiffs seek to protect against the government's justifications for the burdens established.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992);  *Mich. State A. Philip Randolph Inst.*, 833 F.3d at 663.

24

71.     Ohio imposes a substantial burden on voting by rejecting mail-in ballot applications and ballots of potentially thousands of Ohio voters because of alleged signature mismatches without pre-rejection notice or sufficient opportunity to resolve the mismatch or otherwise confirm those voters' identities.

72.     Defendant has no legitimate interest in rejecting mail-in ballot applications and ballots for signature mismatch without affording voters adequate notice and an opportunity to cure.  The State's interest in ensuring voters are qualified is undermined, not enhanced, by the erroneous rejection of ballot applications or ballots for signature mismatches.

## COUNT II

**Ohio's Inconsistent Signature Match Practices Violate Voters' Equal Protection Rights**

73.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

74.     The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  In *Louisiana v. United States*, the Supreme Court affirmed that voting rights "cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."  380 U.S. 145, 153 (1965).  *Bush v. Gore* reaffirmed that the Fourteenth Amendment's Equal Protection Clause forbids the State from, "[h]aving once granted the right to vote on equal terms . . . by later arbitrary and disparate treatment, valu[ing] one person's vote over that of another."  531 U.S. 98, 104–05 (2000).  That rule extends beyond "the initial allocation of the franchise" to "the manner of its exercise."  *Id*. at 104.  Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment."  *Id*. at 106–07; *see also League of Women Voters v. Brunner*, 548 F.3d 463, 476-78 (6th Cir. 2008).

75.     With respect to both ballot applications and mail-in ballots, the counties of Ohio, which are subject to Defendant's guidance and directives, apply inconsistent standards to signature matching, notice of mismatches, and cures for those mismatches, all in violation of Plaintiffs' equal protection rights.

76.     Where identical disparities may exist concerning a signature on an absentee ballot application and the signature on the voter's registration form, an application may be subject to evaluation and rejection in one jurisdiction while undergoing no such examination in another jurisdiction.  This leads to arbitrary results where there is greater likelihood in some places that one citizen's vote will not be counted on the same terms as the vote of a citizen in another location.  *See id*.

77.     Likewise, a mail-in ballot with a signature disparity identical to that of one submitted and accepted in another county may be rejected in another county.  This leads to inconsistent and arbitrary results where some voters' votes will not be counted on the same terms as those of other voters within the same state, under the rules promulgated by the same Secretary of State.  *See id*.

78.     Notice provisions throughout Ohio are also inconsistent.  Some Ohio counties notify voters by telephone or email about the status of their ballot applications and ballots; others rely on postal mail.  Thus, some voters with signature mismatches receive sufficient notice in time to cure their ballots, while others lack that opportunity and may never receive notice before the cure deadline.  This leads to inconsistent and arbitrary results where there is greater likelihood in some places that a citizen's vote will not be counted on the same terms as that of a citizen in another location.  *See id*.  While Directive 2020-11 addresses some of these inconsistencies for ballots in the November 2020 election, that directive does not have

permanent effect. Even for the November 2020 election, the directive does not clearly apply to signature mismatches on ballot applications.

79.     The cure provisions are also inconsistent and lead to disparate treatment. For ballot applications, Ohio statutes provide no cure provision at all, with the result that some Ohio counties do not conduct matching, some provide voters with an opportunity to cure mismatches on ballot applications, and still others provide no opportunity or a limited opportunity to cure. This leads to inconsistent and arbitrary results where there is greater likelihood in some places that one citizen's vote will not be counted on the same terms as the vote of a citizen in another location.

## COUNT III

**Ohio's Failure to Provide Voters Adequate Notice and Sufficient Opportunity to Cure Signature Mismatches Violates the Procedural Due Process Guarantee of the Fourteenth Amendment**

80.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

81.     The Fourteenth Amendment prohibits states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. Am. XIV. This due process principle protects Plaintiffs from the depravation of their right to vote by absentee ballot, unless Ohio provides effective notice of the depravation and an opportunity to cure. *See, e.g.*, *Fla. Democratic Party v. Detzner*, No. 4:15-cv-607, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) (finding unconstitutional a Florida statutory scheme providing the opportunity to cure for no-signature ballots but denying that opportunity to mismatched signature ballots); *Democratic Exec. Com. of Fla. v. Detzner*, 347 F.Supp.3d 1017 (N.D. Fla. 2018) (granting a preliminary injunction halting rejection of mail-in and provisional ballots for mismatched signatures); *Self Advocacy Solutions N.D. et.al v. Jaeger et. al.*, No. 3:20-cv-00071, 2020 WL 3068160 (D.N.D.

