**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF OHIO, A. PHILIP RANDOLPH INSTITUTE OF OHIO, GEORGE W. MANGENI, and CAROLYN E. CAMPBELL,** | |
| **Plaintiffs,** | CASE NO.  20-cv-3843-MHW-KAJ |
| **v.** | JUDGE MICHAEL WATSON |
| **FRANK LAROSE, in his official capacity as Secretary of State of Ohio,** | MAGISTRATE JUDGE KIMBERLY JOLSON |
| **Defendant.** | |

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiffs League of Women Voters of Ohio, A. Philip Randolph Institute of Ohio, George W. Mangeni, and Carolyn E. Campbell (collectively, "Plaintiffs") respectfully move the Court, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction that:

(1)  enjoins Ohio Secretary of State Frank LaRose ("Defendant LaRose") from enforcing provisions of Ohio law that require election officials to conduct signature matching on absentee ballots without providing adequate time to cure a purportedly mismatched signature before the date by which Ohio boards of elections must complete the canvass of returns; and

(2)  enjoins Defendant LaRose from permitting county boards of elections from conducting signature matching on absentee ballot applications, or, in the alternative, to direct Defendant LaRose to confirm that Directive 2020-11, issued

-1-

by Defendant LaRose on July 6, 2020, requires boards of elections to promptly contact voters by telephone and email in sufficient time to correct absentee ballot applications rejected on the basis of signature mismatch.

With the November 3, 2020 election approaching, Plaintiffs respectfully request the Court to schedule a status conference to set an expedited briefing schedule as soon as possible. Plaintiffs further respectfully request a ruling on this motion by no later than September, 22, 2020, to permit six weeks for any appeal and to ensure that relief from Ohio's deficient notice-and-cure process in signature matching is implemented prior to the General Election.

As set forth in the Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have established that they are likely to succeed on the merits, that Plaintiffs will suffer irreparable harm if the Court declines to issue this preliminary injunction, that the issuance of this preliminary injunction would cause no substantial harm to others, and that the public interest will be served by the Court's granting of this preliminary injunction.

DATED: August 24, 2020

Respectfully submitted,

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
*Trial Counsel*
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
flevenson@acluohio.org

T. Alora Thomas-Lundborg[*]
Dale Ho[*]
Jonathan Topaz[*]
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: (212) 519-7866
Tel: (212) 549-2693
athomas@aclu.org

dale.ho@aclu.org
jtopaz@aclu.org

Ezra Rosenberg[+]
Pooja Chaudhuri[+]
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

C. William Phillips*
Joshua B. Picker*
John F. Nelson[+]
Katherine P. Onyshko*
Jeremy Patashnik*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 841-1000
cphillips@cov.com
jpicker@cov.com
jnelson@cov.com
konyshko@cov.com
jpatashnik@cov.com

*Pro Hac Vice
[+]Pro Hac Vice forthcoming

Attorneys for Plaintiffs

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In every election, Ohio erroneously rejects thousands of absentee ballot applications and absentee ballots based upon perceived signature mismatches.  These rejections result from nonuniform and standardless decisions by various officials across the state, without giving voters adequate notice of or opportunity to cure the rejection.  About 85% of Ohioans who voted in the 2020 Primary Election did so by mail-in absentee ballot, and with the continuing COVID-19 pandemic, election officials are expecting an avalanche of mail-in absentee ballots in November.  As a result, the number of applications and ballots rejected because of a purported signature mismatch will likely climb to tens of thousands in the November General Election.

Signature matching, as practiced in Ohio, is notoriously inaccurate.  Research demonstrates that election officials are prone to deciding erroneously that authentic voter signatures do not match file signatures.  Certain classes of voters—non-English speakers, the disabled, and older voters among them—are most likely to produce inconsistent-appearing signatures and are therefore especially susceptible to being disenfranchised.  Although fraud prevention is often touted as a reason for signature matching, the risk of erroneous rejection of a legitimate ballot is staggeringly greater than that of the erroneous acceptance of a fraudulent one.  At least one expert estimates that there is a 97% probability that a ballot that has been rejected because of a purported signature mismatch has been wrongly rejected.

This motion for a preliminary injunction—and this litigation more broadly—does not seek a declaration that signature matching cannot comport with the Constitution.  Rather, this motion aims to ameliorate two constitutional problems with Ohio's current procedures for signature matching.

*First*, when absentee ballots are rejected because of a purported signature mismatch there

-1-

is no adequate procedure or practice under Ohio law for voters to learn of purported signature mismatches and to cure them. Ohio law directs boards of elections to give notice to voters whose absentee ballots were rejected, but the notice periods fail to provide adequate opportunity to cure. Boards of elections stop notifying voters of signature mismatches on their ballots six days after Election Day, and voters have until only seven days after Election Day to cure a mismatched signature. These deadlines not only guarantee that not all voters will be able to address perceived signature irregularities, but they are also entirely unnecessary. Ohio could provide additional notice and opportunity to cure deficient ballots without impacting statutory election certification deadlines: Mail-in ballots may be received by a board of elections within ten days after Election Day, and Ohio boards of elections need not complete the canvass of votes until twenty-one days after Election Day. With the deepening crisis of U.S. postal mail delivery, it is imperative that Ohioans have a full opportunity to receive notice and opportunity to cure ballots flagged for signature mismatch. Ohio's failure to provide adequate opportunity to cure absentee ballot rejections unconstitutionally deprives Plaintiffs of procedural due process and their right to vote.

*Second*, although Ohio law does require boards of elections to conduct signature matching on absentee ballots, it does not require matching on *applications* for absentee ballots. Yet in practice, many counties do reject applications on that basis. Further, Ohio law provides no standard or procedure applicable to or followed by any particular county for signature matching. The norms and criteria for matching, and the level and nature of training for analysis vary widely from county to county, as do the number and identity of which election officials in a county are to make the matching or rejection decision. As a result, Ohioans' fundamental right to vote is subject to the whims of different county election officials, increasing the likelihood of

erroneous rejections.  Treating different voters differently in ways that affect whether they will be allowed to vote and whether their votes will be counted violates the Equal Protection Clause.

Ohio Secretary of State Frank LaRose—the defendant here—has recognized many of these problems with signature matching but has failed to correct them.  On July 6, 2020, Defendant LaRose issued Directive 2020-11, which instructed county boards of elections to provide specific notice of certain defects on applications and ballots.  With respect to *applications*, the directive requires boards of elections to notify voters promptly via telephone or email, whenever possible, if voters submit applications that "do[] not contain all the required information."  With respect to *ballots*, the directive requires boards of elections to notify voters by phone and email when those voters submit ballots with a "deficiency on their ID envelope."

Although recognizing the problems, the directive does not solve them.  *First*, it does not direct counties to cease signature matching on applications, which is nowhere provided for in Ohio statutes or regulations.  *Second,* even assuming signature matching on applications were appropriate, the directive does not provide notice procedures for boards of elections when there is a supposedly a *mismatched* application signature, as opposed to an application that is simply *missing* a signature.  *Third*, Directive 2020-11 does not address Ohio's deficient cure deadlines for cast ballots.  It does not narrow the two-week gap between the last day a voter may cure a mismatch (seven days after Election Day) and the date when the boards of elections must finish their canvass (twenty-one days after Election Day).

The situation is urgent.  Given the certainty that mail-in voting in the upcoming General Election will be significantly higher than in past general elections because of the COVID-19 pandemic, without judicial intervention now, these constitutional violations threaten to disenfranchise tens of thousands of Ohio voters.  For this reason, Plaintiffs ask the Court to issue

a preliminary injunction:

(1)     to enjoin Defendant LaRose from enforcing provisions of Ohio law that require

        election officials to conduct signature matching on absentee ballots without

        providing adequate time to cure a purportedly mismatched signature before the

        date by which Ohio boards of elections must complete the canvass of returns;

(2)     to enjoin Defendant LaRose from permitting county boards of elections from

        conducting signature matching on absentee ballot applications, or, in the

        alternative, to direct Defendant LaRose to confirm that Directive 2020-11 requires

        boards of elections to promptly contact voters by telephone and email in sufficient

        time to correct absentee ballot applications rejected on the basis of signature

        mismatch.

## STATEMENT OF FACTS

The COVID-19 pandemic will increase reliance on voting by mail in the upcoming

General Election.  Potentially millions of voters will choose not to risk the dangers of voting in

person, given that health experts and federal, state, and local government officials emphasized

the importance of protective measures such as avoiding large gatherings and social distancing.

