# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

LEAGUE OF WOMEN VOTERS et. al.    :
    :
    **Plaintiffs,**    :
    :
    :
    **v.**    :    **CASE NO.  20-cv-3843**
    :
    :    **JUDGE WATSON**
**FRANK LAROSE**    :
    :
    **Defendant.**    :

---

## DEFENDANT SECRETARY OF STATE FRANK LAROSE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)*
*Counsel of Record*
ANN YACKSHAW (0090623)
BRANDI SESKES (0077648)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.pfeiffer@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov
Brandi.Seskes@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

## INTRODUCTION

"Ohio is a national leader when it comes to early voting opportunities." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016). And yet Ohio must defend countless cases "asking the federal courts to become entangled, as overseers and micromanagers, in the minutiae of state election processes." *Id.* at 622. Ohio has even faced "cases" without plaintiffs, initiated by district courts themselves based on anonymous phone calls. *See In re 2016 Primary Election*, 836 F.3d 584, 585–86 (6th Cir. 2016). This case presents yet another bizarre twist on Ohio election litigation. This time, Plaintiffs ask the Court to redecide an issue litigated four years ago. *Ne. Ohio Coal. for the Homeless v. Husted (NEOCH)*, 837 F.3d 612 (6th Cir. 2016).

In *NEOCH*, the Sixth Circuit upheld the constitutionality of Senate Bill 205, which "reduced the number of post-election days for absentee voters to cure identification-envelope errors . . ., from ten to seven." *Id.* at 618. An identification-envelope signature that did not correspond to the voter's registration signature was one such error. Ohio Rev. Code § 3509.07. Plaintiffs contended that the shortened cure period imposed an undue burden on their right to vote under the *Anderson-Burdick* standard, *id.* at 635, violated their equal-protection rights, *see id.* at 635-36, and also violated their procedural-due-process rights because cure forms "may arrive after the end of the cure period," *see Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 U.S. Dist. LEXIS 74121, at *138 (S.D. Ohio June 7, 2016). The Sixth Circuit found that the shortened cure period survived all three challenges.

Now, four years later, error correction for absentee ballots has become one of the hottest issues for the upcoming presidential election. So, Plaintiffs sued. Plaintiffs claim that the deadline to correct signature mismatches on identification envelopes imposes an undue burden on their right to vote under the *Anderson-Burdick* standard, violates their equal-protection rights, and violates their procedural-due-process rights because cure forms may arrive after the end of the cure period.

1

Sound familiar? It should. *NEOCH* makes half of this case easy: the Sixth Circuit has already upheld the notice-and-cure period for correcting absentee-ballot errors, including mismatched signatures, against the challenges Plaintiffs assert here. Plaintiffs never mention *NEOCH*, make no attempt to distinguish it, and fail to show why they are substantially likely to succeed on the merits of the claims already decided in that case.

The other half of this case is just as easy. Plaintiffs challenge the practice of matching signatures on absentee-ballot *applications*, claiming Ohio law does not permit matching at the application stage. But their argument ignores the plain language of the law, which requires boards to verify that every absentee-ballot application includes "the elector's signature." Ohio Rev. Code § 3509.03(B)(2). Plaintiffs do not explain how a board of elections can determine whether the signature on an absentee-ballot application is "the elector's signature" without matching it to the voter's information on file. Nor do they establish any likelihood of success on their claims that signature matching on absentee-ballot applications is unconstitutional.

If the Sixth Circuit's binding precedent is not enough to deny Plaintiffs' motion then consider this: Ohio election officials reject a *miniscule* amount of absentee ballots for signature mismatch. Just months ago, in the 2020 primary election, Ohio election officials rejected only 217 out of 1,565,792 absentee ballots cast by mail for signature mismatch. In the 2018 general election, just 234 out of 949,104 by-mail absentee ballots, and in the 2016 general election, only 335 out of 1,206,416 by-mail absentee ballots were rejected for signature mismatch. The *NEOCH* Court was correct when in 2016 it deemed the challenged provisions a *trivial* burden on voting. 837 F.3d at 635. The statistics prove that nothing has changed. Ohio's legitimate interests in identifying voters, preventing fraud, and administering its elections still easily outweigh the trivial burden on

2

voting.  Plaintiffs are not likely to succeed on the merits of their claims, and their motion for preliminary injunction should be denied.

I.    **FACTS**

   All registered voters in Ohio may vote by absentee ballot, for any reason or for no reason at all.  Ohio Rev. Code § 3509.02.  They may vote by absentee ballot either by mail or in person for almost a month prior to the election.  Ohio Rev. Code §§ 3509.01(B), 3509.051.  Regardless of the method chosen, for the last one hundred years, Ohio law has required a voter who casts an absentee ballot to provide a signature to verify that voter's identity.  *See* Ex. A, Ohio Gen. Code § 4785-138, Senate Bill 2 (88th GA) (p. 67 of 108).

   A.    **Applying for an Absentee Ballot**.

   To receive an absentee ballot by mail, a voter must apply in writing.  Ohio Rev. Code § 3509.03(A).  The application window is long.  For the upcoming 2020 Presidential General Election, voters could begin requesting absentee ballot applications on January 1, 2020, and can continue to do so until noon on Saturday, October 31, 2020, the third day before the election.  Ohio Rev. Code § 3509.03(D); Ex. B, Declaration of Amanda Grandjean at ¶ 5.

   Absentee ballot applications are widely available.  In fact, Defendant LaRose mailed an application—already prefilled with the voter's name and address—to every registered voter in advance of the 2020 Presidential General Election.  Grandjean Dec. at ¶ 15.  Voters also may request an application through the Secretary of State's website or by calling the Secretary of State.  *Id*. at ¶ 11.  Or they may contact their county board of elections to request one via telephone or email.  *See League of Women Voters v. LaRose*, No. 2:20-cv-1638, 2020 U.S. Dist. LEXIS 91631, at *20-21 (S.D. Ohio Apr. 3, 2020).  Alternatively, a voter may access and print a fillable PDF of the application on the Secretary of State's website.  *See* Form No. 11-A, Absentee Ballot Application, available at https://www.ohiosos.gov/globalassets/elections/forms/11-a_english.pdf

(last accessed September 11, 2020). Applications also are available through a link on the websites of both major political parties and Plaintiff League of Women Voters. *See* "Request Your Vote By Mail Application," https://ohiodems.org/vote/ (last accessed September 11, 2020); "Let's Start Your Vote By Mail Application," https://slate.ohiogop.org/vote-by-mail/ (last accessed September 11, 2020); "Get Ready to Vote," https://www.lwvohio.org/register-to-vote (last accessed on September 11, 2020).

But voters need not use any of these applications. Voters can create their own application by writing the required information on any available piece of paper. *League of Women Voters*, 2020 U.S. Dist. LEXIS 91631, at *20-21. Indeed, an absentee-ballot application need not be "in any particular form." Ohio Rev. Code § 3509.03(B). It simply must include: the voter's name, date of birth, address, identification (*i.e.*, driver's license number, last four digits of the voter's social security number, or a copy of a valid form of identification), election for which the voter is requesting a ballot, and signature with an affirmation declaring that the voter is eligible to vote. Ohio Rev. Code § 3509.03(B)(1)-(9).

After completing an application, a voter can mail the application to the board of elections or return the application at the board of elections' office either in person or by the board's contactless and secure drop box, available twenty-four hours a day and seven days a week. Grandjean Dec. ¶¶ 13-14; Ohio Rev. Code § 3509.03(D).

Once received, the board of elections must review the application to ensure that it contains all the information required by statute, including the voter's signature. Ohio Rev. Code §§ 3501.011(A), 3509.04(A); Grandjean Dec. at ¶ 17. The voter's signature is "the mark of that elector as it appears on the elector's voter registration record." Ohio Rev. Code § 3501.011(C). Accordingly, boards compare the signature on the application to the voter's record in the board of

elections' county voter registration system.  Ex. C, Declaration of David Payne ¶¶ 4-5; Ex. D, Declaration of Brian Cleary ¶ 2.  Both the Cuyahoga and Franklin County Boards of Elections train staff members to presume validity and to review signatures liberally, erring on the side of accepting a signature.  Payne Dec. ¶ 13; Cleary Dec. ¶ 5.  If the information and signature are verified, the board mails an absentee ballot to the voter.  Ohio Rev. Code § 3509.04(B).

If any piece of information is missing, including the voter's signature as it appears on the registration record, the board must "promptly" notify the voter, so the voter may cure the application during the application window.  Ohio Rev. Code § 3509.04(A). To ensure promptness, Defendant LaRose has directed boards of elections to notify a voter by telephone and email "to complete this process as quickly as possible."  Grandjean Dec. at ¶ 20.  However, a voter need not wait for notification to fix a mistake.  A voter can track the status of an application online using the board of elections' tracking system.  *Id*. at ¶ 21.

A voter who requests an absentee ballot is not required to vote by absentee ballot.  If a voter requests an absentee ballot but never receives it or decides to vote in-person, the voter can appear at the appropriate polling location on Election Day and cast a provisional ballot.  Ohio Rev. Code § 3509.09(B).  Additionally, due to COVID-19, any voter who is concerned about entering a polling location on Election Day, or is physically unable to do so, may remain in his/her vehicle and vote curbside at the polling location.  Grandjean Dec. at ¶ 46.

