Vol. 2 – 1

```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3    THE NORTHEAST OHIO COALITION )
      FOR THE HOMELESS, et al.,    )
 4                                 )
                       Plaintiffs, )
 5                                 )
                  vs.              )     CASE NO. 2:06-CV-00896
 6                                 )
      JON HUSTED, in his official  )
 7    capacity as Secretary of     )
      State of Ohio, et al.,       )
 8                                 )
                       Defendants. )
 9    _____ )

10
                 TRANSCRIPT OF BENCH TRIAL – VOLUME 2
11         BEFORE THE HONORABLE ALGENON L. MARBLEY, JUDGE
                  THURSDAY, MARCH 17, 2016; 8:30 A.M.
12                        COLUMBUS, OHIO

13
      APPEARANCES OF COUNSEL:
14

15    FOR THE PLAINTIFFS:            SUBODH CHANDRA, ESQ.
                                     CAROLINE GENTRY, ESQ.
16                                   DONALD J. McTIGUE, ESQ.
                                     SANDHYA GUPTA, ESQ.
17                                   ANA CRAWFORD, ESQ.

18    FOR THE DEFENDANTS:            RYAN L. RICHARDSON, AAG
                                     SARAH E. PIERCE, AAG
19                                   TIFFANY L. CARWILE, AAG
                                     BRODI J. CONOVER, AAG
20                                   ZACHERY P. KELLER, AAG

21    COURT REPORTERS:               DENISE N. ERRETT
                                     DARLA J. COULTER
22                                   (614) 719-3029

23
      Transcript recorded by mechanical stenography, transcript
24    produced by computer.

25
```

<pre>
                                                        Vol. 2 -   2
 1                              I-N-D-E-X

 2                              VOLUME 2

 3

 4      PLAINTIFFS' WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

 5      EBEN McNAIR                   4      28        62        --
        ANTHONY PERLATTI            141      65        --       164
 6      TIMOTHY M. P. BURKE         197     168        --       214
        ZACHARY WEST                221     236       255        --
 7

 8                               - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

 1          (In Columbus, Franklin County, Ohio, Thursday, March 17,

 2     2016, 8:30 a.m., in open court.)

 3          THE COURT:  Good morning, everyone.  And happy

 4     St. Patrick's Day to one and all!

 5          Mr. McTigue, it's appropriate that you should start us

 6     off today.

 7          MR. McTIGUE:  Yes, although I didn't wear my green

 8     tie.

 9          THE COURT:  I was wondering.  Mr. Chandra, Mr. Conover

10     and I wore green ties.

11          MR. McTIGUE:  I'm in mourning.  I have to be here.

12          THE COURT:  Okay.

13          And I take it, Ms. Richardson and Mr. McTigue, that you

14     were able to meet and work through some of the exhibit issues.

15          And, Ms. Gentry, I take it that you and Ms. Carwile have

16     worked out something; is that right?

17          MS. GENTRY:  Actually, Your Honor, that examination is

18     being handled by Ms. Gupta.

19          THE COURT:  Okay.

20          MS. RICHARDSON:  And Mr. Keller, as well.

21          THE COURT:  Ms. Gupta and Mr. Keller are going to work

22     on those?

23          MS. RICHARDSON:  Yes.

24          MS. GUPTA:  We're working on it.

25          THE COURT:  All right.  Do you want to call your first

Vol. 2 –    4

1    witness, then, Mr. McTigue?

2         MR. McTIGUE:  I call Eben McNair.

3         THE COURT:  Mr. McNair, please come forward and be

4    sworn.

5         (Witness sworn.)

6         COURTROOM DEPUTY CLERK:  Please be seated, sir.

7         Are you going to need water this morning?

8         THE WITNESS:  I would appreciate it.

9                            – – –

10                        EBEN MCNAIR,

11      AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

12                     DIRECT EXAMINATION

13    BY MR. McTIGUE:

14    Q.    Mr. McNair, could you state and spell your full name?

15    A.    Eben Orlando McNair, IV.  E-b-e-n, O-r-l-a-n-d-o,

16    M-c-N-a-i-r.

17    Q.    Okay.  And you also go by Sandy, correct?

18    A.    Correct.

19    Q.    Okay.  Mr. McNair, let's start by giving the Court some

20    background on your -- or some information on your background in

21    elections.

22    A.    I was on the Board of Elections from approximately May

23    of 2007 until the end of February of this year.  Before that, I

24    did election protection work.

25         You want more detail, or is that enough?

Vol. 2 –    5

1    Q.    Well --

2            THE COURT:    Which Board of Elections was that?

3            THE WITNESS:    I'm sorry, Your Honor.    Cuyahoga County.

4            THE COURT:    All right.

5    BY MR. McTIGUE:

6    Q.    So, from 2007 'til March of this year, you were a member

7    of the Board of Elections, correct?

8    A.    End of February, correct.

9    Q.    End of February.    Okay.

10           During that time, did you ever serve as Chair of the

11   Board?

12   A.    I would -- I served as Acting Chair on occasion, but not

13   as -- I was never formally the chair.

14   Q.    Okay.    And you are also an attorney, licensed in Ohio,

15   correct?

16   A.    Yes.

17   Q.    Now, are you familiar with Senate Bill 205 and Senate

18   Bill 216?

19   A.    Generally, yes.

20   Q.    Okay.    And did you provide written testimony to the

21   General Assembly with regard to those two bills?

22   A.    Yes.

23   Q.    Okay.    I would like to -- I'm going to show you an

24   exhibit.    This is Plaintiffs' Exhibit 1217.    It will be on

25   the -- should end up being on the monitor in front of you.

Vol. 2 -   6

1    Would it be easier for you to have a hard copy of this?

2       A.    Probably.

3       Q.    Okay.

4            THE WITNESS:  Will I find it in here?

5    BY MR. McTIGUE:

6       Q.    No.  This is Exhibit 1217.  It's going to be in a later

7    binder.

8            THE COURT:  What exhibit number is that?  P1217?

9            MR. McTIGUE:  1217.

10           THE COURT:  That's P1217, isn't it?

11           MR. McTIGUE:  Yes, P1217.

12           THE COURT:  Thank you.

13           MR. McTIGUE:  Volume 20.

14           COURTROOM DEPUTY CLERK:  That's 1167.

15        I'm sorry.  What was the exhibit number?

16           MR. McTIGUE:  1217, Volume 20.

17           THE WITNESS:  Thank you.

18        Yes.  I have it in front of me.

19     BY MR. McTIGUE:

20       Q.    Okay.  Could you -- What you have in front of you is a

21    three-page document; is that correct?

22       A.    Yes.

23       Q.    Okay.  Could you look at all three pages and then tell

24    us if this is a true copy of the written testimony, your

25    written testimony?

Vol. 2 -  7

1      A.   Yes, it is.

2      Q.   Okay.  And this is the written testimony that you

3   submitted to the House Policy and Legislative Oversight

4   Committee?

5      A.   Yes.

6      Q.   On Senate Bill 216?

7      A.   Correct.

8      Q.   Okay.  Now --

9           THE COURT:  1217.

10          MR. McTIGUE:  Pardon?

11          THE COURT:  No, I was telling Ms. Clark it was 1217.

12   BY MR. McTIGUE:

13     Q.   So, with respect to your testimony, your testimony was

14   in writing only, right?  Not oral?

15     A.   Correct.

16     Q.   And what prompted you to send in written testimony to

17   the Senate committee?

18     A.   I was concerned about the changes to the law that were

19   being considered because I thought that those changes would be

20   adverse to good voter election administration.

21     Q.   And did you have specific concerns?

22     A.   Well, in this testimony -- I gave other testimony, but

23   this testimony related to the wrong church/wrong pew issue.

24   And my view that the legislation didn't go far enough in terms

25   of wrong church/wrong pew; that the Legislature should consider

Vol. 2 -    8

1    when they're in the wrong, voting in the wrong church or in the

2    wrong location where one can demonstrate that that occurred

3    because of poll-worker error, which is an issue we track in

4    Cuyahoga County.  And it was clear to me, based upon our

5    tracking, that there was substantial poll-worker error in the

6    sense that poll-workers were not properly directing voters, not

7    only not to the correct precinct when they were in the correct

8    location, but not even directing them to the correct location

9    when they were in the wrong location.  So, that was the first

10   part of my written testimony.

11        Q.    Okay.  And what else did your testimony address?

12        A.    Senator Seitz was proposing to reduce the number of days

13   after the election where a provisional ballot could be

14   corrected and be counted.  I had read in the press that he was

15   doing this because he thought it was a burden on boards of

16   elections.  And Cuyahoga County has the largest jurisdiction,

17   and it was really no burden on us.  I mean very, very few

18   people came in on the days he wanted to cut back, days eight,

19   nine and ten.  So, it just seemed to me that it was -- either

20   he was -- well, he was simply, in my view, mistaken in his

21   assessment that this was in any way a burden on boards of

22   elections.  It's a very few number of voters; but, from an

23   elections administration perspective, there was no reason to

24   not allow those votes to be counted if they could be fixed on

25   days eight, nine and ten after the election.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 9 of 263 PAGEID #: 1066
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/04/18 Page: 9 of 263 PAGEID #: 23091

Vol. 2 –   9

1    Q.    And so we're clear what we're talking about here, we're

2    talking about provisional voters being able to come into the

3    boards of elections to supply an ID or correct an ID issue that

4    they had with regard to their provisional affirmation form?

5    A.    Correct, when it's a correctable mistake, yes.  And the

6    last -- the last concern I raised was the additional

7    requirements that were being discussed to be added to the law

8    with respect to the ballot envelope.  I believe it was the

9    birthdate and address, that those were now going to become

10   fatal fields if they weren't properly filled out.  And my

11   concern is that would unreasonably disenfranchise voters.

12   Q.    And, again, we're talking about provisional ballots,

13   correct?

14   A.    Yes.

15   Q.    I want to go back to something you said regarding the

16   first issue, which was that the Cuyahoga County Board of

17   Elections was tracking wrong precinct provisional votes.  Can

18   you elaborate on what the Cuyahoga County Board was doing?

19   A.    Well, we tracked not only people who were voting in the

20   wrong precinct and correct location, but also people that were

21   voting in the wrong location.  My view in reading the election

22   cases that had come out is that there was very little actual

23   evidence about what was going on in the field on Election Day.

24   Why were people -- Why was that happening?

25         And so I wanted our Board and the other Board members

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 10 of 263 PAGEID #: 1067
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/04/16 Page: 10 of 263 PAGEID #: 24667

Vol. 2 - 10

```
 1    agreed that we would -- we would track that.  And what
 2    we -- what we found is that it really is, from our -- my -- our
 3    perspective, poll-worker error, because the poll-workers were
 4    directed that if somebody was in the wrong location, they were
 5    to so note that.  And in virtually every instance when somebody
 6    was voting in the wrong location, that was not being noted by
 7    our poll-workers.  So, either our poll-workers didn't know that
 8    those individuals were voting in the wrong location, or they
 9    were not following the express directions that we had given
10    them, which was to so note that.  So, in either way, either
11    way, poll-workers were committing error, from my perspective.
12        Q.   So, in Cuyahoga County, then, are the poll-workers
13    instructed by the Board or the Board staff that trains them to
14    notate in some way when a voter comes into the wrong polling
15    location and is supposed to be sent to another building,
16    another location?
17        A.   Yes.  They're supposed to note that this -- this voter
18    was -- was directed to go to a different polling location and,
19    nonetheless, voted at this wrong polling location.  It's a part
20    of the training we do.  It's in our election poll-worker
21    training manual.
22        Q.   And where are they supposed to make that notation?
23        A.   I -- I believe it's on the provisional ballot.
24        Q.   On the form?
25        A.   On the form, yes.
```

1    Q.   Okay.  So, is this an added requirement, or is this a

2   requirement that Cuyahoga does that isn't done statewide?

3    A.   Yes.

4    Q.   Okay.  So, it was something initiated by your Board?

5    A.   Yes.

6    Q.   I see.

7    A.   By me, yes.

8    Q.   Okay.

9    A.   The Board agreed, yes.

10    Q.   Now, with respect to the shortening of the time period

11   by three days, you've already testified that very few -- the

12   experience was, when it was ten days, there would be very few

13   voters that would come in on days eight, nine and ten?

14    A.   Correct.

15    Q.   Okay.  So, for the additional voters that did come in,

16   though, on days eight, nine and ten, did that increase in any

17   substantial way the cost of operating the Board of Elections?

18    A.   No.  It was a de minimus number of people who came in,

19   and it was -- I mean, it didn't increase, I would say, our cost

20   at all.  It was simply staff handling -- There was a de minimus

21   number of individuals.

22        And I think the Senator had said he was concerned about,

23   if the election were close and it would come down to those

24   provisionals, that by shortening it, people wouldn't have to

25   wait as long for the next presidential election to get the

1   results, but we have to wait ten days anyway.  So, it

2   didn't -- it didn't -- shortening the time period did not in

3   any way shorten our getting out results with respect to the

4   final count as to counting provisionals.

5      Q.   In fact, that's the next question I was going to ask.

6   So, let me follow up on what you've just said.

7         Under the old law -- in other words, pre-Senate Bill

8   216 -- and under the current law, provisional ballots cannot be

9   opened and counted until after ten days after the election,

10  correct?

11     A.   Correct.

12     Q.   Okay.  So, shortening that time period for voters to

13  come in and -- provisional voters to come in and fix an ID

14  issue doesn't speed up the processing of provisional ballots?

15     A.   Correct.  They're completely separate issues.

16     Q.   Okay.  It doesn't allow the Board to get the official

17  canvass done earlier?

18     A.   It does not, because that ten-day period that we must

19  wait has not changed.

20     Q.   Okay.  Now, I also want to go back to the third issue,

21  which is the mandatory fields.  And you've mentioned that the

22  new law made birthdate and address mandatory, that previously

23  it wasn't mandatory, correct?

24     A.   Yes.

25     Q.   Okay.  So, after this law went into effect, did this law

1    have any impact in resulting in ballots, provisional ballots,

2    being rejected based on those fields?

3       A.    Yes.  We get -- We get reports as to why provisionals

4    are rejected.  And in the November 2015 election, we

5    rejected -- I believe the number was 75 -- provisional

6    ballots/envelopes that we would not have rejected before the

7    new law went into effect.  And I believe most of those related

8    to no birthdate being filled out.

9       Q.    So, let me follow up on that, on the date of birth

10   issue.

11         You're saying that most of those related to not having

12   any birthdate filled in at all?

13      A.    Correct.

14      Q.    Okay.  So, it was -- the space was blank?

15      A.    Yes.

16      Q.    Okay.  Were there some, as well, where the birthdate was

17   there but there was an error?

18      A.    Well, I know that there were some that came before the

19   Board because, as part of the new law, as I recall, if all the

20   other fields are otherwise filled out but there is a problem

21   with the birthdate, that can come before the Board; and if

22   three Board members agree that it otherwise is proper, we can

23   count it, which -- I don't know -- frankly, didn't make any

24   sense to me.  I don't know why, if there is something that's

25   blank and there is no information on it, that gets

 1    disqualified.  But if there is a document that has

 2    misinformation on it, you can still count it.  But that's the

 3    law, and we followed it as best we could.

 4       Q.   Well, with regard to the provisional ballots where the

 5    birthdate field had an error of some kind --

 6       A.   Yes.

 7       Q.   -- you said those came before the Board?

 8       A.   Yes.

 9       Q.   Did the Board count those ballots?

10       A.   Generally, we did.  You know, we saw a number of those.

11    I don't -- I can't remember any one that we did not count.

12       Q.   Okay.  And taking that a step further, you mentioned

13    that the new law provides that, upon a vote of three Board

14    members, the Board can choose to, essentially, ignore a problem

15    with the birthdate?

16       A.   Yes.

17       Q.   Has the Board, Cuyahoga Board, set any kind of formal

18    policy that that's what they will do?

19       A.   No.

20       Q.   Okay.

21       A.   We've taken them as they've come.

22       Q.   Okay.  And you also mentioned that you did not -- it's

23    your understanding that the Board doesn't have that same

24    discretion, by the vote of three members, when the birthdate

25    field is blank?

Vol. 2 - 15

1    A.    Correct.  My understanding is, the way that we process

2   those is, they don't come before the Board, and they're deemed

3   to be not valid and not countable.

4    Q.    And do you know where that -- where that understanding

5   comes from, whether -- has it been in writing or verbally

6   explained?

7    A.    That's my understanding of what the law requires.  Now,

8   whether that is something we've gotten from counsel or if

9   that's a directive, frankly, I don't know, sitting here.  I

10  would have to go back and research that.

11   Q.    Okay.  And, by "counsel," you would be referring to the

12  County Prosecutor's Office?

13   A.    County Prosecutor's Office and/or if we received some

14  counsel from the Secretary of State's regional attorney

15  assigned to us.

16   Q.    Okay.  Now, with regard to Exhibit 1217, you've already

17  indicated that this is a true and authentic copy of your

18  written testimony to the committee, correct?

19   A.    Yes.

20       MR. McTIGUE:  Okay.  At this point, Your Honor, I

21  would move the admission of Plaintiffs' Exhibit 1217.

22       THE COURT:  Any objection, Ms. Richardson?

23       MS. RICHARDSON:  Your Honor, we do object on relevance

24  and hearsay grounds as stated in our motion in limine.

25  Understanding the Court's ruling on that motion, we have no

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 16 of 263 PAGEID #: 1073
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/05/16 Page: 16 of 263 PAGEID #: 24998

Vol. 2 – 16

```
 1   further objection, other than it's our understanding that it

 2   will not be offered for the truth of the matter.

 3            THE COURT:  That's correct.  That is correct.

 4            MS. RICHARDSON:  Thank you, Your Honor.

 5            THE COURT:  All right.  It will be admitted.

 6            MR. McTIGUE:  Okay.  Thank you.

 7     BY MR. McTIGUE:

 8     Q.   Now, Mr. McNair, you also submitted testimony, written

 9   testimony, on Senate Bill 205, correct?

10     A.   Yes.

11     Q.   And could you give the witness Exhibit 1269,

12   Plaintiffs' -- P1269, or it may be in the same book.

13     A.   Yes, it is.

14     Q.   Okay.  Thank you.

15            THE COURT:  Excuse me, Mr. McTigue.  Is that gentleman

16   a witness who just came in?

17            MS. GENTRY:  Your Honor, he is a paralegal with our

18   office.

19            THE COURT:  All right.

20            MS. GENTRY:  Thank you.

21     BY MR. McTIGUE:

22     Q.   And this is a six-page document, correct?  If you could

23   look at all six pages.

24     A.   Yes.

25     Q.   And is this a true and authentic copy of your written
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 17 of 263 PAGEID #: 1074
Case: 2:06-cv-00896-ALM-TPK Doc #: 656-5 Filed: 04/03/12 Page: 17 of 263 PAGEID #: 24934

Vol. 2 - 17

1    testimony to the Senate State Government Oversight and Reform

2    Committee on Senate Bill 205?

3        A.   Yes.

4        Q.   Okay.  And explain what prompted you to submit written

5    testimony on Senate Bill 205.

6        A.   There is, I think, a general thrust in the Legislature

7    to have rules with respect to how boards of elections would run

8    that would be uniform at a level of detail that I thought was

9    contrary to good election administration, was contrary to the

10   history in the State in terms of the discretion boards of

11   elections had, ignored the extreme differences in the various

12   boards of elections, the problems that they had or the issues

13   they had to address, because the counties were so -- were so

14   diverse.

15        And I thought that, at least with respect to the OAEO,

16   they improperly -- they did not understand the law.  And I

17   thought that was having some effect on how the Legislature was

18   looking at this requirement, or lack of requirement, of

19   uniformity.  So, I wanted to lay out my view as to why I

20   thought that the major cases did not require the kind of

21   uniformity that was being considered by the Legislature.

22        Q.   And, for the record, OAEO is the Ohio Association of

23   Election Officials?

24        A.   Yes.  And then I -- The Secretary of State has also

25   taken this position.  He had done it, in particular, with

1  respect to early voting.  He had taken this position with

2  respect to the vote-by-mail program that we had.  These were

3  all initiatives that helped us, in Cuyahoga County, run

4  elections, I think, much better if you focus on the

5  presidentials.  Two Thousand Four was a very, very bad election

6  administration experience in Cuyahoga County.  And by making

7  changes between then and 2008 and 2012, we were doing things

8  that no other county was doing.  It helped us, I think, run

9  much better elections, in particular on the presidential and

10 relieving the pressure that occurs during an Election Day for a

11 presidential election.

12     Q.   And what types of things were you doing in Cuyahoga

13 County that other counties were not?

14     A.   Well, we -- we had a vote-by-mail program, which we sent

15 unsolicited vote-by-mail applications to a large swath of the

16 voters; and then we paid for the postage back if they filled

17 those out.  If they then requested a vote-by-mail ballot and we

18 sent it to them, we would then pay the postage back to us.  And

19 at the time we started it, I don't think any other county did

20 so.  Other counties followed us thereafter, and then we were

21 prohibited from doing that.  And I think that was a mistake.

22 It was a mistake by the Secretary of State.  It was a mistake

23 by the Legislature.

24          And I think, similarly, there was press for uniformity

25 with respect to early in-person voting.  Again, that was a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 19 of 263 PAGEID #: 1076
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/04/16 Page: 19 of 263 PAGEID #: 24906

Vol. 2 - 19

1    program that we were aggressive about, and, again, that was cut

2    back, in part, on this notion of uniformity, that all of the

3    boards should be open at the same time on the same days.  And

4    at the end of my testimony, on the last page I point out why

5    this simply doesn't work.  The Secretary of State had issued

6    uniform hours; and for our county, anyway, he simply

7    issued -- he had us being open at the times people weren't

8    coming in to vote and had us close during times that we had

9    historical evidence that showed that that is when people would

10   come to vote.  And we provided that evidence; and it was, from

11   our perspective, ignored.

12     Q.   And let me direct your attention, as well, to the last

13   paragraph of your testimony.  And it appears, there, that

14   you're discussing again the issue of what we have been

15   referring to as the five fields.

16     A.   Correct.

17     Q.   Okay.  And just elaborate what your concern was here,

18   because now we're talking about absentees.

19     A.   Right.  So, the same -- the same issue occurred, my

20   understanding, with the proposed legislation for absentees as

21   it did for provisionals.  And, again, by making these fields

22   basically mandatory, or fatal if there were a mistake, there

23   was no reason to do that from a good elections administration

24   perspective.  It would only cause the disenfranchisement of

25   voters when we otherwise knew that that was a valid -- that

Vol. 2 - 20

1   contained a valid ballot because we had sufficient information

2   to compare the other three fields in our database to know that

3   that was -- that was a ballot that should be counted.

4      Q.   And, in fact, with regard to the absentees, date of

5   birth is on the application form already, correct?

6      A.   Yes.

7      Q.   Okay.  And do you recall if date of birth was also

8   on -- Before Senate Bill 205, do you recall if date of birth

9   was on the ID envelope for absentee ballots?

10     A.   I believe it was, but I'm now speculating a bit.

11     Q.   But do you know, in any event, the boards of elections

12  did not -- before 205, at least -- did not reject any absentee

13  ballots based on a lack of a birthdate?

14          MS. RICHARDSON:  Objection.

15          THE COURT:  Basis?

16          MS. RICHARDSON:  Leading.

17          THE COURT:  Well --

18          MR. McTIGUE:  I'm calling him on cross.

19          THE COURT:  Well, he's being called as upon cross

20  pursuant to 611.  He is identified with an adverse party, and

21  so that was the Court's ruling previously.  So, he's allowed to

22  lead this witness.

23          MS. RICHARDSON:  Your Honor, may I request a side-bar?

24          THE COURT:  Yes, you may.

25     (Thereupon, the following proceeding was held at side-bar.)

Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 21 of 263 PAGEID #: 24908

1         MS. RICHARDSON:  Your Honor, Mr. McNair is no longer a

2   member of the Board of Elections, and it's my understanding

3   that he's being offered here today not to provide Board

4   testimony but to speak about the opinions that he personally

5   submitted on his own behalf in support of or in opposition to

6   the legislation that is actually being challenged here.  So,

7   this witness is not aligned with the Secretary of State and, in

8   fact, has taken positions directly contrary to the laws that

9   are here.

10        MR. McTIGUE:  Well, with regard to the written

11  testimony that he submitted to the General Assembly that he was

12  acting in a personal capacity, I think it may even say it's not

13  on behalf of the Board of Elections.  He's speaking for

14  himself.  However, I'm also asking him questions regarding what

15  the Board -- when he was on the Board, what was the Board's

16  practices with regard to, well, in this case, this question of

17  absentee ballots.  And that's in his capacity as a former

18  elections official.

19        THE COURT:  Okay.  My position had been that these

20  boards of elections witnesses and the ones that were here

21  yesterday were still with the boards of elections.  So, they

22  were identified with an adverse party under Rule 611.  I was

23  unaware until you just brought -- well, I was aware, based on

24  his testimony today, that he's no longer with them; he left the

25  Board of Elections in February of this year, I believe it was.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 22 of 263 PAGEID #: 1079
Case: 2:06-cv-00896-ALM-TPK Doc #: 355 Filed: 04/06/10 Page: 22 of 263 PAGEID #: 24904

Vol. 2 - 22

1       So, the mere fact that he's testifying about his duties

2  with the Board of Elections at the time that he was with them,

3  but is no longer with them, does not bring him within Rule 611

4  proscription about -- or prescription, I should say -- about

5  being able to lead a witness who is identified with an adverse

6  party.

7       So, I'm going to sustain your objection.  Mr. Eben

8  McNair doesn't fall under the Court's previous order because

9  he's no longer identified with an adverse party.  And so you're

10 going to have to take him as upon direct.

11      MS. RICHARDSON:  Thank you, Your Honor.

12    (The following proceedings were had in open court.)

13      THE COURT:  Please continue, Mr. McTigue.

14      MR. McTIGUE:  Thank you, Your Honor.

15      THE WITNESS:  Your Honor, may I supplement an answer I

16 gave earlier to give a more complete answer?

17      THE COURT:  Certainly, you may.

18      THE WITNESS:  With respect to this Exhibit 1269, the

19 other reason, I think, is best summarized in the

20 second-to-the-last substantive paragraph in my written

21 testimony, which is, I think, both the Secretary of State and

22 the Legislature were focused on the wrong end of the election

23 process.  They were focused on uniformity at the front end.

24 And that's a profound mistake in my view.  What we should have

25 been looking at is focusing on uniformity at the back end; that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 23 of 263 PAGEID #: 1980
Case: 2:06-cv-00896-ALM-TPK Doc #: 6565 Filed: 04/03/16 Page: 23 of 263 PAGEID #: 24769

Vol. 2 -  23

  1    is to say, making sure that everybody had the same good

  2    Election Day voting experience across the counties, that there

  3    were no long lines, et cetera.  And so that was another

  4    important aspect of my written testimony.

  5         Thank you.

  6         MR. McTIGUE:  Your Honor, at this time, I would

  7    actually -- I'd like to move admission of Plaintiffs' Exhibit

  8    1269.

  9         THE COURT:  Any objection to 1269?

 10         MS. RICHARDSON:  The same objections previously noted.

 11         THE COURT:  Your objection is noted.  1269 will be

 12    received.

 13         MS. RICHARDSON:  Thank you.

 14     BY MR. McTIGUE:

 15    Q.   Okay, Mr. McNair, while you were on the Cuyahoga County

 16    Board of Elections and prior to Senate Bill 205 becoming

 17    effective, if an absentee voter left the birthdate field blank

 18    on their ID envelope, what was the Board's practice in terms of

 19    whether to count it or not count it?

 20    A.   We would count it.

 21    Q.   And what was the Board's practice if there was some

 22    inconsistency in the date of birth with the voter registration

 23    records?

 24    A.   My understanding is that we would count it.

 25    Q.   Okay.  I would like next for you to look at Plaintiffs'

```
 1   Exhibit 1233.

 2     A.   Yes.

 3     Q.   Okay.  And that's a three-page document, correct?

 4     A.   Four, I think.

 5     Q.   Yes.  I'm sorry.  Four.

 6          And can you identify what this document is?

 7     A.   Yes.  This is an e-mail I sent to the Secretary of

 8   State.  It was a part of a series of e-mails I sent again

 9   raising the concerns that I had with respect to

10   disenfranchising otherwise eligible electors for voting in

11   either the wrong location or the wrong -- at the wrong precinct

12   in the right location.

13     Q.   And this e-mail is specifically to Ms. Gretchen Quinn,

14   correct?

15     A.   Yes.  Gretchen Quinn, at the time, was the regional

16   attorney from the Secretary of State's Office assigned to us.

