Vol. 6 – 1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3     THE NORTHEAST OHIO COALITION )
       FOR THE HOMELESS, et al.,    )
 4                                  )
                       Plaintiffs,  )
 5                                  )
                vs.                 )      CASE NO. 2:06-CV-00896
 6                                  )
       JON HUSTED, in his official  )
 7     capacity as Secretary of     )
       State of Ohio, et al.,       )
 8                                  )
                       Defendants.  )
 9     _____)

10
                 TRANSCRIPT OF BENCH TRIAL – VOLUME 6
11        BEFORE THE HONORABLE ALGENON L. MARBLEY, JUDGE
                 WEDNESDAY, MARCH 23, 2016; 8:30 a.m.
12                       COLUMBUS, OHIO

13
       APPEARANCES OF COUNSEL:
14

15     FOR THE PLAINTIFFS:              SUBODH CHANDRA, ESQ.
                                        CAROLINE GENTRY, ESQ.
16                                      DONALD J. McTIGUE, ESQ.
                                        SANDHYA GUPTA, ESQ.
17                                      ANA CRAWFORD, ESQ.

18     FOR THE DEFENDANTS:              RYAN L. RICHARDSON, AAG
                                        SARAH E. PIERCE, AAG
19                                      TIFFANY L. CARWILE, AAG
                                        BRODI J. CONOVER, AAG
20                                      ZACHERY P. KELLER, AAG

21     COURT REPORTERS:                 DENISE N. ERRETT
                                        DARLA J. COULTER
22                                      (614) 719-3029

23
       Transcript recorded by mechanical stenography, transcript
24     produced by computer.

25
```

Vol. 6 – 2

1                         I-N-D-E-X

2                         VOLUME 6

3

4     PLAINTIFFS' WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

5     JEFFREY TIMBERLAKE          --       4       19        --
      JOCELYN BUCARO              65       29       --        85
6     NINA TURNER                 87       --       --        --
      LAVERA SCOTT               232      190       --       243
7     NINA TURNER                 --      253      261        --
      BRIAN SLEETH               287      272       --        --

8

9

10                        – – –

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 6 —   3

1          (In Columbus, Franklin County, Ohio, Wednesday, March 23,

2     2016, 8:30 a.m., in open court.)

3              THE COURT:  Good morning, everyone.

4          Mr. Keller, are you ready to proceed with your cross?

5              MR. KELLER:  Yes, Your Honor.

6                             - - -

7                     JEFFREY TIMBERLAKE,

8          HAVING BEEN PREVIOUSLY DULY SWORN, FURTHER TESTIFIED AS

9     FOLLOWS:

10                      CROSS-EXAMINATION

11     BY MR. KELLER:

12     Q.    Good morning, Dr. Timberlake.

13     A.    Good morning.

14     Q.    When we left off yesterday, we were on Plaintiffs'

15     Exhibit P1194, on page PTF212.  Will you let me know when

16     you're there?

17     A.    Yes.

18     Q.    And I will cut directly to the chase.  Are you aware

19     that there are math errors in the 2008 and 2010 percentage

20     columns for ballots rejected?

21     A.    When you made me aware of that yesterday, I went and

22     double-checked.  And, yes, there are some errors.

23     Q.    I'd like you to turn two pages, now, to your Table 7 on

24     page PTF-214, or 58, of that report.

25     A.    Yes.

Vol. 6 —   4

1    Q.   And are you aware that the number of ballots you're

2    reporting as rejected for 2014 is about 500 higher than what

3    were reported to the Secretary?

4    A.   That, I am not aware of.  And I didn't -- so I didn't

5    double-check that.  I could double-check it, you know, at some

6    point.  But that -- that, I was not aware of.

7    Q.   But you don't have any reason to doubt the Secretary's

8    numbers, do you?

9    A.   Only if I were to -- I would want to see the number and

10   then see what I did to calculate it and if there was some

11   differences in the data that I had, you know, whether there was

12   a calculation error, whether there was just a difference in the

13   data that I had versus what the Secretary has.

14   Q.   Okay.  All right.  I'd just like to speak to you, now

15   more generally, about the Calculus of Voting.  I know you had

16   talked about how you're familiar with the broader category

17   of -- I believe it's rational choice theory?

18   A.   That's correct.

19   Q.   And Calculus of Voting is a subset of that theory,

20   correct?

21   A.   That's the way I think of it, yes.

22   Q.   But you've never taught a course specifically on the

23   Calculus of Voting, correct?

24   A.   Correct.

25   Q.   You've never written a paper specifically on the

1   Calculus of Voting, correct?

2     A.    That's correct.

3     Q.    And you've never used the Calculus of Voting prior to

4   your work in these cases, correct?

5     A.    Correct.

6     Q.    And am I right that you don't know enough about the

7   specific Calculus of Voting theory to tell me whether there is

8   a standard set or list, things political scientists would

9   consider in evaluating voting costs?

10    A.    I would be surprised if there were a standard set.  But

11  if there were, I don't think that I could list them.  So, I

12  could speculate on what I think they would be, but I don't

13  think that I would be able to report what the average political

14  scientist would include in the Calculus of Voting.

15    Q.    All right.  I want to walk you through some Calculus of

16  Voting hypotheticals.  And for each of them, I'm going to give

17  you two states, State A and State B.  And I want you to assume

18  that, other than the specific differences I describe, there are

19  no other differences in the voting systems of those states.  Do

20  you understand the scenario I'm setting up?

21    A.    Yes.

22    Q.    All right.  And the ultimate question is going to be the

23  same each time:  Which state system, on the whole, imposes a

24  lower voting cost under the Calculus of Voting?  Do you

25  understand?

Vol. 6 —   6

1    A.    Yes.

2    Q.    All right.  So, for the first scenario, State A does not

3    allow absentee voting in person without an excuse, whereas

4    State B allows no-excuse absentee voting in person for all

5    voters.  Which state has the lower cost?

6    A.    State B would in that scenario.

7    Q.    For the second one, State A does not allow absentee

8    voting by mail without an excuse, whereas State B does allow

9    absentee voting by mail without an excuse?

10   A.    State B would have the lower cost in that scenario.

11   Q.    And for the third scenario, State A requires all voters

12   to provide a government-issued photo identification with

13   voting, whereas State B requires all voters to provide some

14   form of identification but allows options, including but not

15   limited to the photo ID option?

16   A.    State B would have the lower cost, according to the

17   Calculus of Voting.

18   Q.    Am I right in thinking that, under the Calculus of

19   Voting, the more voting options a person has, the lower the

20   cost?

21   A.    That's correct, because they would have a wider variety

22   of ways of voting.  And that would reduce the cost of any one

23   method.

24   Q.    And are you aware that Ohio voters all get to choose

25   between Election Day voting, early in-person voting, and early

1  voting by mail?

2    A.   I am aware, yes.

3    Q.   So they can choose whatever option they think imposes

4  the lowest cost on them, correct?

5    A.   That may or may not be why they choose those options.

6  But they do have options, yes.

7    Q.   And to make sure I'm clear, if they feel like one of

8  these options imposes too many costs based on their scenario,

9  they can choose a different one?

10   A.   According to the Calculus of Voting, which does focus

11  very much on cost, yes.

12   Q.   I would like to talk to you a little bit about your

13  Senate Factor Five analysis.  Am I correct that you did not --

14  in your September report, you didn't conduct any analysis on

15  whether the inequalities that you highlighted have actually

16  affected voter turnout?

17   A.   That's correct.

18   Q.   And so your report doesn't actually include any analysis

19  linking the Senate factor -- five factors to any decrease in

20  voter participation, correct?

21   A.   Correct.

22   Q.   Would you concede that minority turnout would at least

23  be one thing you would want to look at in understanding whether

24  socioeconomic disparities have actually hindered minority

25  participation in the voting process?

 1   A.    Well, let me start by saying that my understanding of

 2   the Senate factors was less that it was a call to identify

 3   specific factors that directly prohibit minorities or another

 4   protected group from voting, but, rather, the context in which

 5   voters vote.  And, then, in terms of turnout, this is where I

 6   depart a little bit from the Calculus of Voting framework,

 7   because there are an awful lot of other things that factor into

 8   a person's actual voting behavior than simply their own

 9   personal socioeconomic characteristics.  But I would not be --

10   in general, I don't think it would be unreasonable to look at

11   turnout as something that one might be interested in.

12   Q.    So, to go back to my question, if you did want to try

13   and see if there is a link between socioeconomic disparities

14   and whether those have hindered minority-voter participation,

15   minority turnout is something you might want to look at?

16   A.    Yes, I would concede that.

17   Q.    And, similarly, your discussion within your Senate

18   Factor Five analysis does not include any discussion of African

19   American or minority turnout in recent elections in Ohio,

20   correct?

21   A.    I think that's correct.

22   Q.    I'd like to have you turn to page 38 of your September

23   report.  And that is going to be PTF194.

24   A.    Yes.

25   Q.    Here, you include the Subsection C on voter ID laws?

Vol. 6 –    9

1    A.    Yes.

2    Q.    And in that first sentence, you talk about how, in 2006,

3    Ohio passed an ID system where voters provide their name,

4    current address, and some form of identification, correct?

5    A.    Yes.

6    Q.    And that was 2006, correct?  So, before the challenged

7    laws?

8    A.    Correct.

9    Q.    Now, in that next sentence, you -- and I'm going to read

10   the first part of the sentence -- you use the phrase "Recent

11   statistical analyses demonstrate that states such as Ohio

12   passing restrictive voter ID laws ..."

13        Did I read that portion of the sentence correct?

14   A.    Yes.

15   Q.    And, now, am I right in thinking you haven't actually

16   done anything to evaluate whether Ohio's identification laws

17   are restrictive in comparison with other states?

18   A.    That's correct.

19   Q.    For example, you didn't study any other states voter

20   identification laws, correct?

21   A.    Correct.

22   Q.    And is it fair to say, then, if I'd asked you to put

23   Ohio on a continuum of least restrictive states to most

24   restrictive, you wouldn't know where it fell?

25   A.    That's probably correct, yes.

Vol. 6 - 10

1    Q.   So, would you concede, then, to the extent this sentence

2    suggests you're making any determination about the

3    restrictiveness of Ohio ID laws, that's an improper reading of

4    the sentence?

5    A.   I think that, if I had had the chance to write the

6    sentence over again, I think I would just scratch the term

7    "such as Ohio," because I think that Ohio is clearly a state.

8    So it's kind of redundant.

9         So the findings from the research are that states

10   passing -- that there's a correlation between the passage of

11   restrictive voter ID laws and the variables that are mentioned

12   in the sentence.  So "such as Ohio," in some sense, is kind of

13   extraneous in that sentence.

14   Q.   And that research you're citing in that sentence is

15   national research, correct?

16   A.   Yes.  I'm sorry.  Yes.

17        THE COURT:  Could I have a side-bar for a moment?

18     (Thereupon, the following proceeding was held at side-bar.)

19        THE COURT:  All right.  Here is my question, as the

20   finder of fact.  And, you know, under -- Would somebody get

21   that page -- Never mind.  I can get it.

22        The sentence reads -- I think this is the same sentence,

23   isn't it?  "Recent statistical analyses demonstrate that states

24   such as Ohio passing restrictive voter ID laws over the last

25   six to seven years are those that, one, have higher

Vol. 6 - 11

1    minority-population representation and, two, that had higher

2    minority and low-income voter turnout in 2008."  Is that the

3    sentence?

4            MR. KELLER:  That is the sentence, Your Honor.

5            THE COURT:  Okay.  Would you read back Mr. Keller's

6    question?

7        (The last question was read by the court reporter.)

8            THE COURT:  Here is my concern:  Under 106, when you

9    read half the sentence and -- you read half the sentence in the

10   record -- did you intend just to read half the sentence, and

11   then ask the question about half the sentence?

12           MR. KELLER:  I believe -- Sorry.  I believe, in my

13   phrasing of the sentence, it was very clear that I said this

14   portion of the sentence.  I'm happy to read the rest into the

15   record, though.  That's fine.

16           THE COURT:  Because, as a fact-finder, I'm not going

17   to read half that sentence.

18           MR. KELLER:  No, I understand.

19           THE COURT:  But before I want to ask you about it, I

20   want to make sure that I'm not taking something out of context.

21   But it would help me if I knew what -- If you're going to

22   extract from this witness what he knows about this sentence, I

23   want to know what he knows about the entire sentence.

24           MR. KELLER:  Absolutely.

25           THE COURT:  And not because -- Half the sentence

1  doesn't mean anything, because that's not what the sentence

2  says, because it's just half.  So I don't want you to leave him

3  resting on half of a sentence.  I want the whole sentence.

4         MR. KELLER:  Okay.

5         THE COURT:  And you have the advantage of me, acting

6  as a juror, telling you this is not what I need.  I don't need

7  to know what half the sentence means because, if I take

8  something -- if I take half the sentence, I may take it out of

9  context.  If I take the whole sentence and you cross-examine

10  him on the whole sentence, that will be more beneficial to the

11  Court as the fact-finder.

12         MR. KELLER:  Absolutely, Your Honor.

13         THE COURT:  All right.

14     (The following proceedings were had in open court.)

15         THE COURT:  Mr. Keller, please continue.

16  BY MR. KELLER:

17  Q.   Dr. Timberlake, on the whole page, I want to make sure

18  we have that full sentence in the record that we were talking

19  about.  It reads:  "Recent statistical analyses demonstrate

20  that states such as Ohio passing restrictive voter ID laws over

21  the last six to seven years are those that, one, have higher

22  minority-population representation and, two, that had a higher

23  minority and low-income voter turnout in 2008."  Did I read

24  that sentence correctly?

25  A.   I trust that you did, but I closed the pages.  Could you

Vol. 6 - 13

```
 1    tell me what page we're on again?  I'm sorry.

 2      Q.    I'm sorry.

 3            THE COURT:  194.

 4    BY MR. KELLER:

 5      Q.    PTF194.

 6      A.    Okay.

 7            Yes.

 8      Q.    And you were saying that, if you had that sentence to

 9    write over again, you would take the "such as Ohio" out?

10      A.    Right.  As I read it now, it seems extraneous, because

11    Ohio is a state.  So it seems fine just to say "states."

12            So, there's a correlation across states.

13      Q.    And the research you're citing in that sentence did

14    national studies, correct?

15      A.    I think that's correct, yes.

16      Q.    And so they weren't just focusing on Ohio?

17      A.    That is correct.

18      Q.    And you haven't done any study of Ohio's restrictiveness

19    in comparison to other states?

20      A.    That's correct.

21      Q.    And you wouldn't say that all laws that require some

22    form of identification are restrictive, would you?

23      A.    No, I would not say that.

24      Q.    And if a state were to provide a number of

25    identification options, that would make it less restrictive in
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 14 of 296 PAGEID #: 1334
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/03/16 Page: 14 of 296 PAGEID #: 29324

1    comparison to a state that provides fewer, correct?

2    A.    Yes.    That's similar to the hypothetical you raised

3    before.

4    Q.    All right.    I'd like to have you turn now to page 41.

5    So PTF197.

6    A.    Yes.

7    Q.    And in this subsection, C, you go over -- you provide

8    five examples of racial appeals in Ohio, correct?

9    A.    Yes.

10   Q.    And these were five examples that you took from -- I'm

11   sure I'm going to butcher this pronunciation -- Dr. Roscigno's

12   report?

13   A.    Roscigno, yes.    And, yes, that is where the examples

14   came from.

15   Q.    You'd admit -- Let's say, since 2000, you would admit

16   that there has been a large number of political campaigns in

17   Ohio, correct?

18   A.    Yes.

19   Q.    And is it also fair to say that, in that time frame,

20   there has been a large number of political rallies in Ohio?

21   A.    Yes.

22   Q.    And your analysis of racial appeals in this section

23   isn't meant as a comprehensive analysis of political campaigns

24   in Ohio?

25   A.    No.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 15 of 296 PAGEID #: 1335
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 15 of 296 PAGEID #: 29825

1    Q.    Or political rallies in Ohio?

2    A.    No.

3    Q.    I'd like to have you turn now to page 45.

4         THE COURT:  PTF201, for the record.

5    BY MR. KELLER:

6    Q.    And in Subsection D, you're focusing on Senate Factor

7    Seven with regard to minority representation?

8    A.    Yes.

9    Q.    Am I right in this section you are including information

10   from the 19th Century?

11   A.    Yes.  I think Table 3 discusses the number of African

12   Americans ever elected.  So, it's not totally clear what the

13   time frame is, but it's meant to be since the position was

14   available in the State of Ohio.

15   Q.    But is there information that's included in your tables

16   that goes back to the 1800s?

17   A.    Yes.

18   Q.    Would you concede that in a study about the impact of a

19   recent election law on the success of minorities in reaching

20   public office, data from recent years would be more important

21   than data from the 19th Century?

22   A.    To be honest, I don't know how courts apply this factor

23   when considering the context in which politics takes place in a

24   given jurisdiction.  So, if a court were trying to figure out

25   the specific impact of a specific law at the current moment,

 1   then that -- your question makes sense, or the implication of

 2   your question makes sense.  If the Court was trying to figure

 3   out the, sort of, broader historical context in a state, then

 4   it seems like the historical context would make sense.  But I

 5   simply don't know how courts apply this particular factor in

 6   this case, or in any case, really.

 7       Q.   On that same PTF201, if you look towards the -- if you

 8   look on the last paragraph, the first sentence, you do concede

 9   that Ohio has made significant progress, when it comes to

10   minority representation, at State and federal levels,

11   historically, and especially since the 1960s.  Did I read that

12   correctly?

13       A.   Yes.

14       Q.   Let's turn to Table 3 in that section.  So that's going

15   to be on the next page, PTF202.

16       A.   Yes.

17       Q.   And, in this table, you didn't include any column

18   showing the number of African Americans who have run for any of

19   these offices, correct?

20       A.   That's correct.

21       Q.   So the table doesn't include any type of success ratio,

22   correct?

23       A.   Correct.

24       Q.   I'd like to have you jump to page 49.  So that's going

25   to be PTF205.  This is your Senate Factor Nine analysis,

1    correct?

2       A.    Yes.

3       Q.    And that deals with the justifications for -- potential

4    justifications for the law?

5       A.    Yes.

6       Q.    You wrote this in September, before you knew about the

7    NEOCH case, correct?

8       A.    Correct.

9       Q.    And you mention at numerous times -- yes.  You mention

10   at multiple times in this section the NAACP case, correct?

11      A.    It looks like it's mentioned twice, yes, at least twice.

12      Q.    And are you aware that the NAACP case involved a

13   challenge to Ohio's early voting calendar?

14      A.    I think that I am aware of that, yes.

15      Q.    And that calendar is not at issue in this case?

16      A.    Yes.

17      Q.    Am I right that there is no specific reference to Senate

18   Bills 205 and 216 in this section?

19      A.    I think that's correct, yes.

20      Q.    And I believe we covered this yesterday, but just to

21   make sure, is it fair to say that you haven't performed any

22   independent analysis of the specific justifications in this

23   case?

24      A.    That's correct.

25      Q.    I have down, from yesterday, that in your direct you had

Vol. 6 – 18

1   mentioned that for Senate Factors One, Two, Three, Six, and

2   Seven you relied on Dr. Roscigno's report?

3       A.   More heavily than Senate Factor Five is the way I think

4   I phrased it, yes.

5       Q.   And that's because the Factors involved in Senate Factor

6   Five you were more familiar with in comparison to those other

7   factors?

8       A.   That's correct.

9       Q.   And am I right that if we were to do a comparison

10  between that NAACP case report and your report in this case, it

11  wouldn't just be that you followed his report, it would be

12  that, various sections, you copied his words, correct?

13      A.   That's correct.

14          MR. KELLER:  May I have a moment to consult, Your

15  Honor?

16          THE COURT:  Yes, you may.

17     (Whereupon, there was a brief interruption.)

18          MR. KELLER:  No further questions, Your Honor.

19          THE COURT:  Thank you, Mr. Keller.

20       Mr. McTigue, any redirect?

21          MR. McTIGUE:  Yes, Your Honor.

22       Your Honor, as an initial matter, it occurs to me that I

23  may have forgotten, at the end of the direct testimony

24  yesterday, to move into exhibit -- or into

25  admission -- Plaintiffs' Exhibit 1195, which is Dr.

Vol. 6 – 19

1    Timberlake's rebuttal report to Dr. Hood.

2              THE COURT:  Any objection, Mr. Keller?

3              MR. KELLER:  No, Your Honor.

4              THE COURT:  1195 will be received.

5              MR. McTIGUE:  Thank you.

6                            - - -

7                      REDIRECT EXAMINATION

8      BY MR. McTIGUE:

9      Q.    Okay.  Dr. Timberlake, do you recall Mr. Keller asking

10    you a number of questions yesterday concerning the tables in

11    your reports both as to usage rates and rejection rates of

12    absentee ballots and provisional ballots?

13     A.    Yes.

14     Q.    Okay.  And those tables provide usage and rejection

15    rates as to minority and white voters, correct?

16     A.    Not specifically of minority and white voters, but the

17    analyses of the correlation between percent minority in the

18    county.  And then the attempt is to infer from that the

19    disproportionate usage and rejection of these ballots by

20    minorities, themselves, relative to whites.

21     Q.    And you recall questions yesterday, as well, from Mr.

22    Keller where he asked about trends from one election to

23    another?

24     A.    Yes.

25     Q.    Okay.  And do you recall, as well, him asking you if you

1   were, in these tables, attempting to measure the impact of the

2   specific changes in the absentee and provisional voting

3   requirements enacted by Senate Bills 205 and 216?

4        A.   I do recall it, yes.

5        Q.   Okay.  Do you recall what your response was to that?

6        A.   I believe that I said it was not to measure the specific

7   impact.

8        Q.   So, if it wasn't to measure the specific impact of the

9   changes in the law, what was the purpose of those analyses?

10       A.   The purpose was to assess, as I think about it as a

11  demographer, the extent to which minorities are at risk of

12  having their votes be counted impacted by the law.  So, for

13  reasons that I've discussed, I think yesterday, but I can

14  elaborate on, I think that the only real way to test the

15  specific impact of those laws would be a way in which we would

16  require data that we simply don't have.  And so what I've been

17  saying in some of my rebuttal reports is that the defense

18  experts' focus on that, I think, is misguided.

19           And so what I think makes more sense is to have other

20  testimony, other ways in which the Court can gather information

21  about the impact other than the kind of statistical analysis

22  that I'm performing.  So what I'm trying to show -- what I'm

23  trying to answer is the question of whether there appears to be

24  any correlation at all between percent minority and, let's say,

25  the rejection of provisional ballots.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 21 of 296 PAGEID #: 1341
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/03/20 Page: 21 of 296 PAGEID #: 29623

Vol. 6 - 21

```
 1          I don't know enough about how the Court would make a
 2   decision about the impact of the law.  But when I was going
 3   into the research, it made sense to me that if there was no
 4   relationship ever at any time between minorities and voting in
 5   these ways, then in some ways it would be hard to see how there
 6   could be a disparate impact, even though there may be an impact
 7   on all voters.
 8          So, the logic of the argument is, if the way in which
 9   the law impacts voters is by making it harder for specific
10   categories of voters to vote -- and, by "that category," I mean
11   the less educated, less literate, poorer and so forth -- those
12   are all characteristics which are correlated with race and the
13   idea that is, if minorities are more likely to use these voting
14   methods and more likely, already, to have their ballots
15   rejected, then it would stand to reason that these burdens
16   would be disproportionately concentrated on minorities
17   themselves.
18   Q.   So, Dr. Timberlake, is it fair to say that, in terms of
19   the statistical analysis reflected in the tables in your
20   reports, the bottom line there is showing a disproportionate
21   rejection rate for provisionals based on race?  "By race," I
22   should say.
23          MR. KELLER:  Objection, Your Honor.  Leading.
24          THE COURT:  Sustained.  Rephrase.
25          MR. McTIGUE:  Certainly.
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 22 of 296 PAGEID #: 1342
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/03/16 Page: 22 of 296 PAGEID #: 29836

Vol. 6 - 22

```
 1          MR. KELLER:  Thank you, Your Honor.

 2    BY MR. McTIGUE:

 3    Q.    Bottom line, can you tell us what those tables show?

 4    A.    Well, the bottom line is that, particularly in terms of

 5    the rejection of provisional ballots and, to some degree, in

 6    terms of the rejection of absentee ballots, there -- in many of

 7    the years, but not all -- I think 2014 was an outlier, or an

 8    exception -- in most years, there was a positive correlation

 9    between the percent minority in the county and the rejection

10    rate of provisional and absentee ballots.  Controlling for a

11    number of characteristics, that might be alternative

12    explanations for why you would see that correlation.  So the

13    evidence that is indicative of -- What the evidence shows is

14    that there is a positive relationship between percent minority

15    and these rejection rates.  And an inference that one could

16    draw from that is that the reason that that correlation exists

17    is because minorities in high-minority counties are using these

18    ballots and having their ballots rejected at higher rates.

19    Q.    And, to be clear, by "positive relationship," you mean

20    higher rate?

21    A.    Yes.  So, a positive correlation in statistics means

22    that, as one variable gets bigger, the other variable tends to

23    get bigger, too.  So, as the percentage of minorities rises in

24    a county, the rate of rejection of provisional ballots also

25    tends to go up, and vice versa.
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 23 of 296 PAGEID #: 1343
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 23 of 296 PAGEID #: 29851

Vol. 6 - 23

1    Q.    And if the Court were to -- Well, if the Court were to

2    conclude that any of the specific changes enacted in Senate

3    Bills 205 and 216 were resulting in rejection of provisional or

4    absentee ballots, what would be your conclusion as to the

5    likely racial impact of that?

6    A.    In general, if it could be established that the changes

7    in the law increase the likelihood of provisional or absentee

8    ballots being rejected, then it would stand to reason

9    that -- and particularly if the reasons for those rejections

10   had to do with something about the voters' own characteristics,

11   like their education level or their literacy or something like

12   that, then it would stand to reason that the laws would

13   disproportionately impact the group that has more disadvantage

14   on those characteristics, such as education, literacy, poverty,

15   income, and things like that.

16        So, the logic of what I've been talking about is that,

17   if the -- if the way in which Senate Bills 205 and 216 impact

18   voters is by making it harder for the less educated and the

19   less literate to vote correctly, let's say, then, logically,

20   statistically, it would stand to reason that that impact would

21   be visited upon the group that has less of education, less

22   literacy.  And, in the State of Ohio and in many other states,

23   that group would be African Americans, compared to whites.

24   Q.    And, as a sociologist, do you study societal factors

25   such as education, poverty, residential, mobility, literacy,

1    automobile ownership and any disparity regarding those factors

2    by race?

3              MR. KELLER:  Objection.  Compound.

4              THE COURT:  Sustained.  It's the conjunctive "and"

5    that floored you, Mr. McTigue.

6              MR. McTIGUE:  Yes.  Let me --

7              THE COURT:  Rephrase your question.

8              MR. McTIGUE:  -- rephrase the question.

9      BY MR. McTIGUE:

10     Q.    So, Dr. Timberlake, as a sociologist, do you study

11    societal factors such as education, poverty, residential

12    mobility, literacy and automobile ownership?

13     A.    I study factors like that.  I have not specifically

14    studied automobile ownership or literacy, but the other ones

15    you mentioned I have.

16     Q.    Okay.  And do you study those factors in relationship to

17    whether there's any disparity among those factors by race?

18     A.    Yes.  That has been the topic of most of my research.

19     Q.    Now, you were also, I think, asked by Mr. Keller

20    yesterday -- Let me back up one second.  You've already stated

21    that you answered Mr. Keller's questions yesterday that your

22    statistical analysis was not measuring the impact of the

23    changes in the laws directly, correct?

24     A.    That's correct.

25     Q.    Okay.  And that would be -- Well, do you recall

Vol. 6 - 25

1  questions from Mr. Keller yesterday about you weren't measuring

2  positive changes or negative changes?

3      A.   Correct.  I do recall that, yes.

4      Q.   And do you recall, as well -- Well, strike that.

5           Again, bottom line, from your perspective, if there is a

6  rejection rate of provisionals or absentees that that -- that

7  rejection rate, without knowing what it's specifically due to,

8  still accounts for what?

9      A.   I'm not sure I understand the question.  Perhaps you

10  could --

11     Q.   Certainly.  You indicated that you recalled -- and I

12  agree, that question was pretty bad.  You did state that you

13  recall answering questions yesterday about you were not

14  evaluating either negative or positive impacts from the laws at

15  issue in this case.

16     A.   Yes.

17     Q.   Okay.  However, your statistical analysis, both

18  pre-implementation and post-implementation of these laws, still

19  shows rejection rates, correct?

20     A.   Yes, with some exceptions that I think we discussed

21  yesterday.  Not every year shows what I would consider to be a

22  strong relationship between county-percent minority and

23  rejection rates.  But, in general, particularly in presidential

24  election years, there appears to be a fairly strong

25  relationship between, especially, provisional ballot rejection

1    and county-percent minority.

2       Q.    Now, I want to also ask you, based on some questions

3    that Mr. Keller asked yesterday, your report in the present

4    case, which is Plaintiffs' Exhibit P1194, incorporates the

5    report that you filed in the OOC case, correct?

6       A.    That's my understanding, yes.

7       Q.    And, in the OOC case, you had also filed two errata

8    statements to that report, correct?

9       A.    Correct.

10      Q.    Okay.  And those errata statements are incorporated with

11   the report that you are filing in this case, correct?

12      A.    Correct.

13      Q.    Okay.  Now, with regard to the -- and you were asked

14   some questions yesterday about this, about the -- I don't

15   remember if you were asked or if you volunteered it, but you

16   gave some explanation about the two errata statements.

17            My question is, again, more bottom line.  Did those

18   corrections that are set forth in the errata statements change

19   any of the conclusions that you reached in the report in the

20   OOC case?

21      A.    The bottom line is no.  The first erratum was simply to

22   correct the alignment of some rows in Table 1.  So, it was

23   unrelated to the analysis entirely.  It was a presentation

24   error, essentially.

25            The second erratum had to do with some slight changes in

1    the way in which I calculated the county poverty rates.  And,

2    by assigning a cutoff of 15 percent poverty in a county to put

3    a county in a high poverty group or a low poverty group, that

4    caused three counties to change groups from the earlier

5    analysis, or the earliest version of Table 1, to the latest

6    version of Table 1 in the OOC report.

7            Those counties are all very small in population, and so

8    they don't contribute very much to the overall results that you

9    would get.  They're something like -- Two of the counties were

10   less than one percent of Ohio's population, and the other

11   county was something like 1.2 percent.  And, so, when you

12   switch those three counties into different groups, it just

13   doesn't impact the analysis appreciably.

14           THE COURT:  Did the second erratum in any way change

15   your conclusion, Doctor?

16           THE WITNESS:  No, it did not.  And I think it states

17   as much in that erratum.  I think the very last sentence of

18   the, sort of, paragraph in that mentions that.

19           MR. McTIGUE:  Your Honor, may I have a moment?

20           THE COURT:  And I want to understand.  Those two

21   errata statements relate to Judge Watson's case, the OOC case;

22   am I correct?

23           THE WITNESS:  That's correct.

24           THE COURT:  And were there any errors to be corrected

25   in your report in this case, which is 1194?

1          THE WITNESS:  Not that I'm aware of.

2          THE COURT:  All right.

3       Go ahead, Mr. McTigue.

4          MR. McTIGUE:  May I have a moment?

5          THE COURT:  Yes.

6      (Whereupon, there was a brief interruption.)

7          MR. McTIGUE:  No further questions, Your Honor.

8          THE COURT:  Any recross, Mr. Keller?

9          MR. KELLER:  No, Your Honor.

10          THE COURT:  All right.  Thank you very much, Dr.

11   Timberlake.

12          THE WITNESS:  Thank you, Your Honor.

13        (Witness excused.)

14          MS. CRAWFORD:  The Plaintiffs call Jocelyn Bucaro.

15        (Witness sworn.)

16          MR. McTIGUE:  Your Honor, may I approach and retrieve

17   some of the exhibits?

18          THE COURT:  Yes, you may.

19       Ma'am, bend the microphone towards you and speak clearly

20   into it, please.

21          THE WITNESS:  Okay.

22          THE COURT:  Please proceed. Ms. Bucaro.

23          MS. CRAWFORD:  Thank you, Your Honor.

24                           - - -

25

```
 1                    JOCELYN BUCARO,

 2      AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

 3                    CROSS-EXAMINATION

 4      BY MS. CRAWFORD:

 5      Q.   Mrs. Bucaro, thank you for coming up today from Butler

 6      County.  I understand it's election season, so you have a lot

 7      going on.

 8           Could you please state your full name for the record?

 9      A.   Jocelyn Bucaro.

10      Q.   And what is your current position?

11      A.   Deputy Director of the Butler County Board of Elections.

12           THE COURT:  Ms. Bucaro, would you spell your last name

13      for the record, please?

14           THE WITNESS:  Sure.  B-u-c-a-r-o.

15           THE COURT:  All right.

16      BY MS. CRAWFORD:

17      Q.   And how long have you been with the Board of Elections?

18      A.   Four-and-a-half years.

19      Q.   Has that always been as the Deputy Director?

20      A.   I was hired originally as Director, and was appointed

21      Deputy Director four years ago.

22      Q.   Okay.  And what are your duties in your current

23      position?

24      A.   Together with the Director, we manage the office at the

25      Board of Elections, carry out the duties proscribed in the Ohio
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 30 of 296 PAGEID #: 1850
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 30 of 296 PAGEID #: 23830

Vol. 6 - 30

 1   Revised Code to register voters, prepare for the -- prepare

 2   ballots, accept candidate filings, test voting equipment,

 3   prepare for an election, hire precinct election officials, all

 4   of the duties proscribed in the Revised Code.

 5     Q.    Thank you.

 6          MS. CRAWFORD:  And, Your Honor, as an initial matter,

 7   I would like to introduce the stipulated exhibits.  And Mr.

 8   Conover can correct me, but they are Plaintiffs' Exhibit 973

 9   through 987, Exhibits 1747 through 1998 --

10          THE COURT:  Wait.  1747 through 1998?

11          MS. CRAWFORD:  Yes, Your Honor.  And then Plaintiffs'

12   Exhibits 3925 through 3930.

13          THE COURT:  So, Mr. Conover, 973 through 978 --

14          MS. CRAWFORD:  987.

15          THE COURT:  I'm sorry.  I was looking at 987, and I

16   read something different.  Imagine how that happens.

17          1747 through 1998 and 3925 through 3930.

18          Mr. Conover, is there any objection to the admission of

19   those exhibits?

20          MR. CONOVER:  No objection, Your Honor.

21          THE COURT:  All right.  Thank you very much.

22          MR. CONOVER:  Thank you.

23          THE COURT:  Ms. Crawford, please continue.

24          MS. CRAWFORD:  Thank you.

25     BY MS. CRAWFORD:

Vol. 6 — 31

1    Q.   Ms. Bucaro, what is your understanding -- Well, first I

2    should ask, are you familiar with the requirements for absentee

3    and provisional ballots?

4    A.   Yes.

5    Q.   And what is your understanding of the information a

6    voter must provide on a provisional ballot form in order for

7    that ballot to count?

8    A.   They have to provide their printed name, their current

9    address, their date of birth, one form -- a proper form of

10   identification, including a Social Security number, last four

11   digits, an Ohio driver's license or State ID number, or show a

12   copy of a utility bill or other form of identification

13   proscribed, and provide their signature.

14   Q.   And do you know whether any of these required categories

15   are the result of recent changes in the law?

16   A.   Yes.

17   Q.   And which of these?

18   A.   The date of birth, current address -- and current

19   address are the two new pieces of information.

20   Q.   And that's the 2014 change?

21   A.   Correct.

22   Q.   Okay.  And, just briefly, would you describe the Butler

23   County Board's process for reviewing provisional ballots in the

24   office?

25   A.   The Board has a policy directing the staff of the Board

Vol. 6 - 32

1   of Elections to provide a review of provisional ballot

2   envelopes to determine whether or not the voter was eligible to

3   cast a ballot in the election.  That includes two checks by a

4   Democrat staff person and a Republican staff person in our

5   office.  We review the envelope for completion.  Whether or not

6   there is any information on the face of the envelope that's

7   missing that's required, that would be noted.  We then look the

8   voter's registration up in our voter registration database to

9   determine whether or not the voter was registered in Butler

10  County.  And if we don't locate them in Butler County, we'll

11  look them up in the statewide voter registration database to

12  determine if they're registered anywhere else in the State of

13  Ohio.

14       If we determine that the voter was registered in Butler

15  County, we then determine whether or not their current address

16  is a valid address in the County.  And we also determine

17  whether or not the voter cast any other form of ballot, meaning

18  an absentee ballot, in Butler County in the election.

19       We'll also determine whether or not the voter cast the

20  ballot in the correct precinct or polling location based on

21  their current address.

22       If the voter was determined to be registered in a

23  different county, we will contact that county to determine

24  whether or not the voter cast a ballot in that county, as well

25  as this -- for this election.

1    If we determine that the voter cast only this ballot in

2 this election, was eligible, resides at the address they

3 listed, you know, cast the ballot in the correct location,

4 everything was completed properly, we'll recommend to the Board

5 that the ballot be counted. And if any of that information is

6 determined to be inaccurate or invalid, then we would recommend

7 the ballot not be counted.

8    Q.  Let me try and break that down a little bit.

9    A.  Yeah.

10    Q.  So, when the Board is actually reviewing the

11 recommendations, do they look at the actual provisional ballot

12 envelopes themselves, or do they look at a report?

13    A.  They do not look at the ballots, the provisional ballot

14 envelopes for ballots that we recommend to be counted. They do

15 review the face of the envelope on ballots that are determined,

16 or recommended, not to be counted.

17    Q.  So, all of the ones that you recommend to be not

18 counted, the Board will look at each envelope individually?

19    A.  They'll -- Yes. They don't always look at each

20 envelope. If we determine a voter was not registered anywhere

21 in the State of Ohio, generally, they'll look at that as a

22 category of envelopes; and they won't necessarily review each

23 individual envelope. But for other categories in which voters

24 votes won't be counted, they'll look at individual envelopes.

25    Q.  Okay. And you talked a little bit about that review

 1  process.

 2     A.    Uh-huh.

 3     Q.    Let me show you --

 4           THE COURT:  Before you proceed, Ms. Crawford, I need

 5  to make sure that Ms. Clark has the stipulated exhibits.

 6           (Brief pause in the proceedings.)

 7           THE COURT:  Thank you, Ms. Crawford.  Please continue.

 8           MS. CRAWFORD:  Yes.

 9           THE COURT:  Incidentally, quick question for you,

10  Ms. Bucaro.  Has Butler County ever undertaken, prior to the

11  enactment of either Senate Bill 205 or 216, any studies to

12  determine whether there was voter fraud?

13           THE WITNESS:  We have under directive by the Secretary

14  of State, and we have not found that to be -- we have found one

15  instance where a voter cast a ballot in Butler County and in

16  Hamilton County in the same election.  And that voter was

17  referred to the Prosecuting Attorney's Office and, I believe,

18  was charged.

19           THE COURT:  Okay.  In which election was that?

20           THE WITNESS:  It was before I started.  I believe it

21  was 2010.

22           THE COURT:  And the directive came from the Secretary

23  of State to conduct some type of survey to determine whether

24  there was voter fraud?

25           THE WITNESS:  In that case, no.  But in subsequent

Vol. 6 - 35

 1  elections, there have been directives from the Secretary of

 2  State's Office.

 3          THE COURT:  And what do those directives require you

 4  to do?

 5          THE WITNESS:  They required us to determine whether or

 6  not any voter may have committed voter fraud.  And, if so, the

 7  Board can determine in a public meeting whether or not to refer

 8  those instances to our prosecuting attorney.  And the directive

 9  also asks us to determine whether or not there were any

10  instances of voter suppression, as well, and refer those in the

11  same way.

12          THE COURT:  And what did you understand, or what do

13  you understand, voter suppression to mean?

14          THE WITNESS:  Voter intimidation, efforts to prevent a

15  voter who otherwise is eligible to vote from voting.

16          THE COURT:  Were these directives passed down to your

17  Board before the enactment of either 205 or 216, to your

18  knowledge?

19          THE WITNESS:  I believe the first one came after the

20  2012 election.  So, yes.

21          THE COURT:  Okay.  But that was the only one?

22          THE WITNESS:  Yeah.  I believe -- yeah.  Uh-huh.

23          THE COURT:  And what did that first directive require

24  you to do?

25          THE WITNESS:  To look for both instances of voter

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 36 of 296 PAGEID #: 1356
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 36 of 296 PAGEID #: 23850

Vol. 6 - 36

1   suppression and voter fraud.

2          THE COURT:  Did it delineate how you were to go about

3   looking for voter suppression or voter fraud?

4          THE WITNESS:  To my recollection, no, hu-uh.

5          THE COURT:  But Butler County never conducted any

6   independent surveys or analyses to determine whether there was

7   voter fraud?

8          THE WITNESS:  The only -- the only survey we would

9   have conducted would have been, through the provisional review

10  process, if a voter was found to have voted in both our county

11  and in a different county, then that would be the only review.

12         THE COURT:  Right.  All right.

13       Please continue, Ms. Crawford.

14       MS. CRAWFORD:  Thank you, Your Honor.

15  BY MS. CRAWFORD:

16  Q.   Just a couple of questions about what Judge Marbley

17  asked you about.  With respect to the voter who voted in both

18  Hamilton and Butler County, were both of those votes ultimately

19  counted?

20  A.   I believe they were, yes.

21  Q.   Both votes were counted?

22  A.   Uh-huh.

23  Q.   Okay.

24         THE COURT:  Was that voter voting by provisional

25  ballot?  Did he or she?

Vol. 6 - 37

1      THE WITNESS:  It was before I was appointed.

2      THE COURT:  Oh, I see.

3      THE WITNESS:  It was before I was involved.  So,

4  without looking again at the facts of the case, I can't speak,

5  for sure, whether or not it was a provisional ballot the voter

6  cast.

7      MS. CRAWFORD:  Okay.

8   BY MS. CRAWFORD:

9   Q.   And if you'd take a look, this is the form you spoke

10  about about provisional review where each reviewer makes

11  notations on the back of the provisional ballot envelope,

12  correct?

13  A.   Yes, that's correct.

14  Q.   And, so, it states the party of the reviewer and the

15  items they reviewed in that checklist, correct?

16  A.   Correct.

17  Q.   And then, ultimately, it gives a reason why that

18  provisional ballot should be valid or invalid, correct?

19  A.   Correct.

20  Q.   Okay.  And I'll come back to this particular one, but I

21  just wanted to provide an example.

22      THE COURT:  While you're doing that, Ms. Crawford, Mr.

23  McTigue, a young lady just came into the courtroom.  Do you

24  know whether she is one of your witnesses?

25      MR. McTIGUE:  Yes.

1    BY MS. CRAWFORD:

2    Q.    And with respect to that form, does the Board of

3    Elections see the provisional ballot review form?

4    A.    Yes.

5    Q.    So, they see that form when they're making their

6    decision about the particular provisional ballots?

7    A.    Yes.

8    Q.    Okay.  Now, when a voter is actually voting a

9    provisional ballot and filling out the associated affirmation

10   form, do you instruct precinct election officials to look to

11   see whether a form is complete prior to leaving a polling

12   place?

13   A.    Yes.

14   Q.    And the poll-worker -- you actually have a process in

15   Butler County where the poll-worker is required to affix their

16   signature on the receipt from the electronic poll books,

17   correct?

18   A.    Yes.

19   Q.    And could you explain that process for me, please?

20   A.    So, we have used electronic poll books now for four

21   years in Butler County.  And our electronic poll books have a

22   printer.  When a voter is checked in on the ePoll book, if the

23   voter is found to be a provisional voter for whatever reason,

24   the poll-workers print a receipt and circle the voter's

25   precinct where they should vote.  And they initial that receipt

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 39 of 296 PAGEID #: 1359
Case: 2:08-cv-03898-ALM-TPK Doc #: 660 Filed: 04/03/12 Page: 39 of 296 PAGEID #: 23547

Vol. 6 - 39

 1    before sending the voter to the provisional area or to the

 2    correct polling location.

 3         The provisional check-in judges then are instructed to

 4    advise the voter on filling out the provisional form, make sure

 5    they give the voter the correct precinct envelope that matches

 6    the precinct on that receipt.  The voter then completes the

 7    envelope per the instructions, and then the poll-workers are

 8    instructed -- two poll-workers are instructed to review the

 9    form for completion and initial the receipt before taping it to

10    the back of the provisional envelope.

11    Q.   Thank you.  And what is the purpose of the poll-workers

12    signing that receipt?

13    A.   If we find that a provisional envelope was not completed

14    properly by the voter, we will review which poll-workers

15    reviewed that particular envelope.  And we may not ask them to

16    return, or we may retrain them.  We'll -- We'll use that as a

17    skills assessment for our poll-workers.

18    Q.   So it's to identify which, if any, poll-workers are

19    making errors?

20    A.   Yes.

21    Q.   Okay.  And if there are, in fact, information -- there

22    is information missing on the provisional ballot envelopes, you

23    aren't permitted to contact the voters, via phone or e-mail, to

24    correct that information, correct?

25    A.   That's correct.

1    Q.    And that's by directive?

2    A.    Yes.

3    Q.    And Board members from Butler County have even requested

4    that you contact these voters, correct?

5    A.    Yes.

6    Q.    But you're unable to do so, per directive?

7    A.    Correct.

8    Q.    But you are permitted to contact voters after the

9    election has been certified for additional information for

10   registration purposes, correct?

11   A.    Yes.

12   Q.    Could you explain this distinction?

13   A.    No.  I don't know that I can explain.  The distinction

14   between contacting them before the election is certified and

15   after?

16   Q.    Right.  Is it simply just you're only allowed to contact

17   them for registration purposes?

18   A.    Well, as we are with any other voter registering to

19   vote, we are permitted to contact them if they did not provide

20   a required piece of information on their registration form.

21   We're actually required to contact them for the missing

22   information.

23   Q.    So you're required to contact them for missing

24   information after the election has been certified?

25   A.    Yes.

Vol. 6 -  41

1 Q. But you cannot contact them prior to certification to

2 ask about questions you might have on their individual form?

3 A. As I understand the directive, yes.

4 Q. Okay.  Now, with respect to the date-of-birth field, the

5 law allows Boards to accept ballots despite a date-of-birth

6 mismatch or omission by a vote of three Board members, correct?

7 A. Yes.

8 Q. And is this true for provisionals, as well as absentees?

9 A. Yes.

10 Q. And what is your understanding of this exception?

11 A. My current understanding is that it applies to the month

12 and day of a voter's birthdate; that if the month or day does

13 not match the voter registration record, that the Board, by a

14 vote of three members, can accept that provisional ballot for

15 counting.

16 Q. And the Board can still verify the identity of

17 individuals who leave their date of birth off of provisional or

18 absentee envelopes, correct?

19 A. In most cases, yes.

20 Q. And prior to this law, you were still -- prior to this

21 law which added the date-of-birth field, your office was able

22 to identify voters before the date-of-birth requirement,

23 correct?

24 A. Yes.

25 Q. But now the Board is required to reject ballots with

1    missing date of births that under the previous laws they would

2    not have had to reject, correct?

3      A.   Yes.

4      Q.   Now, this is Plaintiffs' Exhibit 1764.  And, here, the

5    vote was rejected due to date of birth error, correct?  I can

6    show you the next page.

7            THE COURT:  You mean the ballot was rejected?  You

8    said "the vote."  The ballot was rejected?

9            MS. CRAWFORD:  Yes.

10   BY MS. CRAWFORD:

11     Q.   This is the form on the back.

12     A.   Yes.

13     Q.   And if you -- The bottom line -- I don't know if you can

14   read it -- but it says the BMV has her date of birth as

15   7-27-50, although her registration card says 7-25-50, correct?

16     A.   Uh-huh.

17     Q.   And the voter provided --

18           THE COURT:  When you said "uh-huh," you mean "yes"?

19           THE WITNESS:  Yes.  I'm sorry.  Yes.

20           THE COURT:  That's all right.

21           MS. CRAWFORD:  Thank you, Your Honor.

22   BY MS. CRAWFORD:

23     Q.   And the voter provided her date of birth on the

24   provisional envelope as 7-27-50, correct?

25     A.   Yes.

Vol. 6 -  43

1    Q.    But despite this discrepancy in the system, this was not

2    resolved in favor of the voter, correct?

3    A.    Yes.

4    Q.    It was -- Rather, it was provided to us as one of the

5    provisional ballots that was ultimately not counted, correct?

6    A.    Yes.

7    Q.    And if you take a look at the form, it appears the voter

8    was found to not currently be registered by the first reviewer,

9    correct?

10   A.    Correct.

11   Q.    But the second reviewer was able to find that voter in

12   your system, correct?

13   A.    It appears that way, yes, uh-huh.

14   Q.    And because her date-of-birth field was incorrect, or

15   there were multiple date-of-births contained within your

16   system, could the inability to find her by the first reviewer

17   have been because they used the voter's date of birth to search

18   for that voter?

19   A.    It's possible, yes.

20   Q.    So more fields for your office also have the possibility

21   of introducing more errors into your database, correct?

22          MR. CONOVER:  Objection, Your Honor.

23          THE COURT:  Basis, Mr. Conover?

24          MR. CONOVER:  Speculation.

25          THE COURT:  Well, as the Deputy Director of the Butler

Vol. 6 — 44

1    County Board of Elections, I believe that Mrs. Bucaro will be

2    in a position to answer that question, given her

3    responsibilities, position, and experience.  So your objection

4    is overruled.

5         You may answer, Ms. Bucaro, if you know.

6           MR. CONOVER:  Thank you, Your Honor.

7           THE WITNESS:  In a case like this, yes, it could.

8           MS. CRAWFORD:  Thank you.

9    BY MS. CRAWFORD:

10   Q.   Now, with respect to the address field on provisional

11   ballots, when a voter is required to vote a provisional ballot,

12   prior to a voter even receiving that provisional ballot from a

13   poll-worker, a voter would have had to provide a current

14   residence to that poll-worker verbally, correct?

15   A.   Yes.

16   Q.   And you testified the poll-worker then will circle the

17   correct precinct on the receipt, correct?

18   A.   Yes.

19   Q.   So, only after that poll-worker has confirmed the

20   correct precinct is a provisional voter provided with the

21   provisional ballot, correct?

22   A.   Yes.

23   Q.   And because of this process, there isn't a concern that

24   a voter is voting in the improper precinct based on that

25   address, correct?

Vol. 6 - 45

1    A.    No.  That's very rare in Butler County.

2    Q.    Okay.  Now, now that address is a required field on

3    provisional ballot envelopes, you've had approximately 24

4    voters whose ballots were rejected based on the address field

5    between 2014 and 2015 elections, correct?  I can show you

6    the --

7    A.    I'm going to say, based on your knowledge of looking at

8    our records and the records that we've provided, I will say

9    that sounds about right.

10   Q.    Okay.  Well, I can show you the certification form.

11   A.    Thank you.

12   Q.    This is Plaintiffs' Exhibit 3926.  And if you look at

13   B6, that says seven voters failed to provide the current

14   address, correct?

15   A.    Yes.  And this was for 2014, or '15?

16   Q.    2014.

17   A.    Okay.

18   Q.    And this is Plaintiffs' Exhibit 3928.  And it's for

19   2015, correct?

20   A.    Uh-huh, yes.

21   Q.    And, in B6, it says 17 voters failed to provide a

22   current address, correct?

23   A.    Yes.

24   Q.    Okay.  And many of these voters actually were rejected

25   in Butler County due to an invalid address, correct?

1  A.   Yes.

2  Q.   And what does it mean when the address is invalid?

3  A.   It means that the address could not be verified as a

4  valid address in Butler County in our voter registration

5  system.

6  Q.   And is this in the directive that requires you to check

7  whether or not the address is valid?

8  A.   I'm not sure that it specifies specific address points

9  being confirmed in our voter registration database.  To my

10  knowledge, I -- I don't know.

11  Q.   But this is the process your office goes through when

12  processing provisional ballots?

13  A.   Correct.  Our system is connected to our county GIS

14  mapping system.  And we use address points for our voter

15  registration, rather than address ranges.

16  Q.   And do you ever check to make sure -- other databases to

17  make sure a residence is valid?

18  A.   Yes, always.

19  Q.   And what databases are those?

20  A.   The County Engineer's Office and the County Auditor's

21  Office.

22  Q.   Okay.  Do you ever check Google Maps?

23  A.   No.  That's -- No.

24  Q.   Do you ever go out to the property to see if it's a

25  valid address?

Vol. 6 -  47

1    A.    Not when reviewing provisional ballots.

2    Q.    Okay.  This is Plaintiffs' Exhibit 1747.  And if I turn

3  to the second page, you can see this provisional ballot was

4  rejected for an invalid address, correct?

5    A.    Yes.

6    Q.    But the voter did fill in that address field, correct?

7    A.    Yes.

8    Q.    And I will represent to you that I went to Google Maps

9  for this voter, and it does come up as a valid address.  But

10  despite it coming up as valid, if it doesn't come up in your

11  search of the GIS database or Auditor's Office, then you're

12  required to reject it, correct?

13          MR. CONOVER:  Objection, Your Honor.

14          THE COURT:  Just a second.

15      Mr. Conover?

16          MR. CONOVER:  Objection, Your Honor.

17          THE COURT:  What's your basis?

18          MR. CONOVER:  Counsel was testifying.

19          THE COURT:  I'm sorry.  I think I misheard you.  What

20  is your legal basis, Mr. Conover?

21          MR. CONOVER:  She had said that she had gone to the

22  Google Maps herself and was giving that testimony.

23          THE COURT:  This is cross-examination, as you know,

24  Mr. Conover.  Ms. Crawford is allowed to lead.  I think that

25  that information was put in context to the question.

1        And you are right, generally.  While the editorial

2   remarks 99.9 percent of the time would be stricken, in the

3   context of this question, I'm going to allow that opening

4   sentence to stand.

5        MR. CONOVER:  Thank you, Your Honor.

6        THE COURT:  Your objection is noted, but overruled.

7        MR. CONOVER:  Thank you, Your Honor.

8        THE COURT:  You may answer, Ms. Bucaro, if you know.

9        THE WITNESS:  Because we're asked to determine whether

10  the voter provided a current address, if we can't determine

11  whether the address is valid, then we would reject the ballot.

12  BY MS. CRAWFORD:

13  Q.   Okay.  This is Plaintiffs' Exhibit 1749.  And this

14  particular provisional ballot was also rejected for address

15  reasons, correct?

16  A.   Yes.

17  Q.   And, again, it appears the voter lists a full address,

18  correct?

19  A.   Yes.

20  Q.   But when your staff looked it up, they could not find

21  this address?

22  A.   Correct.

23  Q.   And are you aware there is an Oxford Reily Road in

24  Butler County?

25  A.   Am I personally aware?  No.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 49 of 296 PAGEID #: 1369
Case: 2:06-cv-00896-ALM-TPK Doc #: 360 Filed: 04/03/16 Page: 49 of 296 PAGEID #: 23657

Vol. 6 - 49

1    Q.   I think it's only two letter -- there is a road that's
2    only two letters off.  So if the voter only misspelled his
3    street address, is this something that your office would
4    correct?
5    A.   Yes.  We would not discount because of a misspell.
6    Q.   Okay.  And how would this be caught in your search?
7    A.   We would have searched, in multiple ways, for this
8    address point.
9    Q.   Okay.  Do you remember the particular places that were
10   searched for for this particular ballot?
11   A.   I do not.  I did not take part in this search.
12   Q.   Okay.  This is Plaintiffs' Exhibit 1753.  And this
13   voter's provisional ballot was also rejected for an invalid
14   address, correct?
15   A.   Yes.
16   Q.   And the voter wrote on the address line "Hope Mission,"
17   correct?
18   A.   Yes.
19   Q.   And do you know that Hope Mission is a homeless shelter?
20   A.   Yes.
21   Q.   And this voter wrote the name of the homeless shelter in
22   the street address line, correct?
23   A.   Yes.
24   Q.   And, in addition, the voter provided three forms of
25   identification, correct?

1    A.   Yes.

2    Q.   And the rest of the ballot form appears to be complete,

3    correct?

4    A.   Yes.

5    Q.   And on the following page, it does -- it is checked that

6    the voter is registered, correct?

7    A.   Yes.

8    Q.   But, yet, under the new laws that the address is a

9    required field, this ballot was rejected, correct?

10   A.   Yes.

11   Q.   Do you think this is fair?

12   A.   No.

13           MR. CONOVER:  Objection, Your Honor.

14           THE COURT:  Basis?

15           MR. CONOVER:  Argumentative.

16           THE COURT:  Overruled.

17           MR. CONOVER:  Thank you.

18   BY MS. CRAWFORD:

19   Q.   Now, with respect to the identification field, if

20   someone provides a Social Security number but they previously

21   provided a driver's license number or other kind of

22   identification to the Board but that was not a Social Security

23   number, can the Board accept the ballot still?

24   A.   If they provide something other than a Social Security

25   number?

1    Q.    Let me state it a little differently.

2    A.    Okay.

3    Q.    So, in your system, the voter has previously provided

4    the Social Security number --

5    A.    Uh-huh.

6    Q.    -- and that's the number you have in your system.

7    A.    Uh-huh.

8    Q.    Then later they provide a driver's license number or

9    other identification, but that new form is not in your system.

10   Are you able to accept that ballot?

11   A.    Yes.

12   Q.    Okay.  I'm showing you Plaintiffs' Exhibit 1768.  And,

13   here, the ballot was rejected due to an error in the last four

14   digits of the Social Security number, correct?

15   A.    Yes.

16   Q.    And it looks like the voter wrote "0857."  But if we

17   look at the back, in the notes, it says:  System has -- at the

18   bottom -- System has 0851 and does not -- I don't know what the

19   next word is, but have 0857.  Correct?

20   A.    Uh-huh.  Yes.

21   Q.    We don't know which number is actually correct, right,

22   the voter or the one in the system?

23   A.    No, not based on this discrepancy.

24   Q.    And you aren't permitted to contact the voter to find

25   out which is actually the correct identification number,

1   correct?

2     A.   Yes.

3     Q.   In this case, you're relying on the system to be

4   correct, right?

5     A.   And the voter's original registration card, if we have

6   it.

7     Q.   Right.  But even if you did have the voter's original

8   registration form, here, we're talking about the difference

9   between a "1" and a "7," correct?

10    A.   Yes.

11    Q.   And, those two numbers, they could look pretty similar

12   on a voter's registration form, correct --

13    A.   Yes.

14    Q.   -- because it's handwritten?

15    A.   Uh-huh, yes.

16    Q.   So there is the possibility that your system -- it was

17   entered into your system incorrectly, right?

18    A.   Yes.  Usually, we will look for the voter registration

19   card to ensure that that was not the case and make sure that

20   what our system has matches what the voter gave us in their

21   registration card in a discrepancy like this.

22    Q.   Thank you.  Now, Butler County provides no notice to a

23   provisional voter to correct any error on their provisional

24   application form, correct?

25    A.   Yes.

 1   Q.   But a provisional voter is able to come in to show a

 2   valid ID if they did not have valid ID with them on Election

 3   Day, correct?

 4   A.   Yes.

 5   Q.   And they have seven days to do so?

 6   A.   Yes.

 7   Q.   And, previously, those voters had ten days, correct?

 8   A.   Yes.

 9   Q.   Now, can someone with an ID mismatch come in to fix that

10   problem within that seven-day period?

11   A.   No.

12   Q.   So, if it was an instance like I showed you before, that

13   voter wouldn't be able to come in and correct that?

14   A.   No.

15   Q.   And it happens infrequently that voters come in to

16   provide identification, correct?

17   A.   Yes.

18   Q.   Because a voter would have to realize on his or her own

19   that they forgot to provide identification of some sort,

20   correct?

21   A.   They're given --

22        MR. CONOVER:  Objection, Your Honor.

23        THE COURT:  Basis, Mr. Conover?

24        MR. CONOVER:  Calls for speculation.

25        THE COURT:  Sustained.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 54 of 296 PAGEID #: 1374
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/03/16 Page: 54 of 296 PAGEID #: 29364

Vol. 6 — 54

```
 1            MR. CONOVER:  Thank you.

 2            THE COURT:  Rephrase your question, Ms. Crawford.

 3            MS. CRAWFORD:  Thank you, Your Honor.

 4     BY MS. CRAWFORD:

 5     Q.   You don't reach out to voters to tell them there is

 6   missing identification information on their provisional

 7   envelopes, correct?

 8     A.   No.

 9     Q.   Not by phone?

10     A.   No.

11     Q.   You do provide them with the hotline form when they're

12   voting, correct?

13     A.   Yes.

14     Q.   And the only reason a voter is allowed to come in is to

15   provide identification that had not previously been provided,

16   correct?

17     A.   Yes.

18     Q.   Do you think there would be a difference between

19   allowing someone to fix a missing identification problem and

20   allowing someone to fix a missing date of birth or address?

21     A.   No.

22     Q.   Now, in terms of absentee ballots, could you briefly run

23   through your process for reviewing absentee ballots?

24     A.   Are you referring to applications or returning voted

25   absentee ballots?
```

1    Q.   I'm referring to reviewing the absentee ballot

2    envelopes.

3    A.   It's a similar process.  We have our staff overview the

4    envelope by first looking up the voter's record in our voter

5    registration system, comparing the information provided on the

6    ID envelope with the information in our system, including the

7    voter's name, the voter's date of birth, the ID provided,

8    whether it be the last four digits of the voter's Social

9    Security number or driver's license number, and checking to

10   ensure the voter signed the ID envelope, and making sure the

11   signature roughly matches the signature in our system.

12   Q.   And when a ballot is rejected, does your staff keep

13   track of the reason that it's rejected?

14   A.   Yes.

15   Q.   And you provided us with a spreadsheet of the voters and

16   the reason their ballots were rejected, correct?

17   A.   Yes.

18   Q.   I'm not going to be able to fit all of this on here, but

19   this is Plaintiffs' Exhibit 3924.  And does this appear to be

20   that spreadsheet --

21   A.   Yes.

22   Q.   -- of the rejected absentee ballots?

23   A.   Yes.

24        MS. CRAWFORD:  At this time, Your Honor, I'd like to

25   move Plaintiffs' Exhibit 3924 into evidence.

1        THE COURT:  Any objection, Mr. Conover?

2        MR. CONOVER:  I'd only object in the sense that I

3    don't know what year this is from.

4        THE COURT:  All right.  Your objection is well taken.

5        Ms. Crawford, would you establish, through the witness,

6    the year of this exhibit?

7        MS. CRAWFORD:  Yes, Your Honor.

8    BY MS. CRAWFORD:

9    Q.   Do you know what year this is?

10   A.   It appears to be 2014.

11       THE COURT:  And on what do you base that, Ms. Bucaro?

12       THE WITNESS:  Their return date.

13       THE COURT:  Any further objection, Mr. Conover?

14       MR. CONOVER:  No objection, Your Honor.

15       THE COURT:  Exhibit 3924 will be received, Ms.

16   Crawford.

17       MS. CRAWFORD:  Thank you, Your Honor.

18   BY MS. CRAWFORD:

19   Q.   Now, with respect to absentee voting, is the process the

20   same for early in-person voters and a vote by mail?

21   A.   No.  In-person early voters are permitted to vote on our

22   electronic voting equipment, and they are not required to

23   complete an ID envelope.

24   Q.   So there is no risk of a ballot being rejected for

25   failing to fill out that ID envelope properly for in-person

1    voters, correct?

2      A.    Correct.

3      Q.    Now, in terms of notice to absentee voters, unlike

4    provisional voters, absentee voters do get an opportunity to

5    correct the information, missing or incorrect information,

6    provided on their absentee envelopes, correct?

7      A.    Yes.

8      Q.    And that is through the Form 11-S?

9      A.    Yes.

10     Q.    And use of this form requires a certain degree of

11   literacy, correct?

12     A.    Yes.

13     Q.    You have to be able to read and understand the error

14   that voter has made?

15     A.    Yes.

16     Q.    And it's asking voters to fill in correctly the same

17   information that they already once filled in incorrectly,

18   right?

19     A.    Yes.

20     Q.    And you aren't permitted to contact voters via telephone

21   or e-mail to make these corrections, right?

22     A.    No, not -- not over the phone, correct.

23     Q.    But you do have phone numbers and e-mail addresses for

24   at least some of these voters from their absentee ballot

25   application forms, correct?

1    A.    Yes.

2    Q.    Because that is a field on the -- optional field on the

3    application form, correct?

4    A.    Yes.

5    Q.    So it's possible that you could contact these voters if

6    permitted?

7    A.    Yes.

8    Q.    And voters have seven days after the election to return

9    the 11-S forms, correct?

10   A.    Yes.

11   Q.    And when does your office stop mailing 11-S forms during

12   that seven-day period?

13   A.    We mail them out for any ballot that we receive that was

14   timely mailed before Election Day but we receive after Election

15   Day.  If there is information missing, we will send them an

16   11-S form as long as we determine the ballot is eligible.

17   Q.    So, do you mail out 11-S forms all the way up until the

18   sixth day after the election?

19   A.    We could, yes.

20   Q.    And it's possible at that point the voter might not even

21   receive that 11-S form until after the cure period, correct?

22   A.    Yes, uh-huh.

23   Q.    Now, with respect to identification on absentee ballot

24   envelopes, your Board is required to reject a ballot even if

25   the Social Security number or driver's license number is only

1   one number off, correct?

2      A.   Yes.

3      Q.   Now, I'm showing you what's been marked as Plaintiffs'

4   Exhibit 1998.  And, in this example, it appears the ballot was

5   rejected due to the Social Security number, correct?

6      A.   Yes.

7      Q.   And if we take a look at the following form, this is

8   their voter's registration form, correct?

9      A.   Yes.

10     Q.   And, here, the number is 7429?

11     A.   Yes.

12     Q.   And if we look back at the original, or look back at the

13  absentee envelope, the voter appears to have written "7924"?

14     A.   Yes.

15     Q.   So it appears the voter transposed a few numbers,

16  correct?

17     A.   Correct.

18     Q.   And, as we saw, in order to receive this particular

19  ballot, the voter already had to fill out the application with

20  the correct Social Security number?

21     A.   Yes.

22     Q.   And they wouldn't have received that ballot unless the

23  Social Security number was correct originally?

24     A.   Yes.

25     Q.   So, essentially, at this point, her ballot is required

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 60 of 296 PAGEID #: 1380
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/03/16 Page: 60 of 296 PAGEID #: 29869

Vol. 6 – 60

1   to be denied under the directive for transposing a few numbers,

2   correct?

3   A.   Correct.

4   Q.   And under the laws and directives, the Board has no

5   discretion to accept ballots like this, correct?

6   A.   Correct.

7   Q.   Now, prior to the new laws, you were able to count

8   absentee ballots when they were missing or had incorrect

9   date-of-births, correct?

10   A.   Yes.

11   Q.   Now I'm showing you Plaintiffs' Exhibit 3925.  And it's

12   the Official Certification for Absentee Ballots for 2014,

13   correct?

14   A.   Yes.

15   Q.   And if you take a look at C6 where it says "Missing or

16   incorrect birthdates that does not meet exceptions," there were

17   186 voters' ballots who were rejected because of the

18   date-of-birth field, correct?

19   A.   Yes.

20   Q.   And this is Plaintiffs' Exhibit 3927, and it's the 2015

21   Absentee Ballot Certification, correct?

22   A.   Correct.

23   Q.   And, at C6, it says, for date of birth, there were 25

24   ballots that were rejected?

25   A.   Yes.

1   Q.   Thank you.  Assuming there are no other errors on these

2   absentee ballot envelopes, these ballots would have been

3   counted prior to the new laws, correct?

4   A.   Correct.

5   Q.   And, during the 2014 election, you actually changed

6   forms in the midst of the election due to the errors being made

7   with respect to the date-of-birth field, correct?

8   A.   Yes.

9   Q.   And this is Plaintiffs' Exhibit 3929.  And can you tell

10  if this was the original form?

11  A.   Yes.

12  Q.   And how can you tell that?

13  A.   Because of the date-of-birth fields.  The text, month,

14  day and year, is contained within the boxes.

15  Q.   And this is Plaintiff's Exhibit 3930.  And this is the

16  new form where the date-of-birth field has been altered?

17  A.   Yes.

18  Q.   And could you please explain why you made this change?

19  A.   Because we found a lot of voters were leaving the

20  birthdate fields blank on the original form.  And we determined

21  that it was probably because of the way the form was formatted

22  with those boxes containing the text, month, day and year; that

23  voters were just glancing over that and missing those fields

24  that were required.

25  Q.   And did this change help?

1    A.   Yes.

2    Q.   And that can just be seen by the numbers, correct?

3    A.   Yes, uh-huh.

4    Q.   And this looks -- this forms looks a little different

5    than the ones we've seen for other counties.  So, you are

6    permitted to create your own forms, correct?

7    A.   Yes.

8    Q.   And you made this change because you wanted these votes

9    to be able to count, correct?

10   A.   Yes.

11   Q.   Now, I'm showing you what's been marked as Plaintiffs'

12   Exhibit 1987.  And this is the absentee ballot envelope,

13   correct?

14   A.   Yes.

15   Q.   And it appears, here, that the voter provided the

16   current date, rather than her year of birth, correct?

17   A.   Yes.

18   Q.   And that's because the "10-29-15" is in the

19   date-of-birth field and at the bottom, correct?

20   A.   Yes.

21   Q.   And is this something that would fall within that

22   exception we discussed earlier?

23   A.   I suppose it could, yes.

24   Q.   And this is the voter's registration form, correct?

25   A.   Yes.

Vol. 6 – 63

1    Q.    And, here, it appears her birthdate is 11-13, 1994?

2    A.    Yes.

3    Q.    And do you -- do you know if the Board voted with

4    respect to this particular ballot?

5    A.    I do not believe they did, no.

6    Q.    Now, with absentees, voters have already filled out the

7    date-of-birth field once prior to receiving an absentee ballot,

8    correct?

9    A.    Yes.

10   Q.    In fact, they're required to fill it out correctly in

11   order to receive that ballot?

12   A.    Yes.

13   Q.    And do you think it's fair that voters are having their

14   ballots rejected for failing to fill out the date-of-birth

15   field on absentee ballot envelopes?

16   A.    I don't know that I can answer that.  The ID envelope,

17   when it returns, we have to be able to determine that the voter

18   cast the ballot.  So, in that -- in that case, if a date of

19   birth can help us determine if that was the voter who cast it,

20   I -- I understand the requirement.  I don't know that I can

21   speak to its fairness.

22         If we can otherwise determine the voter cast that ballot

23   and filled that form out, then, no, I don't believe it's fair.

24   Q.    Okay.  So, in this particular case, your office writes

25   in the name and the address, or has it printed, correct?

Vol. 6 - 64

1    A.   Yes, correct.

2    Q.   And you have that voter's driver's license, correct?

3    A.   Yes.

4    Q.   And you have their signature, correct?

5    A.   Yes.

6    Q.   And if you look back at the application, the name,

7  address -- the name appears to be the same, correct?

8    A.   Yes.

9    Q.   The address appears to be the same, correct?

10   A.   Yes.

11   Q.   The driver's license number appears to be the same,

12 correct?

13   A.   Yes.

14   Q.   And the signature appears to be the same, correct?

15   A.   Yes.

16   Q.   So do you believe you're able to identify this voter

17 without that information?

18   A.   Yes.

19        MS. CRAWFORD:  Thank you.

20      Your Honor, could I have a minute to confer with

21 counsel?

22        THE COURT:  Yes, you may.

23        MS. CRAWFORD:  Thank you.

24    (Whereupon, there was a brief interruption.)

25        MS. CRAWFORD:  No further questions at this time.

Vol. 6 —  65

1    Thank you, Ms. Bucaro.

2            THE WITNESS:  Okay.

3            THE COURT:  Thank you, Ms. Crawford.

4         Mr. Conover, cross?  I mean -- You're direct, actually.

5            MR. CONOVER:  Thank you.

6                        DIRECT EXAMINATION

7     BY MR. CONOVER:

8     Q.   Good morning, Ms. Bucaro.  Thank you for being here.

9     And I know that we've previously met; but, just for the record,

10    my name is Brodi Conover.  I'm from the Ohio Attorney General's

11    Office and represent the Defendants Secretary of State and the

12    State of Ohio in this case.

13            I'd like to kind of just track Ms. Crawford's

14    questioning a little bit and to cover a little bit more for

15    you.

16            So, what is the population of Butler County?

17    A.   I believe it's around 380,000.

18    Q.   And do you know --

19            THE COURT:  What's the county seat?

20            THE WITNESS:  Hamilton.

21            THE COURT:  Hamilton, Ohio, is the county seat?

22            THE WITNESS:  Uh-huh.

23    BY MR. CONOVER:

24    Q.   And how many registered voters are there in Butler

25    County?

Vol. 6 — 66

1    A.    Currently, 237,000.

2    Q.    And do you know how these numbers compare relative to

3  other counties in the State?

4    A.    We're the eighth largest county in the State.

5    Q.    Thank you.  And are you a member of a political party,

6  Ms. Bucaro?

7    A.    I am.

8    Q.    And which party is that?

9    A.    Democrat.

10    Q.    And do you hold any positions in the Butler County

11  Democratic Party?

12    A.    I do.

13    Q.    And what position is that?

14    A.    Chair.  I'm the Chairwoman.

15    Q.    Thank you.  And can you describe your role as the

16  Chairwoman of the Butler County Democratic Party?

17    A.    I help recruit candidates and help to support them.

18    Q.    Thank you.  And do you know what a superdelegate is?

19    A.    Yes.

20    Q.    And what is that?

21    A.    It's a, in the Democrat National Committee, an unpledged

22  delegate to the National Convention.

23    Q.    Thank you.  And can you describe the difference in your

24  role as Deputy Director of the Butler County Democratic Party,

25  or -- excuse me -- Butler County Board of Elections and the

Vol. 6 — 67

1    Chairwoman of the Butler County Democratic Party?

2     A.    Sure.  I do not wear a party hat as Deputy Director of

3    the Board of Elections in any sort of partisan way.  We operate

4    to serve the voters, all the voters of the County.  And when

5    I'm Chairwoman of the Democratic Party, I'm serving the members

6    of the Party and Democratic voters in the County.

7     Q.    Thank you.  What is the Ohio Association of Election

8    Officials?

9     A.    It's —— It's the lobbying organization of election

10   officials in the State of Ohio.

11    Q.    And can you just briefly describe the structure of the

12   OAEO?

13    A.    Sure.  There are three officers —— four officers and a

14   Board of Trustees.  And we have an Executive Director.

15    Q.    And are you an active member of the OAEO?

16    A.    I am.

17    Q.    What positions do you hold?

18    A.    Currently, the Second Vice-President.  And I'm also on

19   the Legislative Committee.

20    Q.    Thank you.  I'd now like to move into the voting, kind

21   of, apparatus in Butler County.  And I'd first like to start

22   with the DRE machines that you all use.  And I believe that

23   you've mentioned on your cross that an early voter —— an early

24   in-person absentee voter would vote via a DRE machine?

25    A.    Correct.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 68 of 296 PAGEID #: 1388
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/05/16 Page: 69 of 296 PAGEID #: 29376

Vol. 6 - 68

1   Q.   And are votes on DRE machines counted immediately?

2   A.   No.

3   Q.   And how is that information, that ballot information,

4   stored on the DRE machine?

5   A.   They're cast in early voting as a provisional vote,

6   meaning we do not accept them until after early voting, or,

7   until after the polls close and early voting has closed on

8   Election Day -- on Election Day.  In that way, we are able to

9   go and identify a vote; not see the ballot or see how a voter

10  voted, but identify a vote if a voter is determined to be

11  ineligible for the election.

12  Q.   And I think you described that a voter like this would

13  fill out an application, but would not fill out the absentee

14  envelope?

15  A.   Correct.

16  Q.   And what, if any, risk is there that another individual

17  would vote that person's vote on the DRE machine?

18  A.   Very little.  The voter still has to complete the

19  application, and that information is verified before they're

20  given their ballot.

21  Q.   Thank you.  What precinct should a voter vote in?

22  A.   Their home precinct where they currently reside.

23  Q.   And I think you mentioned that you often search

24  different databases to confirm a voter's identity, what their

25  address or their date of birth or one of their ID requirements

1   is, right?

2     A.   Yes.

3     Q.   And why do you search different databases?

4     A.   To ensure the information we have is correct in our

5   system.

6     Q.   And I think you also mentioned that you check to make

7   sure that a voter has only voted one ballot, especially in the

8   provisional context?

9     A.   Yes.

10    Q.   And why do you do that?

11    A.   Because the voter is only eligible to vote once.

12    Q.   And I realize I'm kind of all over the place.  So I

13  apologize.

14    A.   That's okay.

15    Q.   It's just following my notes.  But when a voter

16  registers, you mentioned that there is an option to give a

17  phone number or an e-mail address?

18    A.   Yes.

19    Q.   Is that required?

20    A.   No.

21    Q.   So, do you have a phone number for every registered

22  voter in Butler County?

23    A.   No.

24    Q.   Do you have an e-mail address for every registered voter

25  in Butler County?

1    A.   No.

2    Q.   So, I think Ms. Crawford also showed you two different

3  absentee identification envelopes, one from the beginning of

4  the 2014 election and one, kind of, that you changed in the

5  middle; is that correct?

6    A.   Correct.

7    Q.   And are those forms proscribed by the Secretary of

8  State?

9    A.   They follow a form proscribed by the Secretary of State.

10  We do have the form we use currently reviewed by the Secretary

11  of State to ensure it meets their requirements.

12    Q.   But the absentee form that you use is specific to Butler

13  County, correct?

14    A.   Yes.

15    Q.   Thank you.  And I think Ms. Crawford asked you about

16  when you're mailing out 11-S forms up to the sixth day after

17  the election.  Is it required that a voter send in the 11-S

18  form via mail?

19    A.   No.

20    Q.   So a voter could drop off an 11-S form?

21    A.   Yes.

22    Q.   And Ms. Crawford also asked you a little bit about

23  literacy.  Does any form require some level of literacy?

24    A.   Yes.

25    Q.   And what does the Board do to assist either low literate

1   or illiterate voters?

2   A.   If a voter is in our office and requires assistance, we

3   can provide it.  If a voter requires assistance at a polling

4   location, two precinct election officials of opposite party are

5   permitted to assist a voter.

6   Q.   Do you know where the authority comes from for that

7   assistance?

8   A.   From the Ohio Revised Code.

9   Q.   Thank you.  And is it possible that family members could

10  assist the voter?

11  A.   Yes.

12  Q.   And I think on your cross you mentioned that Butler

13  County has used electronic poll books since 2012?

14  A.   Correct.

15  Q.   And do those poll books consolidate the poll books in

16  Butler County?

17  A.   Yes.

18  Q.   And can you just kind of describe the process for a

19  voter, when they walk into the polling location, how they would

20  engage with the electronic poll book?

21  A.   Sure.  The poll books are connected to one another via

22  network cables.  So, a voter can check in at any electronic

23  poll book in a polling location.  With the exception, I

24  believe, of two polling locations in Butler County, all of our

25  locations have multiple precincts.  So, voters do not have to

1   know what precinct they belong to to check in at our polling

2   locations.

3       And the poll-workers would then ask the voter for their

4   name and current address and look them up by their name and

5   then verify their address and their ID with the voter at

6   the -- on the ePoll book.

7   Q.   And has that had any benefit on election administration

8   in Butler County?

9   A.   Yes.

10  Q.   And what benefits have those had?

11  A.   Well, it helps the voters, because they don't have to

12  know their precinct.  Very few voters know what precinct they

13  live in.

14      It helps to identify what precinct a voter should vote

15  in for a provisional ballot to ensure they vote in the right

16  precinct and polling location.

17      It can provide the voter with a receipt with their

18  correct polling location address at the polls on Election Day.

19      And, then, it vastly reduces the amount of staff time,

20  required both before an election and after an election, in

21  preparing the poll books for the polling locations, updating

22  with absentee voter information, and then uploading our voter

23  history and helping us speed up our provisional processing

24  after the election.

25  Q.   And I'm now going to go back to provisionals.  I know I

Vol. 6 -  73

1    was just there.  So I apologize for coming back to it.  And you

2    described a process where the precinct election officials are

3    required to check the form for completeness and initial; is

4    that right?

5    A.   Yes.

6    Q.   And are you required to have your precinct election

7    officials do that?

8    A.   No, although I believe the Secretary of State's training

9    for precinct election officials does highly recommend it.

10   Q.   Okay.  Thank you.  And, then, I believe, also,

11   actually -- Strike that.

12        With a provisional ballot, what purpose does a

13   provisional ballot have for a non-registered voter?

14   A.   For a non-registered voter, it would register them.

15   Q.   And was that true for provisional ballot affirmation

16   forms prior to 2014?

17   A.   It was true for provisional ballot affirmation forms

18   that contained the registration criteria on the back of the

19   former form that was used before 2014.

20   Q.   So was it a separate form, then?

21   A.   The form used previously had two sides.  On the reverse

22   side was basically a registration form, and voters were asked

23   to complete that if they needed to update information.  We had

24   previously instructed our poll-workers to ask all voters voting

25   provisionally to complete that form.

1   Q.   But were they required to fill that form out?

2   A.   No.  No.

3   Q.   So their vote wouldn't have been rejected?

4   A.   In most cases, no.

5   Q.   Okay.  Thank you.

6        I'd now just like to go over a couple of the exhibits

7   that Ms. Crawford showed you.  And I'm going to start with

8   3925, which I believe was the 2014 absentee certification; is

9   that right?

10  A.   Yes.

11  Q.   And, here, in Section B, how many -- in 2014, how many

12  absentee ballots were counted in Butler County?

13  A.   20,200.

14  Q.   I should specify the domestic civilian ballots.

15  A.   Okay.  20,297 were counted.

16  Q.   And how many were rejected?

17  A.   449.

18  Q.   And, looking at the bottom here, what was the most

19  common reason for rejecting a provisional ballot in 2014 -- or

20  an absentee ballot in 2014?

21  A.   Ballots not received on time.

22  Q.   And then, also, what was -- The reason given in C11, how

23  many were rejected for that reason?

24  A.   Three.

25  Q.   And what is the reason that those were rejected?

1    A.    The voter was deceased prior to the date the ballot was

2    cast.

3    Q.    And now I'd like to bring up Plaintiffs' Exhibit 3927

4    which I believe was the 2015 version of that form.  And how

5    many domestic civilian ballots were counted in 2015?

6    A.    8,973.

7    Q.    And how many were rejected?

8    A.    144.

9    Q.    And what was the most common reason for rejection?

10   A.    Ballots not timely received.

11   Q.    And how many were --

12   A.    92.

13   Q.    Thank you.  Now I'd like to bring up Plaintiffs' Exhibit

14   3926.  And what is this form?

15   A.    The Official Certification for Provisional Ballots Cast

16   in the November 2014 Election.

17   Q.    Thank you.  And how many provisional ballots were

18   counted in full in 2014?

19   A.    1,242.

20   Q.    And how many were rejected?

21   A.    117.

22   Q.    And what was the most common reason for rejection?

23   A.    Voters not registered.

24   Q.    And how many?

25   A.    81.

Vol. 6 — 76

1     Q.   I'd also like to --

2          THE COURT:  And, just for clarity in the record,

3     that's voter not registered in the State.

4          THE WITNESS:  Yes.

5          THE COURT:  Is that right?

6          THE WITNESS:  Yes.

7          THE COURT:  Because if the voter was -- if it was the

8     right church/wrong pew --

9          THE WITNESS:  Right.

10         THE COURT:  -- you would have counted that provisional

11    ballot; is that right?

12         THE WITNESS:  Yes.

13         THE COURT:  So, what your Board did was to confirm

14    that there was no voter in that state registered by that

15    particular name --

16         THE WITNESS:  Correct.

17         THE COURT:  -- before that ballot was not counted?

18         THE WITNESS:  Yes.

19         THE COURT:  If the voter was registered in some other

20    precinct --

21         THE WITNESS:  Yes.

22         THE COURT:  -- the provisional ballot was counted?

23         THE WITNESS:  If all other requirements were met, yes.

24    Correct.

25         THE COURT:  Okay.  Okay.  So B1 doesn't cover right

Vol. 6 — 77

1    church/wrong pew?

2         THE WITNESS:  No.  That only -- That only covers a

3    voter we did not identify as having been registered anywhere in

4    the State of Ohio before.

5         THE COURT:  So, a right church/wrong pew provisional

6    ballot could be discounted if the other fields are not properly

7    completed?

8         THE WITNESS:  Yes.

9         THE COURT:  Please continue, Mr. Conover.

10        MR. CONOVER:  Thank you, Your Honor.

11   BY MR. CONOVER:

12   Q.   And what is the rejection reason listed in B10?

13   A.   The voter had already voted.

14   Q.   And what does that mean?

15   A.   In most of those cases, it would have meant the voter

16   cast an absentee ballot.

17   Q.   Okay.  Thank you.  How many were rejected for that

18   reason?

19   A.   Nine.

20   Q.   Thank you.  And, then, finally --

21        THE COURT:  Just one followup question to that --

22        THE WITNESS:  Uh-huh.

23        THE COURT:  -- just out of curiosity.

24        So, if a provisional ballot is found -- if a provisional

25   ballot voter also is found to have cast an absentee ballot,

1    that provisional ballot is not counted, correct?

2            THE WITNESS:  Correct.

3            THE COURT:  Is that absentee ballot then pulled and

4    not counted?

5            THE WITNESS:  No.  That would have been counted.

6            THE COURT:  That would have been counted?

7            THE WITNESS:  Yes.

8            THE COURT:  So the voter is not disenfranchised?

9            THE WITNESS:  Correct.

10           THE COURT:  Please continue, Mr. Conover.

11           MR. CONOVER:  Thank you, Your Honor.

12      BY MR. CONOVER:

13      Q.   And, finally, Plaintiffs' Exhibit 3928, this is the 2015

14   provisional certification?

15      A.   Yes.

16      Q.   And, in 2015, how many provisional ballots in Butler

17   County were counted in full?

18      A.   2,029.

19      Q.   And how many were rejected?

20      A.   344.

21      Q.   And what was the most common reason for a provisional

22   ballot being rejected in 2015?

23      A.   Voter not registered in the State of Ohio.

24      Q.   And how many were rejected for that reason?

25      A.   295.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 79 of 296 PAGEID #: 1399
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/12 Page: 79 of 296 PAGEID #: 23887

Vol. 6 — 79

1   Q.   And, again, B10 was the voter already voted, correct?

2   A.   Yes.

3   Q.   And how many were rejected for that reason?

4   A.   Seven.

5   Q.   Thank you.

6        THE COURT:  Put that back up for a moment, please, Mr.

7   Conover.

8        MR. CONOVER:  Yes, Your Honor.

9        THE COURT:  Under B6, 17 were rejected because the

10  voter failed to provide current address?

11       THE WITNESS:  Yes.

12       THE COURT:  And that meant that the Board had searched

13  the database to determine whether there was any available

14  address for the voter and found none; is that right?

15       THE WITNESS:  Not in every case.  In some of those

16  cases, the voter did not complete the address field at all,

17  didn't give us any address in that field in some of those

18  cases.  In others, the voter didn't provide a house number or

19  not a complete house number or we weren't able to, as you said,

20  find the address in any of our databases.

21       THE COURT:  In those instances, were you otherwise

22  able to identify the voter, let's say by name or signature?

23       THE WITNESS:  We may have been, yes.

24       THE COURT:  And even if you were able, otherwise, to

25  identify that voter by name or signature, his or her ballot was

Vol. 6 - 80

 1    not counted because the address was improper?

 2            THE WITNESS:  Correct.

 3            THE COURT:  That also means that you had determined,

 4    from looking at the provisional ballot, that the voter was

 5    registered in the State?

 6            THE WITNESS:  Yes.

 7            THE COURT:  Please continue, Mr. Conover.

 8            MR. CONOVER:  Thank you, Your Honor.

 9      BY MR. CONOVER:

10    Q.   I'd next just like to ask a few questions about, kind

11    of, the Board review on the back end.

12            What is currently going on at the Board of Elections in

13    Butler County?

14    A.   We're reviewing provisional ballots cast in the March

15    15th primary.

16    Q.   Thank you.  And who ultimately makes the decision to

17    accept or reject provisional and absentee ballots?

18    A.   The Board of Elections.

19    Q.   Is that a bipartisan process?

20    A.   Yes.

21    Q.   And can you just briefly explain that process?

22    A.   We have two Democrat Board members and two Republican

23    Board members, and they have to agree by a vote of at least

24    three members to approve or not approve all provisional

25    ballots.

1    Q.    And I think on your cross you mentioned that the Board

2    does look through individual envelopes?

3    A.    Yes.

4    Q.    And why does the Board do that?

5    A.    Our Board -- All of our Board members, regardless of

6    party affiliation, want to count any eligible voter's vote.

7    And they -- we generally hold our poll-workers responsible if a

8    voter's vote does not count.  So they often want to see how our

9    poll-workers have done in terms of reviewing these envelopes.

10   They also want to see if there is any way we can, under the

11   directive, count any of these ballots.

12          MR. CONOVER:  Just a quick moment, Your Honor, to

13   confer?

14          THE COURT:  All right.

15      (Whereupon, there was a brief interruption.)

16          THE COURT:  May I ask you one other question?  I just

17   don't know the answer to this.

18      What happens if there is a two-two tie?

19          THE WITNESS:  It would go to the Secretary of State to

20   break the tie.

21          THE COURT:  Is there any field on this exhibit, which

22   is on the monitor now --

23      What's that exhibit number, Mr. Conover, the one that's

24   on the screen right now?

25          MR. CONOVER:  Oh, there is one on the screen.

Vol. 6 — 82

1          THE COURT:  Yes, there is.

2          MR. CONOVER:  3928, Your Honor.

3          THE COURT:  All right.  Is there a field that shows

4    how many tie votes you had that were sent to the Secretary?

5          THE WITNESS:  We had none.

6          THE COURT:  You had none?

7          THE WITNESS:  Correct.

8          THE COURT:  Was the poll-worker tasked with the

9    responsibility of ensuring that the fields on the provisional

10   ballot were adequately completed?

11         THE WITNESS:  Yes.

12         THE COURT:  So, why wasn't it the poll-worker's

13   responsibility in those 17 instances where there was, like, an

14   incomplete address or inadequate address, why wasn't the

15   poll-worker responsible then?

16         THE WITNESS:  Well, if the address doesn't exist in

17   our databases, we don't expect our poll-workers to know that

18   information.  But we would -- we would hold the poll-workers

19   responsible if the voter did not complete -- give us any

20   address or give us an incomplete address, because --

21         THE COURT:  Okay.  So, these 17, then, are not

22   incomplete addresses?

23         THE WITNESS:  They could be.  That would include

24   incomplete addresses.

25         THE COURT:  All right.  I'm confused now.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 83 of 296 PAGEID #: 1403
Case: 2:06-cv-00896-ALM-TPK Doc #: 666-6 Filed: 04/03/12 Page: 83 of 296 PAGEID #: 24693

Vol. 6 - 83

 1              THE WITNESS:  Okay.

 2              THE COURT:  So the poll-worker is responsible if there

 3      is an incomplete address?

 4              THE WITNESS:  Yes.

 5              THE COURT:  If there's an incomplete address that gets

 6      to the Board, the Board rejects that ballot even though it was

 7      the poll-worker's fault?

 8              THE WITNESS:  We hold the poll-worker responsible for

 9      reviewing the envelope for completion.  Ultimately, it is the

10      voter's responsibility to complete the form; but we know, you

11      know, that it's -- it's a long form.  And we want our -- we

12      want our voters' votes to count.  So we ask our poll-workers

13      and hold our poll-workers accountable for making sure that the

14      voter completed every required field.  And we train them for

15      that.

16              THE COURT:  All right.  I'm still unclear, and I think

17      that maybe, if I ask a couple more questions, you can provide

18      clarity.

19              THE WITNESS:  Okay.

20              THE COURT:  If the poll-worker is responsible for

21      making sure that the voter provides a complete address and an

22      incomplete address on a provisional ballot leads to that

23      provisional ballot being rejected, then, how is the poll-worker

24      being held responsible if the end result is that the voter's

25      vote is not cast?

Vol. 6 – 84

1        THE WITNESS:  Well, the voter's vote would not be

2   cast.  And we, in all likelihood, would not ask that

3   poll-worker to work again.

4        THE COURT:  But there is no relief for that

5   disenfranchised voter?

6        THE WITNESS:  That's correct.

7        THE COURT:  Do you know the degree of frequency with

8   which you have those incomplete addresses?

9        THE WITNESS:  It has been significantly reduced since

10  we started training and, really, holding our poll-workers

11  accountable for this.  It's gone down, but it's not eliminated.

12  And that's frustrating.

13       THE COURT:  Please continue, Mr. Conover.

14       MR. CONOVER:  I have no further questions, Your Honor,

15  at this time.

16       THE COURT:  Okay.

17     Ms. Crawford, do you have any recross?

18       MS. CRAWFORD:  Yes, I do, Your Honor.

19       THE COURT:  Do you have much recross, Ms. Crawford?

20       MS. CRAWFORD:  No.

21       THE COURT:  I don't care how much you have.  I'm just

22  trying to determine whether to take our morning recess, now

23  that it's 10:30.  If you had one or two questions -- and I mean

24  one or two questions mathematically speaking, as opposed to --

25       MS. CRAWFORD:  It would be more than one or two

Case: 2:06-cv-00896-ALM-TPK Doc #: 606 Filed: 04/03/16 Page: 85 of 296 PAGEID #: 23695

Vol. 6 — 85

1 questions.

2          THE COURT:  All right.  We're going to take a

3 10-minute recess now.  We'll stand in recess until 10:40.

4          (Recess taken from 10:30 a.m. until 10:40 a.m.)

5          THE COURT:  Please proceed, Ms. Crawford.

6          MS. CRAWFORD:  Thank you, Your Honor.

7                    RECROSS-EXAMINATION

8  BY MS. CRAWFORD:

9  Q.   Now, Ms. Bucaro, you talked a little bit about voter

10 assistance.  When you say you can assist a voter when they

11 require assistance, doesn't that mean the voter needs to

12 request assistance?

13 A.   Yes.

14 Q.   And a voter would need to know he or she needs

15 assistance, correct?

16 A.   Yes.

17 Q.   So, we've showed you a few instances where there are

18 small errors on forms, correct?

19 A.   Yes.

20 Q.   And is it fair to say that some of these voters whose

21 ballots were rejected didn't know that they needed assistance?

22          MR. CONOVER:  Objection, Your Honor.

23          THE COURT:  Sustained.

24          MR. CONOVER:  Thank you.

25          MS. CRAWFORD:  Thank you, Your Honor.

Vol. 6 — 86

1    BY MS. CRAWFORD:

2    Q.    You also discussed the process of voter credit.  When

3    does the voter receive credit for voting?

4            MR. CONOVER:  Objection, Your Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  Voter history?

7    BY MS. CRAWFORD:

8    Q.    Yes, I'm sorry.  I understand that's the other name for

9    it.

10   A.    Yeah.  It's given immediately after Election Day for all

11   voters who voted on Election Day and whose votes were counted.

12   And then it's updated, after we complete the official

13   certification of the election, for any voters whose votes were

14   counted after Election Day.

15   Q.    Does a voter receive credit for voting, or put into

16   their history, even if that voter's vote was not counted?

17           MR. CONOVER:  Objection.  Outside the scope, Your

18   Honor.

19           THE COURT:  Sustained.

20           MR. CONOVER:  Thank you, Your Honor.

21   BY MS. CRAWFORD:

22   Q.    Now, you testified that you understand there are reasons

23   that these additional fields, address and date of birth, make

24   it more convenient to the Board, correct?

25   A.    Yes.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 87 of 296 PAGEID #: 1407
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/12 Page: 87 of 296 PAGEID #: 29693

Vol. 6 - 87

 1    Q.   But because these fields aren't filled out, that isn't a

 2    reason to reject the ballot, correct?

 3    A.   Not if we can determine the voter through other means.

 4    Q.   Okay.  And you also testified that the Board wants votes

 5    to be counted, correct?

 6    A.   Correct.

 7    Q.   But they're only able to count these ballots if

 8    permitted to do so under law and directive, correct?

 9    A.   Correct.

10         MS. CRAWFORD:  Thank you.

11       No further questions, Your Honor.

12         THE COURT:  Any redirect, Mr. Conover?

13         MR. CONOVER:  No, Your Honor.

14         THE COURT:  Ms. Bucaro, thank you very much, ma'am.

15    You may be excused.

16         THE WITNESS:  Thank you.

17         THE COURT:  Your next witness, Mr. Chandra?

18         MR. CHANDRA:  Your Honor, we will call State Senator

19    Nina Turner.

20         THE COURT:  Okay.

21       Senator Turner, please come forward and be sworn.

22         THE WITNESS:  Thank you, Your Honor.

23                          - - -

24                     NINA TURNER,

25    AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 88 of 296 PAGEID #: 1408
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 88 of 296 PAGEID #: 23698

```
 1                    DIRECT EXAMINATION

 2     BY MR. CHANDRA:

 3     Q.    Could you please state your name for the record?

 4     A.    My name is Nina Turner.

 5     Q.    Could you please spell your first name?

 6     A.    N-i-n-a.

 7     Q.    Please tell the Court a little bit about your

 8     educational background?

 9     A.    Well, I am a resident of Cleveland, born and raised in

10     Cleveland, received all of my higher education degrees,

11     starting at Cuyahoga Community College and then Cleveland State

12     University, where I earned a bachelor's and a master's degree

13     in history.

14     Q.    Both degrees were in the subject of history?

15     A.    Yes.

16     Q.    Was there a particular focus in your history curriculum?

17     A.    Yes.  I am currently a tenured professor at Cuyahoga

18     Community College, and I teach African American and U.S.

19     history.

20     Q.    Okay.  We'll come back to that.

21     A.    Okay.

22     Q.    I was just focused on the educational background first.

23     A.    Yes.

24     Q.    So was there a particular focus within history in your

25     educational curriculum as a student?
```

Vol. 6 - 89

1    A.    Yes.  For my master's degree, African-American history,

2    with a specific focus on the 20th century.

3    Q.    Did you write a master's thesis as part of that

4    education?

5    A.    Yes.

6    Q.    What was the subject?

7    A.    It was L. Pearl Mitchell and the NAACP.

8    Q.    And what about that?

9    A.    The fight for equality in the NAACP and, really, the

10   role that she played as an African-American woman.  And women

11   are often left out of that history.

12   Q.    And after your education, what did you start to do

13   professionally?  Have we completed your educational

14   credentials?

15   A.    Yes.  Yes.

16   Q.    Okay.  Nothing else to add?

17   A.    No.

18   Q.    So, after your education, could you please tell the

19   Court about your career as it developed; go over the course of

20   your resume?

21   A.    I was a legislative service commission intern for the

22   Statehouse once I graduated with my master's degree.  So, I

23   spent almost two years in the Legislature as an intern -- well,

24   less than two years as an intern.  And then I was hired by

25   then-Senator Rhine McLin to be a legislative aide for her in

Vol. 6 - 90

1    the Senate. And, after that, I went back to --

2    Q.  If you could slow down a little bit. Give us a sense of

3    the time frames involved for that kind of work.

4    A.  This was in the late '90s, latter part of the '90s. I

5    worked for Senator Rhine McLin of Dayton at the time.

6    Q.  Okay. And what were your duties?

7    A.  First I started off as a fellow, or intern, as they

8    called it when I was there, but now we're fellows. And I would

9    handle constituency work.

10        And then, later, before my internship actually ended,

11   the Senator hired me to be a legislative aide. So, I helped

12   write policies and took constituent concerns and complaints and

13   traveled to the district, those types of things.

14   Q.  And Senator McLin was from where?

15   A.  Senator McLin was from Dayton, Ohio.

16   Q.  Montgomery County?

17   A.  Montgomery County, yes.

18   Q.  Let's start with your responsibilities with

19   constituents. What sorts of issues did you work on when

20   dealing with constituents of Senator McLin from Dayton?

21   A.  Anything from education policy and concerns. We had

22   some voting concerns. From time to time, constituents would

23   call to find out about the rules of voting or ask questions.

24        Constituents would often have legislative ideas that

25   they wanted the Senator to push forward. Senator McLin, at the

Vol. 6 — 91

1    time, was also -- I believe she was the chair of the -- There

2    was a prison panel that the Legislature had, as well.  And, so,

3    she was either the chair or co-chair of that panel.  So, we did

4    lots of work with the re-entry community, the prison

5    population, as well.

6    Q.    Is Senator McLin African American?

7    A.    Senator McLin is African American.

8    Q.    And what was the nature of the constituency that she was

9    representing?

10   A.    She had a mixed constituency; but, primarily, in the

11   Dayton area, mainly African Americans.

12   Q.    And, so, after completing that constituency work, tell

13   us about the policy-related work that you did for Senator

14   McLin?

15   A.    Well, her focus was certainly the prison industry,

16   primarily.  She cared a great deal about education, as well.

17   So we worked on those policies.

18         In 1999, or in the late '90s -- I might not have the

19   years exactly right, but that was really when the DeRolph case

20   came down.  I remember that kind of being the highlight of my

21   career, being in the Legislature when the courts determined

22   that the way that we fund education in the State of Ohio is

23   unconstitutional because of our overreliance on property taxes.

24   And Senator McLin played a really strong role in that.  She was

25   also a member of the controlling board, as well.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 92 of 296 PAGEID #: 1412
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/04/16 Page: 92 of 286 PAGEID #: 29706

Vol. 6 — 92

1      So those are the kinds of issues that we worked on.

2   Q.   Drilling down a little deeper into the education-policy

3   issues, what sorts of education-policy issues, besides working

4   on the DeRolph case and the issue of funding of districts, did

5   you work on for Senator McLin in the General Assembly?

6   A.   Well, in terms of budgets, the Senator was always

7   concerned about whether or not the Legislature was putting

8   forth requisite funding to make sure that education was funded

9   properly.  This was even before DeRolph, but those issues were

10  very important to her.

11  Q.   During the course of your work, would you review

12  statistical information about the performance of schools?

13  A.   Yes, but I don't remember -- That was a long time ago.

14  So I don't remember any of the details in that.

15  Q.   Did you wind up reviewing any information related to

16  literacy rates around the State?

17  A.   For Senator McLin, probably; but I don't remember any of

18  the details from that time period.

19  Q.   Okay.  So if you could please progress forward in your

20  career.  Anything more to add about the work you did for

21  Senator McLin?

22  A.   No.

23  Q.   Okay.  If you could continue forward to the rest of your

24  career.

25  A.   I went on to work for then-Mayor Michael R. White as a

Vol. 6 - 93

1  legislative aide for him for the City of Cleveland.  Mayor

2  White was the second African American elected in the City of

3  Cleveland to be mayor, with the Honorable Carl B. Stokes being

4  the first.

5       So I went on to work for him as a legislative aide, and,

6  then, about eight months into my service with him was elevated,

7  or promoted, if you will, to be a member of his cabinet.  So I

8  became the executive assistant for legislative affairs.  And,

9  in that role, my job was to deal with the City Council, solely,

10  with the mayor and his legislative priorities.

11  Q.   Could you please explain, both with respect to your role

12  as a legislative aide and then the promotion to be executive

13  assistant to the mayor, what kinds of duties you had?

14  A.   Well, my role as a legislative aide, I worked for a

15  cabinet member.  And so my job was to be in the Council

16  Committee, taking the notes, pushing for the mayor's policies

17  to be presented.  Unlike on the State level, where most

18  legislation that is put forward in the Legislature comes from

19  members of the General Assembly, on the local level, at least

20  in the City of Cleveland, most of the legislation that the

21  council hears is really started by the departments.  There are

22  about 14 city departments in the City of Cleveland, anything

23  from the Department of Safety to the Water Department.  Most of

24  that legislation originated on the administrative side of the

25  House.  So, it's definitely the opposite of what happens on the

Vol. 6 - 94

1    State level.

2          So my job was to work with the executive assistant for

3    City Council to make sure that any of the concerns that the

4    Council had, to lobby and to make sure that the mayor's

5    priorities were intact.  That's what I did, primarily.

6    Q.   Actually, I need to go back to one thing from the

7    Senator McLin era.

8    A.   Sure.

9    Q.   You mentioned the DeRolph decision and funding for

10   schools.  Could you describe for the Court what was the central

11   issue in the DeRolph case with regard to equal funding?

12   A.   If my memory serves me correctly, the central issue was

13   that the way that we fund education in the State of Ohio is

14   unconstitutional because of the overreliance on property taxes.

15   And, so, those young folks who have the benefit of living in a

16   city where the property taxes are rich -- where they're

17   wealthier, the tax base is wealthier in terms of property, we

18   spend more money.  And then in cities, and/or even our rural

19   counties, as well, in places where the property base is not as

20   robust, then those students are denied the ability to have the

21   same level of funding.

22         And, basically, the Ohio Supreme Court said, very

23   clearly, that the way that we fund education in the State of

24   Ohio is unconstitutional because of that, because it allows for

25   people who live in wealthier areas to have more money given

Vol. 6 - 95

1   towards education.  And -- well, we didn't get to my service in

2   the Legislature, but a lot of that still overlapped in my time

3   in serving in the General Assembly.

4     Q.   So, we'll come to that, but --

5             THE COURT:  Just a second.

6             MS. RICHARDSON:  Objection, Your Honor, just in terms

7   of relevance.

8             MR. CHANDRA:  If I could have a side-bar to explain?

9             THE COURT:  Yes.

10      (Thereupon, the following proceeding was held at side-bar.)

11            THE COURT:  Go ahead, Mr. Chandra.

12            MR. CHANDRA:  So, I'm laying a foundation for her

13   subsequent testimony about the Senate Factors.  And one of the

14   Senate Factors deals with issues of disparity, by race, with

15   regard to education, poverty and health issues.  So she will be

16   very familiar with these kinds of disparities at the State

17   level from her policy work.  And I'd like her to be able to

18   establish that before she starts responding to questions about

19   the Senate Factors and her personal knowledge of the

20   application of those factors.

21            THE COURT:  Is the senator a lawyer?

22            MR. CHANDRA:  She is not.

23            THE COURT:  Okay.

24            MR. CHANDRA:  But I won't be asking her for legal

25   conclusions.  I'll be asking her for facts of what she is

Vol. 6 — 96

 1   aware.

 2           THE COURT:  You mean you won't be asking her for any

 3   more legal conclusions, because what she just explained to me

 4   is what the State Supreme Court did in the school funding case.

 5   She kind of gave me the whole rationale.  And I don't know that

 6   there is a basis for that.

 7           And I don't know the fact that the Supreme Court has

 8   said that the State funding school system is unfair necessarily

 9   raises the inference that the voters who participated in the

10   educational system that was unfairly funded are somehow not as

11   well educated.

12           MR. CHANDRA:  That's what I was coming to next, about

13   her policy understanding of that from the work she did, from

14   the review she did, any -- you know, what was her understanding

15   of that and what was the basis for it.

16           So I didn't control her answer, obviously, in terms of

17   her legal --

18           THE COURT:  Right.  But my point, Mr. Chandra, is

19   this:  This is far afield.  And I agree with Ms. Richardson,

20   that is irrelevant, or I should say is not relevant.  And so

21   I'm going to sustain the objection to the last question and

22   answer because, you know, with her work in the field and

23   whatnot, she could still, you know, I think, get to the same

24   place that you're trying to get to without establishing what

25   she knows about State -- the adequacy of State funding of, you

1    know, education throughout the State.  I mean, it's been an

2    ongoing battle and ongoing issue.  There have been

3    numerous -- even with that case, there have been numerous

4    Supreme Court cases, as you know, that address that issue.  And

5    I don't want -- I don't want to chase red herrings.

6            MR. CHANDRA:  That's fair, Your Honor.  If I could get

7    a little bit of guidance, though, just because -- I agree with

8    the Court that that's really not where I was headed with it.

9            THE COURT:  Okay.

10           MR. CHANDRA:  But what I wanted to be able to do is

11   see if she has personal knowledge to ward off future objections

12   as we get to the Senate Factors, about her knowledge, then, of

13   racial disparities in the educational system and what impact

14   those might have.  So that was really the only reason, was a

15   foundational question for her policy work and knowledge, not

16   for the substance of the answer, at all.

17           MS. RICHARDSON:  Your Honor, may I respond?

18           THE COURT:  Yes, please.

19           MS. RICHARDSON:  In addition to the relevance

20   objection, I also think we're starting to get into areas where

21   she would be giving opinions that are outside the scope of a

22   lay opinion.  She has not been designated as an expert in this

23   case.

24           MR. CHANDRA:  It's all based on her personal knowledge

25   and familiarity with the issues.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 98 of 296 PAGEID #: 1418
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/03/16 Page: 98 of 296 PAGEID #: 29766

Vol. 6 - 98

```
 1          THE COURT:  Let's get to her personal knowledge and
 2   familiarity.  But I don't want to be so circuitous in doing so.
 3   Let's get the record in, because she does have some rich
 4   experiences and she is familiar -- she could be familiar from
 5   committees that she served on, from -- it could be a whole host
 6   of things.  I don't know.
 7          MR. CHANDRA:  That wasn't the answer I was fishing
 8   for.
 9          THE COURT:  I understand.  But, you know, craft your
10   questions so you can get the answers that you need.  But I just
11   don't want us to go circuitously.
12          MR. CHANDRA:  Absolutely.
13          THE COURT:  Thank you.
14     (The following proceedings were had in open court.)
15   BY MR. CHANDRA:
16   Q.   Senator Turner --
17          THE COURT:  Please continue, Mr. Chandra.
18          MR. CHANDRA:  Thank you, Your Honor.
19   BY MR. CHANDRA:
20   Q.   Senator Turner, from your work on educational policy
21   issues in the General Assembly, did you become familiar with
22   information concerning disparities by race in education in
23   Ohio?
24   A.   Yes.
25   Q.   And what sorts of information do you recall with respect
```

Vol. 6 – 99

1    to that topic?

2       A.    Only in reference to my time with Senator McLin, or just

3    in general?

4       Q.    Right now, we're just focused on your time with Senator

5    McLin.

6       A.    I mean, there was always, for the Senator's perspective,

7    always this epic battle to ensure that students in urban

8    centers, in particular, had the requisite investments in

9    education.

10      Q.    And, then, what information did you -- what knowledge

11   did you gain about the extent to which there are racial

12   disparities in education in Ohio?

13      A.    That in urban areas, typically, in terms of tax levies,

14   in particular, if the State is not taking up -- really, what I

15   gained from that experience, and also the DeRolph experience,

16   is that, if the State is not paying for the lion's share of the

17   educational pursuits of young people in the State and the other

18   portion of it falls to local governments, students, depending

19   on where they live and how property rich their communities are,

20   may not receive the same type of funding.

21           And, so, in urban areas like a Dayton, Ohio, or like

22   Cleveland, where I live, we typically find that students who

23   live in those areas do not have the same level of funding.  And

24   that was really the crux of the DeRolph decision.

25      Q.    Beyond funding, however, did you also gain information

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 100 of 296 PAGEID #: 1420
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/21 Page: 100 of 296 PAGEID #: 23789

Vol. 6 — 100

1    about educational outcomes, by race, across the State?

2    A.   Yes.   Yes.   There is an achievement gap, you know, in

3    the State and in this country.   The gap is very wide between

4    African Americans and white students, and also Latino students,

5    as well.   And that gap is still in full effect, unfortunately,

6    today.

7    Q.   And from your policy study, did you draw a conclusion

8    about the factors that led to that achievement gap?

9          MS. RICHARDSON:   Objection.

10         THE COURT:   Sustained.

11         MS. RICHARDSON:   Thank you, Your Honor.

12   BY MR. CHANDRA:

13   Q.   From your policy study, did you formulate a belief about

14   the factors that led to that racial achievement gap?

15         MS. RICHARDSON:   Objection.   Same objection, Your

16   Honor.

17         THE COURT:   Ms. Turner, did you undertake any specific

18   policy studies relating to what Mr. Chandra has denominated the

19   achievement gap?

20         THE WITNESS:   Well, Your Honor, in my readings, not

21   just as an legislative aide, but as an educator, and really

22   working at a time when Governor Strickland was the governor, he

23   had a program to try to close the achievement gap, which then

24   Senator Prentiss, when she was no longer in the Senate, led

25   that.   And it showed very clearly, statistically, that there is

Vol. 6 – 101

1    an academic-achievement gap between African Americans, Latinos,

2    and whites, and especially among African-American males, and

3    that if the State did not make the requisite investment

4    necessary to get those students who live in poorer and browner

5    communities up-to-speed, that we limit their ability to be able

6    to graduate from high school.  And that is just the

7    foundational point.

8        And in the 21st Century, a high school diploma is no

9    longer even a starting point.  You really need folks to have

10   high skills or higher degrees.

11       So, absolutely, Your Honor, both my time as a

12   legislative aide, but also my time as being a state senator in

13   the State, as well.

14       THE COURT:  All right.  All right.  I think that the

15   Senator's testimony is adequate, Mr. Chandra.  I don't think

16   that there is additional information that the Court will need.

17   And consistent with our discussion at side-bar, I would think

18   that you can move on to another area of inquiry.

19       MR. CHANDRA:  Thank you, Your Honor.

20       MS. RICHARDSON:  Thank you, Your Honor.

21   BY MR. CHANDRA:

22   Q.   So we were progressing through your career.  And

23   I -- Now I can't remember where we left off, because I asked

24   you to jump back.  I think we were back at your City of

25   Cleveland time.

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

1    A.   Yes.

2    Q.   What sorts of policy issues, or legislative issues, did

3    you work on during your time as both a legislative aide and

4    then as an executive assistant to the mayor on behalf of the

5    administration?

6    A.   Well, my time in the City, most of those bills were

7    functional.  So, you know, the mayor's Department of Service,

8    for example, might introduce a bill to the Council to have them

9    fund salt, to pay for salt or snow removal or garbage pickup,

10   those kinds of things.  So it was very functional to the

11   everyday duties and needs to run the City, more than -- Unlike

12   being on the State level, where it's more policy and

13   academically or intellectually driven, on the City level, not

14   so much.

15   Q.   Okay.  So, were you with the City of Cleveland and with

16   Mayor White at the time that there was mayoral control over the

17   schools?

18   A.   No.  That was before my time.

19   Q.   Before your time?

20   A.   Yes.

21   Q.   And were you involved in any legislative work related to

22   the school district?

23   A.   Not that I can recall.

24   Q.   Okay.  It's possible?

25   A.   It is possible, because, the time that the mayor came to

1   do that, I might have been a legislative service, either fellow

2   or -- but I didn't, directly, have any involvement in that

3   change.

4       Q.   Okay.  Anything further you want to share with the Court

5   regarding your time working for the City?

6       A.   No, nothing I can think of right now.

7       Q.   Okay.  Then, let's move forward and progress through

8   your career, please.

9       A.   Okay.  So, after --

10      Q.   How many years did you work for the city?

11      A.   Well, I worked for Mayor White for almost three years.

12  And then he didn't seek reelection.  And, from there, I ran for

13  my very first office in 2001.  I ran to become City

14  Councilwoman of Ward 1.

15          Before that -- Let me backtrack for the Court.

16          I did spend some time working for the Cleveland

17  Metropolitan School District as the Director of Government

18  Affairs.  I lobbied on behalf of Cleveland's children, right

19  here, with the Legislature.  And then I ran for Cleveland City

20  Council in 2001.  I was not successful in that run.

21      Q.   Before we come to that, I want to pause on your time

22  working as a lobbyist for the school district?

23      A.   Okay.

24      Q.   On what sorts of issues did you lobby for the school

25  district?

1    A.    Funding is always the number-one issue, trying to find

2    the resources to educate Cleveland's children.  Overwhelmingly,

3    the children that attend the Cleveland public schools are

4    African American.  And most of them are poor.  Most of the

5    students in the Cleveland Municipal School District qualify for

6    free lunch, which says a lot about the lack, or, the

7    socioeconomic challenges of the children in that school

8    district.  So, it was always mostly about money.

9    Q.    Okay.  And how many -- what period of time did you do

10   that?

11   A.    This was in the early 2000s.

12   Q.    Okay.  Do you remember the length of time?

13   A.    I was at the school district maybe two or three years,

14   as well.  And, at the same time, I was also an adjunct

15   professor at Cuyahoga Community College at the time, as well.

16   Q.    Teaching what at that time?

17   A.    Teaching African-American history and African-American

18   women's history.

19   Q.    Okay.  Did your curriculum include civil rights history?

20   A.    It does.  I mean, when we talk about African-American

21   history, of course, we definitely cover civil rights.

22   Q.    And did it include curriculum on history of

23   discrimination against African Americans?

24   A.    We talked about -- It wasn't a specific topic, but we

25   definitely talked about discrimination against African

1   Americans and the epic battle of African Americans throughout

2   their history in this country to fight for equality and

3   justice; that the African-American struggle in the United

4   States of America has been one of liberation.

5      Q.   Did your curriculum also --

6           MS. RICHARDSON:  Objection, Your Honor.

7           THE COURT:  I'm sorry?

8           MS. RICHARDSON:  Objection, Your Honor.

9           THE COURT:  Basis?

10          MS. RICHARDSON:  Opinion testimony.

11          THE COURT:  Overruled.

12          MS. RICHARDSON:  Thank you, Your Honor.

13   BY MR. CHANDRA:

14      Q.   And, finally, did your curriculum include information

15   about voting rights history?

16      A.   Oh, absolutely.

17      Q.   Okay.  So, you said you ran for Ward 1 council seat?

18      A.   Yes.

19      Q.   What year was that?

20      A.   That was 2001.  I was not successful.  And then I ran

21   again, four years later, in 2005.  And I was successful that

22   year.  And I became the first African-American woman to

23   represent Ward 1, which is the Lee-Harvard area in the City of

24   Cleveland.

25      Q.   Could you please describe the demographics of your

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-6 Filed 09/12/20 Page: 106 of 296 PAGEID #: 1426
Case: 2:00-cv-03893-MLW-TFA Doc#: 660 Filed 04/06/18 Page: 106 of 296 PAGEID #: 29429

Vol. 6 – 106

1    district, if you know?

2        A.    Yes.   Ward 1 is overwhelmingly African American.   It's

3    also the community that I grew up in, primarily because my

4    grandparents purchased a home in that community.   It is a place

5    in the City of Cleveland where African Americans actually

6    migrated to and were not relegated to.   And so it was -- it was

7    a very robust middle-class community when I was growing up; not

8    so much now; but, growing up, it was.

9        Q.    And, so, please provide more details about -- let's

10   start with the educational profile of the district, if you

11   know.

12       A.    I don't know the exact educational profile of Ward 1 at

13   this time, but I can just say that, you know, based -- my

14   grandparents, that older generation that were fighting very,

15   very hard for people like me and subsequent generations to have

16   better opportunities, Ward 1 certainly had a higher level of

17   education when it comes to African-American communities, as

18   compared to a Hough, which is a poorer community.   But African

19   Americans in the City of Cleveland, right now, overall, one in

20   five -- only one in five have a high school diploma.   And that

21   is really the bare minimum that you can have in a

22   knowledge-based economy.   And 36 percent of Clevelanders live

23   in poverty in the City of Cleveland.

24          So Ward 1, although it, for the African-American

25   community, may have higher levels and be a little more robust,

Vol. 6 – 107

1  overall the City of Cleveland, which is about 56-percent

2  African American, is suffering -- African American, is

3  suffering.

4         And, by the way, just this year, alone, the City of

5  Cleveland was named the most distressed city in the nation.

6  And it was based on income -- you know, the gap between the

7  poor and wealthy.

8  Q.   Within Ward --

9         MS. RICHARDSON:  Objection, Your Honor.

10        THE COURT:  Basis?

11        MS. RICHARDSON:  Opinion testimony.

12        THE COURT:  This witness has not testified as an

13  opinion witness.  But, given her work and her experience, this

14  would be within the kin of her knowledge base.  So your

15  objection is overruled.

16        MS. RICHARDSON:  Thank you, Your Honor.

17  BY MR. CHANDRA:

18  Q.   Within Ward 1, has there been a change, to your

19  knowledge, in the educational profile over the course of the

20  time that you've been residing within Ward 1?

21  A.   Yes, absolutely, there has been a change.  I mean, the

22  poverty that has overtaken the City of Cleveland certainly has

23  affected Ward 1.  And as generations like my grandmother, the

24  baby-boom generation, transitions, you find a younger,

25  less-educated generation has moved into Ward 1.  So Ward 1 is

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 108 of 296 PAGEID #: 1428
Case: 2:20-cv-03843-MLM-TPA Doc #: 660 Filed: 04/06/28 Page: 109 of 380 PAGEID #: 23428

Vol. 6 – 108

1  feeling the same effects that some of our neighbors in a Hough

2  may feel, as well.  There is definitely a demographic -- a

3  socioeconomic shift in Ward 1, as it is in the entire City of

4  Cleveland.

5     Q.   And, so, my question was with respect to education.  How

6  about with respect to the economy within Ward 1?  And let's say

7  with incomes.

8     A.   I don't have the exact data for that.  What I can say is

9  what I said before.  In terms of the levels of poverty, 36

10  percent of the people who live in the City of Cleveland are

11  impacted by poverty.  I can say that, as a councilwoman in Ward

12  1, I used to do these activities monthly called *Walks With*

13  *Turner.*  And I would walk the community with some elders just

14  to knock on doors and, you know, check on neighbors, and

15  especially streets that were plagued by either drug activity --

16  A lot of elders in the community had lots of fear.  They didn't

17  sit out on their porches like they once did when I was growing

18  up.  And I thought it was part of my duty to make sure that the

19  residents of Ward 1 knew that they were not alone.

20        And so you would see the devastation in the communities.

21  You would see, you know, piles up of trash and garbage and the

22  kind of deterioration that you just -- I didn't see when I was

23  growing up.  Those things are very symbolic of a lack of

24  resources in a community.  So I did see that type of activity

25  going on in Ward 1 when I was the councilwoman.

1    Q.   Have you seen a change in Ward 1 with respect -- since

2    the time you've been living there, with respect to the issue of

3    health?

4    A.    In one particular community -- one particular community

5    in my ward, there was always concerns about smelling gases.

6    This was in the Seville -- Miles-Seville community within

7    Ward 1.  And so there was also always concerns -- and I had to

8    bring out East Ohio Gas on a number of occasions to have

9    community meetings -- that, somehow, that particular community

10   was being plagued with environmental racism.

11   Q.   I'm going to -- Actually, let's continue your career

12   progression.

13        So, as a Ward 1 councilwoman, what sorts of policy

14   issues were you advocating?

15   A.    Pretty much, you know, the same that I was doing as a

16   legislative, or, somebody in the mayor's cabinet.  But then,

17   now, I'm front seat, up front.  I pushed a lot of policies that

18   had to do with curfew.  I was very concerned about young people

19   being out on the streets at night at times where their parents

20   were not watching them or some responsible adult; just really

21   wanted to make sure that our young people were safe.  But in

22   terms of the everyday policy positions, in terms of pushing,

23   again, it's still -- most of the policy that ran the City came,

24   still came, from the administrative side of the House.

25   Q.   Okay.  And if you could continue your career progression

1   from there.

2     A.    In the latter part of 2008, I was approached to compete

3   for an appointment to the Ohio Senate.  At that time, Senator

4   Lance Mason had been tapped by Governor Strickland to become a

5   judge.  And so that left a vacancy.  So I did compete.  And the

6   only group that had to make that decision -- There was about

7   two years left on then-Senator Mason's term -- was the Democrat

8   caucus.  So, I competed among other State reps and others who

9   wanted that position.  And I was selected, unanimously, by the

10  Senate Democrat caucus.  They were the only ones who had to

11  make that decision because it was a two-year -- two years left.

12  So I was sworn in to become a State senator in Two

13  Thousand -- the latter part of 2008.  And then I ran for the

14  seat in 2010.

15    Q.    And can you -- What district number was that?

16    A.    District 25.

17    Q.    Would you describe the demographics of the district to

18  the Court, please?

19    A.    When I started before redistricting, mainly, I had only

20  Cuyahoga County.  My district, District 25, has cities in it

21  such as Cleveland; but I also had cities like Beachwood and

22  Shaker.  So you could go from a very wealthy community to

23  communities that were in poverty.  So, we spanned the gamut.

24         Demographically, in terms of race, my district was not a

25  majority of African American.  It was pretty much mixed.  It

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 111 of 296 PAGEID #: 1431
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 111 of 296 PAGEID #: 24731

Vol. 6 - 111

1    was a solidly mixed community.

2        Q.    Was the percentage of African-American constituents

3    higher than in the general population in Ohio, to your

4    knowledge?

5        A.    To my knowledge, that would be true.

6        Q.    Okay.  And what other communities were in your district,

7    and did it change over time?

8        A.    Large Jewish population in my district, having

9    Beachwood.  And, yes, it did change, over time, after

10   redistricting.  Then District 25 started to engulf portions of

11   Lake County.  So, it had Painesville, portions of that county,

12   that had, you know, higher numbers of Latino populations as

13   well.

14       Q.    And, then, was East Cleveland in your district at any

15   time?

16       A.    Yes, absolutely.  East Cleveland was in my district

17   before I left the Legislature.  It had not been previously.

18   But, yes, East Cleveland was in the district.

19       Q.    Would you describe for the Court, please, the

20   demographics of East Cleveland?

21       A.    East Cleveland is an overwhelmingly majority African

22   American.  They have about a little less than 25,000

23   constituents.  High poverty rates.  There was a study conducted

24   by Case Western Reserve in 2012 that showed that the reading

25   level -- that 79 percent of the residents that live in East

Vol. 6 – 112

1 Cleveland are functionally illiterate.

2    MS. RICHARDSON:  Objection.

3    THE COURT:  Basis?

4    MS. RICHARDSON:  Hearsay.  Also opinion testimony.

5 Outside the scope of personal knowledge.

6    THE COURT:  I'm going to overrule the objection in

7 part and sustain it in part.  The portion that references the

8 Case Western study will be stricken on the basis of inadequate

9 foundation.

10   Mr. Chandra, you have -- I'm going to give you an

11 opportunity to lay the foundation for the Senator's reliance on

12 this study, but I will note that I don't know that it is

13 dispositive, given the voting issues in this case, unless you

14 can somehow tie it up.  So --

15    MR. CHANDRA:  I hope to connect later, Your Honor.

16    THE COURT:  All right.  Your objection is sustained in

17 part and overruled in part.

18    MS. RICHARDSON:  Thank you, Your Honor.

19 BY MR. CHANDRA:

20 Q. Senator, how did you become -- Well, let me back up.

21   So, did you have direct dealings with East Cleveland

22 constituents?

23 A. Yes, I did.  I participated in community meetings.  I

24 even met with the mayor.  East Cleveland was in dire economic

25 straits.  It still is.  And the Auditor of the State -- and I

Vol. 6 - 113

1   might not be getting his ruling exactly right; but, in other

2   words, East Cleveland was not able to meet its obligations, its

3   fiduciary obligations, to the citizens of that city.

4       BY MR. CHANDRA:

5       Q.   You mean a financial --

6       A.   Financial.  I'm sorry.  Yes, financial.

7           So, yes.  I had meetings with the mayor of that city.  I

8   had meetings with the council president of that city, because

9   it pained me and concerned me greatly.  I mean, what can we do

10  to increase the financials of the city?  What could I do, as a

11  State senator, to help them out?

12          A lot of that had to do with concentrations of poverty.

13  And, so, when you have people living in a city and their

14  employment level is not high, their education level is not

15  high, then they don't have the same capacity or ability to pay

16  into the tax structure.  And so, really, you're managing

17  poverty.  And that was a very real concern for the city of East

18  Cleveland.  The State took notice of that.  The auditor of the

19  State took notice of that, and it was pretty devastating.  It

20  still is right now.

21      Q.   Did you interact directly with East Cleveland residents?

22      A.   Yes.  We've had many meetings.  I mean, East Cleveland

23  residents, you know, concerned about whether or not, when they

24  dial 911, will the police come; will EMS come; will fire come;

25  will my snow be removed; will my garbage be picked up.  Those

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 114 of 296 PAGEID #: 1434
Case: 2:00-cv-03893-NLM-TPAJ Doc #: 6660 Filed: 04/06/20 Page: 114 of 380 PAGEID #: 23732

Vol. 6 – 114

 1   were very real, quality-of-life concerns for the residents of

 2   the city.

 3       Q.   Did you have the opportunity to interact with East

 4   Cleveland residents to the point where you were able to assess

 5   their functional literacy?

 6       A.   No.

 7       Q.   Okay.  So did you undertake any sort of effort to gather

 8   information about literacy issues among your constituents?

 9       A.    Not literacy issues, per se; but, in terms of being a

10   State senator and fighting very hard for educational funding

11   and hearing from superintendents, not just in East Cleveland

12   but throughout my district, that the State of Ohio was

13   abdicating its responsibility to solve DeRolph, those are the

14   kinds of issues that I -- that I dealt with as a State senator.

15       Q.   Okay.  Did you at some point come across any studies of

16   literacy in East Cleveland?

17       A.   Yes, I did come across studies, not just in East

18   Cleveland, but in the City of Cleveland, as well.  There was a

19   Case Western Reserve study.  Yes.

20       Q.   This is what I want to break into pieces here.

21       A.   Okay.

22       Q.   How did you come across a Case Western Reserve study?

23       A.   In my -- In my research -- again, I am an educator, too.

24   I mean, I was not just a State senator.  I am an educator.  And

25   I am a professor at a university that accepts all people.  And

1    the campus that I teach at is also the campus that I graduated

2    from.  It is nestled in the heart of the City of Cleveland,

3    surrounded by projects, by CMHA projects, by a community that

4    is socially and economically depressed.

5        So, for me, my passion has always been that of

6    education.  So I've always taken that very personally, because

7    I am a first-generation college graduate.  And I know the power

8    of education to help somebody change the trajectory of their

9    lives, to become -- I consider myself a cycle-breaker.  And my

10   son was a second-generation college graduate.  So, for me,

11   education was always important.  Those are the issues that I

12   care about the most.

13       So, when I'm talking to superintendents, when I'm

14   talking to residents who worry about whether or not their child

15   is going to be educated just based on the fact that they might

16   not be property rich, when you talk about pass-the-book

17   budgeting, which the State of Ohio was very much involved in,

18   when you cut education to a city, funding to education for

19   cities like Cleveland and East Cleveland and then that city has

20   to depend on residents to pass an operating levy to get those

21   funds but at the same time those residents are poor and they're

22   just trying to make ends meet, or you have an older population,

23   a more seasoned population, and those elders are on a fixed

24   income and, even though they want to very much help Mrs. Jones'

25   son or daughter get a great education, they're also worried

1   about whether or not they can pay their mortgage or feed

2   themselves, and so any increase to their taxes causes a burden,

3   and who suffers?  The black and brown and poor white children

4   in those communities.

5      Q.   Senator, I appreciate that, but what I --

6          MS. RICHARDSON:  Objection, Your Honor.

7          THE COURT:  Side-bar.

8      (Thereupon, the following proceeding was held at side-bar.)

9          MS. RICHARDSON:  Your Honor, this is extensive

10  background.  And I don't mean to interrupt, but we've gone far

11  afield from what's relevant to this case.  And to the extent

12  where this is all leading is, again, to get into studies and

13  other documents, those would be hearsay.  And, as a lay

14  witness, she cannot introduce those.

15         THE COURT:  Go ahead, Mr. Chandra.

16         MR. CHANDRA:  I was not trying to elicit that

17  narrative response, Your Honor.  I was simply trying to

18  establish that she had come across this study, what was she

19  aware of regarding it, and its methodology.  Did she --

20         THE COURT:  How are you going to get that testimony

21  in?  Under which exception under 803 does it come in, or does

22  it come in under 804?

23         MR. CHANDRA:  I think it might come under both, Your

24  Honor.  But what I'm trying to do is establish some foundation

25  for her knowledge and experience about the literacy issues

1   involving her constituents, the statistics.  And then that

2   connects to the Senate Factors.

3        THE COURT:  I really think that you have gone far

4   afield in trying to present whatever background you think you

5   need to establish for her to testify about the Senate Factors.

6   It's almost as though you focused -- you're trying to prove

7   functional illiteracy in her district.  That's not this case.

8   That's not what this case is about.  This case is not about

9   functional illiteracy.  This case is about whether 205 and 216

10  are constitutional.  Right?

11       MR. CHANDRA:  If I may, Your Honor, one of our claims

12  is a Voting Rights Act literacy claim.  And, so, under the

13  Senate Factors, one of the things we want her to be able to

14  testify about is her perception, then, about the impact of 205

15  and 216 on her particular constituency about which she has

16  personal knowledge.

17       THE COURT:  Yes.  Yes.  Yes.  I agree.  But, you know,

18  as a fact finder, I think that you have laid a sufficient

19  foundation without going into, you know, various studies,

20  because -- I don't want you to take a road -- you know, you

21  have to prove the validity of the studies, and Ms. Richardson

22  has to prove the invalidity of the studies to get back to

23  whether the education component of the Voting Rights Act has

24  somehow been vitiated.

25       So, take it from the finder of fact that, you know,

1    you've laid a sufficient foundation.  And let's not forget the

2    broader issues as you do your drill-down.  Okay?

3           MR. CHANDRA:  I'll keep moving forward.  Thank you,

4    Your Honor.

5       (The following proceedings were had in open court.)

6           THE COURT:  Please continue, Mr. Chandra.

7           MR. CHANDRA:  Thank you, Your Honor.

8    BY MR. CHANDRA:

9    Q.   So, just wrapping up your professional background, you

10   served as a State senator from what year to what year?

11   A.   From 2008 through 2014.  I didn't run for my second

12   term, which was up in 2014.  Instead, I ran for Secretary of

13   State.

14   Q.   Okay.  And what were the years of that campaign?

15   A.   2014.

16   Q.   And during your time as a State senator, did you

17   interact, directly, with constituents from your district?

18   A.   Yes.

19   Q.   Including African-American constituents?

20   A.   Yes.

21   Q.   And, during your statewide run, did you interact with

22   voters around the State?

23   A.   Yes.

24   Q.   Did that include African-American voters?

25   A.   Yes.

1    Q.    Okay.  And what -- how are you currently employed?

2    A.    I am a tenured professor at Cuyahoga Community College.

3    Q.    And teaching, there, what subject?

4    A.    I teach African-American history, African-American

5    women, U.S. history, and urban studies.

6    Q.    And do you do anything else, professionally, right now?

7    A.    I took a leave of absence from the Ohio Democratic Party

8    --

9    Q.    And what was --

10   A.    -- as the Chair of Party Engagement.

11   Q.    Okay.  All right.  I'd like to turn your attention

12   now -- Is there anything more about your professional

13   background we left out?

14   A.    No.

15   Q.    All right.  I'd like to turn your attention now to

16   several factors.  And I'm going to ask you questions about

17   each.

18         First, based upon your experience, are you aware of a

19   history of official discrimination that has touched the rights

20   of minority citizens in Ohio to register, vote, or otherwise

21   participate in the democratic process?

22   A.    Absolutely.

23         MS. RICHARDSON:  Objection.

24         THE COURT:  Overruled.

25         MS. RICHARDSON:  Thank you, Your Honor.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 120 of 296 PAGEID #: 1440
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/06/10 Page: 120 of 296 PAGEID #: 23720

Vol. 6 – 120

1      THE WITNESS:  Yes.

2    BY THE COURT:

3    Q.   Could you please describe what that history of which you

4    are aware is?

5    A.   From my personal experience, the history that I am aware

6    of, in 20 -- in 2006, *Boustani vs. Husted,* in the Legislature

7    at that time, a legislation was passed to give poll-workers the

8    authority --

9    Q.   Legislation?

10   A.   Or -- yes, was passed to give poll-workers the ability

11   to question the citizenship of those who would go and vote.  If

12   it was determined that that person was a naturalized citizen, a

13   poll-worker could demand that that person show their paperwork

14   before they could vote.

15      Just, you know, boggles my mind.  For me, in the

16   legislature, myself, just firsthand seeing countless numbers of

17   voter suppression bills pass --

18   Q.   Before you move on, let me ask a followup question about

19   the statute you just described?

20   A.   Yes.

21   Q.   Who was the Speaker of the House, if you know, at the

22   time that that statute was signed into law?

23   A.   The Speaker of the House at that time was Jon Husted,

24   who is the current Secretary of State.

25   Q.   Okay.  And do you have knowledge of what happened with

Vol. 6 - 121

1    that statute eventually?

2      A.    Eventually -- I mean, through courts --

3            MS. RICHARDSON:  Objection.  I apologize.  Objection,

4    Your Honor.

5            THE COURT:  To the question of whether she has

6    knowledge of what happened to the statute?

7            MS. RICHARDSON:  May I request a side-bar, Your Honor.

8            THE COURT:  Yes.

9       (Thereupon, the following proceeding was held at side-bar.)

10           MS. RICHARDSON:  Your Honor, I object to the line of

11   questioning about a statute that is not at issue in this case

12   and has nothing to do with the issues.  I thought that

13   prior -- I did not object to the prior question; but if it's

14   clear that we're going to be going down the line and continuing

15   to get into this, I object, generally, on relevance grounds.

16           THE COURT:  What's the relevance, Mr. Chandra?

17           MR. CHANDRA:  So, one of the Senate Factors or Factors

18   under *Thornburg v. Gingles* is a history of discrimination.  And

19   we are going through the witness' understanding of what she

20   believes to be a history of discrimination.

21           The *Boustani* case is a clear example of that where --

22   The statute at issue is a clear example of that.

23   Discrimination against naturalized citizens in voting.  And

24   that -- I mean, again, I don't have very many questions about

25   it, but it's part of what she knows about the history of

1    discrimination.  We're trying to make our record.

2          THE COURT:  Tell me how the statute relates to this,

3    the statute that you are inquiring about.

4          MR. CHANDRA:  Because it's a part of the history of

5    official discrimination by the State of Ohio in voting.  And,

6    so, that history is directly relevant.  Under the Senate

7    Factors, it's one of the things to be considered by the Court.

8    Now, the Court can give it whatever weight it desires, but it

9    is an express thing the courts consider when applying those

10   Gingles factors.

11         MS. RICHARDSON:  This case is not about naturalized

12   citizens or immigration.  First of all, we would, obviously,

13   object to the accusation that there was intentional

14   discrimination.  As we've stated, we object, generally, to

15   legislative intent on the basis that it is not possible to

16   divine the intent of the Legislature from individual people.

17   But, here, we have a situation where we don't even have any

18   evidence --

19         THE COURT:  I've already ruled on the legislative-

20   intent issue.

21         MS. RICHARDSON:  Thank you, Your Honor.

22         THE COURT:  They can provide legislative intent.  I'm

23   just trying to get my head around how the statute that you're

24   referring to plays into it.  I still am at a loss.

25         MR. CHANDRA:  That means I'm failing to explain it,

1    Your Honor.

2          When I look at that first Senate Factor -- and I can

3    bring it to you to look at -- when I look at it, the plain

4    language of that first Senate Factor calls for an analysis of

5    the history of discrimination.  I mean, that's what it

6    requires.  And, so, this witness --

7          THE COURT:  We need a statute that deals with

8    immigration to do so?

9          MR. CHANDRA:  Well, immigration is correlated with

10   race, Your Honor.

11         THE COURT:  Yeah, but --

12         MR. CHANDRA:  There are a few more questions that I

13   can ask this witness that will help make that connection.

14         THE COURT:  You don't think that -- Is your ultimate

15   point that there was discrimination based on race in this case?

16         MR. CHANDRA:  Yes.

17         THE COURT:  And is your goal to establish, by way of

18   foundation, that there is a history of racial discrimination in

19   this country?

20         MR. CHANDRA:  Not even so much in the country, Your

21   Honor.  I'm focused on Ohio.

22         THE COURT:  In Ohio?

23         MR. CHANDRA:  Yes.  Yes, on our defendants.  Yes.

24   And, specifically, the statute was about voting.  And, so,

25   voters would be -- poll-workers were required to ask the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 124 of 296 PAGEID #: 1444
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/04/08 Page: 124 of 386 PAGEID #: 23732

Vol. 6 – 124

 1    citizenship status, or given that discretionary option, which

 2    then, we would contend, would be correlated by race.  They're

 3    not going to ask somebody who looks, you know, Caucasian that

 4    question.  They're going to ask people of color.  The question

 5    gets asked:  Are you a citizen?  That was the first question in

 6    the statute.

 7           The second question required, if you said "yes" -- and

 8    these are voters who are registered already, by the way -- the

 9    second question was:  Native born or naturalized?

10           Now, a guy who looks like me gets asked that question.

11    So now the next question, if you say naturalized, is:  Show me

12    your certificate of naturalization.

13           And you would not get a regular ballot unless you could

14    do that, immediately, on the spot.  The Defendant Secretary of

15    State, Jon Husted, was the Speaker of the House when that was

16    passed.  It's from the last ten years.  And I'm not going back

17    way back in time.  I'm trying to move, from this point forward,

18    to this witness' understanding of the history of discrimination

19    that's within her knowledge.

20           THE COURT:  All right.

21           Go ahead, Ms. Richardson.

22           MS. RICHARDSON:  Your Honor, even just the

23    justification that was given here assumes so many facts that

24    are not in evidence and that this witness would not be able to

25    bring in evidence.  These are highly inflammatory and

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 125 of 296 PAGEID #: 1445
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/28 Page: 125 of 296 PAGEID #: 20755

Vol. 6 - 125

1    prejudicial accusations.  And the statute does not have

2    anything to do with the issues in this case.  It's not a

3    statute issue, and it does not bear on the issues to be

4    decided.  It's highly prejudicial and not of any probative

5    value.

6         THE COURT:  How is it highly prejudicial?

7         MS. RICHARDSON:  Because, based on the description

8    that was just given here, it appears that counsel intends to

9    create an inference that this was motivated by an intent to

10   discriminate.  And there is no basis in the evidence for

11   assuming that.  And, again, these statutes have no bearing on

12   the statutes that are actually being challenged in this case.

13        THE COURT:  You mean you think that he's creating an

14   inference that 205 and 216 were created based on an intent to

15   discriminate?

16        MS. RICHARDSON:  We certainly --

17        THE COURT:  Is that what you're saying?

18        MS. RICHARDSON:  No, Your Honor.  We certainly

19   disagree with that, as well; but that is a claim they have made

20   in this case.

21        THE COURT:  No.  No.  I'm saying, your claim is that's

22   the inference that he's creating?

23        MS. RICHARDSON:  Absolutely, Your Honor.

24        MR. CHANDRA:  One last response, if I may, Your Honor?

25        So, the Court may not be aware that the federal court

1    did strike down the statute as unconstitutional discrimination.

2    That holding was not appealed by the State of Ohio.  And I do

3    not want to suggest to the Court that what we're saying is that

4    this particular statute and what happened with it, taken in

5    isolation, should lead to the immediate conclusion that Senate

6    Bills 205 and 216 therefore display an intent to discriminate.

7         But what I'm saying is, there are nine factors in the

8    Gingles factors.  And the history of discrimination by these

9    defendants is one of them.

10        THE COURT:  I'm going to allow this.

11        I will tell you that it is of very marginal relevance,

12   and probably even of less persuasive value, in the overall

13   scheme of things when you think about the cumulative evidence

14   that we've received.

15        MR. CHANDRA:  Yes.

16        THE COURT:  But I will come back to you, Ms.

17   Richardson, and tell you that it's going to be important, in my

18   view, for you to give me evidence of what was the milieu out of

19   which these two statutes arose, because I'm continuing to hear

20   testimony that there were, you know, no issues from Boards of

21   Elections, that they were doing just fine with the signature

22   and with the way it was before the larger field factors came

23   into play.  And, you know, I have a concern now, from hearing

24   the evidence and from having read all the briefs in this case,

25   that we have a solution looking for a problem, which is of

1  great concern when we have constitutional rights that we're

2  debating, and particularly the right to vote, which to me lies

3  right at the heart of our democracy.  Once you start tampering

4  with the right to vote, the future of democracy, itself, is

5  imperiled.  That's just what I think.

6         MS. RICHARDSON:  Thank you, Your Honor.

7         THE COURT:  But I'm not in your case in chief, but I

8  am going to give you the benefit of a roadmap.

9         MS. RICHARDSON:  Thank you, Your Honor.

10         THE COURT:  And that's kind of like the main stop on

11  the roadmap to me.  I'm going to allow it; but, Mr. Chandra, I

12  beseech you to -- you know, a direct route is not a bad thing.

13  You know.

14         MR. CHANDRA:  Okay.  I'll cover this factor as fast as

15  I can, Your Honor.

16         THE COURT:  Look, I want you to be quick, but not in a

17  hurry.  And, you know, I really think we're going around the

18  elbow to get to the thumb when you can just go more directly.

19  And much of this is surplusage.

20         As I just told Ms. Richardson from her vantage point,

21  I'm telling you that, when I sit down to write this case,

22  ninety percent of what you have just adduced will not be a part

23  of the calculus, because it was -- it's of marginal relevance

24  in the overall scheme of this.  So, you know, with all of the

25  collective wisdom in the room, we should be able to more

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 128 of 296 PAGEID #: 1448
Case: 2:20-cv-03843-MLM-TPA Doc #: 666-1 Filed: 04/08/19 Page: 128 of 296 PAGEID #: 23730

Vol. 6 - 128

 1   narrowly focus this on the issues.

 2        I want both sides to trust your instincts.  Really, both

 3   sides are really very smart lawyers who don't trust their

 4   instincts because -- really, you've taken a shotgun approach

 5   when a more focused approach would be far more effective, you

 6   know.  But, you know, I empathize with you, because you don't

 7   know -- this argument may not succeed, so I'm going to try

 8   every argument imaginable with respect to this point.  And

 9   that's what we've had.  And you're much brighter than that,

10   both sides.

11        MR. CHANDRA:  Your Honor --

12        THE COURT:  No, no further comment necessary.  I just

13   felt constrained to remind everybody that, you know, you trust

14   your instincts and experience so we can get to the heart of

15   these matters, because all of this, the platitudes and whatnot,

16   they're unnecessary.  So --

17        MS. RICHARDSON:  Thank you, Your Honor.

18      (The following proceedings were had in open court.)

19        THE COURT:  Please continue.

20        MR. CHANDRA:  Thank you, Your Honor.

21   BY MR. CHANDRA:

22   Q.   Senator Turner, could you please continue your response

23   with respect to aspects of a history of discrimination in

24   voting that you perceived by the State of Ohio?

25   A.   Yes.  So, in 2008, we know that an overwhelming majority

1    of African-American voters in this state and all across the

2    country were very excited about the prospect of electing the

3    first African-American President to the United States of

4    America.

5         In 2008, in Cuyahoga -- in my county, alone -- and I was

6    there at the Board of Election -- at the Board of Elections,

7    there to see thousands of people, mainly African Americans.

8    But wrapped around the corner of East 30th and Euclid, I saw

9    generations of folks there to cast that ballot.  An

10   overwhelming number of African Americans turned out that year.

11        Since 2008 and *Shelby County vs. Eric Holder,* we have

12   seen an influx of bills be introduced across this country

13   and --

14   Q.   I'm going to focus your attention on Ohio.

15   A.   -- in Ohio to create more barriers for people to be able

16   to come out and exercise their right to vote.  And in my

17   opinion the target has been African Americans, Latinos, poor

18   people, older people, and young people.

19        In Two Thousand -- Well, I want to go, if I

20   could -- 2012, if I could use 2012 as an example, directives

21   were put out by the current Secretary of State, Jon Husted, to

22   take away the last three days of early voting, to take away

23   evening hours where working folks, people who cannot just take

24   off from work, would utilize, African Americans, poor people.

25   Souls to the Polls was impacted as well.  My caucus --

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Vol. 6 - 130

1    Q.    What does that mean?

2    A.    Souls to the Polls is Sunday voting that the

3    African-American community, and everybody -- It's not just

4    African Americans.  Everybody can utilize that Sunday vote, but

5    it was very clear from a cultural perspective that the

6    African-American community overwhelmingly used Souls to the

7    Polls.  And that was churches.  You go to church that morning;

8    and, as a community, you would go and vote.  And we saw that

9    play out in 2008 in Cuyahoga County; across the State, but, in

10   Cuyahoga County, I was there to witness that.

11        In 2012, because of efforts by the General Assembly and

12   the current Secretary of State to take away that kind of

13   access, my caucus did what we call -- we called it the

14   Sleep Out to Vote.  And, so, we slept out all over the State of

15   Ohio, from Cincinnati, to Cleveland, to Dayton, to Youngstown.

16   For me, I slept out on the corner of East 30th and Euclid,

17   where the polling place -- where the Board of Elections is in

18   Cuyahoga County, all night long.  We slept out the day before

19   early voting started because we did not know what the court

20   ruling would be in terms of returning those last three days.

21   And we wanted to alert our constituents that, don't wait, just

22   in case; you've got to get out here; and you've got to vote now

23   because what you have become accustomed to might not

24   necessarily be the reality.

25        That's -- those -- That kind of anxiety that voters had

1   about that -- you know, I had meetings with my constituents.

2   Questions were raised about, I was able to do it in 2008; why

3   can't I do it now in 2012.  The African-American community was

4   -- had a great deal of anxiety at over that.

5       So, thank God, the courts did overturn that.  But we had

6   no idea.  We didn't know whether or not that was going to

7   happen.

8   Q.  Would you please explain, as part of your answer, why is

9   it that you perceive those actions to curtail early voting as

10   part of the history of official discrimination touching the

11   rights of African-American voters?

12   A.  Because --

13       MS. RICHARDSON:  Objection.

14       THE COURT:  Overruled.

15       MS. RICHARDSON:  Thank you, Your Honor.

16       THE WITNESS:  Because the African-American community,

17   generationally, we're amendment citizens.  You know, it took an

18   amendment to the Constitution to give us our citizenship in

19   this country.  The 15th Amendment, you know, gave black men the

20   right to vote; 19th Amendment, women to vote.

21       The African-American community, from generation to

22   generation, understands clearly -- I understand clearly, as a

23   citizen of this State and in this country, that African

24   Americans have had to fight for the fundamental right to vote.

25       And, so, for us, culturally, in my opinion and what I

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 132 of 296 PAGEID #: 1452
Case: 2:20-cv-03843-MLM-TPA Doc #: 660 Filed: 04/06/18 Page: 132 of 380 PAGEID #: 24790

Vol. 6 - 132

1    have been able to witness, that right to vote is so

2    fundamental.  And, so, when you see the pattern of African

3    Americans, in 2008 alone, the African-American voter is 26

4    times more likely to vote early in person, to use those early

5    voting days, to vote on Sunday as a community.

6          That was real.  It was palpable, and there is empirical

7    data to back that up.  So the African-American community

8    understood very clearly that the taking away of Sundays was a

9    direct affront to the very group that utilizes that day the

10   most from a cultural perspective.  And that was African

11   Americans.

12   BY MR. CHANDRA:

13   Q.    Okay.  So are there any other aspects of the history of

14   official discrimination touching the rights of African-American

15   citizens to vote in Ohio that you perceive?

16   A.    Yes.  So, in 2013, about 15 -- could be more -- bills

17   were introduced by my colleagues on the Republican side of the

18   aisle to again thwart access to the ballot box.  It had a

19   disproportionate impact on African Americans, anything from

20   introducing strict voter ID laws, which many African Americans

21   do not have the strict ID's that are necessary -- a lot of poor

22   people don't have the strict ID's necessary -- to the taken

23   away of Golden Week, again, the opportunity in the State of

24   Ohio that voters once had to both register and vote at the same

25   time.

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

1          There are studies that show that people who vote early

2    in the State of Ohio, whether they're poor and white, poor

3    blacks, poor Hispanics, poor people in general, utilize that

4    time because it didn't necessarily require them to take off

5    from work on Election Day, again another push by people who are

6    elected for a living to thwart access to the ballot box in the

7    great State of Ohio.

8          So, that came rapidly.  It was furious in 2013.  We

9    really couldn't keep up with all of the bills that were being

10   either -- both introduced and/or passed in the Legislature.

11          THE COURT:  Just a moment.

12     (Whereupon, there was a brief interruption.)

13          THE COURT:  Please continue, Mr. Chandra.

14          MR. CHANDRA:  Thank you, Your Honor.

15   BY MR. CHANDRA:

16   Q.   And I wanted to see if we could wrap up this area.

17          Any other aspects of the history of official

18   discrimination you believe have affected Ohio's

19   African-Americans citizens in voting?

20   A.   In terms of a climate that was created in the State,

21   that continues.  I mean -- well, I guess we'll get to Senate

22   Bills 205 and 216.  But, in 2012, when African Americans raised

23   concerns and other civil rights groups, like the NAACP and

24   others, church leaders, raised concerns about the stripping

25   away of the Sundays and the evening -- just access to the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 134 of 296 PAGEID #: 1454
Case: 2:00-cv-00893-ALM-TPA Doc #: 660 Filed: 04/08/28 Page: 134 of 396 PAGEID #: 29752

Vol. 6 – 134

1    ballot box, GOP Doug Preisse, who was the leader, the Chairman,

2    of the Franklin County Board at the time, or Chairman of the

3    Republican Party, but a member of the Franklin County Board,

4    made a comment that was very clear that, in the response to the

5    concerns that the African-American community had about --

6            MS. RICHARDSON:  I'm sorry.  Excuse me.

7         Objection, Your Honor.

8            THE COURT:  Sustained.

9            MS. RICHARDSON:  Thank you, Your Honor.

10           THE COURT:  Please rephrase your question, Mr.

11   Chandra.

12     BY MR. CHANDRA:

13     Q.    What other -- What other knowledge do you have remaining

14   of the history of official discrimination by the State of Ohio

15   that touched the rights of minority citizens, specifically

16   African Americans, to vote or otherwise participate in the

17   Democratic process?

18     A.    By the State of Ohio, I mean, just the different bills

19   that were passed and/or proposed created barriers.  It created

20   an environment of confusion.  I mean, on the floor, every

21   single time those bills were -- if they made it to the floor,

22   the ones that did make it to the floor, you know, I expressed

23   my objection to those bills, particularly because of the impact

24   that it would have on the African American --

25     Q.    Aside from Senate Bills 205 and 216, any specific bills

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 135 of 296 PAGEID #: 1455
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/16 Page: 135 of 396 PAGEID #: 23493

Vol. 6 - 135

1   that you want to mention?

2      A.   Well, the taking away of Golden Week.

3      Q.   You did mention that one.  Any others that you haven't

4   mentioned so far?

5      A.   The voter ID law, which, you know, again, stripped voter

6   ID.

7          I'm trying to call to my mind.  There were about 15

8   bills that were introduced at the time.  So, I don't remember

9   all of them off the top of my head.

10     Q.   That's fine.  So let's move on to another Factor.

11     A.   Sure.

12     Q.   Do you have knowledge of the extent to which elections

13  in Ohio are racially polarized?

14     A.   Yes.  Just looking at the voting patterns -- I can use

15  my county as an example -- at the time that we had a county

16  commissioner form of government -- we had three county

17  commissioners -- there was one African-American county

18  commissioner, Peter Lawson Jones, at the time.  And when he

19  would run in Cuyahoga County, he would not get nearly as many

20  votes as his white counterparts running for the same position.

21         In 2006, when on the Democrat side there were -- well,

22  we have five statewide officers.  There were four whites

23  running.  And one African-American woman, Representative

24  Barbara Sykes, from Akron at the time, was running for Auditor.

25     Q.   Is she African American?

1    A.    She is African American, from Akron.  That year, every

2    single Democrat won, except for Representative Barbara Sykes,

3    in the State of Ohio.

4         The State has a problem, a racial problem, in terms of

5    electing African Americans to statewide office.  I ran in 2014,

6    as well.  So, you know, I have some personal experience with

7    that.  But, yes, it is -- it can be very racially polarizing in

8    the State of Ohio, especially for higher offices.

9    Q.    And turning to another Factor, Senator -- and just let

10   me know if this is encompassed in your previous answers -- are

11   you aware of the use of voting practices or procedures that may

12   enhance the opportunity for racial discrimination aside from

13   Senate Bills 205 and 216?

14            MS. RICHARDSON:  Objection.  Leading.

15            MR. CHANDRA:  I can rephrase it, if you'd like, Your

16   Honor.

17            THE COURT:  Overruled.

18            MS. RICHARDSON:  Thank you, Your Honor.

19            THE WITNESS:  Could you repeat the question?

20            MR. CHANDRA:  Sure.  I'll ask the court reporter to

21   read it back.

22            THE COURT:  Ms. Errett, would you read it back,

23   please?

24        (The last question was read by the court reporter.)

25            THE WITNESS:  And it has to be legislative?

Vol. 6 - 137

1    BY MR. CHANDRA:

2    Q.    Any voting practices or procedures.

3    A.    I mean, for -- Well, the Judge will tell me

4    whether -- You know, going back to 2012, when billboards

5    appeared in the African-American community, billboards that

6    said that --

7                 MS. RICHARDSON:  Objection.

8                 THE COURT:  Overruled.  This is not being offered for

9    its truth, but for its effect on the senator.

10               MS. RICHARDSON:  Thank you, Your Honor.

11               THE COURT:  You may complete your answer, Senator.

12               THE WITNESS:  Thank you, Your Honor.

13               You know, in 2012 -- you know, very heated, I mean, from

14   comments made by officials saying that they didn't believe that

15   the process should be contorted to enhance African Americans

16   being able to come out to vote, to billboards appearing in poor

17   neighborhoods in the City of Cleveland -- appearing across the

18   State, but particularly in the City of Cleveland, right up the

19   street from where I teach at Cuyahoga Community College on the

20   Metro Campus.  A billboard appeared right off of Community

21   College Avenue that read that voter fraud is a crime.  It had a

22   big gavel, a judge gavel, punishable by three-and-a-half years

23   in prison, $10,000 fine.

24               I went to that location off of Community College Avenue

25   with Cleveland City Councilwoman Phyllis Cleveland.  And, you

Vol. 6 – 138

1    know, my heart just really skipped beats to see that kind of

2    billboard in a very poor African-American community.

3        Folks from the community started to gather around myself

4    and Councilwoman Cleveland, and people were absolutely

5    outraged.  I was outraged.  The councilwoman was outraged.  And

6    the whole environment was about, why would this happen.

7        Over the course of being an elected official, both in my

8    capacity as a councilwoman and as a State senator, every year,

9    I would get the question from my constituents about whether or

10   not ex-offenders in the State of Ohio had the right to vote.

11       Once ex-offenders have served their time, they can vote

12   in this State.  They may have to re-register, depending on how

13   long they've been gone, but they can vote.  But it just speaks.

14       Every year, there is a fear that this population will

15   not be able to vote.  And, so, to have that kind of billboard,

16   for me, it was voter intimidation:  Felony, voting, put

17   together in a community that is already socially and

18   economically depressed.

19       And people that were there, they were just -- it was

20   just gut-wrenching outrage about what was happening in that

21   community, again feeding on what was already going on in the

22   State at that time, the whole debate about whether or not Souls

23   to the Polls would happen, the last three days would be there.

24   It was this whole electric environment that created more

25   barriers for people to be able to vote, and particularly the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 139 of 296 PAGEID #: 1459
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 139 of 296 PAGEID #: 23439

Vol. 6 - 139

 1    African-American community.

 2         We get about 5,000 ex-offenders returning to the county,

 3    a year, in Cuyahoga County.  So, it was very distressing.

 4      BY MR. CHANDRA:

 5      Q.   Okay.  I'd like to show you what's been marked as

 6    Plaintiffs' Exhibit 1236.

 7              MS. RICHARDSON:  Objection, Your Honor.

 8              THE COURT:  Side-bar.

 9         (Thereupon, the following proceeding was held at side-bar.)

10              THE COURT:  How much more do you have, Mr. Chandra,

11    approximately?

12              MR. CHANDRA:  Depending on the succinctness of the

13    witness' responses, I'm about two-thirds of the way through my

14    outline.

15              THE COURT:  All right.  So we're not going to finish

16    before lunch.

17         All right.  Go ahead, Ms. Richardson.

18              MS. RICHARDSON:  Your Honor, this is hearsay.  It's

19    403.  This is a report that was not put out by any of the

20    defendants in this case or the State.  It has no bearing on the

21    issues here.  There is text underneath the billboard that is

22    also hearsay.  And there is no indication as to who put that

23    text there or where it came from.

24              THE COURT:  I understand.

25              MR. CHANDRA:  I'm actually surprised to hear the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 140 of 296 PAGEID #: 1460
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 140 of 296 PAGEID #: 23790

Vol. 6 - 140

```
 1   witness testifying about this particular billboard with respect

 2   to this Factor, which is about the voting procedures.  And it

 3   may or may not bear on that Factor.  I'm not sure how to

 4   interpret that Factor myself, Your Honor.  But with respect to

 5   one of the Factors that's coming up shortly -- and I can grab

 6   the exact wording for you, but it has to do with any effort at

 7   intimidation or climate type of issues with respect to voting

 8   and race.  And, if I may, can I grab my list?  It's directly

 9   related to that Factor because, when I asked Senator Turner, in

10   preparing her, that question, this is what came to mind.  She

11   personally saw the billboard.

12         THE COURT:  All right.  All right.  I'm going to allow

13   her testimony because, as I said previously, Ms. Richardson,

14   it's not being offered for the truth.  It's being offered to

15   show what effect it had on her and others and, you know, what

16   she perceived.  And so I'm going to keep it in that context

17   and, you know, allow it for that limited purpose.

18         So, your objection is noted, but overruled.  We're going

19   to break now for lunch.  We're going to resume at one o'clock.

20         MS. RICHARDSON:  Thank you, Your Honor.

21         MR. CHANDRA:  Thank you.

22         COURTROOM DEPUTY CLERK:  All rise, please.

23      Court stands in recess until one o'clock.

24      (Recess taken at 12:10 p.m.)

25                             - - -
```

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

```
 1                    Wednesday Afternoon Session

 2                    March 23, 2016

 3                    1:00 p.m.

 4                    - - -

 5         THE COURT:  Mr. Chandra, are you ready to proceed?

 6         MR. CHANDRA:  I am, Your Honor.

 7         THE COURT:  Please proceed.

 8         MR. CHANDRA:  Senator Turner wanted to explain her

 9   need to go to Ballot Board to the Court and see if she could be

10   excused and then come back.

11         THE COURT:  What time do you need to be excused,

12   Senator?

13         THE WITNESS:  Your Honor, I need to be at the Ballot

14   Board, which is at the Statehouse, by 2:30.

15         THE COURT:  All right.  And so you need to leave

16   here -- what? -- around 2:15?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.

19         MR. CHANDRA:  Thank you, Your Honor.

20         THE COURT:  How long would you be gone for?

21         THE WITNESS:  Your Honor, it typically don't last more

22   than 30 minutes.

23         THE COURT:  Okay.  All right.

24      Since we don't have a jury, we can accommodate you

25   easily.
```

Vol. 6 - 142

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Please continue, Mr. Chandra.

3          MR. CHANDRA:  Thank you very much, Your Honor.

4    BY MR. CHANDRA:

5    Q.   Senator Turner, when we left off, you were describing a

6    billboard that you saw.  And I'd like to focus your attention

7    on Plaintiffs' Exhibit 1236.  I'm going to zoom in a little

8    bit.

9          Is this a true and accurate depiction of the billboard

10   that you saw in Cleveland's central neighborhood?

11   A.   Yes.

12   Q.   Okay.  And again, could you read the billboard, please,

13   into the record?

14   A.   On the billboard, it says -- it reads, rather:  "Voter

15   fraud is a felony."

16   Q.   With an exclamation mark?

17   A.   With an exclamation mark.  There is a gavel, also, on

18   the billboard, that appears to be similar to a judge's gavel.

19   Up to three-and-a-half years and a $10,000 fine.

20   Q.   Okay.  And have you already said what you needed to say

21   about your reaction to this?

22   A.   Yes.

23   Q.   Okay.  Did you have discussions about this billboard

24   with members of the community?

25   A.   Yes.

Vol. 6 - 143

1    Q.    And could you tell us about the nature of those

2  discussions?

3    A.    In the discussions with members of the community, and

4  also Councilman Phyllis Cleveland, who was a representative of

5  this community, it was really -- people were very outraged.

6  They were upset.  They didn't know why such a billboard would

7  appear in the African American community.  And, also, it caused

8  some fear.

9         Again, about 5,000 ex-offenders return to Cuyahoga

10  County on a regular basis.  And I've consistently been

11  questioned about whether or not ex-offenders have the right to

12  vote.  So, this kind of conjured up that whole notion that, if

13  I -- if I vote, you know, am I breaking a crime.

14    Q.    Did you try to do anything about the presence of this

15  billboard?

16    A.    Yes, we did.  I worked with Councilwoman Phyllis

17  Cleveland, and also activists in the community, to try to get

18  Clear Channel to remove the billboards.

19    Q.    What is Clear Channel?

20    A.    Clear Channel, they are the owners of the billboards.

21  So they're the company that owns the billboards.  At first,

22  they said they could not, and they would not remove them.  But

23  the pressure from the community -- we continued.

24         And finally, they did remove the billboards from the

25  Cleveland area; and Clear Channel did replace those billboards

1    with words that said "Voting is a right, not a crime."

2    Q.   I may have missed this.  What was the time frame in

3    which the billboard appeared?

4    A.   The time frame was right before the fall 2012

5    presidential election.

6    Q.   Okay.  Okay.  I'd like to move on, please.

7         We have discussed three factors so far.  I'm going to

8    skip what would be considered the fourth, and I'll describe the

9    next one as the fifth factor.

10        Do you have knowledge of the extent to which, based on

11   your experience, members of the African-American community bear

12   the effects of discrimination in such areas as education,

13   employment, and health that hinder their ability to participate

14   effectively in the political process?

15   A.   Yes.  Again, my constituents in the City of Cleveland

16   and Cuyahoga County, in particular, reading levels, you know,

17   are not -- again, 43 percent of residents who live in Cuyahoga

18   County are functionally illiterate.

19        Just to give you an example of that, not being able to

20   read a bus schedule, for example, or not being able to write a

21   simple letter, they are impacted by education, or lack thereof.

22   The socioeconomic status, again, with the City of Cleveland

23   being considered the most distressed city in the nation, and

24   the poverty levels -- socioeconomic status has a lot to do with

25   the quality of life that people have or may not have.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 145 of 296 PAGEID #: 1465
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 145 of 336 PAGEID #: 23453

Vol. 6 — 145

1    Q.    Turning back to your time on Cleveland City Council, did

2    you have interactions with residents that informed your views

3    of these issues?

4    A.    Oh, yes.  On a regular basis, I had monthly meetings in

5    my community.  I did *Walks With Turner*, as I mentioned earlier.

6    So, I was very actively engaged.  And, oftentimes, in the

7    meetings, my constituents would talk about their quality of

8    life.

9         Ward 1 is an aging community.  I believe that our

10   population is older than the population within the City of

11   Cleveland itself.  So a lot of the concerns were from elders

12   about what they could afford and what they could not afford.

13   Q.    Specifically with regard to the comments you made about,

14   and your observations about, functional illiteracy --

15   A.    Yes.

16   Q.    -- did you have any experiences relative to your time as

17   the Ward 1 councilwoman that informed your views about literacy

18   as a problem in your community?

19        MS. RICHARDSON:  Objection.

20        THE COURT:  Overruled.

21        MS. RICHARDSON:  Thank you, Your Honor.

22        THE WITNESS:  Not -- not directly, just -- not

23   directly.

24   BY MR. CHANDRA:

25   Q.    Okay.  And how about as a State senator?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 146 of 296 PAGEID #: 1466
Case: 2:20-cv-03843-MLM-TPA Doc #: 6607 Filed: 04/06/16 Page: 146 of 396 PAGEID #: 23794
Vol. 6 - 146

1    A.    Not directly.

2    Q.    Okay.  Did you, in any of your time in public service in

3    assisting your constituents, did you ever engage with

4    individual constituents with regard to the filling out of

5    government-related forms?

6    A.    No.

7    Q.    Okay.  Did you ever task that responsibility to any

8    members of your staff?

9    A.    No.

10    Q.    Okay.  And, so, from what did you formulate your

11    understanding of the level of literacy within the population

12    that you were engaging?

13    A.    Besides the statistics, in some -- in many of my

14    community meetings, I mean, I had meetings where I would bring

15    in experts -- I'm going to use the Board of Elections for an

16    example -- to have people from the Board of Elections to come

17    in to talk to my constituents about what the rules were, what

18    kind of information they had to fill out.  Lots of times,

19    people needed help filling out those types of forms.

20            MS. RICHARDSON:  Objection.

21            THE COURT:  Basis?

22            MS. RICHARDSON:  Hearsay.

23            THE COURT:  Overruled.

24            MS. RICHARDSON:  Thank you, Your Honor.

25    BY MR. CHANDRA:

1   Q.   Turning your attention now to what I'll call the sixth

2   factor, have you had experience with the use of overt or subtle

3   racial appeals in political campaigns in Ohio?

4   A.   Well, this billboard is one example of that.  And so I

5   won't repeat, you know, what I said.  But, yes.

6   Q.   Have you personally, in running for statewide office,

7   been the target of anything you perceived as an overt or subtle

8   racial appeal in a political campaign?

9   A.   Yes.

10   Q.   Could you please describe the circumstances?  And if

11   you'd talk directly into the microphone, please, I'm having

12   trouble hearing you.

13   A.   Yes.  In my running for Secretary of State, there was an

14   ad put out by the current Secretary of State that had very

15   racial overtones; tried to paint me as a slum landlord.

16        MS. RICHARDSON:  Objection.

17        THE COURT:  Sustained.

18        MS. RICHARDSON:  Thank you, Your Honor.

19   BY MR. CHANDRA:

20   Q.   Could you please, to the best of your recollection,

21   describe the actual content of the mailing that you're

22   describing?  What did it say, to the best of your recollection?

23   A.   Well, it was both a commercial, but also literature that

24   was mailed out to funders that -- Some of those funders, or

25   people who would be donors, gave me a copy of it.  And it

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 148 of 296 PAGEID #: 1468
Case: 2:00-cv-03893-MLM-TPA Doc #: 660 Filed: 04/06/19 Page: 148 of 296 PAGEID #: 29790

Vol. 6 - 148

1    really tried to paint me as somebody --

2    Q.    I'll stop you for a moment.

3    A.    Sorry.  Okay.

4    Q.    I'm not speaking to what it was trying to do.

5    A.    Okay.

6    Q.    I'm asking you to answer only your recollection of the

7    content of -- Let's start with the T.V. advertisement you're

8    talking about, and then we'll turn to the mailer.  What was the

9    content?

10            MS. RICHARDSON:  Objection.  I'm sorry, Your Honor.

11   Objection.  Calls for speculation and hearsay.

12            MR. CHANDRA:  Not for the truth, Your Honor.

13            THE COURT:  Overruled.

14            THE WITNESS:  In the mailer that went out to donors,

15   on the mailing, it had that I was a -- used the term "slum

16   landlord," that term used with the fact -- and my picture was

17   distorted.

18   BY MR. CHANDRA:

19   Q.    In what way?

20   A.    Darker.  You know, so it really fed into the stereotypes

21   about African Americans that some people in society hold.  It

22   turned out not to be true, to the extent that I had to, you

23   know, go to the judge within that housing court to get that

24   judge to make that known on the record.  And my attorney at the

25   time did send that to -- I want to say it was the Republican

1    Party.  But -- yes.

2    Q.   I'm sorry.  What did you mean by "send it to the

3    Republican Party"?

4    A.   I mean to send what the judge had to say about that

5    claim to the Republican Party and to ask them to cease and

6    desist.

7    Q.   And -- I'm sorry.  I may have missed this, but could you

8    tell -- from the face of the mailer that you were provided,

9    what did it state the origin of the mailing was, the disclaimer

10   that --

11   A.   Yes.  I believe the disclaimer had the Republican Party

12   disclaimer on it, to the best of my recollection.

13   Q.   Which one?  Ohio or --

14   A.   Ohio Republican Party, yes.

15   Q.   Okay.  So you've described the mailer.  Anything more to

16   add about that with respect to your response as to why that was

17   an overt or subtle racial appeal in your view?

18   A.   No.

19   Q.   Okay.  And, then, turning now -- I think you said there

20   was a television ad?

21   A.   There was a television ad.  I don't remember the ad

22   totally.

23   Q.   Okay.  Was the comment -- Excuse me.  Was the content

24   regarding this slumlord allegation?

25   A.   Yes.  Yes.

1    Q.   And was a similarly darkened depiction of you --

2    A.   Distorted.

3         MS. RICHARDSON:  Objection.  Leading.

4         THE COURT:  Sustained.  Rephrase.

5    BY MR. CHANDRA:

6    Q.   Was there any depiction of you, or a photograph of you,

7    or video in the ad?

8    A.   Yes, and it was distorted.

9    Q.   In what way?

10   A.   Just visually distorted, did not depict me as I am right

11   now.  There's a distortion to, in my opinion, to exaggerate the

12   fact that I am African American and to tie my ethnicity to the

13   term "slum landlord."

14        MS. RICHARDSON:  Objection.

15        THE COURT:  Basis?

16        MS. RICHARDSON:  Hearsay.

17      May I request a side-bar, Your Honor?

18        THE COURT:  I'm going to sustain the objection.

19        MS. RICHARDSON:  Thank you.

20        MR. CHANDRA:  With respect to the question or the

21   answer, Your Honor?

22        THE COURT:  With respect to the answer.

23        MR. CHANDRA:  Okay.  The entire answer, Your Honor, or

24   a portion of it?

25        THE COURT:  Rephrase your question, Mr. Chandra.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 151 of 296 PAGEID #: 1471
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 151 of 296 PAGEID #: 29753

Vol. 6 - 151

1        MR. CHANDRA:  Sure.

2    BY MR. CHANDRA:

3    Q.    So, you've described the depiction of you as distorted.

4    Without getting into the purpose that you perceived, could you

5    just simply describe for the Court how the depiction was

6    distorted?

7    A.    The picture was dis- --

8        MS. RICHARDSON:  Objection.

9        THE COURT:  Overruled.

10        MS. RICHARDSON:  Thank you, Your Honor.

11        THE WITNESS:  The picture was distorted in that it did

12    not depict me as I am right now, as I appear in this court

13    right now, upstanding; you know, darkened.  The picture and

14    what was said about me really adds to the stereotype about

15    African Americans.

16    BY MR. CHANDRA:

17    Q.    Okay.  I'd like to turn your attention now -- Do you

18    have anything more to add to your answer about the use of overt

19    or subtle racial appeals in Ohio political campaigns?

20        MS. RICHARDSON:  Objection.

21        THE COURT:  Sustained.

22        MS. RICHARDSON:  Thank you, Your Honor.

23    BY MR. CHANDRA:

24    Q.    What other overt or subtle racial appeals in political

25    campaigns in Ohio are you aware of?

Vol. 6 - 152

1    A.    In --

2         MS. RICHARDSON:  Objection.

3         THE COURT:  Sustained.

4         MS. RICHARDSON:  Thank you, Your Honor.

5    BY MR. CHANDRA:

6    Q.    Have you completed your answer regarding the use of

7    overt or subtle racial appeals in Ohio political campaigns?

8    A.    No.

9         MS. RICHARDSON:  Objection.

10        THE COURT:  Sustained.  That calls for a narrative.

11   Mr. Chandra.  I've given you a roadmap.  And the Senator would

12   be an excellent witness to follow that roadmap.  You just have

13   to take her down that particular roadmap, Mr. Chandra, without

14   leading.

15        And let's allow relevancy to be the test.  And let's

16   start with that which is most relevant to the issues in this

17   case and veer away from that which is least.

18        MR. CHANDRA:  May I have a side-bar, Your Honor?

19        THE COURT:  Yes, you may.

20     (Thereupon, the following proceeding was held at side-bar.)

21        THE COURT:  Mr. Chandra, I'm trying really hard to get

22   you to focus on just have the witness testify about the stuff.

23        If I told you that I'm giving you 30 minutes, end of

24   story, I don't care what happens, if you can't get it out in 30

25   minutes, you're toast, that would change the nature of your

Vol. 6 - 153

1   questioning.  But I have resisted the Gwinn model, even though

2   he's one of my closest friends.

3         MR. CHANDRA:  She clerked for him.

4         THE COURT:  He is a great jurist, as far as I'm

5   concerned.  But, Mr. Chandra, most of the morning -- What I'm

6   going to have to do is to try to go out and just aggregate that

7   which is most relevant from that which is at the margins.  And

8   I shouldn't have to do that.  No fact finder should have to

9   wonder what you're talking about on direct.

10        So I'm just saying let's get to what you know are the

11  really critical issues and why you called her, because you

12  didn't call her to give me a history lesson about race

13  relations in Cleveland.

14        MR. CHANDRA:  Respectfully, Your Honor, I am

15  sensitive, and hypersensitive to, what the Court wants to focus

16  on as a fact finder.  But for purposes of making our record

17  beyond even the Court, we can't control the fact that the

18  Supreme Court gave us these Gingles factors.  And this is our

19  only witness who will fully address it.

20        THE COURT:  I understand that.  Mr. Chandra, I

21  understand that.  And I understand the background that you have

22  to get.  But, as much as any witness, we've existed around the

23  periphery.  I really want to get to the substance because

24  this -- this has been so peripheral, that it's peripheral even

25  to the Gingles factors.  That's what I'm trying to tell you.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 154 of 296 PAGEID #: 1474
Case: 2:06-cv-00896-ALM-TPA Doc #: 660 Filed: 04/06/20 Page: 154 of 399 PAGEID #: 29762

Vol. 6 - 154

1    Get to them.  Identify the factors.  Ask her what

2    supports the factors and keep moving.  If you want to go into

3    the Senate Factors, identify the factors, keep moving.  Just

4    identify them as if they were a headnote.  And then take that

5    headnote and develop the evidence.  But this -- this is

6    not -- we're really not getting there.

7         MR. CHANDRA:  Your Honor, that was the question.  That

8    was, specifically, Gingles Factor Seven, the way I phrased it:

9    Is there anything more to your response on an overt or subtle

10   racial --

11        THE COURT:  No, that was not -- You see, you are

12   taking it out of context, because what that was was an

13   invitation to provide a narrative.  So, now, that much, I do

14   know.  So be more focused.  And, you know, you're skillful.

15   You're very skillful, and certainly skillful enough to be

16   focused without leading.  So let's --

17        MR. CHANDRA:  I'll move on to the next factor.  I have

18   two more factors left.

19        THE COURT:  Well, get to them.  I don't mind -- what I

20   mind is that we are -- it's almost a theoretical exercise in

21   the factors, as opposed to an evidentiary exercise in the

22   factors.  I want to know the evidence which supports the

23   factors, not what, theoretically, could support the factors.

24        All right.

25        MS. RICHARDSON:  Thank you, Your Honor.

```
1          (The following proceedings were had in open court.)

2     BY MR. CHANDRA:

3     Q.   Senator Turner, I'd like to turn your attention now to

4     what I'll characterize as the eighth factor.  Have you, in your

5     experience, perceived a significant lack of responsiveness by

6     Ohio elected officials to the particularized needs of African

7     American community members?

8     A.   Yes.

9              MS. RICHARDSON:  Objection.

10             THE COURT:  Overruled.

11             MS. RICHARDSON:  Thank you, Your Honor.

12    BY MR. CHANDRA:

13    Q.   And if you could please go through, first, without

14    explanation, and identify as many of those as possible.

15    A.   In the realm of the education budget, and also the

16    general budget, in particular monies to the local government

17    funds.

18    Q.   Now if you could please explain that part of your

19    answer.

20    A.   For the education budget itself, beginning with Governor

21    Kasich's first budget, funds were cut to K-through-12

22    education.  And I know that I mentioned earlier in terms of

23    what impacts that has on communities that are already poor.

24    Particularly, African American communities where we see that

25    there are lower literacy rates and graduation completion rates
```

1   in those communities, it further exacerbates the quality of

2   life.  And so, again, it forces local communities to have to

3   try to supplement those funds by passing levies, which is very

4   hard when a community is already being suffocated by poverty.

5   Q.   Now, turning specifically to the issue of voting, have

6   you perceived any significant lack of responsiveness by the

7   relevant elected officials to the particularized needs of the

8   African American community?

9   A.   Yes.

10   Q.   And could you please explain that answer now?

11        MS. RICHARDSON:  Objection.

12        THE COURT:  Overruled.

13        MS. RICHARDSON:  Your Honor, may I make just a

14   continuing objection to the opinion testimony?

15        THE COURT:  Well, typically, I would allow that.  But

16   what you consider opinion testimony I consider fact testimony.

17   And it may be easier, for record preservation purposes, for you

18   simply to interpose your objection.

19        The Court certainly understands your need to protect

20   your record and to object to any testimony that you believe is

21   not in keeping with the rules of evidence.

22        So, your objection is duly noted, but overruled.

23        MS. RICHARDSON:  Thank you, Your Honor.

24        THE COURT:  You may answer, Senator.

25        THE WITNESS:  Thank you, Your Honor.  The scaling back

1    of access to the ballot box, whether it's through taking away

2    early voting dates and times, introducing legislation that will

3    cause voters to have to jump through more hurdles and hoops

4    that have, again, a disparate impact on the African-American

5    community.

6         I was in the Legislature at the time that all of those

7    things were happening, whether it was happening through

8    directive by the Secretary of State or whether it was happening

9    through the passing through statute -- through law.

10   BY MR. CHANDRA:

11   Q.   How long has Secretary of State Husted been the

12   Secretary of State?

13   A.   Since 2010.

14   Q.   During that time, has Secretary of State Husted, to your

15   knowledge, turned to you or other members of the Ohio Black

16   Legislative Caucus to ask for input regarding his directives or

17   other voting procedures that he has adopted?

18        MS. RICHARDSON:  Objection.

19        THE COURT:  Sustained.

20        MS. RICHARDSON:  Thank you, Your Honor.

21   BY MR. CHANDRA:

22   Q.   Since your time as a State senator, has Secretary of

23   State Husted reached out to you, personally, and asked for your

24   input with regard to voting procedures or directives as they

25   might affect your African-American constituents?

1    A.    No.

2    Q.    And to the best of your knowledge, has Secretary of

3    State Husted reached out just asking what you know -- to

4    members of the Ohio Black Legislative Caucus for that same type

5    of input?

6    A.    To the best of my knowledge, no.

7    Q.    Does that surprise you in any way?

8         MS. RICHARDSON:  Objection.

9         THE COURT:  Sustained.

10        MS. RICHARDSON:  Thank you, Your Honor.

11   BY MR. CHANDRA:

12   Q.    Have you written correspondence to the Secretary of

13   State regarding voting issues and procedures that would affect,

14   in your perception, your African-American constituents?

15   A.    Yes.

16   Q.    And has Secretary of State Husted ever responded

17   positively to you concerning your input?

18   A.    No.

19   Q.    Okay.  I would like to turn your attention, now, to what

20   I'll call the ninth factor.  And I'm going to break the

21   question into two parts, first with regard to Senate Bill 205,

22   and then with regard to Senate Bill 216.

23   A.    Okay.

24   Q.    Are you familiar with Senate Bill 205?

25   A.    Yes.

1    Q.   And what does Senate Bill 205 do, to the best of your

2    recollection?

3    A.   To the best of my recollection, it changes the absentee

4    ballot procedures in the State of Ohio.  It makes the five

5    fields on that -- on the envelope, itself, it moves from being

6    sufficient to forcing the voter to be -- to have sufficiency

7    and completeness.

8    Q.   And do you have any knowledge of whether Senate Bill

9    205 -- I'm sorry.  Was your answer complete?

10   A.   And I just wanted to also add, about the bill, that it

11   prohibits Boards of Elections from mailing out unsolicited

12   absentee ballot applications to their constituents.  And it

13   also prohibits the Secretary of State from doing the same

14   unless the General Assembly gives -- provides the budget to do

15   so.  Unless the General Assembly approves it, the Secretary of

16   State now no longer can mail out unsolicited absentee ballot

17   applications.

18   Q.   Okay.  Are you aware of anything in Senate Bill 205 that

19   addresses the issue of poll-worker assistance to voters?

20   A.   Yes.  Poll-workers can no longer assist folks that are

21   filling out those applications in the way -- or that ballot.

22   They could previously do that, before Senate Bill 205.  But now

23   they cannot unless that person makes it known that they have

24   some type of handicap and they need help.

25   Q.   Okay.  Were you in the State Senate at the time Senate

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 160 of 296 PAGEID #: 1480
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/19 Page: 160 of 296 PAGEID #: 23460

Vol. 6 - 160

1   Bill 205 was introduced?

2     A.   Yes, I was.

3     Q.   And what was your understanding, gained from your time

4   in the State Senate, about the policy underlying the need for,

5   or even advisability, of Senate Bill 205?

6     A.   On the floor of the Senate, which our floor proceedings

7   are recorded, there was robust debate about the merits of this

8   bill.  My Republican colleagues, to my mind, did not give any

9   justification as to why they want to change the way things

10  were.

11        Making those five fields -- First of all, if someone

12  gets an absentee ballot, that means that they were already

13  entitled to that ballot.  So I could not understand why the

14  General Assembly wanted to force voters to jump through

15  additional hoops.

16        And to -- again, even if the Board of Elections could

17  identify -- and I argued this on the floor of the Senate:  That

18  even if the Board of Elections could determine that that person

19  is exactly who they say they are, if the five fields are not

20  completely filled out -- remember, we went from the burden of

21  just having to complete that to -- being complete or

22  sufficient -- we moved from sufficiency to sufficiency and

23  completeness.  So now the Legislature moved the burden from the

24  poll-worker to the voter.

25        And in my floor speech, I distinctly remember that we're

Vol. 6 - 161

1   moving to a tale of two cities, if you will:  One that gives

2   access to voters and one that takes it away, and that it would

3   have -- doing something like this would have a disproportionate

4   impact on the African-American community and poor people and

5   would disenfranchise folks, in violation, in my opinion, of the

6   Civil Rights Act of 1964.

7       Q.   Did you hear any proponent -- Well, first of all, who is

8   the sponsor of Senate Bill 205?  Do you recall?

9       A.   I believe the sponsor was Senator Coley, but I might not

10  be -- It was either Senator Coley or Senator Burke.  But I

11  might not be correct.

12      Q.   Okay.  Did you hear, you know, either sponsor or other

13  proponents' rationales being offered for why Senate Bill 205

14  was necessary?

15      A.   Yes.  I listened intently.  The rationale was

16  uniformity, which, you know, to my mind, made no sense.  And I

17  argued that in my floor speech, again, which was recorded, that

18  uniformity for government is not the same -- you know, that we

19  shouldn't be fighting for uniformity for government at the

20  expense of the voter.

21      Q.   Senator -- I'm sorry -- which aspect of Senate Bill 205

22  were you hearing, because you described different pieces of it?

23  Which aspect of Senate Bill 205 were you hearing this

24  uniformity argument on?

25      A.   When -- I think it was Senator Coley -- when he got up

1  to give his speech, he just talked about -- just, overall, he

2  made a general, to my recollection, just a general statement

3  about how this bill was good government and that it would

4  provide uniformity within the voting space.

5     Q.    Did he provide -- Did he offer voter fraud as a

6  potential rationale for it?

7     A.    Not that I can recall.  In his statements, not that I

8  can recall.

9     Q.    Did you hear from any of the proponents for Senate Bill

10 205 a rationale about the need to stop voter fraud?

11    A.    Not that I recall.  Not that I can recall.

12    Q.    Were you present for the Senate floor speeches on Senate

13 Bill 205?

14    A.    I was present for the floor speeches for the entirety of

15 Senate Bill 205.

16    Q.    Have you heard any proponents -- Well, I don't want to

17 repeat myself.

18        Have you heard any rationale from anyone supporting

19 Senate Bill 205 of voter fraud being a reason that that bill

20 needed to be adopted?

21    A.    Rationale from any of the proponents of Senate Bill 205?

22    Q.    Yes.

23    A.    Not that I recall.  I mean, the testimony that I

24 remember was really about uniformity and how this would be good

25 for the government.  The argument that I made on the floor was

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 163 of 296 PAGEID #: 1483
Case: 2:20-cv-03843-MHW-KAJ Doc #: 660 Filed: 04/08/20 Page: 163 of 396 PAGEID #: 21731

Vol. 6 – 163

 1    that this puts at peril and it puts up another barrier for

 2    people who are trying to vote; that it's a solution in search

 3    of a problem that does not exist; that the voters in my

 4    district, and also in the State of Ohio, have come to be able

 5    to have poll-workers help them; and, also, if the Board of

 6    Elections can identify -- and, again, it's important to know

 7    that these are people who are getting a ballot that the Board

 8    of Elections already determined that they are who they say they

 9    are; and then to have their ballot somehow thrown out for

10    immaterial reasons did not make a lot of sense to me.

11         I remember Senator Tavares on the floor, you know,

12    reading partial, partial responses from the President of the

13    NAACP of Ohio about how this would have a negative impact on

14    the African-American community.  I remember Senator Shirley

15    Smith, who was the ranking minority member for the Senate

16    Democratic caucus on the committee that heard the bill, talking

17    about being very weary of the fact that all of these anti-voter

18    bills were coming at us fast and furious.

19         All of those things were debated on the floor, but my

20    colleagues who had sponsored the bill and my Republican

21    colleagues never gave legitimate justification for why more

22    barriers should be put up.

23    Q.   Senator, when you articulated your objections as you've

24    just described them to Senate Bill 205 --

25    A.   Yes.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 164 of 296 PAGEID #: 1484
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/20 Page: 164 of 296 PAGEID #: 23472

Vol. 6 — 164

1    Q.    -- what replies did you hear from the proponents in

2    response to those specific objections?

3              MS. RICHARDSON:  Objection.

4              THE COURT:  Overruled.

5              MS. RICHARDSON:  Thank you, Your Honor.

6              THE WITNESS:  They pretty much ignored what I had to

7    say and my other colleagues on the Democratic side had to say

8    about the negative impact that it would have on the

9    African-American community and the poor communities, and they

10   passed the bill.

11   BY MR. CHANDRA:

12   Q.    But what about specifically in response to the point

13   about the voters have already been qualified by the Boards of

14   Elections before they got the ballot?  What was the response to

15   that factual observation?

16   A.    No response whatsoever.

17   Q.    Okay.  I'd like to turn your attention, now, to Senate

18   Bill 216.  Were you in the State Senate when Senate Bill 216

19   was introduced?

20   A.    Yes, I was.

21   Q.    Do you recall who the sponsor was at this time?

22   A.    I believe the sponsor was Senator Bill Seitz.

23   Q.    All right.  And what rationale did you hear offered by

24   Senator Seitz for the need for Senate Bill 216?  Before we do

25   that, could you describe, for the record, to your

Vol. 6 – 165

1  understanding, what does Senate Bill 216 accomplish?

2     A.    To my understanding, Senate Bill 216 deals with

3  provisional ballots and how -- again, the five fields and

4  changing, really, the standard within those five fields.

5     Q.    And please explain that a little bit more.

6     A.    That making those five fields, that, again, they have to

7  be sufficient and complete and that if the person that is

8  filling out that absentee or -- excuse me, not

9  absentee -- provisional ballot does not have all of those five

10  fields exactly, so if they make a mistake with the birthdate

11  where today's date is or that kind of immaterial mistake, that

12  their provisional ballot could be thrown out. And also the

13  bill lessened the cure period, if my memory serves me

14  correctly, from ten days, I think, to seven.

15     Q.    Okay. And was there anything in the bill with regard to

16  poll-worker assistance again?

17     A.    Yes, that poll-workers could not assist voters in

18  filling this out. Prior to the passage of that bill,

19  poll-workers did the majority of the work in filling out the

20  fields because they are the experts. They are the ones that

21  are trained to help the voter through this process to make

22  sure, as much as possible, that that provisional ballot can be

23  counted. And that changed under that bill.

24      And, if I can add, the U.S. Elections Assistance

25  Commission ranked the State of Ohio within the top ten states

1   who reject provisional ballots.  So, even before that, we were

2   not doing a great job in the State of Ohio of making sure that

3   we counted as many provisional ballots as we could so that we

4   didn't disenfranchise people.  And, then, to have this kind of

5   bill pass the Legislature further exacerbated that in terms of

6   the throwing out of ballots of voters that should legitimately

7   be counted.

8      Q.   Is that commission you just mentioned a federal agency?

9      A.   Yes, it is.

10      Q.   So did you articulate concerns about the bill --

11   Actually, let me -- before we get to that, I asked you only

12   about Senator Seitz.

13      A.   Yes.

14      Q.   From other proponents of Senate Bill 216, what

15   rationales did you hear for why Senate Bill 216 was necessary?

16      A.   I didn't hear any good rationale.  And I did --

17      Q.   No.  I'm sorry.  Not good.  What rationales did you

18   hear?

19      A.   I heard that -- I'm trying to think.  I think Senator

20   Seitz just said, again, in terms of streamlining the process

21   for elections officials, that this bill needed to pass, and

22   something about lawsuits, too, some lawsuits being filed

23   against the State for those fields.

24      Q.   With respect to what?  What do you mean "with the

25   fields"?  With poll-workers' assistance?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 167 of 296 PAGEID #: 1487
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 167 of 396 PAGEID #: 29785

Vol. 6 – 167

 1   A.   Yes, that if the poll-worker was the one assisting the

 2   voter, that it would open the State up to lawsuits.  Those two

 3   things, I remember distinctly.

 4   Q.   And, so, anything else in terms of rationales that you

 5   heard from proponents?

 6   A.   No, not that I can recall.

 7   Q.   Turning now to your reaction, did you engage in the

 8   floor debate on the bill?

 9   A.   Yes, I did.

10   Q.   And what did you say about Senate Bill 216 that

11   you -- Well, let's leave it at that.

12   A.   I responded in the same way I did to Senate Bill 205 and

13   every other bill, to my mind, that was introduced by my

14   Republican colleagues to make it harder for people to vote:

15   That this bill would have a disenfranchising effect on African

16   Americans and poor people.  To throw out, again, their ballot

17   for immaterial reasons, even if the Board of Elections can

18   determine that the person is who they say they are, is an

19   affront to the fundamental right to vote.  I argued that on the

20   floor.  My Democratic colleagues argued that on the floor, but

21   it fell to deaf ears.  The bill passed.

22   Q.   What response did you hear from the proponents of Senate

23   Bill 216 to the arguments that you made against the bill?  What

24   was the reply?

25   A.   I don't remember exact words; but, certainly, they

1  just -- they didn't agree with us, and they passed the bill.  I

2  mean, they gave no -- they didn't even respond to what we were

3  raising.  The issues that we were raising fell on deaf ears,

4  actually.

5    Q.   What about specifically with regard to the issue of

6  poll-worker assistance?

7    A.   I mean, they -- they didn't see any reason why

8  poll-workers should -- I don't remember exactly what they said,

9  but the end result was this:  They passed the bill.  And the

10  bill is very clear that poll-workers can no longer assist

11  people in filling out those provisional ballots.  And it causes

12  harm to voters.

13    Q.   All right.  Did your colleague, Senator Skindell,

14  comment on Senate Bill 216 during the floor debate?

15    A.   Yes, Senator Skindell did comment --

16         MS. RICHARDSON:  Objection.

17         THE COURT:  Objection as to whether Senator Skindell

18  commented --

19         MS. RICHARDSON:  Your Honor --

20         THE COURT:  -- or you're anticipating the next

21  question as to what he said?

22         MS. RICHARDSON:  I believe the witness was just about

23  to explain what was said.  And you're right.  That was the

24  basis for my objection.

25         THE COURT:  All right.

```
1              Senator, I want you to answer only the question asked,
2     which was whether Senator Skindell commented on Senate Bill 216
3     during the floor debate.
4              THE WITNESS:  Yes, Your Honor.
5              THE COURT:  All right.
6     BY MR. CHANDRA:
7     Q.   And were you present for his comments?
8     A.   Yes, I was.
9     Q.   And what did you hear from Senator Skindell?
10             MS. RICHARDSON:  Objection.
11             THE COURT:  Overruled.
12             MS. RICHARDSON:  Thank you, Your Honor.
13             THE WITNESS:  I heard Senator Skindell, first of all,
14    say that the bill should be defeated.  His major concern about
15    the bill was the five fields -- and he held up the document
16    that a voter would have to fill out -- and how difficult it
17    would be to read.  And, particularly, the difficulty as it
18    relates to older people, he raised that objection very
19    strongly.
20    BY MR. CHANDRA:
21    Q.   And was there any response from the proponents of Senate
22    Bill 216 to his specific objections?
23    A.   No.
24    Q.   You mentioned, among your objections, the reduction of
25    the cure period post-election?
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 170 of 296 PAGEID #: 1490
Case: 2:00-cv-03893-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 170 of 296 PAGEID #: 23470

Vol. 6 – 170

1    A.    Yes.

2    Q.    Do you have a view that you've developed, based on your

3    experience with your constituents and voters, about the impact

4    of that reduced cure period, let's say on voters of Ward 1?

5    A.    Ward 1?  Yes, I do.  Some poorer people tend to be very

6    transient.  And I experienced that both as a councilwoman, you

7    know, sending out mailings and having those mailings returned.

8    The person, in terms of palpably more socially and economically

9    challenged, tend to move a lot.  So, when it relates to that

10   particular bill, to reduce the cure period, if somebody has

11   moved, they may not get the letter to let them know that they

12   need to go down to their Board of Elections to correct an error

13   in time before the cure period is over.

14        So, again, that further disenfranchises people in the

15   African-American community and people who are poor.

16        MR. CHANDRA:  Okay.  Your Honor, may I have a moment

17   to confer?

18        THE COURT:  Yes, you may.

19        MR. CHANDRA:  Thank you.

20        (Brief pause in the proceedings.)

21        MR. CHANDRA:  Okay.

22        Your Honor, at this time, I would like to move into

23   evidence Plaintiffs' Exhibit 1236.

24        THE COURT:  Any objection?

25        MS. RICHARDSON:  Yes, Your Honor.  The objections

1   previously noted based on hearsay, 403, and relevance.

2           THE COURT:  For the reasons previously given, I'm

3   going to overrule it.  1236 will be received.

4           MS. RICHARDSON:  Thank you, Your Honor.

5           MR. CHANDRA:  And I have no further questions.  Thank

6   you, Your Honor.

7           THE COURT:  Thank you.

8       If you will take the exhibit off the Elmo, Mr. Chandra.

9       Ms. Richardson, cross-examination?

10          MS. RICHARDSON:  Thank you, Your Honor.

11          THE COURT:  And you need to break at what time to get

12  over to the Statehouse?

13          THE WITNESS:  By 2:15, Your Honor.

14          THE COURT:  All right.

15          THE WITNESS:  Thank you.

16          THE COURT:  Ms. Richardson, you have until

17  approximately 2:15 and then the Senator has to leave.  She can

18  return if you're not done with your cross.

19          MS. RICHARDSON:  Thank you, Your Honor.

20                          CROSS-EXAMINATION

21    BY MS. RICHARDSON:

22    Q.   Good afternoon, Senator Turner.

23    A.   Good afternoon.

24    Q.   My name is Ryan Richardson, and I represent the

25  defendants in this case, the State of Ohio and Ohio Secretary

Vol. 6 - 172

1   of State Jon Husted.

2        Senator Turner, I believe you testified on direct that

3   you were previously the head of engagement for the Ohio

4   Democratic Party; is that correct?

5   A.   Yes.

6   Q.   And what did that position involve in terms of

7   responsibilities?

8   A.   Going out working with constituents, working with people

9   who had a desire to run for office.  So, really, traveling

10   around the State and doing community engagement, primarily.

11   Q.   As part of your role in that position, were you familiar

12   with the Ohio Democratic Party's Twitter account?

13   A.   I knew we had a Twitter account, yes.

14   Q.   And are you aware that the Twitter handle for that

15   account is @OHDems?

16   A.   Yes.

17   Q.   Thank you.  Senator Turner, Mr. Chandra asked you a

18   number of questions about the passage of Senate Bill 216.  Do

19   you recall that?

20   A.   Yes.

21   Q.   And based on your testimony today, is it fair to say

22   that you followed that bill's progress through the General

23   Assembly?

24   A.   Yes, but I was not on the committee that, you know,

25   deliberated in a deep way the bill.  But, yes.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 173 of 296 PAGEID #: 1493
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 173 of 296 PAGEID #: 24781

Vol. 6 - 173

 1    Q.    And were you aware of the committee hearings related to

 2    this bill?

 3    A.    I knew that they were happening, yes.

 4    Q.    So you were aware that there were actually four

 5    different committee hearings for Senate Bill 205 in the Senate;

 6    is that correct?

 7    A.    I'm not aware of how many.  I knew that the bill had

 8    hearings, yes.

 9    Q.    And are you aware that there were four committee

10    hearings for Senate Bill 216 in the Senate?

11    A.    No.

12    Q.    And you provided some testimony about -- well, actually,

13    let's strike that.

14          You provided some testimony about what you recalled in

15    terms of the various reasons that were offered by the bill's

16    sponsor.  Do you recall that?

17    A.    Yes.

18    Q.    I'm going to show you what's been marked as Plaintiffs'

19    Exhibit 1308.

20          MR. CHANDRA:  Your Honor, objection.  May we have a

21    side-bar, please?

22       (Thereupon, the following proceeding was held at side-bar.)

23          THE COURT:  Go ahead.

24          MR. CHANDRA:  Just briefly, Your Honor, I just wanted

25    to object only for the limited purposes of any reasons for the

Vol. 6 - 174

1    statute being potentially viewed as hearsay, because it's

2    coming out through this witness in terms of impact-on-the-

3    speaker impeachment.  I'm fine with all of that.  But I just

4    didn't want the Court to be accepting this evidence to the

5    extent that it's hearsay as to the rationales.

6           MS. RICHARDSON:  May I respond, Your Honor?

7           THE COURT:  Yes, you may.

8           MS. RICHARDSON:  Your Honor, this is evidence of the

9    context within which this bill was raised.  And this witness,

10   in particular, as well as others, has been testifying about the

11   reasons in opposition.

12          THE COURT:  Yes.  Your objection is noted, but

13   overruled.

14          MR. CHANDRA:  Okay.

15          MS. RICHARDSON:  Thank you, Your Honor.

16      (The following proceedings were had in open court.)

17          THE COURT:  Ms. Richardson, please continue.

18          MS. RICHARDSON:  Thank you, Your Honor.

19   BY MS. RICHARDSON:

20   Q.   Senator Turner, are you familiar with this document?

21   A.   No.

22   Q.   If you take a look at the top of the document, does it

23   state that this is sponsor testimony?

24   A.   Yes.

25   Q.   And which Senator drafted this?  Can you tell that from

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 175 of 296 PAGEID #: 1495
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/12 Page: 175 of 296 PAGEID #: 23793

Vol. 6 – 175

1    this document?

2    A.   Yes.

3    Q.   And who was that?

4    A.   Senator Bill Seitz.

5    Q.   And I believe you testified earlier that, to your

6    recollection, Senator Seitz was the sponsor of Senate Bill 216;

7    is that correct?

8    A.   Yes.

9    Q.   And you were asked some questions on direct about

10   whether Senator Seitz offered reasons for introducing this law.

11   Do you recall that?

12   A.   Yes.

13       MR. CHANDRA:   Objection.   Mischaracterizes the

14   question.

15       THE COURT:   Overruled.

16   BY MS. RICHARDSON:

17   Q.   Senator, if you take a look at the first full paragraph

18   on that page, it states there:  "The primary purposes of this

19   legislation are to reduce the number of provisional ballots

20   cast in the State of Ohio and to codify the United States Sixth

21   Circuit Court of Appeals' decision pertaining to provisional

22   ballots as a result of two cases, *SEIU v. Husted* and *NEOCH v.*

23   *Husted*."

24       Did I read that correctly?

25   A.   Yes.

1    Q.    And I'm going to ask you to take a look a little bit

2    further down on the same page.  If you look at the last full

3    sentence in the paragraph that begins with "First" --

4    A.    Yes.

5    Q.    -- and that sentence states:  "Consequently, Senate Bill

6    216 requires right church/wrong pew ballots to be counted

7    unless a poll-worker completes a form that explains the

8    poll-worker acted appropriately."

9         Did I read that correctly?

10   A.    Yes.

11   Q.    The last paragraph that begins on this first page starts

12   with the word "Third."  Do you see that?

13   A.    Yes.

14   Q.    And it states there:  "Third, Senate Bill 216 simplifies

15   the reasons for voting provisionally in an election."  Is that

16   correct?

17   A.    Yes.

18   Q.    And it states:  "I worked on this issue with then-

19   Secretary of State Jennifer Brunner, and we came to an ..."

20        If you'll look at the next page, it follows there:

21   "... came to an agreement that this portion of the law needed

22   to be simplified."

23        Did I read that correctly?

24   A.    Yes.

25   Q.    If you look at the paragraph that begins with the word

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 177 of 296 PAGEID #: 1497
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 177 of 296 PAGEID #: 23783

Vol. 6 - 177

1    "Sixth" -- and I'll ask you to just take a look at the

2    paragraph.   In that paragraph, it's describing the aspect of

3    216 that requires the voter, not the poll-worker, to complete

4    the ballot affirmation statement.   Is that correct?

5      A.   This is in the fifth, the one that starts with "Fifth"?

6      Q.   The one that starts with "Sixth."

7      A.   Oh, Sixth.

8           Yes.

9      Q.   And the last sentence in that paragraph states:  "This

10    will decrease the chances of incorrect information being

11    recorded on the voter's behalf which could potentially lead to

12    more litigation or their ballot not being counted."

13          Did I read that correctly?

14     A.   Yes.

15     Q.   Thank you, Senator.

16          And you're aware that there were proponents of Senate

17    Bill 216, correct?

18     A.   Well, I'm not in committee.  I'm not in that committee.

19     Q.   But you followed the bill as it went through the General

20    Assembly, I believe you testified earlier, correct?

21     A.   Yes, somewhat.

22     Q.   I'm going to show you what's been marked as Plaintiffs'

23    Exhibit 1294.  And at the top of this page, it states:

24    "Interested Party Testimony, Ohio Association of Election

25    Officials, SB 216."

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 178 of 296 PAGEID #: 1498
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/10 Page: 178 of 296 PAGEID #: 29796

Vol. 6 — 178

1      Did I read that correctly?

2    A.    Yes.

3    Q.    And are you familiar with the Ohio Association of

4    Election Officials?

5    A.    Yes.

6    Q.    And what is that organization, to your understanding?

7    A.    To my understanding, it is an organization of elections

8    administrators in the State of Ohio from both parties.

9    Q.    Thank you, Senator.  And if you take --

10         MR. CHANDRA:  Your Honor, objection to the use of the

11   exhibit for the same reasons stated in chambers.

12         THE COURT:  Overruled.

13   BY MS. RICHARDSON:

14   Q.    And, Senator, if I can direct you to the second full

15   paragraph that begins with "OAEO," it states there:  "OAEO is

16   generally supportive of the direction that SB 216 takes us,

17   chiefly, establishing consistency in the casting of provisional

18   ballots in Ohio."

19         Did I read that correctly?

20   A.    Yes.

21   Q.    And it continues:  "Court cases have established, and

22   our experiences have confirmed, that standardizing forms and

23   processes for casting provisional ballots will lead to greater

24   ease for voters and election administrators and accuracy in our

25   election results."

Vol. 6 – 179

1      Do you see that?

2  A.   I do.

3  Q.   I'm going to ask you to take a look at the second page

4  of this same document.  And I'll ask you to take a look at the

5  paragraph that begins with "Based on court cases."

6  A.   Yes.

7  Q.   And I'll give you a moment.  I'm not going to read the

8  entire paragraph.

9  A.   Okay.

10 Q.   Have you had an opportunity to read that paragraph?

11 A.   Yes.

12 Q.   And is that paragraph describing the fields that are

13 required on the provisional ballot affirmation statement?

14 A.   Yes.

15 Q.   And if you take a look at the second full sentence in

16 that paragraph that begins with "However," it states there:

17 "However, the exclusion of date of birth and current address

18 actually has the unintended consequence of causing the

19 rejection of some provisional ballots."

20      Did I read that correctly?

21 A.   Yes.

22 Q.   And, in that sentence, they're referring to the fact

23 that excluding date of birth and current address from the

24 fields that the voter is required to complete.  Is that your

25 understanding of this paragraph?

 1           MR. CHANDRA:  Objection, Your Honor.

 2           THE COURT:  Basis?

 3           MR. CHANDRA:  Competency of the witness to testify as

 4   to the intent of the author.

 5           THE COURT:  Overruled.

 6    BY MS. RICHARDSON:

 7    Q.    Thank you, Senator.  You may answer.

 8    A.    Yes.

 9    Q.    And it goes on:  "In particular, without a voter's

10   current address, a provisional ballot that has been cast

11   because the voter has moved but has not updated their address

12   with the Board is likely to be rejected."

13           Do you see that?

14    A.    Yes.

15    Q.    And it states:  "One solution that the committee might

16   consider to help with this problem would be to require date of

17   birth and current address to be mandatory fields and then allow

18   the 12-B form to double as a voter registration as this Bill

19   currently allows."

20           Did I read that correctly?

21    A.    Yes.

22    Q.    And if you take a look at the last full sentence in that

23   paragraph, it begins with "As is always"?

24    A.    Uh-huh.

25    Q.    "As is always the case with mandatory forms, there is a

1   balance between what we require the voter to fill out with what

2   the election officials actually need to process the ballot.

3   The solution outlined above is one way to strike that balance."

4       Did I read that correctly?

5   A.   Yes.

6   Q.   Senator, I'll ask you now to take a look at the last

7   paragraph on this page.

8   A.   Yes.

9   Q.   And is that paragraph referring to the cure period for

10  provisional ballots?

11  A.   Yes.

12  Q.   Do you have an understanding as to what the cure period

13  is as it relates to provisional ballots?

14  A.   Yes.

15  Q.   What is your understanding?

16  A.   My understanding is that it's the time that is allowed

17  from the time that the Board of Election realizes that there

18  may be some discrepancy and they notify, or attempt to notify,

19  the voter, it's the time period in which the voter can come and

20  make a correction.

21  Q.   And in the last -- the second-to-the-last line of this

22  letter that you can see here on this page, it states:  "The

23  bill as written reduces that time period to three days.  I

24  believe the intent of this provision is to allow Boards of

25  Elections enough time to take that information into

Vol. 6 – 182

1  consideration before beginning ..."  And it continues onto the

2  next page.  We start at the beginning of this page.

3      "... before beginning the official canvass 11 days after

4  the election.  OAEO recognizes that the intention of this

5  provision is admirable, but would suggest that voters begin in

6  seven days to provide this information."

7      Did I read that correctly?

8  A.   Yes.

9  Q.   And it states:  "Practically speaking, Boards are not

10 receiving this information from voters after seven days.  Thus,

11 this change would create the headroom for Boards between days

12 seven and eleven after the election to process this

13 information, while giving voters sufficient time to submit it."

14     Did I read that correctly?

15 A.   Yes.

16     MR. CHANDRA:  Objection, again, to the hearsay nature,

17 Your Honor.

18     THE COURT:  Overruled.

19 BY MS. RICHARDSON:

20 Q.   Do you know whether the law, as it was ultimately

21 passed, provided for seven days as the OAEO recommended?

22 A.   I believe that it did.

23 Q.   Thank you, Senator.

24 A.   Uh-huh.

25 Q.   I'd like you to take a look at one more document with

 1   respect to SB 216.  And is this also interested-party testimony

 2   from the Ohio Association of Election Officials?

 3   A.   Yes.

 4        MR. CHANDRA:  Same objection, Your Honor.

 5        THE COURT:  All right.  Overruled.

 6   BY MS. RICHARDSON:

 7   Q.   And in the first full paragraph, beginning with "OAEO

 8   supports" --

 9   A.   Yes.

10   Q.   -- it states:  "OAEO supports the intent of this

11   legislation, which is to standardize the provisional ballot

12   affirmation envelope and allow it to double as a voter

13   registration form."

14        Did I read that correctly?

15   A.   Yes.

16   Q.   Down at the bottom of this page, it states:  "We are

17   glad the bill allows voters to register to vote as part of the

18   provisional process.  Currently, a provisional voter must

19   complete two separate forms on Election Day ..."  And it

20   continues onto the next page.  "... if they want to update

21   their registration with the Board of Elections.  They must

22   complete the 12-B affirmation form and a separate voter

23   registration form located on the back of the 12-B envelope.

24   Our association worked closely with Senator Seitz and

25   then-Secretary Brunner to resolve this issue."

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 184 of 296 PAGEID #: 1504
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 184 of 396 PAGEID #: 23792

Vol. 6 - 184

1      Do you see that?

2    A.   Yes.

3    Q.   It says:  "Unfortunately, the legislation we arrived at

4    did not become law.  However, we are happy that this concept

5    has been picked up as part of SB 216 and believe this provision

6    is worthy of support."

7         Did I read that correctly?

8    A.   Yes.

9    Q.   If you take a look a little bit further down on that

10   page, the paragraph that begins "In many cases" --

11   A.   Uh-huh.

12   Q.   -- "In many cases where a voter has moved and not

13   updated their registration, having a voter's current address is

14   an essential piece of information in order to count a

15   provisional voter's ballot.  We need to know where a voter

16   currently resides in order to verify that they are voting in

17   the correct precinct.  Absent this information, we may have to

18   unnecessarily reject a ballot due to our lack of ability to

19   confirm this information."

20        Did I read that correctly?

21   A.   Yes.

22   Q.   And then I'm going to ask you to read the first

23   paragraph, or -- sorry -- the last paragraph on this page.  And

24   let me know when you're ready for me to move to the next page.

25   A.   Okay.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 185 of 296 PAGEID #: 1505
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/20 Page: 185 of 296 PAGEID #: 23795

Vol. 6 - 185

1    Q.    And I'll ask you to read through the first full

2    paragraph, there, ending with "Voter registration database."

3    A.    Okay.

4    Q.    And are the paragraphs that I just directed your

5    attention to referring to the date-of-birth requirements,

6    specifically?

7    A.    Yes.

8    Q.    And, in these paragraphs, is the OAEO describing what

9    they call a catch 22 on the date-of-birth requirement?

10   A.    Yes.

11   Q.    And they describe that -- and I'll read it exactly for

12   you so that I don't paraphrase -- the date of birth is an

13   additional piece of identifying information.  However, we see

14   many mistakes made when voters fill out this field.  For this

15   reason, many election officials do not believe it should be a

16   required piece of information.  However, because this

17   information is required for a voter registration form, this

18   puts us in a difficult spot.  Requiring the date of birth could

19   result in mistakes that affect our ability to count votes.  Not

20   requiring it could mean we are not able to update a voter's

21   registration, and they would potentially be forced to vote

22   provisionally in future elections.

23         Did I read that correctly?

24   A.    Well, I can't see the last part, but the first part.

25   Q.    Okay.  Thank you.  Fair enough.  Thank you, Senator.

1    A.    Yes.

2    Q.    So, in the next paragraph, they say:  "Due to this catch

3    22 situation, we worked with the sponsor on an amendment to

4    solve this problem."

5          Correct?

6    A.    Yes.

7    Q.    And it states:  "The amendment in question allows us to

8    do three things.  First, it only requires us to match the day

9    and month of the birthdate.  This will be helpful as voters

10   sometimes write down the current year in this field, as opposed

11   to the year they were born.  Secondly, the amendment exempts

12   people whose birthdate appears as 1-1, 1800, in a statewide

13   voter registration database."

14         And, then, if you take a look, it says:  "The committee

15   heard testimony last week as to the necessity of this change.

16   Finally, the amendment creates a catch-all to allow Boards to

17   count provisional ballots even when the date of birth does not

18   match our database so long as the Board can determine the

19   identity of the voter based on other information provided."

20         Do you see that?

21   A.    Yes.

22   Q.    And do you know whether the bill, as passed, did, in

23   fact, contain the amendment that the AOEO recommended?

24   A.    I'm not sure on this one.

25   Q.    Senator, you also described the circumstances

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 187 of 296 PAGEID #: 1507
Case: 2:00-cv-03893-ALM-TPA Doc #: 660 Filed: 04/06/18 Page: 187 of 296 PAGEID #: 23793

Vol. 6 - 187

1    surrounding the passage of SB 205; is that correct?

2    A.    Yes.

3    Q.    And you are aware that SB 205 also had proponents,

4    correct?

5    A.    If you say so, yes.  I only say that because I wasn't in

6    the committee.  So --

7    Q.    Sure.  And, again, as you testified, you did follow,

8    closely, this bill as it was introduced and considered by the

9    Senate, correct?

10   A.    Correct, but not every single aspect.  So I can't say

11   absolute, absolute that I know that there were proponents,

12   but --

13   Q.    Thank you for that clarification, Senator.

14   A.    Uh-huh.

15   Q.    And I believe you testified that you recalled that

16   Senator Coley was the sponsor of this?

17   A.    Yes.

18   Q.    And I have put on the Elmo what's been marked as

19   Plaintiffs' Exhibit 1287.  Can you tell me what this document

20   is?

21   A.    It appears to be a copy of Senator Coley's testimony in

22   the Government Oversight and Reform Committee.

23        MR. CHANDRA:  Same objection, Your Honor.

24        THE COURT:  Overruled.

25   BY MS. RICHARDSON:

1    Q.    And I'll direct your attention to the third paragraph

2  here that begins with "Whether."

3    A.    Yes.

4    Q.    And it states:  "Whether you reside in Lima or Lowell,

5  Batavia or Bedford Heights, Hamilton or Hilliard, you should

6  play by the same rules.  That is why I introduced Senate Bill

7  205.  This bill contains a number of provisions to streamline

8  and clarify election laws related to absentee ballots."

9    A.    Yes.

10   Q.    Did I read that correctly?

11   A.    Yes.

12   Q.    I'll show you, now, what's been marked as Plaintiffs'

13  Exhibit 1286.

14       MR. CHANDRA:  Your Honor, I just wanted to note the

15  time for the Court.

16       THE COURT:  I'm keeping my eye on it.  She has about

17  four minutes.

18       MS. RICHARDSON:  Thank you, Your Honor.

19  BY MS. RICHARDSON:

20   Q.    Senator, this is proponent testimony that was offered by

21  Steve Cuckler; is that correct?

22   A.    Yes.

23   Q.    And Steve Cuckler is a member of the Delaware County

24  Board of Elections; is that right?

25   A.    Yes.

Vol. 6 - 189

1   Q.    And if you take a look at the bullet points here that

2   Mr. Cuckler has provided, the fifth bullet point down, it

3   states:  "SB --"

4         MR. CHANDRA:  Same hearsay objection, Your Honor.

5   BY MS. RICHARDSON:

6   Q.   It states --

7         THE COURT:  Overruled.

8         MS. RICHARDSON:  Thank you, Your Honor.

9   BY MS. RICHARDSON:

10  Q.   It states:  "SB 205 is a step in the right direction in

11  terms of election law reform.  We need more uniformity in

12  standards in Ohio, not less."

13       Is that correct?

14  A.   That's what it says.

15  Q.    And, in general, Mr. Cuckler is talking about the

16  process for mailing out applications for absentee ballots,

17  correct?

18  A.   It appears.

19  Q.    And do you know whether, at the time that SB 205 was

20  introduced, there was some confusion in terms of the mailing

21  out of absentee ballots?

22  A.   When you say "confusion in the mailing out," I think --

23  do you mean that some Boards of Elections mailed out absentee

24  ballot applications and some did not?

25  Q.   That's correct.  Is that your understanding?

1    A.   Yes.  I wouldn't call it confusion.  But, yes, that was

2  what was happening in the State of Ohio.

3         THE COURT:  All right.  Let's stop right there.  And

4  you may resume with the Senator when she returns.

5         MS. RICHARDSON:  Thank you, Your Honor.

6         THE COURT:  Thank you, Senator.

7         THE WITNESS:  Thank you.

8         MS. RICHARDSON:  Thank you, Senator.

9         (Whereupon, the witness steps down from the witness

10  stand.)

11        THE COURT:  Who is your next witness, Mr. Chandra?

12        MR. CHANDRA:  We will be calling Lucas County, Your

13  Honor, a representative from Lucas County.

14        MS. GENTRY:  Lavera Scott, Your Honor, from Lucas

15  County.

16        THE COURT:  All right.

17      Ms. Scott, please come forward and be sworn.

18                      - - -

19               LAVERA SCOTT,

20    AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

21                 CROSS-EXAMINATION

22  BY MS. GENTRY:

23  Q.   Good afternoon, Ms. Scott.

24  A.   Good afternoon.

25  Q.   Thank you for coming in today.

Vol. 6 – 191

1        Could you please state your name for the record?

2   A.   Yes.  It is Lavera Scott.

3   Q.   Could you, please, spell your first name?

4   A.   L-a-v-e-r-a.

5   Q.   And you are currently the Deputy Director for the Lucas

6   County Board of Elections?

7   A.   Yes.

8   Q.   And you've been in that position since June of 2015?

9   A.   Yes.

10  Q.   Prior to that, you were the Interim Deputy Director for

11  the Lucas County Board of Elections; is that right?

12  A.   Yes.

13  Q.   And you were in that position from June of 2014 to June

14  of 2015?

15  A.   Correct.

16  Q.   Could you briefly describe your responsibilities as

17  Deputy Director as they relate to absentee ballots and

18  provisional ballots?

19  A.   My main responsibility is to -- I'm currently

20  responsible for ordering the actual paper ballots that are used

21  for absentee ballots and provisional ballots, also doing any of

22  the ballot proofing, help assisting with approving ballot

23  language before we send it to the State.  And I'm hiring

24  individuals to work in both of those areas.

25  Q.   How many full-time staff does the Lucas County Board

Vol. 6 – 192

1    have?

2        A.    Twenty-four.

3        Q.    And when it comes to processing absentee ballots and

4    provisional ballots, do you ever hire seasonal workers?

5        A.    Yes.

6        Q.    This past primary election, did you hire seasonal

7    workers?

8        A.    Yes.

9        Q.    Do you recall approximately how many seasonal workers

10   you hired to handle absentee ballots and provisional ballots?

11       A.    There are approximately eight additional seasonal staff

12   working the absentee department.  And then, for provisionals,

13   there were approximately eight, as well.  Four of them were the

14   same employees that worked in absentee.

15       Q.    Do those seasonal workers report to someone who is a

16   full-time staff member?

17       A.    Yes, they do.

18       Q.    And do those full-time staff members ultimately report

19   to you and to the Director?

20       A.    Yes.

21       Q.    I want to ask you about what -- Strike that.

22             Do you also have some responsibility with regard to

23   training the poll-workers and the seasonal workers with regard

24   to absentee ballots and provisional ballots?

25       A.    In my current position, not day to day.  In reference to

1   approving the materials that go out, yes.  In my prior position

2   as Voter Services Manager, which I was prior to becoming

3   Interim, I did the majority of the training for both of those

4   areas.

5   Q.   I want to focus -- first I'm going to ask you about

6   provisional ballots.  And I want to start with how provisional

7   ballots are handled at the polling place on Election Day.

8        So, when a person comes in to vote and it's determined

9   that they need to vote a provisional ballot, do they go to a

10  special table or special poll-worker to help them with that

11  process?

12  A.   Yes.  Each of our locations has a provisional table.

13  Q.   And does the poll-worker who works at the provisional

14  table have a special title or name?

15  A.   No.

16  Q.   So, after the provisional voter fills out the

17  provisional ballot affirmation form, does the poll-worker at

18  that table check the form to make sure it's completely filled

19  out?

20  A.   They are trained to view the form, yes.

21  Q.   Why are they trained to review the form for

22  completeness?

23  A.   Because the person that is going to be issuing them the

24  paper ballot, as well, they check it to make sure that the

25  address -- normally, it's on there, if they can.  That way, if

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 194 of 296 PAGEID #: 1514
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 194 of 296 PAGEID #: 23902

Vol. 6 - 194

1   they have questions in reference to something that's missing,

2   they're trained to look at it.

3       Q.   All right.  You raised an excellent point.  Let me try

4   to clarify something.

5           Does the voter fill out the provisional ballot

6   affirmation form before, or after, they receive their ballot?

7       A.   They fill out the affirmation form, in our locations,

8   prior to.

9       Q.   And, then, to determine what precinct that person should

10  vote in, does the poll-worker look at the address that the

11  voter wrote down on their form?

12      A.   Yes.

13      Q.   And then the poll-worker consults a street guide to

14  determine what precinct it should be?

15      A.   Correct.

16      Q.   And if the address that's written down on the form is

17  incomplete, what is the poll-worker trained to do?

18      A.   They're trained to inquire as to clarification for the

19  address.

20      Q.   And they need to do that in order to know what precinct

21  the person should vote in, correct?

22      A.   Correct.

23      Q.   Now, when a voter uses a form of ID that they can hand

24  to the poll-worker, is the poll-worker trained to check that ID

25  to determine whether it's current and valid?

1    A.    They're trained to view it, yes.

2    Q.    And after they have reviewed the ID, the poll-worker is

3    trained to check the box on the provisional ballot affirmation

4    form that states that an ID was provided; is that correct?

5    A.    Correct.

6    Q.    Why is the poll-worker responsible for checking that box

7    on the form?

8    A.    For the identification itself?

9    Q.    Yes.

10    A.    If the poll-worker -- If you give the -- for instance,

11    most -- the majority of the provisionals we get, a lot of them,

12    the actual voter just writes in their Social Security number,

13    their last four digits.  Therefore, there is no other boxes

14    that they need to check.

15        If they're not going to be giving, or showing -- if

16    they're not going to be providing the last four digits of their

17    Social Security number and they're using some other form of ID,

18    another type of paper form, that's when they are to check the

19    box, if they're going to be providing a utility bill or

20    something like that.

21    Q.    And why do you train the poll-worker to check the box,

22    instead of just relying on the voter to figure out that they

23    need to check the box?

24    A.    Well, when the -- How can I say this?  When the voter is

25    given the envelope, I can say that most -- the majority of the

Vol. 6 – 196

 1    voters because I also manage an early vote center -- so, there,

 2    I have more direct interaction with a lot of the voters.  If

 3    it's anything other than the last four digits of their Social

 4    Security number, a lot of the times they don't know

 5    which things they are supposed to do.

 6         So the followup of the poll-worker is that, if it's not

 7    on there -- they are to verify that information.  As I stated,

 8    they are to review and verify it.  If the voter does not put it

 9    on there, they are to review it.  That is part of the training.

10    Q.   And they are to check the box?

11    A.   Yes, if the -- if the voter failed to do so.

12    Q.   Okay.  So there are times when the voter doesn't

13    understand that they need to check a box, as well as show their

14    ID?

15             MS. CARWILE:  Objection.  Speculation.

16             THE COURT:  Overruled.

17             MS. CARWILE:  Thank you.

18    BY MS. GENTRY:

19    Q.   You can answer.

20    A.   I can assume that.  I mean, I would assume so.

21    Q.   Based on your experience actually working with voters at

22    the early vote center, have you observed that sometimes voters

23    don't understand that, after they hand the ID over, they also

24    have to go back and check a box?

25    A.   It's usually a simultaneous thing that happens there,

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 197 of 296 PAGEID #: 1517
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/20 Page: 197 of 296 PAGEID #: 23903

Vol. 6 - 197

1   to, whereas, when you're filling out the actual envelope, if a

2   voter comes up afterwards and they don't have it completely

3   filled out, then they would fill it out for them, or they would

4   give it to the poll-worker.

5       In our -- In the early vote center, it's a little bit

6   different, because it's absentee voting initially.  But, in any

7   forms they fill out, I have definitely witnessed that sometimes

8   voters are not sure which boxes they should fill out.

9   Q.   And your poll-workers are trained to assist them in

10  figuring out what should be filled out, correct?

11  A.   Yeah.  That's part of the training.

12  Q.   Why do you train your poll-workers to assist the voters

13  if they're confused or they don't understand what to do?

14  A.   Personally, I mean, we are mandated to provide

15  poll-worker training.  And, I mean, the -- the guidelines that

16  we receive are pretty specific.  I mean, at any time, going --

17  if you can go a little extra to assist the voter, it's just

18  something that they're trained to do, to try to ensure that

19  every voter that's theirs can be -- their needs can be met.  If

20  you can at all do it, then we ask them to do it.

21  Q.   Your poll-workers will assist the voter even if the

22  voter doesn't say, I'm disabled and I need help, or, I'm

23  illiterate and I need help; is that correct?

24  A.   If they're assisting them in reference to paperwork or

25  anything like that just in reference to -- There's a difference

1   between assisting a voter and voting, per se.

2           If they are disabled or they –– then we have to have

3   them fill out the form.  And our poll-workers and bipartisan

4   teams assist the voter with actual –– the voting process.

5           In reference to completion of paperwork, if they state

6   that they need assistance, by the same token, we have a

7   bipartisan team that is there to assist them in completing that

8   if they request it.

9           We cannot assume, with anyone –– we cannot gauge,

10  necessarily, if a voter may need assistance if they don't state

11  it.  But they are trained, if the information is missing, to at

12  least try to ascertain what help is needed.

13  Q.    Okay.  With regard to the review of provisional ballots

14  after the election, it's correct, is it not, that sometimes

15  seasonal workers will review the provisional ballots to

16  determine whether the information is complete and correct and,

17  therefore, the ballot can be counted?

18  A.    Correct.

19  Q.    And I believe that they sit in a room together, to

20  process the provisional ballots, along with two staff members

21  who are there to supervise and answer questions?

22  A.    Right.  A minimum of two full-time staff is at where we

23  process provisionals at.  In our office, we do all of our

24  post-election activities at our early vote center.  So there

25  are, at a minimum, two full-time staff that are there for the

1    process of processing the provisionals.

2    Q.   And the review of the provisional ballot is conducted by

3    just one person -- is that right? -- of a particular

4    provisional ballot affirmation form?

5    A.   The initial review, yes.  The processing itself, yes.

6    Q.   And that involves -- I believe you testified in your

7    deposition that there is a bipartisan approach in the sense

8    that Republicans and Democratic workers sit next to each other

9    while they're processing their own stacks of ballots.  Is that

10   fair?

11   A.   Yes.

12   Q.   Now, if a ballot is -- if a person conducting the

13   initial review concludes that the ballot should be counted

14   because the form is correctly and completely filled out, is

15   there any second level of review that's conducted?

16   A.   There is a second level of review for all of the

17   provisionals.  Once all of the provisionals are processed,

18   there -- they run an audit list, itself, which is going to show

19   all the provisionals that were entered.  And then a minimum of

20   those two full-time staffs, sometimes other managers, depending

21   on who's available, as well, do a second review, partially just

22   to make sure that the numbers are correct, to make sure that

23   every one that we accounted for is actually entered, and to

24   make sure that the names and things are correct on there.

25        So most provisional ballots are reviewed a minimum of at

Vol. 6 - 200

1   least two times in reference to checking to make sure that

2   they're entered properly.

3     Q.   Let me break it down a bit so I can be a little more

4   specific.

5          In the initial review, will the reviewer compare the

6   Social Security number, if that's provided, against the Social

7   Security number in the voter registration database to make sure

8   they match?

9     A.   Yes.

10    Q.   All right.  And, then, in the second level of review,

11  does the reviewer do the same thing?  Do they also take the

12  Social Security number and look at the database to see if they

13  match?

14    A.   No.

15    Q.   And with regard to an address, can you describe what

16  review the initial reviewer does to confirm whether there is a

17  valid address on the form?

18    A.    We look into our local -- our database.  And if it's an

19  address -- We have a lot of new, for instance, subdivisions

20  where we have a lot of new addresses at.  And if they have any

21  questions in reference to research of those, those are actually

22  turned over to one of the IT managers, that may need to look up

23  addresses to doublecheck to make sure that the precinct that

24  they voted them in, especially if it's a new area, is, indeed,

25  the precinct that they should have voted in.

Vol. 6 - 201

1    Q.   Do you know what database the IT person reviews to

2    determine whether the address is correct?

3    A.   We use ARIES, which is the County data GIS system that's

4    also used by the Auditor's Office.

5            MS. GENTRY:  Your Honor, I'm going to show the witness

6    a few documents.  So this might be a good time to read into the

7    record the exhibits that we have stipulated to admitting.

8            THE COURT:  Please proceed.

9            MS. GENTRY:  Thank you, Your Honor.

10           My understanding -- and, Ms. Carwile, correct me if I'm

11   wrong -- is that we have stipulated to the admission of

12   Plaintiffs' Exhibits 988 through 998, 3453 through 3709, and

13   7026 through 7033.

14           MS. CARWILE:  That is correct, Your Honor.

15           THE COURT:  All right.  Thank you, Ms. Carwile.

16           Those documents will be admitted.

17           MS. GENTRY:  Thank you, Your Honor.

18    BY MS. GENTRY:

19    Q.   Ms. Scott, I'm showing you what's been marked as

20   Plaintiffs' Exhibit 3454.  This is a voter named David Bell.

21   And his vote -- his provisional ballot was rejected because of

22   a lack of an address, which I can show you.

23           The second page of the exhibit contains this page from

24   your provisional statistics report.  And do you see that David

25   Bell's vote was rejected for lack of an address?

Vol. 6 - 202

1    A.    Correct.

2    Q.    Now, he does have a street address on his form.  Do you

3  see that?

4    A.    Uh-huh.

5    Q.    Can you explain why that was not sufficient?

6    A.    I can tell you that I know that that address is flagged

7  in our system.  That is a U.S. postal address on 724 Dussel.

8  So, therefore, it is not a residential address.

9    Q.    Did you mean 427 Dussel?

10   A.    Yes.  I'm sorry.  427 Dussel.

11   Q.    So it's a commercial address, first of all, correct?

12   A.    Correct.

13   Q.    Are you allowed to -- Are voters allowed to use

14  commercial addresses as their street address?

15   A.    No.

16   Q.    And, then, it's also a place where mail is delivered,

17  correct?

18   A.    Correct.

19   Q.    And the Secretary of State has instructed the Boards of

20  Elections not to allow voters to use such addresses for their

21  registration and for voting purposes; is that right?

22   A.    Correct.

23   Q.    Do you make any inquiry as to whether voters who use

24  commercial addresses are homeless, for example, and reside

25  outside of the building?

Vol. 6 - 203

1    A.   We don't make inquiries.  At the time, if someone uses

2    that address to attempt to register, then they -- Of course,

3    all voters that are sent letters stating that they cannot be

4    registered due to whatever the reason was.  And this person

5    would in turn, based upon that, be sent that same letter in

6    reference to stating that that was not a residential address.

7         THE COURT:  Excuse me for one second.

8         MS. GENTRY:  Yes, sir.

9      (Whereupon, there was a brief interruption.)

10        THE COURT:  Please proceed, Mrs. Gentry.

11        MS. GENTRY:  Thank you, Your Honor.

12   BY MS. GENTRY:

13   Q.   Ms. Scott, we were talking about this particular ballot

14   that's in front of you and the issue of commercial addresses.

15   Is it your understanding that if a person actually lives at the

16   location of a commercial address -- for example, if they lived

17   above the business or in the back room or in the basement --

18   could they use it as their voting address?

19   A.   Yes.

20   Q.   Now -- I'm sorry.  Go ahead.

21   A.   And there are some places within our city that that has

22   occurred.

23        This particular address is a United States Post Office.

24   There is no residential at that address.

25   Q.   Okay.  Just taking --

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 204 of 296 PAGEID #: 1524
Case: 2:06-cv-00896-ALM-TPA Doc #: 660 Filed: 04/06/18 Page: 204 of 296 PAGEID #: 23522

Vol. 6 - 204

```
 1              THE COURT:  Just a P.O. box?

 2              THE WITNESS:  Yes.  It's an actual post office.

 3              THE COURT:  Oh!  So the address is the location of the

 4  post office, itself?

 5              THE WITNESS:  Exactly.

 6              THE COURT:  I see.

 7              THE WITNESS:  Exactly.

 8   BY MS. GENTRY:

 9   Q.   Taking what you said about commercial addresses, how

10  does the Board know if a person is living at a commercial

11  address?

12   A.   Our current system that we use, as I stated, is linked

13  to ARIES, which is part of the Auditor's Office, which zones,

14  of course, for commercial addresses.  So, because our system is

15  built upon those, those that come up as commercial addresses

16  are flagged in our system.

17              There are some addresses that we've actually had to have

18  our IT manager drive by to see if there was residential

19  addresses.  So we're well aware that it can occur because it

20  has occurred in our county before.

21   Q.   And the only way you know it has occurred is by actually

22  going to drive out and see if somebody is living there?

23   A.   Correct.  Once we -- We'll send a letter to them, as I

24  stated, to anyone, in reference to their registration.  And

25  there have been instances where they've stated, Well, this is
```

Vol. 6 – 205

1   my current address, and we've been able to verify that and

2   register them at that address.

3       Q.   All right.  Now, with regard to Mr. Bell, his ballot was

4   not rejected because he wasn't a registered voter, correct?

5       A.   Correct.

6       Q.   All right.  So, it's fair to assume that he is a

7   registered voter in the State of Ohio?

8       A.   At that time, I would assume, yes.

9       Q.   All right.  Do you know whether Mr. Bell was given any

10  notice that his provisional ballot was rejected because he's

11  using an address that he can't use?

12      A.   I don't -- There was no notice sent to him besides the

13  hotline form given to all voters so they can call to verify.

14  At that point, he would have been told.  But I can't say if

15  this individual called or not, no.

16      Q.   And that notice you're talking about with the hotline,

17  that's given to all provisional voters, correct?

18      A.   Correct.

19      Q.   Or it's supposed to be, correct?

20      A.   Correct.

21      Q.   You don't actually know if it's given to all provisional

22  voters, but your workers are trained to give it out, correct?

23      A.   They're trained to give it out, yes.

24      Q.   And that requires the voter to read it and understand

25  that they can call a number and determine if their vote has

1    been counted?

2      A.    Correct.

3      Q.    That requires some affirmative action by the voter,

4    correct?

5      A.    Correct.

6      Q.    But you're saying there was no notice to Mr. Bell,

7    affirmatively, by the Board, to let him know his vote was

8    rejected and why?

9      A.    No.   There is -- There is currently no -- no procedure

10   stating to send notification to provisional voters that their

11   vote was not counted.

12     Q.    Is there any reason why the Board could not provide that

13   notice?

14     A.    Our Board -- if it's not currently mandated, no.

15   We -- We don't tend to make up our own rules and send out

16   additional notice not mandated for us to do.

17     Q.    So you only do what you're mandated to do?

18     A.    Correct, in reference to notices.

19     Q.    Ms. Scott, now I'm going to show you what's been marked

20   as Plaintiffs' Exhibit 3455.   This is Mr. Bell's provisional

21   ballot from the next year, from 2015.   And if you'd like, I can

22   put this back, the other one, back up so you can compare and

23   confirm that this is the same person.

24          Do you see that their Social Security numbers are the

25   same?

Vol. 6 - 207

1    A.    Yes.

2    Q.    And the birthdate is the same?

3    A.    Yes.

4    Q.    So this is the same David Bell who voted a provisional

5    ballot two years in a row, correct?

6    A.    Correct.

7    Q.    And both ballots were rejected because he wrote down the

8    address of 427 Dussel?

9    A.    Correct.

10   Q.    Unless Mr. Bell takes the initiative to call and find

11   out if his vote was counted, he has no way of knowing that his

12   votes will never be counted so long as he uses that address; is

13   that right?

14   A.    In reference to voting, no.  But he would -- he should

15   have also been sent a letter stating he was unable to be

16   registered at that address if he was doing a change of address.

17   I don't know if that was a change of address for him or if he

18   also has another address listed without looking at his file.  I

19   don't know if he has another address listed in his file or if

20   he's only using that for provisionals.

21   Q.    Okay.  And with regard to registration, is it your

22   understanding that the Board uses provisional ballots as a way

23   to register voters who are not registered, correct?

24   A.    Correct.

25   Q.    But the Board doesn't do that for voters who are already

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 208 of 296 PAGEID #: 1528
Case: 2:20-cv-03843-MLW-TPA Doc #: 66-6 Filed: 04/06/20 Page: 209 of 386 PAGEID #: 2526

Vol. 6 - 208

1    registered, correct?

2    A.    As a change-of-address form, yes.

3    Q.    So, you would -- you believe that the Board would have

4    sent him a change-of-address form?

5    A.    If it was a valid change, he would have received -- If I

6    move from a correct, or proper, address and an address that can

7    be precincted, yes.

8         The address Dussel cannot be precincted because it's

9    listed as a post office address.  So he would have received a

10   letter to state that that address -- in reference to him doing

11   a change of address.  But I don't know, without looking at his

12   file, if he also has that as a mailing address, only which he

13   can do, or if he has it listed as -- attempted to list it as a

14   personal address as well.

15   Q.    And you also don't know, without looking at his file,

16   whether he, in fact, was sent a change-of-address notice?

17   A.    Correct.

18   Q.    All right.  Ms. Scott, I'm going to show you what's been

19   marked as Plaintiffs' Exhibit 3462.  This is another individual

20   who used the same address, 427 West Dussel.  Do you see that?

21   A.    Yes.

22   Q.    And his ballot was also rejected for a lack of an

23   address.  Do you see that right there (indicating)?

24   A.    Yes.

25   Q.    And it's your understanding that this individual should

Vol. 6 - 209

1   also have received a change-of-address card?

2    A.   Yes.

3    Q.   But you don't know whether that was done?

4    A.   No.

5    Q.   All right.  I'm going to show you Plaintiffs' Exhibit

6   3460.  This voter was also rejected for lack of an address,

7   Moore is the last name.  Can you tell me why this voter was

8   rejected for lack of an address?

9    A.   Not without the database, no.

10    Q.   But you see that she wrote -- to the street address, she

11   wrote Airport Highway, Apartment E.  Do you see that?

12    A.   Uh-huh.

13    Q.   Does that have any meaning for you, as someone who lives

14   in Lucas County?

15    A.   No.  Airport Highway is several miles long.  There would

16   be no way to precinct her based upon just Airport Highway.

17    Q.   And then, in the city field, she wrote 1 Clare Commons.

18   Do you see that?

19    A.   Uh-huh.

20    Q.   Is that a "yes"?

21    A.   Yes.

22    Q.   Clare Commons, does that have any meaning to you?

23    A.   Not at all.

24    Q.   So you don't know if that's a subdivision or a street or

25   an apartment building, correct?

1    A.    Correct.

2    Q.    But the person who reviewed this ballot should have

3    reviewed the database to determine if they can figure out what

4    1 Clare Commons is?

5    A.    There would be no way to search for the word 1 Clare

6    Commons in the voter registration database.

7    Q.    Would there be a way to search for it in another

8    database?  I'm sorry?

9    A.    Probably -- Depending if it's a proper name and not just

10   a name that someone assigns to it, then the IT manager that

11   does the street and range road guides would probably be able to

12   try to ascertain if that's truly a building name properly used

13   within the County.

14   Q.    Could your reviewers or IT person use Google to

15   determine what Clare Commons is and if it's an apartment

16   building?

17   A.    I'm sure he could.

18   Q.    Are they trained to?

19   A.    No, they're not trained to use Google to search things.

20   I'm not sure what our IT manager -- I cannot speak for him.  I

21   do not know all resources that he utilizes.  But he's

22   worked -- He worked for the County -- the Auditor's Office,

23   themself, for over 20 years.  So he would probably have a much

24   better -- broader knowledge of where to look for addresses than

25   I ever would.

Vol. 6 – 211

1   Q.   Is it fair to say that he –– What's his name?

2   A.   That would be Martin Limmer.

3   Q.   Martin Limmer, is a he a Republican or a Democrat?

4   A.   He's a Republican.

5   Q.   And he has the discretion to determine what he's going

6   to search to find out whether or not he can –– he can identify

7   this address?

8   A.   No.  If –– If an address is turned into him, there is an

9   actual file –– If people have questions in reference to

10  addresses, there is an actual file that they can go into.  And

11  then he, in turn, posts whatever addresses he's asked to search

12  for anybody that's doing any type of data entry, any new

13  subdivisions, annexations, all of those things.

14  Q.   But in terms of what databases he decides to search ––

15  for instance, if he decided to search Google Maps –– he would

16  have the ability to do that, correct?

17  A.   If he chose to, yes.

18  Q.   And there is no Board policy as to what he is or is not

19  permitted to search or required to search?

20  A.   There is no Board policy, no.

21  Q.   I'm going to show you what's been marked as Plaintiffs'

22  Exhibit 3480.  This is a 2015 provisional ballot.  And we did

23  not receive information about why the specific 2015 ballots

24  were rejected.  So I don't actually know why this was rejected.

25       And my question to you is, by looking at it, can you

1  tell why this was rejected?

2  A.    No, not without looking at the list.  They

3  have -- Unless there was, truly, no identification shown, I

4  would have assume in reference to what's checked on there.

5  Q.    What do you mean?

6  A.    In reference to the last box.  It appears that the last

7  box is checked on here to state that they had some additional

8  type of government ID.

9  Q.    So it should not have been rejected for lack of ID,

10  correct?

11  A.    Not if it -- not if they showed -- not if the voter

12  truly provided it, no.

13  Q.    Well, the reviewer would have no way of knowing whether

14  the voter truly provided it, correct?

15  A.    Correct.

16  Q.    The reviewer should assume that if the box is checked,

17  then the ID requirement is satisfied, correct?

18  A.    Correct.

19  Q.    Are your reviewers trained to accept any provisional

20  ballot where that box is checked in terms of the ID

21  requirement?

22  A.    Yes, unless there is any accompanying notes or anything

23  stating otherwise, yes.

24  Q.    Are you aware of any accompanying notes that have

25  indicated that ID was not provided?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 213 of 296 PAGEID #: 1533
Case: 2:06-cv-00896-ALM-TPA Doc #: 660 Filed: 04/06/18 Page: 213 of 296 PAGEID #: 29533

Vol. 6 - 213

 1    A.    For this particular one, no.

 2    Q.    In general, for any voter, any provisional voter?

 3    A.    Usually, if there is something that needs to be brought

 4    to attention, some poll-workers will make sure that they do

 5    list a note in their judge's notes.  Or if they forgot to mark

 6    a box, sometimes they'll even write that down.

 7          So, if there is any specific instances that they want to

 8    notify us of, then the judge's notes give them an opportunity

 9    to do that.

10    Q.    Do your seasonal workers and full-time staff who review

11    the provisional ballots have access to the judge's notes?

12    A.    As needed, yes.

13    Q.    And how would they know if they needed to review the

14    judge's notes?

15    A.    During the official canvassing process, before any

16    provisionals are counted, judges' notes are a part of the

17    provisional -- of the official canvassing.  Those are

18    available, and they are with every precinct before official

19    canvassing.  And that is before any provisionals are ever

20    counted.

21    Q.    But are they given, physically given, to the reviewer

22    who sits in a separate room looking at hundreds of ballots?

23    A.    No, but they're given to the people doing the canvassing

24    of the provisionals who have the provisional list at that time.

25    So, if there is any notes or anything that will come up, there

1  have been times where a voter -- where the worker has clearly

2  written "no" that a provisional that may have been questionable

3  before or something was missing, the judges' notes have stated,

4  This person did provide this, or I forgot to notate this; and

5  we've had to go back to fix the provisional and ballot itself.

6  So at the time the official canvassing is done, before they're

7  actually counted, before the Board votes on those, that

8  information is available.

9    Q.   Okay.  So it's available to later reviewers, but not the

10  initial reviewers?

11    A.   Correct.

12    Q.   And are your later reviewers instructed to make sure

13  that they fix any discrepancies that they see?

14    A.   Yes.

15    Q.   One more question on this.  If you were, today, to go

16  back and try to figure out why this ballot was rejected, is

17  there a way to do that?

18    A.   No.  Besides looking at the database, no.  I don't know

19  exactly what this person was thinking at that time.  Besides

20  directly talking to just workers or trying to get them to

21  remember what occurred, no.

22    Q.   And you don't know which worker made the decision not to

23  count this ballot, correct?

24    A.   Yes.  By looking up the voter, themselves, there is an

25  electronic footprint that would tell me who actually processed

Vol. 6 – 215

1    that.

2        Q.    Now, am I correct that that electronic footprint you

3    talk about is erased after every election cycle to make room

4    for the new election cycle?

5        A.    No.  The actual transaction, itself, will -- we could

6    always go back to see who processed something.  It's not going

7    to be in the module for normal workers to look at, but

8    everything is archived.

9        Q.    Okay.  So the IT person could go back and find out who

10   processed it, correct?

11       A.    Yes.

12       Q.    And, then, you would need to talk to that person to find

13   out why they rejected it?

14       A.    To see if they remember, yes.

15       Q.    There is nothing else written down as to why this ballot

16   was rejected?

17       A.    No, not to the best of my knowledge.  No.

18       Q.    Okay.  I am going to turn, now, to absentee ballots.

19             Oh!  Before I do that -- I'm sorry -- I do have a few

20   more questions.

21             Going back, I just want to ask you about the different

22   fields.

23             Do your reviewers reject a provisional ballot if the

24   name is written in cursive, instead of being printed?

25       A.    No.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 216 of 296 PAGEID #: 1536
Case: 2:06-cv-03893-ALM-TPK Doc #: 660 Filed: 04/06/21 Page: 216 of 389 PAGEID #: 29324

Vol. 6 – 216

1    Q.    All right.  Okay.  Thank you.  When the Board makes a

2    decision as to what ballots to count, it makes that decision

3    based on categories of ballots, correct?

4    A.    Correct.

5    Q.    Can you describe that process?

6    A.    All of the provisional ballots are counted and separated

7    into all valid, in ward precinct order, all invalid, in ward

8    precinct order, with the specific categories as to why they

9    were reviewed, the reason -- when they were reviewed, what was

10   determined by the user.  And then all of those ballots are

11   taken to the Board meeting and given to the Board; at their

12   discretion, how many they actually, physically look at.  There

13   is a list.  We make sure that the ballots are in the same order

14   as the list.  And we take them to the Board meeting.

15   Q.    And in your experience in the November 2014 election and

16   November 2015 election, did the Board review individual

17   provisional ballots and vote whether to accept or reject

18   individual ballots?

19   A.    There were some in reference to birthdate.  I don't know

20   exactly which election it was.  But, each election, there is

21   usually some that they may have questions about that were

22   deemed, especially with the birthdate issue, because of all the

23   other criteria, of course, is there, the Board can choose to

24   accept those.

25          So that is definitely one category that we bring to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 217 of 296 PAGEID #: 1537
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/08/10 Page: 217 of 396 PAGEID #: 29823

Vol. 6 - 217

 1  their attention.  All the other ones, they can go through them.

 2  Some, they have particular questions about.  Some, they do not.

 3  It's just truly up to the Board.

 4    Q.   And based on your recollection, does your Board have a

 5  policy of whether to accept ballots where the date of birth is

 6  incorrect but the other information is correct?

 7    A.   Yes.  And from my experience, that has been the issue.

 8  If all the other information has been correct, they have

 9  accepted those.

10    Q.   When, generally, after the election does this meeting

11  that you're talking about occur where they go through the

12  provisional ballots and determine what to count?

13    A.   Sometime before certification.  I mean, each Board is

14  different.  And their schedules are different.  But it occurs

15  anywhere -- sometimes it's the 12th day after the election,

16  depending on when they must send the results to the State.

17  It's usually one or two days before.  Sometimes it's -- if it's

18  a very small number of provisionals, it may be four days

19  before.  It just depends upon the Board.

20    Q.   And is it your understanding that that meeting to review

21  provisional ballots cannot be held until at least ten days

22  after the election?

23    A.   Correct.

24    Q.   Now I want to turn to absentee ballots.  What is the

25  process for an in-person early voter who walks into the Board

Vol. 6 - 218

1    of Elections to vote?

2      A.    When they walk into our early vote center?

3      Q.    Yes.

4      A.    There is check-in tables, electronic.  We use -- Our

5    actual voter database is in our early vote center.  So the

6    voters walk up to the first check-in table.  They give their

7    name.  The voter -- The worker looks them up in the computer.

8    They give them the absentee application to fill out.  They fill

9    that out.  They take it up to the second area, to where they're

10   processed at.  And, after that point, they're issued either

11   their paper ballot or a TSX card to vote.

12     Q.    Okay.  Moving back to when they're issued an

13   application, does the worker print a label that has their name

14   and address on it and put it on the application?

15     A.    That's after they're processed.  When you initially come

16   in, you initially come in, you just come in.  You give them

17   your name.  They give you your application to fill out at that

18   point.

19     Q.    Okay.  At that point, they have to write their name and

20   address and everything else?

21     A.    They do that at the table.  When you come in, the first

22   thing is just a check-in.  That's it.  It's just a check-in

23   because some people, if you determine at that point that the

24   person has moved and they need to vote provisionally, then they

25   will let them know that at that point when they check in.

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-6 Filed: 09/12/20 Page: 219 of 296 PAGEID #: 1539
Case: 2:06-cv-00896-ALM-TPK Doc#: 660 Filed: 04/06/18 Page: 219 of 296 PAGEID #: 19527

Vol. 6 — 219

1    Q.    Okay.

2    A.    They do not issue them anything from the computer at

3    all.  The only thing they hand them is the absentee application

4    to complete.

5    Q.    And after they complete the application, they then take

6    that back to the counter so that it can be reviewed?

7    A.    After they complete the application, they take it to the

8    processing area, where it's actually processed at that point.

9    It is directly into our normal registration system.  It is all

10   of the same protocol that, you know, that we use for even

11   mailing the absentees.

12         They enter the absentee application into the database.

13   And then the person -- There is a label that is printed out.

14   It has the person's name, has the person's address.  And there

15   is an actual signature book that is created.  The person is

16   asked to verify their name and address, just to make sure that

17   it's correct.  They sign, and then they get their ballot,

18   whether it's a paper ballot or a TSX card.

19   Q.    Do they also have to provide their date of birth and ID

20   on their application?

21   A.    On the application, itself.  But they are not -- and the

22   workers are trained to tell them that their identification,

23   itself, is not needed, simply because they are absentee voting.

24   Q.    What do you mean by that?

25   A.    When people want to give you -- want to physically give

Vol. 6 - 220

1    you a driver's license or physically give you my State ID.

2    Q.    And that's not required?

3    A.    Not for absentee voting.

4    Q.    Okay.  So it's just name and address that is required,

5    and then a signature?

6    A.    On the application, itself, you put your identification

7    just as you would in any -- on the absentee application.  But

8    some people are in the habit of voting at a polling location.

9    So, when they walk in the door, they think they have to hand

10   you a driver's license, when, in fact, we give them the

11   application to fill out.

12         On the application, they complete the necessary fields,

13   which is their name, their address, their identification, their

14   signature.

15   Q.    Okay.  Okay.  Thank you for clearing up my confusion on

16   that point.  And, so, when they actually -- to get the

17   ballot -- after their application is approved, in order to get

18   the ballot, they need to verify their name and address?

19   A.    They've already -- You're signing next to -- It prints

20   out a label.  And the label is going to say Lavera Scott.  It's

21   going to have my address on it.  And the only thing that they

22   do, they're signing next to that, just as they would in a

23   normal signature type of book.

24         And, at that point, they've already filled out their

25   application.  They're already completed.  And it's partially

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 221 of 296 PAGEID #: 1541
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/08/16 Page: 221 of 296 PAGEID #: 23823

Vol. 6 - 221

```
 1   just to doublecheck to make sure that the person that is doing

 2   the data entry didn't put Lavera Scott, Jr. -- excuse me -- or

 3   Lavera Scott, Sr., those types of things.  It's just a

 4   verification to make sure that I, as a person processing your

 5   application, pulled the correct voter in.

 6   Q.   Okay.  I understand.  And, just to confirm, they don't

 7   need to show ID or write their date of birth at that stage,

 8   correct?

 9   A.   No.  The only place they do that is on the actual

10   application itself.

11   Q.   Okay.  So, after they sign where their name and address

12   is, they have a choice of either getting a paper ballot or --

13   you said a TMX card?

14   A.   Everybody is issued -- Our county is -- excuse me.  We

15   use DREs.  So they're automatically going to be offered,

16   normally, a voter access card to go vote on the TSX machines.

17   You have some voters that request a paper ballot, which they

18   can do.  And if they request a paper ballot, then we issue them

19   the paper ballot.

20   Q.   Do you also issue -- The voters who request a paper

21   ballot, do you also issue them an ID envelope?

22   A.   Yes.

23   Q.   And then they need to fill out that ID envelope

24   completely?

25   A.   Correct.  The ID envelope is going to have the label,
```

1   the same label that goes on the application.  For paper

2   ballots, it prints off three copies, instead of two, so they

3   don't need to rewrite their address and things on there.  But

4   they just fill out the ID envelope there.  And the ID envelope

5   is deposited into the ballot box, or their ballot, once they're

6   done voting.

7       Q.   Does anyone at the Board of Elections check their ID

8   envelope for completeness before they deposit it into the

9   ballot box?

10      A.   If there is someone on the floor available -- I can't

11  say that every single one of them is checked; but, generally,

12  we have enough people that -- in all honesty, most people that

13  fill out paper ballots, some of them do require a little bit

14  more assistance.  And there is usually a person -- we always

15  have a person available on the floor that actually takes the

16  TSX cards or directs the voter to the ballot box.  And one of

17  the things that they're trained to do is just say, Please make

18  sure that your envelope is completed properly, although it's

19  written on the envelope.  It's the same person that would

20  normally take the TSX card from the voter once they're done

21  voting.

22      Q.   Why do you say that some voters require more assistance?

23      A.   Some voters do.  My experience, a lot of the voters that

24  come to vote paper are -- some people just like voting paper.

25  Some of them tend to be slightly older, more mature; and they

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 223 of 296 PAGEID #: 1543
Case: 2:06-cv-00896-ALM-TPK Doc #: 360 Filed: 04/06/20 Page: 223 of 296 PAGEID #: 29593

Vol. 6 - 223

1   just choose to vote paper ballot.  And, so, sometimes they may

2   need more assistance in reference to the fact of making sure

3   that they know where to put the ballot at, that they -- and if

4   at any point we have to have a team read ballots to people, no

5   matter what age they are, then, of course, as I stated before,

6   we have to have a bipartisan team assist them.

7      Q.   And have you also had to have a bipartisan team read the

8   form to people?

9      A.   Yes, we have had to do that, as well.

10     Q.   And in order to do that, does the voter have to request

11  help on the basis of being disabled or illiterate?

12     A.   They don't have to say that.  If they just tell us that

13  they need assistance, we have a bipartisan team to assist them.

14     Q.   Okay.  And just so I'm clear, the voters who choose to

15  vote on the machine never have to fill out an ID envelope; is

16  that right?

17     A.   Correct.

18     Q.   Now, can you describe what the process is for reviewing

19  ID envelopes to determine whether they're complete and correct

20  and, therefore, the ballot inside can be counted?

21     A.   Once the ballots are received in our office, we have

22  teams of workers that we use -- we have a bar code on our -- on

23  our actual envelopes which is unique to that voter.  We run

24  those bar codes in so that we bring up the voter that's

25  associated with that envelope.  And then, at that point, that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 224 of 296 PAGEID #: 1544
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 224 of 296 PAGEID #: 23932

Vol. 6 – 224

1   voter's information is populated on the screen, which would

2   have their name, their address, their ID, all of their criteria

3   needed.

4         The person that's checking them checks the face of that

5   envelope against the face of what's on the actual screen.  And

6   then they have to initial in the corner, once they're done with

7   it, in reference to checking that envelope.

8         If for any reason something is missing on the envelope,

9   then they are to circle what's missing and put those with the

10  ones that would be challenged, because those are the ones that

11  we would have to send the letters to, that would be missing

12  something on their ID envelope.

13  Q.   When you say "the letters," you mean the Form 11-S?

14  A.   Yes.

15  Q.   You mentioned that there is a bar code that's unique to

16  each voter; is that right?

17  A.   Correct.

18  Q.   And it's placed on the ID envelope?

19  A.   Correct.

20  Q.   So, when that envelope comes back, you can look -- you

21  can run the label and verify who that ballot was issued to,

22  correct?

23  A.   Correct.

24  Q.   And, then, so long as they sign it, you know who

25  actually filled out the envelope and returned the ballot,

Vol. 6 – 225

1   correct?

2      A.   I wouldn't assume that.  But I could say that, if the

3   signatures match, we know that person signed it, yes.

4      Q.   Okay.  All right.  I'm going to show you what's been

5   marked as Plaintiffs' Exhibit 3672.  And this voter was born in

6   1913.  And the vote was cast, I believe, in 1914 -- let's

7   see -- oh, no -- 1915.  So she was more than a hundred years

8   old at the time; would you agree?

9      A.   Correct.

10     Q.   And it appears that this vote -- that this ballot was

11  rejected because of the Social Security number; is that right?

12     A.   Yes.

13     Q.   And you can tell that because it's circled?

14     A.   Correct.

15     Q.   All right.  I'm going to show you the application, which

16  is the second page.  Now, can you compare -- Sorry.

17         Can you compare the Social Security number on the

18  application with the Social Security number on the ID envelope?

19     A.   Yes.

20     Q.   Are they the same?

21     A.   It appears so, yes.

22     Q.   And, then, there is a note next to the ID number on her

23  Social Security number on the application.  Do you see that?

24     A.   Yes, I -- I can see it.  I don't know what it states,

25  but I can see that there is a note.

Vol. 6 - 226

1    Q.    Let me see if I can zoom in.

2          All right.  Can you read that note now?

3    A.    Yes.

4    Q.    What does it say?

5    A.    "Per call this is right."

6    Q.    Okay.  So that indicates, does it not, that the 8301 is

7    the correct number?

8    A.    Correct.

9    Q.    When the reviewer checked this ballot, they didn't look

10   at the application form, did they?

11   A.    No.

12   Q.    They only looked at what was in the database, correct?

13   A.    Correct.

14   Q.    And it's reasonable to infer that the number 8301 was

15   not in the database, correct?

16   A.    Correct.

17   Q.    So this ballot should not have been rejected; is that

18   right?

19   A.    Correct.

20   Q.    And it was only rejected because the information in the

21   statewide database, or the county database, was incorrect?

22   A.    I would assume so, yes.

23   Q.    That's what it appears to be?

24   A.    Yes, either -- correct or missing.  With it being that

25   old, I don't even know if they had to provide them at that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 227 of 296 PAGEID #: 1547
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 227 of 296 PAGEID #: 29835

Vol. 6 - 227

1    point.  I don't know when she had actually registered herself,

2    or if it was prior to having to provide your Social Security

3    number.  If they would have used a generic -- If she registered

4    a very long time ago, before that was part of her actual file,

5    I don't know that without looking at the actual registration.

6        Q.   Okay.  That answer raises a couple of issues that I want

7    to ask about.  One is in terms of what's required for

8    registration.  Is it your understanding that, today, if a voter

9    registers, they have to provide their date of birth and their

10   ID?

11       A.   Correct.

12       Q.   But if a voter registered 30 or 40 years ago, they did

13   not have to provide their date of birth and ID; is that

14   correct?  Or do you know?

15       A.   I know that the ID requirements have changed.  I don't

16   know exactly when it changed.  I know that, for some voters

17   that have been registered with us, the birthdates were not part

18   of their original registration.

19       Q.   Okay.  And the ID, also, was not part of the

20   registration?

21       A.   Correct.

22       Q.   Now, do you train your workers that, if they are trying

23   to match an ID with the database and they're looking at a

24   Social Security number on the form, but there is nothing in the

25   database, should they reject the ballot or count the ballot?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 228 of 296 PAGEID #: 1548
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/08/16 Page: 228 of 296 PAGEID #: 23936

Vol. 6 - 228

1      A.   They should inquire with someone as to either pulling

2   the original registration or ask someone else.  That's what

3   they're trained to do.

4      Q.   Okay.  And, then, that person that they ask at the

5   supervisory level, or if it's yourself, what do you do if you

6   cannot match the Social Security number because it's just not

7   in there anywhere?

8      A.   If it's not in the database itself, then, on the

9   registration form itself, as this one stated -- This was okay

10  per the telephone call -- that was on there -- if it's

11  information -- what I've determined is that, if it's missing

12  information and we ask people to update the registration, they

13  normally will.

14         I know that, personally, our county sent out letters, in

15  2013 and '11, to all voters that did not have date of births or

16  had birthdates of the one, one, nine, nine, nine, or the 1900.

17  And so we did send letters, and we did receive quite a few of

18  those back to be able to add that information to people's

19  registration system.  So we would, in turn, do that to people

20  that don't have that.  We do send letters out to those voters.

21     Q.   Okay.  And I understand that that might help for future

22  elections, but this lady is a hundred years old.  She might not

23  get to vote in another election.  What happens to her ballot if

24  the 8301 is not in the database and it's nowhere in her voter

25  registration card?

Case: 2:06-cv-03843-MHW-TPA Doc #: 660 Filed: 04/08/20 Page: 229 of 296 PAGEID #: 23937

1    A.   Well, on this one, like I said, without looking at it, I

2    can't tell you exactly what's in here.  I'm going to assume,

3    based upon what is written, that it is not.  But I cannot tell

4    you exactly what's in here for myself, no.

5    Q.   And I understand that you don't know.  Let me make it a

6    broader question.

7         For any voter who does not have a matching ID in the

8    database -- it's simply not there -- but they've written down

9    an ID, should their vote be counted or rejected?

10   A.   According to our current procedure and laws, it would be

11   rejected.

12   Q.   Okay.  Thank you.  Now, when you say the ballot should

13   be rejected, if it's an absentee ballot, is that decision made

14   by the Board?

15   A.   The Board also receives -- For all absentees, no, unless

16   there is ones that are questionable, like the date-of-birth

17   issues.  Those normally go to the Board.

18   Q.   But if it's not an issue that's either questionable or a

19   date-of-birth issue, then the staff would make a decision as to

20   whether to count or reject?

21   A.   Correct.

22   Q.   Okay.  And the one we just looked at with the

23   hundred-year-old voter that, apparently, the ID didn't match,

24   that would have been a staff decision?

25   A.   Correct.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 230 of 296 PAGEID #: 1550
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 230 of 296 PAGEID #: 23930

Vol. 6 - 230

 1    Q.   Can you -- Strike that.  Have you heard the term "voter

 2    credit"?

 3    A.   No.

 4    Q.   All right.  Are you familiar with the concept of giving

 5    a voter credit for voting; even if their vote isn't counted,

 6    you still show in their history --

 7    A.   Yes.

 8    Q.   -- that they voted?

 9    A.   Correct.

10    Q.   All right.  What is your understanding of that concept?

11    A.   If a voter submits the ballot, and even -- usually, we

12    would get some type of directive exactly telling us, and we

13    follow that.  If they submit it, even if it's an invalid

14    provisional, for instance, they still do receive voter history

15    for that election.  And that was the same with absentees.  They

16    still get voter history for voting.

17    Q.   What is the benefits to the voter of having it show in

18    their history that they voted that year?

19    A.   I would assume that it would be to show that they voted

20    so that, after two federal elections, they remain an active

21    voter.

22    Q.   And before you can give a voter, let's say, credit in

23    their history for voting, you have to determine that they're an

24    eligible voter, correct?

25    A.   Correct.

1    Q.    And you have to know that their identity is confirmed,

2    correct?

3    A.    Correct.

4    Q.    But even for voters that are eligible and their identity

5    is confirmed, you might still have to reject their ballot

6    because of an error or omission on the form; is that right?

7    A.    Correct.

8          MS. GENTRY:  Your Honor, may I consult with counsel?

9          THE COURT:  Yes, you may.

10          MS. GENTRY:  Thank you.

11       (Whereupon, there was a brief interruption.)

12          MS. GENTRY:  Ms. Scott, I do have a followup question.

13    BY MS. GENTRY:

14    Q.    Earlier in your testimony, you referred to the hotline

15    form that's given to voters to tell them that they can call and

16    find out if their vote was counted or rejected, correct?

17    A.    Correct.

18    Q.    And the decision to count or reject that ballot is made

19    more than ten days after the election.  Is that fair to say?

20    A.    Correct.

21    Q.    That's because the meeting can't be held any sooner?

22    A.    Correct.

23    Q.    So is it your understanding that there is only a

24    seven-day period when a voter can come in to cure a failure to

25    provide ID?

1    A.   Correct.

2    Q.   Even if the provisional voter calls that hotline number,

3    they won't be able to learn, within that seven-day period, that

4    there is a problem that they need to fix; is that right?

5    A.   Correct.

6    Q.   Okay.

7         MS. GENTRY:  Thank you, Your Honor.  I have no further

8    questions at this time.

9         THE COURT:  All right.  Ms. Gupta might have -- Are

10   you done?

11        MS. GENTRY:  I'm done, Your Honor.

12        THE WITNESS:  Thank you.

13        THE COURT:  Why don't we take our afternoon recess.

14   Now it's 3:15.  We'll stand in recess until 3:30.

15        (Recess taken from 3:15 p.m. until 3:30 p.m.)

16                             – – –

17        THE COURT:  Ms. Carwile, are you ready to begin your

18   cross-examination?

19        MS. CARWILE:  Yes, Your Honor.  Thank you.

20        THE COURT:  Please begin.

21        MS. CARWILE:  Would it be possible to get the blue

22   arrows removed from the screen?

23        THE CLERK:  Just hit clear on the screen.

24        MS. CARWILE:  Thank you.

25

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 233 of 296 PAGEID #: 1553
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 233 of 296 PAGEID #: 13573

Vol. 6 - 233

 1                        DIRECT EXAMINATION

 2   BY MS. CARWILE:

 3       Q.   Ms. Scott, I don't believe we've met.  My name is

 4   Tiffany Carwile.  I'm here on behalf of the defendants, the

 5   Secretary of State and State of Ohio.

 6            How are you today?

 7       A.   Tired, but fine.

 8       Q.   I understand.  I will try to be as brief as possible.

 9            It's my understanding that you are the deputy director

10   of the Lucas County Board of Elections; is that correct?

11       A.   Correct.

12       Q.   And you've been in that position since when?

13       A.   June of 2015, previously interim from 2014 to '15.

14       Q.   Okay.  And are you associated with a political party?

15       A.   Yes, ma'am.

16       Q.   And what party is that?

17       A.   I'm a Democrat.

18       Q.   Do you hold any other positions with the Democratic

19   Party?

20       A.   I'm on the executive committee as well.

21       Q.   And you mentioned you had 24 full-time employees with

22   the Board?

23       A.   Correct.

24       Q.   How many seasonal employees do you anticipate hiring for

25   the 2016 General Election?

Vol. 6 - 234

1    A.    Between -- for all operations, I can say probably

2    anywhere between 60 and 80.

3    Q.    And how many registered voters are in your county?

4    A.    Currently 298,000.

5    Q.    And what is the Board's budget?

6    A.    I don't know.  Currently this year we're at

7    1.98 million.

8    Q.    Okay.  Thank you.

9         And I want to show you what's been marked as Plaintiffs'

10   Exhibit 989.  And could you tell me what this document is?

11   A.    That's an internal report we use for provisional

12   statistics.  We use, as one of the means for auditing the

13   actual provisionals just in reference to the counts, the number

14   that we state we received, and then we -- the hand count.  And

15   then this is directly from the registration system to assure

16   that one wasn't missed.

17   Q.    And what year was this one for?

18   A.    2015 general.

19   Q.    And how many provisional ballots were valid in 2015?

20   A.    1978.

21   Q.    And how many were not counted?

22   A.    Invalid 411.

23   Q.    And could you tell me what was the most common reason

24   why a ballot was determined to be invalid?

25   A.    Not registered in Ohio.

Vol. 6 – 235

1    Q.    Okay.  Do you know, how many did that include?

2    A.    Two hundred, I believe that's 66.

3    Q.    Did that help?

4    A.    Thank you.  Yes.

5    Q.    Do you know how many of those you were able to register

6    after the 2015 election?

7    A.    No.  Not the exact number, no.

8    Q.    Do you know an approximate?

9    A.    No.  Because the not registered in Ohio, some of those

10   could be people that actually listed addresses that were not in

11   your county so, therefore, they could not be registered.  We do

12   still get people that may be visiting through the state fill

13   out provisional envelopes, and those would not be able to be

14   registered so I can't tell you exactly.

15   Q.    That's all right.  Thank you.

16         THE COURT:  Before you leave that, though, Ms. Scott,

17   I see that one wrong precinct in wrong location led to 105

18   ballots being not counted; is that right?

19         THE WITNESS:  That's correct, sir.

20         THE COURT:  So that's not right church/wrong pew, is

21   it?

22         THE WITNESS:  No.  That is the actual wrong polling

23   location as well as the wrong precinct.

24         THE COURT:  For those persons, they may have been

25   voters registered in Ohio; is that right?

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Vol. 6 – 236

 1              THE WITNESS:  Correct.

 2              THE COURT:  In fact, they were voters registered in

 3     Ohio; otherwise, they would have been in the column not

 4     registered in Ohio; is that correct?

 5              THE WITNESS:  Correct.

 6              THE COURT:  So these 105 people were people who were

 7     registered in the State of Ohio, right?

 8              THE WITNESS:  Correct.

 9              THE COURT:  But who had come to the wrong voting

10     location?

11              THE WITNESS:  Correct.

12              THE COURT:  Do you -- were your poll workers

13     instructed to send them to the correct location?

14              THE WITNESS:  That is part of their training, yes.

15              THE COURT:  Do you know whether they, in fact, sent

16     these 105 people to the correct location?

17              THE WITNESS:  I cannot say definite, no.

18              THE COURT:  So we don't know whether that -- well, we

19     do know.  Those ballots -- those folks' ballots weren't counted

20     so apparently they would have said that they -- that despite

21     the fact that they were in the wrong voting location, they

22     refused to go elsewhere and they insisted on voting.  Is that

23     that category of persons?

24              THE WITNESS:  Yes.  Some people that insist on going

25     to their old polling location instead of going to their new

1    polling location, or some people actually from verifying

2    previously just put -- they put different addresses; some

3    people only go to the polling locations closest to them.  But

4    they are directed to go to the proper polling location when

5    they come in, whether they choose to leave or not.  And if they

6    choose that they want to stay there and vote, the poll worker

7    will issue them a ballot.

8              THE COURT:  Is a poll worker instructed to inform that

9    voter that that voter's ballot will not be counted because that

10   voter is voting in the wrong location?

11             THE WITNESS:  Yes.

12             THE COURT:  Do you know whether in these 105 instances

13   the poll worker so instructed the voter?

14             THE WITNESS:  I can only say they were instructed to

15   instruct the voter.

16             THE COURT:  All right.

17          Thank you, Ms. Carwile.

18           MS. CARWILE:  Thank you, Your Honor.

19   BY MS. CARWILE:

20     Q.   I'm going to turn to the second page of this document,

21   and what does this depict?

22     A.   In the system itself when you're processing the

23   provisional, the registration system requires you to have not

24   only the reason on the front end but the issue reason.  So

25   those would be that, address change, new precinct, those are

Vol. 6 - 238

1   people that actually moved to new precincts. Name change, same

2   precinct.

3       So those are reasons on -- if we can determine why it

4   was issued based upon what they checked on the envelope itself,

5   such as name not being in the signature book, those may be

6   people that, A, for some people from the time -- it could be

7   from the time the signature book is ordered from the time that

8   they actually vote, they could be missing due to that. Or they

9   could actually be from other -- and it should be -- some of

10  those actually probably should come in other out-of-county

11  provisionals, but I can say that sometimes that's the reason

12  it's checked on there. Address change and polling, new

13  precinct, provided last four digits of their social only. On

14  some of them, those would be people that some of those people

15  had to come back in in reference to the -- after -- after

16  Election Day. And other is just that they can't find any

17  reason why that person -- why they received that ballot. I

18  didn't move, I didn't change my name. Why did the poll worker

19  have them vote a provisional?

20      If we cannot determine it, in order to still count it we

21  still give it a code, and those are other.

22  Q.   So these were the reasons why the person was given a

23  provisional ballot instead of voting a regular ballot?

24  A.   Correct.

25  Q.   What is the number one reason that someone has to vote a

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 239 of 296 PAGEID #: 1559
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/04/08 Page: 239 of 396 PAGEID #: 23937

Vol. 6 - 239

 1    provisional ballot?

 2      A.   That they actually do move from one precinct to another.

 3      Q.   Okay.  Thank you.

 4           And why is it important for a voter to be in the correct

 5    precinct?

 6      A.   Besides the fact that it's mandatory by the State for

 7    us?

 8           Well, there are local options as far as -- so say you

 9    have a local issue that involves just that precinct?  Of

10    course, you would want people that live in that precinct to be

11    the ones that vote on those, whether it's a liquor option, it

12    could be a school levy or something that's unique to certain

13    precincts.

14           So there are definitely things that are precinct

15    specific that of course you will want people that live within

16    those precincts to be able to vote on.

17      Q.   Now, I'm not familiar with Lucas County.  Are there any

18    parts of Lucas County that would have different State

19    representatives?

20      A.   Yes.  We have different State representatives throughout

21    the county.

22      Q.   Okay.  Thank you.

23           And on your prior examination you had mentioned that you

24    have poll worker training and that you had received guidelines.

25           Who did you receive guidelines for with regard to poll

Vol. 6 – 240

1  worker training?

2    A.   We received the flip chart from the Secretary of State's

3  office itself, and we use that in our training.  And then we

4  also have a local guide that we use that goes over more local

5  issues in conjunction with the flip charts that we provide at

6  poll worker training.

7    Q.   Okay.  Great.  Thank you.

8         And I want to show you what's been marked -- you saw

9  this.  It's Plaintiffs' Exhibit 3454, and this was Mr. Bell's

10  ballot.  Does that sound correct?

11    A.   Correct.

12    Q.   And you noted that the address that he gave was for a

13  U.S. postal service --

14    A.   Correct.

15    Q.   -- location?

16         From this ballot do you know where Mr. Bell physically

17  resides?

18    A.   No.

19    Q.   And do you know what precinct he should vote in?

20    A.   No.

21    Q.   And are you able to determine if Mr. Bell cast the

22  correct ballot?

23    A.   Not from this, no.

24    Q.   All right.  Thank you.

25         What would you need to be able to determine whether

Vol. 6 – 241

1   Mr. Bell cast the correct ballot?

2     A.    Well, based upon the Dussel Street address itself, that

3   would be one precinct.  I'm going to have to assume he doesn't

4   live in a post office box so, therefore, the address that he

5   would live at would not be that one, but we would need the

6   voter registration system to see if that was a mailing address.

7         Which I found that a lot of times when they do these

8   post office boxes, that is their true mailing address for them

9   but not their residential.

10    Q.    Okay.  So you would need his actual residential address?

11    A.    Correct.

12    Q.    In Section 4, what is that section used for?

13    A.    That's for their former address.  And it states if you

14  moved without updating your registration and that person, he

15  says yes.

16    Q.    Okay.  And was it your testimony that if they mark yes,

17  that you would send them a registration notice letter?

18    A.    A registration card, yes.

19    Q.    Okay.  Is my understanding correct then that this form

20  can also be used to update your registration if you had not

21  previously updated it?

22    A.    Yes.

23    Q.    Okay.  And if a voter is not registered in your county

24  and they fill out all their fields correctly -- or sorry,

25  excuse me.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 242 of 296 PAGEID #: 1562
Case: 2:00-cv-03893-ALM-TPK Doc #: 666-6 Filed: 04/06/20 Page: 242 of 296 PAGEID #: 23893

Vol. 6 – 242

1      If the voter is not registered in the State of Ohio and
2  they fill out all the fields correctly on the provisional
3  ballot envelope, what happens with regard to their
4  registration?
5  A.   If they're not in the State of Ohio itself?
6  Q.   Yes.
7  A.   Nothing.
8  Q.   Do you update their -- do you register them if they fill
9  out the provisional ballot correctly?
10 A.   Oh, if they are coming into -- I thought you meant ones
11 we didn't count because they weren't in Ohio.  I apologize.
12      Yes, then they would at that time be registered within
13 the state.
14 Q.   All right.  And why can they be registered with the
15 provisional ballot form?
16 A.   Because that's currently part of the guidelines that we
17 received in the elections manual that they can.
18 Q.   And prior to 2014 if they filled out just the
19 provisional affirmation form, would they have been able to
20 register to vote?
21 A.   Previously we were given registration forms with the
22 actual absentee -- I mean, excuse me, with the provisional
23 ballot as well.  When you voted provisionally, you got a
24 registration card along with the affirmation statement.
25 Q.   Was the registration card mandatory?

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 243 of 296 PAGEID #: 1563
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 243 of 296 PAGEID #: 23951

Vol. 6 - 243

1    A.   They would turn that in with it.  They are trained that

2    they should receive both.  And at one point the actual 12B

3    actually had the registration attached to it as well.

4    Q.   Okay.  Do you know whether -- when it had been attached

5    to it, do you know if that section was a mandatory section for

6    that provisional ballot?

7    A.   For the provisional portion of it -- well, it was a

8    carbon so it was part of the form.  It was no different than

9    them filling out all of the necessary fields in reference to

10   their registration or provisional.

11   Q.   Okay.

12         MS. CARWILE:  May I have a moment to confer,

13   Your Honor?

14         THE COURT:  Yes, you may.

15         MS. CARWILE:  Nothing further, Your Honor.

16         THE COURT:  Thank you, Ms. Carwile.

17      Ms. Gentry, anything further?

18         MS. GENTRY:  Yes, Your Honor.  I have two points to

19   cover with the witness.

20         THE COURT:  All right.

21         MS. GENTRY:  Actually, three, I apologize.  Three

22   points.

23         THE COURT:  Okay.

24                    RECROSS-EXAMINATION

25   BY MS. GENTRY:

Vol. 6 - 244

1    Q.   Ms. Scott, I want to ask you about the wrong precinct

2  issue that you testified about early in your testimony with

3  Ms. Carwile, and this relates to the issue of whether a person

4  who's in the wrong location will have their ballot thrown out,

5  whereas, someone who is in the correct location but wrong

6  precinct is treated differently.  So that's my preface for it.

7       Now, is it your understanding that if a person is in the

8  right church but wrong pew -- so, in other words, they're in

9  the right location but wrong precinct -- that they should be

10  directed to the right precinct?

11       MS. CARWILE:  Objection, Your Honor.  Beyond the scope

12  of my questioning.

13       THE COURT:  I'm going to allow this because I asked

14  that question and it may -- while it wasn't within the scope of

15  your questioning, it was within the scope of mine.  So if she

16  needs to clarify that point, I'm going to allow it.

17       Overruled.

18       MS. CARWILE:  Thank you, Your Honor.

19       MS. GENTRY:  Thank you, Your Honor.

20       THE WITNESS:  Can you repeat the question for me?

21  BY MS. GENTRY:

22    Q.   Sure.

23       Is it correct that if a voter is in the right location

24  but wrong precinct, then they need to be directed to the

25  correct location within -- or correct precinct within that

 1   location?

 2    A.   They should be directed to the correct precinct, yes.

 3    Q.   And there's a requirement that the poll worker fill out

 4   a form that shows that they directed the voters to the right

 5   precinct, correct?

 6    A.   The 12D form, yes.

 7    Q.   Yes.  And if that form is not filled out, there's no

 8   documentation that the person was told to go to the precinct --

 9   to the correct precinct, then their vote gets counted even

10   though it was in the wrong precinct, correct?

11    A.   Correct.  And the current manual states that the ballot

12   can be remade on issues that they are allowed to vote upon.

13    Q.   Correct.

14         So, for instance, a statewide race or a statewide issue

15   they would be able to vote on regardless of what precinct they

16   actually voted in, correct?

17    A.   Correct.

18    Q.   And their vote in that case, the case of the correct

19   location but wrong precinct, the absence of a document allows

20   their vote to be counted because you presume that the poll

21   worker never gave them the instruction, correct?

22    A.   Correct.

23    Q.   Now, it's a different situation for a person who is in

24   the wrong location, correct?

25    A.   Correct.

1    Q.    There's no form that the poll worker has to fill out to

2    show that they told the voter to go to their correct precinct

3    in a different location, correct?

4    A.    Correct.

5    Q.    So the voter who's in the wrong location to begin with

6    does not have the same protections that a voter who's in the

7    right location has with respect to wrong precinct issues,

8    correct?

9    A.    There is currently no process for that, correct.

10   Q.    But the only difference between the two groups of people

11   is that one person made it to the right building and the other

12   person made it to a different building, correct?

13   A.    I would assume, yes.

14   Q.    All right.  We've shown you the ballot for David Bell,

15   and you'll recall he was -- his vote was not counted because he

16   gave an address of 427 West Dussel, which is the post office;

17   correct?

18   A.    Correct.

19   Q.    His ballot was not rejected for not being a registered

20   voter, correct?

21   A.    Correct.

22   Q.    So is it fair to infer that his registration card has a

23   different address other than the post office address?

24   A.    I would assume, yes.

25   Q.    And in your answers before you actually suggested that

1    perhaps he was writing down his mailing address instead of his

2    residence address.

3      A.   Correct.

4      Q.   Do voters sometimes do that, they accidentally write

5    down their mailing address instead of their residence address?

6      A.   I would assume that only because I know that's a post

7    office so I would assume that that's why he did.

8      Q.   And more than one person has done that, correct?

9      A.   Correct.

10     Q.   The registration address where Mr. Bell is actually

11   registered could be in the same precinct as the post office,

12   couldn't it?

13     A.   I would have no idea.

14     Q.   You'd have to check, correct?

15     A.   Right.

16     Q.   But it could be in the same precinct?

17     A.   It could be.

18     Q.   And so he might have voted in the correct precinct even

19   though he wrote down his mailing address, correct?

20     A.   It's possible, yes.

21     Q.   But you don't have any processes to check to determine

22   what address he's registered at and whether the precinct was

23   correct?

24     A.   Well, the process would be -- I'm going to assume that

25   it's not even in the correct precinct because I can say this:

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 248 of 296 PAGEID #: 1568
Case: 2:00-cv-03893-ALM-TPA Doc #: 666 Filed: 04/06/21 Page: 248 of 396 PAGEID #: 23898

Vol. 6 - 248

1          If you have people that are issued provisional ballots

2     when they possibly should not have had one because they moved

3     within that same precinct, that is one of the codes we do use,

4     that they moved within their same precinct.

5     Q.    Well, he was rejected two years in a row, correct?

6     A.    Correct.  I'm going to assume that his is not in that

7     precinct, I would assume, because that's also a code you could

8     use as well.  His, besides it being a residential -- besides it

9     being a commercial, if it's the same precinct, if I list an

10    address, old address and new address and it's the same

11    precinct, first of all, our question is why did that person

12    vote provisionally anyway.  So that is a coding that we

13    normally do try to use because that's a training issue that we

14    try to focus on, that people are being asked to vote

15    provisionally when they should not have to because they moved

16    within the same precinct if they had all the other information

17    they needed.  So I would probably assume that his address is

18    not within that one.

19    Q.    You have no evidence as to whether he moved, though,

20    correct?

21    A.    I have no evidence of either.

22    Q.    And you have -- and you really have no evidence as to

23    where his registration address is other than what's on the card

24    in his file, correct?

25    A.    I have no -- I'm sorry?

1    Q.   Okay.  You don't know where his registration address is

2    unless you look at his registration card.

3    A.   Correct.  Correct.

4    Q.   When he came in and verbally gave his address to the

5    worker -- well, strike that.  I think I'm getting confused.

6         You said that the poll worker looks at his -- the

7    address he writes down and determines what precinct that

8    address is, correct?

9    A.   Correct.

10    Q.   In order to determine what ballot to give him?

11    A.   Correct.

12    Q.   Are your poll workers trained not to accept addresses

13    like 427 West Dussel, which is the post office address?

14    A.   No.

15    Q.   Why not?

16    A.   They're looking it up in the street and road guide.  In

17    the street and road guide there are addresses within that range

18    that may be residential addresses.  So, no, they're not trained

19    to tell -- look at that and say you're giving me a residential

20    address, no, they're not.

21    Q.   So the street guide contains both commercial addresses,

22    government addresses and residential addresses?

23    A.   It contains all addresses within the GIS database.  So

24    there could be an address that is residential and next to it

25    could be commercial.  Or, like we discussed previously, up and

1   down, upper and lower.  So it could very well be some addresses

2   that are both, and the poll worker would not know that.  No,

3   they would not.

4   Q.    You anticipated my question.  So the poll worker might

5   think it's a valid address because it's in the guide, but later

6   on it will be determined that it's not valid?

7   A.    Correct.

8   Q.    And there's nothing in the street guide that alerts the

9   poll worker that certain addresses are not valid for voting

10   purposes?

11   A.    No.

12   Q.    Finally, Ms. Carwile asked you about using the

13   provisional ballot form as it's been modified to register

14   people to vote.

15        Do you recall that?

16   A.    Yes.

17   Q.    Isn't it true that the form could request that

18   information from voters but not throw out their vote just

19   because they didn't fill out a field?

20   A.    Is it true that it can be used that way?  I'm --

21   Q.    Yes.  Isn't it true that the form could stay exactly the

22   way it is but Boards could still count votes if they've

23   identified that the voter is who they say they are and that

24   they're eligible to vote?

25   A.    If -- if that was -- if that's the directive we were

Vol. 6 – 251

1    given, yes.

2       Q.   Yeah.  There's no reason you can think of why that

3    couldn't be the law if the law were changed, correct?

4       A.   Correct.

5            MS. GENTRY:  All right.  Thank you, Your Honor.  No

6    further questions.

7            THE COURT:  All right.  Ms. Carwile?

8            MS. CARWILE:  Just very briefly, Your Honor.

9            THE COURT:  All right.

10                        REDIRECT EXAMINATION

11   BY MS. CARWILE:

12      Q.   I apologize for keeping you.  I'm going to make this

13   really brief.

14           This is Plaintiffs' Exhibit 3454.  You've seen it.  What

15   does -- in Section 4, what does that checkmark or the X tell

16   you?

17      A.   He said he moved and he did not update his address.

18      Q.   So that would be evidence that Mr. Bell actually had

19   moved in 2014?

20      A.   Correct.

21      Q.   And do you know what his residence is based on this

22   form?

23      A.   No.

24           MS. CARWILE:  Okay.  Thank you.

25           Nothing further.

1          THE COURT:  Ms. Scott, thank you very much, ma'am.

2    You may be excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  Your next witness?

5          MR. CHANDRA:  So, Your Honor, Senator Turner is on her

6    way back from Ballot Board.  She texted a few minutes ago so

7    she should be here momentarily.  We can either continue with

8    her, or we have another witness waiting from Warren County.  I

9    do believe it will be moments because it was probably 7 or 8

10   minutes ago she said she was on her way back.

11         THE COURT:  All right.  We'll wait for Senator Turner

12   then because we already have Mr. Davis' testimony that will be

13   truncated so there's no need to have that many open spaces.

14        So we'll resume when Ms. Turner arrives.

15         MR. CHANDRA:  Our understanding, Your Honor, is that

16   we have to close business at 5:00 today; is that correct?

17         THE COURT:  Yes, because I have class.

18        The only other day we need to talk about, I believe, is

19   Monday.  I have something at 2:30, but I'm trying to reschedule

20   that.  I'll have -- I should have something definitive on that

21   by tomorrow.  And what may have to happen is I may have to

22   address that business so we might have to take about an hour to

23   an hour-and-a-half Monday afternoon, and then we can come back.

24   And on Monday and Wednesday of next week we can work until 5:00

25   o'clock because I, once again, have class.

1          MR. CHANDRA:  Okay.  Thank you, Your Honor.  I will go

2     see what the status is with Senator Turner.

3          (Thereupon, a recess was taken.)

4          THE COURT:  Please proceed.

5          MS. RICHARDSON:  Thank you, Your Honor.

6                              – – –

7                         NINA TURNER,

8          HAVING BEEN PREVIOUSLY DULY SWORN, FURTHER TESTIFIED AS

9     FOLLOWS:

10                       CROSS-EXAMINATION

11                         (Continued)

12    BY MS. RICHARDSON:

13      Q.   Good afternoon, Senator Turner.

14      A.   Good afternoon.

15      Q.   Before we broke we were taking a look at Plaintiffs'

16    Exhibit 1286.  And you testified earlier that this is proponent

17    testimony that was offered by Steve Cuckler.

18          Do you recall that?

19      A.   I do.

20      Q.   And I believe right as we were closing I had asked you

21    whether one of the things that Mr. Cuckler is talking about in

22    this testimony is the issue of a statewide mailing; is that

23    correct?

24      A.   Yes.

25      Q.   And based on your review of Mr. Cuckler's testimony, is

1    it your understanding that Mr. Cuckler was recommending that

2    the State -- the Secretary of State be the individual

3    responsible for sending out absentee ballot applications?

4      A.   Yes.

5      Q.   And if you'll take a look at the seventh bullet down

6    where it begins in Delaware County?

7      A.   Uh-huh.

8      Q.   And it states:  In Delaware County, we have three cities

9    that straddle into Franklin County, Columbus, Dublin and

10   Westerville.  Did I read that correctly?

11     A.   Yes.

12     Q.   And it states:  In Delaware County we have 13 school

13   districts and education centers that straddle multiple

14   counties, such as Marion, Licking, Morrow and Union Counties as

15   well.

16          Did I read that correctly?

17     A.   Yes.

18     Q.   Thank you, Senator.

19          And it states in the next bullet point:  If there is not

20   a uniform and consistent process of sending absentee ballot

21   applications to voters, it creates unequal access to the ballot

22   for voters who live in the same governmental jurisdiction and

23   causes confusion with voters.

24          Did I read that correctly?

25     A.   Yes.

1    Q.    He provides an example.  He states in the next bullet

2    point that there are streets in Columbus, Dublin and

3    Westerville where one --

4              MR. CHANDRA:  Your Honor, objection as to the previous

5    portion as to relevance.  We're not challenging that.  And also

6    the same continuing hearsay objection.

7              THE COURT:  Overruled.

8              MS. RICHARDSON:  Thank you, Your Honor.

9    BY MS. RICHARDSON:

10    Q.    And in this testimony Mr. Cuckler states:  As an

11    example, that there are streets in Columbus, Dublin and

12    Westerville where one side is in Delaware, yet the other side

13    is in Franklin.

14              And he states:  If Franklin County sends out absentee

15    applications and due to budget constraints Delaware County does

16    not, you have a situation where neighbors are treated

17    differently and voters who happen to live in larger counties

18    with sizeable financial resources have more access to a ballot

19    to vote on the very same issues and candidates as their

20    neighbors who happen to live in smaller counties.

21              Did I read that correctly?

22    A.    I can see the first part, and I assume you read the

23    second part correctly.

24    Q.    Thank you, Senator.  I apologize.

25    A.    That's okay.

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Vol. 6 — 256

1          Thank you.  Yes.

2     Q.   And now that you can actually see the document, did I

3     read that correctly?

4     A.   Yes.

5     Q.   Thank you.

6          And in the last bullet point it states:  Surveys sent

7     out by Senators Seitz and Smith to election officials in all 88

8     counties found that the overwhelming majority of counties

9     support -- and it moves on to the next page -- the Secretary of

10    State being responsible for sending out absentee ballot

11    applications.

12          MR. CHANDRA:  Objection; double hearsay, Your Honor.

13          THE COURT:  Overruled.

14          MS. RICHARDSON:  Thank you, Your Honor.

15    BY MS. RICHARDSON:

16    Q.   Did I read that bullet point correctly?

17    A.   Yes.

18    Q.   And, finally, it states:  In my opinion, we need more

19    clarity, uniformity and consistency in Ohio's election laws.

20    SB 205 is a positive step in that direction.

21          And did I read that correctly?

22    A.   Yes.

23    Q.   Thank you, Senator.

24          And I believe you mentioned that with Senate Bills 205

25    and 216, there was vigorous debate.  Do I recall that correctly

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-6 Filed 09/12/20 Page 257 of 296 PAGEID#: 1577
Case: 2:00-cv-03898-ALM-TPA Doc#: 660 Filed 04/06/18 Page 257 of 396 PAGEID #: 29963

Vol. 6 - 257

 1    from your testimony?

 2      A.   Yes.

 3      Q.   And some of that debate may be reflected in the formal

 4    records from the senate; is that correct?

 5      A.   Yes, on the senate floor.

 6      Q.   And there may have also been conversations and debates

 7    that took place outside of the context of the formal record; is

 8    that fair?

 9      A.   That's fair.

10      Q.   Senator, Mr. Chandra asked you some questions about a

11    billboard that was erected in your community.  Do you recall

12    that?

13      A.   I do.

14      Q.   That billboard was not put up by the General Assembly,

15    was it?

16      A.   No.

17      Q.   And it was not put up by any -- any of the defendants in

18    this case, correct?

19      A.   Not to my knowledge.

20      Q.   You were asked a series of questions on your direct

21    about preventing fraud.  Do you recall that?

22      A.   Preventing fraud?  Okay.

23      Q.   Let me clarify my question.

24           I believe you were asked some questions about whether

25    any of the sponsors or proponents of Senate Bills 205 and 216

1    mention fraud as a specific reason for the bills.

2      A.   Yes.

3      Q.   And you would agree that preventing fraud is not the

4    only potential interest an election law can serve, correct?

5            MR. CHANDRA:  Objection.

6            THE COURT:  Sustained.  Rephrase your question.

7            MS. RICHARDSON:  Thank you, Your Honor.

8    BY MS. RICHARDSON:

9      Q.   Senator, are there a variety of different important

10   interests that can be taken into account in determining whether

11   a regulation with respect to an election should be passed?

12           MR. CHANDRA:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  Yes.

15   BY MS. RICHARDSON:

16     Q.   You were also asked a series of questions about

17   provisional ballots.  Do you recall that?

18     A.   Yes.

19     Q.   And I believe you referenced some statistics from the

20   EAC.  Do you recall that?

21     A.   Yes.

22     Q.   Do you remember which year you were referring to when

23   you referenced those statistics regarding provisional ballots

24   in Ohio?

25     A.   No.  I'm not sure of the year of the EAC's report.

Vol. 6 – 259

1    Q.    Are you aware that in 2012 the EAC reported that 26

2  states counted less than half of their provisional ballots?

3    A.    No.

4    Q.    Are you aware that in 2012 Ohio exceeded 80 percent of

5  the provisional ballots counted?

6          MR. CHANDRA:  Your Honor, objection to this line of

7  questioning.

8          THE COURT:  Overruled.

9          THE WITNESS:  No.

10 BY MS. RICHARDSON:

11   Q.    And are you aware that in 2014 Ohio counted over

12 90 percent of provisional ballots?

13   A.    No.

14   Q.    And that it was one of only five states to have

15 acceptance rates that high?

16   A.    No.

17   Q.    And in 2014 Senate Bills 205 and 216 were in place; is

18 that correct?

19   A.    Yes.

20   Q.    Senator Turner, I asked you a little bit earlier about

21 the Ohio Democratic Party's Twitter account.  Do you recall

22 that?

23   A.    Yes.

24   Q.    And you testified that @OhioDEMS is the Twitter handle

25 for the Ohio Democratic Party, correct?

1    A.   Yes.

2    Q.   I'm going to show you what has been premarked as

3  Defendants' Exhibit 63.  Are you familiar with this?

4    A.   I had not seen this Tweet when it went out.  I'm not

5  sure when it went out.

6    Q.   And based on the Twitter handle at the top of the page,

7  you can tell this is a Twitter that went out from the Ohio

8  Democratic Party, correct?

9    A.   Correct.

10    Q.   And it states:  Early voting is easy and convenient and

11  open to every registered Ohio voter, correct?

12    A.   Correct.

13    Q.   Senator Turner, you have never been a member of a Board

14  of Elections in the State of Ohio, have you?

15    A.   No.

16    Q.   And you've never been employed by a Board of Elections

17  in the State of Ohio, correct?

18    A.   Correct.

19    Q.   And in 2014 you ran for the position of Ohio Secretary

20  of State, correct?

21    A.   Correct.

22    Q.   And Jon Husted was your opponent in that race, correct?

23    A.   Yes.

24       MS. RICHARDSON:  Your Honor, may I confer?

25       THE COURT:  Yes, you may.

1      MS. RICHARDSON:  No further questions, Your Honor.

2   Thank you, Senator.

3      THE COURT:  Thank you, Ms. Richardson.

4   Mr. Chandra, any redirect?

5      MR. CHANDRA:  Yes, Your Honor.

6                 REDIRECT EXAMINATION

7  BY MR. CHANDRA:

8   Q.   Senator Turner, I'm going to show you one by one the

9  various exhibits that Ms. Richardson was showing you, and I'll

10 start with Plaintiffs' Exhibit 1308.

11     Is this the sponsor testimony from Senator Bill Seitz

12 for Senate Bill 216?

13  A.   Yes.

14  Q.   Now, I know that Ms. Richardson directed you to certain

15 portions of it, but I would like you to please skim the

16 document again.

17     Let me know when you're done with the first page, and

18 I'll turn to the second page.

19  A.   Okay.  Okay.

20  Q.   Okay.  So I just moved it up.  Did you get a chance to

21 skim the whole document?

22  A.   I skimmed, yes.

23  Q.   Okay.  And if you need me to put it back up, let me

24 know.

25  A.   Okay.

1     Q.   My question is having reviewed the document again and

2     the approximately seven supposed reasons justifying Senate Bill

3     216, do you see anything in those reasons that would cause you

4     to conclude that disenfranchising a voter for failure to fill

5     out the five fields completely and correctly is justifiable?

6           MS. RICHARDSON:  Objection.

7           THE COURT:  Basis?

8           MS. RICHARDSON:  Leading.

9           THE COURT:  Overruled.

10           MS. RICHARDSON:  Thank you, Your Honor.

11           THE WITNESS:  No.

12   BY MR. CHANDRA:

13     Q.   Do you see anything in Plaintiffs' Exhibit 1308 that

14     causes you to conclude that disallowing poll workers from

15     assisting voters in completing provisional ballot forms is

16     justifiable?

17     A.   No.

18     Q.   Okay.  So I would like to move you now to Plaintiffs'

19     Exhibit 1437.  This was the interested party testimony

20     regarding Senate Bill 216 by Ken Terry of the Ohio Association

21     of Election Officials.  And if you could please just take a

22     moment to review the testimony, let me know when you need me to

23     move it up and move to the next page.

24     A.   You can move it up.  Okay.

25     Q.   Senator Turner, do you see anything in Plaintiffs'

1   Exhibit 1437, Mr. Terry's testimony of interested party Ohio

2   Association of Elected Officials, that suggests to you that

3   disenfranchising a voter for failure to completely and

4   accurately fill out the five fields on the provisional ballot

5   affirmation form is justifiable?

6     A.   No.

7          MS. RICHARDSON:  Objection.

8          THE COURT:  Basis?

9          MS. RICHARDSON:  Leading.

10         THE COURT:  Sustained.  Rephrase, Mr. Chandra.

11         MS. RICHARDSON:  Thank you, Your Honor.

12  BY MR. CHANDRA:

13    Q.   Do you see anything in Plaintiffs' Exhibit 1437 that

14  causes you to rethink your earlier testimony in which you

15  stated that disenfranchising voters for failure to fill out the

16  form is unjustifiable?

17    A.   No.

18    Q.   Okay.  Specifically, do you see -- did you have an

19  opportunity to read the section of Plaintiffs' Exhibit 1437

20  that talked about using the provisional ballot affirmation form

21  as a means of updating voter registration?

22    A.   Yes.

23    Q.   Okay.  Do you see any connection between the need to --

24  or the desirability of using that form to update a voter's

25  registration with the need to -- or any need to disenfranchise

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Vol. 6 – 264

```
 1   the voter while doing so?

 2     A.   No.

 3     Q.   What about with respect to assistance by a poll worker

 4   in completing the form, does anything in Plaintiffs' Exhibit

 5   1437 cause you to change the view you expressed that

 6   disenfranchising the voter is not acceptable?

 7          MS. RICHARDSON:  Objection.

 8          THE COURT:  Basis?

 9          MS. RICHARDSON:  Continuing to lead.

10          THE COURT:  Sustained.  Rephrase, Mr. Chandra.

11          MS. RICHARDSON:  Thank you, Your Honor.

12          MR. CHANDRA:  I'm sorry, could I have the question

13   read back to me, and I'll try to reformulate it?

14       (Question read back.)

15   BY MR. CHANDRA:

16     Q.   That's a bad question anyway, so thank you.

17          Does anything in Plaintiffs' Exhibit 1437, Mr. Terry's

18   testimony, cause you to believe that prohibiting poll workers

19   from assisting voters in filling out provisional ballot

20   affirmation forms is justifiable?

21     A.   No.

22     Q.   Okay.  I'd like to now show you Plaintiffs' Exhibit

23   1294, which is the interested party testimony on behalf of the

24   Ohio Association of Election Officials of Aaron Ockerman.

25          Do you remember seeing this exhibit earlier?
```

 1    A.    Yes.

 2    Q.    And Ms. Ryan showed it to you.  Is there anything --

 3    first of all, let's make sure you've had a chance to skim

 4    through it again.

 5    A.    Okay.

 6    Q.    Last page.

 7    A.    Okay.

 8    Q.    Okay.  Senator Turner, does any of the reasoning offered

 9    by Mr. Ockerman in Plaintiffs' Exhibit 1294 on behalf of the

10    Ohio Association of Election Officials cause you to believe

11    that disenfranchising voters for failure to completely and

12    accurately fill out the provisional ballot affirmation form is

13    justifiable?

14    A.    No.

15          MS. RICHARDSON:  Objection.

16          THE COURT:  Basis?

17          MS. RICHARDSON:  Leading.

18          THE COURT:  Sustained.

19          MS. RICHARDSON:  Thank you, Your Honor.

20          THE COURT:  Rephrase, Mr. Chandra.

21   BY MR. CHANDRA:

22    Q.    Does anything about Plaintiffs' Exhibit 1294, Senator

23    Turner, influence your thinking as expressed in your earlier

24    testimony about the justifiability of disenfranchising voters

25    for failure to fill out the provisional ballot affirmation form

Vol. 6 - 266

1   completely and accurately?

2     A.   No.

3     Q.   I'm going to show you Plaintiffs' Exhibit 1438,

4   interested party testimony of Karla Herron with the Ohio

5   Association of Election Officials regarding Senate Bill 205 on

6   absentee ballots.  And, if you could, take whatever time you

7   need to revisit this exhibit.

8          MS. RICHARDSON:  Objection, Your Honor.

9          THE COURT:  Basis?

10         MS. RICHARDSON:  Outside the scope of my cross.  This

11  is not one we went over during cross-examination.

12         THE COURT:  Sustained.

13         MS. RICHARDSON:  Thank you, Your Honor.

14         MR. CHANDRA:  I'll withdraw it.

15  BY MR. CHANDRA:

16    Q.   Okay.  I will show you then Plaintiffs' Exhibit 1287,

17  and this was the document that was State Senator William Coley,

18  II's, sponsor testimony regarding Senate Bill 205.  Do you

19  recall Ms. Richardson showing you this document?

20    A.   Yes.

21    Q.   And if you could please revisit it to ensure you're

22  familiar with it.

23    A.   Okay.

24    Q.   Now, Ms. Richardson was asking you from this document

25  questions about the proffered rationale of uniformity.

 1           Do you recall that?

 2       A.   Yes.

 3       Q.   Is there anything about Senator Coley's rationale as

 4   expressed in Plaintiffs' Exhibit 1287 that causes you to

 5   reconsider your earlier testimony about the justifiability of

 6   disenfranchising voters who fail to completely fill out their

 7   absentee ballot forms that accompany the absentee ballots being

 8   returned?

 9       A.   No.

10           MS. RICHARDSON:  Objection, Your Honor.  Same leading

11   question.

12           THE COURT:  I'm going to overrule it.

13           MS. RICHARDSON:  Thank you, Your Honor.

14           MR. CHANDRA:  I'm sorry, I didn't hear the Court's

15   ruling.

16           THE COURT:  Overruled.

17           MR. CHANDRA:  Thank you.

18   BY MR. CHANDRA:

19       Q.   And is there anything about Senator Coley's testimony as

20   shown to you in Plaintiffs' Exhibit 1287 that causes you to

21   believe that prohibiting poll workers from assisting voters in

22   filling out the form accompanying absentee ballots is

23   justifiable?

24       A.   No.

25       Q.   Plaintiffs' Exhibit 1286 was proponent testimony from

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-6 Filed 09/12/20 Page 268 of 296 PAGEID #: 1588
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed 04/06/20 Page 268 of 296 PAGEID #: 23976

Vol. 6 – 268

1    Steve Cuckler, C-U-C-K-L-E-R.  I'll note for the record that

2    this document is highlighted.

3            MS. RICHARDSON:  Mr. Chandra, do you want to switch

4    out?  You should have -- those are my notes.  You should have

5    the -- there should be -- excuse me, Your Honor.

6    BY MR. CHANDRA:

7      Q.   So this is Mr. Cuckler's proponent testimony.  Do you

8    recall Ms. Richardson showing you this?

9      A.   Yes.

10     Q.   And there are a number of bullet points on the page?

11     A.   Yes.

12     Q.   Have you had a chance to review it?

13     A.   Yes.

14     Q.   Is there anything about anything that Mr. Cuckler

15   testified to that causes you to rethink your earlier testimony

16   about the justifiability of disenfranchising a voter who does

17   not fill out the absentee ballot form completely and

18   accurately?

19     A.   No.

20     Q.   And one of the things that Mr. Cuckler talked about in

21   this testimony that Ms. Richardson showed you was the example

22   she went over concerning voters on different sides of the

23   street in the same community and the mailing of absentee forms

24   to them -- or ballot applications to them.

25            Do you recall that discussion?

1    A.   Yes.

2    Q.   Okay.  And what is your position with regard to whether

3    or not counties -- let me rephrase that.

4         What is your position with regard to the alleged need

5    for uniformity across Ohio with the Secretary of State in

6    control sending out absentee ballot applications to voters?

7    A.   Well, I have grave concerns about that and expressed

8    that in the senate.  Uniformity for government is not equity

9    for the voter.  So if you take a county as large as Cuyahoga

10   County and you compare large counties to the smallest county,

11   larger counties -- or Cuyahoga County has about 38 times the

12   population of the smallest county.

13        And so to say this -- Mr. Cuckler's testimony is really

14   all about -- from my reading, about the administration of

15   elections and not about what the center focus should be, which

16   is to make voting easy and accessible for the voters.

17   Q.   So what are -- in your view, what are the differences

18   between larger counties like Cuyahoga County and smaller

19   counties with regard to absentee ballot applications?

20   A.   Well, population is number one.  And just to, you know,

21   remind -- just thinking about 2004, you know, what happened in

22   Ohio when we became the laughing stock of the nation because

23   lines were long and people were waiting for hours and hours.

24   And the General Assembly did correct that in 2006; I wasn't a

25   member at that time.  But one of the reasons for the mailing

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 270 of 296 PAGEID #: 1590
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/16 Page: 270 of 296 PAGEID #: 23870

Vol. 6 - 270

 1    out of absentee ballot applications is to ensure as much as one

 2    can that we don't have a repeat of 2004.

 3          And so for counties like Cuyahoga County, it is

 4    important that we can mail out those absentee ballot

 5    applications.  That is what Cuyahoga County had been doing

 6    before the General Assembly took away that authority.  And so I

 7    had constituents of mine in 2014, for example, who were

 8    confused because they were accustomed to getting the absentee

 9    ballot application from the Cuyahoga County Board of Elections,

10    but instead they got it from the Secretary of State.  His name

11    was all over the envelopes, and some people in my district

12    thought it was advertisement for his reelection.

13    Q.    And what did you come to understand about that reaction?

14    A.    Some voters --

15          MS. RICHARDSON:  Objection.

16          THE COURT:  Yes, Ms. Richardson?

17          MS. RICHARDSON:  Vague question, calls for speculation

18    and calls for hearsay.

19          THE COURT:  Overruled.  You may answer.

20          MS. RICHARDSON:  Thank you, Your Honor.

21          THE WITNESS:  Thank you, Your Honor.

22          Some of my voters -- and these were elderly

23    African-American voters -- threw out the absentee ballot

24    application, quite frankly, because they were accustomed to

25    getting that from the Boards of Election instead of the

 1   Secretary of State.

 2   BY MR. CHANDRA:

 3       Q.   Finally, I would like to show you what has been marked

 4   as Defendants' Exhibit 63.  This is the Tweet from the Ohio

 5   Democratic Party.  Could you please read the first couple of

 6   lines before the URL into the record?

 7       A.   Yes.  Early voting is easy and convenient and open to

 8   every registered Ohio voter.  Get more information.

 9            And then the URL for Ohio DEMS is listed.

10       Q.   Okay.  Just from your understanding as, you know, a

11   sometime Democratic Party official, what is your understanding

12   of what the purpose of such a Tweet is?

13       A.   The purpose is to get people to vote.  And in a Tweet

14   with 140 characters, it certainly would not be feasible or

15   appropriate for the Democratic Party to go into a big debate

16   while you're trying to get voters to come out to vote about the

17   fact that you have less opportunity to vote, so that Tweet was

18   just trying to get people out to vote.

19            MR. CHANDRA:  Okay.  I have no further questions,

20   Your Honor.

21            MS. RICHARDSON:  No questions, Your Honor.  Thank you.

22            THE COURT:  Senator, thank you very much.  You may be

23   excused.

24            THE WITNESS:  Thank you, Your Honor.

25            MR. CHANDRA:  We'll call our next witness, Your Honor.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 272 of 296 PAGEID #: 1592
Case: 2:06-cv-00896-ALM-TPK Doc #: 666 Filed: 04/06/20 Page: 272 of 296 PAGEID #: 23896

1        THE COURT:  Your next witness, Mr. Chandra, or

2   Ms. Gentry?

3        MS. GENTRY:  Yes, Your Honor.  We call Brian Sleeth to

4   the stand.

5                          – – –

6                       BRIAN SLEETH

7     AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

8                     CROSS-EXAMINATION

9   BY MS. GENTRY:

10    Q.   Good afternoon, Mr. Sleeth.

11    A.   Good afternoon.

12    Q.   Could you please state and spell your name for the

13  record?

14    A.   Brian, B-R-I-A-N, Sleeth, S-L-E-E-T-H.

15    Q.   You are currently the director of the Warren County

16  Board of Elections?

17    A.   Yes, I am.

18    Q.   You've been in that position for two-and-a-half years?

19    A.   Yes, that's correct.

20    Q.   Previously you were the deputy director of the Warren

21  County Board of Elections?

22    A.   Yes.

23    Q.   And you were in that position for a year?

24    A.   Yes.

25    Q.   How many full-time staff do you have?

Vol. 6 - 273

1    A.    Eight.

2    Q.    And what generally are your job responsibilities with

3    regard to absentee and provisional ballots?

4    A.    My job?

5    Q.    Yes.

6    A.    Overseeing the whole entire process from the incoming

7    ballots coming in, getting them processed, and the same day

8    absentee voting in office.  We also make sure those are all

9    accounted for every day.  We tally them up and make sure

10   they're all accounted for.

11   Q.    I'm going to ask you about the process of provisional

12   ballots being filled out at the polls on Election Day.  Okay?

13   A.    Uh-huh.

14   Q.    Now, the voters must fill out all five fields, being

15   printed name, address, date of birth, I.D. and signature,

16   correct?

17   A.    Yes.

18   Q.    Does the printed name have to be printed or can it be

19   cursive?

20   A.    We accept either.

21   Q.    My understanding is that in your jurisdiction poll

22   workers are trained to check the box on the form that states

23   that an I.D. was provided to them; is that correct?

24   A.    That's correct.

25   Q.    Why do you have poll workers check that box on the

Vol. 6 - 274

1    provisional ballot affirmation form?

2      A.   They're required to -- if the voter does not have a

3    driver's license or does not provide the last four digits of

4    their social, they're allowed the option to show the poll

5    worker any of those alternative forms of I.D., and the poll

6    workers acknowledge that and it gets checked on the form.

7      Q.   And it gets checked by the poll worker?

8      A.   Yes.  I'm sure that the voters have checked it in the

9    past, but I'm not there at the polls and we assume that they

10   are doing that.

11     Q.   You train your poll workers to check the box?

12     A.   Yes.

13     Q.   Are poll workers also trained to review the provisional

14   ballot form for completeness before the voter leaves the

15   polling place?

16     A.   Yes.  Before they're issued a ballot.

17     Q.   This is at the polling place?

18     A.   Yes.

19     Q.   Describe that process to me.

20     A.   Well, when it's -- when we get to the point where we

21   decide if they're a provisional voter or not, whatever the

22   reasons may be, the poll worker sends the voter off with the

23   form, the provisional ballot envelope, and has them complete it

24   and then bring it back to the table.  And then they preview it

25   just to make sure that all the necessary fields are filled in.

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

1    And then they are ordered to proceed after that in giving the

2    person the correct ballot.

3     Q.   Now, how do they know which precinct ballot to give to

4    the voter?

5     A.   Currently right now we use the electronic poll book, and

6    you would look up the voter's current address to determine

7    where they're supposed to be voting.

8     Q.   And is that address given to the poll worker verbally by

9    the voter, or do they look at the form?

10    A.   Either way.

11    Q.   I'm going to ask you about nursing home voters.

12         MS. GENTRY:  And, Your Honor, this might be a good

13    time to read the stipulation into the record.

14         THE COURT:  All right.

15         MS. CARWILE:  It's my understanding that the parties

16    have agreed to stipulate to the admission of Exhibits P386

17    through P443 and also P2371.

18         THE COURT:  Mr. Conover?

19         MR. CONOVER:  That's correct, Your Honor.

20         THE COURT:  The Court will admit P386 through 443 and

21    P2371.

22         MS. GENTRY:  Thank you, Your Honor.

23         THE COURT:  Please continue, Ms. Gentry.

24         MS. GENTRY:  Thank you, sir.

25    BY MS. GENTRY:

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 276 of 296 PAGEID #: 1596
Case: 2:00-cv-03893-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 276 of 296 PAGEID #: 23894

Vol. 6 — 276

1    Q.    Mr. Sleeth, I'm showing you what's been marked as

2    Plaintiffs' Exhibit 391.  This is a provisional ballot that was

3    rejected for not having a date of birth.  Do you see that?

4    A.    Yes.

5    Q.    There is a label with the name Otterbein Lebanon and

6    then an address that's placed near the street address portion

7    of the form.  Do you see that?

8    A.    Yes, I do.

9    Q.    What is Otterbein Lebanon?

10   A.    It's a senior living facility, a senior facility.

11   Q.    Is that another name for a nursing home?

12   A.    Yes, a nursing home.

13   Q.    Why is that label placed on this form?

14   A.    Most of the voters there in nursing homes struggle to

15   write all that information out.  And so that we're able to read

16   that when it comes back to the Board of Elections office, we

17   populate that field with the address of the facility.  The

18   facility uses the same address for the whole entire place.  All

19   the residents have that same address.

20   Q.    So does that mean that all the of the residents of the

21   nursing home are registered to vote using the nursing home as

22   their address?

23   A.    Yes, that's correct.

24   Q.    In this case the label is placed over the date of birth

25   field.  Do you see that?

1    A.   Yes.  It looks like it's just placed a little bit higher

2    than we usually place it.

3    Q.   And that's done by the Board?

4    A.   It's done by our officials that go out to the polls.  We

5    have -- we hire a bipartisan team that goes out to the nursing

6    homes and helps with the voting process, and one of those

7    individuals must have placed the label higher than usual.

8    Q.   And by obscuring the date of birth field, arguably it

9    made it difficult to see it and fill it in; is that fair?

10   A.   I mean, it still says date of birth to the left there

11   and we'll -- just half the first box is covered there by the

12   label.

13   Q.   All right.  I believe you testified in your deposition

14   that the Board of Elections goes to every length to make sure

15   that the provisional ballot envelope is filled out for nursing

16   home voters.  Do you recall that?

17   A.   Yes, that's correct.

18   Q.   Why is that?

19   A.   I mean, our goal at the Board of Elections is to make

20   sure that, you know, we don't have to go out there multiple

21   times.  And to make sure that they do provide all the required

22   information on the envelope, we try to assist the voters as

23   best we can.

24   Q.   And is it your experience that nursing home voters in

25   particular require more assistance than the regular voter?

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-6 Filed: 09/12/20 Page: 278 of 296 PAGEID #: 1598
Case: 2:06-cv-00896-ALM-TPK Doc#: 660 Filed: 04/06/18 Page: 278 of 396 PAGEID #: 23990

Vol. 6 - 278

1    A.    Absolutely.

2    Q.    Do you have an understanding as to why?

3    A.    Just because of their age.  You know, sometimes -- you

4  know, this form is not -- you know, it's pretty small, hard to

5  read in some spots.  You know, it's pretty -- we do take

6  magnifying glasses out to our nursing homes that magnifies the

7  whole page.  But, you know, it's hard for, you know, a general

8  person in the facility to fill out this form unassisted.

9    Q.    Do you also rely on the nursing home facility to give

10  you some information, such as date of birth?

11   A.    Yeah.  Initially, when we go out to the facilities, we

12  reach out to the -- it's usually the activities coordinator who

13  helps us out.  We reach out to them first to find out which

14  residents would like to participate in the voting process, and

15  we provide them a list of everybody that's registered at that

16  location.  And anybody that's not on that list we ask the

17  nursing home to, you know, gather that information so we can --

18  when we go out there, we can help get them registered to vote.

19   Q.    All right.  Thank you, Mr. Sleeth.

20        Now, I want to turn to the procedure that you follow

21  when you determine whether to count a provisional ballot.

22        It's my understanding that you follow the seven steps

23  that are laid out in the directive; is that correct?

24   A.    That's correct.

25   Q.    And it's your understanding that the year of birth in

1   the date of birth field must be correct; is that right?

2   A.   That's correct.

3   Q.   So if the voter gets the month and day right but writes

4   down the current year accidentally, that vote will be rejected?

5   A.   I mean, I would have to review the directive myself.  I

6   don't have the whole thing memorized.  But any of those type of

7   things are presented to our bipartisan board, and they would

8   vote on that individually to reject or accept that based on the

9   directive.

10   Q.   In your mind is there an issue as to whether the -- you

11   can confirm that the voter is over the age of 18?

12   A.   Can I confirm that?

13   Q.   Is that an issue in your mind as to why the year needs

14   to be correct?

15   A.   Yeah.  I mean, if it has the current year -- you know, I

16   mean, if it was 2014 and it said 2014, then you would, I guess,

17   question if they were eligible to even cast a ballot.

18        But that's why we have them vote the provisional ballot

19   so it allows us to further investigate that.

20   Q.   If they're a registered voter, then they must be over

21   the age of 18, correct?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes.

25   Q.   Is it your understanding that the directive allows the

Vol. 6 – 280

1   Board of Elections to count a ballot that has -- an absentee or

2   provisional ballot that has a wrong date of birth if they find

3   that all of the other information on the form is correct?

4     A.   Without having the directive in front of me, I don't

5   think I could answer that.

6     Q.   Okay.  You have been present when the Board has reviewed

7   provisional ballots, correct?

8     A.   Thousands, yes.

9     Q.   Okay.  And do you recall a time when the Board ever

10  voted to count provisional ballots or absentee ballots that had

11  a defective date of birth?

12    A.   I don't recall that, no.

13    Q.   What does the Board -- what do you do or your staff do

14  if you have a social security number, let's say, written down

15  that doesn't match anything in your database because the voter

16  never provided their social security number before?  What do

17  you do?

18    A.   Yeah, if the field is blank in our database and they

19  provide us a social security number, we update our records with

20  the last four digits of their social security number.

21    Q.   You presume it's correct?

22    A.   Yes.

23    Q.   And you count the ballot?

24    A.   Yes.

25    Q.   You have dealt with at least one homeless voter; is that

1   correct?

2      A.   Yes.

3      Q.   Can you describe that for the Court?

4      A.   Yeah.  Several years ago when I was working, we got a

5   phone call from a poll worker who had someone there that

6   claimed that they were homeless and wanted to know how to

7   proceed from there on determining where they should be voting.

8   So in talking to the poll worker -- and I talked to the voter;

9   it was a male.  I don't have any other information besides

10  that.  But we found that he was living outdoors and he gave me

11  an address so I used that address to determine which precinct

12  and which ballot to give him, and then that address is now in

13  our voter registration system.

14     Q.   And the address that he gave you corresponded roughly to

15  the location where he was living outdoors?

16     A.   Yes.  Luckily it was in the middle of a precinct so

17  there was no gray area there.  We knew exactly where it was.

18     Q.   And that was an unusual circumstance; is that right?

19     A.   It was the first time that's happened to me.  I mean,

20  you know, you have people that live in hotels and stuff and use

21  that address, but this is the first one that I had experienced

22  in my four years of being in various roles at the Board of

23  Elections office that I've experienced that.

24     Q.   It's correct that provisional ballots are presented to

25  the Board to make a final determination as to whether to count

Vol. 6 - 282

1   them, true?

2   A.   Yes, that's correct.

3   Q.   However, you do not present absentee ballots to the

4   Board to decide whether or not to count them, correct?

5   A.   That's correct.

6   Q.   And that's because if the staff determines that there's

7   a problem with an absentee ballot, you send out a Form 11S,

8   correct?

9   A.   Yes, that's correct.

10  Q.   If there's no Form 11S that's returned, you

11  automatically reject the ballot?

12  A.   Yes.  We report the numbers to the Board.  But if it's

13  deficient, we do let the Board see those.  But, again, it

14  hasn't been voted on since I've been there.

15  Q.   And finally, Mr. Sleeth, I want to ask about the process

16  that happens when an absentee voter appears to vote early at

17  the Board.  It's my understanding that the voter first fills

18  out an application and it's checked against the database,

19  correct?

20  A.   An application -- we hand them both the application and

21  the envelope that their ballot will be sealed in.  We hand them

22  both at the same time.

23  Q.   And they fill out both at the same time?

24  A.   That's correct.

25  Q.   And both of them are checked at the same time?

Vol. 6 – 283

1    A.   Yes.

2    Q.   And only after the I.D. envelope is confirmed to be

3  correct is the voter handed a ballot, true?

4    A.   That's correct.

5    Q.   So there's no risk that an in-person voter is going to

6  be disenfranchised because of a mistake on their I.D. envelope,

7  correct?

8    A.   That's correct.  We would catch it on the spot.

9        MS. GENTRY:  Your Honor, may I have a moment to confer

10 with counsel?

11       THE COURT:  Yes, you may.

12       MS. GENTRY:  Thank you.

13 BY MS. GENTRY:

14   Q.   Just a couple of questions, Mr. Sleeth.

15       When the Board rejects a provisional ballot because of a

16 failure to fill out one of the five fields, does the Board

17 provide any notice to the voter that they have rejected their

18 ballot for that reason?

19   A.   No, they do not.  But we follow up with each voter that

20 had an incomplete form.  Since we can't register the voter by

21 that, we do follow up with a problem letter and give them an

22 application to register correctly so they're registered in time

23 for the next election.

24   Q.   And that's even for voters who are already registered

25 but you don't have a valid address, let's say?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 284 of 296 PAGEID #: 1604
Case: 2:00-cv-00893-ALM-TPA Doc #: 660 Filed: 04/06/20 Page: 284 of 300 PAGEID #: 23092

Vol. 6 - 284

1    A.   Yes.  Yeah, we attempt to reach them.

2    Q.   So it's possible to reach out and ask them to register

3  with a form.  You don't need to just provide the provisional

4  ballot form?

5    A.   No, we do that after the election, we can do that.

6    Q.   If you recall the ballot I showed you with the nursing

7  home that was rejected for lack of date of birth, why wasn't

8  that date of birth filled in by someone at the nursing home?

9  Why didn't your bipartisan team make sure that happened?

10   A.   You know, we're not really sure about that.  I reviewed

11  all of our procedures after that to make sure that, you know,

12  they do get a date of birth from the voter in the future so we

13  don't have anything like that.

14   Q.   And, finally, Mr. Sleeth, if -- not finally, I'm sorry.

15       In that case where a bipartisan team went out and met

16  with the voter, was it possible to identify that the voter was

17  an eligible voter even without their date of birth?

18   A.   No, not at that time.  Not when we were out there with a

19  provisional.

20       When we go out to the nursing homes originally, we get

21  an application from the voter so we can go back to our office

22  and verify that in our voter registration system.  And then to

23  vote provisional, usually if a nursing home resident votes

24  provisional it's we've got to the nursing home and they've --

25  all of a sudden it was somebody not on our list.  And there's

1   no way to run back to the Board of Elections office to verify

2   the information, we just don't have the manpower to do that, so

3   a provisional is the default there for a situation like that,

4   and I assume that's what happened there.

5       Q.   And, finally, if there is a provisional ballot that has

6   everything filled out but one field, let's say the date of

7   birth but you can verify the name, address, the I.D. and the

8   signature, is it -- do you think that it's fair to reject the

9   ballot simply because of the lack of date of birth?

10      A.   I mean, you know, as a Board of Election office we have

11  to follow the directives.  And it is a required field and it

12  says on the envelope that this is a required field to be filled

13  in for your ballot to count so, you know, I just have to go by

14  what the rules are today.

15      Q.   I understand that you have to follow the law, but do you

16  believe that it's fair?

17      A.   I don't think I've -- I try --

18           MR. CONOVER:  Objection, Your Honor.

19           THE COURT:  Overruled.

20           MR. CONOVER:  Thank you.

21           THE WITNESS:  At the Board of Elections office I try

22  not to bring my feelings into anything there.  We try to work

23  as a bipartisan team and try not to make our own opinions.  You

24  know, we -- we run our office in pretty much direct order from

25  the Secretary of State's office and try not to -- again, you

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 286 of 296 PAGEID #: 1606
Case: 2:06-cv-00896-ALM-TPA Doc #: 660 Filed: 04/06/18 Page: 286 of 296 PAGEID #: 23994

Vol. 6 - 286

 1   know, everybody has their own political opinions, but we try to

 2   check that at the door when we go into the building.  And I've

 3   always tried to maintain that since the day I started there.

 4   BY MS. GENTRY:

 5     Q.   And I understand that on the job you want to maintain

 6   your neutrality.  But as you sit here today asked the question

 7   directly, do you think it's fair?

 8           MR. CONOVER:  Objection, Your Honor.

 9           THE COURT:  Overruled.

10           THE WITNESS:  I think with a birth date missing,

11   personally I think if the birth date is missing, then there's

12   no way to tell if that is, indeed, the voter to be able to

13   verify that key piece of information.  I mean, we use birth

14   dates every day in our office to tell if this person is a

15   father, son.  You know, it's hard to tell.  Sometimes people

16   with the same name it's hard to tell -- we have to use a birth

17   date to determine if it's a junior or a senior and stuff like

18   that.  So, you know, as an administrator, I feel it's very

19   important to have a date of birth to verify if that is, indeed,

20   the voter.

21   BY MS. GENTRY:

22     Q.   Even if you have a signature and a social security

23   number that verifies that it's the voter?

24     A.   I mean, if you have the social security number, I guess

25   it would, you know, further lead you to believe that that is

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

Vol. 6 – 287

1   the case.  So, you know, in that particular case, I would think

2   that, you know, that one might be able to count if the law

3   allowed that.

4           MS. GENTRY:  All right.  Thank you.

5           THE COURT:  Thank you, Ms. Gentry.

6           Unless you have only a 5 minute cross-examination,

7   Mr. Conover, we're going to resume Mr. Sleeth's

8   cross-examination at 8:30.

9           MR. CONOVER:  My only concern would be that he would

10  be driving back up from near Cincinnati in the morning so I

11  will do my darndest to get it done as quickly as possible.

12          THE COURT:  Please proceed.

13          MR. CONOVER:  Thank you, Your Honor.

14                      DIRECT EXAMINATION

15  BY MR. CONOVER:

16    Q.   Good afternoon, Mr. Sleeth.

17    A.   Good afternoon.

18    Q.   I know that we've previously met, as I'm a voter of

19  Warren County.  But, for the record, my name is Brodi Conover,

20  and in this case I represent the defendants, the Secretary of

21  State and the State of Ohio.

22          Are you a member of a political party, Mr. Sleeth?

23    A.   Yes.

24    Q.   What party is that?

25    A.   Democratic.

Vol. 6 - 288

1    Q.    And do you hold any positions in the county party?

2    A.    In the county party?  No, I do not.

3    Q.    What is the Ohio Association of Election Officials?

4    A.    What is that?

5    Q.    Yes.

6    A.    I'm sorry.  It's an organization that consists of 12

7    Republicans, 12 Democrats, and I belong on a legislative

8    committee there.

9         MR. CHANDRA:  I apologize.  I'm not able to hear.

10   Would you mind speaking into the microphone?  Thank you.

11   BY MR. CONOVER:

12   Q.    And I believe you said there are eight full-time

13   employees at the Board?

14   A.    Yes, that's correct.

15   Q.    Do you hire any part-time or seasonal employees?

16   A.    Yes.

17   Q.    How many?

18   A.    This election, I believe we had about 14 people working

19   for us.

20   Q.    And what does -- what do those 14 people do?

21   A.    They work in our absentee department.  I usually -- I do

22   not use our full-time staff for absentee, we need them in the

23   office since, you know, we're a small office so we depend on

24   our repeat people that come back and work for us.  Each

25   election we depend on them to work back in the absentee

1    department and go out to nursing homes.

2    Q.    And do you hire -- I think you said nursing homes.  Do

3    you hire people specifically for the nursing home operation?

4    A.    Usually.  But we did -- some of those workers that want

5    extra hours, we will have them work in our office as well.

6    Q.    And how many precinct election officials does the Board

7    hire?

8    A.    We have approximately 688 to staff all the polling

9    locations, and we hire about 25 to 30 extra.

10   Q.    And can you just briefly describe the training that

11   those precinct election officials receive leading up to

12   Election Day?

13   A.    Yes.  They all receive approximately two-and-a-half to

14   three hour training, and I do all the training personally.  My

15   deputy director handles the provisional section, but we do

16   dedicate about 20 minutes of just training on provisional

17   ballots.

18   Q.    And I think you described that process for Ms. Gentry,

19   but I want to follow back up on it in a little bit more detail.

20        So what specifically are the poll workers instructed to

21   do when a provisional voter comes up to the precinct table?

22   A.    They're to make sure that they are in the correct

23   precinct by looking up their address, make sure that they're at

24   the correct table, not just at the correct location, so that

25   they get the correct ballot.

1    Q.    And why is it important to look that voter up by their

2    address?

3    A.    To determine which ballot that they should receive.

4    They could maybe be in a different school district, the

5    precinct across the table, so we want to make sure they're

6    voting on the correct things.

7    Q.    And are the precinct election officials provided with a

8    checklist for provisional voters?

9    A.    Yes, they are.

10    Q.    And can you describe that checklist?

11    A.    I devised a checklist to give -- because it is a

12    confusing process sometimes for our workers who only work twice

13    a year -- and we developed just a simple checklist.  Obviously,

14    it's not required, but we ask them to fill it out just to

15    ensure that they have looked up -- it gives them some reminders

16    that they looked up the address, they're making sure that

17    they're reviewing all sections of the front of the provisional

18    envelope, the six sections there to make sure that everything

19    is filled out before giving them the ballot.

20    Q.    So when the Board begins to process a provisional

21    affirmation statement on the back end after Election Day, what

22    pieces of information does the Board use to verify the identity

23    of the voter?  How do you look the voter up?

24    A.    Oh, yeah, we use the statewide voter database, and we

25    look up the voter there to see if they're registered in another

Vol. 6 - 291

1   county if they're not already registered in ours.  I mean, we

2   obviously start with our county first if they've just moved

3   within the county.  But if they're not registered here, we do

4   reach outside and go in all 88 counties -- or 87 counties we

5   can search in.

6   Q.   And when you look the voters up in the statewide

7   database, what pieces of information do you use to look them

8   up?

9   A.   We use their last name, date of birth, and depending on

10  the I.D. that they provided us.  But we search several

11  different ways.  That's the first one.  We can't find them

12  there, we do some different wild card searches.

13  Q.   And why do you use those pieces of identification

14  information, the name, I.D., and then I believe you said date

15  of birth?

16  A.   That's how the database is designed to search by those

17  fields, and it's easier to -- you know, the more information

18  you put in there, the most likely you are going to find the

19  voter.

20  Q.   And what is a wild card search?

21  A.   It's just when you take off their first name and maybe

22  just search by date of birth just to see if -- you know, look

23  at all the registered voters with that date of birth and then

24  maybe the first initial and last initial of their name.  That's

25  putting in the least amount of information.

1    Q.    And I believe that you said that the Board sends

2    election officials out to nursing homes, but are there other

3    areas or other locations in the county that the Board might

4    send multiple ballots to?

5    A.    Just in general from absentee ballot applications?

6    Q.    Uh-huh.

7    A.    I mean, I would say they would go to, you know, your

8    large apartment complexes or any other senior facility that's

9    not a nursing home, like the rehab centers and places like

10   that.

11   Q.    And how does the Board verify the identity of those

12   voters?

13   A.    When the voter registers to vote there, we send an

14   acknowledgment card in the mail to them.  And if it does not

15   come back return to sender from the post office, we -- you

16   know, they're good to go to vote.

17   Q.    And how can a voter track the status of their absentee

18   ballot?

19   A.    It's -- we post that on our website, and the voter can

20   look up their own name to see the status of their absentee

21   ballot.

22   Q.    Can they call into the Board?

23   A.    Absolutely.

24   Q.    And do voters call into the Board?

25   A.    All the time.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-6 Filed: 09/12/20 Page: 293 of 296 PAGEID #: 1613
Case: 2:06-cv-00896-ALM-TPK Doc #: 660 Filed: 04/06/18 Page: 293 of 396 PAGEID #: 29903

Vol. 6 - 293

```
 1        MR. CONOVER:  I'm almost done, Your Honor, Your Honor,

 2   just very quickly.

 3   BY MR. CONOVER:

 4     Q.   And you may have mentioned this on your cross, but I

 5   just wanted to verify.  What purpose does a provisional ballot

 6   have for a non-registered voter?

 7     A.   It will get them registered for the next election if

 8   filled out completely and correctly.

 9     Q.   And why is that?  Or how is that?

10     A.   How is -- I mean, they're not -- they're not registered

11   so we use that as a voter registration card, and then we'll

12   mail them an acknowledgment card to that address to confirm

13   that it is a valid address, and then they will be registered.

14     Q.   Is that because all the required information to register

15   is on the provisional affirmation?

16     A.   Yes.

17     Q.   And have you registered voters as a result of them

18   filling out a provisional affirmation statement?

19     A.   Yes.

20     Q.   And do you know if any of those voters have voted in

21   subsequent elections?

22     A.   That data could be found by asking our vendor who

23   manages our voter registration system.

24     Q.   Is it your understanding that that may have occurred?

25     A.   Yes.
```

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI

1    Q.   And then, finally, kind of just on the Board's review,

2  what information does the Board staff provide to the actual

3  Board when they're reviewing provisional ballots?

4    A.   They provide copies of -- on the ones in question, they

5  provide copies of the screenshots of the searches that they

6  have done on the statewide voter registration database that

7  show that they did search it and it came back empty.

8    Q.   And why does the Board staff do that?

9    A.   Just so there's -- so the Board members have no doubt

10  that we did our best to search for that voter in the statewide

11  database and they were not found so we provide the copies to

12  the Board.

13   Q.   Does the Board staff review individual ballots or ballot

14  forms?

15   A.   Yes.

16   Q.   And what's the most common reason for a provisional

17  ballot being rejected?

18   A.   They're not registered in the state.

19       MR. CONOVER:  Just one quick moment, Your Honor.

20       Nothing further.

21       THE COURT:  I take it that you have nothing further as

22  well, Ms. Gentry?

23       MS. GENTRY:  That's correct, Your Honor.

24       THE COURT:  Okay.  Mr. Sleeth, thank you very much,

25  sir.  You can be excused.

Vol. 6 – 295

1    THE WITNESS:  Thank you.

2    THE COURT:  Have a safe trip back.

3    THE WITNESS:  Thank you.

4    THE COURT:  Ms. Gentry, we will begin tomorrow at 8:30

5  with whatever witnesses you have.

6    MS. GENTRY:  Thank you, Your Honor.

7    THE COURT:  Anything further from the Defense --

8  Ms. Gentry, is there anything further from the Plaintiff?

9    MS. GENTRY:  Your Honor, just in planning witnesses

10  for tomorrow, can we plan on a full day for tomorrow?

11    THE COURT:  You can plan on a full day for every day

12  except Monday at this point.

13    MS. GENTRY:  Thank you, Your Honor.  Nothing further.

14    THE COURT:  And then Monday we'll just have a gap, but

15  we'll still have a full day.

16    Ms. Richardson?

17    MS. RICHARDSON:  Nothing from the Defense, Your Honor.

18    THE COURT:  Thank you.

19    MS. RICHARDSON:  Have a good evening.

20    THE COURT:  Everyone have a good evening.

21    (Proceedings concluded at 5:06 p.m.)

22    – – –

23

24

25

1

2                    C E R T I F I C A T E

3

4           We do hereby certify that the foregoing is a true and

5    correct transcript of the proceedings before the Honorable

6    Algenon L. Marbley, Judge, in the United States District Court,

7    Southern District of Ohio, Eastern Division, on the date

8    indicated, reported by us in stenotypy and transcribed by us or

9    under our supervision.

10

11                              s/Denise Errett, FCRR
                                Denise Errett, FCRR
12                              Official Federal Court Reporter

13                              s/Darla J. Coulter, RMR
                                Darla J. Coulter, RMR
14

15                              DATE:  March 28, 2016

16

17

18

19

20

21

22

23

24

25

Exhibit F, NEOCH v. Husted Trial Tr. Vol. VI