Vol. 4 - 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3      THE NORTHEAST OHIO COALITION )
       FOR THE HOMELESS, et al.,    )
4                                   )
                      Plaintiffs,   )
5                                   )
                 vs.                )      CASE NO. 2:06-CV-00896
6                                   )
       JON HUSTED, in his official  )
7      capacity as Secretary of     )
       State of Ohio, et al.,       )
8                                   )
                      Defendants.   )
9      _____ )

10

               TRANSCRIPT OF BENCH TRIAL – VOLUME 4
11      BEFORE THE HONORABLE ALGENON L. MARBLEY, JUDGE
                 MONDAY, MARCH 21, 2016; 8:30 A.M.
12                      COLUMBUS, OHIO

13

       APPEARANCES OF COUNSEL:
14

15      FOR THE PLAINTIFFS:              SUBODH CHANDRA, ESQ.
                                         CAROLINE GENTRY, ESQ.
16                                       DONALD J. McTIGUE, ESQ.
                                         SANDHYA GUPTA, ESQ.
17                                       ANA CRAWFORD, ESQ.

18      FOR THE DEFENDANTS:              RYAN L. RICHARDSON, AAG
                                         SARAH E. PIERCE, AAG
19                                       TIFFANY L. CARWILE, AAG
                                         BRODI J. CONOVER, AAG
20                                       ZACHERY P. KELLER, AAG

21      COURT REPORTERS:                 DENISE N. ERRETT
                                         DARLA J. COULTER
22                                       (614) 719-3029

23

       Transcript recorded by mechanical stenography, transcript
24     produced by computer.

25

```
                                                    Vol. 4 -    2
1                             I-N-D-E-X

2                             VOLUME 4

3

4    PLAINTIFFS' WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

5    WILLIAM ANTHONY             40       4       --         69
     ERIC MORGAN                 98      78       --        101
6    MEGHAN LEE                  143     104      --         --
     BRIAN DAVIS                 157     --       --         --
7

8                              - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 3 of 241 PAGEID #: 1619
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/06/16 Page: 3 of 241 PAGEID #: 23174

Vol. 4 -   3

1    (In Columbus, Franklin County, Ohio, Monday, March 21, 2016,

2    8:30 a.m., in open court.)

3         THE COURT:  Good morning, everyone.  I hope everyone

4    had a pleasant weekend.

5         Were we able to get coordinated everything that we

6    talked about on Friday?

7         MS. GENTRY:  Yes, Your Honor.

8         THE COURT:  Ms. Gentry.

9         MS. GENTRY:  Yes.  We have conferred with the State.

10   And we are going to be able to admit a number of depositions

11   and exhibits and not call the witnesses live.

12        THE COURT:  Perfect.  And Ms. Richardson?

13        MS. RICHARDSON:  I agree, Your Honor.

14        THE COURT:  All right.  Perfect.  Well, thank you very

15   much.  I appreciate everyone's continued cooperation and

16   collaboration.

17        Ms. Gentry, you want to call Mr. Anthony?

18        MS. GENTRY:  Yes, Your Honor.  Thank you.

19        THE COURT:  Continue with his testimony.

20        Mr. Anthony, please come forward.  You're still under

21   oath.

22        THE WITNESS:  Thank you.  How are you doing, sir?

23        THE COURT:  I'm good.

24        THE WITNESS:  Still under oath?

25        THE COURT:  Still under oath.  Please be seated.

1          THE WITNESS:  Thank you.

2                          - - -

3                  WILLIAM ANTHONY,

4      HAVING PREVIOUSLY BEEN DULY SWORN, FURTHER TESTIFIED AS

5    FOLLOWS:

6                  CONTINUED CROSS-EXAMINATION

7    BY MS. GENTRY:

8    Q.    Good morning, Mr. Anthony.

9    A.    Good morning.  How are you?

10   Q.    Very good.  How are you?

11   A.    I'm doing great this morning.  Thank you.

12   Q.    When we left off on Friday, we were talking about the

13   process for provisional ballots at the stage where the person

14   comes into the polling place and fills out a provisional

15   ballot.  Do you recall that, generally?

16   A.    Yes, I do.

17   Q.    Is it correct that you train your poll-workers to review

18   the ballot form after they fill it out to make sure that it's

19   complete?

20   A.    Yes.

21   Q.    Can you tell me a little bit about that?

22   A.    From what I recall --

23   Q.    Yes.

24   A.    -- in the training classes, we have the poll-worker look

25   at all the items that are supposed to be filled out, you know,

1    the name, the address, the date of birth, Social Security, the

2    driver's license, and then the actual signature.  So we have

3    them take a quick look at that to make sure that every item is

4    filled out.

5        Q.    Why do you do that?

6        A.    Well, because if somebody has been missing that, it

7    could invalidate the provisional envelope, I mean the

8    provisional envelope, or a vote.

9        Q.    Mr. Anthony, are you familiar with a template that is

10   used to help the poll-worker check the ballot form?

11       A.    Yeah.  We just started using that this year, I believe.

12   And the template would actually be just a white template that

13   would go over the absentee -- I mean the provisional --

14   envelope.  And it would have cutouts on all the places that are

15   supposed to be filled out.  And you could put the template on

16   top of the provisional envelope and immediately see if there is

17   a blank or a void spot that wasn't filled out.  And then

18   they're to give that back to the voter and have them complete

19   it, if they can.

20       Q.    Why did the Board start using the template this year?

21       A.    We started using the template this year because we were

22   still getting a lot of -- not a lot, but we were getting more

23   than we wanted of provisional ballots that were coming in not

24   completed.

25       Q.    Did the Board, or -- I'm sorry -- did you find that it

Vol. 4 -   6

1    was effective to use the template?

2      A.    Well, we're finding out now.  It's my understanding we

3    just used it for this election cycle.  So we have 11,000

4    provisional votes this cycle.  And we'll see how it goes.  You

5    know, we keep -- I keep a daily -- We also have a new program

6    that we put in to help search names and keep track of the ones

7    we accept and don't accept and the reason for it.  So I can

8    look at my phone and I can see how many we've processed already

9    and basically where we're having the good and the bad ones.

10     Q.    Why do you keep track of it kind of on a real-time

11   basis?

12     A.    It's something we do.  I just like to know that.  I

13   mean, it's something we do in order to kind of just help us in

14   processing in general.

15     Q.    Are there times, Mr. Anthony, when the Board will

16   contact a provisional voter to let them know that they made a

17   mistake on their form or there is an omission on their form to

18   give them a chance to come in and fix it?

19     A.    Yes.  To my understanding, yes.

20     Q.    All right.  What is your understanding?

21     A.    That they have seven days to correct an error --

22     Q.    And --

23     A.    -- after the election.

24     Q.    For example, they would have seven days to bring in an

25   ID if they didn't have one, correct?

1    A.   That's correct.

2    Q.   Would they also be notified if they left off their date

3    of birth or left off -- or miswrote their date of birth?

4    A.   Yes and no.  Our Board has the ability -- the

5    four-member Board has the ability, by a vote of at least three

6    of them, to accept a date of birth that may not be correct or

7    may be missing a date.

8    Q.   In terms, however, of communicating with the provisional

9    voter to let them know that they made a mistake --

10   A.   Yes.

11   Q.   -- on date of birth, does your Board do that?

12   A.   Yes.

13   Q.   And is that done by telephone or by mail?

14   A.   I'm not sure.

15   Q.   Okay.

16   A.   I'm not sure now on that, whether it's mail or

17   telephone.

18   Q.   Okay.  And what is the purpose of doing that:

19   Contacting the provisional voter to let them know they made a

20   mistake on their form?

21   A.   To correct the form so we could count it.

22   Q.   Mr. Anthony, is it correct that, when the Board meets to

23   vote on provisional ballots, they do it by category?

24   A.   Yes.

25   Q.   And, for example, one category might be "not

Vol. 4 - 8

1   registered"; and, therefore, it's going to be rejected?

2       A.    That's correct.

3       Q.    And another category might be that the form is

4   incomplete?

5       A.    I believe so.

6       Q.    And, in fact, the Board only reviews the particular

7   provisional ballots that the staff puts in front of them for

8   review; is that correct?

9       A.    That's correct.

10      Q.    The Board doesn't decide which ones to review after

11  looking at everything, do they?

12      A.    No.   We have -- We have -- As we're processing the

13  provisional ballots, we have a team of Democrat and Republican

14  that are to review each of the ballots.   They're basically

15  given that authority by the Board to look at each ballot so, if

16  there is a concern, that team could either fix it or find the

17  answer, or those are the ones that come before the Board

18  itself.

19      Q.    And I believe you testified earlier that there are times

20  when the Board will vote to accept a ballot even though the

21  date of birth is wrong or missing?

22      A.    That's correct.

23      Q.    Do you recall -- Well, let me show you.   This is from

24  Plaintiffs' Exhibit 1150.   And I'm going to -- hopefully,

25  you'll be able to see this, Mr. Anthony.

```
 1              MS. GENTRY:  Ms. Clark, could you switch the Elmo?

 2   This must be --

 3              COURTROOM DEPUTY CLERK:  No?

 4              MS. GENTRY:  I'm sorry.  I'm technologically

 5   challenged.  Thank you.

 6              COURTROOM DEPUTY CLERK:  You're welcome.

 7              THE WITNESS:  Okay.

 8    BY MS. GENTRY:

 9    Q.   Okay.  Who is Mr. Scarbrough?

10    A.   Scarbrough.  His name is Will Scarbrough, and he was our

11   Democrat worker in the provisional -- in the processing of

12   provisional ballots.

13    Q.   All right.  And this -- just so I can orient you for a

14   moment, these proceedings are from 2014.  And there is a

15   recommendation here from the staff to count a provisional

16   ballot where the person omitted his last name in the last name

17   field but printed it at the top.  Do you see that?

18    A.   Yes.

19    Q.   And there is -- there is the rest of the -- is it your

20   recollection that the Board voted to count that ballot?

21    A.   As I read -- yes.

22    Q.   Then, going down on that page, 38, there is also an

23   issue with the ballot where the person wrote the wrong street.

24   Instead of writing East 15th, he wrote East 1t.  Do you see

25   that?
```

Vol. 4 - 10

1    A.   Yes.

2    Q.   And the staff recommended that that be approved?

3    A.   Yes.

4    Q.   Is it your understanding that the Board has the

5    discretion to count ballots even though there are minor errors

6    or omissions in the ballot form?

7    A.   Yes, you know, provided we could verify that the voter

8    is who the voter is.

9    Q.   Yes.

10   A.   Okay.  All right.

11        COURTROOM DEPUTY CLERK:  Excuse me.  What was that

12   exhibit number?

13        MS. GENTRY:  Oh, I'm sorry.  I believe it was 1150.

14   Yes, it was Plaintiffs' 1150.

15        COURTROOM DEPUTY CLERK:  Thank you.

16   BY MS. GENTRY:

17   Q.   Now I want to ask you about an issue regarding a work

18   book that poll-workers use to write down information about a

19   provisional ballot.  Let me show you.

20        So this is from the same exhibit.  This is Exhibit 1150.

21   And the issue here is that, apparently, there is a work book

22   page that the poll-worker fills out if they see the ID of the

23   individuals.  Are you familiar with that?

24   A.   I think I am.  I'm quite sure if I saw the form itself

25   --

Vol. 4 - 11

1    Q.    The provisional ballot form?

2    A.    Yeah.  But --

3    Q.    I can show you an example.  All right.

4    A.    Okay.

5    Q.    This is Plaintiffs' Exhibit 2378.  Does that help

6    refresh your recollection?

7    A.    Yes, it does.

8    Q.    All right.

9    A.    Thank you.

10   Q.    Yes.  What is this work book that's mentioned here in

11   Plaintiffs' Exhibit 1150?

12   A.    I'm not sure what they're talking about there.

13   Q.    Okay.

14   A.    I'm not sure if they're talking about the poll book.

15   The poll book -- you know, on a poll book there is

16   another -- if there is a problem or a concern, they write a

17   note.  And then that gets kind of part of the poll book.  So

18   I'm -- that's the best I could come with that.

19   Q.    You're not familiar with a procedure where the

20   poll-worker will actually write something down if they check an

21   ID?

22   A.    I'm not that familiar with that.  Sorry about that.

23   Q.    Are you familiar with the issue of giving voters credit

24   for voting even if their ballot is not counted?

25   A.    Yes.

1    Q.    Could you describe that?

2    A.    The way that works, if -- It's the motor voter law.  It

3    says that if a person doesn't have any activity in their voter

4    registration, that they could be, you know, purged over a

5    number of years, I think over two presidential cycles.  And so

6    what we do is, for example, if they sign a petition, that's an

7    activity.  If they vote and we somehow can't count it, that's

8    an activity.

9    Q.    And you only do that because you can identify the voter;

10   is that correct?

11   A.    That's correct.

12   Q.    You have to determine that it's an eligible voter and

13   identify them in order to give them credit?

14   A.    That's correct.

15   Q.    So it's possible to discard someone's vote but still

16   give them credit for voting?

17   A.    That's correct, or have an activity on their -- on their

18   file, on their voter file.

19   Q.    Correct.  I'm going to show you just a few -- well, I

20   want to show you some provisional ballots, Mr. Anthony.  Do you

21   recall you were present during the telephone deposition of

22   Alicia Healey?  Do you recall that?

23   A.    Yes.

24   Q.    And do you recall testimony about cursive -- a cursive

25   name in the printed name field being unacceptable?

Case: 2:06-cv-00896-ALM-TPK Doc #: 657 Filed: 04/03/16 Page: 13 of 241 PAGEID #: 29684

Vol. 4 - 13

```
 1      A.   I'm familiar with that, yes, but I -- I sort of remember

 2   that.

 3      Q.   Okay.  Let me show you.  So this is one of the ballots

 4   that I asked Ms. Healey about.  The name is written in cursive.

 5   If you see, on the left-hand label, that's -- Where it says

 6   "result," that's a code for why the ballot was rejected,

 7   correct?

 8           MR. CHANDRA:  What's the exhibit number?

 9           MS. GENTRY:  I'm sorry.  It's Plaintiffs' Exhibit

10   2374.

11           THE WITNESS:  Where do you see "Results"?

12      BY MS. GENTRY:

13      Q.   Right there (indicating).

14      A.   Oh!  Right there?

15      Q.   Yep.  And I'll turn the page so you can see the code.

16      A.   Okay.  Okay.

17      Q.   So you see the "No printed name"?

18      A.   Yes.

19      Q.   Before the deposition, was it your understanding that

20   some votes were being rejected because people wrote their name

21   in cursive instead of printing it?

22      A.   Yes.

23      Q.   And is that a Board policy?

24      A.   It's not a Board policy.  I believe it's an SOS policy.

25      Q.   Is that only the case for provisional ballots, and not
```

Case: 2:06-cv-00896-ALNW-TPK Doc#: 658 Filed: 04/03/16 Page: 14 of 241 PAGEID #: 23989

Vol. 4 - 14

1    for absentee ballots?

2      A.    I'm not sure, because, on this form, it asks the voter

3    to print their name.

4      Q.    Correct.  It says "Print"?

5      A.    Could you pull it down?  Did they sign their name as

6    well?

7      Q.    Yes.

8      A.    Yeah.  I probably would have counted that one.

9      Q.    You would have counted it?

10     A.    Yeah, I would have counted that one.

11     Q.    Why?

12     A.    All the information looks like it's correct.  The Social

13   Security -- If their Social would have matched, if the address

14   would have matched, that's something that I would have probably

15   counted if I was -- if it came before me as a Board member.

16   But if it came before our Board and they denied it, well, I

17   would have counted it.

18     Q.    And often the Board members don't even see the

19   provisional ballots; isn't that right?

20     A.    Well, they should see those that there are questions

21   about.  They -- We do show them to the Board members.  So, if

22   this was in a pile of ones that we denied, then the Board could

23   have asked to see that one.  So --

24     Q.    You mean if it was one of the categories --

25     A.    Yes.

```
 1    Q.    -- a stack that was rejected?
 2    A.    Right.  And that one, it should still have -- if it was
 3    denied, it should have been -- that should have been looked at
 4    by another set of eyes.  So --
 5    Q.    What is the other set of eyes that should have --
 6    A.    Whoever did the first go-through of it.  We do, I
 7    believe, two passes, or sometimes three passes, of these.  So I
 8    may be the first one to enter the data.  And then another
 9    person also does -- reenters that same data to make sure that
10    we're not forgetting, or, we haven't overlooked an item on
11    there.  To me, that would have been one that should have been
12    flagged that it should have been looked at by a Democrat and a
13    Republican.  And if all the other -- if all the other
14    information on there is correct, that vote should have counted.
15    Q.    Were you surprised by Ms. Healey's testimony that she
16    rejects ballots that have cursive printed names?
17    A.    No, I'm not, because it says the printed name.  So if
18    you have a person processing that follows what it says, a
19    printed name, then she's following what the directive said:  It
20    has to be a printed name.
21    Q.    I'm going to ask you about the second page, just so I
22    understand the review process.
23          So am I correct that there were three reviewers, at
24    least, for this particular ballot?
25    A.    Okay.
```

1    Q.   Is that -- Is that my understanding, that there's --

2    there's three columns for initials and date?

3    A.   That's correct.

4    Q.   And it looks like three different people reviewed it?

5    A.   Yes.  Yes.

6    Q.   All right.  And the first person who reviewed it, it

7    looks like they wanted to accept it.  Is that right?

8    A.   Looks like it, whoever that signature -- yes.

9    Q.   And you know that because the accepted column has the

10   initial, or -- I'm sorry -- the accepted row has the initial

11   next to it?

12   A.   That's correct.

13   Q.   And then 001 is the code for approving it?

14   A.   That's correct.

15   Q.   It looks like the second person thought that it should

16   be rejected?

17   A.   Yes.

18   Q.   What happens in a situation like that where one person

19   thinks a ballot should be rejected and one person thinks it

20   should be approved?

21   A.   They should go to the supervisor.  It should be a

22   Democrat and a Republican that then reviews it.  And then, if

23   they can't agree, then it comes to myself or the Deputy

24   Director or it goes before the Board itself.

25   Q.   In this case, it looks like, the third person, their

1  name begins with a J.  Do you see that?

2      A.    Yes.

3      Q.    Do you know who that is?

4      A.    No.  No, I do not.

5      Q.    Should there have been two final reviewers, not just

6  one, so that it could be bipartisan?

7      A.    It should have been.  That's my understanding.  I

8  don't -- I don't work the provisional room.  So that's my

9  understanding how it should work.

10     Q.    All right.  So this -- It doesn't appear that this

11 followed the process that it should have; is that right?

12     A.    It doesn't look like it.

13          MS. RICHARDSON:  Objection.

14          THE COURT:  On what basis?

15          MS. RICHARDSON:  Calls for speculation.

16          THE COURT:  Overruled.  Mr. Anthony is certainly in a

17 position to testify as to this, given his position and the

18 nature of his experience.

19          You may answer, Mr. Anthony, if you know.

20          MS. RICHARDSON:  Thank you, Your Honor.

21          THE WITNESS:  What was the question again?

22          THE COURT:  Could you read it back, Ms. Errett?

23     (The last question was read by the court reporter.)

24          THE WITNESS:  That's correct.

25     BY MS. GENTRY:

1    Q.   Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

2    P-2378.  This is a provisional ballot that was rejected due to

3    failure to put in the last name.  But you can see, in the label

4    down below that, apparently it was -- the Board was able to

5    determine who the person was.  Do you see that?

6    A.   Yes.

7         THE COURT:  Ms. Gentry, I'm sorry.  What was the

8    exhibit number for the document we just completed review?

9         MS. GENTRY:  Yes, Your Honor.  That was Plaintiffs'

10   Exhibit 2374.

11        THE COURT:  All right.  Thank you.

12        MS. GENTRY:  Thank you.

13   BY MS. GENTRY:

14   Q.   And I'll show you the second page so you can see what

15   happened.

16        So it appears that Mr. Hughes' ballot was rejected

17   because he didn't print his last name.  Would you agree with

18   that?

19   A.   Yes.

20   Q.   But the reviewer knew that his last name was Hughes and

21   that he was registered in Jackson County.  Do you see that?

22   A.   Yes.

23   Q.   And, in fact, all the other information for him matched,

24   including his address and his Social Security number and his

25   birthdate.  Would you agree with that?

Vol. 4 - 19

1    A.    Yes.

2    Q.    Was it correct to reject this ballot for the failure to

3    print the last name?

4    A.    Unfortunately, yes.

5    Q.    And why do you say "Unfortunately, yes"?

6    A.    Because you have to put your -- you have to print your

7    first name and your last name.

8    Q.    Okay.  So even though it was obviously an oversight and

9    the Board knows who he was, they had no choice but to reject

10   the ballot?

11   A.    That's correct.

12        THE COURT:  And why was it, again, that they had no

13   choice but to reject the ballot, Mr. Anthony?

14        THE WITNESS:  Because the -- on the form itself,

15   the -- it's my understanding that the Secretary of State

16   requires to have the first name and the last name printed at

17   the top of the original form.

18        THE COURT:  And even if -- just so that we're

19   clear -- I know that Mrs. Gentry has asked you that; but even

20   if the cursive last name was, let's say is legible, it still

21   can be rejected because it's not printed?

22        THE WITNESS:  That's correct.

23   BY MS. GENTRY:

24   Q.    Mr. Anthony, I want to ask you about Plaintiffs' Exhibit

25   2407.  And this is a ballot that was rejected for incomplete

 1    information.  And, specifically, this voter did not write down

 2    their street name, although they did write down their street

 3    address.  And I want to call your attention to the label at the

 4    bottom of the page, which has the complete address.  What is

 5    that label?

 6       A.   The one that's in highlight?

 7       Q.   Yes, the one that says 3680 Spangler Road.

 8       A.   That's probably the one that -- the provisional, who

 9    they were processing that provisional ballot.  They pulled the

10    address up and probably affixed it to it.

11       Q.   And that's part of their regular procedure, is to affix

12    a label with the voter's information to the provisional ballot?

13       A.   That's correct.

14       Q.   And this particular label also includes the Social

15    Security number, driver's license number, and birthdate?

16       A.   Yes.

17       Q.   Is the purpose of having that label to make it easy to

18    compare the information?

19       A.   That's correct.

20       Q.   So, clearly, the person reviewing this knew that this

21    voter lived at 3680 Spangler Road, correct?

22       A.   That's correct.

23            MS. RICHARDSON:  Objection.

24            THE COURT:  Basis?

25            MS. RICHARDSON:  Calls for speculation.

Vol. 4 - 21

1          THE COURT:  Overruled.

2          MS. RICHARDSON:  Thank you, Your Honor.

3     BY MS. GENTRY:

4     Q.   But it still -- the Board still had to reject the ballot

5     because the voter didn't write the words "Spangler Road"?

6     A.   Apparently.  Now, I kind -- I disagree with that.  All

7     the other information was correct on the -- and we found the

8     voter -- although the information was correct and we found the

9     voter in our voter registration files, that should have been

10    brought before the Board and let the Board make that

11    determination.

12    Q.   All right.  And you believe the Board would have had the

13    discretion to count this ballot?

14    A.   Yes.

15    Q.   I want to show you Plaintiffs' Exhibit 2410.  And this

16    is a similar situation, Mr. Anthony, except, instead of leaving

17    off the street name, this person left off the number but wrote

18    down the street name.  However, according to the label, the

19    reviewer was able to determine who it was and find the right

20    number for the street.  Do you see that?

21    A.   Yes.

22    Q.   And do you similarly believe that this should have been

23    brought before the Board?

24    A.   Yes.

25    Q.   And you believe the Board would have had the discretion

Vol. 4 - 22

1    to vote to count this?

2    A.   They should have.  It could have still ended up in a tie

3    vote, though.  So --

4    Q.   Have you seen that happen with, specifically, these five

5    field issues?  Has the Board tie-voted?

6    A.   No.  Our Board, no, ma'am.  At least we get three votes.

7    Q.   Okay.

8    A.   So, one way or the other.

9    Q.   Now, I want to show you Plaintiffs' Exhibit 2380.  And

10   this is a ballot that was rejected for failure to fill out the

11   street address, although you can see on the label the reviewer

12   managed to find the street address, apparently.  Let me first

13   ask you, this label that says Andrew John Drive, do you -- do

14   you know, from looking at this label, whether that's the new

15   address or the old address for this voter?

16   A.   No.

17   Q.   Is there any record that would tell us where this

18   address came from?

19   A.   That address came from our files, from our voter

20   registration data.

21   Q.   So it would have been the old address for the voter?

22   A.   Or his current address.

23   Q.   All right.  Over on the left, it says "Correct ballot

24   style issued."  Do you see that?

25   A.   Yes.

Vol. 4 - 23

1    Q.    Does that --

2    A.    Yes, I do.

3    Q.    Does that mean that the voter was in the correct

4    precinct?

5    A.    Yes.

6    Q.    How can the reviewer determine that the voter is in the

7    correct precinct if the voter didn't write down their address?

8    A.    Probably by the name and the Social Security number

9    or maybe they put a driver's license.  By the name or the

10   driver's license number and the signature.

11   Q.    Okay.  So, are you -- Let me try to break apart what

12   you're saying.  Do you mean that, because of those pieces of

13   information, they were able to pull up this label that had an

14   address of 5855 Andrew John Drive?

15   A.    Yes.

16   Q.    And then they were able to determine that the ballot

17   that was voted was in that precinct, that it was at 5855 Andrew

18   John Drive?

19   A.    Yes.

20   Q.    Do you believe this is one of the ballots that should

21   have gone to the Board for a vote to determine whether to count

22   it, even though the street address is missing?

23   A.    Yes.

24   Q.    And that's because the reviewer was, obviously, able to

25   figure out what the address was?

Vol. 4 - 24

1    A.    That's correct.

2    Q.    Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

3    P2398.  Mr. Anthony, this is a ballot voted by -- I'll

4    represent to you that she is a homeless individual.  It appears

5    she wrote down the wrong address.  She wrote down 795 Van

6    Buren, but the reviewer apparently wrote 595 is a shelter.  Do

7    you agree?

8    A.    Yes.

9    Q.    Now, this particular ballot was rejected for voting in

10   the wrong precinct.  Can you tell what information on here

11   would support a conclusion that Ms. McCullough voted in the

12   wrong precinct?

13   A.    No, I cannot, unless the Van -- unless that address is

14   in a different precinct.  But, clearly, the voter was at a

15   homeless shelter.  That should have counted.  That vote should

16   have counted.

17   Q.    Why do you say that vote should have counted?

18   A.    Because we're allowed to use shelters, or a location

19   like the corner of 5th and 3rd, as the voter's address if all

20   the other information is correct.  So, if the date of birth and

21   the last four of their Social matches, then that vote should

22   have counted.

23   Q.    And, in this case, by looking at the label, you can see

24   that both of those things matched, correct?

25   A.    That's correct.

1    Q.    And in this case, this is a homeless voter who used her

2    Social Security number to vote.  Is it your understanding that,

3    under the NEOCH consent decree, this vote should have been

4    counted?

5    A.    Yes.

6    Q.    And that's regardless of whether she wrote down the

7    wrong address or voted in the wrong precinct?

8    A.    That's correct.

9    Q.    Does the Board have a process in place to make sure that

10   voters like Ms. McCullough have their votes counted?

11   A.    That's correct.

12   Q.    What is that process?

13   A.    That process, again, they vote 595 at the shelter.  That

14   should have been the trigger right there.  And then the team,

15   the Democrat and Republican, should have looked at that.  And

16   then it should have been placed in the NEOCH bin.

17   Q.    What is the NEOCH bin?

18   A.    Well, bins are, like, just boxes that we put -- we

19   separate -- segregate or separate all of the ballots as they're

20   processing them.  So if there is not registered, no ID, so

21   forth and so on.  And then we have a NEOCH.  And so if you're

22   processing one -- and that looks like a shelter -- that should

23   have went into the NEOCH box, the NEOCH.

24   Q.    And the NEOCH ballot should be counted so long as the

25   Social Security number matches?

1    A.   So long as we could identify that voter as that voter.

2  So Social Security, and we look at the signature as well.

3    Q.   Okay.  Thank you.

4         Now I'm going to show you Plaintiffs' Exhibit P2486.

5  The ballot for Faith McCullough that we just looked at was from

6  2014.  This is her 2015 provisional ballot.  And, this time,

7  her ballot was rejected because she didn't write down a form of

8  ID.

9         I want to call your attention to the bottom of the page.

10  There is a blacked-out line there.  Do you see that?

11    A.   Yes, I do.

12    Q.   And that -- underneath that blacked-out line, there is a

13  place for the poll-worker to mark if the voter has to return

14  with ID in seven days, correct?

15    A.   Yeah.  I believe that's what that says.  Yes, that's

16  what that says.

17    Q.   I'll show you --

18    A.   Yeah.  I -- I -- Okay.  Yes.

19    Q.   Do you have any knowledge as to why that information was

20  blacked out of the copy that was given to us?

21    A.   I have no idea why it was blacked out.  It shouldn't

22  have been blacked out.

23    Q.   Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

24  2464.  This is another provisional ballot that was rejected

25  because of a lack of identification, and I want to draw your

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 27 of 241 PAGEID #: 1643
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 27 of 241 PAGEID #: 29598

Vol. 4 - 27

 1    attention to the bottom.  Here, the information was not blacked

 2    out.  It appears that the poll-worker did not check a box that

 3    the voter is to provide ID in seven days.  Do you see that?

 4       A.   Yes, I do.

 5       Q.   And do you also agree that there is no ID provided?

 6       A.   From looking at the form, there is no ID provided, that

 7    is correct.

 8       Q.   Is there a discrepancy there?

 9       A.   Can you pull it down a little bit?  Did they put their

10    name on there and date of birth?

11            So they put their date of birth, they signed it, and

12    their address, but no form of ID.

13       Q.   Correct, and no notation that the voter should provide

14    ID within seven days?

15       A.   Yeah.  That -- yes.

16       Q.   Is that an error by the poll-worker?

17       A.   I don't know, but they should have checkmarked it.

18       Q.   Is another possibility that the voter did show their ID

19    but didn't check a box?

20            MS. RICHARDSON:  Objection.

21            THE COURT:  Sustained.

22            MS. RICHARDSON:  Thank you, Your Honor.

23    BY MS. GENTRY:

24       Q.   What are the different scenarios that could explain the

25    fact that there is no ID but the poll-worker didn't check the

 1    box that they have to come back with ID?

 2            MS. RICHARDSON:  Objection.

 3            THE COURT:  Overruled.

 4            MS. RICHARDSON:  Thank you, Your Honor.

 5            THE WITNESS:  The individual poll-worker, you know,

 6    sometimes that happened.  We -- you know, they should

 7    have -- they should have given -- you know, they should have

 8    told the voter that they need to provide that information to

 9    us.  And they should have checked the box that they -- that

10    they told the voter, or that they let the voter know that, in

11    order for that ballot to be counted, we need to verify the ID.

12      BY MS. GENTRY:

13      Q.   So your poll-workers are trained to -- the reason they

14    check the box is that's a reminder to them to tell the voter

15    that they have to come back; is that right?

16      A.   Or provide that information, yes.

17      Q.   Right, that they have to provide the ID within seven

18    days?

19      A.   That's correct.

20      Q.   So if the box is not checked and there is no ID checked,

21    then you would conclude that this was poll-worker error?

22      A.   Yes.

23      Q.   Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

24    P2399.  This ballot was rejected for having an address that

25    does not exist.  But if you look at -- if you compare the

1   address that was written down with the label, I think you can

2   see what happened.  Do you see what happened there?

3   A.   Yes.

4   Q.   Can you describe what happened?

5   A.   Looked like she got the address mixed up, the actual

6   number of the street mixed up.

7   Q.   So she transposed the numbers; is that fair to say?

8   A.   Well, she did something.  She got the last two right,

9   the 53 right.  She got the -- yeah.  Looks like she transposed

10  the 36 to a 63.

11  Q.   In your view --

12       MS. RICHARDSON:  Objection.

13       THE COURT:  Just a second.  Ms. Richardson, yes.

14       MS. RICHARDSON:  The question called for speculation

15  as to what the voter did.

16       THE COURT:  Well, it's apparent that the difference

17  between the printed on the label, the address label, and the

18  address written on the ballot itself, those first two figures

19  have been transposed by someone.  If you assume that the voter

20  completed that top portion, there was this -- the numbers were

21  transposed.  And so I think that goes to weight more so than to

22  admissibility.

23       You're going to have an opportunity to cross-examine on

24  it, but I don't find a basis to keep out his testimony for

25  stating what appears to have taken place.  I think you can draw

Vol. 4 — 30

1    an inference from that.  I will allow the testimony to stand,

2    but I will say that it goes to weight, and not to

3    admissibility, your objection.

4              MS. RICHARDSON:  Thank you, Your Honor.

5              THE COURT:  All right.  Please continue, Ms. Gentry.

6              MS. GENTRY:  Thank you, Your Honor.

7    BY MS. GENTRY:

8    Q.    Mr. Anthony, is this the type of ballot that you believe

9    should have been brought before the Board for a decision?

10   A.    Yes.

11   Q.    And do you believe that they would have had the

12   discretion to vote to count this ballot?

13   A.    If all the other information is correct, and it looks

14   like it was, yes.

15   Q.    And that's because a minor error like this should not be

16   used to invalidate a ballot?

17   A.    Yes.

18   Q.    All right.  We're working down the stack here.  I am

19   going to show you Plaintiffs' Exhibit P2405.  Now, this ballot

20   was rejected for a Code 006.  And just so you can see, a 006 is

21   form incomplete.  Do you agree?

22   A.    Yes.

23   Q.    Now, it appears from my review that the form is, in

24   fact, complete.  Could you please look at it?  And I'm going to

25   ask you if you agree with that.

```
 1      A.   Can you scroll it up?  Does it have a signature on it as

 2   well?

 3           Okay.  It appears complete.

 4      Q.   The one exception is there is no zip code.  Would that

 5   be a basis, in your view, to reject the ballot, for lack of a

 6   zip code?

