Vol. 10 -    1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3      THE NORTHEAST OHIO COALITION )
        FOR THE HOMELESS, et al.,    )
 4                                   )
                      Plaintiffs,    )
 5                                   )
                 vs.                 )    CASE NO. 2:06-CV-00896
 6                                   )
        JON HUSTED, in his official  )
 7      capacity as Secretary of     )
        State of Ohio, et al.,       )
 8                                   )
                      Defendants.    )
 9      _____ )

10

             TRANSCRIPT OF BENCH TRIAL - VOLUME 10
11        BEFORE THE HONORABLE ALGENON L. MARBLEY, JUDGE
                 TUESDAY, MARCH 29, 2016; 8:30 A.M.
12                      COLUMBUS, OHIO

13

        APPEARANCES OF COUNSEL:
14

15      FOR THE PLAINTIFFS:          SUBODH CHANDRA, ESQ.
                                     CAROLINE GENTRY, ESQ.
16                                   DONALD J. McTIGUE, ESQ.
                                     SANDHYA GUPTA, ESQ.
17                                   ANA CRAWFORD, ESQ.

18      FOR THE DEFENDANTS:          RYAN L. RICHARDSON, AAG
                                     SARAH E. PIERCE, AAG
19                                   TIFFANY L. CARWILE, AAG
                                     BRODI J. CONOVER, AAG
20                                   ZACHERY P. KELLER, AAG

21      COURT REPORTERS:             DENISE N. ERRETT
                                     DARLA J. COULTER
22                                   (614) 719-3029

23

        Transcript recorded by mechanical stenography, transcript
24      produced by computer.

25
```

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

```
                                         Vol. 10 -    2
 1                      I-N-D-E-X

 2                     VOLUME 10

 3

 4   DEFENDANTS' WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS0

 5
     M. V. HOOD, III              5      87     --        --
 6   SHERRY POLAND              175     242     --        --

 7

 8                        - - -

 9
```

1    (In Columbus, Franklin County, Ohio, Tuesday, March 29, 2016,

2  8:30 a.m., in open court.)

3        THE COURT:  Good morning, Counsel.

4        ALL COUNSEL:  Good morning, Your Honor.

5      Ms. Richardson, is your first witness your expert?

6        MS. RICHARDSON:  Yes, Your Honor.

7        THE COURT:  All right.

8      Just one moment.  Just one moment.

9      Ms. Richardson --

10        MS. RICHARDSON:  Yes, Your Honor.

11        THE COURT:  -- please call your first witness.

12        MS. RICHARDSON:  Thank you.  At this point, the

13  defense calls Dr. Trey Hood to the stand.

14    (Witness sworn.)

15        THE COURT:  Before we begin with Dr. Hood's

16  testimony -- You may be seated, Dr. Hood.

17        THE WITNESS:  Yes, Your Honor.

18        THE COURT:  Mr. Chandra, do you --

19        MR. CHANDRA:  I will be, Your Honor.

20        THE COURT:  Okay.  Do you wish to rest, or are we

21  going to go back into your case, at all, before we get to

22  rebuttal?

23        MR. CHANDRA:  We will be going back to the extent that

24  Mr. Damschroder is a common witness, Your Honor.  And then

25  there are certain stipulations we're still trying to finalize

Vol. 10 -   4

 1  with the defense.  We're waiting for some answers.

 2          THE COURT:  Is Mr. Damschroder going to be a witness

 3  in your case in chief?

 4          MR. CHANDRA:  He was going to be, Your Honor, and he

 5  is going to be; but by agreement with the defense, what we've

 6  done is say all of that will be presented during the course of

 7  their portion of the case, so that he just comes once.

 8          THE COURT:  So, after Mr. Damschroder, you will rest?

 9          MR. CHANDRA:  Yes, subject to the stipulations and

10  some of the outstanding matters we'll discuss with the Court

11  with respect --

12          THE COURT:  All right.  But we're going to decide upon

13  a time when you will rest.

14          MR. CHANDRA:  Yes.

15          THE COURT:  And then we'll be totally in the defense

16  case in chief.  And, then, if you choose to put on a rebuttal

17  case, we'll come with the rebuttal case, I believe we said,

18  either Wednesday afternoon or Thursday morning.

19          MR. CHANDRA:  Correct.

20          THE COURT:  When is Damschroder supposed to be here?

21          MS. RICHARDSON:  Tomorrow, Your Honor.

22          THE COURT:  All right.  Okay.

23      Thank you.  Please proceed.

24          MS. PIERCE:  Thank you, Your Honor.

25                          - - -

```
 1                         M. V. HOOD,

 2        AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

 3                       DIRECT EXAMINATION

 4     BY MS. PIERCE:

 5     Q.   Good morning, Dr. Hood.  Could you please state your

 6    name for the record?

 7     A.   M. V. Hood, III.

 8     Q.   And where are you currently employed, Dr. Hood?

 9     A.   I'm currently a professor of political science at the

10    University of Georgia.

11          THE COURT:  Could you spell your first name, Mr. Hood?

12          THE WITNESS:  Well, I just go by my initials, Your

13    Honor.

14          THE COURT:  All right.

15          THE WITNESS:  It's M period, V period, Hood, III.

16          THE COURT:  All right.

17          THE WITNESS:  Most people call me Trey, because I'm

18    the third.

19          THE COURT:  I understand.

20        Where are you from, Dr. Hood?

21          THE WITNESS:  I'm from Texas, originally, but we've

22    been in Georgia since 1999.

23          THE COURT:  All right.  Where in Texas?

24          THE WITNESS:  Waco.

25          THE COURT:  All right.
```

```
 1              MS. PIERCE:  Thank you, Your Honor.

 2       BY MS. PIERCE:

 3       Q.   Dr. Hood, if you could turn to Tab D9 in that binder

 4  next to you --

 5       A.   Okay.

 6       Q.   -- what is that document, sir?

 7       A.   It's a fairly recent copy of my curriculum vitae.

 8       Q.   And if you would just flip through it quickly, does it

 9  look to be a fair and complete copy of your CV?

10       A.   Yes.

11       Q.   Thank you.

12            Dr. Hood, if you could, please walk the Court through

13  your educational background.

14       A.   Certainly.  I've got three degrees in political science

15  from three different universities:  A B.S. from Texas A&M in

16  1991, an M.A. from Baylor in 1993, and a Ph.D. from Texas Tech

17  in 1997.

18       Q.   And when did you join the faculty at the University of

19  Georgia?

20       A.   In August of 1999.

21       Q.   And are you tenured there?

22       A.   Yes.

23       Q.   Okay.  Could you describe the subject areas, generally,

24  of your work as a professor?

25       A.   Sure.  Just in general, my areas of teaching and
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 7 of 329 PAGEID #: 1864
Case: 2:06-cv-00896-ALM-TPK Doc #: 364 Filed: 04/04/08 Page: 7 of 329 PAGEID #: 3094

Vol. 10 -    7

 1  research involve American politics and policy, generally.  More

 2  specifically, if we delve under the surface a little bit, I

 3  teach and conduct research in the areas of southern politics,

 4  racial politics, electoral politics, and election

 5  administration.

 6    Q.   And what are the general subject areas of the classes

 7  that you teach at the University of Georgia?

 8    A.   I teach a variety of classes at the University of

 9  Georgia.  I teach large introductory sections of American

10  government.  I teach an American government honors variant of

11  that class.  I teach -- typically teach classes about once a

12  year, upper-level undergraduate class in southern politics.  I

13  also have taught a graduate variant in southern politics.  I

14  have a heavy dose of voting rights, not surprisingly, in that

15  class.

16        I also teach a graduate-level class on election

17  administration.  And I'm scheduled to teach that this coming

18  fall again, in conjunction with the elections.  I've taught a

19  variety of other classes over the years, including some

20  undergraduate research methodology classes, as well.

21    Q.   And I notice you have quite a few publications listed on

22  your CV.  Could you just generally describe for the Court the

23  subject area of your published research?

24    A.   Sure.  Again, it's all in the general area of American

25  politics and policy.  My research interests and the classes I

 1   teach overlap heavily.  So, I've published articles on election

 2   administration, southern politics, electoral politics, racial

 3   politics.  And there's, obviously, a heavy overlap between

 4   those subject areas themselves.

 5   Q.   Have you ever examined demographic components of voting

 6   behavior in your research and published work?

 7   A.   Yes, very frequently.  I mean, almost -- or quite a bit

 8   of southern politics research deals with demographic data.

 9   Q.   And have you ever analyzed the public-policy

10   implications of election laws in your published research?

11   A.   Yes.  In the area of election administration, I've

12   touched upon the areas of voter ID, early in-person voting, and

13   voter fraud, to name a few things.

14   Q.   Do you review articles for publication?

15   A.   Constantly.

16   Q.   Okay.

17   A.   Frequently, very frequently.

18   Q.   Is that part of the peer-review process?

19   A.   It's part of the peer-review process, yes.  And it's

20   part of, I guess, the expectation of being in the academy as a

21   professor.  So --

22   Q.   Do you sit on any boards of any publications?

23   A.   Right now, I'm on two editorial boards, two journal

24   boards, one for *Social Science Quarterly*; and the other is for

25   a journal specifically in the area of election administration,

1    *Election Law Journal.*  So --

2      Q.    And I notice on the first page of your CV here that you

3    have published a peer-reviewed book.  Could you describe for

4    the Court what that book is about?

5      A.    Right.  A few years ago, myself and a couple of

6    coauthors published a book called *The Rational Southerner,*

7    which was our effort to theoretically and empirically try to

8    explain the changes that have occurred politically in the South

9    since the Voting Rights Act was implemented.  So we covered

10   about a 45-, 50-year time period there.

11            THE COURT:  What did you conclude, Dr. Hood?

12            THE WITNESS:  Well, a couple of things, Your Honor.

13   The two biggest things that have occurred in the South since

14   the Voting Rights Act was implemented was, one, black

15   enfranchisement, or re-enfranchisement, depending on how you

16   want to look at that, and two-party growth, you know, viable

17   two-party competition in the region.

18            And we found evidence that black mobilization, to some

19   extent, drove Republican growth.  And, in some cases, there is

20   actually a reciprocal relationship between Republican growth

21   driving black mobilization.  So that's -- that's a real short

22   encapsulation of the book.

23     BY MS. PIERCE:

24     Q.    Have you ever been accepted by a court as a qualified

25   opinion witness, Dr. Hood?

Vol. 10 - 10

1    A.    Yes.

2    Q.    And about how many times, would you say?

3    A.    Somewhere between ten and fifteen times.

4    Q.    Did you serve as an opinion witness in a case in Ohio

5    last fall?

6    A.    Yes.

7    Q.    Could you describe a little bit about what that case was

8    about?

9    A.    It was a case involving various components of Ohio's

10   election law.  Some of the things included -- There's some

11   overlap with this case in terms of provisional balloting and

12   absentee balloting.  But that case also included some other

13   issues like same-day registration during the early-in person

14   voting period, or Golden Week, early in-person voting, and a

15   number of other issues as well.

16   Q.    And if I refer to that as the ODP case, will you know

17   what I'm referring to?

18   A.    Yes.

19   Q.    Okay.  Great!

20        THE COURT:  Dr. Hood, in addition to that case -- and

21   I think that you're talking about the case before my friend and

22   colleague, Judge Watson.  Is that right?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Have you testified in other voting-related

25   cases?

Vol. 10 - 11

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  And have these been restricted to any

3    region of the country, or has it been throughout the country?

4          THE WITNESS:  Well, I've got to say most of it's been

5    in the South, although I've participated in some cases in

6    Wisconsin.  The rest of them, for me, primarily, have been in

7    the South.

8          THE COURT:  Do those cases -- Do those voting cases in

9    which you participated involve your analyzing provisional

10   ballots?

11         THE WITNESS:  Sometimes, Your Honor, yes.

12         THE COURT:  Absentee ballots?

13         THE WITNESS:  Sometimes, Your Honor.

14         THE COURT:  Voter fraud?

15         THE WITNESS:  I -- I've never really conducted my own

16   voter fraud research in relation to a case, specifically, Your

17   Honor.  I've done some academic --

18         THE COURT:  Have you been involved in any cases where

19   a legislation was enacted to combat voter fraud?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.

22         THE WITNESS:  Several voter ID cases.

23         THE COURT:  And in those voter ID cases, Dr. Hood, did

24   you look at whether the incidence of fraud was so significant

25   as to precipitate the enactment of measures to curb such fraud?

1          THE WITNESS:  Well, I didn't really perform an

2    analysis on that specific question.  A lot of times in these

3    voter ID cases, I was -- I was involved in doing things like

4    database matching to try to figure out what percentage of the

5    voting population did or didn't have a voter -- a qualified ID,

6    for instance, Your Honor.  I mean, I did write, or touch upon,

7    the area of voter fraud.  But I didn't execute a specific

8    analysis in those cases of voter fraud.  If --

9          THE COURT:  No.  That answers my question.  Thank you,

10    Dr. Hood.

11          Please continue, Ms. Pierce.

12          MS. PIERCE:  Thank you, Your Honor.

13      BY MS. PIERCE:

14      Q.   Dr. Hood, have you conducted any academic research into

15    the issue of voter fraud?

16      A.   I've published one article in the area of voter fraud,

17    yes.

18          THE COURT:  What was that article, Dr. Hood?

19          THE WITNESS:  That's listed in my CV.

20          THE COURT:  Would you pull that CV for me, please,

21    Betty?  Would you pull the CV for me?

22          MS. PIERCE:  It's D9.

23          THE COURT:  Go ahead, Doctor.

24          THE WITNESS:  Okay.  I'm just trying to find the

25    exact -- exact title here.

```
 1          Okay.  It's on page II of my CV.  And the title of the
 2   article is They Just Don't Vote Like They Used To:  A
 3   Methodology to Empirically Assess Election Fraud.
 4     BY MS. PIERCE:
 5     Q.   And has --
 6              THE COURT:  What volume is that in?
 7              MS. PIERCE:  It's Volume I, Your Honor, Exhibit D9.
 8              COURTROOM DEPUTY CLERK:  It's in the white notebook,
 9   if you have one.  You don't have one?
10              MS. PIERCE:  Your Honor, you're welcome to mine.
11              THE COURT:  No.  You can leave yours on the Elmo.  Mr.
12   Conover can give me his.
13              MR. CONOVER:  I will have to go find you one, Judge.
14   I think it may be in Judge Frost's chambers, too.
15       (Whereupon, there was a brief interruption.)
16              MR. CHANDRA:  Your Honor, we can give you ours.
17          What did you conclude in your article, Dr. Hood?
18              THE WITNESS:  A couple of things, Your Honor.  This
19   article specifically was -- part of it was methodological.
20   What we were doing is coming up with a methodology, or a
21   framework, to try to study and detect voter fraud.  So, that
22   was part of it.  And that could be applied again and again and
23   again.
24          We took that methodology, or that framework, and we
25   applied it to searching for specific incidents of voter fraud
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 14 of 329 PAGEID #: 1871
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 14 of 329 PAGEID #: 30931

Vol. 10 - 14

```
 1    in the State of Georgia in the 2006 midterm.  We were basically

 2    looking for dead voters, or someone voting on behalf of the

 3    deceased, which has been a problem in Georgia if you go back

 4    far enough in time, to the 1946 gubernatorial election, for

 5    instance.

 6         But applying our methodology to a search for that type

 7    of voter fraud in that particular midterm election, we weren't

 8    able to uncover anyone that appeared to be voting on behalf of

 9    deceased.

10         So, in a nutshell, that's sort of what we concluded from

11    that article.

12         THE COURT:  Okay.  I'm somewhat familiar with that

13    phenomenon, having gone to law school in Chicago and having

14    read various articles about how the dead often voted.

15         THE WITNESS:  It did happen, in the past, at least.

16         THE COURT:  Yes.  That was in the past, of course.

17    Please continue, Ms. Pierce.

18         MS. PIERCE:  Thank you, Your Honor.

19         At this time, I tender Dr. Hood as a qualified opinion

20    witness in political science, election administration, voter

21    behavior, and quantitative analytical methods.

22         THE COURT:  Mr. McTigue, any objection?

23         MR. McTIGUE:  Was political science -- I don't have

24    any objection on political science.

25         What was the second one?  I'm sorry.
```

 1            MS. PIERCE:  We had election administration, voter

 2    behavior, quantitative analytical methods.

 3            MR. McTIGUE:  Your Honor, I would object on the voter

 4    behavior and quantitative analytical methods.

 5            THE COURT:  Your objection is duly noted, but

 6    overruled.

 7            Dr. Hood, under Johnson, is going to be allowed to

 8    testify as an opinion witness.  And he will be able to touch on

 9    the issues of election administration, voter behavior,

10    quantitative analytical methods, and things Southern politics.

11            MS. PIERCE:  Thank you, Your Honor.

12            THE COURT:  As a Southerner, Dr. Hood, that's a matter

13    of certain interest to me, as well.  Unfortunately, those are

14    not issues in this case.  I don't think we have any southern

15    voters who are alleged to have participated in any level of

16    fraud that caused the enactment of either 205 or 216.  Do we,

17    Ms. Pierce?

18            MS. PIERCE:  Not unless I'm one, Your Honor, no, sir.

19            THE COURT:  Maybe a voter in southern Ohio, but not

20    the true South.

21            Please continue, Ms. Pierce.

22      BY MS. PIERCE:

23      Q.    And, Dr. Hood, could you just run us through what your

24    background and expertise is in election-administration matters?

25      A.    Okay.  Again, primarily, or, some of the areas I've

1   touched on in election administration, in terms of published

2   research, involve, again, voter ID, voter fraud, and early

3   in-person voting.

4            MS. PIERCE:  Okay.  And I'd also like to move

5   Dr. Hood's CV into evidence that's Defendants' Exhibit 9.

6            THE COURT:  Any objection to D9, Mr. McTigue?

7            MR. McTIGUE:  No objection.

8            THE COURT:  D9 will be received.

9   BY MS. PIERCE:

10  Q.    Dr. Hood, if you could turn to Tab D8 in the binder.

11  A.    Okay.

12  Q.    And what is this document?

13  A.    This is an expert report I submitted in this case.

14  Q.    And just flipping through it, does it appear to be an

15  accurate and complete copy of that report?

16  A.    Yes.

17  Q.    What were you asked to do in this case, Dr. Hood?

18  A.    I was asked to analyze three separate issues, changes

19  specifically regarding Ohio's absentee ballot law and

20  provisional ballot law, and also to analyze an issue of

21  multi-precinct locations.

22  Q.    And did this overlap at all with your work in the case

23  last fall, the ODP case?

24  A.    Yes, fairly heavily.

25  Q.    And what materials did you rely on in forming your

```
1    opinions in this initial report?

2      A.    There were a number of pieces of evidence I looked at,

3    including statistical data from the Ohio Secretary of State's

4    Office that I analyzed, and sworn statements, or interviews,

5    that I conducted with Ohio election officials both at the

6    Secretary of State's Office -- excuse me -- and at the local

7    level, the county level.

8      Q.    And let's talk about the county election officials

9    first.  Why were those interviews important to your analysis in

10   this case?

11     A.    Well, just like any policy issue, someone writes policy

12   and someone implements policy.  And, in this case, the

13   Legislature in Ohio and the Secretary of State's Office are,

14   essentially, formulating policy.  But it's these local election

15   officials at the county level that are actually implementing,

16   or putting, the policy in place.

17         So it's very important, in my opinion, to see what's

18   going on at the point of implementation.  And those are the

19   people to talk with about that.

20     Q.    Have you relied on similar information in your own

21   research?

22     A.    Yes.  Yes.  You know, it's typically called elite

23   interviews at that level.  And I've interviewed a number of

24   people over the years for different research projects I've been

25   involved with:  Former elective officeholders, bureaucrats
```

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    within the State administration, et cetera.

2    Q.   And have you used that information in your peer-reviewed

3    publications?

4    A.   Oh, yes, directly.

5    Q.   So is that an accepted practice in political-science

6    research?

7    A.   Yes.

8    Q.   Did you review the law and directives that were

9    implicated in this case?

10   A.   I did.  I did.  So, both the statutory law and

11   directives put out by the Secretary of State's Office, yes, and

12   other publications from the Secretary of State's Office.

13          MR. McTIGUE:  Your Honor, not objection, just -- I'm

14   really having trouble hearing the witness.

15          THE COURT:  Okay.  All right.

16          THE WITNESS:  Sorry about that.  Is that better?

17          MR. McTIGUE:  That's a little better, yes.

18   BY MS. PIERCE:

19   Q.   So, stepping way back, Dr. Hood, what options do voters

20   in Ohio have to cast a ballot?

21   A.   Any qualified voter in Ohio can vote in person early

22   before Election Day, absentee by mail before Election Day, or

23   at their precinct on Election Day.

24   Q.   Turning to page 3 of your report, which is the first

25   substantive section, what does this section discuss?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 19 of 329 PAGEID #: 1876
Case: 2:06-cv-03803-NLH-KAJ Doc #: 364-8 Filed: 04/04/16 Page: 19 of 329 PAGEID #: 30949

Vol. 10 - 19

1    A.    This section discusses changes to the provisional

2    balloting process in Ohio.

3            THE COURT:  What is -- Give me that number again.

4            MS. PIERCE:  It's page 3, Your Honor.  It's Tab D9.

5    BY MS. PIERCE:

6    Q.    And what are provisional ballots, Dr. Hood?

7    A.    A provisional ballot's cast when a voter shows up at the

8    polls, for instance, and there could be some issue.  There

9    might be a registration issue, for instance.  But a provisional

10   ballot is not a regular ballot.  If someone's qualified at the

11   point in time when they arrive at the polls to cast a regular

12   ballot, then they'll cast a regular ballot.  Otherwise, they

13   may be forced to cast a provisional ballot.

14   Q.    I apologize, Dr. Hood.  The Judge does not have his

15   materials.

16           THE COURT:  I don't have D9, for whatever reason.

17           THE WITNESS:  I think this is D8.

18           MS. PIERCE:  Yeah.  It is D8.  I apologize.

19           MR. CHANDRA:  We'll give you a copy of ours, Your

20   Honor.

21           MS. PIERCE:  And I have an extra copy, too, actually.

22        Your Honor, may I approach?

23           THE COURT:  Sure.

24           COURTROOM DEPUTY CLERK:  Am I correct, because I wrote

25   "D8," and you were saying "D9"?

1          MS. PIERCE:  I made a mistake.  That's D8.  That's the

2    initial report.  And this is D10, the rebuttal report.

3          THE COURT:  Just a moment.  I want to go back to look

4    at some testimony.

5        Please continue.

6          MS. PIERCE:  Thank you, Your Honor.  Very sorry about

7    that.

8      BY MS. PIERCE:

9      Q.   Dr. Hood, I just want to give you an opportunity to

10   answer or finish your answer to my question about what --

11         THE COURT:  Read the question back, and beginning of

12   his answer, please, Ms. Errett.

13      (The last question and answer were read back by the court

14   reporter.)

15         THE COURT:  Please continue.

16         MS. PIERCE:  Thank you.

17     BY MS. PIERCE:

18     Q.   Anything you'd like to add to that, Dr. Hood?

19     A.   Well, I could also say, provisional ballots are a

20   fail-safe.  Again, someone shows up at the polls, and there may

21   be an issue.  It allows them to cast the ballot.  And then

22   election officials can sort things out after the election is

23   over with.  And so there is still a chance that the provisional

24   ballot will be converted or -- in some states, it's called

25   curing -- and converted over to a regular ballot and counted.

1    Q.    And how do the laws at issue in this case change the

2    provisional balloting process in Ohio?

3    A.    A couple of things.  One, there is a couple more pieces

4    of information that someone needs to put on their provisional

5    ballot affirmation form now.  And those are, specifically,

6    their address and their date of birth.  In addition, they need

7    to put their name, sign the provisional ballot, and also

8    provide some type of identification.

9    Q.    And in your analysis, does adding those additional

10   fields, date of birth and address, have any administrative

11   benefits?

12   A.    Well, again, it -- it makes it easier for election

13   officials to locate someone, or not, in the State registration

14   database.  And, again, that's part of the process that these

15   provisional ballots are going to go through.  These election

16   officials at the local level are going to try to locate

17   someone's provisional ballot to see if they're registered, if

18   they're registered in the right place, et cetera.  And, so, the

19   more data fields you have, the easier it is to find someone in

20   a database.

21   Q.    Are there any other benefits that adding those

22   particular fields to a provisional affirmation form have for

23   the voter?

24   A.    Well, if someone's registration needs to be changed --

25   in other words, maybe they've moved -- it can be updated by the

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 22 of 329 PAGEID #: 1870
Case: 2:06-cv-00896-ALM-TPK Doc #: 654-8 Filed: 04/03/16 Page: 22 of 329 PAGEID #: 30948

Vol. 10 - 22

 1    local election officials; or if they need to register,

 2    period -- if they thought that they were registered in Ohio but

 3    they weren't and they cast a provisional ballot, the local --

 4    the county election officials will go ahead and register them

 5    to vote in that county.

 6    Q.    And besides adding the additional information fields,

 7    did the law make any other changes to the provisional ballot

 8    process in Ohio?

 9    A.    The cure period is now at seven days.  So, if there are

10    any -- any additional information needs to be added by the

11    voter to the provisional ballot, they have seven days after the

12    date of the election to get that done.  And, really, the only

13    two things -- the only two pieces of information that someone

14    may need to add after the fact, after the election, for a

15    provisional ballot or if they didn't provide ID at the time

16    when the provisional ballot was cast, they may need to provide

17    proof of identification during that seven-day period.

18          And the only other reason would be if the ballot -- if

19    the elector was being challenged, they could provide evidence

20    that they were a qualified elector before the Board.

21          So, those are really the only two reasons that someone

22    would have to do something additional during this seven-day

23    period following the election.

24    Q.    And in your analysis, are there administrative

25    justifications for that change in the cure period?

1    A.   Well, a lot -- I'm going to bleed over a little bit into

2    the absentee ballot changes, a lot of what went on with the

3    standardization process between provisional and absentee

4    ballots.  So, now the period whereby someone may have to

5    provide additional information for their absentee ballots is

6    also seven days.  Administratively, the county boards need to

7    start their official canvass by Day 11.  So, there has to be a

8    start and stop period to when voters can add information to

9    either provisional ballots or absentee ballots after the date

10   of the election.

11   Q.   Now, let's turn to Table 1 on page 6 of your report.

12   I'll show you on the screen, as well.

13        What does this table show us, Dr. Hood?

14   A.   I collected some data from the Ohio Secretary of State's

15   Office involving provisional ballots.  And I have things

16   operationalized in slightly different manners here, but this is

17   -- this would be the total number of provisional ballots cast,

18   the number of provisional ballots rejected, or, specifically,

19   the number of rejected due to voter error out of the total

20   number of ballots cast.  So there's -- There's actually quite a

21   bit of information encapsulated in this table.  And it goes

22   from 2008 to 2015.

23        So, there are three election cycles, or periods,

24   pre-implementation, before these changes to the law took effect

25   regarding provisional ballots; and I have data on two election

 1   cycles, 2014 and 2015, that are occurring after implementation.

 2         THE COURT:  Doctor, before we get to the data that

 3   you've collected in Table I, I want to go back for a moment to

 4   what you were asked to analyze in the information you were

 5   provided.

 6         Were you provided any information which indicated to you

 7   that either Senate Bill 205 or 216 was enacted to cure a

 8   problem precipitated by voter fraud?

 9         THE WITNESS:  No, Your Honor.  And --

10         THE COURT:  Go ahead.

11         THE WITNESS:  And I did not conduct what I might call

12   a legislative-intent analysis.

13         THE COURT:  Is it typical in a case of this variety,

14   based on your experience, to conduct such a legislative-intent

15   analysis?

16         THE WITNESS:  I've seen it sometimes; and sometimes,

17   no.

18         THE COURT:  Have you ever conducted a

19   legislative-intent analysis?

20         THE WITNESS:  Not primarily.  I'm typically involved

21   more on the administration side of things.

22         THE COURT:  Were you told the reason that precipitated

23   the enactment of either 205 or 216?

24         THE WITNESS:  No, Your Honor.  I was just asked to do

25   an analysis on what -- what these laws were and what the

1    changes might bring about.

2          THE COURT:  You were told -- Well, what were you told

3    about the changes that the laws might bring about?

4          THE WITNESS:  Well, I was asked -- I was asked to

5    issue my own assessment of whether or not, for instance, these

6    changes to provisional ballot laws or absentee ballot laws

7    were, were or were not, causing, say, more provisional ballots

8    to be rejected or not.

9          THE COURT:  But you were never told the circumstances

10   which led to the enactment of either of these two laws?

11         THE WITNESS:  No, sir.

12         THE COURT:  Did you do any independent research which

13   gave you some idea of what led to the enactment of 205 or 216?

14         THE WITNESS:  No, Your Honor.  I didn't conduct any

15   analysis involving legislative intent or what actually happened

16   in the Legislature.

17         THE COURT:  And as you approached your work, you had

18   no idea of why the Legislature enacted either 205 or 216?

19         THE WITNESS:  No, Your Honor.

20         THE COURT:  All right.  Please continue, Ms. Pierce.

21         MS. PIERCE:  Thank you, Your Honor.

22     BY MS. PIERCE:

23     Q.   Dr. Hood, how did you come to the conclusion that the

24   changes to the provisional balloting laws had administrative

25   benefits?

1    A.   Well, again, through talking with officials like

2  Mr. Damschroder or through reading sworn statements that were

3  issued in the ODP case, which I also relied on in this case,

4  from county election officials.

5    Q.   And how many of those sworn statements from county

6  election officials did you have at your disposal?

7    A.   I don't remember exactly.  There were quite a few,

8  though.  I didn't make use of all of them in this case.  I

9  would say -- I don't want to exaggerate, but more than 20,

10  probably.

11        THE COURT:  Did you come to the conclusion that there

12  were administrative benefits to the changes in the provisional

13  balloting laws, Doctor, based just on the sworn statements from

14  county elected officials?

15        THE WITNESS:  Primarily, yes, Your Honor, and I guess

16  my experience with, you know, looking into these types of

17  issues myself.

18        THE COURT:  And, Ms. Pierce, you're going to have him

19  tell me what the administrative benefits are, right?  You're

20  getting to that?

21        MS. PIERCE:  Yes, Your Honor.  We can do that right

22  now.

23        THE COURT:  All right.

24   BY MS. PIERCE:

25    Q.   Dr. Hood, in terms of provisional balloting, because

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 27 of 329 PAGEID #: 1884
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 27 of 329 PAGEID #: 30991

Vol. 10 - 27

 1    we'll turn to absentees in just a minute, but could you explain

 2    for the Court what those administrative benefits are again?

 3       A.    Sure.  Again, someone comes in and needs to vote a

 4    provisional ballot.  There is a couple of extra information

 5    fields that are added, again, specifically, address and date of

 6    birth, in addition to the other fields that were previously

 7    required.  These fields -- Anytime you're searching in a

 8    database, like the voter registration database, the more fields

 9    you have to draw upon, the easier it is to locate a case and be

10    confident that the case you've located is the voter attached to

11    that provisional ballot, which is, obviously, very important.

12    You don't want to have a lot of false positives.

13       Q.    And do you have experience, yourself, searching through

14    those types of databases?

15       A.    Yes, quite a bit of experience, both academically and in

16    court cases.

17       Q.    And what is your understanding of the time frame

18    election officials in Ohio have to search for provisional

19    voters in their databases?

20       A.    Well, they need to get that done by Day 7.  Then they

21    need to get ready, starting on Day 11, to start the official

22    canvass, the official vote canvass.

23       Q.    Thank you, Dr. Hood.  And if I could direct your

24    attention back to Table I, you conducted a quantitative

25    analysis of the provisional ballot changes, as well.  And I

1   think you mentioned that you operationalized these numbers a

2   couple different ways.  Could you just walk us through what

3   that means?

4      A.    Okay.  So, for all the figures, all the percentages in

5   this table, the denominator is the total votes cast in a given

6   election.  So, I've got a column for the total number of

7   provisional ballots cast.  And I will add at this point that

8   there are many reasons why someone may have to cast a

9   provisional ballot.  In the number of provisional ballots

10  rejected -- it's in the next column -- and, again, there are

11  many reasons why a provisional ballot might ultimately be

12  rejected.  The most prevalent reason, actually, is that

13  someone's not registered to vote in the State of Ohio, or

14  wasn't registered to vote 30 days out from the election in the

15  State of Ohio.

16          And, then, there is some very detailed data, actually,

17  from the Secretary of State's Office, where I could hone in

18  specifically on looking at provisional ballots that were

19  rejected solely due to voter error.  And that would be failure

20  to provide, for instance, information for one of these five

21  fields that we're talking about.

22          So, actually -- and, again, the category existed prior

23  to 2014, when the current law was implemented.  But 2008

24  through 2012 would only include three categories.  In 2014 and

25  2015, it would include the additional two.  So there would be

1    five in all.

2         So, the number of potential reasons why a provisional

3    ballot might be rejected because of voter error actually

4    increases, of course, in 2014.  But what we want to look at, or

5    hone in on, if you will, is the provisional ballot rejection

6    rate, especially due to voter error.  And so that's categorized

7    over in the far right column this table.

8    Q.   And just to be clear, Dr. Hood, what are the three

9    categories of voter error pre-2014?

10   A.   Okay.  Failure to sign, failure to provide your name or

11   identification.

12   Q.   And what are the categories of voter error that you

13   looked at post-2014?

14   A.   Those plus an address issue or date of birth issue.

15   Q.   And why is it important to break down rejection reasons

16   in that way?

17   A.   Well, again, what we're trying to do, or what I'm trying

18   to do here, is figure out what is the impact of the law or the

19   change in the law.  It's -- It's not looking at, necessarily,

20   total provisional ballots cast, or even total provisional

21   ballots rejected.  But when we have data at this granular level

22   like we have here, we want to hone into that level and say, did

23   the change to the law as it was implemented in 2014 increase

24   the number of provisional ballots that were rejected because of

25   voter error or not.  That's the question I'm looking at.

1    Q.   So why did you include data from elections all the way

2    back to 2008?

3    A.   Well, anytime we do what we call a policy-impact

4    analysis -- and there are many different variants of this -- we

5    want to have a pre- and post-implementation time-point,

6    primarily, so we can look back and say, you know, what was

7    the -- what was the rejection rate due to voter error prior to

8    the law being implemented and then after the law was

9    implemented.  And we're looking to see if there is an increase,

10   or decrease, related back to that base number we've calculated.

11         THE COURT:  Doctor, one of the things that your chart

12   demonstrates is that, for the '08 and '12 elections, you have

13   greater voter turnout than you do for the '10 and '14 election.

14   Is that right?

15         THE WITNESS:  Certainly, Your Honor, yes.

16         THE COURT:  And you would expect that because the '08

17   and '12 elections are presidential election cycles, correct?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  And you typically have more voters

20   participating in the electoral process during presidential

21   election cycles, correct?

22         THE WITNESS:  Yes, Your Honor, almost always.

23         THE COURT:  Yes.  Now, there were more voters in '08

24   than in '12, correct?

25         THE WITNESS:  Yes.  Yes, sir.

1          THE COURT:  And more in '10 than in '14, correct?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Does the total number of voters in those

4     two comparable cycles suggest any type of trend?

5          THE WITNESS:  Well, there's -- you know, if you

6     compare presidential to presidential, midterm to midterm --

7          THE COURT:  Yes.

8          THE WITNESS:  -- there's a slight drop in turnout.

9     Interestingly, turnout goes up in this off off-year election in

10    2015, compared to 2014.  So -- but you're right.

11         THE COURT:  Basically, your experience, is that

12    suggestive of anything?

13         THE WITNESS:  Just to be totally honest, predicting

14    voter turnout or explaining voter turnout, there are a myriad

15    of factors involved with that --

16         THE COURT:  Okay.

17         THE WITNESS:  -- including things like voter interest,

18    how competitive the campaigns are, how much money is being

19    spent.

20         THE COURT:  Or as extraneous as the weather.  The

21    weather is a factor, too, right, because, if you were in the

22    middle of a deluge in '14 but it was nice and sunshiny in '15,

23    that might account for some variation, right?

24         THE WITNESS:  That's true, even the weather can.

25         THE COURT:  Even the weather can.

1       Now, one of the issues that you look at is -- when you

2   are analyzing new measures that impact one's right to vote is

3   whether the new measures impose an unreasonable burden on the

4   franchised; is that right?

5       THE WITNESS:  That's correct, Your Honor.  I'm trying

6   to do that through this analysis.

7       THE COURT:  Absolutely.

8       THE WITNESS:  Yes.

9       THE COURT:  And can we look at this chart and tell

10  whether the additional burdens might be enforcing in any way

11  whether the voter elects to participate in the process?

12      THE WITNESS:  Well, this -- this only would -- these

13  data in this chart would only be reflective of those that

14  showed up to vote.

15      THE COURT:  Right.

16      THE WITNESS:  That's true.

17      THE COURT:  And I take it that you have a similar

18  chart for absentee ballots, right?

19      THE WITNESS:  Unfortunately, as great as the data are

20  in this case to analyze this question, in my opinion, the data

21  that the Secretary of State's Office in Ohio collects on

22  absentee ballot rejection rates is not -- not at the level

23  needed to perform the same kind of analysis.

24      So, to actually answer your question, no, I was unable

25  to perform a similar type of empirical analysis for absentee

1    ballots in this case.

2           THE COURT:  And you did no analysis to determine what

3    extent, if any, the changes to the provisional ballots might

4    have discouraged persons from exercising the franchise?

5           THE WITNESS:  I can't comment on that, Your Honor.

6           THE COURT:  Well --

7           THE WITNESS:  I don't have any evidence one way or the

8    other on that.

9           THE COURT:  Right, but -- and you weren't asked to do

10   that type of analysis, either, were you?

11          THE WITNESS:  That's correct, Your Honor.

12          THE COURT:  Please continue, Ms. Pierce.

13          MS. PIERCE:  Thank you, Your Honor.

14    BY MS. PIERCE:

15    Q.   Dr. Hood, are there differences between each of the

16   elections you have data listed here, elections for which --

17    A.   Just in a general sense?

18    Q.   In a general sense.

19    A.   Certainly.  I mean, they're different candidates,

20   different offices, different issues.

21    Q.   Does that impact your analysis of this data in any way?

22    A.   Well, it doesn't impact, specifically, the analysis I'm

23   trying to do here.  And, again, that's one of the reasons --

24   you know, turnout rates vary.  The number -- the literal number

25   of people turning out varies across elections.  And that's why

1  we convert things to percentages, so that we can directly

2  compare across these election cycles.

3    Q.    And how did you calculate the percentages in the "Total

4  Provisional" and the "Provisional Rejected" columns?

5    A.    Okay.  Well, that's simply -- you can see the numbers,

6  the little numbers there in the brackets.  So, it's just -- for

7  instance, in 2015, it's 79,414 divided by 3,255,537.

8  Everything's being divided by the total number of votes cast,

9  which is the denominator for all of these figures.

10   Q.    And looking at this data you've collected, Dr. Hood,

11  what do you take away?  What are your conclusions?

12   A.    Maybe we can look -- you know, I summarize things down

13  at the bottom of the table, the bottom two rows, of

14  post-implementation and pre-implementation time periods.

15        So the post-implementation time period will be 2014 and

16  2015.  Pre-implementation will be 2008 through 2012.  And I

17  guess the biggest take-away point, or summation point, would

18  be, in the far right column, even though the number of

19  categories in which someone's provisional ballot might have

20  been rejected because of voter error increases, the provisional

21  ballot rejection rate due to voter error falls from .06 percent

22  in the pre-implementation period to .02 percent in the

23  post-implementation period.  So there's actually a dropoff.

24        So, this would lead me to believe that the State asking

25  provisional voters for these additional pieces of information

1   has not increased the rejection rate.

2     Q.   And I think you mentioned that the 2015 election was an

3   unusual off off-year election.  What did you mean by that?

4     A.   Well, it's unusual.  Again, the others are federal

5   election cycles.  I wanted -- Since I was -- I was able to

6   update my figures from the ODP case before this case, but I was

7   only able to do that using the 2015 General.

8          Obviously, we haven't had the 2016 General yet.  It was

9   a little bit different.  Again, I'm not an Ohio resident, but

10  there was a ballot initiative dealing with marijuana.  And that

11  may have been one of the reasons there was a slight uptick in

12  voter turnout there.

13    Q.   In comparing the two post-implementation years, 2014 and

14  2015, what observations do you make?

15    A.   Well, again, the provisional ballot rejection rate

16  because of voter error in 2014 is .02 percent.  And it goes up,

17  just slightly, to .03 percent in 2015.  But, again, that's

18  equal to or less than the preceding three federal election

19  cycles for that same metric.

20    Q.   And did the number of provisionals cast increase between

21  those two years?

22    A.   Between 2014 and 2015?

23    Q.   Yes, sir.

24    A.   Yes.  Yes.  The literal number goes from about 49,000 to

25  79,000.

1    Q.    Okay.  Let's turn now to your Figure 1 on the next page.

2    A.    Okay.

3    Q.    What does this figure tell us?

4    A.    This is a little bit different way of looking at the

5    same issue.  Here, we're looking at the number of provisional

6    ballots rejected because of voter error out of the total number

7    of provisional ballots cast.  So the denominator changes to the

8    total number of provisional ballots cast.  So it's just a

9    different way to look at the same issue again.  And I have the

10   same election cycles plotted on the figure.  And I also have a

11   pre-implementation and post-implementation bar over to the far

12   left of the figure.

13         And, again, what we see, just in a nutshell, is that,

14   even operationalizing this metric a little bit different, in a

15   little bit different manner, the rejection rate goes -- falls

16   from 1.6 percent, pre-implementation, to 1.2 percent,

17   post-implementation.

18         So, again, we see a drop in the overall provisional

19   ballot rejection rate due to voter error, even operationalizing

20   this measure slightly differently.

21   Q.    And -- I'm sorry.

22         THE COURT:  Doctor, excuse me for a second.  A couple

23   of questions, Doctor.

24         Did you disaggregate these numbers along county lines at

25   all?

Vol. 10 - 37

1          THE WITNESS:  No, Your Honor.

2          THE COURT:  So you don't know whether the counties

3    with the highest number of minority voters had proportionately

4    higher rejection rates than the counties with the smallest

5    number of minority voters?

6          THE WITNESS:  That's correct.  I didn't perform that

7    analysis.

8          THE COURT:  And you have never been asked to look at

9    the propriety of any of those numbers; is that right?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  All right.  Were you asked to look at the

12    report of the plaintiffs' expert, Dr. --

13          MS. PIERCE:  -- Timberlake.

14          THE COURT:  -- Timberlake?

15          THE WITNESS:  Yes, sir, I was.

16          THE COURT:  So you're familiar with his findings that

17    counties with the highest number of minority voters also had

18    the higher rejection rates?

19          THE WITNESS:  I'm familiar with his finding, although

20    I don't -- I don't agree with the way that he conducted --

21          THE COURT:  I understand that.  That was my next

22    question.  But you don't agree with those findings?

23          THE WITNESS:  I don't agree with the way he conducted

24    his analysis, no, Your Honor.

25          THE COURT:  Okay.  But you didn't conduct an

1  alternative analysis of your own to pressure test his

2  conclusions?

3        THE WITNESS:  No.  I just -- I just analyzed his

4  analysis.

5        THE COURT:  I see.  Okay.  All right.

6   BY MS. PIERCE:

7   Q.  Dr. Hood, could you remind me -- I apologize if you said

8  this already.  Is Figure 1 analyzing your voter-error category

9  or provisional rejections overall?

10  A.  No, just the voter-error category.  So, it's very

11  specific again.

12  Q.  And what do you, again, do you take away from this

13  figure about the impact that this change to the provisional

14  ballot law had in Ohio?

15  A.  Well, both Table 1 and Figure 1, again, things are

16  measured slightly differently; but the number of ballots being

17  rejected because of voter error because of those five

18  categories we discussed actually fell in the

19  post-implementation period -- it did not rise -- compared to

20  the pre-implementation period.

21        And I should note, as well, that, you know, especially

22  looking at Table 1, that three-hundredths of a percentage

23  point, these are very small numbers.

24        THE COURT:  Doctor, I want to make sure that I

25  understand Table I correctly.

1    You do look at the number of ballots rejected due to
2 voter error.  That's the column to the far right; is that
3 correct?
4         THE WITNESS:  Yes, Your Honor.
5         THE COURT:  But the table to the left of it, which is
6 Provisional Ballot Rejected, that covers all of the provisional
7 ballots rejected, for whatever reason; is that right?
8         THE WITNESS:  That's exactly right.  And that would
9 include voter error, too.
10         THE COURT:  Yes.  And, so, we see a decrease in the
11 number of ballots rejected post-implementation; is that right?
12         THE WITNESS:  Total -- Total provisional ballots?
13         THE COURT:  Yes.
14         THE WITNESS:  Yes, Your Honor.
15         THE COURT:  That's about three-tenths of a percent?
16         THE WITNESS:  Yes, Your Honor.
17         THE COURT:  Okay.  And there is also a precipitous
18 decrease in the number of total votes cast pre-implementation,
19 versus post-implementation?
20         THE WITNESS:  Yes.  You're comparing about 15.3
21 million votes to about 6.4 million votes there.  Yes.
22         THE COURT:  So it's over double the amount?
23         THE WITNESS:  Yes.  In terms of the literal turnout,
24 yes.
25         THE COURT:  Okay.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 40 of 329 PAGEID #: 1887
Case: 2:06-cv-00896-ALM-TPK Doc #: 654 Filed: 04/03/16 Page: 40 of 329 PAGEID #: 30584

Vol. 10 - 40

 1    BY MS. PIERCE:

 2    Q.   Why, Dr. Hood, did you compare percentages across your

 3    table?

 4    A.   Well, it's a way to standardize across these different

 5    elections which, as has been noted, have different turnout

 6    rates.

 7    Q.   So, if we compare the percentages that you note here, is

 8    that an apples-to-apples comparison across this table?

 9    A.   Yes.

10    Q.   Thank you.

11         THE COURT:  Doctor, one final question on this chart.

12    Would I err in concluding that there was some type of

13    atmosphere of discouragement because of the additional fields

14    placed on the provisional ballots, you know, based on the fact

15    that the share provisional votes are approximately the same for

16    2008 and 2012 but half from 2010 to 2014?  Does that tell me

17    anything about the burden that it places, or the impact that it

18    has, on voter participation?

19         THE WITNESS:  Well, I think from the standpoint for

20    those voters that showed up to the polls, it doesn't seem to be

21    a larger burden.  Now, again, I didn't perform an analysis in

22    terms of whether this was a deterrent effect or not, that's

23    true.  So I can't say -- I can't say anything at all about

24    that.

25         THE COURT:  But for me to reach that conclusion, I

 1   would have, also, to conclude that the voters knew about the

 2   additional fields and they decided not to show up with less

 3   than proper ID, or whatever, to cast the ballot?

 4        THE WITNESS:  Well, I think you're right.  In order to

 5   make a deterrent argument, voters would have to know about the

 6   changes to these laws ahead of time.

 7        THE COURT:  All right.

 8        Please continue, Ms. Pierce.

 9        MS. PIERCE:  Thank you.

10   BY MS. PIERCE:

11   Q.   And what benefit to the voters did the addition of those

12   two new information fields on a provisional affirmation have?

13   A.   Well, again, you're voting a provisional ballot.  It may

14   or may not be counted.  It's not a regular ballot.  So it's to

15   the voter's benefit, in my opinion, to offer these additional

16   data fields so they can be located in the voter registration

17   database and any other issues may be cleared up to where that

18   ballot, again, can be converted and counted as a regular

19   ballot.

20        I may be remembering incorrectly, but I think

21   Mr. Damschroder described provisional ballots to me, in Ohio,

22   as a fail-safe measure.  It allows someone who may have a

23   problem who comes in on Election Day, or even during the early

24   in-person voting period, to go ahead and vote a ballot, and

25   then things can be sorted out, after the fact, by local

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 42 of 329 PAGEID #: 1889
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 42 of 329 PAGEID #: 30989

Vol. 10 - 42

1   election officials when there is a little more time.  They,

2   obviously, can't do all this on Election Day.

3     Q.   And from your examination of these statewide provisional

4   numbers, what's the number-one reason that a provisional ballot

5   is rejected in Ohio?

6     A.   Someone's literally not even registered to vote in Ohio;

7   they think they are, but they're not.

8     Q.   And in what -- what benefit does the new provisional

9   affirmation form have for those voters?

10    A.   Well, in that particular hypothetical, they would -- the

11  local election officials would go ahead and register them to

12  vote so they would be qualified to vote in the next election.

13    Q.   Would that have an impact, long term, over the

14  provisional -- numbers of provisional ballots rejected?

15    A.   Well, there's probably always going to be provisional

16  ballots cast, for some reason.  But, hypothetically, it's

17  possible, you know, if you're registering people to vote who

18  have an issue and have voted provisionally, that the number of

19  provisional ballots might fall off in the future.

20    Q.   And looking at your Table I, does the total percentage

21  of provisional ballots rejected fall from 2008 to 2015?

22    A.   Yes.  Yes.  It goes from .56 percent to .26 percent.

23    Q.   Turning to the next substantive section of your report

24  on page 7, what does this section discuss?

25    A.   This looks at the changes to the absentee balloting

1  process that were put in place.

2      Q.  And what is an absentee ballot in Ohio?  What does that

3  mean?

4      A.  Well, technically, it's a ballot voted before Election

5  Day.  So, you could vote an absentee ballot completely through

6  the mail, or -- very technically, we use the term, a lot of

7  times, early in-person voting; but, in Ohio, you're still,

8  technically, voting absentee before Election Day.  It could be

9  done in person, though, as well.

10     Q.  Okay.  And how are absentee ballots different from

11  provisional ballots?

12     A.  Well, someone that's qualified to vote an absentee

13  ballot is voting a regular ballot.  It's not a provisional

14  ballot.

15     Q.  And how do the laws at issue change the absentee

16  balloting process in Ohio?

17     A.  Well, again, it required that those two extra fields of

18  information be added to the absentee ballot identification

19  envelope, specifically, date of birth and residential address.

20     Q.  Do those additions have administrative benefits in your

21  analysis?

22     A.  Well, again, yes, because absentee ballots by mail,

23  especially, have to be processed by local election officials,

24  it allows them, again -- Everyone's got to be located in the

25  registration database and checked off.  And so this allows, or

1    helps to facilitate, that process, for one.

2        Q.   Are there any secondary benefits, then, to that change?

3        A.   Well, occasionally -- again, this is not in the context

4    of fraud; but occasionally you have someone that's turned in

5    their absentee ballot by mail and shows up to vote on Election

6    Day.  Maybe they've forgotten.  So, in that case, you know,

7    they've already been flagged in the registration database as

8    having cast a ballot; and the local election officials at the

9    precinct can say, Hey, you've already voted.  So that's another

10   potential benefit.

11       Q.   Now, you don't provide a quantitative assessment like

12   you did for provisional ballots.  Why is that?

13       A.   No.  Unfortunately, again, as detailed as the data were

14   for provisional ballots, there were just not enough detailed

15   information provided by the State on absentee ballot rejection

16   rates, specifically.  And, again, really what we want to do is

17   hone -- is zoom down to this level of an absentee-by-mail

18   ballot being rejected specifically because the voter failed to

19   provide one of these additional fields.  And that information

20   is just not there, unfortunately.  So I wasn't able to perform

21   an empirical analysis.

22       Q.   Why is zooming into that level important in this case?

23       A.   Well, again, I'm trying to figure out whether the change

24   to the law had an impact or not.  The change to the law in no

25   way, for instance, changed the requirement that voters have to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 45 of 329 PAGEID #: 1002
Case: 2:06-cv-03863-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 45 of 329 PAGEID #: 30903

Vol. 10 - 45

```
 1    have their absentee ballots by mail turned in by a certain date
 2    following the election.  In fact, that's -- I know from other
 3    information, not quantitative information, but, for instance,
 4    from talking to election officials --
 5            MR. McTIGUE:  Objection.  I think we need a --
 6            THE COURT:  What's the basis of your objection, Mr.
 7    McTigue?
 8            MR. McTIGUE:  Pardon?
 9            THE COURT:  What's the legal basis for your objection?
10            MR. McTIGUE:  Foundation and hearsay.
11            THE COURT:  I'm going to sustain it with respect to
12    hearsay only for that portion of the answer that begins:  In
13    fact, I know from other information, not quantitative
14    information but, for instance, from talking to election
15    officials.
16            MS. PIERCE:  Your Honor, may we have a quick side-bar
17    on that point?
18            THE COURT:  Yes, you may.
19       (Thereupon, the following proceeding was held at side-bar.)
20            THE COURT:  Go ahead, Ms. Pierce.
21            MS. PIERCE:  Your Honor, opinion witnesses are able to
22    rely on hearsay evidence in forming their analysis.  And that's
23    what Dr. Hood is doing here.
24            MR. McTIGUE:  It's unclear to me whether he's talking
25    about elections officials in Georgia or, you know, in Ohio,
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 46 of 329 PAGEID #: 1903
Case: 2:06-cv-03883-ALM-TPK Doc #: 664-8 Filed: 04/03/16 Page: 46 of 329 PAGEID #: 30973

Vol. 10 - 46

1   whether these were people in Ohio that he relied on for his

2   report or not.

3            THE COURT:  Well, under 702, he can rely on bases that

4   are typically relied upon by experts in the field.  So, I tell

5   you what:  Why don't you rephrase your question so that it's

6   clear as to which experts he's relying upon for whatever

7   conclusions he's about to draw.

8            MS. PIERCE:  Okay.

9            THE COURT:  And I think that, based on what he

10  testified about previously, he's probably talking about the

11  election officials here in Ohio about whom he spoke.  But why

12  don't you clarify that for the record?

13           MS. PIERCE:  Yes, Your Honor.

14           THE COURT:  Your objection is overruled.

15           MS. PIERCE:  Thank you, Your Honor.

16     (The following proceedings were had in open court.)

17  BY MS. PIERCE:

18  Q.   Dr. Hood --

19  A.   Yes.

20  Q.   -- we had discussed, previously, some interviews and

21  other materials that you relied on in this case.  Could you

22  refresh our recollection about where those materials came from?

23  A.   Well, I mean, I conducted an interview, myself, via

24  phone, with Mr. Damschroder.  The other information came

25  through written declarations from local election officials.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 47 of 329 PAGEID #: 1004
Case: 2:06-cv-00896-ALM-TPK Doc #: 364-8 Filed: 04/03/16 Page: 47 of 329 PAGEID #: 30971

Vol. 10 - 47

 1    Q.    And did you use those materials in forming your opinions

 2    in this report that we've been discussing?

 3    A.    Yes.

 4    Q.    Okay.  And is that a typical practice in your research

 5    as a political scientist?

 6    A.    Yes.

 7    Q.    And could you remind us what those are called, again, in

 8    your view?

 9    A.    These would be called elite interviews.

10    Q.    And have you used similar types of evidence to do your

11    own published analyses and research?

12    A.    Certainly.  I've included a lot of different interviews

13    I've conducted with various officials, or former politicians,

14    and not all my research, but quite a bit of my research.

15            THE COURT:  You said they're called what type of

16    interviews?

17            THE WITNESS:  Elite interviews, Your Honor.  Elite.

18            THE COURT:  E-l-i-t-e?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Okay.

21    BY MS. PIERCE:

22    Q.    And, based on those materials that you gathered in Ohio,

23    what are your conclusions about the administrative benefits of

24    the new fields of information for absentee ballots?

25    A.    Well, again, I'm going to bring provisional ballots back

1 into this, because one of the things that the law changed, it

2 helped to standardize the process between -- to some degree

3 between the absentee and the provisional ballot process in

4 terms of the number, or the types and number of types -- excuse

5 me -- between the number and types of information fields

6 required for either a provisional ballot affirmation statement

7 or an absentee by-mail ballot identification envelope.  So, it

8 standardized the process.

9      It also standardized the process in terms of how long

10 the voter has to provide additional information -- seven days,

11 that is -- for either provisional or absentee ballots.  So it

12 did that as well.

13 Q.   Did you examine statewide absentee ballot data at all?

14 A.   Yes, I did, to the extent to which I determined that the

15 data were not sufficient or relevant enough for me to conduct a

16 specific empirical analysis.  So, yes, I looked at those data.

17 Q.   And from your review of your elite interviews and the

18 absentee ballot data, what is the number-one reason that an

19 absentee ballot is rejected in Ohio?

20 A.   Simply because it's not returned in time.

21 Q.   Let's turn to the final substantive section of your

22 first report.  It starts on page 9.  What does this section

23 examine?

24 A.   This examines issues with multi-precinct voting

25 locations.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 49 of 329 PAGEID #: 1906
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/13 Page: 49 of 329 PAGEID #: 30979

Vol. 10 -  49

1    Q.    And what is your understanding about the claims in this

2    case regarding multi-precinct voting locations?

3    A.    Well, the issue, in a nutshell, is that a physical

4    voting location may contain more than one precinct.  That's a

5    multi-precinct voting location.

6          So, the example -- This is just a hypothetical example.

7    Maple Elementary School could contain voting precincts Maple A,

8    B and C, for instance.  So, if you were in one of those

9    precincts, you would go to Maple Elementary School to cast your

10   ballot.  And the issue is that, until recently, you needed to

11   get into the right line, essentially, to go to the right

12   precinct table to cast your ballot within that voting location.

13   Otherwise, you'd have to cast a provisional ballot.  It's been

14   called, by some, the right church/wrong pew problem.

15   Q.    And what are your conclusions about this particular

16   problem?

17   A.    Well, there are a couple of things we can say.  One, I

18   mean, if that happened, if I showed up to a multi-precinct

19   voting location and I was in the wrong line, the voting

20   official, precinct official, is going to tell me I'm in the

21   wrong precinct line:  You need to vote in Maple A, over here.

22         So I can certainly get out of line and go vote -- and

23   get into the right line and vote a regular ballot.  I don't

24   have to leave that location, that physical location.

25         If I insist on casting the ballot in that line, I'm

1   going to have to cast a provisional ballot. And it's going to

2   be documented by the Secretary of State's Office Form 12-D.

3   So, we do know how many provisional ballots are being cast for

4   this particular problem, because we have very detailed data on

5   this.

6         Now, a couple of things have changed more recently. One

7   is technological, and one is actually a change to election

8   administration.

9         If you go into a multi-precinct voting location and the

10   location has a consolidated poll book -- in other words, all

11   the precincts at that location are consolidated in a single

12   poll book -- well, then you really don't have the right

13   church/wrong pew problem. So, consolidating the poll books

14   helps to solve that problem. And, very recently, I've

15   gotten -- December 15th, 2015, the Secretary of State in Ohio

16   issued a new directive that any county utilizing multi-precinct

17   polling locations needs to consolidate their poll books. So

18   that should help solve that issue, one.

19         Second, many counties -- I've got 56 out of 88 counties

20   in Ohio, before the 2016 presidential election, are going to be

21   employing electronic poll books. And this has a number of

22   advantages. One, it should eliminate the right church/wrong

23   pew problem, because, if someone goes into a multi-precinct

24   voting location, actually, the whole county's voter

25   registration database is going to be loaded into that

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 51 of 329 PAGEID #: 1908
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/13 Page: 51 of 329 PAGEID #: 34975

Vol. 10 - 51

1    electronic poll book.  And that has a couple of advantages, as

2    well.  One, just from an administration standpoint, if you're

3    using electronic poll books, it speeds up the check-in process.

4    And anybody that comes in and uses, say, a driver's license or

5    a state ID card that has a bar code on it -- an Ohio driver's

6    license or state ID, that is -- that has a bar code on it, that

7    can be scanned.  They can be located very quickly in the voter

8    registration database and checked off and get processed and get

9    their ballot.

10        It also -- you know, so it -- it potentially can save in

11    terms of labor costs and other kinds of supply costs like

12    paper, as well, which, you know, we don't always think about,

13    but these are some costs that are associated with running an

14    election.

15   Q.    How do ePoll books address this right church/wrong pew

16   issue?

17   A.    Well, again, the entire county's registration database

18   is going to be loaded into the electronic poll books.  So, if

19   you went to a multi-precinct voting location and you happen to

20   get in the wrong line, they're going to be able to find you and

21   check you in.

22   Q.    Okay.

23   A.    I have some statistics here about the number of

24   provisional votes that were cast because of this particular

25   issue.

1    Q.   And what are those statistics?

2         MR. McTIGUE:  Objection, Your Honor.  I don't know

3    where these statistics are coming from.  We need a foundation.

4         THE COURT:  So, you have a foundational --

5         MR. McTIGUE:  Yes.

6         THE COURT:  Sustained.

7         Establish your foundation, Ms. Pierce.

8         MS. PIERCE:  Yes, Your Honor.

9    BY MS. PIERCE:

10   Q.   Dr. Hood, where is this statistical information cited?

11   A.   It's recorded on a form, Form 12-D.  And these

12   statistics are collected by the Secretary of State's Office.

13   So these data are coming directly from the Secretary of State's

14   Office.

15   Q.   And are they reported in your initial report?

16   A.   Yes.

17   Q.   Okay.  And what are those statistics?

18   A.   Well, the number of provisional ballots that were cast

19   were cast specifically because of this right church/wrong pew

20   issue.  So, for instance, in 2015, there were a total of 62 of

21   these types of provisional votes cast, which would equate to

22   .08 percent of the total number of provisional votes cast in

23   2015 or .002 percent of the total votes.  And we can keep

24   going.  I've got some statistics there, as well, for 2014 and

25   2012.

1    Q.    What are your overall conclusions about this

2    multi-precinct voting locations issue?

3    A.    Well, even before some of these recent changes, again,

4    the deployment of electronic poll books and this directive from

5    the Ohio Secretary of State that counties using multi-precinct

6    locations have to consolidate their poll books, which should

7    solve the problem, the number of provisional ballots being cast

8    for this specific reason were very -- were very low.

9    Q.    From your initial report, what are your conclusions, or,

10   what do you conclude about the changes to Ohio election law

11   contained in SBs 205 and 216?

12   A.    Well, I mean, in terms of this last issue we just talked

13   about, given the changes that are to be implemented before

14   2016, I don't see how this continues to be an issue, really.

15        In terms of absentee ballots and provisional ballots,

16   the changes to those laws, I haven't found any evidence that

17   there's any kind of detrimental impact from those.  And, in

18   addition, there seem to be some really I would just call,

19   common-sense administrative justifications for these changes to

20   the law.

21   Q.    Okay.  And do you hold those conclusions with a

22   reasonable degree of professional certainty?

23   A.    Yes.

24   Q.    Okay.  Now, Dr. Hood, if you could turn to --

25        MS. PIERCE:  Excuse me, Your Honor.  At this point,

Vol. 10 - 54

 1    I'd move Defendant's D8 into evidence.

 2              THE COURT:  Any objection?

 3              MR. McTIGUE:  Yes, Your Honor.  We object on the basis

 4    that the actual report simply seems to be a reflection of his

 5    subjective opinions, not based on any --

 6              THE COURT:  Doesn't that go to weight, and not to

 7    admissibility, Mr. McTigue?

 8              MR. McTIGUE:  Yes.  Yes, Your Honor.

 9              THE COURT:  All right.  D8 will be received.

10    BY MS. PIERCE:

11    Q.    Dr. Hood, please, if you could, turn to Tab D10 in your

12    binder.

13    A.    Okay.

14    Q.    What is that document?

15    A.    It's a rebuttal declaration I issued in this case.

16    Q.    And just flipping through it, does it appear to be a

17    fair and complete copy of that report?

18    A.    Yes.

19    Q.    And what were you asked to do in that report?

20    A.    To respond to certain components of Professor

21    Timberlake's report that he submitted.

22    Q.    Okay.  And are you familiar with what are called the

23    Senate Factors?

24    A.    Yes.

25    Q.    And how are you familiar with those factors?

Vol. 10 - 55

1    A.    Both through academic work and teaching, as well as

2    their use in some cases I've been involved with.

3          THE COURT:  What are the origins, Doctor, of the

4    Senate Factors?

5          THE WITNESS:  These were some factors that were added

6    by a Senate committee which are supposed to compliment the

7    Section 2 analysis, essentially, some additional

8    considerations, Your Honor.

9    BY MS. PIERCE:

10   Q.    What does Senate Factor Five examine, Dr. Hood?

11   A.    Senate Factor Five looks at socioeconomic disparities

12   typically between racial groups.

13   Q.    And what do you conclude about Dr. Timberlake's Senate

14   Factor Five analysis?

15   A.    Well, again, if you're talking about disparities in

16   employment or income or poverty or education or health, I would

17   agree with Dr. Timberlake that all of these things can be

18   documented.  Typically, we use, you know, data like census data

19   to document these things.  And many times there are racial

20   disparities that exist on these factors.

21   Q.    Were you able to discover any evidence that minorities

22   in Ohio are hindered from participation in the political

23   process?

24   A.    Well, that's one question.  I mean, whether or not

25   disparities exist and can be documented, I would agree with

1   that -- with that particular approach.  But the real question

2   is, do these disparities seem to interact with some election

3   device, for instance, or provision to the extent to which the

4   election device or provision is hindering the ability of the

5   minority group to participate equally in the political process.

6   Now, there, I guess I would differ with Dr. Timberlake.

7       Q.    How so?

8       A.    Well, I looked at some of my own evidence, which is

9   cited a little bit later, for instance, in terms of

10  registration and turnout rates between blacks and whites in

11  Ohio.  And I don't find that there is a disparity in political

12  participation rates.  We can get into some of the details of

13  that; but that's, in a nutshell, what I found.

14      Q.    Okay.  Let's turn to Figure 1 on page 3 of your rebuttal

15  report.

16      A.    Okay.

17      Q.    What does this figure show?

18      A.    This is a chart that shows registration -- voter

19  registration rates between blacks and whites in Ohio from 2006

20  to 2014.  So these are census data.  These are surveys.  And

21  because of that, I also have the confidence bans there, which

22  are the lines with the caps on the ends.  Those are the

23  confidence figures there.  And I can get to that in a minute.

24          But we don't know -- In some states like Georgia, for

25  instance, that records the race of registrants, we don't have

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 57 of 329 PAGEID #: 1914
Case: 2:06-cv-00896-ALM-TPJ Doc #: 648 Filed: 04/03/16 Page: 57 of 329 PAGEID #: 30934

Vol. 10 - 57

 1    to estimate these factors.  We know that.  In Ohio, we don't

 2    know someone's -- a registrant's race.  And so this is one of

 3    the ways, using these census surveys -- and, in fact, Professor

 4    Timberlake, in part of his report, relies on these same data --

 5    this is one of the ways to look at it in states where the race

 6    of registrants is not recorded.

 7            THE COURT:  Doctor, when you analyzed Dr. Timberlake's

 8    work, did you disagree with the actual statistics that showed

 9    higher rejection rates in counties with higher minority

10    populations?

11            THE WITNESS:  I don't disagree that he found that.

12            THE COURT:  Okay.  You just disagree with the

13    conclusion that he drew from that data?

14            THE WITNESS:  Well, I disagree with the way he carried

15    out his analysis, which would also lead me to disagree with his

16    conclusion.

17            THE COURT:  Right.

18            THE WITNESS:  I'm not questioning whether he got that

19    result.

20            THE COURT:  You don't dispute that -- By way of

21    example -- I don't recall, right offhand, all of his findings;

22    but, by way of example, Franklin County was a higher minority

23    population, had a higher rejection rate than Darke County, with

24    a very low minority population, for instance.

25            THE WITNESS:  I don't remember that specific example

 1    either; but, again, I'm not questioning his literal findings --

 2          THE COURT:  Okay.

 3          THE WITNESS:  -- if that makes sense, Your Honor.

 4          THE COURT:  That does.  All right.

 5          THE WITNESS:  Okay.

 6          THE COURT:  Please continue.

 7          MS. PIERCE:  Thank you, Your Honor.

 8    BY MS. PIERCE:

 9    Q.    And, Dr. Hood, when you referred to his findings, are

10    you referring to his report in the ODP case or his more recent

11    report in the NEOCH case?

12    A.    Well, either one.  I mean, he essentially replicated a

13    lot of his analyses from that case over to this case.

14    Q.    Okay.

15    A.    There were some additional analyses which I was not

16    asked to analyze.  And I believe Professor McCarty analyzed and

17    provided a rebuttal for those analyses.

18    Q.    So, let me direct your attention back to Figure 1.  And

19    I think you were going to explain to us what the confidence

20    bans mean.

21    A.    Right.  So, because these are surveys, we don't know the

22    exact level in the population.  And so we produce a statistical

23    confidence level around that estimate.

24          So, the estimate will be the top of the bar.  And then

25    the confidence ban would be this vertical line that's capped.

Vol. 10 - 59

1    And so anytime the confidence bans in a given year between

2    black and white estimates overlap with one another, that's

3    another way of saying that they're statistically

4    indistinguishable; or, in lay terms, another way to say this is

5    to say they're the same; we can't differentiate between black

6    and white registration rates statistically.

7    Q.   And what do you --

8    A.   So, as we can see in the figure, black and white

9    registration rates vary.  Sometimes the black rate is higher

10   than the white rate.  But the important thing to look at is

11   that that these confidence bans overlap in every election cycle

12   analyzed there.  And, because of that, we can essentially

13   say -- I'll just say, in lay terms, black and white

14   registration rates, in Ohio, from 2006 to 2014 were the same.

15   They were statistically indistinguishable.

16         THE COURT:  Dr. Hook, could you explain to me what

17   confidence bans are?

18         THE WITNESS:  Right.  So, this is a survey.  These are

19   surveys conducted by the Census Bureau.

20         THE COURT:  Okay.

21         THE WITNESS:  And because it's a survey, we're

22   drawing -- the Census Bureau is drawing a sample out of the

23   population, the population being, you know, the voting age

24   population of Ohio.

25         And a sample is typically not going to look exactly like

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 60 of 329 PAGEID #: 1917
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 60 of 329 PAGEID #: 30934

Vol. 10 - 60

```
 1   the population.  But, again, besides the example of literally

 2   trying to enumerate everyone in the State, the only way to

 3   conceivably do this is to draw a sample.

 4        So, what the confidence ban does is -- and I didn't get

 5   to this, but what we can say is that, here's our estimate, say,

 6   of black registration; say it's -- oh, I don't know.

 7            THE COURT:  Let's use 2008.

 8            THE WITNESS:  Okay, 2008.  It looks like -- I don't

 9   have the exact number, but it looks like to be about 75

10   percent.

11            THE COURT:  That's right.

12            THE WITNESS:  Okay.  That's our best estimate of what

13   the black registration rate in Ohio was in that given year.

14   But what the confidence ban does is tell us that we can be 95

15   percent certain -- and, again, that's the level that we

16   typically achieve (sic) to reach in statistics -- we can be 95

17   percent certain that the true value for black registration

18   rates in 2008 in Ohio ranged from about 70 percent -- I'm just

19   eye-balling this -- to about 81 percent.

20            THE COURT:  Okay.

21            THE WITNESS:  So we're 95 percent certain, which is

22   pretty good, that the black -- the true value of the black

23   registration rate in that year is inside of that bar.

24            THE COURT:  Okay.

25            THE WITNESS:  Does that --
```

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

 1          THE COURT:  Yes.  So, the confidence ban for the white

 2     registration rate in 2008, we're 95 percent sure it's between

 3     70 and about 73, 75, percent?

 4          THE WITNESS:  Somewhere in there, right.

 5          THE COURT:  The confidence ban always is a, pretty

 6     much, a 95 percent number, irrespective of the length, the

 7     actual length of the confidence ban itself?

 8          THE WITNESS:  I'm sorry.  In this case, these are

 9     numbers the Census Bureau calculated.  This is actually a 90

10     percent confidence.  You could calculate it at different

11     levels.  This is a 90 percent confidence ban.

12          THE COURT:  It says, as with Figure 1, a 90 percent

13     confidence interval.  All right.  So the confidence ban

14     throughout this chart is 90 percent?

15          THE WITNESS:  Yes, that's correct.

16          THE COURT:  All right.  And so the makers of the chart

17     itself would denominate the percentage that would be ascribed

18     to the confidence ban, right?

19          THE WITNESS:  Correct.  In this case, I'm relying on

20     the Census Bureau's calculation.

21          THE COURT:  Yes.  I understand.

22          THE WITNESS:  Okay.  Okay.  Yes.

23          THE COURT:  Thank you, Ms. Pierce.

24          MS. PIERCE:  Thank you, Your Honor.

25       BY MS. PIERCE:

1    Q.    And so what does it tell us when the two confidence bans

2    for each of the two bars overlap?

3    A.    Well, again, it -- it says that for -- in a given year,

4    if the confidence ban for white registration is overlapping in

5    the range where the confidence ban for black registration is,

6    we -- all we can say is that, essentially, the white and black

7    registration rates are statistically indistinguishable again.

8    They're the same, essentially.  They may not be the same in

9    reality.  And almost certainly they're not exactly the same.

10   But from the survey data that we have here, they're the same.

11   Q.    And what does -- what conclusions do you draw from this

12   table, then?

13   A.    Well, in any of these given election cycles from 2006 to

14   2014, these bans are overlapping.  So, essentially, I guess,

15   the way to summarize Figure 1 would be that black and white

16   registration rates in Ohio from 2006 to 2014 were statistically

17   the same.

18   Q.    Okay.  Turning to Figure 2 on page 4 of your rebuttal

19   report, what does this figure depict?

20   A.    These are turnout rates.  So, again, from the same

21   Census Bureau information, these are actual turnout rates

22   between blacks and whites in Ohio from 2006 to 2014.  So, for

23   instance -- we'll start over here in 2006 -- the white turnout

24   rate, the estimate is higher than the black turnout rate.

25   Because the confidence bans are not overlapping, we can be

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 63 of 329 PAGEID #: 1920
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/04/16 Page: 63 of 329 PAGEID #: 30920

Vol. 10 - 63

1    confident that, in reality, in the population, that the true

2    white turnout rate does exceed the black turnout rate in 2006.

3    But, then, if we look at '08 or 2010 or 2014, again we have

4    these overlapping confidence bans.  And so that tells us that,

5    in 2008, 2012 and 2014, that black and white turnout rates are,

6    again, statistically the same.

7         In 2012, the black turnout rate exceeds the white

8    turnout rate, and the confidence bans do not overlap.  So, in

9    2012, we can say specifically that black turnout was

10   statistically higher than white turnout.

11        So, from 2008 to 2014, the most recent federal election

12   cycles for which we have data, the black turnout rate and the

13   white turnout rate were essentially the same or the black

14   turnout rate exceeded the white turnout rate in one of those

15   election cycles.

16   Q.   And what do these data tell you about the ability of

17   minorities in Ohio to participate in the political process?

18   A.   Well, at least looking at these metrics, which are,

19   again, very common in terms of political participation,

20   registration rates and turnout rates, it doesn't appear that

21   even if -- and, again, I'm not necessarily disputing the fact

22   that socioeconomic differences exist in Ohio between blacks and

23   whites; but, even with those differences, Senate Factor Five

24   doesn't seem to be impinging on the ability of especially black

25   Ohioans to participate in the political process.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 64 of 329 PAGEID #: 1921
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/03/16 Page: 64 of 329 PAGEID #: 38923

Vol. 10 - 64

1   Q.   Turning to the next Senate Factors, what do Senate

2   Factors One and Three examine.

3   A.   These Senate Factors specifically look at -- Are we

4   on -- One and Three?  This is a history of racial

5   discrimination in the State.

6   Q.   And what did you note about Dr. Timberlake's examination

7   of these factors?

8   A.   Well, he does provide some examples.  Some of the

9   examples he provides are 200 years old, essentially.  So, they

10   certainly don't give us an idea of whether or not this is a

11   recent issue in Ohio.

12       And then I looked at the Voting Rights Act and

13   application of the Voting Rights Act, especially the Section 4

14   triggers that would cause a jurisdiction like a state or a part

15   of a state to be covered under Section 5.  And those were

16   executed in '65, '70, and '75.  And, again, those were

17   specifically designed to bring jurisdictions under Section 5

18   coverage that had a history of voter discrimination.

19       Ohio was not covered under Section 5 by any of these

20   Section 4 triggers and has never been covered -- nor has any

21   part of Ohio been covered by Section 5 of the Voting Rights

22   Act.

23       So, we know there's some more recent evidence looking

24   for voter discrimination and a history of voter discrimination.

25   Q.   What did you note about Dr. Timberlake's more recent

1    examples that he identifies in his report?

2       A.   Well, he only has a few recent examples.  He looks at a

3    couple of different things.  Again, one was requiring voters to

4    bring IDs to the poll.

5            Now, this has been a very contentious issue in some

6    states, but Ohio does not have a strict government-issued photo

7    ID law.  There are various forms of photo ID, both -- excuse

8    me.  There are various forms of ID, both photo and non-photo,

9    that can be presented in Ohio to meet that requirement.  So,

10   it's a fairly low bar.  And, really, the documentation

11   requirements for identification in Ohio are very similar to

12   those laid out in HAVA, the Help America Vote Act, which is a

13   piece of federal legislation.

14           He also has an example concerning poll watchers, but

15   poll watchers are available in Ohio from both political

16   parties, Republicans and Democrats.  And a poll watcher can't

17   directly challenge a voter.  Only a duly-sworn election

18   official can challenge a voter's right to cast a ballot in

19   Ohio.  So, again, I don't see a lot of evidence there, as well.

20           Oh!  And I think the other thing that he offers is

21   changes to Ohio's early in-person voting laws.  Again, I did a

22   pretty detailed analysis of those changes in the law.  I wasn't

23   able to find any kind of detrimental impact.  The law has

24   changed in terms of the early in-person voting period in Ohio.

25   Again, I wasn't able to find any evidence that there was a

1    negative impact from the change in the law.  It's still

2    available.  Voters can still go vote early in person in Ohio.

3    And Professor McCarty had submitted a report in the ODP case

4    that specifically looked at the changes to Ohio's early

5    in-person voting law as maybe impacted by race and was not able

6    to find any kind of racial effects.  So I offer that as some

7    additional evidence here.

8         So, the examples of changes to Ohio's election code that

9    Professor Timberlake mentions, again, I don't -- I can't find

10   any evidence that these are racially discriminatory, for

11   instance, in any manner.

12   Q.   Turning to the next Senate Factor you discuss -- it's

13   Senate Factor 2 -- what does this Senate Factor consider?

14   A.   This is a Senate Factor that looks at racially polarized

15   voting.  So, what is the degree to which, for instance, blacks

16   vote in one direction and whites may vote in another direction?

17   Q.   And what did you conclude about Dr. Timberlake's

18   assessment of this Senate Factor?

19   A.   I mean, there is racially polarized voting in Ohio.

20   Racially polarized voting exists throughout a lot of the United

21   States.  And, again, part of that, as a political scientist and

22   someone that studied the party structure, especially in the

23   South, part of it has to do with a close congruence with groups

24   underlying the basis of support for the two major political

25   parties in the U.S.

1        A majority, more than a majority, of black Americans

2    typically identify and vote Democratic.  In a lot of states,

3    more than a majority of whites now typically identify and vote

4    Republican.  So, part of this is -- there is racial

5    polarized -- racially polarized voting.  Part of it is a

6    reflection of the partisan distribution and, again, the groups

7    underlying the two major political parties in the United

8    States.  But again -- and Professor Timberlake provides some

9    examples of racially polarized voting in Ohio, which I don't

10   necessarily dispute.  But even in those cases, we see that it

11   is possible for the black candidate-of-choice to win election,

12   which, again, is a key component if we were doing, say, a

13   Section 2 vote-dilution analysis, which I know we're not in

14   this case.  But I'm just saying racially polarized voting can

15   exist.  But the real question is what kind of impact is it

16   having, or not, on the ability of minority voters to elect a

17   candidate of their choice.

18       And, again, I don't -- if you even look at the examples

19   he talks about in Ohio, it's still possible for the black

20   community to elect candidates of their choosing.

21   Q.   Let's turn to the next Senate Factor you discuss, which

22   is number Six.  What does this Senate Factor consider?

23   A.   These are, specifically, racial appeals related to

24   political campaigns or candidates.  And I think he provides

25   some examples.  I think he only provides a handful, about five,

Vol. 10 - 68

1    examples.  I did look into these a little closer.

2         Most of these cases, there's not a direct tie that I can

3    find between the examples that Professor Timberlake provides in

4    his report and a direct connection to a campaign or candidate,

5    specifically.

6    Q.   And why is that direct connection to a campaign or

7    candidate important?

8    A.   Well, that's my understanding of this particular Senate

9    Factor:  That there needs to be, you know, a more direct

10   connection.  I mean, some of the examples he provides are

11   unpalatable, but again --

12        MR. McTIGUE:  Objection, Your Honor.  He's providing a

13   legal conclusion.

14        THE COURT:  Side-bar.

15      (Thereupon, the following proceeding was held at side-bar.)

16        THE COURT:  Go ahead.  I couldn't divine from his

17   answer the legal conclusion that you thought he was providing.

18        MR. McTIGUE:  He's saying that the Senate Factor would

19   have to tie the behavior to a candidate's campaign.  And that's

20   not -- that's not really within the Senate Factor.  I mean, I

21   think he's essentially interpreting the Senate Factor, and that

22   becomes a legal conclusion.

23        THE COURT:  Well, one of the problems that you would

24   have for any of his conclusions, as a political scientist, he

25   gives -- he interprets data.  And, almost of necessity, that

Vol. 10 - 69

1  intersects with the bills itself.  So he looks at it -- Though

2  he opines on the bills kind of indirectly, he does so from the

3  perspective of a political scientist.  But he's still opining

4  on laws and legislation.  So I understand -- Go ahead.

5        MR. McTIGUE:  But I think what he's doing is, he is

6  interpreting the law, the Senate Factor, to say that it

7  includes this type of evidence of a connection or, you know, of

8  what's relevant.  And I think that that is more of a legal

9  conclusion than a political science conclusion.

10        THE COURT:  I understand.  I think that goes to the

11  weight, not to the admissibility, of the testimony, because, as

12  an opinion witness, I believe that, with his background and

13  experience, he's permitted to testify and to give the opinion

14  that he has given.  So your objection is duly noted, but

15  overruled.

16     (The following proceedings were had in open court.)

17        THE COURT:  Please continue, Ms. Pierce.

18        MS. PIERCE:  Thank you, Your Honor.

19        THE COURT:  Thank you.

20  BY MS. PIERCE:

21  Q.   Dr. Hood, in your professional experience, why is it

22  important to have a connection between those examples and a

23  candidate or campaign?

24  A.   Well, again, that's my understanding of the Senate

25  Factor, plus I would also note that, given the freedoms that

```
 1   Americans enjoy, anyone can say anything whether or not a

 2   candidate or a campaign may want them to say something or

 3   express a viewpoint on their behalf.  And, again, we may find

 4   it unpalatable; but it doesn't necessarily mean that it's a

 5   direct reflection of the candidate or campaign.

 6      Q.   And taking Dr. Timberlake's examples, were you able to

 7   discover any connection between a campaign or candidate and

 8   those appeals?

 9           THE COURT:  Which appeals -- which factor are we

10   talking about, now, Ms. Pierce?

11           MS. PIERCE:  I'm sorry, Your Honor.  Senate Factor

12   Six.

13           THE COURT:  The use of racial appeals?

14           MS. RICHARDSON:  Yes, sir.

15           THE COURT:  Okay.

16           MS. PIERCE:  It starts on page 6.

17           THE COURT:  Yes.

18    BY MS. PIERCE:

19      Q.   And were you able to discover any connection?

20      A.   No, either none or just a very tenuous type of

21   connection.

22      Q.   Taking, for example, the billboard that he cites, did

23   you discover any connection between that and a campaign or

24   candidate?

25      A.   No.  No, I didn't.  I did some research on that and
```

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

Vol. 10 - 71

1    found an article in the *Huffington Post* which actually equated

2    the billboard, or credited the billboard, to, quote, an

3    undisclosed private family foundation, end quote.  So that was

4    the evidence that I was able to, sort of, bring to bear on that

5    particular example that Professor Timberlake cited.

6            THE COURT:  Doctor, did you look at what effect, if

7    any, that billboard may have had on, first, the precinct in

8    which it was located?

9            THE WITNESS:  I did not, Your Honor.

10           THE COURT:  Did you look at the effect that it might

11   have had on the county in which it was located?

12           THE WITNESS:  I did not, Your Honor.

13           THE COURT:  Okay.  And you did understand that that

14   billboard was in a primarily, or predominantly,

15   African-American county?

16           THE WITNESS:  Yes.

17           THE COURT:  I shouldn't say a predominantly

18   African-American county.  A predominantly African-American

19   neighborhood.

20           THE WITNESS:  Yes.  From Professor Timberlake's

21   description of it, yes.

22           THE COURT:  Yes.

23           THE WITNESS:  Yes.

24           THE COURT:  Okay.  Please continue, Ms. Pierce.

25     BY MS. PIERCE:

Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/04/16 Page: 72 of 329 PAGEID #: 30939

Vol. 10 - 72

1    Q.   In your opinion, Dr. Hood, are the number of examples

2    Dr. Timberlake cites significant?

3    A.   Not -- not particularly, given the number of elections

4    that have been held in Ohio, say, over the last ten years, from

5    the local level on up, and the number of candidates and

6    campaigns and voters involved in all of these processes,

7    not -- not particularly.

8           THE COURT:  Is there a number, Doctor -- Given the

9    numerical background against which you would consider

10   Ms. Pierce's question, is there a number that would be

11   statistically significant?

12          THE WITNESS:  That's a fair question, Your Honor.  I

13   don't know that I would put it in the terms of statistically

14   significant.  It would probably have to be greater than five.

15   But I think, even more importantly, I would be looking for a

16   much more direct connection between the use of these messages

17   and a candidate or a campaign specifically.

18          THE COURT:  I understand.  I understand.  In other

19   words, you wouldn't be looking for something that might

20   generally -- might be of general impact or that might generally

21   express a political position?

22          THE WITNESS:  I think those are less germane, if you

23   will, examples.

24          THE COURT:  I understand.  Why would you find them

25   less germane?

1      THE WITNESS:  Well, again, we may not find it very

2  palatable.  But anyone can show up at any campaign with a

3  T-shirt with some obscene message on it.  And, again, that's

4  not necessarily being sanctioned by the candidate or campaign

5  themselves.

6      THE COURT:  I understand.

7      Ms. Pierce, the Court has a small proceeding that is to

8  begin at 10:30.  I think that the litigants are here.

9      Let's stand in recess until 10:45, at least until 10:45.

10  Is this a good breaking point, or do you need to ask at least

11  one or two followup questions?

12      MS. PIERCE:  No, sir.  This is a good breaking point.

13      THE COURT:  All right.  All right.  Thank you.

14      COURTROOM DEPUTY CLERK:  All rise, please.

15      (Recess taken at 10:30 until 10:45 a.m.)

16      THE COURT:  Ms. Pierce, please proceed.

17      MS. PIERCE:  Thank you, Your Honor.

18  BY MS. PIERCE:

19  Q.   Dr. Hood, I believe we left off at Senate Factor Seven,

20  at the top of Senate Factor Seven.  What does this Senate

21  Factor consider?

22  A.   Yes.  I don't think we'd gotten to this one yet, but

23  this Senate Factor looks at descriptive representation for

24  minorities within the State, or within a local area, in this

25  case within Ohio.

Vol. 10 - 74

1    Q.    And what do you conclude about Dr. Timberlake's analysis

2    of this Senate Factor?

3    A.    Well, I just don't agree with him.  And I've performed

4    some of my own analyses here to look at black descriptive

5    representation in Ohio at various office-holding levels.

6            So, if you look at things statewide, blacks in Ohio

7    comprise about 11.4 percent of Ohio's voting-age population.

8    So I've got a number of comparisons here.  Like, for instance,

9    if you look in Table 1, you can look at representation  in the

10   Ohio General Assembly; for instance, how many black House and

11   Senate members are there versus, again the voting-age-

12   population figure.

13           So, for instance, in the House, 11.1 percent of

14   Statehouse members are black, again compared to 11.4 percent

15   statewide.  And 12.1 percent of the Senate is comprised of

16   black legislators.  And, again, the statewide comparison number

17   is 11.4 percent.

18           I'll also note that, even though blacks, alone, as an

19   electorate, cannot, obviously, elect someone statewide, there

20   have been a number of candidates in Ohio elected to State

21   constitutional offices who are black, including to the

22   Lieutenant Governor's Office, the Treasurer, and the Secretary

23   of State; in addition, at least one black Ohio Supreme Court

24   member.

25           But you can also look more at the local level, and I've

1  got some comparisons in Table 2 to some of the larger

2  municipalities in Ohio and, again, membership on city councils.

3  So, for instance, if you look at Columbus, in Columbus, 25.1

4  percent of the voting-age population in Columbus is black; but

5  blacks comprise 50 percent of city council members.  And so you

6  can compare the other figures.  In Cleveland, for instance,

7  they're at 47.1 percent on the city council are blacks, city

8  council members, compared to just under 50 percent black

9  voting-age population in the city.  So, very close.

10       And, again, in Cincinnati, 44.4 percent of the city

11  council are black city council members compared to less than 40

12  percent black voting-age population.

13       So, if you look at things in a number of different

14  office-holding levels, or even at the State level, I would

15  disagree with Professor Timberlake on this particular factor

16  that blacks have not achieved descriptive representation at

17  levels requisite with their share of the voting-age population

18  in the State, or at the local level, whatever we're talking

19  about.

20  Q.   Thank you, Dr. Hood.  So, moving along to Senate Factor

21  Eight, what does this particular Factor consider?

22  A.   This looks at the level of responsiveness of elective

23  officeholders, specifically to the minority community in the

24  State.

25  Q.   And what do you conclude about Dr. Timberlake's analysis

1    of this particular Senate Factor?

2       A.    Well, he -- he makes the case that these election

3    provisions are evidence of unresponsive policy making.  I

4    don't -- On the other hand, I don't really find a lot of

5    evidence for that.  Again, these are -- these are very

6    incremental changes to Ohio's election code, in my opinion.

7    There are administrative justifications that have been

8    presented for these changes.

9          In terms of Ohio's overall election scheme, for

10   instance, it's fairly easy to cast a ballot in Ohio.  And

11   that's not really been altered.  You can vote early in person

12   before Election Day, absentee by mail, or you can vote at your

13   precinct on Election Day.  So, I just don't agree with

14   Professor Timberlake and his assessment there.

15      Q.    Okay.  And moving to Senate Factor Nine, what does this

16   particular Factor consider?

17      A.    Well, in a lot of ways, this -- well, this particular

18   Senate Factor deals with how tenuous a policy may be.  And,

19   again, a lot of the things I just said in relation to Factor

20   Eight I'll probably say again; but, again, I found that there

21   are certainly administrative justifications for why these

22   changes to Ohio's election code were put into place.

23          And in terms of being tenuous or responsive, on the

24   other hand, some of the changes we've seen have been issued to

25   deal with some problems like the right church/wrong pew

1    problem.  You know, there have been solutions implemented to

2    deal with that.

3         So, again, the State's charged with administering

4    elections.  They have to write -- In conjunction with the

5    General Assembly, they have to write the rules of the game, so

6    to speak, to implement and to carry out the election.  And

7    local officials have to implement these rules and procedures.

8         And, again, I really view these, especially these

9    changes to absentee or provisional balloting provisions, to be

10   dealing with those types of issues, again, literally,

11   election-administration issues.

12   Q.   And why is it important to consider justifications for a

13   change in law in terms of this Senate Factor?

14   A.   Well, again, you want to make sure that there is not

15   some other -- that there is a justification, one, and that it

16   doesn't have, or, it's not resulting in a disparate racial

17   impact, for instance.

18   Q.   Did Dr. Timberlake consider any in his analysis?

19   A.   Any --

20   Q.   Justifications for the laws.

21   A.   Certainly not these types of justifications.  I don't

22   think he relied on testimony or interviews from election

23   officials, for instance.

24   Q.   And --

25            THE COURT:  Doctor, one of the issues that -- we have

1  competing issues here, because, on the one hand, we have the

2  issues that you've identified, which is efficient election

3  administration.  That's one of the justifications you give for

4  adding these two additional fields.

5         THE WITNESS:  Yes, Your Honor.

6         THE COURT:  Is that right?

7         THE WITNESS:  That's correct.

8         THE COURT:  And then we have that juxtaposed to

9  disenfranchising voters who fail to fill out the forms

10 correctly.

11        THE WITNESS:  That's true.  Someone who, for instance,

12 votes a provisional ballot might not have that ballot

13 converted.

14        THE COURT:  Right.

15        THE WITNESS:  That's true.

16        THE COURT:  And so that's why it's important, to me,

17 at least, to figure out what precipitated the enactment of

18 these measures.

19     Now, Doctor, I assume that you are aware that,

20 before -- at some point in Ohio's elections history, you

21 relied, principally, on your signature?

22        THE WITNESS:  I remember reading something to that

23 effect, yes.

24        THE COURT:  And do you know the extent to which the

25 elections were undermined by reliance simply on a signature?

```
 1            THE WITNESS:  I can't answer that question, Your
 2   Honor.  I don't know.
 3            THE COURT:  Based on your experience -- I mean, I know
 4   that in -- the South is a unique laboratory because there were
 5   a number of measures that, historically, were enacted, some
 6   contend, as an impediment to voting, such as literacy tests,
 7   poll tax and the like.
 8            THE WITNESS:  No argument with you on those points.
 9            THE COURT:  And you're intimately familiar with those?
10            THE WITNESS:  Yes, sir.
11            THE COURT:  And those were ultimately found to
12   constitute a burden to the exercise of the franchise; is that
13   right?
14            THE WITNESS:  That's correct.  We no longer have
15   literacy tests, white primaries, poll taxes, et cetera.
16            THE COURT:  But, when they were enacted, there was a
17   rationale given for those; is that right?
18            THE WITNESS:  Certainly, yes.
19            THE COURT:  And the rationale, in many respects, were
20   racially-neutral rationale; is that true?
21            THE WITNESS:  Sometimes, yes.  I think, in the case of
22   the white primaries, it's sort of hard to get to a
23   racially-neutral rationale for that.
24            THE COURT:  But if you take the literacy test, for
25   instance, the rationale was that, well, we think that we should
```

1  have an educated voter voting who understands that about which

2  he or she is voting.

3           THE WITNESS:  That's correct, yes, or everyone has to

4  pay the poll tax, whether you're black or white.

5           THE COURT:  Yes.

6        Please continue, Ms. Pierce.

7        MS. PIERCE:  Thank you, Your Honor.

8  BY MS. PIERCE:

9  Q.   In your review of the materials in this case, Dr. Hood,

10 have you uncovered any evidence that these laws have had a

11 detrimental impact across the State in terms of provisional

12 ballot rejections?

13 A.   No, not on that particular question.  No.

14 Q.   Let's turn to -- I believe we're on page 9 of your

15 rebuttal report.  And there is a paragraph here labeled

16 "Additional Considerations."  What are you talking about in

17 this particular paragraph?

18 A.   Well, this is, at the end of the enumerated Senate

19 Factors, the committee stipulated that the Factors that they'd

20 outlined weren't necessarily exhaustive or exclusive and that

21 you could consider -- and that other matters could be

22 considered along with these factors.  And, you know, that's

23 part of what I've done here, is to look into other types of

24 justifications.

25 Q.   And what, in this paragraph, do you conclude about Dr.

1   Timberlake's analysis of the Senate Factors?

2       A.   Well, again, he certainly doesn't really -- doesn't

3   really take an election-administration viewpoint of these

4   particular changes to Ohio's election code.

5       Q.   And turning to the final section of your report,

6   Dr. Hood, labeled "Issues of Methodology," what are you

7   discussing in this section?

8       A.   I'm specifically discussing a set of analyses Professor

9   Timberlake undertook, initially, for the ODP case, but which he

10  also presented in this case as well.  These are the

11  county-level analyses that he performed.  And I raise a number

12  of issues with those.

13      Q.   Okay.  And, briefly, could you explain to us the

14  methodology Dr. Timberlake used in his ODP report, which I

15  believe is the one you were addressing here?

16      A.   Yes.  Yes.

17      Q.   Okay.

18      A.   He grouped counties in Ohio together by racial and

19  ethnic classifications.  So he had a category, for instance,

20  high minority counties.  And then he had a couple of other

21  categories:  White, low income, and white higher income

22  counties, as well.

23      Q.   And how was that approach deficient in your opinion?

24      A.   Well, I mean, there certainly are counties in Ohio that

25  have higher minority populations, higher black populations,

1    specifically.  But even in those counties, if you combine those

2    counties together, you're only looking at about a 30-percent

3    minority population.  So, 70 percent of those counties,

4    collectively, are non-Hispanic whites or Anglos, I would say.

5    And it's very difficult, or I would argue really impossible or

6    impermissible, to make or try to draw statistical conclusions

7    with these types of data.  You just don't have the range

8    necessary to confidently conclude, since this is

9    aggregate -- these are aggregate-level data, that, for

10   instance, if you find that provisional ballot rejection rates

11   are higher in high minority counties, you still haven't

12   connected the dots.  You haven't established, causally, that

13   these provisional ballots that are being rejected are from

14   minority voters.  You just don't know that.

15        It's called the ecological fallacy.  It's making

16   individual-level inferences incorrectly from aggregate-level

17   data.

18   Q.    And, in that approach, did Dr. Timberlake break down the

19   reasons for provisional ballot rejections?

20   A.    No.  He seemed to only be using the overall provisional

21   ballot rejection rate, which, again, I would disagree with,

22   because we have much finer data we can look at.

23   Q.    Did Dr. Timberlake offer a new approach in his report in

24   this case?

25   A.    Yes.  So, I wasn't asked to offer any opinions on that.

1   And I will say that he also looks at the absentee ballot

2   rejection rate at the county level, as well.  But he has some

3   additional problems there in that, again, we don't know why the

4   absentee ballots are being rejected.

5       The number-one reason an absentee ballot is rejected in

6   Ohio is because it's late; it's not turned in on time.  It

7   doesn't have anything to do with these additional fields we're

8   talking about.

9       And he's also combined two different types of absentee

10  ballots, the in-person variety when someone goes to vote early

11  in person, along with the mailed absentee ballot rate.  So he's

12  combined those two figures together.  Again, I would argue they

13  need to be separate, and we need a much more finer degree of

14  specificity in terms of why a provisional ballot is being

15  rejected in order to draw these conclusions.

16      And I wouldn't have used county data.  I mean, I

17  oftentimes use aggregate-level data to make individual-level

18  inferences.  That's a very common thing that social scientists

19  do, but I'm usually relying on the precinct-level data or

20  below; so much smaller geographic units that have much greater

21  variance.  For instance, I just finished a project in South

22  Carolina.  I mean, there, you've got precincts that are zero

23  percent black, all the way up to a hundred percent black.  And

24  what that means in statistical terms is that we have more power

25  to make inferences when we have that kind of variation across

1    geographic units.

2           THE COURT:  Doctor, did you get any precinct-level

3    data for your analyses in this case?

4           THE WITNESS:  No, sir.

5           THE COURT:  Were you offered any precinct-level data?

6           THE WITNESS:  No, sir.

7           THE COURT:  Did you request any precinct-level data?

8           THE WITNESS:  Not in this case, no.

9           THE COURT:  Would precinct-level data have assisted

10   you in your analysis of Dr. Timberlake's report?

11          THE WITNESS:  I could have reconstituted his analysis

12   using precincts and maybe drawn some different conclusions.

13          THE COURT:  Could you have looked at -- let's say, if

14   you had looked at precinct-level data for predominantly

15   African-American precincts in Cuyahoga County, could you have

16   then -- in county comparisons that Dr. Timberlake did, could

17   you have then compared the rejection rate at the precinct-level

18   to comparable precincts in predominantly majority counties?

19          THE WITNESS:  Well, I think at that point -- I think

20   what you're talking about, it's typically called the

21   homogeneous precinct analysis.  And, so, typically what we

22   would do is not compare precincts to counties at that point but

23   compare predominantly African-American precincts, say 90

24   percent greater, to predominantly white precincts, say 90

25   percent greater white.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1          THE COURT:  Okay.

2          THE WITNESS:  Now, I don't know -- I just don't know

3    the answer to this.  I don't know if these rejection rates are

4    available at the precinct level.  I mean, I know they're

5    available at the county level and the state level, because I

6    made use of them.  I just don't know if they're available at

7    the precinct level.

8          THE COURT:  But the data was actually collected,

9    ironically enough, at the precinct level; wasn't it?

10          THE WITNESS:  No disagreement there.  It's amazing how

11    quickly information gets lost, sometimes, in life.  So --

12          THE COURT:  Yes, it is.

13          All right.  Thank you, Doctor.

14          Please continue, Ms. Pierce.

15          MS. PIERCE:  Thank you, Your Honor.

16    BY MS. PIERCE:

17    Q.   So, overall, Dr. Hood, looking back at Dr. Timberlake's

18    ODP analysis, in your opinion, did he offer any evidence of a

19    disparate impact from these laws?

20    A.   I don't believe so.  And, again, it gets back to I would

21    not have operationalized these analyses in the way he did.  And

22    because of that, I don't think that the inferences he draws

23    from his conclusions, or from his findings, are valid.

24    Q.   And based on your experience, Dr. Hood, do benefits to

25    election administration also accrue to voters?

1    A.    Certainly.  It should make elections more efficient and

2    timely for voters, as well, in terms of, say, for instance, the

3    amount of time it takes someone to go to the polling station,

4    go through the process, and cast a ballot, for instance, and

5    also, hopefully, increase accuracy in elections, as well.

6    Q.    Taking a step back from your rebuttal report, Dr. Hood,

7    overall, what did you conclude about Dr. Timberlake's analysis

8    of the Senate Factors?

9    A.    In general, I disagreed with a lot of the analysis

10   Professor Timberlake undertook with the Senate Factors.  I

11   guess, from a lot of the data I actually collected directly,

12   for instance, relating to turnout or to registration or to

13   black office-holding levels, there doesn't seem to be a lot of

14   evidence that Senate Factors are being violated, so to speak.

15   Q.    Okay.  And do you hold those conclusions with a

16   reasonable degree of professional confidence?

17   A.    Yes.

18         MS. PIERCE:  Okay.

19         Just a moment to confer, Your Honor, if I might?

20         THE COURT:  Yes.

21         MS. PIERCE:  Thank you.

22      (Whereupon, there was a brief interruption.)

23         MS. PIERCE:  Thank you, Your Honor.

24         And, Dr. Hood, I have no further questions at this time.

25         THE COURT:  Thank you, Ms. Pierce.

Vol. 10 - 87

1          MS. PIERCE:  I apologize.  At this point, I'd like to
2   move his rebuttal report into evidence, Defense Exhibit 10.
3          THE COURT:  Any objection?
4          MR. McTIGUE:  No objection.
5          THE COURT:  Exhibit 10 -- Defense Exhibit 10 will be
6   received.
7          MS. PIERCE:  Thank you, Your Honor.  I apologize.
8          THE COURT:  Yes.
9                        CROSS-EXAMINATION
10  BY MR. McTIGUE:
11  Q.   Good morning, Dr. Hood.
12  A.   Good morning.
13  Q.   Welcome back to Ohio.
14  A.   Thank you.
15  Q.   I am Donald McTigue.  I think we met in the earlier
16  case, although I didn't question you in that case.
17  A.   Nice to make your acquaintance again.
18  Q.   I want to go to your curriculum vitae, which I believe
19  is Defendants' Exhibit 9.  And I direct your attention to page
20  IX, the last item there.  And let's see here.
21       I'm looking for what the -- These are under the heading
22  of "Papers and Activities at Professional Meetings."  Do you
23  see the item that says:  "I know I voted, but I'm not sure it
24  got counted"?  I just can't pass up that title and want you to
25  tell me what you were addressing there.

1   A.   Okay.  Page 9 -- let's see.

2   Q.   It's a small -- I'm sorry.  It's Roman numeral.  So,

3   small I, small X.

4   A.   Okay.

5        THE COURT:  This is Exhibit D9?

6        MR. McTIGUE:  I thought it was Exhibit 9, the

7   curriculum vitae.

8        THE WITNESS:  It is.  I found it.  I found it.

9        So, that is a conference paper which is an earlier

10  version of the publication.

11       THE COURT:  Which one are we looking at now?

12       MR. McTIGUE:  The bottom one, Your Honor.

13       THE COURT:  I know I voted, but I can't say --

14       MR. McTIGUE:  Yes.

15       THE COURT:  Okay.

16       THE WITNESS:  Okay.  So that's an earlier version of

17  something that was eventually published as -- on page 3, or

18  III, "One Person; No Vote; One Vote; Two Votes.  Voting

19  Methods, Ballot Types and Undervote Frequency in the 2000

20  Presidential Election."  So, it's an earlier variant of that

21  publication.

22    BY MR. McTIGUE:

23   Q.   And what were some of the issues?  Let's ask what are

24  the factual issues that you were looking at in terms of whether

25  ballots were counted or not counted?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 89 of 329 PAGEID #: 1946
Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/03/16 Page: 89 of 329 PAGEID #: 30819

Vol. 10 -  89

 1    A.    Sure.  I mean, at that particular point in time, that

 2  was following the 2000 election.  And we all remember what

 3  happened in Florida, probably.  And Georgia had sort of a

 4  patchwork of different types of election technology, including

 5  mechanical-lever voting devices, different types of optical

 6  scan, punch cards, and even paper ballots.  And that's one of

 7  the things we were looking at, were the different undervote

 8  frequencies related to those technologies.

 9    Q.    Okay.  So, you were not looking at issues related to how

10  voters completed application forms or absentee identification

11  envelopes or --

12    A.    No, not that.  There was -- There were some different

13  types of optical-scan ballots in Georgia, because there were

14  different types of optical-scan technology being used.  And one

15  of the things we looked at in terms of ballot type was whether

16  someone had to darken in an oval or connect an arrow to

17  complete their vote.

18    Q.    Okay.  I have another question, or series of questions,

19  regarding your curriculum vitae -- well, actually, I don't

20  think it's on the curriculum vitae -- in terms of the cases

21  that you've testified in.  However, in your report, which is

22  Defendants' Exhibit 8 -- okay -- if you go to the second page

23  --

24    A.    Yes.

25    Q.    -- the bottom paragraph lists cases in which you've

1    testified.  And it says -- That's correct?

2      A.    Yes.

3      Q.    Okay.  So it says ten cases in the preceding four years.

4            Now, one of those cases listed there is -- Actually, I

5    don't see it listed there -- is *Common Cause/Georgia versus*

6    *Billups.*  Were you -- Did you appear in that case as an expert

7    witness?

8      A.    Yes.  The reason it's not listed there is because it was

9    more than four years ago.

10     Q.    How long ago was that case?

11     A.    Oh, I want to say 2007, I mean, from my memory.

12     Q.    Okay.  And how come you limited yourself to four years?

13     A.    I was told at one point that that was -- that, under the

14   Federal Rules, those were the cases I was supposed to list.

15     Q.    Okay.  No.  In fact, in the Billups case, or that case,

16   the Billups case involved issues regarding absentee voting,

17   correct?

18     A.    Only as it was connected to the voter ID issue.

19     Q.    Okay.  So voter ID issues?

20     A.    Yes.

21     Q.    Okay.  And, in that case, the Court excluded you as an

22   expert witness; is that correct?

23     A.    That's correct.

24     Q.    And in doing so, the Court commented that he found your

25   report to not be reliable or admissible under Daubert due to

1   methodological shortcomings; is that correct?

2       A.   Well, I'm going to assume you're reading correctly from

3   the opinion.  So, I don't have the opinion in front of me.

4       Q.   Okay.  Now, you do list, going back to the exhibit,

5   *State of Florida vs. United States.*  And in that case, the

6   Court rejected your expert opinion due to a number of

7   methodological flaws, correct?

8       A.   Well, my opinion was admitted.

9       Q.   Your opinion was admitted?

10      A.   Well, my -- I wasn't excluded as an expert, I guess.

11      Q.   Right.  You were admitted as an expert, but was your

12  expert -- your written report, was that accepted into evidence

13  or --

14      A.   Yes.  That doesn't mean that they agreed with it.  I'm

15  just saying it was accepted into evidence.

16      Q.   Do you recall the judge commenting that your opinion

17  suffered from a number of methodological flaws?

18      A.   Well, again, I don't have the opinion in front of me,

19  but something like that, yes.

20      Q.   So, let me go to the next case, which is *NAACP versus*

21  *Walker.*  Actually, before I do that, let me go back to the

22  Florida case.  What were -- What were the legal issues in the

23  Florida case?

24      A.   It was primarily about early voting.

25      Q.   And was this a situation where Florida had cut back on

1    early voting?

2       A.   Yes.  It was a -- specifically, it was a Section 5 case

3    dealing with early voting.  There was some other more minor

4    issues, but that was the main issue.

5       Q.   Okay.  So, let's now go to the *NAACP versus Walker* case.

6    What did this case deal with?

7       A.   Voter ID in Wisconsin.

8       Q.   And that would be voter ID, voting at the polls?

9       A.   Well, actually, in Wisconsin, you'd have to present ID,

10   whatever form of voting you're engaged in.

11      Q.   So absentee or provisional, as well?

12      A.   Well, that may be a reason you may have to vote a

13   provisional ballot, actually, in Ohio; if you don't show up

14   with the right ID.

15      Q.   Okay.

16      A.   But absentee by mail, absentee in person, or at the

17   polls on Election Day, yes.

18      Q.   And that case was dealing with in-person voter ID?

19      A.   Well, again, in Wisconsin, if you send in your ballot

20   via mail, you'd have to photocopy your ID.

21      Q.   Okay.

22      A.   So, any form of voting.

23      Q.   And, in that case, the judge rejected your findings

24   because, quote, they did not adequately explain, or that you

25   did not adequately explain or justify your failure to adjust

Vol. 10 - 93

 1   data for out-of-state migration or deceased voters, correct?

 2      A.   Yes.

 3      Q.   Okay.  Now, you also mentioned the *Jones versus*

 4   *Deininger* case.  Is that the -- Is that case the same case as

 5   *LULAC versus Deininger*?

 6      A.   I don't know.

 7      Q.   Okay.

 8      A.   I can tell you, *Jones v. Deininger* was consolidated with

 9   *Frank v. Walker*.  They were federal cases.

10      Q.   Okay.

11      A.   I do know that.  I don't -- Sometimes case names change,

12   I know.  But --

13      Q.   And, in that case, did the judge reject your expert

14   opinion as, quote, suspect?

15      A.   I don't know if he used that particular term.

16      Q.   Okay.  Do you recall the judge stating, among other

17   things, that you had failed to meaningfully test your

18   hypotheses?

19      A.   I mean, I don't remember that specifically.

20      Q.   Do you remember the judge indicating that you were --

21   finding fault with your opinion because you had used such a

22   small sample size that no reasonable social scientist could

23   draw conclusions about a state population from it?

24      A.   I don't remember that specifically.

25      Q.   Okay.

1    A.    I mean, I was doing some -- I mean, I'm not saying

2  you're misrepresenting.  I just don't remember that.  I was

3  doing some database matching, which involves huge numbers,

4  typically.

5    Q.    What was the issue, while we're -- in the *Frank versus*

6  *Walker*?

7    A.    It was a voter ID case.

8    Q.    Okay.  So, this was -- was it the same ID requirement or

9  issues as in the *NAACP versus Walker* case?

10    A.    Well, I guess the legal issues were different, but it

11  was about Wisconsin's voter ID statute.

12    Q.    And, lastly, I wanted to ask you about the case of

13  *Veasey versus Perry.*  Do you recall what that that case was

14  about?

15    A.    Texas voter ID.

16    Q.    And do you recall the judge stating in his opinion that

17  he gave your report little weight because it contained several

18  significant methodological oversights?

19    A.    Well, I think she said that.

20    Q.    Or she.  I'm sorry.

21    A.    Yes.

22    Q.    Now, I want to turn, now, to your report in this case.

23  You've already answered some questions about, I guess, research

24  that you did to -- that you relied -- research that you relied

25  upon in preparing your report.  And you had indicated that you

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

Vol. 10 - 95

1    had reviewed declarations of Ohio elections officials.  Do you

2    recall that?

3     A.    Yes.

4     Q.    Okay.  Specifically, how many written declarations did

5    you review?

6     A.    Well, I can't -- I don't know, specifically.

7     Q.    Okay.  Well, let me ask.

8     A.    The ones -- let me say this.

9     Q.    Sure.

10    A.    The ones I utilized in this report are cited in the

11   footnotes.

12    Q.    Okay.

13    A.    I mean, I don't do anything without citations.  So --

14    Q.    So you don't do anything without citations.  So the

15   reports for this particular -- the declarations for this

16   particular report, those declarations are cited here?

17    A.    Yes, certainly.  Yes.

18    Q.    Okay.  Regarding those declarations, who provided you

19   with those declarations?

20    A.    They were given to me through counsel.

21    Q.    Counsel for the defendants?

22    A.    Yes.

23    Q.    Okay.

24    A.    So, the Ohio Attorney General's Office.

25    Q.    Fine.  And were those declarations prepared by the Ohio

 1  Attorney General's Office?

 2    A.   Can you define "prepared"?

 3    Q.   Well, were they -- were they drafted for signature by

 4  the declarants?

 5    A.   I didn't do that directly, if that's what you're asking.

 6    Q.   Okay.  Well --

 7    A.   I just received the final product.

 8    Q.   Okay.  Did you provide any input to the Attorney

 9  General's Office in terms of the types of questions that the

10  declarants should be asked about and respond to in their

11  declarations?

12    A.   Not specific questions, but I did ask for information

13  regarding their viewpoints on changes that were, you know,

14  under challenge to Ohio's election law and, in more general,

15  you know, their take on the conduct and administration of

16  elections where they were at, at their local level in their

17  county, for instance.

18    Q.   So, you asked for the Attorney General's Office to ask

19  the declarants for their viewpoints on the new laws?  Did I say

20  that correctly?

21    A.   Information on implementation of the new laws, or the

22  changes to the laws.

23    Q.   Well, viewpoints and information on the implementation

24  would be two different things, correct?

25    A.   Well, they oftentimes offered viewpoints, in addition, I

1    guess, to more mundane administrative information.

2      Q.    Well, what I'm trying to get at is, what, specifically,

3    did you ask the Attorney General's Office to have the

4    declarants address?

5      A.    Well, again, from memory -- it's been a while --

6      Q.    Sure.

7      A.    -- I wanted local election officials' opinions on the

8    changes to these election laws.

9      Q.    Well, for example, did you ask the Attorney General's

10   Office to ask the declarants whether or not, in the absence,

11   say, of a date of birth on a provisional affirmation form, they

12   could still determine the identity of the voter?

13     A.    I don't remember asking that specific question.

14     Q.    What specific questions did you ask for other than for

15   their opinion on the new law?

16     A.    There were more general questions because I wanted to

17   hear what the officials had to say without me providing leading

18   questions, per se.

19     Q.    Okay.

20     A.    I don't remember asking that specific question that you

21   just asked.

22     Q.    But, so far, the only thing I hear you saying is that

23   you asked the Attorney General's Office to ask local officials

24   for their opinions about the new laws.

25          MS. PIERCE:  Objection, Your Honor.

 1          THE COURT:  Basis?

 2          MS. PIERCE:  Mischaracterizes testimony.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  Opinions and how these changes were

 5     being implemented.  I guess I could add that.

 6     BY MR. McTIGUE:

 7     Q.   And how -- Okay.  And how the change were being

 8     implemented?

 9     A.   Yes.

10     Q.   Okay.  And in terms of how -- well, those were just

11     open-ended questions, basically?

12     A.   Fairly open -- yeah, I think that's fair.  Now, I

13     conducted an interview, myself, in which I asked --

14     Q.   I'm going to get to that.

15     A.   Okay.  All right.

16     Q.   Okay?  So, in terms of how the laws were being

17     implemented, what did you learn from the declarations as to how

18     these local boards were implementing these new laws?

19     A.   Well, some of what I learned in the ODP case is not

20     necessarily directly germane to this case, like, say, early

21     in-person voting.  But they would -- they would give an

22     account, essentially, a report, through this declaration, of,

23     you know, did the shortened early voting period affect turnout,

24     affect the ability to process voters in that time frame, those

25     kinds of things, as an example.

Vol. 10 - 99

1    Q.   Okay.  Well, can you come up with an example of what you

2    learned from these declarations as to how the local officials

3    were implementing the laws as they relate to the changes that

4    we're talking about today, the changes in the laws, either

5    the -- well, let's break it down --

6    A.   Okay.

7    Q.   -- the five fields, or the -- if you even want to focus

8    on the address and date-of-birth fields?  Did you learn

9    anything from those declarations as to how the local officials

10   were implementing those changes?

11   A.   I don't remember any -- just sitting here today, I don't

12   remember anything that specific on that particular topic.

13   Q.   Well, let's ask now -- or let me ask whether you learned

14   anything from the local officials who gave you these

15   declarations regarding how they were implementing the new

16   shortened time period for curing ID issues on provisional

17   ballots.

18   A.   Well, they were implementing it within the scope of the

19   parameters set out.  I did learn -- Now, something I just

20   remembered, I did learn that -- and, again, I'd have to go back

21   and review all these declarations specifically; but, in

22   general, I can remember several instances of local election

23   officials indicating that having these additional fields helped

24   them locate voters in the registration database.  So, I do

25   remember that.

1          Now I'd have to go back and review the declarations to

2     figure out who said what exactly, but --

3     Q.   And do you recall whether those declarations indicated

4     only that it helped them identify voters, or was the

5     information more specific, such as it made the process faster

6     of identifying voters?

7     A.   I don't know that I -- I don't -- I don't know that I

8     recall that adjective.  I'm not saying it wasn't there.  But

9     helped, assisted them in identifying voters, I remember

10    language to that extent.

11    Q.   Okay.  Do you recall any of those declarations saying

12    that having the date of birth enabled us to identify a voter

13    that we could not otherwise have identified?

14    A.   I don't remember anything -- language that specific, no.

15    Q.   Now, with regard to the shortened cure period from ten

16    days to seven, that was actually shortened for both

17    provisionals and absentees, correct?

18    A.   Yes.

19    Q.   Okay.

20    A.   Although -- okay.  Again, from memory, it's my

21    understanding that this process also put in place a procedure

22    whereby absentee ballot mistakes could be corrected.  And I

23    don't know that that existed prior to this change.  If I'm

24    wrong, I'm glad to be corrected.

25    Q.   It existed by directive, but not in the statute.

1    A.    Right.

2    Q.    Okay.  Now, I'd asked you if the declarants had

3    indicated how they were implementing the shortened cure period.

4    And you said they were implementing it within the parameters of

5    the law.

6    A.    I meant time-frame-wise, seven days.

7    Q.    Okay.

8    A.    That's what I meant.

9    Q.    Well, did you learn anything from those declarations as

10   to how many people, for example, were taking advantage of the

11   cure period?

12   A.    No.

13   Q.    Did you gather any information as to how many people

14   attempted to take advantage of the cure period, say on days

15   eight, nine and ten after the election?

16   A.    Well, prior to the change in the law, I'm assuming

17   you're talking about?

18        Oh, people -- okay.  I'm sorry.  Maybe I misunderstood

19   your question.  People that may have come in to try to cure an

20   issue after the seven days?  Is that fair?

21   Q.    Yes, uh-huh.

22   A.    No, I didn't learn anything about that particular --

23   Q.    Okay.  Did you learn anything about -- now going to how

24   you first interpreted my question, did you learn anything from

25   elections officials as to, before the law changed, how many

1  people took advantage of the law during days eight, nine, and

2  ten?

3    A.   No.  No, did not.

4    Q.   Did you learn anything from the declarations as

5  to -- This question is on absentees -- as to how many voters

6  were able to timely correct their ID envelope based on having

7  received Form 11-S?

8    A.   No, not specific statistics.  I do know that process

9  exists and how it works, but not specific statistics.

10   Q.   Okay.  Now let's go to -- you said you did an interview

11 of one election official.  I'm assuming you're talking about

12 Matthew Damschroder?

13   A.   That's correct.

14   Q.   Okay.  And Mr. Damschroder works for the Secretary of

15 State's Office, correct?

16   A.   That's correct.

17   Q.   Okay.  And was this by telephone or in person?

18   A.   Telephone.

19   Q.   Okay.  And was it one call or multiple calls?

20   A.   Again, my recollection is it was -- it was one call.

21   Q.   It was one call?

22   A.   That's my recollection.

23   Q.   Okay.

24   A.   Yes.

25   Q.   How long did that call last?

1    A.   I asked a lot of questions.  An hour, maybe.

2    Q.   Okay.  And that interview was actually conducted in the

3    other case, the -- in conjunction with compiling your report in

4    the OOC-ODP case that Judge Watson heard, correct?

5    A.   That's exactly correct, yes.

6    Q.   You didn't conduct another interview with

7    Mr. Damschroder for purposes of the reports prepared in this

8    case?

9    A.   No.  I'm referring to that interview.

10   Q.   Okay.  Now, that case, the other case, involved a host

11   of issues beyond what's involved in the present case, correct?

12   A.   Yes.  I think that's -- that's fair to say.

13   Q.   Okay.  For example, that case included issues about the

14   elimination of Golden Week?

15   A.   Yes.

16   Q.   Okay.  The prohibition in the law on a Board of

17   Elections having more than one early vote center?

18   A.   Yes.

19   Q.   Issues related to the mailing out of unsolicited

20   absentee ballot applications by the Secretary of State?

21   A.   Well, yes.  I mean, I guess, specifically, who those

22   were being sent to was the issue, not whether it could be done.

23   Right?

24   Q.   Right.

25   A.   Yeah.

1    Q.    Or the fact that the law prohibited anyone else from

2    mailing those out?

3    A.    You mean like third-party groups, for instance?

4    Q.    Yeah.  Well, no.  I'm sorry.  Any other governmental

5    body.

6    A.    Right.  Right.

7    Q.    Okay.  And you recall, as well, there were issues

8    regarding reduction in the number of DRE machines, the formula

9    that is used for that purpose?

10   A.    Yeah.  There was -- there were questions about the

11   formula that was used.

12   Q.    Okay.  And you recall that a very, kind of, big issue,

13   maybe overriding theme in that case had to do with long lines

14   that voters had to endure?

15   A.    Well, I mean, that was brought up.  I don't know that

16   that was a specific legal issue in the case.

17   Q.    Okay.  So, did your hour conversation with

18   Mr. Damschroder include all of these topics?

19   A.    Well, certainly most of them, yes.

20   Q.    In addition to the issues in this case about the five

21   fields and the --

22   A.    Yes.  Yes.

23   Q.    -- the shortened cure period?

24   A.    In addition to me just asking general questions about

25   how Ohio administers elections.

1    Q.    In terms of your phone interview with Mr. Damschroder,

2    did you keep a record of that call?

3    A.    Well, I -- I know I took notes.

4    Q.    So you had handwritten notes.  Did you record the

5    conversation?

6    A.    No.

7    Q.    Okay.  Did you -- prior to the call, or even during the

8    call, did you provide Mr. Damschroder with a list of questions

9    that you wanted to ask about?

10   A.    I don't remember doing that, no.

11   Q.    Do you know if Mr. Damschroder was provided a list of

12   issues to discuss by the Attorney General's Office?

13   A.    I -- I have no idea about that.

14   Q.    Now, with regard to the call with Mr. Damschroder, did

15   you ask him -- Well, let me -- I'm just going to give it to you

16   more open-ended.  How did that call progress?  What did you,

17   you know, ask him?  Did you just throw it open and ask him to

18   address the changes in the various laws that were being

19   challenged in the earlier case?

20   A.    I think this was -- this was a while ago in time, maybe

21   last summer.  I'm not sure, to be honest with you.  But it was

22   awhile ago.

23         So I think, at that point -- again, this is my

24   recollection of things, sitting here today -- I'd probably done

25   some research on my own about these changes and about Ohio and

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 106 of 329 PAGEID #: 1963
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/07 Page: 106 of 329 PAGEID #: 30898

Vol. 10 - 106

1   about Ohio's election law.  And I don't remember just throwing

2   it open, as you say.  I think I probably had questions -- well,

3   I know I did -- questions specifically about how this works or

4   how this doesn't work, what's the procedure.

5   Q.   Okay.  So --

6   A.   I think I probably had specific questions.

7   Q.   Okay.  So let's -- let's try to focus, then, on the

8   issues in this case.

9        Do you recall, specifically, what you asked

10  Mr. Damschroder regarding the changes in Senate Bill 205?

11   A.   Not specifically.  And I don't know that I would have

12  used -- used that language.  I may have said:  Please describe

13  some of the changes to the absentee voting or provisional

14  balloting, is probably what I said.

15   Q.   And the same sort of, then, question to Mr. Damschroder

16  with regard to Senate Bill 216 on provisional ballots?

17   A.   Yes.

18   Q.   So you would have asked him to describe what the changes

19  are that these two laws have enacted?

20   A.   How did the law exist before?  What changed?

21   Q.   Now, did Mr. Damschroder, either on his own or in

22  response to a question from you, offer any rationale or

23  justification for the requirements in the new laws for the

24  birthdate?

25   A.   I don't remember, specifically.  If he did, it would

1    have been the same one I've been talking about:  Administrative

2    justification.

3        Q.    If he did?

4        A.    Yeah.  I just don't remember that specifically.

5        Q.    Again, did you -- either in response or to a question

6    from you or on his own, did Mr. Damschroder offer any

7    justification or benefits related to requiring the address on

8    the provisional ballot form?

9        A.    Same answer:  I don't remember specifically; but, if he

10   did, it would have been, again, to locate voters in the voter

11   registration database.

12       Q.    Okay.  But, again, you don't remember if he specifically

13   offered that?

14       A.    Not sitting here, no.

15       Q.    Okay.  And, then, what about with respect to the issue

16   of the shortened cure periods for the absentee and provisional

17   ballots?  I know, on direct, you've already given your view on

18   the benefits of that; but did that come up in your conversation

19   with Mr. Damschroder?

20       A.    Well, this is what I remember on that:  I do remember us

21   discussing -- and, again, this was part of my general inquiry

22   into how elections are administered in Ohio -- we went through

23   the timeline.  Part of that is the end of the cure period, and

24   then the start of the official canvass on Day 11.  I remember

25   talking about that.  So, in the context of that, yes.

```
1    Q.    And do you recall Mr. Damschroder -- what, if anything,

2    Mr. Damschroder said about when the official canvass must

3    begin?

4    A.    I believe, from memory, it's Day 11.

5    Q.    Have you checked the Ohio law yourself?

6    A.    I'm sure at some point I did, yes.

7    Q.    And --

8    A.    All of these provisions, I read the statutory code or

9    the Secretary of State's directive that was related to these

10   issues.

11   Q.    And doesn't the Ohio statute actually say that the

12   official canvass must begin no earlier than 11 days after the

13   election and no later than 15 days after the election?

14   A.    Well, if you're representing that that's what the

15   statute says, I'll accept that.  I remember the 11-day start

16   period.

17   Q.    Okay.  So I'm still -- I'm a little vague here about

18   whether Mr. Damschroder offered any specific justification for

19   why the cure period, or, why the cure period being shortened to

20   seven days was a good idea from the standpoint of election

21   administration.

22            MS. PIERCE:  Objection, Your Honor.

23            THE COURT:  Basis?

24            MS. PIERCE:  Asked and answered.

25            THE COURT:  Overruled.
```

Vol. 10 - 109

1        THE WITNESS:  Okay.  One more time.  I'm sorry.

2     BY MR. McTIGUE:

3     Q.   Okay.  Let me rephrase it --

4     A.   Okay.

5     Q.   -- even though the objection was overruled.

6          You have some memory of this topic coming up in your

7     conversation with Mr. Damschroder?

8     A.   That's correct.  I remember talking about the timeline.

9     Q.   And you remember about the official canvass starting 11

10    days after the election?

11    A.   Yes, I do.  I do remember that.

12    Q.   So do you recall, specifically, Mr. Damschroder

13    describing what the benefit would be, in terms of the official

14    canvass, to truncate the ten-day period?

15    A.   I don't remember, specifically, if he said something

16    about that or not --

17    Q.   Okay.

18    A.   -- sitting here.

19    Q.   And are you --

20    A.   If he -- if he -- I do remember, again, talking about

21    the timeline and an end to the cure period and the start of

22    other processes that had to begin.  I do remember that.

23    Q.   Okay.  But you don't recall any specific justification

24    from him?

25    A.   Not sitting here, no.

1    Q.    And are you aware that, under Ohio law, provisional

2    ballots -- are you -- Let me rephrase it.

3          Are you aware that, under Ohio law, the Board of

4    Elections must rule on the acceptance or rejection of

5    provisional ballots?

6    A.    Yes, I am aware of that.  Yes.

7    Q.    Are you also aware that, under Ohio law, the Board of

8    Elections cannot vote on acceptance and rejection until after

9    the ten-day period after the -- until after ten days after the

10   election?

11   A.    I don't know that I was aware of that specific fact.

12   Q.    Okay.  And are you aware that, under Ohio law and

13   procedures adopted, or proscribed, by the Secretary of State, a

14   Board of Elections may not process any additional absentee

15   ballots until after the tenth day after the election?

16   A.    Okay.  What do you mean by --

17   Q.    Yes.  Let me explain.

18   A.    Okay.

19   Q.    Are you aware that, on election night, Boards of

20   Elections conduct an unofficial count?

21   A.    Yes.

22   Q.    Okay.  And that would include people who voted at the

23   polls, correct?

24   A.    Correct.

25   Q.    And it would include, let's say, any absentee ballots

1   that had been received by the Board by the day of the election

2   and the Board had been able to process, correct?

3       A.    From my understanding, yes, that's correct.

4       Q.    Okay.  Now, are you aware, as well, though, that, under

5   Ohio law, absentee ballots can come in after the day of the

6   election and still be valid so long as they are postmarked by

7   the day before the election?

8       A.    Yes.  Yes, that's correct.

9       Q.    And, so, those ballots would not have been in the

10  unofficial count from election night, correct?

11      A.    That's correct.

12      Q.    So they would have to be included in the official count,

13  or what's called the canvass?

14      A.    Right.  They get counted later.

15      Q.    And are you aware that, under procedures proscribed by

16  the Secretary of State, none of those what are sometimes

17  referred to as late absentees or post-Election Day absentees

18  can be counted until after the tenth day following the

19  election?

20      A.    So they're counted when the official canvass starts?

21      Q.    Yes.

22      A.    Yes, I think I was aware of that.

23      Q.    Not earlier.  Specifically, that they are -- are you

24  aware that the Ohio law, or the procedures, do not allow the

25  boards to count them during the ten-day period?  Maybe

Vol. 10 – 112

1   that's --

2    A.   I think I'd read that at some point, yes.

3    Q.   Okay.  In the telephone interview that you did with

4   Mr. Damschroder, did the two of you discuss the issue of the

5   right church/wrong pew voter?

6    A.   I'm sure we did.  I mean, we touched on most of

7   the -- that was an issue in the ODP case, as well.

8    Q.   Right.  And did the two of you discuss whether or

9   not -- Let me back up.

10        I think you've already indicated that the Secretary of

11   State, in December of last year, directed that Boards of

12   Elections must have consolidated poll books in multi-precinct

13   polling places, correct?

14   A.   That's correct.

15   Q.   Now, your interview with Mr. Damschroder was, I think

16   you said, maybe in the summer of last year?

17   A.   From what I remember, yes.  I mean, it may be --

18   Q.   In the footnote?

19   A.   It could be in the footnote.  It probably should be.

20   Q.   Okay.

21   A.   I also cited a declaration of his, but --

22   Q.   I think, on page 3, it looks like it was August --

23   Footnote #2, August 5th, 2015.

24   A.   Okay.  Well, that's summer.  At least I remembered that

25   correctly.

 1    Q.   It's summer, yes.  So, do you recall Mr. Damschroder

 2    bringing up, or -- let me rephrase it.  Do you recall whether

 3    the two of you discussed the possibility, or plans, for the

 4    Secretary of State to order that boards use consolidated poll

 5    books in multi-precinct polling locations?

 6    A.   I think so.  I think it was in the works, so to speak,

 7    because, in the previous case, in the ODP case, you know, there

 8    was -- there's a -- again, I may not get all of this correct,

 9    but there was a period in which the change had to be opened to

10    comment, for instance.  I believe I am remembering all this

11    correctly.  So it was pending -- the provision was pending

12    during the ODP case.  It wasn't -- it wasn't --

13    Q.   All right.  Yes.

14    A.   Okay.

15    Q.   Okay.

16    A.   And, then, so that is something I've updated from that

17    case to this case.

18    Q.   Okay.  So, specifically, you recall the two of you

19    discussing that, though, in the phone call?

20    A.   I think so, yes.

21    Q.   Okay.  In that call, did Mr. Damschroder discuss the

22    fact that the Senate Bill provides that a Board of Elections,

23    on a vote of at least three members, may vote to consolidate

24    the poll books?

25    A.   I don't know that he said that.  I read a whole lot of

 1   material for this case and the other case.  And so I think, at

 2   some point, I ran across that information.

 3      Q.   Do you recall whether Mr. Damschroder discussed, at all,

 4   with you whether or not the Secretary of State would have the

 5   legal authority to order the boards to consolidate poll books,

 6   given the statutory language requiring a vote of three members?

 7      A.   I don't remember getting into that level of detail.  I

 8   don't remember talking about that particular topic.

 9      Q.   Before I forget, I want to go back to the declarations

10   from local elections officials in Ohio.  Did you pick any of

11   the counties to provide declarations to you?

12      A.   No.

13      Q.   Okay.  Did you offer to the Attorney General's Office

14   any specific recommendations regarding which counties

15   declarations should come from?

16      A.   Not specifically.

17      Q.   Generally?

18      A.   I think I probably said something like "across the

19   State."

20      Q.   Okay.  Now, you also indicated, a little bit ago, here,

21   that you did some of your own research.  Now, I assume by that,

22   other than these declarations and the phone interview, I take

23   it from that you mean you went and read the statutes?

24      A.   Correct.

25      Q.   Okay.  And in reading the -- did you also read the

1  actual bills, the final versions of the bills that enacted

2  these laws?

3    A.   I probably read the statutes.

4    Q.   Okay.  So, without reading the bill, you couldn't see

5  what the old language was that was repealed?

6    A.   Well, not the language; but, again, it's one of the

7  things I'd asked about.

8    Q.   You asked who?

9    A.   Well, for instance, Mr. Damschroder.

10   Q.   Okay.  But you didn't go read, line by line, what was

11 taken out, what was added?

12   A.   I'm not certain.  I mean, I know I had to get an idea,

13 since I was rendering an opinion, what changed to what.  So, at

14 some point, I had to look at what the previous law looked like

15 to understand the changes.

16   Q.   Do you recall in your -- well, before I move on to

17 that -- okay.  So, you read the statutes?

18   A.   Right.

19   Q.   And I think you said in direct you went to the Secretary

20 of State's website to get some of the statistics on provisional

21 and absentee voting?

22   A.   True, and plus certain Secretary of State directives --

23 I think that's all posted on the website -- and other materials

24 available on the Secretary of State's website.

25   Q.   So would that be the scope, then, of the independent

 1   research that you did on your own?

 2     A.   I think that encompasses most of it, yes --

 3     Q.   Okay.  And back to the conversation with Mr. Damschroder

 4   --

 5     A.   -- at least in this case.

 6     Q.   Okay.

 7     A.   I mean, you know, I had -- the other case involved more

 8   issues.  So I did more analysis related to the other case.

 9     Q.   And in your conversation with Mr. Damschroder, do you

10   recall the two of you discussing whether or not a date of birth

11   was necessary, let's say absolutely necessary, to identify

12   whether a voter is an eligible voter?

13     A.   I don't remember discussing that topic.

14     Q.   Did the two of you discuss, at all, the exceptions

15   enacted in the law regarding the date-of-birth field?

16     A.   Well, I don't know if I discussed it with him or I read

17   about it.  I mean, some of it is included in my report.

18     Q.   And one of those exceptions in the law allows a Board of

19   Elections to, essentially, waive the date-of-birth requirement

20   on the provisional or absentee form by a vote of three members,

21   correct?

22     A.   Yes.  I remember reading -- for one, I read a directive

23   and studied a directive from the Secretary of State -- excuse

24   me -- Secretary of State's Office that detailed the process for

25   going through provisional ballots.  And it wasn't a flowchart,

1   but you can sort of think of it that way:  Step 1, Step 2, Step

2   3.

3       Q.   Right.

4       A.   So, yes.

5       Q.   And you recall -- but you do recall, specifically, that

6   the law allows for a Board of Elections to waive that

7   requirement for the birthdate, correct?

8       A.   Yes.

9       Q.   And, to be fair, it says if the Board finds that the

10  other fields are all complete?

11      A.   Yes.  And I think something to the extent to which there

12  are no other issues, for instance, the voter's registered and

13  all that kind of thing.

14      Q.   Yes.

15      A.   Yes.

16      Q.   Okay.  Fine.  So, did you have any discussion with

17  Mr. Damschroder about any consideration by the Secretary of

18  State to ordering the boards to adopt a uniform policy of not

19  requiring the date-of-birth field to be filled in so long as

20  the other four fields are filled in and the person is otherwise

21  qualified to vote?

22      A.   I don't remember discussing that, that topic.

23      Q.   Okay.

24          MR. McTIGUE:  Your Honor, at this point, I'm going to

25  be getting into his report.  Did you want me to plow on?

1          THE COURT:  How much more do you think -- Well, we

2     have redirect, anyway.  It's 12:10 now.  We will reconvene at

3     1:15.

4          (Recess taken at 12:10 p.m.)

5                         - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                Tuesday afternoon session

 2                                March 29, 2016

 3                                      - - -

 4              THE COURT:  Mr. McTigue, please proceed.

 5              MR. McTIGUE:  Thank you, Your Honor.

 6   BY MR. McTIGUE:

 7      Q.   Dr. Hood, as part of your preparation for the report in

 8   this case and, for that matter, in the other case before Judge

 9   Watson, did you interview Secretary of State John Husted?

10      A.   No, I did not.

11      Q.   Did you ever request to interview him?

12      A.   No.

13      Q.   Now, I think the Judge had asked you some questions

14   about demographic factors, and I have a few questions regarding

15   that as well.

16           Would you agree that certain demographic factors of

17   voters can affect their participation in the political process?

18      A.   I could agree with the statement that we know that there

19   are certain corletts, demographic corletts, related to, say,

20   turning out to vote.

21      Q.   Okay.  And let me be more specific.

22           Are you aware of any correlation between low income or

23   poverty and African-American citizens?

24      A.   I'm aware that that correlation can exist, yes.

25      Q.   And that African-Americans suffer disproportionately
```

1   more so than whites from poverty and low income, correct?

2      A.   In many cases, yes.

3      Q.   And did you look at any information regarding those

4   statistics with regard to African-Americans in Ohio?

5      A.   Not beyond what Professor Timberlake had in his report.

6      Q.   Okay.  And are you aware of a correlation between

7   African-Americans and illiteracy or low education rates?

8      A.   Well, those are two different things.

9      Q.   Okay.  Well, let me -- I'll break it down as illiteracy.

10     A.   I have not any time recently looked at illiteracy rates

11  in relation to racial or ethnic categories.

12     Q.   Are you aware of any correlation between low levels of

13  education and African-Americans?

14     A.   Yes.

15     Q.   And what is that correlation?

16     A.   Well, not always, but in some cases racial minorities

17  have lower levels of education than, say, Anglos or

18  non-Hispanic whites.

19     Q.   Okay.  And quality of education also is disproportionate

20  in terms of how it affects African-Americans in general,

21  correct?

22     A.   Yes, certainly.  Certainly historically, and it can vary

23  greatly even today.

24     Q.   And would you agree that low levels of education and

25  lower quality of education can disproportionately affect

 1   African-Americans' literacy?

 2      A.   Well, that's a logical conclusion I guess you could

 3   draw.  You know, I haven't studied that particular linkage.

 4      Q.   And did you look at any of these literacy or -- well, I

 5   think you've already indicated literacy, but in terms of

 6   education have you looked at any statistics relative to

 7   African-Americans in Ohio?

 8      A.   Not beyond what Professor Timberlake had in his report.

 9      Q.   Are you aware of any correlation between residential

10   instability and African-American populations?  And by that I

11   mean frequency of moving.

12      A.   I know what you're talking about.  I haven't looked at

13   that particular factor in relation to a racial or ethnic group.

14   I mean, in general, though, the more someone moves, the less

15   likely they are to turn out to vote just as a general

16   proposition.

17      Q.   I'm sorry, the more what?

18      A.   The more someone moves.  The more residential

19   instability there is, the less likely they are to turn out to

20   vote in general.  Again, I haven't really looked at that in

21   terms of specific racial or ethnic groups, though.

22      Q.   Wouldn't you agree with me that lower education or lower

23   quality of education would lead to more provisional ballot

24   forms and absentee envelopes being rejected?

25           MS. PIERCE:  Objection, Your Honor.

Vol. 10 – 122

1          THE COURT:  Basis?

2          MS. PIERCE:  Compound, sir.

3          THE COURT:  I agree.

4       Rephrase your question, Mr. McTigue.

5          MR. McTIGUE:  Certainly.

6    BY MR. McTIGUE:

7      Q.   Dr. Hood, wouldn't you agree that lower levels of

8    education would lead to greater rejection rates of provisional

9    application forms by that group of persons compared to the

10   general population?

11     A.   So what you're saying is would -- if we had two groups

12   of provisional voters; is that fair?

13     Q.   Yes.  Let's say you have two groups of provisional

14   voters, one with low education and the other with higher

15   education.  Would you expect a higher incidence of rejection of

16   provisional forms in the one group than the other?

17     A.   Well, I didn't study that question, and I don't know

18   that that necessarily would be the relationship we'd observe.

19   I think it's an empirical question.  It could be studied.  I

20   don't know the answer to that sitting here now.  I mean, if

21   someone walks into a polling place and irregardless of their

22   education level and they're not registered to vote in Ohio,

23   their provisional ballot is probably going to be rejected or

24   should be rejected, right?  So --

25     Q.   Well, let me refine my question.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 123 of 329 PAGEID #: 1980
Case: 2:20-cv-03843-MHW-KAJ Doc #: 364-8 Filed: 04/08/21 Page: 123 of 329 PAGEID #: 30947

Vol. 10 - 123

1          I'm talking about rejection of provisional ballots based

2     on the five fields being either incorrectly completed or not

3     being fully completed.

4     A.    Well, again, just to state for the record I didn't study

5     that question.  I think it's open to study.  I'm not an expert

6     either in literacy rates.  I would think that someone with a

7     fairly low level of education, though, could complete those

8     fields on the provisional ballot affirmation form.

9     Q.    But you don't know because you haven't studied it?

10    A.    Yes, I haven't studied that question.

11    Q.    And in terms of citizens who are less residentially

12    stable than other citizens or the population in general, you've

13    already stated that data indicates that those people that may

14    vote in that group who are less residentially stable are less

15    likely to vote, correct?

16    A.    As a general proposition, yes.

17    Q.    But for those in that group who do choose to vote, isn't

18    it true that there are -- that they are more likely to have to

19    cast a provisional ballot than the rest of the population?

20    A.    Again, I'll just state that I didn't conduct research

21    into that particular question, and I guess in answer to your

22    question specifically, not necessarily.  You asked about would

23    they have to vote provisional ballots at greater rates.  I

24    mean, if they had moved and they had changed their voter

25    registration then, no, they wouldn't have to vote a provisional

1    ballot.  If they've moved and they haven't, then they might

2    have to vote a provisional ballot.

3       Q.   But wouldn't you agree that registered voters who are in

4    either group, the group that is residentially less stable and

5    the group of voters who are residentially more stable, in

6    either case there are voters in both groups who cast

7    provisional ballots because they didn't update their

8    registration by the cutoff before the election?

9       A.   I'm sure that's probably the case, yes.

10      Q.   And wouldn't it be common sense that for all these

11   people who did not update their registration before the

12   deadline after they moved, that you're going to have

13   disproportionately more people casting provisional ballots who

14   are residentially less stable?

15      A.   I would agree that someone who has moved frequently who

16   hasn't updated their voter registration data or information is

17   going to be more likely to have to cast a provisional ballot,

18   yes.

19      Q.   And wouldn't you also agree that a person who is less

20   educated is more likely to make mistakes in completing the

21   provisional affirmation form?

22          MS. PIERCE:  Objection, Your Honor.

23          THE COURT:  Basis?

24          MS. PIERCE:  Asked and answered.

25          THE COURT:  Overruled.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 125 of 329 PAGEID #: 1982
Case: 2:06-cv-00896-ALM-TPA Doc #: 664-8 Filed: 04/06/18 Page: 125 of 329 PAGEID #: 30843

Vol. 10 - 125

```
 1              THE WITNESS:  Again, I don't know the answer to that

 2    question.

 3    BY MR. McTIGUE:

 4       Q.    But isn't it common sense?

 5       A.    Well, again, I mean, unless, perhaps, someone is

 6    completely unable to fill out the form at all, I would think

 7    they'd be able to recall and write down that basic information.

 8       Q.    I would like to turn your attention now to page 3 of

 9    your report which is Exhibit D8, and I have it up on the screen

10    as well.

11              I would like to draw your attention to the third

12    paragraph that starts the Plaintiffs further assert.  Do you

13    see that?

14       A.    Yes.  Yes.

15       Q.    Okay.  And I'm going to read this as a preface to my

16    question.  It says:  The Plaintiffs further assert that

17    requiring provisional voters to provide these two pieces of

18    information will result in the rejection of large numbers of

19    these ballots for trivial errors.

20              And then the next sentence you give an example.

21              In other words, a voter incorrectly records their

22    residential address by misspelling their street name.

23              It goes on to say that this allegation, however, fails

24    to take into account that county election boards review

25    provisional ballots.
```

Vol. 10 - 126

1      So what is your point that you're making?

2   A.    Well, I guess one point is that a group of individuals

3   are making an assessment of these ballots.  It's not just a

4   completely mechanical process, in other words.

5   Q.    And the next sentence in your report says:

6          Further, it is the duty of County Boards of Elections,

7   and this body only, to examine and render a decision concerning

8   whether a provisional ballot should be counted.

9          Correct?  That's what it says, right?

10   A.    That's my understanding, yes.

11   Q.    Okay.  Now, the core of my question, though, relates to

12   your next statement which is:

13          As such, provisional ballots are subject to scrutiny by

14   a group of individuals who are able to screen out what could be

15   termed trivial errors from substantive errors.

16          So what -- obviously, this is a statement that you're

17   making in your report about Boards being able to distinguish

18   between trivial and substantial errors.  What are examples of

19   trivial errors?

20   A.    Well, as I say, like, for instance, misspelling a street

21   name.

22   Q.    Okay.

23   A.    But not -- maybe not to the extent to which the Board

24   can't tell what street name it is.

25   Q.    Well, let me -- before -- I'm going to ask you about

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1   some other examples, possible examples.  But before I do, what

2   is your definition of trivial versus substantive?

3      A.   Well, my definition of a substantive error would be

4   something that precludes the Board from being able to identify

5   who that voter is.

6      Q.   Okay.  And so if there is an error, say, in the address

7   but the Board can still determine the identity of that voter

8   from the other information and from their own records and

9   determine that that person cast a ballot in the correct

10  precinct, then that would be a trivial -- whatever the error

11  was on the address would be a trivial error.

12     A.   I guess as long as the voter was otherwise qualified to

13  cast a ballot with that caveat, yes.

14     Q.   And in terms of, say, date of birth, let's say a person

15  wrote down -- like, my birth date is February 17, 1954, but

16  let's say I wrote down February 7, 1954.  Would that be a

17  trivial error?

18     A.   Well, the Board can determine whether or not they can

19  proceed with processing that provisional ballot at that point

20  if the date of birth, for instance, didn't match the date of

21  birth in the voter registration record.

22     Q.   Okay.  And let's say that I wrote down my correct birth

23  date, but on the last four digits of my social security number

24  I transposed, say, the last two numbers.  Would that be a

25  trivial error?

Vol. 10 - 128

1    A.    Well, again, under the definition I just gave here, you

2    know, as long as there is enough information to affirmatively

3    identify who that voter was, then yes.

4    Q.    Now, as part of your preparation for either the report

5    in this case or the report in the other case, did you

6    actually -- did you look at any actual provisional ballots that

7    had been rejected?

8    A.    No.

9    Q.    Did you look at any absentee ballots that had been

10   rejected?

11   A.    No.

12   Q.    Are you aware of whether or not there are any uniform

13   standards established by the Secretary of State or otherwise in

14   Ohio for Boards of Elections to follow in determining whether

15   an error is trivial or non-trivial?

16   A.    I don't think they use that terminology.  I know there's

17   a set of procedures that the Secretary of State's office has

18   laid out for, for instance, processing provisional ballots.

19   And it's, again, almost like a flowchart step one, step two,

20   step three.

21   Q.    But those procedures that the Secretary of State has

22   laid out for processing provisional ballots do not actually set

23   forth any criteria for the Board to determine when it can

24   ignore an error; is that correct?

25   A.    Well, I guess it doesn't lay out every possible

1    scenario, no.  I mean, there are some exceptions built in.  For

2    instance, if the voter's date of birth is the default date of

3    birth in the voter registration database of, I think, 1-1-1800,

4    then the instructions indicate that the date of birth field can

5    be ignored in that case.

6           So there's some -- I guess there's some scenarios laid

7    out but, no, not every scenario is laid out.

8    Q.   Well, in terms of that scenario that you just mentioned,

9    that is in the Secretary of State's directive --

10   A.   Right.

11   Q.   -- that's a scenario that's actually in the law,

12   correct?

13   A.   Yes.

14   Q.   Okay.  And the law actually has two exceptions to the

15   date of birth date field, correct?

16   A.   Yes.

17   Q.   Okay.  The one is what you mentioned, which is if the

18   registration database has a birth date of 1-1-1800, then the

19   Board can skip that field; correct?

20   A.   Correct.

21   Q.   Okay.  And wouldn't you agree with me that that then

22   indicates that maybe that field's not so important?

23   A.   Well, I mean, it just indicates to me that in that

24   particular case, this is the guidance that should be followed.

25   It doesn't mean that the date of birth field is unimportant,

Vol. 10 - 130

1   necessarily.

2       Q.    But what it means is that the date of birth is not

3   necessary to determine the identity of the voter?

4       A.    It may or may not be, no.

5       Q.    The other exception --

6       A.    Again, just the general rule with databases is the more

7   fields you have to work off of, the more positively you can

8   identify a particular record in the database.

9       Q.    And the other exception which I think we talked about

10  before lunch was the ability of a Board by a vote of three

11  members to agree to overlook any errors on the date of birth if

12  they -- if the other fields are filled in and the Board is able

13  to determine the qualifications of the voter, correct?

14      A.    That's correct.

15      Q.    Okay.  And doesn't that indicate to you that the General

16  Assembly did not consider date of birth to be a necessary

17  requirement in order to have a ballot -- or, let's say, to

18  identify a person's eligibility to cast a ballot?

19              MS. PIERCE:  Objection, Your Honor.

20              THE COURT:  As to form?

21              MS. PIERCE:  Form, and calls for speculation.

22              THE COURT:  I don't think that it calls for

23  speculation from this opinion witness, but I'm going to sustain

24  your objection as to form.

25              Ms. Coulter, would you read the question back, please?

 1        (Question read back.)

 2            THE COURT:  Narrow your question.  There are two

 3    questions in there, Mr. McTigue.

 4    BY MR. McTIGUE:

 5      Q.   And, Dr. Hood, wouldn't you agree that the exception

 6    that the General Assembly has built into the law for a Board to

 7    waive the date of birth field means that date of birth is not a

 8    necessary element to determine whether a ballot -- or to

 9    determine -- I'm sorry -- to determine if a person is a

10    qualified voter?

11      A.   Well, again, I didn't conduct a legislative intent

12    analysis, but just logically that would sort of fly in the face

13    of what the legislature did.  Otherwise, why would they add

14    that to the statute?  I mean, they did provide these two

15    exceptions that we've discussed.  I can't say that they didn't

16    think that it wasn't an important field to have on there.

17      Q.   Now, we started down this line of questions because I

18    had asked about whether or not there was anything in the

19    Secretary of State's directive or procedures to the Boards

20    regarding how to determine whether something is trivial/not

21    trivial, and I want to now ask you, you mentioned -- and in

22    response to that question you mentioned the -- these two

23    provisions that are in the law regarding date of birth.  Do you

24    recall that?

25      A.   Yes.  Yes.

1    Q.   Okay.  So is there anything else, though, in the

2    Secretary of State's directive or instructions to the Boards

3    that you're aware of that gives the Boards guidance as to

4    what -- what types of -- what types of errors can be

5    overlooked?

6     A.   Not that I can recall sitting here.  Again, I'd probably

7    have to look at that directive again, which was quite lengthy,

8    to double check to see if there's anything in there.

9     Q.   And wouldn't you agree with me that without having

10   written guidelines from the Secretary of State, different

11   county boards may treat the exact same error differently?

12    A.   Hypothetically, it's possible.  I mean, I would say

13   there are written guidelines.  They don't necessarily encompass

14   every potential scenario, no.

15    Q.   Well, you say there are written guidelines, but you

16   don't recall what they are except --

17    A.   There are general written guidelines for how to process

18   provisional ballots.

19    Q.   But that's in terms of the steps for processing

20   provisional ballots, correct?

21    A.   Well, and that's part of what we're talking about here.

22    Q.   But is there anything in there that you recall as to how

23   to -- for example, when it says -- or if it says check field 2

24   to see if the voter has filled in their voter registration

25   address --

1    A.    Okay.

2    Q.    -- does it say anything else about how to deal with

3  either an error in a house number or the absence of a zip code?

4    A.    Not that I recall.

5    Q.    Okay.  So basically the directive tells the Boards to

6  check for the fields, that they're filled in?

7    A.    That's part of the process, yes.

8    Q.    Okay.  Let me ask you regarding field number one, which

9  for provisional ballots requires the voter to print their name.

10         Would you agree that if a voter wrote their name in

11  cursive, that that is a trivial error?

12   A.    As long as it was legible.

13   Q.    Okay.  What if the voter left it -- left that line

14  blank, did not print or write cursive?

15   A.    That would make things difficult.

16   Q.    Well, now let me add to that scenario.  But the voter

17  signed on the bottom on the signature line in cursive.  Then

18  would leaving the printed name field blank be a trivial error?

19   A.    I don't know.  I don't know the answer to that.

20   Q.    And, well, what if we add to that scenario that the

21  signature line where the signature is in cursive is legible and

22  matches the signature of the voter that's on file with the

23  Board of Elections?  Then would leaving the printed name field

24  blank be a trivial error?

25   A.    Well, it might not -- I'll say this.  It might not

Vol. 10 - 134

1   result in that hypothetical scenario with not being able to

2   positively identify the voter in that particular case if their

3   signature was legible and if the other data fields all matched

4   up.

5    Q.   I think I may have missed the beginning part of your

6   answer.   Did you say it is fatal or not fatal?

7    A.   I don't know the answer exactly to that hypothetical,

8   but I guess what I said is it might not preclude the Board from

9   being able to identify who that voter is.   That's what I said.

10    Q.   Okay.   Thank you.   I just -- if I could ask you to speak

11   a little closer, I'd appreciate it.   Thank you.

12    A.   Okay.   Sorry.

13    Q.   Of the five fields, would you agree that the legible

14   written signature of the voter is probably the most important

15   in being able to determine that the ballot is being cast by a

16   qualified elector?

17    A.   The most important?   I don't know that it's the most

18   important in terms of identification of that voter.   If it's a

19   provisional ballot affirmation statement, they're signing,

20   they're making statements so that part of it is important.

21    Q.   Well, let's talk about absentee envelopes.

22    A.   Okay.

23    Q.   So would you agree that the handwritten signature is the

24   most important piece of information there to authenticate who

25   the voter is casting this ballot?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 135 of 329 PAGEID #: 1992
Case: 2:00-cv-03893-MHW-TPK Doc #: 664 Filed: 04/06/20 Page: 135 of 329 PAGEID #: 30893

Vol. 10 – 135

1    A.   It's certainly one way you can double check with the

2   signature on file to try to ensure that the person casting the

3   absentee ballot signature matches up with that on the

4   registration file.

5         Again, most -- we didn't -- this is something I wrote on

6   but we didn't talk about earlier.  A lot of these absentee

7   ballot request forms and envelopes later come pre-populated now

8   with name and address so that's quite handy for voters who want

9   to engage in absentee by mail balloting.  So they would need to

10  add, obviously, their date of birth, some form of

11  identification and then sign the absentee ballot identification

12  envelope, but their name and their address should be

13  pre-populated in a lot of cases.

14   Q.   You talk in your report about, you know, one of the

15  benefits of the changes in the law is standardization.  Do you

16  recall using that term?

17   A.   Yes.

18   Q.   Okay.  So wouldn't you agree with me that leaving the

19  determination of what constitutes a trivial error to each of 88

20  County Boards of Elections leads to non-standardization?

21   A.   Well, yes and no.  I guess I would say that the process

22  is standardized.  Again, we're looking at a problem of really

23  policy implementation.  Not a problem, but just a manner in

24  which the policy is being implemented where the State is

25  writing rules and regulations for how to conduct elections, but

1    what we call street-level bureaucrats or local election

2    officials are the ones actually implementing the elections.

3         You know, I guess it's -- it's very difficult, period,

4    in any situation involving a policy like this to completely

5    standardize everything, but the process is more standardized

6    than it was in terms of requiring absentee voters by mail or

7    provisional voters to provide the same kinds of information.

8    Q.   So what's more standardized is requiring five fields on

9    absentee -- or not applications, but envelopes and provisional

10   forms, correct?

11   A.   Yes, that's certainly, certainly the case.

12   Q.   But without standardization regarding how those five

13   fields get completed, that could actually lead to less

14   standardization in the implementation.

15   A.   It could.  Although, again, they're guidelines.  They're

16   general guidelines that have been drawn up.

17   Q.   Okay.  I'm going to have you now look at -- well,

18   actually, before I do that, I want to go to the last paragraph

19   of this page in which you discuss the reduction in the cure

20   period from 10 days to 7 days.

21   A.   Okay.

22   Q.   Now, I thought I had heard you on direct indicate that

23   during the what is now 7-day period, that a provisional voter

24   could come into the Board of Elections office and fix any

25   problem with their provisional form; is that correct?

1   A.   No.

2   Q.   Okay.

3   A.   No, that's not what I said.

4   Q.   You didn't?  Okay.  Then what did you say?

5   A.   I mean, from my understanding of Ohio's election code,

6   there are two reasons why someone may have to supplement a

7   provisional ballot.  One of those reasons is if they didn't

8   provide proper identification at the time when the provisional

9   ballot was cast.  They could provide it then, but if they

10  don't, they'll be informed -- they're given a form, I can't

11  remember the form number, that explains you need to provide

12  within the next 7 days following the election a certain type of

13  identification.

14       The only other reason that I'm aware of -- and if I'm

15  wrong, I'm glad to be corrected, but the only other reason that

16  I'm aware that someone may have to supplement, if you will, a

17  provisional ballot is if their qualifications as an elector are

18  being challenged and they could answer that challenge.

19       So that's what I said earlier.

20  Q.   Okay.  With regard to absentee voters, they also have 7

21  days to come into the Board of Elections office after the

22  election to cure their I.D. envelope, correct?

23  A.   Correct.

24  Q.   Okay.  So we have a standardization in terms of the 7

25  days?

Vol. 10 - 138

1    A.    That's correct, yes.

2    Q.    However, is it your understanding that under the newly

3    enacted laws, that the absentee voter can actually come in and

4    cure a problem with any of the five fields?

5    A.    I believe that's correct from what I remember, yes.

6    Q.    So that's not standardization, is it?

7    A.    Well, not in that regard, no.

8    Q.    And is it also your understanding that absentee voters

9    who have a problem with one of their five fields are mailed a

10   letter by the Board of Elections to indicate what the problem

11   is and their right to come in and fix it?

12   A.    Yes.  They're informed in writing, from what I

13   understand.

14   Q.    And that would include both if the voter left something

15   blank or misstated something or stated something incorrectly,

16   correct?

17   A.    From what I understand, yes.

18   Q.    And are you aware that there's no similar letter sent to

19   provisional voters who have an error on their form?

20   A.    Not for just an error.  Again, if they didn't provide

21   identification, they're going to be notified at that point in

22   time.  Provisional voters, that is.

23         Or if they're challenged as an elector, I'm assuming

24   that some kind of written notice is going to be sent.

25   Q.    And I understand what you're saying about being

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 139 of 329 PAGEID #: 1006
Case: 2:20-cv-03843-MHW-KAJ Doc #: 36-8 Filed: 04/06/20 Page: 139 of 329 PAGEID #: 3889

Vol. 10 – 139

 1    challenged as an elector, and I'm going for simplicity to leave

 2    that aside.

 3     A.    Okay.

 4     Q.    Okay?  I'm talking about the five fields.

 5         Are you aware that no letter is mailed to provisional

 6    voters who have a problem with one of their five fields?

 7     A.    Yes.  Although, they're casting the provisional ballot

 8    in person, of course, and an absentee by mail ballot is not

 9    being cast in person.

10     Q.    Correct.

11         Now, are the -- let me ask you this question:

12         A provisional voter who has -- say, they had an error.

13    They wrote down their Ohio driver's license number on the form,

14    but they transposed a number or they left off the last digit.

15    So that would not then -- and let's say that, as a result, it

16    does not match with the driver's license number in the

17    registration database.

18         That voter would have no way of knowing about this

19    error, correct?

20     A.    From my understanding, no.

21     Q.    Okay.  But if an absentee voter had the exact same

22    problem with the way they filled out their driver's license

23    number, they will get a letter from the Board of Elections

24    telling them about that issue, correct?

25     A.    From what I understand, yes.

1    Q.    So that would be an example of non-standardization,

2    correct?

3    A.    In that example, yes.

4    Q.    Now, you mentioned briefly that provisional voters do

5    get a form and I think you said at the time, but what you mean

6    is at the time that they were casting their provisional ballot.

7    And you reference this, I believe, at the top of page 4.

8    A.    Yes, that's correct.  Form 12H, it looks like.

9    Q.    Yes.

10         So if we have a provisional voter who at the time they

11   voted believed that they had, say, shown I.D. to the polling

12   place official but did not checkmark the box on the form saying

13   that they had showed I.D., would there be any reason for that

14   voter to think they should go into the Board of Elections

15   within 7 days and checkmark the box?

16         MS. PIERCE:  Objection, Your Honor.

17         THE COURT:  Basis?

18         MS. PIERCE:  Speculation.

19         THE COURT:  Overruled.  This is an opinion witness.

20         THE WITNESS:  So if someone comes in, a provisional

21   voter to the polls and they believe they've shown the election

22   official identification but they haven't; is this right so far?

23   BY MR. McTIGUE:

24   Q.    Yes.

25   A.    Okay.  Well, I guess under that hypothetical, then they

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 141 of 329 PAGEID #: 1998
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 141 of 329 PAGEID #: 30893

Vol. 10 - 141

1    would falsely believe that they had met that requirement.

2         Again, I mean, there is a real person there at that

3    point with provisional ballots.  There's an election official.

4    Q.   And if I go back to the letter sent to absentee voters

5    who have an issue on their five fields, are you aware that the

6    Secretary of State's directive requires Boards to send that

7    letter out only through the 6th day after the election?

8    A.   I believe I remember reading that.

9    Q.   Okay.  And --

10   A.   I mean, there is a cutoff.  I remember that.

11   Q.   Okay.  And you're aware, correct, that the statute

12   provides that a voter can come in in person and fix whatever

13   the problem is with their five fields by the 7th day after the

14   election, correct?

15   A.   Right.  I think that's the end of the period there, yes.

16   Q.   But if the voter chooses to -- and, again, we're talking

17   absentee voters.  The absentee voter could choose to mail in to

18   the Board of Elections the correct information as long as it's

19   postmarked by 7 days after the election and received by 10 days

20   after the election, correct?

21   A.   From what I remember, yes.

22   Q.   Okay.  Now, provisional voters who fail to show their

23   I.D. don't have the option of mailing in I.D., correct?

24   A.   I don't believe so.

25   Q.   They have -- actually, the provisional voter actually

1    has to get down to the Board of Elections' office during

2    regular business hours and show I.D. or fill in I.D.

3    information, correct?

4       A.    Yes.

5       Q.    Okay.

6       A.    Yes.

7       Q.    And are you aware that absentee voters, in addition to

8    either taking it themselves to the Board or mailing it in, the

9    information, they can entrust a close relative to deliver the

10   information to the Board of Elections?

11      A.    Well, I know they can entrust a close relative to

12   deliver their absentee ballot in the first place so I'm

13   assuming they could deliver this additional information as

14   well.

15      Q.    Okay.  And are you aware that a provisional voter who

16   didn't provide I.D. cannot send a close relative down to the

17   Board of Elections within that 7 days to provide the necessary

18   I.D.?

19      A.    Correct.

20      Q.    So in all these ways the process is not standardized

21   between the provisional voter and the absentee voter who has a

22   problem with regard to the I.D.

23      A.    There are differences, yes, between the processes.

24      Q.    I'm curious, did you review any data on -- let's say,

25   pre-implementation of these two laws, did you review any data

1    on how many voters took advantage -- how many absentee voters

2    took advantage of the cure period on days 8, 9 and 10?

3       A.   No, I don't know the answer to that question.

4       Q.   How about with regard to provisional voters?

5       A.   No.

6       Q.   Okay.  Post-implementation of these new laws, have you

7    looked at any data as to how many absentee or provisional

8    voters attempted after the 7 days and by the 10th day to cure

9    the problem?

10      A.   No.

11      Q.   Okay.  I want to turn now to page 6 of your report.  And

12   this is Table 1, correct?

13      A.   Correct.

14      Q.   Okay.  And I believe -- I don't know if it was in answer

15   to the Judge's questions or on direct examination, but I think

16   you explained that the last column where you have calculated

17   rejected due to voter error, that you did that by dividing the

18   number of rejected ballots due to voter errors.  And, for

19   example, I think the first line is 936.  That's your raw

20   number?

21      A.   Right.

22      Q.   And so you divided that by total votes cast?

23      A.   In this table, yes.  Yes, total votes cast is the

24   denominator for all of these percentages.

25      Q.   So when we say total votes cast, we're talking about all

1   the regular ballots and all the absentee ballots and all the

2   provisional ballots?

3     A.   Well, absentee ballots are regular ballots.

4     Q.   Okay.

5     A.   I mean, they're just another kind of regular ballot, I

6   guess.  That should include the total number of ballots cast as

7   reported by the Secretary of State's office.

8     Q.   Okay.  Wouldn't it have been more useful to calculate

9   the percentage of provisional ballots rejected based on voter

10  error by dividing that number by the total provisional ballots

11  cast?

12    A.   I do.

13    Q.   In Figure 1.

14    A.   Yes.

15    Q.   Yes.  But not in this chart.

16    A.   No.  That's not what this table does.

17    Q.   Okay.  Well --

18    A.   It does it in Figure 1.  I mean, these are just

19  different ways to operationalize the same concept.

20         It's not as though I didn't do it.  I just did it in

21  Figure 1, not in Table 1.

22    Q.   Why did you choose not to do it on Table 1?

23    A.   Well, because the comparison I was making in Table 1

24  were these various categories out of the total number of votes

25  cast, which I would argue is one valid way of looking at this.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 145 of 329 PAGEID #: 2002
Case: 2:20-cv-03843-MHW-KAJ Doc #: 064-8 Filed: 04/06/20 Page: 145 of 329 PAGEID #: 36093

Vol. 10 - 145

 1        We can argue about exactly how to operationalize this

 2   concept, but that's certainly one way to look at this.

 3   Q.   And let me ask you this:

 4        In your opinion, what is the more useful way to look at

 5   this, based on a percentage of all the votes cast or a

 6   percentage of the provisionals that were cast?

 7   A.   I think they both yield pertinent information.  I mean,

 8   a lot of times in the fields of social sciences, we test things

 9   in more than one manner.

10   Q.   I'm going to show you an exhibit.  I actually have it

11   here at the podium.  I'm placing on the projector here what is

12   labeled as Plaintiffs' Exhibit P7039.  And you see that there

13   are some handwritten calculations, correct?

14   A.   Yes, I see that.

15   Q.   And I'll represent to you that these hand calculations

16   were actually done by my associate this morning and verified by

17   me.

18        If you look down the row called provisional rejected and

19   look at the handwritten calculation, does that correspond -- do

20   these correspond closely to what you have in Figure 1, which

21   is, I believe, on the next page?  Well, no, a couple -- yes,

22   next page.

23   A.   It looks to be fairly close, yes.

24   Q.   And with regard to your column of rejected due to voter

25   error, I believe you testified that you calculated the voter

Vol. 10 - 146

1    error from the various columns that the Secretary of State has

2    on his spreadsheets that are on his website, correct?

3        A.    Yes, that's correct.

4        Q.    Okay.  And the first handwritten set of calculations,

5    for example, where it says 1.18, that is a calculation based on

6    what the percentage would be with regard to rejected due to

7    voter error divided by total provisionals.  And moving over to

8    the right, the calculation -- or, I'm sorry, I think actually

9    the first one is the 1.18 might be -- is based more on the

10   total votes cast.  Would you agree with that?

11       A.    No.

12       Q.    No?

13       A.    No.

14       Q.    What --

15       A.    I didn't calculate this.

16       Q.    I did the calculation.  I'm sorry for the confusion

17   here.

18            The 1.18 represents a percentage based on the rejected

19   due to voter error divided by total provisionals.  Would you

20   agree with that?

21       A.    It seems to be pretty close to the figures I have --

22       Q.    Okay.

23       A.    -- in Figure 1.

24       Q.    Okay.  And if I go one step over to the right where it

25   says 7.67 percent, I'll represent to you that that's a

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 147 of 329 PAGEID #: 2004
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/08/16 Page: 147 of 329 PAGEID #: 30091

Vol. 10 - 147

 1   calculation based on the total rejected due to voter error

 2   divided by total rejected provisionals.

 3        My question to you is is there any -- in your mind any

 4   useful information to be derived by dividing the percentage

 5   of -- dividing the number of rejected provisionals by the total

 6   provisionals rejected as opposed to total provisionals?

 7   A.   Well, it's another way to look at this concept, I would

 8   agree with you about that.  I didn't calculate these numbers.

 9   Q.   Okay.

10   A.   And you didn't go all the way down the column, either.

11   Q.   You're talking about at the bottom where you have

12   post-implementation and pre-implementation?

13   A.   Yes.

14   Q.   I'm going to get back to that.

15   A.   Okay.  All right.  I would agree that's another way to

16   look at this, yes.

17   Q.   Okay.  And is there any -- is there any reason that that

18   calculation would be more relevant than the other two methods

19   of calculating?

20   A.   Not necessarily.  I think I've given two relevant

21   methods of calculating this concept.

22   Q.   Okay.  So if --

23        THE COURT:  Just a second, Mr. McTigue.  I want to

24   make sure I understand.

25        So if we look at the 2014 General Election, the

Vol. 10 - 148

1   12.65 percent represents what in your calculation, Mr. McTigue?

2        MR. McTIGUE:  The 12.65 is the 599 divided by 4734.

3        So, in other words, the column that has the 4734 are

4   total rejected provisionals.  So of the total rejected

5   provisionals, how many of those rejected provisionals are due

6   to voter error?

7        THE COURT:  And that would be 12 percent?

8        MR. McTIGUE:  Yes.

9        Okay.  If we -- let me go to -- hold on.  Can I confer

10  for a second, Your Honor?

11       THE COURT:  Yes.

12     (Thereupon, an off-the-record discussion was held.)

13       MR. McTIGUE:  Your Honor, I could either go down

14  this -- this is a demonstrative exhibit.  Obviously, I could go

15  down and read these numbers, or I would ask it might be easier

16  if we could just move to introduce this.

17       MS. PIERCE:  Objection, Your Honor.

18       THE COURT:  Well, demonstratives typically -- go

19  ahead, Ms. Pierce.

20       MS. PIERCE:  I mean, Your Honor, he did not make these

21  calculations.  He barely knows what's being said here.  So I

22  can't allow this to be moved into evidence for the truth of the

23  matter here.

24       THE COURT:  I'm going to exclude it based on the fact

25  that as a demonstrative, it won't come in as substantive

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 149 of 329 PAGEID #: 2006
Case: 2:06-cv-00896-ALM-TPK Doc #: 364 Filed: 04/06/07 Page: 149 of 329 PAGEID #: 2006

Vol. 10 - 149

 1    evidence.  Its use is to help illustrate the testimony.

 2            So I'm going to sustain your objection.

 3            MS. PIERCE:  Thank you, Your Honor.

 4            MR. McTIGUE:  Let me go to -- well, let me take this

 5    off and go back to -- if I could have somebody instruct me on

 6    how to get rid of the blue arrows.

 7            THE CLERK:  Hit clear on the screen.

 8    BY MR. McTIGUE:

 9       Q.    Regarding post-implementation and pre-implementation,

10    those lines, you calculated these as just essentially the

11    aggregate of the election data that you have up above it,

12    correct?

13       A.    That's correct.

14       Q.    Now, I notice that you didn't include the 2013 general

15    or 2011, 2009 or 2007.  Why not?

16       A.    To be honest with you, when I was able to update my

17    report from the ODP case, I just made use of the most recent, I

18    guess, statewide general election which was available which was

19    2015, and it gave me -- those other elections were

20    pre-implementation.  This is at least one more

21    post-implementation point to add; 2015, that is.

22       Q.    Yes.  But the data from those odd year elections, odd

23    numbered years, could have impacted the percentages that you

24    have in the second, third and fourth columns, correct?

25       A.    It's possible.  Again, the table I had, the Table 1 --

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-8 Filed: 09/12/20 Page: 150 of 329 PAGEID #: 2007
Case: 2:06-cv-00896-ALM-TPK Doc#: 664 Filed: 04/06/20 Page: 150 of 329 PAGEID #: 3004

Vol. 10 - 150

```
 1    or I don't know what number it was in the ODP report that I

 2    wrote -- didn't include 2015.  It only had one

 3    post-implementation data point.

 4          So why didn't I include some of these other odd numbered

 5    year elections?  Because I was really just focused on trying to

 6    include another post-implementation data point.  That's why.

 7    Q.    But isn't the point of aggregating data to aggregate

 8    enough data so that when you then average it, you're kind of

 9    eliminating the lows and the spikes?

10    A.    Well, I'm not really averaging here.  I'm just

11    aggregating and recalculating the percentage, to be fair.

12    Q.    But part of the reason for aggregating it is to, again,

13    kind of remove the effects of one election that might have a

14    very high number and another election have a low number?

15    A.    Well, you'd have more data to draw an inference from.

16    Q.    Right.

17    A.    Again, I'm not trying to in any way manipulate any of

18    this.  I'm just -- again, had those elections

19    pre-implementation, combined those.  Had a couple of elections

20    post-implementation, combined those.

21    Q.    Wouldn't you agree that it's more useful to compare

22    apples to apples and oranges to oranges in terms of elections?

23    A.    Well, I would agree that's what I'm doing here in terms

24    of these categorizations like provisional ballots counted and

25    provisionals rejected or rejected due to voter error.  I would
```

1   argue this is pretty much apples to apples.

2    Q.   Okay.  So we have --

3    A.   There are different kinds of elections here, yes, and

4   we've talked about the difference between presidential

5   elections and midterm elections, et cetera.  So that's

6   certainly true.

7    Q.   And so you have here two -- I'm sorry, one presidential

8   election, correct?

9    A.   I think there are two.

10    Q.   Two.  I'm sorry, yes.  2008, 2012.

11     And you have two gubernatorial elections, 2010, 2014,

12   correct?

13    A.   Correct.

14    Q.   But for 2015, that's a municipal election year, correct?

15    A.   Correct.  I mean, that's part of what's going on in

16   2015.  There's also statewide ballot initiatives.

17    Q.   But you don't have any other comparable election

18   pre-implementation to go with your 2015 general.

19    A.   That's true.

20    Q.   Now, I want to go to page 8 of your report.  And to be

21   clear, we are now in the part of the report that deals with

22   absentee balloting, correct?

23    A.   That is correct.

24    Q.   Okay.  So we've moved from provisional.  And in the

25   first full paragraph that starts with the words Plaintiffs

Case: 2:00-cv-03893-MLM-TPJ Doc #: 664-8 Filed: 04/06/21 Page: 152 of 329 PAGEID #: 3097

1    further allege, you again state in the -- I'm sorry, not again

2    state, but you state in the second sentence that the process

3    mandates that the local Boards must notify voters of their

4    absentee -- if their absentee ballot does not -- I think you

5    mean do not -- contain the requisite information under

6    discussion.

7         Do you see that?

8    A.    Yes.  Yes.

9    Q.    Did you do any -- and, of course, you're referring to

10   Form 11S?

11   A.    Right.  So we talked about this earlier.

12   Q.    Yes.  Did you do any investigation as to whether some

13   Boards of Elections make telephone calls to absentee voters

14   that have problems with their forms and other Boards do not?

15   A.    I didn't investigate that question, no.

16   Q.    Now, again here you talk about that -- further on in the

17   paragraph you indicate that this deadline is consistent with

18   the deadline to cure a provisional ballot and also falls prior

19   to the start of the official vote canvas on the 11th day

20   following the date of the election.

21        Okay.  Do you see that?

22   A.    Yes, that's -- yes.

23   Q.    Did you do any investigation as to when Boards

24   throughout Ohio actually begin their official canvas?

25   A.    No, I didn't -- I didn't conduct a survey of local

Vol. 10 - 153

1    election officials on that question.

2        Q.    Okay.  So in your next sentence you indicate that --

3    that it is also relevant to note an election official is

4    examining -- or are examining these absentee ballots, and that

5    they are qualified to make a distinction between an error that

6    should disqualify a ballot versus one that should not.  Do you

7    see that?

8        A.    Yes.

9        Q.    And, again, are you referring to trivial errors?

10       A.    I think we could probably apply that synonym in that

11   case, yes.

12       Q.    So, again, it's up to each Board of Elections to

13   determine what's trivial in that case?

14       A.    Well, they are the -- the bureaucrats implementing

15   policy at that particular point, yes.

16       Q.    Now, in terms of this shorter cure period both for

17   provisionals and absentees, you seem to connect that to being a

18   benefit to the Boards of Elections because of when the official

19   canvas starts, correct?

20       A.    Well, yes.  There has to be an end point to the process.

21       Q.    But, again, you did not -- you don't know -- let me

22   rephrase that.

23           In the declarations that you relied upon or in your

24   conversation with Mr. Damschroder, did any of these folks

25   explain to you how having those three days -- or how that --

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 154 of 329 PAGEID #: 2011
Case: 2:06-cv-00896-ALM-TPA Doc #: 664 Filed: 04/06/21 Page: 154 of 329 PAGEID #: 30013

Vol. 10 - 154

```
 1   how moving the date back would actually allow them to begin the

 2   official canvas any earlier than they otherwise would?

 3             MS. PIERCE:  Objection, Your Honor.

 4             THE COURT:  Basis?

 5             MS. PIERCE:  Asked and answered.

 6             THE COURT:  Overruled.

 7             THE WITNESS:  I don't remember having that particular

 8   conversation, for instance, with Mr. Damschroder.

 9   BY MR. McTIGUE:

10   Q.   Okay.  Before I move off of this page, I do want to draw

11   your attention to footnote number 15 which states that, again,

12   as highlighted in the section on change to provisional

13   balloting, the idea is to use these additional identifiers;

14   that is, date of birth, to positively identify voters, not to

15   disqualify ballots based on inconsequential errors on the part

16   of voters.  For example, see discussion of date of birth issues

17   and provisional ballots.

18             So is it your position, and wouldn't you agree, that

19   these dates of fields should not be used to disenfranchise

20   voters when the Board is otherwise able to identify who the

21   voter is that cast that ballot?

22   A.   Well, again, that's for the Board to make that

23   determination.

24   Q.   Yes, but here in your footnote you seem to be saying

25   that the idea for requiring these fields or the additional
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 155 of 329 PAGEID #: 2012
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 155 of 329 PAGEID #: 30913

Vol. 10 - 155

1   fields is to positively identify voters, not to disqualify

2   ballots.

3       A.   That's from my understanding the administrative

4   justification for those fields.

5       Q.   Okay.  I want to ask you now a few questions related to

6   the next part of your report starting on page 9, and I only

7   have a couple questions here.

8            You've already explained that the Secretary of State in

9   December of last year mandated that the Boards have combined

10  poll books in multi-precinct polling locations, correct?

11      A.   Correct.

12      Q.   Okay.  And you're aware that the Secretary of State did

13  that by directive, correct?

14      A.   Yes.  I've got it footnoted here, yes.

15      Q.   And directives of the Secretary of State can be

16  rescinded at any time by either the current Secretary of State

17  or the next Secretary of State, correct?

18      A.   I'm assuming they can be changed by subsequent office

19  holders sort of like an executive -- federal executive order

20  from the President.

21      Q.   Now, you did discuss on direct the form, I think it's

22  12B, that --

23      A.   12D.

24      Q.   Yes.

25      A.   D.

 1    Q.   Yes.  D, yes.

 2         Now, that form provided documentation in the -- in the

 3    case of a voter who was in the correct polling location but was

 4    at the wrong precinct, correct?

 5    A.   They're at the wrong precinct line, yes, and did not go

 6    to the right precinct line.

 7    Q.   Right.  And so is it your understanding that the purpose

 8    of that form was to create a tool to document whether in that

 9    situation of the right church/wrong pew voter whether or not

10    the ballot was being cast in the wrong precinct due to poll

11    worker error or voter error?

12    A.   I can't speak to why the form was developed, but it

13    certainly helps document the prevalence or not of this issue,

14    I'll say that.  I mean, it's a tool that we can count now.

15    Q.   Now, we have another situation of the -- the wrong

16    church/wrong pew when the person is in the wrong polling place,

17    and the polling place official has the same duty to inform the

18    voter that they're in the wrong location, correct?

19    A.   Yes.  Yes.

20    Q.   And they have the same duty to tell the voter where

21    they're supposed to be?

22    A.   Yes, they're supposed to do that.

23    Q.   And tell them where -- you know, where that location is,

24    correct?

25    A.   Yes.

1    Q.    And they also have the duty to tell the voter that if

2    they choose to vote where they are right now, they can do that

3    but their ballot will not be counted.

4    A.    They can cast a provisional ballot.

5    Q.    Yes, right.  And that it won't be counted.

6    A.    Most likely not if it is determined that they're in the

7    wrong precinct.

8    Q.    Well, no, what I'm saying is the polling place official

9    is required to tell the voter that under Ohio law, correct?

10   A.    I believe so, yes.

11   Q.    Okay.

12   A.    I mean, I'd actually call that the wrong church/wrong

13   church problem, but --

14   Q.    Okay.

15   A.    If we want to keep the metaphor going.

16   Q.    So wouldn't it be useful from an election administration

17   standpoint to have a form similar to 12D that documents whether

18   poll workers are doing their jobs in notifying the wrong

19   church/wrong church voter of where they need to go to actually

20   vote?

21   A.    Well, if there was -- I'll just say this:  If there was

22   a form -- I think this is documented to a certain degree.  I

23   think there are, for instance, aggregate counts on these types

24   of votes that are cast provisionally.

25         If there was a form, would it document the issue to an

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 158 of 329 PAGEID #: 2015
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 158 of 329 PAGEID #: 30052

Vol. 10 - 158

 1    even greater degree?  Yes.

 2      Q.    Now, before I move on I just want to talk more -- kind

 3    of more generally about what you've already testified to on

 4    direct as to the purposes you believe are served by the changes

 5    in these laws and regarding the five fields.

 6          You've indicated that the more data you have, it makes

 7    it easier to identify a voter in the database, correct?

 8      A.    To affirmatively identify a voter's specific record,

 9    yes.

10      Q.    And in terms of being able to -- well, let me strike

11    that.

12          Are you aware of how many instances there were prior to

13    these laws where a Board of Elections could not identify a

14    voter in their database without the additional information?

15      A.    No, I'm not aware.  I can't report on that.

16      Q.    Okay.  So wouldn't you agree that -- well, let me --

17    I'll rephrase that.

18          It seems that you're saying there's a benefit to

19    election administration at least to elections officials in

20    terms of processing these.

21      A.    Yes.  There could be a benefit to voters as well.

22      Q.    Okay.  And so what is the benefit to voters?

23      A.    If someone -- again, a provisional ballot's not a

24    regular ballot, whether we're talking about absentee by mail or

25    voting at the precinct.  So having that voter -- having local

Vol. 10 - 159

1   election officials be able to locate that voter's record

2   affirmatively in the registration database, and once they've

3   checked to make sure that there aren't any other issues that

4   the vote can be cured and converted to a regular ballot, well,

5   that would be a benefit to the voter, I would say.

6           And, again, if their registration record needs to be

7   updated or if they need to create a registration record,

8   period; in other words, they thought they were registered in

9   Ohio but they really weren't, that can be --

10  Q.   I want to treat this as two different issues, the issue

11  about whether they need to update their registration or get

12  registered, and then the voter who is already registered and

13  their registration is up to date.

14          How does filling out these five fields benefit that

15  voter?

16  A.   If -- benefit which voter?  I guess I'm -- I've lost you

17  for a second.

18  Q.   The -- well, talking about provisional voters.

19  A.   Okay.

20  Q.   Okay.  So someone who shows up but doesn't have I.D.

21  Okay?  And so they have to fill out the provisional form.  They

22  haven't moved, they're a registered voter in the county.  How

23  are they benefited?

24  A.   And I guess under that scenario, too, they couldn't even

25  provide, for instance, the last four of their social security

1  number or any other type of identification?  Is that what

2  you're --

3    Q.   Yes.

4    A.   We'd have to hypothetically think that, right?

5    Q.   Yes.

6    A.   So how are they benefited?  Well, again, it allows them

7  to cast a ballot.  It's a provisional ballot.  If they don't

8  have I.D. or they can't provide any form of identification in

9  terms of the requisite information that could be provided

10  without actually having I.D., if that makes sense, they would

11  be allowed to go ahead and vote that ballot and they would be

12  informed this is how you can cure this provisional ballot at

13  this time.

14    Q.   Okay.  So that --

15    A.   And then if they had just forgotten their I.D., they

16  could follow through and provide that.

17    Q.   But that voter also -- is also at risk -- increased risk

18  of being disenfranchised by having to complete the information

19  correctly or by having to come back to the Board of Elections

20  office within 7 days, correct?

21    A.   Well, they're having to come back to the office in

22  fairness because of an I.D. issue, which is not affected by the

23  law we're talking about.  So that's a little bit different

24  issue.

25    Q.   Well, as a general proposition, would you agree with me

1  that the more fields that a voter has to complete and complete

2  properly increases the chances that their ballot will not be

3  counted?

4    A.   It's possible.  But I think in most cases most voters --

5  again, I don't think the legislature created a bar that's too

6  high to meet for most people.

7    Q.   Okay.  That's for most people.  But --

8    A.   Almost everyone.  How is that?  I mean --

9    Q.   With regard to using this form as -- the provisional

10  form as a registration form, you've indicated that that helps

11  get people registered for the next election, correct?

12    A.   Correct.

13    Q.   Okay.  And it also helps people to update their

14  registrations if they're already registered, correct?

15    A.   Correct.  Like, if they've -- they've moved.

16  Residential address, for instance.

17    Q.   Yes.  But those two things in themselves only help those

18  people for future elections, correct?

19    A.   That's true, yes.

20    Q.   Okay.  So with regard to the present election, obviously

21  the person who is not registered at all is out of luck, they

22  can't vote.  But the person who is registered and has moved now

23  has to complete a form that has additional information that

24  they're at risk of committing an error on, correct?

25    A.   That's true, they do have to complete a provisional

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

 1   ballot affirmation form, and it requires these data fields that

 2   we've been talking about.

 3   Q.   So more fields mean that there are increased chances for

 4   mistakes.

 5   A.   Hypothetically.

 6   Q.   Okay.  Now, I do want to go to the last page of your

 7   report now.  You probably thought we'd never get there.

 8        In the last paragraph you say that:

 9        In summary, I can think of no reason that would lead me

10   to believe that the election changes under challenge in this

11   case have or will have a detrimental impact on the ability of

12   Ohio voters to cast a ballot, including minority voters.

13        Very simple question.  What in your report discusses

14   minority voters other than that sentence?

15   A.   Well, I didn't test for those effects directly, no.  But

16   I guess my argument is if I'm having a hard time finding

17   general effects, that would apply to subsets of the population

18   as well.

19   Q.   But earlier when I started my cross, I think you

20   indicated there could be certain demographics that make it --

21   put African-Americans at greater risk of rejection, correct?

22   A.   I don't know that we ever got that far, did we?  I mean,

23   we talked about demographic corletts in voter turnout.  And,

24   again, most political scientists can talk about that all day

25   long; although, again, I will point out in another component I

Vol. 10 - 163

1    was able to show that in Ohio, at least, registration and

2    turnout rates are essentially equivalent for blacks and whites.

3          So, again, these socioeconomic disparities may exist and

4    we know that there's a linkage in general in political science

5    through political science research of voter turnout, but,

6    again, if turnout and registration rates are equal, they're

7    equal.

8    Q.    Doctor, I would like to actually now ask you a few

9    questions about your -- the rebuttal report which, I believe,

10   is Defendants' Exhibit 10.  Rebuttal report, correct?

11   A.    Correct.

12   Q.    Now, in this report you provide a rebuttal to

13   Dr. Timberlake's consideration of the so-called Senate Factors,

14   correct?

15   A.    Correct.

16   Q.    Okay.  You did not do any primary expert report in this

17   case regarding the Senate Factors, did you?

18   A.    Well, I did some investigating.  I don't know what you

19   call -- what your definition of primary is.

20   Q.    Okay.  We already went over your report which was D8.

21   A.    Okay.  But --

22   Q.    And in that report you don't discuss any -- anything

23   about the Senate Factors, correct?

24   A.    That's true, yes.

25   Q.    Okay.  And this is the only other report, D10, that

1    you've done in this case, correct?

2      A.   Right.

3      Q.   Okay.

4      A.   I guess I just didn't understand your question.

5      Q.   Sure.  That's what I meant by a primary report as

6    opposed to a rebuttal.

7      A.   Okay.  Sorry.

8      Q.   Okay?  Were you ever asked in this case to do a primary

9    expert report on the Senate Factors?

10     A.   No.

11     Q.   Okay.  I want to go to page 1 of the report, and your

12   position here in the last paragraph is that before one can

13   widen the scope to examine other factors such as socioeconomic

14   disparities, a causal connection needs to be established

15   showing the election practices in question is/are denying

16   racial minorities an equal opportunity to participate in the

17   political process.  Correct?

18     A.   Correct.

19     Q.   Okay.  But I think you've already testified that you

20   didn't look at whether there were any racial disparities in

21   terms of participation in the election process, correct?

22     A.   I didn't directly, no.

23     Q.   Now, you have figures -- Figure 1, which is Ohio

24   registration rates by race, and then Figure 2 which is on the

25   next -- on page 4 which is Ohio turnout rates by race.

1    Correct?

2      A.    Correct.

3      Q.    Now, you conclude from these figures -- and I believe

4    you testified to this -- that African-American voters have an

5    equal opportunity to participate in the election process.

6      A.    Based on these metrics, is what I said.

7      Q.    Yes.  But this doesn't answer the question of once I

8    have the opportunity to participate, how am I being affected by

9    any rules regarding whether my ballot is going to be counted,

10   correct?

11     A.    Correct.

12          MS. PIERCE:  Objection.

13          THE COURT:  Basis, Ms. Pierce?

14          MS. PIERCE:  Vague, Your Honor.

15          THE COURT:  Overruled.

16   BY MR. McTIGUE:

17     Q.    And for these two --

18     A.    One more time on that previous question.  It sort of --

19     Q.    Sure.  I'm going to have the court reporter read it

20   back.

21     A.    Okay.

22        (Question read back.)

23          THE WITNESS:  That's correct.  But part of my initial

24   report looks at that question.

25   BY MR. McTIGUE:

1    Q.   I'm sorry?

2    A.   Part of my initial report does look at that question

3    specifically.

4    Q.   The initial report in this case, or are you talking

5    about the other case?

6    A.   Well, either one.  I mean, you know, again, everything

7    we've been talking about gets at the question to some extent of

8    the changes, for instance, in the provisional ballot law

9    increase the provisional ballot rejection rate, for instance.

10   Q.   Yes.  But in the initial report in this case, you didn't

11   look at any racially-based data.

12   A.   That's true.

13   Q.   Okay.  And in terms of the data that you used for

14   Figures 1 and 2, am I correct you used the current population

15   survey published by the Internal Revenue Service?

16   A.   By the Census Bureau.

17   Q.   I'm sorry, the Census Bureau?

18   A.   There's a footnote 7 citation.

19   Q.   Okay.  Now, Doctor, I'm going to put on the screen a

20   document titled at the top State Politics and Policy Quarterly.

21   Do you see that?

22   A.   Yes.

23   Q.   And, for the record -- I'll move this down here -- this

24   is marked as Plaintiffs' Exhibit 7040.

25        Doctor, are you familiar with this?

1    A.    Yes.

2    Q.    Could you just tell us what this is?

3    A.    It's an article I co-authored in State Politics and

4 Policy Quarterly.

5    Q.    And I see your name there in the -- on the face of the

6 report, correct?

7    A.    Correct.

8    Q.    Now, I will tell you what you're looking at has some

9 highlighted portions that I highlighted.  In this first

10 paragraph -- if we look at the second paragraph it says the

11 validated black turnout numbers are much lower than those

12 reported in national studies like the current population

13 survey, but our analysis indicates that compared to 2004,

14 African-American registration and voting in Georgia was

15 markedly higher in 2008.

16         Do you see that?

17    A.    Yes.

18    Q.    Now, in this report you criticize the use of current

19 population survey data, correct?

20    A.    Well, I think, in general, it's a fair proposition to

21 say that we raised questions about survey data related to

22 turnout in general no matter who is conducting the survey.

23         And this is a survey.

24    Q.    Yes.  I want to skip to -- let me ask, first, if I

25 understand what you were just saying -- I think my question was

1  whether or not the population survey information is a subject

2  of criticism by you in this report in terms of it not being as

3  reliable as other sources.

4    A.   It's not validated turnout, no.

5    Q.   I'm sorry, it's not?

6    A.   It's not validated turnouts, no.

7    Q.   I see.  So I now want to turn back to your rebuttal

8  report and take you to your consideration of Senate Factor

9  Five.

10        I'm sorry, I'm going to actually move forward to your

11  consideration of Senate Factors One and Three, which is on page

12  5.

13    A.   Okay.

14    Q.   Okay?

15    A.   All right.

16    Q.   Thank you.

17        Now, it appears that what you're saying here is that

18  because Ohio is not one of the pre-clearance states under the

19  National Voting Rights Act, that that is substantial evidence

20  that Senate Factors One and Three do not apply.  Is that what

21  you're saying?

22    A.   Well, I think it's some evidence.

23    Q.   But that's primarily what you're talking about here in

24  this section of your report, correct?

25    A.   Right.  Right.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 169 of 329 PAGEID #: 2026
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/18 Page: 169 of 329 PAGEID #: 30030

Vol. 10 - 169

1    Q.   Okay.  And now I want to go to -- well, actually, let me

2    just ask this more broadly.  You recall you were asked some

3    questions about your criticism of Dr. Timberlake's inclusion of

4    the billboard that stated that -- and let me get the exact --

5    A.   I can't even remember what the billboard said at this

6    point.

7    Q.   Okay.  I'm going to show you from Plaintiffs' Exhibit

8    1194, and it is on page PTF00199.

9         Okay.  Do you recall seeing this previously?

10   A.   Yes.  Yes.

11   Q.   Okay.

12   A.   I do.

13   Q.   And you recall in your report, your rebuttal report,

14   taking issue with how significant or insignificant this is in

15   terms of reliance by Dr. Timberlake, correct?

16   A.   I took issue with it, yes.

17   Q.   Okay.  You took issue with it.

18        Did you have any information about where this billboard

19   was actually located?

20   A.   No.

21   Q.   So you don't know if it was in a white neighborhood or

22   an African-American neighborhood?

23   A.   Well, the Judge and I had a discussion about this

24   earlier in the morning so I'm --

25   Q.   But when you prepared your rebuttal report --

1    A.    Well, all I knew is what Professor Timberlake reported.

2    I did some additional examination into who produced the

3    billboard.

4    Q.    And it was a family -- according to the Huffington Post,

5    a family -- an out-of-state family foundation, correct?

6    A.    Yes, from what I was able to determine.

7    Q.    If we assume that this billboard and identical

8    billboards were strategically placed in African-American

9    neighborhoods in at least a couple of large cities in Ohio,

10   would that cause you to consider this to be more relevant?

11   A.    Well, my criticism in regard to Professor Timberlake's

12   report is I couldn't find a very direct connection to a

13   campaign or candidate.

14   Q.    And that's actually where I was going to go next.  So

15   you consider that for purposes of the Senate --

16        THE COURT:  I'm not -- just for record purposes,

17   Doctor, I'm not certain that you answered Mr. McTigue's

18   question so I'm going to ask Ms. Coulter to read back the

19   question and the answer.

20     (Question and answer read back.)

21        THE COURT:  So, Doctor, if these billboards were

22   placed in cities that had a sizeable minority population, would

23   that cause you to consider the billboards themselves to be more

24   relevant?  That was the question.

25        THE WITNESS:  Well, I certainly think we can probably

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1   peer into the intent behind whoever was running the billboards.

2   My point, Your Honor, was I just wasn't able to connect that to

3   a particular campaign or candidate.

4              THE COURT:  No, I understand.

5              THE WITNESS:  Okay.  Thank you.

6              THE COURT:  No.  Thank you.

7              Please continue, Mr. McTigue.

8   BY MR. McTIGUE:

9    Q.   Yes.

10        So is it your position that -- that in consideration of

11   the Senate Factors, that only attempts at voter intimidation

12   based on race are relevant if they're conducted by or connected

13   to campaigns of candidates?

14    A.   I think they're much more relevant.  How's that?

15    Q.   Well, that's something, since you asked.

16        I think -- not I think.  But in your report you also

17   considered the statement -- a statement made by Mr. Doug

18   Preisse.  Do you recall that?

19    A.   The chair of the --

20    Q.   Yes.

21    A.   Yes.  Yes.  I'm just trying to remember --

22    Q.   Yes, Chair of the Franklin County Republican Party.

23        And I'm putting on the screen -- this is, again,

24   Plaintiffs' Exhibit P1194, and it's page PTF00200.  And you'll

25   see underneath the photograph it says, third, in August 2012,

1   Doug Preisse, the Republican Party Chairman of Franklin County,

2   in a campaign supporting cutbacks in early voting program --

3   I'm sorry -- cutbacks to Ohio's early voting program stated

4   publicly, quote, I guess I really actually feel we shouldn't

5   contort the voting process to accommodate the urban - read

6   African-American - voter turnout machine, period.

7        Do you see that?

8   A.   Yes.

9   Q.   And did you address this in your report, your rebuttal

10  report?

11  A.   Yes.

12  Q.   Okay.  And what's your conclusion about the relevance of

13  this statement?

14  A.   Well, again, the only sentence I have in here about that

15  particular example was that it didn't reference any specific

16  campaign or candidate again.

17  Q.   Would it be more relevant, in your opinion, if you knew

18  that Mr. Preisse was also a member of the Franklin County Board

19  of Elections when he made this statement?

20  A.   Well, perhaps more relevant than a private citizen.

21  Q.   More relevant than, I'm sorry?

22  A.   A private citizen, for instance.

23  Q.   Okay.  But in terms of being relevant to the

24  consideration of the Senate Factors --

25  A.   Well, again, I've sort of given my understanding of this

```
 1   particular Senate Factor.  I guess I have a tighter net than

 2   Professor Timberlake does.

 3           MR. McTIGUE:  Your Honor, can I have a moment to

 4   confer?

 5           THE COURT:  Yes.

 6           MR. McTIGUE:  Thank you.

 7           MR. McTIGUE:  Your Honor, I do want to move into

 8   admission Plaintiffs' Exhibit P7040.

 9           THE COURT:  Any objection to P7040, Ms. Pierce?

10           MS. PIERCE:  None, Your Honor.

11           THE COURT:  P7040 will be received, Mr. McTigue.

12           MR. McTIGUE:  Thank you, Your Honor.

13   BY MR. McTIGUE:

14      Q.   I want to cover one more area, and that has to do with

15   early in-person voting.

16      A.   Okay.

17      Q.   So you're aware that some people vote in Ohio early

18   in-person on DRE machines, correct?

19      A.   Yes.

20      Q.   And others vote on paper --

21      A.   Well, yes.

22      Q.   -- in other counties?

23      A.   Yes.  Yes.

24      Q.   Okay.

25      A.   Yes, that's correct.  I'm trying to re-affiliate myself
```

1    with some of this information.

2      Q.   And are you aware that when you vote -- and Ohio

3    considers this voting absentee?

4      A.   Right.  It's a form of in-person absentee balloting.  So

5    that's why I was trying to remember.  Whether you vote a paper

6    ballot or a DRE machine, you still have to fill out your

7    absentee ballot form; whereas, in some states that have what we

8    call, I guess, truer early in-person voting, it's more like

9    going to vote at the polls on election day at the precinct.

10     Q.   Now, are you aware that in Ohio if you vote early

11   in-person on a DRE machine, you complete an application for the

12   ballot, but you do not complete an I.D. envelope?

13     A.   I don't -- I honestly don't know if I remembered that

14   particular point.

15     Q.   So you're not aware of whether or not an in-person paper

16   ballot voter has to complete two forms versus one form for a

17   DRE voter?

18     A.   I'm not disputing it.  I just --

19     Q.   You just don't remember that?

20     A.   I honestly just don't remember that.

21        MR. McTIGUE:  Okay.  Your Honor, if I could have one

22   more moment?

23        THE COURT:  Yes.

24        MR. McTIGUE:  Thank you, Your Honor.  I have no

25   further questions.  Thank you.

Vol. 10 - 175

1          THE COURT:  Thank you, Mr. McTigue.

2          MS. PIERCE:  No redirect, Your Honor.

3          THE COURT:  No redirect, Ms. Pierce?

4          MS. PIERCE:  Yes, sir.

5          THE COURT:  Professor Hood, thank you very much, sir.

6   You may be excused.

7          THE WITNESS:  Thank you, Your Honor.  I appreciate it.

8          THE COURT:  Have a good day.  Safe travels.

9          THE WITNESS:  Thank you.

10         THE COURT:  Ms. Richardson, your next witness?

11         MS. RICHARDSON:  Your Honor, the Defense calls Sherry

12  Poland to the stand as our next witness.

13                        - - -

14                    SHERRY POLAND

15    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

16         THE COURT:  Please proceed, Mr. Conover.

17         MR. CONOVER:  Thank you, Your Honor.

18                  DIRECT EXAMINATION

19  BY MR. CONOVER:

20  Q.   Good afternoon, Ms. Poland.  Could you please state and

21  spell your name for the record, please?

22  A.   Sherry Poland, S-H-E-R-R-Y P-O-L-A-N-D.

23  Q.   Ms. Poland, where are you currently employed?

24  A.   I'm the director of the Hamilton County Board of

25  Elections.

1    Q.    How long have you been at the Board?

2    A.    I've been with the Board since March of 2004.  I was

3    appointed director in June of 2014.

4    Q.    And what positions did you have prior to becoming

5    director?

6    A.    Prior to becoming director I was the operations

7    administrator, and prior to that I was an elections specialist.

8    Q.    Can you explain the duties that you had as an elections

9    specialist?

10    A.    Right.  As an elections specialist I was responsible for

11    the ballot design, layout, programming the vote, counting the

12    database, conducting logic and accuracy testing, among other

13    duties.

14    Q.    As operations administrator, can you describe the duties

15    that you had in that role?

16    A.    Sure.  Overseeing those same duties, but also overseeing

17    the provisional verification process, the absentee return

18    verification process.  The IT department was under my

19    supervision at that time.

20    Q.    And then you became director in June of 2014, correct?

21    A.    Correct.

22    Q.    Can you describe your responsibilities as director?

23    A.    Sure.  Overseeing the day-to-day operations of the Board

24    which includes everything I mentioned before, in addition to

25    maintaining the voter registration database, securing polling

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 177 of 329 PAGEID #: 2934
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 177 of 329 PAGEID #: 36964

Vol. 10 - 177

 1   locations, making sure that they're ADA compliant, recruiting

 2   and training and assessing approximately 2700 poll workers,

 3   campaign finance along with managing our budget, among other

 4   duties.

 5       Q.   Who do you report to as director?

 6       A.   Four person bipartisan Board.

 7       Q.   And what is your interaction with the Board?

 8       A.   Yes.  The Board sets policy, and I implement that

 9   policy.

10       Q.   Are you associated with a political party?

11       A.   I am.  I'm associated with the Republican Party.

12       Q.   Thank you.

13            How many full-time employees does the Board have?

14       A.   Including myself and the deputy director, there are 42

15   full-time employees currently.

16       Q.   And do you hire any part-time or seasonal employees?

17       A.   We do.  Especially during election cycles we hire,

18   depending on the type of election, anywhere from approximately

19   20 up to 200 seasonal employees.

20       Q.   And for the fall 2016 election, how many do you

21   anticipate?

22       A.   In a presidential year that would be the maximum,

23   somewhere around 200.

24       Q.   And I think you previously said this, but how many

25   precinct election officials does the Board hire?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 178 of 329 PAGEID #: 2035
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/18 Page: 178 of 329 PAGEID #: 36092

Vol. 10 - 178

1    A.    Approximately 2700.

2    Q.    Can you describe the training that those PEOs receive?

3    A.    They attend a 4-hour training class in the month leading

4    up to election day.  We also implemented something new that we

5    call Practice Makes Perfect because we implemented a new

6    system, the electronic poll books.  So poll workers after they

7    attend their 4-hour training class, if they would like to come

8    to the Board of Elections and receive more hands-on experience,

9    they can do that as well.  And then the poll workers themselves

10   meet at the polling location the night before the election,

11   Monday evening, to organize their polling location.

12   Q.    Could you just broadly describe what's covered in that

13   4-hour precinct election official training?

14   A.    Yes.  There's a lot that's covered in the 4-hour time

15   period.  The first thing we need to train on is the supplies

16   that they pick up on Saturdays.  The voting location managers

17   and deputy managers are assigned to certain locations the

18   Saturday before election day to pick up all of their supplies,

19   then they're trained on what to do Monday night at their

20   organizational meeting and that entails going through all their

21   supplies, checking off, taking inventory, making sure they

22   received everything and that everything they have is for their

23   correct precincts and polling location.  They set up the

24   location, they set up the voting equipment, the electronic poll

25   books.  They -- we have to employ 116 troubleshooters, who in

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 179 of 329 PAGEID #: 2036
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/16 Page: 179 of 329 PAGEID #: 30766

Vol. 10 - 179

1    the field on Monday night deliver those last minute absentee

2    voter lists because voting absentee voting in Ohio does not end

3    until 2:00 p.m. on Monday, and we need to provide notice to the

4    polling locations of those voters who voted in those final few

5    days.  So we employ 116 troubleshooters to deliver those lists

6    on Monday night.  And then the poll workers have to update the

7    E-Poll books with that information.  And that's just what

8    they're trained on for Monday night, and then we go into

9    election day.

10   Q.   Okay.  And what is the Board's budget for 2016?

11   A.   It's approximately a little under 9 million.

12   Q.   Okay.  I would like to kind of get away from the

13   mechanics of the Board a little bit and talk a little bit about

14   registration.  How many registered voters are there in Hamilton

15   County?

16   A.   Approximately 550,000.

17   Q.   How does that compare to the rest of the state?

18   A.   Hamilton County is the third largest county in the State

19   of Ohio.

20   Q.   What information is required to register to vote?

21   A.   The voter must complete a registration form providing

22   their name, their address, their date of birth, a form of I.D.

23   and their signature.

24   Q.   And when the Board receives an individual's

25   registration, how is that processed internally?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 180 of 329 PAGEID #: 2037
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-1 Filed: 04/06/18 Page: 180 of 329 PAGEID #: 36094

Vol. 10 - 180

1    A.   Yes.  It's -- we have a batching system.  So the

2    registration forms are batched together and then scanned into

3    our voter registration system so we can capture the image of

4    the voter registration form, and then our data entry clerks

5    enter the information contained on the form.  We then have a

6    staff of editors, and their job is to proof everything that the

7    data entry clerks entered so that we can try to ensure the most

8    accurate voter registration rolls.

9    Q.   And can a voter include optional information on that

10   registration form?

11   A.   Yes.  I believe there's a place for the voter to list

12   their telephone number.

13   Q.   And what does the Board do if a voter chooses to list

14   their telephone number?

15   A.   It has been our practice not to enter the telephone

16   number into our voter registration system because of complaints

17   we received from voters that if we enter that into our voter

18   registration system and then there's public records requests

19   from campaigns, they now have the voters' phone numbers.  And

20   it's my experience and the Board's experience that voters do

21   not like to be called by robocalls or political campaigns so

22   it's our practice not to enter their phone number into our

23   system.

24   Q.   And would the Board have telephone numbers for all

25   registered voters?

Vol. 10 - 181

1    A.    Not for all registered voters, no.

2    Q.    Okay.  I would like to move a little bit into how the

3    Board might assist voters if they have any questions.

4          Within the registration context, if a voter were to call

5    in or need assistance with the registration form, what

6    assistance might the Board offer?

7    A.    We have staff that are assigned to our registration

8    department to answer any questions the voter may have and

9    provide assistance.  During election cycles, we hire additional

10   staff to man the phones for those types of questions, as well

11   as, you know, we do have voters who appear in person to

12   register.  So we always make sure we have experienced

13   registration staff at those front desks.

14   Q.    And I think you alluded to this, but during the absentee

15   voting process, so there are 28 days prior to election day, how

16   does the Board assist voters if they have questions?

17   A.    Sure.  We hire approximately -- usually four seasonal

18   staff members that work full-time during the election cycle.

19   They are there whatever the hours are we're open for absentee

20   voting.  If it's 8 to 5 or 8 to 7, we have the phones manned

21   during all hours that we're open for absentee voting.  And

22   that's their sole purpose, is to answer questions from the

23   voters regarding absentee voting.

24   Q.    And how might the Board assist homeless individuals in

25   voting?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 182 of 329 PAGEID #: 2039
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/20 Page: 182 of 329 PAGEID #: 36708

Vol. 10 - 182

1    A.   If a -- typically, if there's a voter who is homeless in

2  Hamilton County, they register from one of the shelters, and I

3  really have not seen that to be a problem.  We send -- as we do

4  with any voter who registers in Hamilton County, they are sent

5  an acknowledgment card.  An acknowledgment card is sent to the

6  shelters.  To my knowledge, the shelters do not return those

7  acknowledgment cards as being undeliverable.

8       The only particular instance I can recall with a

9  homeless voter who wasn't sure where to go to vote I believe

10  was in the 2008 presidential election where our help desk

11  received a call from a voter who indicated that they recently

12  had become homeless and that they were sleeping in their car,

13  and that they had slept in the parking lot of the church that

14  was the polling location that they appeared to vote in.  And

15  they indicated that it was their -- the voter's intent to

16  return to that parking lot for as long as they could so the

17  voter voted provisionally, because it was a change of address,

18  listing the address of that church parking lot and indicated

19  that they were homeless -- that the voter was homeless, and our

20  Board counted -- voted to count that ballot.

21    Q.   And how might the Board assist a voter that either has

22  low literacy or is illiterate?

23    A.   Yes.  Voters, whether they appear in person at the Board

24  of Elections during early voting or if they go to the polling

25  place on election day, they can bring someone that they choose

 1   with them.

 2        If they do not have someone with them, they can ask for

 3   assistance from our poll workers, and a bipartisan team can

 4   assist the voter in marking their ballot.

 5   Q.   And does the Board handle nursing home voters

 6   differently?

 7   A.   We do.  We send a packet to every nursing home in

 8   Hamilton County asking if their residence would like to

 9   participate in our nursing home program.  Some voters choose to

10   receive their ballots by mail, other voters choose to receive

11   assistance from our bipartisan teams.  So we send the teams to

12   the nursing homes at a scheduled date and time.  We send

13   applications first so that the voters fill out the

14   applications.  We also send these packets out prior to the

15   close of registration.  That way if the voter has recently

16   moved to the nursing home, we have time to change their address

17   before our bipartisan teams go there to assist them with

18   voting.

19   Q.   Okay.  Great.  Now, I would like to just kind of move

20   into voting generally.  What precinct should a voter vote in?

21   A.   They should vote in the precinct in which they live.

22   Q.   And why is that?

23   A.   Because the contests that appear on their ballot are

24   specific to that precinct.  You have school districts.  We have

25   many different types of voting districts, congressional

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 184 of 329 PAGEID #: 2041
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-1 Filed: 04/06/18 Page: 184 of 329 PAGEID #: 36963

Vol. 10 - 184

1    districts State, House, school districts.  And they're

2    particular, the contests that appear are particular to that --

3    or can be particular to that specific precinct.  We even have

4    some questions and issues that appear on the ballot that may

5    only appear in one particular precinct; for example, like a

6    local option contest.  That type of contest is only for the

7    voters who live in that particular precinct.

8    Q.   And how many ballot styles might Hamilton County have in

9    any given election?

10   A.   Depending on the type of election, we could have

11   anywhere from 556 to close to 2000.

12   Q.   And how do most voters in Hamilton County actually cast

13   their ballot?

14   A.   In their precinct on election day.

15   Q.   And do you know how many that might be?

16   A.   It varies election to election, but on average it's

17   about 70 percent.

18   Q.   And how do the remaining 30 percent vote?

19   A.   By absentee voting, both by mail and in person.  Some

20   absentee voting more voters -- out of the absentee voters, more

21   voters vote by mail than in person in Hamilton County.

22   Q.   And I think you had mentioned that there's two methods,

23   there's the election day voting and absentee voting.

24   A.   Correct.

25   Q.   How is election day voting different than in person --

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 185 of 329 PAGEID #: 2042
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 185 of 329 PAGEID #: 36063

Vol. 10 - 185

1    than even in -- excuse me, let me strike that.

2         How is election day voting different than in-person

3    absentee voting?

4    A.   Yes.  Election day voting, the -- the I.D. laws are

5    different.  For a voter who appears in the precinct on election

6    day, they have to provide some sort of I.D., a valid form of

7    I.D., they have to show it to the poll workers.  There's many

8    different types of valid I.D., but they do have to show it, to

9    display it to the poll worker.  It could be a driver's license,

10   state identification card, military card, utility bill, that

11   sort of thing.

12        If they cannot provide it, then they can vote

13   provisionally providing the last four digits of their social

14   security number.

15        But when a voter appears in person early, they fall

16   under the absentee voting guidelines for providing

17   identification so they do not have to display I.D.  They just

18   have to -- they can just record it on the I.D. envelope.  So

19   they fall under the same I.D. guidelines as a voter by mail,

20   not a voter that's appearing at the polling place.

21        There's also differences with our staffing.  You know,

22   in the polling place we have -- our poll workers only work one

23   or two days a year versus the staff that we have at the Board

24   of Elections, we have at least two full-time employees.  And

25   then we have seasonal staff, but they work on that project for

1    28 days, and they have access to supervisors and

2    administrators.

3        Q.    Thank you.

4            Are there any electoral jurisdictions in Hamilton County

5    that cross over county lines?

6        A.    Yes, we have several.  Our congressional districts, both

7    first and second, cross over into other counties.  We have many

8    school districts that cross over into other counties.  We even

9    have one city that crosses over into three different counties.

10       Q.    And what election administration issues does that create

11   for the Board?

12       A.    Yes.  We have to stay in contact with all the

13   overlapping counties; first of all, to ensure that all the

14   counties are notified when there's a filing of a particular

15   question and issue or candidate filing, whether or not there

16   were enough signatures for that candidate to appear on the

17   ballot, the proper ballot language.  So that's shared amongst

18   the counties.

19           And then we also have to share results.  The least

20   majority counties have to report to the most populous county.

21       Q.    And now I would like to move into provisional voting.

22   Why might a voter have to vote a provisional ballot on election

23   day?

24       A.    There's numerous reasons.  It's usually because the

25   voter's either identity or eligibility to cast a regular ballot

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 187 of 329 PAGEID #: 2044
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/20 Page: 187 of 329 PAGEID #: 30911

Vol. 10 - 187

1    cannot be determined at the time the voter's appearing to cast

2    their ballot.  The biggest reason, the most common reason I

3    would say that a voter votes provisionally is because they have

4    moved, changed their address, and have not updated the Board of

5    Elections with that new address.  A voter may also vote

6    provisionally because they have already requested an absentee

7    ballot.  Perhaps the acknowledgment card that the Board of

8    Elections mailed to the voter was returned by the post office

9    as undeliverable so their address cannot be confirmed.  They

10   may also be required to vote provisionally because they do not

11   have a valid form of I.D.

12      Q.   And would a -- is it possible that an absentee or an

13   early voter may have to vote provisionally?

14      A.   Yes.  Once a voter requests an absentee ballot, they are

15   then flagged that they must vote provisionally once that

16   request has been made.

17      Q.   When do the majority of provisional voters vote?

18      A.   On election day.

19      Q.   Thanks.

20           What information is required on a provisional

21   affirmation statement?

22      A.   The same information that's required on a registration

23   form.  It's the voter's name, their date of birth, address, a

24   form of I.D., and their signature.

25      Q.   And what changes have there been to the required fields

1  since 2014?

2      A.    I believe in the summer of 2014 the changes that were

3  made is that the date of birth and address is now required by

4  the voter.

5      Q.    Has that information -- that new information been

6  helpful to the Board?

7      A.    Yes, it has been extremely helpful.

8      Q.    In what way?

9      A.    By adding the requirement of the date of birth Boards of

10  Elections are -- can identify the voter.  It's an additional

11  piece of information that has enabled Board of Elections staff

12  to confirm the voter's identity and, therefore, count their

13  provisional ballot.  Our -- in the same -- the way it works

14  with the reason that the address has helped Boards of

15  Elections, is that in the past we've not been able many times

16  to confirm where the voter is living if the voter does not

17  provide that information on the provisional envelope, and that

18  would lead to their provisional ballot being rejected for being

19  in the wrong location -- wrong precinct, wrong location because

20  we cannot determine -- we cannot confirm where they are living.

21          So the result of this law has been that our acceptance

22  rates on provisional ballots has increased.  The number of

23  ballots being rejected for not being able to identify the voter

24  which would be not registered and wrong precinct, those numbers

25  have declined since this law was passed.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 189 of 329 PAGEID #: 2046
Case: 2:06-cv-00896-ALM-TPA Doc #: 664 Filed: 04/06/20 Page: 189 of 329 PAGEID #: 30719

Vol. 10 - 189

 1   Q.   So if I understand your explanation on the address, I'm

 2   going to put a hypothetical out there.  So pre-2014 if a voter

 3   had lived in Franklin County was registered in Franklin County

 4   but then moved to Hamilton County without updating their

 5   registration, had completed the pre-2014 affirmation statement,

 6   what would have happened to that voter?

 7   A.   If a voter -- when a voter moves into their Hamilton

 8   County -- they may have done everything right, determined what

 9   their new polling location should be, their new precinct, go to

10   that location.  The poll worker may do everything right as far

11   as verifying that, yes, this new address is in this precinct

12   and that polling location, and then the poll worker provides

13   the envelope and the ballot to the voter.

14        But if the voter doesn't fill in the address, when that

15   envelope comes down to the Board of Elections, there's no way

16   for the bipartisan team of election officials to know where the

17   voter is living now so we would have to assume they're still in

18   Franklin County or still in whatever address was their former

19   address, which means that's a wrong location ballot and the

20   ballot can't be counted.

21   Q.   And why isn't it enough for a voter to just give their

22   current address verbally to the poll worker?

23   A.   Because the officials at the -- it's the Board -- it's

24   the Board's responsibility to determine the eligibility of the

25   provisional ballots.  And without that information on the

1  envelope, there's no way for Board staff to know their address.

2  Q.  And I think you mentioned in one of your previous

3  answers about verifying the identity of a voter; is that right?

4  A.  Yes.

5  Q.  What does that mean to you, to verify the identity of a

6  voter?

7  A.  Right.  So that we can confirm that the Board of

8  Elections bipartisan officials can confirm that the person who

9  completed the affirmation statement and cast the ballot is the

10 individual we have registered to vote.

11 Q.  Now moving a little bit to how a provisional voter is

12 processed, when a provisional -- or a voter may show up at the

13 polling location on election day.  How does the precinct

14 election official process a provisional voter in Hamilton

15 County?

16 A.  Right.  We have implemented electronic poll books in

17 Hamilton County.  So the poll worker's trained that if the

18 voter provides I.D. in the form of a driver's license or a

19 state identification card, that can be swiped so we can

20 locate -- the poll worker can locate the voter easily within

21 the E-Poll book.  But if the voter does not have a driver's

22 license or a state identification card as their form of I.D. or

23 if it simply won't scan, there's what we call manual look-up.

24 And the way we teach the poll workers to do a manual look-up is

25 to type in the first few letters of their last name and their

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 191 of 329 PAGEID #: 2048
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 191 of 329 PAGEID #: 36740

Vol. 10 - 191

```
 1   year of birth, because that usually brings the voter's -- that
 2   specific voter's information up.  If you just type in the
 3   voter's name, you're going to get a very long list of voters
 4   that you then have to scroll through to choose to select the
 5   correct voter.
 6      Q.    And who completes the actual provisional affirmation
 7   statement?
 8      A.    The voter.
 9      Q.    And do you think it's important that the voter completes
10   that information?
11      A.    Yes.
12      Q.    Why do you think that?
13      A.    If someone else completed that information for the
14   voter, they may make a mistake on filling that out.  Perhaps
15   they -- if the voter verbally communicated their address or
16   their date of birth or their -- their -- the last four digits
17   of their social, the poll worker may hear it wrong or record it
18   wrong.  This way it's completely in the hands of the voter.
19      Q.    And what information does the Board provide to voters --
20   to provisional voters specifically to check the status of their
21   provisional ballot?
22      A.    They're given what we call a provisional hotline form.
23   It's a prescribed form by the Secretary of State so all
24   provisional voters in the State of Ohio are given the same
25   form, and it has a toll free number on it that the voter can
```

1    call to determine whether or not their provisional ballot was

2    counted.

3        Q.    Is that given to every provisional voter?

4        A.    Yes.

5        Q.    How does the -- so once the provisional ballot has been

6    cast -- and we're back at the Board of Elections after election

7    day.  How does the Board staff process those provisional

8    affirmation statements and ballots?

9        A.    Right.  The first thing Board staff does, is we review

10   every envelope to -- first thing we look for is whether or not

11   the voter provided a former address in another Ohio county

12   outside of Hamilton because we need to send that information

13   off to the other counties to verify, one, that the voter was

14   registered in the other county, and, two, that the voter did

15   not also cast a ballot in that county.  And that takes time.

16   And, you know, as soon as election day ends, the clock is

17   ticking.  We have to -- we have 14 days to complete this

18   verification process so we want to get that started right away.

19          We then apply a label to the provisional envelope.  It's

20   a working label that helps our bipartisan team step through the

21   verification process.  Then the bipartisan team will sit

22   together at computer terminals, and they -- they search for the

23   voter in our voter registration database and compare the

24   information on the envelope to what's contained in the voter

25   registration database.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/08/16 Page: 193 of 329 PAGEID #: 36737

1    Q.    And there was a little bit I want to unpack there but,

2    first, why does a bipartisan team process the provisional

3    affirmation statements?

4    A.    It's -- the provisional verification process is a very

5    tedious process.  It's -- we go to great lengths to -- to make

6    sure we've exhausted all efforts to identify the voter, to find

7    the voter in the voter registration system, and to make sure

8    that the information on the envelope matches what's in the

9    voter registration system.  And it just -- it's our feeling

10   that it's helpful to have two sets of eyes on that.

11   Q.    And I think you mentioned that a label is affixed to the

12   envelope; is that right?

13   A.    That's correct.

14   Q.    And what's on that label?

15   A.    It's everything that's required of -- of the voter.  Is

16   the voter registered?  Did they print their name, sign, provide

17   I.D.?  Does the I.D. match?  Date of birth, does the date of

18   birth match?  Does their signature match?  Did they vote in the

19   correct precinct, and did they only cast one ballot in the

20   election?

21   Q.    And then I think you also mentioned that the bipartisan

22   team will then search for the voter in the voter registration

23   database; is that right?

24   A.    Yes.

25   Q.    What pieces of information does the Board staff use to

1    look up those voters' information?

2       A.    Right.  They use the voter's name, as well as the house

3    number.  The address house number is often helpful when

4    searching a database, but not always with provisionals because,

5    again, the most common reason a voter is voting provisionally

6    is because they've moved so then you wouldn't get a hit on the

7    address.  But also year of birth is helpful.

8       Q.    And if a voter doesn't appear in the Hamilton County

9    voter registration database, does the Board staff look at

10   additional data?

11      A.    Yes.  We have our registration specialist -- if the

12   original bipartisan team cannot locate the voter, then the

13   affirmation statements go to our registration specialist who,

14   again, double check our database just to make sure we have not

15   made a mistake with the voter's records, and then they also --

16   then they check the statewide voter registration database to

17   see if, perhaps, the voter was registered in another Ohio

18   county.

19      Q.    And I believe you mentioned that you might use the

20   statewide Secretary -- is that --

21      A.    The Secretary of State maintains the statewide voter

22   registration database.

23      Q.    But the staff Board frequently would use it to search

24   the database?

25      A.    Yes.  Every provisional envelope, if we -- every

```
 1    provisional voter, if we cannot locate the voter registration

 2    status within Hamilton County's database, is then checked in

 3    the statewide database.

 4       Q.   And can you just explain how the staff uses that

 5    database, the statewide database?

 6       A.   Right.  There's a voter query.  There's a portal set up

 7    for Boards of Elections, and we have a username and password to

 8    get into the portal.  And there's a voter query section, and

 9    you can query on a voter's first name, last name, date of birth

10    and last four digits of their social security number.

11       Q.   Ms. Poland, is this -- what is this?

12       A.   That is a screenshot of the statewide voter registration

13    system using the Board of Elections' portal.

14       Q.   And is it similar -- or is this what the Board staff

15    would use to look up voters in the statewide database?

16       A.   Yes, that's correct.

17       Q.   And what were the search parameters of the search that's

18    conducted on the screen?

19       A.   Do you want me to list all fields or what was completed

20    in this?

21       Q.   Just which search was used on this screen.

22       A.   In this screen the voter's last name, first name was

23    entered into the search.

24       Q.   And what name was entered?

25       A.   Last name Brown, first name Daniel.
```

 1    Q.   And how many search records were returned?

 2    A.   368 records.

 3    Q.   Thank you.  And that was just by searching by name?

 4    A.   By first name and last name, correct.

 5         THE COURT:  And that was for the statewide database,

 6   Ms. Poland, or for the Hamilton County database?

 7         THE WITNESS:  That was the statewide.

 8         THE COURT:  Because that -- you aren't limited to

 9   counties.  You're limited to the state for provisional ballot

10   and absentee ballot purposes; is that right?

11         THE WITNESS:  That's correct.  As long as you're a

12   registered voter anywhere in the State of Ohio, you can vote.

13   BY MR. CONOVER:

14    Q.   And can you -- what was the search parameters for this

15   next screenshot?

16    A.   This was last name and first name.

17    Q.   And what was -- what search terms were used?

18    A.   Last name Clark, first name Betty.

19    Q.   And how many records were returned?

20    A.   106 records returned.

21    Q.   Thank you.  And we've got just a few more.

22         The next search, what search terms were used?

23    A.   Again, last name, first name.  Last name Pierce, first

24   name Sarah.

25    Q.   And how many records were returned?

Vol. 10 - 197

```
 1    A.   41 records returned.

 2    Q.   Thank you.

 3         MS. GENTRY:  Your Honor, objection.

 4         THE COURT:  Basis?

 5         MS. GENTRY:  Hearsay.  The witness -- well, may I have

 6    a sidebar?

 7         THE COURT:  Sure.

 8                          - - -

 9    Thereupon, the following proceeding was held at sidebar out

10    of the hearing of the open courtroom:

11         MS. GENTRY:  Your Honor, the basis is Mr. Conover

12    initially said that one exhibit would be used as a

13    demonstrative, and I thought he meant just to show her what the

14    fields are on the portal.  Now it appears he's trying to use

15    these to get in evidence about searches he or somebody in his

16    office ran in the database which is not publicly available.

17    The witness hasn't run the searches.  I have no way of knowing

18    whether the searches are true or not.  He's trying to get in

19    substantive evidence about how many names were returned.

20    There's a lack of foundation and also hearsay objection.

21         MR. CONOVER:  Ms. Poland ran the search.  I'm happy to

22    lay that foundation.

23         THE COURT:  At this point your objection is sustained

24    because of lack of foundation.  Mr. Conover can lay the

25    foundation and elicit that same information.
```

1      How much more do you have, do you think, Mr. Conover?

2           MR. CONOVER:  Are you going to hold me to it?

3           THE COURT:  No.  I won't treat you -- this is an equal

4    protection thing, Mr. Conover.  I'm going to treat everybody

5    the same.  So no.

6           MR. CONOVER:  I would assume 45 minutes to an hour.

7           THE COURT:  Is this a convenient place to break, or do

8    you want to shore this up and then break?

9           MR. CONOVER:  I have three more.  If I can do the

10   foundation quickly and get through those, then we can break.

11          THE COURT:  All right.  Thank you.

12      (Back in open court.)

13          THE COURT:  Please continue, Mr. Conover.

14   BY MR. CONOVER:

15    Q.   Ms. Poland, for the last three demonstratives I showed

16   you, the search for Daniel Brown showing 368 records, for Betty

17   Clark showing 106 records, and for Sarah Pierce showing 41

18   records, who conducted those searches?

19    A.   I did.

20    Q.   And when did you do that?

21    A.   Yesterday.

22    Q.   Thank you.

23          The next search, Ms. Poland, can you describe what

24   search was run there?

25    A.   This was a search of the statewide voter registration

Vol. 10 - 199

1   database using only the last four digits of a social security

2   number, and the results was a message that says your search

3   will return too many results.  Please enter additional

4   information.

5       Q.   Thank you.

6           MR. CONOVER:  And then last one, Your Honor.

7           THE COURT:  All right.

8   BY MR. CONOVER:

9       Q.   Ms. Poland, can you tell me which search parameters were

10  used in this search?

11      A.   Birth date and last four digits of the social security

12  number.

13      Q.   And which birth date and social security number were

14  used?

15      A.   July 6 of 1985, and the last four digits of the social

16  is 3345.

17      Q.   And what voter did this identify?

18      A.   Sarah Pierce.

19      Q.   And just to be clear, I think it says that three records

20  were returned, but how many active were?

21      A.   Just one.  There's an indication the other two records

22  were merged so there's one active record.

23          MR. CONOVER:  Thank you.  We can go ahead and break at

24  this time, Your Honor.

25          THE COURT:  All right.  It's 10 minutes until 4:00.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 200 of 329 PAGEID #: 2057
Case: 2:06-cv-03843-MHW-KAJ Doc #: 664-1 Filed: 04/06/20 Page: 200 of 329 PAGEID #: 30724

Vol. 10 - 200

 1   We'll stand in recess until 4:05.

 2       (Thereupon, a recess was taken.)

 3           THE COURT:  Mr. Conover, please continue.

 4           MR. CONOVER:  Thank you, Your Honor.

 5   BY MR. CONOVER:

 6    Q.   Ms. Poland, I would like to talk about provisional

 7   voting.  What happens if a voter does not fill out the required

 8   information on the provisional affirmation statement?

 9    A.   If the voter fails to provide identification on the

10   provisional affirmation statement, that voter has 7 days to

11   appear in person at the Board's office and provide that I.D.

12    Q.   And when the Board is processing a provisional

13   affirmation statement after election day, if a piece of

14   information is incorrect or missing, how -- what does the Board

15   do?

16    A.   If it's incorrect, we search our documents, our records

17   of the Board, as best we can to make sure that there wasn't a

18   data entry mistake made on our end to make sure we didn't have

19   a typo in the voter's social security number or date of birth,

20   that sort of thing.  So we search our records first.  And then

21   if our records do correctly match what the voter has submitted

22   in the past other than the date of birth mismatch, then the

23   ballot is recommended to be rejected.

24    Q.   And how does the Board utilize that label that is

25   affixed, the provisional affirmation label?

 1    A.   Right.  As a working document to remind them of all of

 2    the things they need to check, and they check off as they go

 3    along, the bipartisan election officials, through every step

 4    that must be completed on the affirmation statement, and then

 5    they sign off.

 6    Q.   And when you say sign off, what do you mean by that?

 7    A.   Each election official either puts their initials or

 8    signs their name to the label.

 9    Q.   Is there additional review for in-question ballots?

10    A.   Right.  All ballots that are initially set for

11    rejection -- recommend to reject are then reviewed again by an

12    additional team.

13    Q.   Is that a bipartisan team?

14    A.   Correct.

15    Q.   And I think you mentioned that the bipartisan team --

16    the initial bipartisan team will search the databases and the

17    original registration records; is that right?

18    A.   The initial team conducts a search of Hamilton County's

19    voter registration database, correct.

20    Q.   And why does that team search into the -- search the

21    database?

22    A.   In order to identify the voter is a registered voter in

23    Hamilton County.

24    Q.   And I'd like to talk a little bit about the cure period

25    for provisional ballots.  What is the cure period currently?

Case: 2:06-cv-00896-ALM-TPK Doc #: 648 Filed: 04/06/18 Page: 202 of 329 PAGEID #: 30728

```
 1    A.    The voter has -- for provisional ballots?

 2    Q.    Yes, ma'am.

 3    A.    The voter has 7 days.

 4    Q.    And has that changed?

 5    A.    Yes.  It used to be 10 days.

 6    Q.    And what, if any, benefits are there for that 7-day cure

 7  period in lieu of 10 days?

 8    A.    It's a benefit for the Boards of Elections because we

 9  have -- there's several different processes that are occurring

10  post-election.  One is the provisional verification process,

11  the other is there's still absentee ballots that are being

12  returned.  As long as they're postmarked by the day before

13  election day and received by the 10th day, they can be counted.

14  We can run into situations where a voter will cast two ballots.

15  They will cast an absentee ballot, and they'll also cast a

16  provisional ballot.  So when we're conducting the verification

17  process, part of that is to ensure that the voter did not also

18  cast another ballot.  So it's important to have an ending to

19  say, okay, this is the last day that a provisional ballot --

20  any changes can occur to this provisional ballot as far as

21  providing additional information so that we can do a crosscheck

22  to ensure that of voters who did cast two ballots, only one is

23  going to be counted.

24    Q.    And how many individuals actually come in to cure the

25  I.D. deficiency on a provisional ballot?
```

1    A.    In Hamilton County our experience has been very few.  In

2    fact, in this past March election we had two voters and,

3    actually, neither one of them needed to appear because they had

4    both provided their social security number on their provisional

5    envelope.

6    Q.    And would it be possible to contact each provisional

7    voter that had an incomplete or incorrect provisional

8    affirmation statement?

9    A.    I think that would be nearly impossible in the time

10   frame that's given for Boards of Elections to fairly -- we

11   wouldn't be able to conduct -- to contact all voters so then

12   some voters are contacted, and some voters are not.  I don't

13   think that would be fair.

14   Q.    Why would it be nearly impossible?

15   A.    It's a short amount of time that we have.  Again, these

16   provisional ballots, the majority of them -- vast majority of

17   them are cast on election day.  Our staff works anywhere from

18   16 to 24 hours on election day.  So on Wednesday it's a very

19   small skeleton crew that works, and I think this is typical of

20   most -- I think, I believe, most Boards of Elections in Ohio

21   that just answer the phones.  So we hit the ground running on

22   Thursday morning very -- first project that we start is the

23   provisional verification process.  But it takes working very

24   long hours, including weekends.  We don't -- do not have enough

25   full-time staff to conduct this process.  We have to have

1    seasonal employees also work on this task, and it has to be

2    completed before the 14th day.

3         That universe of which voters did not supply information

4    is not known until those final days so I don't see how there's

5    time once you know that universe to then notify the voters and

6    then allow time for the voters to then respond to that notice.

7    I don't know how that -- the time frames would all have to

8    change.  We would need longer periods of time to certify an

9    election.

10   Q.   And now I would like to talk a little bit about the old

11   provisional affirmation forms, so pre-2014.  What information

12   was required on that form?

13   A.   The voter's printed name, a form of I.D. and their

14   signature.

15   Q.   And was there also a registration form included with

16   that?

17   A.   Right.  The affirmation statement was on the front of

18   the envelope, and then there was a registration form on the

19   back of the envelope.

20   Q.   Which information was required to count the ballot?

21   A.   To count the ballots, the information contained on the

22   affirmation.

23   Q.   And did the individual provisional voters always fill

24   out the registration form on the back?

25   A.   No.

1  Q.   And what would have happened if an unregistered

2  individual had not completed the registration form on the back

3  but had completed the information on the front?

4  A.   Their provisional ballot would not be counted, and they

5  would -- they would still not be registered.  They would not be

6  a registered voter in the State of Ohio.

7  Q.   So under the new laws has the standard for reviewing

8  provisional affirmation forms changed?  And what I mean by that

9  is so pre-2014, name, some form of I.D. and signature were

10 required.  Did those have to be correct?

11 A.   Yes, those had to be correct.

12 Q.   So if information was incorrect, the ballot would not be

13 counted?

14 A.   That's correct.

15 Q.   So the only changes were adding the two new fields of

16 date of birth and address, right?

17 A.   That's correct.

18 Q.   And I believe you mentioned this before but I just want

19 to verify, how have acceptance rates changed in Hamilton County

20 since 2014?

21 A.   The acceptance rates of provisional ballots have

22 increased.

23 Q.   And what is the most common reason for rejecting a

24 provisional ballot?

25 A.   That the voter is not registered.

1    Q.    And what does the current affirmation statement do for

2    that unregistered voter?

3    A.    It provides the Boards with more information about the

4    voter in order to identify the voter and identify that the

5    voter is a registered voter in the State of Ohio.

6    Q.    And if a voter -- or if an individual is not registered

7    but completes that provisional affirmation statement, what does

8    it do for that unregistered individual?

9    A.    Although their ballot for that election cannot be

10   counted, it then registers that voter for all future elections.

11   Q.    And why can it now act as a registration?

12   A.    Because it has all five items that are required of a

13   registration form.  It is a registration form.  It's also a

14   change of address form and a change of name form.

15   Q.    Was the previous form a registration form or a change of

16   address form?

17   A.    The previous provisional affirmation was not, no.

18   Q.    And I believe that you mentioned that non-registered

19   voters is the biggest reason that provisional ballots are

20   rejected.  Has Hamilton County registered any of those voters

21   that were rejected in 2014 or 2015?

22   A.    Yes.  Yes.  The provisional affirmation form registers

23   the voter.

24   Q.    And do you know how many?

25   A.    I did look at our records from November of 2015.  I

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 207 of 329 PAGEID #: 2064
Case: 2:06-cv-00896-ALM-TPK Doc #: 604 Filed: 04/06/18 Page: 207 of 329 PAGEID #: 30791

Vol. 10 - 207

1    believe there were approximately 256 voters whose provisional

2    ballots were not counted for the reason of not being registered

3    at the time they cast the ballot.  233, I believe, of those

4    were able to be registered from completing the provisional

5    affirmation, and approximately 60 of those then went on to cast

6    a regular ballot -- I'm sorry, this was from the November '14

7    election.  And then they were able to cast a regular ballot in

8    the November '15 election, approximately 60.

9    Q.    Thank you.

10        Now I would like to talk a little bit about absentee

11   voting.  But, first, how are provisional ballots different from

12   absentee ballots?

13   A.    Provisional ballots are cast by voters whose identity or

14   eligibility to vote is in question at the time they cast their

15   ballot.  That is not true of an absentee voter.

16   Q.    So an absentee voter is an eligible voter?

17   A.    Correct.

18   Q.    And what are the different ways that a voter in Hamilton

19   County can vote by absentee ballot?

20   A.    They can request a ballot by mail, or they can appear in

21   person at the Board's office.

22   Q.    And I know there's a lot of differences, but how

23   generally are those different -- are those methods different?

24   A.    Right.  Well, an absentee voter that requests a ballot

25   by mail fills out an application, typically, and mails it in to

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 208 of 329 PAGEID #: 2065
Case: 2:06-cv-00896-ALM-TPA Doc #: 664 Filed: 04/06/18 Page: 208 of 329 PAGEID #: 30792

Vol. 10 - 208

1    the Board.  However, they could drop off that application in

2    person requesting the ballot to be mailed to their house.  The

3    ballot is mailed.  It can be mailed to their residence address,

4    or it could be mailed to a different address.

5           For example, if the voter is out of the county or out of

6    the state during the election cycle, it can be sent to their

7    mail-to address.  The ballot is voted and then returned by

8    mail.

9           In-person voting the voter actually comes to the Board

10   of Elections, signs off, fills out an application, receives the

11   ballot, identification envelope, completes the identification

12   envelope, ballot, and drops it in the ballot box typically all

13   on the same visit at the same time at the Board.  However, if a

14   voter appears in person, requests a ballot and asks to take it

15   with them, they can -- they can do that.

16   Q.    So a voter can kind of mix and match the methods; is

17   that fair?

18   A.    Yes.

19   Q.    And what information is required on an absentee

20   identification envelope?

21   A.    The voter's name, date of birth, form of I.D., address

22   and signature.

23   Q.    And what changes have there been to those required

24   fields since 2014?

25   A.    The date of birth and the address were new since 2014.

1    Q.    And are those two new requirements helpful from an

2    elections administration standpoint?

3    A.    They are helpful, again, for similar reasons, that it

4    allows the Board of Elections to identify the voter.

5    Q.    And how does having more information help in identifying

6    the voter?

7    A.    Frequently -- well, we do have individuals who have the

8    same first and last name and same address, typically fathers

9    and sons living in the same household, junior/senior.

10        So if a senior requests an absentee ballot by mail, we

11    want to ensure that we're putting that on senior's record, not

12    junior's record.

13        If junior -- if we did put it on the wrong record and

14    then junior appeared to vote, he -- he would be required to

15    vote a provisional ballot because he would have been flagged as

16    voting absentee.  So the additional information, especially of

17    the date of birth, helps in junior/senior situations.

18    Q.    Has that junior/senior situation ever happened in

19    Hamilton County?

20    A.    Yes.

21    Q.    And have you ever had any concerns that the wrong voter

22    voted an absentee ballot that was returned to the Board?

23    A.    That someone other than the voter who requested it, yes.

24    Q.    And can you just kind of explain some instances where

25    that's happened?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 210 of 329 PAGEID #: 2067
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/20 Page: 210 of 329 PAGEID #: 36094

Vol. 10 - 210

```
 1      A.    We did.  We had an instance of a voter who requested an

 2   absentee ballot in the name of her granddaughter.  She used her

 3   granddaughter's name, her granddaughter's -- this was prior to

 4   2014.  She used her granddaughter's name, address, signed that

 5   to our elections officials.  Seemed similar -- the signature

 6   seemed similar to what we had on file.  And she had it mailed

 7   to her address, not to her granddaughter's address.  So after

 8   the election sometimes there's anomalies in elections where a

 9   voter will cast two ballots in one name, and so we researched

10   that to figure out why this anomaly happened.  And in this

11   particular instance when we contacted the granddaughter and

12   asked if she had voted both a provisional ballot and an

13   absentee ballot, she said that she did not vote absentee.  Her

14   grandmother had voted that, and that her grandmother did that

15   because she didn't think she would get up and go vote.  She was

16   an 18-year-old voter, and this was her first election; it was a

17   presidential.  But because her grandmother had voted her

18   absentee ballot, the granddaughter had to vote provisionally,

19   and that provisional ballot was not counted.

20      Q.    And who was that, I guess, the grandmother?

21      A.    The grandmother was Melowese Richardson.

22      Q.    Did Melowese Richardson vote any other absentee ballots?

23      A.    Yes.  She voted an absentee ballot in her own name, she

24   voted a regular ballot in her own name, and she cast three

25   additional absentee ballots in the names of other individuals.
```

1    Q.   And how many votes were counted in 2008 that Melowese

2    Richardson cast?

3    A.   I believe it was in 2012.

4    Q.   I'm sorry, 2012.

5    A.   Six.

6         THE COURT:  Ms. Poland, Ms. Richardson cast six

7    ballots in 2012?

8         THE WITNESS:  Yes.

9         THE COURT:  Was she prosecuted for it?

10        THE WITNESS:  She was.

11        THE COURT:  Now, prior to the enactment of either

12   Senate Bill 205 or Senate Bill 216, did Hamilton County conduct

13   any type of survey or analysis to determine the incidence of

14   voter fraud?

15        THE WITNESS:  We did not have a survey.  What we do

16   after --

17        THE COURT:  Let me change the word.  Did you conduct a

18   study?

19        THE WITNESS:  Yes.

20        THE COURT:  All right.  Tell me about the study.

21        THE WITNESS:  Yes.  After each election we look at any

22   anomalies that may have occurred, like an instance where -- and

23   the majority of time this is it, where a voter casts two

24   ballots and usually only one is counted.  Usually the

25   safeguards we have in place will catch more than one being

1    counted.  Sometimes it doesn't, as in the case of Melowese.

2    But we contact the voters.  We have a bipartisan team contact

3    the voters.  Sometimes it's a very legitimate reason.  Usually

4    the voter will put the -- cast the ballot by mail the day

5    before election day and then become concerned that it may not

6    reach us in time so then they'll go to their polling place and

7    vote provisionally.

8         But whenever we do have that occur after county-wide

9    elections, we have bipartisan election officials just look into

10   the matter.  And if there's something that rises to the level

11   where it could be fraud, we present it to our Board, and then

12   our Board, if they feel the need is there, they then refer to

13   the prosecutor's office.

14        THE COURT:  And my question was slightly different.

15   But you answered another question that I would have had, so I

16   appreciate your answer.  But what I'm trying to determine is

17   whether you conducted some type of scientific study to

18   determine the incidence of voter fraud in Hamilton County?

19        THE WITNESS:  No.

20        THE COURT:  Has that type of study ever been

21   undertaken in Hamilton County, to your knowledge?

22        THE WITNESS:  Not to my knowledge.

23        THE COURT:  And after each election, what you're

24   telling me is that your Board of Elections does an analysis of

25   the data to search for any anomalies, right?

1          THE WITNESS:  Correct.

2          THE COURT:  Some of those anomalies may bespeak voter

3    fraud, right?

4          THE WITNESS:  Yes.

5          THE COURT:  And some anomalies may suggest nothing,

6    right?

7          THE WITNESS:  Correct.

8          THE COURT:  And then some anomalies might mean that

9    you need to tweak your administrative system; is that right?

10          THE WITNESS:  That's correct.

11          THE COURT:  Now, for the 2012 presidential election,

12    you had more voters than you had had in the 2010 off-year

13    election, didn't you?

14          THE WITNESS:  Correct.

15          THE COURT:  What was the incidence of fraud that you

16    noted in the 2012 election?

17          THE WITNESS:  I don't have that answer.

18          THE COURT:  Do you recall how many instances of fraud

19    there were in -- that you were able to ascertain in the 2012

20    election?

21          THE WITNESS:  I recall three.

22          THE COURT:  Three.  And out of how many votes cast in

23    the 2012 election, approximately?

24          THE WITNESS:  We would have had over 400,000 ballots

25    cast.

Vol. 10 - 214

1          THE COURT:  Is that sort of what you get in

2   presidential election years, about that range, maybe somewhere

3   under 10 actual fraudulent votes cast?

4          THE WITNESS:  I think that's -- about a dozen would

5   probably be a fair statement.  About a dozen.

6          THE COURT:  Okay.  Now, do you have any predominantly

7   minority precincts in Hamilton County?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  And where would they be located,

10  what townships or cities?

11         THE WITNESS:  Sure.  In the Village of Lincoln Heights

12  and some precincts in the city of Cincinnati.

13         THE COURT:  Did you undertake a study to look at the

14  incidence of rejected provisional ballots, let's say, in the

15  Cincinnati precinct to which you just referred?

16         THE WITNESS:  No.

17         THE COURT:  Are there any precincts in Hamilton County

18  that are predominantly white?

19         THE WITNESS:  Yes.

20         THE COURT:  So that we can make it an apples-to-apples

21  comparison, and excuse this if this language comes out crude,

22  but are there any precincts which are as predominantly white as

23  the precinct that you referred to in Cincinnati is

24  predominantly black?  So let's say the precinct in Cincinnati

25  is 95 percent black.  Do you have a precinct elsewhere in

 1   Hamilton County that's 95 percent white?

 2           THE WITNESS:  I would think so.

 3           THE COURT:  Okay.  So you could do an apples-to-apples

 4   comparison of precincts within Hamilton County; is that right?

 5           THE WITNESS:  We may need outside data.  We do not

 6   track by race.

 7           THE COURT:  Okay.

 8           THE WITNESS:  So we would need to have other --

 9           THE COURT:  And I'm not asking you to track by race.

10   But what I'm saying is if the demographics of one of your

11   precincts is 95 percent African-American and the demographics

12   of one of your precincts is 95 percent white, you have the data

13   to do an apples-to-apples comparison of those two precincts,

14   don't you?

15           THE WITNESS:  Yes.

16           THE COURT:  And you could look at that predominantly

17   white precinct and tell me the rejection rate of provisional

18   ballots, right?

19           THE WITNESS:  Yes.

20           THE COURT:  And you could look at that

21   African-American precinct and tell me the rejection rate of

22   provisional ballots there too, couldn't you?

23           THE WITNESS:  Yes.

24           THE COURT:  All right.  But that was not done, was it?

25           THE WITNESS:  No.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1          THE COURT:  How difficult would it be to just pull the

2     raw data?  You see the number of provisional ballots, the

3     number rejected for Precinct A, let's call that the Cincinnati

4     precinct, and the number of provisional ballots cast and the

5     rejection rate for Precinct B, which is the predominantly white

6     precinct.  How much time would that involve?

7          THE WITNESS:  We -- we track the provisionals by -- by

8     precinct in our database so we would be able to pull up that

9     information.

10         THE COURT:  Okay.

11         THE WITNESS:  To pull up the number accepted, the

12    number rejected per precinct.

13         THE COURT:  So if I asked you to do that for these two

14    hypothetical precincts that we've been talking about, is it

15    something that you could bring to me tomorrow, for instance?

16         THE WITNESS:  Possibly.

17         THE COURT:  All right.  Okay.  I may ask you to do

18    that.

19         THE WITNESS:  Okay.

20         THE COURT:  But I'm going to allow Mr. Conover to

21    continue because I don't know what more information he may

22    adduce which may answer the question that I asked you.

23         Please continue with your examination, Mr. Conover.

24         MR. CONOVER:  Thank you, Your Honor.

25    BY MR. CONOVER:

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 217 of 329 PAGEID #: 2074
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/20 Page: 217 of 329 PAGEID #: 38744

Vol. 10 - 217

1    Q.    I just want to follow up on the Melowese Richardson

2   case, one question.  I believe you said that there were six

3   votes counted that Melowese Richardson cast?

4    A.    Correct.

5    Q.    Two questions.

6          Were the voters whose ballots she cast, were they able

7   to vote -- or were their ballots counted that they cast?

8    A.    I believe -- I believe that the only voter was the

9   granddaughter that I described before.  I think -- I believe

10   she was the only one who attempted to vote.  The other ballots,

11   there was one that she cast in her granddaughter's name and

12   then there were two she cast in her own name, and then the

13   other voters did not attempt to vote, to the best of my

14   recollection.

15    Q.    So the granddaughter attempted to vote but was -- her

16   vote did not count?

17    A.    It did not.

18    Q.    Were there any other instances of voter fraud in

19   Hamilton County in 2012?

20    A.    That I recall regarding absentee, we had a woman who

21   requested an absentee ballot, and she passed away before her

22   ballot was mailed to her.  Her ballot was mailed to her and it

23   was received by her husband, and her husband voted the ballot

24   and completed the identification envelope and mailed it back to

25   the Board of Elections and that ballot was counted.

1          We had a similar situation with a woman who had

2    requested an absentee ballot, passed away before the ballot was

3    received.  Her housemate/roommate received the ballot, voted

4    the ballot, filled out the envelope and mailed it in, and that

5    ballot was also counted.

6    Q.   Now, I would like to talk a little bit about the I.D.

7    envelope for absentee voting.  Does the Board prefill some of

8    the required information?

9    A.   For the absenteeism envelope, yes.  We preprint the

10   voter's name and address -- residential address on the

11   envelope.

12   Q.   How does the Hamilton County Board preprint that

13   information?  Or where might be a better question?

14   A.   It's a label that's placed in the spot where the voter

15   formerly, before this law was passed, would handwrite it in

16   themselves.

17   Q.   And why does the Board now do that?

18   A.   Per directive from the Secretary of State.

19   Q.   And then once the Board receives the absentee

20   identification envelopes, what happens if part of that

21   information is incorrect or missing?

22   A.   I'm sorry, could you repeat the question?

23   Q.   So when the Board receives the identification envelopes,

24   the absentee identification envelopes in the office, what

25   happens if some of that information on the I.D. envelope is

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1   either missing or incorrect?

2       A.    First we check the records of the Board to see if

3   perhaps we had a data entry error.  If what we have on file in

4   our system matches what the voter has previously supplied to

5   us, then we send the voter what's called an 11S form.  It's a

6   prescribed form from the Secretary of State's office where we

7   indicate what information was either missing or incorrect, and

8   that's mailed to the voter.

9       Q.    And so then the voter has an opportunity to cure that

10  absentee identification envelope?

11      A.    They do.

12      Q.    And what does the Board do to help the voter cure their

13  I.D. envelope?

14      A.    The voter can return the 11S by mail.  They can also

15  appear in person at the Board of Elections.  And we, again,

16  continually have our staff phone -- certain staff that are

17  dedicated to answer those types of questions from voters if

18  they have a question regarding why they received the 11S form,

19  that sort of thing.

20      Q.    And if a voter were to call in, could they verbally

21  correct their absentee identification envelope over the

22  telephone?

23      A.    No.  They have to complete the form.

24      Q.    And what information is the voter given when they

25  receive that absentee identification envelope?

1    A.   There's an instruction sheet that we include with the

2    ballot.  It instructs the voter to fill out the absentee

3    envelope.  It also instructs the voter how to mark the ballots.

4    And we also put postage -- the amount of the postage that's due

5    in order for the voter to return the ballot.

6    Q.   And how can a voter track the status of their absentee

7    ballot?

8    A.   They can track two ways.  One, they can call the Board

9    of Elections, and we can -- staff can look up their information

10   and let them know if we've received their application.  They

11   can also track online.  We have a feature on our website called

12   Track My Absentee Ballot.  And if they put in their identifying

13   information into the website, it will let them know if their

14   application has been received, if it was accepted, if their

15   ballot has been mailed to them, if the ballot has been returned

16   and accepted by the Board.  Or it also will let them know if

17   there was something wrong with their absentee ballot and if

18   further action needs to be taken.

19   Q.   Okay.  Thank you.

20        I'd now like to show you what's been marked as

21   Plaintiffs' Exhibit 444.  And what is this document,

22   Ms. Poland?

23   A.   This is Hamilton County's official certification for

24   provisional ballots from the November 4, 2014, general

25   election.

1    Q.    And is this something that you all keep in the ordinary

2   course of business?

3    A.    We do.  It's a form that's required by the Secretary of

4   State's office.

5    Q.    And for 2014 how many provisional ballots were counted

6   in full?

7    A.    Counted in full?  4288.

8    Q.    And how many were rejected?

9    A.    523.

10    Q.    And what was the most common reason for rejecting a

11   provisional ballot in 2014?

12    A.    Voter not registered in the state.

13    Q.    Thank you.

14         MR. CONOVER:  At this time, Your Honor, I would like

15   to move Plaintiffs' Exhibit 444 into evidence.

16         THE COURT:  Any objection, Ms. Gentry?

17         MS. GENTRY:  No objection.

18         THE COURT:  Exhibit 444 will be received.

19   BY MR. CONOVER:

20    Q.    And, Ms. Poland, this has been marked as Plaintiffs'

21   Exhibit 445.  What is this document?

22    A.    This is Hamilton County's official certification for

23   provisional ballots from the November 3, 2015, general

24   election.

25    Q.    And how many provisional ballots were counted in full?

1    A.    Counted in full?  11,543.

2    Q.    And how many were rejected?

3    A.    666.

4          I'm sorry, that's the number of not registered.  The

5    total number rejected is 1034.

6    Q.    How many were rejected for not being registered in the

7    State of Ohio?

8    A.    666.

9    Q.    What was the most common reason for rejection in 2015?

10   A.    Not registered in the State.

11         MR. CONOVER:  At this time, Your Honor, I would like

12   to move Plaintiffs' Exhibit 445 into evidence.

13         THE COURT:  Any objection?

14         MS. GENTRY:  No objection.

15         THE COURT:  445 will be received, Mr. Conover.

16         MR. CONOVER:  Thank you, Your Honor.

17   BY MR. CONOVER:

18   Q.    Ms. Poland, what is this form?

19   A.    This is Hamilton County's official certification for

20   absentee ballots from the November 4, 2014, election.

21         MR. CONOVER:  And this has been previously marked as

22   Plaintiffs' Exhibit 446.

23   BY MR. CONOVER:

24   Q.    Looking at Section B of this form, how many absentee

25   ballots were counted in 2014?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 223 of 329 PAGEID #: 2080
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 223 of 329 PAGEID #: 30747

Vol. 10 - 223

```
 1      A.    Submitted for counting, 54,581.

 2      Q.    And how many were rejected?

 3      A.    962.

 4      Q.    And then looking at Section 3, what was the most common

 5   reason for rejecting an absentee ballot in 2014?

 6      A.    That would be Section C?

 7      Q.    Yes.

 8      A.    The most common reason is the ballot was not received on

 9   time.

10      Q.    And how many were rejected for that reason in 2014?

11      A.    719.

12            MR. CONOVER:  At this time, Your Honor, I would like

13   to move Plaintiffs' Exhibit 446 into evidence.

14            THE COURT:  Any objection?

15            MS. GENTRY:  No objection, Your Honor.

16            THE COURT:  446 will be received.

17   BY MR. CONOVER:

18      Q.    Finally, Ms. Poland, this has been previously marked as

19   Plaintiffs' Exhibit 447.  What is this form?

20      A.    This is Hamilton County's official certification for

21   absentee ballots from the November 3, 2015, general election.

22      Q.    In Section B, how many absentee ballots were counted in

23   2015?

24      A.    19,490.

25      Q.    And how many were rejected?
```

Vol. 10 - 224

1    A.    643.

2    Q.    And then what was the most common reason for rejecting

3    an absentee ballot in 2015?

4    A.    Ballot was not received on time.

5    Q.    And how many were rejected for that reason?

6    A.    541.

7          MR. CONOVER:  At this time I would like to move

8    Plaintiffs' Exhibit 447 into evidence.

9          THE COURT:  Any objection?

10         MS. GENTRY:  No objection.

11         THE COURT:   447 will be received.

12         MR. CONOVER:  Thank you, Your Honor.

13   BY MR. CONOVER:

14   Q.    Ms. Poland, I would like to briefly talk about the

15   petition process in Hamilton County.  Can you just generally

16   describe how petitions work in Hamilton County?

17   A.    Sure.  We receive petitions both from candidates to be

18   placed on the ballot, as well as for, more specifically,

19   usually statewide questions or issues.

20         When those petitions are received, we have -- elections

21   officials will research every -- every signature on the

22   petition to see if we can identify the voter through the voter

23   registration system to ensure that the voter is a registered

24   voter in Hamilton County and at the address supplied on the

25   petition.

Vol. 10 – 225

1    Q.    And what information is provided on those petitions?

2    A.    The voter's signature and address is required.

3  Sometimes the signers will also print their name, but it's only

4  required that they sign and provide an address.

5    Q.    And how does the Board identify those individuals?

6    A.    We attempt to identify by address.  Many times it's very

7  difficult to read signatures.  We do our best to try to attempt

8  to identify the voter through their name and through the

9  address.

10   Q.    And you say attempt.  Is it sometimes difficult to

11 identify the voter?

12   A.    It is difficult to identify voters by just a signature

13 and an address.

14   Q.    And do the petition committees compensate for that

15 difficulty?

16   A.    They do.  Typically --

17         MS. GENTRY:  Objection.  Hearsay, lack of foundation.

18         THE COURT:  Well, you mean to "they do"?

19         MS. GENTRY:  I'm sorry.  To the question, Your Honor.

20         THE COURT:  I don't think so.  I think that this

21 witness is in a position to testify as to what the petition

22 committees do.  The petition committees report to you, don't

23 they?

24         THE WITNESS:  They file their petitions with us, with

25 the Board of Elections.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    THE COURT:  All right.  Overruled.

2    You may answer.

3    THE WITNESS:  Typically, what we see from committees

4  that are circulating petitions is that they will obtain double

5  the number of required signatures needed.  For example, if they

6  need a hundred signatures to be placed on the ballot, they will

7  actually collect 200 signatures because during the signature

8  verification process, it typically runs anywhere from 50 to

9  70 percent valid.  Valid meaning the Board of Elections is able

10  to identify the voter as a registered voter and that the

11  voter's at the address on the petition so that we do not have

12  high acceptance rates on petitions.

13  BY MR. CONOVER:

14   Q.    Next I would like to talk a little bit about electronic

15  poll books.  First, does Hamilton County have multi-precinct

16  voting locations?

17   A.    Yes, we do.

18   Q.    And does Hamilton County use E-Poll books?

19   A.    Yes, we do.

20   Q.    And how long have you had E-Poll books?

21   A.    We first implemented E-Poll books in August, a special

22  small election in August 2014.  Had our first countywide in

23  November 2015 and then, again, they were just used this past

24  March 2016 election.

25   Q.    And do those E-Poll books consolidate the poll books in

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 227 of 329 PAGEID #: 2084
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/16 Page: 227 of 329 PAGEID #: 36791

Vol. 10 - 227

1    each location?

2      A.    They do.  The E-Poll books have all voters in the county

3    contained in each E-Poll book, which is different than the

4    previous paper poll books.

5      Q.    And can you just describe the process for when a voter

6    walks in to a multi-precinct voting location, how they might

7    interact with the electronic poll book?

8      A.    Right.  It's changed with the implementation of the

9    E-Poll book.  There's not separate tables set up for the

10   separate precincts.

11        With the E-Poll book we're able to have any voter, no

12   matter what precinct they belong to as long as they're at the

13   right location, come to any table to check in.  So it's helped

14   speed things up in the voting process.

15        On the paper signature poll books the average time to

16   check in was approximately 3 minutes.  With the E-Poll book

17   it's approximately 1 minute so it's a quicker check-in.

18        The voter announces their name and address to the poll

19   worker and provides a form of I.D. to the poll worker.  If it's

20   a driver's license or a State of Ohio identification card, then

21   that can be scanned in order to locate the voter in the E-Poll

22   book.  If they do not provide that type of I.D. or for some

23   reason their license won't scan, they can do a manual look-up

24   where we advise them to enter the first few letters of the

25   voter's last name along with their house number.  And then if

Vol. 10 - 228

1    that doesn't bring them up, the second step is the first few

2    letters of the voter's last name and their year of birth.

3       Q.   And what happens if the voter is at the wrong polling

4    location?

5       A.   If they're at the wrong polling location, the E-Poll

6    books have -- will display a Google map screen on the E-Poll

7    book that can be flipped to show the voter so it shows the

8    voter a Google map of where their correct polling location is.

9    It also has the capability to text or e-mail the voter if they

10   would like the polling place information sent to their cell

11   phone.

12      Q.   And what impact has this had on wrong polling location

13   voters in Hamilton County?

14      A.   Although the system is still relatively new, we still --

15   we are seeing a decrease in the number of wrong precinct

16   ballots cast in Hamilton County.

17      Q.   And prior to arriving at an incorrect polling location,

18   how can a voter obtain information on actually going to the

19   correct polling location?

20      A.   Right.  From our website we have a button very

21   prominently displayed on our website called Where Do I Vote so

22   the voter simply clicks on that button, puts in their address

23   and can find out their polling location that way.  They can

24   also call the Board of Elections for that information.  And in

25   presidential years we -- the Hamilton County Board of Elections

1    sends an election day postcard to every registered voter in the

2    county that has their polling location information on it.

3      Q.    And what benefits, if any, have electronic poll books

4    had for voters?

5      A.    Several.  One, again, is the quicker check-in time by

6    being able to have a voter check in at any table.  In the past

7    you might have a long line at Precinct A and no line at

8    Precinct B, but the voters couldn't go over to Precinct B and

9    the poll workers from Precinct B couldn't assist because

10   everything was precinct specific.  So now that we have the

11   electronic poll books, all poll workers work together at the

12   location as one big team to process the voters more

13   efficiently.

14          In addition to it being a quicker check-in process, it's

15   a more accurate check-in process.  If the voter moves and has

16   not updated their address with the Board of Elections, in the

17   past poll workers would have to flip through pages and pages of

18   street -- a street index that has ranges, and many times it's

19   broken down to odd or even streets because precinct lines run

20   down the middle of streets so they would have to decipher the

21   correct location, correct precinct for the voter.  But with the

22   E-Poll book, the poll worker simply types in the voter's

23   address, and the poll book deciphers that for the poll worker

24   and displays the correct precinct in the correct location.

25   And, again, that screen can be flipped to then show the voter

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 230 of 329 PAGEID #: 2087
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 230 of 329 PAGEID #: 36794

Vol. 10 - 230

1  and also can be texted or e-mailed to the voter.

2  Q.  I would like to talk a little bit about the

3  post-election procedures at the Board.  When the polls close on

4  election day at 7:30, what happens at the Board of Elections?

5  A.  Yes.  There's many things going on election night.  Once

6  the polls close 7:31 we begin to tabulate all the absentee

7  ballots.  They are prepped and scanned and prepared for

8  tabulation prior to the polls closing, but we do not hit

9  tabulate until the polls close at 7:31.  We also, I believe I

10  mentioned earlier, have 116 troubleshooters in the field.  They

11  stay out in the field to assist the poll workers with their

12  closing duties.  There's many things the poll workers have to

13  do in the locations.  They have to shut down all of the voting

14  equipment, they have to do ballot accounting, they have to

15  inventory, make sure they're packing up everything correctly.

16  There's chain of custody forms, seals, that kind of thing.

17      So while that's happening out in the field, we have our

18  troubleshooters roving to assist the poll workers if they need

19  help.  We staff our help desk that is taking calls from the

20  poll workers if they need help shutting down.  We also hire an

21  additional approximately 200 people.  We have 25 drop-off

22  locations throughout Hamilton County, and they're manned by

23  bipartisan election officials to receive the ballots and memory

24  cards from the poll workers.  They drop them off at those

25  locations.  Then also have additional staff at the Board

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 231 of 329 PAGEID #: 2088
Case: 2:06-cv-03386-ALM-TPK Doc #: 664-8 Filed: 04/06/07 Page: 233 of 329 PAGEID #: 36799

Vol. 10 - 231

1    office that are waiting for the memory cards and ballots to

2    come down so bipartisan election officials can inspect those

3    materials and then tabulate the ballots and initiate our

4    final -- our unofficial results for the night.  There's also

5    logic and accuracy testing that's conducted both prior and

6    after every count.

7        Q.   And so then election night ends at some point.  In the

8    days following the election, what is happening at the Board?

9        A.   Right.  In the days following, many times the two or

10   three weeks after an election day is just as busy or sometimes

11   maybe even busier than the two or three weeks leading up to

12   election day.  We have the provisional verification process

13   that we talked about previously.  We also still have absentee

14   ballots that are being returned.  Absentee ballots that are

15   returned within the 10 days after election day but postmarked

16   by the day before election day can be counted.  And UOCAVA

17   ballots, our civilians and military overseas have 10 days to

18   return their ballots as well, and they do not need to have a

19   postmark on them for their ballots to be returned and counted.

20   We have thousands of pieces of voting equipment that are out at

21   about 400 polling locations so all of that equipment needs to

22   be retrieved, returned to our Board -- our Board of Elections

23   warehouse where the data is backed up and all the equipment is

24   inspected.  We have close to 400 supply boxes that need to be

25   inspected.  The ballot bags are inspected to ensure that there

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 232 of 329 PAGEID #: 2089
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/08/16 Page: 232 of 329 PAGEID #: 30798

Vol. 10 - 232

 1   wasn't a provisional ballot left in a ballot bag election

 2   night.  So everything is inspected.

 3        There's ballot accounting.  We have 2700 -- well, close

 4   to 3000 with all the additional workers that we hire to pay so

 5   that's a big process in making sure all of those individuals

 6   are paid and paid timely if we want them to come back and work

 7   for us again.

 8        So there's many processes that are occurring, and I'm

 9   sure there's more that I'm forgetting right now.

10   Q.   What does it mean to remake a ballot?

11   A.   Yes.  There's a provision in Ohio law to remake a

12   ballot.  That may happen for several reasons that a ballot

13   needs to be remade.  It could be because the ballot is damaged

14   in some way, perhaps it was torn or ripped and cannot be fed

15   through the scanner.  So a bipartisan team remakes the ballot,

16   and the way that's conducted is one election official will

17   stamp the original ballot with a stamp that says original, and

18   then we'll print a new ballot for that voter's precinct and

19   stamp the word remake on it.  We then have corresponding

20   numbers.  For example, if this would be an absentee ballot, the

21   first ballot would be A-1, and so an A-1 is placed on the

22   remade ballot and A-1 is placed on the original ballot.  It's

23   also logged.  It's logged in a book that records the number and

24   the reason of the remake, but it's not associated with the

25   voter.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 233 of 329 PAGEID #: 2090
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/08/20 Page: 233 of 329 PAGEID #: 36797

Vol. 10 - 233

1    Once the ballot is removed from the envelope, there's no

2   way to match the ballot back up to the voter so that we keep

3   the secrecy of the vote.  And so then one bipartisan election

4   official reads while the other election official votes --

5   records the new ballot.  They then switch and double check to

6   make sure that they read correctly and recorded correctly, and

7   then those are presented to our Board in a public session by

8   similarly situated ballots.  For example, there may be those

9   that were damaged that maybe is the cause for the remake, or it

10  could be a UOCAVA voter who requested to receive their ballot

11  electronically; in that case an overseas voter military or

12  civilian, and we e-mail the ballot to them.  But when they

13  print it they're printing it on regular paper, not ballot

14  paper; it won't go through the scanner so when they mail it

15  back to us, we then have to remake it on official ballot paper.

16     So the ballots are presented to the Board, and they

17  ultimately approve the remade ballot.

18   Q.   Does that remaking of ballots, does it present any

19  issues?

20   A.    Yes.  As I explained, it's a tedious process going

21  through that.  We -- depending on the type of elections, we

22  could have hundreds and hundreds of remakes both in absentee

23  and from the precinct from election day, and all of that has to

24  be presented to the Board and done at the same time as all

25  these other functions.

Vol. 10 – 234

1    Q.   I would like to talk a little bit about voter history,

2    but can you just briefly explain what is voter history?  Or

3    voter credit, maybe, is the better word.

4    A.   Voter credit, right.

5         Voter credit is basically flagging the voter's record in

6    the voter registration database indicating that the voter has

7    cast a ballot in that election.

8    Q.   And how does the Board process or give voter credit?

9    A.   Voter credit?

10        Now because of the electronic poll book, we are able to

11   electronically upload that information into our voter

12   registration system; although, we do also still provide the

13   paper signature poll books to the polling places just in case

14   there would be a problem with the electronic version, we have

15   the paper as a backup.

16        So Board of Elections staff has to go through every

17   paper signature poll book even though it may not have been

18   used, but just to ensure that it wasn't used.  And if it was

19   and a voter did sign in the paper poll book, then credit would

20   be issued that way.

21   Q.   Can a voter receive credit even if their ballot is not

22   counted?

23   A.   Yes.  Per Secretary of State directive, the only time a

24   voter would not receive credit for casting a ballot would be if

25   the voter was not registered or if, I believe, if an absentee

Vol. 10 - 235

1  ballot was returned after the deadline, credit is not received.

2  Q.    And why can credit be given but the ballot not

3  necessarily be counted?

4  A.    In issuing the voter credit, for example, for a voter

5  that we -- I mean, obviously, those that are not registered,

6  they're not given voter credit.

7       For other voters, we may not be able to confirm their

8  identity enough to issue -- to count the ballot, but it's our

9  best guess as far as awarding credit.

10      So I -- there's a difference between giving credit that

11  allows someone's registration status to stay active than

12  counting a ballot.

13  Q.    Now, I would like to talk just a little bit about when

14  the Board -- the Board of Elections' review and final vote in

15  the official canvas.  When the Board staff finalizes kind of

16  processing the provisional and absentee ballots, what is given

17  to the Board?

18  A.    The envelopes are not given to the Board.  We give a

19  summary recommendation to the Board by category of similar

20  ballots.  For example, the staff recommends 5000 provisional

21  ballots be accepted, the staff recommends 400 ballots be

22  rejected due to the voter not being registered.  So we just

23  present the different categories with the numbers to the Board,

24  but we do have the envelopes available in case the Board would

25  request to review the envelopes.

```
1    Q.    And does the Board ever request to review the envelopes?
2    A.    They do.
3    Q.    And who ultimately makes the decision to accept or
4  reject those ballots?
5    A.    The Board.
6    Q.    And I believe you said that the staff makes
7  recommendations on kind of batches of --
8    A.    Yes.
9    Q.    -- ballots?
10         Does the Board typically accept those recommendations?
11   A.    They do typically accept the staff's recommendation,
12  yes.
13   Q.    And do you as a staff member try to find ways to reject
14  ballots?
15   A.    Absolutely not.
16   Q.    And then just a few questions in closing.
17         Have you begun planning for the 2016 general election?
18   A.    Yes.
19   Q.    And what have you done?
20   A.    Yes.  We've set our budget for the 2016 election.  We
21  have begun lining up our seasonal staff members to join us.  We
22  have set our schedules.  We have projects ongoing that we've
23  started to help recruit poll workers, Our Youth At The Booth
24  Program, our Partners In Democracy Program.  All of that is
25  gearing up for the presidential election.  We also are -- will
```

                                                        Vol. 10 - 237

 1   be conducting site visits to all of our polling locations to

 2   ensure ADA compliance, and we're working with the Secretary of

 3   State's office on that project.

 4        So we have numerous projects that we've begun to prepare

 5   for the November election, even though we're still working on,

 6   actually, the primary right now.

 7   Q.   And what would changes to elections laws at this point

 8   of the year mean for your election administrative planning for

 9   2016 general?

10           MS. GENTRY:  Objection.

11           THE COURT:  Basis?

12           MS. GENTRY:  Vague.

13           THE COURT:  Overruled.

14        You may answer if you understand, Ms. Poland.

15           THE WITNESS:  Yes.  It's been my experience that we

16   always try to do as little change as possible in a presidential

17   year.  It's our biggest election.  Our turnout in this past

18   March election was 42 percent.  We were a little over

19   40 percent this past November.  We'll see 70 to 80 percent

20   turnout.  We're going to double what we typically do, and it's

21   been my experience -- this will be my fourth presidential --

22   that you never want to implement something new in a

23   presidential election.

24           MR. CONOVER:  Just a moment to confer, Your Honor?

25           THE COURT:  Yes.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    MR. CONOVER:  No further questions.

2    THE COURT:  Okay.

3    MS. GENTRY:  Your Honor, I approximately have about

4  two hours.

5    THE COURT:  How many more witnesses do you have

6  tomorrow, Ms. Richardson?

7    MS. RICHARDSON:  We have two witnesses tomorrow,

8  Your Honor.

9    THE COURT:  And how long do you anticipate they will

10  be?

11    MS. RICHARDSON:  It depends on the cross.  As we

12  mentioned earlier today, Matt Damschroder is a witness both for

13  the Defense and for --

14    THE COURT:  But you're going to call him in your case

15  in chief, and they can cross-examine.  I was -- I was

16  baffled -- sidebar.

17                          - - -

18    Thereupon, the following proceeding was held at sidebar out

19  of the hearing of the open courtroom:

20    THE COURT:  So here's my concern.  You're going to

21  call Mr. Damschroder in your case in chief?

22    MS. RICHARDSON:  That's right.

23    THE COURT:  I couldn't figure out, Mr. Chandra, why

24  you were going to hold your case open to call Mr. Damschroder

25  in your case in chief because either way you're going to

1   cross-examine him.  And so, you know, I'm -- I mean, now it may

2   be that you're concerned that Ms. Richardson will go into areas

3   that are not of concern to you and you wanted to go in certain

4   other areas in your case in chief, and so you wanted your cross

5   to be able to focus on those areas.

6           MR. CHANDRA:  Plus, in case for some reason they

7   decided strategically not to call him, then we're left holding

8   the bag.

9           THE COURT:  Well, here's what we're going to do.  I'm

10  going to get a commitment from Ms. Richardson up or down

11  whether she's going to call him and, as a matter of

12  superintendence, I'm going to give you the opportunity to

13  cross-examine him, you know, first within the scope of her

14  direct, but if you can indicate to me why you need to go into

15  this other area in light of my, you know, admonition that you

16  should just close your case and we can proceed in the defense

17  case, I can give you leeway to go into the areas that you deem

18  warranted for Mr. Damschroder.  Because I've done that before

19  on -- in cases where you called an adverse party or an adverse

20  witness in your case in chief but the witness was from out of

21  town so I will let you do yours, and then I will let the

22  Defense examine the witness to the extent that they would have

23  examined the witness had they called that witness in the

24  Defense case-in-chief just so that the witness won't have to

25  come back a week later.  Let's say the witness was in New York.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 240 of 329 PAGEID #: 2007
Case: 2:20-cv-03843-MLM-IPA Doc #: 66-4 Filed: 04/06/16 Page: 240 of 329 PAGEID #: 38784

Vol. 10 - 240

 1    So I can do that again with Mr. Damschroder, and so, you know,

 2    he doesn't -- he won't have to come back.  He can be here for

 3    one examination only, you could rest.  Then you can come back

 4    and, you know, do whatever you're going to do in your rebuttal

 5    case.

 6         Now, is Mr. Damschroder definitely coming tomorrow?

 7         MS. RICHARDSON:  He is coming tomorrow.  We do have

 8    another witness who -- Ken Terry who is coming in.  He's

 9    actually retiring this week so it's my understanding that

10    tomorrow morning is his only availability.  If at all possible,

11    maybe if -- I have not checked with Ms. Poland to see if she

12    could --

13         MR. CONOVER:  I do not know her availability.  I know

14    there was concerns with administering this election that this

15    may be the only time so I haven't talked to her about coming

16    back.

17         MS. RICHARDSON:  Our plan previously when we assumed

18    we would get through Ms. Poland today was to start with

19    Mr. Terry tomorrow morning, and then Mr. Damschroder will begin

20    immediately after.

21         THE COURT:  We can finish her tonight.

22         MS. GENTRY:  Your Honor, may I just say we also listed

23    Ms. Poland as a witness in our case in chief, and so we have

24    the same understanding that they're calling her so we only put

25    her on once, but I may have questions that go beyond

1    Mr. Conover's direct?

2              THE COURT:  Yes.  But -- okay.  That's fine.

3              MR. CHANDRA:  One second, Your Honor.  I want to make

4    sure I didn't get confused by the procedure that you're then

5    stating about tomorrow.

6              THE COURT:  I'm going to clarify it.

7         We're going to finish Ms. Poland tonight.  In the

8    morning Mr. Terry is going to be put on.  We're going to do

9    Mr. Terry, and then Mr. Damschroder is going to be put on.  And

10   she's going to call Mr. Damschroder in her case and you are

11   going to get to cross-examine him, but you're going to

12   cross-examine him for this case and for whatever you wanted to

13   call him for yourself.  He's going to have one

14   cross-examination then one direct then any recross and

15   redirect.

16             MR. CHANDRA:  That was essentially our plan so thank

17   you.

18        (Back in open court.)

19             THE COURT:  Go ahead, Ms. Gentry.

20             MS. GENTRY:  Ms. Poland, I apologize in advance.  My

21   questions are going to jump around a bit because I'm both

22   asking you follow-up questions for Mr. Conover and asking you

23   other questions that I had.  So I'll try not to repeat myself,

24   and I'll try to move quickly.

25             I want to begin with -- well, Your Honor, we have

1   reached a stipulation on exhibits to admit, if I can read that

2   into the record.

3           THE COURT:  Absolutely, you may.

4           MS. GENTRY:  Thank you, Your Honor.

5       We have agreed to stipulate to the admission of

6   Plaintiffs' Exhibits 444 through 454.

7           THE COURT:  Okay.

8           MS. GENTRY:  2092 through 2357, and 7039 through 7044.

9           MR. CONOVER:  That's right, Your Honor.

10          THE COURT:  All right.

11          MS. GENTRY:  Thank you, Your Honor.

12          THE COURT:  Well, then 444 through 454, 2092 through

13  2357 and 7039 through 7044 will all be received pursuant to

14  stipulation.

15          MS. GENTRY:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MS. GENTRY:

18    Q.   Ms. Poland, I want to show you what's been marked as

19  Plaintiffs' Exhibit 7044, and this is from the documents that

20  you e-mailed to us approximately a week ago.

21    A.   Okay.

22    Q.   And I want to show you a particular voter registration

23  form.  All right.  Do you recognize this type of voter

24  registration form?

25    A.   I believe this is an older -- an older form that perhaps

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 243 of 329 PAGEID #: 2100
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 243 of 329 PAGEID #: 36109

Vol. 10 - 243

```
 1    was used prior to my work at the Board of Elections.

 2        Q.   Okay.  You began in what year?

 3        A.   I began in 2004.  This seems to be a different format

 4    than what we normally have.

 5        Q.   It appears that this one was signed in 2012.

 6        A.   It's a different format than what we normally see.

 7        Q.   But this is one of the records -- voter records that you

 8    produced in this litigation?

 9        A.   Yes.  It's a record from the Board of Elections, yes.

10        Q.   Right.  And do you see that there's a category for race

11    or ethnic group?

12        A.   I do see that.

13        Q.   Does the Hamilton County Board of Elections keep that

14    information regarding race or ethnic group in its database?

15        A.   No.

16        Q.   Do you know why not?

17        A.   It's been the practice long before I was with the Board

18    we do not track by gender or race.

19        Q.   Do you have an understanding as to why that is?

20        A.   I would think that gender or race doesn't -- it doesn't

21    have any bearing on administrating elections.  There would be

22    no reason to track that.

23        Q.   One of the incidents you talked about in your testimony

24    was a poll worker who voted, I think you said, six times, the

25    Melowese Richardson.  Do you recall that?
```

Vol. 10 - 244

1     A.   Yes.

2     Q.   All right.  Was Mrs. Richardson a poll worker with the

3    Hamilton County Board of Elections?

4     A.   Yes, she was.

5     Q.   Is she still a poll worker?

6     A.   No.

7     Q.   And would you expect that she would know her

8    granddaughter's birthday?

9     A.   Yes.

10    Q.   Now, I want to turn to the issue of -- I'm sorry.  I'm

11   going to get my notes in order here.

12         You testified earlier that adding the address

13   requirement to the provisional ballot form prevents ballots

14   from being rejected for being voted in the wrong precinct.  Do

15   you recall that?

16    A.   Yes.

17    Q.   Is it your testimony that before 2014, the Hamilton

18   County Board of Elections rejected provisional ballots if there

19   was no address written on them?

20    A.   If the address -- if the voter voted in a precinct that

21   was not tied to their address that was on file with the Board

22   of Elections, then we would have to reject the ballot for being

23   in the wrong location because the only record we have of where

24   the voter lives is on our voter registration database.

25    Q.   Now, just to make sure I'm correct about this, both

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 245 of 329 PAGEID #: 2102
Case: 2:06-cv-03896-ALM-TPA Doc #: 664-8 Filed: 04/06/18 Page: 245 of 329 PAGEID #: 36103

Vol. 10 - 245

1  before 2014 and after 2014, when a provisional voter appeared

2  at the polls to vote, they would verbally tell their address to

3  the poll worker, right?

4      A.   They verbally tell the address to the poll worker, but

5  that doesn't get the information to the bipartisan teams at the

6  Board.

7      Q.   Please just answer my questions, and then you'll see

8  where I'm going with this.

9          So they would verbally tell their address to the poll

10  worker, correct?

11     A.   Correct.

12     Q.   And based on what they said, the poll worker would make

13  sure they gave them the correct ballot for the precinct, right?

14     A.   That's correct.

15     Q.   And it was the poll worker's responsibility to make sure

16  that they are getting the right precinct ballot to that

17  provisional voter, correct?

18     A.   It is the poll worker's responsibility, correct.

19     Q.   The voter would have no information about which precinct

20  they should be voting in, correct?

21     A.   No, that's not correct.  The voter is supplied

22  information with the precinct they should be voting in.

23     Q.   Even if they've moved and haven't updated their address?

24     A.   They can obtain that information from our website or

25  from calling the Board of Elections.  We do list their precinct

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 246 of 329 PAGEID #: 2103
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/15 Page: 246 of 329 PAGEID #: 36190

Vol. 10 - 246

 1   information on our website.

 2     Q.   But you list the information based on the address that

 3   you have in your database, correct?

 4     A.   No.  Or the voter can type in their new address.  That's

 5   the point of putting it on our website, so that they can type

 6   in their new address and find out their new precinct and their

 7   new polling location information.

 8     Q.   Okay.  So a voter who has taken the initiative to go on

 9   your website and put in their new address might know what

10   precinct they're in; is that what you're saying?

11     A.   Yes.

12     Q.   But a voter who has not gone on your website to do that

13   and simply shows up to vote and says that they have a new

14   address relies on the poll worker to give them the correct

15   precinct ballot, correct?

16     A.   That's correct.

17     Q.   And it's your testimony that if the voter didn't write

18   down that address -- even before 2014, if they didn't write

19   down the address on their form, their new address, then the

20   vote would be rejected?

21     A.   That's correct.  Because it's up to the Board to count

22   the ballot, and we would have no way of knowing where the voter

23   was living.

24     Q.   All right.  Ms. Poland, I'm showing you what's been

25   previously marked as Plaintiffs' Exhibit 1501.  And do you

Vol. 10 - 247

1   recognize this as the prior provisional ballot affirmation form

2   that was in effect before 2014?

3       A.   I believe so, yes.

4       Q.   All right.  And do you see in the top box there are

5   three required -- I'm sorry, yes -- no, that's correct.  Three

6   required pieces of information that the voter must provide:

7   Full name, identification and a signature, correct?

8       A.   That's correct.

9       Q.   There's no place in that box for the voter to write an

10  address, is there?

11      A.   No.  It was on the back of the envelope.  This is the

12  front.  It was on the back.

13      Q.   And next to the box it says that this is the mandatory

14  information required for your ballot to count; is that correct?

15      A.   That's correct.

16      Q.   Now, you said on the back there was a place -- let me

17  show that to you.  Is this the back of the provisional ballot

18  affirmation form as it existed before 2014?

19      A.   Yes, it is.

20      Q.   All right.  And this would be filled out by a voter who

21  had a change of address or a change of name?

22      A.   Correct.

23      Q.   And do you see up at the top it says failure to complete

24  this form will not cause your provisional ballot to be

25  rejected?

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 248 of 329 PAGEID #: 2105
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-1 Filed: 04/06/16 Page: 248 of 329 PAGEID #: 36172

Vol. 10 - 248

1    A.   That's correct, yes.

2    Q.   But it's your testimony that the Hamilton County Board

3    of Elections did reject ballots if voters didn't put down their

4    address on the back of this form?

5    A.   If they voted at a polling location that did not

6    correspond to the address that was on file with the Board of

7    Elections, that's correct, because we would have no way to

8    confirm they cast the ballot in the correct precinct.

9    Q.   Now, no directive required the Board to reject ballots

10   in that circumstance, did it?

11   A.   The directive requires the Board to confirm that the

12   voter voted in the correct precinct.

13   Q.   You're saying a specific directive prior to 2014

14   required votes to be rejected if the voter had moved and failed

15   to write their address down on the form that tells them they

16   don't need to write their address down?

17   A.   The directive required the Board of Elections to confirm

18   the voter's address and that the voter cast the ballot in the

19   correct precinct.

20   Q.   Didn't the poll worker confirm that when they handed

21   them the ballot after being told their address?

22   A.   We are required -- the Board of Elections is required to

23   confirm that.

24   Q.   And did the Board of Elections direct its poll workers

25   to write the address down so that the Board could later confirm

Case: 2:20-cv-03843-MHW-KAJ Doc#: 41-8 Filed: 09/12/20 Page: 249 of 329 PAGEID #: 2106
Case: 2:20-cv-03843-MLM-KAJ Doc#: 064-8 Filed: 04/06/19 Page: 249 of 329 PAGEID #: 3670

Vol. 10 - 249

1   it?

2     A.    No.  It was the voter's responsibility to write the

3   address down.

4     Q.    But the voter wasn't told it was their responsibility,

5   were they?

6     A.    That's why we've received more voters -- that's why this

7   new law has led to more votes being counted.  It was confusing

8   on this form that says that you don't have to provide your

9   address.  What the voters didn't know was that if they do

10  provide their address, then that will help the Board of

11  Elections in confirming that they corrected -- voted their

12  ballot in the correct precinct.  So I believe that the

13  confusion you're explaining on this form is why we are

14  receiving the information we now need that has led to more

15  ballots being accepted.

16    Q.    So as I understand your testimony, it's important to

17  have the address in the mandatory section because Hamilton

18  County was already rejecting ballots if they didn't have the

19  address down.

20    A.    I believe that the directive in the State of Ohio was

21  that Boards of Elections must confirm that the voter received

22  the correct ballot.  If the voter moved, we don't know where

23  they moved to if we don't have it on the affirmation form.

24    Q.    Could you please answer the question that I asked?

25    A.    I thought I did.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 250 of 329 PAGEID #: 2107
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 250 of 329 PAGEID #: 36104

Vol. 10 – 250

```
 1            MS. GENTRY:  Your Honor?

 2            THE COURT:  Read it back, please, Ms. Coulter.

 3        (Question read back.)

 4    BY MS. GENTRY:

 5      Q.   Is that correct?

 6      A.   We weren't rejecting ballots if they didn't have the

 7    address.  If they voted in the precinct that corresponds to the

 8    address that's on file with the Board of Elections, their

 9    ballot was not rejected.

10      Q.   Let me rephrase my question.

11            Isn't it correct that Hamilton County was rejecting

12    ballots because the voter didn't write down a new address that

13    was in a different precinct even though the form --

14            MR. CONOVER:  Objection.  Sorry.

15            THE COURT:  Let her finish the question.  Go ahead.

16            MS. GENTRY:  Thank you.

17    BY MS. GENTRY:

18      Q.   Even though the form told the voter that that

19    information was optional?

20            MR. CONOVER:  Objection, Your Honor.

21            THE COURT:  Basis?

22            MR. CONOVER:  Asked and answered and mischaracterizes

23    testimony.

24            THE COURT:  Overruled.

25            You may answer, Ms. Poland.
```

```
 1           MR. CONOVER:  Thank you, Your Honor.

 2           THE WITNESS:  I'm sorry, could you repeat the

 3    question?

 4           MS. GENTRY:  Could you please read it back?

 5       (Question read back.)

 6           THE WITNESS:  Hamilton County rejected a ballot if the

 7    voter did not provide an updated address in order for the Board

 8    to confirm that the ballot was cast in the correct precinct.

 9    BY MS. GENTRY:

10      Q.   So the answer to my question is, yes, it did that even

11    though the form told the voter that the information was

12    optional.

13           MR. CONOVER:  Objection, Your Honor.

14           THE COURT:  Overruled.

15           MR. CONOVER:  Thank you, Your Honor.

16           THE COURT:  You may answer.

17           THE WITNESS:  If the voter moved, had a change of

18    address and moved into a new precinct and did not update and

19    did not tell the Board, inform the Board where they were moving

20    to, we rejected the ballot per Secretary of State directives.

21    BY MS. GENTRY:

22      Q.   Even though the voter was told that the information was

23    optional, correct?

24      A.   If the voter moved, we needed that information in order

25    to count the ballot, that's correct.
```

1    MS. GENTRY:  Your Honor, could you direct the witness

2  to answer my question?

3         THE COURT:  The question was even though the voter was

4  told that the information was optional, correct?

5         THE WITNESS:  Yes, the form does state that failure to

6  complete this form will not cause your provisional ballot to be

7  rejected.

8         MS. GENTRY:  Thank you, Your Honor.

9  BY MS. GENTRY:

10    Q.   Ms. Poland, did you advise the Secretary of State's

11  office that Hamilton County was rejecting provisional ballots

12  prior to 2014 because the voter did not write down a new

13  address?

14    A.   I believe we did have conversations with the Secretary

15  of State's office, and we were instructed to presume that the

16  voter was still living at the address that was maintained on

17  our voter registration database if we did not receive an

18  updated address from the voter.

19    Q.   Who at the Secretary of State's office did you have

20  those conversations with?

21    A.   I don't recall.

22    Q.   Do you know if Mr. Damschroder was involved in any of

23  those conversations?

24    A.   I don't recall.

25    Q.   Do you know if any other Boards of Elections adopted the

1    same approach as Hamilton County and disenfranchised

2    provisional voters who did not write down their new address?

3              MR. CONOVER:  Objection, Your Honor.

4              THE COURT:  Basis?

5              MR. CONOVER:  Calls for speculation.

6              THE COURT:  Overruled.

7         You may answer, if you can, Ms. Poland.

8              THE WITNESS:  I don't know what other Boards of

9    Elections did.

10   BY MS. GENTRY:

11     Q.   Has this issue ever been discussed, to your knowledge,

12   at any conferences held by the Secretary of State?

13     A.   I don't know.  I don't know.

14     Q.   So is it fair to say that the reason -- or one reason

15   that the number of wrong precinct provisional rejections has

16   gone down in Hamilton County is because these types of

17   ballots -- strike that.

18          Is it fair to say that one reason why the number of

19   wrong precinct rejections has gone down in Hamilton County

20   after the change in the law is because prior to the change in

21   the law, Hamilton County was rejecting ballots where the

22   address was not written down, and after the change in the law

23   the address is now more likely to be written down because the

24   voter knows it's mandatory?

25     A.   I'm sorry, I don't know how to answer that.  Could you

Vol. 10 - 254

1  repeat the question?

2   Q.   All right.  Let me try to break it up.

3       Before the change in the law, Hamilton County was

4  rejecting provisional ballots where the voter had moved but

5  didn't write down the address, correct?

6   A.   Correct.  If we could not confirm their address, they

7  were rejected.

8   Q.   And prior to the change in the law, the voter did not

9  know that Hamilton County made that information mandatory,

10 correct?

11  A.   Ohio law makes that information mandatory in order to

12 confirm their address.

13  Q.   But the form told the voter that the information was

14 optional, correct?

15  A.   It said that -- I don't believe it said optional.  I

16 believe it said failure to fill out this form --

17  Q.   Let me refresh your recollection.  What does the form

18 say?

19  A.   Failure to complete this form will not cause your

20 provisional ballot to be rejected.

21  Q.   And that was not true.

22  A.   Not for voters who had a change of address.

23  Q.   And after the change in the law, voters are now notified

24 that they're required to write down their address.

25  A.   That's -- that's correct.

1    Q.    All right.   And because of that change, because voters

2    now know they need to write down their address, wouldn't you

3    agree that that's one reason why the rejection rate for

4    provisional ballots in the wrong precinct dropped in Hamilton

5    County after the 2014 election?

6    A.    Yes.   That we're now receiving the address, that's

7    correct.

8    Q.    Was any notice given to provisional voters who voted in

9    the wrong precinct that their ballot had been rejected?

10    A.    Voters are given a hotline form that they can call to

11    find out if their ballot was accepted or rejected.

12    Q.    And that would require the voter to take the initiative

13    to ask the question, correct?

14    A.    Yes.

15    Q.    Was any notice provided by the Board of Elections

16    affirmatively to the voter who voted provisionally and whose

17    ballot was rejected to let them know that their vote didn't

18    count?

19    A.    No.   It's up to the voter to contact the Board.

20    Q.    And that's been true before and after 2014, correct?

21    A.    That's correct.

22    Q.    All right.   You testified about by adding dates of birth

23    to the registration form Boards of Elections can more easily

24    confirm the voter's identity and, therefore, count the ballot.

25          Do you recall that?

1    A.    Yes.

2    Q.    Now, you'll recall I just showed you the prior

3    provisional ballot affirmation form, and it did not require

4    date of birth, correct?

5    A.    That's correct.

6    Q.    But you were able to identify provisional voters before

7    the change in the law in 2014, correct?

8    A.    Correct.  But that rate has increased since the voters

9    are now providing their date of birth.

10   Q.    Are you tracking data that shows that you previously

11   rejected voters before 2014 because you couldn't identify them?

12   A.    They fall under the category of not registered.  If we

13   can't confirm the identity and we can't confirm that they're

14   registered, it would fall under the category of not registered.

15   Q.    So is it your testimony that some of the voters who are

16   in the not registered category might actually be registered,

17   but you just don't know?

18   A.    We could not confirm that they were registered, no.

19   It's the example of having 300 and something individuals with

20   the same first and last name in the statewide database.  If we

21   would have had their date of birth, we might have been able to

22   identify them.

23   Q.    But I suppose it goes without saying that you don't know

24   how many not registered voters actually were registered

25   because, at the end of the day, it was your belief they were

1   all not registered, correct?

2      A.   I'm sorry, can you repeat that?

3      Q.   You said that you track how many voters you could not

4   identify before 2014 because they're in the not registered

5   category, correct?

6      A.   Those voters that we could not identify.  There may be

7   300 John Smiths and one of those could be the John Smith that

8   filled out this affirmation, but without additional information

9   we cannot confirm that, and they would have been rejected for

10  not being registered because we could not confirm that they

11  were registered.

12     Q.   And because you couldn't find them at all, you don't

13  know if they were registered or not; is that correct?

14     A.   No.

15     Q.   It's not correct or it is --

16     A.   Sorry.  No, we could not -- we could not find them.

17     Q.   So you don't know how many voters you might have been

18  able to find if only you had more pieces of information,

19  correct?

20     A.   Correct.

21     Q.   And is it your belief that Hamilton County rejected

22  ballots from registered voters prior to 2014 and then put them

23  in the not registered category?

24     A.   We were not able to confirm -- they may have been

25  registered, but we were not able to confirm their identity and,

1  therefore, had to reject.

2  Q.  So you have no basis for drawing any sort of conclusion

3  one way or the other; isn't that right?

4  A.  Through my experience and the experience of our staff, I

5  know that the bipartisan staff in Hamilton County were happy

6  when date of births were made part of the affirmation statement

7  because they would see, as you saw before, hundreds of voters

8  that are listed in the statewide database and it's like if we

9  just had one more piece of information, if we had their date of

10  birth, we could confirm who they were.  So, you know, it

11  ultimately leads to more ballots being counted.

12  Q.  Ms. Poland, I'm going to show you what has been marked

13  as Plaintiffs' Exhibit 7043.

14  A.  Uh-huh.

15  Q.  These are the Hamilton County provisional envelope

16  verification procedures that were in use in the November 2014

17  election; is that correct?

18  A.  Correct.

19  Q.  All right.  And this outlines the procedure that one of

20  your staff would follow to identify a voter who cast a

21  provisional ballot; is that right?

22  A.  Correct.

23  Q.  And these are the procedures that went into effect after

24  the change in the law, right?

25  A.  Correct.

1    Q.   All right.  I want to call your attention to the initial

2    verification process.  Can you just read that highlighted part

3    in step 2 to me -- or number 2?

4    A.   Locate voter.  Search for voter using name or voter

5    code, if available.  If unable to locate voter, enter as little

6    information as possible and use wild card key to broaden the

7    search.

8    Q.   All right.  Let me break that up a little bit.  So this

9    is a person who sits down to find a provisional voter, has in

10   front of them the new provisional ballot affirmation form that

11   has all five fields of information, correct?

12   A.   Correct.

13   Q.   And the instruction is that they should initially search

14   for the voter using their name, correct?

15   A.   Correct.  Or voter code.

16   Q.   What is the voter code?

17   A.   It's the unique identifier that is assigned to each

18   voter in Hamilton County.

19   Q.   And how would the provisional -- the person reviewing

20   the provisional ballots know what a person's voter code is by

21   looking at their form?

22   A.   That pertains to voters who cast their provisional

23   ballots in person at the Board of Elections because their

24   information has been retrieved from the voter registration

25   database and their voter code recorded on the affirmation -- on

Vol. 10 - 260

1   the envelope.

2       Q.   All right.  Is that a barcode?

3       A.   No, it's a handwritten number.

4       Q.   All right.  And when you say handwritten number, you

5   mean someone at the Board of Elections' office actually writes

6   that number onto the provisional ballot affirmation form?

7       A.   Onto a label, right.

8       Q.   And then the label is affixed to the form?

9       A.   Correct.

10      Q.   Is it handwritten on the label, or is it computer

11  printed?

12      A.   No, it's handwritten.

13      Q.   And they do that based on a review of the voter

14  registration database?

15      A.   Correct.

16      Q.   So there's no risk that a person who votes provisionally

17  at the Board of Elections' office is going to be rejected

18  because they can't be identified; is that fair to say?

19      A.   No.

20      Q.   Why not?

21      A.   Because if someone appears at the Board of Elections to

22  vote a provisional ballot, they may not be registered and, in

23  that case, they wouldn't record the voter code number.  But no

24  voter is turned away.  You are still provided a provisional

25  ballot.

1    Q.   Okay.  So that's a fair point.  It needs to be a

2    registered voter, correct?

3    A.   Correct.

4    Q.   But if you find that the voter is a registered and

5    eligible voter, you put their voter code on the provisional

6    ballot if it's cast at the Board of Elections' office.

7    A.   Correct.

8    Q.   That same procedure is not used at the polling place; is

9    that right?

10   A.   No.  The polling place doesn't have access to that

11   information.

12   Q.   Now, they do have access to the E-Poll book you

13   mentioned, right?

14   A.   They do.

15   Q.   And wouldn't that also contain the voter's I.D. code?

16   A.   The E-Poll books do have the voter code.

17   Q.   All right.

18   A.   Correct.

19   Q.   So the same procedure could be used at the precinct

20   location, could it not?

21   A.   No.  There's other identifying information that we have

22   in the voter registration database at the Board office that is

23   not in the E-Poll book.

24   Q.   What is that information?

25   A.   Driver's license number, social security numbers, and

Vol. 10 - 262

1    just the change history of the voter's records.  So the Board

2    has a lot more access in the Board office to data for the voter

3    than the poll workers do.

4       Q.   Are you saying that in order to identify a voter at the

5    precinct location, the poll worker needs to have access to the

6    driver's license and social security number and all those other

7    things that you mentioned?

8       A.   No.  I'm explaining the difference between what's

9    available to the workers at our office in comparison to those

10   at the polling location.

11      Q.   Okay.  But for many provisional voters who are

12   registered, say those who have been required to vote

13   provisionally because they requested an absentee ballot but

14   didn't return it, that's a large category of voters, is it not?

15      A.   Correct.

16      Q.   And those people will be in the E-Poll book, correct?

17      A.   They will, yes.

18      Q.   And they will have a voter code associated with them in

19   the E-Poll book?

20      A.   They do.

21      Q.   All right.  And so it would be a simple matter to write

22   that down, would it not?

23      A.   Yes, they could record the voter code.

24      Q.   But currently under your procedures, they don't?

25      A.   No.  And they don't because it -- it's not the poll

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    worker's -- it's up to the Board to confirm that information.

2          For example, in what I described before, if you have a

3    junior and senior, same first name, same last name, same

4    address and senior requests an absentee ballot.  If we don't

5    have enough -- the date of birth, it's mistakenly put on the

6    junior's, when the junior goes to the polling place to vote,

7    he's going to be flagged as voting provisionally.

8          Well, the poll workers don't have access to the absentee

9    requests -- the absentee module and when the absentee was

10   requested in order to research so that's determined by the

11   Board staff who has access to the full voter registration

12   database, not the poll workers.

13   Q.    Are you suggesting that poll workers can't ever identify

14   provisional voters?

15   A.    No.  I'm saying that the determination -- to make the

16   recommendation on which provisional ballot should be counted is

17   a function of the Board because the Board staff has all the

18   records.

19   Q.    And, Ms. Poland, I'm not asking about that.  I want to

20   make sure my questions are very clear so that you can -- you

21   can answer what I'm asking.

22   A.    Uh-huh.

23   Q.    I'm simply asking whether or not a poll worker who

24   identifies a voter who is in the E-Poll book could write down

25   the voter I.D. code?

Vol. 10 - 264

1    A.   They could.

2    Q.   All right.  Thank you.

3         Now, turning back to this exhibit, so the initial search

4    to determine whether or not, let's say, I think Daniel -- was

5    it Daniel Bell who was the voter who was used in your example

6    that you did a search on, Ms. Poland?

7    A.   Yes.

8    Q.   Let's say you searched for a Daniel Bell and you put in

9    his name or his voter code.  Let's say you get all of the

10   results that you mentioned.  What -- strike that.

11        First of all, are you searching in Hamilton County's

12   database at this point?

13   A.   At this point it would be Hamilton County's.

14   Q.   All right.  So you'll get some number of Daniel Bells,

15   right?

16   A.   Yes.

17   Q.   And at that point can you -- is it possible that you

18   could identify the voter?

19   A.   It could be the information that's displayed when you

20   have the list of voters is the voter's date of birth and --

21   Q.   Signature?

22   A.   No, not immediately.  No, not when you have the list.

23   When you have -- so if you have multiple Daniel Bells, it's the

24   voter's name, the voter's address that's on file with the Board

25   of Elections, and their date of birth.

1   Q.   What about a social security number?

2   A.   I don't believe that that's in the initial search list.

3   I don't believe.

4   Q.   All right.  So poll workers can't find a person by their

5   social security number?

6   A.   Okay.  I'm sorry, you are now referring to poll workers,

7   but I thought you were going through --

8   Q.   I'm sorry, I do mean Board staff, whoever does this.

9   A.   Okay.  Could you repeat the question?

10   Q.   You are saying Board staff could not locate voters by

11   their social security number?

12   A.   No, no.  I'm saying in that initial search result that

13   pops up, there's a list of -- of voters.  And so initially what

14   pops up in the list is the voter's first, last name, address

15   that's on file with the Board, and a date of birth.  I don't

16   believe that the form of I.D. pops up.

17        So then the Board staff would have to click on each one

18   of those voters in order to bring up more information about the

19   voter.

20   Q.   And based on these instructions, it appears that you can

21   identify voters by using their name or their voter code.

22   A.   No.  That's just to get to the initial list.

23   Q.   But that's -- that's -- the instruction is to start

24   there, correct?

25   A.   To start, right.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 266 of 329 PAGEID #: 2123
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 266 of 329 PAGEID #: 30730

Vol. 10 - 266

1    Q.   Yes.  And then it says if unable to locate voter, enter

2    as little information as possible and use wild card key to

3    broaden the search.  What does that mean?

4    A.   If the voter cannot -- or, I'm sorry.  If the staff at

5    the Board of Elections cannot locate the voter, we have wild

6    card keys.  So you would just enter less and less information

7    trying to get, you know, something to pop up that you might be

8    able to get a match on.

9    Q.   So, for example, with Daniel Bell, you might enter Dan

10   Bell?  Is that an example?

11   A.   It's an example.  But more comes into play when it's

12   someone who has a unique name versus a common name.  Common

13   name, you're going to get multiple, multiple listings.

14   Q.   There's nothing in these instructions about searching by

15   date of birth, is there?

16   A.   There's not, but it's my experience that our staff does.

17   Q.   But it's not written in the instructions that you wrote

18   for the 2014 election, correct?

19   A.   No.  These -- these are guidelines.  They do not contain

20   every step of the process, every keystroke of the process.

21   Q.   So you're saying -- are your staff required to search by

22   date of birth even though it's not written in the guidelines?

23   A.   Our staff is required to search for the voter as -- with

24   all the information that's available to them.

25   Q.   But it doesn't say that in this guideline, though, does

1    it?

2       A.   No.  It doesn't have every keystroke that the individual

3    should make in this document, no.

4       Q.   All right.  Do you verbally give your staff those

5    instructions, but you just don't write them down to check the

6    date of birth?

7       A.   We have the staff members review this document, and then

8    we also give verbal instructions.  And the staff that process

9    the provisionals are staff that are experienced with our voter

10   registration system and experienced in conducting voter

11   queries.

12      Q.   So just -- I just want to make sure the record is clear.

13   Even though the guidelines say to search for voter using name

14   or voter code, and that's all it says, you're saying that they

15   should also search by other pieces of information.

16      A.   Our staff will search with all the information that's

17   provided on the affirmation statement, yes.

18      Q.   Now, you previously said, however, they cannot search by

19   social security number.  Isn't that what you said?

20      A.   No.  I said that the social security number doesn't pop

21   up in the listing of the search results when you first do a

22   query.  I believe it's just the name, address and date of birth.

23   I don't believe it's the social.  But I -- I didn't say they

24   couldn't search on a social.

25      Q.   And I don't want to beat a dead horse here so I'm going

Vol. 10 - 268

1   to move on, but isn't it fair to say that prior to 2014, you

2   were able to find voters using a search of their name?

3       A.   We could find voters with that name in the system.  We

4   cannot confirm identity by simply a name.

5       Q.   Okay.  Well, let's go to the next step which is Step 3.

6   You confirm the identity with a signature; isn't that right?

7   Do you see that highlighted portion?

8       A.   That's right.  That's one of the steps.

9       Q.   In fact, that's the next step.  After you search for the

10  voter by name, you confirm their identity by signature; isn't

11  that right?

12      A.   There is -- the way that the module works, when you have

13  your list of voters -- when you have your list of voters, as

14  soon as you click on a voter, the first box that comes up is

15  their signature in order to confirm a signature match.

16      Q.   And that's traditionally been a way of confirming the

17  identity of voters, wouldn't you agree?

18      A.   Signature matches have been, yes.

19      Q.   All right.  And at this point after you have confirmed

20  the signature match, you've identified the voter, correct?

21      A.   Not necessarily, no.

22      Q.   So you can confirm that the signature matches and still

23  be in doubt?

24      A.   Well, it's part of something that has to do with our

25  module.  They can't move past the process.  So when the -- when

1    you click on the voter's name, the screen is populated with

2    information.  But what then pops up is this outer box that has

3    the voter's signature in it.  And you can't see the other

4    information on the screen until you get past the signature box.

5    So you have to say okay before you can then see the voter's

6    date of birth, social security number, driver's license number,

7    that sort of thing.  So it's just -- it's a step in the module.

8    Q.   Well, let's look at these steps in the module that you

9    have written in your guidelines.  After the signature match is

10   selected okay in number 3, then you select the election and the

11   year in number 4; is that correct?

12   A.   Right.  We do have the note in here that if the

13   signature was missing or doesn't match, it must still be

14   selected as a provisional voter before it can be rejected.  And

15   that describes the process I said before, in order to move

16   through the process, they have to select okay.

17   Q.   And my question was about step number 4, Ms. Poland.  Is

18   that correct, the next step in your guidelines is to select the

19   election and the date, correct?

20   A.   Yes.

21   Q.   And then in number 5 they select the reason for voting

22   provisionally, correct?

23   A.   Correct.

24   Q.   And then in number 6 you click add and record the

25   P-number on the envelope, correct?  And at this point you have

1    identified the voter; isn't that right?

2       A.   No.

3       Q.   So at this point you're still in doubt as to who the

4    voter is?

5       A.   Right.  They're still going through the verification

6    process.

7       Q.   All right.  Just so I'm clear, even if you've matched

8    the signature, you still consider yourself to be in doubt?

9       A.   As I pointed out before, we're not saying for sure that

10   you've matched the signature.  In order to get to the rest of

11   the screen, you have to click okay, confirm signature just to

12   move past that.  It's -- it's something with our software

13   system.

14      Q.   And before you had the date of birth available to you,

15   was the signature enough to confirm the identity of the voter?

16      A.   Not always, no.

17      Q.   For some of them was it enough?

18      A.   We still had to -- there wasn't only the signature that

19   you matched.  You also had a form of I.D.

20      Q.   And I understand that you're going to check to confirm

21   that everything is filled out perfectly and correct.  I

22   understand that.  I'm talking about a different issue which is

23   just confirming the identity of the voter.

24           Is it your testimony that if you match the signature,

25   that's not enough to confirm the identity of a voter?

1  A.   The confirming the identity is met once this whole

2  process is completed.

3  Q.   All right.  But you didn't answer my question.

4       Is it your testimony that matching the signature is not

5  enough to confirm a voter's identity?

6  A.   No.  It's not enough, no.  We would complete the

7  process.  We go through the entire process.

8  Q.   And you're aware that prior to 2006 signatures were

9  considered to be enough to verify a person's identity?  Are you

10 aware of that?

11 A.   As far as provisional verification?

12 Q.   As far as a ballot being cast.

13 A.   I don't recall what the provisional guidelines were

14 prior to 2006.

15 Q.   And this was before provisional ballots even.

16      I'm just talking about identifying the voter.  Is it not

17 true that historically you can identify voters by matching

18 their signature?

19 A.   For certain purposes, yes, you can identify voters by

20 matching their signature.

21 Q.   Well, if you identify them, you can identify them for

22 all purposes, can't you?

23 A.   There's certain information that's required depending on

24 what is occurring in the election process.

25 Q.   Okay.  And I understand that you might be thinking about

1    what the law requires, and right now I'm not asking you about

2    the five fields that the law requires.  I'm just asking about

3    identifying the voter by signature.

4         Historically you could identify voters by signature,

5    true?

6              MR. CONOVER:  Objection, Your Honor.

7              THE COURT:  Basis?

8              MR. CONOVER:  Asked and answered.

9              THE COURT:  Overruled.

10             MR. CONOVER:  Thank you.

11             THE WITNESS:  Identify the voter for what purpose?

12   BY MS. GENTRY:

13   Q.   To make sure they are who they say they are.

14   A.   For purposes of signing a petition or for purposes of

15   registering to vote?  I guess I'm just --

16   Q.   Just to confirm that the person is who they say they

17   are.  Not -- just so you know that the person who shows up to

18   vote is the same person who registered to vote.  A signature is

19   the traditional way of doing that, right?

20   A.   We'd need more than just a signature to confirm a

21   voter's identity.

22   Q.   Okay.  Let's look at the next part of the guideline.

23        So the first part was just entering the provisionals

24   into the module.  Do you see that?  And then after you've done

25   that, then you determine the validity of the ballot, correct?

Vol. 10 – 273

1    A.    Correct.

2    Q.    And at this point you've established the identity of the

3    voter, haven't you?

4    A.    No.  The identity of the voter is not established until

5    you complete the process.

6    Q.    Now, this doesn't say that this part of the guidelines

7    is to determine the identity, does it?

8    A.    It's to determine the validity.

9    Q.    Correct.  And validity and identity are not the same

10   thing necessarily, are they?

11   A.    No.

12   Q.    All right.  So to determine the validity of the ballot

13   after you've matched the signature, now you look at the five

14   fields to see if they're complete and correct; is that right?

15   A.    I'm sorry.

16   Q.    By the five fields, I mean name, signature, date of

17   birth, address and identification.

18   A.    Right.  I missed the first part of your question.

19   Q.    I'm sorry.

20         After you have confirmed that the signature matches,

21   then you look to see whether the five fields that I described

22   are completely and correctly filled out.  That's what your

23   guidelines provide, right?

24   A.    I don't believe that we're confirming the signature at

25   the first point.  I've explained that before that we say okay

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 274 of 329 PAGEID #: 2131
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 274 of 329 PAGEID #: 36793

Vol. 10 - 274

1   to get past the signature box so that we can get to the other

2   information.  It's -- it's a soft -- our software.  We have to

3   select okay for signature match just in order to remove the box

4   so we can look at the other identifying information on the

5   voter's screen.

6       Q.   Okay.  So because your software does not distinguish

7   between a matching signature and a non-matching signature, are

8   you saying that portion of your review is meaningless?

9       A.   It's a way to enter the information into our provisional

10  module, right.  We're continuing the review throughout the

11  process.

12      Q.   So even though the guidelines suggest that you confirm

13  the signature at this point, you're saying you don't; is that

14  right?

15      A.   No, that's not what -- I don't believe that that's what

16  this says.  We -- we explain -- and I read it before, once you

17  highlight and accept voter, the signature confirmation box

18  containing the voter's signature will appear.  Confirm

19  signature match, select okay.  Even if the signature was

20  missing or doesn't match, it must still be selected as a

21  provisional voter before it can be rejected.

22          We have to go through that process in order to move on.

23  We're still verifying the person's identity.

24      Q.   Now, previously Mr. Conover showed you the statistics

25  for the 2014 election on provisional ballots.  Do you recall

1    that?

2     A.    Yes.

3     Q.    All right.  And there's a category for how many ballots

4    were rejected because the signature didn't match; is that

5    right?  Do you see it here, non-matching signature on

6    provisional envelope?

7     A.    Yes.

8     Q.    Zero ballots were rejected?

9     A.    In that particular election, correct.

10    Q.    All right.  So can we assume in 2014 when you went

11   through this process, that there were no ballots that were

12   flagged as having a non-matching signature?

13    A.    That's correct.

14    Q.    Okay.  So at this part of the process in 2014 you, in

15   fact, were -- or not you -- your staff was confirming the

16   signature match, correct?

17    A.    They confirm the signature match but not at this part

18   during the process.  It's -- it's -- you have to take the

19   process as a whole.  And as you go through this, that's one of

20   the steps that the -- that the staff is doing.  They have the

21   ability in the provisional module.  They pull up show

22   signature, and it brings the signature up again for the

23   bipartisan teams to compare the signature on the screen, what's

24   on file with what is on the envelope.  And, in fact, I believe

25   it's -- if you look at the label, it's one of the later steps,

Case: 2:20-cv-03843-MHW-TPK Doc #: 41-8 Filed: 09/12/20 Page: 276 of 329 PAGEID #: 2133
Case: 2:06-cv-00896-ALM-TPK Doc #: 664-8 Filed: 04/06/18 Page: 276 of 329 PAGEID #: 30350

Vol. 10 - 276

```
 1    I believe.
 2      Q.   Ms. Poland, I understand that they might look at the
 3    signature again later in the process, but isn't it true that
 4    your guidelines provide that almost right away in the process
 5    they look to match the signature?
 6      A.   They've not confirmed the signature at the beginning of
 7    the process.
 8      Q.   That's not what these guidelines say.
 9      A.   I disagree.  That is what it says.  This is in order to
10    move past the okay box so that we can see the voter's social
11    security number and the voter's date of birth or their address.
12      Q.   All right.  Let's move on.
13           Now, you also talked about voter credit.  Do you recall
14    that?
15      A.   Yes.
16      Q.   And you said that voter credit will only be given to
17    voters -- well, no, I'm sorry, strike that.  I'm thinking of a
18    different issue.
19           Isn't it true that voter credit is only given to voters
20    who have been determined to be eligible voters?
21      A.   No.
22      Q.   That's not true?
23           All right.  I'm going to show you what has been
24    previously marked --
25           MS. GENTRY:  Sorry, Your Honor, I've mislaid it.  May
```

 1    I have a moment to retrieve it?

 2            THE COURT:  Please.

 3   BY MS. GENTRY:

 4      Q.    I'm going to show you what's been previously marked as

 5   Plaintiffs' Exhibit P23.  And do you recognize this document?

 6      A.    Yes.  This is from -- this is the Secretary of State's

 7   Ohio Election Official Manual.

 8      Q.    And is it your understanding the Ohio Election Official

 9   Manual has essentially taken the place of directives?

10      A.    Yes.

11      Q.    All right.  So in this case Chapter 8 of the manual is

12   the same as Directive 2015-30?

13      A.    Yes.

14      Q.    And in -- as -- in your position as director of the

15   Hamilton County Board of Elections, you're familiar with the

16   contents of this directive?

17      A.    Yes.  Although, I have not reviewed this portion

18   recently.

19      Q.    I'm going to turn to page 8-30, and this is the

20   directive regarding voter history.  This portion of the

21   directive that I've highlighted states that for purposes of

22   assigning voter history, a voter's records should be marked as

23   having voted in an election only if any of the following are

24   true.

25            Do you see that?

```
 1      A.   Yes.

 2      Q.   And one possibility -- let me take the last bullet point

 3   first -- is that the voter is an eligible elector of the State

 4   of Ohio and casts a provisional ballot regardless of whether

 5   the ballot was eligible to be counted.

 6           Do you see that?

 7      A.   I do.

 8      Q.   So a provisional voter will only get credit for voting

 9   if they've been determined to be an eligible voter; isn't that

10   right?

11      A.   Yes, that's what this says.

12      Q.   And this is the directive that you follow in your

13   responsibilities as director?

14      A.   Yes.

15      Q.   Then moving up a bullet point, this refers to absentee

16   voters.  And you testified that an absentee voter who returns

17   their ballot late will not get credit; is that correct?

18           MR. CONOVER:  Objection, Your Honor.

19           THE COURT:  Basis?

20           MR. CONOVER:  Mischaracterizes her previous testimony.

21           THE COURT:  Overruled.

22        You may answer, Ms. Poland.

23           THE WITNESS:  Could you repeat the question?

24   BY MS. GENTRY:

25      Q.   Sure.
```

1    I believe you testified that absentee voters who return

2 their ballot late after the deadline do not get credit for

3 voting.  Is my memory correct of your testimony?

4   A.   I believe that's what I said.

5   Q.   Yes.  And this confirms what you said on that point,

6 right?

7   A.   Yes.

8   Q.   And an absentee voter who timely returned the ballot

9 should get credit regardless of whether the ballot was eligible

10 to be counted, correct?

11  A.   An absentee voter who timely returned their ballot is

12 given credit regardless of whether or not it was eligible to be

13 counted.

14  Q.   And would you agree that an absentee voter who returns a

15 ballot must be an eligible voter, correct?  That's the only

16 reason they were given a ballot in the first place, right?

17  A.   Correct.

18  Q.   Okay.  So having looked at this directive from the

19 Secretary of State, would you agree with me that voters will

20 only get credit if they are determined to be eligible voters in

21 the State of Ohio?

22  A.   Correct.

23  Q.   And would you also agree with me that voters who are

24 eligible voters in the State of Ohio can get credit for voting

25 even if their vote is not counted?

```
 1     A.   Voters can get credit, yes, even if their vote is not

 2     counted.

 3     Q.   Thank you.

 4          I want to ask you now about E-Poll books.  And you

 5     testified that E-Poll books have all the voters in the county

 6     in them; is that right?

 7     A.   All registered voters, correct.

 8     Q.   All right.  And you testified that even if a person

 9     shows up in the wrong location, they can be now identified and

10     directed to the correct location; is that right?

11     A.   Correct.

12     Q.   And I believe you said that has resulted in fewer wrong

13     precinct votes?

14     A.   We're starting to see a decline.  It's relatively still

15     new.

16     Q.   In what election did you start to see that decline?

17     A.   Between -- it was just this past March election and

18     compared to November.

19     Q.   All right.  So I take it from your earlier testimony

20     that poll workers now have to tell a voter if they're in the

21     wrong location; is that correct?

22     A.   Poll workers have always been instructed to determine --

23     to direct the voter to their correct location.

24     Q.   Even if they're in the wrong polling location, they've

25     been required to do that?
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 281 of 329 PAGEID #: 2138
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 281 of 329 PAGEID #: 38599

Vol. 10 - 281

```
 1       A.   If they're in the wrong -- I'm sorry.

 2       Q.   If they're in the wrong building, they're still required

 3   to tell the voter where to go?

 4       A.   If they're in the wrong -- if they're in the wrong

 5   precinct of a correct location.

 6       Q.   Then are they're required if they're in the correct

 7   location?

 8       A.   Correct.

 9       Q.   But, historically, poll workers in Hamilton County have

10   not been required to tell voters that they're in the wrong

11   location; isn't that true?

12       A.   No.  If a voter appears -- the poll workers are trained

13   that if a voter appears in a polling location and they announce

14   their address and that address does not match what's on file,

15   in their E-Poll book they are to enter their new address into

16   the E-Poll book and provide the voter with their new location.

17       Q.   And I'm talking about the time before the E-Poll book.

18   Isn't it true that prior to the institution of the E-Poll book,

19   voters who showed up in the wrong building were not directed to

20   their correct building and correct precinct?

21       A.   No.  Poll workers were trained at that time to determine

22   the voter's correct polling location, but using paper means

23   instead of electronic means.

24       Q.   I don't believe you answered the question that I asked,

25   Ms. Poland.
```

```
 1           MS. GENTRY:  Would it be possible to have the question

 2    read back, Your Honor?

 3           THE COURT:  Ms. Coulter?

 4      (Question read back.)

 5           THE WITNESS:  No, that's not correct.

 6    BY MS. GENTRY:

 7      Q.   Ms. Poland, I'm going to show you what's been marked as

 8    Plaintiffs' Exhibit P449.  And I apologize for the small print.

 9    I will zoom in.  But this is a transcript of the November 18,

10    2014, Board meeting of the Hamilton County Board of Elections.

11           And it shows you were present.  Do you see that?

12      A.   Yes, I do.

13      Q.   All right.  I'm going to direct your attention to page

14    44 and then the top of 45.

15           And isn't it true that you were specifically asked by a

16    Board member and also by a member of the public whether

17    voters -- I'm sorry, let me make sure you can see this whole

18    thing -- whether voters -- well, let me read the question then.

19           Mr. Faux asked:  The question we're getting at is were

20    these voters advised they were not in the right place?

21           Do you see that?

22      A.   Yes.

23      Q.   And your answer was:  It's something that we can look at

24    post-election.  But as far as the eligibility for the ballots

25    to be counted, it's not something we look to because it doesn't
```

1  apply.

2    A.  This was in regards to the 12D form.

3    Q.  You did not understand that question as asking whether

4  the voters were advised that they were not in the right

5  location?

6    A.  That's -- I'd like to see what's above the transcript.

7        MR. CONOVER:  Objection, Your Honor.  I don't believe

8  this is inconsistent with what she's said.

9  BY MS. GENTRY:

10   Q.  Do you see that portion there?

11       THE COURT:  Just a second.

12       Thank you, Mr. Conover, for your insights on this, but

13  do you have an objection?

14       MR. CONOVER:  To the use of the deposition to impeach

15  the witness.

16       THE COURT:  The objection is duly noted but overruled.

17       MR. CONOVER:  Thank you, Your Honor.

18       MS. GENTRY:  And, Your Honor, I will note for the

19  record that this is a transcript of the hearing held by the

20  Board of Elections, not a sworn deposition.

21       THE COURT:  I understand.

22       MS. GENTRY:  Thank you.

23  BY MS. GENTRY:

24   Q.  Do you see that the question that was asked is:  Did the

25  poll workers realize that these people were in the wrong -- or

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 284 of 329 PAGEID #: 2141
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 284 of 329 PAGEID #: 30503

Vol. 10 - 284

1    did you figure it out?  And then you answered about the 12D

2    form.  And then Mr. Faux specifically asked whether voters were

3    advised they were in the wrong place, and you did not respond

4    that voters are advised that they're in the wrong place.

5    A.    This -- this -- it was in regards to the 12D form.  A

6    12D form is a form that only applies to right precinct/wrong

7    location.  It doesn't apply to wrong precinct/wrong location.

8    So that -- my answer was in regards to wrong precinct/correct

9    location.

10   Q.    All right.  Now, in the 2015 election was there an issue

11   with the E-Poll books in Hamilton County regarding crashing?

12   A.    Not crashing.  We did have an issue in Hamilton County

13   where the E-Poll books and the printers were failing to

14   communicate with each other.  Post-election through our testing

15   it was revealed that it was due to a mechanical defect in a

16   router manufactured by a company called NetGear, and they've

17   recognized that and all the routers were replaced and we had a

18   very smooth election just this past March.

19   Q.    As a result of the malfunction of the E-Poll books, were

20   a number of people required to cast provisional votes?

21   A.    Yes.

22   Q.    How many?

23   A.    I believe it was around 12,000.  I don't have that exact

24   number.

25   Q.    And were those 12,000 provisional votes reviewed to

1    determine if they met the five field requirement and then

2    rejected if they didn't?

3        A.    No.  Because of the unique circumstance with the 2015

4    election, voters who should have been allowed to cast a regular

5    ballot were given provisional ballots -- or provisional

6    envelopes of the same ballots.  So we sought an opinion from

7    our legal counsel on whether or not those voters who should

8    have been regular voters had to meet the requirements of a

9    provisional voter, and we followed the advice of counsel on

10   those.

11       Q.    And the advice you were given from your legal counsel

12   was that it was permissible to treat those voters as regular

13   voters, correct?

14       A.    Correct.

15       Q.    So the fact that they counted -- let me show you and

16   just make sure that I have the correct opinion.

17             I'm showing you what's been marked as Plaintiffs' P452.

18   Is this the legal opinion you were referencing?

19       A.    That's correct.

20       Q.    And so it is now the policy of the Hamilton County Board

21   of Elections that if a voter votes a provisional ballot through

22   some fault of a poll worker or the Board, then their

23   provisional ballot is not reviewed for the same defects that a

24   ballot cast by another provisional voter would be reviewed for;

25   is that right?

 1          MR. CONOVER:  Objection, Your Honor.

 2          THE COURT:  Overruled.

 3      You may answer, Ms. Poland.

 4          THE WITNESS:  No.  This opinion was in regards to the

 5  unique situation that arose in November of 2015.

 6  BY MS. GENTRY:

 7  Q.    So it only applied in 2015?

 8  A.    Correct.

 9  Q.    Let me show you what's been marked as Plaintiffs'

10  Exhibit P453.  This is another guideline that's similar to what

11  we looked at before, but this one is from -- let me turn the

12  page -- November 5, 2015.  Do you see that?

13  A.    Yes.

14  Q.    All right.  And it says on the first page you've added

15  to what was before, that if the voter should have cast a

16  regular ballot, then you want that to be noted, correct?

17  A.    That's correct, due to the unique circumstance of 2015.

18  Q.    And that was so you could count ballots in the 2015

19  election that should not have been cast provisionally?

20  A.    Correct.

21  Q.    And is it your testimony that you no longer have this

22  instruction in your guidelines?

23  A.    I don't believe so.

24          THE COURT:  You don't believe -- just so that I'm sure

25  what that answer means, you no longer have that in your

```
 1    guideline; is that right?

 2            THE WITNESS:  Correct.  That was added for the

 3    November 2015 election.

 4            THE COURT:  Okay.  Thank you.

 5    BY MS. GENTRY:

 6      Q.   So in this most recent election if a voter voted

 7    provisionally because the poll worker made a mistake in looking

 8    them up, for example -- and that's mentioned in Mr. Stevenson's

 9    letter.  Do you see that?

10      A.   Right.  Again, that was due to the implementation of the

11    E-Poll books, voters had difficulty -- poll workers had

12    difficulty looking voters up.  We didn't have those issues in

13    this March election, the same issues that we had in

14    November 2015.

15      Q.   So you had no issues with poll workers being able to

16    locate voters in the E-Poll books?

17      A.   No, you would never -- no election is perfect.  You're

18    always going to have some problems.  But there were specific

19    problems in November of 2015.  In addition to the router

20    defect, there was a programming error in the E-Poll book where

21    voters who registered timely were in the database but marked

22    that they had registered late, and that's what Mr. Stevenson, I

23    believe, is referring to in this opinion.  That didn't occur in

24    this past March election.

25      Q.   So the Board has chosen not continue to follow this
```

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 288 of 329 PAGEID #: 2145
Case: 2:00-cv-03893-ALM-TPA Doc #: 664 Filed: 04/06/10 Page: 288 of 329 PAGEID #: 36342

Vol. 10 - 288

1   particular exception after the November 2015 election; is that

2   what you're saying?

3   A.   Right.  That this opinion was meant only for the

4   November 2015 election.

5   Q.   But it's true, is it not, that this opinion shows that

6   it is possible to excuse any defects in a provisional ballot

7   envelope if there's a finding that the person never should have

8   voted provisionally in the first place?

9   A.   I -- that was an extraordinary circumstance.  And I've

10  administered over 40 elections, and we've never had one quite

11  as what happened in November of 2015 so I wouldn't say that

12  anything that arose out of that would then become some sort of

13  common practice or policy.

14  Q.   And that wasn't my question.  I'm not asking if it's a

15  common practice.  I'm simply asking you, doesn't this example

16  show that it is possible to excuse errors in the provisional

17  ballot affirmation form if there's a finding that the person

18  never should have voted provisionally in the first place?

19  A.   For the specific reasons that are in -- that this

20  opinion is referring to, yes, those voters -- those voters were

21  incorrectly flagged to vote provisionally.  You don't have that

22  in most elections.

23  Q.   And I understand -- I think you answered my question,

24  but I just want to be sure.

25       So, yes, it is possible to excuse voter error on a

Vol. 10 - 289

1   provisional ballot if there's a finding that the person never

2   should have voted provisionally in the first place?

3        MR. CONOVER:  Objection, Your Honor.

4        THE COURT:  Basis?

5        MR. CONOVER:  Asked and answered.

6        THE COURT:  Overruled.

7        MR. CONOVER:  Thank you.

8        THE WITNESS:  For this particular election our legal

9   counsel advised that there was.

10  BY MS. GENTRY:

11    Q.   So, yes, it is possible?

12    A.   In this particular election.  I'm not going to -- I

13  can't guess at what our legal counsel may recommend in future

14  elections.

15    Q.   And I'm not asking you to guess.  I'm just asking you to

16  admit that since it happened, it's obviously possible; right?

17        MR. CONOVER:  Objection, Your Honor.

18        THE COURT:  Overruled.

19        THE WITNESS:  It happened in the November 2015

20  election due to the unusual circumstances.

21  BY MS. GENTRY:

22    Q.   And, therefore, it's possible.

23        MR. CONOVER:  Objection, Your Honor.

24        THE COURT:  Overruled.

25        You may answer, Ms. Poland.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 290 of 329 PAGEID #: 2147
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/16 Page: 290 of 329 PAGEID #: 30344

Vol. 10 - 290

```
 1              THE WITNESS:  If we had unique circumstances that
 2     arise again like did in -- like they did in the November 2015,
 3     then, yes, it could be possible.
 4     BY MS. GENTRY:
 5       Q.   I'm just asking for a yes or no.  So it is possible.
 6              THE COURT:  I think she -- that that last answer
 7     covered it.  I think she said, yes, it could be possible.
 8              MS. GENTRY:  Thank you, Your Honor.  Thank you,
 9     Ms. Poland.
10     BY MS. GENTRY:
11       Q.   You also testified about validating signatures on
12     petitions.  Do you recall that?
13       A.   Yes.
14       Q.   And my understanding of your testimony is that the Board
15     of Elections has a responsibility to verify the identity of
16     voters based solely on their signature and address, and I
17     believe you mentioned sometimes their printed name.  Is that
18     right?
19       A.   The -- right, the signature verification process for
20     petitions requires the Boards of Elections to compare the
21     signatures and the address to what's on file.
22       Q.   And the date of birth is not contained on the petition
23     form, correct?
24       A.   No, it's not.
25       Q.   And the I.D. is not contained on the petition form,
```

Vol. 10 - 291

 1   correct?

 2      A.   No, it's not.

 3      Q.   All right.  And you said that committees collect extra

 4   signatures because -- can you refresh my recollection?  Why was

 5   it that committees have to collect extra signatures?

 6      A.   Right.  It's my experience that committees collect extra

 7   signatures.  Typically whatever the required number of valid

 8   signatures threshold, they -- committees will typically submit

 9   double that number, and that is because so many of the

10   signatures cannot be verified by the Board of Elections.

11      Q.   Well, first of all, going to your knowledge, these are

12   committees who filed the petitions with the Board, correct?

13      A.   Correct.

14      Q.   And have you had conversations with committees who filed

15   petition signatures about why they submit extra signatures?

16      A.   I've had conversations with circulators, yes.  It's not

17   always a committee; it could just be one individual circulator

18   that's circulating petitions.

19      Q.   So your understanding about why they collect double of

20   the number of signatures they need is based on what?

21      A.   It's based on in order to meet that requirement.

22      Q.   And I'm not asking you for what it is.  I'm just asking

23   you is it based on your conversation with individual

24   circulators?

25      A.   In just my experience in working at the Board of

1    Elections.  When we receive petitions, they typically run

2    anywhere from just a 50 to 70 percent validation rate.  So, in

3    other words, only 50 to -- on a good one would be 70 percent

4    would be determined to be valid signatures by Board of

5    Elections.

6      Q.    So the validation rate is really what drives the need to

7    collect maybe twice as many signatures; isn't that right?

8      A.    Right.  Right.

9      Q.    It's not a concern that maybe these are registered

10   voters who just can't be identified because their signature is

11   too messy or something like that?

12     A.    That's part of it.

13     Q.    But it's the validation rate that drives the numbers,

14   correct?

15     A.    That's what we're validating.  We're validating their

16   signature and address.

17     Q.    You are also validating whether or not they're

18   registered, right?

19     A.    Right, which we determine that based on their signature

20   and their address.

21     Q.    And you determine that many people who sign petitions

22   are not registered voters, correct?

23     A.    Correct.

24     Q.    And then you also determine that signatures are not

25   valid because the voter is registered but not at the address

1    they list, correct?

2      A.    Correct.

3      Q.    So you can identify that person and their address and

4    then find that it's not a match, right?

5      A.    Not always.  And --

6      Q.    Sometimes?

7      A.    Sometimes.  Sometimes.  We will many times mark that the

8    voter is not registered at this address because we can -- we

9    can confirm the address because the address is printed so it's

10   easier to read than just a signature.  So we can at least pull

11   up the address and be able to see which voters are registered

12   at that address and be able to say, well, none of these

13   signatures match anyone who's at this address.  It's not

14   verifying whether or not they're registered, but a lot of times

15   we can find them easier by the address than by the signature.

16     Q.    But you can identify that they are not registered or

17   they're not registered at the address based solely on the

18   address and signature?

19     A.    No.  They may be -- they may be registered at a

20   different address.  We can't identify the voter always just

21   based on the signature and the address.

22     Q.    And my question is more simple than that.  If you simply

23   have an address, you said you can determine who is registered

24   to vote at that address, right?

25     A.    We can look to see if there's a signature match, right,

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 294 of 329 PAGEID #: 2151
Case: 2:06-cv-00896-ALM-TPK Doc #: 664 Filed: 04/06/18 Page: 234 of 329 PAGEID #: 36536

Vol. 10 - 294

1    from those listed at that address.

2      Q.    Okay.  And if a signature doesn't match, then you know

3    that person isn't registered at that address, correct?

4      A.    We cannot, right, accept that.

5      Q.    Right.  And at that point you invalidate the signature,

6    correct?  You don't do a wide-ranging search to see if you can

7    find a person anywhere in the State of Ohio who has that

8    signature, right?

9      A.    There's no way to search by just -- by that mechanism

10   without additional information from the voter.

11     Q.    And you don't try to do that.

12     A.    No.

13     Q.    You would validate the signature by simply looking at

14   the address to see what signatures match the address, correct?

15     A.    Correct.

16     Q.    Thank you.

17           You also testified about the 7-day cure period being

18   reduced from 10 days.  Do you recall that?

19     A.    Yes.

20     Q.    And you testified that it is a benefit to the Board to

21   the administration of the election; is that right?

22     A.    It helps, right.  It helps with the administration of

23   the election.

24     Q.    Does the law permit you to review provisional ballots

25   where an I.D. is still needed before the 11th day of the

1  election -- after the election?

2     A.   I'm sorry, could you say that again?

3     Q.   Does the law permit Boards of Elections to review

4  provisional ballots that have been set aside because they still

5  need I.D. before the 11th day of the election?

6     A.   They are -- we are conducting the verification process

7  during the days leading up to the 11th day.

8     Q.   For all provisional ballots?

9     A.   For all provisionals.

10    Q.   So there's no requirement that you not review some

11  provisional ballots until the 11th day after the election?

12    A.   No, I don't believe so.

13    Q.   And, as I understand your testimony, the reduction to 7

14  days really was a benefit to the Board, correct?

15    A.   It did help, right.

16    Q.   It was not a benefit to the voter, was it?

17    A.   No.  I -- we have -- but I -- I'm -- I'm not aware of

18  any voter that has appeared at the Board of Elections after the

19  7th day to provide I.D.

20    Q.   Do you have personal knowledge of every voter who has

21  appeared at the Board of Elections to provide I.D.?

22    A.   No, I don't, but my staff have not brought that to my

23  attention.

24    Q.   Have you asked for reports about what days people come

25  to the Board of Election to provide I.D.?

1   A.   I did ask, yes, I did.

2   Q.   Which election?

3   A.   Just this March election.

4   Q.   Okay.  And they only had 7 days, correct?

5   A.   Right.  And we had two voters that appeared during that

6   7 days.

7   Q.   But you're not saying that you tracked data about the

8   10-day period prior to these changes in the law in 2014?

9   A.   No.  No.

10   Q.   You did not track data?

11   A.   We did not track data.

12   Q.   Thank you.

13       Now, you said that it would be very burdensome or

14   impossible to send out notices to provisional voters of

15   deficiencies in their ballots.  Do you recall that?

16   A.   Yes.

17   Q.   Now, is it correct that the Board of Elections does send

18   out 11S forms which are notices of deficiency to absentee

19   voters as late as the day of the election?

20   A.   That's correct.

21   Q.   All right.  So if you receive a ballot on the day of the

22   election, you still send notice to the voter -- to the absentee

23   voter that there's a problem that needs to be fixed, correct?

24   A.   On the absentee voter, that's correct.

25   Q.   And you receive the provisional ballots on the day of

Vol. 10 - 297

1    the election, correct?

2       A.    But the provisional ballots have not been entered into a

3    module so there's been no capture of the voter's data on

4    election day.  That process takes the full 11 days to complete.

5    Absentee voters are all -- before they receive their ballot,

6    their address has been updated, their information is contained

7    in the database.  It's all there so it's much easier, and we

8    can do it in a much more timely manner than compared to a

9    provisional.  And we're receiving -- in the November of 2015

10   election we received 12,000 provisional envelopes.  Absentees

11   are floating in over a 28-day period.  They're not all coming

12   in on one day.

13      Q.    Okay.  So from a bureaucratic point of view, it's simply

14   not possible to allow provisional voters to fix mistakes with

15   their ballot envelope; is that your testimony?

16      A.    Not in the time frame that's given.

17      Q.    You would need a longer time frame?

18      A.    There would be a longer time frame to certify the

19   election.

20      Q.    And how long a time frame would you need?

21      A.    How long is fair for a voter to receive notice?  What

22   should be the time frame?  If we don't have that universe

23   created until the 11th day and then we need time to mail the

24   notice for them to get to the voter and then time for the voter

25   to mail that back, how long -- how long would we need?

1    Q.    And that's my question to you.  Do you have any idea how

2    long you would need?

3    A.    I think it would be weeks.  We could be delaying results

4    of elections for -- right now it's 21 days.  It would have to

5    go longer than that.

6    Q.    Okay.  So it's really impossible to fix this problem

7    with giving notice to provisional voters; is that your

8    testimony?

9    A.    I think it's close to impossible without extending the

10   timelines to certify an election to provide equal notice to all

11   voters, which would be by mail.

12   Q.    Okay.  So is it fair in your view that an absentee voter

13   who gives the Board his ballot on the day of the election gets

14   notice and an opportunity to correct any deficiency; whereas, a

15   provisional voter with the same deficiency doesn't get any

16   notice or any opportunity to correct?

17   A.    I don't -- I don't think that's an unreasonable rule,

18   no.

19   Q.    And my question is is it fair?

20   A.    I do think it's -- I do think it's fair, to the best of

21   our ability.

22   Q.    Why is it fair to the voter?

23   A.    The voter is voting provisionally, there's some sort of

24   eligibility in question.  There's a reason why that person had

25   to vote provisionally.  There's a reason why.  There's

Vol. 10 - 299

1    something they -- there was a change of address that wasn't

2    updated.  They requested an absentee ballot then decided not to

3    vote that absentee ballot, there's some sort of reason.

4       Q.   Let's take those reasons.  So you said -- I think you

5    said earlier that many voters who vote provisionally do so

6    because they had requested an absentee ballot but didn't return

7    it; is that right?

8       A.   Or they just request an absentee ballot.  We have voters

9    who return the absentee ballot and also vote provisionally.

10      Q.   Okay.  So they have to vote provisionally if they've

11   been given an absentee ballot, correct?

12      A.   If they've requested an absentee ballot.

13      Q.   And voters who are given an absentee ballot have already

14   been found to be eligible, right?

15      A.   If their -- if their record is marked that they

16   requested an absentee, that's correct.

17      Q.   And my question is a little different.

18           Absentee voters who request an absentee ballot and their

19   application is approved, you know they're an eligible voter,

20   right?

21      A.   That's correct.

22      Q.   But they may still be required to vote provisionally,

23   right?

24      A.   Right.

25      Q.   If they don't return the ballot, they have to vote

1   provisionally, right?

2   A.   That's correct.

3   Q.   So that's a category of eligible voters who,

4   nevertheless, have to vote provisionally, correct?

5   A.   Right.  Their eligibility is in question because they

6   may cast two ballots.  They've been given two ballots, and the

7   reason that they have to vote provisionally is to prevent two

8   ballots from being counted.

9   Q.   And perhaps we're using different terms.  When I mean

10  eligibility, I mean eligibility to vote under Ohio law which

11  means over the age of 18, registered for 30 days in the State

12  of Ohio before the date of the election, and a U.S. citizen.

13       Would you agree with me that those are the requirements

14  to be an eligible voter in the State of Ohio?

15  A.   Yes.

16  Q.   All right.  And absentee voters by definition have been

17  determined to be eligible voters in the State of Ohio.

18  A.   Yes.

19  Q.   All right.  So there are some provisional voters who the

20  Board knows are eligible voters, correct?

21  A.   Yes.

22  Q.   All right.  And it's still your testimony that it's fair

23  not to give them notice of a deficiency that will cause their

24  vote to be rejected?

25  A.   If they requested an absentee ballot, they are given

1  notice, if the ballot they returned.  If they request an

2  absentee ballot and then decide to also go to the polling

3  place --

4    Q.  I'm sorry.  I asked that question without letting you

5  know where I was going so I think I lost you.

6         We had been talking about provisional voters don't get

7  notice.  Do you remember that?

8    A.  Right.

9    Q.  Absentee voters do get notice of a deficiency.

10   A.  Correct.

11   Q.  You said you believed that was fair because provisional

12  voters have some issue with eligibility; is that right?

13   A.  Right.

14   Q.  All right.  And now we've established that some

15  provisional voters don't have an issue with eligibility.  We

16  know they're eligible, correct?

17   A.  They're eligible to vote.  It's whether or not their

18  provisional ballot is eligible to be counted because they may

19  have already cast another ballot.

20   Q.  And my question is not with regard to the issue you just

21  mentioned.

22        My question is if the provisional ballot has some

23  deficiency in one of the five fields that an absentee voter

24  would get notice of and an opportunity to correct, the

25  provisional voter who we know is eligible does not get notice

1    of an opportunity to correct; is that fair?

2              MR. CONOVER:  Objection, Your Honor.

3              THE COURT:  Basis?

4              MR. CONOVER:  Asked and answered.

5              THE COURT:  Overruled.

6         You may answer, Ms. Poland.

7              THE WITNESS:  I think that what is required of the law

8    today is -- is -- is fair to the best of our ability what we

9    can -- what we can do.

10   BY MS. GENTRY:

11     Q.   All right.  And do you have any explanation as to why

12   it's fair to treat provisional voters really like a second

13   class of voters when compared to absentee voters on this point?

14             MR. CONOVER:  Objection, Your Honor.  Asked and

15   answered and argumentative.

16             THE COURT:  Overruled.

17             MR. CONOVER:  Thank you.

18             THE WITNESS:  I don't believe that it's treating

19   provisional voters like a second class citizen.

20   BY MS. GENTRY:

21     Q.   Well, you'll agree it's treating them differently.

22     A.   It's treating them differently.  Provisional voters are

23   in a different category of voters than absentee voters or

24   voters who cast a regular ballot.

25     Q.   And I understand that your belief is that it's fair to

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1   treat them differently by not giving them notice or an

2   opportunity to correct, and my question is why do you believe

3   that it's fair to treat them differently?

4           MR. CONOVER:  Objection, Your Honor.

5           THE COURT:  Overruled.

6           THE WITNESS:  I don't know what more Boards of

7   Elections can do to assist voters in this manner.  The only

8   other thing we could do would be to extend the deadline on when

9   elections have to be certified, and that, for example, in this

10  November election it could affect the country.

11  BY MS. GENTRY:

12    Q.   So because the law requires ballots to be tossed or

13  rejected if the five fields are not correctly and completely

14  filled out, there's really no choice but to throw them out; is

15  that what you're saying?

16          MR. CONOVER:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  Well, we're required to follow the law.

19  BY MS. GENTRY:

20    Q.   Even if following the law means that there's really no

21  choice but to reject those ballots without giving any notice or

22  opportunity to correct?

23    A.   We -- we're required -- Boards of Elections are required

24  to follow the law, and that's what we do.

25    Q.   And in your view, that's synonomous with fairness?

```
 1            MR. CONOVER:  Objection, Your Honor.

 2            THE COURT:  Sustained.

 3   BY MS. GENTRY:

 4     Q.   All right.  I'll move on.

 5          You testified earlier about father and son voters who

 6   have the same name.  Do you recall that?

 7     A.   Yes.

 8     Q.   And you testified that there is sometimes confusion

 9   about their identity because their name is the same; is that

10   your testimony?

11     A.   Yes.

12     Q.   All right.  And in your experience when you have that

13   situation, are the signatures of the two voters different?

14     A.   They could be.  They could be similar, they could be

15   different.

16     Q.   Do you have any experience with father/son voters of the

17   same name?

18     A.   I know that we have -- yes, we have voters -- fathers

19   and sons who have the same name, yes.

20     Q.   So you know whether or not their signatures are

21   different?

22     A.   I -- I could not think of a specific example right now

23   to say that -- I mean, whether or not we've had difficulty

24   based solely on a signature verification.

25     Q.   And I'm not asking if you've had difficulty based on
```

Vol. 10 - 305

1  signature verification.  I'm simply asking you -- you testified

2  that you know of father/son voters in Hamilton County, correct?

3  A.   Yes.

4  Q.   Do you know whether or not their signatures were

5  identical?

6  A.   I don't know that.

7  Q.   All right.  And do you know whether their driver's

8  license numbers were identical?

9  A.   I don't know that.  Sometimes one voter may submit a

10 driver's license number, and one -- the other voter may submit

11 a different form of I.D.  We don't have driver's license

12 numbers for all voters.

13 Q.   Do you have any evidence that father and son voters in

14 the example that you've given have been confused for each other

15 when they've given a signature and a form of I.D.?

16 A.   It's been my experience, it's been reported to me by

17 staff that we have -- had placed the request for an absentee

18 ballot on -- for example, on a father when it should have been

19 placed on a son and vice versa.  I've had reports from staff of

20 that, yes.

21 Q.   And the application form requires signature, correct?

22 A.   It does.

23 Q.   And the application form requires I.D., correct?

24 A.   It does.

25 Q.   All right.  So if there was a mistake made, was that a

Vol. 10 – 306

1    mistake by the poll worker?

2        A.    If it was put on the wrong record, it would have been a

3    mistake made by someone at the Board of Elections office.

4        Q.    Oh, I'm sorry, Board of Elections office.  Thank you.

5            It was not because -- as far as you know, it wasn't

6    because the father's signature and identification was identical

7    to the son's signature and identification?

8        A.    I don't know that.

9        Q.    All right.  You also testified that the Board does

10   receive some telephone numbers from absentee voters on their

11   application; is that right?

12       A.    I believe it was referring to registration forms.

13       Q.    Okay.  I'm sorry.  Registration forms.

14       A.    Yes.

15       Q.    Also on application forms, does the Board get that

16   sometimes?

17       A.    Yes.  There is a spot on the form for it, correct.

18       Q.    And I take it then that the Board also does not capture

19   the phone number in its records when it's provided on an

20   absentee application?

21       A.    That's not our practice, correct.

22       Q.    However, I believe the application states that the phone

23   number might be useful if there's an issue; is that right?  Do

24   you recall?

25       A.    I don't recall.

1    Q.    Does the Board of Elections ever contact voters by phone

2    because their application is defective?

3    A.    No.  We -- we contact the voter through written

4    communication through a letter.

5    Q.    And you mentioned that the phone numbers are not

6    captured in the database because there's a fear that they might

7    be publicly disclosed; is that right?

8    A.    That had been a long-standing practice of the Board not

9    to enter because of complaints from voters.

10    Q.    And these complaints came about because their

11    information was disclosed to campaigns; is that right?

12    A.    I don't know that.  I don't know that.  Even today we

13    still receive complaints from voters when campaigns make

14    robocalls to them even though we do not release phone numbers

15    because they're not in our database, but voters still assume

16    that it's coming from the Board of Elections.

17    Q.    And do you know -- do you have a basis for knowing that

18    the reason that the Board doesn't put phone numbers in the

19    database is because there's this concern about disclosure?

20    A.    That's what I was told by prior administration.

21    Q.    All right.  Now, when -- have you had the experience of

22    actually disclosing registration forms or other voter forms as

23    a public record?

24    A.    Yes.

25    Q.    When you do that, you redact the social security number?

```
 1    A.   That's correct.

 2    Q.   And you redact the date of birth?

 3    A.   Yes.

 4    Q.   Is there any reason why you couldn't redact the

 5  telephone number?

 6    A.   No.

 7    Q.   All right.  You also testified that you have had very

 8  few issues come up regarding homeless voters.  Do you recall

 9  that?

10    A.   Yes.

11    Q.   Does the Board of Elections keep track of homeless

12  voters?

13    A.   No.

14    Q.   Do you have any way of knowing how many homeless voters

15  are in Hamilton County?

16    A.   No.  We do not -- we just -- in the past we would have

17  larger numbers of registered voters in precincts that contained

18  shelters, and so we monitor that because there's a maximum

19  number of registered voters allowed in a precinct so we monitor

20  the overall numbers.  And I know that our staff that's in

21  charge of that will notice, you know, larger numbers in

22  precincts where there's shelters, and we just make sure we keep

23  that number under the state maximum.

24    Q.   So to the extent you track homeless voters, it's for

25  purposes of drawing precinct boundary lines in precincts that
```

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    contain shelters; is that fair to say?

2      A.    Uh-huh.

3      Q.    Do you track homeless voters for any other purpose?

4      A.    No.

5      Q.    And do you know -- well, strike that.

6            Let me ask the same question about illiterate or

7    semi-literate voters.  Do you know how many illiterate or

8    semi-literate voters there are in Hamilton County?

9      A.    No.

10     Q.    Do you have any way of tracking how many literate or

11   semi-literate voters there are in Hamilton County?

12     A.    Not to my knowledge.

13     Q.    Now, sometimes voters will request assistance because

14   they're illiterate; is that right?

15     A.    Voters do request assistance, yes, for multiple reasons.

16     Q.    And they have to fill out a form in order to do that?

17     A.    No, they do not.

18     Q.    They don't have to fill out a form requesting bipartisan

19   assistance with marking their ballot?

20     A.    No.

21     Q.    They simply have to ask verbally for help?

22     A.    Correct.

23     Q.    And are your poll workers trained to offer assistance to

24   people who look like they might be struggling because they

25   can't read the forms?

1    A.    Correct.  We do have a portion of our training section

2    that speaks specifically to those issues.

3    Q.    And that training instructs poll workers to offer

4    assistance to people who haven't asked for help but look like

5    they need to because they're struggling?

6    A.    Well, assistance as far as marking the ballot?

7    Q.    No, filling out the forms.

8    A.    Filling out the --

9    Q.    Identification envelope or the provisional ballot

10   affirmation form.

11   A.    So when they're voting in-person absentee?  Okay.

12   Q.    Right.  Or provisionally at the polls.

13   A.    When the voter asks for assistance, we will provide

14   that.

15   Q.    My question is if they don't ask but the poll worker can

16   see that they're struggling, I thought you said that there was

17   training that goes to the issue.

18   A.    In regards to accessibility for the polling locations

19   and for recognizing voters who may need assistance in

20   maneuverability issues.

21   Q.    Okay.  So the training you're talking about doesn't go

22   to filling out a form?

23   A.    No.

24   Q.    You also testified that it's important that voters vote

25   in the precinct where they live.  Do you recall that?

Vol. 10 - 311

1    A.    Yes.

2    Q.    Would you agree that the absentee ballot form -- I can

3    show you one, if you need -- requires the voter to write down

4    their voting residence?

5    A.    Yes.

6    Q.    And by law they need to write down their registration

7    address, correct?

8    A.    Correct.

9    Q.    Now, their registration address might not be the place

10   they're currently living, true?

11   A.    It may not be the place that they're temporarily

12   residing, that's correct.  They might be on vacation, that sort

13   of thing.

14   Q.    Or a college student?

15   A.    Correct.

16   Q.    So you've had cases where college students will write

17   down the place where they're temporarily living as their voting

18   residence, correct?

19   A.    It's -- we have a place for mail-to address so

20   there's -- on the form there's a place for the residence

21   address, and then there's another place for the mail-to address

22   if they would like their ballots mailed some place other than

23   their residence address.

24   Q.    All right.  But the mailing address is different from

25   the registration address in the example you provided.

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1    A.    Correct.

2    Q.    Let me show you an example.  This is Plaintiffs' Exhibit

3    P2200, and this is a voter last name Bicknell.  It appears he

4    voted in the office; is that right?

5    A.    Yes.  The label indicates he voted in office.

6    Q.    But even though he voted in the office, he was required

7    to write his voting residence.  Do you see that?

8    A.    That's correct.  This is no longer the policy.  This was

9    from 2014.

10   Q.    All right.  And before I go forward, let me just make

11   sure I understand.  After the 2014 election, Boards of

12   Elections were required to put a label on every identification

13   envelope that contained the name and address of the voter,

14   correct?

15   A.    Correct.

16   Q.    And after that point the voter would not be disqualified

17   for writing down the wrong address; is that right?

18   A.    Right.  Correct.

19   Q.    Okay.  Now, in this case in 2014, his voting residence

20   was a different address.  Do you see that -- let me zoom in.

21   I'm sorry.

22         He was registered at 2851 Ridgewood.  Do you see that?

23   A.    Yes, I do.

24   Q.    But he wrote down the wrong address.  Do you see that?

25   A.    I do.

1    Q.   And his ballot was rejected for a mismatched address?

2  Let me see, this is Frank Bicknell.  I knew I should have

3  highlighted this.

4         THE COURT:  While you're doing that, let's take about

5  a 5-minute recess until quarter to 7:00.

6     (Thereupon, a recess was taken.)

7         THE COURT:  Please continue.

8         MS. GENTRY:  Thank you, Your Honor.  And I will be

9  very brief so that we can all get home or to our hotels.

10  BY MS. GENTRY:

11    Q.   Ms. Poland, when we left off, I was just asking you to

12  confirm that this voter's vote was rejected because of the

13  address issue, and I believe I located him right here.  Do you

14  see that?  Do you see Frank Bicknell?

15    A.   I do, yes.

16    Q.   Okay.  And his ballot was rejected because of an address

17  mismatch?

18    A.   That's correct.

19    Q.   Now, finally, Ms. Poland, would you agree that even with

20  two layers of bipartisan review on the absentee ballots, that

21  sometimes the Board makes a mistake and rejects a ballot even

22  though the data all matched?

23    A.   It could happen, yes.

24    Q.   This is Plaintiffs' Exhibit P2292.  And you'll see the

25  voter on his I.D. envelope wrote his social security number as

1    7382.  Do you see that?

2    A.   I do.

3    Q.   All right.  And then he was sent an 11S form requiring

4    him to provide proof of identity.  Do you see that?

5    A.   Yes.

6    Q.   Now, actually, his application had that same social

7    security number, 7382.  Do you see that?

8    A.   I do.

9    Q.   However -- this is Mr. Bailey.  Mr. Bailey's vote was

10   rejected because his I.D. did not match.  Do you see that?

11   A.   I do.

12   Q.   Okay.  And that was an error on the part of the Board?

13   A.   Well, what you don't show here is what's currently on

14   file or what was on file at the time that this was verified.

15   The I.D. on the application may not match the social security

16   number contained in the voter registration database.

17   Q.   All right.  And if that were the case --

18   A.   The voter should have been sent a letter at the time the

19   application was submitted.

20   Q.   That's true.  But then also if that were the case, then

21   what was in the database was wrong, correct, because the voter

22   said that his social is 7382 on his registration form in 2015.

23   A.   Well, it would need more research at that point.  That's

24   correct that our staff should not have sent a ballot at that

25   time because the social security number did not match what was

1    on file with the Board.

2      Q.   Now, wouldn't -- this registration form was filled out

3    before the voter filled out the I.D. envelope, right?

4      A.   It is.  But this is what would trigger our staff -- what

5    should have triggered our staff to review.  If that social

6    security number on the application at the time we received it

7    did not match what we had on file, this could have been

8    something where voters' records were merged where it's not the

9    same person as another voter, and that should have been handled

10   at that time before the voter received the ballot.

11     Q.   Let me see if I can simplify this a little bit.  The

12   voter wrote the same I.D. on their registration form and their

13   I.D. envelope, correct?  Just yes or no.

14     A.   That's not -- I don't think that's their registration

15   form.  It's their application.  It's not their registration

16   form, correct?

17     Q.   I'm sorry, yes.  On their application form and I.D.

18   envelope they wrote the same I.D. number, correct?

19     A.   Correct.

20     Q.   And the process requires the application form

21   information to be verified before a ballot is issued.

22     A.   That's correct.

23     Q.   And what you're saying is that perhaps the staff made an

24   error and didn't realize that 7382 is not the same as what's in

25   their system.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 316 of 329 PAGEID #: 2173
Case: 2:00-cv-03893-MLM-TPA Doc #: 664-8 Filed: 04/06/18 Page: 316 of 329 PAGEID #: 36340

Vol. 10 – 316

1    A.    That's correct.

2    Q.    All right.  And so in that case the staff made an error

3    at an earlier point in the process.

4    A.    Correct.

5    Q.    But at some point in the process the staff made an

6    error, correct?

7    A.    Correct.

8    Q.    Thank you.

9          And because of that error, whether -- regardless of when

10   it was made in the process, because of the Board error this

11   voter was disenfranchised, correct?

12   A.    I would have preferred to have seen our records and what

13   the Board was looking at, what our staff was looking at, and I

14   don't believe that you have that.

15   Q.    So you can't -- you don't know that a staff error caused

16   his vote to be rejected?

17   A.    I would -- before confirming that I would prefer to see

18   what the -- what the staff was viewing at the time they

19   processed that application.

20   Q.    Now, you don't keep that information, though, do you,

21   regarding what the staff reviewed when they were looking at

22   either the application or the I.D. envelope?

23   A.    It should be in our change history, yes.

24   Q.    With regard to the I.D. envelope, though, when the

25   investigation is done to determine if an I.D. envelope or

1    provisional ballot affirmation form is correct, the staff

2    person doesn't keep a record of what they looked at, true?

3        A.    It's in the registration system.

4        Q.    They keep a record?

5        A.    There's a record in our voter registration system.  Any

6    time there's a change made to the voter registration system, we

7    have a record of that.

8        Q.    Do you recall that I took your deposition in this

9    matter?  Do you recall that?

10       A.    Yes.  Yes.

11       Q.    And you recall that I asked you about the label on the

12   side of the provisional ballot affirmation form?  Do you recall

13   that?

14       A.    Yes.

15       Q.    That's the label that the election workers write their

16   notes on, correct?

17       A.    Correct.

18       Q.    And didn't you tell me that the only record of what

19   those reviewers did appears on that label on the provisional

20   ballot affirmation form?

21       A.    Right.

22       Q.    There's no separate information about their

23   investigation or what they looked at or why they decided what

24   they did, correct?

25       A.    No.  It's what's contained in the voter registration

1    system, and I believe during the deposition I did refer to that

2    numerous times, that I would have to look at our voter

3    registration system to be able to determine what the bipartisan

4    teams were reviewing.

5      Q.   And you also testified that essentially you would be

6    doing review a second time, correct?  You're not able to see

7    exactly what they did because they don't keep track of exactly

8    what they looked at, right?

9      A.   Right.  We have data in our voter registration system.

10   Any time there's a change made, that change is recorded.

11     Q.   I understand there is a lot of data they can look at.

12   All I'm trying to establish is there's no record of exactly

13   what they looked at.  All you can do is look at it now and see

14   what the information is and make a decision now as to what

15   matches or doesn't match.

16     A.   Right.  We should be able to see through our change

17   history what the voter's social security number was in November

18   of 2014 on our records.

19     Q.   Right.  And I think you've answered my question, but

20   just to be sure, you don't know what the bipartisan teams

21   looked at or determined when they reviewed Mr. Bailey's ballot.

22         MR. CONOVER:  Objection, Your Honor.

23         THE COURT:  Overruled.

24      You may answer.

25         THE WITNESS:  Sitting here right now, I do not.

1    BY MS. GENTRY:

2       Q.    I'm showing you another absentee ballot.  This is

3    Plaintiffs' Exhibit 2245.  And this one, I'll show you first it

4    was rejected for lack of date of birth not provided.  Do you

5    see that?  This is Adolphus -- I can't pronounce the last name.

6    It's right here (indicating).  Do you see it?

7       A.    Yes.

8       Q.    And so his ballot was rejected because of the date of

9    birth field.  And would you agree that on his application, his

10   date of birth is December 31, 1936.  Would you agree with that?

11      A.    I don't -- I'm sorry.  You moved it so quickly, I don't

12   know if it was rejected for no date of birth or because it

13   didn't match.

14      Q.    I'll get this so you can see it.  I apologize for the

15   zooming errors on my part.  Right there (indicating).

16      A.    Okay.  I see it, yes.

17      Q.    It was rejected for date of birth not provided?

18      A.    Yes.

19      Q.    And, in fact, the date of birth was provided, correct?

20   December 31, 1936?  Do you see it on the I.D. envelope?

21      A.    I do, yes.

22      Q.    And it matches the application?

23      A.    Yes, it matches the application.  I don't know if it

24   matched what was on file in our voter registration system at

25   the time the bipartisan teams reviewed this.

1    Q.   Well, you'll agree that it shouldn't have been rejected

2    for no date of birth provided, right?

3    A.   No.  It could have been a mismatch, correct.

4    Q.   But the stated reason is no date of birth provided, and

5    it's clearly provided; right?

6    A.   Correct.

7    Q.   And you're not able to conclude that this ballot should

8    not have been rejected because the date of birth doesn't have a

9    mismatch, does it?

10   A.   I don't know the date of birth on file with the Board of

11   Elections at the time this ballot was reviewed.

12   Q.   All right.  So just so I understand your testimony, even

13   if the application form is filled out by the voter and verified

14   by the Board of Elections, it might still contain a mistake.

15   A.   Board staff could have made a mistake, yes.

16   Q.   And in that case if the voter wrote down the exact same

17   information on their I.D. envelope, their ballot would be

18   rejected because of a mismatch with the database?

19   A.   That is why, right, the practice should be to

20   investigate it when -- at the time the application is received

21   rather than when the ballot is received.

22   Q.   All right.  But in that case the Board made a mistake at

23   the very outset by approving the information on the application

24   form, right?

25   A.   At some point there was a mistake made.

1    Q.    And even though it was the Board who made a mistake,

2    it's the voter who lost the right to vote?

3    A.    At some point the Board made a mistake, that's correct,

4    that led to the ballot not to be counted.

5            MS. GENTRY:  Thank you, Your Honor.  I have no further

6    questions.

7            THE COURT:  Mr. Conover, redirect?

8            MR. CONOVER:  Nothing from the Defense, Your Honor.

9            THE COURT:  Ms. Poland, thank you very much, ma'am.

10           THE WITNESS:  Thank you.

11           THE COURT:  Travel safely going back to Hamilton

12   County.

13           THE WITNESS:  Thank you.

14           THE COURT:  Ms. Richardson, anything further?

15           MS. RICHARDSON:  Nothing further for today.  Thank

16   you, Your Honor.

17           THE COURT:  We have two tomorrow, a witness at 8:30

18   and then Mr. Damschroder, then you will rest.

19           Mr. Chandra, do you -- in light of what we discussed at

20   sidebar today, do you choose to rest now since Mr. Damschroder

21   will be available for your cross-examination into the areas

22   that you were going to call him on your direct so that way we

23   have at least one case close as we proceed into the Defense

24   case?

25           MR. CHANDRA:  Sure, we could do that, Your Honor, but

1   it's still subject to stipulations that we're still trying to

2   iron out with the Defense.  We're waiting back for some

3   answers, and we should be all tied up tomorrow morning.  So we

4   can do that now subject to that, or we could do it all

5   together --

6          THE COURT:  We can do it in the morning.

7          MS. RICHARDSON:  And, Your Honor, my understanding, I

8   think the issue is they're still waiting for some declarations

9   from voters.  So will that be available by tomorrow?

10          MR. CHANDRA:  We are waiting to hear back on various

11   categories of stipulations which are still on your plate, and

12   then there are individual declarations and some county

13   declarations outstanding, Your Honor.  Part of what we may ask

14   for is, you know, if we could have through the end of next week

15   to submit those because they're still being gathered due to the

16   logistics of trial that was part of the streamlining of the

17   case we talked about at the beginning.  So subject to those

18   little loose ends, we would be ready to rest.

19          MS. RICHARDSON:  I would certainly agree with that,

20   Your Honor.

21          THE COURT:  All right.  We can do it in the morning.

22   We can do it at 8:30.  And then as soon as we complete our

23   housekeeping matters, we'll begin with your witnesses.  You

24   just have the two witnesses.

25          Mr. Chandra, how many rebuttal witnesses do you now

 1    anticipate?

 2              MR. CHANDRA:  We're down to two, Your Honor.

 3              THE COURT:  All right.  Will those witnesses be

 4    available tomorrow in the event that we finish with

 5    Mr. Damschroder?  How long do you anticipate your direct on

 6    Mr. Damschroder is going to be?

 7              MS. RICHARDSON:  I would expect it to be approximately

 8    two hours, Your Honor.

 9              THE COURT:  And how long do you expect your cross to

10    be that includes the matters that you anticipated going into in

11    your case in chief?

12              MR. CHANDRA:  Probably about two hours as well,

13    Your Honor.

14              THE COURT:  Okay.  So we're going to allot five hours

15    for Mr. Damschroder because I want to factor in,

16    Ms. Richardson, your redirect which may be more expansive than

17    ordinary simply because Mr. Chandra is going to go into some

18    other matters that I'm going to allow him to go into to avoid

19    having his case in chief remain open.

20              MS. RICHARDSON:  Thank you, Your Honor.

21              THE COURT:  So how long is your first witness?

22              MS. RICHARDSON:  I would expect it to be an hour to an

23    hour-and-a-half, Your Honor, in terms of direct.

24              THE COURT:  Who has that witness?

25              MS. CRAWFORD:  I do on cross.

Case: 2:20-cv-03843-MHW-KAJ Doc #: 41-8 Filed: 09/12/20 Page: 324 of 329 PAGEID #: 2181
Case: 2:06-cv-00896-ALM-TPA Doc #: 664 Filed: 04/06/10 Page: 324 of 329 PAGEID #: 30543

                                                          Vol. 10 - 324

 1            THE COURT:  And how long --

 2            MS. CRAWFORD:  About an hour on cross-examination.

 3            THE COURT:  So my plan is to finish him in the morning

 4     before lunch.  So you said you thought about an hour?

 5            MS. RICHARDSON:  Yes, Your Honor.

 6            THE COURT:  Is that what you said?

 7            MS. RICHARDSON:  Yes, and hour to an hour-and-a-half.

 8            THE COURT:  Hour-and-a-half of that.

 9            MS. CRAWFORD:  An hour.

10            THE COURT:  An hour.  So that's what you have.  You

11     have 90 minutes, you have 60 minutes.

12         Mr. Chandra?

13            MR. CHANDRA:  And, Your Honor, I will have one of the

14     rebuttal witnesses here tomorrow by the afternoon just to be

15     able to go.  I don't anticipate that being a witness that would

16     last more than maybe 45 minutes, and we are going to work to

17     try to jettison the other rebuttal witness through discussion

18     tonight.  So we may be able to finish tomorrow if we can get

19     through everybody expeditiously.

20            THE COURT:  The first witness will be done by noon.

21     The second witness, Mr. Damschroder, if we can get him done by

22     5:00, that would be perfect.  And then if it's a short last

23     witness, we could put him on.  If not, we'll put him on first

24     thing Thursday morning.  All right?

25            MR. CHANDRA:  Thank you, Your Honor.

1        THE COURT:  Thank you very much, everyone.

2                         - - -

3      Thereupon, the following proceeding was held at sidebar out

4    of the hearing of the open courtroom:

5        MS. RICHARDSON:  Your Honor, with apologies for

6    extending the day even further, Mr. Chandra has alerted us to

7    who the rebuttal witnesses will be, and one of those witnesses

8    we believe would qualify as an expert witness that was not

9    disclosed, and so we do object to that witness.

10       THE COURT:  Who is he or she?

11       MS. RICHARDSON:  Dr. Salling, is my understanding.

12       MR. CHANDRA:  It's Professor Mark Salling of Cleveland

13   State University.  Our view is he's a rebuttal to their

14   rebuttal expert.  There was no deadline for disclosing

15   anything.  And, specifically, what he would be testifying to is

16   his research showing that African-Americans have a highly

17   disproportionate use in Cuyahoga County and other urban

18   counties of early in-person voting.  That would be it.  He

19   would get on, he would talk about the studies he's done in that

20   regard to rebut the rebuttal, and that would be as far as we

21   would go.

22       MS. RICHARDSON:  Your Honor, this is a central claim

23   in their case that they raised in their complaint that they

24   have known about throughout.  They had an opportunity to

25   disclose experts; they did so.  We disclosed experts.

1    Under Rule 26 they're obligated to let us know the

2  experts and the basis of the opinion that those experts will

3  provide.  They have not done so.

4    MR. CHANDRA:  It just goes to Dr. McCarty, and he was

5  a rebuttal expert.  So until we saw his testimony and his

6  report, we were not -- nor were there any deadlines associated

7  with our --

8    THE COURT:  Typically, as you know, rebuttal witnesses

9  are not required to be disclosed.

10    What I'm going to have to look at is whether that rule

11  extends to people who may be giving opinion testimony.

12    At this point I'm not going to grant your motion.  I'm

13  going to -- as we stand here right now, I don't know that

14  there's any rule that prohibits them doing what they're doing

15  because he is a rebuttal witness.  But I'm sure that this is

16  not the first time this issue has arisen, and so I'm going to

17  figure it out between now and 8:30.

18    MS. RICHARDSON:  Thank you, Your Honor.

19    And I would just note that -- and I don't have the date

20  in front of me right now, but consistent with the Court's

21  schedule, Dr. McCarty's report was provided several months ago.

22  And if this is a response to Dr. McCarty, first of all, there

23  was --

24    THE COURT:  Well, here's the thing.  Dr. McCarty was

25  called in your case in chief.

1      MS. RICHARDSON:  Correct.

2      THE COURT:  Okay.  So as Plaintiffs' who have the

3  burden, it's a little bit different.  I mean, either way you

4  cut it, the proffered witness is a rebuttal witness.

5      Now, the question is because he's an expert, do the

6  normal rules apply to him such that he had to be disclosed?

7  That's a legal/evidentiary issue that, you know, I'm going to

8  look at.

9      But just to keep it going, until I find -- determine

10  otherwise, I'm going to have this witness made available, you

11  know, to testify.  But if I determine overnight that it's

12  not -- it's not the case that he can testify or that he should

13  have been disclosed because he occupies that special status as

14  an opinion witness --

15      MS. RICHARDSON:  Your Honor, in the event that he is

16  permitted to testify, can we ask for the disclosures that would

17  otherwise be required for an expert under the rules in terms of

18  the opinions that he intends to provide and the bases for those

19  so that we have an opportunity to prepare a response?

20      THE COURT:  Well, I'm just sorry, I don't know the

21  answer to that because he's a rebuttal witness, and I'm not

22  certain that as a rebuttal witness all of that is required.

23      But do you know what opinions he's expected to provide?

24      MR. CHANDRA:  I wish I did.  I'm hoping tonight that

25  he will send me whatever studies he has performed, copies of

Vol. 10 - 328

1    those along with his CV.  What I promised counsel as a

2    professional courtesy, even if not required, the moment I have

3    it in hand, I will e-mail it to you.  I did ask him to bring,

4    you know, multiple copies if he has access to a printer for

5    copies tomorrow.  He said he would be able to.  I will ask him

6    if he has access to be able to send Pdfs to do that, and I will

7    forward them the moment I get them to the Defense team.

8            THE COURT:  All right.  Let's do that.  And, you know,

9    we'll all have a little work to do this evening to see if that

10   issue has been passed on.  I'm sure it has.  I just haven't had

11   it.

12           MS. RICHARDSON:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14      (Proceedings concluded at 7:12 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X

1

2                    C E R T I F I C A T E

3

4            We do hereby certify that the foregoing is a true and

5    correct transcript of the proceedings before the Honorable

6    Algenon L. Marbley, Judge, in the United States District Court,

7    Southern District of Ohio, Eastern Division, on the date

8    indicated, reported by us in stenotypy and transcribed by us or

9    under our supervision.

10

11                         s/Denise Errett, FCRR
                           Denise Errett, FCRR
12                         Official Federal Court Reporter

13                         s/Darla J. Coulter, RMR
                           Darla J. Coulter, RMR
14

15                         DATE:  April 4, 2016

16

17

18

19

20

21

22

23

24

25

Exhibit H, NEOCH v. Husted Trial Tr. Vol. X