27

June 3, 2020) (granting a preliminary injunction against North Dakota statutes governing signature mismatches on mail-in ballots on procedural due process grounds).

82.      Defendant fails in his due process obligation by failing to provide adequate notice or opportunity to cure to voters whose absentee ballot applications and absentee ballots were rejected due to signature mismatches. Defendant's failure to provide a sufficient notice or opportunity to cure signature mismatches in absentee ballot applications and ballots violates the Fourteenth Amendment's procedural due process guarantee.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

83.      Declare signature matching for absentee ballot applications and absentee ballots by county boards of elections in Ohio to be unconstitutional to the extent that standards and procedures are not uniformly applied across Ohio counties and boards fail to provide adequate notice of a mismatch and an opportunity to cure; and

84.      Declare Ohio Rev. Code § 3509.06(D)(1) unconstitutional to the extent that it permits or requires signature matching on absentee ballots with insufficient notification of mismatches and opportunities to cure.

85.      Issue preliminary and permanent injunctions requiring that the Secretary of State issue directives to county boards of elections to cease all signature matching of absentee ballot applications until such time as (1) uniform standards directed to each county board of elections, and implemented by each county, governing the analysis of signatures for purposes of matching, (2) uniform procedures are promulgated by Defendant, directed to each county, and implemented by each county, governing the procedure to be followed before an absentee ballot application can be rejected for signature mismatch, (3) uniform periods and means of adequate notice that an absentee ballot application has been rejected are promulgated by Defendant,

directed to each county, and implemented by each county, and (4) a uniform procedure for an adequate opportunity to cure a rejection of an absentee ballot application is promulgated by Defendant, directed to each county, and implemented by each county; or, in the alternative, that the Secretary afford Ohio voters the option of submitting an application for an absentee ballot online using an electronic signature.

86.        Issue a preliminary and permanent injunction enjoining Defendant from enforcing the portions of Ohio Rev. Code § 3509.06 requiring signature matching on absentee ballots unless (1) uniform standards are promulgated by Defendant, directed to each county, and implemented by each county, governing the analysis of signatures for purposes of matching, (2) uniform procedures are promulgated by Defendant, directed to each county, and implemented by each county, governing the procedure to be followed before an absentee ballot can be rejected for signature mismatch, (3) uniform periods and means of adequate notice that an absentee ballot has been rejected are promulgated by Defendant, directed to each county, and implemented by each county, and (4) a uniform procedure for an adequate opportunity to cure a rejection of an absentee ballot—including a provision stating that any voter who receives notice that the voter's absentee ballot has been rejected has a reasonable opportunity to cure up to and through the last possible day of canvassing and before certification—is promulgated by Defendant, directed to each county, and implemented by each county.

87.        Award Plaintiffs their costs, including attorneys' fees under 42 U.S.C. § 1988, Code of Civil Procedure § 1021.5, and any other available statutes; and

88.        Provide such other and further relief as the Court deems just.

Dated: July 31, 2020                    Respectfully submitted,


                                        /s/  Freda J. Levenson

                                        Freda J. Levenson (0045916)
                                        American Civil Liberties Union of Ohio Fdtn.
                                        4506 Chester Avenue
                                        Cleveland, OH 44103
                                        Tel.: (216) 472-2220
                                        Facsimile: (216) 472-2210
                                        flevenson@acluohio.org


                                        T. Alora Thomas-Lundborg*
                                        Dale E. Ho*
                                        Jonathan Topaz*
                                        American Civil Liberties Union Foundation
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        Tel.: (212) 549-2500
                                        athomas@aclu.org
                                        dho@aclu.org
                                        jtopaz@aclu.org


                                        Ezra Rosenberg*
                                        Pooja Chaudhuri*
                                        Lawyers' Committee for Civil Rights Under Law
                                        1500 K Street NW Suite 900
                                        Washington, DC 20005
                                        Tel.: (202) 662-8600
                                        erosenberg@lawyerscommittee.org
                                        pchaudhuri@lawyerscommittee.org


                                        C. William Phillips*
                                        Joshua B. Picker*
                                        John F. Nelson*
                                        Katherine P. Onyshko*
                                        Jeremy Patashnik*
                                        Covington & Burling LLP
                                        620 Eighth Avenue
                                        New York, NY 10018
                                        Tel.: (212) 841-1000

30

wphillips@cov.com
jpicker@cov.com
jnelson@cov.com
konyshko@cov.com
jpatashnik@cov.com

*Pro Hac Vice* forthcoming