Indeed, in the 2020 Primary Election,  Ohio saw a significant increase in mail-in absentee voting.

In Ohio's 2016 Primary Election, only 8.7% of the ballots cast were mail-in absentee ballots.[1]  In

---

[1]    Absentee voting statistics reported on the Secretary of State website include a breakdown of
absentee ballots "cast by mail (or dropped off at BOEs)" and absentee ballots "requested & cast
in person."  The figure above includes only the former and not the latter.  In total, 287,817 of the
3,302,832 total votes cast in the Spring 2016 Primary Election were mail-in absentee ballots.
Ohio Secretary of State, 2016 Official Elections Results,
https://www.sos.state.oh.us/elections/election-results-and-data/2016-official-elections-results/
(last visited Aug. 20, 2020).

the 2020 primary, that figure was 85.3%.[2]

Significantly greater numbers of Ohioans will vote by mail this November than in prior general elections and in the 2020 Primary Election. In the 2016 General Election, only 21.2% of the approximately 5.6 million Ohio voters casting ballots voted by mail-in absentee ballot, or approximately 1.2 million voters.[3] It is safe to assume that at least double that number will vote by mail in November, given that the vast majority of voters in the Spring 2020 Primary Election voted by mail. Accordingly, on June 15, 2020, Defendant LaRose announced that the Ohio Controlling Board had authorized the use of federal funds to permit him to mail absentee ballot applications to all 7.8 million registered Ohio voters. Defendant LaRose has encouraged Ohio voters to vote by mail, stating in an interview that:

> [W]e expect turnout in the 2020 election to be the highest we've seen, bar-none. What that means is that for us to have that safe and secure experience on Election Day, we need to have a lot of Ohioans take advantage of early voting and vote by mail. Of course, it's a safe option for those who are concerned about leaving their house (due to COVID-19). . . . Voting by mail is a secure process in Ohio.[4]

Because, as Defendant LaRose has conceded, many more Ohioans than usual will likely vote by mail in the upcoming election, even more voters will face the prospect of having their absentee ballot application or absentee ballot erroneously disqualified because of the deficiencies in

---

[2]   1,565,792 of the 1,834,465 total votes cast in the Spring 2020 primary Election were mail-in absentee ballots. Ohio Secretary of State, 2020 Official Election Results for the March 17, 2020 Election, https://www.sos.state.oh.us/elections/election-results-and-data/2020/ (last visited Aug. 20, 2020).

[3]   Ohio Secretary of State, 2016 Official Elections Results, https://www.sos.state.oh.us/elections/election-results-and-data/2016-official-elections-results/ (last visited Aug. 20, 2020).

[4]   WTOL Newsroom, *Is Mail-In Voting Safe? Yes, and Ohio's System Is Among the Best in the Country, LaRose Says*, WTOL 11 (Aug. 4, 2020), https://www.wtol.com/article/news/special-reports/88-counties/is-mail-in-voting-safe/512-904800d1-1758-4ac8-a739-9c3556b44733

Ohio's signature-matching process described below.

**A.      Ohio Fails to Provide an Adequate System for Notice and Cure of Defects on Absentee Ballots.**

Ohio's procedures of notifying voters of signature mismatches on mail-in ballots and its deadlines to cure those mismatches are inadequate to prevent voters from losing their ability to cast absentee ballots.

When a board of elections receives an absentee ballot, "election officials . . . compare the signature of the elector on the outside of the identification envelope with the signature of that elector on the elector's registration form."  Ohio Rev. Code § 3509.06(D)(1).  Ohio gives broad authority to election officials to challenge absentee ballots because of a perceived mismatched signature but provides no process or standards by which they should do so.  According to statute, "[a]ny of the precinct officials may challenge the right of the elector named on the identification envelope to vote the absent voter's ballot upon the ground that the signature on the envelope is not the same as the signature on the registration form." *Id.* § 3509.06(D)(2)(a) (emphasis added).[5]

Ohio law also provides no meaningful guidance on what it means for an official to "compare" the signatures on a ballot and registration form, Ohio Rev. Code § 3509.06(D)(1), or for those signatures to be "not the same," *id.* § 3509.06(D)(2).  No Ohio statute, regulation, or Secretary of State directive specifies how election officials should compare a voter's ballot signature to the signature on their voter registration form.  The Secretary of State's Office does not appear to provide training for election officials in handwriting analysis or signature

---

[5]    Ohio statute and the Ohio Election Manual do not specify the number of precinct officials who must or may review any given ballot, nor does either source of law dictate what must happen when a precinct official "challenge[s]" a ballot on signature-mismatch grounds.  *See id.* § 3509.06(D); Ohio Election Manual 5-33–35.

matching. Declaration of Jeremy Patashnik (Patashnik Decl.) ¶ 17. No Ohio law requires that election officials receive such any training.

The lack of statewide standards for signature matching results in significantly different procedures across Ohio with respect to several key features of the signature-matching analysis. *Id.* ¶¶ 10–16.[6] Notably, procedures used by boards of elections across Ohio diverge in terms of the number and source of signatures that their personnel use to perform a match.[7] These differences increase the likelihood of erroneous rejections because of perceived signature mismatches.

Once Ohio election officials have determined that a signature does not match, the process set by statute for notifying voters of the rejection of their absentee ballots has historically been slow. A county board must notify voters by "written mail" if their absentee ballot is rejected

---

[6]  For example, Brown County's clerks compare signatures by eye to a voter's prior signatures on file, referring any potential mismatches to the Director and Deputy Director for a determination. Only if the staff cannot decide do they refer the ballot to the full board of elections. *Id.* ¶ 15. Yet, in Butler County, all signature mismatches go to the Board of Elections for review. *Id.* ¶ 11. In Carroll County, an election official need only determine that a signature bears some similarity to the file signatures to be accepted. *Id.* ¶ 16.

[7]  Sixty-eight of Ohio's eighty-eight boards of elections own and/or use software capable of capturing a voter's signature made by a stylus on a pad when voters sign in to vote absentee in person, although not all of the boards have invested in the pads or styluses for this yet. Patashnik Decl., Ex. 13 (Transcript, Meeting of the Ohio Board of Voting Machine Examiners (June 12, 2020)), at 49–50. Several, but not all, boards currently collect and keep several signatures from a variety sources, such as from voter documents and from online registrations at the Bureau of Motor Vehicles. *Id.* at 59–60. These boards maintain a file of these signatures as "reference signatures," so that when they perform signature-matching, they are doing it against a variety of samples instead of a single exemplar. They do this despite the clear language of Ohio's statute requiring that the absentee ballot signature match "the"—singular— "of that elector *on the elector's registration form*." Ohio Rev. Code § 3509.06 (D)(1) (emphasis added). The Franklin County Board of Elections "typically" compares a voter's signature to "what's on the registration form." Patashnik Decl., Ex. 13 at 69. Stark County keeps a catalogue of signatures but "update[s] the signature" it uses to compare with a more recent one, when available. *Id.* at 69–70. Some, but "not all," counties update their voter registration signature from what they have collected from electronic pollbooks, even though what is captured on a pad "is going to vary somewhat" from a wet signature on paper. *Id.* at 71–72

because of a mismatched signature or any other defect with the voter's ballot identification envelope. Ohio Rev. Code § 3509.06(D)(3)(b). U.S. Postal Service mail takes several days at a minimum and is increasingly subject to delays. Secretary of State Directive 2020-11 addresses a few, but not all, of the notice issues, and only with respect to the November 2020 General Election. The directive provides that "[b]oards must utilize telephone and email addresses" to "notify voters that have a deficiency on their ID envelope [for a cast mail-in ballot] as quickly as possible." Ohio Sec'y of State, Directive 2020-11, at 13 (July 6, 2020). The directive does not alter the deadlines to cure a defective signature but notes that a forthcoming directive regarding the November 2020 election will "include additional information regarding the cure period for absentee and provisional ballots." *Id.*

Boards of elections must "give the voter an opportunity to supplement the voter's identification envelope" to cure a defect, including a signature mismatch. Ohio Sec'y of State, Election Official Manual, at 5-30 (Dec. 18, 2019) [hereinafter, Ohio Election Manual]. But the timeline that Ohio has set to cure a mismatched signature fails to provide many Ohio voters with adequate time or opportunity to cure a purportedly mismatched signature. To cure a deficient ballot, a voter must provide the missing information "to the board of elections in writing and on a form prescribed by the secretary of state not later than the seventh day after the day of the election." Ohio Rev. Code § 3509.06(D)(3)(b). Ohio law establishes a needlessly early deadline for an Ohio voter to cure a mismatched signature. While a deficient absentee ballot must be cured by the seventh day after the election, *id.*, county boards may continue to receive ballots up until the tenth day after an election, *id.* § 3509.05(B). A voter whose ballot arrives at the board of elections after the seventh and until the tenth day—perfectly in time—will receive no notice or opportunity *at all* to cure a perceived mismatch. What is more, county boards of elections are

not required to begin canvassing election returns until the fifteenth day after the election, *id.* § 3505.32(A), and boards are not required to complete their canvass until twenty-one days after the election. *Id.* Boards may even amend a canvass up to eighty-one days after the election. *Id.* Thus, there is a full two week period between when mismatched signatures may be cured and when boards of elections must finish their canvass. Voters whose absentee ballots have been rejected because of signature mismatch cannot try to cure the rejections during that period.