**B.    Voting And Returning An Absentee Ballot.**

In Ohio, voters enjoy almost a month of early absentee voting.  With some exceptions not relevant here, absentee ballots go out to voters beginning October 6, 2020, the day after the close of voter registration.  Ohio Rev. Code § 3509.01(B)(2).

Each absentee ballot packet includes an identification envelope that the voter must complete and sign.  Ohio Rev. Code § 3509.05; Grandjean Dec. at ¶¶ 26, 31.  As with an

application, the voter or a family member may return a voted absentee ballot by mail or at the board of elections' office, either in person or by a contactless and secure drop box, which is available twenty-four hours a day and seven days a week. Ohio Rev. Code § 3509.05(A); Grandjean Dec. at ¶¶ 27, 29.

To be counted, an absentee ballot must be timely received no later than the close of polls on Election Day, *i.e.*, by 7:30 p.m., if delivered in person. Ohio Rev. Code § 3509.05. Voters must postmark ballots returned by mail no later than the day before Election Day, *i.e.*, November 2, 2020, and the board must receive them no later than the 10th day after Election Day. *Id*.

The board of elections reviews all absentee ballots for timeliness and completeness. Ohio Rev. Code § 3509.05-.06; Grandjean Dec. at ¶ 32.[1] As with an application, the information and signature provided on the identification envelope must match the voter's record in the board of elections' county voter registration system. Payne Dec. at ¶¶ 9-10; Grandjean Dec. at ¶ 34. If a piece of information is missing or if the signature does not match, the voter has an opportunity to cure the ballot. *Id*.

In 2014, Ohio codified a procedure for voters to cure deficient absentee ballot identification envelopes. *See NEOCH*, 837 F.3d at 635. Boards send voters a Form 11-S with a pre-addressed return envelope to correct any identification-envelope mistakes. Grandjean Dec. at ¶ 34. A strict notice schedule dictates the timing of the boards' mailings. Early in the absentee period, *i.e.*, between October 6 and October 24, a board must mail a Form 11-S not later than two business days after receiving the deficient identification envelope. Grandjean Dec. at ¶ 39. From October

---

[1] Despite the outdated language of Ohio Rev. Code § 3509.06, boards of elections do not send identification envelopes to a precinct polling location for tabulation or review. Grandjean Dec. at ¶32. Boards of elections review all identification envelopes and tabulate all absentee ballots at the board of elections' office. *Id*.

26 until October 30, the board must issue the Form 11-S not later than one calendar day after the identification envelope is received. *Id.* And late in the process, *i.e.,* from October 31 until November 9, the board must issue a Form 11-S on the same day that a deficient identification envelope is received. *Id.* In addition to mailing the Form 11-S, Defendant LaRose has directed boards of elections call and/or email voters to apprise them of their mistakes. Grandjean Dec. at ¶ 35. However, as with an application for an absentee ballot, a voter need not wait for notification or a Form 11-S. A voter can track the status of an absentee ballot online using the board of elections' tracking system. *Id.* at ¶¶ 22, 24.

A voter may return the Form 11-S in person, by drop box, or by mail. Grandjean Dec. at ¶¶ 37-38. A board of elections must receive a completed Form 11-S by the 7th day after an election, or the 11-S must be post-marked by the 7th day after the election and received by the board of elections by the 10th day after the election. Grandjean Dec. at ¶ 41.

### C. The Number Of Absentee Ballots Rejected For Mismatched Signatures.

Mismatched signatures are rare in Ohio. For the 2016 general election, Ohio 1,206,416 absentee ballots were cast by mail and 335 absentee ballots were rejected for a non-matching signature. *Id.* at ¶ 42. For the 2018 general election, 949,104 absentee ballots were cast by mail and 234 ballots were rejected for a non-matching signature. *Id.* Of the 1,565,792 absentee ballots cast by mail in the 2020 primary, only 217 were rejected for a non-matching signature. *Id.* at ¶ 43. The number of Ohio voters who cast absentee ballots in the 2020 primary dramatically increased due to COVID-19, but the number of absentee ballots rejected for a mismatched signature remained consistent with prior elections.

### D.  Plaintiffs' Claims

Plaintiffs George Mangeni, Carolyn Campbell, the League of Women Voters, and the Ohio A. Philip Randolph Institute brought this lawsuit against Secretary LaRose.  In this motion, Plaintiffs do not ask this Court to deem signature-matching unconstitutional.[2]  Plaintiffs seek only to "ameliorate" signature-matching issues exacerbated by COVID-19 and the United States Postal Service.  Pls. Mot. for PI, Doc. 24 at PageID#133-35.  As set forth below, Plaintiffs' claims are meritless and their motion for preliminary injunction should be denied.

## II.  LAW AND ARGUMENT

### A.  Standard Of Review

To obtain a preliminary injunction, Plaintiffs must show: (1) they have strong likelihood of success on the merits; (2) they would suffer irreparable injury absent the injunction; (3) issuance of an injunction would not cause substantial harm to others; and (4) the public interest would be served by issuance of an injunction.  *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

### B.  All Plaintiffs lack Article III standing to sue.

Plaintiffs seek to enjoin signature matching on all absentee ballot applications and on late received absentee ballots where the time for cure has lapsed.  Pls. Mt. for PI at PageID#129.  They allege that the signature-matching process in Ohio is so error prone that valid applications for absentee ballots will be rejected, resulting in thousands of Ohioans being disenfranchised from the right to vote in the 2020 general election in violation of the First Amendment and the Equal

---

[2] Plaintiffs state that "whether or not Ohio has a legitimate interest in conducting signature matching in general" is "a question that is not the subject of this litigation and not before this Court."  Pls. Mot. for PI at PageID#157.  Accordingly, the declaration of Plaintiffs' expert Linton Mohammed, which challenges the efficacy of signature matching in general, is irrelevant to the very narrow issues before the Court on the motion for preliminary injunction.  It does not relate at all to whether Ohio law permits boards of elections to use signature matching on absentee-ballot applications or to the notice-and-cure period for absentee ballots, the only two issues here.

Protection Clause. *Id.* at PageID#132.  Plaintiffs also claim that any late-received absentee ballots where there is an "inadequate" time to cure signature mismatches must be automatically counted, despite not being verified, in order to comport with procedural due process. *Id.* at PageID#161-162.  Plaintiffs' claims are meritless.  But this Court should deny the Plaintiffs preliminary injunctive relief because they lack standing to bring their claims.

"To establish Article III standing, a party must meet three requirements: (1) he must demonstrate injury in fact—a harm that is both concrete and actual or imminent, not conjectural or hypothetical; (2) he must establish causation—a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant; and (3) he must demonstrate redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Davis v. Detroit Pub. Schs. Cmty. Dist.*, 899 F.3d 437, 443 (6th Cir. 2018) (quotation marks omitted).  "The burden of establishing standing is on the party seeking federal court action." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002).  Additionally, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

### 1. Mangeni and Campbell fail to show an actual or imminent injury.

Foremost among the requirements for standing is "injury in fact." *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018).  An injury must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992)).  "In the typical case, a statute must be enforced against the plaintiff before he may challenge its constitutionality, but pre-enforcement is available in some contexts if threatened enforcement [is] sufficiently imminent – that is, there is a credible threat that the provision will be enforced against the plaintiff." *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016) (quotation marks omitted) (alteration in original).   Anticipated

injuries that are not sufficiently imminent are too speculative for Article III purposes. "'Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly* impending.'" *Id.* at 416 (quoting *Lujan*, 504 U.S. at 565 n.2).

George Mangeni lacks standing because he is not an absentee voter by mail. Mangeni Dep. 16:20-25; 17:1-3, Doc. 40 at PageID#719. Except for the 2020 primary election, when he had no choice but to vote by mail, Mangeni has voted in person in every election since he became a registered voter in 2015. *Id.* Indeed, Mangeni intends to vote in person at his assigned polling location on Election Day 2020. *Id.* at 33:12-22, PageID#723. Mangeni therefore lacks any concrete, imminent injury from signature matching on absentee ballots or applications or the cure period because they simply will not apply to him. Accordingly, Mangeni lacks standing to bring his claims.