17   And then I copied Mr. Damschroder, who was the number two

18   person in the Secretary of State's Office.  Our lawyers,

19   Marilyn Jacobcik, who was the regional liaison from the

20   Secretary of State's Office assigned to us, and then the other

21   people, are all internal Cuyahoga County Board of Elections

22   Board members or employees.

23     Q.   And, in summary, this e-mail again expresses your

24   concerns about not counting ballots, provisional ballots, cast

25   in the wrong polling location?
```

1          MS. RICHARDSON:  Objection.

2          THE COURT:  Basis?

3          MS. RICHARDSON:  Leading and hearsay.

4          THE COURT:  Sustained.

5      Rephrase your question, Mr. McTigue.

6          MR. McTIGUE:  Certainly.

7    BY MR. McTIGUE:

8    Q.  Can you summarize what the principal point is of the

9    e-mail?

10   A.  The principal point was to try and assist the Secretary

11   of State's office to give the Secretary of State specific facts

12   with respect to these issues so it would help, hopefully,

13   better inform the Secretary of State's office in terms of the

14   decisions that were being made with respect to people who were

15   either voting in the wrong location or at the correct location,

16   wrong precinct and to note that a lot of this, from my

17   perspective and what I think this document tries to document,

18   is this arises from poll-worker error.  Poll-workers were

19   not -- and there are poll-workers -- were not giving voters the

20   correct information to assist them to vote at the correct

21   precinct.

22   Q.  This particular e-mail, this is a true and accurate copy

23   of the e-mail that you sent?

24   A.  Yes.  And, again, it was part of my attempt to argue

25   that, where we could demonstrate poll-worker error, that we

 1    shouldn't disenfranchise otherwise eligible electors in terms

 2    of counting their votes.

 3           MR. McTIGUE:  Your Honor, at this time, I would move

 4    admission of Plaintiffs' Exhibit P1233.

 5           THE COURT:  Any objection?

 6           MS. RICHARDSON:  We do object, Your Honor, on hearsay

 7    grounds.

 8           THE COURT:  Could you put 1233 back up?

 9           MR. McTIGUE:  Yes.

10           THE COURT:  All right.  Your objection is noted, but

11    overruled.

12           MS. RICHARDSON:  Thank you, Your Honor.

13           THE COURT:  P1233 will be admitted.

14     BY MR. McTIGUE:

15     Q.   Now, Mr. McNair, while you were a member of the Board of

16    Elections, do you know whether or not the Board made attempts

17    to contact absentee voters regarding missing or incorrect

18    information on their ID envelopes?

19           MS. RICHARDSON:  Objection.  Leading.

20           THE COURT:  Overruled.

21           MS. RICHARDSON:  Thank you, Your Honor.

22           THE WITNESS:  I -- Yes, it was the 11-S form that we

23    sent them.

24     BY MR. McTIGUE::

25     Q.   To your knowledge, did the Board make attempts to

1   contact these absentee voters by other means other than Form

2   11-S?

3       A.   Yes.   I believe that we tried other means, and then this

4   issue was raised with the Secretary of State, and he forbade us

5   from contacting people by calling them on the phone or

6   e-mailing them or otherwise trying to communicate with them in

7   a way that was more expeditious than through mail.

8           MS. RICHARDSON:   Objection.   Hearsay.

9           THE COURT:   Overruled.

10  BY MR. McTIGUE:

11      Q.   Do you know what the practice of the Cuyahoga County

12  Board of Elections is with respect to providing or not

13  providing any assistance to provisional voters in completing

14  the provisional affirmation form?

15      A.   That changed over time.   I'm not exactly sure when that

16  change occurred.   But I think originally the law was that the

17  poll-workers, the election officials, were to complete that

18  information.   And then the law changed so that the elector was

19  to complete that information.

20          I would say, generally, in Cuyahoga County, we have a

21  culture of trying to assist electors.   So, if an elector were

22  filling out the information and had a question or concern, we

23  would direct our people to assist in trying to get that

24  completed.   So, that's kind of a general summary, I think, of

25  our position.

1   Q.   Do you know whether the poll-workers are instructed to

2   review the provisional ballot affirmation form for completeness

3   before it's cast?

4   A.   I don't know.

5   Q.   Okay.

6        MR. McTIGUE:  Your Honor, could I have a moment?

7        THE COURT:  Yes, you may.

8     (Whereupon, there was a brief interruption.)

9        MR. McTIGUE:  No further questions, Your Honor.

10       THE COURT:  Thank you, Mr. McTigue.

11     Ms. Richardson?

12       MS. RICHARDSON:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MS. RICHARDSON:

15   Q.   Good morning, Mr. McNair.

16   A.   Good morning.

17   Q.   My name is Ryan Richardson, and I represent the

18   defendants in this case, the Ohio Secretary of State and the

19   State of Ohio.

20       Mr. McNair, are you affiliated with a particular

21   political party?

22   A.   Yes.

23   Q.   What is that party?

24   A.   Democratic Party.

25   Q.   And you hold several positions for the Democratic Party;

 1    is that correct?

 2     A.    For the party in Cuyahoga County, yes, I do.

 3     Q.    What positions do you hold?

 4     A.    I'm a precinct committee person.  I'm an executive

 5    committee person, I'm the city leader of my local community.  I

 6    am counsel to the party.  I am parliamentarian for the party.

 7    I sit on the chairs cabinet.

 8     Q.    Is it correct to say that you are general counsel for

 9    the Cuyahoga County Democratic Party?

10     A.    I am counsel for the Party, yes.

11     Q.    Thank you.  Earlier --

12     A.    I guess -- That's an unpaid position.

13     Q.    Thank you.

14           Earlier, you described various testimony that you

15    submitted to the General Assembly on S.B. 205 and 216; is that

16    correct?

17     A.    Yes.

18     Q.    And that was testimony that you provided in your

19    personal capacity, correct?

20     A.    I think -- it's -- it's a tricky situation.  I think I

21    said it was -- I wasn't speaking officially as a Board member,

22    because the Board -- the Board only acts through the four

23    members.  But it was informed by my work on the Board, I would

24    say, principally.  So, I think the simple answer to your

25    question would be "yes."

1   Q.   And, in fact, you expressly noted in Plaintiffs' Exhibit

2   1269, which was your testimony regarding S.B. 205, "My

3   testimony today reflects my personal thoughts."  Do you see

4   that listed there?  Do you still have the exhibit in front of

5   you?

6   A.   Yes, I see what you have put up.  So, I wanted to be

7   clear that I was not speaking for the Board.  But -- So, in

8   that sense, yes, I was speaking personally; but my comments

9   were really almost completely informed by my experience on the

10  Board of Elections.

11  Q.   But they were your personal views regarding the law?  As

12  you stated in the letter?

13  A.   Yes.  My personal, versus official, taking a position

14  officially as a -- yes.

15  Q.   Thank you.

16       You are aware, however, that there were board members

17  from various boards across the State that did believe that S.B.

18  205 addressed many issues in the law, correct?

19            MR. McTIGUE:  Objection, Your Honor.

20            THE COURT:  Basis?

21            MR. McTIGUE:  It's hearsay by the nature of the way

22  the question is worded.

23            THE COURT:  I'm not sure that it calls for a hearsay

24  response, but I'm going to ask you to rephrase your question

25  because it's unclear from this witness' background and

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 31 of 263 PAGEID #: 1988
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/04/16 Page: 31 of 263 PAGEID #: 24788

Vol. 2 -   31

1    experience that he would know what board members from various

2    boards across the State would believe.  So, it's beyond the

3    scope of this witness' knowledge based on the foundation that

4    is of record at this time.  So, the objection is sustained on

5    another basis.

6              MS. RICHARDSON:  Thank you, Your Honor.

7    BY MS. RICHARDSON:

8    Q.   Mr. McNair, are you aware of whether there were

9    proponents to S.B. 205?

10   A.   Yes.

11   Q.   Are you aware that some proponents included members of

12   various boards of elections across the State?

13   A.   I am not aware.

14   Q.   And with respect to S.B. 205, the letter that you

15   submitted to the General Assembly described, primarily, your

16   concerns with respect to the provision of the law that

17   prevented counties from sending their -- sending absentee

18   ballot applications to voters; is that correct?

19   A.   I would say it was more general than that.

20   Q.   In what way?

21   A.   It was trying to address, I think, the more general view

22   of the OAEO and the State Legislature and the Secretary of

23   State's perspective that uniformity was required at a level of

24   detail that I believe was not legally correct.  That was, I

25   would say, the thrust of the first -- one, two, three --

1    three-and-a-half pages.  And then I went into more detail about

2    how that was manifesting itself in various specific provisions

3    that were being considered in the law.

4       Q.   So, more generally, you disagreed with the proposition

5    that the Constitution requires perfect uniformity, correct?

6            MR. McTIGUE:  Objection.

7            THE COURT:  Just a second.

8            THE WITNESS:  Sorry, Your Honor.

9            THE COURT:  Mr. McTigue?

10           MR. McTIGUE:  Constitution requires?

11    BY MS. RICHARDSON:

12       Q.   Mr. McNair, did you indicate in your --

13           MS. RICHARDSON:  Excuse me.  I'm sorry.  I will

14    rephrase, Your Honor.

15           THE COURT:  All right.

16    BY MS. RICHARDSON:

17       Q.   Mr. McNair, in your submission to the General Assembly,

18    did you indicate your opinion that the Supreme Court's

19    decisions do not require perfect uniformity across the boards?

20       A.   That's not how I would describe what I wrote.

21       Q.   How would you describe it?

22       A.   Well, respectfully, as I thought I've already testified,

23    that there was a misapprehension by the OAEO and the

24    Legislature and the Secretary of State regarding the level of

25    specificity and uniformity that is required.  In my view, the

1  cases certainly permitted much more diversity, especially where

2  there was a rationale for that diversity.

3     Q.   And the cases you discussed in your letter included the

4  Supreme Court's decision in Bush v. Gore, correct?

5     A.   Yes.

6     Q.   And if you would turn to Page 4 of Plaintiffs' Exhibit

7  2380, at the beginning of the second paragraph, you provided

8  your opinion that, under this case law, quote, Where a

9  rationale is presented for the complaint about lack of

10  uniformity, the courts are deferential to those decisions.  Did

11  I read that correctly?

12     A.   You did.

13     Q.   And part of the reason, in your view, that some

14  uniformity is necessary is because there are significant

15  differences between the various boards and counties across the

16  State; is that correct?

17     A.   I'm sorry.  Would you restate the question?

18     Q.   Sure.  Part of the reason that you believe that

19  uniformity is not required on all levels is because there are

20  significant differences in the county boards of elections

21  across the State; is that fair?

22     A.   That the county boards of elections face very different

23  issues from one county to another, yes.

24     Q.   And, among those, some of the 88 counties across the

25  state, like Cuyahoga County, for example, are very large

1  counties, correct?

2    A.   Yes.

3    Q.   Others, however, are very small.  Would you agree with

4  that?

5    A.   Yes.

6    Q.   And, as a large county, Cuyahoga County has far more

7  resources than many of the smaller counties across the State,

8  correct?

9    A.   Yes.

10   Q.   And, in fact, are you aware that there are some Boards

11  that have just a few individuals on their permanent staff?

12   A.   Yes.

13   Q.   Approximately how many individuals did you have on

14  permanent staff while you were at the Cuyahoga County Board of

15  Elections?

16   A.   I think it was about 96.

17   Q.   And you would acknowledge that some of the various items

18  that you have proposed might be more difficult for smaller

19  counties, correct?

20   A.   I was proposing that counties be able to address these

21  issues at the level that each county thought was appropriate,

22  mindful of the particular problem that they faced, the staffing

23  that they had, and to acknowledge, generally, the diversity of

24  each county.  So, you know, for us, long lines is always a very

25  big concern for presidential elections.  And for other

1    counties, they don't have that concern.

2         Well, I think we should be allowed to address our

3    concerns in a more robust way.  For example, having extended

4    early voting hours, that shouldn't be required.  The fact that

5    we need this doesn't mean it should be imposed upon some other

6    small county who really can't meet that requirement.  That's

7    why my view is we should, you know, focus on the back end:

8    What is it that we have to do to run fair elections where

9    people don't have to wait in long lines?  How do we accomplish

10   that goal?  For us in Cuyahoga County, the answer may be very

11   different than it is for a small county.

12   Q.   And so, for example, you testified that, for Cuyahoga

13   County, with approximately 96 staff members, it was not a major

14   problem to process provisional ballots between day seven and

15   ten after the election, correct?

16   A.   Well, it wasn't a major problem, because we had so few

17   people come in.  And so I was dumbfounded by Senator Seitz's

18   comments.  We're the largest county.  We have very few people

19   come in.  So -- and, presumably, we would have the most come

20   in, because we're the most populous county.

21        So, it seemed that would be a de minimus issue for any

22   county, no matter how large or small.

23   Q.   You don't know what burden it might be for a very small

24   county with just a few members of staff on hand to process

25   provisional ballots during those last few days, correct?

1    A.   Well, I would -- no.  I would -- I mean, common sense

2    tells me that if we have very, very few in Cuyahoga County, a

3    county that is much, much smaller than us would have, you know,

4    you could count them on one hand, if you had any.

5    Q.   And aside from your speculation in that regard, you

6    haven't done any particular study to confirm that that's the

7    case for smaller counties, correct?

8    A.   Correct.  I've performed no studies on that issue.

9    Q.   You haven't reviewed any data or statistics regarding

10    how many individuals would be impacted in some of these smaller

11    counties, correct?

12    A.   Correct.

13    Q.   And you don't know what the burden would be for those

14    smaller counties, correct?

15    A.   No.  I testified why I believed that there would be no

16    burden on those counties.

17    Q.   One of -- I'd like to turn, specifically, to the issue

18    of provisional ballots more generally for a moment, and one of

19    the issues that you described earlier in your testimony today,

20    and also in your testimony to the General Assembly, was the

21    issue of wrong location/wrong precinct votes; is that correct?

22    A.   Yes.

23    Q.   Can you describe what wrong location/wrong precinct

24    means very briefly?

25    A.   Based upon where somebody lives, they are to vote at a

Vol. 2 - 37

1   particular precinct in a particular location.  Some people go

2   to the correct location, but that location has multiple

3   precincts in it; and while they're at the correct polling

4   location, somehow they end up voting at the wrong precinct in

5   that multi-precinct location.

6          The other instance would be somebody goes to simply the

7   wrong polling location and they should be at a different

8   polling location where their precinct is where they should

9   vote.

10  Q.   And the reason that it's important to know what precinct

11  a voter lives in is because the ballots actually differ based

12  on the precinct, correct?

13  A.   They can, yes.

14  Q.   And so there may be issues or candidates that are

15  specific to a particular precinct, correct?

16  A.   Yes.  I mean, I should be clear that my view that where

17  there's poll-worker error and it should be counted, as my

18  testimony, I think, makes clear, that those -- the ballots

19  should be counted only where that person is otherwise a

20  qualified elector to vote.  So, presidential, Senate, the

21  most -- most issues or races are common across the county.  If

22  they're not and the person votes something they shouldn't vote

23  on, then, obviously, it shouldn't be counted, whether they're

24  in the correct location or not.

25  Q.   And can you describe, just as a logistical matter, how

1  you would count only those votes relating to issues that a

2  person outside of the precinct is qualified for?

3      A.   Well, I mean, we do that now.  We take those -- I mean,

4  I would defer to staff in terms of logistically how they do

5  that.  But we find somebody voted in the wrong precinct now.

6  And then we would go through it and make sure that there was

7  nothing, you know, where they should have voted.  And so then

8  we know if there's anything on the ballot that they did vote

9  that they weren't otherwise qualified for.  And if that's the

10  case, we would remake that ballot so it would only show the

11  races that they were qualified to vote.

12      Q.   And so I'd like to break that down a little bit.  Is it

13  fair to say that --

14      A.   I'm sorry.  I am assuming we'd remake the ballot.  I

15  would have to check with staff to see if that's exactly what we

16  would do; but, in any event, we would only count -- I think we

17  would remake the ballot, because then we'd have to scan it

18  again.

19      Q.   So, to break that down, essentially what a board would

20  have to do is first determine which issues and candidates the

21  particular voter was eligible to vote for.  Is that fair?

22      A.   Yes.

23      Q.   And then they would have to actually go through and

24  remake the ballot, correct?

25      A.   If it turned out that the person, the elector, voted for

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 39 of 263 PAGEID #: 1096
Case: 2:06-cv-00896-ALM-TPK Doc #: 656-1 Filed: 04/03/16 Page: 39 of 263 PAGEID #: 23726

Vol. 2 - 39

 1    some candidate or some issue that they weren't otherwise

 2    qualified for.  But, you know, that generally -- I mean, that's

 3    the exception; that's not the rule.  The rule is typically

 4    if -- It's pretty rare in the same location, for example, that

 5    the substance is going to be different in terms of what they're

 6    voting for.  We do have -- I mean, we even have some split

 7    precincts that we have to be mindful for.

 8    Q.    Would you be surprised to learn that in many counties

 9    the ballots differ significantly based on individual local

10    issues that are precinct specific?

11    A.    Well, that -- I mean, that can happen.  I -- I guess

12    I -- I don't want to confuse the periphery with the core.

13    That's all.

14    Q.    And in each of those cases, the Board would have to

15    essentially remake the ballot to reflect only those issues and

16    candidates that the voter is eligible to vote for, correct?

17    A.    Yes, and we do that now.

18    Q.    And you do that now for ballots that were cast in the

19    wrong location?

20    A.    No, in the correct, the correct location, the wrong

21    precinct.

22    Q.    And so now just focusing specifically on the wrong

23    location situation that we've been discussing; in order to make

24    the changes that you propose, the boards would to additionally

25    remake any ballots that were cast in the wrong location; is

1    that fair?

2      A.   Yes, but I want -- again, I want to be clear that I -- I

3    was urging that only when there was demonstrated poll-worker

4    error.  And so if our poll-workers have not identified that

5    person to be in the wrong location, as they're required to do,

6    frankly, I think that's really on us as an agency.  As an

7    agency, we should have poll-workers that are directing people

8    to the correct location.

9          Now, as a practical matter, when you're hiring 5,000

10   people for a one-day event, you're not going to get,

11   necessarily, all the most qualified people that you want.  And

12   so one way for us to adjust that problem that you just can't

13   get around because that's how elections work is, we direct our

14   poll-workers to note that they're in the wrong location.  And

15   so we know if they don't tell them that, then we've made an

16   error; and we shouldn't disenfranchise people for that.

17   That's -- That's my view of how it would be better to run

18   elections, and that's what I was urging the Legislature to

19   adopt, unsuccessfully; but that's what I was urging.

20     Q.   And, in fact, you testified earlier that, in Cuyahoga

21   County, you did implement a rule that requires poll-workers to

22   note if someone is voting in the wrong location, correct?

23     A.   Yes.

24     Q.   And yet you found that that wasn't happening, right?

25     A.   I -- We found that our poll-workers were not --

1    either they weren't following our instructions because they

2    weren't so noting that and allowing that person to vote in the

3    wrong location, or they somehow didn't realize that that person

4    was, in fact, voting in the wrong location, and so didn't

5    implement that part of the instructions that we gave them. But

6    in either event, it was -- the poll-worker made an error either

7    by not following our instructions or not identifying that

8    person as being in the wrong location.

9    Q.   So, in essence, based on your experience in Cuyahoga

10   County, in your view, all of those would constitute poll-worker

11   error, correct, regardless of the reason that the individual

12   actually ended up in the wrong location, correct?

13   A.   Yes.

14   Q.   And you found it very difficult to track, for the issue

15   of wrong location, whether or not a person's arrival at a wrong

16   location was due to poll-worker error, correct?

17   A.   What we found is that, the people that were voting in

18   the wrong location, there was no indication that the

19   poll-worker had so noted that.

20   Q.   And so you would count all of those ballots, correct?

21   A.   In my view, we should count all of those ballots where

22   the elector is qualified to vote on the issues or the

23   candidates for whom they voted.

24   Q.   And this process of remaking ballots and counting these

25   ballots for wrong-location voters would happen after the tenth

Vol. 2 —  42

1    day following the election, correct?

2    A.    Yes.

3    Q.    And that would be when boards are otherwise processing

4    provisional ballots, correct?

5    A.    Yes.

6    Q.    And when they're conducting the official canvass?

7    A.    Yes.

8    Q.    And there are numerous other administrative tasks that

9    take place during that time frame, correct?

10   A.    Yes.  It's -- I agree with you, it's a busy time.

11   Q.    Have you conducted any study to determine what the

12   impact of counting all wrong-location ballots would be for any

13   county?

14   A.    I don't have the numbers here, but we do have what those

15   numbers are.

16        What was the Gretchen Quinn exhibit?  Do you know which

17   one that was, because that was -- I think there was a

18   hundred -- 109 voters there.  So, in that election, there would

19   be 109 -- I believe that was the number -- that we would have

20   to fix.  So, it's not a huge number.  But, still, it's 109

21   people that got disenfranchised.

22   Q.    And have you conducted any review of what the impact

23   would be of requiring a smaller county to remake ballots for

24   every ballot that was cast in the wrong location?

25   A.    No, I haven't conducted any such study.  The

1   reason -- but that was the reason I was writing the Secretary

2   of State these e-mails to say, here, here is our experience.

3   Please consider this when you think about how to administer

4   elections.  And as I think my e-mail to Gretchen Quinn points

5   out, this was one of a series of e-mails that I sent the

6   Secretary of State to which I got no response.

7       Q.   And the e-mail that you're referring to is Plaintiffs'

8   Exhibit 1233.  That e-mail was sent from your personal e-mail

9   address; is that correct?

10      A.   Let me get there.  I believe you're correct, but let me

11  just get there.

12           My law firm e-mail address.

13      Q.   And it was not sent from a Board address; is that

14  correct?

15      A.   Yes.  I do not know how to access my Board e-mail

16  remotely.

17      Q.   Did you consult the other members of the Board before

18  sending this e-mail?

19      A.   I don't have a specific recollection as to the

20  discussions we had back in July of 2012 when I sent this; but,

21  certainly, I talked to my Board members about this.  I

22  talked -- I mean, that's why we implemented this program of

23  tracking the wrong location.  It was -- So, this was a matter

24  that I brought up at Board meetings.  Certainly, this e-mail --

25  and if you go back and find all the other e-mails, I mean,

1    every communication I had with the Secretary of State, I

2    certainly copied my fellow Board members; and, you know, that

3    would generate discussion, sometimes one on one, sometimes --

4    but often at public Board meetings.

5      Q.   Thank you, Mr. McNair.  And I don't mean to interrupt

6    you, but my question is really more limited.

7           The e-mail that you sent was in your personal capacity.

8    It does not represent a formal opinion of the Cuyahoga County

9    Board of Elections, correct?

10     A.   Well, this was not sent in my personal capacity.  It was

11   sent as a member of the Board of Elections.  And indeed --

12     Q.   Mr. McNair, did the Board approve -- excuse me, I'm

13   sorry.

14          Mr. McNair, did the Board approve this e-mail as an

15   official statement of the Board before it was sent to the

16   Secretary of State's Office?

17          THE COURT:  Ms. Richardson, you're going to have to

18   let Mr. McNair finish answering this question, because he was

19   answering the question that you asked as you asked.  And you

20   may cross-examine him on the answer that you are given, but you

21   can't back away from the answer on the basis of it being

22   nonresponsive because, as I read it, it was being responsive.

23   And I want to hear the rest of that answer.

24          MS. RICHARDSON:  Thank you, Your Honor.

25     BY MS. RICHARDSON:

Vol. 2 - 45

1   Q.   And, Mr. McNair, I apologize.  I certainly didn't mean

2   to interrupt you.  Please complete your answer.

3        THE COURT:  I want the record to be clear that you

4   didn't do it in a mean spirit or rude manner; but, just as a

5   matter of practice, I -- he was giving an answer to the

6   question asked.

7        Ms. Errett, would you please read the question back and

8   Mr. McNair's partial answer?

9            (Question and answer read back by the court reporter.)

10           THE COURT:  Finish that answer, please, Mr. McNair.

11           THE WITNESS:  Yeah.  My recollection is that, as I

12  look at this -- This was several years ago -- but, on page 2,

13  it talks about these 109 instances.  So, I remember sitting

14  with staff and actually going over those provisional ballot

15  envelopes.  And to do that, I needed Democrat and Republican.

16  My recollection, it was Betty Edwards and Tony Calliger

17  (phonetic), and there were some other staff in the room when I

18  was looking at these.  And I discussed with my Board members

19  it's something that I wanted to do.  And so I think they were

20  aware of what I was doing, because I wanted to understand on

21  really a voter-by-voter basis what was going on with this

22  problem.  So they knew.

23  BY MS. RICHARDSON:

24  Q.   Thank you, Mr. McNair.  So, if I understand your

25  testimony correctly, you had informed your various Board

 1   members of your personal views, and you copied them on the

 2   e-mail, correct?

 3   A.   Certainly, I did at least that.  My normal practice

 4   would be, if I was going to do this, I would have invited one

 5   of my Republican colleagues to join me, if he wanted to.  But I

 6   don't have a specific recollection that I did this with respect

 7   to this particular project that I did.

 8   Q.   Thank you.  And, in fact, looking just at the e-mail

 9   itself, there is no indication that the views of any other

10   Board member are expressed in this e-mail, correct?

11   A.   Correct.

12   Q.   And there is no indication that the Board ever voted on

13   the content of this e-mail, correct?

14   A.   Correct.

15   Q.   And in your written testimony on S.B. 216, Plaintiffs'

16   Exhibit 1291, you specifically addressed this issue of --

17   A.   I'm sorry.  What is that exhibit number again?

18   Q.   Sure.  It's Plaintiffs' Exhibit 1291.

19   A.   I don't seem to have it.

20   Q.   Oh, maybe there's -- Actually, I think there may be

21   multiple copies.  I think the one in front of you might be

22   Plaintiffs' Exhibit 1217.

23        COURTROOM DEPUTY CLERK:  Which one do you want, 1217

24   or 1291?

25        MS. RICHARDSON:  I believe he has 1217 in front of

 1   him.

 2           THE WITNESS:  I have 1217, yes.  Thank you, Counsel.

 3           MS. RICHARDSON:  1217 will work.  Thank you very much.

 4   It's a duplicate.  I apologize.

 5           THE WITNESS:  Yes.

 6   BY MS. RICHARDSON:

 7   Q.   And as we've discussed, you mentioned this wrong

 8   church/wrong pew -- or wrong-location issue in this letter,

 9   correct?

10   A.   Yes.

11   Q.   And in this letter, you acknowledged that there are

12   differences in the role of a General Assembly, with respect to

13   election laws, than the role of courts, correct?

14   A.   Yes.

15   Q.   And you acknowledge in this letter that counting wrong

16   location votes is not a constitutional requirement as you

17   understand the applicable case law, correct?

18   A.   I'm not sure I said that.  Where did I say that?

19   Q.   I would ask you -- I would direct your attention to the

20   second page, and about halfway through the second complete

21   paragraph.

22   A.   Yes.

23   Q.   There is a sentence that begins:  This Legislature

24   approaches voting rights from a very different perspective.  Do

25   you see that?

1    A.    No.

2          I'm sorry.  Yes, I see it now.

3    Q.    And your point there is that, while wrong-location votes

4    are not required to be counted as a constitutional matter, you

5    urge the General Assembly to adopt that approach as a

6    legislative matter; is that fair?

7    A.    I think, actually, I -- I can see how you would infer

8    that; but I was -- I think I was trying to hedge my bets a bit

9    more than that.

10   Q.    How so?

11   A.    I guess it's not clear to me, as a constitutional

12   matter, if being in the wrong -- voting in the wrong place and

13   not counting that where there's clear poll-worker error, if

14   that's not a constitutional violation.  I mean, I'm a lawyer.

15   I was mindful of the SEIU v. Husted Sixth Circuit decision,

16   which I think certainly went the other way, although I think

17   that's been vacated now.

18         But, as I also note in that case, it was done under

19   great duress and without, I think, sufficient facts developed

20   for the court.  And that's really what I was trying to do in

21   the Gretchen Quinn e-mail, was to try and develop kind of

22   what's really going on out in the field, because I don't think

23   the -- at least the earlier cases, there was a lot of

24   discussion about what was going on out in the field; and, to

25   the extent to which voters were being not served well by

1    poll-workers on many occasions, even those poll-workers are

2    trying to do the very best job they can under very trying

3    circumstances.

4       Q.   But you don't disagree with what you wrote in the letter

5    that you submitted to the General Assembly that there is a

6    difference from the role of the General Assembly in examining

7    these issues and the role of the courts in evaluating

8    constitutionality, correct?

9       A.   Yes.   My point, generally, was that the Legislature can

10   do, arguably, much more to protect voters than what the

11   Constitution requires, and the Legislature should take that

12   approach.

13      Q.   And this letter reflects your views, as a legislative

14   matter, of the policies that you would have liked to have seen

15   implemented, correct?

16      A.   Well, no.   That's -- I don't think I would really quite

17   describe it that way.   It was really -- As I said earlier, it

18   was my view that the -- that the Legislature and the Secretary

19   of State and the Ohio Association of Election Officials

20   misunderstood basic propositions of the Constitution and what

21   was or was not required with respect to uniformity.   And I was

22   trying to give my view as to trying to assist those, that

23   audience, in re-looking at how they were approaching this

24   problem.

25      Q.   So, you were expressing your view that uniformity is

1    not -- should not be required in all instances, correct?

2        A.    That's an imprecise way to put it.  But, yes, the answer

3    to your question would be "yes."

4        Q.    And one of the other issues that you have also discussed

5    is a -- the issue of wrong-precinct votes that take place in

6    the right location.  Do you understand what I mean by that?

7        A.    Yes.

8        Q.    And is that a fair characterization?

9        A.    I'm sorry.  Would you ask the question again?

10       Q.    Sure.  Let me -- I'll rephrase.

11            You are aware of the issue of votes that have been cast

12   in the wrong precinct but right location, correct?

13       A.    Yes.  My understanding was that the legislation was,

14   basically, going to put into the legislate -- put into law that

15   part of the SIEU v. Husted case that dealt with the right

16   church/wrong pew issue.

17       Q.    In other words, it would codify the ruling that those

18   votes should count, correct?

19            MR. McTIGUE:  Objection.

20            THE COURT:  Basis?

21            MR. McTIGUE:  Calls for a legal conclusion.

22            THE COURT:  Overruled.

23        You may answer.

24            THE WITNESS:  Yes.  Unless the elector had been

25   properly counseled by the poll-worker and told that they should

Vol. 2 -  51

1   go vote in a particular precinct and the elector refused, then

2   that wouldn't count.  And I -- frankly, I don't -- so, that's

3   what the law said.  I, frankly, don't recall if the SEIU vs.

4   Husted case had that addition to it.

5   BY MS. RICHARDSON:

6   Q.   And you are aware that one of the things that S.B. 216

7   did was to allow the boards of elections to consolidate poll

8   books at multi-precinct voting locations, correct?

9   A.   I believe that's true.  It's not something I focused on,

10  because it's not something we were interested in doing in

11  Cuyahoga County.

12  Q.   And by consolidating poll books at multi-precinct voting

13  locations, it eliminates the concern about voters going to the

14  wrong precinct within the right location, correct?

15  A.   No.

16  Q.   Where the poll books are consolidated at a

17  multi-precinct location, someone from any precinct within that

18  location will be on the same poll book, correct?

19  A.   I -- I believe that's true.  We tried this as an

20  experiment in Cuyahoga County, and it did not work.  And I'm

21  trying -- I think, because our -- our poll-workers were then

22  pulling the wrong -- some of them were pulling the wrong

23  ballots.  So, it did not address the issue of the voter getting

24  the right ballot.  We -- that was -- you know, that was many

25  years ago now, but it did not work for us.  It works much

1  better in a DRE county, but it -- it can cause, and did cause,

2  confusion, at least in our county, because we have optical

3  scan, and it was a problem with getting -- notwithstanding

4  doing that, there was a problem -- I don't specifically recall

5  now, but the voter was still getting the wrong ballot too

6  often.  And so we abandoned that approach.

7  Q.  And are you aware of whether other counties have had a

8  very different experience with respect to consolidated poll

9  books?

10  A.  My understanding is it works well in the DRE counties,

11  but it does not work well, at least for us, as I just said,

12  where you have a paper ballot.

13  Q.  But you don't disagree that, in many counties across the

14  State of Ohio, consolidating poll books eliminates the issue

15  with respect to wrong precinct ballots, correct?

16  A.  In DRE counties, my understanding is that that is a very

17  helpful change.

18  Q.  You also mentioned the Ohio Association of Election

19  Officials, correct?

20  A.  Yes.

21  Q.  And that is a bipartisan organization comprised of

22  election administrators across the State, correct?

23  A.  I think that's how they describe themselves.

24  Q.  And, in fact, it is comprised of equal numbers of

25  Democratic and Republican members of the boards, correct?

Vol. 2 - 53

1    A.    I'm sorry.  Ask that again.

2    Q.    Are you aware of whether the Ohio Association of

3    Election Officials is comprised of equal numbers of Democratic

4    and Republican board administrators?

5    A.    My understanding is that that also includes board

6    members, as well.

7    Q.    Thank you.  But an equal -- it is a bipartisan board

8    comprised of both Democratic and Republican members, correct?

9    A.    It has an equal number of Democrats and Republicans, who

10   are either election officials or Board members.

11   Q.    And you mentioned this, I believe, already; but the Ohio

12   Association of Election Officials supported several aspects of

13   the laws that are challenged here, correct?

14   A.    I -- I don't know that I mentioned that.  My

15   understanding was, in one of my written testimonies, they had

16   published a summary, I think, of recommendations which I

17   thought were fundamentally misinformed legally, and so I talked

18   to them about that.  And, after talking to them about that, I

19   became even more convinced that they had been misinformed

20   legally and that -- on this uniformity issue.  And so that was

21   kind of part of what animated me to deal with this in the

22   Legislature.

23         And I know that the OAEO was upset that the Legislature

24   only picked -- it only picked certain parts of that

25   recommendation.  The OAEO's view was that it should be

Vol. 2 – 54

1  implemented wholesale, and that's not what the Legislature did,

2  and there were officials of the OAEO that were upset about

3  that.

4       MS. RICHARDSON:  Your Honor, I would move to strike

5  the last part of that where he's testifying on what the

6  specific recommendations were on hearsay grounds.

7       THE COURT:  Let me hear you at side-bar on that.

8     Mr. McTigue?

9    (Thereupon, the following proceeding was held at side-bar.)

10      THE COURT:  Mrs. Errett, read back the last question,

11  please.

12      Go ahead.

13    (The last question was read by the court reporter.)

14      THE COURT:  What you wanted is that last clause, that

15  the officials of the OAEO were upset about that, is that what

16  you asked to be stricken?

17      MS. RICHARDSON:  And, Your Honor, the part immediately

18  prior to that where, as I understood his answer, he's

19  testifying as to what they told him.

20      THE COURT:  Okay.

21      MS. RICHARDSON:  I believe my question was much more

22  limited than that, whether he was aware they had supported

23  aspects, not calling for the content of their specific

24  recommendations.

25      THE COURT:  Okay.

 1          MR. McTIGUE:  Yeah, I mean, I think it's within the

 2     scope of answering the question, but he couldn't answer the

 3     question "yes" or "no," but --

 4          THE COURT:  And he answered most of the question.

 5          MR. McTIGUE:  Yes.

 6          THE COURT:  But he talked about what the AOEO --

 7          MS. RICHARDSON:  OAEO.

 8          THE COURT:  OAEO.  Okay.  I'm going to sustain the

 9     objection.

10          MS. RICHARDSON:  Thank you, Your Honor.

11          THE COURT:  Yes.

12          MR. CHANDRA:  Because we represent separate and

13     distinct parties in terms of NEOCH and CCH, from time to time

14     we may want to lodge evidentiary objections to questions that

15     are being asked or answers that are given on behalf of our

16     clients even though we weren't the questioning party

17     originally.  Is that okay with the Court, for us to be able to

18     preserve our record with respect to a separate objection,

19     stating the basis for it?

20          THE COURT:  That presents somewhat of a conundrum

21     because, on the one hand, you're trying this case jointly, and

22     you've designated various people to examine the witnesses.  And

23     I gave the plaintiffs the leeway to examine -- four different

24     attorneys to examine the same witness.  That attorney is acting

25     on behalf of the different parties.  So, you represent SEIU,

Vol. 2 - 56

1    for instance, and Mr. McTigue is representing the Ohio

2    Democratic Party.  You're representing different interests, and

3    you may conduct different --

4              MR. CHANDRA:  It's not going to happen often.  But

5    what is happening is, just our ability to communicate in

6    real-time is limited.  Sometimes Don isn't seeing an issue I'm

7    seeing.

8              THE COURT:  I will allow that --

9              MR. CHANDRA:  Very judiciously.

10             THE COURT:  -- on a very limited basis.  And you have

11   to make it clear to me that, you know, they're divergent

12   interests.  So you have to protect that interest, because I can

13   see a circumstance in which your interest and the Democratic

14   Party's interest may be different; and so certain evidence that

15   may come in against him should not come in as against you.

16             MR. CHANDRA:  We'll sit together and try to

17   coordinate, but I just wanted to be sure.

18             THE COURT:  That would be a unique circumstance, but I

19   will permit it.

20         Do you have any objection you want to make for the

21   record, Ms. Richardson?

22             MS. RICHARDSON:  Your Honor, only that, if we are

23   receiving objections from numerous attorneys, that it does seem

24   like we will be hampered in our ability to conduct our

25   questioning.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 57 of 263 PAGEID #: 1114
Case: 2:06-cv-00896-ALM-TPK Doc #: 656-5 Filed: 04/06/16 Page: 57 of 263 PAGEID #: 21134

Vol. 2 - 57

```
 1            THE COURT:  Yeah.  So I will handle it on a

 2    case-by-case basis, but you are going to need to be explicit as

 3    to why your interests diverge.  And you may, you know, object

 4    independently of Mr. McTigue.

 5        (The following proceedings were had in open court.)

 6            THE COURT:  Ms. Richardson, please continue.

 7            MS. RICHARDSON:  Thank you, Your Honor.

 8    BY MS. RICHARDSON:

 9    Q.   Mr. McNair, I understand that you have testified today

10    and in your witness submissions that we've discussed that you

11    personally disagree with the policies reflected in these laws,

12    but I want to ask you a very limited question.  You are aware

13    that there are others who have offered various rationale for

14    these laws, correct?

15    A.   In favor of these laws?

16    Q.   Correct.

17    A.   Well, I'm aware of Senator Seitz's comments that I cite

18    to.  I don't know that I am aware of anything else here today.

19    Q.   And in fact, even today in your testimony, you have

20    identified two rationales that were offered.  And I understand

21    that you personally disagree, but one of the rationale that

22    you've mentioned already today that was offered in support is

23    the uniformity, correct?

24    A.   Well, I don't -- I guess, on the reduction from ten to

25    seven days, I don't think uniformity was -- that wasn't the
```

1    thrust -- there was already a uniform rule.  So I wasn't

2    questioning whether there should be a uniform rule there.  So,

3    I would say, no, uniformity was not the issue in that case.

4         With respect to the five fields, there already was

5    uniformity.  So, my objection wasn't to uniformity.  My

6    objection was creating additional requirements for no good

7    elections administration purpose that would unreasonably and

8    unfairly disenfranchise individuals, including the 75 I talked

9    about earlier in Cuyahoga County at the November 2015 election.

10   The uniformity arguments really dealt more with the Vote By

11   Mail Program and Golden Week, which really haven't been the

12   focus, I don't think, of your questions or Mr. McTigue's

13   questions.

14   Q.   Mr. McNair, I appreciate that you disagree with the laws

15   and the policies that are reflected, and I understand that you

16   disagree with the point regarding uniformity.  My question is

17   simply this:  You don't disagree that one of the rationales

18   that were offered by proponents of this bill is that it would

19   help increase uniformity, correct?

20   A.   Well, I don't want to appear truculent, but the

21   uniformity issue was focused -- my recollection is it was

22   focused on the arguments with respect to Golden Week and the

23   Vote By Mail program, not the fields issue, because that

24   already was uniform.  So I don't think people were complaining

25   about, or it wasn't -- so uniformity wasn't a rationale there.

1    Q.    With respect to the five-fields issue that you bring up,

2    I believe you testified earlier that even before these laws

3    were passed, birthdate and address were fields that appeared on

4    the absentee ballot, on the absentee ballot envelope, correct?

5    A.    Yes.

6    Q.    And are you aware of whether because those fields were

7    included on the envelope the view in some counties was that

8    they were, in fact, required prior to passage of the laws in

9    this case?

10   A.    I don't know.

11   Q.    And are you aware of whether there was confusion about

12   which fields were actually required because of the discrepancy

13   between the forms themselves and the law at that time?

14   A.    There was not confusion in Cuyahoga County.  I can't

15   speak for the confusion or lack thereof in other counties.

16   Q.    One of the issues you testified about in your letter to

17   the General Assembly with respect to Senate Bill 205 was

18   the --

19   A.    I would call it written testimony.

20   Q.    -- with your written testimony -- Thank you for that

21   clarification -- was the issue of statewide mailings, correct?

22   A.    Let me get back here.

23         Yes.

24   Q.    And you point out in that letter -- and, again,

25   understanding that you disagree -- but you point out in that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 60 of 263 PAGEID #: 1117
Case: 2:06-cv-00896-ALM-TPK Doc #: 565 Filed: 04/03/16 Page: 60 of 263 PAGEID #: 28747

Vol. 2 - 60

```
 1    letter that proponents of the bill had identified greater

 2    uniformity as one of the reasons for implementing this

 3    requirement, correct?

 4      A.   Maybe I did.  I forget that.  Can you just point to

 5    where that is --

 6      Q.   Sure.

 7      A.   -- in my testimony?

 8      Q.   And, in fact, I think there are several references

 9    throughout the letter.  If you look at the second paragraph on

10    the first page --

11      A.   Second paragraph, yes.

12           The Court concluded?  That paragraph?

13      Q.   I believe it starts with "The principal thrust."

14      A.   I'm on page 2.  I'm sorry.  Where are you?

15      Q.   And maybe we can --

16      A.   Excuse me.  I mean, I did -- I think I already

17    acknowledged that uniformity was an issue with respect to

18    Golden Week and Vote By Mail.

19      Q.   Golden Week was not an issue that was covered in either

20    of the two laws that are challenged here, correct?

21      A.   Well, that, I don't recall.  Let me say, more generally,

22    I guess, in-person early voting.

23      Q.   And is it your understanding that either of the laws at

24    issue in this case made any changes to early voting hours?

25      A.   I don't -- I don't know.  I don't believe so.
```

Vol. 2 - 61

1   Q.   And one of the other rationale that were offered in

2   support of the laws that are at issue in this case is the

3   decrease in burdens on county elections administrators,

4   correct?

5   A.   I -- Boy!  I'm not sure I believe you are correct.  I'm

6   not sure.

7   Q.   You testified earlier today that, while you disagree

8   with the point, you are aware that one of the rationale that

9   was offered in support of the changes to the cure period

10  related to the burden on various county boards of elections,

11  correct?

12  A.   The cure period.  I'm sorry.  I thought you were -- I

13  was focused on the provisional and absentee -- Correct.

14          MS. RICHARDSON:  Your Honor, may I confer just

15  briefly?

16          THE COURT:  Yes, you may.

17      (Whereupon, there was a brief interruption.)

18          MS. RICHARDSON:  No further questions at this time.

19          THE COURT:  Any redirect, Mr. McTigue?

20      MR. McTIGUE:  Yes, Your Honor.

21      If I may have a moment, Your Honor?

22          THE COURT:  Yes.

23      (Whereupon, there was a brief interruption.)

24                     REDIRECT EXAMINATION

25  BY MR. McTIGUE:

Vol. 2 - 62

1    Q.   Okay.  Mr. McNair, I want to ask you a couple of

2    questions that you were asked by defense counsel related to

3    consolidated poll books.

4         Are you aware that Senate Bill 205 provided that a board

5    of elections could, by a vote of three members, decide to

6    consolidate the poll books in a multi-precinct polling

7    location?

8    A.   I'm aware that that was one of the provisions.  I don't

9    know which law it was in.

10   Q.   Okay.  Your board, the Cuyahoga Board, never voted to

11   consolidate the poll books, other than that one -- I think you

12   referred to it as a trial -- that they did sometime in the

13   past?

14   A.   Yes.

15   Q.   Okay.  And that was -- about when was that?

16   A.   Jane Platten was still the director.  So that was, you

17   know -- I don't know -- five years ago, at least.

18   Q.   Okay.  And since the new law, Senate Bill 205 and 216,

19   since those two new laws have come into effect, the Cuyahoga

20   County Board has not voted to consolidate the poll books at

21   multi-precinct polling locations, correct?

22   A.   Yes, correct.

23   Q.   Okay.  However, the Secretary of State issued a

24   directive requiring -- sometime in December of last year --

25   requiring boards to do that, correct?

Vol. 2 - 63

1    A.   I don't know that.

2    Q.   Okay.  Now, you were also asked some questions -- Well,

3    before I go on, let me -- let me make sure we're clear on the,

4    what the problem was on the consolidated poll books.  You

5    indicated that because it -- because Cuyahoga is an all paper

6    ballot county, that there were problems with -- I'm -- with

7    what?

8    A.   Well, my recollection is vague on this issue, but I

9    believe that there was a problem about then, after somebody

10   signed in, because everything was consolidated, that they

11   might, the voter might, get the -- get the wrong ballot at the

12   next stage of the process, because now all the ballots were

13   kind of consolidated in one place.  So, they're all lined up

14   together, whereas before they would be segregated by precinct.

15   Q.   I see.  Okay.

16        Now, turning our attention to the questions you were

17   asked regarding the five fields, and specifically the

18   requirements regarding address and date of birth on the

19   absentee envelope and on the provisional affirmation form, you

20   previously testified that the Board of Elections in Cuyahoga

21   County did not disqualify either absentee voters or provisional

22   voters when that information was either missing or did not

23   match the provisional ballot, or -- I'm sorry -- did not match

24   the voter registration database; is that correct?

25   A.   That's certainly true with respect to the date of birth.

```
1    I believe it was also -- it also was true -- well, I mean, Vote

2    By Mail, I think we had to get the right address back when

3    there was the request for the ballot, but not when we got the

4    envelope, the absentee ballot, back.  So your statement's

5    correct.

6       Q.   Okay.  And is it fair to say, then, that the Cuyahoga

7    County Board was able to properly identify the eligibility of

8    that voter to cast that ballot without having that information?

9       A.   Yes.

10           MR. McTIGUE:  Thank you.

11           THE COURT:  Ms. Richardson?

12           MS. RICHARDSON:  No further questions.

13           THE COURT:  Any recross?

14           MS. RICHARDSON:  No, Your Honor.  Thank you.

15           THE COURT:  Mr. McNair, thank you very much, sir.  You

16   may be excused.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Ladies and gentlemen, it's 10:25 now.

19   We'll take our morning recess until 10:35.

20       (Recess taken from 10:25 a.m. until 10:35 a.m.)