 7      A.   Yes.

 8      Q.   It would?

 9      A.   Yes.  It should have been reviewed.  And if the folks

10   processing it could not agree, it should have came before the

11   Board.

12      Q.   All right.  Let me ask specifically about the zip code.

13   If a voter fails to write down the zip code, does that require

14   the ballot to be rejected?

15      A.   It's not a complete address.  So it probably does.

16      Q.   Okay.  And in this case it appears both reviewers agreed

17   that it should be rejected.  Do you see that?

18      A.   Yes.

19      Q.   In that event, there would be no further review; is that

20   right?

21      A.   I'm not sure.  I would -- Well, obviously that's what

22   happened here.  It's signed off.

23      Q.   What should happen?

24      A.   Well, I would have thought that one of the reviewers

25   would have thought that the zip code should have been a reason
```

1   to bring it before the Board.

2   Q.   Why do you say that the zip code issue should be a

3   reason to bring it before the Board?

4   A.   All the other information was correct.

5   Q.   All right.  So, again, that would be a minor error that

6   could be excused by the Board in your view?

7   A.   Yes.

8   Q.   Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

9   2511.  And the only reason I'm asking you about this is, it

10  appears that the database used by the County misspelled the

11  voter's last name.  Do you see that?

12  A.   Yes.

13  Q.   So that's an error in the database.  Would you agree?

14  A.   Yes.

15  Q.   How often are there errors like that in the database

16  used by the County; do you know?

17  A.   No, I do not.

18  Q.   Is there a way for voters to know what their information

19  is in the database?

20  A.   Yes.

21  Q.   How can they do that?

22  A.   They could request a copy, or they could go online and

23  pull up their record, and they can see what their record is

24  through our web page.

25  Q.   The individual voter can look at their voter information

1    page through the website?

2        A.    They could look at how we had them registered and their

3    address on our website, yes.

4        Q.    Could they look at their Social Security number or their

5    driver's license number?

6        A.    No, but they could look at their -- I'm not sure on that

7    one.  But I know that -- we have our database set up now that a

8    voter could look at their information if they know their first

9    and last name and the number of their street.  And then their

10   file will come up and they could take a look at it, or look at,

11   you know, what information we have on file for them --

12       Q.    And do you --

13       A.    -- their address and what ballot style, what polling

14   location they're supposed to vote at, and their congressional

15   district or, you know, school district, et cetera.

16       Q.    So they can find some information out, but not

17   necessarily all of their information; is that fair to say?

18       A.    That's correct.  And if -- and if this person would have

19   looked it up and they would put in their right last name, they

20   probably wouldn't have -- they would probably have to call us

21   and say, Hey, I can't find myself in the database.

22       Q.    Now, in this case, the voter actually crossed out the

23   wrong name and wrote in her name correctly.  Do you see that?

24       A.    Yes.

25       Q.    And is that something that should have triggered a

Vol. 4 - 34

1   change in the database?

2      A.   It should have.

3      Q.   All right.  I'm going to show you the last page of this

4   exhibit.  This is the report run by the Board on the absentee

5   ballots that were denied.  And in this case, her name is near

6   the bottom, the fourth name from the bottom.  Do you see that?

7      A.   Yes.

8      Q.   And it still is misspelled?

9      A.   Yes.

10     Q.   All right.  Does that suggest to you that the Board did

11  not fix it after reviewing her ballot?

12     A.   Yes.

13     Q.   Mr. Anthony, I'm going to show you Plaintiffs' Exhibit

14  2598.  And first I'm going to show you the reason why this

15  ballot was rejected.

16          So the voter's last name is Quinlan, and his vote was

17  denied for no birthdate.  Do you see that?

18     A.   Yes.  I do.

19     Q.   All right.  Now, his ID envelope does have a birthdate.

20  Do you see that?

21     A.   Yes.

22     Q.   April 29th, 1965?

23     A.   Yes.

24     Q.   And that birthdate matches what was on his application

25  form?

1    A.    Yes.

2    Q.    This ballot should not have been rejected; is that

3  right?

4    A.    That's correct.

5    Q.    What levels of review are in place to ensure that voters

6  like Mr. Quinlan are not disenfranchised because of a mistake

7  in the review process?

8    A.    Again, we have the teams of Democrat and Republican

9  that's supposed to review these to make sure that this type of

10  mistake does not happen.  I guess I'm going to have to tighten

11  up the process a little bit.

12    Q.    Mr. Anthony, is one of the problems that your Board

13  faces the fact that there are so many absentee ballots and

14  provisional ballots that have to be reviewed in a very short

15  period of time?

16    A.    That shouldn't matter.  They should still get it right.

17    Q.    That's correct, they should still get it right; but

18  sometimes they don't, as we've seen?

19    A.    Obviously.

20    Q.    What do you attribute that to?

21    A.    I don't know.  Like I said, I'm going back and have a

22  talk with them, but -- I'm going back to have a talk with my

23  staff about that.  I counted -- You showed me eleven of them,

24  or nine of them, that should have been counted or should at

25  least have been reviewed.  That's not acceptable.

Vol. 4 - 36

1    Q.   All right.  Mr. Anthony, what do you -- what is the

2    process that your Board should follow, or your staff should

3    follow, if the voter provides an ID that is not in the

4    database?  For example, if the only ID that's in the database

5    is the driver's license number but the voter provides a Social

6    Security number, what should the Board staff do in that

7    instance?

8    A.   Well, that's -- I'm not -- They should look at -- You

9    know, I would think that our system would be such that they

10   could do a cross-check and find the person if some information

11   is not there.

12        I mean, we're constantly trying to get our database to a

13   point where it's, you know, is accurate; but we still have the

14   human error in there.  We enter the data, you know, have clerks

15   that enter the data.  And we try to cross-check it and make

16   sure it's correct.  But sometimes you have human error.

17   Q.   How does your staff cross-check the information?

18   A.   They let another set of eyes look at it.

19   Q.   That's when they're inputting information into the

20   system?

21   A.   That's correct.

22   Q.   With regard to the 11-S process, Mr. Anthony, are you

23   familiar with the process of sending out Form 11-S's to

24   absentee voters?

25   A.   The 11-S is a request for more information?  What is the

1    11-S?  Show that to me so I make sure.

2    Q.   Yes.  Let me show that to you.

3          MS. GENTRY:  May I have one moment, Your Honor?

4          THE COURT:  Yes.

5     (Whereupon, there was a brief interruption.)

6    BY MS. GENTRY:

7    Q.   All right.  This is from Plaintiffs' Exhibit 3.

8          COURTROOM DEPUTY CLERK:  Did you say 3?

9          MS. GENTRY:  Yes, Plaintiffs' Exhibit 3.

10   BY MS. GENTRY:

11   Q.   And I'll show you the whole document, Mr. Anthony.

12   A.   Okay.

13   Q.   Have you seen this form before?

14   A.   Yes.

15   Q.   And are you familiar with the Board's process for

16   sending out this form?

17   A.   Yes.

18   Q.   It's my understanding that the Board does not keep

19   copies of the forms that are sent out.  Is that also your

20   understanding?

21   A.   I'm not sure on that one.

22   Q.   Do you know how quickly the Board sends out Form 11-S's

23   to absentee voters who have made a mistake?

24   A.   As soon as we know -- As soon as we get the absentee

25   ballot in, we look at it.  If it's missing information, we mail

1   the form out.

2      Q.   You try to turn it around very quickly?

3      A.   Yes, the same day.

4      Q.   Why do you try to turn it around so quickly?

5      A.   Because they have seven days to respond, or they have --

6   you know, we need the information to count their ballot.

7      Q.   Are there times when the Board will also call a voter to

8   let them know that there was a mistake that needs to be

9   corrected?

10     A.   I'm not sure, but -- I'm not sure.

11     Q.   Do you know whether the Board has the capability of

12  making robocalls?

13     A.   Yes, we do.

14     Q.   And is there any reason you can think of why the Board

15  could not make robocalls to voters who have made a mistake on

16  their ballot and need to come in to correct it?

17     A.   No.

18          MS. GENTRY:  Your Honor, may I have a moment to confer

19  with counsel?

20          THE COURT:  Yes, you may.

21          MS. GENTRY:  Thank you.

22     (Whereupon, there was a brief interruption.)

23  BY MS. GENTRY:

24     Q.   Mr. Anthony, very briefly, you had mentioned that you

25  are going to go back and talk to your staff about some of their

1    mistakes.  Is that fair to say?

2     A.    Yes, it is.

3     Q.    And you believe -- you've testified today that there are

4    a number of ballots that were rejected that you believe should

5    have at least been considered by the Board; is that right?

6     A.    Yes.

7     Q.    Do you believe it was unfair to reject those votes?

8          MS. RICHARDSON:  Objection.  Argumentative.

9          THE COURT:  Overruled.

10          THE WITNESS:  I don't know if I would use the word

11   "unfair."  I would say that it appears to be something that we

12   can improve upon.

13    BY MS. GENTRY:

14    Q.    Why would you need to improve upon it if it's not

15   unfair?

16          MS. RICHARDSON:  Objection.  Asked and answered.

17          THE COURT:  Sustained.

18          MS. RICHARDSON:  Thank you, Your Honor.

19    BY MS. GENTRY:

20    Q.    What do you mean when you say it is something that you

21   could improve upon?

22    A.    That means, our processes, we need to take another look

23   at how we are processing it.  You know, maybe I'm working folks

24   too many hours during the provisional vote period.  Maybe we

25   need more eyes on it.  There's some things I'm going to have a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 40 of 241 PAGEID #: 1656
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/04/16 Page: 40 of 241 PAGEID #: 29250

Vol. 4 - 40

 1    talk with our team and see what we can do to improve it.

 2      Q.   Okay.  So, when you say "improve it," you mean the

 3    accuracy of the review?

 4      A.   That's correct.

 5          MS. GENTRY:  Thank you, Mr. Anthony.

 6          Your Honor, I have no further questions at this time.

 7          THE COURT:  Thank you, Ms. Gentry.

 8          Ms. Richardson.

 9          MS. RICHARDSON:  Thank you, Your Honor.

10                         DIRECT EXAMINATION

11    BY MS. RICHARDSON:

12      Q.   Good morning, Mr. Anthony.

13      A.   Good morning.

14      Q.   We've met previously.  But for the record, my name is

15    Ryan Richardson, and I represent the defendants in this case,

16    the Ohio Secretary of State, John Husted, and the State of

17    Ohio.

18          Mr. Anthony, is Franklin County a bipartisan Board?

19      A.   Yes, it is.

20      Q.   And I believe you testified on Friday that you are a

21    member of the Democratic Party; is that correct?

22      A.   That's correct.

23      Q.   So does that mean that you have a Republican

24    counterpart?

25      A.   That's correct.

1    Q.    And who is that individual?

2    A.    It's David Payne.

3    Q.    And what is his title?

4    A.    He's the Deputy Director.

5    Q.    Are you also a member of an association called the Ohio

6  Association of Election Officials?

7    A.    Yes, I am.

8    Q.    Can you describe what that organization is?

9    A.    That organization consists of all the 88 county Boards

10  of Elections.

11    Q.    Is it also a bipartisan organization?

12    A.    Yes, it is.

13    Q.    And you would describe yourself as active in that

14  organization; is that correct?

15    A.    Yes.

16    Q.    Does the OAEO include both large and small Boards of

17  Elections?

18    A.    Yes, it does.

19    Q.    As a result of your involvement in that organization,

20  have you had an opportunity to interact with some of the board

21  members from smaller boards?

22    A.    Yes, I have.

23    Q.    And has that given you some insight into how some of

24  those smaller boards may differ from larger boards like

25  Franklin County?

```
1              MS. GENTRY:  Objection.

2              THE COURT:  Basis?

3              MS. GENTRY:  Hearsay.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6     BY MS. RICHARDSON:

7     Q.   And can you describe generally what some of your

8     impressions are about some of those differences?

9     A.    Well, the major difference is the size.  The other

10    difference is staff.  We have more staff assigned to specific

11    areas of responsibility.  Smaller boards, they tend to be

12    generalists.  They tend to do it all.  Money-wise, we have a

13    much larger budget, because we are a larger county.  So we're

14    able to -- our budgets are just larger.

15             THE COURT:  Mr. Anthony --

16             THE WITNESS:  Yes.

17             THE COURT:  -- contextually, does size matter?

18             THE WITNESS:  No, it does not.  They still have to

19    comply with the same rules and regulations that we have to

20    comply with.

21             THE COURT:  And does proportionality kind of take

22    hold?  In other words, proportionately are the budgets for

23    smaller proportionately the same as the budgets for larger

24    boards?

25             Let me make up something, for instance.
```

Vol. 4 - 43

1          THE WITNESS:  Yeah.

2          THE COURT:  If larger boards are allocated -- you

3    know, let's say you have a hundred voters, and you're allocated

4    a hundred dollars, basically averaging out to a dollar per

5    voter for you to administer the election.  Would a smaller

6    board, let's say with 50 voters, be allocated $50 so that they

7    would have still a dollar per voter even though their budget

8    would be smaller?

9          THE WITNESS:  In some cases not.

10         THE COURT:  Okay.

11         THE WITNESS:  I believe that, in some cases -- I

12   believe the Secretary of State does ask all of our boards what

13   it cost us to put on an election.

14         THE COURT:  Yes.

15         THE WITNESS:  And then you divide that by the number

16   of voters you have registered, and you get a kind of cost per

17   voter.

18         THE COURT:  Right.

19         THE WITNESS:  I know they've started doing that the

20   last several years.  So that would be a report that you could

21   kind of get some idea.

22         THE COURT:  Is the cost per voter approximately the

23   same from board to board, irrespective of size?

24         THE WITNESS:  Now that, I don't know.

25         THE COURT:  All right.

1        Thank you, Ms. Richardson.  Please continue.

2           MS. RICHARDSON:  Thank you, Your Honor.

3     BY MS. RICHARDSON:

4     Q.    And in terms of funding, are the respective

5     counties -- do the respective counties receive funding from

6     their county commissioners?  Is that typically how the budget

7     works?

8     A.    That's correct.

9     Q.    I believe you may have testified about this earlier, so

10    I apologize if I'm repeating, but how many full-time employees

11    does the Franklin County Board of Elections hire?

12    A.    We have 42 full-time staff; but, during the election

13    cycle, it could swell up to about 300 people.

14    Q.    And how many poll-workers, or PEOs, does the Franklin

15    County Board employ?

16    A.    Depends on the size of the election.  Upwards to almost

17    5,000.

18    Q.    Do you hire new poll-workers for each election?

19    A.    We try not, but we -- we have a lot of repeat, but we're

20    constantly recruiting.  We're constantly recruiting

21    poll-workers.

22    Q.    Are you in the middle of that process right now for the

23    2016 general election?

24    A.    Yes, we are.

25    Q.    And how does someone who is interested in becoming a

Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 45 of 241 PAGEID #: 29926

Vol. 4 - 45

1    poll-worker apply for that position?

2      A.    We put it on our web page.  We aggressively seek out

3    employers, large employers:  City, elected -- excuse

4    me -- government employees.  And so we're constantly -- you

5    know, word of mouth.  We're out there, every day, trying to get

6    folks who want to be a poll-worker.

7      Q.    Are there particular qualifications that an individual

8    must have in order to be hired as a poll-worker?

9      A.    They must be registered -- They must be registered to

10   vote.  Excuse me.

11     Q.    Thank you, Mr. Anthony.

12           In your experience, do the poll-workers that have been

13   hired at Franklin County, at the Franklin County Board of

14   Elections, come from a variety of different backgrounds?

15     A.    That's correct.

16     Q.    Do you hire poll-workers from both parties?

17     A.    Yes.

18     Q.    And how are those poll-workers trained in Franklin

19   County?

20     A.    Well, we believe we have one of the best training

21   programs in the country.  We put them through a four-hour

22   training, initially.  And then we -- we try to separate the

23   duties of what we're going to have the poll-workers do.  Then

24   we have what we call PMP.  That's pretty much just-in-time

25   training that we offer right before Election Day just in case a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 46 of 241 PAGEID #: 1662
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/05/16 Page: 46 of 241 PAGEID #: 2902

Vol. 4 -  46

1   person forgot what they're supposed to do.  Then we make them

2   go through another test, but basically to see how much they

3   retain with what we train them.  And if we see that they're

4   weak in some areas, we zero down on those areas and try to get

5   them all up to speed.

6   Q.   Thank you.  And in your experience, do all counties in

7   Ohio offer the same type of training program?

8           MS. GENTRY:  Objection.

9           THE COURT:  Basis?

10          MS. GENTRY:  Lack of foundation.

11          THE COURT:  I'm going to sustain it.  But you may ask

12  this question, but you first need to establish a foundation for

13  how Mr. Anthony might know that.

14          MS. RICHARDSON:  Thank you, Your Honor.

15  BY MS. RICHARDSON:

16  Q.   Mr. Anthony, as a result of your interactions with other

17  counties in the State of Ohio, have you gained some insight as

18  to how various other counties may train their poll-workers?

19  A.   Yes.

20  Q.   And based on that, do you have a sense as to whether

21  other counties provide similar types of training programs?

22  A.   They do not.

23  Q.   And how do those training programs in some of the other

24  counties compare to the Franklin County training program?

25  A.   I don't think they're as intense as our training program

1  is.

2  Q.  Thank you, Mr. Anthony.

3  I'd like to ask you a few questions about absentee

4  voting in Franklin County.  I believe you testified previously

5  that a voter who votes by mail or on a paper ballot in person

6  must complete five fields on an ID envelope; is that correct?

7  A.  Yes.

8  Q.  And can you remind me what those five fields are?

9  A.  They have to print their name.  They have to give us a

10  date of birth or -- their address, their correct address, their

11  Social Security -- the last four of the Social Security, or

12  their driver's license.  And they must sign it.

13  Q.  Thank you.  And are those the same five fields that are

14  necessary to register to vote in Ohio?

15  A.  That's correct.

16  I'm sorry.  Yes.

17  Q.  Thank you.  And are they also the same five fields that

18  are necessary to apply for an absentee ballot?

19  A.  Yes.

20  Q.  Once a voter sends in a completed absentee ballot, are

21  there ways for that voter to track the status of the ballot?

22  A.  Yes.

23  Q.  Can you describe those for me?

24  A.  If a person requests an absentee ballot, we assign -- we

25  scan that information in.  We assign a number for that ballot,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 48 of 241 PAGEID #: 1664
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 48 of 241 PAGEID #: 29504

Vol. 4 - 48

1   and we scan it into our system.  And, so, we're able to track

2   that ballot because we have a -- we use -- we call it the

3   Relia-Vote System, a Pitney Bowes system to process the

4   absentee requests.  And we send it out.  We mail sort it.  We

5   put an intelligent bar code on there.  And, so, we track all

6   that information.  And we put that information on that voter's

7   file.  So, if a voter calls in, we could pretty much tell --

8   you know, we know when it reached the mailbox -- I mean the

9   post office.  Because it's presorted, we even know which

10  precinct or mailing location, substation, it may have gone to.

11  And, so, a person can track their ballot.  And, so, if they

12  mail it back, it comes back through and it has the information

13  on there, when we receive it in that same Pitney Bowes system,

14  we know that we've received it.

15    Q.    Thank you, Mr. Anthony.  I'd like to ask you a few

16  questions about some of the numbers for absentee ballots.  And

17  I will show you what's been marked as Plaintiffs' Exhibit 1147.

18        Can you see that okay, Mr. Anthony?

19    A.    Yes, I can.

20    Q.    And I believe this was a document that you were asked

21  about on Friday.  Do you recall that?

22    A.    Yes.

23    Q.    And what is this document?

24    A.    This document shows absentees that were, I guess,

25  counted and the reason they were denied.

1    Q.   And this is for the 2012 election; is that correct?

2    A.   That's correct.

3    Q.   And can you tell -- Excuse me.  Can you tell from this

4    document whether absentee ballots were rejected in 2012 because

5    they were not turned in by the deadline?

6    A.   Yes.

7    Q.   How many were rejected because they were late?

8    A.   609.

9    Q.   And, in 2012, were absentee ballots rejected because

10   they did not include any ID envelope?

11   A.   Yes.

12   Q.   So, in 2012, having an ID envelope was a requirement at

13   that time; is that correct?

14   A.   Yes, it was.

15   Q.   And were ballots also rejected because they did not have

16   a signature?

17   A.   Yes.

18   Q.   So signature was also a required field in 2012; is that

19   correct?

20   A.   Yes.

21        THE COURT:  Ms. Richardson, Ms. Gentry, could you

22   approach for a moment?

23   (Thereupon, the Court and Counsel conferred out of the

24   hearing of the court reporter.)

25   (Recess taken from 9:50 a.m. until 9:55 a.m.)

1    THE COURT:  Please continue.

2    MS. RICHARDSON:  Thank you, Your Honor.

3  BY MS. RICHARDSON:

4  Q.   Mr. Anthony, before the break, we were taking a look at

5  Plaintiffs' Exhibit 1147.  And I'll continue to direct your

6  attention to that document.  Can you tell from this form

7  whether, in 2012, there were absentee ballots that were

8  rejected because there was no ID?

9  A.   Yes.

10  Q.   And how many were rejected for that reason?

11  A.   75.

12  Q.   Was a voter required to provide some form of ID in 2012

13  for their absentee ballots?

14  A.   Yes.

15  Q.   Thank you, Mr. Anthony.

16       I'll show you now what's been marked as Plaintiffs'

17  Exhibit 1145.  Mr. Anthony, are you familiar with this

18  document?

19  A.   Yes, I am.

20  Q.   What is this document?

21  A.   This is our official tabulation of absentee votes that

22  we received.  It has the total number, and then it breaks down

23  those that we denied or rejected and those that we counted.

24  Q.   And if you look at Section B, does that section tell you

25  how many total absentee ballots were counted in 2014?

Vol. 4 - 51

1    A.   Yes.

2    Q.   How many were counted?

3    A.   99,951.

4    Q.   And how many total were rejected in 2014?

5    A.   2,259.

6    Q.   Thank you, Mr. Anthony.

7         And does Section C of this document provide some of the

8    reasons that ballots were rejected in 2014?

9    A.   Yes.

10   Q.   Can you tell from this what the number one reason that

11   absentee ballots were rejected was in 2014?

12   A.   Yes.

13   Q.   What was that?

14   A.   Not registered or -- yeah.  Let me look at that again.

15   Looks like it was ballots not received on time and missed the

16   deadline.

17   Q.   And how many absentee ballots were rejected for that

18   reason in 2014?

19   A.   1,497.

20   Q.   Thank you, Mr. Anthony.

21        And if you take a look at C5, what is that reason

22   referring to?

23   A.   Returned without an ID envelope.

24   Q.   How many were rejected for that basis?

25   A.   73.

1    Q.   If you take a look at C10, what does that reason refer

2    to?

3    A.   That there were multiple ballots returned in one

4    envelope.

5    Q.   How many were rejected for that reason?

6    A.   Four.

7    Q.   And can you tell me what does that mean?

8    A.   That meant that someone -- multiple voters put their

9    information in a single provisional envelope, I mean absentee

10   envelope.

11   Q.   Thank you, Mr. Anthony.

12        And, C11, do you see that?

13   A.   Yes.

14   Q.   What does that refer to?

15   A.   The voter deceased prior to the date the ballot was

16   cast.

17   Q.   And how many were rejected for that reason?

18   A.   17.

19   Q.   I'll show you now what's been marked as Plaintiffs'

20   Exhibit 1146.  Are you familiar with this document, Mr.

21   Anthony?

22   A.   Yes, I am.

23   Q.   And what is this document?

24   A.   It's the same as you showed me before, but it's for the

25   November 3, 2015, general election.

1   Q.   Thank you.  And I will represent to you that we have

2   already gone over some of this.  So I won't ask you to go over

3   all of the numbers here.  But if you take a look at Section B,

4   does that tell you how many absentee ballots were counted in

5   2015?

6   A.   Yes, it does.

7   Q.   And how many were counted?

8   A.   38,975.

9   Q.   Thank you, Mr. Anthony.

10       And how many total were rejected in 2015?

11  A.   1,169.

12  Q.   And can you tell from this document what the number one

13  reason that absentee ballots were rejected was in 2015?

14  A.   It looks like it was ballots not received on time and

15  missed the deadline.

16  Q.   And how many were rejected for that reason?

17  A.   900.

18  Q.   Thank you.  I'd like to switch topics for a moment and

19  turn to provisional ballots.  You were asked some questions

20  about provisional ballots on your direct; is that correct?

21  A.   Yes.

22  Q.   What is a provisional ballot?

23  A.   A voter has to vote a provisional ballot if they don't

24  have ID or they've moved or they cannot provide some form

25  of -- When I say "ID," I mean birthdate, driver's license,

Vol. 4 - 54

1    Social Security.  It's basically a voter where they may not be

2    in our -- If it's on Election Day, they may not be in our poll

3    book.

4        Q.    Is it fair to say these are voters for whom there has

5    been some question raised about their eligibility to vote?

6        A.    Yes.

7        Q.    When are most provisional ballots cast in Ohio in your

8    experience?

9        A.    Election Day.

10       Q.    In Ohio --

11             THE COURT:  You said "cast" and not "counted," right?

12             MS. RICHARDSON:  Correct, Your Honor.  Thank you.

13   BY MS. RICHARDSON:

14       Q.    In Ohio, are all voters who are unable to cast a regular

15   ballot given the option to cast a provisional ballot?

16       A.    Yes.

17       Q.    And is that true even if the voter is not registered to

18   vote?

19       A.    Yes.

20       Q.    Can you describe what the process is in Franklin County

21   for reviewing provisional ballots?

22       A.    On Election Day or after?

23       Q.    We'll start with Election Day.  Thank you.

24       A.    You're welcome.

25             The poll-worker is instructed to make sure that all the

1    information on the provisional envelope is correct, or at least

2    filled out.  They don't know whether it's correct or not, but

3    at least filled out.  So, that's the first part on Election

4    Day.

5         During the counting, or the processing of provisional

6    votes, we then take -- we have a team of our staff that then

7    goes through each one of them and look at all that information

8    that's on the provisional ballot and check it against what

9    information we have in our database.

10   Q.    And who is ultimately responsible for deciding whether a

11   provisional ballot will be rejected?

12   A.    The Board.  The Board members.  The four Board members.

13   Q.    And I believe you testified earlier that, in most cases,

14   the Board agrees on whether or not particular provisional

15   ballots should be rejected.  Is that fair?

16   A.    That's fair.

17   Q.    Mr. Anthony, are you the person who is personally

18   responsible for reviewing the provisional ballots for Franklin

19   County?

20   A.    It falls on my shoulder, but I do have a team of folks

21   that actually sits down and reviews them.

22   Q.    And is that team of individuals specifically trained on

23   the laws and directives that govern provisional ballots?

24   A.    Yes, they are.

25   Q.    You were asked questions about a handful of provisional

1  ballots on direct.  Do you recall that?

2    A.   Yes.

3    Q.   Did you personally review any of those provisional

4  ballot affirmation forms prior to today?

5    A.   No, I don't believe I did.

6    Q.   I'd like to ask you questions about just one of the

7  ballots that you were shown.  And I will show you what has been

8  marked as Plaintiffs' Exhibit 2378.  Do you recall discussing

9  this ballot during your direct?

10    A.   Yes.

11    Q.   And do you recall what the reason appeared to be that

12  this particular ballot was rejected?

13    A.   The voter did not print their last name.

14    Q.   And I believe you were also asked about the label that

15  was affixed to the ballot; is that correct?

16    A.   Yes.

17    Q.   When would that label have been affixed to the ballot?

18    A.   During the processing -- during the processing stage.

19    Q.   And on the label, does it show, there, a middle initial

20  for the voter?

21    A.   Yes.

22    Q.   What is the middle initial that's provided there on the

23  label?

24    A.   D.

25    Q.   And if you take a look up at the top of the form, did

1    the voter provide his middle name?

2      A.   Yes.

3      Q.   What was the middle name?

4      A.   Patrick.

5      Q.   I'll direct your attention to the bottom of the

6    affirmation form and the signature box.

7      A.   Okay.

8      Q.   Is there a signature provided there?

9      A.   Yes.

10     Q.   Is that signature legible?

11     A.   It's -- I'm not sure -- If it matched what he has on his

12   registration.

13     Q.   And would the individual on your staff who was reviewing

14   this ballot have been able to tell what the voter's name was

15   just by looking at this signature?

16     A.   No.

17     Q.   And the name of the person that they thought it was,

18   listed on this label, has a D for a middle initial, correct?

19     A.   That's correct.

20     Q.   I'm going to show you what's been marked as Plaintiffs'

21   Exhibit 1142.  Are you familiar with this document, Mr.

22   Anthony?

23     A.   Yes.

24     Q.   What is this document?

25     A.   This would be our Certification of Provisional Ballots

Vol. 4 — 58

1    for the November 4th, 2014, General Election.

2    Q.    And can you tell from this document how many total

3    provisional ballots were cast in 2014?

4    A.    Yes.

5    Q.    How many were cast?

6    A.    7,366.

7    Q.    And how many were rejected?

8    A.    619.

9    Q.    Can you tell from this form what the top reason was that

10    provisional ballots were rejected in 2014?

11    A.    Voter not registered to vote in the State.

12    Q.    And how many were rejected for that reason?

13    A.    324.

14         MS. RICHARDSON:  And, Your Honor, I'm not sure if

15    Plaintiffs' Exhibit 1142 has been moved into evidence; but, if

16    it has not been, I would move to admit that at this time.

17         THE COURT:  Any objection, Ms. Gentry?

18         MS. GENTRY:  No objection, Your Honor.

19         THE COURT:  1142 will be received.

20         MS. RICHARDSON:  Thank you, Your Honor.

21    BY MS. RICHARDSON:

22    Q.    Mr. Anthony, I now have up what's been marked as

23    Plaintiffs' Exhibit 1143.  Are you also familiar with this

24    document?

25    A.    Yes, I am.

1    Q.    What is this document?

2    A.    Looks like our provisional vote for -- or the same

3  document as before, but for the November 3, 2015, election.

4    Q.    Thank you, Mr. Anthony.  And can you tell how many total

5  provisional ballots were cast in 2015?

6    A.    10,558.

7    Q.    And how many full ballots were counted in 2015?

8    A.    8,986.

9    Q.    And were there additional ballots where part of the

10  ballot was counted?

11   A.    Yes.

12   Q.    How many were part of the ballot -- how many part

13  ballots were counted?  Excuse me.

14   A.    189.

15   Q.    And how many total ballots were rejected?

16   A.    1,383.

17   Q.    Does this document also tell you what the number one

18  reason was that provisional ballots were rejected in 2015?

19   A.    Yes.

20   Q.    And what was that reason?

21   A.    Not registered in the State of Ohio.

22   Q.    And how many of the 1,383 rejected ballots were rejected

23  because the voter was not registered?

24   A.    742.

25   Q.    Mr. Anthony, under the laws that were enacted in 2014,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 60 of 241 PAGEID #: 1676
Case: 2:06-cv-00896-ALW-TPK Doc #: 558 Filed: 04/03/16 Page: 60 of 241 PAGEID #: 29330

Vol. 4 - 60

1  can a completed provisional ballot affirmation now count as a

2  registration form?

3  A.   Yes.

4  Q.   So, if a voter, one of the voters that we looked at

5  whose ballots were rejected because they were not registered in

6  2014 or 2015 goes to vote in the next election, will that voter

7  be registered?

8  A.   Yes.

9  Q.   Will that voter also be eligible to cast a regular

10 ballot in the next election?

11 A.   Yes.

12 Q.   Thank you.

13      I'd like to ask you a few questions now about voting

14 locations and precincts.  I believe you testified on Friday

15 that it's important for a voter to vote at the correct

16 location.  Do you recall that?

17 A.   Yes.

18 Q.   And why is that important?

19 A.   In Ohio, all votes are precinct-based.  So you must

20 live -- so you must live -- you must vote in the precinct in

21 which you live.  The only exception would be during the early

22 vote period.

23 Q.   And why does it matter whether a voter votes in the

24 correct precinct?

25 A.   Because the items that they need to vote on -- Because

Case: 2:06-cv-00896-ALM-TPK Doc #: 656-7 Filed: 04/03/20 Page: 61 of 241 PAGEID #: 1937

Vol. 4 - 61

1   of district boundaries, you may have a school boundary that

2   crosses many precincts, or even from across the street to

3   another voter.

4   Q.   And so are the issues and races potentially different

5   from one precinct to the next?

6   A.   Yes.

7   Q.   How can a voter find out what his or her proper voting

8   location is?

9   A.   They could go online on our web page and enter their

10   first and last name and the street address, and it will pull up

11   their information.  And it will tell them where their voting

12   location is, and also what's in their -- their congressional,

13   Senate and House and school districts.

14   Q.   And could someone also contact the Board of Elections by

15   phone or in person to ask that question?

16   A.   Absolutely.

17   Q.   How many different precincts are there in Franklin

18   County?

19   A.   There is over 800 of them.  I don't know the exact

20   number.

21   Q.   Sure.

22   A.   Okay.

23   Q.   And you described on your direct -- I believe it's a

24   LID.  Did I get that term correct?

25   A.   Yes.

1    Q.    What is a LID?

2    A.    Location identification.

3    Q.    Is another way to describe a LID -- Is it fair to say

4    that's a multi-precinct location?

5    A.    We break every location into a LID to help us track

6    locations.  When we deliver equipment and we process

7    information back in, we break it down to a LID.  And, yes, it

8    does include where we have multiple precincts in one location,

9    but it could be a single LID, as well.

10    Q.    Thank you for that clarification.  And, in Franklin

11    County, have you implemented a system that combines precincts

12    in a location into a single poll book?

13    A.    Yes, we have.

14    Q.    Can you describe what that process has been?

15    A.    In the past, if you would go into a voting location that

16    had multiple precincts in it, then each precinct had their

17    individual table set up in that precinct.  So if a voter walked

18    into a room, they would have to go to the correct table in

19    order to vote in their correct precinct.

20          We've moved to a LID, to a multiple-precinct process, I

21    believe in '06, where a voter would walk into that same

22    precinct; and, instead of it being separated by tables, we've

23    combined the precincts in that LID; and it was separated by

24    alpha, by your last name.  So we would have, depending on how

25    large the precinct is, five stations, up to seven; some places,

1    15 stations.

2    Q.    And so under the revised system, is it fair to say that

3    a voter would just need to go to the table with his or her last

4    name identified?

5    A.    That's correct.  That's correct.

6    Q.    Are you aware of whether the Secretary of State's Office

7    has directed that counties should consolidate poll books?

8    A.    Yes.

9    Q.    And to your knowledge, has the State also allocated

10   money for 88 counties to purchase electronic poll books?

11   A.    Yes.

12   Q.    Has Franklin County purchased an electronic poll book?

13   A.    Yes, we have.

14   Q.    Can you describe what that means?

15   A.    Yes.  We purchased poll books this past year.  And what

16   a poll book will do is, currently, we were using paper poll

17   books, where we would print the name of each voter by their

18   street address; and then when a voter shows up to vote, the

19   poll-worker would have to ask them for their name and their

20   street address; and then they would find them in that poll

21   book.  And those poll books would have been separated by alpha.

22   So A through H, for example; L through M for example.  So a

23   person would stand in line, and that poll-worker would go

24   through the poll book until they find the person's name.

25        With electronic poll books, all a person would have to

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-7 Filed: 09/12/20 Page: 64 of 241 PAGEID #: 1680
Case: 2:06-cv-00896-ALM-TPK Doc #: 557 Filed: 04/03/20 Page: 64 of 241 PAGEID #: 29989

Vol. 4 - 64

```
 1   do is go to any open line and present their ID, and the poll

 2   book would pull up that voter's information.