Further, in some instances, due to apparent errors at the county boards of elections, Ohio's signature-match system fails to provide voters who timely submitted ballots *any* notice that their ballots were rejected. For example, Plaintiff George W. Mangeni mailed an absentee ballot in the 2020 Primary Election on April 22, 2020—five days before the postmark deadline in that election and twelve days before the deadline to cure a mismatched signature. Declaration of George W. Mangeni ¶ 8. Although there may have been time for Mr. Mangeni to cure the defect—even with Ohio's current narrow cure window—Mr. Mangeni never received notice that his ballot had been rejected because of a purported signature mismatch. *Id.* ¶ 9.

**B.      Signature Matching on Absentee Ballot Applications and Absentee Ballots Is Grossly Inaccurate.**

Adequate notice of and opportunity to cure a mismatched signature on an absentee ballot application or absentee ballot is all the more important in light of the fact that signature matching—especially when performed by non-specialists—is inherently prone to errors. Those errors will inevitably multiply in a nearly all-mail election in which boards of elections will receive significantly more applications and absentee ballots as in a typical general election.

As Plaintiffs' expert Dr. Linton Mohammed explains, lay individuals are highly likely to make mistakes in signature-comparison determinations and are particularly prone to conclude that signatures do not match when they were written by the same person. One study found that

lay individuals erroneously rejected genuine signatures in over 26% of cases, more than 3.5 times the error rate of trained forensic document examiners. Declaration of Dr. Linton A. Mohammed ("Mohammed Declaration") ¶ 33. Professional document examiners work under special conditions, using magnification and correct lighting, *id.* ¶ 40, and have been screened for vision problems that election officials are not even aware they might have—such as "form blindness." *Id.* ¶ 28. Signature comparison by lay people is unlikely to be performed with this rigor. The risk of disenfranchisement through a false signature-mismatch determination is especially high among young, old, disabled, ill, and non-native English signatories because those populations have high signature variability, *id.* ¶ 27, and Ohio's system requires election officials to compare the signature on a voter's absentee ballot to the *one* signature on the voter's registration form on file with the county board of elections.[8] Ohio Rev. Code § 3509.06(D)(1). Even trained handwriting analysts require *multiple* comparison samples to determine whether a signature is authentic. Mohammed Decl. ¶¶ 29, 52. In addition, years—perhaps even decades— may have elapsed between when the voter signed a registration form and when the voter votes an absentee ballot, over which time natural variations in a voter's signature may have emerged.

The predictable result of asking untrained election officials to conduct signature matching is that the vast majority of absentee ballots rejected due to signature mismatches are, in fact, genuine votes. Expert Report of Alex Street ("Street Report") ¶¶ 18–20. As Plaintiffs' expert Dr. Alex Street estimates, because the underlying rate of false signature rejection is so high and the number of fraudulent ballots is so low, "for every one invalid ballot that is correctly rejected for signature mismatch, an additional 32 valid ballots are wrongly rejected due to errors by the

---

[8]    Despite the statutory requirement that election officials use a single comparator signature, some counties collect and use multiple signature samples. *See supra* note 7.

non-experts trying to verify signatures." *Id.* ¶ 19. This high rate of false rejection illustrates the paramount importance that Ohio's notice and cure procedures must give all voters a realistic opportunity to make sure erroneously rejected ballots are counted.

**C. The Unnecessarily Short Period to Receive Notice of and Cure a Mismatched Signature Is Undercut by Ohio's Reliance on the U.S. Postal Service for Communications Concerning Absentee Ballot Applications and Absentee Ballots.**

Because Ohio's absentee ballot process depends upon the mail at every stage, mail delays will prevent many voters from curing signature mismatches. For Ohio voters who have signature-match problems on their applications or ballots, paperwork may have to travel through the U.S. mail system up to *eight times* before those voters' ballots may be ultimately counted.[9] While Defendant LaRose's Directive 2020-11 potentially eliminates one of those mailings by permitting the boards of elections to contact voters by phone and email of a signature mismatch on an absentee ballot (when the voter chooses to provide such contact information), that still leaves up to seven separate mailings—the last of which must be received within seven days of the election—required for some voters to have their ballot counted.

Even before the COVID-19 pandemic, the U.S. Postal Service was experiencing

---

[9] Those eight mailings are: (1) the state or county board of elections mails each voter a mail-in ballot application; (2) the voter fills out the application and mails it to the board of elections; (3) if the board of elections challenges the signature on the application, the board may mail the voter a notice of the defect and a form to cure it; (4) the voter signs the cure form and mails it back; (5) the board of elections mails an absentee ballot to the voter; (6) the voter fills out the ballot, signs it, and returns it via U.S. mail; (7) if the board of elections determines the voter's signature does not match the signature on file, the board must mail the voter a Form 11-S to cure the problem; and (8) the voter then fills out and signs Form 11-S and mails it back to the board of elections, and that ballot is counted only if Form 11-S is received by seven days after Election Day (even though ballots are accepted until ten days after the election). Expert Report of Daniel C. McCool (McCool Report) ¶¶ 15–16.

significant delays in mail delivery.[10]  COVID-19 has intensified these mail problems.  The U.S.

Postal Service has seen significant delays both due to increase in demand and limited capacity, as

nearly 3,000 postal employees have tested positive for COVID-19.[11]  By the Defendant's own

admission, the U.S. Postal Service—overwhelmed and underfunded during the pandemic—

cannot ensure that voters will receive their ballots in enough time to comply with deadlines.

Defendant LaRose reported that "we are finding that the delivery of the mail is taking far longer

than what is published by the United States Postal Service as expected delivery times.  Instead of

first-class mail taking 1-3 days for delivery, we had heard widespread reports of it taking as long

as 7-9 days."[12]  Defendant LaRose informed state lawmakers that such "delays mean it is very

possible that many Ohioans who have requested a ballot may not receive it in time."[13]  The Ohio

Association of Election Officials reported that their organizational members also informed them

of "outrageous" postal delays during the Spring primary.[14]

As Professor McCool observes, "[g]iven these problems, there is a mismatch between the

timetables set out in Ohio election law for the signature match curing process, and the realities of

---

[10]   As Professor McCool explains: "Starting in 2011, the [United States] Postal Service began closing post offices and processing centers. In Ohio, nine processing facilities were closed in 2012. . . . As a result, some mail from Ohio had to be sent to Michigan to be sorted, then sent back to Ohio."  McCool Report ¶ 18.

[11]   Jennifer Smith, *Postal Package Deliveries 'Bogged Down' With Delays, Backlogs*, Wall Street Journal (June 1, 2020) https://www.wsj.com/articles/postal-package-deliveries-bogged-down-with-delays-backlogs-11590836400.

[12]   Letter from Frank LaRose, Ohio Sec'y of State, to Ohio Congressional Delegation (Apr. 23 2020), https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf.

[13]   *Id.*

[14]   Ryan McCarthy & Maryam Jameel, *The Postal Service Is Steadily Getting Worse – Can It Handle a National Mail-In Election?*, ProPublica (June 15, 2020), https://www.propublica.org/article/the-postal-service-is-steadily-getting-worse-can-it-handle-a-national-mail-in-election.

mail delivery in the current era." McCool Report ¶ 25. The Ohio Election Manual assumes that "point-to-point delivery of First-Class Mail is 2 to 5 days." Ohio Election Manual, at 5-24. Even under the best of circumstances, the timeline for a voter who submits a ballot close to Election Day, to receive Form 11-S, and return it by the seventh day after the election leaves little room for delay. *See* McCool Report ¶ 27. In a COVID-19 world where mail takes up to nine days, voters who submit ballots a full week before the election have no chance of having their ballot reach the board of elections in time to provide a cure period should their signature be determined not to match. *Id.* ¶¶ 25–27. The U.S. Postal Service itself warned Defendant LaRose in a July 30, 2020 letter that "there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted."[15]

The experience of Ohio voters in the 2020 Primary Election bears this out. In that primary, 317 ballots—which otherwise would have been counted if they had been delivered on time—were not delivered to the Butler County Board of Elections until two weeks after the deadline and thus were not counted.[16] The same delay prevented timely submitted ballots from being counted in Geauga and Lucas Counties.[17] With the types of delays acknowledged by the State, large swaths of voters will never receive notice in time to cure signature mismatches, or if they do cure, the ripple effect of having to do those additional mailings, means that their ballot

---

[15] Patashnik Decl., Ex 14 (Letter from Thomas J. Marshall, U.S. Postal Service General Counsel, to Frank LaRose, Ohio Sec'y of State (July 30, 2020)).