Carolyn Campbell also fails to establish a concrete, imminent injury from a possible signature mismatch on her absentee ballot or application. Start with the 2020 primary election. Campbell submitted a signature on her absentee ballot application that did not match her registration signature. Campbell Dep. 11-12, Doc. 40-2 at PageID#688. She cured that signature mismatch when she successfully returned her updated signature to the Cuyahoga County Board of Elections on March 20, 2020. *Id.* at 12-13, PageID#688. The Board mailed Campbell her absentee ballot, but it never received it back from Campbell. Cleary Dec. at ¶ 16. Therefore, Campbell's failure to cast a vote in the 2020 primary election was not due to a signature mismatch, or because of the cure deadlines. It was because the Board never received her absentee ballot. *Id.*

Looking forward to the 2020 general election, Campbell will encounter none of the same issues. She will mail her absentee ballot application to the Cuyahoga County Board of Elections

on September 10, 2020, well ahead of the deadline and in plenty of time for her to receive her absentee ballot.  Campbell Dep. at 43, Doc. 40-2 at PageID#696.  And she will use her updated signature on the application, so she will most certainly have no rejection based on a signature mismatch.  *Id.*  This time around, Campbell's plans for how she will be returning her absentee ballot are vastly different too.  She has a family reunion on October 10 in the Cleveland area and, if she has her absentee ballot by then, she plans to drop off it off at the Cuyahoga County Board of Elections.  *Id*. at 44-45, PageID# 696.  If not, she will "mail it in as soon as [she] fills it out very immediately after receiving it." *Id.* at 45:16-17, PageID#696.  Therefore, Campbell's experience in the 2020 primary election does nothing to establish that rejection of her absentee ballot in the 2020 general election for a signature mismatch with no time to cure is concrete or imminent.  *See Warshak v. United States,* 532 F.3d 521, 533 (6th Cir. 2008) (Plaintiff could not rely on past instances of alleged unconstitutional searches of his email accounts to show that "he will be exposed to future unconstitutional searches" because the probability of future harm "turns on a long list of speculative assumptions.").

What is more, Campbell controls the chain of events.  Indeed, whether Campbell's absentee ballot will be counted in the 2020 general election depends on decisions she has yet to make.  It's possible, yes, that Campbell will wait until late in the absentee period to submit her ballot and will choose to revert back to her previous signature, resulting in a ballot rejection. But Campbell has not one shred of evidence showing that any of those events are likely to occur.  Indeed, Campbell does not know if she will vote by mail this November, but she is sure that she will diligently and timely submit her absentee ballot application and absentee ballot in time for it to be counted.  Campbell Dep. at 44-45, Doc. 40-2 at PageID#696. Any threat of injury depends on "chain of

contingencies," and this does not satisfy Article III.  *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013).   Speculation cannot establish Article III standing.

Campbell lacks standing for one last reason.  She is likely  ineligible to vote in Ohio's 2020 general election because she is a resident of Indiana.  Ohio law provides that "if a person removes from this state and continuously resides outside this state for a period of four years or more, the person shall be considered to have lost the person's residence in this state, notwithstanding the fact that the person may entertain an intention to return at some future period."  Ohio Rev. Code § 3503.02(F).

Campbell, a 37-year-old single person with no children, is registered to vote in Cuyahoga County at what she claims is her "permanent address" with her mother at 1227 Eastwood Ave. in Mayfield Heights.  Campbell Dec. ¶ 2; Campbell Dep. at 7-8, 25, Doc. 40-2 at PageID#687, 691. But several critical pieces of information show that Campbell is no longer a resident of Ohio and is therefore ineligible to vote there this November: (1) she has maintained full-time, permanent employment in Indiana for over *five years* (*Id*. at 30-33, PageID#693); (2) Campbell has maintained permanent living arrangements in Indiana through apartment leases and homes for over *five years* (*Id*. at 33-38, PageID#693-95); (3) she has not stepped foot in Ohio since December 2019 (*Id*. at 32, PageID#693); (4) she is an established volunteer at two animal shelters in Indiana and her doctor and dentist are all in Indiana (*Id*. at 39-40, PageID#695); (5) she maintains a bedroom at her mother's house in Mayfield Heights and she assists her mother with tasks but she does not pay rent or otherwise contribute financially to the household (*Id*. at 25-26, PageID#691-92).  Additionally, Campbell's declaration that she has resided with her mother since 2006 is also patently false because she lived in Stark County from 2014 to 2015 and even registered to vote there.  *Id*. at 23-25, PageID#691.  Campbell also resided in several apartments around the

Cleveland area throughout the years, despite her declaration that she has resided with her mother since 2006. *Id*. at 29-30, PageID#692-93.

At bottom, the Secretary has presented ample evidence to show that Campbell is a resident of Indiana, and Campbell has *no* evidence to show that she actually resides in Ohio. In fact, she even sat for her deposition in this case from her residence in Greenfield, Indiana. *Id*. at 7-8, PageID#687. And Campbell has no plans to return to Ohio – "So I do not have a plan set in pace to leave Indiana or to get another job somewhere, but I do not have a plan to stay in Indiana for the rest of my life." *Id*. at 35:13-16, PageID#694. Accordingly, Campbell lacks standing for this additional reason.

> **2.  The Organizational Plaintiffs fail to show actual or imminent injury that is fairly traceable to the Defendant.**

Like an individual plaintiff, an organization must establish standing by showing that it has suffered "an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable decision from the court." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation." *Lujan*, 504 U.S. at 561.

An organization has standing when: (1) a defendant's actions impede its efforts to carry out its mission, and (2) forces the organization to divert its resources in order to address the defendant's action. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). LWV and APRI attempt a resource-diversion theory to establish injury. They claim that the challenged provisions have caused them to divert resources away from "other voter registration and education activities." Am. Compl., Doc. 25, PageID # 499-50, ¶¶ 19, 23. In other words, because Ohio's absentee-

voting signature matching and cure processes are so onerous, they have to conduct extra voter-education services to educate voters about the processes. *Id.* at ¶¶ 20, 23.

In this case, the resource-diversion theory fails for several critical reasons. First, LWV and APRI challenge absentee voting provisions that have been in place since 2014, and in the case of signature matching generally, for nearly a hundred years. *See NEOCH*, 837 F.3d at 635. As a matter of law, there is nothing new here. But the COVID-19 global pandemic struck earlier this year and limited voting in the 2020 primary election to mail-in absentee ballots only. And the Plaintiffs credit COVID-19 with an anticipated rise in mail-in absentee voting for the 2020 general election. Am. Compl. ¶ 1. So, LWV and APRI have increased their focus on absentee voting processes in voter education and outreach because of the COVID-19 epidemic. In fact, according to LWV, "very, very few folks were really voting absentee until recently." Miller Dep. 18: 1-2, Doc. 40-4 at PageID# 750. To be sure, LWV believed the provisions that it now challenges have been "problems" in years past. *Id.* at 27-28, PageID#752. Until COVID-19, however, LWV had been focused on other absentee voting issues such as online applications. *Id.* at 31-32, PageID# 753.

In these pandemic times, LWV refocused its efforts on absentee voting. These efforts do not deal exclusively with the signature matching and cure provisions. Instead, those issues just became part and parcel of LWV's regular voter-education efforts on absentee voting. Examples include: (1) an increase in educational flyers surrounding absentee voting in the COVID era, which among other things, also included signature matching and cure processes (*Id.* at 45, 53, PageID# 756, 758); (2) town halls where a wide variety of subjects were discussed including signature matching and cure processes (*Id.* at 46, PageID#757); (3) increase in volunteer training on the "challenges of the absentee system" (*Id.* at 49, PageID#757); and (4) updating the website with a

"Voting With COVID" page (*Id.*). At bottom, LWV failed to offer any evidence that it diverted resources to deal with the challenged provisions exclusively.

The same is true for APRI. APRI educates voters about absentee voting in general through voter registration drives and phone banks, but it is not educating its members on signature matching and the cure processes at this time. Washington Dep. at 39-43, 47-48, Doc. 40-1 at PageID# 623-24, 625. APRI may use its phone banks closer to Election Day to educate voters about signature matching. *Id.* at 48-49, 53, PageID#625-26. APRI is drafting a "working document" on the challenged provisions but is not sure "how all this is going to play out [yet]." *Id.* at 46; 4-5, PageID#625. But general education on voting by mail has always been a service APRI provides to its members and the public. *Id.* at 57-58, PageID#627-28. At present, however, APRI is still "putting their plan together" to "try to figure out how to incorporate this whole thing of signature into our overall plan." *Id.* at 60, PageID#628. Like LWV, APRI has failed to offer any evidence that it diverted resources to deal exclusively with the challenged provisions.

The Sixth Circuit's decision in *Fair Elections Ohio* is controlling. Like here, the *Fair Elections Ohio* plaintiffs claimed to have diverted resources to address an already existing voting law. 770 F.3d at 459. The organizational plaintiff sued and moved to enjoin existing laws that provided different absentee ballot deadlines for jailed voters and hospitalized voters. To establish standing, the plaintiff claimed that it was compelled to divert resources to address the issue of late-jailed electors. *Id.* at 460. But the Sixth Circuit found that the organizational plaintiff could not establish standing, "merely by virtue of its efforts and expense to advise others how to comport with the law." *Id*. The Court explained, "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already." *Id.* at 459-460.

15

Now compare *Fair Elections Ohio* with *NEOCH*, where the organizational plaintiffs challenged *newly enacted* provisions involving voter identification. The *NEOCH* Court explained:

> "[T]hat distinction is not just academic. Whereas the *Fair Elections* plaintiff merely exhausted "efforts and expense [in] advis[ing] others how to comport with" *existing* law, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of SB 205 and SB 216. In the past, NEOCH focused on educating and assisting the homeless with mail-in voting. Given the changes ushered in by SB 205 and SB 216, NEOCH determined that its resources are better spent assisting the homeless in participating in early in-person voting. To that end, it plans to redirect its focus for the 2016 general election by encouraging early in-person voting and driving homeless voters to the polls. It reports that this will require more volunteers, time, and expenditures. That is not simply the "effort and expense" associated with advising voters how to "comport" with the law, but an overhaul of the get-out-the-vote strategy of an organization that uses its limited resources helping homeless voters cast ballots. Their injury is imminent, as well as concrete and particularized.