21           THE COURT:  Ms. Gupta, your next witness.

22           MS. GUPTA:  Yes, Your Honor.  Plaintiffs' calls

23   Mr. Anthony Perlatti.

24           THE COURT:  Okay.

25       Mr. Perlatti, please come forward and be sworn.
```

 1        (Witness sworn.)

 2          THE COURT:  Please proceed.

 3                       - - -

 4                  ANTHONY PERLATTI

 5     AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

 6                  CROSS-EXAMINATION

 7    BY MS. GUPTA:

 8    Q.    Good morning, Mr. Perlatti.  You and I just met.  My

 9    name is Sandhya Gupta.  I'm one of the attorneys for

10    Plaintiffs's Northeast Ohio Coalition for the Homeless and

11    Columbus Coalition for the Homeless.

12          Would you please state and spell your name for the

13    record?

14    A.    Anthony Perlatti, A-n-t-h-o-n-y, P-e-r-l-a-t-t-i.

15    Q.    And what is your position, Mr. Perlatti?

16    A.    I am the Deputy Director at the Cuyahoga County Board of

17    Elections.

18    Q.    And how long have you been with the Board of Elections?

19    A.    I've been employed with the Board of Elections since

20    November of 2007 and in my current capacity of Deputy Director

21    since February of 2013.

22    Q.    And what was your position before you were Deputy

23    Director?

24    A.    I was the Human Resources Manager.

25    Q.    I'm sorry.  The Human Resources --

1    A.    Human Resources Manager.

2    Q.    Okay.  And have you held other positions with the Board?

3    A.    No, I have not.

4    Q.    Okay.  Could you describe some of your responsibilities

5  and duties in your current position?

6    A.    I am responsible, really, for the administration of

7  elections.  So, overseeing -- This is working with the

8  Director, day-to-day operations of the office, preparation for

9  elections, assisting with the writing of internal policies and

10  procedures at the Board, supervising staff, basically managing

11  the operation and then planning the preparations for elections,

12  execution of the election on Election Day, and all the duties

13  that come post election.

14    Q.    And are you familiar with the requirements for absentee

15  and provisional ballots?

16    A.    Yes.

17    Q.    Are you involved in the process of determining whether a

18  ballot should be accepted or rejected?

19    A.    I -- So is that for provisionals or absentee?

20    Q.    Both.

21    A.    Both?  We -- I had worked with staff to create the

22  procedures that we have in place.  In many of those

23  determinations, the vast majority of the determinations are

24  made by staff at a lower level based on the procedures that we

25  have in place.  And then certain instances that don't fit

1   neatly into one of our procedures or the category that's

2   questionable, those then will start to elevate up through the

3   chain of command.  And at times I do review some of the

4   absentee ballots that may be in question.

5       Regarding the provisional process, all of the rejected

6   provisionals, the Director and I, we will flip through all of

7   those to make sure that that is, in fact, what we want to

8   present to the Board as being invalid provisionals.

9   Q.   And when you say you flip through them, are you doing an

10  independent review of those?

11  A.   We're doing a physical site review of the envelopes, and

12  we will do that with the Manager and Assistant Manager of our

13  registration department with us.  Those are the individuals who

14  are responsible for reviewing the -- or overseeing the

15  provisional process.  And then we will work with them to ask

16  questions as to what is in our registration database for an

17  individual, have them provide us with copies of documents that

18  we may need to further clarify on some issues, on some of the

19  envelopes.

20      Some envelopes are clear-cut:  You can see that

21  something is missing.  And, per our directive, you can't accept

22  that.

23      There may be others that may be questionable, and then

24  we ask for the information that we need, depending on whatever

25  the particular circumstance is surrounding an envelope.

Vol. 2 - 68

1    Q.   Okay.  So, let's talk about the provisional ballot for a

2    moment.  What is your understanding of the information that a

3    voter is required to provide on a provisional ballot form in

4    order for that ballot to count?

5    A.   Currently, an individual has to provide five pieces of

6    information.  They have to provide a printed name, an address,

7    date of birth, a form of ID, and a signature.

8    Q.   And do you know whether any of those required categories

9    are a result of recent changes in the law?

10   A.   Yes.  Two of the five, those two being date of birth and

11   address.

12   Q.   Okay.  So, just briefly, would you run us through the

13   Board's process for reviewing provisional ballots?

14   A.   So, the provisional ballots, we will have a team of

15   employees who will do the initial review.  From that initial

16   review, they will have the physical provisional envelope with

17   them; and they'll be seated at a computer terminal, with access

18   to the Cuyahoga County voter registration database as well as

19   access to the statewide voter registration database.

20        They will first view the envelope to see if the five

21   required fields are there.  And if all five are, they will go

22   ahead and they will proceed to look into the Cuyahoga County

23   database to see then if they can identify the voter from the

24   information that's provided.  If they can and if everything

25   matches and is sufficient, they will go ahead; and they will

 1    indicate that that provisional ballot envelope is valid, and

 2    then move onto the next.

 3         At some point later in the process, an employee of a

 4    different political party will come back; and they will -- they

 5    will view -- physically view the envelope, then, to ensure that

 6    the five required fields are on the envelope.  And if they are,

 7    we now have had a bipartisan team view that provisional

 8    envelope and consider it valid.

 9         THE COURT:  Mr. Perlatti, when you say that you looked

10    to determine whether the five required fields are on the

11    envelope, do you mean whether they're literally printed on the

12    envelope or whether they have been satisfactorily completed on

13    the envelope?

14         THE WITNESS:  Step 1 is, actually, are they physically

15    contained on the envelope, without a review of the database,

16    determining is the information provided correct.  Then they

17    will move into that first, but the first is just --

18         THE COURT:  To see if the envelope has been printed

19    properly?

20         THE WITNESS:  Exactly.  Right.

21         THE COURT:  Okay.

22         THE WITNESS:  That would be the first step.

23         THE COURT:  I see.

24         THE WITNESS:  And then the second step, you go into

25    the registration database; and, the information they did

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 70 of 263 PAGEID #: 1127
Case: 2:06-cv-00896-ALM-TPK Doc #: 365 Filed: 04/04/16 Page: 70 of 263 PAGEID #: 21737

Vol. 2 - 70

1    provide, you know, is that correct?  Is that their birthdate?

2    Is that, in fact, the matching signature?  And then they will

3    go through.  And if all that matches, they then will make the

4    determination that is a valid provisional envelope; everything

5    is correct.

6              THE COURT:  All right.  Thank you.

7         Please continue, Ms. Gupta.

8    BY MS. GUPTA:

9    Q.   Could you continue your response to the question about

10   the process?

11   A.   Okay.  So, then, as they go through the review against

12   the registration database, if they find that one of those five

13   fields is incorrect, then the employee will indicate where the

14   error exists, in which one of those fields, and mark it as --

15   initially, as invalid.

16              That provisional envelope, we will then take that to a

17   separate quality assurance team and that quality assurance

18   team, will then do a further review of the envelope, or of the

19   information on the envelope, to the database, to then see, the

20   initial determination, was that in fact correct and should the

21   provisional ballot remain invalid, or if they're able to find

22   additional information -- maybe they find something in the

23   statewide that the first person didn't -- they will then go

24   ahead and they will make the change and have that corrected.

25              The first person on the quality assurance team will be

Vol. 2 -  71

1    of the opposite political party as the person who made the

2    initial verification.  And if that quality assurance individual

3    does make a correction, then a second person on the quality

4    assurance team of the opposite political party will view that

5    to -- I guess, to verify that, in fact, the overturning of the

6    initial person's rule is correct and that a bipartisan team

7    agrees --

8    Q.   Now, Cuyahoga County, your board, keeps track of who has

9    reviewed a ballot, correct?

10   A.   Yes.  Each of our operators will have a unique

11   identifier assigned to them so we can track who is touching the

12   ballot as it goes through its process.

13   Q.   And that information is kept with the voter's record, or

14   module; is that correct?

15   A.   In the -- In the -- In our registration database, the

16   provisional module, there will be a record of who the operator

17   was who worked on the envelope, as well as, physically, on the

18   envelope itself, at the bottom, is a place to indicate the

19   initials of the operator who worked on the ballot, as well as

20   their party affiliation.

21   Q.   Okay.  And when a ballot is rejected, your staff keeps

22   track of the basis of that rejection, correct?

23   A.   We will -- We will indicate the reason for the

24   rejection.

25   Q.   And that's also in that same module?

1    A.    That will be in the provisional module.

2    Q.    Okay.  I'm going to ask you questions about the date of

3    birth fields that you mentioned.

4         Now, the law allows boards to accept ballots, despite a

5    date-of-birth mismatch, by a vote of three board members; is

6    that correct?

7    A.    That is correct.

8    Q.    Okay.  And has the Cuyahoga Board adopted a policy of

9    counting any ballots with a date-of-birth mismatch?

10   A.    Our Board -- Well, the Board follows the criteria

11   outlined in Secretary of State directive.  And so our staff,

12   if -- taking away the date-of-birth field, if the other four

13   required fields are complete and correct and if the month

14   and/or day is wrong on the date of birth, we will bring that to

15   our Board at a meeting and let them know this date of birth is

16   a mismatch and the other four required fields are complete and

17   correct, and therefore recommend that they go ahead and approve

18   those to be counted.

19        And thus far in Cuyahoga County, the Board members have

20   approved for those to be counted.

21   Q.    Now, what if the date of birth is missing all together?

22   A.    If the date of birth is completely absent, then that

23   provisional envelope is rejected for a missing date of birth,

24   and we do not take that to the Board, recommending approval.

25   It's presented to them as an invalid provisional because of

1    complete missing of the field.

2    Q.   Now, the Board can still verify the identity of an

3    individual even without the date of birth, can't it?

4    A.   Many times, it can.

5         MR. KELLER:  Objection.  Speculation.

6         THE COURT:  Overruled.

7         THE WITNESS:  Many times, they can.  In fact, prior to

8    the current law, the previous form of the provisional envelope

9    did not require date of birth, and we were successful in

10   identifying voters without that information and able to

11   validate and invalidate provisional envelopes.

12   BY MS. GUPTA:

13   Q.   You just answered my next question, which was going to

14   be, you were able to verify the identity of voters even before

15   the date-of-birth requirement, correct?

16   A.   That is correct.

17   Q.   And it's the case that the Board can still verify the

18   identity of a voter even though they don't have a correct date

19   of birth written, correct?

20        MR. KELLER:  Objection.  Speculation.  Vague.

21        THE COURT:  Overruled.  You may answer.

22        THE WITNESS:  The Board -- the Board can -- in most

23   instances, they can identify a voter without having the correct

24   date of birth.  If you -- If you have a name that you can --

25   Let's say you see their printed name.  That's your first piece

Vol. 2 - 74

1   where you're looking to try to find them.  And then, with the

2   ID, that's an indicator to help to match it up.  And then,

3   basically, you get to the signature; and the signature is

4   probably the most important piece on there, trying to get a

5   matching signature to the database.  And so if we can get that

6   signature to match, then we're confident that that is the

7   person.

8       BY MS. GUPTA:

9       Q.   Okay.  Now, you also mentioned the current -- the other

10  new requirement is the current address, correct?

11      A.   That is the other additional -- yes -- additional

12  requirement that's been added.

13      Q.   Now, even if someone -- even if a voter leaves off their

14  current address on their provisional ballot form, your staff

15  can find what the voter's precinct is, can't they?

16      A.   If -- Well, if there is no address, we can try to

17  identify the voter in the voter registration database.  And

18  then whatever record, whatever the address is on record in the

19  database, that would be the precinct of record that we would

20  have for them.

21      Q.   Would you agree that most of the -- Let me start that

22  again.

23          Would you agree that most of the time that a voter has

24  to vote a provisional ballot is because they have asked --

25  they've requested an absentee ballot but not returned it?

1    A.    Many voters vote provisional for that scenario where

2    they have requested a Vote By Mail ballot and did not return

3    it.

4    Q.    And in those situations, you would have their current

5    address in the database, correct?

6    A.    Correct.  So, when they had requested the vote-by-mail

7    ballot -- It would have been in the registration database --

8    that would have been viewed to determine which precinct and

9    ballot to mail them, and then it would be that same database

10   that would be used on the provisional verification process.

11         So, it would be the same address that was viewed to send

12   out the vote-by-mail ballot.  And then, that same address, that

13   would be used during the provisional process to validate that

14   they, in fact, received the correct ballot.

15   Q.    And so those individuals, if such an individual left off

16   their current address on their provisional form, you could

17   still find their correct precinct, correct?

18   A.    In that scenario, yes, we could.

19   Q.    Okay.  And your staff was able to determine the correct

20   precinct even before the requirement for a current address,

21   correct?

22         MR. KELLER:  Objection.  Mischaracterization.

23         THE COURT:  Overruled.

24    You may answer, Mr. Perlatti.

25         THE WITNESS:  Yes, they could determine what the

1  precinct was.

2    BY MS. GUPTA:

3    Q.   And they could determine this even before the

4  requirement for a date of birth, correct?  They could determine

5  the correct precinct even before there was a requirement for a

6  date of birth, correct?

7    A.   Correct.  Under the -- Under the previous form of the

8  envelope, with the three required fields being printed name,

9  ID, and signature, Cuyahoga County Board of Elections was

10  successful, again, in validating and invalidating provisional

11  envelopes under that set of guidelines, or rules, provided to

12  us.

13    Q.   So a voter could leave off both their date of birth and

14  their current address, and staff could still determine that

15  that voter is an eligible voter; is that correct?

16    A.   Yes.

17    Q.   But the Board currently rejects ballots for an incorrect

18  address even if there is only one number missing from an

19  address; is that correct?

20    A.   That is correct.  If the address is not complete, then

21  we will determine that to be a fatal flaw; and we'll invalidate

22  the provisional envelope.

23    Q.   You don't reject if there is a problem with the zip

24  code, do you?

25    A.   I -- I am not -- I am not positive on that.  I

1    think -- I do think staff focus more on house number, street

2    name, and city.  But I am not positive on the zip code.

3      Q.   I'm going to turn to asking you a couple of questions

4    about the identification requirement.  If a voter provides a

5    Social Security number on their provisional ballot form but

6    they previously provided a driver's license or other kind of

7    identification and not a Social Security number, then does the

8    Board accept that ballot?

9      A.   The Board will just because -- because that -- When a

10   person registers, they're not required to provide both a Social

11   Security number and their driver's license number.  They need

12   to provide one of those pieces of information.  And, so, what

13   we receive on the registration card is what we will populate

14   the database with.

15           If the person provides the other acceptable form of

16   identification and we don't have a record of that, we don't

17   penalize them and reject them because they provided the

18   alternate form of identification.

19              MS. GUPTA:  May I confer, Your Honor, for a moment?

20              THE COURT:  Yes, you may.

21              MS. GUPTA:  Thank you.

22     BY MS. GUPTA:

23     Q.   Thank you.  Now, as to the requirement of a printed

24   name, Mr. Perlatti, would the Board reject a ballot for a lack

25   of a printed name even if you could tell, from the signature,

1    what the voter's name is?

2       A.   Again, in the provisional processing?

3       Q.   Yes.

4       A.   Yes, we would, because the printed name is one of the

5    five required fields that have to be present on the envelope.

6       Q.   And could you still verify the identity of a voter if

7    all of the other fields were complete and correct?

8       A.   Many times, you could.

9       Q.   Okay.  Mr. Perlatti, I'm going to show you what has been

10   marked as Plaintiffs' Exhibit 1501.  This is the -- Just a

11   moment.  Do you recognize this document?

12      A.   This -- This is the provisional ballot form, I think,

13   12-B.

14      Q.   And you are aware that this is the provisional ballot

15   form that was in place before the new requirements?

16      A.   Can you slide it up a little bit, please?

17           Yes.  The form that we used in Cuyahoga County looked a

18   little bit different than this, but it had the -- This top part

19   was correct.  And then we had a registration card, also, on our

20   form.

21           MS. GUPTA:  At this time, Your Honor, I'd like to move

22   into evidence Plaintiffs' Exhibit 1501.

23           THE COURT:  Any objection?

24           MR. KELLER:  No objections, Your Honor.

25           THE COURT:  Exhibit 1501 will be received.

Vol. 2 -  79

1          MS. GUPTA:   Thank you.

2      BY MS. GUPTA:

3      Q.   Mr. Perlatti, you testified a minute ago that you're not

4    sure, if there is a problem with the zip code, whether that

5    ballot would be rejected or not?

6      A.   That's correct.

7      Q.   If one of your staff testified in an earlier deposition

8    that such ballots are not rejected, would you have any reason

9    to disagree with that testimony?

10     A.   I would not.

11     Q.   Now, Cuyahoga provides no notice to a provisional voter

12   to correct any error on their provisional affirmation form,

13   correct?

14     A.   That is correct.

15     Q.   A provisional voter is able, however, to come in and

16   show a valid ID if the voter did not have a valid ID with them

17   on Election Day, correct?

18     A.   That is correct.

19     Q.   And they have seven days to do so?

20     A.   Yes.

21     Q.   They previously had ten days?

22     A.   Yes, they did.

23     Q.   Now, can someone with an ID mismatch come in to fix that

24   problem within the seven-day period?

25     A.   I'm not positive.  I do not recall that happening in

1    Cuyahoga, but I don't -- I would have to -- I don't know if

2    they could or couldn't.  I would have to research that.

3        Q.    And what would you look into to determine whether or not

4    a voter can come in to correct an ID mismatch?

5        A.    I would probably first consult with our -- We'll look at

6    the code, potentially with our prosecutor's office, and get

7    guidance from the Secretary of State's -- the legal counsel

8    assigned to our area.

9        Q.    Now, as far as you know, nothing besides an ID problem

10   can be corrected, correct?

11       A.    Correct.

12       Q.    But there wouldn't -- there would be no difference,

13   would there, between allowing someone to fix an ID problem and

14   allowing that person to come in to fix an address or a date of

15   birth or a name problem?

16            MR. KELLER:  Objection, Your Honor.  Vague.

17            THE COURT:  Just a second.

18        Did you say "vague"?

19            MR. KELLER:  I did, Your Honor.

20            THE COURT:  Mr. Keller, overruled.  I think it

21   identifies the areas that Ms. Gupta is inquiring about.  So I'm

22   going to allow the question to stand.

23        You may answer, Mr. Perlatti, if you understand.

24            THE WITNESS:  Okay.  So, the question is --

25            THE COURT:  Ms. Errett, please read the question back.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 81 of 263 PAGEID #: 1188
Case: 2:06-cv-00896-ALM-TPK Doc #: 356 Filed: 04/03/12 Page: 81 of 263 PAGEID #: 24788

Vol. 2 - 81

```
 1        (The last question was read by the court reporter.)

 2            THE WITNESS:  I would -- Under -- I believe, under

 3   current law, they're not able to do that.  But, if the law were

 4   to allow someone to come in during that ten-day, or now

 5   seven-day, window to cure or to fix something, I mean, we would

 6   be able to comply with that.

 7   BY MS. GUPTA:

 8   Q.   Okay.  Now, poll-workers are supposed to give out a

 9   sheet of paper at the poll with a provisional hotline number;

10   is that correct?

11   A.   Correct.  I believe it's Form 12-H.

12   Q.   Okay.  Now, you don't know whether that's actually

13   provided, do you?

14   A.   I know we print them.  So we print them, and we pack

15   them, and we instruct and train the poll-workers to distribute

16   those forms when they give the provisional envelope to the

17   voter.

18   Q.   But you don't actually know whether they follow through?

19            MR. KELLER:  Objection.  Asked and answered.

20            THE COURT:  Overruled.

21            THE WITNESS:  I mean, I -- Physically, at a polling

22   location, I haven't been able to view them doing that.  I do

23   know that, when the supplies come back at the end of the night,

24   some of the -- some of the packs are ballot, or, the tablets

25   with that form are untouched.  And some of them -- some are
```

Vol. 2 — 82

 1   distributed.

 2     BY MS. GUPTA:

 3     Q.   Okay.  Now, Cuyahoga provides notice to all provisional

 4   voters whose ballots are rejected, correct?

 5     A.   Yes.  Post election, after certification of the

 6   election, we do send out notifications.

 7     Q.   And this came about at the suggestion of a Board member?

 8   Do you know?

 9     A.   Yes.  Former Board Member Debbie Sutherland, she had

10   raised that concern.  And I want to say that it may have

11   started in 2012, but I'm not positive of the year.

12     Q.   Okay.  Now, you've never heard back from anyone to whom

13   a notice was sent out that the individual who cast the ballot

14   was not that person, correct?

15     A.   No.  I'm not aware of that communication, no, someone

16   coming back and saying, Why did you send this to me; I did not

17   vote provisionally.

18     Q.   Okay.  So, in other words, since beginning to send

19   notices out, you've not had a situation where a missing piece

20   of information or an incorrect piece of information was the

21   result of an impersonator standing in for a voter, correct?

22     A.   I'm not aware of that.

23     Q.   In fact, at the same time as the notices are sent out,

24   the Board also sends out registration cards to individuals who

25   had non-matching information so that they can update their

Vol. 2 - 83

 1  registration information, right?

 2    A.   That is correct.

 3    Q.   Okay.  And you can verify the identity of individuals to

 4  whom you send out notices, correct?

 5    A.   Yes.  We have to know who they are in order for us to

 6  send something to them.

 7    Q.   All right.  And, just to clarify, the notices we're

 8  talking about are the post-election rejection notices?

 9    A.   Yes.

10    Q.   Okay.  Mr. Perlatti, I'm going to show you some specific

11  ballots.  Let's start with what's been marked as Plaintiffs'

12  Exhibit 2817.

13         Now, let me just -- Do you see, Mr. Perlatti, on this

14  provisional ballot form, that a voter, the voter in question,

15  crossed off the current address form (sic)?

16    A.   Yes.

17    Q.   Or -- excuse me -- not the form, but the current address

18  field.

19    A.   Yes.

20    Q.   And this ballot was rejected on this basis.  Would you

21  agree?

22    A.   I -- I don't know if this was or wasn't.  If we look at

23  the bottom, I could probably determine.

24         It looks like that's an "Approved" checkmark at the

25  bottom, I think.  It's very small.  It's hard to see.

Vol. 2 — 84

1          MS. GUPTA:  Your Honor, if I may have a moment to

2    confer?

3          THE COURT:  Yes, you may.

4          MS. GUPTA:  Thank you.

5       (Whereupon, there was a brief interruption.)

6    BY MS. GUPTA:

7    Q.   Mr. Perlatti, on this ballot, I know you said you

8    weren't sure if this one was rejected, or not, based on the --

9          MR. KELLER:  Objection, Your Honor.  May I have a

10   side-bar?

11         THE COURT:  Yes, you may.

12      (Thereupon, the following proceeding was held at side-bar.)

13         MR. KELLER:  Your Honor, it's just been brought to my

14   attention we do not have these exhibits.

15         THE COURT:  Okay.

16         MS. GUPTA:  Okay.  I thought --

17         MS. CARWILE:  We're missing a box, I think.  We have

18   them ending from the ones you gave yesterday.  It ends around

19   2359.  Then we have 3200, but we're missing the chunk in

20   between.

21         THE COURT:  Okay.

22         MR. CHANDRA:  If I can get co-counsel on this, because

23   they produced the documents?

24         THE COURT:  Okay.

25         MS. GENTRY:  The documents are being copied right now.

Vol. 2 - 85

1   They'll be here by lunchtime.

2          THE COURT:  Okay.  And these are the documents that

3   you want to review now with this witness?

4          MS. GUPTA:  Correct.

5          THE COURT:  Have you already, as I requested, you and

6   Mr. Keller, gone --

7          MS. GUPTA:  We have.

8          THE COURT:  Okay.  Could you go through, then, the

9   documents that you already have gone through?  And, then, with

10  respect to documents that you haven't seen, Mr. Keller, they'll

11  give you an opportunity to look at them over lunch.

12         MR. KELLER:  Your Honor, we may be able to clarify

13  here if you can tell me -- because they were categorized

14  earlier in the exhibit list, but then re-categorized later.  If

15  you can tell me that everything you're going to talk about is

16  on the earlier exhibit list, it's just a different number --

17         MS. GENTRY:  Yes.

18         MS. GUPTA:  That's right.

19         MR. KELLER:  I wanted to make sure.

20         MS. CARWILE:  Do we have Bates numbers?

21         MS. GUPTA:  They do.  And I can mention that when I

22  examine the witness.

23         MR. KELLER:  I appreciate that.

24         THE COURT:  So you have -- Does that clarify things?

25         MR. KELLER:  I think we can keep going.

1    THE COURT:  You withdraw your objection?

2    MR. KELLER:  Yes.

3    THE COURT:  Okay.  Then, you can -- If another exhibit

4  comes up that doesn't fall in the category, then you can -- we

5  can deal with that when you get to it.

6    MR. KELLER:  That's my only other issue.  It's we

7  won't necessarily know in the time it takes.  So, I mean, we

8  just have to rely on opposing counsel, which that's fine; but

9  that's my only reservation.

10    THE COURT:  Is there some way, Ms. Gupta, that you can

11  identify the documents so that he'll know whether it's one of

12  the documents that you've already discussed or whether it's one

13  of the ones that is being copied?

14    MS. GUPTA:  Sure.  Just to clarify, we did actually

15  talk about a stipulation for the range of voter files that are

16  listed.

17    THE COURT:  Okay.

18    MS. GUPTA:  The difference between what has previously

19  been produced and what is currently being copied is that the

20  current version breaks down all the documents by voter file.

21  So, the defendants actually have the complete set.  It's just

22  that they don't have them broken down.

23    The way to remedy this right now is, if I give you the

24  Bates number, then you will know which document I'm referring

25  to.

Vol. 2 - 87

```
 1              THE COURT:  Okay.  So they have the documents, just
 2    not in the order that you are referring to them now?
 3              MS. GUPTA:  That's right.
 4              THE COURT:  Okay.
 5              MS. GUPTA:  You won't have the exhibit number that
 6    they are associated with.
 7              THE COURT:  I see.  But you can give them the Bates
 8    number?
 9              MS. GUPTA:  I can.
10              THE COURT:  That will identify the particular document
11    that they currently have?
12              MS. GUPTA:  That's right.
13              THE COURT:  All right.  Let's do that.
14              MS. GUPTA:  Would you like me to do that right now, in
15    advance, or would you --
16              THE COURT:  Let's do it as we go.  That way, we can
17    continue to move along.
18          And then if, Mr. Keller, you have a problem locating the
19    document, then we can pause for him to locate it.
20          But you can put the documents, also, in the Elmo, so
21    that he can look at it, and the Bates numbers can be
22    coordinated.
23          All right.  Thank you.
24      (The following proceedings were had in open court.)
25      BY MS. GUPTA:
```

1    Q.   Mr. Perlatti, this exhibit that we've been looking at is

2    Bates number Cuyahoga 654.  And we were beginning to follow up

3    on this document.

4         Now, I understood that you weren't able to tell

5    directly, looking at this document, whether it was rejected

6    based on the crossed-off address, correct?

7    A.   Yes.  In this example that you provided, what I'm unsure

8    of -- And this would be a better question for our registration

9    manager, Betty Edwards -- in that there is an address crossed

10   off and one that is not crossed off, both being the same, it

11   looks -- appears to be the same address.  I don't know if, in

12   this situation, if the verification operator would take the

13   address that is presented and see is that the person's current

14   registered address and, if so, does that match the ballot that

15   was issued to the person.  And if the ballot was issued to the

16   person, then, more than likely, I would think that they would

17   validate that.

18   Q.   Let me stop you there.  In fact, if Ms. Edwards did

19   testify that staff is trained to look up the current

20   information, whether or not there is something crossed out,

21   would you have any reason to disagree with that?

22   A.   I would not disagree.  I think that was what I was

23   trying to express.

24   Q.   Okay.  And this is a ballot where someone was -- where a

25   staff person was able to determine what the precinct, correct

Vol. 2 – 89

1   precinct, is.  Isn't that true?

2     A.    Well, I would think, from the information provided, they

3   would be able to tell you what the precinct is for 590 Helper

4   Drive in Bedford, Ohio.

5     Q.    Okay.  And, if you look at the top of the ballot, you

6   see that there is actually a precinct noted there, correct?

7     A.    Correct, Bedford 2A.

8     Q.    Okay.  So, even though the address was crossed off,

9   someone was actually able to determine the correct precinct,

10  correct?

11          MR. KELLER:  Objection.  Speculation.

12          THE COURT:  Overruled.

13          You may answer if you know.

14          THE WITNESS:  I believe from the -- with the

15  crossed-off and the uncrossed-off address being the same, that

16  that's -- they were able to determine that.

17    BY MS. GUPTA:

18    Q.    Okay.  And if Ms. Edwards testified that this ballot was

19  rejected, would you have any reason to disagree with that?

20    A.    I would -- I would engage in a conversation to get the

21  reasons for her, her action, whether rejected or accepted.

22    Q.    Okay.

23          MS. GUPTA:  Your Honor, plaintiffs and defendants have

24  entered into a stipulation regarding a range of voter files --

25  of documents, which includes 2651 to 3027, subject to a few

Vol. 2 - 90

1    ballots in between --

2              THE COURT:  3027?

3              MS. GUPTA:  Correct.

4              THE COURT:  Okay.

5              MS. GUPTA:  -- subject to a potential exception

6    regarding ballots -- documents that are screen-shots.  And I'm

7    going to cover a couple of those; but I wanted to make sure

8    that, while I have this document, this ballot, up, that we

9    covered that range.

10             THE COURT:  Okay.  All right.

11        Mr. Keller, you agree that you have stipulated to

12   Documents 2651 through 3027?

13             MR. KELLER:  That is correct, Your Honor.  Obviously,

14   we want to see the documents.  This is where the confusion is

15   coming in.

16             THE COURT:  Right.

17             MR. KELLER:  But, yes, subject to -- and it's just a

18   minor foundational issue with a few documents.

19             THE COURT:  All right.  Thank you.

20        Please continue, Ms. Gupta.

21    BY MS. GUPTA:

22   Q.   Mr. Perlatti, I'm going to show you what's been marked

23   as Plaintiffs' Exhibit 2767.  It corresponds with Cuyahoga

24   Bates Number 657.

25             Now, Mr. Perlatti, if you would take a look at the

1    current address field here, you see that the voter left off a

2    street number, correct?

3      A.   Yes.

4      Q.   And if you look at the very top of this ballot, there is

5    a precinct noted there, correct?

6      A.   Yes.

7      Q.   And their staff was able to determine the correct

8    precinct despite the fact that the voter did not put in their

9    street number, correct?

10     A.   Yes.

11     Q.   And they can do this by going into the database and

12   finding the voter using the other information provided,

13   correct?

14     A.   Correct.

15     Q.   Okay.  I'm going to show you what has been marked as

16   Plaintiffs' Exhibit 2775, which corresponds to Cuyahoga Bates

17   Number 662.

18          Now, in this -- Again, if you look at the current

19   address field, Mr. Perlatti, you see that this voter left off

20   their city and zip code, but they do have a street address,

21   correct?

22     A.   That is correct.

23     Q.   And do you know whether this ballot would be rejected on

24   that basis?

25     A.   Yes.

Vol. 2 - 92

1    Q.   And if you look at the very top of this ballot, you see

2    that there's a precinct noted there, right?

3    A.   Correct.

4    Q.   And so staff was able to determine what the correct

5    precinct was despite not having a city, village, or a zip code,

6    correct?

7    A.   Correct.

8    Q.   And, in fact, they can verify the identity of this voter

9    with the other information provided; isn't that true?

10   A.   Yes.

11   Q.   And -- I'm sorry.  I'm going to go back to 2767 for a

12   moment.  This, again, was Cuyahoga 657.

13        I don't believe I asked, regarding this, whether the

14   lack of a street number here would require rejection of this

15   ballot.

16   A.   It would be rejected for lack of the house number,

17   street number.

18   Q.   Okay.  And this is true even though you can verify the

19   identity of this voter based on the other information provided;

20   isn't that true?

21   A.   Correct.  It's -- It's considered an incomplete address

22   under the current provisional criteria.

23   Q.   Okay.  I'm going to show you what's been marked as

24   Plaintiffs' Exhibit 2774.  Corresponds to Cuyahoga 835.

25        Mr. Perlatti, if you look at the current address field

1   on this form, you see that the voter wrote in a street number

2   and a street address, but they wrote it in the City/Village

3   field, correct?

4   A.   Correct.

5   Q.   And if you look down at the former address field, the

6   information is also there.  Do you see that?

7   A.   Yes.

8   Q.   And this -- this ballot would be thrown out, wouldn't

9   it?

10   A.   Again, in this scenario, I would defer to the

11   registration manager because the street address and the current

12   Ohio address field matches the street address in the address

13   that's provided below.  And, so, if this was the

14   person's -- again, if the precincted ballot matched that

15   address, I'm not sure if that would be rejected or approved.

16   Q.   Okay.  And if Ms. Edwards, the registration manager, did

17   testify that this was thrown out, this would be thrown out, you

18   wouldn't have any reason to disagree with that?

19        MR. KELLER:  Objection, Your Honor.

20        Could I have a side-bar, please?

21        THE COURT:  Yes.

22     (Thereupon, the following proceeding was held at side-bar.)

23        MR. KELLER:  Your Honor, I want to make a continuing

24   objection to this line of her testifying to somebody else's

25   testimony with the witness.  He just said what he knew about

1    the ballot.

2              THE COURT:  Read the question back.

3         (The last question was read by the court reporter.)

4              THE COURT:  Do you expect Ms. Edwards to be called?

5              MS. GUPTA:  So, one of our intentions was to try to

6    complete the Cuyahoga material through Mr. Perlatti and thereby

7    avoid the need to bring in Ms. Edwards.  And, in addition, we

8    have designated portions of Ms. Edwards' deposition, some of

9    which has been agreed to by defense, but we haven't agreed on

10   all of it.

11             MR. KELLER:  That is my point.  We entered into

12   designations on the depositions we're stipulating to the

13   admissibility of.  These documents speak for themselves.  If he

14   doesn't personally know, he shouldn't be -- he shouldn't be

15   doing it through somebody else's testimony.

16             THE COURT:  Yes.  I understand.  Here is the dilemma.

17   They work together, correct?

18             MS. GUPTA:  They do.

19             THE COURT:  And what is Ms. Edward's official

20   position, again?

21             MS. GUPTA:  Registration manager.

22             THE COURT:  So she is the registration manager.  And

23   she sort of reports to him?

24             MS. GUPTA:  I believe she reports to Brent Lawler,

25   who then reports to Mr. Perlatti.  And he testified that he

 1    would defer to her.

 2          THE COURT:  All right.  I want you to phrase your

 3    question differently, because you can ask of him the same

 4    proposition; and then, if he agrees, then you don't have this

 5    situation where you're trying to get validation.  I'm not

 6    certain that it's entirely improper for her to secure

 7    validation of what someone in his office does to determine

 8    whether -- I mean, one of the claims.

 9          One of the problems -- One of the issues that they

10    raised is whether these laws and rules, procedures, have been

11    applied uniformly by the various boards of elections.  I think

12    the plaintiffs are entitled to adduce evidence to buttress that

13    aspect of their case.  In doing so, I understand how they would

14    want to establish what the procedures are within an office,

15    such as within the Cuyahoga County Board of Elections.  And I

16    see this as part of that.

17          Having said this, Ms. Gupta, I think Mr. Keller has a

18    valid point.  So, you can't get into all of Ms. Edward's

19    testimony by asking that same question to Mr. Perlatti and then

20    having him validate it.

21          So, what I would ask is, just ask, you know, state the

22    proposition or ask him if, you know, the proposition is

23    supportable or that's how they do certain things in the

24    Cuyahoga County office.  And then the Court can see,

25    independently from Ms. Edwards' testimony, whether she confirms

1  it.

2        MS. GUPTA:  Thank you.

3        MR. KELLER:  Thank you.

4    (The following proceedings were had in open court.)

5        THE COURT:  Ms. Gupta, rephrase your question.  And

6  please continue.

7        MS. GUPTA:  Thank you, Your Honor.  I'm actually

8  prepared to move on from that --

9        THE COURT:  All right.

10        MS. GUPTA:  -- document.

11    Just a moment, Your Honor.  I appear to be missing a

12  document.

13        THE COURT:  All right.

14  BY MS. GUPTA:

15  Q.   Okay.  I'm going to show you Plaintiffs' Exhibit 2839,

16  which corresponds to Cuyahoga Bates Number 713.

17    Mr. Perlatti, earlier we talked about the date-of-birth

18  requirement, correct?

19  A.   Yes, we did.

20  Q.   And I believe you testified that the Board will reject

21  ballots, across the board, if there is a missing date of birth,

22  true?

23  A.   True.

24  Q.   Now, on this ballot that you have up on your screen, you

25  would be able to verify the identity of this voter even though

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 97 of 263 PAGEID #: 1154
Case: 2:06-cv-03843-MHW-TPK Doc #: 656 Filed: 04/04/16 Page: 97 of 263 PAGEID #: 24174

Vol. 2 - 97

```
 1    there is no date of birth, correct?

 2      A.   Yes.

 3      Q.   I'll move on to --

 4           MS. GUPTA:  Ms. Clark, would you switch the screen,

 5    please?

 6      BY MS. GUPTA:

 7      Q.   We're pulling up here, Mr. Perlatti, Plaintiffs' Exhibit

 8    2846, which corresponds to Cuyahoga 1027.  Are you able to see

 9    this document without the window in front of it?

10      A.   I can see the first three fields.

11      Q.   Okay.  Actually, this question -- the question I have is

12    about -- is about the top of the ballot.  So -- There we go.

13           So, looking at the date-of-birth field on this ballot, I

14    believe you testified that -- Whoops!

15           Okay.  We're looking more closely at the date-of-birth

16    field on this.  And, as I understand your testimony, the Board

17    will not reject ballots that have a mismatch of a date of

18    birth, correct?

19      A.   If there is a mismatch of date of birth, again, if the

20    other four required fields are complete and correct, we will

21    present that to the Board for their approval or validation of

22    the provisional envelope.

23      Q.   Now, this -- in this example before you -- Let me go

24    back for a second.  Excuse me.

25           In the last two election cycles, the Board did not throw
```

1 out any ballots based on a mismatch of date of birth, did it?

2   A.   Can you define "election cycle"?

3   Q.   Excuse me.  General election of 2014 and general

4 election of 2015.

5   A.   I do not recall a provisional being rejected for a

6 mismatch, because I believe the other criteria were met, and

7 the Board approved to go ahead and accept the provisional

8 envelopes, or provisional ballots.

9   Q.   So, the form that's in front of us, would this have been

10 rejected for a missing date of birth?

11   A.   I do not know what staff did on that, but it looks like

12 a date of birth is presented in the field, not just -- not

13 necessarily in the boxes to the right.  So I -- My opinion is,

14 I think that could be -- if that birthdate was correct, that

15 could be a valid envelope.

16   Q.   Okay.  And, this particular ballot, you don't know -- do

17 you know whether it was accepted or rejected?

18   A.   That, I do not know.

19   Q.   Okay.  Moving on to -- And, Mr. Perlatti, would

20 Ms. Edwards, the registration manager, be in the best position

21 to answer that question?

22   A.   She may recall --

23       MR. KELLER:  Objection, Your Honor.  Vague.

24       THE COURT:  Rephrase your question, Ms. Gupta.  I'm

25 going to sustain it.

```
 1              MR. KELLER:  Thank you.

 2              MS. GUPTA:  I'm going to withdraw the question.

 3              THE COURT:  All right.

 4              MS. GUPTA:  Okay.

 5       BY MS. GUPTA:

 6       Q.   I'm going to show you, Mr. Perlatti, Plaintiffs' Exhibit

 7       2866, which corresponds with Cuyahoga 1134, and I'm going to be

 8       asking you some questions about the identification requirement.