 3       Q.   Thank you, Mr. Anthony.

 4           In Franklin County, if a voter has questions about how

 5   to complete an absentee ballot ID envelope, can that voter

 6   reach out to the Board for guidance?

 7       A.   Yes.

 8       Q.   Can they do that over the phone?

 9       A.   Yes.

10       Q.   Could they also do that in person by coming into the

11   Board?

12       A.   Yes.

13       Q.   And do you have intake individuals who are responsible

14   for providing guidance to voters for questions like these?

15       A.   Yes.

16       Q.   And I believe you testified on direct that you train

17   your poll-workers to go through every line that's supposed to

18   be filled out on a ballot; is that correct?

19       A.   That is correct.

20       Q.   Do you train the poll-workers not to fill in the forms

21   for the voters?

22       A.   Yes.

23       Q.   And that's because the poll-workers could get the

24   information wrong; is that fair?

25           THE COURT:  Ms. Richardson --
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 65 of 241 PAGEID #: 1681
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 65 of 241 PAGEID #: 29584

Vol. 4 - 65

 1              MS. RICHARDSON:  Yes, Your Honor.

 2              THE COURT:  -- do you want to rephrase that question

 3      in light of my guidance provided at side-bar moments ago?

 4              MS. RICHARDSON:  Thank you, Your Honor.

 5      BY MS. RICHARDSON:

 6      Q.   Mr. Anthony, why is it important that the voter complete

 7      his or her own ballot, rather than the poll-workers?

 8      A.   It would cut down on poll-worker error.

 9      Q.   Thank you, Mr. Anthony.

10              Are poll-workers specifically trained to assist

11      individuals who have low literacy?

12      A.   Yes.

13      Q.   Can you describe that training?

14      A.   Well, it may be best described by my trainer, but it is

15      my understanding that we -- if we have an individual that does

16      have poor literacy skills, that they will take the time to walk

17      through the forms with them.

18      Q.   And does that include even getting a bipartisan team of

19      individuals to assist?

20      A.   Yes.

21      Q.   I'm going to ask you a very obvious question.  So I

22      apologize.  Is the pre-election time period a very busy time

23      period for the Boards?

24      A.   Yes, it is.

25      Q.   Can you describe, just generally, some of the tasks that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 66 of 241 PAGEID #: 1682
Case: 2:06-cv-00896-ALM-TPK Doc #: 657 Filed: 04/03/13 Page: 66 of 241 PAGEID #: 2987

Vol. 4 - 66

1    the Boards have to complete in preparing for an election?

2    A.   Well, training -- training the 4,000-plus poll-workers,

3    making sure all of our machines go through a test.  We have to

4    make sure that -- I'm forgetting what it's called -- logic and

5    accuracy testing on all the voting machines.  We have to make

6    sure that the voter files are up to date, that we've -- you

7    know, that all the folks that have voter registration forms,

8    that they get turned into us on time, so that we can -- to

9    input them into our system.

10        We have to make sure we have all the polling locations

11   identified, paid for, ready to go.  And, I mean, it's a lot.

12   We have to be prepared and ready for the absentee ballots.  We

13   have to be ready to send out the overseas and military ballots

14   prior to election, track them, bring them in.  I mean -- not

15   bring them in.  You know, receive them in.

16        And then, during all of this, we still do -- there is

17   petitions that we have to check if there is an issue, a

18   statewide issue or local issue.  We have -- We have to check

19   those petitions for accuracy and make sure that the signers are

20   registered to vote.

21        We have to deal with campaign finance for candidates,

22   candidate folks, candidates who want to be on the ballot.  We

23   have to make sure that those petitions have the correct number

24   of valid signatures on them.

25        We have to prepare for -- I believe we have over a

Vol. 4 - 67

1    thousand ballot styles.  So we have to print them.  We have to

2    figure out which ballot styles go in which precinct.  So we

3    have to have a staff that sits down and just reviews those.

4         And everything is subject to the public coming in and

5    looking at it, as well.  So we have -- there is a public period

6    during all of our processes where the public is invited in to

7    look at everything that we've done.

8    Q.    Thank you, Mr. Anthony.  And what about on Election Day?

9    What are some of the responsibilities that the Board must

10   complete on Election Day?

11   A.    On Election Day, we must make sure that every polling

12   location is open and running by 6:30 and that they close at

13   7:30.  We have to make sure that we have staff available if

14   there is any problems out there in our over 300, almost 400,

15   precincts.  We have a staff of rovers that basically have an

16   area, and they travel around and make sure, you know, that we

17   don't run out of paper, we don't run out of absentee ballots,

18   or -- and so we basically -- you know, if a machine goes down,

19   we would be able to repair the machine.

20        We answer a lot of questions.  Voters call us wanting to

21   know, you know, from where they vote to complaints about what

22   we're doing, or however they perceive that we're doing.

23   Q.    And, Mr. Anthony, finally, what responsibilities does

24   the Board have in the post-election period?

25   A.    In the post-election period, we still have to -- On

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 68 of 241 PAGEID #: 1684
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 68 of 241 PAGEID #: 29289

Vol. 4 - 68

1    Election Night, the count is the unofficial canvass.  Post

2    election, we have a time-specific period that we must have the

3    official canvass, or the official votes in.  That means that we

4    still -- there still may be absentee ballots at the post office

5    that need to be in.  They have ten days to get to us.  We have

6    overseas ballots that still have to be brought into our

7    process.  We have to tabulate and count all of the paper

8    ballots.  We have to separate the provisional ballots, process

9    those.

10           MS. RICHARDSON:  Thank you, Mr. Anthony.

11        Your Honor, may I confer?

12           THE COURT:  Yes, you may, Ms. Richardson.

13       (Whereupon, there was a brief interruption.)

14     BY MS. RICHARDSON:

15     Q.    Just one more question, Mr. Anthony.

16     A.    Yes.

17     Q.    I asked you some questions about training for PEOs or

18     poll-workers.  Do you recall that?

19     A.    Yes.

20     Q.    How is the training for PEOs funded?

21     A.    County commissioners give us money.  And, some of the

22     training, the Secretary of State provides some training, some

23     monies for training.  We have -- they offer grants, and we

24     always put in for the grants.  It may be for ADA training, or

25     it may be for online training.

 1            MS. RICHARDSON:  Thank you, Mr. Anthony.  No further

 2    questions.

 3            THE COURT:  Ms. Richardson, thank you.

 4            MS. RICHARDSON:  Thank you, Your Honor.

 5            THE COURT:  Ms. Gentry, do you have any recross?

 6            MS. GENTRY:  Yes, Your Honor, I do.

 7                        RECROSS-EXAMINATION

 8      BY MS. GENTRY:

 9      Q.   Mr. Anthony, you testified in response to

10    Mrs. Richardson's questions that a bipartisan team can assist a

11    voter who is illiterate.  Do you recall that?

12      A.   Yes.

13      Q.   Isn't it true that, before a bipartisan team can assist

14    a blind, disabled, or illiterate voter, that the voter first

15    has to request help on the basis that they are blind, disabled,

16    or illiterate?

17      A.   Yes.

18      Q.   They actually have to affirmatively ask for help,

19    correct?

20      A.   They do.

21      Q.   Do you have experience working with voters who either

22    cannot read or have a low level of literacy?

23      A.   Personally?

24      Q.   Yes.

25      A.   Yes.

1    Q.   All right.  You have some experience there?

2    A.   Yes.

3    Q.   All right.  And are you aware that there is a spectrum

4    of illiteracy?  There are some people who cannot read at all

5    and some people who have difficulty?

6    A.   Yes.

7    Q.   Are you also aware that some people who are illiterate

8    are embarrassed to admit it?

9    A.   Yes.

10   Q.   Are you also aware that some people who are illiterate

11   are not fully aware of the extent to which they don't

12   understand things?

13        MS. RICHARDSON:  Objection.

14        THE COURT:  Yes.

15        MS. RICHARDSON:  Calls for speculation.

16        THE COURT:  Overruled.  She asked if this witness is

17   aware, which tests his personal knowledge.  And given Mr.

18   Anthony's background and his experience, I believe he is

19   qualified to answer that question.

20        You may answer, Mr. Anderson -- Mr. Anthony.

21        THE WITNESS:  Yes.

22        THE COURT:  I'm sorry.

23        THE WITNESS:  Yes.

24   BY MS. GENTRY:

25   Q.   So, in your experience, are there times when a voter who

Vol. 4 - 71

1    may be illiterate does not ask for help?

2       A.   Yes.

3       Q.   You also testified that people can look up their polling

4    location online.  Do you recall that?

5       A.   Yes.

6       Q.   All right.  If a person is illiterate, they're not able

7    to use that functionality, are they?

8               MS. RICHARDSON:  Objection.

9               THE COURT:  Sustained.

10   BY MS. GENTRY:

11      Q.   How can a person who is illiterate use that technology?

12      A.   I'm not sure.  They could probably have someone help

13   them or they could call us, call our office.

14      Q.   They'd have to call, you said, or visit the office?

15      A.   Call or visit our office or get someone to assist.

16      Q.   You also testified that it's important to cut down on

17   poll-worker error.  Do you recall that?

18      A.   Yes.

19      Q.   Why is that important?

20      A.   For the obvious reason.

21      Q.   What is the obvious reason?

22      A.   The obvious reason is, we try to count

23   every -- we -- it's imperative that we make the process open,

24   fair, and honest, and everyone who comes in to vote would

25   have -- will be able to cast their ballot correctly.

1    Q.    And how does poll-worker error prevent that from

2  happening?

3    A.    If a poll-worker directs them to the wrong precinct or

4  if a poll-worker lets them leave out without completing

5  the -- if a poll-worker could just tell them, Hey, you didn't

6  complete the form, please complete it, those type of things.

7    Q.    Does the Board have discretion to count ballots where

8  the form is defective because of poll-worker error?

9    A.    Hmm.  I remember a directive, but I'm not certain, but I

10  think there was a directive that we can if we could -- if it

11  could be proved that it was poll-worker error.

12    Q.    All right.  You were also asked about the five fields

13  being necessary to register to vote.  Do you recall that?

14    A.    Yes.

15    Q.    And on the current registration form, it does require

16  all five fields; is that right?

17    A.    That's correct.

18    Q.    However, if a voter registered 30 or 40 years ago, isn't

19  it true that the five fields were not required?

20    A.    That's correct.

21    Q.    All right.  And, in fact, if a voter has been registered

22  for that long, then perhaps they only needed to provide their

23  name and address and their signature; isn't that correct?

24    A.    When?  Back then?

25    Q.    Yes.

Vol. 4 - 73

1    A.    I believe that's correct, yeah.

2    Q.    You were also asked about -- I'm sorry -- Plaintiffs'

3    Exhibit 2378, the Mr. Hughes ballot.  Do you recall that?

4    A.    Yes.

5    Q.    And it was pointed out that there is a discrepancy in

6    the middle initial that this database has and the middle name

7    that the person wrote down.  You recall that?

8    A.    Yes.

9    Q.    However, the Social Security number matches for the

10   Andrew D. Hughes that's in the system; isn't that right?

11   A.    Yes.

12   Q.    And the driver's license number matches, correct?

13   A.    Yes.

14   Q.    And the date of birth matches, correct?

15   A.    Yes.

16   Q.    And the address matches, correct?

17   A.    Yes.

18   Q.    Therefore, to the extent that there is a discrepancy in

19   the middle name, that does not suggest to you that it's a

20   different person, does it?

21   A.    No.

22   Q.    And based on your experience as an elections official,

23   is it more likely that the mistake with the middle name is in

24   the system and not what the voter wrote down?

25   A.    It could have been.

1    Q.    It could have been?

2    A.    It could have been a mistake on our data entry.

3          MS. RICHARDSON:  Objection.  The question calls for

4    speculation.

5          THE COURT:  Is this the same exhibit -- We went over a

6    similar exhibit during your cross-examination, if I recall, Ms.

7    Gentry.  Is this the same one?

8          MS. GENTRY:  Yes.  Yes.  Mrs. Richardson also asked

9    about it.

10          THE COURT:  Yes.  I recall that.

11          MS. GENTRY:  It is --

12          THE COURT:  Is this not asked and answered?  I thought

13    that you covered this same information on your direct.

14          MS. GENTRY:  I did, Your Honor.  Mrs. Richardson

15    suggested that there is a discrepancy with the middle name and

16    the middle initial and suggested that perhaps it's a different

17    person.

18          THE COURT:  I understand.  Okay.  I understand the

19    nuance.

20        Your objection is overruled.

21        You may answer, Mr. Anthony.

22          THE WITNESS:  It appears that we had his middle name

23    as a D.

24    BY MS. GENTRY:

25    Q.  A "D" and a "P" could look pretty similar to a person

1    who is inputting the information?

2            MS. RICHARDSON:  Objection.

3            THE COURT:  Sustained.

4            MS. GENTRY:  All right.

5    BY MS. GENTRY:

6    Q.    Mr. Anthony, you also talked about the poll book

7    consolidation that Franklin County has done; is that right?

8    A.    Yes.

9    Q.    And you testified that the Secretary has directed all

10   the counties to consolidate poll books.  Do you recall that?

11   A.    There was a directive, yes.

12   Q.    Is it your understanding that a directive can also be

13   rescinded by a Secretary of State?

14   A.    Yes.

15           MS. GENTRY:  Your Honor, may I have a moment to

16   confer?

17           THE COURT:  Yes, you may.

18           MS. GENTRY:  Thank you.

19      (Whereupon, there was a brief interruption.)

20           THE COURT:  Please continue, Ms. Gentry.

21           MS. GENTRY:  Thank you, Your Honor.

22   BY MS. GENTRY:

23   Q.    I am wrapping up.  Mr. Anthony, you testified that,

24   after 2014, the provisional ballot form with the five fields

25   can be used to register voters.  Do you recall that?

 1    A.    Yes.

 2    Q.    And you testified that that was a good thing?

 3    A.    Yes.

 4    Q.    Isn't it true that the same form could be used to

 5    register voters without having to disenfranchise people because

 6    of a minor mistake?

 7          MS. RICHARDSON:  Objection.

 8          THE COURT:  Overruled.  You may answer, Mr. Anthony.

 9          THE WITNESS:  Yes.

10    BY MS. GENTRY:

11    Q.    And you also said that you had a concern that

12    poll-worker error will disenfranchise voters.  Do you recall

13    that?

14    A.    Yes.

15    Q.    Are you also concerned that minor errors or omissions by

16    voters will lead to the disenfranchisement of voters?

17    A.    Yes.

18    Q.    Was it fair to shift the burden of filling out the form

19    on the ID issue from the poll-worker to the voter?

20          MS. RICHARDSON:  Objection.

21          THE COURT:  Basis?

22          MS. RICHARDSON:  Argumentative.

23          THE COURT:  Overruled.  You may answer, Mr. Anderson.

24          THE WITNESS:  No, I don't.  I think the poll-worker

25    should not be doing that.

 1    BY MS. GENTRY:

 2    Q.   I'm sorry.  Could you say that again?

 3    A.   The poll-worker should not do that.  That puts, I think,

 4    undue pressure on the poll-worker; and it probably will create

 5    more poll-worker error if the poll-worker had to fill out the

 6    information.

 7    Q.   So you'd rather have the voter bear the risk of being

 8    wrong?

 9    A.   Yes.

10    Q.   I believe, though, in your testimony earlier you said

11    that those minor mistakes should be excused?

12         MS. RICHARDSON:  Objection.

13         THE COURT:  Overruled.

14         THE WITNESS:  Yes.

15         MS. GENTRY:  All right.  Thank you, Your Honor.  I

16    have no further questions.

17         THE COURT:  Thank you, Ms. Gentry.

18       Ms. Richardson, do you have anything further?

19         MS. RICHARDSON:  No further questions.  Thank you,

20    Your Honor.

21         THE COURT:  Thank you, Ms. Richardson.

22       Mr. Anthony, thank you very much, sir.  You may be

23    excused.

24         THE WITNESS:  Thank you, sir.

25         THE COURT:  It's 10:35, now, by the Court's clock.  We

 1    will stand in recess for 15 minutes, until 10:50.

 2           (Recess was taken from 10:35 a.m. until 10:50 a.m.)

 3             THE COURT:  Mr. Chandra, or whomever is next?

 4             MS. CRAWFORD:  Plaintiffs call Eric Morgan, Your

 5    Honor.

 6             THE COURT:  Okay.

 7             COURTROOM DEPUTY CLERK:  Sir, come forward to be

 8    sworn, please.

 9           (Witness sworn.)

10                          – – –

11                     ERIC MORGAN,

12     AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13                     CROSS-EXAMINATION

14     BY MS. CRAWFORD:

15     Q.   Thank you for coming, Mr. Morgan.  My name is Ana

16    Crawford.  And I represent the plaintiffs in this matter.

17           Could you please state your full name for the record?

18     A.   Eric Morgan.

19     Q.   Mr. Morgan, what is your current position?

20     A.   Deputy Director of Miami County Board of Elections.

21     Q.   How long have you been with the Board of Elections?

22     A.   Three years.

23     Q.   And what was your position previous to that?

24     A.   I worked for Compunet Clinical Laboratories.

25     Q.   And in your current position as Deputy Director, what

1   are your duties?

2       A.   I am responsible for preparing the ballot for each

3   election.

4       Q.   And are you familiar with the requirements for absentee

5   and provisional ballot forms?

6       A.   Yes.

7       Q.   And are you involved in the process of determining

8   whether a ballot should be accepted or rejected?

9       A.   For absentee, yes.

10      Q.   And provisionals, as well?

11      A.   Not the process, but at the end, yes.

12      Q.   Okay.  And how many people would you say, on your staff,

13  review each provisional and absentee ballot?

14      A.   Two.

15      Q.   And do they review those together, or at separate times?

16      A.   Together.

17      Q.   And is that, I take it one, Democrat and one Republican?

18      A.   That's correct.

19      Q.   Okay.  And after these are reviewed by your staff, does

20  your staff make recommendations to the Board about whether or

21  not a ballot should be accepted or rejected?

22      A.   Yes.  We have reports that we present to the Board.

23      Q.   And what's contained in those reports?

24      A.   Basically, it breaks the provisionals down into

25  different categories on why they would be rejected or accepted.

1   Q.   Okay.  And does the Board actually review the particular

2   ballot envelopes, or do they review just that report?

3   A.   The report.

4   Q.   So they don't ever look at the individual ballot

5   envelopes?

6   A.   Not -- not regularly.

7   Q.   And when would be -- when would they review those ballot

8   forms?

9   A.   If there is a question that the staff or myself or the

10  Director cannot determine.

11  Q.   Could you please provide an example of those, one of

12  those questions?

13  A.   I don't have an example.  It hasn't happened.  But since

14  we do not accept them, we -- The Board gives the final

15  approval.  So, to give an example, I don't have one that's

16  happened.

17  Q.   Okay.  So the majority of the time, they're relying on

18  the reports created by your staff?

19  A.   Yes, correct.

20  Q.   Okay.  So, if a mistake is made by the Board of

21  Elections staff when reviewing a form, is it possible that the

22  Board might not necessarily find and correct that mistake?

23  A.   It's possible.

24  Q.   Because they don't see the ballot envelopes, themselves,

25  correct?

 1    A.    Correct.

 2              MR. CONOVER:  Objection.

 3              THE COURT:  Basis, Mr. Conover?

 4              MR. CONOVER:  Calls for speculation, Your Honor.

 5              THE COURT:  Well, as I've previously ruled, based on

 6    his experience as the Deputy Director -- He's in charge of the

 7    ballots.  He indicated that he is in charge of the process and

 8    is involved in the process.  He would know -- he would have a

 9    knowledge base that would enable him to answer this.  You can

10    certainly test the basis of his knowledge, Mr. Conover, on

11    cross-examination.  But I'm going to allow this testimony.

12    And, remember, it goes to weight, and not to admissibility, in

13    the Court's view.  So your objection is noted, but overruled.

14              MR. CONOVER:  Thank you, Your Honor.

15              THE COURT:  Please continue, Ms. Crawford.

16    BY MS. CRAWFORD:

17    Q.    And if a mistake were made when in fact that voter were

18    a valid voter, would that unknowingly disenfranchise -- I'll

19    rephrase that question.

20              If there is a mistake made by your staff and, in fact,

21    that vote should have been counted, could the Board unknowingly

22    disenfranchise a voter?

23              MR. CONOVER:  Objection, Your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  It's possible.

1    MS. CRAWFORD:  Okay.  And at this time, I think it's a

2    good place to discuss the stipulations reached between the

3    parties regarding the exhibits.  Correct me if I'm wrong, but

4    Plaintiffs' Exhibits 605 through 787, Plaintiffs' Exhibit 2366,

5    and Plaintiffs' Exhibits 3912 through 3916 were stipulated to.

6         Correct?

7         MR. CONOVER:  That's correct, Your Honor.

8         THE COURT:  All right.  3912 through 3916, 605 through

9    787, and Exhibit 2366 will be received.

10        MS. CRAWFORD:  Thank you, Your Honor.

11   BY MS. CRAWFORD:

12   Q.   Now, Mr. Morgan, what is your understanding of what

13   information a voter is required to provide on a provisional

14   ballot form for that ballot to be counted?

15   A.   Name, address, and a secondary form of identification,

16   as well as their signature.

17   Q.   Could you speak into the mic, please?

18   A.   Yes.

19   Q.   Thanks.  And is date of birth also a required field?

20   A.   That's correct.

21   Q.   Okay.  And the date of birth and address categories are

22   new requirements as of 2014, correct?

23   A.   I am -- I cannot answer that.

24   Q.   Okay.  But you're aware that the directive 2015-20 is

25   the most recent provisional voting directive from the Secretary

1    of State?

2      A.    Correct.

3      Q.    And in this new voting directive, name, address, date of

4    birth, identification, and signature are required fields,

5    correct?

6      A.    Correct.

7      Q.    Okay.  And could you just briefly run through the

8    Board's process for reviewing each provisional ballot in the

9    office?

10     A.    Each individual team of Democrat and Republican review

11   each provisional ballot, enter it into our system, see if the

12   voter is a registered voter in Miami County.  They determine if

13   they were in the correct precinct or, in fact, if they are a

14   registered voter.  If they are not, we check with other

15   counties to see if they were a registered voter in those

16   counties and if they'd voted in that election.

17     Q.    And do you keep track of what team members review each

18   ballot?

19     A.    Not each ballot.

20     Q.    Okay.  And with respect to provisionals, your office

21   keeps a list of the voter and the reason that voter's ballot

22   was rejected, correct?

23     A.    Correct.

24     Q.    And this is what's been identified as Plaintiffs'

25   Exhibit 607.  And, Mr. Morgan, is this the 2014 list that you

1   produced to our office of why the provisional ballots were

2   rejected?

3       A.   That's correct, I believe, yes.

4       Q.   And this is Plaintiff's Exhibit 608.  And is this the

5   2015 list of the provisional ballots that were rejected?

6       A.   Correct.

7       Q.   Okay.  Now, with respect to the date-of-birth field, are

8   you aware of the exception that allows Boards to accept ballots

9   despite a date-of-birth mismatch or omission by a vote of three

10  Board members?

11      A.   Yes.

12      Q.   Could you explain that exception, please?

13      A.   I believe the exception is if it is in the year of the

14  date of birth.  And that's determined from our Board.

15      Q.   So the Board votes if there is a year --

16      A.   Yeah.  If the year is incorrect, our Board will accept

17  it.

18      Q.   Has that happened?

19      A.   Not that I am aware of.

20      Q.   So you aren't aware of any -- your Board ever voting to

21  accept a provisional ballot --

22      A.   That's correct.

23      Q.   And prior to the date of birth being a required field,

24  your office was still able to identify the identity of the

25  individuals without the date-of-birth field, correct?

Vol. 4 - 85

1    A.    Yes.

2          MR. CONOVER:  Objection, Your Honor.

3          THE COURT:  Overruled.

4    BY MS. CRAWFORD:

5    Q.    And now that that date-of-birth field is a required

6    field, the Board is required to reject ballots with missing

7    date of births that under previous laws would not have been

8    rejected, correct?

9    A.    That would be correct.

10   Q.    Okay.  Now, with respect to the address field, when a

11   voter is required to vote a provisional ballot, prior to a

12   voter even receiving a provisional ballot from a poll-worker, a

13   voter would have had to provide a current address to the

14   poll-worker verbally, correct?

15   A.    That's correct.

16   Q.    And the poll-worker would then look up that address to

17   ensure the voter's voting in the correct precinct?

18   A.    That is correct.

19   Q.    And only after a poll-worker has confirmed that the

20   voter is in the correct precinct would they provide that

21   provisional ballot to the voter, correct?

22   A.    Correct.

23   Q.    And because of that process, there is no concern that a

24   voter is voting within the improper precinct without the

25   address field, correct?

1          MR. CONOVER:  Objection, Your Honor.

2          THE COURT:  Basis?

3          MR. CONOVER:  Speculation.

4          THE COURT:  Well, if I understand the question

5   correctly, she is asking what the Board -- she is asking the

6   question from the Board's perspective.  And that is, in the

7   course of that process, there's no concern that a voter is

8   voting within the improper precinct without the address field.

9   So it's uniquely within his province.  So your objection, Mr.

10  Conover, is overruled.

11         You may answer, Mr. Morgan.

12         THE WITNESS:  Please repeat.

13         COURTROOM DEPUTY CLERK:  Could you read it back to

14  him?

15      (The last question was read by the court reporter.)

16         THE WITNESS:  If a voter does not want to change -- If

17  they are in the incorrect precinct, the voter can still demand

18  to vote in that precinct.

19  BY MS. CRAWFORD:

20  Q.    And how frequently would you say that happens?

21  A.    Not frequently.

22  Q.    And do you instruct your poll-workers to make a notation

23  if that does happen?

24  A.    Yes.

25  Q.    So you would know those instances when a voter did

1   demand to vote in the incorrect precinct?

2      A.   That's correct.

3      Q.   Okay.  So, prior to the new law adding the address field

4   on a provisional ballot form, you're able to determine the

5   correct precinct of the voters, correct?

6      A.   With the address?

7      Q.   Prior to the address field.

8      A.   That would be correct.

9      Q.   Okay.  And you're able to determine the identity of the

10  provisional voters, correct?

11     A.   Correct.

12     Q.   Okay.  And Miami County provides no notice to a

13  provisional voter to correct any error on their provisional

14  affirmation form, correct?

15     A.   Correct.

16     Q.   And a voter is able to come in and show valid ID if they

17  did not have a valid ID with them on Election Day, correct?

18     A.   Correct.

19     Q.   And they have seven days to do so?

20     A.   That's correct.

21     Q.   Previously, voters had ten days to come in and provide

22  ID, correct?

23     A.   Correct.

24     Q.   But this happens infrequently, right --

25     A.   Correct.

Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/03/16 Page: 88 of 241 PAGEID #: 29754

Vol. 4 — 88

1    Q.   -- because a voter would have to realize, on their own,

2    that they made a mistake in the ID field, correct?

3    A.   For mistakes, that's correct.

4    Q.   Okay.  You say "for mistakes" because they are provided

5    with the hotline form, correct?

6    A.   Correct.

7    Q.   Okay.  But nothing besides an ID mistake or leaving it

8    off can be fixed or corrected?

9    A.   Correct.

10   Q.   Correct?

11   A.   If they leave it off the envelope, the poll-worker would

12   give them a notice and instruct them to provide that within

13   seven days.

14   Q.   But a voter who left off, say, a date of birth on their

15   provisional ballot affirmation form couldn't come in within

16   that seven-day window and correct it?

17   A.   Correct.

18   Q.   Okay.  And the same is true if a voter left off his or

19   her printed name?

20   A.   Correct.

21   Q.   And if a voter left off his or her address, they

22   wouldn't be able to come in and correct that, correct?

23   A.   Correct.

24   Q.   Okay.  Now, with respect to absentees, could you briefly

25   run through your process for reviewing absentee ballots?

1   A.   A team of Democrat and Republican receive the absentee

2   envelopes, review the information on the envelope for accuracy.

3   If there is any errors, we indicate on the envelope what the

4   error is, send the voter a notice, along with the 11-S form,

5   for them to correct their mistake.

6   Q.   And after you send that 11-S form, does the voter need

7   to understand -- read and understand the 11-S form in order to

8   correct any mistakes the voter made?

9   A.   It would be indicated, on the 11-S form, what they need

10  to correct.

11  Q.   And sometimes -- When you say "indicated," it's written,

12  correct?

13  A.   There is a box where you can check what the deficiency

14  was so that they can provide -- We provide a letter, as well,

15  sending those.

16  Q.   But a voter would need some degree of literacy to read

17  and understand this form, correct?

18  A.   Correct.

19  Q.   Or will need to ask someone for assistance, correct?

20  A.   Correct.

21  Q.   Okay.  And when an absentee ballot is rejected, does

22  your staff keep track of the reason it's rejected?

23  A.   Yes, as indicated on the ID envelope.

24  Q.   How does your staff indicate the reason for rejection on

25  the ID envelope?

Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 90 of 241 PAGEID #: 29766

Vol. 4 - 90

1    A.    If there is an error with any section of the ID

2    envelope, it's circled with a red pen to indicate what the

3    error is.

4    Q.    So there is just -- just a circle, no other indication

5    --

6    A.    No.

7    Q.    -- besides that?

8          Okay.  And do you keep a running list of the names of

9    voters and the reason they were rejected?

10   A.    They are entered as rejected into our voter registration

11   system.

12   Q.    But when our office asked you to provide a list why each

13   voter's ballot was rejected, you don't have that type of list,

14   correct?

15   A.    Correct.

16   Q.    Okay.  So the only way, really, to tell whether a ballot

17   was rejected is by looking at the ballot to see if there is

18   that circle on the form?

19   A.    Correct.

20   Q.    Okay.  Mr. Morgan, I'm showing you what's been marked as

21   Plaintiffs' Exhibit 617.  I'll try and zoom out a little bit.

22   And this is an absentee ballot envelope, correct?

23   A.    Correct.

24   Q.    And from what is circled, it appears the voter provided

25   the current year rather than the year of his birth, correct?

1    A.    Correct.

2    Q.    Because it's circled?

3    A.    Correct.

4    Q.    And is this something that would fall within the

5    exception we talked about earlier regarding date of birth?

6    A.    It should, yes.

7    Q.    So the Board would be able to vote to accept or reject

8    this on a vote of three votes?

9    A.    Correct.

10   Q.    And because your office provided this to us as one of

11   the rejected ballots, we can assume this was one of the

12   rejected ballots?

13   A.    Correct.

14   Q.    Okay.  Mr. Morgan, I'm showing you what's been marked as

15   Plaintiffs' Exhibit 730.  And this one appears, also, to have

16   been rejected for a lack of date of birth, correct?

17   A.    Correct.

18   Q.    And it looks like the address sticker is actually

19   covering the date-of-birth field.  Is that correct?

20   A.    It appears to be correct.

21   Q.    And when are these address stickers placed on the

22   absentee ballot envelopes?

23   A.    During the process of sending the voter the absentee

24   ballot.

25   Q.    Is that prior to the vote, when the voter receives it?

1    A.   Yes, that's correct.

2    Q.   Okay.  So the voter got this with the sticker covering

3    the date-of-birth field, correct?

4    A.   Correct.

5    Q.   But, yet, the reason her vote got denied was because she

6    failed to fill out a blank that was actually covered up by the

7    Board of Elections?

8    A.   That appears to be correct.

9    Q.   And do you think this is fair?

10       MR. CONOVER:  Objection, Your Honor.

11       THE COURT:  Overruled.

12       THE WITNESS:  No.

13   BY MS. CRAWFORD:

14   Q.   Thank you.  But while I'm on the topic of these address

15   stickers, it's clear that Miami County does place the address

16   stickers within the address field, correct?

17   A.   Correct.

18   Q.   And because of this, Miami County has not needed to deny

19   any absentee ballots because this voter simply failed to fill

20   in the address field in 2014 and 2015, correct?

21   A.   Correct, as well as the name, their name.

22   Q.   Right.  But because it's placed over the address field,

23   there is no way a voter could simply fill in something else?

24   A.   Typically, the sticker is placed at the top of the

25   envelope.

Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/03/16 Page: 93 of 241 PAGEID #: 29704

Vol. 4 — 93

1    Q.    But it wasn't in this instance?

2    A.    That's correct.

3    Q.    Okay.  Now, Board staff are trained to check the

4    application for an absentee ballot first against the

5    registration before sending out the ballot and a ballot

6    envelope, correct?

7    A.    Correct.

8    Q.    And if this procedure is followed, a voter would never

9    receive an absentee ballot without first filling out the

10   identification fields on the application, correct?

11   A.    Correct.

12   Q.    And, so, when a voter is filling out an identification

13   envelope, the voter has already previously provided the Board

14   with identification information in their application, correct?

15   A.    Correct.

16   Q.    And with respect to identification, your Board is

17   required to reject a ballot even if a Social Security number or

18   driver's license number is only one number off, correct?

19   A.    Correct.

20   Q.    Does the Board -- if there is an instance like this, are

21   they able to vote, or, have any discretion to vote to accept

22   that ballot?

23   A.    None that I'm aware of.

24   Q.    And is that per directive?

25   A.    I believe so.

1    Q.   Okay.  Now I'm showing you what's been marked as

2    Plaintiffs' Exhibit 735.  And in this example, it appears the

3    ballot was rejected due to the voter's Social Security number

4    being one number off, correct?

5    A.   It appears to be.

6    Q.   And it appears to be because only one number in the

7    Social Security number is circled, correct?

8    A.   Correct.

9    Q.   And previously this voter ostensibly would have provided

10   her correct Social Security number in her absentee ballot

11   request to receive that ballot, correct?

12   A.   Correct.

13   Q.   So, here, her ballot is being denied for making a

14   one-number error on this particular form, correct?

15   A.   Correct.

16   Q.   And under the laws and directives, the Board has no

17   discretion to accept these ballots, correct?

18   A.   Correct.

19   Q.   I want to discuss if there are any differences between

20   your early in-person and early vote-by-mail absentee ballots.

21   Is the process the same for in-person voters as absentee

22   mail-in voters?

23   A.   They fill out the same form.

24   Q.   Okay.  And for in-person voters, do they vote on a DRE

25   machine, or do they vote by optical scan?

1    A.    DRE.

2    Q.    And, so, when a voter votes by DRE machine, do they have

3    to fill out the absentee ballot envelope?

4    A.    No, they do not.

5    Q.    So they only are required to fill out an application,

6    correct?

7    A.    Correct.

8    Q.    Whereas, by mail, they're required to fill out the

9    envelope, as well as the application, correct?

10    A.    Correct.

11    Q.    So, when they, a voter, votes by DRE, there is no risk

12    of their ballot being rejected for failing to fill out the

13    absentee envelope correctly?

14    A.    Correct.

15    Q.    Okay.  Is your staff asked to review an absentee ballot

16    envelope?

17          I'm sorry.  I'll withdraw that question.

18          With respect to notice, unlike provisional voters,

19    absentee voters do get an opportunity to cure errors, correct?

20    A.    Correct.

21    Q.    You testified that's through the 11-S form, correct?

22    A.    Correct.

23    Q.    In addition to that form, do you contact voters via

24    telephone or e-mail?

25    A.    No.

1    Q.    And it is your understanding that you're not permitted

2    to by directive?

3    A.    Some of the information is not provided to do that.

4    Q.    So you're talking about you might not always have a

5    voter's telephone or e-mail address?

6    A.    Correct.

7    Q.    But there is a field on the absentee ballot application

8    that provides for that telephone and e-mail address, correct?

9    A.    Correct.

10   Q.    But you just don't have all of those for all the voters?

11   A.    It's not required.

12   Q.    Okay.  So it would be possible to contact at least some

13   voters, correct?

14   A.    Correct.

15   Q.    And voters have seven days after the election to return

16   11-S forms, correct?

17   A.    Correct.

18   Q.    And when does the Board stop mailing 11-S forms to a

19   voter?

20   A.    We send out 11-S forms as long as we are checking and

21   receiving the absentee ballots or envelopes.

22   Q.    So a Board could send the notice all the way up to until

23   the sixth day after the election?

24   A.    Correct.

25   Q.    But if a -- if an 11-S form is sent on the sixth day, do

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 97 of 241 PAGEID #: 1713
Case: 2:06-cv-00896-ALM-TPK Doc #: 656 Filed: 04/04/16 Page: 97 of 241 PAGEID #: 29743

Vol. 4 - 97

1  you think it's likely that that voter is going to receive it

2  prior to the end of that seven-day cure period?

3     A.   No.

4     Q.   Okay.

5          MS. CRAWFORD:  Your Honor, could I have one minute to

6  confer?

7          THE COURT:  Yes, you may.

8      (Whereupon, there was a brief interruption.)

9          MS. CRAWFORD:  I have one housekeeping matter.  I'm

10 not sure if, perhaps, when we were going through the stipulated

11 exhibits, whether it was stated incorrectly by me; but it

12 should be Exhibits 605 to 787.  I'm not sure what was said.  I

13 was just told that I might have -- there might have been a

14 miscommunication.

15         MR. CONOVER:  That's what I had, Your Honor.

16         MS. CRAWFORD:  Okay.  I just wanted to make sure.

17 Thank you.

18         THE COURT:  Ms. Crawford, do you have additional

19 questions?

20         MS. CRAWFORD:  Just a few, Your Honor.

21         THE COURT:  Okay.  All right.

22    BY MS. CRAWFORD:

23    Q.   Mr. Morgan, you talked about the date-of-birth exception

24 where the Board is able to vote to accept a ballot.  Has the

25 Board ever accepted a provisional or absentee ballot with an

```
 1    incorrect date of birth when the other four fields are filled

 2    in correctly?

 3      A.    Not that I'm aware of.

 4            MS. CRAWFORD:  Okay.  Thank you, Your Honor.

 5            THE COURT:  All right.

 6            MS. CRAWFORD:  And thank you, Mr. Morgan.

 7            THE COURT:  Mr. Conover, as upon direct.

 8            MR. CONOVER:  Thank you, Your Honor.

 9                        DIRECT EXAMINATION

10      BY MR. CONOVER:

11      Q.    Good morning, Mr. Morgan.  We just met; but, for the

12    record, my name is Brodi Conover.  And, in this case, I

13    represent the defendants the Secretary of State and the State

14    of Ohio.

15            Are you a member of a political party?

16      A.    Correct.

17      Q.    And what party is that?

18      A.    Democratic Party.

19      Q.    Thank you.  How many full-time employees does the Miami

20    County Board of Elections, have?

21      A.    Four.

22      Q.    And Ms. Crawford asked you a few questions about the

23    absentee process at the Miami County Board of Elections.  If a

24    voter were to have questions about the absentee process, does

25    the Board provide any help to assist that voter?
```

Vol. 4 - 99

1    A.   Yes.

2    Q.   And how does the Board assist that voter?

3    A.    If the voter does not know what information is required,

4    we can tell them what to fill in and what's required.  And when

5    a voter calls to our office during election time, the -- there

6    is a pre-recording that will instruct voters on what

7    information is required.

8    Q.   And is the Board the only source of assistance a voter

9    could receive?

10   A.    Our website, as well, has information on how to fill out

11   absentee applications.

12   Q.   Could a voter get help from a family member?

13   A.   Yes.

14   Q.   And Ms. Crawford also asked you a little bit about the

15   Miami County Board's process for provisional ballots.  When the

16   Board receives provisional ballots after Election Day, how does

17   the Board verify voters, or look up voters in the voter

18   registration database?

19   A.    We use the statewide voter registration database to look

20   up voters in other counties, as well as our voter registration

21   system, to verify if a voter has recently moved or if they are

22   a registered voter of Miami County.

23   Q.   And does the Board use a certain piece of information to

24   look up the voters?

25   A.    We typically look up by date of birth.

1    Q.    And why do you use date of birth?

2    A.    It narrows down the voter fairly well.

3    Q.    Thank you.  And I'd like to now just talk a little bit

4    about the two exhibits, or two of the exhibits, that Ms.

5    Crawford used.  The first is Plaintiffs' Exhibit 607.  And I

6    think this was the rejection reasons for the 2014 election for

7    provisional ballots; is that right?

8    A.    Correct.

9    Q.    Okay.  And looking through this --

10         MR. CONOVER:  Your Honor, may I approach?  It may be

11   easier just to --

12         THE COURT:  Yes, you may.

13   BY MR. CONOVER:

14   Q.    Could you just look through that and tell me the most --

15   the reason that most provisional ballots were rejected, or the

16   most common reason?  I'm sorry.

17   A.    Not a registered voter.

18   Q.    Thank you.

19         And, now, this is Plaintiffs' Exhibit 608.  And this is

20   the same list, I believe, for the 2015 election.

21   A.    Correct.

22         MR. CONOVER:  May I approach again, Your Honor?

23         THE COURT:  Yes, you may.

24   BY MR. CONOVER:

25   Q.    Mr. Morgan, what was the most common reason for

1    rejection in the 2015 election for provisional ballots?

2    A.   Voter is not registered.

3    Q.   Thank you.  Regarding the absentee ballot -- I believe

4    Ms. Crawford ended some of her questioning on the 11-S form and

5    asked you a little bit about the time frame for an 11-S form.

6    Can a voter drop an 11-S form off in person?

7    A.   Yes.

8             MR. CONOVER:  Just a moment, Your Honor.

9             THE COURT:  All right.

10            MR. CONOVER:  No further questions.  Thank you, Mr.

11   Morgan.

12            THE COURT:  Thank you, Mr. Conover.

13            MS. CRAWFORD:  Just a few questions, Your Honor.

14            THE COURT:  All right.

15                         RECROSS-EXAMINATION

16   BY MS. CRAWFORD:

17   Q.   Mr. Morgan, you testified that one of the ways a voter

18   could check on the status of their ballot is through your

19   website, correct?

20   A.   Correct.

21   Q.   For a voter to access it via the website -- this may be

22   a silly question -- they would actually need Internet access of

23   some sort, correct?

24   A.   Correct.

25   Q.   And they would need to be able to navigate that website

```
 1   and understand the Internet to a certain degree to use it?

 2     A.   Correct.

 3     Q.   So this might be challenging for some, particularly

 4   elderly people?

 5          MR. CONOVER:  Objection, Your Honor.

 6          THE COURT:  Well, sustained.

 7          MS. CRAWFORD:  Thank you, Your Honor.

 8   BY MS. CRAWFORD:

 9     Q.   And you testified that you typically use the date of

10   birth to look up a voter, correct?

11     A.   Correct.

12     Q.   But this is at administrative convenience, correct?

13     A.   Correct.

14     Q.   You could actually use other fields to look up a voter,

15   correct?

16     A.   That's correct.

17     Q.   And you also testified that a voter can drop off the

18   11-S form at your office, correct?

19     A.   Correct.

20     Q.   But if your office mails those 11-S forms even up to the

21   sixth day of that cure period, a voter might not even receive

22   that prior to the seventh day in the mail, correct?

23     A.   Correct.

24          MS. CRAWFORD:  Thank you.  No further questions.

25          THE COURT:  Mr. Conover?
```

```
 1          MR. CONOVER:  Nothing further, Your Honor.

 2          THE COURT:  Mr. Morgan, thank you very much, sir.  You

 3   may be excused.

 4          THE WITNESS:  Thank you.

 5          MR. CHANDRA:  Would you like us to call the next

 6   witness, Your Honor?

 7          THE COURT:  Yes.

 8          MS. GENTRY:  Your Honor, plaintiffs call Meghan Lee.

 9          THE COURT:  All right.

10          COURTROOM DEPUTY CLERK:  Ma'am, come forward and be

11   sworn, please.  Come forward, please.

12      (Witness sworn.)

13          MS. GENTRY:  Your Honor, before we begin, we did

14   consult with the State.  And we have an exhibit range we've

15   stipulated to the admission of.

16          THE COURT:  All right.

17          MS. GENTRY:  And that range is P1078 through P --

18          THE COURT:  Wait a minute.  P1078, uh-huh.

19          MS. GENTRY:  Yes, Your Honor, through P1141.

20          THE COURT:  Uh-huh.

21          MS. GENTRY:  And also P2365.

22          THE COURT:  All right.

23      Mr. Keller?

24          MR. KELLER:  That's correct, Your Honor.

25          THE COURT:  All right.  So Plaintiffs' Exhibits 1078
```

 1    through 1141 and 2365 will be admitted.

 2         MS. GENTRY:  Thank you, Your Honor.

 3                      - - -

 4                  MEGHAN LEE,

 5    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

 6                CROSS-EXAMINATION

 7    BY MS. GENTRY:

 8    Q.   Ms. Lee, could you please state and spell your name for

 9    the record?

10    A.   It's Meghan Lee, M-e-g-h-a-n, L-e-e.

11    Q.   When you speak, be sure to speak into the mic.  It's a

12    little hard to do, but that will help us all.  Thank you.

13         Ms. Lee, what is your position?

14    A.   I'm the Director of the Meigs County Board of Elections

15    office.

16    Q.   And how long have you been in that position?

17    A.   I've been Director since March 1st of this year.  And

18    I've been Deputy Director since February 1st of 2012.

19    Q.   And did you have any election experience before you

20    became Deputy Director in 2012?

21    A.   Yes.  I was the Clerk for the Meigs County Board of

22    Elections starting in September of 2011, and I was also working

23    there, part-time, in college, in 2008.

24    Q.   Can you briefly describe your responsibilities with

25    regard to absentee ballots and provisional ballots?

1   A.   What was it?

2   Q.   Can you describe your job responsibilities with regard

3   to absentee ballots and provisional ballots in your position as

4   Director?

5   A.   Okay.  Well, me and the Deputy Director share our

6   duties.  When we get applications for absentees, we both share

7   the responsibility of entering them into the system.  We both

8   share the responsibility of making sure that our ballots are

9   printed the same day that we receive the applications, and we

10   both mail those out the same day as well.  And when we receive

11   them back into the office, we both take turns checking them in,

12   entering them then into our system.

13   Q.   When you say "enter them in," what are you entering in?

14   A.   Well, when we get back an absentee, we have an

15   application number on it.  Everybody has their own application

16   number.  And we type in that application number to make sure

17   that it is in the system as received.

18   Q.   And when you say "We check it in," do you mean yourself

19   and the Deputy Director?

20   A.   Yes.  Yes.

21   Q.   Do you have any staff help you with this process?

22   A.   We do hire a -- wouldn't be really part-time, but

23   somebody that will come in occasionally and help us out,

24   usually around election time, when we get really busy.

25   Q.   What process do you go through when you check an

Vol. 4 – 106

1    absentee application to make sure that all of the information

2    is correct?

3       A.   We bring up the voter's record in our system.  We use

4    TRIAD, and the system we use is EVIS.  And it has all of our

5    registered voters in it.  We will look them up by name.  And we

6    will go down through the application, make sure name is still

7    the same, the address is still the name.  We check date of

8    birth and a form of ID and make sure they have the correct

9    election, you know:  General, primary or special.  And then we

10   make sure that they sign the bottom of that form.

11      Q.   When absentee voters come into the office to vote, do

12   they fill out an ID envelope, or do they vote on the DRE

13   machine?

14      A.   No.  They fill out an ID envelope.

15      Q.   Does your county have DRE machines?

16      A.   No.

17           THE COURT:  Does anyone from the Board of Elections,

18   any of the election workers, aid the voter in completing the

19   absentee envelope, ID envelope?

20           THE WITNESS:  Yes.

21           THE COURT:  And to what extent are you allowed to aid

22   the voter in completing the ID envelope?

23           THE WITNESS:  Well, normally, I will ask for their ID.

24   And then I'll give them the application and tell them what they

25   need to fill out.  And one of us will usually fill out their ID

1   envelope for them, and then have them sign the bottom of it.

2   It's just to help the process along, make sure they have what

3   they need.

4           THE COURT:  And who made the determination that the

5   process that you just described should be employed in Meigs

6   County?

7           THE WITNESS:  Well, when I started, that was the

8   process that was shown to me, so we just continued on with it.

9           THE COURT:  Is the process memorialized anyplace?

10          THE WITNESS:  Not that I know of.

11          THE COURT:  Is the process mandated by any directives

12   from the Secretary of State's Office?

13          THE WITNESS:  You mean how we help them fill things

14   out?

15          THE COURT:  Yeah, the process that you just described.

16          THE WITNESS:  Oh, no, not that I'm aware of.

17          THE COURT:  All right.

18   BY MS. GENTRY:

19   Q.   And when you say that you help people fill them out, is

20   that only if they ask for help, or do you do it for everyone?

21   A.   We do it for everybody.

22   Q.   When -- I want to switch, now, to provisional voters who

23   vote -- Well, first of all, do provisional voters sometimes

24   vote at the Board of Elections?

25   A.   Yes.

1    Q.    And do you also assist provisional voters with filling

2    out their form at the Board of Elections?

3    A.    Yes.

4    Q.    In a similar process to what you described with absentee

5    voters?

6    A.    Right.  Usually, I'll give them the absentee

7    application, and then I'll have their ID, and I'll fill out

8    their provisional envelope for them and then just have them

9    sign.

10    Q.    On the -- On Election Day when people vote provisional

11    ballots at the polls, are your poll-workers trained to also

12    help voters fill out their provisional ballot affirmation form?

13    A.    No.

14    Q.    Are your poll-workers permitted to help voters fill out

15    their provisional ballot affirmation form?

16    A.    Yes.

17    Q.    Under what circumstances?

18    A.    Well, it's -- I guess -- I mean, we tell them that they

19    can if it will help the process.  But we actually, more or

20    less, tell them, you know, just make sure it's filled out

21    correctly before they turn it in back to the poll-worker.

22    Q.    Do you discourage your poll-workers from helping people

23    to fill out their forms at the polling place?

24    A.    No.

25    Q.    And when you tell people to make sure it's filled out,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 109 of 241 PAGEID #: 1725
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/16 Page: 109 of 241 PAGEID #: 9785

Vol. 4 - 109

1    what do you mean by that?

2      A.    Just to make sure it has their name on it.  We tell them

3    to make sure it has their current address on it.  We tell them,

4    you know, a form of ID, either the last four of their Social or

5    their driver's license number, and to make sure it's signed.

6      Q.    Now, moving ahead to the process when you are reviewing

7    absentee ballot forms and provisional ballot forms to determine

8    what to count, who does that review in your office?

9      A.    Both myself and the Deputy Director.

10     Q.    Are there any staff who do that review with you?

11     A.    You mean, like, Board members or --

12     Q.    No, employees or seasonal workers.

13     A.    Oh, yes, seasonal workers as well.

14     Q.    And how do you determine which ballot forms are reviewed

15   by you and which ballot forms are reviewed by seasonal workers?

16     A.    We really don't decide who gets what.  It's just whoever

17   isn't busy at the moment.

18     Q.    And when that review is conducted, is it done by one

19   person or by two people?

20     A.    Usually just one person.

21     Q.    And that person makes a determination as to what -- Let

22   me ask it differently.

23          For instance, if you're reviewing an absentee ballot

24   envelope and it looks to you like it should be counted, what do

25   you do with it?

1    A.    If it looks like it should be counted, we just enter it

2    in with all of the other absentee envelopes and ballots that we

3    get.

4    Q.    Does it go to the Board for a decision?

5    A.    No.

6    Q.    Are there some absentee envelopes that go to the Board

7    for a decision?

8    A.    Yes.  We've had a few, before, that have gone to the

9    Board for a decision.

10    Q.    And what -- what types of absentee envelopes have gone

11    to the Board for a decision as to whether or not to count it?

12    A.    Well, we had a few -- I think it was in 2015 -- where

13    the poll-worker, or not poll-worker, the voter had put the

14    polling location as their address on the front of the envelope;

15    but they had their ID sticker on the back that said, you know,

16    their name and their address.  So we took it to the Board to

17    let them make a decision on, you know, the front of the

18    envelope.

19    Q.    And what did the Board decide?

20    A.    They decided to accept them because of the sticker on

21    the back, and we knew that the address that they had put on the

22    front was actually a polling location address.

23    Q.    If you come across a provisional ballot in your review,

24    a provisional ballot form or absentee form that in your

25    judgment should not be counted, what do you do with that?

1    A.    We will have the Board decide on those.  We will let the

2    Board know why we've, you know, held it aside and let them know

3    the reason that we thought that they should make a decision on

4    it.

5    Q.    I want to show you -- I'm going to show you Plaintiffs'

6    Exhibit 1081.  And these are the absentee ballots that were

7    counted and rejected in the last general election.  And it

8    appears that only three absentee ballots were rejected in the

9    November, 2015, election; is that correct?

10   A.    Yes.

11   Q.    And two were rejected because the stub was -- Stub A was

12   detached?

13   A.    Yes.

14   Q.    And one was rejected because of no voter signature?

15   A.    Yes.

16   Q.    And you did not reject any for missing or wrong

17   information in the other fields, such as name, ID, and date of

18   birth, is that right, or address?

19   A.    Yes.

20   Q.    I'm going to show you a couple of absentee ballots from

21   the November, 2015, election.  This is an example of a ballot

22   where the voter filled out part of the address but not the

23   complete address.  Do you recall why this ballot was counted?

24   A.    I don't recall why, but most likely because on the back

25   of the envelope it did have the ID sticker that had the name

1   and the complete address.

2     Q.   And that's the issue you talked about before?

3     A.   Yes.

4     Q.   This is Plaintiffs' Exhibit 1117.  And in this instance,

5   it appears that the year of the birthdate is missing, but this

6   ballot was counted.  Can you explain why this ballot was

7   counted even though the year was missing?

8     A.   Well, to be honest, that's my handwriting.  And I

9   probably just skipped over the year.

10    Q.   When you say your handwriting, you mean you actually

11  filled out this ballot for the voter?

12    A.   Yeah.  It looks like an ID envelope.  And, I mean,

13  that's my handwriting.  So --

14    Q.   Thank you for the clarification.  Yes, it's the ID

15  envelope.

16         And do you recall -- Well, first of all, do you recall

17  whether you were the person who reviewed this to determine

18  whether or not it should be counted?

19    A.   Well, since I filled it out, it was probably one that

20  came into the office to vote.  So they were already checked in.

21  When you issue a ballot in office, it's automatically checked

22  back in.  So probably when I was helping her fill this out, I

23  skipped over the year; and, since it was already checked in, it

24  probably didn't need reviewed.  I probably just put it in our

25  ballot box --

Vol. 4 - 113

1    Q.    Okay.

2    A.    -- after she was -- after she had left.

3    Q.    All right.  There was no need for a separate review

4    because you had just done it?

5    A.    Right.  And we'd seen her driver's license number.  She

6    had filled out the application for a ballot.  So --

7    Q.    Okay.  Thank you.

8          This is Plaintiffs' Exhibit 1124.  And, Ms. Lee, this is

9    one where the birthdate was omitted completely but the ballot

10   was counted.  Do you recall whether ballots like this, where

11   the birthdate was missing, were taken to the Board for

12   approval?

13   A.    I don't think they were.

14   Q.    Were they simply approved at your level, by yourself, or

15   by your deputy?

16   A.    Correct, yeah, both of us.

17   Q.    And it's your understanding that you had the discretion

18   to count a ballot where the birthdate is missing so long as the

19   other information is correct?

20   A.    Well, honestly, I think we did have quite a few that

21   didn't have the date of birth that we just missed checking.

22   Q.    And why did you count the -- why did you determine that

23   the ballot should be counted?

24   A.    Well, like I said, we just -- we missed that section on

25   the date of birth, and it just went through.

1    Q.    So, in other words, you felt like it was your error?

2    A.    Yes.

3    Q.    And you didn't want to penalize the voter for that?

4    A.    Correct.

5    Q.    I'm going to show you Plaintiffs' Exhibit 1137.

6          This is another absentee ballot from 2015 that was

7    counted although there's no ID.  It appears the box was

8    checked, but there is nothing written in to show what the ID

9    number was.  Do you see that?

10   A.    Yes.

11   Q.    And, then, I'll show you the bottom as well.

12         Why was this vote counted?

13   A.    I assume, again, office error; it just got by us.

14   Q.    But you had already seen the ID.  So you were

15   comfortable counting the ballot?

16   A.    Yeah, we are.  Like I said, we have it in the system,

17   most likely, already in our system.  It's on the absentee

18   application.  So --

19   Q.    And when you say "on the absentee application," you mean

20   the voter has already given you all this information one time

21   already?

22   A.    Correct.  This looks like one that was probably mailed

23   out.  So --

24   Q.    And in that case it would be voter error, rather than

25   your error?

1    A.    Yes.

2    Q.    But you counted it anyway?

3    A.    Correct.

4    Q.    Why?

5    A.    Got by me, I guess, when we checked it in.

6    Q.    All right.  Ms. Lee, I'm going to show you -- it's a

7    document that you brought today.  We've marked it as P7024.

8          MS. GENTRY:  Your Honor, may I show it to counsel?

9          THE COURT:  Yes, you may.  It's P7024.

10         MS. GENTRY:  P7024, yes, sir.

11         Your Honor, at this time, I would move to admit P7024

12   into evidence.

13         THE COURT:  Any objection?

14         MR. KELLER:  No objections, Your Honor.

15         THE COURT:  P7024 will be received.

16         MS. GENTRY:  Thank you, sir.

17   BY MS. GENTRY:

18   Q.    Ms. Lee, I'm showing you Plaintiffs' 7024.  Is this one

19   of the documents you brought today?

20   A.    Yes.

21   Q.    And this is the official certification for the absentee

22   ballots cast in Meigs County in November, 2014?

23   A.    Yes.

24   Q.    Looking at the reason why ballots were rejected, it

25   appears that only nine absentee ballots were rejected in

1   November of 2014?

2       A.   Correct.

3       Q.   And eight of those were because they were late; is that

4   right?

5       A.   Yes.

6       Q.   And one ballot was rejected because of a missing or

7   incorrect birthdate?

8       A.   Correct.

9       Q.   And no other absentee ballots were rejected in 2014,

10  correct?

11      A.   Correct.

12      Q.   All right.  I'm going to show you Plaintiffs' Exhibit

13  Number 1106.  This is a 2014 ballot that was counted although

14  the name and address are missing.  Do you see that?

15      A.   Yes.

16      Q.   And was this ballot counted for the same reason you said

17  before:  Because the printed label is on the other side?

18      A.   Yes, I believe so.

19      Q.   All right.  I'm going to show you Plaintiffs' Exhibit

20  P1119.  This is another absentee ballot that was cast in the

21  November, 2014, election.  Do you know whether this ballot was

22  counted or rejected?

23      A.   I'm not sure, off the top of my head, if it was or was

24  not.  I assume that it was counted.

25      Q.   That's because only one ballot was not counted for lack

1    of date of birth or --

2    A.    Correct.

3    Q.    You would agree that the year is wrong?

4    A.    Yes.

5    Q.    Okay.  I'm showing you Plaintiffs' Exhibit P1122.  This

6    is another November, 2014, ballot.  Does it appear that the

7    date of birth is wrong on this one?

8    A.    Yes.

9    Q.    The voter apparently wrote down the current date?

10   A.    Correct.

11   Q.    But to your knowledge, this ballot was counted?

12   A.    I think so.  And, I mean, not to make excuses for this

13   one, but that address is actually for one of our local nursing

14   homes.  So, if I did see the incorrect date, if the month and

15   the day were correct, I probably did let that one slide by.

16   Q.    The second page of the exhibit has the application form

17   with the month and the day of the birthdate.  And it appears

18   the voter's birthdate was March 12 of 1936.  Would you agree

19   that's a different day and -- month and day than the birthdate

20   on the first page?

21   A.    Yes.

22   Q.    Do you and your Deputy Director also have a policy of

23   counting ballots where the birthdate is obviously an error, as

24   in this case where it's the current day?

25   A.    No, we don't have a policy.

1    Q.    What would you do, normally, in a circumstance like

2    this?

3    A.    Well, I counted it.  So I probably would.  Like I said,

4    it was from a local nursing home.  And I probably just went

5    ahead and accepted it, or somebody in my office would have just

6    accepted it.

7    Q.    Does the fact that it was from a nursing home

8    bear -- play a part in your decision?

9    A.    Yes.

10   Q.    Why?

11   A.    I guess just because -- I don't want to say you feel

12   sorry for them, but you just want to make exceptions for them.

13   Q.    Is that because you know that they might be struggling

14   to fill everything out correctly?

15   A.    Right.

16   Q.    Rather than show you all of these affirmation forms from

17   2014, I'll just ask you do you recall whether there were a

18   substantial number of forms where the birthdate was missing but

19   the ballot was counted anyway?

20   A.    Right.

21   Q.    You recall that?

22   A.    Yes.

23   Q.    I'm going to show you Plaintiffs' Exhibit P1136.  And,

24   from looking at the numbers of how few ballots were rejected,

25   we know none of them were rejected because of a lack of ID,

Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/08/16 Page: 119 of 241 PAGEID #: 24735

1    correct?

2      A.    Correct.

3      Q.    And this ballot did not have an ID written in?

4      A.    Correct.

5      Q.    But it was counted anyway?

6      A.    I believe so.

7      Q.    All right.  Do you know why it was counted?

8      A.    Unless it was office error.

9      Q.    Again, that would be somebody who wrote it in for the

10   voter at the Board of Elections?

11     A.    Well, this one, I'm not sure if it was actually mailed

12   or if it was in our office.  It looks like his handwriting.  So

13   I assume this one was mailed.  And then when we got it back in

14   and checked it in, perhaps we missed it.

15     Q.    Typically, if you saw and noticed that there was no ID,

16   would you reject the ballot?

17     A.    Well, first, we would send them -- We have the form that

18   we can send out and then give them a chance to provide the ID.

19   So, I mean, if we would have caught it in the office, we would

20   have sent them that form.  And then when they mailed it back to

21   us, that's when we would have put it with this envelope to make

22   sure that it was counted.

23     Q.    Okay.  Thank you.

24            Now I'm going to show you Plaintiffs' Exhibit P1138.

25   This appears to be the same situation, Ms. Lee, where there was

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 120 of 241 PAGEID #: 1736
Case: 2:06-cv-00896-ALM-TPK Doc #: 653-7 Filed: 04/06/16 Page: 120 of 241 PAGEID #: 23796

Vol. 4 - 120

1    no ID but the ballot was counted.  Would you agree with that?

2      A.    Yes.

3      Q.    And is this another error on your part, do you believe?

4      A.    I believe so.

5      Q.    Thank you.

6            THE COURT:  That was not your handwriting on this one,

7    was it?

8            THE WITNESS:  I don't think that was my handwriting.

9    No, that's not my handwriting.

10           THE COURT:  All right.

11     BY MS. GENTRY:

12     Q.    Was the error made by someone, either yourself or the

13   Deputy Director, in the process of approving this ballot to be

14   counted?

15     A.    What was it, again?

16     Q.    You said earlier that there was an error made.  Isn't

17   it -- Is it correct that the error was made when either

18   yourself or the Deputy Director decided that this ballot should

19   be counted and didn't notice that there was no ID?

20     A.    Right.

21     Q.    Okay.  All right.  I'm going to show you what's been

22   previously marked as Plaintiffs' Exhibit P1121.  In this case,

23   the birthdate is wrong.  Would you agree?

24     A.    Yes.

25     Q.    And then, today, you produced a number of documents,

1   including the application for this particular voter.  We have

2   marked it P7022.

3          MS. GENTRY:  Your Honor, may I show it to opposing

4   counsel?

5          THE COURT:  Yes, you may.

6          MS. GENTRY:  Thank you.

7      (Whereupon, there was a brief interruption.)

8          THE COURT:  Mr. Keller, have you seen -- obviously,

9   you haven't seen this document before.

10         MR. KELLER:  I have not seen this document, but I

11  think if I get the --

12         THE COURT:  Is this one of those instances where you

13  may have been previously provided the document but the Bates

14  numbers don't align?

15         MR. KELLER:  I do not believe that's the case, Your

16  Honor, with this one.

17         THE COURT:  Okay.  All right.

18       Have you had a chance to review it, Mr. Keller?

19         MR. KELLER:  Yes, Your Honor.

20         THE COURT:  All right.

21         MS. GENTRY:  Your Honor, at this time, we would ask

22  that Exhibit P7022 be admitted into evidence.

23         THE COURT:  7022?

24         MS. GENTRY:  Yes, sir.

25         THE COURT:  Any objection to 7022?

1          MR. KELLER:  I do think it should be on the record

2    that these were brought in today pursuant to a subpoena, but no

3    specific objections to this document, Your Honor.

4          THE COURT:  All right.  There being no objections,

5    7022 will be received.

6          MS. GENTRY:  Thank you, Your Honor.

7          THE COURT:  Is 7024 of that same variety, Mr. Keller?

8          MR. KELLER:  7024, Your Honor?

9          THE COURT:  Yes.  That was one that, apparently, you

10   all had --

11         MR. KELLER:  Yes.

12         THE COURT:  -- agreed to.  Is that one that just came

13   in today, as well?

14         MR. KELLER:  I believe on that form, yes.  I believe,

15   that one, we might have had before.  No?

16         THE COURT:  Well, 7022 will be received.

17       Ms. -- Could I -- Mr. Keller --

18     (Thereupon, the Court and Counsel conferred out of the

19   hearing of the court reporter.)

20     BY MS. GENTRY:

21     Q.   All right.  I'm going to show you Plaintiffs' Exhibit

22   1121 again.  You saw it already.  This is the ID envelope for

23   Ms. Mary Lyons.  And I want to call your attention to her

24   Social Security number.  Do you see that number?

25     A.   Yes.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 123 of 241 PAGEID #: 1739
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/18 Page: 123 of 241 PAGEID #: 21794

Vol. 4 - 123

1    Q.    Now I'm going to show you her application to vote

2    absentee, and this is P7022.  Do you see that the Social

3    Security number on her application is different?

4    A.    Yes.

5    Q.    And should that have been a reason to reject this

6    ballot?

7    A.    I'm not sure.  I don't really remember this one coming

8    through the office; but, if we had seen the ID -- I mean, I'm

9    not sure.