[16] Ryan McCarthy & Maryam Jameel, *The Postal Service Is Steadily Getting Worse – Can It Handle a National Mail-In Election?*, ProPublica (June 15, 2020), https://www.propublica.org/article/the-postal-service-is-steadily-getting-worse-can-it-handle-a-national-mail-in-election.

[17] *Id.*

ultimately arrives too late to be counted. This is particularly true for those voters who temporarily reside outside Ohio or overseas.

Plaintiff Campbell was disenfranchised in the Spring 2020 Primary Election because her application was erroneously rejected due to a purported signature mismatch, and the time taken by the resulting mailings prevented her from curing the problem in time to vote. Ms. Campbell mailed her absentee ballot application in mid-February 2020. Declaration of Carolyn E. Campbell ¶ 6. Her application was denied for signature mismatch on March 5, 2020. *Id.* at ¶ 7. After being notified of the denial, Ms. Campbell promptly cured the application and resubmitted it; her application was accepted on April 23, 2020. *Id.* ¶ 9. She was sent an absentee ballot the next day, but she did not receive it until *after* the April 27, 2020 postmark deadline for the Primary Election. *Id.* ¶ 9–10. Nevertheless, Ms. Campbell submitted her ballot, but it was not counted in that election. *Id.* at ¶ 11.

**D.      Ohio Lacks Any Policy or Procedure for Whether and How Absentee Ballot Applications Will Be Rejected, What Notice Is Provided, and How Purported Defects May Be Cured.**

An Ohio voter must submit a new absentee ballot application before every election in which they choose to vote absentee. Ohio Rev. Code § 3509.03(A). The application must be signed by the voter, *id.* § 3509.03(A), but Ohio statutes and regulations neither require nor authorize county boards of elections to conduct signature matching on absentee ballot applications, *see id.* § 3509.03. Accordingly, Ohio law does not provide any standards or procedures by which local boards of elections should compare signatures on absentee ballot applications to those on file, nor has the Secretary of State issued any directives or guidelines governing that process. By the same token, no statewide statute, permanent regulation, or guidance governs when, how, or even if, election officials must notify an applicant that their application has been rejected because of a signature mismatch. *See id* § 3509.04(A). Nor does

any such provision govern how an application mismatch may be cured.  *See id.*  The Ohio

Election Official Manual, issued by the Secretary of State, is silent on the process for signature

matching, notice, and cure for absentee ballot applications.  *See* Ohio Election Manual, at 5-1–4.

Nevertheless, many of Ohio's eighty-eight county elections boards compare voter

signatures on absentee ballot applications to a signature or multiple signatures on file for the

voter and routinely disqualify absentee voter applications based on a board employee's

perception of a signature discrepancy.  According to responses to Plaintiffs' records requests

from seventy-six Ohio boards of elections, twenty-seven counties in Ohio have confirmed that

they reject absentee ballot applications for signature mismatch, including Franklin County and

Cuyahoga County, Ohio's two largest counties by population  Patashnik Decl. ¶ 7.  Of the

remaining counties that replied to Plaintiffs' records requests, none denied conducting signature

matching on absentee ballot applications.  *Id.* ¶ 8.  Adding to the confusion and lack of

uniformity, some counties do not track their rejections of absentee ballot applications or their

reasons for rejections.  *Id.* ¶ 9.  Absent clear state directives, county boards have developed local

*ad hoc* procedures for matching signatures on absentee ballot applications, and these procedures

vary between counties.  *Id.* ¶ 10–16.[18]  Ohio counties that engage in signature matching on

absentee ballot applications also lack a uniform procedure for providing notice and allowing

voters to cure purported mismatches, creating discrepancies in the likelihood that Ohio voters in

---

[18]  For example, Butler County's local procedures instruct election officials to look for a "3-point match" for application signatures.  Patashnik Decl. ¶ 11.  In Wyandot County, the Director, Deputy Director, and two clerks review mismatched signatures, though it is not clear if all of those officials review every signature.  *Id.* ¶ 12.  In Hardin County, a single election official may declare a mismatch but the application is rejected only when the entire election staff reaches a consensus or, failing that, the entire board of elections decides.  *Id.* ¶ 13.  Delaware County requires that every mismatch be reviewed by a Republican election official and a Democratic election official.  *Id.* ¶ 14.

various counties will have their absentee votes counted.[19]  Even if a county board of elections

notifies a voter of a signature mismatch on an absentee ballot application, there is no uniform

procedure for the voter to cure that mismatch.[20]

　　　While no permanent regulation provides for a uniform process for the notice or cure of

signature mismatches on absentee ballot applications, Directive 2020-11 provided some

guidance to election officials for the handling of an absentee ballot application that "does not

contain all of the required information."  Ohio Sec'y of State, Directive 2020-11, at 12 (July 6,

2020).  Directive 2020-11 provides that, for the November 2020 election, "[i]f a board of

elections receives an absentee ballot application that does not contain all of the required

information, the board must promptly notify the voter of the additional information required to

be provided by the voter to complete the application."  *Id.*  The directive further requires that

"[b]oards must utilize telephone and email addresses" to provide such notice.  *Id.* at 13.

　　　But this directive does *not* provide that boards of election must notify voters whose

application is rejected because of a signature *mismatch*—as opposed to voters whose applications

---

[19]  Some, but not all, counties attempt to notify voters whose absentee ballot applications have been rejected via letter, email, or phone call, or a combination of all three.  For example, Butler County has a form letter it sends to voters whose applications it rejects.  *Id.* ¶ 19.  Knox County sends a letter and a copy of the rejected application.  *Id.* ¶ 20.  Richland County attempts to contact a voter by phone, mail, and email.  *Id.* ¶ 21.  While most county boards of elections use an online tracking system that allows voters to track the status of their absentee ballot application and ballots, those tracking systems do not automatically notify a voter that a ballot or application has been rejected unless the voter affirmatively queries that system, nor do they provide a voter with the reasons such as signature mismatch that a ballot is rejected.  *Id.* ¶ 23.  Some counties that responded to Plaintiffs records requests apparently do not track efforts to notify voters of rejected absentee ballot applications at all.  *Id.* ¶ 18.

[20]  Some county elections boards require voters whose applications have been rejected to submit a form correcting the problem.  *Id.* ¶ 19–21.  Hardin County apparently sends voters with mismatched signatures on absentee ballot applications provisional ballots rather than asking them to resubmit applications for normal ballots, a process nowhere authorized by Ohio law or regulation.  *Id.* ¶ 22.

are rejected because they are *missing* signatures or other "required information." This omission matters because the absentee ballot scheme set forth in the Ohio Revised Code distinguishes between ballots that do not contain complete information and ballots that are rejected for signature mismatch. *See, e.g.,* Ohio Rev. Code § 3509.06(D)(3)(b) ("If the election officials find that the identification envelope statement of voter is incomplete *or* that the information contained in that statement does not conform to the information contained in the statewide voter registration database concerning the voter . . . ." (emphasis added)); *id.* § 3509.07 (distinguishing between a ballot being "incomplete" and a ballot having signatures that "do not correspond with the person's registration signature").

## E. A Significant Number of Ohio Voters Have Lost the Right To Vote Because of Perceived Signature Mismatch.

The United States Election Assistance Commission's Election Administration and Voting Survey publishes data from Ohio and around the country that demonstrate the real risks of disenfranchisement due to signature mismatch.[21] The survey reports that in the 2016 General Election, 324 absentee ballots were rejected because of signature mismatch, and in the 2018 midterm General Election, 225 ballots were rejected for signature mismatch.[22] The numbers for the 2020 Primary Election have not yet been reported, but Plaintiff Mangeni is an example of a voter disenfranchised in 2020 because of purported signature mismatch on an absentee ballot.