837 F.3d at 624 (internal citations omitted).

Here, LWV and APRI fall within the *Fair Elections Ohio* paradigm for several reasons. First, they only challenge existing laws. Second, the supposed "diversion" of resources is just advising voters on how to comport with the existing laws on absentee voting. Finally, and most importantly, the supposed "diversion" isn't much of a diversion at all. LWV and APRI have always used their resources to educate voters on absentee voting laws. With the onset of COVID-19, LWV and APRI now answer questions and educate voters on signature matching and the cure provision as part of their absentee-voter education efforts. Ultimately, they have failed to show injury—that resources have been *diverted* to account for a new law.

Put another way, even if LWV and APRI can establish an injury, they cannot show that it is fairly traceable to the Secretary. If there is a culprit here, it is the COVID-19 global pandemic. As discussed above, LWV and APRI revised their focus on voter education and voter services to deal with the increase in mail-in absentee voting in the 2020 primary election due to the pandemic. The law on signature matching and curing hasn't changed. And LWV and APRI did not prioritize

resources on the challenged provisions until the COVID-19 pandemic made it imperative. Because of this, LWV and APRI simply prioritized education on Ohio's entire absentee-ballot process and swept the signature matching and cure provisions in with it. Time and again, the Sixth Circuit and other courts around the nation have made clear that pandemic-created injuries do not automatically translate into unconstitutional state-created injuries. *Thompson v. DeWine,* 959 F.3d 804 (6th Cir. 2020).[3]

It logically flows from the teachings in *Thompson* and similar cases nationwide that LWV's and APRI's decision to prioritize resources on Ohio's absentee-ballot process because of the COVID-19 pandemic is not fairly traceable to state action by the Secretary.

### 3. The Organizational Plaintiffs lack associational standing.

LWV and APRI lack standing to sue on behalf of their membership. "In addition to establishing standing because of a direct injury to the association, an association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tenn. Republican Party v. SEC,* 863 F.3d 507, 520 (6th Cir. 2017). "To establish

---

[3] *See, e.g.*, *Duncan v. LaRose*, No. 2:20-cv-2295, 2020 U.S. Dist. LEXIS 152715, at *6 (S.D. Ohio Aug. 24, 2020); *Bond v. Dunlap*, No. 1:20-cv-00216, 2020 U.S. Dist. LEXIS 131389, at *34-37 (D. Me. July 24, 2020); *Kishore v. Newsom*, No. 20-5859, 2020 U.S. Dist. LEXIS 141645, at *18-20 (C.D. Cal. July 20, 2020); *Fagin v. Hughs*, No. 20-CV-00765, 2020 U.S. Dist. LEXIS 126129, at *14 (W.D. Tex. July 17, 2020); *Libertarian Party of Pa. v. Wolf*, No. 20-2299, 2020 U.S. Dist. LEXIS 124200, at *46 (E.D. Pa. July 14, 2020), *aff'd Libertarian Party*, 2020 U.S. App. LEXIS 23769 (3d Cir. July 28, 2020); *Kishore v. Whitmer*, No. 20-11605, 2020 U.S. Dist. LEXIS 120737, at *36 (E.D. Mich. July 8, 2020), *aff'd by Kishore*, 2020 U.S. App. LEXIS 26827 (6th Cir. Aug. 24, 2020); *Libertarian Party of Conn. v. Merrill*, No. 3:20-CV-0467, 2020 U.S. Dist. LEXIS 113922, at *45 (D. Conn. June 27, 2020); *Hawkins v. DeWine*, No. 2:20-cv-2781, 2020 U.S. Dist. LEXIS 111037, at *22 (S.D. Ohio June 24, 2020), *aff'd by Hawkins*, 2020 U.S. App. LEXIS 24371 (6th Cir. Aug. 3, 2020); *Common Sense Party v. Padilla*, No. 2:20-cv-01091, 2020 U.S. Dist. LEXIS 112669, at *20 (E.D. Cal. June 26, 2020); *Whitfield v. Thurston*, No. 4:20-cv-00466, 2020 U.S. Dist. LEXIS 110373, at *72 (E.D. Ark. June 24, 2020); *Sinner v. Jaeger*, No. 3:20-cv-76, 2020 U.S. Dist. LEXIS 105014, at *22 (D.N.D. June 15, 2020).

organizational standing, plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm.  Such specificity requires that the plaintiff-organization name the individuals who were harmed unless *all* the members of the organization are affected by the challenged activity." *Id.*  (citation and quotation marks omitted).

LWV and APRI fail to identify even one member that will suffer a concrete, imminent harm.  Miller Dep. at 34, 66-67, Doc. 40-4 at PageID#754, 762; Washington Dep. at 22, Doc. 40-1 at PageID#619.  Instead, they claim that their members generally will be affected by the challenged absentee voting provisions. LWV claims, without evidence, that their members are affected by "Ohio's inconsistent procedures for signature matching and its insufficient notice and cure provisions for signature mismatches." Am. Compl., Doc. 25, PageID#499-500, ¶ 20; Miller Decl., Doc. 24-2, PageID 341, ¶ 12.  But LWV offers no members who have had their absentee ballots rejected because of a signature mismatch.  Miller Dep. at 34.  And LWV doesn't keep records of signature matching rejections or how their members vote.  *Id.* at 32, 35, PageID#754. It's purely speculative that LWV's members will vote absentee by mail and that their absentee ballots will be rejected in the three days between the deadline to cure and the deadline for receiving absentee ballots.  Accordingly, LWV lacks standing to bring this action on behalf of its members.

APRI also lacks associational standing.  APRI merely claims that "voters, including Ohio APRI's members, face disenfranchisement due to the State's failure to provide sufficient notice of signature mismatches or opportunities to cure rejected absentee applications and ballots." Am. Compl. ¶ 23; Washington Dec. ¶ 12 at PageID#349.  APRI also offers no evidence that their members will be harmed by the challenged absentee voting provisions.  In fact, APRI admitted that it is not aware of a single member that has had an absentee ballot rejected because of a mismatched signature. Washington Dep. at 22, Doc. 40-1 at PageID#619.  No APRI member has

even complained about the cure period. *Id.* And some, but not all, APRI members will vote by mailed absentee ballot. *Id.* at 23, PageID#619. APRI members vote by "[T]he method of their choice. Some members vote early. Some vote by mail. Some vote on election day." *Id.* As to how they will return their absentee ballots, APRI members are "all over the place. People are planning on putting them in the drop box, some are planning on mailing it in." *Id.* at 26, PageID#620. No APRI member plans to return his or her ballot late in the absentee voting period. *Id.* at 27-28, PageID#620. Thus, like LWV, APRI lacks standing to bring claims on behalf of its members.

### 4. The requested relief will not remedy the Plaintiffs' alleged injuries.

Last, the Plaintiffs cannot show a substantial likelihood that the requested relief will remedy their alleged injuries. *See Davis,* 899 F.3d at 443. As to Mangeni and Campbell, the laws that they seek to enjoin will not apply to them. Mangeni will vote in-person on Election Day, and Campbell has cured her signature defect. If she does vote by mail, she will return her ballot well ahead of the deadline to cure. Therefore, neither Mangeni nor Campbell will be negatively impacted by signature matching or cure deadline such that an injunction would remedy their alleged injuries. Finally, the requested relief will not remedy LWV's and APRI's alleged injury either. Indeed, the requested injunction will make the organizations divert more resources for education and outreach, especially now that the election is fast approaching. For these reasons, the plaintiffs cannot establish redressability.

### C. Plaintiffs' Claims Are Not Likely To Succeed On The Merits.

#### 1. Plaintiffs' *Anderson-Burdick* claim is not likely to succeed because there is only a "trivial" burden on voting.

Plaintiffs' claim that the challenged statues unconstitutionally burden their right to vote will not succeed on the merits. When considering challenges to state election laws under the First

and Fourteenth Amendments, the Court must first weigh the "character and magnitude" of the asserted injury to the rights protected by those amendments, *i.e.*, the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The level of scrutiny applied to the challenged law depends on the magnitude of its burden on voting.

Courts should evaluate the voting burden from the perspective of the affected electors, taking into account the voting opportunities the state provides. *Mays v. LaRose*, 951 F.3d 775, 784-85 (6th Cir. 2020). This cuts both ways. On one hand, the *Anderson-Burdick* test does not measure the burden a challenged law imposes on the "electorate as a whole," but instead considers the burden on the voters affected by that law. *Id.* at 785. But the test also takes into account "the landscape of all opportunities that Ohio provides to vote" to the affected electors. *Id.* Alternative voting opportunities, whether or not they still remain available, must be considered. *Id.*

Once a court has established a regulation's burden on voting, it must select the appropriate level of scrutiny. Reasonable and non-discriminatory restrictions on voting receive rational-basis review, and the State's "important regulatory interests are generally sufficient to justify the restrictions." *Id.* at 784 (quotation marks omitted). But a severe burden on voting, "such as exclusion or virtual exclusion from the ballot," receives strict-scrutiny review, and the regulation must advance a compelling State interest. *Id.* In the cases that fall between, the court must weigh the burden on voting against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quotation marks omitted). The State's interest in "orderly election administration," when supported by evidence, justifies even a "moderate" burden on voting. *Id.* at 792.