 9              If you can -- The parts that would need to be focused

10       are the identification part and then -- Excuse me.  I'm sorry.

11       The document that I -- I'm sorry -- that I was interested in

12       was 2886.  If I said "2866," I misspoke.

13              Thank you.

14              Actually, I found my copy, and it might be a little bit

15       easier to read.

16              Okay.  So, starting over with this exhibit, it's

17       Plaintiffs' Exhibit 2886, and it's Bates stamped Cuyahoga 1110.

18              MR. KELLER:  Your Honor, may I have a second?  We're

19       just confirming.

20              THE COURT:  Yes.

21         (Whereupon, there was a brief interruption.)

22              MR. KELLER:  Thank you, Your Honor.  Oh!  I'm sorry,

23       Your Honor.  I don't think we have this one.

24              THE COURT:  All right.  Would you -- Ms. Gupta, would

25       you give him a moment to at least look at this document?
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 100 of 263 PAGEID #: 1157
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 100 of 263 PAGEID #: 2157

Vol. 2 - 100

 1          MS. GUPTA:  Certainly.

 2      (Whereupon, there was a brief interruption.)

 3          THE COURT:  Does this document -- Does this exhibit

 4   consist of only one page, Ms. Gupta?

 5          MS. GUPTA:  It does.

 6          THE COURT:  All right.

 7      Do you need to see the original, or is that that you see

 8   on the screen sufficient?  In other words, do you need to see

 9   the paper?

10          MR. KELLER:  I can go off the screen, Your Honor.

11          THE COURT:  All right.

12          MS. GUPTA:  May I proceed, or do you want me to wait?

13   I can wait.

14          THE COURT:  Well, Mr. Keller, are you done reviewing

15   the document?  Or, if you haven't, would you let the Court know

16   when you have?

17          MR. KELLER:  Yes, Your Honor.  I'm okay.  We can keep

18   going.

19          THE COURT:  All right.

20      Ms. Gupta, please proceed.

21          MS. GUPTA:  Okay.

22    BY MS. GUPTA:

23    Q.  Mr. Perlatti, looking at this document, I'm going to

24   point you to the bottom of the ballot.  Below the voter's

25   signature and date, do you see there it says:  "07 --

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 101 of 263 PAGEID #: 1158
Case: 2:20-cv-03843-MHW-KAJ Doc #: 6565 Filed: 04/06/20 Page: 101 of 263 PAGEID #: 2158

Vol. 2 - 101

1    non-matching SSN#"?

2      A.    Yes.

3      Q.    And if this document was produced in response to a

4    request for documents relating to rejection of ballots on the

5    basis of identification, would you have any reason to disagree

6    that this ballot was included in that?

7      A.    No.  If it was presented as a missing, or a mismatch, of

8    Social Security number, then, without actually looking at the

9    database myself, I am assuming, then, that that Social Security

10   number is incorrect.

11     Q.    And, then, that -- would you also agree that, if it

12   were -- if this document was produced in response to a request

13   for ballots rejected on the basis of an ID mismatch, that this

14   ballot, then, was rejected on that basis?

15     A.    Yes.

16     Q.    Okay.  Thanks.

17           Now, would this ballot, then, have been thrown out

18   because of the -- I believe you just testified that it would

19   be -- It was -- It would be thrown out on the basis of a

20   mismatching Social Security number?

21           MR. KELLER:  Objection.  Mischaracterization.

22           THE COURT:  Overruled.

23           MR. KELLER:  Thank you, Your Honor.

24           THE WITNESS:  Yes.  If staff determined that was the

25   incorrect Social Security number, then it would be rejected for

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 102 of 263 PAGEID #: 1159
Case: 2:00-cv-03893-ALM-TPA Doc #: 656 Filed: 04/06/18 Page: 102 of 263 PAGEID #: 23784

Vol. 2 — 102

1    that.

2      BY MS. GUPTA:

3      Q.    Okay.  Now, if you look down a little farther on this

4    ballot, you'll see that the voter also checked the box relating

5    to -- indicating that the voter showed their photo

6    identification, correct?

7      A.    Yes, that box is checked.

8      Q.    So this ballot would be thrown out on the basis of a

9    mismatching identification despite the fact that the -- oh,

10   excuse me.  Let me back up one second.

11         Showing a valid form of identification satisfies the ID

12   requirement; does it not?

13     A.    I'm not as familiar with that part of the ID regarding a

14   provisional ballot.

15     Q.    Well, let's look at the instructions on the left-hand

16   side of the form.  Under "Identification," you see where it

17   says "Do ONE of the following"?

18     A.    Correct.

19     Q.    And the third bullet point there -- Well, I can read

20   these out.  You can either write your full Ohio driver's

21   license or a state ID card number or write the last four digits

22   of your Social Security number, or check the box next to the

23   form of identification you showed to the precinct election

24   official, correct?

25     A.    Yes.

1    Q.   Okay.  So, would you agree that, then, showing

2    the -- showing one's ID, photo ID, is sufficient to meet the

3    identification requirement on this form?

4    A.   That is one of the acceptable forms listed.

5    Q.   Okay.  And the fact that the individual checked off the

6    box indicating that they showed that ID meets that requirement,

7    correct?

8    A.   The box is checked.  So, looks like that requirement was

9    met.

10   Q.   Okay.  So, now, this ballot, however, was thrown out on

11   the basis of a mismatch of ID despite the fact that the

12   individual met the ID requirement by showing their ID, correct?

13        MR. KELLER:  Objection, Your Honor.  Asked and

14   answered.

15        THE COURT:  Sustained.

16        MS. GUPTA:  Okay.

17        MR. KELLER:  Thank you, Your Honor.

18   BY MS. GUPTA:

19   Q.   Do you agree that this -- Withdrawn.

20        I'm going to show you what's been marked as Plaintiffs'

21   Exhibit 2856.  It's also Bates Number Cuyahoga 1131.

22        MR. KELLER:  Your Honor, can I have a moment?  I don't

23   think we have this one, as well.

24        THE COURT:  All right.

25        (Whereupon, there was a brief interruption.)

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 104 of 263 PAGEID #: 1161
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 104 of 263 PAGEID #: 21794

Vol. 2 - 104

 1          MR. KELLER:  Sandhya, is this one on your exhibit

 2   list?  Is this on your exhibit list?

 3          MS. GUPTA:  Which Bates number is it?  It's 2856.

 4          MR. KELLER:  Did you have an update to your exhibit

 5   list yesterday?

 6          (Counsel confer off the record.)

 7          MR. KELLER:  Thank you, Your Honor.

 8          THE COURT:  All right.

 9          Please continue, Ms. Gupta.

10          MS. GUPTA:  Okay.

11    BY MS. GUPTA:

12    Q.   Mr. Perlatti, looking at this document, if I were to

13   represent that this document was produced in response to a

14   request for documents -- in response to a request for ballots

15   thrown out because of an error in the ID, would you have any

16   reason to dispute that?

17          MR. KELLER:  Objection, Your Honor.  Speculation.

18   Form.

19          THE COURT:  Overruled.  Mr. Perlatti is in a position

20   he can answer it, if you know, Mr. Perlatti.

21          THE WITNESS:  I just -- I see that there's the last

22   four of a Social provided.  I don't know if that's the correct

23   Social, or not, for the individual.  If it was provided as a

24   mismatch of information, then I can make an assumption that the

25   Social Security number is incorrect and that's why it was

1    rejected.

2      BY MS. GUPTA:

3      Q.    This, too, is a document where the voter checked off the

4    box indicating that she showed a photo ID, correct?

5      A.    Yes, that box is checked.

6      Q.    Okay.  And there appears, also, to be -- Let me back up

7    for a moment.

8          So, again, as with the last ballot form we just looked

9    at, the ballot would have been thrown out on the basis of an ID

10   mismatch despite the fact that the photo identification box is

11   checked, correct?

12     A.    Yes.

13     Q.    And, in this example, the voter also put in a number in

14   the driver's license field, correct?

15     A.    Yes.

16     Q.    Are you able to tell whether that driver's license is in

17   the correct form or not?

18     A.    It doesn't look like it's the driver's license number

19   that was put there.  There's two numbers, a lot of times, on a

20   driver's license:  Your actual license number that begins with

21   an alpha character, and then I believe there is a picture (sic)

22   that is close to the picture and -- which is not the actual

23   driver's license number.  Sometimes individuals will put that

24   on a registration card or provisional envelope.  And that's

25   not -- that's not their correct number.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 106 of 263 PAGEID #: 1163
Case: 2:00-cv-03893-MHW-KAJ Doc #: 656 Filed: 04/06/20 Page: 106 of 263 PAGEID #: 2793

Vol. 2 - 106

1    Q.   If a voter puts both a driver's license number and a

2    Social Security number and one of them is incorrect, would you

3    reject that ballot?

4    A.   I believe, if one of the two was correct, that they

5    would accept that ballot.

6    Q.   Okay.  But the same is not true if you have someone who

7    checked off the box and put in a mismatching Social?

8    A.   That -- I don't believe that has been the practice in

9    Cuyahoga.

10   Q.   And, just to clarify, you don't believe what is the

11   practice?

12   A.   If there -- If the driver's license or Social Security

13   number does not match the registration database and the box is

14   checked, the one that we're talking about as far as photo

15   identification being shown to the precinct election official, I

16   don't think we approve that ballot in Cuyahoga.

17   Q.   Let me ask you some questions about the absentee

18   procedure.  Unlike provisional voters, absentee voters do get

19   an opportunity to cure errors, correct?

20   A.   On their -- Yes, on their ballot identification

21   envelope.

22   Q.   Thank you for clarifying.  Yes.  And that's through the

23   Form 11-S, correct?

24   A.   Correct.

25   Q.   Okay.  Now, you're not permitted to contact absentee

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 107 of 263 PAGEID #: 1164
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/20 Page: 107 of 263 PAGEID #: 24769

Vol. 2 - 107

 1   voters in any other way besides the Form 11-S; is that true?

 2   A.   That's correct.  That's my understanding.

 3   Q.   Sometimes, you do have the phone number, an e-mail

 4   address -- even sometimes an e-mail address for absentee

 5   voters, correct?

 6   A.   That is correct.

 7   Q.   And you could actually do phone calls through robocalls;

 8   could you not?

 9   A.   We could.  If the information -- If we loaded the

10   information into our system, we could.

11   Q.   But you're not permitted to do that?

12   A.   That's correct.

13   Q.   And there's no record of whether an 11-S form was

14   actually sent to a voter, is there?

15   A.   I do not believe that we keep a copy of the 11-S form

16   that's sent to a specific individual.  The procedure is, when

17   we challenge someone, then the next step in the process is, you

18   go ahead and you put an 11-S form out.  Typically, we get it

19   out in the same day.  Sometimes it's the next day.  And it also

20   depends on the param- -- There's parameters set out in a

21   directive as to when you have to send them.  We always comply

22   with that; but, more than likely, we do it the same day that we

23   execute the challenge.

24   Q.   And I'm going to ask you a question about address, the

25   address requirement on an absentee ballot.  You know, let me

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 108 of 263 PAGEID #: 1165
Case: 2:20-cv-03843-MLM-TPA Doc #: 656-5 Filed: 04/06/20 Page: 108 of 263 PAGEID #: 3195

Vol. 2 – 108

1   back up for one second.

2       When you talked about the fields that are required on

3   the provisional ballot, as far as you know, the same

4   requirements are present on the absentee ballot as are on the

5   provisional, correct?

6   A.    Right.  The same five fields have to be present on the

7   identification envelope.

8   Q.    And those five fields are the printed name, the ID, date

9   of birth, signature, and --

10  A.    -- address.

11  Q.    Thank you.

12  A.    Yes.

13  Q.    As to the address, actually, Cuyahoga County was

14  pre-printing addresses, correct, for some time?

15  A.    Yeah.  We have been pre-printing name and address on our

16  identification envelopes.

17  Q.    And now you're not; is that true?

18  A.    We still put that information on the envelope.  It's the

19  manner in which we do that information.  So, previously, on the

20  identification envelope, on the left half of the form, you

21  would have -- that's where you would have all the verbiage

22  requiring your name and address and your ID.  And all that

23  would be on that side.  And the right side of the envelope is a

24  spot where almost like a mailing address would be printed

25  there.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 109 of 263 PAGEID #: 1166
Case: 2:20-cv-03843-MLM-KAJ Doc #: 656 Filed: 04/06/18 Page: 109 of 263 PAGEID #: 2470

Vol. 2 - 109

1    Previously, Cuyahoga, on the left-hand side, in the

2    printed name field and in the address field, we would have our

3    printer populate that information on that part of the form.

4    And, additionally, we would have it on the right side of the

5    envelope in the form of, like, a mailing address, with the name

6    and the street, street address, below that.  So, we did both of

7    those previously.

8         In the last election, I think -- I believe it was just

9    starting with the last election -- we no longer put it on the

10   left-hand side of the envelope, but we maintained it on the

11   right-hand side.  We stopped doing it on the left-hand side

12   because it was very difficult for the printer to, at a very

13   high percentage, consistently get that information to hit the

14   spot on the form, to get that variable data printed.  And so

15   sometimes it would be halfway through, like, a line below the

16   line.  And it just -- it didn't look correct.  So, we stopped

17   that; but we kept it on the right-hand side of the envelope.

18   And per direction from the Secretary of State's Office, that

19   information appearing on the envelope, even when it's -- when

20   we have it on it, the right side of the form meets the

21   requirements of the Secretary of State to have that information

22   pre-populated on the form.

23   Q.   So, just to be clear, if there was a mistake in how

24   someone wrote their address on that left-hand side, would that

25   be cause to reject the ballot?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 110 of 263 PAGEID #: 1167
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 110 of 263 PAGEID #: 24767

Vol. 2 – 110

1  A.   No.  I believe we would -- we would use the address that

2  we pre-printed on the envelope.  And the ballot that we sent

3  them corresponds to that address that we pre-printed on the

4  envelope.

5  Q.   Moving on to a question about identification matching.

6       THE COURT:  Before you move on to another area, could

7  I see you and Mr. Keller right here?

8    (Thereupon, the Court and Counsel conferred out of the

9  hearing of the court reporter.)

10      THE COURT:  Please continue, Ms. Gupta.

11      MS. GUPTA:  Thank you, Your Honor.

12 BY MS. GUPTA:

13 Q.   Mr. Perlatti, isn't it true that, before -- so, in the

14 process of reviewing absentee ballots, would you agree that the

15 Board's staff are trained to check the absentee application

16 that comes in, first, against the registration database before

17 sending out a ballot?

18 A.   We instruct our employees to compare the vote-by-mail

19 application, or absentee application, to the database to see if

20 the information is correct.

21 Q.   And then, at that point, you contact a voter if there is

22 some mismatch in the application, a mismatch with the

23 information in the registration database; is that correct?

24 A.   We'll send a letter out to the individual.  And,

25 depending on what part we are of the election cycle, basically,

Vol. 2 - 111

1    focusing on the registration deadline, if it's pre-registration

2    deadline, we'll send out a letter, and we'll include a

3    registration card and an additional vote-by-mail application.

4    And, then, this way, if there is an issue with the

5    registration, they can complete a registration card, send that

6    in, and then send another vote-by-mail application with that.

7         And upon receiving that, if it's correct, we'll go ahead

8    and process.  If it is after the close of registration, they're

9    not able to update the registration record.  So, at that point,

10   we would send them a letter.  I believe we still include the

11   registration card because, ultimately, we want to get the

12   registration correct when we are able to update it.  But, in

13   that scenario, we would not send out another vote-by-mail

14   application because we're not able to adjust their record.

15        I think, also, in that letter, we may indicate to them

16   that, if there was a change, if there was a change of address,

17   that they could go to the polls and vote provisionally on

18   Election Day.

19   Q.   Let me show you what's been marked as Plaintiffs'

20   Exhibit 2974.  It corresponds to Cuyahoga 482 and 483.

21        That's 482.  I'm actually going to try to put them side

22   by side, but I'm having a little difficulty.

23        Mr. Perlatti, if I were to represent to you that this

24   document was produced in response to a subpoena request for

25   documents -- for ballot forms rejected on the basis of a mis-,

1   or, an incorrect ID, would you have any reason to dispute that?

2       A.   No.  If my staff provided it for that, then it's

3   probably correct.

4       Q.   Okay.  Are you able to tell -- Well, let me back up.

5            In this instance, you see that on the right-hand side is

6   the vote-by-mail ballot application, correct?

7       A.   Correct.

8       Q.   And on the left-hand side is the ID envelope?

9       A.   Yes.

10      Q.   Okay.  And the last four digits of the Social Security

11  number actually match in both cases, correct?

12      A.   Yes, they do.

13      Q.   Are you able to tell from this why this would have been

14  rejected?

15      A.   The only thing I can think of is that the -- and I don't

16  know this without looking at the registration database, but the

17  registration database may have a different last four Social

18  Security number for this individual.  And, so, if that were to

19  be true, then the application was incorrectly processed and the

20  ballot sent out.

21           There is, I believe, a higher level of scrutiny, or, in

22  Cuyahoga County, there is a higher level of scrutiny on the

23  returned ballots that come back, versus the application.  It

24  doesn't justify sending out, if that was wrong, sending it out

25  in the first place; but that -- and I don't know if that is the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 113 of 263 PAGEID #: 1170
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 113 of 263 PAGEID #: 24799

Vol. 2 - 113

```
 1   case; but that, potentially, could be the scenario here.

 2         This is not an excuse, but the reality is that you bring

 3   on a lot of temporary employees and other staff; and they may

 4   have -- they may have gotten that one wrong.

 5   Q.    Sure.

 6   A.    Now, but, also, an 11-S form would be sent out to the

 7   individual to try to cure that ballot.

 8   Q.    I'm going to show you what's been marked as Plaintiffs'

 9   Exhibit 2988.  It's corresponds to Cuyahoga 476 and 477.  And,

10   primarily, I'd like you to look at 477.

11   A.    Which one is 477?

12   Q.    That's this document, the one with the screen-shot.

13   A.    Okay.  Thank you.

14   Q.    Mr. Perlatti, if I were to represent to you that this

15   ballot was, or -- excuse me -- this document was produced in

16   response to plaintiffs' request for documents that show the

17   identification envelope and what that was compared to, would

18   you have any reason to dispute that?

19   A.    Well, obviously, this document we're looking at is not

20   an application.  This looks to be a screen-shot of our voter

21   registration database, in which information is inputted from an

22   application.  Staff -- I mean, I believe the staff provided you

23   this screen-shot probably because they may have had

24   difficulties in trying to find the application because of the

25   volume of them.  But that's -- that is a -- that's -- I don't
```

1    know if our DIMS registration database -- It looks like it's

2    out of the absentee module.

3        Q.   Okay.  And if you can look at the field -- it states

4    "Election" and "11-4, 2014."  Are you able to verify that this

5    is a screen-shot that would have correlated to what a staff

6    member would have seen at the time they were making the

7    comparison between the ID envelope and the information in the

8    database?

9        A.   Yes.

10       Q.   Okay.  And I'm going to show you Plaintiffs' Exhibit

11   2984, which corresponds to Cuyahoga 544 to 545.  And, in

12   particular, I'm going to direct your attention to the Bates

13   stamp number 545.  Do you see that as a screen-shot as well?

14       A.   Yes.

15       Q.   And, with this document, it says -- With the last, if I

16   were to represent that this document was produced in response

17   to a request for documents showing what the ID envelope was

18   compared to, would you have any reason to dispute that?

19       A.   No.  This information would be inputted from the

20   application.

21       Q.   Okay.  And would you be able to verify that this

22   screen-shot of the database corresponds to what a staff member

23   would have seen, what the screen would have looked like, what

24   the staff member would have seen when they did the actual

25   comparison to the ID envelope at the time, at the time of the

1    election?

2    A.    This would -- This would be the screen.

3    Q.    Thank you.

4          MS. GUPTA:  Your Honor, could we have a side-bar, if

5    you want?  Or do you want --

6          MR. KELLER:  If we could just have a moment to confer,

7    Your Honor?

8          THE COURT:  Yes.  Yes, you may.

9       (Whereupon, Counsel confer off the record.)

10         MR. KELLER:  Your Honor, can I have a side-bar,

11   please?

12         THE COURT:  Yes.

13     (Thereupon, the following proceeding was held at side-bar.)

14         MR. KELLER:  What we're trying to clarify is, I want

15   to record to be clear on which information is present at the

16   time they're processing the ballot.  I assume, based on the

17   questions we've heard so far, that at the top is -- I'm not

18   sure if this is or is not.  I guess I can --

19         THE COURT:  Can you establish that, Ms. Gupta, with

20   this witness?

21         MS. GUPTA:  Let me make sure I understand what you're

22   asking.

23         MR. KELLER:  These top fields, would that stay static?

24   Or is that based on the most recent information they have?  I

25   just want to make sure we know what the information comes from

1    and what time it's reflective of.

2         MS. GUPTA:  I see.  Do you want to ask it on cross, or

3    would you prefer that I do it?

4         THE COURT:  If you want to get this document in --

5         MS. GUPTA:  Okay.  I'll handle it.

6         THE COURT:  -- then you need to --

7         MS. GUPTA:  I'll be happy to.

8         THE COURT:  I think that would be a part of the

9    foundation.

10        MS. GUPTA:  Okay.  Sure.  So, it's a matter of asking

11   about the information above?

12        MR. KELLER:  Yeah.  How I interpreted his answer is

13   that, the bottom, with the poll fields, that's there at the

14   time of the comparison of the ballot.  But I just want to make

15   sure the record is clear on whether it is or not.  I don't know

16   the answer.

17        MS. GUPTA:  All right.

18        THE COURT:  Just clarify that.

19        MS. GUPTA:  Okay.  Thank you, Your Honor.

20        THE COURT:  All right.

21     (The following proceedings were had in open court.)

22    BY MS. GUPTA:

23    Q.   Mr. Perlatti, drawing your attention back to Cuyahoga

24   545, this is the screen-shot that we were just looking at.  And

25   could you actually just clarify that, when you testified that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 117 of 263 PAGEID #: 1174
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 117 of 263 PAGEID #: 24794

Vol. 2 - 117

```
 1   this is the screen-shot that a staff member would have been

 2   looking at at the time they were making the comparison between

 3   the ID envelope and the database, that the information -- that

 4   all of the information as presented here would have been what

 5   that staff member saw, including the information where at the

 6   top of the form it states voter's name and address on file?

 7      A.    You see the name, the address, the ID, the date of

 8   birth, and the signature, a picture of the signature that we

 9   have on file in the registration database.

10      Q.    And that's at the time they're reviewing the document,

11   or -- excuse me -- the ID envelope?

12      A.    Yes.

13      Q.    And it's not -- that information and the voter's name

14   and address on file would not be updated, which is to say that,

15   if this were printed, let's say in the last couple of months,

16   would this screen-shot possibly show an updated address for the

17   voter?

18      A.    That's an IT question for the IT department.  So, as far

19   as is this module -- I believe, when they're viewing this,

20   they're viewing this -- it should be -- it pulls from the main

21   registration database.  So, all of this is done in the

22   registration database, which is made up of different modules.

23   So, there's a -- there's a provisional module.  There's an

24   absentee module.  You have the main database, which has

25   their -- really, their registration record.  So, it's all
```

1    feeding from that one area.

2        And, so, this should update in live time.  It should

3    have their current information.  But then, once the close of

4    registration happens, it's locked down because you can't make

5    any adjustments to the database at that point in time because

6    registration has closed as far as updating -- well, anything

7    you would update via a registration card.

8        So, that's what -- So, again, once the close of

9    registration comes, the database is locked down.  And that's

10   what it looks like for that election cycle.  And then, once you

11   certify the election, the database is opened back up again; and

12   any updates that need to happen occur.

13   Q.   Okay.  Just a moment.

14       (Thereupon, Counsel confer off the record.)

15       MS. GUPTA:  So, Your Honor, we would move into -- It

16   looks like there may still be some question about the documents

17   showing a screen-shot.  And I believe we can sort it out

18   separately.  But I guess what I would like to do is to move

19   these exhibits -- The specific screen-shot documents that Mr.

20   Keller has identified, I can read them off, move them into

21   evidence, and we can make a record.

22       THE COURT:  Do you move this 00545 into evidence?

23       MS. GUPTA:  Right.  Actually, it's connected to -- I

24   believe this one was connected to 2984, P2984.

25       THE COURT:  Okay.  Do you have an objection to P2984,

1    Mr. Keller?

2          MR. KELLER:  Your Honor, we do at this time, based on

3    relevance, potential 403 confusion issues.  I don't want to

4    keep --

5          THE COURT:  The Court is not confused.  And, as the

6    finder of fact, I think that your objection probably goes more

7    to weight, and not to admissibility.  Mr. Perlatti has

8    identified the document.

9          You know what the document is.  Am I correct, Mr.

10   Perlatti?

11         THE WITNESS:  On the screen-shot?

12         THE COURT:  Yes.

13         THE WITNESS:  Yes.

14         THE COURT:  All right.  And is this a document that

15   you typically deal with in your capacity as Deputy Director of

16   the Cuyahoga County Board of Elections?

17         THE WITNESS:  Yes.

18         THE COURT:  I'm going to admit it.  And you certainly

19   have an opportunity to cross-examine on that document, which

20   would more frame the weight the Court will attribute to the

21   exhibit, as opposed to whether the exhibit is admissible.  The

22   exhibit certainly will come in as an 803.6 exhibit.  And so I'm

23   going to allow it.  I've already determined that those

24   documents are relevant previously.  And so your objection is

25   well taken, but overruled.

1    Please continue, Ms. Gupta.

2    MS. GUPTA:  Your Honor, just a question.  There are

3    other screen-shot documents like that.

4    THE COURT:  Do you have the same objection to those

5    screen-shot documents; or was your objection, Mr. Keller,

6    limited to the one that we saw on 00545?

7    MR. KELLER:  It's the same objection.  I just want to

8    preserve it, but I understand the Court's ruling.

9    THE COURT:  All right.  So, with that understanding,

10   have you and Ms. Gupta conferred on the remaining screen-shot

11   documents?

12   MR. KELLER:  It's the same issue as to all those

13   screen-shot documents.

14   THE COURT:  Yeah.  But my question is, have you seen

15   the other screen-shot documents.  And your objection is as to

16   relevancy; is that right?

17   MR. KELLER:  And 403, Your Honor.

18   THE COURT:  And maybe -- Do you want to state for the

19   record what you believe is the confusing part that you believe

20   would also confuse the Court?

21   MR. KELLER:  I will say I'm confused at this point.  I

22   don't know whether that information is at the time they printed

23   it or at the time that the voter was evaluated for whether they

24   had mismatching information.

25   THE COURT:  And you don't know the answer to that, Mr.

1  Perlatti?

2       THE WITNESS:  No.  And that's where, with the IT, I

3  don't know, when they printed this, if that absentee module is

4  kind of like locked down for that election or, once we're up

5  and updating again, if this has been updated.  That, I

6  can't -- I don't know, because when -- When I'm viewing it at

7  that point in time in the election process, I know that that

8  information is good at that point in time, but I --

9       THE COURT:  And what you can do, Mr. Keller, is

10  explore that on cross-examination.  As I said, that will inform

11  the weight that the Court gives to that document and others

12  related to that document, the screen-shots.  But my point is

13  that these are documents that are kept and maintained in the

14  regular and ordinary course of his business.  And he's

15  testified to that.  And he's identified at least this specific

16  document.

17       And, presumably, if you all stipulate to it or if Mr.

18  Perlatti can so inform the Court, all the documents in this

19  category are the same.  And so they would be business records,

20  and they would be admissible.  But you may be able to establish

21  that the Court shouldn't give weight to those documents because

22  they don't inform any of the Court's decisions on the issues

23  pending before the Court.

24       Does that clarify it for you?

25       MR. KELLER:  I understand the Court's ruling, yes.

 1            THE COURT:  Okay.  All right.

 2            MS. GUPTA:  Your Honor, then, would you like me to

 3      read off the exhibits that have those screen-shots?

 4            THE COURT:  Exactly.

 5            MS. GUPTA:  Okay.  So plaintiffs will move into

 6      evidence Plaintiffs' Exhibit 2988, 2984, which is the one we

 7      were just discussing, 2660, 2663, 2668, 2675, 2677, 2687.

 8            THE COURT:  Mr. Keller?

 9            MR. KELLER:  Your Honor, it's the -- The only other

10      point beyond the objection is that I cannot tell, without the

11      Bates numbers, whether we even have gotten this.

12            THE COURT:  All right.  Here is what we're going to

13      do:  With the exception of 2984, which I've just admitted, I'm

14      going to hold in abeyance my admission until after lunch.  And

15      during the lunch break, Mr. Keller, I want you to get together

16      with Ms. Gupta and harmonize these numbers with the Bates

17      numbers that you already have.

18          It's already been established as a matter of record that

19      you have these documents.  It's just that there is a disconnect

20      between the Bates numbers and the exhibit numbers, from what

21      I'm given to understand.  Is that correct?

22            MR. KELLER:  That is not correct, Your Honor.

23            THE COURT:  All right.

24            MR. KELLER:  My understanding is that, some documents,

25      we did not have.  I'm, obviously, kind of working on the fly

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 123 of 263 PAGEID #: 1180
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 123 of 263 PAGEID #: 3809

Vol. 2 - 123

```
 1    here, but based on my understanding --

 2           THE COURT:  Okay.  So we'll determine, after lunch,

 3    which documents you have, which ones you don't have.  The ones

 4    you don't have, you should be provided over the lunch break so

 5    that you can look at them.  And, at that time, I will rule on

 6    their admissibility.  But I will tell you that the likelihood

 7    is I will find them admissible on the same basis as 2984,

 8    although I will give some consideration to your argument as to

 9    you are not being provided with these documents in advance of

10    trial, which may be a separate basis to exclude them.  But

11    that's more a discovery issue than an evidentiary issue, but

12    I'll have to wait until you get a chance to compare.

13           I might be mistaken, but my anticipation was that you

14    and Ms. Gupta would have resolved all of these issues before

15    Mr. Perlatti took the stand, because I had directed counsel,

16    yesterday, to get these document issues resolved so that we

17    would be able to take up time with testimonial evidence, as

18    opposed to arguments about which documents correspond to which

19    numbers.

20           Did you all not get a chance to do that this morning as

21    I directed?

22           MS. GUPTA:  Your Honor, we did.  We did as to the

23    majority of the documents.  And those screen-shots were the

24    exception that we determined we would ask foundational

25    questions about.  And I don't think we were aware that the
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 124 of 263 PAGEID #: 1181
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 124 of 263 PAGEID #: 23504

Vol. 2 - 124

 1    defendants did not have the other set of documents.

 2            THE COURT:  Okay.  All right.

 3            MS. GUPTA:  I apologize.

 4            THE COURT:  Who has the witness after Mr. Perlatti?

 5            MR. McTIGUE:  I do, Your Honor.

 6            THE COURT:  Please stand, Mr. McTigue.  And who is

 7    that witness?

 8            MR. McTIGUE:  Mr. Tim Burke.

 9            THE COURT:  And who is Mr. Burke?

10            MR. McTIGUE:  He is on the Board of Elections for

11    Hamilton County.

12            THE COURT:  All right.  Do we have the same -- Who

13    has -- Ms. Conover?

14            MR. CONOVER:  Yes.

15            THE COURT:  Do we have the same kind of issues that we

16    have here with Mr. Perlatti?

17            MR. CONOVER:  So, last evening, Mr. McTigue

18    represented that Mr. Burke would only be testifying about the

19    legislative intent in his testimony in front of the General

20    Assembly.  And this morning we heard that there may be

21    documents now involved that he would be authenticating.  So,

22    we're not prepared for that this morning.

23            THE COURT:  All right.  The documents that you're

24    going to review, Mr. McTigue, are you certain that those

25    documents have already been produced to the defense?

1          MR. McTIGUE:  Yes.  Yes, Your Honor.

2          THE COURT:  All right.  So I want the two of you, over

3    lunch, also, to get together.  If there are documents that we

4    could stipulate to, stipulate to them.  I don't want this same

5    type of back-and-forth over whether they have them, whether the

6    numbers correspond, because this takes up Mr. Perlatti's time.

7    He didn't ask to be here.  The rest of us asked to be here.

8    And I take great exception to wasting Mr. Perlatti's time

9    because he has one election that is completed, but probably not

10   totally complete, and he has a big election coming up in

11   November that you might have heard of that he has to prepare

12   for.

13         So I'm going to -- Do you have any more before we break

14   for lunch?

15         MS. GUPTA:  I have -- I do have just a little bit

16   more, Your Honor.

17         THE COURT:  Okay.  And I hope that the just a little

18   bit more is not this same we-don't-know-whether-we-have-these-

19   documents issues.  Please tell me they're not.

20         MS. GUPTA:  I don't believe we have additional issues

21   on that.  In fact, plaintiffs and defendants were able to agree

22   on a slew of other exhibits, as well, which I was going to

23   mention at the end.

24         THE COURT:  Okay.  You have 15 minutes to conclude

25   your examination.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 126 of 263 PAGEID #: 1183
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/10 Page: 126 of 263 PAGEID #: 23369

Vol. 2 – 126

```
 1          MS. GUPTA:  Very well.

 2          THE COURT:  Have a seat, Mr. Keller.

 3          MR. KELLER:  Thank you, Your Honor.

 4     BY MS. GUPTA:

 5     Q.   Mr. Perlatti, thank you.

 6          Turning for a moment to early in-person voting, your

 7     staff is present to ensure that voters know to fill everything

 8     out; is that correct?

 9     A.   Well, when they come in-house, they meet with one of our

10     employees.  In the application, once we have their address,

11     we'll print the application.  They will look at it, fill in the

12     other information.  And then we'll go ahead and get them the

13     ballot and give them the ballot and the identification

14     envelope.  And then they will go into a voting booth and vote

15     that.

16          So, they do not turn the ballot back in to our staff

17     when they're done voting.  We have a ballot box in the voting

18     room that, when they're done, they just submit it into that.

19          So, staff -- staff is there to assist them in, I guess

20     for the application process, in getting them -- so we can get

21     them the correct ballot.  But then, once the ballot is issued

22     with the ID envelope, they are -- basically, they're on their

23     own, you know, in the room.

24     Q.   But the staff does sometimes -- as they return that

25     ballot and ID envelope to the voter, there's nothing that
```

Vol. 2 - 127

1    prevents them from saying to the voter, Make sure you fill out

2    everything correctly, that kind of thing?  Would that be

3    correct?

4     A.    That's correct.  They probably, in fact, do direct them,

5    Please make sure you fill out the envelope completely.

6     Q.    Okay.  I would like to show you what's been marked as

7    Plaintiffs' Exhibit 3027.  And it corresponds to Cuyahoga 1143

8    and 1144, but we're going to focus on the first page.

9          Mr. Perlatti, do you recognize this document?

10    A.    I'm sure I've seen it before.  And from the title on the

11   document --

12          MR. KELLER:  Objection, Your Honor.  I'm sorry, but we

13   haven't seen this.

14          MS. GENTRY:  Your Honor, this was actually used at a

15   deposition.  And I know it was produced.  I have a copy right

16   here (indicating).  It was Plaintiffs' Exhibit 38 at the

17   deposition in Cuyahoga County.  I'm happy to provide it to

18   counsel right here.

19          MS. CARWILE:  Your Honor, the problem, they submitted

20   their exhibit list.  I've gone through it since all this issue

21   has come up.  There's a number of these documents that are not

22   on their Exhibit B, or Appendix B to the joint pretrial, which

23   was their amended exhibit list.

24          THE COURT:  All right.

25          MS. CARWILE:  And so they're not in our documents that

 1    they've provided to us as exhibits for this trial.

 2            MS. GENTRY:  Your Honor, that's simply not correct.

 3            MS. CARWILE:  Can you tell me, then, where it is,

 4    because I just spent the last time looking for it?

 5            MS. STOCK:  I gave you a supplement of the Exhibit B.

 6    And then I just gave you two notebooks of these documents that

 7    we're just talking about.  We just got them copied.

 8            MS. CARWILE:  The supplement yesterday is not the same

 9    thing as getting this pre trial.

10            THE COURT:  All right.  All right.  We're going to

11    continue with Mr. Perlatti's --

12        Ms. Carwile, have you ever heard the expression that, in

13    the battle of the elephants, only the grass gets hurt?  You

14    ever heard that?

15            MS. CARWILE:  No.

16            THE COURT:  Would you know what it means?

17            MS. CARWILE:  No.

18            THE COURT:  That when the two sides are warring back

19    and forth, poor Mr. Perlatti, here, has to sit down and suffer

20    through it.  And, if anyone was paying attention, I just said

21    that we don't want to further burden Mr. Perlatti.

22        Now, I'm going to allow him to testify about this

23    document.  And we're going to sort this out after he gets off

24    the stand.

25        Ms. Gupta has about seven minutes to complete her

1    examination.  And so she is going to complete her examination

2    with dispatch.  And, if there are any more substantive

3    objections, I won't restrict you from making the objections.

4    And then we'll have an all-counsel meeting at the conclusion of

5    the direct, and we'll sort out this whole conundrum of the

6    exhibits.  And this is inevitable in a case with this

7    many -- that's this paper intensive.  So, the test will be

8    surprise and prejudice.

9          MS. CARWILE:  Yes.  Sorry, Your Honor.  Thank you.

10          THE COURT:  Nothing to apologize for.

11       Please continue.

12    BY MS. GUPTA:

13    Q.   Mr. Perlatti, you were saying about this document --

14    A.   Yes.  So, this looks like a report that we would print.

15    And it looks like this indicates, for the certain types of

16    provisional categories, whether you count it valid or not, do

17    you update their record or not, and do you give them voter

18    history or not.

19    Q.   Okay.  And you see -- Right.  So, you see the columns at

20    the top, including Count Ballot, Update Vote, Update Voting

21    History, or -- excuse me -- Update VH?

22    A.   Yes.

23    Q.   And "Update VH" stands for update voting history,

24    correct?

25    A.   Voter history.

1    Q.    And what does "Update Vote" refer to?

2    A.    "Update Vote," I believe that is updating their voter

3    registration record.

4    Q.    And what about updating VH?

5    A.    That's giving them credit for voter activity in this

6    election, or in the election.

7    Q.    Okay.  Now, if you look at fields 3, 5, 6, 7, 8 and 11,

8    those correspond to missing address, missing date of birth,

9    non-matching date of birth, missing ID, non-matching ID, no

10   printed name, correct?

11   A.    Yes.

12   Q.    And for all of those I just read off, there is a "Y,"

13   i.e. the letter "Y," under "Update VH," true?

14   A.    Yes.

15   Q.    And that reflects the fact that a voter is given voting

16   history credit for -- excuse me -- they're given credit for

17   voting even though -- excuse me.  Let me back up for a second.

18         For those same fields that I mentioned, under "Count

19   Ballot," there is an "N," a letter "N," for "No," true?

20   A.    Correct, yes.

21   Q.    And so the voter -- meaning that the voter is given

22   credit for voting for those fields that I mentioned even though

23   that voter's vote hasn't counted, correct?

24   A.    Right.  There is a record of voter activity in that

25   election, and their ballot did not count.

1    Q.    And so the Board is able to verify the identity of the

2    individual even though there may have been an omission or a

3    mismatch of information, correct?

4    A.    That is correct.

5         MS. GUPTA:  I'd like to confer with Counsel, Your

6    Honor.

7         THE COURT:  You may.

8      (Whereupon, there was a brief interruption.)

9         MS. GUPTA:  Your Honor, there are no further

10   questions; but I want to put on the record the stipulation, on

11   the range of documents that we've come to, there might be a

12   couple documents in there that I would need the witness to

13   authenticate.

14        THE COURT:  Okay.  If you stipulated to them, why do

15   you need Mr. Perlatti to authenticate them?

16        MS. GUPTA:  There was the range -- It's the range,

17   actually, between Plaintiffs' Exhibits 1041 to 1055.

18        THE COURT:  Have you conferred with opposing Counsel

19   about this?

20        MS. GUPTA:  We did, but there were a couple of

21   exceptions in that range.

22        THE COURT:  All right.  What were the two exceptions?

23        MR. KELLER:  I'm sorry.  I'm confused.  We already

24   went over the screen-shot issue.

25        MR. PIERCE:  Your Honor, we stipulated to admission of

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 132 of 263 PAGEID #: 1189
Case: 2:06-cv-00896-ALM-TPA Doc #: 656 Filed: 04/06/18 Page: 132 of 263 PAGEID #: 28354

Vol. 2 - 132

```
 1    portions of a deposition that was taken of one of Mr.