10    Q.    Why aren't you sure?

11    A.    I don't know, at the time, if we looked at her

12    registration record and saw that we -- one of them was the

13    correct ID.  Sometimes we get applications in the office where

14    they actually give us the last four of their driver's license

15    number, as well.  So it may be, at the time, we compared it to

16    her driver's license number and the last four that she gave us

17    and determined that one of them -- we did have both of them and

18    one of them was correct.

19    Q.    Going back to 7022, isn't it true that the application

20    has to be correct in all respects in order for a ballot to be

21    issued?

22    A.    Yes.

23    Q.    And at the time that this application was approved,

24    someone would have checked the numbers, correct?

25    A.    Correct.

1    Q.    In fact, it looks like someone crossed out the last two

2    digits of the Social Security number and reversed them; isn't

3    that right?

4         MR. KELLER:  Objection, Your Honor, I think we're at

5    speculation now.

6         THE COURT:  Sustained.

7    BY MS. GENTRY:

8    Q.    Do you have any explanation as to why that Social

9    Security number was changed on the application?

10   A.    No.

11   Q.    I'm going to ask you -- Let's see -- I'm going to turn

12   to provisional ballots now and ask you to look at Plaintiffs'

13   Exhibit 1088.  And it appears -- I'll show you the entire

14   thing, but it appears this ballot was rejected because of a

15   nonexistent address?

16   A.    Correct.

17   Q.    And you can see, there, that that's the reason why it

18   was rejected?

19   A.    Correct.

20   Q.    Now, among the documents that you brought today were

21   this voter's registration update from 2007, and we've marked

22   these papers as Plaintiff's Exhibit 7021.

23        MS. GENTRY:  Your Honor, may I show them to opposing

24   counsel?

25        THE COURT:  Yes, you may.

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

1      MS. GENTRY:  Thank you.

2      (Whereupon, there was a brief interruption.)

3      MS. GENTRY:  Your Honor, at this time, we would move

4   that Plaintiffs' Exhibit 7021 be admitted into evidence.

5      THE COURT:  Mr. Keller, any objection to 7021 being

6   received?

7      MR. KELLER:  Yes, Your Honor.  I think both because

8   we're getting into a situation now where I do think it's

9   getting prejudicial in that I'm not able to review these

10  documents in any type of timely manner.  Also, this one does

11  get into the voter snapshot issue we had before.  And I

12  understand the Court has ruled on that, but I reserve that same

13  objection.

14     THE COURT:  All right.  Other than the snapshot issue,

15  what is your objection to 7021 substantively?

16     MR. KELLER:  I just want a chance to be able to

17  actually look and compare and not --

18     THE COURT:  How many of these exhibits do you have,

19  Ms. Gentry?

20     MS. GENTRY:  Your Honor, I believe only one more.

21     THE COURT:  All right.  Here is what we're going to

22  do.  I was going to allow you to -- give you the opportunity to

23  complete your direct examination.  In an ideal universe, that's

24  what I would prefer, so that Ms. Lee could be done and out of

25  here by 12:30.  But, instead, I'm going to break for lunch at

1    this point.

2         We'll stand in -- It's 12:10.  We'll stand in lunch

3    recess until 1:15.

4         I want you to provide to Mr. Keller, over the lunch

5    break, 7021, 7022 and -- Do you have another exhibit that was

6    brought pursuant to subpoena today by Ms. Lee?

7              MS. GENTRY:  Yes, Your Honor.  I have 7023 and 7025.

8              THE COURT:  Okay.

9              MS. GENTRY:  And I will show those all to him.

10             THE COURT:  So those will be 7021, -22, -23 and -25.

11   Those four documents will be provided to Mr. Keller.

12        Mr. Keller, you can hold in abeyance your objection,

13   because this may cure that circumstance we're looking at.  And

14   it gives you an hour.  I think they're all pretty much the

15   same, with, you know, some information missing.  And the vote

16   was either counted or not.  But at least you will have an

17   opportunity to review the documents thoroughly.

18             MR. KELLER:  Absolutely, Your Honor.

19             THE COURT:  So we will stand in recess for one hour.

20        (Recess taken at 12:17 p.m.)

21                                 - - -

22

23

24

25

1              Monday Afternoon Session

2              March 21, 2016

3                     - - -

4         THE COURT:  Ms. Lee, please resume the stand.

5         While Ms. Lee is coming up, you will recall on Friday we

6    had a discussion about Monday and -- the 28th and this Friday

7    and some of the subpoenas that you had -- were we able to get

8    that rearranged, or we're going to need to call some witnesses

9    out of order?

10         MS. GENTRY:  I'll defer to Ms. Richardson on that.

11         THE COURT:  Ms. Richardson?

12         MS. RICHARDSON:  Your Honor, what we discussed, it was

13   brought to our attention that Friday is a difficult date for

14   many of the Boards because they have a deadline that day, and

15   so what we discussed with Ms. Gentry was bringing in one of our

16   experts that day, if the Court does not mind witnesses going

17   out of order.

18         THE COURT:  No, I don't.  I don't.  So we'll just have

19   those witnesses that were scheduled for Friday on Monday.

20         MS. RICHARDSON:  Exactly, Your Honor.

21         THE COURT:  Okay.  That's fine.

22         MS. RICHARDSON:  Thank you, Your Honor.

23         THE COURT:  Ms. Gentry, please continue.

24         MS. GENTRY:  Thank you, Your Honor.

25   BY MS. GENTRY:

```
1      Q.   Ms. Lee, I just want to go over a couple things just to

2   fill in a few blanks.  This is Plaintiffs' Exhibit 1119.  This

3   is the one where it appears that there's a digit missing from

4   the date of birth.  Do you recall that?

5      A.   Yes.

6      Q.   And this is the same voter's application which you

7   produced today and we have labeled Bates number -- or

8   Plaintiffs' Exhibit Number 7023.  I'm just going to compare it.

9           Does that show what the date of birth should have been?

10           THE COURT:  What is it -- this is 7023?

11           MS. GENTRY:  Yes, Your Honor.

12           THE COURT:  And, Mr. Keller, did you have an

13   opportunity to review that series of documents over the lunch

14   break?

15           MR. KELLER:  I did, Your Honor.  And opposing counsel

16   and I discussed a slightly narrower one of the document's

17   admission, and I'm withdrawing any objections.

18           THE COURT:  All right.  Good enough.  All right.

19           Please continue, Ms. Gentry.

20           MS. GENTRY:  Thank you, Your Honor.

21   BY MS. GENTRY:

22      Q.   So does it appear that rather than writing a 4 for the

23   year, this voter should have written 43?

24      A.   Yes.

25      Q.   But it was counted anyway?
```

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 129 of 241 PAGEID #: 1745
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/16 Page: 129 of 241 PAGEID #: 23305

Vol. 4 - 129

1    A.   Yes.

2         MS. GENTRY:  Your Honor, I would move that Plaintiffs'

3    Exhibit 7023 be admitted.

4         THE COURT:  Any objection, Mr. Keller?

5         MR. KELLER:  No, Your Honor.

6         THE COURT:  7023 will be received.

7         MS. GENTRY:  Thank you, Your Honor.

8    BY MS. GENTRY:

9    Q.   Now, I'd like to go back to the ballot -- or the ballot

10   form we were last looking at, which is Plaintiffs' Exhibit

11   1088.  And this ballot was rejected because the address does

12   not exist.  Do you see that?

13   A.   Yes.

14   Q.   Now, I'm going to show you what has been marked as

15   Plaintiffs' Exhibit 7021, and there are two pages.  This is the

16   same voter, and it states -- it appears she's filled this out

17   in 2007.  Do you see that?

18   A.   Yes.

19   Q.   And she lists her previous house address as 391 Weber

20   Hill Road.  Do you see that?

21   A.   Yes.

22   Q.   And then on her ballot she states that she has moved to

23   391 Weber Street.  Do you see that?

24   A.   Yes.

25   Q.   Do you know whether when the person who checked this

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 130 of 241 PAGEID #: 1746
Case: 2:20-cv-03843-MLM-TPK Doc #: 653 Filed: 04/06/24 Page: 130 of 241 PAGEID #: 2360

Vol. 4 - 130

1   address, do you know whether they looked back at her records to

2   see that she once lived at 391 Weber Hill Road?

3   A.   I'm not sure if anybody did check back with her

4   registration to see if it was on there from a previous address.

5   Q.   What is the normal procedure that you and your deputy

6   director follow when you're trying to determine whether an

7   address is valid?

8   A.   Well, we have a list of street addresses in our system,

9   our EVIS photo registration system, and if we go to put in an

10  address, it lets us know if the numbers are not in range so

11  that flags us to investigate it a little further.  We may have

12  sent her a postcard just to confirm her address, and it may

13  have come back to us as not a valid house number.

14  Q.   Now, with a provisional ballot there's no time to send

15  out a postcard and have it come back, is there?

16  A.   We try.  We send them out as soon as possible and see if

17  we do get any back.

18  Q.   And what do you send to them?

19  A.   It's just a little postcard that just -- I'm not sure

20  exactly the words on it, but it says it's from the Board of

21  Elections office and just tells them that we received your

22  provisional ballot and we're confirming your address.

23  Q.   So in this case whoever wrote that out would simply

24  write 391 Weber Street?

25  A.   Correct.

1    Q.   Do you know whether in Meigs County there's both a Weber

2    Hill Road and a Weber Street?

3    A.   I'm not sure.

4    Q.   And you said you weren't sure if anybody would go back

5    and check the voter registration to see whether the address was

6    there, correct?

7    A.   Correct.

8    Q.   Is that something that's -- that's ever done in your

9    experience, checking these addresses?

10   A.   I don't think we've ever checked back for a previous

11   address on a voter registration card that I'm aware of.

12   Q.   What do you check?

13   A.   For?

14   Q.   When you check an address, you only check the current

15   database, I believe you said.

16   A.   Right.  And then in the 2015 election we did check the

17   post office website, and there was an option in there for us to

18   put in an address and it would let us know whether or not it

19   was a valid address.  So we have been using that.

20       MS. GENTRY:  Your Honor, I would move -- I may have

21   done this and, if so, I apologize, but I would move P7021 into

22   admission.

23       THE COURT:  I don't think that you have.

24       THE CLERK:  It's already in.

25       THE COURT:  7021 is in.

Vol. 4 - 132

1          MS. GENTRY:  Thank you, sir.

2          THE COURT:  It was 23 and subsequent ones that were

3  not.

4          MS. GENTRY:  Okay.

5  BY MS. GENTRY:

6    Q.    I'm going to show you what's been marked as Plaintiffs'

7  Exhibit P1089.  This is another provisional ballot that was

8  rejected because the address does not exist.  The address that

9  the voter wrote down is 36125 Allen Street.  And now I'm going

10  to show you the second page.  Or, I'm sorry, the third page.

11          And the -- well, first of all, what is this document?

12  I'll show you the top of it.  Do you see that it's a

13  provisional audit report?

14    A.    Yes.

15    Q.    What is that?

16    A.    When we put our provisional envelopes into our

17  provisional tracking system, it can generate a report and list

18  everybody that we've put in the system.  And it also -- as you

19  can see, it keeps track of our notes.  Like, if -- if it's

20  pending Board approval or if it's recommended to reject.

21    Q.    And in this case, Ms. Windon's address is slightly

22  different.  It's listed here as being 36130 Allen Street.  Do

23  you see that?

24    A.    Yes.

25    Q.    Do you have any understanding as to why that is

1    different from what she wrote down on her provisional ballot

2    affirmation form?

3        A.   I'm not sure.

4        Q.   When is this data, the data that's in her street

5    address, when is that populated in this database?

6        A.   What do you mean?

7        Q.   Well, I'm trying to figure out in terms of the timing,

8    would somebody have typed in 36130 after they got her

9    provisional ballot, or is that preexisting data?

10       A.   That, I'm not sure.  I don't know if that was the last

11   number in the street address in our -- in our system and maybe

12   it just defaulted to that.  Or I think we do have to put in

13   some address when we enter them into the provisional tracking

14   system in order to get them into the system.  So I'm not sure

15   why that number is different.

16       Q.   All right.  I'm going to show you what's been marked as

17   P1090, and this particular voter listed his street address as

18   34005 McCumbee Hill Road.  Do you see that?

19       A.   Yes.

20       Q.   And then the provisional audit report states that his

21   address is actually 34005 McCumber Road, not McCumbee Hill.  Do

22   you see that?

23       A.   Yes.

24       Q.   Are there two different roads in Meigs County, one

25   that's McCumber and one that's McCumbee Hill?

Vol. 4 - 134

1    A.    No.  There's no McCumbee Road that I'm aware of.

2    Q.    Okay.  What is the road that you're aware of?

3    A.    I think it's just McCumber Road.

4    Q.    So the voter wrote it down wrong on his provisional

5  ballot application?

6    A.    Yes, I think so.

7    Q.    But it was counted anyway?

8    A.    Correct.

9    Q.    Was that the correct decision, to count the ballot?

10   A.    I'm not sure.  I hope so.

11   Q.    Let me change the question.  In your view, based on your

12  understanding of the directives of the law, was it correct to

13  count the ballot?

14        MR. KELLER:  Objection; improper opinion.

15        THE COURT:  Well, Ms. Lee is the director of the Meigs

16  County Board of Elections; is that right, Ms. Lee?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.  I'm going to allow her to

19  answer this question, if you can.

20        THE WITNESS:  Yes.

21        THE COURT:  Go ahead.  You may.

22        MR. KELLER:  Thank you, Your Honor.

23        THE WITNESS:  With -- I just assumed when we received

24  it as McCumber Hill Road, that it was just McCumber Road

25  because there was no McCumber Hill Road.

1   BY MS. GENTRY:

2      Q.   So you understood the voter just made a mistake?

3      A.   Yeah.

4      Q.   And that mistake shouldn't be something that

5   disqualifies the vote?

6      A.   I don't think so.

7      Q.   I'm going to show you what's been marked as P1091.  And

8   in this case you can see the voter wrote the number for the

9   street in the street address box and wrote the name of the

10  street in the city and village box and didn't write a city and

11  village.  Do you see that?

12     A.   Yes.

13     Q.   I'm going to show you the second page.  And it appears

14  that the number in -- the number and street name are correct,

15  but he omitted Albany, Ohio, from the street address on his

16  provisional ballot form.  Would you agree with that?

17     A.   Yes.

18     Q.   And this ballot was still counted, correct?

19     A.   Correct.

20     Q.   So is it -- is it your understanding that it's -- it's

21  okay to omit the city so long as the street address is correct?

22     A.   At the time I think so.  We -- we knew from the zip code

23  that it was Albany, and we knew Salem School Lot Road was out

24  in Albany so --

25     Q.   Okay.  Thank you.

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

1       Let me show you what's been marked as P1093.  In this

2  case it appears that the voter wrote -- well, first of all, do

3  you recognize whether this handwriting is yours or the deputy

4  director's?

5  A.   It looks like the number may be my writing.

6  Q.   But the Erwin Drive is not your writing?

7  A.   I don't think so.

8  Q.   Is it possible that you wrote in the number of the

9  street address there?

10  A.   Yes.

11  Q.   And would you have done that only if the voter was in

12  person?

13  A.   Probably so, yeah.

14  Q.   Why would you have done that?

15  A.   Well, if they were there and they filled it in, if they

16  were still there, maybe I wrote it in for them.  I'm not sure.

17  I don't remember this particular ballot.

18  Q.   All right.  I'm going to show you what's been marked as

19  Plaintiffs' Exhibit 1094.  Again, focusing your attention on

20  the street address line, is that -- is any of that your

21  handwriting?

22  A.   I don't think so.

23  Q.   Does it appear to be the deputy director's handwriting?

24  A.   No.

25  Q.   Do you know who crossed out the number and wrote it

1   above?

2    A.   I would assume Ms. Klein.

3    Q.   All right.

4    A.   But I can't tell from this picture.

5    Q.   I want to show you what's been marked as Plaintiffs'

6   Exhibit P1092.  It's a multi-page exhibit, and I'm going to

7   start with the third page.  This is a fax.

8         First of all, is that your handwriting on this fax?

9    A.   Yes.

10   Q.   Can you explain to the Court what this -- what type of

11  fax this is?  What's the purpose of it?

12   A.   When we have provisionals that come into the county that

13  are actually from another county, they're registered in another

14  county, we will send the county a fax with the name and a copy

15  of the provisional envelope front and we just confirm that they

16  are registered in that county; in this case it would be Athens

17  County.  And we make sure that they didn't vote in that

18  election in Athens County.

19   Q.   Now, I'm going to turn to the page that's been Bates

20  numbered Meigs 67, part of the same exhibit.  And is that the

21  fax you would have received in return from Athens County?

22   A.   Yes.

23   Q.   It indicates that the voter was registered and did not

24  vote in Athens?

25   A.   Correct.

```
 1     Q.    And does this appear to be the copy of the provisional

 2   ballot that was returned by Athens County looking at the stamp

 3   in the bottom --

 4     A.    Yes.

 5     Q.    -- left?

 6     A.    Yes.

 7     Q.    Now, I want to call your attention to the address on

 8   this ballot.  This was faxed back from Athens County, and the

 9   address is 41509 Park Road, Apartment 7.  Do you see that?

10     A.    Yes.

11     Q.    Now, I want to turn to the -- to the first page of the

12   exhibit.  It has been changed from 41509 to 41059.  Do you see

13   that?

14     A.    Yes.

15     Q.    Do you know who changed that?

16     A.    No.

17     Q.    Is it correct that that would have had to have been

18   changed after the document was sent to Athens County?

19     A.    I'm not sure.

20     Q.    Could it have been changed before that?

21           MR. KELLER:  Objection.  I think we're into

22   speculation.

23           THE COURT:  Sustained.

24           MR. KELLER:  Thank you.

25   BY MS. GENTRY:
```

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

1    Q.   What is the voter's address as it's contained within the

2  database maintained by the county according to the provisional

3  audit report?

4    A.   What was the question?

5    Q.   What is the voter's address according to the data that's

6  provided in the provisional audit report?

7    A.   I guess I don't understand.

8    Q.   Can you read the street address there?  It's 41059 Park

9  Road.

10   A.   Yes.

11   Q.   All right.  So the correct address for the voter is

12  41509?

13   A.   I assume so.

14   Q.   And the provisional form that was faxed back on

15  November 13 had the wrong address; isn't that true.  It was

16  41509?  That's the one that was faxed back?

17   A.   Yes.

18   Q.   And that's the wrong address?

19   A.   I guess so.

20   Q.   Do you have any explanation as to how the document got

21  changed to be the correct address?

22   A.   No.

23   Q.   I'm going to show you what's been marked as Plaintiffs'

24  Exhibit P1095.  I'm specifically going to ask you about the

25  birth date.  This is another provisional ballot that was

1    counted.  Do you recognize the handwriting that has the numbers

2    in the boxes for the birth date?

3    A.   Yes, I think so.

4    Q.   Whose handwriting is that?

5    A.   I think it would have been my coworker at the time, the

6    previous director.

7    Q.   So it appears that the director wrote in the full birth

8    date, month, day and year for that voter?

9    A.   Correct.

10   Q.   Looking at the date of the -- that was filled out by the

11   voter, November 4, 2014, that was the date of the election; is

12   that correct?  Do you recall?

13   A.   I think so.

14   Q.   Do you have any knowledge as to whether your coworker

15   filled this out at -- while she was standing with the voter?

16   A.   I'm not sure.

17   Q.   I'm going to show you what's been marked as P1096.

18        Now, in this case I want you to just take a look at the

19   birth date.  It's written as 12-17-1963.  Do you see that?

20   A.   Yes.

21   Q.   But according to the data in the provisional audit

22   report, the birth date is actually 12-27-63; is that correct?

23   A.   Yes.

24   Q.   All right.  Should this ballot have been counted?

25   A.   I think so.  I'm not -- I don't remember what the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 417 Filed: 09/12/20 Page: 141 of 241 PAGEID #: 9757
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/28 Page: 141 of 241 PAGEID #: 21757

Vol. 4 - 141

 1    previous date of birth was, but on the audit report it pulls

 2    what we have from the voter registration system so we may have

 3    it wrong in our voter registration system.

 4        Q.   Are you required by the law to match whatever

 5    information the voter writes down with the information that's

 6    in your system?

 7        A.   Yes.

 8        Q.   So if -- in this case, if the information does not

 9    match, does the Board have discretion to count the ballot

10    anyway if it believes that the information in the database is

11    wrong?

12        A.   Yes.

13        Q.   All right.  I want to show you Plaintiffs' Exhibit

14    P1099.  And in this case, there's writing at the top that says

15    different social than on file.  Do you see that?

16        A.   Yes.

17        Q.   The voter also provided a driver's license number?

18        A.   Yes.

19        Q.   And I'll represent to you that the driver's license

20    number matches, but the social security number does not.  And

21    then there's also a notation of different social than what's on

22    file.  Do you see that?

23        A.   Yes.

24        Q.   What is the -- what is the policy that your Board

25    follows when one I.D. is correct but another form of I.D. is

 1   wrong?  Is it okay to count the ballot in that circumstance?

 2      A.   I think so.  We don't really have a policy on that, but

 3   I think we probably would have went with the driver's license

 4   number.

 5      Q.   Based on your experience, is that the approach that the

 6   Board has taken?

 7      A.   Yes.

 8      Q.   All right.  And the final situation I want to show you

 9   is -- appears in P1102.  And this is a ballot where the voter

10   provided both their driver's license number and the social.  Do

11   you see that?

12      A.   Yes.

13      Q.   And then it appears on the data from the professional

14   audit report, it appears it does not have either the social

15   security number or the driver's license number in the database;

16   is that correct?

17      A.   Correct.

18      Q.   What do you or your coworker do in that situation when

19   you can't match the I.D. information against anything?

20      A.   Well, we -- we do have some records that don't have any

21   I.D. so we -- like, from this we probably would have entered in

22   the driver's license and social that he provided into his voter

23   registration system.

24      Q.   And then you would have it for future elections?

25      A.   Right.

1    Q.   But for this election, do you just assume that it's

2    correct?

3    A.   Yeah, because I -- we didn't probably have anything to

4    compare it to.

5          MS. GENTRY:   Thank you.

6          Your Honor, I have no further questions.

7          THE COURT:   All right.  Mr. Keller?

8          MR. KELLER:   Thank you, Your Honor.

9          THE COURT:   Your examination?

10                     DIRECT EXAMINATION

11   BY MR. KELLER:

12   Q.   Good afternoon, Ms. Lee.

13   A.   Good afternoon.

14   Q.   I know we met briefly this morning, but my name is

15   Zachery Keller, and I represent defendants the Ohio Secretary

16   of State and the State of Ohio.

17   A.   Uh-huh.

18   Q.   I would like to start by showing you what's been marked

19   and admitted into evidence as Plaintiffs' Exhibit 2365.  Do you

20   see the "to" line in there?

21          THE COURT:   2365?

22          MR. KELLER:   Yeah 2365.

23   BY MR. KELLER:

24   Q.   Do you see the "to" line towards the top of that

25   document?

1    A.   Yes.

2    Q.   Who's Ms. Johnston?

3    A.   She was our former director.

4    Q.   You say former.  Did she leave recently, or what was the

5    situation?

6    A.   Yes.  She retired at the end of February.

7    Q.   What party was Ms. Johnston affiliated with?

8    A.   Democrat.

9    Q.   Which party are you affiliated with?

10   A.   Republican.

11   Q.   Am I right then in thinking that your current deputy

12   director is also a Democrat then?

13   A.   Correct.

14   Q.   I know you spoke about this briefly in the direct, but

15   can you walk us through what the staffing is like at the Meigs

16   County Board of Elections?

17   A.   It's just myself and the director, and we have a deputy

18   director and we do have seasonal help.

19   Q.   When you say seasonal help, can you sort of give me a

20   description of that?

21   A.   Well, like, this past election we had a lady come in for

22   the last two weeks before the election just to help us out with

23   people coming into the office to vote and getting things ready

24   for the election.

25   Q.   How do you and the deputy director divide tasks then?

```
 1     A.   We just take whatever needs to be done, and we just

 2   share all of our duties.

 3     Q.   So what areas does that mean that you will both have to

 4   cover?

 5     A.   Well, like, helping people vote, helping people register

 6   to vote.  When we have applications come in for ballots, we

 7   both -- you know, if she's not busy, she will put the

 8   applications in the system.  If I'm not, I will.  Printing them

 9   out, we take turns printing out ballots and getting them ready

10   to mail.

11     Q.   Let me ask it this way:  Is there any part of the

12   election process that one or both of you isn't involved in?

13     A.   No, I don't think so.

14     Q.   What's the size of Meigs County?

15     A.   We have about 23,000 people.

16     Q.   Do you know how that compares to other counties in Ohio?

17     A.   I'm not really sure.

18     Q.   Do you have any sense of the relative size of Meigs

19   County?

20     A.   I guess.

21     Q.   Okay.

22          THE COURT:  What is the county seat of Meigs County,

23   Ms. Lee?

24          THE WITNESS:  Pomeroy.

25          THE COURT:  Pomeroy?
```

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

Vol. 4 – 146

1          THE WITNESS:  Uh-huh.

2   BY MR. KELLER:

3      Q.    Are you familiar with training of precinct election

4   officials in Meigs County?

5      A.    Yes.

6      Q.    How many precinct election officials does Meigs County

7   have?

8      A.    We have about eight.

9      Q.    How are they trained?

10     A.    We have training sessions at our office, and they come

11  in for training.

12     Q.    Who performs the training sessions?

13     A.    Well, normally our director did the trainings, but this

14  past election I did the trainings.

15     Q.    And how long does a poll worker -- how long is a poll

16  worker trained for?

17     A.    I would say about an hour-and-a-half.

18     Q.    Are they paid for that training?

19     A.    Yes.

20     Q.    And who pays for that?

21     A.    We do.

22     Q.    Now, do you know the budget of Meigs County Board of

23  Elections?

24     A.    Yes.

25     Q.    And what is it?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 147 of 241 PAGEID #: 1763
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/16 Page: 147 of 241 PAGEID #: 23363
Vol. 4 - 147

```
 1    A.   Right now for this year, I think it is about 250,000.
 2    Q.   And do you have any idea of how that budget compares to
 3  other county Boards of Elections?
 4    A.   No.
 5    Q.   I would like to walk you through a few documents.  You
 6  do have a volume -- you should have Volume 15 right next to you
 7  there, but I can also show you on the Elmo for most of these.
 8         I would first like to direct your attention to
 9  Plaintiffs' Exhibit 1078.  Do you recognize this document?
10    A.   Yes.
11    Q.   And what is this document?
12    A.   This is the certification form for absentees and
13  provisional.
14    Q.   And what is Section B on this document?
15    A.   Reasons provisional ballots were rejected.
16    Q.   And 2014, you said, was the year for this report?
17    A.   Yes.
18    Q.   In 2014 what was the most common reason for rejection?
19    A.   Voter not registered in the State of Ohio.
20    Q.   Now, I'm going to show you what's been marked as
21  Plaintiffs' Exhibit 1079, and what year is this form for?
22    A.   2015.
23    Q.   And what is this form?  Sorry.
24    A.   Oh, it's provisional ballots, the certification form to
25  the Secretary of State's office.
```

1    Q.   And what was the most common reason in 2015 for

2    provisional voters being rejected?

3    A.   Voter not registered in the State of Ohio.

4    Q.   I would like to turn your attention to Plaintiffs'

5    Exhibit 1085.  This one it might be easier for you to be able

6    to flip through.

7    A.   Okay.

8    Q.   And so I would like you to look at that.  And just to

9    let you know when you're looking, my question is -- oh, first

10   let me just ask if you notice on the left-hand column there's a

11   row in each of the individual break -- in each of the

12   individual breakdowns that has all capital letters towards the

13   bottom?

14        Do you see that?

15   A.   Yes.

16   Q.   And the first one, it says unknown?

17   A.   Yes.

18   Q.   And the second one, it says moved from Athens County?

19   A.   Yes.

20   Q.   What is that information?

21   A.   Those are just notes that we can put with the -- in the

22   provisional tracking system just to let us know why we put them

23   in there and what we discovered when we investigated these.

24   Q.   And just to make sure I understand, what are those notes

25   explaining?

1    A.    Like, that second one, they moved from Athens County, it

2    just lets us know that that one was one that we had to fax to

3    Athens County to make sure that they were registered in Athens

4    County and they did not vote in Athens County.

5    Q.    Is that why the person cast a provisional ballot?

6    A.    Correct.

7         MS. GENTRY:  Objection; calls for speculation.

8         THE COURT:  Sustained.

9  BY MR. KELLER:

10   Q.    Is that your understanding of why the person -- your,

11   being the Board of Elections' understanding, as to why the

12   person voted a provisional ballot?

13        MS. GENTRY:  Same objection.

14        THE COURT:  Well, I'm going to let the witness answer

15   this question, Mr. Keller.  But before she answers this

16   question, I want you to establish a foundation for how she

17   either in her individual capacity or as Board chair would know

18   why this particular person cast a provisional ballot.  So I'm

19   going to sustain your objection for the moment, but you may

20   reask that same question once you establish the basis for her

21   testimony.

22  BY MR. KELLER:

23   Q.    Let me just ask more generally.  How is this document

24   put together?

25   A.    This report, you mean?

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

1    Q.   Yes, exactly.

2    A.   When we get our provisionals and we enter them into our

3    provisional tracking system, this is a list of all those that

4    we were -- that we had entered into the system.

5    Q.   And why do you put this document together?

6    A.   It helps us keep track of all the provisionals that we

7    do have.

8    Q.   Are you involved in that process?

9    A.   Yes.

10   Q.   And do you understand the format of this document?

11   A.   Yes.

12   Q.   All right.  So -- so returning to that -- that

13   capital -- capital letter phrasing there, what does that tell

14   you about that provisional voter?

15   A.   They're just notes that we put in the system just to

16   help us keep track of them.  When you have so many of them, you

17   know, when you pick one up, it's easier to pick up this report

18   and see why we have that provisional.

19   Q.   And that deals with your understanding of why the person

20   voted provisionally?

21   A.   Correct.

22   Q.   Now, I would like you to scan through the document, but

23   I want to let you know my question before you do that.

24        My question is going to be what's the most frequent

25   reason those notes are indicating provisional ballots were

1    cast?

2          MS. GENTRY:  Objection, Your Honor.

3          THE COURT:  Overruled.

4          THE WITNESS:  It looks like most of these they have

5    moved without updating their registration with us at the Board

6    of Elections office.

7    BY MR. KELLER:

8    Q.    Okay.  So when a voter moves without updating their

9    registration, if they don't provide as some part of provisional

10   process their current address, what's the most recent address

11   you're going to have in the database?

12   A.    You mean if they've moved within our county?

13   Q.    Any person that's moved.  I'm not asking about the type

14   of move.

15   A.    Uh-huh.

16   Q.    I'm asking if someone's moved without updating their

17   registration and then they go and vote provisionally, if they

18   don't as part of the provisional ballot process provide their

19   current address, what's going to be the most recent address in

20   your database?

21   A.    Well, if they've moved outside the county, we won't have

22   one.  But if they move within the county, then we would just

23   have an older address to go by.

24   Q.    I would like to show you what's been marked as

25   Plaintiffs' Exhibit 1080.  That should also be in the binder in

1  front of you.  And I would like to turn your attention -- let

2  me know when you get there.

3  A.  Okay.

4  Q.  Well, let me first ask, what is this document?

5  A.  This looks like an absentee survey that the Secretary of

6  State had us fill out.

7  Q.  And what year is this for?

8  A.  2014.

9  Q.  So I would like to direct your attention, first, to --

10  if you see on the bottom of the page, there's Meigs and then a

11  number.  I would like you to go to Meigs 6.

12        THE COURT:  Do you have it, Mr. Keller?

13        MR. KELLER:  I do, yeah.  Do you want it on the Elmo?

14        THE COURT:  Yes, please.  It just makes it so much

15  more convenient.

16        MR. KELLER:  No, that makes complete sense.

17        THE COURT:  Thank you.

18  BY MR. KELLER:

19  Q.  Are you there?  Sorry.

20  A.  Yes.

21  Q.  Now, when it says non-UOCAVA, is that domestic ballots?

22  A.  Yes.

23  Q.  And how many of those ballots in 2014 were transmitted

24  by mail?

25  A.  Looks like 1003.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 153 of 241 PAGEID #: 1769
Case: 2:06-cv-00896-ALM-TPK Doc #: 653-7 Filed: 04/06/16 Page: 153 of 241 PAGEID #: 23324

Vol. 4 - 153

 1    Q.    And if you look at the 6B right underneath that, what is

 2    that number?

 3    A.    36.

 4    Q.    I'm sorry, what is that number describing?

 5    A.    Hand-carried ballots.  A voter can come into the office

 6    and request a ballot and then take it with them and vote it at

 7    home or wherever they want to take it and return it later on.

 8    Q.    So in 2014, if you combine those numbers, you had 1039

 9    voters that either the ballot got sent to or they decided to

10    take it home?

11    A.    Correct.

12    Q.    Then if you look towards the bottom of the page, how

13    many of those ballots were ultimately cast?

14    A.    888.

15    Q.    And if you turn to the next page, I just want as a

16    comparison, how many ballots were cast by people in person?

17    A.    286.

18          MR. KELLER:  May we have a moment to confer,

19    Your Honor?

20          THE COURT:  Yes, you may.

21          MR. KELLER:  No further questions, Your Honor.

22       Thank you, Ms. Lee.

23          THE COURT:  Do you have any further questions,

24    Ms. Gentry?

25          MS. GENTRY:  No, Your Honor.

```
 1              THE COURT:  Ms. Lee, you may be excused.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Ms. Gentry, your next witness, please.

 4              MR. CHANDRA:  We will call the executive director of

 5    NEOCH, Brian Davis, Your Honor.

 6              THE COURT:  Thank you.

 7              MR. CHANDRA:  Your Honor, before we begin, if we could

 8    discuss the issue of stipulations.

 9         Stipulations with regard to NEOCH were a bit more

10    tedious than with some of the others because there are some

11    that there was no objection, there's some where there's a

12    partial objection so my colleague, Ms. Gupta, can go through

13    and recite those things which are in each of those categories

14    for the Court.

15         I'm sorry, if we could have a moment to confer one last

16    time, Your Honor.

17              THE COURT:  Ms. Gupta, are you all --

18              MS. GUPTA:  Yes, Your Honor, I can read off the

19    portions of the exhibits that the Defendants and Plaintiffs

20    have stipulated to.

21              THE COURT:  All right.

22              MS. GUPTA:  And the specific nature of some of those

23    stipulations.  And you have to forgive me, some of these may be

24    out of order but I'm going to do the best I can here.

25              THE COURT:  Okay.  All right.  Thank you.
```

1    MS. GUPTA:  So the first category of documents that

2    the -- that we have stipulations as to are 1659 -- and these

3    are Plaintiffs' exhibits -- excuse me.