The scope of the problem is much larger than the Election Assistance Commission data show because Ohio does not report the number of absentee ballot *applications* rejected for purported signature mismatches. Street Report ¶ 27 ("By studying data on the application stage I

---

[21] *See Election Administration and Voting Survey (EAVS) Comprehensive Report*, U.S. Election Assistance Comm'n (last visited July 29, 2020), https://www.eac.gov/research-and-data/studies-and-reports.

[22] Street Report, tbl.A1 & tbl.A2.

am revealing what I believe was a previously invisible layer of the issue. The data show that, much like an iceberg, this previously hidden layer is much bigger than the layer which was already visible."). It is likely that thousands of absentee ballot applications are rejected because of signature mismatch every election cycle. *Id.* at ¶ 26.[23] Indeed, according to boards of elections' responses to Plaintiffs' records requests, there have been *at least* 10,038 instances of absentee ballot applications being rejected for "signature issues" since the 2016 General Election, and in only 26% of those cases was a rejected applicant confirmed to have been able to resolve the problem and receive an absentee ballot or cast a provisional ballot at a polling location. *Id.* at ¶ 30.[24] Because only a "relatively small number" of Ohio's eighty-eight counties "provided data in a format amenable for analysis," it is likely that many more voters had applications rejected due to purported signature mismatches, but it is not known precisely how many more. *Id.*

All told, when one considers the number of absentee ballot applications and absentee ballots that were erroneously rejected, and not cured, because of a purported signature mismatch during past election cycles—as well as the fact that the 2020 General Election will be conducted largely by mail—potentially tens of thousands of Ohioans could be disenfranchised because of Ohio's constitutionally deficient signature-matching procedures.

---

[23] As the Associated Press reported in December, 2019, "[t]housands of Ohio voters were held up or stymied in their efforts to get absentee ballots for [the 2018] general election because of missing or mismatched signatures on their ballot applications." *See* Julie Carr Smyth, *AP Exclusive: Thousands of Ohio Absentee Applications Denied*, Associated Press (Dec. 16, 2019), https://apnews.com/ddfed70e98d79cf0bee49eb1d9fd85b9.

[24] Boards of elections that provided data on rejected applications sometimes used a generic description like "signature issues" to describe all problems related to signatures on applications, including mismatched signatures and missing signatures. Street Report ¶ 26. In cases in which data clearly delineate between mismatched and missing signatures, 45% of applications were rejected due to purportedly mismatched signatures and 55% of applications were rejected because of missing signatures.

**STANDARD OF REVIEW**

On a motion for a preliminary injunction, this Court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997).

**ARGUMENT**

**I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

"At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not 'prove his case in full.'" *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (citations omitted). Plaintiffs are likely to succeed on the merits of their claims and prove that Ohio's procedures for signature matching on absentee ballot applications and absentee ballots are constitutionally deficient because those procedures (1) impermissibly infringe on Plaintiffs' constitutional right to vote, (2) violate the Fourteenth Amendment's protections of procedural due process, and (3) violate the Fourteenth Amendment's guarantee of equal protection under the law.

**A.      Ohio's Signature-Matching Processes Infringe upon Plaintiffs' Fundamental Right to Vote.**

The right to vote is a "'precious' and 'fundamental' right." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). The right to vote "is protected in more than the initial allocation of the franchise. Equal

protection applies as well to the manner of its exercise." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore,* 516 U.S. 98, 104 (2000)). The right to vote may not be "unjustifiably burdened." *Obama for Am.*, 697 F.3d at 431. To demonstrate their voting rights have been unjustifiably burdened, "Plaintiffs [do] not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternate means of access to the ballot.'" *Id.* (citations omitted).

Laws that burden the franchise are subject to the sliding-scale *Anderson-Burdick* test. That analysis requires courts to "weigh the 'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

As set forth below, because of the burdens—individually and collectively—that Ohio's signature-matching processes place on voters, Ohio's system fails the *Anderson-Burdick* test. Allowing election officials to reject absentee ballot applications and absentee ballots based on Ohio's inaccurate signature-matching procedures, without providing voters adequate notice and a sufficient opportunity to cure the rejection, deprives voters of their right to vote. There is no state interest sufficiently weighty that justifies that burden.

### 1. Ohio's Signature Match Processes Impose a Substantial Burden on Plaintiffs' Right to Vote.

When assessing the burden on Plaintiffs' right to vote under *Anderson-Burdick*, courts assess both "the character and magnitude of the asserted injury." *Obama for Am.*, 697 F.3d at 429 (quoting *Burdick*, 504 U.S. at 434). Courts must view the restriction "from the perspective

of only affected electors—not the perspective of the electorate as a whole." *Mays v. LaRose*, 951 F.3d 775, 785–86 (6th Cir. 2020); *see also Frank v. Walker*, 819 F.3d 384, 386-87 (7th Cir. 2016) (Easterbrook, J.) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily."). Which is why even if signature matching regimes where "a comparatively small number of voters are likely to be disenfranchised based on a signature mismatch each election cycle" courts have found that they violate the right to vote. *Frederick v. Lawson*, No. 119-CV-01959, 2020 WL 4882696, at *16 (S.D. Ind. Aug. 20, 2020). The touchstone of the analysis is how significantly the restriction threatens the right to vote for those voters who are harmed. The Sixth Circuit has found substantial burdens when evaluating laws that fell far short of complete disenfranchisement. *See, e.g., Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 664 (6th Cir. 2012) (finding substantial burden where measures indirectly increased wait times at the polls or caused voter confusion that increased the risk of voters incorrectly marking their ballot); *Obama for Am.*, 697 F.3d at 430–31 (finding substantial burden where Ohio eliminated three days of early voting, even though Ohio still offered voters full week of early voting and in-person voting on Election Day).

In first assessing the *character* of the burden, Ohio's restrictions constitute an absolute bar to certain Ohioans' right to vote in two respects. *First*, Ohio's signature-match scheme completely disenfranchises voters whose absentee ballots are erroneously rejected because of signature mismatches but who are not provided sufficient notice or time to cure their ballots before the deadline. Under current law, some Ohio voters will not even receive any notice of a mismatched signature. Absentee ballots can be received as late as the *tenth* day after the election and still be counted, provided they were postmarked on or before the day before Election Day.

Ohio Rev. Code § 3509.05(B). However, voters are only afforded notice of a mismatch of a ballot received up to *six* days after an election and only have up until *seven* days after an election to cure mismatched signatures or other defects with their absentee ballots. *Id.* § 3509.06(D)(3)(b). As a result, boards of elections continue to receive timely absentee ballots for *three days* after the opportunity to cure has already elapsed. In analogous circumstances, the Eleventh Circuit "ha[d] no trouble finding Florida's scheme impose[d] at least a serious burden on the right to vote" in large part because "voters whose signatures were deemed a mismatch might not learn that their vote would not be counted until it was too late to do anything about it." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320-21 (11th Cir. 2019); *see also Fla. Democratic Party v. Detzner*, No. 4:15-cv-607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) (finding unconstitutional a Florida statutory scheme providing the opportunity to cure for no-signature ballots but denying that opportunity to mismatched signature ballots).

Even voters who might receive timely notice of a purportedly mismatched signature may not have any practical opportunity to cure. Because Ohio relies on the U.S. Postal Service and because the State provides a needlessly short window to cure mismatched signatures—leaving a two-week gap between when a ballot must be cured, and when boards of elections must finish their canvass—the cure period is inadequate for many Ohio absentee voters. *See Ohio Rev. Code* § 3509.06(D)(3)(b) (setting the deadline to cure an absentee ballot at seven days after Election Day); *id.*. § 3505.32(A) (setting the deadline for county boards of elections to complete their canvass twenty-one days after Election Day). This short cure period is particularly burdensome in light of the serious delays in delivery time the U.S. Postal Service is currently experiencing, with First-Class Mail taking as long as nine days to reach its destination, as

Defendant LaRose acknowledged earlier in the pandemic.[25]  Once a voter has received a ballot (a process that requires several mailings), three pieces of mail must be exchanged to cure a purported signature mismatch on that ballot: (1) the voter must mail the ballot; (2) the board of elections must receive the ballot, determine there is a purported mismatch, and mail the voter Form 11-S; and (3) the voter must return the completed Form 11-S.  If each mailing takes nine days to deliver and signature mismatches must be cured by seven days after the election, a voter must mail their ballot *twenty days* before the election to cure a potential signature mismatch under current Ohio procedures.  Under this scenario, the huge numbers of Ohio voters who mail their absentee ballots within twenty days of the General Election would have no opportunity to cure a purported signature mismatch.  *See* McCool Report ¶¶ 25–27; Street Report ¶¶ 43–47.