### a. The burden on voting is minimal.

***Signature matching on absentee-ballot applications.*** Plaintiffs claim that the "signature-match regime constitutes absolute disenfranchisement for those voters whose absentee ballot *applications* are erroneously rejected for signature mismatch and who are either not notified in sufficient time to cure or not notified at all." Pls. Mot. for PI at PageID#154.

As an initial matter, Plaintiffs offer no evidence of the number voters who suffer "absolute disenfranchisement" because they do not receive a rejection notice or do not receive it in time to cure. Plaintiffs' expert believes the number to be in the tens of thousands. *Id*. at PageID#149. But he admits that he could not track how many voters whose ballot applications were rejected cured the application or chose to vote in person. Street Dep. at 71:12-72:10, Doc. 40-5 at PageID#801. Moreover, the expert never even attempted to calculate how many voters *tried* to cure but were not timely or failed to cure for some other reason. *Id*. at 104:18-22, PageID#809. Plaintiffs have produced no evidence that any voter, much less tens of thousands of them, was absolutely disenfranchised because the voter's application was rejected.

Next, Plaintiffs fail to take into account the alternative voting opportunities available to affected voters. *Mays*, 951 F.3d at 785. When these opportunities are factored in, it becomes clear that signature matching does not rise to the level of even a moderate burden on voting.

It is now September 12, 2020, and the full panoply of voting alternatives, including mailed absentee voting, early in-person voting, and election-day voting, remain available to Ohio voters. Secretary LaRose explained the absentee-ballot application process and lengthy application window above. *See supra* Section I(A). But even if the application period lapses before a voter submits a compliant absentee-ballot application, contrary to Plaintiffs' representation, the result is not disenfranchisement. Voters have 24 days of early in-person voting, including two days after

the application deadline. Thus, if a voter fails to submit a compliant absentee-ballot application,[4] that voter can vote in person between 1:00 and 5:00 p.m. on Sunday, November 1 or between 8:00 a.m. and 2:00 p.m. on Monday, November 2. *See* Election Official Manual, Directive 2019-28 at 5-9. And of course, that voter can choose to vote on Election Day between 6:30 a.m. and 7:30 p.m. Ohio Rev. Code § 3501.32.[5] And the voter need not risk his health to do so in the midst of the COVID-19 pandemic; the voter can cast a ballot curbside. Grandjean Dec. at ¶ 46.

Plaintiffs insist that these alternative voting opportunities are not enough. Because no state laws or regulations *require* counties to inform voters whose applications were rejected for a signature mismatch, Plaintiffs claim that many voters—up to tens of thousands—will be disenfranchised by signature matching on ballot applications. Pls. Mot. for PI at PageID#149. This claim lacks a legal and factual basis. Legally, the boards must notify voters "promptly" when the voters' applications do not contain all of the required information, Ohio Rev. Code § 3509.04(A), including "[t]he elector's signature," Ohio Rev. Code § 3509.03(B)(2). The elector's signature, in turn, is the "mark of that elector *as it appears on the elector's voter registration record*." Ohio Rev. Code § 3501.011(C) (emphasis added). So, there is no way to evaluate whether a signature on an application is *the elector's* signature under these statutes without comparing it to the signature in the county's voter registration system. It's no different than checking the birthdate and voter-identification information on the application against the information in the voter registration system to confirm accuracy. The boards have no other way to confirm that a voter's signature, birthdate, and identification are the voter's.

---

[4] A voter can track the status of the ballot, so the voter will *know* by the application deadline whether the voter's application has been accepted or rejected. *See supra* Part I(A). Voters in the latter category will know, therefore, that they must cast ballots in person.
[5] Ohio offers 229 total hours of in-person voting opportunities.

Factually, Plaintiffs have produced precisely zero evidence that boards do not notify voters when ballot applications are rejected for a mismatched signature. Indeed, the evidence shows just the opposite. In Butler County, for example, a team reviews ballot applications coded by first-level reviewers as mismatches, and after confirming the mismatch, the team mails a rejection letter. Doc. 24-1 at PageID#215. Knox County also sends a rejection letter. *Id*. at PageID#251. Wyandot County, Carroll County, and Richland County notify applicants with signature mismatches by phone and/or letter. *Id*. at PageID#224, 245, 253. Hardin County and Delaware County stated that they notify voters of mismatches in accordance with the Ohio Election Official Manual, which requires boards to "notify the voter of the missing information and ask the voter to resubmit a complete application." Directive 2019-28 at 5-22; Doc. 24-1 at PageID#231, 238. Moreover, Secretary LaRose recently standardized the notice process, instructing all county boards to use telephone and email to notify voters of errors in their absentee-ballot applications. Grandjean Dec. at ¶ 20.

And again, it cannot be emphasized enough that the failure to submit a valid absentee-ballot application does not disenfranchise any voter—the voter will simply have to vote in person. Considering *all* voting opportunities available, matching signatures on absentee-ballot applications results in no burden at all on voting.

***Cure period.*** Next, Plaintiffs argue that the signature-comparison requirement and corresponding deadline to cure signature mismatches, Ohio Rev. Code § 3509.06, together impose a severe burden on voting, specifically, on those voters who wait until the very last minute to submit their absentee ballots. Plaintiffs contend that "Ohio's signature-match scheme completely disenfranchises voters whose absentee ballots are erroneously rejected because of signature mismatches but who are not provided sufficient notice or time to cure their ballots before the deadline." Pls. Mot. for PI at PageID#152.

Binding Sixth Circuit authority rejects that contention.  In *NEOCH*, the Sixth Circuit considered the precise question posed here: does the deadline for correcting errors on absentee-ballot identification envelopes unconstitutionally burden the right to vote?  837 F.3d at 635.  The answer was an easy "no."  First, the Sixth Circuit deemed the burden on voting "trivial."  *Id*.  The court noted that "the single election-board official whose trial testimony the district court cited in support of its conclusion [that the reduced cure period burdened the right to vote] stated that in Hamilton County, Ohio's third most populous, 'very few voters' cured their ballots during that three-day window."  *Id*. at 628; *see also* Ex. E, *NEOCH v. Husted*, Trial Tr. Vol. II at PageID#28690 ("[Q]: [H]ow many voters would come in on days 8, 9 and 10 to fix a problem on either their provisional form or their absentee? A. Certainly a very few voters would come in during that period of time.  I don't have a specific number for you.").  Accordingly, the court concluded that "reducing from ten to seven the number of days for correcting absentee-ballot errors . . . imposes a trivial burden on Ohio voters."  *Id.* at 635.  Plaintiffs never mention *NEOCH*,[6] much less attempt to argue that its evaluation of the cure period's burden on voting does not apply.

Current difficulties—the ongoing COVID-19 pandemic and reported slowdowns in mail delivery times—do not displace *NEOCH* as binding authority.  Admittedly, "these are not normal times."  *Thompson*, 959 F.3d at 809.  "[A] disease beyond the control of the State" might make in-person voting less attractive or could prompt many Ohioans to vote by mailed absentee ballot, perhaps for the first time.  *Id*. at 810.  But these difficulties do not "mean that Plaintiffs are *excluded*

---

[6] Plaintiffs urge the reasoning of the Eleventh Circuit, which found that "Florida's scheme impose[d] at least a serious burden on the right to vote" when "voters whose signatures were deemed a mismatch might not learn that their vote would not be counted until it was too late to do anything about it."  Pls. Mot. for PI at PageID#153 (quoting *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320-21 (11th Cir. 2019)).  But Plaintiffs fail to state why this Court should—or is permitted to—follow the logic of the Eleventh Circuit when the Sixth Circuit has already decided the issue.

from the ballot" or prevented from voting. *Id*. Indeed, in *Thompson*, the Sixth Circuit rejected the contention that the pandemic transforms minimal or moderate voting burdens into severe ones. *Id*. at 811 ("Requiring Plaintiffs to secure hundreds of thousands of signatures in support of their initiative is a burden. That said, Ohio requires the same from Plaintiffs now as it does during non-pandemic times. So the burden here is not severe."). Four years ago, *NEOCH* found that the challenged notice-and-cure period imposes a trivial burden in non-pandemic times, and that conclusion still holds true here.