 2    Perlatti's employees, the head of the registration department.

 3              THE COURT:  Yes.

 4              MR. PIERCE:  And Ms. Gupta wanted to introduce some

 5    exhibits that were talked about at that deposition although

 6    that deposition testimony did not sufficiently authenticate the

 7    documents because that employee did not recognize them as

 8    documents from her department.

 9              THE COURT:  All right.

10              MR. PIERCE:  So, I mentioned to Ms. Gupta, if she

11    could lay the foundation with Mr. Perlatti as to those

12    documents' authenticity, then we could --

13              THE COURT:  All right.  That's fine.  I just asked

14    which documents they were.  How many documents are there?

15              MR. PIERCE:  Just two, to my understanding, Your

16    Honor.

17              THE COURT:  Does your case rise and fall on those two

18    documents?

19              MS. GUPTA:  No, it does not.

20              THE COURT:  What are these documents about?

21              MS. GUPTA:  They were poll-worker training documents.

22    One was a training manual, I believe.  I'm sorry.  I just seem

23    to have misplaced the paper that indicated which exact ones

24    they were, but they were indicated in the deposition of

25    Ms. Edwards.
```

```
 1              THE COURT:  Ms. Pierce, do you know which ones they
 2    are?
 3              MR. PIERCE:  Yes, Your Honor.  I believe they're
 4    10 --
 5              THE COURT:  I don't care who locates them for me.
 6              MR. PIERCE:  Yes, sir.
 7              THE COURT:  Just locate them, please.
 8              MR. PIERCE:  Yes, Your Honor.
 9          Your Honor, I believe that P1050 is one of them.  P1051
10    is the other.  P1052.
11          I apologize, Your Honor.  There were three.
12              THE COURT:  All right.  There are three.
13          Is there anyone who can put their fingers on P1050
14    through P1051?
15              MS. GUPTA:  I believe Diane is doing that.
16              THE COURT:  All right.
17              MS. GUPTA:  Thank you.  1050, 1051, 1052.  Thank you.
18       BY MS. GUPTA:
19       Q.   Mr. Perlatti, just quickly, I'd like to show you what
20    has been marked as Plaintiffs' Exhibit 1050.  And it is Bates
21    stamped "Cuyahoga 81."  I'll put it this way (indicating).  Do
22    you recognize this document?
23              THE COURT:  Why don't you hand the document to him.
24    Let him thumb through it, because it's multiple pages.  I'm
25    presuming that it's a document -- You can give it to him, Ms.
```

```
 1    Gupta.  It's a document that the defense has?

 2            MR. PIERCE:  It is, Your Honor.

 3            THE COURT:  So, it's a document that the defense has

 4    seen?

 5            MR. PIERCE:  We have seen it, yes, Your Honor.

 6            THE COURT:  All right.

 7        Mr. Perlatti, would you review that document and tell me

 8    whether you're familiar with it, please?

 9            MS. GUPTA:  This document was produced by the Cuyahoga

10    Board of Elections in response to our subpoenas.

11            THE COURT:  All right.

12            THE WITNESS:  This document, this definitely is a

13    Board of Elections training document.  And it looks like this

14    is a part -- that this is associated with our poll-worker

15    department as one of their training tools.

16            THE COURT:  Are you familiar with it, Mr. Perlatti?

17            THE WITNESS:  I have -- I have probably -- Well, I'm

18    familiar with the content inside.  But to say this is

19    specifically a poll-worker training manual, that I

20    can't -- without seeing the title page, I can't say that's

21    exactly what it is.  But all the content in here -- and

22    this -- This follows the form of our training manual.  So my

23    best assumption is that's what it is.

24            MS. GUPTA:  Your Honor, we would move Plaintiffs'

25    Exhibit 1050 into evidence.
```

 1          THE COURT:  Mr. Keller?

 2          MR. KELLER:  No objections, Your Honor.

 3          THE COURT:  1050 will be received.

 4     BY MS. GUPTA:

 5     Q.   Mr. Perlatti, I'm going to show you what has been marked

 6     as Plaintiffs' Exhibit 1051.  It corresponds to Cuyahoga 102 to

 7     112.

 8          MS. GUPTA:  Your Honor, may I approach so that the

 9     witness can review?

10          THE COURT:  Yes.

11          THE WITNESS:  This is a document produced by our

12     poll-worker department for provisional training.

13          THE COURT:  Yes.  What document number is that?

14          MS. GUPTA:  That is 1051, Your Honor.  And we would

15     move to admit it.

16          THE COURT:  Any objection to 1051?

17          MR. KELLER:  No, Your Honor.

18          THE COURT:  1051 will be received.

19       What's next?

20     BY MS. GUPTA:

21     Q.   And, Mr. Perlatti, I'm going to show you what's been

22     marked as Plaintiffs' Exhibit 1052, which is Cuyahoga 113 to

23     122.

24          MS. GUPTA:  May I approach, Your Honor?

25          THE COURT:  Yes, you may.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 136 of 263 PAGEID #: 1193
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/10 Page: 136 of 263 PAGEID #: 23130

Vol. 2 — 136

```
 1            THE WITNESS:  This, also, is a document out of our
 2   Cuyahoga County's poll-worker department for training
 3   poll-workers on processing provisionals.
 4            MS. GUPTA:  Your Honor, we would move 1052 into
 5   evidence.
 6            THE COURT:  Any objection, Mr. Keller?
 7            MR. KELLER:  No, Your Honor.
 8            THE COURT:  1052 will be received.
 9            MS. GUPTA:  And I don't know if I moved into evidence
10   Plaintiffs' Exhibit 3027, which was the document on voting
11   history that we were looking at.  So we would move for that
12   into evidence.
13            THE COURT:  3027, did you say?
14            MS. GUPTA:  Correct, yes, 3027.
15            THE COURT:  Any objection to 3027, Mr. Keller?
16            MR. KELLER:  Just the objection that it wasn't on
17   their list, but no other objection.  I don't know if you want
18   to make a continuing objection to that.
19            MS. GENTRY:  Your Honor, do you want the explanation
20   on that?
21            THE COURT:  Is that one that was on the supplemental
22   exhibit list?
23            MS. GENTRY:  Yes.
24            THE COURT:  And it was on the supplemental list
25   because --
```

1    MS. GENTRY:  Because it was produced by Cuyahoga

2 County at their deposition, which I believe was last week.  It

3 was after our initial list was provided.

4    THE COURT:  I see.  All right.  I'm going to admit it.

5    MR. KELLER:  Thank you, Your Honor.

6    MS. GUPTA:  And the final thing I just want to make

7 sure we have on the record is that, as to the balance of the

8 exhibits, Plaintiffs' 1041 to 1055, plaintiffs and defendants

9 have stipulated as to those.

10    And I have no further questions.

11    THE COURT:  Have you so stipulated?

12    MR. KELLER:  That's correct, Your Honor.

13    THE COURT:  All right.

14    Mr. Perlatti, you may step down.  It's ten minutes to

15 1:00.  We're going to stand in lunch recess until 1:45.  It's

16 12:50 now.  So, you may be excused.  The lawyers may not.

17    THE WITNESS:  Should I leave this document here?

18    THE COURT:  Just leave everything where it is.

19    THE WITNESS:  Thank you.

20    THE COURT:  And, Mr. Perlatti -- Mr. Perlatti --

21    THE WITNESS:  Yes.

22    THE COURT:  -- you're to return for your examination

23 by the defense at -- Will 55 minutes give you ample time to get

24 some lunch?

25    THE WITNESS:  Yes.

 1          THE COURT:  One forty five, we'll resume.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  Now, are there -- It's kind of difficult

 4     to narrow, because it doesn't seem that there is a definite set

 5     of exhibits that are going to be used for each witness because

 6     it seems that the testimony seems to shift, or at least the

 7     questioning seems to shift, which is, I think, the point that

 8     Ms. Carwile was attempting to make.  So, to address that issue

 9     and so that we can move through at greater dispatch, you can

10     take the amount of time you need on the discrete exhibits, but

11     what I don't want is for us to waste time determining whether

12     they have the exhibits, whether the defense has the exhibits,

13     and maybe it does but there may be different numbers associated

14     with the same exhibits.  And so that's not something that we

15     should take court time with.  That's something that should be

16     covered either on the breaks or at the conclusion of today.

17          Instead of wading through it tomorrow morning, we're

18     going to conclude at 5:00.  And, at five o'clock, until

19     whatever time you're done, you're going to prepare the exhibits

20     for tomorrow's witnesses so that we can get through tomorrow's

21     witnesses without having to determine whether you have this

22     exhibit and what the number is.  And that's what I want to

23     avoid.  That doesn't prejudice either party because you still

24     have the opportunity to question the witnesses on the

25     respective exhibits, but I don't want us to waste time trying

 1   to determine who has what.

 2        Now, Mr. McTigue and Mr. Conover, I'm tasking you with

 3   eliminating that problem for the next witness.

 4        Who comes after Mr. McTigue's next witness?  Who is the

 5   second witness this afternoon after Mr. McTigue's?

 6        MR. McTIGUE:  Zach West, who is the operations

 7   director and in-house legal counsel for the Ohio Democratic

 8   Party.  And he's been attending as our party representative.

 9        THE COURT:  So I am going to assume that he's not

10   testifying about the same type of exhibits as Mr. Perlatti.

11        MR. McTIGUE:  No.  There is no exhibits.

12        THE COURT:  There are no exhibits.  And how long do

13   you anticipate your next witness will be, not Mr. West, the

14   witness before Mr. West?

15        MR. McTIGUE:  I anticipate that to be the same length

16   as whatever my direct was with Mr. McNair.  And let me explain,

17   Your Honor.  We were considering -- Brodi is correct.  We were

18   considering going through some individual voter packets with

19   the witness from Hamilton County, but we've decided not to do

20   that.  So, there is basically two exhibits, and that's

21   legislative testimony.

22        THE COURT:  All right.  Just as long as you sit down,

23   and I want to make sure that they have those two exhibits that,

24   you know, you referenced.  And then we'll cover tomorrow -- At

25   the end of today's proceedings, I want to know who the

1    witnesses are, who has them, and whether you all have sat down

2    to go through the exhibits, at least to make sure with two

3    issues in mind:  One, to make sure that the defense has the

4    exhibits that you plan to use and, secondly, that if they're

5    matters to which you can stipulate, you'll stipulate to them.

6    And then, you know, the other exhibits that require either

7    foundation or extended testimony, you could at least make sure

8    that everyone has them.  And then you can inquire as the

9    situation may warrant.

10        So, that's going to be our approach for the remainder of

11   the trial.

12        Are there any issues from the plaintiff?

13        MS. GUPTA:  No, Your Honor.

14        MS. GENTRY:  No, Your Honor.

15        THE COURT:  Mr. Conover, since you're standing, any

16   issues from the defense?

17        MR. CONOVER:  Not at this point, Your Honor.

18        THE COURT:  All right.  We will reconvene at 1:45.

19        (Recess at 1:00 p.m.)

20                              – – –

21

22

23

24

25

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

```
 1                           Thursday Afternoon Session

 2                           March 17, 2016

 3                                 –  –  –

 4           THE COURT:  All right.  Mr. Perlatti's daughter is in

 5      a science fair this evening at 6:00 in Cleveland, and he's

 6      going to be done and out of here by 3:00.  That's not

 7      aspirational.

 8           Mr. Keller, your examination.

 9           MR. KELLER:  Thank you, Your Honor.

10                           DIRECT EXAMINATION

11   BY MR. KELLER:

12      Q.   Good afternoon, Mr. Perlatti.

13      A.   Good afternoon.

14      Q.   I know we met earlier, but my name is Zachery Keller.

15      I'm counsel on behalf of the Ohio Secretary of State and the

16      State of Ohio.

17           Are you affiliated with a political party?

18      A.   Yes.  I am a registered Democrat.

19      Q.   Am I right in thinking then that the director is a

20      Republican then?  Is that how it works?

21      A.   That is correct.

22      Q.   And are you aware of what you have -- what fields of

23      information you have to provide to register to vote in Ohio?

24      A.   Yes.

25      Q.   And what are those fields?
```

Vol. 2 - 142

1    A.   To register to vote you have to provide your printed

2   name, your date of birth, an address, a form of I.D., whether

3   it's last four of your soc or your driver's license number, and

4   you have to provide your signature, as well as attesting to

5   being a citizen.  And also I think the other, I think you

6   attest to be -- to maybe not be convicted of a felony.

7    Q.   And those first five fields that you went through, those

8   are the same as on the absentee envelope and the provisional

9   ballot affirmation?

10   A.   That's correct.

11   Q.   And, to your knowledge, have any of the registration

12   fields changed since you've been a part of the Board?

13   A.   I am not aware of that.

14   Q.   Mr. Perlatti, I'm going to show you what's been marked

15   as Plaintiffs' Exhibit 1042 which was recently admitted into

16   evidence by stipulation.  It is in a binder over there, but

17   I'll show it to you on the Elmo also.

18   A.   Okay.

19   Q.   Do you recognize this document?

20   A.   This looks like a provisional certification report that

21   we would send post-election, I think, with a certification.

22   Q.   And which election was this one for?

23   A.   This was November 3, 2015.

24   Q.   And if you look at Section B, can you describe to me

25   what that section does?

Vol. 2 - 143

1    A.   B, as in boy, you said?

2    Q.   Yes.  Sorry.

3    A.   It says reasons provisional ballots were rejected.

4    Q.   And if you look down in that section, what reason had

5    the most rejections for the 2015 election?

6    A.   So is the first number 770 in line 81 -- or is that B-1,

7    I'm reading?

8    Q.   That's how I read it.

9    A.   It's just not real focused.

10        Yeah, voter not registered in the State.

11   Q.   If I have you look up at column -- or row, excuse me,

12   A-4, how many total ballots were rejected in the November 2015

13   election?

14   A.   Yeah, it is 1272.

15   Q.   And I'm going to ask you to do some rough math here.

16        Roughly what percentage then were rejected for not

17   registered in the State?

18   A.   That is -- what is that?  Two thirds, maybe?

19   Q.   Now, I'm going to show you what has been marked as

20   Defense Exhibit 55.  Do you recognize this document?

21   A.   Yes.  That's provisional form 12B.

22   Q.   And what is that used for?

23   A.   For provisional -- provisional voting in an election --

24   well, provisional voting on Election Day or during early

25   in-house voting.

1    Q.   Does this appear to be a current version of that form?

2    A.   Yes, it is.

3         MR. KELLER:  Your Honor, at this time I would like to

4    move Defense Exhibit 55 into evidence.

5         THE COURT:  Any objection, Ms. Gupta?

6         MS. GUPTA:  None.

7         THE COURT:  Defendant's Exhibit 55 will you received.

8    BY MR. KELLER:

9    Q.   And if you look at this form, which fields are required?

10   A.   Rows 1, 2, 3, 5 and 6.

11   Q.   I'm sorry, my fault.  What are those fields, though?

12   What are the names -- what are the --

13   A.   Full name -- the full name, date of birth, current Ohio

14   address, identification and affirmation.

15   Q.   Now, what happens if a non-registered individual

16   completes this form?

17   A.   If a non-registered individual completes the form in

18   totality with all the fields, then on Election Day their ballot

19   will not be counted but the -- the provisional envelope serves

20   then as a registration card and we'll register them for the

21   next election.

22   Q.   And what's the impact of that on future voting?

23   A.   Well, now they are -- as long as -- you know, you can go

24   through the whole acknowledgment affirmation process through

25   it, but if everything comes back okay, they now are a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 145 of 263 PAGEID #: 1202
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/16 Page: 145 of 263 PAGEID #: 21897

Vol. 2 – 145

1    registered voter eligible to vote a regular ballot in the next

2    election barring that there's no address change or anything

3    like that.

4    Q.   And I think you might have spoken about this on direct,

5    but just to make sure we have a clear record, to your knowledge

6    have the provisional ballot affirmation fields changed since

7    you started working for the Board?

8    A.   The 12B form?

9    Q.   Yeah, the fields required on that form.

10   A.   They have changed.

11   Q.   And what were the prior fields?

12   A.   Prior to this it was full name, it was identification

13   and affirmation.  Those were the parts for the voter.  And then

14   also there was a section required to be completed by the poll

15   worker.  And what I'm not -- what we did in Cuyahoga -- and I

16   wasn't part of the form myself before, but we also then printed

17   a registration card on the bottom of our provisional envelope

18   also.

19   Q.   I'm going to show you what's been marked as Defense

20   Exhibit 58.  Do you recognize this form?

21   A.   Yes.  This is the provisional 12B form that was prior to

22   the current version that we're using.

23   Q.   And I'm going to flip to the backside.  Is this similar

24   to what you were referencing?

25   A.   That's -- yes, the registration card.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 146 of 263 PAGEID #: 1203
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 146 of 263 PAGEID #: 23893

Vol. 2 - 146

```
 1    Q.    All right.  I'm going to turn back to the front.

 2          Now, how many fields does this -- does this affirmation

 3    have on it?

 4    A.    This has three.

 5    Q.    By completing those three fields, would a voter be

 6    registered?

 7    A.    No, they would not.

 8    Q.    And if you look on the other side of the form, can you

 9    read to me the line above the horizontal line at the top in the

10    smaller font right under the title?

11    A.    The line under change of name?

12    Q.    It starts with failure.

13    A.    Okay.  It's a little blurry, but I think it says failure

14    to complete this form will --

15    Q.    I'll get it.

16    A.    I think I can get it.

17          Failure to complete this form will not cause your

18    provisional ballot to be rejected.

19    Q.    Can you describe to me the different stages the absentee

20    voting cures in?

21    A.    What do you mean different stages?

22    Q.    Well, do you apply -- first, how does the process -- the

23    general steps of the process work?

24    A.    Yeah.  So voting by mail or early in-house voting is a

25    two-step process.  It starts with the application and which the
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 147 of 263 PAGEID #: 1204
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/16 Page: 147 of 263 PAGEID #: 23629

Vol. 2 - 147

 1    individual completes that application.  And upon the

 2    application being completed correctly, then Boards of Election

 3    will send out a vote by mail ballot.

 4      Q.    And are the steps -- those two basic steps the same for

 5    mail-in and early voting?

 6      A.    They are.

 7      Q.    And is it possible to mix and match methods as far as

 8    in-person and mail-in?

 9      A.    What do you mean by mix and match?

10      Q.    For example, could I go and pick up -- go apply for a

11    ballot at the Board, take it home with me and complete it and

12    then mail it in?

13      A.    Yes, you could.

14      Q.    Or could I do it the other way around?

15      A.    Yes.  You can request a ballot by mail mailed to you,

16    and you can physically bring that to the Board of Elections and

17    drop it off in the ballot box.

18          And, you know, vice versa, like you said, you can come

19    to the Board, request the ballot, receive the ballot and then

20    take that home with you, and either mail it in or come back at

21    a later date and deposit it in the ballot box at the Board of

22    Elections.

23      Q.    Will the person necessarily be in the presence of an

24    election official when they complete their ballot and I.D.

25    envelope?

1    A.    The I.D. envelope?

2         In-House they will get it there.  They may start to fill

3    it out in front of the employee but they are not required to,

4    and they may not.  They may take that with them to the voting

5    booth and then complete it in the booth with their ballot.

6    Q.    What location is an Election Day voter supposed to vote

7    at?

8    A.    Well, the thing is I'm going to give you, like, a

9    two-part there.

10        So an Election Day voter, if you -- so if you -- you can

11   go to the polls on Election Day and, if you have not had an

12   address change, you would go to your specific location where

13   your precinct is located and vote a regular ballot there.

14        If you did have an address change and you did not update

15   that with the Board of Elections prior to the close of

16   registration, you could do one of two things:

17        You could go to the polling location in which your new

18   updated address resides in and vote a provisional ballot at

19   that location, or you can -- on Election Day you can come to

20   the Board of Elections and vote a provisional ballot at our --

21   in our offices.

22        But only for address changes can you come -- can you

23   vote provisionally at the Board on Election Day.

24   Q.    How common is it for someone to have moved without

25   updating their registration?  Is that a frequent scenario, or

```
 1    is it rare?

 2              MS. GUPTA:  Objection.

 3              THE COURT:  I'm sorry?

 4              MS. GUPTA:  Just objection on the basis of a compound.

 5              THE COURT:  Yes.  I'm going to sustain it.  Just break

 6     up your questions, Mr. Keller.

 7    BY MR. KELLER:

 8      Q.    How common is it for a voter to have moved without

 9     updating the registration?

10      A.    It happens every election.

11      Q.    And I believe if I understood right, you said that's a

12     reason that -- that's one potential reason to vote

13     provisionally?

14      A.    Yes.  If you have -- if you've moved and not updated

15     your registration by the close of registration.

16      Q.    Do you have any idea where that ranks as far as reasons

17     to vote provisionally as far as frequency?

18      A.    Again, rank, I don't know, but it does happen in every

19     election.

20      Q.    So for a person who wants to vote on Election Day who

21     has moved without updating their registration, where are they

22     supposed to go?

23      A.    They are supposed to go to the polling location in which

24     their new address resides.

25      Q.    So let's say I move from Columbus to Cleveland without
```

1  updating my registration.  Do you understand the scenario I'm

2  setting up?

3    A.    Uh-huh.

4    Q.    So I'm going to show you again --

5         MR. KELLER:  And, I apologize, Your Honor.  If I have

6  not already, I would like to move Defense Exhibit 58 into

7  evidence.

8         THE COURT:  Ms. Gupta, any objection to 58?

9         MS. GUPTA:  No objection, Your Honor.

10        THE COURT:  Defense Exhibit 58 will be received,

11  Mr. Keller.

12        MR. KELLER:  Thank you, Your Honor.

13  BY MR. KELLER:

14    Q.    So, again, we're in the scenario where I lived in

15  Columbus, I moved to Cleveland.  Okay?

16    A.    Uh-huh.

17    Q.    So if I go to my new Cleveland address and were to just

18  fill out the information on the front side of Defense Exhibit

19  58, what would be the most recent address the Board of

20  Elections would have for me?

21    A.    Cuyahoga County would not have an address for you.  We

22  would then go to the statewide voter registration database and

23  that would have, in your scenario, whatever your Columbus

24  address was.

25    Q.    So without further information, where would it look like

1    I should have voted?

2       A.   From the -- just from the envelope alone, we would not

3    know.  It would be based on the poll worker asking you where do

4    you reside and then you verbally telling them that, and then

5    they would attempt to find the precinct for you within Cuyahoga

6    County.

7       Q.   And you wouldn't have that address?

8       A.   No.  They would verbally ask you to provide it at the

9    polls.

10      Q.   But what about after the fact when you're checking my

11   provisional ballot?

12      A.   Oh, no.  When we're going -- post-election in the

13   provisional review, no, we wouldn't have -- from this unless

14   you completed the registration card which was on the backside

15   of the form.

16      Q.   And it would look -- if I didn't do that, it would look

17   like I should have voted in Columbus; am I right there?

18      A.   Well, if you didn't do that, we wouldn't be able to

19   validate your -- your provisional in Cuyahoga County.

20      Q.   You had mentioned that one of the five fields across the

21   different processes was form of identification, correct?

22      A.   Yes.

23      Q.   And what is your understanding of what acceptable forms

24   of identification are when registering to vote?

25      A.   Registering to vote?  Last four of your social security

1    number or driver's -- and/or driver's license number.

2      Q.   Are there any other acceptable documents?

3      A.   I -- I do not think -- I don't believe so on a

4    registration.

5      Q.   What about for provisionally voting?

6      A.   Provisionally voting?

7           There is the opportunity to provide a utility bill, a

8    bank statement, things like that.  I think you can attach that.

9      Q.   And if we look at field number 5 for Defense Exhibit 55,

10   is that the list of acceptable provisional identification?

11     A.   Yes.

12     Q.   Do voters have to use the same form of identification

13   they used when registering when they vote?

14     A.   No, they don't.

15     Q.   You had mentioned in your earlier testimony, I

16   believe -- and correct me if I'm wrong -- that sometimes you

17   have to search county or statewide databases for provisional

18   voters.

19     A.   Yes.  When we -- every provisional that we process, we

20   have to -- we utilize those two databases.

21     Q.   And are you able to search by more than one information

22   field when you're searching for a voter?

23     A.   Yes.

24     Q.   And what does searching by more than one field do to

25   your search?

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

1    A.   The -- the increased number of fields can reduce the

2    number of potential records to choose from.  So, you know, if

3    you put in just name, you may -- you may -- if it's a common

4    name, it may return a list of individuals.  And then as you add

5    more criteria, that list shrinks and shrinks.

6    Q.   Sir, I'm going to show you what's been marked as

7    Plaintiffs' Exhibit 1054, which has been moved into evidence

8    pursuant to stipulation.  And if you want to see the whole

9    document, I believe it's in Volume 13 in front of you.

10    A.   Could I see the top of it just real quick?

11    Q.   I'll zoom out.

12    A.   Okay.

13    Q.   Do you recognize this?

14    A.   I think this is our registration department DIMS

15    provisional training -- training document -- or document that

16    they have when they're processing.

17    Q.   What is DIMS?

18    A.   I'm sorry.  DIMs is the registration database that

19    Cuyahoga County utilizes.

20    Q.   I'm going to ask you to turn to, I believe it's the

21    second page.

22    A.   Which document am I going to here?

23    Q.   It's still the same document.  It's Bates stamped

24    Cuyahoga -- or CUY126.

25    A.   Do you have a tab number?

```
 1     Q.   It's Plaintiffs' Exhibit 1054.  I apologize.

 2     A.   Okay.

 3     Q.   Are you there?

 4     A.   Yes.

 5     Q.   Do you see towards the bottom of the page the field that

 6   starts with bullet point 6?

 7     A.   Hold on.  I have some blank pages in here.

 8     Q.   I have it up on the screen, too.

 9     A.   Okay.  Bullet point number 6?  Is that --

10     Q.   Yes.

11     A.   That effectively search the DIMS database there?  Start

12   search by using the first three letters?

13     Q.   Yes, that's what I meant.  Are you there?

14     A.   Yes.

15     Q.   What do those bullets reflect?  What is that?

16     A.   This is different search criteria that the employee

17   would utilize when trying to locate a voter in the registration

18   database.

19     Q.   And how many are -- how many different searches are

20   listed there?

21     A.   There's eight on this page, eight combinations.

22     Q.   Of those eight combinations how many include either date

23   of birth or address?

24     A.   Five.

25     Q.   Earlier I asked you -- I had -- I showed you, and I can
```

Vol. 2 - 155

1   show you again, Plaintiffs' Exhibit 1042 that had reasons for

2   rejection.  Is it possible that an absentee or a provisional

3   ballot can have more than one deficiency?

4     A.   Yes.

5     Q.   When you report it to the Secretary of State after an

6   election, do you pick one, or are there different codings?

7     A.   I believe that they -- they just pick one.  We don't

8   necessarily have a hierarchy, but they select one.

9     Q.   Does your Board have any online options that a voter can

10  utilize when tracking a ballot?

11    A.   Yes.

12    Q.   What can they do?

13    A.   On our website -- let me see.

14         After you -- when we -- when we process the application,

15  I believe a person can find that on our website.  And then when

16  we mail the ballot, that's a date that they can watch when the

17  ballot is returned.  That's a date that they can view from our

18  website.

19    Q.   And in addition to any online resources, do voters ever

20  call the Board?

21    A.   Asking that information?

22    Q.   Correct.

23    A.   Yes, they do.

24    Q.   Can they ask other questions of the Board?

25    A.   They can -- they can ask us all kinds of questions.

1    Q.    And do they ever -- in addition to calling, does anyone

2    ever show up to the Board with questions?

3    A.    The public can -- they can come in and ask questions.

4    Q.    And what do you do to assist voters when they come in

5    and ask questions?

6    A.    Well, depending what the question is, we will direct

7    them -- we'll try to direct them to the appropriate department

8    for them to get answers to their questions.

9         There's another tool that Cuyahoga has as far as

10   tracking your ballot.  It's something new that we implemented

11   this year.  It's called Voter Notify, and that's a service

12   where voters where subscribe to this, and they can elect to

13   either have a text message or an e-mail or both sent to

14   whatever they registered when they subscribed.  And what

15   happens is when the Board mails out a ballot, then we will send

16   either the text or e-mail or both, whatever they signed up for.

17   And then when the Board receives their ballot back, we will

18   send out again either a text, e-mail or both, depending on what

19   they subscribed for.

20   Q.    I'm going to shift gears for a moment.

21        Can you describe to me the basic timeline for absentee

22   voting?

23   A.    As far as what the window is in which people can

24   participate?

25   Q.    Absolutely.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 157 of 263 PAGEID #: 1214
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 157 of 263 PAGEID #: 2639

Vol. 2 - 157

1    A.    Absentee voting starts the first day after the close of

2    registration.

3    Q.    And how long does it run?

4    A.    Vote by mail, until then you can request to receive an

5    absentee ballot through 12 noon on the Saturday prior to

6    Election Day, and you can come in and vote in person through

7    2:00 o'clock on the Monday before Election Day.

8    Q.    And when is the first time the Board counts either

9    officially or unofficially absentee ballots?

10   A.    As far as tabulating the results?

11   Q.    Yes.

12   A.    The results are -- well, there's a whole process prior

13   to Election Day in getting the ballots prepared, but counties

14   are required to vote by 7:45 on Election Day their absentee

15   ballots, as well as any in-house ballots by 7:45.  They may not

16   expect it really to happen on Election Day, but you will

17   include those eventually, the in-house Election Day voters.

18        No, I'm sorry, the provisional.  So they wouldn't be

19   included in that total.

20   Q.    The provisional wouldn't?

21   A.    No, they would not because you can't process -- you

22   can't open a provisional until 11 days after the election.

23   Q.    And my question might have been unclear.  What about

24   absentee, when are absentee first counted?

25   A.    Boards of Elections 10 days prior to an election are

1   able to physically open up the identification envelope and

2   remove the ballots from those envelopes, and then they are able

3   to -- well, we're optical scan.  So I can't speak to DREs

4   because I'm not sure -- I think in those counties they actually

5   vote on TSX machines, I'm positive, or a touch screen.

6       But in Cuyahoga in an optical scan environment we can --

7   for both by mail and in-house voting, we can start to open

8   those ballots 10 days prior to the election, and at that point

9   in time, too, you can start to run those ballots through

10  scanners to collect what the results are but you can't upload

11  any of those.

12      And then those -- those -- in our system it's a USB

13  thumb drive.  Those results are saved in a safe, and then on

14  Election Night those come out and that is what is uploaded

15  between 7:30 and 7:45.

16  Q.   Based on your experience -- and I'm only looking for an

17  estimation here -- what percentage of absentee ballots would

18  you say are received by Election Night?

19  A.   We have -- in Cuyahoga we probably average between 85

20  and 90 percent return rate on our absentee ballots.  Of those

21  requested, 85 to 90 percent is typically returned.

22  Q.   Now, I want to talk about the timeline for provisional

23  voting.  When do those provisional ballots get cast?

24  A.   On Election Day.

25  Q.   So when -- how does the process work then for -- for

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 159 of 263 PAGEID #: 1216
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/12 Page: 159 of 263 PAGEID #: 23616

Vol. 2 – 159

 1    processing them and counting provisional ballots?

 2      A.    So on the day following Election Day in Cuyahoga we --

 3    I'll speak to Cuyahoga specifically because that's what I know,

 4    but this applies to a lot of the State.

 5           You -- you begin then on the day after an election, you

 6    are able to start to review those provisional envelopes to see

 7    if all their criteria is met and do your processing of them.

 8           The ballots have to remain within the provisional

 9    envelope.  And so you go through that process, and on the 11th

10    day following the election is the first time where you have an

11    opportunity to actually open the provisional envelopes and take

12    the ballots out.

13           Now, Boards of Election are not required to be done with

14    their verification within 10 days; you can go past that if you

15    need more time.  But that's the first opportunity you have to

16    do that.

17           And prior to opening any provisional envelopes, Boards

18    of Election have to have a meeting of their Board members in

19    which the Board members take a vote on accepting or

20    invalidating provisional envelopes.

21      Q.    What's the general timeline for that meeting?  When does

22    that take place?

23      A.    Well, the earliest it can happen is 11 days, on the 11th

24    day after the election.

25           Typically, in Cuyahoga we don't have it on the 11th

1   because the 11th, I believe, typically is a Saturday so we will

2   have that meeting usually on the following Monday or Tuesday.

3   Q.   Can the Board determine the validity of provisional

4   ballots on a rolling basis, or does it happen all at the same

5   time with the provisional ballots?

6   A.   It happens all at the same time.

7   Q.   So could it happen before the cure period ends?

8   A.   Could that meeting happen before?

9        The meeting -- well, the meeting could happen before;

10  however, if someone came in and the cure period was still going

11  on and they cured their ballot, then you'd have to have another

12  meeting in order to rule on that once previously deemed invalid

13  provisional.  We would have to vote then to make that valid.

14  Q.   You had mentioned that the voter determination generally

15  consists of all the provisional ballots at the same time, or am

16  I --

17  A.   Yes.  Yes, you want to present everything at one time.

18  Q.   How big is Cuyahoga in comparison to other Ohio

19  counties?

20  A.   As far as registered voters?

21  Q.   Yes.  Let's start there.

22  A.   Cuyahoga has the highest number of registered voters in

23  the State of Ohio.

24  Q.   How many staff do you have at your Board of Elections?

25  A.   We have about 95 permanent employees.  And then like

Vol. 2 – 161

 1   most Boards of Election, when you get into what we consider the

 2   election cycle, you bring on temporary resources to assist

 3   them.

 4      Q.   Are you aware of the general staffing of other Boards?

 5      A.   I -- I -- I am not other than I've heard that we have

 6   the most permanent employees.

 7      Q.   I'm going to show you what has been marked as

 8   Plaintiffs' Exhibit P2984, and I'm going to turn to the second

 9   page of that document.

10        Ms. Gupta had asked you some questions about this.  I

11   just want to make sure I understand where -- what this

12   information consists of.

13        If you look at the -- so the snapshot is sort of divided

14   into a smaller box on top and a bigger box below; does that

15   sound right?

16      A.   Yes.

17      Q.   So in the top box you have a name and an address and

18   some other identification information, correct?

19      A.   That's correct.

20      Q.   Are you aware of whether that information is from the

21   time the snapshot is taken, or is it from the time the ballot

22   that this is connected to was evaluated?

23      A.   Can you repeat that again?

24      Q.   I'm wondering if -- I'm just trying to make sure I

25   understand what this -- the timing of this information on top

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 162 of 263 PAGEID #: 1219
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/10 Page: 162 of 263 PAGEID #: 23844

Vol. 2 - 162

1  here that consists of Ms. Turner's address and I.D.

2  information.

3    A.    And this is what I was speaking to before.

4          When we're in live time with the election, that

5  information will be current with what's in our voter

6  registration database.

7          What I -- what I'm not sure is now once we get past the

8  election and data entry resumes again, I don't -- so this

9  snapshot, I don't know, you know, if this is updated or not.

10 And that's where before, like with the IT department or even

11 our -- the assistant manager of the absentee process, Patrick

12 McCauley, he would be able to better tell you because I believe

13 this snapshot was taken post-election in the process of

14 providing documents for this case.

15         So I can tell you, like, what's on there, but whether

16 that module stays the same for a specific election indefinitely

17 or if that changes that, I'm not sure because I've only kind of

18 worked with it in live time when you're in the voting window.

19   Q.    And this question is not about this specific snapshot,

20 but am I correct in thinking the database information itself

21 can change and be updated?

22   A.    The -- well, again, there's -- you have DIMS, as we

23 talked about, the registration database which is the main --

24 the main database, and then there's the different modules that

25 are all affiliated with it, absentee, provisional, poll worker

 1   module, campaign finance module.  So all these different

 2   modules feed into the master data, the master data being put in

 3   by the registration department with the registration cards and

 4   things like that.  So these other modules feed off of that

 5   data.

 6          Now, the interaction between them, where the live

 7   registration database, you can make changes to that and, yes,

 8   those happen in realtime.  And that's why I said previously,

 9   like, we lock down the database on the close of registration,

10   and then it opens back up again pretty much the day after we

11   certify the election.  And then you put your data in there

12   because that -- that live main database will change.

13          How it affiliates with the modules, that technical

14   piece, I don't know.  Someone in our office will know that, but

15   I'm not the guy who knows and can't give you that today.

16   Q.   Okay.  I think I understand.  Thank you.

17          MR. KELLER:  May I have a moment to confer with

18   co-counsel?