4         So Plaintiffs' Exhibit 1659, 1732, 1671, 1637 through

5    1640.  1682, 1558, 1413 through 1415.  Okay.  1678.

6         Now, there is a second category of documents to which

7    the parties have stipulated only as to -- so, excuse me, the

8    parties are stipulating as to their admissibility, but not for

9    the truth of the matter.

10         So documents that -- or exhibits that the parties are

11    agreeing will be admitted to show -- to show, for example, that

12    NEOCH has engaged in certain activities.

13         THE COURT:  Okay.

14         MS. GUPTA:  And those documents include the following:

15    1686, 1696, 1697, 1698, 1634, 1680, 1642, 1664, 1692, 1703,

16    1720, 1705, 1679, 1708, 1714, 1716, 1722, 1582.

17         THE COURT:  Wait a minute.  1716.

18         MS. GUPTA:  Uh-huh.  1722.

19         THE COURT:  1722.

20         MS. GUPTA:  Uh-huh.  And then 1582 through 1584.  And

21    then 1556, 1546, 15 -- oh, excuse me.  That covers that.

22         And then there's a third set here of documents that --

23    excuse me, let me back up.

24         In that last category there is -- there are two

25    additional documents -- well, no, there's one additional

1  document that -- that once excised and made a new document will

2  be in that last category.

3        So the new -- the old exhibit was 1534, but the part of

4  that that's going -- there's going to be a part of that that's

5  going to be -- that the parties have agreed to stipulate not as

6  to the truth of the matter but for other reasons, and that's

7  going to be the new Exhibit 7026.

8        And, similarly, there's a portion of the existing

9  Exhibit 1416 that will become 7027, and that portion of 1416 is

10 Bates number 667 to 677.

11        THE COURT:  But it's coming in as 7026 so you're

12 not -- you're not offering 1416, are you?

13        MS. GUPTA:  No.  I'm sorry, let me scratch that,

14 Your Honor.  This one is actually 7027.

15        THE COURT:  All right.

16        MS. GUPTA:  The one previous was 7026.

17        And then, finally, 7029 is -- this -- I'm sorry, 7029 I

18 don't think is only for the -- do you have a concern about the

19 truth of the matter for that one?

20        MS. RICHARDSON:  No, I don't.

21        MS. GUPTA:  7029 will fall into the first category of

22 documents which are admissible beyond, you know --

23        MR. CHANDRA:  Including for the truth.

24        MS. GUPTA:  Okay.  Thank you.

25        And that covers it, Your Honor.

 1        THE COURT:  All right.  Ms. Richardson, do you still

 2   stipulate?

 3        MS. RICHARDSON:  Yes, Your Honor, we stipulate.

 4        THE COURT:  All right.  So those documents -- make a

 5   note for the record that document 7029 is in the first category

 6   of documents as opposed to the second category.

 7        And with that caveat, they will be received.

 8        Ms. Richardson, is there anything further?

 9        MS. RICHARDSON:  Nothing further.  Thank you, Your

10   Honor.

11        MR. CHANDRA:  May I proceed, Your Honor?

12        THE COURT:  Yes, you may.

13        MR. CHANDRA:  Thank you, Your Honor.

14                           - - -

15                        BRIAN DAVIS

16    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

17                     DIRECT EXAMINATION

18   BY MR. CHANDRA:

19   Q.   Sir, you've been sworn in?

20   A.   Yes.

21   Q.   Could you please state your name for the record and

22   spell it?

23   A.   Brian Davis, B-R-I-A-N, D-A-V-I-S.

24   Q.   And what is your current position, sir?

25   A.   Executive Director of the Northeast Ohio Coalition for

1    the Homeless.

2        Q.   Could you please tell the Court about your educational

3    background?

4        A.   Sure.

5             I attended high school here in Columbus and then went to

6    college at Case Western Reserve University and graduated in

7    1989.

8        Q.   And what was your degree in?

9        A.   Political science and history.

10       Q.   And what did you do -- start doing professionally after

11   college?

12       A.   I started volunteering with the Coalition to assist them

13   in the publication of the street newspaper.

14       Q.   When you are referring to the Coalition, you're talking

15   about your current employer, the Northeast Coalition for the

16   Homeless?

17       A.   That's correct.

18       Q.   And so tell us more about what you did with the

19   Coalition as a volunteer.

20       A.   Recruited new vendors to sell the paper, wrote stories

21   for the paper, edited the stories and then printed it for

22   publication and sales on the street.

23       Q.   Judge Marbley being from Columbus may not be familiar

24   with the paper.  Could you please describe what it is?

25       A.   It's similar, actually, to the paper that's in Columbus,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 159 of 241 PAGEID #: 1775
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/18 Page: 159 of 241 PAGEID #: 20330

Vol. 4 - 159

```
 1   but it's a 16-page newspaper written about half of the stories

 2   by homeless people, and then they sell it on the streets for a

 3   dollar at that time, now a $1.25.

 4           THE COURT:  What's the name of the paper?

 5           THE WITNESS:  It was called the Homeless Grapevine in

 6   Cleveland.  Now it's called the Homeless Street Chronicle in

 7   Cleveland.

 8   BY MR. CHANDRA:

 9   Q.   What was it that as a recent college graduate attracted

10   you to that particular role?

11   A.   I thought it was wonderful having guys write down their

12   stories and sell them on the streets as an alternative to

13   panhandling, much like the founding fathers did on the streets

14   of Boston in New England.

15   Q.   So then did your role with the Coalition evolve over

16   time?

17   A.   Yes.  A position opened up, and I became the program

18   director for the Coalition under the umbrella of the Cleveland

19   Tenants Organization who had taken over the organization for a

20   brief period of time while we struggled with finances back in

21   the 1990s.

22   Q.   About when was it that you took that program director

23   position?

24   A.   1995.

25   Q.   And what is the Cleveland Tenants Organization?
```

1    A.    They are in -- they assist in implementation and

2    enforcement of the landlord/tenant law in Cleveland.

3    Q.    Okay.  And so what did you do in that role?

4    A.    Basically the Coalition was without any staff at that

5    time so I started developing programs and basically took the

6    organization from a position of relying mostly on volunteers to

7    reestablishing its nonprofit status and reestablishing it as a

8    viable organization within Cleveland.

9    Q.    And what specific programmatic activities were you

10   engaged in in that position?

11   A.    Mostly advocacy, public policy, some coordination of

12   services to homeless individuals, and the street newspaper.

13   Q.    Okay.  Well, we'll come more to what the Coalition does.

14        Tell us about your continued career progress in the

15   organization.

16   A.    We broke away from the Cleveland Tenants Organization in

17   the late 1990s, and I became the executive director then and

18   remained the executive director through the financial downturn

19   in 2008.  The organization wanted to then hire a big name to

20   try and bring in additional dollars, and so I became the

21   community organizer at that time and we had a series of interim

22   executive directors.  We never were able to find a big name to

23   raise funds so we -- so the board reappointed me in 2015 as the

24   executive director.

25   Q.    Okay.  So did your moving from the executive director to

1   the community organizer position have anything to do with

2   performance?

3       A.    No.  I still did most of the administration, development

4   and implementation of the programs of the Coalition.  We just

5   had an interim executive director who would sign documents and

6   act as the executive director for public purposes, media, those

7   kind of things.

8       Q.    What prior role, if any, did the interim executive

9   director have with the Coalition?

10      A.    Both the interim executive directors had been board

11  members of the Coalition.

12      Q.    Okay.  And so what year did you say you came back to

13  being executive director?

14      A.    Last year, 2015.

15      Q.    All right.  What is it that drew you to this work of

16  working with homeless populations?

17      A.    I wanted to be a community organizer, and homeless

18  people and those who are living in subsidized housing are

19  oftentimes left out in public discussions so I wanted to

20  participate and get involved in some of the issues that are

21  facing the -- usually the lowest income individuals in our

22  community.

23      Q.    What is the Northeast Ohio Coalition for the Homeless?

24  What kind of organization is it?  First of all, is it a

25  for-profit organization?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 162 of 241 PAGEID #: 1778
Case: 2:06-cv-00896-ALM-TPK Doc #: 653 Filed: 04/06/10 Page: 162 of 241 PAGEID #: 21338

Vol. 4 - 162

1    A.    It's a nonprofit charitable organization.

2    Q.    Organized under 501(c)(3)?

3    A.    Yes.

4    Q.    And what is its purpose?  What does it do?

5    A.    We came together in the 1980s to address the huge

6    numbers of families that were showing up homeless in our

7    community.  We didn't have a response at that time, and the

8    primary purpose when we started was to try and improve services

9    to families in Cleveland.  And so from our founding we had

10   always been an advocacy public policy organization to raise the

11   issues around the lack of housing, lack of jobs, healthcare,

12   civil rights issues facing homeless people, and we are a

13   membership organization with both individual and organizational

14   members.

15   Q.    When you talk about advocacy, what are you referring to?

16   What specifically would the organization do?

17   A.    The big areas that we focus on are healthcare, housing,

18   income and civil rights.  And civil rights include the right to

19   shelter, the right to a decent shelter, and voting activities

20   are under our advocacy in the civil rights area.

21   Q.    Okay.  With whom -- and the answer may vary depending on

22   the category, but to whom do you advocate as an organization?

23   A.    Our basic goal is to make sure that the voices of

24   homeless people are heard at city hall, at the county

25   administration building, and in the media.  So we're trying to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed 09/12/20 Page 163 of 241 PAGEID #: 1779
Case: 2:00-cv-03843-MHW-TPA Doc #: 658 Filed 04/06/20 Page 163 of 241 PAGEID #: 23338

Vol. 4 - 163

 1    advocate and trying to bring the problems faced by homeless

 2    people to elected officials and keep that in their mind and not

 3    have them ignore these very critical issues in the community.

 4       Q.   Okay.  So you started to mention the voting advocacy.

 5    Could you please explain to the Court how it is that voting

 6    rights fit into the Coalition's interests and objectives?

 7       A.   Sure.  One of the original things that attracted -- that

 8    got my attention from the Coalition was a picture of these nuns

 9    who were being sworn in to be -- to go out into the community

10    and register homeless people.  So from our founding, which a

11    lot of religious organizations were among the original founding

12    board of the Coalition, one of the primary objectives was

13    voting and making sure that homeless people participate in both

14    being registered and then getting out and actually voting.

15       Q.   But why is that an important part of the advocacy you

16    mentioned with respect to city hall and other elected

17    officials?

18       A.   Because elected officials don't often think that

19    homeless people participate in the voting process, and so if

20    you can sit down with a mayor or city council member and say,

21    you know, we have X number of voters who are here with us, that

22    says a lot more than just people who are coming with issues

23    with government.  We always try to couch our advocacy around we

24    represent a group of voters who will participate in a

25    democracy.

1    Q.   And when you've had those conversations with elected

2    officials, in your perception has that had any impact on your

3    success in the advocacy on policy issues that you engage in?

4    A.   Yes.  I think we've had a lot of success over the years

5    in improving the conditions in the shelter which are entirely

6    local decisions.  We've had a lot of success in protecting the

7    rights of homeless people in Cleveland.  We have an agreement

8    that the police will not harass people for purely innocent

9    behavior on the streets.  And all of that comes from being able

10   to show that we have voters who are sitting before you to say,

11   you know, they -- they care.  They -- even though they're

12   moving frequently, moving in shelters, they do certainly

13   participate in the process.

14   Q.   Okay.

15        THE COURT:  Is that agreement that you reached with

16   the Cleveland police department part of a Memorandum of

17   Understanding?  Was it memorialized?

18        THE WITNESS:  Yes.  It's a federal settlement.  We

19   sued in federal court to get some protections and, yeah, it's

20   one of the few in the United States that is memorialized in an

21   actual signed consent decree with the City of Cleveland.

22        THE COURT:  It only related to -- it only related to

23   the homeless, though?

24        THE WITNESS:  Yes.  Yes.  I mean, that's our

25   membership so yes.

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

 1          THE COURT:  I take it that Tamir Rice's family were

 2   not homeless, though?

 3          THE WITNESS:  No, they were not for some period of

 4   time, Your Honor.

 5   BY MR. CHANDRA:

 6     Q.   Mr. Davis, so from your perspective as executive

 7   director of the Coalition, what impact then does

 8   disenfranchisement of the Coalition's homeless constituency

 9   have on the ability of the Coalition to engage in its advocacy

10   efforts with elected and other public officials?

11     A.   Yes.  Since our founding it's been a core part of our

12   mission, and we would consider that the work that we do in

13   registering and transporting individuals to actually vote that

14   were diminished if they were then -- we would consider it a

15   failure if those individuals go to all that trouble, and then

16   their ballot wasn't counted.

17     Q.   And, I'm sorry, I wasn't clear with my question.

18          What impact would disenfranchisement of those voters

19   have on the Coalition's advocacy efforts with public and other

20   elected officials?

21     A.   Well, I think if we are unsuccessful, then we can't show

22   as broad a constituency to our elected officials.

23     Q.   Okay.  Could you please describe what NEOCH's advocacy

24   activities are with respect to voting rights, or its activities

25   with respect to voting rights?

1   A.    Sure.  We take the lead in --

2   Q.    Let me withdraw that.  Let me come to that.  Let me ask

3   you a foundational question.

4         Have you had the opportunity as the executive director

5   of NEOCH over the years to observe or have knowledge about what

6   the particular voting rights challenges are for homeless

7   populations?

8   A.    Yes.

9   Q.    And how have you developed that experience?

10  A.    As the executive director, I oversee all of the voting

11  operations from the training that we do to -- through the

12  registration drives, the meetings that we have with urging

13  people to Get Out The Vote, and then driving people -- helping

14  them through that process and then making sure that their

15  ballots did count.

16  Q.    And over the course of how many years have you been

17  engaged in those activities?

18  A.    Since the -- since I started even volunteering at the

19  Coalition.

20  Q.    So since the late 1980s?

21  A.    No, since 1994.

22  Q.    Okay.  And then would the same experience be true for

23  your time, your stint, as a community organizer when you were

24  not in the executive director role?

25  A.    Yes.

Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/20 Page: 167 of 241 PAGEID #: 23533

1    Q.   So then based on that experience that you have, what

2    are, if any, the particular challenges that face the homeless

3    populations in voting?

4    A.   We rely on a residential system, a ward-based -- a

5    precinct-based system.  So homeless people move frequently and,

6    therefore, they face challenges of regularly having to update

7    their registration to the point that, you know, we -- we limit

8    our activities to the summer before the election because people

9    move so frequently.  And homelessness is, for the most part for

10   the majority of people, only a short-term stay of their life,

11   and so we know that they are having to continue to change their

12   registration.

13        There's also a question about whether -- you know, what

14   address do they use.  That's always a difficulty for homeless

15   people because oftentimes it's more where they get their mail

16   than where they are actually residing on that day.

17        And then you have the complication of what happens if

18   you become homeless after the registration deadline and the

19   validity of your ballot using provisional ballots.

20   Q.   Are there issues with identification?

21   A.   Yes.

22   Q.   Describe those, please.

23   A.   Because people are moving so frequently and even moving

24   every other day into a new bed, they often lose their important

25   documents.  They're either lost or stolen.

1    So we have to assist individuals, and we helped start

2    what was called an I.D. collaborative with all the social

3    service providers in Cleveland to provide the money for

4    identification and then the expertise in navigating the 50

5    different states' rules for how to get the basis of all I.D.,

6    which is a birth certificate.  So we do between 3000 and 4000

7    pieces of I.D. -- of individuals to receive pieces of I.D.

8    every year because most of our population are regularly losing

9    their I.D. or having struggles with keeping those important

10   documents with them.

11   Q.   When did those particular efforts start with respect to

12   the I.D. help activities?

13   A.   In 2005.  For our -- the Coalition began to organize an

14   effort in 2005.

15   Q.   And was that in reaction to anything?

16   A.   That was in reaction to the law that forced people if

17   they were voting in person to have to show an I.D., yes.

18   Q.   And what did they have to do before that to prove

19   identity?

20   A.   They had to sign their name and declare that they were

21   who they said they were when they showed up.

22   Q.   So in addition to the issues that you've mentioned so

23   far for the particular challenges of homeless populations, are

24   there other issues?

25   A.   With regard to voting I think there's -- there's an

1    issue with transportation to the -- either on Election Day to

2    the precinct of origin or the precinct that they're registered

3    at, or before the election transportation issues to the early

4    voting site.  We -- we certainly try to overcome that, but

5    transporting on your own is very difficult and very expensive.

6          The other issue is the U.S. mail system, how it really

7    is cumbersome for a homeless individual to find a place to

8    receive mail from housing authorities, as well as the Board of

9    Elections.

10   Q.    With the -- you mentioned the receipt of mail issue.

11   Could you please explain more to the Court why that would be a

12   problem?

13   A.    The U.S. mail system has no issue with the shelters

14   being declared residences, but we have many homeless people who

15   sleep on the street or move around from one shelter to the

16   other and so, therefore, use a drop-in center, a daytime

17   shelter basically that serves food as their residence.  And the

18   postal service has been -- we've been in negotiations actually

19   since October over these sites being declared commercial --

20   commercial property or commercial mailing addresses, and so

21   we're having to struggle with whether those can be used by the

22   homeless on both the east side and west side as actual

23   residences -- or actually where they can receive mail and will

24   that mail then go back if the postal service says --

25   Q.    What do you mean by go back?

1  A.   Go back to -- will they not deliver it because it's not

2  a residence.  And then the mail would go back to the -- to

3  the -- either the housing authority or social security office

4  or the Board of Elections.

5  Q.   You discussed issues with transportation.  And is there

6  any particular challenge associated with the homeless voter

7  simply waiting until Election Day to vote as opposed to the

8  early in-person option that you mentioned that would require

9  transportation?

10  A.   So in my experience in helping people register, about

11  half the individuals use a family member or friend or a place

12  that is reliable for receiving mail as their address, and so

13  they would then have to go to that precinct in order to vote

14  because they couldn't vote near the shelter, typically, because

15  that's not where they're usually from, that's not where they're

16  usually receiving mail so the 50 percent would have to figure

17  out the precinct that they would need to go to and then find

18  the transportation out to that area.

19       And, you know, as I said, people are regularly becoming

20  homeless, and we've had to transport people, you know, to

21  Summit County, to surrounding areas because they became

22  homeless in the 30 days after -- or they became homeless after

23  the registration deadline was over.

24  Q.   Have you had any experience with whether in-person

25  voting versus early in-person voting, so-called absentee

1  voting, whether one or the other leads to greater instances of

2  provisional ballots being provided to the voters?

3    A.   So after the I.D. law went into place, we downplayed

4  voting on Election Day.  Still made it available, still had

5  volunteers assist on that day, but there's a higher likelihood

6  that they won't have I.D. and they'll have to vote a

7  provisional ballot.

8       We try as hard as we can to avoid a provisional ballot

9  because of the problems associated with it and the different

10  interpretations.  So we always try to focus on early -- oh, and

11  the other issue is that if you are taking somebody out to the

12  precinct, those are volunteers that are only typically working

13  one or two times a year and don't have the -- as much knowledge

14  as the Board of Elections employees if you vote early.

15    Q.   But what is the concern about provisional balloting?

16    A.   The affirmation.  You can make mistakes on it and,

17  therefore, your ballot wouldn't count.  There are -- we just

18  think that it's another layer of complication that trips up our

19  voters.  And so while we still help with people on Election

20  Day, we certainly have downplayed the importance of that and

21  recommend early voting.  And certainly in the past we

22  recommended Golden Week as the best chance for a homeless

23  individual to vote.

24    Q.   And Golden Week was what?

25    A.   Was the time that you could register and vote at the

1   same time, and it was not allowed in 2014.

2   Q.   Okay.  I would like to turn your attention now to the

3   second supplemental complaint where the Coalition is a

4   plaintiff.

5        Why did Northeast Ohio Coalition for the Homeless file

6   the second supplemental complaint?

7   A.   It -- so we had gone through this lawsuit regarding

8   I.D.s, had come to a consent decree that we felt was workable

9   for everyone, and we've had over the years a series of attempts

10  by the legislature to undermine what we felt was that

11  agreement, especially the purpose of that consent decree.

12  Q.   And what specific purposes did you feel were being

13  undermined?

14  A.   That every indigent and homeless individual's legitimate

15  ballot get counted, and that provisional ballots, no matter if

16  there are disparities throughout the 88 counties, that those

17  still should be counted.

18  Q.   If you're able, what specifically is the concern with

19  regard to Senate Bills 205 and 216 challenged in the second

20  supplemental complaint that imposes an impediment to the

21  ballots of homeless individuals, including your members, having

22  their ballots counted?

23  A.   Well, in both the absentee ballots by mail and in the

24  provisional ballots, we think that there is legitimate voters

25  as described in the consent decree whose ballots are being

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 173 of 241 PAGEID #: 1789
Case: 2:06-cv-00896-ALM-TPK Doc #: 653 Filed: 04/06/28 Page: 173 of 241 PAGEID #: 21384

Vol. 4 - 173

1    tossed out even though the Boards can identify who those

2    individuals are and, therefore, those votes which we feel are

3    extremely important are not counted.

4        Q.   Do you believe that that includes homeless voters voting

5    using social security numbers as identification?

6        A.   Yes.

7             MS. RICHARDSON:  Objection.

8    BY MR. CHANDRA:

9        Q.   How so?

10            THE COURT:  Just a second.  You had an objection,

11   Ms. Richardson?

12            MS. RICHARDSON:  I do, Your Honor; leading.

13            THE COURT:  Sustained.  Rephrase your question.

14            MS. RICHARDSON:  Thank you, Your Honor.

15   BY MR. CHANDRA:

16       Q.   So let me back up a little bit and try to understand --

17   you've described the issues with identification homeless voters

18   have.  Could you please tell us what forms of identification do

19   homeless and indigent voters typically use?

20       A.   After -- I mean, we do help with that so we try to get

21   the proper documents, but that's one of the reasons we avoid

22   Election Day as our focus because we never know if they've lost

23   their I.D. or they don't have either the State I.D. or their

24   birth certificate so we avoid that.  And most -- most of the

25   time they're going to use the last four digits of their social

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 174 of 241 PAGEID #: 1790
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/16 Page: 174 of 241 PAGEID #: 23399

Vol. 4 - 174

1   as an alternative because, you know, as I said, a

2   significant -- thousands of people in Cuyahoga County who

3   become homeless lose their documents.

4       Q.   What was your understanding of the protections of the

5   consent decree with respect to those social security number

6   voters?

7       A.   That their ballots would be counted.  Not just in

8   Cuyahoga County, but throughout the State.

9       Q.   Did you have an understanding that there was any special

10  conditions in addition to the SSN that would be imposed upon

11  those voters before their votes would be counted?

12      A.   No.

13      Q.   All right.  And so turning back to the question of

14  Senate Bills 205 and 216, what concerns do you have with

15  respect to those bills' provisions and their impact on those

16  social security number voting voters who are homeless and

17  indigent?

18      A.   That it undermines the agreement that we had in the

19  consent decree because legitimate voters are having their

20  ballot thrown away for reasons that are minor not -- not having

21  anything to do with whether the Board of Elections can identify

22  the individual.  And I really think that the -- the ballot

23  needs to be preserved.  I think that, you know, if homeless

24  people go to the trouble of figuring out what the registration

25  is, where they're residing and matching that to the Ohio

Vol. 4 - 175

1   system, that we should give the benefit of the doubt if these

2   voters show up to vote in person.

3   Q.   So during the course of this litigation have you had the

4   opportunity to review documents that were produced by the

5   Cuyahoga County Board of Elections?

6   A.   Yes.  We -- I went over all of the provisional ballots

7   that were discarded, as well as the absentee ballots that were

8   discarded.

9   Q.   Okay.  I would like to show you one such ballot in

10  particular.  If we could please bring up Plaintiffs' Exhibit

11  2398.  Okay.  Actually -- okay.

12       Let's withdraw that, and instead I'll put on the screen

13  Plaintiffs' Exhibit 7017.

14       MR. CHANDRA:  I believe this has been admitted

15  already, Your Honor.

16       THE COURT:  What number is that?

17       MR. CHANDRA:  7017, Plaintiffs' Exhibit, Your Honor.

18       And, Your Honor, to clarify, these were previously

19  contained within Plaintiffs' Exhibit 1063 and now they've been

20  broken out.  So let me just show them to opposing counsel,

21  Your Honor, and make sure there's no objection.

22       THE COURT:  All right.

23       MR. CHANDRA:  My understanding, Ms. Ryan will not

24  admit to their admission, Your Honor.  That's Plaintiffs'

25  Exhibit --

```
 1              THE COURT:  You mean she doesn't object to their

 2    admission?

 3              MR. CHANDRA:  Yeah.  Plaintiffs' Exhibit 7017 and

 4    7018, those are the two documents I'm going to use.

 5              THE COURT:  Any objection, Ms. Richardson?

 6              MS. RICHARDSON:  No objection, Your Honor.

 7              THE COURT:  All right.  7017 and 7018 will be

 8    received.

 9              MR. CHANDRA:  I apologize.  I called her Ms. Ryan

10    again.  I apologize, Ms. Richardson.

11    BY MR. CHANDRA:

12      Q.   So putting Plaintiffs' Exhibit 7017 back on the screen,

13    this is a Mr. Arnold.  Is this one of the documents that you

14    reviewed from Cuyahoga County as part of this litigation in

15    this case?

16      A.   Yes.

17      Q.   Okay.  And do you understand from looking at this

18    document the significance of this document with respect to your

19    concerns about the homeless population and voting?

20              MS. RICHARDSON:  Objection.

21              THE COURT:  Sustained.  Rephrase your question,

22    Mr. Chandra.  That was leading.

23              MS. RICHARDSON:  Thank you, Your Honor.

24              MR. CHANDRA:  Thank you, Your Honor.

25    BY MR. CHANDRA:
```

1    Q.    Is there anything about Plaintiffs' Exhibit 7017,

2   Mr. Arnold's application here, that you find significant?

3    A.    I'm aware that he registered at the address of 2100

4   Lakeside, which is the largest shelter in Cuyahoga County.

5    Q.    Okay.  And then --

6    A.    And then he had his absentee ballot tossed out because

7   the address that he included in the street address isn't

8   correct.

9         MS. RICHARDSON:  Objection.

10         THE COURT:  Basis?

11         MS. RICHARDSON:  Outside of the scope of this witness'

12   knowledge.

13         MR. CHANDRA:  I can lay some additional foundation.

14         THE COURT:  I'm going to sustain your objection at

15   this time, Ms. Richardson.  You may lay some foundation,

16   Mr. Chandra, that will allow Mr. Davis to give that level of

17   information.

18         MR. CHANDRA:  Okay.  Thank you, Your Honor.

19   BY MR. CHANDRA:

20    Q.    Did you review public records of the Cuyahoga County

21   Board of Elections as to what happened with this particular

22   voter's ballot?

23    A.    Yes.

24    Q.    And what was that?

25    A.    We reviewed all of the ballots that were not accepted

1    for absentee voting in both 2014 and 2015 and all the ballots

2    that the provisional affirmation form were not accepted in both

3    2014 and 2015.

4        Q.    Okay.  Just so we can break your testimony into pieces

5    here, what's the significance of the address that you were

6    telling the Court about?

7        A.    2100 Lakeside is the largest men's shelter in Ohio, and

8    it was the location that Mr. Arnold used as -- on his

9    registration form.

10       Q.    And did you -- from your review of Board of Elections

11   records, was there an explanation as to the reason that -- or

12   the purported reason that Mr. Arnold's ballot was rejected?

13       A.    It was in the folder of absentee -- or vote by mail

14   applications that were not valid that were not in the documents

15   from Cuyahoga County.

16       Q.    Okay.  And were you able to tell from your review of the

17   records on what basis it was deemed not valid?

18       A.    Yes.  We reviewed the absentee ballot request form, and

19   there was an issue with the address being different than the --

20   than the voter.  Plus, if you go back --

21       Q.    That's the second page of this exhibit?

22       A.    Right.  But if you go back, I think that the --

23       Q.    Back to the first page?

24       A.    Yeah.  Yeah.  Yeah, I mean, his address should have been

25   2100 Lakeside because that's the indication on the label on the

Vol. 4 - 179

1  right.

2  Q.  Okay.

3  A.  That's where he's registered, according to Cuyahoga

4  County.

5  Q.  So just to be clear we understand your testimony, on the

6  form accompanying the ballot there's a different address than

7  was on the absentee ballot request form?

8  A.  Yeah.  The address that he included is different than

9  the one that --

10  Q.  That he included with what?

11  A.  That he included on the envelope at 130 something

12  West -- I can't read -- 13th or 83rd.  Whatever that address is

13  is not correct.

14  Q.  Okay.  I'm going to show you Plaintiffs' Exhibit 7018,

15  and this appears to be a Mr. Davis?

16  A.  Robert Davis, yes.

17  Q.  Robert Davis.

18      And then -- what is the address on this form on the top

19  page which is the form accompanying the ballot?

20  A.  On the right-hand side, or --

21  Q.  Number 2, blank 2.

22  A.  He marked 1200 Ontario.

23  Q.  What's the significance of that address for those who

24  don't live in Cleveland?

25  A.  That's the jail address.  That's the actual physical

1    jail address.

2        Q.    And then if you look at the second page of Plaintiffs'

3    Exhibit 7018, what is the address that Mr. Davis put on his

4    application for an absentee ballot?

5        A.    He used the large shelter, 2100 Lakeside, as his

6    address.

7        Q.    Okay.  And would that have been the registration

8    address, to your knowledge?

9        A.    Yes.  That should have been the registration -- that's

10   indicated on the envelope also as the Board of Elections

11   address for him.

12       Q.    And then just to put Plaintiffs' Exhibit 7018 back on

13   the screen, could you point out the address to which the Board

14   of Elections apparently mailed the ballot?

15       A.    It's mailed to the P.O. Box for the Cuyahoga County

16   jail.

17       Q.    Okay.  So that P.O. Box corresponds with the jail, to

18   your knowledge?

19       A.    Right.  And his address is up at the top there, his

20   registration address, and it says in littler letters 2100

21   Lakeside Avenue.

22       Q.    I'm sorry, where does it say that?

23       A.    Right underneath the barcode.

24       Q.    Oh, I see.  Okay.

25            Okay.  And so I want to point out one other thing with

Vol. 4 – 181

1    respect to these two exhibits, 7017 and 7018, and that is this:

2         If you look at 7017 blank 4 and also on the second page,

3    the checkmarked form of I.D, what did Mr. Davis -- or, sorry,

4    what did Mr. Calvin use to -- as his I.D. for voting purposes?

5    A.   The last four digits of his social security number.

6    Q.   And are the numbers consistent on both documents within

7    Plaintiffs' Exhibit 7017?

8    A.   Yes.

9    Q.   Similarly, with respect to Mr. Davis, Plaintiffs'

10   Exhibit 7018, what did Mr. Davis use for his I.D. for voting

11   purposes?

12   A.   On the envelope he used the last four digits of his

13   social security, and on the application he also used the same

14   four digits.

15   Q.   Okay.  And so from your vantage point as the Coalition's

16   executive director, what is the significance of the

17   disenfranchisement of these two voters with regard to the

18   social security number consent decree issue you were talking

19   about earlier?

20        MS. RICHARDSON:  Objection.

21        THE COURT:  Basis?

22        MS. RICHARDSON:  Leading and outside the scope of this

23   witness' knowledge.

24        THE COURT:  Overruled.

25        MS. RICHARDSON:  Thank you, Your Honor.

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

1           THE WITNESS:  Both individuals --

2    BY MR. CHANDRA:

3      Q.    Could you speak right into the microphone?  I'm sorry.

4      A.    Both individuals were homeless, unfortunately went to

5    jail and tried as hard as they could to vote, and their ballots

6    were tossed out.

7      Q.    What is your view as a party to the consent decree -- as

8    a representative of a party to the consent decree about the --

9    whether these two votes should have been counted under the

10   consent degree?

11          MS. RICHARDSON:  Objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  These were both legitimate voters that

14   should have been allowed to vote, and I think that it

15   undermined the consent decree.

16   BY MR. CHANDRA:

17     Q.    Now, do you have an understanding from your dealings

18   with the Cuyahoga -- well, let me back up and lay a foundation.

19          Do you engage on a regular basis with the staff of the

20   Cuyahoga County Board of Elections?

21     A.    Yes.

22     Q.    Including their leadership?

23     A.    Yes.

24     Q.    And from that engagement and your voting rights

25   advocacy, have you developed your own understanding about what

1    their process is for dealing with SSN 4 voters?

2    A.   They have a number of documents that go through the

3    consent decree and then call it the NEOCH voters and have

4    pretty clear directions -- especially at the Board -- for the

5    staff at the Board of Elections for making sure that our voters

6    have their vote count when they show up.

7    Q.   Now, in making the claim that you just did about these

8    particular two voters and the NEOCH consent decree, are you

9    contending that the signature shouldn't have to match?

10    A.   No.

11        MR. CHANDRA:   Okay.  May I have a moment to confer on

12    this topic, Your Honor?

13        THE COURT:   Yes.

14        MR. CHANDRA:   Thanks for the moment, Your Honor.

15   BY MR. CHANDRA:

16    Q.   Okay.  I would like to turn your attention now to

17    NEOCH's membership, the Coalition's membership.  You've

18    described what the organization does.  Could you please explain

19    how it is organized?  I mean, it's called a coalition.  Why is

20    that?