*Second*, Ohio's signature-match regime constitutes absolute disenfranchisement for those voters whose absentee ballot *applications* are erroneously rejected for signature mismatch and who are either not notified in sufficient time to cure or not notified at all.  No state law or regulation compels or expressly permits county election officials to conduct a signature match analysis for applications for absentee ballots.  Yet, at least twenty-seven Ohio counties conduct signature matching at the application stage and deny applications based on a perceived mismatch.  *See* Patashnik Decl. ¶ 7.  There are no state laws or regulations that require that counties inform voters whose applications are rejected on account of signature mismatch, set a timeframe for notice to those voters, or lay out how voters can cure any perceived signature mismatch on an absentee ballot application.  For personal and public health reasons, many voters in the upcoming General Election—particularly elderly voters and those with pre-existing

---

[25]  Letter from Frank LaRose, Ohio Sec'y of State, to Ohio Cong. Delegation (Apr. 23 2020), https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf.

medical conditions—will have no practical choice but to vote by mail.  If their absentee ballot applications are denied because of an erroneous signature mismatch and they do not receive notice or a meaningful opportunity to cure the mismatch, such voters will be completely disenfranchised.

The *magnitude* of the burden—*i.e.*, the number of Ohioans who will be disenfranchised without notice or opportunity to cure—is also substantial with respect to the upcoming General Election both because the signature-match process itself yields highly inaccurate results and because there will be unprecedented levels of mail-in absentee voting in November.  In the 2018 General Election—a midterm election conducted before the COVID-19 pandemic drastically increased the rate of mail-in voting—thousands of Ohio voters' absentee ballot applications were rejected because of purported signature mismatches.[26]  Boards of elections across Ohio have confirmed that they have rejected more than 10,000 absentee ballot applications for "signature issues" since the 2016 General Election—with the actual number potentially much higher, given that relatively few counties submitted usable data in response to Plaintiffs' records requests. Street Report ¶ 30.

As Defendant LaRose has acknowledged, mail-in voting in the 2020 Ohio General Elections will be significantly higher than it has been in all past general elections because many Ohioans will seek to avoid voting in-person at crowded, indoor polling places during the pandemic.[27]  With the large influx of additional mail-in voters, and a U.S. Postal System that is already struggling to deliver mail on-time, *see* McCool Report ¶¶ 18–27, it is eminently

---

[26]    Julie Carr Smyth, *AP Exclusive: Thousands of Ohio Absentee Applications Denied*, Associated Press (Dec. 16, 2019), https://apnews.com/ddfed70e98d79cf0bee49eb1d9fd85b9.

[27] WTOL Newsroom, *Is Mail-In Voting Safe? Yes, and Ohio's System Is Among the Best in the Country, LaRose Says*, WTOL 11 (Aug. 4, 2020), https://www.wtol.com/article/news/special-reports/88-counties/is-mail-in-voting-safe/512-904800d1-1758-4ac8-a739-9c3556b44733

foreseeable that tens of thousands of Ohio voters who timely apply for and submit mail-in ballots will, through no fault of their own, fail to cure a purportedly mismatched signature on absentee ballot application in time to receive a ballot for the General Election or fail to cure a purportedly mismatched signature on an absentee ballot before Ohio's arbitrary seven-day deadline. This more than satisfies the need to establish a substantial burden on Plaintiffs' fundamental right to vote under *Anderson-Burdick*.

### 2. Ohio's Interest in Having Its Current Signature Matching Processes Is Not Sufficiently Weighty to Justify the Burden on Plaintiffs' Right to Vote.

In conducting the *Anderson-Burdick* analysis, "courts will weigh the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Mich. State A. Philip Randolph Inst.*, 833 F.3d at 662–63. Plaintiffs acknowledge that the State has an interest in verifying voters' identify in order to combat voter fraud. However, Ohio has no interest in a signature-matching scheme that lacks adequate notice and an opportunity to cure for two reasons: (1) absentee ballot fraud is exceedingly rare, and (2) the current scheme, wherein the state has set unreasonable deadlines that will not allow for notice and opportunity to cure, is irrational and thus not sufficiently tailored to justify the disenfranchisement that signature matching errors can cause. Ohio has no legitimate interest in refusing to establish a system that guarantees voters will receive timely notice and an adequate opportunity to cure a purported signature mismatch on an absentee ballot application or absentee ballot.

*First*, while isolated incidents of absentee voter fraud may exist, all evidence suggests that it is exceptionally rare in practice, both in Ohio and the country more broadly. *See* Street Report ¶¶ 16–17; McCool Report ¶¶ 28–33.[28] Experts agree that absentee ballot fraud "amounts

---

[28] One recent study found fewer than 500 incidents of absentee voter fraud in the entire United States between 2000–2012, a period during which billions of ballots were cast. Richard L.

to only a tiny fraction of the ballots cast by mail."[29] There is also no evidence that increasing

absentee voting during the COVID-19 pandemic will increase incidents of fraud.[30] Further,

expert testimony in a recent signature-match case in North Dakota found that election officials

without handwriting training are "likely to accept *invalid* absentee ballots." *Self Advocacy Sols.*

*N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *9 (D.N.D. June 3, 2020) (emphasis

added). Not only is there is barely any absentee-ballot fraud to detect, but also Ohio will be

ineffective at detecting even those precious few ballots that may be fraudulent.

*Second*, whether or not Ohio has a legitimate interest in conducting signature matching in

general—a question that is not the subject of this litigation and not before this Court—Ohio

certainly has no legitimate interest in providing voters only seven days after an election to cure

mismatched signatures on absentee ballots, Ohio Rev. Code § 3509.06(D)(3)(b), when ballots

can be received up to ten days after the election and Ohio statute does not require boards of

elections to complete their canvasses until twenty-one days after the election, *id..* § 3505.32(A).

Nor does Ohio have any legitimate interest in allowing county boards of elections to reject

absentee ballot applications on the basis of mismatched signature without providing voters

adequate notice or opportunity to cure, when Ohio law does not even provide for signature

matching on absentee ballot applications. The state has no legitimate interest in maintaining

---

Hasen, *Opinion: Trump Is Wrong About the Dangers of Absentee Ballots*, Wash. Post (Apr. 9, 2020) https://www.washingtonpost.com/opinions/2020/04/09/trump-is-wrong-about-dangers-absentee-ballots/.

[29] Robert Farley, *Trump's Latest Voter Fraud Misinformation*, FactCheck.org (Apr. 10, 2020) https://www.factcheck.org/2020/04/trumps-latest-voter-fraud-misinformation/ (quoting Justin Levitt, voter fraud expert and professor of law).

[30] Indeed, all evidence available suggests the opposite: "[f]ive states … now conduct all elections almost entirely by mail. They report very little fraud." Stephanie Saul & Reid J. Epstein, *Trump is Pushing a False Argument on Vote-by-Mail Fraud. Here Are the Facts*, N.Y. Times (Apr. 11, 2020) https://www.nytimes.com/article/mail-in-voting-explained.html.

those aspects of its signature-matching scheme that threaten to erroneously disenfranchise thousands of eligible voters without proper notice or ability to cure. Notice and cure and allowing citizens to confirm their identity would in fact promote election integrity and lessen the already minuscule probability of fraud. *Frederick*, 2020 WL 4882696, at *15. Ohio's senseless system will harm public confidence in elections. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1324 ("[V]ote-by-mail voters who followed the ostensible deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness . . . ."); *see also Fish v. Schwab*, 957 F.3d 1105, 1135 (10th Cir. 2020) ("[T]his disproportionate impact on qualified registration applicants also may have the inadvertent effect of eroding, instead of maintaining, confidence in the electoral system.") (internal quotations omitted).

Ohio cannot identify any "fraud-prevention interest that justifies depriving legitimate vote-by-mail and provisional voters of the ability to cure the signature mismatch." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1322; *see also Frederick*, 2020 WL 4882696, at *17 (holding that "the State's reasons for the signature verification requirement do not outweigh the burden the challenged statutes place on the fundamental right to vote of Indiana voters entitled to vote by mail-in absentee ballot"). Ohio's current signature-matching scheme fails *Anderson-Burdick* scrutiny.

**B.    Ohio's Signature Matching Process Denies Plaintiffs Procedural Due Process.**

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Courts "engage in a two-step analysis when resolving due process issues"—first, "determine whether a protected property or liberty interest exists," and second, "determine what procedures are required to protect that interest." *Johnston-Taylor v. Gannon*, 907 F.2d 1577,

1581 (6th Cir. 1990).  Under this analysis, Ohio's signature-matching scheme violates Plaintiffs' due process rights.