*NEOCH* already blessed the cure period, and the Court should simply apply its characterization of the cure period's burden on voting as "trivial." And in fact, improved notification requirements render the current cure period even less burdensome than the cure period in *NEOCH.* There, the Sixth Circuit deemed the burden on voting "trivial" even though the boards *never* used telephone or email to inform voters of identification-envelope errors. *See, e.g.*, Ex. F, *NEOCH v. Husted*, Trial Tr. Vol. VI at PageID#29665 (Butler County BOE Deputy Director noting that board was not permitted to contact voters via telephone to correct identification envelopes); Ex. G, *NEOCH v. Husted*, Trial Tr. Vol. IV at PageID#29266 (Miami County BOE Deputy Director noting that board did not contact voters via telephone or email). Now, in addition to email and telephone notifications, voters can sign up for ballot-tracking services that will indicate whether the voter's absentee ballot has been rejected or track the absentee ballot online. Indeed, according to one of the Plaintiffs here, the only notification mechanism missing is the "Pony Express." Washington Dep. 15:21-25; 16:1-3, Doc. 40-1 at PageID#617.

But even pretending *NEOCH* does not exist—as Plaintiffs do—Plaintiffs fail to show that the cure period imposes any appreciable burden on voting. First, Plaintiffs have presented *no* evidence of the number absentee ballots received between seven and ten days after the election

that were not counted because of a mismatched signature. Plaintiffs identify the number of ballots received *after* the absentee-ballot deadline, *see* Pls. Mot. for PI at PageID#144, and the number of ballots ultimately rejected for a signature mismatch, *see id*. at PageID#148. But Plaintiffs have not identified even a single voter whose ballot was received between seven and ten days after the election and was rejected for a mismatched signature.

Should the Court assume that this category of voters exists, it must take into account *all* the alternative opportunities the affected voters enjoy. *Mays*, 951 F.3d at 785. This means that the Court must consider the month-long mail-in absentee period, the notice-and-cure period, the 24 days of in-person early voting, and the thirteen hours of election-day voting as viable voting opportunities.[7]

Plaintiffs do not explain why the cure period burdens the right to vote in spite of these voting opportunities. They simply claim that the cure period is burdensome because it is not coextensive with the absentee-ballot receipt deadline. Not only is Plaintiffs' position foreclosed by *NEOCH*, it finds no support in more recent precedent, which holds that a three-day window in which some voters may find themselves unable to vote is, at most, a "moderate" burden. In *Mays*, the plaintiffs were registered voters arrested in the window after the application deadline and held in detention through election day. 951 F.3d at 780. As in *NEOCH*, the Sixth Circuit did not find a serious or severe burden, and it rejected the argument—similar to Plaintiffs' here—that a missed

---

[7] Provisional voting is yet another option. Voters who requested absentee ballots, but whose absentee ballots have not yet been received by the boards, fall within the category of voters who may cast a provisional ballot on election day. Ohio Rev. Code § 3509.09(B)(1). The board will count the provisional ballot if it determines that the signature on the absentee ballot's identification envelope does not match the signature on the voter's registration form and the voter cast a provisional ballot on the day of the election. Ohio Rev. Code § 3509.09(C)(2). Thus, any voter worried that his ballot might arrive at the board of elections after the cure period ends can simply vote a provisional ballot on election day.

deadline constitutes absolute disenfranchisement once the deadline has passed. *Id*. at 785-86. Plaintiffs could have simply taken "advantage of the opportunities Ohio provides to vote early." *Id.* at 787.

This logic applies equally to Plaintiffs' contention that mail slowdowns, in conjunction with the cure period, impose an undue burden on their right to vote. Pls. Mot. for PI at PageID#153-54. Plaintiffs can avoid uncertainty in mail-delivery times by acting early, using drop-boxes, and tracking their ballots online. And of course, anyone can avoid the uncertainty inherent in absentee voting by voting early in person or on election day, including curbside voting. In light of all these alternative voting opportunities, the cure period's burden is not even the "moderate" burden described in *Mays*.

### b. The State's interests in preventing fraud and ensuring an orderly election justify the challenged laws.

*Verifying identities and preventing fraud.* As Plaintiffs recognize, the State "has an interest in verifying voters' identi[t]y in order to combat voter fraud." Pls. Mot. for PI at PageID#156. Indeed, this Court relied on identity confirmation as a valid state interest earlier this year: "As Secretary LaRose explained, he is required by law to properly verify a voter's identity and a voter's signature . . . . Thus, allowing a person to request an absentee ballot over the phone or online without an accompanying signature undermines that important voter verification safeguard." *League of Women Voters*, 2020 U.S. Dist. LEXIS 91631, at *23 (citation omitted). As LaVera Scott, the Director of the Lucas County Board of Elections, testified in *NEOCH*, a board cannot confirm the identity of an absentee voter until it matches the voter's signature:

> Q. And, then, so long as they sign it, you know who actually filled out the [identification] envelope and returned the ballot, correct?
> A. I wouldn't assume that. But I could say that, if the signatures match, we know that person signed it, yes.

Ex. F, *NEOCH v. Husted*, Trial Tr. Vol. VI at PageID#29832-33.

Further, the matching requirement advances the State's "compelling" interest in combating fraud. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Voting by mail in Ohio is secure, but fraud occurs occasionally, including signature fraud. For example, an Ohio nun pleaded guilty after she cast an absentee ballot for one of her late sisters, and an Ohio widower obtained and submitted an absentee ballot in the name of his deceased wife. Other Ohioans fraudulently submitted absentee ballots on behalf of their children or even on behalf of Ohio voters they were canvassing.[8]

The signature-comparison requirement is just one tool in the board of elections' kit to root out this kind of fraud. A signature-comparison requirement, coupled with the date-of-birth and voter-identification requirements, ensures that each voter attempting to cast an absentee ballot is entitled to do so. And the signature-comparison requirement is a useful backstop when—as in most of the cases cited above—the fraudster knows or has access to the date-of-birth and voter-identification information for the voter, often a family member, whose absentee ballot the fraudster attempts to cast.

Secretary LaRose does not imply here that absentee-voter fraud occurs often or that it calls into question the integrity of Ohio's elections. But Ohio need not wait for fraud to become widespread or threaten the integrity of elections before it acts. "[A] state certainly need not wait for an election issue to arise before enacting provisions to avoid it." *NEOCH*, 837 F.3d at 635.

---

[8] Kimball Perry, *Ohio nun pleads guilty to voter fraud; avoids prison*, The Cincinnati Enquirer (Apr. 16, 2013), available at https://www.usatoday.com/story/news/nation/2013/04/16/nun-voter-fraud/2087893/ (Sister Marguerite Kloos); Kimball Perry, *Ohioan gets 5-year prison term for illegal voting*, The Cincinnati Enquirer (July 17, 2013), *available at* https://www.usatoday.com/story/news/nation/2013/07/17/cincinnati-illegal-voting/2530119/ (Russell Glassop); *State v. LaMaster*, No. 09 CR 001005 (Franklin C.P. 2009) (defendant pleaded guilty to signing her daughter's absentee ballot in addition to her own); *State v. McKinney*, No. 09 CR 006948 (Franklin C.P. 2009) (defendant pleaded guilty to falsely signing applications for absentee ballots while working as a canvasser on a 2009 ballot initiative).

Absentee fraud happens sometimes, and the signature-comparison law helps the boards detect it and prevent it from altering the results of elections or undermining voter confidence in those results. *Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."). Indeed, the very requirement of a signature likely deters voter fraud.

*Orderly election administration.* Plaintiffs entirely overlook the other important State interest at issue here: the orderly administration of elections. As *NEOCH* found, Ohio has an "interest in reducing the administrative strain felt by boards of elections before they begin to canvass election returns." 837 F.3d at 635; *see also Mays*, 951 F.3d at 787-91.

In *NEOCH*, testimony established that the period between election day and the official canvass is "just as busy or sometimes maybe even busier" than the runup to an election. Ex. H, *NEOCH v. Husted*, Trial Tr. Vol. X, Doc. 664 at PageID#30755. Boards must process provisional ballots, including verifying the validity of the provisional voter's affirmation statement. This is an onerous process, lasting through the end of the ten-day period to process provisional ballots before the official canvass begins. *See* Ohio Rev. Code § 3505.183; Payne Dec. ¶¶ 35-38. Processing a provisional ballot may include researching the voter's identity in the county voter registration database or the Statewide Voter Registration Database, calling other boards of elections to check whether the provisional voter cast a ballot there, and verifying identifications for those provisional voters who bring them to the board in the seven days following the election. *Id*. at ¶¶ 40-42. Larger counties in Ohio may need to process tens of thousands of provisional ballots in the brief window between election day and the official canvass. *Id*. at ¶ 36.

While it processes provisional ballots, the boards must simultaneously prepare for the official canvass. Payne Dec. at ¶¶ 31, 35. This involves examining poll books and other records

from the polling locations for any errors, defects, or omissions. The board also must test its tabulating equipment. *Id*. at ¶ 53. At the same time, the board still needs to assign staff to respond to voter inquiries, particularly provisional voters who need to supply identification and absentee voters who need to cure identification-envelope mistakes, and dispatching bipartisan teams to assist voters with curing their ballots. *Id*. at ¶¶ 44, 47, 49, 55-56.

As it attends to these other duties, boards must also review late-arriving absentee ballots and send notice-and-cure forms to voters who submitted deficient ballots. The notice period is extremely tight in the days immediately following the election—the boards must notify absentee voters of any defects *the same day* it receives the absentee ballot. Directive 2019-28 at 5-31; Payne Dec. ¶ 46. Cutting off this notice-and-cure period seven days after the election allows the boards to finish their post-election tasks, conclude the processing of provisional and late-arriving absentee ballots, and prepare for the official canvass.