19          THE COURT:  Yes.

20          MR. KELLER:  I have no further questions at this time,

21   Your Honor.

22          THE COURT:  Thank you, Mr. Keller.

23       Ms. Gupta, do you have any recross?

24          MS. GUPTA:  I do, Your Honor.  Just a few questions.

25

1      RECROSS-EXAMINATION

2   BY MS. GUPTA:

3      Q.   Mr. Perlatti, Mr. Keller was asking you about the timing

4   of the determination that the Board makes regarding the

5   validity of provisional ballots, correct?  Do you remember

6   that?

7      A.   Yes.

8      Q.   And he was asking you about the -- whether it was on a

9   rolling -- whether the validity determination is on a rolling

10  basis or whether it happens all at once, right?

11     A.   Correct, yes.

12     Q.   Okay.  Now, isn't it the case that this -- that,

13  although the Board makes the final validity determination all

14  at one time, the staff is actually determining the validity of

15  provisional ballots earlier than that?

16     A.   Right.  The day after the election is when staff starts

17  to review provisional envelopes and will -- depending on the

18  volume can do that for multiple days to get through all that

19  process to get through them all.  And then that's why when we

20  have our Board meeting -- and I don't recall having a Board

21  meeting prior to the 11th day.  Typically it's, you know, after

22  when they're able to be opened and we want to present

23  everything at one time.

24          So we are working on that process throughout the window

25  from Election Day until we have that Board meeting getting

1    everything prepared to then present that to the Board members

2    for them to take -- take their vote.

3        Q.    Mr. Keller also asked you about online options for

4    providing notice, I believe.

5        A.    Yes.

6        Q.    Now -- and he referred also -- I think I believe you

7    testified to something called Voter Notify?

8        A.    Yes.

9        Q.    Now, do those -- those don't apply to provisional

10   ballots, do they?

11       A.    No.   That's just for absentee.   And, in fact, the

12   thing -- the information on our website was actually mandated

13   of all counties by the Secretary of State's office so everyone

14   has to be able to have that information available to track the

15   ballots.

16           Voter Notify is unique to Cuyahoga County.   It's

17   something that we do that, again, people can subscribe to;

18   they're not forced to do it.

19           For provisionals all that there is is, kind of what we

20   talked about before, the 12H form that should be given when the

21   provisional is given.   And if someone wants to -- what do we

22   call it?   I think -- I believe it's the Free Access System is

23   part of that phone number, and they can call and they'll get

24   placed then with their appropriate county and someone can

25   inquire on their own provisional ballot whether it was valid,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 166 of 263 PAGEID #: 1223
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 166 of 263 PAGEID #: 23848

Vol. 2 - 166

1    invalid, and what the reason is.

2    Q.   Mr. Keller also asked you about the fields that are

3    required for registering to vote, correct?

4    A.   Yes.

5    Q.   Isn't it true -- would you -- excuse me.

6         Will you agree that you could keep the information --

7    the five fields information for purposes of registering a voter

8    without disqualifying other ballots based on an error in those

9    ballots -- excuse me, in one of those five fields?

10   A.   On a provisional ballot?

11   Q.   Yes.

12   A.   Again, we're required by law now that all five fields

13   have to be completed, and we comply with that and we can find

14   voters.  And prior to the law change there was three fields

15   required, and we were able to find voters and approve

16   provisionals and we were able to comply with that.

17        So we -- we comply with the rules that are given to us,

18   and we were successful in both environments.

19   Q.   I believe when Mr. Keller was questioning you, you

20   testified to the fields that were required on the previous

21   provisional affirmation form and you mentioned a section that

22   had to be completed by the poll worker, correct?

23   A.   Yes.

24   Q.   Do you know of any rationale for having the individual

25   voter in the new affirmation form having to check off the box

1    regarding whether they showed identification?

2      A.   I don't know why that -- why that is there for the voter

3    to check that and not the poll worker.

4           MS. GUPTA:  Thank you.

5           Just a moment, if I may confer.

6           One last question, Mr. Perlatti.

7    BY MS. GUPTA:

8      Q.   We talked about -- and I believe this came up as well in

9    Mr. Keller's examination as well -- is the ability to identify

10   the absentee voter as compared to the provisional voter.

11          Isn't it the case that for absentee voters, there is

12   also a barcode that helps identify that voter?

13          MR. KELLER:  Objection, Your Honor.  This is outside

14   the scope of my questions.

15          THE COURT:  It is.  Sustained.

16          MR. KELLER:  Thank you, Your Honor.

17          MS. GUPTA:  No further questions.

18          THE COURT:  I trust that you have nothing further,

19   Mr. Keller?  Or do you?

20          MR. KELLER:  I do not, Your Honor.  You are correct.

21          THE COURT:  Mr. Perlatti, thank you very much, sir.

22          THE WITNESS:  Thank you.

23          THE COURT:  Have a safe trip back and enjoy the

24   science fair.

25          THE WITNESS:  I will.

                                                        Vol. 2 – 168

 1            THE COURT:  Mr. McTigue, your next witness.

 2            MR. McTIGUE:  Mr. Tim Burke.

 3        Sorry that took so long, Your Honor.  Mr. Burke was all

 4    the way down the hallway in the jury room.

 5            THE COURT:  Oh, I see.

 6                            –  –  –

 7              TIMOTHY MICHAEL PATRICK BURKE

 8      AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

 9                        CROSS–EXAMINATION

10   BY MR. McTIGUE:

11     Q.    Could you State your name and spell your last name,

12   please?

13     A.    Timothy Michael Patrick Burke, B–U–R–K–E.

14     Q.    And, Mr. Burke, you are a member of the Hamilton County

15   Board of Elections, correct?

16     A.    I am chairman of the Hamilton County Board of Elections,

17   yes.

18     Q.    And you are a Democrat?

19     A.    I am.

20     Q.    And how long have you been a member of the Board of

21   Elections?

22     A.    Approximately 24 years.

23     Q.    Okay.  And I suppose -- during that 24 years, how long

24   have you served as chair?

25     A.    Approximately 20.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 169 of 263 PAGEID #: 1226
Case: 2:06-cv-00896-ALM-TPA Doc #: 356 Filed: 04/06/10 Page: 169 of 263 PAGEID #: 2850

Vol. 2 – 169

 1    Q.   Okay.  And you are also a licensed attorney in the State

 2    of Ohio?

 3    A.   I am.

 4    Q.   And you also teach election law; is that correct?

 5    A.   I frequently teach continuing legal education programs

 6    in election law.

 7    Q.   Okay.  Now, Mr. Burke, are you familiar with Senate Bill

 8    205 and Senate Bill 216?

 9    A.   I am generally, yes.

10    Q.   Okay.  And did you provide written testimony to the Ohio

11    General Assembly regarding these two bills?

12    A.   I did.

13    Q.   Okay.  And I'm going to now put on -- if you can check

14    your monitor, I'm going to put up what is marked as Plaintiffs'

15    Exhibit 1214.

16    A.   I see it.

17    Q.   Okay.  And can you identify this document?

18    A.   Yes, sir.  It's a letter I wrote.  It's dated

19    February 15, 2014.  It was prepared in my law office, even

20    though it's on Board of Elections stationary.

21    Q.   And this was sent to the chairman of the Policy and

22    Legislative Oversight Committee and the Ohio House, correct?

23    A.   That's correct.

24    Q.   Mr. Dovilla?

25    A.   Correct.

 1   Q.   And it appears from the body of this that it relates

 2   to -- I see reference in the third paragraph to SB 216?

 3   A.   Yes, sir.

 4   Q.   So what prompted you to send this testimony to the

 5   chairman of the committee?

 6   A.   There was -- as the letter states, there was a

 7   concern -- I had a concern, as did some others, that that bill

 8   had the potential to operate to disenfranchise certain voters.

 9   Q.   And specifically what was the concern?

10   A.   That the requirements that were going to be imposed were

11   going to make it far more likely that voters would make

12   technical mistakes and their ballot would end up being

13   disqualified in spite of the fact that they were duly qualified

14   and registered voters.

15   Q.   So let me -- let me break that down for a second, your

16   answer.

17        So we're talking about provisional ballots, correct?

18   A.   Yes, sir.

19   Q.   And you're talking about specific fields such as the --

20   having to print your name?

21   A.   Yes, sir.

22   Q.   And having to provide your date of birth?

23   A.   Yes, sir.

24   Q.   And having to provide an address?

25   A.   Yes, sir.

1    Q.   Okay.  And an I.D.?

2    A.   Yes, sir.

3    Q.   Okay.  And there are various options for the I.D.?

4    A.   Yes, sir.

5    Q.   And then, finally, a signature?

6    A.   Correct.

7    Q.   Okay.  And is it the case that Senate Bill 216 required

8    that the printed name field actually be printed rather than

9    cursive?

10   A.   There was certainly one place where that was an

11   obligation, absolutely, yes.

12   Q.   So was your reading then of the requirements that if --

13   just using myself as an example, if I was to where it said

14   print your name and I was to write it and then I signed at the

15   bottom in my -- you know, in my signature on the signature line

16   and it was legible, you would still have to reject that ballot?

17   A.   I believe that's right.

18   Q.   Because I didn't print my name.

19   A.   Correct.

20        And we had gone through a situation based on a directive

21   from the Secretary of State's office where an elderly voter had

22   filled out that provisional envelope, everything correctly.

23   Her signature where it was required to be a signature at the

24   bottom matched our records entirely.  There was absolutely no

25   dispute from anybody on the Board or staff that what was inside

Vol. 2 – 172

```
 1   that envelope was a ballot cast by a valid registered voter.

 2   But this little old lady had neglected to print her name on the

 3   top of the provisional envelope, and we had to reject --

 4           MR. CONOVER:  Objection.

 5           THE COURT:  Go ahead, Mr. Conover.

 6           MR. CONOVER:  I'd move to strike the answer as the

 7   printed name is not an issue in this case.

 8           MR. McTIGUE:  Actually, Your Honor, I believe that the

 9   printed name is one of the allegations in the complaint.  It's

10   not --

11           THE COURT:  I'll hear you at sidebar, Mr. McTigue.

12                             - - -

13       Thereupon, the following proceeding was held at sidebar out

14   of the hearing of the open courtroom:

15           THE COURT:  Go ahead, Mr. McTigue.

16           MR. McTIGUE:  Yes.  I believe that the -- in the

17   complaint that there is a reference to the printed -- the

18   requirement to print your name.  I believe it is part of the

19   lawsuit.  It's -- or, I mean, to give some credence to the

20   objection, we haven't really been hammering away at that issue,

21   but it is in the complaint.

22           THE COURT:  Mr. Conover?

23           MR. CONOVER:  Your Honor, I think the only two new

24   requirements from Senate Bill 216 and 205 were name and

25   address, not printed name.
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 173 of 263 PAGEID #: 1230
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 173 of 263 PAGEID #: 2839

Vol. 2 - 173

```
1          MR. McTIGUE:  Actually, Your Honor, in the House Bill

2     it had -- it had a requirement for a name, and they inserted in

3     205 -- inserted the word printed in front of the name.  So that

4     has been inserted into 205 as being a print requirement.

5          THE COURT:  The testimony has been fairly consistent

6     that the two new requirements under -- in 205 were date of

7     birth and address.

8          Now, do you dispute, though, Mr. Conover that the

9     printed name was raised in the complaint?

10         MR. CONOVER:  I think, Your Honor, again that it would

11    be the date of birth and current address.  The complaint is

12    long.  I don't have every word memorized.

13         THE COURT:  But you don't dispute that the printed

14    name was a part of the complaint in this case?

15         MR. CONOVER:  Can I ask my co-counsel?

16         THE COURT:  Yes, you can confer.

17         MR. CONOVER:  I think, Your Honor, that 205 and 216,

18    again, were the date of birth and current address, and that the

19    directive that the witness was testifying about predated those

20    laws that required a printed name.

21         THE COURT:  All right.  I'm going to allow it, but I

22    take it that this is the only question about the printed name.

23         MR. McTIGUE:  Yes.

24         THE COURT:  I'm going to overrule your objection on

25    the theory that it's part of the complaint, even though it is
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 174 of 263 PAGEID #: 1234
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/12 Page: 174 of 263 PAGEID #: 21896

Vol. 2 – 174

 1    not part of what has been the thrust of the testimony thus far.

 2        (Back in open court.)

 3          THE COURT:  Please continue, Mr. McTigue.

 4   BY MR. McTIGUE:

 5    Q.   Mr. Burke, Senate Bill 205 added a new requirement for

 6   the voters to provide a date of birth, correct?

 7    A.   It's my understanding, yes, sir.

 8    Q.   Okay.  And previous to 205 coming into effect, was the

 9   Board of Elections hampered in its ability to validate or, you

10   know, identify the eligibility of a provisional voter without

11   the date of birth?

12    A.   Absolutely not.

13    Q.   Okay.  Can you recall specific examples or --

14    A.   I can't recall any examples where we needed the date of

15   birth in order to verify that a voter was a valid voter.

16    Q.   Okay.  And what is your understanding of 205's

17   requirement now on date of birth in terms of it being

18   completely blank as opposed to it being incorrect?

19    A.   My understanding is that if it's completely blank, we

20   must reject it.  If there is an in-correction and we can

21   determine from the body of the rest of the documentation that

22   it's a valid vote, we can accept it.

23    Q.   Okay.  And since 205 came into effect, what has been the

24   practice of the Hamilton County Board of Elections with respect

25   to date of birth problems; meaning, specifically where the date

1    of birth information was incorrect?

2      A.    On provisional ballots?

3      Q.    Yes.

4      A.    If we have had that kind of a problem, it gets presented

5    to the Board typically with a recommendation from the

6    bipartisan staff as to whether or not to accept it.

7           And we examine it -- in an open meeting of the Board of

8    Elections we examine the provisional ballot envelope, we hear

9    what the staff has to say, we look at whatever other

10   documentation we may have, and we make a determination.

11     Q.    Okay.  And can you recall any instances since 205 has

12   come into effect where the Board has voted to reject a

13   provisional ballot due to an address -- an -- I'm sorry, an

14   incorrect date of birth?

15     A.    As I sit here today standing alone, I can't say that I

16   can.

17     Q.    Okay.  But has it been fairly consistent policy of the

18   Board to -- as long as the other fields are filled in, the

19   other four fields, has it been the fairly consistent policy,

20   can you say that at least, what that consistent policy -- I'm

21   sorry, the fairly consistent policy has been?

22     A.    Well, I think the consistent policy is that, first of

23   all, we look at the signature and does the signature match our

24   records.  And then, if necessary, we would look at the other

25   material that's on that and make a determination.

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 176 of 263 PAGEID #: 1233
Case: 2:06-cv-00896-ALM-TPA Doc #: 656-5 Filed: 04/06/12 Page: 176 of 263 PAGEID #: 21893

Vol. 2 – 176

```
 1        And certainly if the signature matches, that's going to

 2   be the overwhelming basis on which we make the decision and

 3   would approve the ballot.

 4     Q.   Okay.  And with respect to the address on a provisional

 5   affirmation form, the address was not previously required,

 6   correct?

 7     A.   Correct.

 8     Q.   And previously was the Board able to identify the

 9   eligibility of a voter without the address?

10     A.   Yes.

11     Q.   Can you recall any instances where the Board was not

12   able to?

13     A.   The only circumstances that I can even think of when the

14   Board might not be able to in the first instance is if it was a

15   voter who was voting a provisional ballot and had previously

16   been registered outside the county.

17     Q.   Okay.

18     A.   That would have been a problem for us initially without

19   having an address.

20     Q.   Okay.  And then -- but you also had, both prior to 205

21   and since 205, an I.D. requirement, correct?

22     A.   Correct.

23     Q.   So you could look it up either based on an Ohio driver's

24   license number or a social security number?

25     A.   Correct.
```

1    Q.    And so in that manner, would you be able to identify the

2    eligibility of that voter within the statewide voter

3    registration database?

4    A.    Yes, we would have been.

5    Q.    Okay.  Now, with respect to Exhibit 1214, is that a true

6    and accurate copy of your testimony, your written testimony?

7    A.    I can't see the exhibit number on what's on the screen

8    at the moment but, yes, if that's -- yes, that is a true and

9    accurate copy of the letter that I prepared and signed.

10   Q.    Okay.  And you submitted that -- even though you are

11   referring to it as a letter and it's in the form of a letter,

12   you consider that to be testimony?

13   A.    I do.

14         MR. McTIGUE:  Okay.  Your Honor, at this time I would

15   move for admission of Plaintiffs' Exhibit P1214.

16         THE COURT:  Any objection, Mr. Conover, to P1214?

17         MR. CONOVER:  Your Honor, I think we're just going to

18   continue to make a written testimony objection that we would

19   continue to make, but other than that, no objection.

20         THE COURT:  It will be received.

21   BY MR. McTIGUE:

22   Q.    Now, Mr. Burke, I'm going to show you Plaintiffs'

23   Exhibit No. 1218.

24   A.    I see that.

25   Q.    Okay.  So this is a two-page document so I'm going to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 178 of 263 PAGEID #: 1285
Case: 2:06-cv-00896-ALM-TPK Doc #: 656-1 Filed: 04/08/19 Page: 178 of 263 PAGEID #: 23685

Vol. 2 - 178

```
 1    first show you the first page.  And when you're done looking at

 2    that, I'll turn to the second.

 3       A.   I'm fine.

 4       Q.   Okay.  Have you had a chance to look at that?

 5       A.   Yes, sir, I have.

 6       Q.   Okay.  And can you identify what this document is?

 7       A.   It is a letter which I prepared.  It was prepared in my

 8    office.  It, again, is written testimony submitted to the chair

 9    of the Policy and Legislative Oversight Committee.  It related

10    to the two bills that are identified in the body of the letter.

11    It was e-mailed from our office to the committee.

12       Q.   Okay.  And I'm going to draw your attention to the

13    second page.

14       A.   Yes, sir.

15       Q.   The first page that I just took off the screen was

16    Senate Bill 238 which has to do with Golden Week, correct?

17       A.   Yes, sir.

18       Q.   But the second page relates to Senate Bill 205, correct?

19       A.   Yes, it does.

20       Q.   Okay.  Can you explain what your concern here was?

21       A.   There were two issues involved.  One was the restriction

22    on the ability of local Boards of Election to mail to a voter

23    an application for an absentee ballot when they hadn't

24    specifically asked for it.  We had been in the practice of

25    mailing applications for absentee ballots to all registered
```

Vol. 2 - 179

1    voters in the county.  This bill prohibited us from doing that.

2         Secondly, there was a concern about this bill that was

3    similar to the concern we just talked about that required more

4    information to be supplied by the voter at the peril of not

5    providing that information, not having their ballot counted.

6    Q.   And the information you're speaking of would be

7    information that the voter would have to provide on what is

8    known as the I.D. envelope?

9    A.   Yes, sir.

10   Q.   And that's the envelope that the voter puts his/her

11   ballot in.  And then if they're voting by mail, they would put

12   that in another envelope and mail it back?

13   A.   Correct.

14   Q.   Okay.  And with regard to Senate Bill 205's requirements

15   that we were just speaking of, what were the new requirements?

16   A.   My understanding is that the new requirements included,

17   again, the birth date, it included address.  And, again, as I

18   sit here, I'm not sure what the other new requirements were off

19   the top of my head.

20   Q.   Now, the I.D. envelope that existed prior to 205 had

21   those two fields, address and birth date; correct?

22   A.   I believe that's true, yes, sir.

23   Q.   What was the practice of the Hamilton County Board of

24   Elections pre-Senate Bill 205 if the birth date wasn't filled

25   in on an I.D. envelope?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 180 of 263 PAGEID #: 1287
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 180 of 263 PAGEID #: 21887

Vol. 2 – 180

1    A.   Typically, our staff would pick up the phone and call

2    the voter.

3    Q.   Okay.

4    A.   Prior to the adoption of this bill and prior to the

5    direction of the Secretary of State that prohibited that from

6    happening.

7    Q.   Okay.  And so let's say the staff reached a voter, and I

8    assume that would be to ask what their birth date was?

9    A.   Yes, sir.

10   Q.   And then what would the staff do with that information?

11   A.   Fill it in.

12   Q.   Okay.  On behalf of the voter?

13   A.   Correct.

14   Q.   Okay.  Let's take a scenario where the staff made an

15   attempt to reach out to the voter and was not successful.

16        What was the Board's policy in terms of -- about whether

17   the absence of the birth date or an incorrect birth date was a

18   fatal flaw?

19   A.   Until this bill, we did not treat it as a -- on a

20   bipartisan basis, we didn't treat it as a fatal flaw.  Again,

21   we had the voter's signature.  If it matched our records, it

22   was the best evidence that this was a valid voter's ballot.

23   Q.   And with regard to the address on the I.D. envelope

24   pre-Senate Bill 205, did the Board of Elections pre-populate

25   the name and address fields?

1    A.    Frequently, yes.

2    Q.    Okay.  So when the ballot was mailed to the voter along

3    with the I.D. envelope, the name and address would already be

4    filled in?

5    A.    Correct.

6    Q.    Therefore, there wouldn't be a cause for the Board to

7    reject an absentee ballot on the basis of a missing address?

8    A.    Correct.

9    Q.    Now, this Exhibit Number 1218 is this a true and

10   authentic copy of your testimony?

11   A.    Again, I can't see the exhibit number on the screen at

12   the moment, but the document that's on the screen is a true and

13   accurate copy of the letter that was prepared in our office

14   that I signed.

15   Q.    Okay.  And I just put it on the screen.

16   A.    Yes, sir, and I can see that now.  It is a true and

17   accurate copy of my letter.

18        MR. McTIGUE:  Your Honor, at this time I would move

19   admission of Plaintiffs' Exhibit P1218.

20        THE COURT:  Any objection, Mr. Conover?

21        MR. CONOVER:  Just the same continuing objection.

22        THE COURT:  P1218 will be received.

23        MR. McTIGUE:  Thank you, Your Honor.

24   BY MR. McTIGUE:

25   Q.    Mr. Burke, with regard to the birth date issue on either

1   absentees or –– absentee envelopes or provisional forms, have

2   you received any instructions from the Secretary of State's

3   office –– and by you, I mean the Board –– as to whether or not

4   the Board may contact voters by telephone or e-mail or text

5   message regarding –– to either fill in or clarify a birth date

6   problem?

7      A.   We've been instructed that we cannot contact voters that

8   way.

9      Q.   Okay.  So ––

10          THE COURT:  Who instructed you?

11          THE WITNESS:  The Secretary of State.  The Secretary

12   of State's office.

13          THE COURT:  In a directive?

14          THE WITNESS:  That's my recollection, Your Honor, yes.

15          THE COURT:  And do you remember approximately when you

16   were so instructed?

17          THE WITNESS:  I'm sorry, Your Honor, I do not.

18          THE COURT:  All right.

19        Please continue, Mr. McTigue.

20        MR. McTIGUE:  Thank you, Your Honor.

21   BY MR. McTIGUE:

22      Q.   And with regard to an absentee voter who has a birth

23   date issue on their envelope, the Board sends Form 11S by mail

24   to the voter, correct?

25      A.   That is correct.

Vol. 2 – 183

1    Q.   Okay.  And that is the only way in which the Board

2  provides notice to that absentee voter?

3    A.   That is now my understanding.  And the problem that

4  creates is that can frequently be too late in the process.

5    Q.   Absentee ballots under the law can be counted by the

6  Board if they are postmarked the day before the election and

7  received no later than 10 days after, correct?

8    A.   That's my understanding, yes.

9    Q.   The cure period for a voter to come in and fix their

10  I.D. envelope ends 7 days before –– I'm sorry, 7 days after the

11  election?

12    A.   I believe that's right.

13    Q.   So the cure period actually ends earlier than the time

14  period for a ballot to come in?

15    A.   Yes, sir.

16    Q.   Now, with respect to provisional voters, are provisional

17  voters sent any kind of notification similar to Form 11S

18  regarding a birth date problem on their provisional form?

19    A.   Mr. McTigue, I'm not sure.

20    Q.   Okay.  Do you recall or do you know whether or not under

21  the law a provisional voter is permitted to come into the Board

22  of Elections' office with or without notice previous to them ––

23  by the Board?  Are they entitled to come in to the Board of

24  Elections' office at any time after the election to cure a

25  birth date problem?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 184 of 263 PAGEID #: 1241
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 184 of 263 PAGEID #: 28844

Vol. 2 — 184

1    A.   For a 10-day period.

2    Q.   But is it to cure the birth date problem or only I.D.

3    problems?

4    A.   Again, I'm not sure.

5    Q.   Okay.  So one of the things that both of these senate

6    bills did was to shorten the cure period from 10 days to 7

7    days, correct?

8    A.   Yes, sir.

9    Q.   Okay.  So, if you know, typically before these bills

10   took effect, how many voters would come in on days 8, 9 and 10

11   to fix a problem on either their provisional form or their

12   absentee?

13   A.   Certainly a very few voters would come in during that

14   period of time.  I don't have a specific number for you.

15   Q.   Okay.  Would you say that the number would be de

16   minimis?

17   A.   Yes, sir.

18   Q.   Would the number -- would the number of voters that came

19   in during those days, would they increase the costs -- would it

20   increase operating costs for the Board of Elections to process

21   them?

22   A.   Not at all, because our staff is there.

23   Q.   Would having them come in during those last three days

24   somehow delay when the Board could conduct its official count?

25   A.   No, not at all, because we can't do the official count

Vol. 2 – 185

1   of provisional ballots and any other late arriving ballots

2   until 10 days have passed so it doesn't slow that down at all.

3     Q.    Do you know if your provisional ballots are not -- not

4   the ballots, but the I.D. envelopes that are mailed to voters

5   have bar codes on them?

6     A.    They do.

7     Q.    And so those bar codes are unique to each voter,

8   correct?

9     A.    I believe that's correct.

10    Q.    And so the barcode would track that this voter had an

11  application for an absentee ballot, then this is the envelope

12  that we mailed the ballot in; and when it comes back in the

13  I.D. envelope, you'd be able to use that barcode to identify

14  the voter, correct?

15    A.    I believe that's right.

16    Q.    Let me ask you -- we haven't really talked about the

17  I.D. field.  And by I.D., I'm not referring to birth date, but

18  either the social security number, driver's license, or that

19  third category of some form of physical I.D. that is presented.

20        With regard to -- and let's talk about -- I suppose

21  either absentee or -- just treat absentees and provisionals

22  together.

23        That I.D. requirement applies to both types of voters,

24  correct?

25    A.    Yes.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 186 of 263 PAGEID #: 1243
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/26 Page: 186 of 263 PAGEID #: 23863

Vol. 2 - 186

```
 1    Q.    And in the absence of that -- one of those forms of

 2    I.D., are you still able to identify from the rest of the

 3    information that you have the voter and whether they're a

 4    registered qualified elector?

 5    A.    We would typically be able to do that, yes.

 6    Q.    So can you think of what purpose -- let's start with the

 7    date of birth.  Can you think of what purpose the date of birth

 8    requirement fulfills?

 9    A.    Honestly, it doesn't add to the ability to determine

10    whether or not it's a valid voter's ballot.

11    Q.    And what about the I.D. requirement?

12    A.    We're getting into an argument, I suppose, with another

13    but, no, I've never thought that the I.D. requirement was

14    necessary.  We operated for decades on the basis of a voter's

15    signature, and that's still the best form of identification.

16          MR. CONOVER:  Objection, Your Honor.

17          THE COURT:  Basis?

18          MR. CONOVER:  Identification is not an issue in this

19    case.

20          THE COURT:  Well --

21          MR. CONOVER:  Sidebar?

22          THE COURT:  No.

23          Overruled.  I believe that the -- the testimony is

24    relevant, and so I'm going to overrule it.

25          MR. CONOVER:  Thank you, Your Honor.
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 187 of 263 PAGEID #: 1244
Case: 2:06-cv-00896-ALM-TPA Doc #: 656 Filed: 04/06/18 Page: 187 of 263 PAGEID #: 2869

Vol. 2 - 187

1          THE COURT:  Mr. Burke, as the chairman of the Hamilton

2   County Board of Elections, are you aware of any study or data

3   compilation undertaken by the Secretary to determine whether

4   either the provisional ballots or the absentee ballots were

5   subject to fraud?

6          THE WITNESS:  I am not aware of any such study,

7   Your Honor.

8          THE COURT:  Do you know of the acceptance rate of

9   absentee ballots during the last election cycle?

10          THE WITNESS:  Your Honor, it tends to vary, but at

11   least in Hamilton County we typically get between 85 and

12   90 percent acceptance.

13          THE COURT:  What was the rejection rate?  Would that

14   be then 10 to 15 percent respectively?

15          THE WITNESS:  I think that's about right, Your Honor.

16   And, typically, the rejection is based on the fact that the

17   voter wasn't registered to vote, period.

18          THE COURT:  If we use the last election as a guide,

19   Mr. Burke, how many provisional ballots were cast?

20          THE WITNESS:  I can tell you from Tuesday's

21   election -- although, the staff would say, well, that's not an

22   entirely accurate count yet because we haven't even found them

23   all yet, but we anticipate that we'll have about 8000 to 8500

24   provisional ballots cast in Hamilton County in Tuesday's

25   election.

1    THE COURT:  And that's what percentage of the overall

2    ballots cast?

3    THE WITNESS:  Boy, we were over a quarter million

4    ballots cast in this election.

5    THE COURT:  Same question with respect to absentee

6    ballots.  What percentage of absentee ballots -- what was the

7    number, and then what was the percentage?

8    THE WITNESS:  Off the top of my head -- and, actually,

9    I -- I could almost get the number out of what I've gotten on

10   the pew in the back.  We've not rejected any absentee ballots

11   yet.  And, frankly, we don't reject very many of those.  That's

12   typically not an issue.  We had in the primary election, as I

13   recall, twenty-five to thirty thousand absentee ballots, early

14   vote ballots.

15   THE COURT:  Out of a quarter of a million?

16   THE WITNESS:  Yes, sir.

17   THE COURT:  So that's about 10 percent?

18   THE WITNESS:  I think that's about right, Your Honor.

19   THE COURT:  Is that roughly what the percentage was

20   for the last election before the primary election?

21   THE WITNESS:  No.  In the General Elections in the

22   gubernatorial election, and in the presidential elections,

23   we -- the State is still sending out applications to all

24   registered voters.

25   But to give you an example of what's happened, in 2008

1   we had over a hundred thousand people vote early.  This year we

2   are dramatically below that because in 2008 we had sent out

3   early vote applications to every registered voter in Hamilton

4   County, and that helped us enormously.  And it's certainly --

5   I'm glad that the State is mailing out the absentee ballot

6   applications for this November's election because it reduces

7   the lines at polling places, and that helps -- it helps the

8   voter and it helps the Board in getting the election done.

9          THE COURT:  If we look at the last -- let's say the

10  2012 presidential election.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Because I'm going to guess, Mr. Burke,

13  that the presidential elections have the greater -- greatest

14  voter turnout; is that right?

15         THE WITNESS:  By far.

16         THE COURT:  What was the percentage of absentee

17  ballots cast in the '12 presidential election?

18         THE WITNESS:  Again, my --

19         THE COURT:  I'm not going to hold you to these

20  numbers.

21         THE WITNESS:  I've got a book sitting in my office

22  that can give you the exact number.  I believe it was around

23  25 percent.

24         THE COURT:  25 percent?

25         THE WITNESS:  Yes, sir.

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

1          THE COURT:  That number was roughly what?

2          THE WITNESS:  I think we probably had close to 400,000

3    ballots cast.

4          THE COURT:  All right.  Now, of the -- of that number

5    of absentee ballots, what percentage were rejected?

6          THE WITNESS:  Absentee ballots, again, I think it

7    would be an infinitesimally small number of rejects.

8          THE COURT:  Probably less than a thousand?

9          THE WITNESS:  I would think so, yes, Your Honor.

10         THE COURT:  Now with respect to provisional ballots --

11         THE WITNESS:  Higher rejection rate.

12         THE COURT:  What percentage of provisional ballots

13   were cast in the '12 election?  Of the overall ballots cast,

14   what percentage were provisional?

15         THE WITNESS:  Again, I think we probably had somewhere

16   between -- somewhere around 15,000 provisional ballots in '12.

17         THE COURT:  4 percent?

18         THE WITNESS:  I think that's right; although, I'm a

19   lawyer not a mathematician for good reason.

20         THE COURT:  Same here.

21       And of those 4000 that were cast, let's say, how many

22   were rejected of the 4000 provisional ballots that were cast?

23         THE WITNESS:  15,000 provisional ballots that were

24   cast.

25         THE COURT:  15,000 provisional ballots were cast --

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 191 of 263 PAGEID #: 1248
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/20 Page: 191 of 263 PAGEID #: 28878

Vol. 2 - 191

```
 1              THE WITNESS:  I think we ran around 85 percent

 2    approval on the provisional ballots.  And most rejections

 3    wouldn't have been in the hyper-technical reasons that we've

 4    been talking about here, but there would be a significant

 5    number of those.

 6              And if I -- if I had known this question would have come

 7    up, I think I could have gotten exact numbers for why in

 8    various categories things were rejected, but the biggest reason

 9    why a provisional is rejected is because the voter is not

10    registered.

11              THE COURT:  All right.  Please continue, Mr. McTigue.

12              MR. McTIGUE:  Thank you, Your Honor.

13    BY MR. McTIGUE:

14      Q.   The new law on provisionals, as you've already noted,

15    has added two fields, the birth date and address field;

16    correct?

17      A.   Yes, sir.

18      Q.   So now these are two more fields that the Board has to

19    spend time checking?

20      A.   That's correct.

21      Q.   Checking to see if they're filled in and then verifying

22    against their databases whether the information is correct?

23      A.   That's correct.

24      Q.   And also if the information is not filled in or is

25    incorrect after checking the voter registration database, the
```

1    Board has to spend more time considering the rejection?

2        A.    Correct.

3        Q.    Because in order to reject a provisional ballot, that

4    has to be done by a vote of the Board of Elections itself,

5    correct?

6        A.    It has to be brought to us in a public meeting.  It has

7    to be presented to us.  It's put in a stack in front of us.

8            We do have a recommendation from the Board staff, but

9    the Board has to take that up and deal with it specifically.

10       Q.    And with respect to absentees, even though previously

11   you had the fields for address and date of birth on the

12   envelope, as you've testified those were not treated as being

13   fatal errors if the error was either an omission or incorrect

14   information.

15       A.    That's correct.

16       Q.    But now the Board is actually required to validate the

17   information in those two fields and spend time and resources on

18   that, correct?

19       A.    Correct.

20       Q.    And if the Board finds in, well, any of the five fields

21   on the absentee, the Board has to send a Form 11S to the voter,

22   correct?

23       A.    Yes, sir.

24       Q.    So that takes additional time and resources in terms of

25   paper and postage?

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

```
 1    A.    It does.

 2    Q.    Let me ask you now about the voters who are -- these

 3   would be provisional voters who are in the correct polling

 4   place but the wrong precinct.

 5         Their ballots can be counted, correct?

 6    A.    Absolutely.

 7    Q.    Okay.  And the new law requires that the poll worker

 8   fill out a form prescribed by the Secretary of State regarding

 9   what we'll call the right polling place/wrong precinct voter,

10   correct?

11    A.    If the poll worker identifies that, yes.

12    Q.    And the law does not require, though, the poll workers

13   to fill out a form for the wrong location and wrong precinct

14   provisional voter.

15    A.    Correct.

16    Q.    Would it be useful to the Board of Elections to have

17   information on how the wrong polling place/wrong precinct

18   voters were assisted by the polling place officials?

19    A.    Yes.

20    Q.    Okay.  Why would that be useful?

21    A.    It would be helpful for us to know which poll workers

22   are doing a good job or not doing a good job.  That's always a

23   helpful piece of information.  We've learned the hard way that

24   we have to make sure our poll workers are fulfilling their

25   jobs.
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 194 of 263 PAGEID #: 1251
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 194 of 263 PAGEID #: 21874

Vol. 2 – 194

 1    Q.   And in terms of being helpful to identify poll workers

 2    who are not doing their job, you're referring to whether or not

 3    the poll worker is referring the voter to the correct --

 4    A.   To the correct place.

 5    Q.   To the correct place?

 6    A.   Right.

 7    Q.   Another polling place?

 8    A.   Right.

 9    Q.   Now, can you think of any justification for -- from the

10    standpoint of speaking as an election official, chairman of the

11    board, can you think of any justification for allowing absentee

12    voters that have a problem with their envelope to come into the

13    Board of Elections and fix that for 7 days after but not

14    allowing provisional voters to do the same except for I.D.

15    issues?

16    A.   No.

17    Q.   So you cannot think of any reason to treat the absentee

18    voter and the provisional voter who have the exact same issue,

19    say, with their date of birth or with their -- with their

20    signature, you can't think of any reason for treating them

21    differently?