21    A.   Because we have both organizational and individuals who

22    on a yearly basis say that they agree with the mission of the

23    Coalition and want to support the efforts and support our

24    advocacy goals for the year so they sign a document that says

25    they are members of the Coalition.

1    Q.   Okay.  We'll come back to the organizational members,

2    but let's start with the individual members.

3         Is there any other category, by the way, that we've left

4    out?

5    A.   No.

6    Q.   Let's start with the individual membership category.

7    How does an individual become a member of the NEOCH?

8    A.   They -- they sign a form and return it to the Coalition.

9    Q.   Okay.  And do they become a member in perpetuity at that

10   point?

11   A.   No.  They have to maintain contact with the organization

12   so we do a membership mailing usually starting in November to

13   individuals who have supported us in the past and ask that they

14   renew their membership.  We also have homeless individuals at

15   our meetings and our direct contact with homeless individuals

16   that we ask them please can you sign this form that says that

17   you will -- that you want to be a member, you want to receive

18   information from the Coalition.  And those individuals, as long

19   as they maintain contact with us, are coming to meetings or are

20   somehow involved with the Coalition throughout the year, they

21   can maintain their membership status.

22   Q.   So NEOCH's individual membership category does include

23   homeless members?

24   A.   Yes.

25   Q.   About how many -- well, first of all, how many

Vol. 4 – 185

1    individual members do you have, approximately?

2    A.   About 400.

3    Q.   And approximately how many of those are currently

4    homeless, to the best of your knowledge?

5    A.   Well, currently homeless is not very many, but remember

6    we've maintained them on our rolls so there's about 60 who

7    have -- when they signed up as a member, they were homeless.

8    Q.   Okay.  Subject to the renewal process that you

9    described?

10   A.   Right.  That's right.

11   Q.   Okay.  You mentioned earlier in your testimony that most

12   homeless people don't stay homeless for very long.  Could you

13   please explain that more as to what the typical process is,

14   recognizing that there will be outliers?

15   A.   Yeah.  So it averages about 20 some days for a single

16   individual in Cuyahoga County.  That's the average time that an

17   individual stays homeless.

18   Q.   I'm sorry, could you repeat that?

19   A.   It's like 22 days on average for a single individual,

20   and it's about 52 to 54 days for a family.  That's the typical

21   time they stay homeless in Cuyahoga County.  So most people are

22   short periods of time.  They may be multiple short periods of

23   time throughout the year, but they're only staying homeless for

24   a brief period of time.  And that also has to do with the

25   federal definition of homelessness is very limited so it's

Vol. 4 - 186

1   really those who are sleeping outside or sleeping in a place

2   not fit for human habitation.  So those who stay with family

3   and friends, they actually lose their status as a homeless

4   individual.

5   Q.   Do you have members who are racial minorities?

6   A.   Yes.

7   Q.   And, if you know, what percentage of your membership may

8   be racial minorities?

9   A.   So I wouldn't know the individual members that we

10  communicate with by mail, but since we're taking the forms in

11  person from homeless individuals, it's about 70 percent of the

12  population are African American.

13  Q.   Are you familiar with the homeless population statistics

14  for Cuyahoga County?

15  A.   Yes.  We -- we request those every year from Cuyahoga

16  County, and we actually post them on our website.

17  Q.   And where does your membership stand in relation to

18  Cuyahoga County's statistics?

19  A.   It mirrors the Cuyahoga County statistics.

20  Q.   So somewhere around 70 percent?

21  A.   Yeah.  Because we're generating our membership in the

22  shelters which is the same population that the county is

23  counting.

24  Q.   All right.  So do you know whether -- have you studied

25  whether any of your individual members voted in 2014?

1    A.    Yes.  We looked through the Cuyahoga County database for

2    all of the homeless members, as well as all of the people that

3    we register to vote.

4    Q.    And what have you determined in terms of the voting

5    patterns and whether people are voting from your membership?

6    A.    It's a pretty significant portion of our members do

7    vote.

8    Q.    Do you have an approximate idea of the percentage?

9    A.    Well, the last time we were able to get a good figure is

10   2012, the presidential election, and it was 72 percent of the

11   individuals voted, the membership and the people that we

12   registered.

13   Q.    And what about 2015?  Have you had the opportunity to

14   review Cuyahoga County's voting records?

15   A.    Yes.  We looked through 2014 and 2015 and determined

16   that some of our members did vote in both years, 2014 and 2015.

17   Q.    Were the percentages similar to the 2014 or 2012 figure

18   that you used?

19   A.    No.  It's much smaller than that.

20   Q.    Is that a typical thing in off-presidential election

21   years?

22   A.    Yes.

23   Q.    Do you have any knowledge, personal knowledge of

24   intentions by your individual members to vote in 2016?

25   A.    Yes.

1    Q.    And how do you know that?

2    A.    We've surveyed a number of our members to ask if they're

3    going to vote this year.

4    Q.    Okay.

5    A.    And, actually, it's also the first question on the

6    membership form.

7    Q.    Okay.  And so at what percentage does the information

8    that you have suggest that people are going to vote in 2016?

9    A.    Of all the people that we've talked to, only one was not

10   going to vote in 2016.

11   Q.    Was there any -- for voting in 2016, was there any

12   racial disparity where, you know, if you look at the race of

13   your membership percentage African American and the percentage

14   white, do you see a divergence at all in who intends to vote?

15            MS. RICHARDSON:  Objection.

16            THE COURT:  Basis?

17            MS. RICHARDSON:  Your Honor, may I request a sidebar?

18            THE COURT:  Yes, you may.

19            MS. RICHARDSON:  Thank you.

20                                - - -

21      Thereupon, the following proceeding was held at sidebar out

22   of the hearing of the open courtroom:

23            MS. RICHARDSON:  At this point it appears that he's

24   offering this testimony on the basis of a survey that was

25   issued and there's been no evidence presented as to what that

Vol. 4 – 189

1    survey is, what questions were included, what the methodology

2    was, whether he was involved.

3           MR. CHANDRA:  If I may, Your Honor.  So this is a

4    member organization and there are a lot of member

5    organizations -- the NRAs -- that survey the sentiment of their

6    members to make decisions.  And so then they speak -- because

7    they are a membership-based organization, they're able to speak

8    to where their members are coming from.  I don't think there's

9    any question about the general reliability of the information

10   he's presenting.  He's not certainly claiming it's

11   mathematically certain in any way.  He's simply describing.

12   And he testified that a hundred percent of the people he's --

13          THE COURT:  Is this a discovery-related issue,

14   Ms. Richardson?  That is, are you getting to we want a copy of

15   the survey?  Is that where you are headed with this?

16          MS. RICHARDSON:  That's part of it, Your Honor.  We

17   have not seen the survey.

18          THE COURT:  Was it requested?

19          MS. RICHARDSON:  We have requested all statistical

20   evidence that they relied upon.  Beyond that, for purposes of

21   the testimony today, there's no foundation, and at this point

22   it would seem to be hearsay.  A hundred percent membership, the

23   survey could have been issued to two individuals.

24          MR. CHANDRA:  But as a member-based organization, he's

25   talking about his own members so I don't see how that's

1    hearsay.

2          And if I could respond to the discovery issue.  So this

3    was apparently -- my understanding from Ms. Gupta, this was

4    addressed in the interrogatory responses, and I do recall that

5    as well.  So I don't know what --

6          THE COURT:  Was a copy of the survey turned over to

7    the State?

8          MR. CHANDRA:  I don't know that it was requested.

9          So there is no written survey.

10         THE COURT:  Okay.  So this is like talking to your

11   constituency about their general attitudes?

12         MR. CHANDRA:  Correct.  All that could be addressed on

13   cross in terms of the weight the Court gives it.

14         THE COURT:  Could you read back the question, please,

15   Ms. Coulter?

16      (Question read back.)

17         MS. RICHARDSON:  Your Honor, may I -- the question

18   previous to that one actually related to the survey.

19         THE COURT:  So you don't object to this survey -- to

20   this question?

21         MS. RICHARDSON:  To the extent that he's relying on

22   the survey that was referenced in his prior answer, that was

23   the basis for my objection.  If he's describing his general

24   understanding, that is a different issue.

25         THE COURT:  Right.  I understand.

1        Ms. Coulter, could you go back the question before that,

2   then?

3      (Question read back.)

4          THE COURT:  So there was no written survey?

5          MR. CHANDRA:  Correct.  But he specifically asked

6   members orally --

7          THE COURT:  I understand that.  I understand that

8   part.  All right.  I don't know that it is -- when you're

9   dealing with groups like this, it's not an individual

10  conversation -- or I don't know that it's individual

11  conversations.  I don't know how he, you know, came in his

12  possession of this information.  I don't know that it's being

13  offered for its truth as much as being offered to show what

14  steps NEOCH took and what steps he took as NEOCH's executive

15  director.

16        Based on that, I'm going to find that it's not

17  inadmissible testimony because of hearsay.  I think that I

18  agree with Mr. Chandra that this is something that you can

19  certainly explore on cross-examination.

20        So I'm going to overrule the objection at this time.

21        MS. RICHARDSON:  Thank you, Your Honor.

22      (Back in open court.)

23          THE COURT:  Mr. Chandra, please continue.

24          MR. CHANDRA:  Your Honor, I did want to mention there

25  are two more exhibits that fall into the first category.  Those

 1   are, with Ms. Richardson's permission, 1560 and 1562.

 2          THE COURT:  All right.  Any objection?

 3          MS. RICHARDSON:  Your Honor, I am -- no objection,

 4   Your Honor.

 5          THE COURT:  All right.

 6          MS. RICHARDSON:  Thank you.

 7          THE COURT:  1560 and 1562 will be received.

 8          MR. CHANDRA:  Your Honor, could I have the last

 9   question read back?  I don't think that there was an answer to

10   it yet.

11      (Question read back.)

12          THE WITNESS:  No.

13   BY MR. CHANDRA:

14    Q.   Okay.  And so given that, what percentage of your

15   membership that has stated that it intends to vote in 2016 is

16   African American?

17    A.   Of the homeless individuals who are members, it's around

18   70 percent.

19    Q.   Okay.  Do you know -- when you reviewed the voting

20   records for 2014, do you know whether any NEOCH members who

21   voted in 2014 were African American?

22    A.   Homeless individuals, yes.

23    Q.   Okay.  And did that reflect the same 70 percent voting

24   rate?

25    A.   Not in 2014.

1    Q.    Okay.  Was it less than that?

2    A.    Yes.

3    Q.    And how about in 2015, do you know whether your members

4    who are African American voted in 2015?

5    A.    Yes, they did.

6    Q.    And do you know if they voted at the same rate as whites

7    in that particular election?

8    A.    As our white members?

9    Q.    Yes.

10   A.    Yes.  They voted at the same rate.

11   Q.    I may have confused you with my prior question so I want

12   to make sure that I'm asking that with respect to 2014.

13        Did your African-American members vote at the same rates

14   as your white members in 2014?

15        MS. RICHARDSON:  Objection; asked and answered.

16        THE COURT:  Overruled.  You may answer.

17        THE WITNESS:  Yes, they voted at the same rate.

18   BY MR. CHANDRA:

19   Q.    Okay.  And so based on your prior testimony for 2014,

20   would it have been 70 percent of your voting membership who are

21   homeless members were African American?

22   A.    That's correct.

23   Q.    Do you -- have you -- as the executive director of NEOCH

24   tasked with overseeing the voting-related activities, have you

25   formulated a belief about whether your individual members will

Vol. 4 - 194

1    be affected in 2016 and beyond by Senate Bills 205 and 216?

2    A.   Yes.

3         MS. RICHARDSON:  Objection.

4         THE COURT:  Overruled.

5         THE WITNESS:  Just as we saw with the change in the

6    I.D. law and some of the other attempts throughout the years,

7    we feel that this new 205 and 216 will -- well, it will cause

8    us to try and have a different strategy for 2016.

9    BY MR. CHANDRA:

10   Q.   Okay.  Let's focus on different pieces of the bills.

11        Okay.  First let's talk about the five field requirement

12   on the absentee and the provisional ballot forms that accompany

13   the ballots.  What impact, if any, do you believe that that

14   requirement will have on your individual members?

15   A.   Every time that you add additional information that is

16   required, you're going to get human error that causes some

17   people to be tripped up.  This is especially true with our

18   constituency which are -- have issues with literacy, and some

19   are disabled.

20   Q.   Okay.  I'll come back to the issue of literacy and

21   disabled in a moment, but let's talk about the complexity issue

22   you raised.  So what is it about the five fields that you think

23   raises issues of complexity that will trip up your members?

24   A.   We at the Coalition assist homeless individuals with all

25   kinds of government forms, from housing to social security

1  disability, Medicaid, all -- you know, so a wide range, and we

2  find that there's a degree of difficulty with a lot of these

3  government forms.  So we have taken to the practice of just

4  always reading the form and our staff and most of the social

5  service staff in Cuyahoga County completing the form for them

6  because there's -- we don't want mistakes on the form.

7  Q.    What in your interaction with your constituency has led

8  you to conclude that there are difficulties with these forms?

9  A.    Just 20 years of working with homeless people.

10  There's -- there's issues with people not being able to

11  understand government forms, and so instead of having them go

12  through the process on their own and make mistakes, they feel

13  humiliated or embarrassed to admit that they may have problems

14  reading or writing and so we just -- to avoid all of those

15  problems, we just help them fill out the forms automatically.

16  Q.    You mentioned the issues of literacy and disability.

17  Let's talk about literacy first.

18       From your long time work in advocacy with the homeless,

19  have you had the opportunity to assess the level of literacy of

20  the constituency that you serve, including your homeless

21  members?

22  A.    Yes.  We work with all of the shelters in Cuyahoga

23  County, and it's about eight to ten percent of the population

24  are absolutely illiterate, but the majority of the population

25  read at about a fourth grade level.

1    Q.    And you talked about -- have you personally experienced

2    in your work with homeless individuals and working with them on

3    paperwork, have you personally experienced or heard these

4    expressions of embarrassment and humiliation about the issue of

5    literacy?

6    A.    Yes.  Last summer we assisted hundreds of people in

7    filling out the application for a Housing Choice voucher and,

8    you know, going through that there -- we don't want to try to

9    embarrass people.  So by just asking them to sit down at the

10   computer and fill those blanks out, oftentimes the staff would

11   have to go back through it and fill it out for them because

12   they're not going to come forward and say, you know, I can't

13   understand this form, they're just going to fill it in

14   incorrectly.  And so it's much easier for us just to go through

15   the form, read the questions out loud and then have the staff

16   individual fill it in for them.

17   Q.    Okay.  You also, in addition to discussing the

18   illiteracy -- actually, let me ask one last question on that

19   point.

20         The issues that you've just described in terms of the

21   percentage illiterate, does that apply to your own homeless

22   membership as well as the homeless constituency that your

23   services serve?

24   A.    I think our membership reflects the homeless population

25   as a whole, yes.

1    Q.    And would that be true across the board for your

2    testimony today?

3    A.    Yes.

4    Q.    Now, let's turn to the issue of disability that you

5    mentioned.  What are you referring to when you mean disability,

6    when you say disability?

7    A.    An individual who has a mental illness especially either

8    overanalyzes forms or can't comprehend what the form is saying,

9    and oftentimes they will either be very literal about it and so

10   they will only put a number down.  For example, if it says

11   street address, they will only put the numbers or those kind of

12   issues.  So to avoid all of those, we always try to assist.

13   And it certainly speeds up the process, and we don't have to go

14   back through and correct issues.

15   Q.    Have you had the opportunity from your work to be able

16   to assess or estimate the approximate number of the

17   constituents and members that you serve, homeless constituents

18   and members who are mentally disabled in that manner?

19   A.    Yes.  About a third of the population.

20   Q.    Those percentages that you discussed, the eight to

21   ten percent completely illiterate, what was the percentage of

22   fourth grade reading level again?

23   A.    It's somewhere between 45 and 50 percent.

24   Q.    Okay.  And then the third or so that are mentally

25   disabled, those percentages, did those apply equally by race?

Vol. 4 - 198

1    A.   Oh, yes.

2    Q.   To your homeless population?

3    A.   Yes.

4    Q.   So the African-American percentage would be similar?

5    A.   Yes.

6    Q.   To the white percentage?

7    A.   Yes.

8    Q.   And Latinos also?

9    A.   Yes.

10   Q.   Okay.  One other question I have about how your

11   individual members would be affected.  You mentioned toward the

12   beginning of your testimony that you are a nonprofit

13   organization, right?

14   A.   Right.

15   Q.   Okay.  But have you had the opportunity to determine at

16   any point during the course of your work the partisan political

17   make up of your membership, your individual members?

18   A.   We can only determine that by looking if they voted in a

19   primary.  So looking through their voting history to determine

20   whether they voted in a primary.  So those that voted in

21   primaries, which is a much smaller percentage of the total, but

22   it's usually about eight to one Democrat to Republican.

23   Q.   So we've been talking about individual members.  Now, I

24   would like to turn your attention to your organizational

25   members.

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 199 of 241 PAGEID #: 1815
Case: 2:06-cv-00896-ALM-TPA Doc #: 658 Filed: 04/06/10 Page: 199 of 241 PAGEID #: 2815

Vol. 4 - 199

1    Do you believe that you have organizational members of

2    the Coalition who will be adversely affected by Senate Bills

3    205 and 216?

4    A.   Yes.

5    Q.   And could you list off who those are and why?  And if

6    they're in different categories, let the Court know.

7    A.   The majority of our organizational members are social

8    service -- homeless social service providers.  They would

9    certainly be affected because Cuyahoga County actually requires

10   any publicly funded shelter or homeless service to provide a

11   voting plan to the county at the beginning of the season and

12   then report on how they did in both registrations and driving

13   people to the polls to make sure that they participate in

14   voting.  So they would be adversely affected because it's part

15   of their funding that they have to help people vote.

16   Q.   Could you explain what you mean by that?  What do you

17   mean it's part of their funding?

18   A.   The Coalition has always taken the lead on voting issues

19   in Cuyahoga County.  We believe that publicly funded programs

20   are an extension of the Motor Voter bill that they should have

21   the same responsibilities for helping people vote as the

22   welfare department or the DMV as public entities.  So they have

23   for the last -- since the 2008 election, they've all had to

24   submit this plan to Cuyahoga County.  We usually take the lead

25   on that, but they're still having -- individually our

1  organizational members will have to submit a plan for how

2  they're going to respond this year.

3     Q.   Okay.  So how does that -- how does Senate Bills 205 and

4  216 affect them, those organizational members?

5          MS. RICHARDSON:  Objection.

6          MR. CHANDRA:  I'll lay more foundation, Your Honor.

7          THE COURT:  Let's hear what Ms. Richardson's basis is

8  first.  I have a thought, too.  Go ahead, Ms. Richardson.

9          MS. RICHARDSON:  Speculation, calls for hearsay.

10         THE COURT:  But I think it's compound because you're

11 asking about both bills, unless you anticipate that Mr. Davis

12 is going to say both bills affect them the same way.  It may or

13 may not given the background that you establish so I'll ask you

14 to rephrase your question.

15         Your objection on the grounds as stated, Ms. Richardson,

16 is overruled.

17         MS. RICHARDSON:  Thank you, Your Honor.

18 BY MR. CHANDRA:

19    Q.   Let me just back up a little bit.

20         When we were talking about individual members, we were

21 talking about the five fields and you talked about the layers

22 of complexity.  Let me ask you a couple more questions about

23 Senate Bills 205 and 216 and the impact on individual members,

24 and then we'll turn back to associational members.

25         First, are you familiar with the requirement from the

Vol. 4 - 201

1   bills about poll workers not being able to assist voters except

2   under circumstances where the voter expresses a disability or

3   illiteracy in filling out the forms, and certainly not filling

4   out the forms themselves as poll workers?

5          MS. RICHARDSON:  Objection; leading.

6          MR. CHANDRA:  I'm just asking if he's familiar with

7   it, Your Honor.

8          THE COURT:  Overruled.  You may answer.

9          MS. RICHARDSON:  Thank you, Your Honor.

10         THE WITNESS:  Yes.

11  BY MR. CHANDRA:

12   Q.   Okay.  Have you had the opportunity to assess the impact

13  of that on your individual homeless membership projecting to

14  the 2016 election and beyond?

15   A.   I'm not sure that it's with our membership.  It's more

16  our constituency.  I've seen changes that have happened from

17  2012 to 2014 in how much help the individuals get when we take

18  them over for early voting, but I'm not sure -- I mean, we

19  weren't strictly focused on individual members.

20   Q.   Okay.  So let's go back and just explain what you mean

21  by assisting voters and taking to the polls and what you've

22  seen.

23   A.   So we regularly drive voters over for the early voting

24  period, and we always have -- the driver is trained to go in

25  with the voter to make sure there's no issue, to make sure that

1    they're at least filling out the paperwork at the beginning.

2    Not helping with the voting process, but filling out the

3    paperwork; basically the envelope at the beginning goes without

4    a hitch and making sure there's no issues where they then are

5    told they have to vote by provisional ballot.

6         And there was in 2012 no problems with the Board of

7    Elections staff offering as much help as possible.

8         In 2014 there seemed to be a hesitancy or can I engage

9    the voter or do I have permission to engage the voter in

10   offering help that we didn't see in previous elections.

11   Q.   And what is your assessment of the impact of that

12   hesitancy on a going-forward basis to the homeless

13   constituencies that you serve as NEOCH?

14   A.   I think that they will make mistakes on filling out

15   the --

16   Q.   Who will, the voters?

17   A.   The voter will -- our members, our constituents will

18   make a mistake in filling out the envelope causing their ballot

19   to be tossed out.

20   Q.   So turn now back to your associational members, your --

21   excuse me, your organizational members.

22        Now -- and I'm going to focus first on Senate Bill 205

23   relating to absentee ballots.  There's early in-person voting

24   which you've been engaged in assisting, right?

25   A.   (Witness nods head.)

 1   Q.   And then there's voting by mail?

 2   A.   Right.

 3   Q.   Have you as an organization before the passage of Senate

 4   Bill 205 been focused on encouraging voters with respect to

 5   both of those absentee options?

 6   A.   We focused on both even in -- at -- during 2014 where

 7   every voter that we came in contact with, we would give a sheet

 8   that has some tips, some frequently asked questions on it, and

 9   then on the back was the absentee ballot, the request for

10   absentee ballot blank form that they could fill out and take

11   with them.  And so it wasn't until we started looking at the

12   Cuyahoga County documents that we saw that this may be

13   problematic for our voters and we may be risking their ballot

14   counting by providing, you know, thousands of these blank forms

15   to our voters.

16   Q.   Okay.  So I just want to make sure that I have a clear

17   answer to my question.

18       Before Senate Bill 205, were you as an organization

19   focused on pushing both aspects, both options of absentee

20   voting, early in-person, and voting by mail?

21   A.   Yes.  We hoped that we could cover everyone by giving

22   them the option either -- of either voting in person, by

23   providing them a ride, or voting by mail by giving them the

24   application themselves to take with them.

25   Q.   Now that you've had the opportunity to assess the impact

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 204 of 241 PAGEID #: 1820
Case: 2:06-cv-00896-ALM-TPK Doc #: 653 Filed: 04/06/16 Page: 204 of 241 PAGEID #: 23879

Vol. 4 - 204

1    of Senate Bill 205, have you changed your strategy or at least

2    started thinking about changing your strategy with respect to

3    which of those two dimensions you would promote in absentee

4    voting, early in-person versus voting by mail?

5    A.    Yes.   Just like when problems came up with I.D. and

6    voting at the precinct in person on Election Day where we had

7    to reassess what we were doing, we're going to have to do the

8    same thing for 2016 and focus all of our primary attention on

9    driving people to the polls and voting in person early and

10   downplay the vote by mail so we will not be offering the blank

11   cards to everyone.

12   Q.    Okay.   So now if you could walk the Court through what

13   that looks like for the Coalition as an organization and, to

14   the best of your knowledge, its individual -- I'm sorry, its

15   organizational members.

16        What does shifting that strategy look like?

17   A.    So remember the bottom line goal for all of us is to

18   make sure that we register as many people as possible and then

19   get them to the polls so that their ballot will count and, you

20   know, that's the overall goal.   And we take the lead in

21   Cuyahoga County with regard to voting activities among the

22   shelters.   We meet with the shelters, we train the shelter

23   staff.   Every shelter assigns one person to be our liaison, and

24   that's who we communicate with on a weekly basis around voting

25   issues.   So I'm confident that the shelters will follow our

1    lead in focusing on driving people over to the polls for early

2    voting and not the vote by mail because of all the problems

3    both with our U.S. mail system, but also the problems of being

4    tripped up and then having their ballot not count.

5          So that will mean that we will have to generate more

6    volunteers to drive people.  It's very time consuming to drive

7    people because you have to -- you have to accompany them in.

8    You can't just take them over to the Board of Elections and

9    drop them off there.  You have to follow them in, make sure

10   that everything goes all right and then transport them back to

11   the Board of Elections.  And so for a facility like the big

12   shelter at 2100 Lakeside that serves 400 people a night, that's

13   going to mean many more trips over to the Board of Elections to

14   vote during that early voting period that we didn't have to do

15   in previous elections.

16     Q.   And is that shelter an organizational member?

17     A.   Yes.

18     Q.   So --

19          THE COURT:  Mr. Chandra, it's 3:30.  I think we'll

20   take our afternoon recess.  The Court has -- I have a brief

21   conference call so we're going to -- actually, it's 3:35.

22   We're going to stand in recess until 4:00 o'clock..

23      (Thereupon, a recess was taken.)

24          THE COURT:  Mr. Davis, you may resume the stand.

25   BY MR. CHANDRA:

Vol. 4 - 206

1    Q.   While we're on that subject, if you could please tell us

2    the other organizational members of the Coalition that you

3    believe based on the information you have would be affected by

4    Senate Bill 205 and 216 collectively.

5    A.   We have Frontline Services which was previously called

6    Mental Health Services.  They run the women's shelter in

7    Cleveland as a member.  We have St. Herman's House of

8    Hospitality is a shelter in Cleveland.  Eden, Incorporated is

9    the mental health housing organization.  They own property.

10   Westside Catholic Center is a shelter for families.  Salvation

11   Army runs a shelter for families.  We have the AFLCIO as an

12   organizational member, as well as the ACLU.  And City Mission

13   is a shelter.

14   Q.   For each of those could you -- and if they can be

15   clustered in categories, feel free.  For each of those could

16   you as executive director explain how they would be adversely

17   affected by Senate Bills 205 and 216 based on the voting

18   regulations contained in those statutes?

19        And, again, if you need to make distinctions by statute,

20   feel free.

21   A.   The homeless programs that -- the homeless social

22   service providers that are our members will follow our lead in

23   focusing our Get Out The Vote campaign, on driving people to

24   the polls, and less so on the vote by mail undertaking.  So all

25   of them will have to spend more resources on volunteers,

1    transportation, using their vans which normally provide other

2    purposes to take people over to the Board of Elections and then

3    help them vote in person.  And then we have -- we have a couple

4    of organizations that are also member organizations that we

5    work with, including the AFLCIO, which we partner with them on

6    voting activities.  And their director we regularly communicate

7    with on voting strategies has said that she will also have

8    negative consequences from the two new pieces of legislation.

9       Q.   And what specifically have you learned from your member

10   organization AFLCIO about the negative consequences?

11      A.   That they will have to expend more resources on getting

12   people to vote in person early as we do.

13      Q.   Okay.  Now, you've mentioned several times --

14           MS. RICHARDSON:  Objection, Your Honor.

15           THE COURT:  Basis?

16           MS. RICHARDSON:  Hearsay.

17           MR. CHANDRA:  If I could respond at sidebar,

18   Your Honor.

19           THE COURT:  Overruled.

20           MS. RICHARDSON:  Thank you, Your Honor.

21   BY MR. CHANDRA:

22      Q.   You've mentioned expending resources several times.

23   Could you please be more specific?  Could you explain what it

24   is to expend more resources both for the Coalition and for the

25   individual member organizations?

1    A.   Sure.

2         So the goal, again, is to register as many people as

3    possible and then get them to vote and have their vote count.

4    So we will have to change our training materials to reflect

5    this new reality of downplaying the vote by mail pieces that

6    are currently part of our training manual.  We will have to

7    spend time during the training sessions on the minutiae of

8    filling out the forms of voting and not the strategies around

9    how do we get the most number of people to the polls.  We'll

10   have to have more time dedicated to transportation using the

11   vans that we have access to, both volunteer and the agency's

12   vans, to get people to volunteer to drive people over to the

13   polls, train those drivers in knowing that people have to be

14   very careful in filling out the forms, and then all of the

15   website would have to be updated.

16        We have a pretty comprehensive website dedicated to

17   voting activities, and so all that would have to be changed to

18   reflect the new reality.

19   Q.   Okay.  Do you have an estimate -- let's just start with

20   the Coalition itself.  Do you have an estimate as to what

21   either additional resources or diversion of resources would be

22   required for the Coalition itself, excluding the organizational

23   members for the time being?

24   A.   So the goal is to get people to vote.  And the

25   individuals before that were relying on their own to vote by

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 209 of 241 PAGEID #: 1825
Case: 2:06-cv-03893-ALM-TPA Doc #: 653 Filed: 04/06/10 Page: 209 of 241 PAGEID #: 23885

Vol. 4 - 209

 1    mail, we're going to have to figure out a way to pick them up,

 2    drive them to the polls.

 3         We also have the issue that we don't have Golden Week

 4    anymore so that has to be factored into the equation.  So we

 5    will just have to juggle our resources to focus on gas,

 6    volunteers, all of the volunteers that we use during the voting

 7    period to focus on driving and getting people to vote.  I'm not

 8    sure if I have an ability to quantify that dollar figure at

 9    this point in the year.

10    Q.   But based upon your past experience in making

11    adjustments to your program, you know, based on changes that

12    occur at the state level, do you have a sense of whether even

13    after you've diverted the resources that you plan to divert you

14    will have as much success as you've had in the past in turning

15    out voters?

16         MS. RICHARDSON:  Objection.

17         THE COURT:  Sustained.  Rephrase your question,

18    Mr. Chandra.

19         MS. RICHARDSON:  Thank you, Your Honor.

20    BY MR. CHANDRA:

21    Q.   So you talked about diverting resources.  Do you have a

22    sense of whether you will -- of how successful you will be

23    compared to your success in turning out voters in the past?

24    A.   Presidential years we're always a lot more successful --

25    Q.   So let's just compare presidential years then.

1   A.   Right.  So the last presidential election we were pretty

2   successful in turning out our voters, but we had a broader

3   strategy so we're going to miss people.

4   Q.   What do you mean by broader strategy?

5   A.   We had a broader strategy in that we were focused on

6   both absentee vote by mail, as well as early in-person taking

7   people to the polls and voting so we had both of those options

8   that we were focused on in 2012.

9        So now if we were just focusing on the early in-person

10  voting, we're going to miss people.  Because homelessness is so

11  cyclical, we're going to not capture as many people as we had

12  in the past so I don't think that we're going to be as

13  successful as we were in 2012.

14  Q.   Now, that was with respect to the Coalition.  Let's talk

15  about your knowledge of the individual member organizations.

16       Now, do you have some knowledge about what either

17  resource allocation or additional expenditure would be required

18  on their part?

19  A.   So remember all of the shelters who are publicly funded

20  have to submit a plan.  So it has to be in, and they get

21  questioned on when they come up for renewal how successful they

22  were in implementing the plan.  And if they all follow our

23  lead, which they've done that for the past 20 years as the

24  Coalition being the lead in Cuyahoga County, they will have to

25  spend more volunteer time, more staff time on taking people

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 211 of 241 PAGEID #: 1827
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/20 Page: 211 of 241 PAGEID #: 21982

Vol. 4 - 211

1    over to the polls and having them vote in person.

2         For a big shelter like 2100 Lakeside with 400 guys every

3    night, that can be a huge allocation of resources.  I would

4    estimate it's probably three times what they've spent in the

5    past.

6    Q.   And what do you base that estimate upon?

7    A.   Just the amount -- I -- from our experience, we dedicate

8    one staff person who just focuses on the early voting.  He

9    spends about 20 hours a week just doing that activity during

10   the election season, during the voting season, and they have --

11   they come in contact with a lot more people than we do.

12        So while the shelter sends people out during the day, I

13   can see them using their van all day to take people over to

14   make sure they vote because we have a limited window as well of

15   when the Board of Elections is open to be able to vote.

16   Q.   You testified earlier about the complexities associated

17   with the five fields.  Why not simply reallocate your resources

18   toward helping people fill out the forms?

19   A.   We've tried that before, but the complexity of when

20   people get their ballots back, getting them all together to

21   complete the absentee envelope, it never worked.  We would talk

22   to a handful of people, and it would be a waste of time for the

23   individual, the volunteer, to go there because so few would

24   have had their ballot returned.  It's really difficult to

25   coordinate that with so many people who are turning over every

Vol. 4 – 212

1  single day.  We really relied on the individual to take the

2  blank form with them, fill it out and then fill out the

3  envelope on their own and return it to the Board of Elections

4  in the past.  And, you know, the risk, I think, is just too

5  great to do that with all of the people who had errors.

6  Q.   What impact does prohibition on poll workers assisting

7  the voters with the forms have on that strategic calculation

8  that you're making?

9  A.   Well, even though they have this apprehension now that

10  they didn't have in the past, they're still trained at the

11  Board of Elections to know what -- the fields that you have to

12  fill in and in making sure that it's complete so they -- we can

13  have a certain level of trust that if we're taking people over

14  to the Cuyahoga County Board of Elections, that with our help

15  as the backup and the Board of Elections' trained staff there,

16  I think that's our best chance of making sure their ballot

17  counts.

18  Q.   At the Cuyahoga County Board of Elections when you or

19  Coalition organizational member representatives accompany

20  voters, are you permitted to go back to the polling area with

21  the voter?