1. **Plaintiffs Have a Protected Liberty Interest that Is Owed Due Process.**

Plaintiffs have clearly defined liberty interests that implicate the due process analysis: their right to vote and their right to vote by absentee ballot.  Rights codified in statute, like Ohio's grant of no-excuse absentee voting for all Ohio voters, are "statutory entitlement[s] for persons qualified to receive them" and cannot be viewed as "a privilege" for which due process is inapplicable.  *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *see also Paul v. Davis*, 424 U.S. 693, 710-11 (1976) (determining private interests protected by due process are those "recognized and protected by state law"); *Frederick*, 2020 WL 4882696, at *12  ("We therefore hold, in line with the vast majority of courts addressing this issue, that, having extended the privilege of mail-in absentee voting to certain voters, the State 'must afford appropriate due process protections to the use of [mail-in] absentee ballots.'" (quoting *Democracy N.C. v. N.C. Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *53 (M.D.N.C. Aug. 4, 2020)); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("[T]he Supreme Court has long held that state-created statutory entitlements can trigger due process . . . ."); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990) (finding that voting absentee "is deserving of due process").  Due process is plainly implicated where, as here, the state has granted citizens the right to vote absentee.  *See Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1269–71 (11th Cir. 2019).

2. **All Three *Mathews* Factors Weigh Heavily in Plaintiffs' Favor**.

Once a valid liberty interest has been established, a Court looks to the *Mathews* balancing test to determine whether a plaintiff's due process rights have been violated, considering: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In this case, all three *Mathews* factors point to the same conclusion: Ohio's current scheme for signature matching on absentee ballot applications and absentee ballots violates voters' procedural due process rights.

The first *Mathews* prong examines "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335. The private interest at issue here is the "fundamental right to vote, which is "entitled to substantial weight" under the *Mathews* analysis. *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *9 (internal quotation marks omitted); *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018). Even if the private interest at issue is the right to vote by *absentee ballot*, that interest is similarly owed significant weight for several reasons.

*First*, courts have recognized the connection between the right to vote and the right to vote absentee. *See Ga. Muslim Voter Project*, 918 F.3d at 1270–71 (noting that, because "the interest in voting by absentee ballot implicates the fundamental right to vote," the interest in voting absentee should be afforded "more than modest weight"); *see also Democracy N.C.*, 2020 WL 4484063, at *53.

*Second*, the right to vote absentee is awarded more weight "where . . . an absentee ballot is the sole available voting method." *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *8. During the COVID-19 pandemic, large numbers of voters are requesting absentee ballots to avoid risking their health and the health of their neighbors and loved ones by voting in-person. For

many Ohioans—including older people and those with underlying conditions that make them at higher risk for severe illness or death from COVID-19—voting absentee is the only way they can exercise their fundamental right to vote in elections taking place during the pandemic. *See Democracy N.C.*, 2020 WL 4484063, at *54 ("[T]he private interest of a voter being able to vote absentee is weighty . . . *particularly in the circumstances present with this pandemic*." (emphasis added)).

*Third*, those who choose to vote absentee, and whose ballots or applications are erroneously rejected without notice or opportunity to cure, are fully disenfranchised. "It cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." *Saucedo v. Gardner,* 335 F. Supp. 3d 202, 218 (D.N.H. 2018); *see also Democracy N.C.*, 2020 WL 4484063, at *54 (finding signature mismatch, without notice or opportunity to cure, "facially effect[s] a deprivation of the right to vote") (quoting *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *9). However this Court precisely defines the private interest, it should be awarded significant weight.

The second *Mathews* factor—"the risk of erroneous deprivation" of the liberty interest at issue, *Mathews*, 424 U.S. at 335—also weighs in Plaintiffs' favor. Plaintiffs face a high risk of erroneous deprivation of their liberty interest if Ohio's signature-matching system is not modified. As noted above in Section I.A.1, Ohio's current signature-matching scheme threatens to erroneously deprive Plaintiffs and Ohio voters of their right to vote because Ohio does not provide adequate notice and opportunity to cure purported signature mismatches on absentee ballot applications and absentee ballots. *See Democracy N.C.*, 2020 WL 4484063, at *54. What is more, election officials conduct signature matching without any guidance or uniform procedures promulgated under state law or regulation, without any technical training on how to

-30-

analyze handwriting or compare signatures, and without decisions being subject to an internal review process. *See Saucedo*, 335 F. Supp. 3d at 217-18 (finding "[t]he absence of functional standards is problematic, and the likelihood of error resulting therefrom is only compounded by the lack of meaningful review or oversight"); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1320 (finding that, absent statewide standards or guidance, "counties may do very little to ensure even and accurate application of the signature-match requirements"). The result of these erroneous rejections has led to the disenfranchisement of thousands of Ohio voters in each election—a figure that will surely be much higher in the 2020 General Election, which will be conducted largely by mail.

The final *Mathews* factor also weighs in Plaintiffs' favor. As noted above in Section I.A.2, the State's interest in its current procedures is slim. If anything, the State's interest in verifying voters' identities to safeguard against voter fraud, and preserve public confidence in elections, would be *promoted* by providing proper notice and opportunity to cure, which would improve accuracy. *See Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10 ("[T]he purpose of the signature-matching requirement is to ensure the same person that signed the ballot application is the person casting the ballot. Notice and cure procedures do exactly that . . . .").

All three factors under the *Mathews* test strongly favor Plaintiffs. As such, the failure to provide sufficient notice and an adequate opportunity to cure the rejections of absentee ballot applications and absentee ballots for signature mismatch constitutes a violation of Plaintiffs' right to procedural due process.

**C.    Ohio's Signature-Matching Process Violates Plaintiffs' Equal Protection Rights.**

"[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Obama for Am.*, 697 F.3d at 428 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). "Having once granted the right to vote on equal terms,

the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 428 (quoting *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)).  The *ad hoc* procedures adopted by county boards of elections for signature matching on absentee ballot applications and absentee ballots, a result of the State's failure to impose uniform standards, violate the equal protection rights of Plaintiffs and Ohio voters.

The Supreme Court has held that "[a]t a minimum . . . equal protection requires 'nonarbitrary treatment of voters.'" *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush*, 531 U.S. at 105).  That is because voting rights "cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar." *Louisiana v. United States,* 380 U.S. 145, 153 (1965).  "A citizen's right to a vote free of arbitrary impairment by state action [is] secured by the Constitution . . . ." *Baker v. Carr*, 369 U.S. 186, 208 (1962); *see also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 n.13 (6th Cir. 2011) ("The Supreme Court has held in cases since *Snowden* [*v. Hughes*, 321 U.S. 1, 8 (1944)] that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination. . . . Of great importance, a showing of intentional discrimination has not been required in these cases.").

*Bush v. Gore* made clear that states must impose uniform electoral rules because only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment."  531 U.S. at 106–07.  The Sixth Circuit has applied this rule in many cases.  *See, e.g., League of Women Voters of Ohio*, 548 F.3d at 477–78 (noting that "a "lack of statewide standards effectively denied voters the fundamental right to vote" and holding that insufficient allocation of machines to certain Ohio jurisdictions "deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal

Protection Clause"); *Hunter*, 635 F.3d at 235 (holding that Ohio had to institute "specific standards for reviewing provisional ballots . . . otherwise [there could be] 'unequal evaluation of ballots'" (quoting *Bush,* 531 U.S. at 106)); *Ne. Ohio Coal. for Homeless*, 696 F.3d at 598 (joining "the parties and the district court in finding that the consent decree's different treatment of similarly situated provisional ballots likely violates equal protection…").