As the Sixth Circuit found in *NEOCH*, "[b]uilding in a three-day buffer between the cure period and the official canvass is a common-sense solution" to ease the burdens on the boards and to preserve time for the "possibility of unforeseeable post-election issues thrust upon the boards." 837 F.3d at 635. And *Mays* confirms that the State's interest in orderly election administration justifies even a moderate burden on voting. 951 F.3d at 792 ("Ohio's interest in orderly election administration is weighty enough to justify the moderate burden its disparate treatment of confined electors places on Plaintiffs' right to vote . . . .").

### c. The State's interests in preventing fraud and ensuring orderly elections easily outweigh the burden on voting, which Plaintiffs failed to establish as anything more than minimal.

Secretary LaRose and Ohio's boards of elections want every registered Ohioan to vote and know that each properly cast vote will count. These twin goals explain Ohio's provisions on signature matching. Boards need to verify voters and to detect and root out absentee-ballot fraud,

so Ohio requires voters to include certain identification information on their absentee-ballot applications and absentee ballots, including signatures. At the same time, boards also need to facilitate voting for each and every eligible voter. So, signature matching in Ohio does not sweep more broadly than it needs to. A mismatched signature does not, for example, trigger any investigation for voter fraud. Nor does a mismatched signature cause the board to toss out the absentee ballot or application and bar that applicant from voting in the election in which the applicant submitted a mismatched signature. Instead, a mismatched signature triggers a notice-and-cure period allowing voters to correct mismatched signatures. Ohio's signature-comparison regime for absentee ballots and ballot applications survives scrutiny under *Anderson-Burdick*.

And, as mentioned many times above, *NEOCH* already decided that the *length* of the notice-and-cure period survives *Anderson-Burdick* balancing as well. There, the Sixth Circuit determined that the "minimal burden on voting is easily outweighed by Ohio's interest in reducing the administrative strain felt by boards of elections before they begin to canvass election returns." 837 F.3d at 635. Plaintiffs offer no reason to depart from the reasoning of *NEOCH* here.

### 2. Plaintiffs' procedural due process claim is not likely to succeed.

Plaintiffs' contention that Ohio's notice-and-cure procedures are constitutionally deficient lacks merit. As an initial matter, this Court need not conduct a separate due process analysis of Ohio's notice and cure procedures. The *Anderson-Burdick* balancing test was designed to determine whether challenged laws satisfy due process. *See Obama for Am. v. Husted*, 697 F.3d 423, 429-30 (6th Cir. 2012) (noting that *Anderson-Burdick* is the "single standard for evaluating challenges to voting restrictions"); *see also Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) ("[The Plaintiff] does not suggest separate analyses for his First Amendment, Due Process, or Equal Protection claims. The Supreme Court has addressed such claims collectively using a single analytic framework."). And the *Anderson-Burdick* framework accounts for the same factors

analyzed under a due process analysis, *i.e.*, (1) the right at stake; (2) potential burdens to that right; and (3) the public interests and the extent to which election laws are serving those interests. *Compare Burdick*, 504 U.S. at 433-34, *with Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Nevertheless, Ohio's notification-and-cure procedures easily satisfy a separate procedural due process analysis. Indeed, they already have. In *NEOCH*, the Sixth Circuit considered and rejected a due process challenge to the cure period. *See NEOCH*, 837 F.3d at 637 ("[T]he alleged harm was caused by the portions of SB[] 205 and SB 216 that impose a completion requirement for the five fields, not the *lack* of process given when a ballot is rejected.").

Procedural due process requires that a person receive notice and an opportunity to be heard when a property or liberty interest is in question. *Jahn v. Farnswoth*, 617 F. App'x 453, 459 (6th Cir. 2015). In conducting a due process analysis, the Court must look to (1) "the private interest affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government and public interests at stake. *Mathews*, 424 U.S. at 335. The final public-interest factor "includes the administrative burden and other societal costs that would be associated with requiring" additional procedures. *Id*. at 347. Under this factor, the State has a compelling interest in its ability to operate fair and efficient elections. *See Wilson v. Birnberg*, 667 F.3d 591, 601 (5th Cir. 2012).

Plaintiffs allege that the private interest affected here is the right to vote by absentee ballot, which they characterize as "the sole available voting method" in Ohio for the November 2020 Presidential General Election. *See* Pls. Mot. for PI at PageID#160, *citing Self Advocacy Sol. N. Dakota v. Jaeger*, No. 3:20-cv-00071, 2020 U.S. Dist. LEXIS 97085, at *8 (D.N.D. June 3, 2020). This is, of course, untrue for all the reasons set forth in Part II(C)(1)(a) *supra*. Absentee voting by

mail is just one among many ways to vote and is not deserving of "significant weight" under the first *Mathews'* factor.

The second *Mathews'* factor, "the risk of an erroneous deprivation," weighs in favor of Ohio. *See* 424 U.S. at 335. In Section II(C)(1)(a) *supra*, Secretary LaRose explained that Plaintiffs offered no evidence of the number of absentee ballots applications rejected but not cured or the number of ballots rejected for mismatched signatures between the seventh and tenth day after Election Day. Plaintiffs need actual evidence to sustain their due process claim. *See Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 U.S. Dist. LEXIS 138492, at *50-51 (M.D.N.C. Aug. 4, 2020) ("Plaintiffs, however, failed to put forth any evidence as to the prevalence of rejections of absentee ballot request forms. The potential future rejection of an absentee ballot request is therefore entirely speculative and cannot serve as the basis for . . . a procedural due process claim . . . ."). In fact, very few absentee ballots—between 217 and 335 in recent general elections—are rejected for a non-matching signature. And there's no evidence at all that any of these ballots were received in the three-day window after the cure period ended. No evidence exists that Plaintiffs "face a high risk of erroneous deprivation of their liberty interest." Pls. Mot. for PI at PageID#161.

Plaintiffs cite to out-of-state cases to bolster their claim of "erroneous deprivation," but these cases simply highlight the efficacy of Ohio's notice-and-cure procedures compared to those states. Pls. Mot. for PI at PageID#161-62. For example, North Carolina offered no statewide cure procedure for a voter to resolve a signature mismatch. *See Democracy N. Carolina*, 2020 U.S. Dist. LEXIS 138492, at *46-50.[9] Likewise, New Hampshire never notified an absentee voter of a

---

[9] Notably, in addition to requiring the signature of a voter on an absentee ballot, North Carolina also requires the signature of a witness – a requirement that recently survived a constitutional challenge. 2020 U.S. Dist. LEXIS 138492, at *102-03.

mismatched signature. *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218 (D.N.H.  2018).  And in North Dakota, the court-ordered remedy for the state's lack of a notice-and-cure period for absentee ballots largely resembles Ohio's existing procedure. *See Self Advocacy Solutions*, 2020 U.S. Dist. LEXIS 108854, at *2-4 (Election officials were required to notify an absentee voter of mismatched signatures by phone or mail and give the voter until the 6th day following the election to cure the issue.).[10]  Ohio is ahead of the pack with its ample notice-and-cure procedures.

Thus, in light of Ohio's notice-and-cure procedures and the relatively low number of ballots rejected for a mismatched signature, "the probable value . . . of additional or substitute procedural safeguards" is negligible. *See Mathews* at 335; *see also Lemons v. Bradbury*, 538 F.3d 1098, 1104-05 (9th Cir. 2008) (rejecting a proposed additional procedural safeguard that would allow signers of a petition to cure their signatures).  The additional burdens on the boards of elections would be "disproportionate to the benefits" of any additional procedures. *Lemons*, 538 F.3d at 1105.  Inevitably, some voters will overlook the notice of an identification-envelope error, decide not to cure, or miss the deadline.  While unfortunate, this does not render Ohio's procedures unconstitutional.  Any voting restriction "is going to exclude, either de jure or de facto, some people from voting." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

Finally, the third *Mathews'* factor, "the government and public interests at stake," weighs heavily in Ohio's favor.  *See* 424 U.S. at 335.  Ohio has a compelling interest in verifying an absentee voter's identity and thwarting fraud. *See* Section II(C)(1)(b) *supra*.  It also has an interest in easing the burdens faced by boards of elections and establishing a "buffer" between the end of

---

[10] Plaintiffs also cite to *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), and *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019), in another portion of their argument.  Those cases concerned a Georgia law that failed to offer any statewide pre-rejection procedure for voters to cure an absentee ballot.

the cure period and the start of the official canvass of the election. *See id.* Balancing these factors, Ohio's generous notice-and-cure procedures continue to satisfy procedural due process. *See NEOCH*, 837 F.3d at 637.

### 3. Plaintiffs' equal-protection claim is not likely to succeed.

Finally, Plaintiffs are unlikely to succeed on their equal-protection claim. While many, including Secretary LaRose and the Sixth Circuit, have criticized this approach, binding authority holds that "when a 'plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters,' this court's precedent requires [application of] the *Anderson-Burdick* framework." *Mays*, 951 F.3d at 783 & n.4 (quoting *Obama for Am.*, 697 F.3d at 429). And that's what Plaintiffs allege here: the boards' supposed inconsistent treatment of absentee ballots and absentee-ballot applications means "there is greater likelihood in some places that one citizen's vote will not be counted on the same terms as the vote of a citizen in another location." Am. Compl. ¶ 79.