22         MR. CONOVER:   Objection, Your Honor.

23         THE COURT:   Sustained.

24   BY MR. McTIGUE:

25    Q.   Lastly, let me ask you about homeless voters.

```
 1          Homeless voters can register by using an address that is

 2     not a standard address; in other words, they can register using

 3     a description such as a park bench in a city park, correct?

 4     A.    That has always been our understanding.  Our Board has

 5     always said that, but I can't tell you of a single example of

 6     that actually occurring on our voting rolls.

 7          What we have a lot of is people who are registered to

 8     vote from the homeless shelter they might most frequently go

 9     to.

10     Q.    But if you had, say, a voter -- a homeless voter who put

11     down their address as saying under -- you know, on the east

12     side of the river under the Main Street bridge --

13     A.    If we ever had that, I'm satisfied that our Board staff

14     would figure out a way to properly record them at that

15     location.

16     Q.    For purposes of registering them to vote?

17     A.    Correct.

18     Q.    And in terms of then the voter, say, voting by -- well,

19     let's say they came in to vote -- to early vote.  How would

20     that be handled?

21     A.    Again, I'm satisfied that our staff would figure out a

22     way to get that person voted.

23     Q.    Okay.

24     A.    I can't tell you that we've had that happen.  I can tell

25     you one thing that we do have happen now; we've had a number of
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 196 of 263 PAGEID #: 1253
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/08/16 Page: 196 of 263 PAGEID #: 23873

Vol. 2 - 196

1    people whose buildings where they are registered in have been

2    torn down so we know they don't live there any longer.

3         If they attempt to vote from that address, it's

4    certainly possible that their vote could be challenged because

5    we've had some folks who have been pretty aggressive at

6    insisting that since that building no longer exists, they can't

7    possibly be living there and that can't be their place of voter

8    registration.  So those voters are challenged if they attempt

9    to vote using that address.  They are not removed from our

10   rolls because we recognize they have the ability to go to the

11   polling place in the precinct they now live in and vote a valid

12   provisional ballot.

13   Q.   And how would the -- in the case of a -- again, a voter

14   that is a homeless voter that registers at an address other

15   than a house and a number and a street, how would that person

16   be entered into the registration system?

17   A.   Because I don't think we've actually had to do that, I

18   can't give you a direct answer to that question other than I

19   can tell you that our Board on a bipartisan basis and our Board

20   staff have been instructed that if you have a homeless person

21   and they want to register from an untraditional location, we

22   will register them there.

23        MR. McTIGUE:  Thank you very much.

24        No further questions, Your Honor.

25        THE COURT:  Thank you, Mr. McTigue.

 1         Mr. Conover, please proceed.

 2                      DIRECT EXAMINATION

 3    BY MR. CONOVER:

 4      Q.   Good afternoon, Mr. Burke.  I think we met once before

 5    but, for the record, my name is Brodi Conover, and I'm from the

 6    Ohio Attorney General's office and in this case I represent the

 7    defendants the Secretary of State and the State of Ohio.

 8         Mr. McTigue walked you through a little bit of your

 9    background so I'm not going to do too much of that, but I just

10    want to confirm that you are --

11         THE COURT REPORTER:  I'm sorry, Mr. Conover, I'm going

12    to have to ask you to slow down.

13         I just want to confirm --

14    BY MR. CONOVER:

15      Q.   That you are the chairman of the Hamilton County Board

16    of Elections.

17      A.   It's happened to me, too.

18         Yes.

19      Q.   Yes, I remember from ODPA and the transcript.

20         And I believe you also said that you are a Democrat?

21      A.   Yes.

22      Q.   And, in fact, you're the chairman of the Hamilton County

23    Democratic Party, correct?

24      A.   Yes.

25      Q.   And can you describe the different types of hats that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 198 of 263 PAGEID #: 1255
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 198 of 263 PAGEID #: 23690

Vol. 2 – 198

 1    you wear as chairman of the Hamilton County Board of Elections

 2    and the Hamilton County Democratic party?

 3      A.    I'm not sure precisely what you mean.  And I think we've

 4    been through a little bit of this before but, obviously, as the

 5    chair of the Board of Elections, as a member of the Board of

 6    Elections, my principal obligation is to ensure that elections

 7    in Hamilton County take place fairly and efficiently.

 8           And I think my Republican counterpart, who is also on

 9    our Board of Elections, would answer that question the same

10    way.

11      Q.    So in your testimony here today, do you represent the

12    Hamilton County Board of Elections?

13      A.    I am speaking on a personal basis today.  I am not

14    attempting to speak on behalf of the four members of the Board

15    of Elections, no.

16      Q.    And are you speaking on behalf of the Hamilton County

17    Democratic party?

18      A.    I am not.

19      Q.    Okay.  I would like to talk a little bit about the

20    written testimony that Mr. McTigue showed you today, and the

21    first one I would like to bring up is Plaintiffs' Exhibit 1214.

22      A.    Yes, sir.

23      Q.    And I believe this was your testimony on Senate Bill

24    216?

25      A.    Yes, sir.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed 09/12/20 Page: 199 of 263 PAGEID #: 1256
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed 04/06/20 Page: 199 of 263 PAGEID #: 23691

Vol. 2 - 199

 1    Q.    And was this testimony submitted on behalf of the

 2    Hamilton County Board of Elections?

 3    A.    No.  And if there was one thing I would do differently

 4    with regard to this, it would not be on Board of Elections'

 5    stationary.  It would have been on my own stationary if I had

 6    that to do over again.

 7    Q.    Thank you.

 8          Can you tell me why you chose to use Board of Elections'

 9    letterhead?

10    A.    Probably because I didn't think very much about doing it

11    in advance.  I just did it.

12    Q.    And when you submitted this letter, this written

13    testimony, excuse me, who is -- you were the chair of the

14    Hamilton County Board of Elections, correct?

15    A.    In 2014, yes.

16    Q.    And who is Mr. Triantafilou?

17    A.    He is another member of the Board of Elections who

18    happens to be the chair of the Hamilton County Republican

19    Party.

20    Q.    And who is Mr. Faux?

21    A.    He is the other Democrat on the Board of Elections.

22    Q.    And who is Mr. Gerhardt?

23    A.    He is the other Republican on the Board of Elections.

24    Q.    And were those three other members of the Hamilton

25    County Board of Elections aware that you submitted testimony in

1   support of --

2       A.   Prior to me doing it, no.

3       Q.   Can I finish my question?

4       A.   I'm sorry.  I apologize.

5       Q.   Thank you.

6            Were those three members of the Hamilton County Board of

7   Elections aware that you submitted testimony against Senate

8   Bill 216?

9       A.   No, not prior to me doing it.

10      Q.   And were they aware you used Board of Elections'

11  letterhead?

12      A.   No, not prior to me doing it.

13      Q.   So again I'll ask, was this testimony on behalf of the

14  Hamilton County Board of Elections?

15      A.   I think I already answered that question, and the answer

16  was no.

17      Q.   Thank you.

18           And now I would like to move a little bit into kind of

19  the voting -- I'm going to say voting apparatus at the Hamilton

20  County Board.  What is the difference between an absentee

21  ballot and a provisional ballot?

22      A.   The absentee ballot today should probably be called an

23  early vote ballot.  Absentee applies to the laws that used to

24  exist a long time ago when you had to be able to establish,

25  typically, you were going to be out of the county on Election

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 201 of 263 PAGEID #: 1258
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 201 of 263 PAGEID #: 24998

Vol. 2 - 201

1    Day in order to vote.  We still use that term, but today it

2    applies to voters who vote in the roughly 30-day period prior

3    to election either by mail or by coming to the Board of

4    Elections and casting an early ballot there.  They are also

5    treated, in your generic, as being an absentee voter.

6         Q.   And what is a provisional voter?

7         A.   A provisional voter is a voter who goes to a polling

8    place on Election Day.  They are not in the voter rolls for

9    that precinct, or in some cases the poll worker is unable to

10   find them in there.  They are still entitled to vote in that

11   precinct if they say their address is in that precinct.  Or

12   even if they simply say I want to vote here, we have to allow

13   them to vote at that location.  And they vote the same ballot

14   that a regular voter would vote but their ballot, instead of

15   being fed into our ballot reader, it goes into a provisional

16   ballot envelope with additional information on it, and that

17   envelope is placed in a separate location in the ballot box.

18        Q.   And is not being in the poll book the only reason

19   someone would vote a provisional ballot?

20        A.   That would typically be it.  I'm trying to think if

21   there may be other reasons.  Conceivably, yes, a newly married

22   person or somebody who for other reasons has changed their

23   name, they may still be -- their former name may be in the

24   book, they're now using a new name.  That could cause a

25   problem.  They may have moved within a precinct.  And while I

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 202 of 263 PAGEID #: 1259
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/10 Page: 202 of 263 PAGEID #: 23894

Vol. 2 - 202

```
 1    don't think they should be required to cast a provisional

 2    ballot, the poll workers may require them to cast a provisional

 3    ballot.  Or if there are other questions.

 4         Like, just Tuesday night, as you know we had a very

 5    strange thing happen Tuesday night.  We had closed the polls at

 6    7:30 after having a very smooth Election Day, as opposed to

 7    last year.  And at 8:01 we had a directive from the Secretary

 8    of State conveying an order from Judge Dlott telling us to keep

 9    the polls open from 7:30 to 8:30.  We had to scramble.  We did

10    have 65 people that we've identified so far who came to a

11    polling place in that 29-minute period of time that we knew

12    about an order, and those folks were able to vote.  They were

13    required to vote a provisional.  Whether they were in the book

14    or not, at that time they had to vote a provisional envelope,

15    and that envelope had the additional information on it that

16    they voted after 7:30.

17         So there are a variety of different reasons why people

18    may vote a provisional ballot.

19    Q.   But those all hinge on -- and a voter's eligibility is

20    in question, correct?

21    A.   Yes.

22         My hesitancy was those folks who voted late on Tuesday,

23    for example, they were eligible voters, there's no question

24    about that.  It's just they didn't -- the question remaining is

25    are they eligible to cast a vote after 7:30?
```

1    Q.   I think Tuesday may have been a unique situation.

2    A.   I think it was.

3    Q.   So I was just meaning in a normal context --

4    A.   To the extent there is a normal context for

5  provisionals, yes.  Typically, the question is whether or not

6  this is a validly registered voter who lives in that precinct.

7    Q.   Thank you.

8       Is Hamilton County a DRE county?  And do you know what I

9  mean by DRE?

10   A.   We are a paper ballot county.

11   Q.   Thank you.

12      And does Hamilton County consolidate their poll books?

13   A.   We have separate -- we still have separate paper poll

14  books for each precinct.  So on Tuesday, for example, there

15  were paper poll books in each precinct, but we are now using

16  E-Poll books, and those have access to the entire voter

17  registration list for Hamilton County.

18   Q.   I'm sorry.  So my question was do you consolidate your

19  poll books, and your answer is by E-Poll books you do

20  consolidate?

21   A.   Correct.

22   Q.   Thank you.

23      Now, I would like to talk a little bit about the

24  absentee process at the Board of Elections.  Can you describe

25  all the steps that the Board staff takes when they process an

1    absentee ballot application form?

2      A.    I'm probably not the right person to ask the details of

3    how that's handled.  I can give you my best understanding of

4    it.  I've never had to do that myself.

5      Q.    That's fine.  If you've never done it, then I don't know

6    it would make sense.

7      A.    Okay.  Thank you.

8      Q.    So you don't know what information Board staff uses to

9    look up voters in the voter registration database?

10     A.    I mean, they use our voter registration database, and

11   we've had them do that any number of times right in front of

12   the Board of Elections in open meetings when we've had to for

13   various reasons.

14     Q.    I just meant when the Board staff receives a voter's

15   absentee application, you do not know the specific information

16   that they enter into your database to ascertain the identity --

17     A.    No, I wouldn't be comfortable giving you the details of

18   that.

19     Q.    Thank you.

20           Similarly, with the provisional process, you don't know

21   how the Board staff process takes -- the specific steps that

22   they take to identify a provisional voter?

23     A.    I can give you a pretty good idea of that because

24   that's, again, a process that sometimes we've had to do right

25   in the middle of Board meetings.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 205 of 263 PAGEID #: 1262
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 205 of 263 PAGEID #: 2887

Vol. 2 - 205

1    Q.   Okay.  If you could please explain.

2    A.   And it's taking the information that is on that poll

3  envelope, putting it in our computer system and matching up

4  what can be matched up, or going to the Ohio voter registration

5  database where a voter has indicated that they used to be

6  registered in Montgomery County and they now live in Hamilton

7  County.

8    Q.   So I believe on your cross with Mr. McTigue, you said

9  that you will absolutely not need date of birth to identify a

10  voter; is that correct?

11    A.   I can't think of a time that we would need the date of

12  birth.

13    Q.   Again, when a Board staff member is processing a

14  provisional ballot, are you aware if they use date of birth or

15  not?

16    A.   I know that that information is available to match to

17  our records.  I don't think it's necessary to do that if we

18  have a voter's signature that matches our records.

19    Q.   Can you search a voter in the voter registration

20  database by signature?

21    A.   We can search the voter's name, and it brings up the

22  voter's signature.

23    Q.   But you said that signature is the most important thing

24  in identifying a voter.  Can you search the database by

25  signature?

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 206 of 263 PAGEID #: 1263
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/12 Page: 206 of 263 PAGEID #: 2898

Vol. 2 - 206

1    A.    We could -- no.

2    Q.    Okay.

3    A.    They could --

4    Q.    Do you know how a Board -- the Board staff verifies a

5    voter's address?

6    A.    By matching it to our records.

7          I'm not sure what you mean by verifying the voter's

8    address.

9    Q.    So do you know what the Geographic Information System

10   is?

11   A.    Yes.

12   Q.    And does the Board utilize the Geographic Information

13   System to verify a voter's address?

14   A.    I do -- you mean to verify whether or not a particular

15   123 East 123rd Street is an address within precinct 3A?  Is

16   that what you're asking?

17   Q.    Yes, sir.

18   A.    We have a system that allows us to determine whether or

19   not a particular address is within the address range in that

20   precinct.

21   Q.    Okay.  I'd also like to ask, does the Board's website --

22   let me start over.

23         Can you describe the Board's website that is made

24   available to absentee voters to check the status of their

25   ballot?

1   A.   We -- you're right, we do have that information on our

2   website, and a voter can go into that to determine whether or

3   not their ballot has been received and processed -- has been

4   received.

5   Q.   Do you know how many voters in Hamilton County have the

6   same name?

7   A.   Do not.

8   Q.   Do any?

9   A.   Sure.

10  Q.   And do you know how many voters in Hamilton County have

11  the same last four of their social security number?

12  A.   Don't know.

13  Q.   Do any?

14  A.   Probably.

15  Q.   And Mr. McTigue asked you a little bit about homeless

16  voters.  Do homeless individuals in Hamilton County have the

17  right to vote?

18  A.   Absolutely.

19  Q.   And I don't want to walk through the specifics of how

20  they register but, again, I believe on your direct -- or your

21  cross, you said that you -- the Board staff would do anything

22  they could to register a homeless voter.

23  A.   Yes, sir.

24  Q.   And that the Board staff would do anything that they

25  could to count a homeless voter's ballot.

1   A.   Yes.

2   Q.   Are you required to have a telephone number to register

3   to vote?

4   A.   No.

5   Q.   And does the Hamilton County Board have current

6   telephone numbers for all registered voters?

7   A.   No.

8   Q.   In fact, the Hamilton County --

9   A.   We don't have birthdays for all registered voters.

10   Q.   And, in fact, the Hamilton County Board of Elections

11   does not record a voter's telephone number or e-mail address in

12   the voter registration database; is that correct?

13   A.   That's correct.

14   Q.   Are you familiar with the Ohio Association of Election

15   Officials?

16   A.   I am.

17   Q.   And are you aware that in support of the challenged

18   provision not -- excuse me.  Let me strike that.

19       Are you familiar with the recommendations from the OAEO

20   that recommended the five identifiers for absentee ballots?

21   A.   I am familiar with they have made several

22   recommendations with which I didn't agree, but yes.

23   Q.   And then it's a little out of order so I apologize, but

24   let's go back to the provisional ballot.

25       What purpose does a provisional ballot have for a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 209 of 263 PAGEID #: 1266
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 209 of 263 PAGEID #: 18591

Vol. 2 - 209

1    non-registered individual?

2    A.    For a non-registered individual?

3    Q.    Yeah.  So you said that the most frequent reason for

4    rejecting a provisional ballot is that an individual isn't

5    registered.

6    A.    Correct.

7    Q.    And does a provisional ballot actually register --

8    A.    Oh, yes, it does.

9    Q.    Thank you.

10         And then, finally, I would like to talk a little bit

11   about --

12   A.    The provisional ballot doesn't.  The -- I get what you

13   mean but, yes, once the voter fills out a provisional envelope,

14   it constitutes a voter registration for them if they hadn't

15   previously been registered.

16   Q.    And why is that?

17   A.    What do you mean why is that?

18   Q.    How can it act as a registration for a non-registered

19   individual?

20   A.    Because it provides all of the information that would

21   otherwise be necessary to register to vote if you had done it

22   30 days in advance of the election.

23   Q.    And the previous version of the provisional affirmation

24   statement did not do that?

25   A.    I'm trying to remember.  I'll accept that.  I -- I don't

1    remember off the top of my head.

2        Q.   Thank you.

3             How many full-time staff members does the Hamilton

4    County Board of Elections have?

5        A.   I believe it's 44 right now.

6        Q.   Thank you.

7             And then, finally, again I would like to talk a little

8    bit about the Board's review of absentee and provisional

9    ballots.

10            How are the ballots presented to the staff or to the

11   Board by the staff?

12       A.   Provisionals?

13       Q.   Yes.

14       A.   They will -- they have started now, for example, going

15   through the 8500 or so provisionals and organizing them in a

16   manner that will allow them to review what's on the outside of

17   the envelopes, and they will begin to make determinations as to

18   which of those, based on the information provided, have been

19   cast by validly registered voters and are entitled to be

20   counted.  They will set aside those which they, on a bipartisan

21   basis, determine for one reason or another are questionable,

22   and those will continue to be reviewed until ultimately a

23   determination is made by a bipartisan team that for one reason

24   or another they're prepared to recommend they not be counted.

25            Those then go to our director and deputy director who

Vol. 2 - 211

1    have to review them hopefully to come to the same conclusion,

2    and they will then present those in a public meeting of the

3    Hamilton County Board of Elections in groups; all of these

4    ballots are to be approved, these ballots are not to be

5    approved because they're not registered.  These ballots are not

6    to be approved because the signatures do not match our

7    registrations.  These ballots don't get approved because we --

8    for whatever reason it may be.

9      Q.    So they -- those provisional ballots that are

10   recommended to be not accepted, they go through three levels of

11   bipartisan review before they get to the Board of Elections?

12     A.    They go through two levels of bipartisan review

13   typically before they go -- come to the Board.

14     Q.    Okay.  Thank you.

15          And then what information is presented to the Board with

16   those recommendations?

17     A.    The ballots -- the provisional ballot envelopes

18   containing the ballots.  And that's another reason why on

19   occasion this envelope gets rejected, is because you can see

20   through the holes there's no ballot in it, there's nothing to

21   be counted.  For whatever reason that may be, that happens.

22          But the envelopes, almost all of which contain ballots,

23   are literally put on the table in front of us and we go through

24   those groupings one at a time and, in many cases, go through

25   each envelope one at a time to determine whether or not we're

1  going to accept the staff recommendation.

2     Q.    So for every ballot that is rejected or accepted, you

3  have the opportunity to review?

4     A.    Yes, sir.  And, again, every ballot envelope.

5     Q.    I'm sorry, yes, ballot envelope.

6           And you just said that in most cases you do do that

7  individual envelope review?

8     A.    No.  To be clear, if we've got a whole stack of

9  envelopes containing ballots that our Board staff have

10 unanimously determined these people are not registered anywhere

11 in the State of Ohio, we don't go through each of those one at

12 a time.  We would typically accept staff's recommendation

13 unless there was some question raised about it; I know this

14 person.  I know that they are living at that address and are

15 registered.

16          But, typically, we wouldn't go through those one at a

17 time.

18    Q.    Is it fair to say you typically accept the staff's

19 recommendation?

20    A.    I would think 99.9 percent of the time we're going to

21 accept the staff's recommendation.

22    Q.    And this may go without saying, but who ultimately

23 accepts or rejects provisional ballots?

24    A.    The Board of Elections.

25    Q.    And that is a bipartisan process?

1    A.    Correct.

2    Q.    And can you explain what that means?

3    A.    It's bipartisan to the extent that the Board is composed

4  of two Democrats and two Republicans, and collectively we are a

5  bipartisan group.

6    Q.    I guess what I mean by that is the composition is that

7  there's four Board of Elections members, correct?

8    A.    Correct.

9    Q.    Two Republicans and two Democrats?

10   A.    Correct.

11   Q.    In order to pass or accept the ballot, it would have to

12 be three members?

13   A.    Correct.

14   Q.    At least three members.

15   A.    Correct.

16   Q.    Okay.  Thank you.

17   A.    Or two members and the Secretary of State.

18   Q.    Thank you.

19        THE COURT:  Mr. Conover, you do recognize that you

20 don't have him as upon cross; am I correct?

21        MR. CONOVER:  I didn't hear an objection, Your Honor.

22        THE COURT:  You just did.

23        MR. CONOVER:  Well, then, can we have a sidebar,

24 please?

25        THE COURT:  No.  You can continue.  But he's as upon

1    direct.  He is the chairman of the Hamilton County Board of

2    Elections and, as I previously ruled on the 611, he is not your

3    witness as upon cross.

4              MR. CONOVER:  Thank you, Your Honor.

5              THE COURT:  I knew that you would know what that

6    meant.

7              MR. CONOVER:  Yes, Your Honor.

8    BY MR. CONOVER:

9      Q.    What is your goal, Mr. Burke, as to when it comes to the

10   ballots that are cast in any given election in Hamilton County?

11     A.    My personal goal?

12     Q.    As a --

13     A.    As a Board member is to see that all ballots that were

14   cast by properly registered voters get counted.

15             MR. CONOVER:  I have no further questions, Your Honor.

16             THE COURT:  Thank you, Mr. Conover.

17          Any recross, Mr. McTigue?

18          MR. McTIGUE:  Yes, Your Honor.

19                       RECROSS-EXAMINATION

20   BY MR. McTIGUE:

21     Q.    And, Mr. Burke, are you a member of the OAEO?

22     A.    I am.

23     Q.    Okay.  Do you consider the OAEO to adequately represent

24   the interests of large counties?

25     A.    No.

1    Q.    Okay.  Would you explain that?

2    A.    The OAEO -- look, they are well-meaning people, but it

3    tends to be dominated by smaller rural counties with much

4    smaller staffs and much smaller voting populations than exist

5    in the larger counties.

6    Q.    And the OAEO voting rights are not proportional based on

7    size of the county, correct?  In other words, each -- each --

8    each person gets one vote?

9    A.    Correct.

10    Q.    Now, you were also asked some questions regarding using

11    the provisional affirmation form to register a voter; in other

12    words, someone who is not registered at all, they can -- under

13    the new law this form can be used to register them and add them

14    to the rolls for future elections, correct?

15    A.    Yes, sir.

16    Q.    They would have also cast the provisional ballot, but

17    that will not be counted, correct?

18    A.    Correct.

19    Q.    Okay.  Now, can you think of any reason -- well, let me

20    step back for a second.

21        So that's a useful function of this form, to register

22    people who aren't registered, correct?

23    A.    It is.

24    Q.    It's the same thing as filling out a regular

25    registration form?

1    A.   Correct.

2    Q.   And can you think of any reason to -- any reason based

3    on the fact that this form can be used to register new voters

4    as a legitimate justification for jeopardizing or

5    disenfranchising people who are already qualified electors

6    because they did not properly fill out date of birth or an

7    I.D.?

8              MR. CONOVER:  Objection, Your Honor.

9              THE COURT:  Basis, Mr. Conover?

10             MR. CONOVER:  Form.

11             THE COURT:  Read the question back.  I want to see if

12   that's the question that you meant to ask, Mr. McTigue, and I

13   want to see if you, Mr. Burke, understand the question.

14      (Question read back.)

15             THE COURT:  Is that the question that you meant to ask

16   in the form in which you meant to ask it, Mr. McTigue?

17             MR. McTIGUE:  Yes, Your Honor.

18             THE COURT:  Okay.  Did you understand it, Mr. Burke?

19             THE WITNESS:  I believe I did, Your Honor.

20             THE COURT:  All right.  I'm going to overrule the

21   objection.  It was confusing to me, too, Mr. Conover.  But if

22   the witness understood it, it's not substantively improper.  I

23   will allow it to stand.

24             MR. CONOVER:  Thank you, Your Honor.

25             THE WITNESS:  No.

Vol. 2 - 217

1   BY MR. McTIGUE:

2     Q.   You were asked if it's possible to search the voter

3   registration database based on the voter's signature, and I

4   think you said no, it's not possible.  Do you recall that?

5     A.   I do recall that.

6     Q.   Okay.

7     A.   And I recall not being allowed to finish what I would

8   have liked to have said.

9     Q.   Yes.  So I now want to ask you what else you wanted to

10  say?

11    A.   My point was we can put the voter's name in; and even if

12  there are multiple people with the same name, we can bring up

13  each one of their signatures on our system, and we can then

14  attempt to match signatures.

15    Q.   And to be clear, what we're talking about is bringing it

16  up on the computer screen, a digital image of their

17  registration signature?

18    A.   Correct.  And, frankly, then if we have to -- and we've

19  had to do this -- we send somebody down in the basement to go

20  get their voter registration card and look at the original

21  signature if there's any reason why we're having a difficult

22  time seeing it on the screen.

23    Q.   In fact, the signature on the screen is commonly the

24  most recent sample of that person's signature, such as the last

25  time they signed a poll book?

1    A.    Typically, that's correct.

2    Q.    All right.  And so if there was a difference, you could

3    basically go back through the paper record to go to the

4    original record if you needed to?

5    A.    Correct.

6    Q.    Now, your testimony regarding the -- or, I'm sorry, your

7    testimony today regarding the testimony you gave to the General

8    Assembly, the written testimony, that was -- you were acting on

9    your own behalf, correct?

10   A.    Correct.

11   Q.    But your -- the content of what you had to say was

12   informed from your experiences as a member of the Board of

13   Elections?

14   A.    They were -- they were informed from my experiences,

15   frankly, from having been in politics now for a very long time,

16   from having been on the Board of Elections for a very long

17   time, from having served as an international supervisor of

18   elections in Bosnia and done election training in Slovakia.

19   From all of those things, that's given me reason to believe

20   what I believe about voting rights, and that's what I was

21   trying to convey in shorthand form in these two letters.

22   Q.    And would that be a fair description of your -- the

23   testimony today in this courtroom, that it's based on your

24   experiences on the Board?

25   A.    My experiences on the Board.  And, as I say, beyond

1    being on the Board but, you know, spending lots of times going

2    door-to-door talking to voters, that's part of the experience

3    which forms my opinions.

4        Q.    You were also asked the question about whether people --

5    some people in Hamilton County would have the same name.  Do

6    you remember that?

7        A.    Yes, sir.

8        Q.    And you were also asked if it's possible that some

9    people in Hamilton County might have the same last four digits

10    of their social security number.

11        A.    Yes, sir.

12        Q.    Okay.  So assuming we had two voters with the exact same

13    name and the exact same last four digits of their social

14    security number who cast, let's say, absentee ballots, they

15    would be in your voter registration database with the same

16    numbers -- or the same last four digits, if that's what they

17    used when they registered, and they would be in the database

18    with the same last name, correct?

19        A.    Correct.  The one thing that wouldn't be the same is

20    their signature.

21        Q.    Okay.  Now, Hamilton County is -- do you know in terms

22    of the 88 counties where it falls in terms of the size

23    population-wise?

24        A.    First of all, it's the best county.

25        Q.    Okay.  That was not my question, Mr. Burke.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 220 of 263 PAGEID #: 1277
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 220 of 263 PAGEID #: 23907

Vol. 2 - 220

```
 1       A.   I believe it's the third largest county in the State of
 2   Ohio.
 3       Q.   Okay.  And of the population, do you know what the
 4   percentage of the population is that's African-American?
 5            MR. CONOVER:  Objection, Your Honor.
 6            THE COURT:  Basis, Mr. Conover?
 7            MR. CONOVER:  Outside the scope.
 8            THE COURT:  Sustained.
 9   BY MR. McTIGUE:
10       Q.   Mr. Burke, based on your experience on the Board of
11   Elections, has the implementation of the mandatory field
12   requirements for absentee voters and provisional voters
13   resulted in disenfranchising otherwise qualified electors?
14       A.   I believe it has.
15            MR. McTIGUE:  No further questions.
16            THE COURT:  Anything further, from you, Mr. Conover?
17            MR. CONOVER:  Nothing further, Your Honor.
18            THE COURT:  Thank you, Mr. Conover.
19        Mr. Burke, thank you very much, sir.  You may be
20   excused.
21            THE WITNESS:  Thank you, Your Honor.  I appreciate it.
22            THE COURT:  It's 4:00 o'clock, ladies and gentlemen.
23   We're going to take our afternoon recess until 4:10, then we'll
24   resume with -- who is the next witness?
25            MR. CONOVER:  Zachary West.
```

```
 1          THE COURT:  With Mr. West.

 2      (Thereupon, a recess was taken.)

 3          THE COURT:  Mr. McTigue, your next witness.

 4          MR. McTIGUE:  I call Zachary West.

 5          THE COURT:  Mr. West, please come forward and be

 6   sworn.

 7                            -  -  -

 8                       ZACHARY WEST

 9    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

10                     DIRECT EXAMINATION

11   BY MR. McTIGUE:

12     Q.    Could you state your full name?

13     A.    Nathaniel Zachary West.

14     Q.    And how do you spell Zachary?

15     A.    Z-A-C-H-A-R-Y.

16     Q.    Okay.  Mr. West, where are you employed?

17     A.    I am the general counsel and director of operations for

18   the Ohio Democratic Party.

19     Q.    And how long have you held that position?

20     A.    Since February of 2014.

21     Q.    And, I'm sorry, that was general counsel and --

22     A.    Director of operations.

23     Q.    Thank you.

24          Now, were you previously employed by the Ohio Democratic

25   Party?
```

1    A.   Off and on since 2004 as a field organizer or scheduler

2    for surrogate events at various times.

3    Q.   Now, as I ask you questions today, I just want to be

4    clear -- since you apparently wear two hats at the party, one

5    as general counsel and one as director of operations -- that I

6    am not asking you any questions that would require you to

7    divulge any attorney/client privileged information.

8    A.   Okay.

9    Q.   Okay?

10        But, you know, let's lay out for the Court in some

11   general way what the difference between those two hats are.

12   A.   General counsel would be chief in-house legal counsel so

13   it's the standard in-house legal work, employment law advice,

14   tax law advice, review of contracts and leases.

15        Director of operations in this sense would be in charge

16   of budgeting, in charge of expenditures, handling any state or

17   federal campaign, and compliance issues.

18   Q.   And in your capacity as director of operations, do you

19   have any involvement or responsibilities with respect to the

20   Ohio Democratic Party's voter education programs?

21   A.   Yes.  I review the materials before they're sent out to

22   ensure they have the proper disclaimer.  I'm in charge of

23   determining whether they are federal or non-federal activity

24   and how to pay for them and how to report them.

25        In my general counsel role I also review it to make sure

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 223 of 263 PAGEID #: 1280
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 223 of 263 PAGEID #: 2409

Vol. 2 - 223

 1    the information contained is accurate and legal.

 2    Q.    Now, I may have gotten ahead of myself there, but

 3    what -- well, does the Ohio Democratic Party conduct voter

 4    education programs?

 5    A.    Yes.

 6    Q.    Can you describe based on your personal knowledge what

 7    those programs are?

 8    A.    Sure.

 9          We do paid and volunteer phone calls to registered

10    Democrats and independents who we think are likely to vote

11    Democrat based on a variety of factors encouraging them to

12    vote, helping them determine what they need to take to the

13    polls with them when they vote in terms of identification and

14    things, and also explain to them what they need to do if

15    they're told to vote a provisional ballot.  We also do a mail

16    program aimed at those same voters, and we go door-to-door in

17    high Democratic turnout neighborhoods providing the same

18    information.

19    Q.    And you mentioned mail programs to voters.  Is this mail

20    program specifically related to voting requirements?

21    A.    Yes.  We -- we do send out what is called a Voter Bill

22    of Rights in presidential years that includes information on

23    the types of I.D. you would need to take to the polls with you,

24    where to go to the polls -- where your voting location is,

25    rather, hours that the polling locations are opened, that sort

Vol. 2 - 224

1    of thing.

2    Q.    Now, these activities on voter education, do they --

3    does the degree of activity fluctuate from year to year?

4    A.    Yes.  Depending on the budget we have, the races on the

5    ballot and a number of other factors, it can vary greatly from

6    one year to the next.

7    Q.    And in what years would you say you have the highest

8    amount of voter education activity?

9    A.    Presidential election years 2008, 2012, 2016, 2020, et

10   cetera.

11   Q.    Okay.  And why is that?

12   A.    Those are the years that have the highest voter turnout.

13   A lot of people will only vote in presidential years and then

14   not vote in midterms or odd numbered years, and people tend

15   to -- if they're not already registered, you tend to have the

16   most new registrants in presidential election years.

17   Q.    And is the Ohio Democratic Party conducting voter

18   education programs for this year, 2016?

19   A.    We will be, yes.

20   Q.    Okay.  Did you conduct any such programs in connection

21   with the primary that we had this week?

22   A.    Yes.  In addition to our voter education efforts, we

23   also do a voter protection effort which would be placing

24   people -- what are called -- I think they're still called

25   challenges under Ohio law; although, they can't actually make

1    challenges at the polls anymore.  But we certify people in

2    polling locations and Boards of Election to serve as observers

3    on Election Day, and we did that in 15 counties in the primary,

4    I believe.

5        Q.   And how do you distinguish between voter education and

6    voter protection?

7        A.   Voter education would be what occurs before Election

8    Day.  It would be in the days and weeks and months leading up

9    to the election where we are educating people on what to take

10   with them or what to do once they get there, where to go, when

11   to go, et cetera.

12           Voter protection would be once they're there and they

13   have questions about they're telling me to vote a provisional

14   ballot or something along those lines, you know, I'm not

15   registered here, what do I do; once they're at the polls, I

16   would say it becomes voter protection rather than voter

17   education.

18       Q.   With regard to voter protection, you mentioned one

19   component; that is, placing observers at Boards of Election

20   and/or polls?

21       A.   Uh-huh, yes.

22       Q.   Okay.  Are there other aspects of the voter protection

23   program?

24       A.   Yes.  We also run a hotline where people can call in and

25   report problems at their polling place.  We have regional what

1   are called boiler rooms, as well as statewide boiler rooms,

2   where we have teams of attorneys both paid and volunteer who

3   can then call Board of Elections and report, you know, we're

4   seeing a lot of provisionals at this location, we think that

5   your staff might need to be retrained, or various other issues

6   that might pop up on Election Day, power outages at the polls,

7   that sort of thing.

8       Q.   And in terms of voter education activities, I think you

9   mentioned mailings.  Are there other kinds of voter education

10  activities that the party has conducted?

11      A.   Yes.  Paid and volunteer phone banks targeting

12  registered Democrats where we have phone numbers for them,

13  canvases by paid and volunteers -- paid staff and volunteers in

14  neighborhoods where high percentages are registered Democrats

15  or that are likely to vote for Democratic candidates in the

16  fall.

17      Q.   And with regard to these phone banks, are those -- those

18  phone banks, are they aimed at voter education or voter

19  turnout, or both?

20      A.   They're aimed at both.  Voter education is a part of

21  turnout, and turnout is a part of voter education.  But,

22  really, it's very hard to separate the two.  And I would point

23  out that the Federal Elections Commission actually treats them

24  interchangeably as well in terms of how we have to pay for

25  them.

1    Q.    And does the party have plans to conduct voter

2    protection activities this year?

3    A.    Yes.

4    Q.    Now, has the party at this time decided what the

5    specific voter protection and voter education activities will

6    be related to the general election?

7    A.    We have not yet.  We have been waiting until we have a

8    nominee to figure it out because much of our strategy will be

9    based on who the nominee is.  Now that it's clear it's Hilary

10   Clinton, we've begun having those plans.  We have been planning

11   in a general sense since at least December of 2015 in terms of

12   just the generic here is where we plan on focusing, but

13   specifics would have to wait until we get a nominee.

14   Q.    And how many members are there of the Ohio Democratic

15   Party?

16   A.    Ohio defines membership in a political party by what

17   ballot you voted in the last partisan primary election.  My

18   understanding is that the unofficial turnout for the Democratic

19   primary held on Tuesday was roughly 1.2 million so it would

20   probably be around 1.2 million members as of today.

21   Q.    And, if you know, how many contributors who are

22   residents of the State of Ohio are contributing contributions

23   to the Ohio Democratic Party?

24   A.    I do not know the number of contributors off the top of

25   my head.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 228 of 263 PAGEID #: 1285
Case: 2:00-cv-03893-ALM-TPA Doc #: 656-1 Filed: 04/06/18 Page: 228 of 263 PAGEID #: 2335

Vol. 2 - 228

1    Q.    But those would be reflected on campaign finance

2    reports?

3    A.    Yeah, they would be either on our reports that we file

4    with the Secretary of State or the Federal Elections Committee.

5    Q.    And both those agencies' reports are public, correct?

6    A.    Yes, you can see them online.

7    Q.    Okay.  Now, in terms of Ohio Democratic Party members,

8    do any of the members vote by absentee?

9    A.    Yes.  I don't know the number off the top of my head,

10   but I know some do -- I vote early in-person which is still

11   technically absentee voting, so at least one that I know of.

12   Q.    Okay.  Is it -- is it fair to say that there are many

13   more than that?

14   A.    Yes.

15   Q.    Okay.  And how -- let me ask this:

16        Does the party conduct any activities aimed at promoting

17   voting early by mail or in-person?

18   A.    Yes.  That is a heavy part of our program Get Out the

19   Vote effort in the fall aimed at either encouraging people to

20   go to their -- usually the county Board of Elections and vote

21   early or vote on -- vote by mail which you can usually do

22   online now, request a ballot online, get it, fill it out and

23   mail it in.

24   Q.    And does the party receive communications either by

25   phone or text or letter from absentee voters?

1    A.   Phone calls, yes.

2    Q.   And would that typically be when they're experiencing a

3    problem or when they're seeking information on how to vote?

4         MS. CARWILE:   Objection; leading.

5         THE COURT:   Sustained.   Rephrase.

6    BY MR. McTIGUE:

7    Q.   Generally, what would be prompting these calls?

8    A.   Sometimes it's that they don't know how to request an

9    absentee ballot, they don't know where to go to vote.

10        Oftentimes, though, it's I requested a ballot and it

11   hasn't arrived yet, or I sent my ballot in and they haven't

12   received it yet.   What do I do?

13        MS. CARWILE:   Objection; hearsay.

14        THE COURT:   Overruled.   It's not being offered for its

15   truth.

16        MS. CARWILE:   Thank you, Your Honor.

17   BY MR. McTIGUE:

18   Q.   Mr. West, are some of the members of the Democratic

19   Party provisional voters?

20   A.   Again, I don't have that number off the top of my head

21   but, yes, I do know some Democrats cast provisional ballots.

22   Q.   How do you know that?

23   A.   Again, we receive phone calls on Election Day that I

24   went to my polling place, I wasn't in the poll book and they

25   gave me this thing to fill out.

Vol. 2 - 230

1    Q.   Mr. West, are you aware that in this case, not the --

2    not what we're trying here today, but that in what's known as

3    the NEOCH case, that there is a consent decree that is still in

4    effect?

5    A.   Yes.

6    Q.   And are you familiar with that consent decree?

7    A.   Generally, yes.  I haven't read it specifically

8    recently, but I'm familiar with the general terms of it yes.

9    Q.   Are you aware that the Ohio Democratic Party is a

10   signatory to that consent decree?

11   A.   Yes.

12   Q.   Now, are you familiar with Senate Bill 205?

13   A.   Yes.

14   Q.   And are you familiar with Senate Bill 216?

15   A.   Yes.

16   Q.   Now, do you see any connection between those bills and

17   the consent decree?

18           MS. CARWILE:  Objection.

19           THE COURT:  Basis, Ms. Carwile?

20           MS. CARWILE:  Calls for a legal conclusion,

21   Your Honor.

22           THE COURT:  Well, Mr. West is a lawyer; though, he's

23   not being called as an expert.  But I think this is the type of

24   testimony that he's capable of giving so your objection is

25   noted, but overruled.

1          MS. CARWILE:  Thank you, Your Honor.

2          THE COURT:  You may answer, Mr. West.

3          THE WITNESS:  Thank you, Your Honor.

4      My understanding is -- my recollection is the consent

5   decree, among other terms, stated that if a voter placed the

6   last four digits of their social security number, a provisional

7   voter included on their provisional ballot form, that they

8   would not be disenfranchised.

9          And that if a voter voted in what's right church/wrong

10  pew, which is where they went to the right polling location in

11  a multi-precinct location and voted in the wrong line, wrong

12  precinct, their vote would still be counted if it was poll

13  worker error.

14      My understanding of Senate Bill 205 is that it added two

15  additional fields to the provisional ballot form that had to be

16  filled out properly or else the ballot would be discarded

17  regardless of whether the voter put the last four of their

18  social or not.

19      My understanding of Senate Bill 216 is that it codified

20  into Ohio law a presumption that if a voter votes in the right

21  church/wrong pew, that it is their error and not poll worker

22  error.  It creates a presumption of voter error instead of poll

23  worker error.

24  BY MR. McTIGUE:

25    Q.   And with regard to Senate Bill 205 and the two fields

1   that you were mentioning, were you mentioning those in

2   connection with provisional votes?

3      A.   Yes.

4      Q.   Okay.  Are you -- did you mean to stay Senate Bill 216?

5      A.   Yes, I'm sorry.  I get those two confused sometimes.

6      Q.   And so then can you explain in your own words whether

7   you see any connection between the consent decree and those two

8   bills?

9      A.   I think we've just discussed 216.

10          205, I think, actually dealt with absentee voting, if I

11   remember correctly, and I believe it added the same two fields

12   to it as on the provisional envelope.  But I may be mistaken

13   about that.

14     Q.   Maybe I wasn't clear on my question, but can you explain

15   in your own words what impact you believe Senate Bill 216 may

16   have with respect to the consent decree?

17     A.   I think it certainly undermines it.  It eliminates at

18   least two of the protections contained in the consent decree by

19   adding the fields and creating the presumption of voter error

20   rather than poll worker error, both which were protections

21   contained within the original consent decree.

22     Q.   Now, you just mentioned that Senate Bill 216 has these

23   additional fields, two additional fields.

24     A.   Uh-huh.

25     Q.   And what else does Senate Bill 216 do with respect to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 233 of 263 PAGEID #: 1290
Case: 2:20-cv-03843-MLM-TPA Doc #: 65-1 Filed: 04/06/18 Page: 233 of 263 PAGEID #: 2339

Vol. 2 - 233

1    provisional ballots?

2       A.    I believe it shortens the cure period from 10 days to 7

3    days if there's an error with the identification field.

4       Q.    And do you anticipate -- and by you, I mean the State

5    party.  Does the State party anticipate that Senate Bill 216

6    will have any impact with regard to the party's voter education

7    and/or voter protection activities?

8            MS. CARWILE:  Objection; leading.

9            THE COURT:  Sustained.

10           Rephrase, Mr. McTigue.

11   BY MR. McTIGUE:

12      Q.    What impact, if any, does the party believe Senate Bill

13   216 will have on the party's activities?

14      A.    We anticipate that it will create a substantial burden

15   on us this fall.  We voters are creatures of habit.  Once they

16   get used to doing something a certain way, they expect that to

17   continue to be the case.  Every year we get calls from people

18   who are upset that their polling location has been changed,

19   sometimes calling and still complaining about a change that was

20   made three or four years in the past because they liked the

21   other location better and don't understand why they don't go

22   back to it, and that's on the basis where you go to vote.

23           When you begin changing forms and things -- which most

24   voters do not follow legislative sessions on ballot forms very

25   closely so they're not aware of changes -- we then have to go

1   back and, instead of registering new voters, educating new

2   voters, encouraging new voters to go vote, we have to spend

3   time and money going back and educating voters we've already

4   talked with about these new fields, these new changes to law

5   and what they need to do now.

6   Q.   So does the party anticipate any increased dedication of

7   resources on voter education for this year?

8        MS. CARWILE:  Objection; leading.

9        THE COURT:  Overruled.  You may answer.

10       THE WITNESS:  Yes.  And I should say it's not just the

11   amount of resources, but it's also the type of resources that

12   we have to spend on this that's problematic for the Democratic

13   Party.

14  BY MR. McTIGUE:

15   Q.   Can you explain?

16   A.   Yeah.  We are governed by the Federal Elections

17   Commissions' regulations on how we pay for activities.  In 2010

18   the Federal Elections Commission greatly broadened the

19   definition of federal election activity to include Get Out the

20   Vote activity, which would be anything that assists someone in

21   voting.  Our voter education would be considered assisting

22   someone in voting, and so we now have to pay for all that with

23   what's called hard dollars or federal dollars which are subject

24   to strict contribution limits, are much harder to raise, and we

25   have a much smaller pool of than soft dollars.

 1          So when we have to go back and educate voters, we're

 2     having to spend a greater portion of a smaller pool of money

 3     than we otherwise would.

 4        Q.    And does the party anticipate that it will have an

 5     increased use of resources for its activities this year?

 6        A.    Yes.  Since it's a presidential year, we will have more

 7     people registering to vote, we'll have more people who plan on

 8     voting, and we'll have to be educating all of them on changes

 9     to the law, yes.

10        Q.    And will that increase resources -- is it tied to any of

11     the requirements under the new law?

12        A.    Yes.  Like I said, we will have to go back and educate

13     voters we had previously educated that now you have to worry

14     about printing your name, you have to fill out these other

15     fields, et cetera.  And also it's no longer right church/wrong

16     pew.  It's now even if you're in the wrong precinct, the

17     presumption is you voted in the wrong location and it's your

18     fault even if the poll worker didn't tell you it was the wrong

19     location, et cetera, et cetera.

20          So we have to go back and tell people affirmatively that

21     they are in the right line when they go to their polling place.

22        Q.    In terms of the Democratic Party's membership in Ohio,

23     does that membership include homeless voters?

24        A.    I believe so, yes.

25        Q.    And why do you believe that?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 236 of 263 PAGEID #: 1293
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 236 of 263 PAGEID #: 16338

Vol. 2 - 236

 1    A.    Obviously, it's going to be hard to locate them in our

 2   voter file to canvas or to send mail to since they wouldn't

 3   necessarily have a permanent address, but from speaking to

 4   field staff, speaking to volunteers who have registered

 5   homeless people leading up to the Democratic primary, I would

 6   assume they then voted in the Democratic primary.

 7    Q.    And let's say a homeless person is registered as a

 8   Democrat based on how they voted in the last primary and their

 9   registration address is a homeless shelter.

10    A.    Uh-huh.

11    Q.    Does the party mail educational material to that

12   address?

13    A.    If it's the registration address, we would pull our mail

14   list from the Secretary of State's voter file that they publish

15   on their website.  So if that's the address on file with the

16   Secretary of State, that's where we would send the mail, yes.

17            MR. McTIGUE:  May I have a moment, Your Honor?

18            THE COURT:  Yes.

19            MR. McTIGUE:  No further questions, Your Honor.

20            THE COURT:  Ms. Carwile?

21            MS. CARWILE:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MS. CARWILE:

24    Q.    Good afternoon, Mr. West.  I don't think we've met

25   officially before.  I'm Tiffany Carwile.  I represent the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 237 of 263 PAGEID #: 1294
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 237 of 263 PAGEID #: 28339

Vol. 2 - 237