22  A.   No.  We can only help them with the information that

23  they fill out at the front table, which is basically the

24  envelope that you -- that we looked at before.  It's the

25  same -- it looks exactly the same as the vote by mail envelope.

1    Q.    So if a poll worker at the Board of Elections in early

2    in-person voting refuses to assist a voter in filling out the

3    form that accompanies the ballot, are you in any position to do

4    anything about that?

5    A.    Yeah.  We can help and we can at that time say, you

6    know, this is where you were registered, this is your address

7    that you have to use, you know, and make sure you sign it in

8    all of the five fields.  Our volunteers can make sure that that

9    happens as a backup to the Board of Elections staff.

10   Q.    How would you know if you were not with the voter with

11   the poll worker?

12   A.    We'll know that you fill out --

13          MS. RICHARDSON:  Objection.

14          THE COURT:  Basis?

15          MS. RICHARDSON:  Speculation.

16          THE COURT:  Overruled.

17          MS. RICHARDSON:  Thank you, Your Honor.

18          THE WITNESS:  You fill out that piece -- the -- the

19   information that you're asked is then printed out by the Board

20   of Elections so, yes, they may make a mistake in the final

21   piece as they drop it into the box, but that's the system we

22   have.  We have to -- I mean, that seems to be the least risky

23   of the options that we have at this point.

24   BY MR. CHANDRA:

25   Q.    In reacting to Senate Bill 205?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 214 of 241 PAGEID #: 1830
Case: 2:20-cv-03843-MLM-TPA Doc #: 653-7 Filed: 04/06/18 Page: 214 of 241 PAGEID #: 21980

Vol. 4 - 214

1    A.    Exactly.

2    Q.    Okay.  I wasn't sure I understood your answer.

3          So with respect to -- there's two forms, right?  There's

4    the form to apply for the ballot.

5    A.    That's right.

6    Q.    And then there's the form that accompanies the ballot.

7    A.    That's correct.

8    Q.    Okay.  So I'm asking now with respect to the form that

9    accompanies the ballot, is someone affiliated with NEOCH with

10   the voter the way the Cuyahoga County Board of Elections system

11   is set up for early in-person voting when that particular form

12   is being filled out?

13   A.    No.  That's at the little booth where they are filling

14   out their ballot.  That's where they fill that out.  But the

15   other errors that are associated with the application are

16   not -- we can help with.

17   Q.    Okay.  I understand.  So I'm now asking about that

18   second form.

19   A.    Okay.

20   Q.    The five fields form for Senate Bill 205.

21   A.    Right.

22   Q.    So with respect to that form, is someone associated with

23   NEOCH in a position at the Board of Elections during early

24   in-person voting to assist the voter in ensuring that that form

25   is filled out correctly if the poll worker doesn't do so?

1     A.   No.

2     Q.   Okay.  Thank you.

3          When does NEOCH do its work on voting activities?  What

4     years, what times of year?

5     A.   We only do even years unless there's a contentious

6     mayoral election, which has happened once in our history in

7     Cleveland.  So we've done an odd year one time.

8          And then we mostly work from March through December of

9     the election year.

10    Q.   Why not do it in the odd years?

11    A.   It's too difficult to get homeless individuals to

12    participate when there's not really anything on the ballot that

13    attracts them or interests them.

14    Q.   Do contested races in the odd years make a difference?

15    A.   Yes.  Only one time was there a contested mayoral race,

16    and we did work --

17    Q.   I see.  Otherwise, we'd have coronations in Cleveland.

18         Okay.  So what other activities would the Coalition be

19    expending resources on when it's not doing voting activities?

20    A.   We coordinate all of the outreach teams.  So, for

21    example, if a police officer found a homeless individual on the

22    street, our number is the one they call first, and then we

23    dispatch an outreach team to go help.  We coordinate all of the

24    housing meetings for all the homeless programs in the

25    community.  We do trainings that aren't associated with voting.

1    We do the homeless legal assistance program, the street

2    newspaper.  In all of our programs we rely heavily on

3    volunteers and others to help in that.

4      Q.   What is NEOCH's overall budget presently?

5      A.   In 2016, it's I think 225,000.

6      Q.   And at some point was it higher than that?

7      A.   Yes.  Before the downturn, it was over 500,000.

8      Q.   So given those smaller resources, do you have a sense of

9    how much of NEOCH's budgeted amount supports the voting-related

10   activities that you've testified about?

11     A.   We don't really break that out.  It's part of our

12   advocacy budget, which does have its own breakout, but it's --

13   you know, in election years and, you know, in the summer and

14   through election season a significant part of our operations is

15   focused on advocacy so, therefore, a large portion of my time,

16   my salary and the resources of the organization are focused on

17   voting during those even years.

18     Q.   Focusing just upon your time -- and you're the sole

19   staff person or sole full-time staff person?

20     A.   Yes.

21     Q.   And how many part-time staff people are there?

22     A.   We have five at the organization.

23     Q.   Okay.  So focusing just on you as the sole full-time

24   staff person, how much of your time in the even numbered years,

25   you know, during the time that you're doing election-related

1    work, would you say is focused upon kind of voter education,

2    voter turnout, things you've testified about that the Coalition

3    does?

4       A.   So it changes also because of presidential year.  So

5    this is a presidential year so it's probably between 20 to

6    25 percent of my time in this year will be dedicated to voting

7    activities.

8       Q.   And as the elections approach, does that amount of time

9    increase?

10      A.   Yeah.  That's an average for the whole year but, you

11   know, the month before the election, almost all my time is

12   spent on voting activities, including volunteer time.

13      Q.   What about the month during prior to that last month

14   where there's still registration activity going on?

15      A.   It's probably 60 to 70 percent of my time.

16      Q.   What do you see as your core voting-related activities?

17      A.   Getting as many people as possible to be registered to

18   vote and then getting them to the Board of Elections to cast a

19   legitimate ballot that counts.

20      Q.   In 2014 after Senate Bills 205 and 216 passed, did you

21   spend or have to spend time educating yourself about the impact

22   of those laws on your constituency?

23      A.   Yes.

24      Q.   Are you able to quantify that at all?

25      A.   Not really.  We also had to train others to understand

Vol. 4 – 218

1    the impact.

2     Q.    Forgive me, but I want to go back a little bit and make

3    sure we've comprehensively covered Senate Bill 216 because we

4    were focused on 205.

5         216, as you know, deals with provisional ballots.  What

6    impact, if any, do you see the five fields provision with

7    respect to provisional ballots having on your homeless

8    constituency?

9              MS. RICHARDSON:  Objection; asked and answered.

10             MR. CHANDRA:  Your Honor, I was trying to break it

11   apart based on the prior objection.

12             THE COURT:  You have asked this question before.

13             MR. CHANDRA:  Okay.

14             THE COURT:  Sustained.

15             MS. RICHARDSON:  Thank you, Your Honor.

16   BY MR. CHANDRA:

17     Q.    With respect to your organizational members, what impact

18   has Senate Bill 216 had on them or will it have on them in your

19   view?

20             MS. RICHARDSON:  Objection, Your Honor; asked and

21   answered.

22             THE COURT:  Sustained.

23             MS. RICHARDSON:  Thank you, Your Honor.

24             MR. CHANDRA:  Can I have a sidebar, Your Honor,

25   please?

1          THE COURT:  Yes.

2                              - - -

3      Thereupon, the following proceeding was held at sidebar out

4  of the hearing of the open courtroom:

5          THE COURT:  Go ahead, Mr. Chandra.

6          MR. CHANDRA:  Your Honor, if I am getting punchy

7  because it's late in the day, I apologize, but I believe in

8  response to an earlier objection about a compound phrasing

9  where I was mentioning both Senate Bills 205 and 216 and you

10  objected, from that point forward I started breaking out my

11  questioning with regard to the organizational members just on

12  205 and absentee voters.  So what I'm trying to do now is pivot

13  and cover the provisional ballot, Senate Bill 216, aspects.

14          Now if I've already covered --

15          THE COURT:  I thought that the question was what

16  effect did 205 and 216 have on your members.

17          MR. CHANDRA:  The last question I asked, I was trying

18  to just focus on 216 because earlier I broke it out and just

19  focused on 205.

20          THE COURT:  Read the question back, Ms. Coulter.

21      (Question read back.)

22          THE COURT:  You're right.  Go ahead, Ms. Richardson.

23          MS. RICHARDSON:  Your Honor, it may be that I have

24  lost track, too, but I believe after the original question

25  which was compound, both questions for 216 and 205 have been

 1    asked individually.

 2          THE COURT:  I don't recall that.  I think that you

 3    asked another question.  I thought that you were going to

 4    simply ask what effect did it have, what effect did 216 have.

 5    I'm going to overrule your objection.  You may ask the question

 6    with respect to 216.

 7          MR. CHANDRA:  Okay.  Thank you, Your Honor.

 8          Just let me mention one other thing.  I believe before

 9    that objection occurred, with respect to organizational members

10    there's no question that I was asking, because I was just

11    trying to get through the outline faster, the impact of 205 and

12    216 on individual members.  But once we turned to

13    organizational members, once the objection was drawn, I've been

14    trying to break it up.

15          THE COURT:  All right.

16          MS. RICHARDSON:  Thank you, Your Honor.

17       (Back in open court.)

18          MR. CHANDRA:  May I respectfully request the court

19    reporter to read back the last question?

20       (Question read back.)

21          MR. CHANDRA:  Your Honor, he may answer, correct?

22          THE COURT:  You may answer.

23          THE WITNESS:  Okay.  Again, this will involve

24    additional time that they have to spend making sure that people

25    avoid provisional ballots because the risk of -- we have no

 1   ability to, you know, hold people's hands through that problems

 2   process, and so the risk of them having the ballot thrown out

 3   because of a technical error is too great of a risk, I think,

 4   for our members.

 5   BY MR. CHANDRA:

 6      Q.    Does NEOCH actually do work for its voting constituency

 7   on Election Day for provisional ballot members?

 8      A.    Yes.  We drive people to the precinct of origin on

 9   Election Day.  We have a whole volunteer crew that assists, and

10   the shelters do the same.  And, actually, we've even had the

11   AFLCIO assist with transportation efforts on Election Day for

12   some of our voters.

13      Q.    Okay.  Earlier I was asking you questions about your

14   personal work time spent on voting-related activities and you

15   offered the Court various percentages.

16         Beyond regular business hours for work, you also

17   volunteer for NEOCH?

18      A.    Yeah.  And that's hard to quantify in our budget because

19   I get paid a salary, but I do spend during the election season

20   as much as up to 80 hours, especially right around the

21   registration deadline, working on getting as many people as

22   possible to vote.  That all depends on the hours that we're

23   allowed to vote early in Ohio, but I have volunteered a lot of

24   time on voting activities.

25      Q.    So we'll come to documents toward the end of your

1    testimony, but do you have a way of measuring your success or

2    ways of measuring your success with regard to the voting

3    advocacy part of your work?

4        A.    So we talked about how difficult it was to determine

5    whether an individual is using a friend's house, family

6    member's house as a registration point or are they using a

7    homeless address, and it's about 50 percent of our population.

8    But we do go through every update of the Cuyahoga County

9    documents and pull out every single person that's registered

10   using a homeless address in Cuyahoga County.  That's one of the

11   measurements we use as far as success, is that every single

12   person who comes in the door gets a blank registration card,

13   and then we go through to see how many are using homeless

14   addresses as their registration point.  Then we go back through

15   after the election and check to see if those individuals that

16   we had tracked vote, and now we've looked at whether they

17   were -- their voted counted or not.

18       Q.    And do you have a way that you report that success?

19       A.    Yes.  We have -- we usually put a report on our website

20   that documents how many people we registered and how many

21   people we got to vote.

22       Q.    You testified earlier about the need to change training

23   materials as a result of Senate Bills 205 and 216.  Could you

24   please go into more detail about what that would entail?

25       A.    Sure.  We offer training either at our office where

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 223 of 241 PAGEID #: 1839
Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/10 Page: 223 of 241 PAGEID #: 23894

Vol. 4 - 223

 1    staff from various agencies come and do a two-hour training

 2    about voting and the strategy, and then there's one liaison

 3    signed up from each of the agencies that we communicate with on

 4    a weekly basis.  We also do trainings in the shelters usually

 5    at staff meetings that's a condensed version of our training,

 6    usually only 20 minutes to a half hour where we go through some

 7    of the issues around voting, and we try to encourage all of the

 8    staff to help people with voting activities.  And then on a

 9    weekly basis we are sending out training materials, newsletters

10    to the liaisons that had signed up at the beginning of the

11    season.

12        Q.   If the federal courts were to invalidate Senate Bills

13    205 and 216, would you still engage in all the revamping of the

14    training and training materials that you've described you would

15    have to do?

16        A.   Yes.  I would still do the revamp, but I wouldn't have

17    to focus on the minutiae of filling out forms.  But I would be

18    doing more of the strategy session, the what is our plan for

19    this year.

20        Q.   Would it be the same amount of work?

21        A.   The Coalition would spend more time on the filling out

22    of forms if these laws stand than we would do if -- if it was

23    struck down.

24        Q.   So just to sum up this area, under Senate Bill 205 and

25    216, what impact does that have on NEOCH and its organizational

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 224 of 241 PAGEID #: 1840
Case: 2:00-cv-03893-ALM-TPA Doc #: 653-7 Filed: 04/06/18 Page: 224 of 241 PAGEID #: 23899

Vol. 4 - 224

1  members in terms of the range of options that it would

2  recommend to voters?

3          MS. RICHARDSON:  Objection, Your Honor; asked and

4  answered.

5          THE COURT:  I'm going to allow you to answer this the

6  last time.

7          THE WITNESS:  Okay.

8          MS. RICHARDSON:  Thank you, Your Honor.

9          THE COURT:  Overruled.

10         THE WITNESS:  We would limit our options to early

11  in-person voting and not stress the vote by mail.

12  BY MR. CHANDRA:

13    Q.   Would you spend time and money on the transportation

14  functions that you described if Senate Bills 205 and 216 were

15  struck down?

16    A.   Yes, we would spend resources on transportation.

17    Q.   I understand you would spend resources.  Would you spend

18  the same amount of resources on the transportation you've

19  described that you will need to do if Senate Bills 205 and 216

20  were struck down?

21    A.   No.  No, we would not.

22    Q.   More or less?

23    A.   We would spend fewer resources.

24    Q.   Are you able to quantify how much less?

25    A.   It would probably be similar to what we spent in 2012,

1    the presidential election.

2       Q.    And do you know about how much that was?

3       A.    I can't separate it out, but I think the -- yeah, we

4    don't separate it out like that.  It would be hard to do that.

5       Q.    I understand you can't quantify it.  Can you

6    characterize it in terms of magnitude, adjectives?

7              MS. RICHARDSON:  Objection, Your Honor.

8              THE COURT:  Sustained.

9              MS. RICHARDSON:  Thank you, Your Honor.

10   BY MR. CHANDRA:

11      Q.    Are there any words you would use to describe how much

12   less you would spend?

13             MS. RICHARDSON:  Same objection, Your Honor.

14             MR. CHANDRA:  Can I have a sidebar on this,

15   Your Honor?

16             THE COURT:  Yes.

17                         - - -

18       Thereupon, the following proceeding was held at sidebar out

19   of the hearing of the open courtroom:

20             THE COURT:  Go ahead, Mr. Chandra.

21             MR. CHANDRA:  So, you know, I'm not trying to lead,

22   Your Honor, but the case law does require that this not be a

23   trivial amount, that there are adjectives in the case law used

24   to characterize it.  And while I'm not going to lead him and

25   feed them to him, I would like him to be able to describe it in

1    terms that might be synonomous with what is in the case law.

2              THE COURT:  This is your witness, Mr. Chandra.  You've

3    had an ample time to prepare him so just ask him what they're

4    going to spend.  I mean, who is in a better position to know

5    than the head of the organization itself?  And so, you know,

6    the reason that I don't allow leading questions,

7    Ms. Richardson, is absolutely right.  On one of the critical

8    issues in the case, one of the critical areas in the case, the

9    lawyer shouldn't be in a position where he's basically

10   suggesting to the witness what he should say to be able to put

11   into play very neatly whatever needs to be said in the

12   equation, as you referenced yourself, from the case law.  So

13   you're going to have to have this witness describe in his own

14   words what his organization has to pay for transportation and

15   related costs.  You can't lead him.

16        So the objection is sustained.

17             MR. CHANDRA:  Okay.  Fair enough.  Thank you.

18             MS. RICHARDSON:  Thank you, Your Honor.

19      (Back in open court.)

20   BY MR. CHANDRA:

21   Q.   So, Mr. Davis, we talked about budget, we talked about

22   staff time.  What voluntary resources does NEOCH bring to bear

23   with its voter advocacy services?

24   A.   We couldn't do the voting activities without our

25   volunteers.  They're a critical piece of the effort to get

1    people to vote.

2       Q.    How many volunteers are involved in a presidential

3    election year typically?

4       A.    Throughout the process I would say over a hundred;

5    somewhere between 100 and 125 volunteers.

6       Q.    And based upon the impact -- let's start with Senate

7    Bill 205.  What impact will that have on the deployment of

8    those volunteer resources?

9       A.    They won't be focused on going into the shelters and

10   urging people to vote by mail but, instead, they will all focus

11   on driving people to the Board of Elections and having them

12   vote.

13      Q.    And what about the impact of Senate Bill 216?

14           MS. RICHARDSON:  Objection, Your Honor; asked and

15   answered.

16           THE COURT:  Sustained.

17           MR. CHANDRA:  With regard to volunteers, Your Honor?

18           THE COURT:  Wasn't that the question you asked with

19   respect to organizational members and then individual members

20   with respect to volunteers?  This is limited to --

21           MR. CHANDRA:  The first question was on 205 only.

22           THE COURT:  All right.  All right.  I will overrule

23   it.  You may answer.

24           THE WITNESS:  Could you repeat the question?

25   BY MR. CHANDRA:

```
 1      Q.   Yes, sure.

 2           I was simply trying to understand the impact on

 3      deployment of your 100 volunteer resources based upon the

 4      impact of Senate Bill 216.  Any change?

 5      A.   They'll just have to be trained in the provisional

 6      ballot provisions to make sure that people are -- all the

 7      drivers, all the volunteers understood what that involves.

 8      Q.   What is the Mature Services program of NEOCH?

 9      A.   Those are most of our part-time staff come from Mature

10      Services.  It's part of the Senior Older Americans Act.  The

11      Department of Labor pays for seniors retrained at organizations

12      so we supervise, oversee their work, and then they are trained

13      in how to hopefully get a more permanent job, sort of a second

14      career.

15      Q.   Okay.  And starting just with Senate Bill 205, does that

16      have any impact on the deployment of that Mature Services

17      program?

18      A.   Yes.  They will -- well, we have one -- well, most of

19      our staff are working on it tangentially, including the Mature

20      Services, but we always have one assigned just to work on

21      voting activities.  And so they will follow the same strategy

22      of focusing on early in-person voting and not the other.

23      Q.   And what impact, if any, would Senate Bill 216 have on

24      the deployment of the Mature Services Program?

25      A.   The same.  They'll focus on the education piece and not
```

1    the increase in the numbers, but focusing on making sure people

2    fill out the forms correctly.

3    Q.   Okay.  I'd like to turn your attention now to some of

4    the individual claims that NEOCH has brought in this matter.

5         First, could you please explain what issues, if any,

6    homeless people may have with respect to having a current

7    address?

8    A.   They struggle with that because they move frequently,

9    they transfer from one shelter to the other on a regular basis.

10   And those who don't use shelters always struggle with where --

11   what should they put down as their residence.  Should -- if

12   they're sleeping on public square in Cleveland, Ohio, should

13   they use that as their residence because that is where they

14   return to every single night?  And some I've seen do, in fact,

15   put that down as their address.

16   Q.   So do you see any distinction between the five fields

17   requirement in Senate Bill 205 and the five fields requirement

18   in 216 before a ballot is counted?  Do you personally see any

19   distinction there?

20   A.   No.

21   Q.   Okay.  So that being your answer, I'm going to ask my

22   question together.

23        So, again, given the current address challenge that you

24   just described to the Court, what impact does the five fields

25   requirement have on homeless voters?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 230 of 241 PAGEID #: 1846
Case: 2:06-cv-00896-ALM-TPK Doc #: 653 Filed: 04/06/18 Page: 230 of 241 PAGEID #: 23405

Vol. 4 - 230

1    A.    There's often confusion on what they should use as their

2    residence because that sometimes is different from where

3    they're receiving their mail.  And whenever a -- whenever the

4    Board of Elections receives the card back after registration,

5    it is automatically flagged to have to vote by -- that

6    individual voter is automatically flagged to have to vote by

7    provisional ballot and, therefore, is more likely to be tripped

8    up by the Senate Bill 216.

9    Q.    I want to turn your attention now to the fundamental

10   unfairness claim.

11        The commercial address you were testifying about

12   earlier, how, if at all, does that relate to that claim?

13   A.    Well, two instances.  One is if the postal -- if we

14   don't resolve this issue in this election year with the postal

15   service, the drop-in centers will be declared commercial

16   businesses and, therefore, would be subject to challenge by the

17   Board of Elections as that's not a residence; that's a

18   commercial place of business.  And then the other is the

19   individual who is sleeping in the alcove of a commercial

20   address and they see that in lights every night, and they use

21   that as their registration point.  It could be flagged as a

22   commercial address and, therefore, not a residence and kicked

23   out.

24   Q.    Turning your attention to the literacy claim, what

25   impact do you see Senate Bill -- first of all, do you see any

1   distinction between Senate Bills 205 and 216 with respect to

2   your literacy claim?

3       A.   No.

4       Q.   Okay.  So what impact do you see the issues of literacy

5   that you've testified about with the homeless population that

6   you serve have -- excuse me.  Let me just withdraw that.

7           What impact do you see Senate Bills 205 and 216 having

8   with respect to the literacy claim that you've brought?

9       A.   My experience is that people are not -- are embarrassed

10  by the fact that they have a low or no ability to read and will

11  not signify so to a Board official, a stranger basically that

12  they need some help and so, therefore, they will be confused

13  and will have their ballot thrown away because of errors that

14  don't have anything to do with identifying who they are.

15      Q.   Do you have any particular stories that come to mind of

16  seeing people hesitant to share that information?

17              MS. RICHARDSON:  Objection.

18              THE COURT:  Sustained.

19              MS. RICHARDSON:  Thank you, Your Honor.

20  BY MR. CHANDRA:

21      Q.   Have you personally witnessed homeless individuals

22  hesitant to share information about their literacy?

23      A.   That is the reason that we read all government forms to

24  our constituency, is because I have seen repeatedly where

25  people make mistakes because they don't understand the form,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 232 of 241 PAGEID #: 1848
Case: 2:00-cv-03893-ALM-TPK Doc #: 656 Filed: 04/06/20 Page: 232 of 241 PAGEID #: 23468
Vol. 4 - 232

1   they can't read the form and make serious mistakes that could

2   cost them housing, could cost them access to benefits.

3   Q.   Turning to some of the race-related and equal protection

4   claims.

5       What percentage -- you've already testified about what

6   percentage of your constituency is African American.  Is the

7   African-American percentage in your membership greater than in

8   the general Cuyahoga County population?

9   A.   Yes.  It's about double the population.

10  Q.   And is the percentage within that population in the

11  population that you serve that is African American greater than

12  the statewide percentage in Ohio of African Americans?

13  A.   I don't know the statewide figures.

14  Q.   Okay.  Do you have any knowledge of whether Cuyahoga

15  County's African-American population is higher than the

16  statewide African-American population?

17  A.   I believe it is, yes, in all the urban communities.

18  Q.   I want to turn your attention to the claim regarding

19  notice, the due process claims.

20      What is your understanding of whether Boards of Election

21  are permitted to contact voters who have deficient five fields?

22  A.   I believe they have 7 days to contact the individual.

23  Q.   And do you know how they contact the individual?

24  A.   By mail.

25  Q.   Do you know whether they also contact those individuals

Case: 2:06-cv-00896-ALM-TPK Doc #: 658 Filed: 04/06/18 Page: 233 of 241 PAGEID #: 23494

Vol. 4 - 233

1    by phone?

2      A.    No, they do not.

3      Q.    And in your experience dealing with the homeless

4    population, would it be possible to reach homeless individuals

5    who have deficient five fields forms by phone?

6      A.    Yes.  Many homeless individuals have a phone, and they

7    include it in the registration.

8      Q.    Do you have experience about whether it would be easier

9    to reach them by phone than by mail?

10     A.    It would be much easier.  It would be nearly impossible

11   to reach somebody by mail in 7 days who is homeless.

12     Q.    Could you please explain your answer to the Court?

13     A.    So the -- one of the issues with the postal service is

14   that the drop-in centers keep mail for 30 days, which is a

15   problem for the postal service.  But the reason that we keep

16   the mail for so long is -- I mean, our members keep the mail

17   for so long is that people are transient all over the city and,

18   if we don't, we'll miss the individual.  So we -- it's really

19   difficult, and that's one of the big challenges that we face,

20   is most of the government only responds by U.S. mail.  And for

21   a homeless individual, that's a big challenge.

22     Q.    So what is the impact in your view of reducing the mail

23   time from 10 to 7 days for the notice?

24     A.    It makes it even less likely that a homeless individual

25   would be able to respond in that time.

1    Q.    Turning back again to the race discrimination claims, do

2   you have any personal knowledge that you have acquired of

3   intentional race discrimination by the General Assembly in

4   enacting Senate Bills 205 and 216?

5          MS. RICHARDSON:  Objection.

6          THE COURT:  Overruled.  You may answer.

7          MS. RICHARDSON:  Thank you, Your Honor.

8          THE WITNESS:  Yes.  I spoke to my elected officials,

9   and they said that these --

10  BY MR. CHANDRA:

11   Q.    When you say elected officials?

12   A.    I'm sorry.  I spoke to State Representative Nickie

13  Antonio and State Representative Mike Foley, and they said that

14  these were attempts to reduce participation in heavy urban

15  areas that are mostly minority and low income.

16         MS. RICHARDSON:  Objection, Your Honor.

17         THE COURT:  Overruled.

18  BY MR. CHANDRA:

19   Q.    I'm sorry.  Were you completed with your answer?

20   A.    Yes.

21         THE COURT:  Well, I want to go back.  I want Mr.-- I

22  want you, Mr. Chandra, to -- we have two persons.  I want to

23  know what he said to each of them because it started out with

24  individual conversations, and it was conflated along the way in

25  his answer.

1      So I'm going to sustain your objection, Ms. Richardson,

2  in as much as, you know, it was they to whom he referred, and

3  I'm going to ask you to desegregate that.

4          MR. CHANDRA:  Thank you, Your Honor.  I'll be able to

5  clear that up.

6  BY MR. CHANDRA:

7   Q.   Was that one conversation you had with them together?

8   A.   No.

9   Q.   So you had separate conversations with two state

10  representatives.  So tell us about the conversation with State

11  Representative Foley.  What did he say?

12          MS. RICHARDSON:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          MS. RICHARDSON:  Your Honor, may I request a sidebar?

15          THE COURT:  Yes, you may.

16          MS. RICHARDSON:  Thank you, Your Honor.

17                          - - -

18      Thereupon, the following proceeding was held at sidebar out

19  of the hearing of the open courtrom:

20          THE COURT:  Go ahead, Ms. Richardson.

21          MS. RICHARDSON:  Your Honor, I believe the question is

22  calling for a hearsay answer and possibly hearsay within

23  hearsay.

24          THE COURT:  We won't know that until we hear it.  But

25  the reason I overruled your objection -- I understood that when

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-7 Filed: 09/12/20 Page: 236 of 241 PAGEID #: 1852
Case: 2:06-cv-03893-ALM-TPA Doc #: 653 Filed: 04/08/10 Page: 236 of 241 PAGEID #: 21452

Vol. 4 - 236

1   you made the objection.  The reason I overruled your objection

2   is the background that Mr. Chandra had established was leading

3   me to a conclusion that it was not being offered for its truth,

4   but to show why he took certain actions.  And so it's the

5   effect on the listener.  It's not being offered for its truth.

6   I'm not taking it for its truth.  I doubt if one representative

7   can speak for what the entire legislature meant.

8          Now, think about it this way:  In practical terms if

9   that could be offered for its truth as to the intent of the

10  legislature, I am absolutely certain beyond peradventure that

11  Mr. Chandra would have called those individual representatives

12  in to tell me that the intent of the legislature in enacting

13  205 and 216 was to discriminate against people of color and the

14  urban poor in elections.  So if it was being offered for its

15  truth, that would certainly -- or in his case, if he could

16  prove it with those two witnesses, we would have instead of a

17  three week trial, probably a one day trial.

18         MS. RICHARDSON:  Thank you, Your Honor.

19         MR. CHANDRA:  Your Honor, I would like to preserve a

20  couple points for the record in response to the Court's

21  analysis on that point so you know where we're coming from on

22  this also.

23         First of all, even if it were for the truth, it's the

24  state of mind exception, it's an intent type issue.

25         Secondly, the State of Ohio is a defendant in this

1   matter on behalf of the General Assembly, it was always said

2   during the course of this case, so these are elected

3   representatives and are admissions of party opponent.

4           THE COURT:  I don't know that -- I don't know whether

5   you can stretch it that far.  I don't know whether these

6   elected officials are speaking on behalf of the State.

7   That's --

8           MR. CHANDRA:  It goes to weight, maybe.

9           THE COURT:  But I let it in, so --

10          MR. CHANDRA:  Okay.

11          MS. RICHARDSON:  Your Honor, based on the ruling I

12  don't think it's necessary to respond, but we would obviously

13  strenuously object to that characterization.

14          THE COURT:  I understand.

15          MS. RICHARDSON:  Thank you, Your Honor.

16          THE COURT:  These will be your last questions

17  because -- you have four minutes to finish for today, at least.

18      (Back in open court.)

19          THE COURT:  Please continue, Mr. Chandra.

20          MR. CHANDRA:  May I have the last question read back,

21  please?

22      (Question read back.)

23          THE WITNESS:  Mike Foley was the previous director of

24  the Cleveland Tenants Organization, and we regularly consulted

25  with him and asked -- I asked why there were so many pieces of

1  legislation coming forward about voting, and he said that this

2  was an attempt to depress minority and indigent -- or low

3  income voting in the urban areas of Ohio.

4  BY MR. CHANDRA:

5   Q.   So tell us about the conversation -- anything more about

6  that conversation?

7   A.   No.

8   Q.   Could you tell us then about the conversation with State

9  Representative Nickie Antonio?

10   A.   She also has a relationship with the Coalition in that

11  she was a board member of the Cleveland Tenants Organization.

12  And in -- it was actually -- I met her when I was doing some

13  voting activities.  I ran across her at the Board of Elections

14  and asked her about why there were so many pieces of

15  legislation, and she indicated the same thing, that there's big

16  struggles down at the statehouse around voting because there

17  were attempts to limit access from minority and low income

18  individuals.

19   Q.   Were there other circumstances that you experienced that

20  caused you to have concern about -- well, let me withdraw that.

21        THE COURT:  Mr. Chandra, it is 5 o'clock.  We can pick

22  up here tomorrow at this very place in the proceedings, because

23  I thought that you were just going to conclude on that one

24  point.

25        MR. CHANDRA:  That's fine.

1          THE COURT:  So you may be excused, Mr. Davis.

2          We will resume with you at 8:30 tomorrow morning.

3          Are there any other matters we need to take up from the

4     Defense?

5          MS. RICHARDSON:  No, Your Honor.

6          THE COURT:  Anything further from the Plaintiff?

7          MR. CHANDRA:  I don't think so, Your Honor.

8          Would you like some information, though, about this

9     witness and how much longer it will take, or are you fine with

10    it?

11         THE COURT:  No.  Thank you.

12         MR. McTIGUE:  Your Honor, can I have one second to

13    confer with Mr. Chandra?

14         THE COURT:  For the first time in this trial, I'm

15    going to limit you to the time you requested so you've got a

16    second.

17         MR. CHANDRA:  Your Honor, one issue that's come up

18    because of the witness order tomorrow, we do have our expert --

19    Plaintiffs' expert witness coming tomorrow.  And because of his

20    teaching schedule, with the Court's permission and if opposing

21    counsel will permit it, what we would like to do is take the

22    witnesses out of order because we do have Mr. Davis as a party

23    representative, and if we could put our expert on first, go

24    ahead and finish with that and continue with Mr. Davis.

25         THE COURT:  That's fine.  One of the reasons that I

1  didn't have you indicate how much time you believe you have

2  left with Mr. Davis, you'll recall on Friday, I gave you your

3  schedule, and you have to abide by it.  And you can manage your

4  time in your case as you deem necessary, but Friday we're going

5  to -- Thursday, you're going to conclude this aspect of your

6  case until Monday.  So you will conclude Thursday,

7  Ms. Richardson will begin her case in chief on Friday.  Then on

8  Monday you will have the witnesses you had subpoenaed for

9  Friday, I believe that's what we agreed, because of the Board

10 of Elections' schedule.  And so your case is to be concluded

11 close of business Monday, and then Ms. Richardson will have

12 Tuesday and Wednesday of next week to conclude.

13      Okay.  All right.  With that being said, thank you very

14 much.  We are adjourned.

15      (Proceedings concluded at 5:04 p.m.)

                            - - -

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4          We do hereby certify that the foregoing is a true and

5    correct transcript of the proceedings before the Honorable

6    Algenon L. Marbley, Judge, in the United States District Court,

7    Southern District of Ohio, Eastern Division, on the date

8    indicated, reported by us in stenotypy and transcribed by us or

9    under our supervision.

10

11                          s/Denise Errett, FCRR
                            Denise Errett, FCRR
12                          Official Federal Court Reporter

13                          s/Darla J. Coulter, RMR
                            Darla J. Coulter, RMR
14

15                          DATE:  March 24, 2016

16

17

18

19

20

21

22

23

24

25

Exhibit G, NEOCH v. Husted Trial Tr. Vol. IV