Ohio's signature-matching scheme—a patchwork of *ad hoc* procedures that vary significantly between counties—is a textbook violation of the Equal Protection Clause's prohibition against "arbitrary and disparate treatment of the members of [the] electorate." *Bush*, 531 U.S. at 105. Defendant LaRose has failed to provide any guidance at all as to whether and how signature matching should be conducted on absentee ballot *applications*, leaving counties to devise their own inconsistent practices.[31] Uncontroverted expert testimony credited in two recent federal court cases found that "election officials are likely to make erroneous signature-comparisons" when "neither state law nor any guidance from state agencies sets forth functional standards for comparing signatures and assessing variations." *Saucedo*, 335 F. Supp. 3d at 217–18; *see also Self Advocacy Sols. N.D.* 2020 WL 2951012, at *9. Given the lack of standards and disparate treatment of absentee ballot applications and absentee ballots across the State, Plaintiffs and millions of Ohioans voting by mail in the General Election face the prospect of being disenfranchised based on the whims of elections officials making arbitrary signature-match

---

[31] At least one county requires individuals from both major political parties to review signatures. Patashnik Decl. ¶ 14. Some counties provide for multiple rounds of signature review, and some do not. *Id.* ¶¶ 10–16. The means of notice and cure for mismatched signatures on ballot applications also differ from county to county. *Id.* ¶¶ 18–22. Similarly, Ohio and Defendant LaRose provide no procedure by which signatures should be matched on absentee ballots themselves. As a result, counties vary on the number of signatures compared to identify a mismatching signature. *See supra* footnote 7. Counties also differ when it comes to who reviews a signature and what it means for a signature to not "match." Patashnik Decl. ¶¶ 10–16.

determinations unless this Court forces Defendant LaRose to provide votes with sufficient notice and a meaningful opportunity to cure mismatched signatures on absentee ballot applications and absentee ballots.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF DEFICIENCIES IN OHIO'S SIGNATURE MATCH PROCESS ARE NOT CORRECTED.

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436, *see also Mich. State A. Philip Randolph Inst.*, 833 F.3d at 669; *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."). "A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am.*, 697 F.3d at 436. This is particularly true because, once an election comes and goes, "there can be no do-over and no redress. The injury to these voters is real and completely irreparable." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). The harm that Individual Plaintiffs and members of Organizational Plaintiffs will suffer absent a preliminary injunction is by definition irreparable. The Sixth Circuit, therefore, regularly grants preliminary injunctions in voting cases where, as here, they are necessary to prevent irreparable injury to plaintiffs. *See, e.g.*, *Obama for Am.*, 697 F.3d 423; *Mich. State A. Philip Randolph Inst.*, 833 F.3d 656.

"This is not a case where failing to grant the requested relief would be a mere inconvenience to Plaintiffs." *Fla. Democratic Party*, 2016 WL 6090943, at *8. As noted above, absent preliminary injunctive relief, Individual Plaintiffs, members of Organizational Plaintiffs, and other eligible Ohio voters face *total* disenfranchisement because they will have limited ability to cure an erroneous signature mismatch on their absentee ballots or applications. Plaintiffs and Ohio voters face grave threats to their right to vote when county election officials

-34-

fail in their efforts to notify voters of their absentee ballot application rejection, given that most counties do not track these efforts; or voters—particularly given the expected huge increase in absentee voting, U.S. Postal Service delays, and public health risks from COVID-19—struggle to properly cure their ballots or ballot applications under the unnecessarily short deadlines Ohio provides.

Organizational Plaintiffs will also likely suffer irreparable injury to their organizational missions. In response to potential mass disenfranchisement of its members and Ohio voters, Plaintiff League of Women Voters of Ohio has been forced to put aside voter registration efforts in the crucial months leading up to an election and instead focus time and resources on educating voters about how to avoid having their applications or ballots rejected because of a purported signature mismatch. Declaration of Jen Miller ¶¶ 25–35; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm to organizational plaintiffs because challenged "obstacles unquestionably make it more difficult for the [organizations] to accomplish their primary mission of registering voters."); *District of Columbia v. U.S. Dep't of Agriculture*, No. 20-119, 2020 WL 1236657, at *29 (D.D.C. Mar. 13, 2020) ("These harms from the forced diversion of resources are similar to those recognized as irreparable harm in other suits"). The A. Philip Randolph Institute is having to dilute its historic voter registration efforts because of the necessity to devote volunteer resources instead to helping voters anticipate and navigate the absentee ballot process, with its signature match detours and booby traps. Declaration of Andre Washington ¶¶ 13–15.[32]

---

[32] To the extent that Defendants challenge the standing of Organizational Plaintiffs to bring this claim, "[t]he Supreme Court and this Circuit have found that a drain on an organization's resources . . . constitutes a concrete and demonstrable injury for standing purposes." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable injury to

## III.    THE PUBLIC INTEREST AND THE LACK OF HARM TO OTHERS FAVOR A PRELIMINARY INJUNCTION.

The balance of equities weighs in favor of granting a preliminary injunction.  The public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437; *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (an "injunction's cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest").  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1078 (6th Cir. 1994).  "There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Secretary of State's] office and other state and local offices involved in elections." *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016); *see also Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10 ("[A]ny fiscal or administrative burden is miniscule when compared to the palpable threat of disenfranchisement . . . ."); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (describing administrative burdens on State Defendants as "minor when balanced against the right to vote, a right that is essential to an effective democracy").

Further, the relief Plaintiffs seek imposes minimal, if any, burden on the State and counties.  Plaintiffs' requested injunction entails two pieces of relief: (1) enjoining Defendant LaRose from enforcing provisions of Ohio law that require signature matching on absentee ballots without extending the period of time during which voters must be notified of and allowed

---

the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests . . . .").  Organizational Plaintiffs also have standing to assert the rights of their members who will vote in the upcoming election.  *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) ("Appellees have standing to assert, at least, the rights of their members who will vote in the November 2004 election.").

to cure purportedly mismatched signatures, and (2) enjoining Defendant LaRose from permitting county boards of elections from engaging in signature matching on absentee ballot applications, or in the alternative, to confirm that his July 6, 2020 Directive 2020-11 requires boards of elections to promptly contact voters by telephone and email in sufficient time to correct their rejected absentee ballot applications.

With respect to absentee *ballots*, election officials are already required under state law and current guidance from the Secretary of State to provide notice to voters of a purported signature mismatch and allow voters to cure those mismatches.  Accordingly, every board of elections already has a set of policies in place to (1) provide notice to voters of mismatched signatures through the sixth day following an election and (2) allow voters to cure mismatched signatures through the seventh day following an election.  The Secretary of State or boards of elections would face minimal, if any, burden to simply extend those existing processes through the twenty-one days following an election that boards have to complete the canvass.

With respect to absentee ballot *applications*, the relief would *ease* the burden on county election boards, because they would no longer have to devote time and resources to signature matching on applications, to the extent that boards currently engage in that process.  The burden under the alternative relief, similarly, is minimal.  Defendant LaRose would need only to clarify that his previously issued Directive 2020-11 applies to signature mismatches, and boards of elections would simply have to extend the notice processes already called for by that directive to applications with purported signature mismatches.

There is simply no contest in weighing these miniscule burdens against the benefit of allowing tens of thousands Ohioans—whose applications or ballots might otherwise be thrown out because of purported signature mismatches—to have their votes counted.  The balance of

equities and the public interest weighs clearly in favor of granting this injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65:

(1) to enjoin Defendant LaRose from enforcing provisions of Ohio law that require election officials to conduct signature matching on absentee ballots without providing adequate time to cure a purportedly mismatched signature before the date by which Ohio boards of elections must complete the canvass of returns;

(2) to enjoin Defendant LaRose from permitting county boards of elections from conducting signature matching on absentee ballot applications, or, in the alternative, to direct Defendant LaRose to confirm that Directive 2020-11 requires boards of elections to promptly contact voters by telephone and email in sufficient time to correct absentee ballot applications rejected on the basis of signature mismatch.

DATED: August 24, 2020                    Respectfully submitted,

*/s/  Freda J. Levenson*
Freda J. Levenson (0045916)
*Trial Counsel*
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
flevenson@acluohio.org

T. Alora Thomas-Lundborg[*]
Dale Ho[*]
Jonathan Topaz[*]
American Civil Liberties Union
125 Broad Street
New York, NY 10004

Tel: (212) 519-7866
Tel: (212) 549-2693
athomas@aclu.org
dale.ho@aclu.org
jtopaz@aclu.org

Ezra Rosenberg[+]
Pooja Chaudhuri[+]
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

C. William Phillips*
Joshua B. Picker*
John F. Nelson[+]
Katherine P. Onyshko*
Jeremy Patashnik*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 841-1000
cphillips@cov.com
jpicker@cov.com
jnelson@cov.com
konyshko@cov.com
jpatashnik@cov.com

*Pro Hac Vice
[+]Pro Hac Vice forthcoming

Attorneys for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 24, 2020, I filed a copy of Plaintiffs' Motion for

Preliminary Injunction and Memorandum of Law in Support of Plaintiffs' Motion for

Preliminary Injunction using the Court's Electronic Filing System, and that counsel for all parties

received electronic notice through that system.

<u>/s/ *Freda J. Levenson*</u>
Freda J. Levenson