First, Plaintiffs assert that "the means of notice and cure for mismatched signatures on ballot applications also differ from county to county." Pls. Mot. for PI at PageID#164; Am. Compl. ¶¶ 78-79. But there is no differential treatment at all. Plaintiffs cite responses to public records requests from various county boards of elections revealing that the boards notify voters of mismatched signatures in several different ways: mail, email, phone, or a combination of these methods. Pls. Mot. for PI at PageID#164 (citing Patashnik Decl. ¶¶ 18-22, Doc. 24-1 at PageID 177-78). But with one exception, these public records responses predate July 6.[11] On July 6,

---

[11] Butler County, Doc. 24-1 at PageID#208 (June 11), Wyandot County, *id.* at PageID#224 (June 3); Hardin County, *id.* at PageID#227 (June 5); Delaware County, *id.* at PageID#235 (June 26); Brown County, *id.* at PageID# 240 (June 12); Carroll County, *id.* at PageID#244 (June 18); Coshocton County, *id.* at PageID#248 (July 9); Knox County, *id.* at PageID#251 (June 8); Richland County, *id.* at PageID#253 (June 9).

Secretary LaRose explicitly instructed the boards how to notify voters of absentee-ballot and application errors, including signature mismatches.  *See* Directive 2020-11.  This directive standardized the notice process, and Plaintiffs offer no evidence that boards are ignoring or disobeying this directive.  There is no differential treatment with respect to notice procedures.

Next, Plaintiffs point out that counties differ "when it comes to who reviews a signature" and how many rounds of reviews signatures receive before they are deemed a mismatch.  Pls. Mot. for PI at PageID#164.  At worst, according to Plaintiffs, "an Ohio voter might be disenfranchised based on a handwriting analysis performed by a single precinct official, decided according to that official's subjective opinion, and given no further review."  Am. Compl. ¶ 50.  But Plaintiffs offer no evidence that this worst-case scenario occurs in *any* county.  Boards repeatedly emphasized that multiple elections officials review purported mismatches.[12]  No board stated that it rejected a ballot based on a single election official's judgment of a mismatch.  And to the extent that job titles of the signature reviewers vary from county to county, Plaintiffs cannot show these differences have any effect on voting.  That is, no evidence exists that fewer ballots are counted when the full board reviews a mismatch as opposed to the director and deputy director.  Accordingly, Plaintiffs have not demonstrated that any purported differential treatment burdens the right to vote.  *Obama for Am.*, 697 F.3d at 429.

---

[12] Butler County, Doc. 24-1 at PageID#215 ("All ballots the staff deemed as mis-compares the four Board members are given copies of all documentation for the board to make the final determination."); Wyandot County, *id.* at PageID#224 (signature mismatches are reviewed by director, deputy director, and two clerks); Hardin County, *id.* at PageID#231 (all staff reviews a signature flagged as a mismatch to reach a consensus; the board reviews if no decision is made by the staff); Delaware County, *id.* at PageID#238 (all signatures are reviewed by a Republican and a Democrat); Brown County, *id.* at PageID#242 (signatures flagged as mismatches are reviewed by the director and deputy director, and if necessary, by the board); Carroll County, *id.* at PageID#245 (confirming that no ballot or application is rejected "without first consulting with at least one other member of our team").

Finally, Plaintiffs complain that no uniform standards govern the process of signature comparison.  Plaintiffs offer little to no evidence of the process that *any* election official uses to compare signatures, that this process differs from county to county, or more importantly, that any differential treatment burdens the right to vote.  *Obama for Am.*, 697 F.3d at 429.  Plaintiffs offer no evidence, for example, that Butler County rejects absentee ballots or applications with its "three-point" method at a higher rate than others.  Pls. Mot. for PI at PageID#146.  Nor do Plaintiffs point to any evidence that counties that train elections officials on signature matching by pairing them with more experienced officials, *see, e.g.*, Delaware County, Doc. 24-1 at PageID#238, have different acceptance rates than counties that do not.  Plaintiffs have offered only limited statewide numbers on rejection rates that do not establish that the different processes of or training on signature matching have any discernable effect.  Put another way, Plaintiffs have not shown any factual likelihood that a signature that would match in Butler County would ultimately be rejected in Knox County.

This lack of proof distinguishes this case from the equal-protection cases cited by Plaintiffs, all of which included concrete evidence of differential treatment that burdened voting.  For example, in *Hunter v. Hamilton Cnty. Bd. of Elecs.*, 635 F.3d 219 (6th Cir. 2011), the plaintiffs showed that 27 ballots cast at the board of elections were counted, while 849 ballots cast at local polling locations were rejected, even though all the ballots contained the same type of error.  *Id*. at 236-37.  Similarly, a consent decree violated equal protection when it allowed boards to count provisional ballots cast in the wrong precinct if the voter used his social security number, but excluded wrong-precinct provisional ballots if the voter used other forms of identification.  *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012).  And *League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008), involved facts establishing that differential

treatment burdened the plaintiffs' right to vote. For example, voters in the 2004 election in some counties waited up to twelve hours to vote, others two, and some not at all. And the plaintiffs showed that counties rejected provisional ballots at rates ranging from 1.5% to 39.5%. *Id*. at 468-69, 477-78.

At this stage of the litigation, Plaintiffs have produced no similar proof. Plaintiffs cannot obtain a preliminary injunction based on their conjecture that votes in different counties will be counted on different terms as other counties.

### D.    Plaintiffs have not shown irreparable harm.

Plaintiffs can only speculate that signature matching will harm them in the upcoming election, and Plaintiffs' fears about what may happen in the future cannot provide the basis for a preliminary injunction. *See, e.g.*, *Regan v. Vinick & Young*, 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction."); *NACCO Material Users, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007) (same).[13]

### E.    The equities favor Secretary LaRose.

Ohio's interests "will suffer if the Court takes away the Ohio General Assembly's prerogative" to set the State's election procedures. *Libertarian Party of Ohio v. Husted*, No. 2:13-

---

[13] Additionally, Plaintiffs' delay belies their claim of irreparable harm. Election officials have been required to verify a voter's signature on an absentee ballot for almost one hundred years, and Plaintiffs have been aware of it for "a while." Ex. A; Miller Dep. at 20:13-25, Doc. 40-4 at PageID#750. Even after filing their Complaint on July 31, Plaintiffs waited three weeks to move for injunctive relief—all less than 90 days before Election Day. Meanwhile, Secretary LaRose and the county boards have been diligently preparing, with over *one million* absentee ballot applications already processed. "Secretary LaRose Announces over One Million Absentee Ballot Applications Received by County Boards of Elections," https://www.ohiosos.gov/media-center/press-releases/2020/2020-09-09/ (last accessed on September 10, 2020). "The equitable doctrine of laches may prevent injunctive relief where a party has delayed the commencement of an action." *Exel Inc. v. Xpedient Mgmt. Grp., LLC*, No. 2:17-cv-1076, 2018 U.S. Dist. LEXIS 6688, at *32 (S.D. Ohio Jan. 16, 2018).

cv-953, 2014 U.S. Dist. LEXIS 49841, at *34 (S.D. Ohio Mar. 19, 2014). This Court has already said that it "does not intrude upon the Ohio legislature's prerogative lightly," and that this factor weighs in favor of denying the preliminary injunction. *Id*. at *35.

  **F.  The public interest does not favor an injunction.**

  The public interest does not favor the alteration of election processes in the weeks leading up to an election. *Purcell*, 549 U.S. at 4; *see also SEIU Local 1 v. Husted*, 698 F.3d 341, 345-46 (6th Cir. 2012) (noting that the public interest strongly disfavors last-minute changes to election procedures). The Sixth Circuit recently clarified that "rewriting a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves." *Thompson*, 959 F.3d at 813. And this is why federal courts "are not supposed to change state election rules as elections approach." *Id*; *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). Changing procedures now, just before election day, "will have inevitable, other consequences." *Thompson*, 959 F.3d at 813.

  Here, the Plaintiffs seek to do exactly what *Thompson* foretold. On the eve of an election, they ask the Court to move a couple pieces on the game board to prepare for a later, fuller assault on Ohio's remaining signature-matching laws if they find success at the preliminary-injunction stage. *See* Am. Compl. ¶ 83 (asking the Court to declare Ohio's entire signature-matching scheme to be unconstitutional). The Sixth Circuit has found that the public interest does not favor this approach to election litigation.

## III. CONCLUSION

  For these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ Julie M. Pfeiffer
_____
JULIE M. PFEIFFER (0069762)*
*Counsel of Record*
ANN YACKSHAW (0090623)
BRANDI SESKES (0077648)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.pfeiffer@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov
Brandi.Seskes@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

/s/Julie Pfeiffer
_____
JULIE PFEIFFER (0069762)*
Assistant Attorney General