```
 1    Secretary of State and the State of Ohio.

 2            How are you doing this afternoon?

 3    A.    I'm doing all right.  How are you?

 4    Q.    I'm doing all right.  Thank you.

 5            I just have a couple of questions -- more than a couple,

 6    but some questions regarding your testimony with Mr. McTigue.

 7            First I want to go over the voting education programs

 8    that you had mentioned, and I just want to make sure I have

 9    them all and we can go into them in a little bit more detail.

10            You had mentioned that you call people that are

11    registered as Democrats and independents; is that correct?

12    A.    Yes.

13    Q.    And you do a mail program?

14    A.    Yes.

15    Q.    A door-to-door program?

16    A.    Yes.

17    Q.    Is that the same as your canvassing?

18    A.    Yeah, canvassing is a another name for door-to-door.

19    Q.    You mentioned phone banks.  Is that the same as the

20    calls you mentioned earlier?

21    A.    Yes.

22    Q.    Is the Voter Bill of Rights part of your mail program?

23    A.    It would be part of the mail program, and we would also

24    post it on our website.

25    Q.    Okay.  Are there any other voter education programs that
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 238 of 263 PAGEID #: 1295
Case: 2:06-cv-00896-ALM-TPA Doc #: 656 Filed: 04/06/10 Page: 238 of 263 PAGEID #: 18990

Vol. 2 - 238

1    the Ohio Democratic Party has done?

2      A.    We post information on our website.  We've -- I know in

3    the past we've posted things on social media.  But phones,

4    canvassing and mail would be our main aspects.

5      Q.    Okay.  Great.

6            And then you mentioned that there was some Get Out the

7    Vote which sometimes you really can't separate from voter

8    education.

9            Is there anything different about your Get Out the Vote

10   efforts than your voter education efforts?

11     A.    Yeah.  I misspoke when I said that.  I was referring to

12   budgeting purposes, really.  But Get Out the Vote would be

13   telling people go vote.  You know, here's where you go vote and

14   that sort of thing.

15           Voter education would be more what you need to take with

16   you to the polls in terms of, you know, photo I.D., utility

17   bill, paystub, something like that, the I.D. requirement, and

18   what to do if you get a provisional ballot, what you need to

19   fill in the fields, that sort of thing.

20     Q.    Generally, what are your Get Out the Vote efforts?

21     A.    There would be phone banks aimed at encouraging people

22   to go vote to make a plan for when and where they're going to

23   go vote, whether it's early vote or at their polling place,

24   what time of day, are you going to go with your spouse, your

25   significant other or whatever.  That sort of thing.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 239 of 263 PAGEID #: 1296
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 239 of 263 PAGEID #: 23371

Vol. 2 - 239

1    Q.    Anything else besides calling people?

2    A.    We also do Get Out to Vote mailers.  The election is

3    coming up, here's your sample ballot with a list of candidates

4    we would like them to vote for.  We also do door-to-door

5    canvases as part of our Get Out the Vote effort.

6    Q.    Anything else?

7    A.    Again, social media.  But those would be the three most

8    significant aspects, I would say, the phones, door-to-door and

9    mail program.

10   Q.    So is it fair to say that it's the same type of program

11   or same type of activities as your voter education program,

12   just the substance is different?

13   A.    The substance is different.  We don't typically combine

14   education material with some of our Geo-TV, mail or in the same

15   phone calls.  We'll typically make different calls for it just

16   to cut down on length.

17   Q.    And going back to the voter education programs and your

18   telephone calls, did you do those telephone calls in 2008?

19   A.    I believe so, yes.

20   Q.    What about in 2012?

21   A.    2012, I know we did, yes.

22   Q.    And did the OD -- sorry.

23   Q.    Did the Ohio Democratic Party do the telephone calls for

24   the 2014 election?

25   A.    To a much smaller extent, yes.

Vol. 2 - 240

1    Q.    Are there plans to do that in 2016?

2    A.    Yes.

3    Q.    Did you do those for the primary this past Tuesday?

4    A.    Did we do?

5    Q.    Sorry, voter education programs for -- through telephone

6    calls?

7    A.    No, not to any extent that I'm aware of.

8    Q.    And no matter what happens with this litigation, you

9    will do telephone calls with regard to voter education?

10   A.    We will do telephone calls regardless; however, they

11   will not be the same type of telephone calls, nor will they

12   necessarily be aimed at the same audience.

13   Q.    Okay.  Same questions with your mail program, did you do

14   those in 2008?

15   A.    Yeah.  We do those every year.

16   Q.    And you'll plan on doing those in 2016?

17   A.    Yes.

18   Q.    That will be the case no matter what happens with this

19   litigation?

20   A.    Yes.  But, again, it will be a different universe that

21   we're sending to, and the substance will be different.

22   Q.    And your door-to-door canvassing, did you do that in

23   2012?

24   A.    Again, we do that every year, yes.

25   Q.    And you'll be doing that in 2016?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 241 of 263 PAGEID #: 1298
Case: 2:06-cv-00896-ALM-TPA Doc #: 656 Filed: 04/06/16 Page: 241 of 263 PAGEID #: 23598

Vol. 2 - 241

```
 1    A.   Yep.

 2    Q.   No matter what happens with this litigation?

 3    A.   Correct.

 4    Q.   And your website and the social media, did you do those

 5  in 2012?

 6    A.   Yes.

 7    Q.   2014?

 8    A.   Yes.

 9    Q.   And do you have plans to do those for 2016?

10    A.   Yes.

11    Q.   And that won't change -- that you will actually do that

12  will not change depending on this litigation?

13    A.   No.

14    Q.   And you mentioned that your voter education fluctuates,

15  the amount you spend on it or the time and the funds.  Is that

16  an accurate statement?

17    A.   Yes.

18    Q.   And I think you mentioned -- I may not have written it

19  down correctly.  You mentioned the money that you have

20  available, the candidates on the -- your Democratic ticket, and

21  then issues that are on the ballot.  Is there any other reason

22  that I'm missing?

23    A.   Also, the number of new voters versus current voters we

24  anticipate voting in the fall.  Of course, seeing a large

25  number of registrants, we're obviously going to be doing more
```

 1   of a voter education program for new voters.  The impact this

 2   litigation has is that it increases our voter education burden

 3   because we have to go back and reeducate voters we had

 4   previously educated due to the changes in the law.

 5     Q.   And you would do voter education on any change to the

 6   election law; isn't that correct?

 7     A.   What do you mean by any change?  I mean, if it's a

 8   technical thing where the Board of Elections -- an internal

 9   Board matter, we probably wouldn't bother voters with it or

10   something like that.

11     Q.   Would any change to the absentee ballot procedures,

12   would you have to do voter education on that?

13     A.   If it was an increased burden, yes.

14     Q.   What about provisional balloting?

15     A.   Again, if there was an increased burden or threshold on

16   the voter, yeah, we would have to educate them on that.

17     Q.   You mentioned that you also do some voter protection

18   activities?

19     A.   Yes.

20     Q.   Is that accurate?

21     A.   Yes.

22     Q.   And I think I got down that you have observers on

23   Election Day?

24     A.   Yes.

25     Q.   That you have a hotline?

1    A.   Yes.

2    Q.   And that there's regional and statewide boiler rooms, I

3    think you said?

4    A.   Yes.

5    Q.   Anything else that you do with regard to voter

6    protection?

7    A.   When possible we ask observers to note who is being

8    asked to vote provisionally.  This is typically only in

9    presidential years because we have a much larger program then.

10        And once we learn -- once we identify who was asked to

11   vote provisionally, we will follow up in targeted races, narrow

12   races where the outcome might change depending on provisional

13   ballots.  We will call as many of those voters as we can

14   identify and encourage them to reach out to the Board and make

15   sure that their ballot was counted.  Or if they have an I.D.

16   issue, to cure the issue.

17   Q.   And did you place observers in the 2012 election?

18   A.   Yes.

19   Q.   How about the 2014?

20   A.   Yes.

21   Q.   And do you have plans to place observers in the 2016

22   election?

23   A.   Yes.  We actually placed them in 15 Boards of Elections

24   on Tuesday.

25   Q.   Okay.  Great.

1          And you noted that you have the observers note

2     provisional voters, and you said you do that in just

3     presidential years?

4     A.    That's typically when we have the resources to do it,

5     yes.

6     Q.    And do you plan to do that in 2016?

7     A.    Yes.

8     Q.    And will that change depending on this litigation?

9     A.    Probably not.  That is more of a safety valve in case we

10    have narrow races.  However, the number of people who have I.D.

11    issues probably will change which would lessen our burden.

12    Q.    The I.D. -- the identification was in place prior to the

13    passage of 205 and 216; isn't that correct?

14    A.    Yes.

15    Q.    And you mentioned that you have a hotline?

16    A.    Yes.

17    Q.    And did you have that hotline in 2012?

18    A.    Yes.

19    Q.    Did you have that hotline in 2014?

20    A.    Yes.

21    Q.    Do you plan to have that in '16?

22    A.    Yes.

23    Q.    And that won't change based on this litigation?

24    A.    No.

25    Q.    And your regional and statewide boiler rooms, did you

```
 1    have those in 2012?

 2      A.    Yes.

 3      Q.    2014?

 4      A.    Yes.

 5      Q.    And did you have those in 2016?

 6      A.    We will, yes.

 7      Q.    Will you have them in 2016?

 8      A.    Yes.

 9      Q.    And that won't change depending on this litigation?

10      A.    No.

11      Q.    You mentioned that you -- that your party does a lot to

12    promote absentee voting; is that correct?

13      A.    Yeah.

14      Q.    And you focus -- that's a heavy part of your Get Out the

15    Vote effort?

16      A.    Yes.

17      Q.    And that is a strategy call for your party?

18      A.    What do you mean by strategy call?

19      Q.    To focus your efforts -- it's a strategy to focus your

20    efforts on absentee voting.

21            MR. McTIGUE:  I'm going to object on a First Amendment

22    basis.  When we get into what constitutes internal party

23    strategy, it's protected by the First Amendment.

24            THE COURT:  Sidebar.

25                         - - -
```

1      Thereupon, the following proceeding was held at sidebar out

2  of the hearing of the open courtroom:

3          THE COURT:  Go ahead, Mr. McTigue.

4          MR. McTIGUE:  Yes.  There's First Amendment protection

5  for political parties and political association rights, mostly.

6  When you're talking about internal party strategies or

7  specifics and such a specific amount of money that you're going

8  to dedicate, when you get beyond kind of generalities then the

9  First Amendment privilege kicks in.  We actually had this come

10  up in Judge Watson's case, and he ruled in a very well-reasoned

11  decision on this about the First Amendment privilege of the

12  party.

13          THE COURT:  Ms. Carwile, why is this even relevant?

14          MS. CARWILE:  It goes to standing, Your Honor.

15          THE COURT:  How?  Is standing one of your affirmative

16  defenses in this case?

17          MS. CARWILE:  Yes, it is, Your Honor.

18          THE COURT:  I don't recall that.  All right.  Go

19  ahead.

20          MS. CARWILE:  I'm not asking for specifics on his

21  voter -- he discussed the absentee voting in his direct

22  testimony.

23          THE COURT:  Because this case is about absentee

24  voting, in part.

25          MS. CARWILE:  Correct.

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

1          THE COURT:  So it would be hard not to -- you can't

2    use that as a basis to get into every aspect that -- of this,

3    some of which may even be protected.  So tell me why this

4    particular issue is germane?

5          MS. CARWILE:  It just goes to show that this was their

6    strategy and that this is their focus and that strategies can

7    change.  I'm not -- my -- I'm not asking more questions besides

8    was this a strategy.  I'm not going to go into any more detail

9    than that.

10          THE COURT:  I understand.  Your objection is

11   sustained.

12          MS. CARWILE:  Thank you.

13      (Back in open court.)

14          THE COURT:  Please continue, Ms. Carwile.

15          MS. CARWILE:  Thank you, Your Honor.

16   BY MS. CARWILE:

17    Q.   You also mentioned that you received calls from voters,

18    both regarding absentee ballots and provisional ballots; is

19    that correct?

20    A.   Yes.

21    Q.   And some of those calls relate to how to request an

22    absentee ballot; is that accurate?

23    A.   Yes.

24    Q.   And questions about they haven't received their ballot,

25    what should they do?

1    A.    Right.

2    Q.    And how to fill out their absentee ballot; is that

3    correct?

4    A.    They usually don't ask us how to fill it out, no.  They

5    ask us for a sample ballot, maybe, but they rarely ask us how

6    do I fill this out.

7    Q.    Fair enough.

8          Do you expect to get those calls in 2016?

9    A.    Yes.

10   Q.    And that wouldn't depend on this litigation?

11   A.    No.

12   Q.    And with regard to provisional ballots, you get calls

13   about people having to have voted provisionally?

14   A.    Yes.

15   Q.    And you expect to get those calls in 2016?

16   A.    Yes.

17   Q.    Okay.  And then on your -- you mentioned that there was

18   a burden because of 205 and 216 on your voter education

19   programs and something about having to reeducate voters.  Could

20   you explain that a little bit more, please?

21   A.    Sure.

22         Like I said, voters are creatures of habit.  Once they

23   become used to filling out something one way, changes such as

24   the additional new fields to that form will -- they'll be

25   surprised and probably confused by why do I have to do this

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 249 of 263 PAGEID #: 1306
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/18 Page: 249 of 263 PAGEID #: 1306

Vol. 2 – 249

 1   now, or they'll just assume it's optional and not fill it out.

 2   So when those changes are made, we have to go back and explain

 3   to the same people we just explained to here's how you fill

 4   this form out.  We will have to go back to them and say, oh,

 5   here's how you fill it out now; remember, there's these two

 6   fields.

 7   Q.   How do you choose the people you call for that?

 8   A.   Again, it's going to be registered Democrats or people

 9   who identify as likely to vote Democratic.

10   Q.   Okay.  And did you call people in 2014?

11   A.   Yes.

12   Q.   And it was based on these changes to the laws?

13   A.   Yes.

14   Q.   Is there anyone new that you would call in 2016 then?

15   A.   Yes.  We would call newly registered Democrats, newly

16   registered unaffiliated voters who we think are likely to vote

17   Democratic, and we provide them with education on what to do.

18   Q.   Wouldn't you have to call those voters no matter what?

19   A.   The new voters, yes.  The old voters, we would not have

20   to call as many if the changes weren't in effect.

21   Q.   You called those old voters, though, presumably in 2014;

22   would that be accurate?

23   A.   People identified as likely to vote in midterm, yes.  As

24   you recall, voter turnout was much lower in 2014.  We

25   anticipated that a head of time so there would be fewer calls

1     than there would be in a presidential year.

2       Q.    So you picked fewer people to call in 2014?

3       A.    We based it on their voting history.  A number of people

4     will only vote in presidential elections so we'll have a much

5     larger universe of people we would need to reach out to again

6     this time to explain the changes that have happened since 2012.

7             MS. CARWILE:  Your Honor, I don't believe he has a

8     copy of the defense exhibits.  Would he be able to get the

9     second binder of the defense exhibits?

10            THE COURT:  Do you have that loose exhibit?

11            MS. CARWILE:  I do, but it's multiple pages,

12    Your Honor.

13            THE COURT:  Are you going to have him look at all the

14    pages or just select pages from that?

15            MS. CARWILE:  Just select pages.  However, this is

16    their interrogatories, and I would like to establish that these

17    are accurate.

18            THE COURT:  All right.

19            THE WITNESS:  I'm sorry, what was the exhibit number?

20    BY MS. CARWILE:

21      Q.    Exhibit No. 26, please.

22            If you can just take a moment to flip through those

23    pages and see if you recognize it.

24      A.    Okay.

25      Q.    Do you recognize this document?

1    A.   Yes.  It appears to be the interrogatories we filed in

2    this case.

3    Q.   If you could turn to page 5 of the interrogatories.

4    A.   All right.

5    Q.   Is the answer to number one in Zachary West, is that

6    you?

7    A.   Yes.

8    Q.   So did you provide the answers to these interrogatories?

9    A.   Yes.

10   Q.   And these appear to be an accurate copy of the

11   interrogatories?

12   A.   Yes.  An accurate copy?

13   Q.   A true and accurate copy.

14   A.   Yes.

15        MS. CARWILE:  Your Honor, I would like to admit

16   Defendant's Exhibit 26.

17        THE COURT:  Any objection, Mr. McTigue?

18        MR. McTIGUE:  No.  No objection, Your Honor.

19        THE COURT:  So please proceed, Ms. Carwile.

20   The exhibit will be admitted.  Exhibit 26 will be

21   admitted.

22        MS. CARWILE:  Thank you, Your Honor.

23   BY MS. CARWILE:

24   Q.   And I have a few questions about the last couple of

25   bullet points in here.  So if you could turn to page 22, or if

Vol. 2 - 252

1   you want to look on the screen, whichever is easier for you.

2     A.   All right.

3     Q.   And the first one says:  No absentee ballot may be

4   rejected on the basis of failure to complete all five fields

5   when a Board of Elections is otherwise able to determine that

6   the ballot was cast by a qualified elector.

7          Did I read that correctly?

8     A.   Yes.

9     Q.   Are you suggesting that as long as there's at least one

10  identifying piece of information that allows the Board to know

11  the voter, that that would be sufficient?

12    A.   I'm sorry, to what the voter?

13    Q.   If all they put on was a name, would that be sufficient?

14    A.   If they can identify that that ballot was cast by a

15  qualified elector and that the elector actually cast that

16  ballot, I think that should be sufficient, yes.

17    Q.   But just having a name, would that enable someone to

18  know whether that elector cast that ballot?

19    A.   I think you would have to ask a Board of Elections

20  official that.

21    Q.   All right.  And with regard to provisional ballots it

22  states:  No provisional ballot may be rejected on the basis of

23  failure to complete all five fields when a Board of Elections

24  is otherwise able to determine that the ballot was cast by a

25  qualified elector.

1          Did I read that correctly?

2     A.    Yes.

3     Q.    And for this one are you also saying that as long as

4    there's at least one identifying piece of information, that

5    that should be sufficient?

6     A.    I think what we are saying in this one is the same thing

7    as we said in the last one, that when a Board of Elections is

8    able to determine that a qualified elector who otherwise would

9    be able to vote casts that ballot, that they should not be

10   disenfranchised due to technical defects such as an empty

11   field.

12    Q.    Is it also important to make sure that the person

13   casting that ballot is that person?

14    A.    Yes.  But, again, if the Board has enough information,

15   our position is that that person should be able to vote

16   regardless of whether they are -- they have met the technical

17   requirements or not.

18    Q.    I understand that.  I'm just making sure that -- it is a

19   valid concern that the person casting the ballot is who they

20   say they are.

21    A.    Yes.  And I think we agree with that.  And we say in

22   here that the Board of Elections is otherwise able to determine

23   that the ballot was cast by a qualified elector.

24    Q.    Okay.  Thank you.

25          And then on the last page -- I'm sorry, not the last

1   page, but page 23.

2     A.   Uh-huh.

3     Q.   Is says that one of your requests is a unified poll book

4   must be used in each multi-precinct polling place, such that a

5   voter attempting to cast a ballot at the correct polling

6   location will not be deemed to be in the wrong precinct and

7   required to cast a provisional ballot.

8       Did I read that correctly?

9     A.   Yes.

10     Q.   Is that still your goal for this litigation?

11     A.   Yes.

12     Q.   And was that also your goal in a prior litigation by the

13   Ohio Democratic Party --

14       MR. McTIGUE:  Let me let her finish the question.

15       THE COURT:  Complete your question, Ms. Carwile.

16  BY MS. CARWILE:

17     Q.   I was also asking if that was a goal in a different

18   case, the Ohio Democratic Party versus Husted that was tried in

19   November of 2015?

20       MR. McTIGUE:  Objection, Your Honor.  I don't see the

21   relevance of that here.

22       THE COURT:  Sustained.

23       MS. CARWILE:  May I confer?

24       THE COURT:  Yes, you may.

25       MS. CARWILE:  No further questions, Your Honor.

1      THE COURT:  Any redirect, Mr. McTigue?

2          Thank you, Ms. Carwile.

3          MR. McTIGUE:  Just one moment, Your Honor.

4                  REDIRECT EXAMINATION

5    BY MR. McTIGUE:

6     Q.   Mr. West, just a couple of questions.

7          Ms. Carwile asked you a series of questions regarding

8    activities conducted by the party, voter education, voter

9    protection, Get Out the Vote activities --

10    A.   Uh-huh.

11    Q.   -- for various years and whether or not the party

12   intended to conduct similar activities this year.

13         And the question -- and the question that I have for you

14   is whether or not these laws would impose a greater burden on

15   ODP with respect to those activities that Ms. Carwile asked you

16   about?

17    A.   With respect to voter education and voter protection, I

18   think they would.  With voter education, certainly, we will

19   have to go back and educate voters who only vote in

20   presidential elections, particularly in areas that see a higher

21   percentage of provisional ballots either because the population

22   is more transient, they are less likely to have I.D., or

23   whatever reason.  We will have to go back and educate those

24   voters as to what they can expect when they go to the polls

25   this time due to the changed laws.  Otherwise, we would not

1  have to conduct as large a voter education program, and we

2  would have more resources, particularly more federal resources,

3  which as I previously discussed are limited, to conduct our

4  core mission of registering voters, getting people out to vote.

5     Q.   And I think -- I don't remember the exact question that

6  you were asked by Ms. Carwile, but part of your response had to

7  do with the party's activities when there's a close election;

8  in other words, after the polls close on Election Day.

9     A.   Uh-huh.

10    Q.   What activities -- or how do these laws that we're

11  talking about relate to the party's involvement with

12  post-election?

13            MS. CARWILE:  Objection; beyond the scope.

14            THE COURT:  I agree.  Sustained.

15            MS. CARWILE:  Thank you.

16            MR. McTIGUE:  I have no further questions then,

17  Your Honor.  Thank you.

18            THE COURT:  Thank you, Mr. McTigue.

19        Ms. Carwile, do you have anything further?

20            MS. CARWILE:  Nothing further, Your Honor.

21            THE COURT:  Mr. West, thank you very much, sir.  You

22  may be excused.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  Mr. McTigue, that will conclude our

25  business for today.

1     How many witnesses remain on the Plaintiffs' witness

2     list at this point?

3          MR. CHANDRA:  You mean in total, Your Honor?

4          THE COURT:  Yes.

5          MR. CHANDRA:  It would take us a little while to find

6     an answer for that because we've been eliminating people that

7     we don't need anymore.

8          THE COURT:  How many do you have on tap for tomorrow?

9          MR. CHANDRA:  So, Your Honor, we have three on tap for

10    tomorrow.  And I'm glad you asked because one of the things we

11    wanted to advise the Court is we had originally been relying on

12    the Court's scheduling order about Fridays being off so when we

13    learned Monday night that that was not the case we were, you

14    know, scrambling to move things to try to fill up Friday.  So

15    we're not certain at this point that we're going to wind up

16    having a full day of witnesses for Friday despite our best

17    efforts.  And so one of our suggestions was going to be -- we

18    haven't had a chance to talk to opposing counsel -- is if the

19    Court wants to start a little later at 9:00, we can do that,

20    but that's kind of where we are with respect to Friday, is the

21    three witnesses.

22         THE COURT:  I understand.

23         MR. CHANDRA:  Sorry about that.  We should be better

24    off next Friday.

25         THE COURT:  It's not a problem, but I want you to be

Vol. 2 - 258

1    clear, and I think that the record should be clear, that Friday

2    was going to be an off day when we thought that this was going

3    to be a two-week trial.  And you'll recall that you told us

4    something quite the contrary later.  And because the Court has

5    a two-month trial that -- that's a criminal trial that's

6    scheduled to begin on April 4, I have to be done with this

7    trial no later than April 1.  So in order to accommodate that,

8    we have to go every day of the week, including Friday.  And I'm

9    not going to -- depending on how we go, I'm looking into the

10   possibility of some Saturday sessions since we don't have a

11   jury.  That's because we have to get this done.  I don't right

12   now foresee that as a likelihood because you are calling

13   witnesses from your list and we're avoiding duplicative or

14   cumulative testimony, but given the compelling issues and the

15   fact that we need to get this done -- this is not one of those

16   cases where we can take two months off and then resume after my

17   first trial because whatever -- if a decision is made that is

18   going to impact in an affirmative way or in a way that may

19   require the Secretary and his Boards of Elections to take some

20   additional steps in preparation for the November election, that

21   needs to be done sooner rather than on the eve of the election.

22   So, you know, we will have to go as we will have to go.

23          Now, having said that, tomorrow we have the investiture

24   of Magistrate Judge Kim Jolson.  That investiture lasts from --

25   will last from approximately 1:30 until -- I would say that it

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

1   will last from probably 1:30 at least until 2:30 because a

2   number of judges are speaking, and we are lawyers at our core

3   and, which Ms. Coulter will attest, means that we have many

4   words that we need to convey.

5        So we will convene tomorrow morning at 8:30 in Judge

6   Frost's courtroom.  We are convening at 8:30 instead of 9:00,

7   Mr. Chandra, because Judge Frost has a criminal calendar at

8   noon so we have to be out of there at 11:45 at the absolute

9   latest.  Originally I was going to have Judge Watson's

10  courtroom, but at the time on Monday when we -- when we made

11  the agreement, he was still in trial but thought that he would

12  be done by now.  He's not so he has to have his own courtroom.

13  And I could use Judge Sargus' courtroom, but his courtroom is

14  serving as the overflow courtroom for this trial.  So we just

15  have, you know, a perfect storm.  So we'll work until 11:45,

16  we'll take an extended lunch.  I'll ask everybody to be back in

17  Judge Frost's courtroom by, you know, 2:30 so that we can

18  resume.  We're going to resume as soon as -- as soon as the

19  investiture is completed, and I would like to work until 5:00.

20  So as would be said, bring me your witnesses.

21       MR. CHANDRA:  Okay.  We will do that, Your Honor.

22       There's one other thing that I would like to advise you

23  of that I haven't had a chance to or with opposing counsel with

24  respect to this whole Friday issue.

25       Before we started trial I had offered Judge Polster in

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 260 of 263 PAGEID #: 1317
Case: 2:20-cv-03843-MHW-KAJ Doc #: 656 Filed: 04/06/16 Page: 260 of 263 PAGEID #: 2942

Vol. 2 - 260

1    Cleveland, who is doing a mediation in a very sensitive matter

2    for Judge Oliver Friday, April 1, and that got scheduled with

3    the parties and lawyers coming from around the country.  So I

4    wanted the Court to just be aware that I have that obligation,

5    I can't change it.  I'm going to work with my co-counsel to try

6    to -- assuming we're still, you know, trying to wrap up on that

7    day, you know, I'm going to try to work with them on that, but

8    I just wanted everybody to be aware of that, with the Court's

9    permission.

10           THE COURT:  I mean, there are -- there are four of

11   you -- there are five of you on the Plaintiffs' side who

12   represent the Plaintiffs.  So if you are out, Mr. Chandra,

13   I'm -- I have no doubt that your colleagues will carry the

14   banner forward.  And so I understand, and you are excused for

15   that day.

16           MR. CHANDRA:  Okay.  Thank you, Your Honor.

17       Then I also want to report I'm never this optimistic at

18   this point in a trial, but actually we do believe that we have

19   covered a lot more territory than we thought we would by now.

20   And, particularly with the Court's facilitation on the

21   stipulations, we do think that we're going to be able to pick

22   the pace up and avoid duplicative testimony over the course of

23   next week.  So we actually feel that even though we have a lot

24   still more to introduce, we do feel that we have made good

25   progress in the case.

```
 1          THE COURT:  Okay.  I have every optimism that we

 2   will -- well, we have -- we have eleven more trial days, and

 3   that's not even counting Saturdays.  So if we count Saturdays,

 4   we have at least 13 more trial days and so, you know, I will

 5   make a determination sometime during the week of the 21st

 6   whether the 26th of March and April 2 will also be trial days.

 7   I'll make that determination in conjunction with counsel.  Not

 8   in conferring with counsel, but in conjunction with counsel in

 9   the sense that if you all are moving along at a clip that looks

10   like we'll be able to finish on the first, we won't have to.

11   But if we have the kind of delays that we had with the one

12   witness, I'm just going to make -- I'm going to make a sua

13   sponte decision for Saturday sessions.

14          Ms. Richardson?

15          MS. RICHARDSON:  Yes, Your Honor?

16          THE COURT:  Anything from the Defense?

17          MS. RICHARDSON:  No, Your Honor.  Thank you.

18          THE COURT:  Thank you.

19          Now, for tomorrow's witnesses, are there any Board of

20   Election -- current Board of Election personnel who are

21   scheduled to be here?

22          MS. GENTRY:  Yes, Your Honor.  All three witnesses

23   are, I believe, current personnel of Boards of Elections.

24          THE COURT:  Okay.  So since we kind of have a good

25   sense now how to move through these examinations with dispatch,
```

1    I'll leave it to counsel -- we're ending early for us today,

2    almost an hour earlier than we ended yesterday.  It's only

3    5:15.  So I will ask counsel to confer with one another so we

4    can get on top of the documents and we'll know what documents

5    you can stipulate to and which ones there will have to be

6    further examination on.

7            MS. GENTRY:  Yes, Your Honor.

8            THE COURT:  So we're all square on the boxes being

9    moved because they have to come in here this evening and set

10   up.

11           MS. GENTRY:  Yes, Your Honor.

12           THE COURT:  And I don't know if any of you have ever

13   observed an investiture, but if you get the opportunity to see

14   Judge Jolson's investiture, I would urge you to observe it if

15   there is space and you otherwise have time.

16        Thank you very much, everyone, for working so

17   cooperatively and collaboratively both among yourselves and

18   with the Court so we could continue to move with some dispatch

19   while at the same time not sacrificing quality.

20        (Proceedings concluded at 5:17 p.m.)

21                         - - -

22

23

24

25

Exhibit E, NEOCH v. Husted Trial Tr. Vol. II

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-5 Filed: 09/12/20 Page: 263 of 263 PAGEID #: 1320
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 263 of 263 PAGEID #: 23949

Vol. 2 – 263

1      C E R T I F I C A T E

2

3          We do hereby certify that the foregoing is a true and

4    correct transcript of the proceedings before the Honorable

5    Algenon L. Marbley, Judge, in the United States District Court,

6    Southern District of Ohio, Eastern Division, on the date

7    indicated, reported by us in stenotypy and transcribed by us or

8    under our supervision.

9

10                         s/Denise Errett, FCRR
                           Denise Errett, FCRR
11                         Official Federal Court Reporter

12                         s/Darla J. Coulter, RMR
                           Darla J. Coulter, RMR
13

14                         DATE:  March 21, 2016

15

16

17

18

19

20

21

22

23

24

25