# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF OHIO, ET. AL., | : | |
| | : | |
| Plaintiffs, | : | Case No. 20-cv-3843-MHW-KAJ |
| | : | |
| v. | : | Judge Michael Watson |
| | : | |
| FRANK LAROSE, in his official capacity as Secretary of State of Ohio, | : | Magistrate Judge Kimberly Jolson |
| | : | |
| Defendant. | : | |

## OHIO SECRETARY OF STATE'S MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF DANIEL MCCOOL, ALEXANDER STREET AND LINTON MOHAMMED

Now comes Ohio Secretary of State, by and through counsel, and respectfully moves this Court to exclude the reports and testimonies of Plaintiffs' proffered experts, Dr. Daniel C. McCool, Dr. Alexander Street and Dr. Linton Mohammed.  A memorandum in support follows.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)*
*Counsel of Record*
LIDIA MOWAD (0097973)
ANN YACKSHAW (0090623)
BRANDI SESKES (0077648)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.pfeiffer@ohioattorneygeneral.gov
Lidia.Mowad@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov
Brandi.Seskes@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

**MEMORANDUM IN SUPPORT**

An expert witness is useful to the Court only if his opinion is an expert one. That is, his opinion must be based on accurate data and information and derived using scientific methodologies. None of the Plaintiffs' experts fit that bill. First, Dr. Daniel McCool, whose scholarship is in Native American studies, does not offer a true expert report. His is an editorial where he read articles on voting and the postal service and gives his thoughts on "voter costs" and whether postal delays would increase those alleged costs. Next, Dr. Alexander Street's report is so infused with inaccurate assumptions, unreliable data, and dubious scientific methodologies that any conclusions contained in his report are either unreliable or irrelevant, or both. Finally, Dr. Linton Mohammed's opinions on the efficacy of signature matching in general is irrelevant to the very narrow issues presented here. Accordingly, the Court should disregard all three reports as unreliable and irrelevant to the issues presented in the Plaintiffs' Motion for Preliminary Injunction.

**I.      STANDARD OF LAW**

Motions in limine to exclude expert reports and testimony allow a court to streamline the presentation of evidence at trial and avoid undue delay and prejudice. *See, e.g., Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). The practice of ruling on such evidentiary motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). A court's streamlining ability transforms into a necessary gatekeeping function when it comes to expert testimony and reports.

A trial judge is laden with a "special obligation" to ensure that any and all expert testimony "'is not only relevant, but reliable.'" *Kumho Tire Co., LTD. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). This

gatekeeping requirement exists "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Federal Rule 702 mandates that expert opinions meet four requirements. Expert opinions must be: 1) "help[ful]" to the trier of fact in "understand[ing] the evidence" or in "determin[ing] a fact in issue"; 2) "based on sufficient facts or data"; 3) "the product of reliable principles and methods"; and 4) provided by an expert that has "reliably applied the principles and methods to the facts of the case." *Id.* What matters is not the "reasonableness *in general*" of the particular methodology used by the expert, but rather "the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire*, 526 U.S. at 153-54 (emphasis added).

The Sixth Circuit has emphasized that trial courts should give a "hard look" at expert testimony "not only because of the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony." *Turpin v. Merrell Dow, Pharmaceuticals, Inc.,* 959 F.2d 1349, 1352 (6th Cir. 1992). The "potential for exaggeration and fraud on the court" is ever present, and the court should be especially vigilant. *Id.* at 1353.

## II. ARGUMENT

### A. Daniel C. McCool.

#### 1. McCool is not qualified to opine on Ohio's election mechanics.

McCool has no experience, let alone expertise, in Ohio voting laws, Ohio citizens, or the United States Postal Service's functioning in Ohio. McCool's background and experience reflect expertise ill-fit to aid the Court in answering the questions in this litigation. McCool's expert

2

report is therefore not relevant or helpful and should be excluded from this Court's consideration.

Relevant evidence is "that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 591-92. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* Expert testimony that does not relate to the issues of the case is not helpful and is thus irrelevant. *Id.*, citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) ("An additional consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). McCool's report is exactly that—not helpful and thus irrelevant.

McCool's claim that he has conducted research on voting rights for over thirty-five years is misleading. McCool Rep., Doc. 24-7, PageID# 399, ¶3. In fact, a review of McCool's qualifications reveals that McCool's research is narrow—focusing, at best, on *Native American* voting rights. *See Id*. at PageID# 427-450. Notably absent from McCool's curriculum vitae is any research or experience in Ohio. *Id.* McCool does not know the voter composition in Ohio; the geography of Ohio; the distance, length of time it takes, or ability for Ohio mail carriers to reach Ohio voters; or the polling locations in Ohio. Yet these are the issues at stake in this litigation. McCool is merely bootstrapping his experience elsewhere in the United States to Ohio—"Ohio, like many other states, will likely experience a dramatic increase . . . ." *Id.* at PageID# 415, ¶ 34. This disconnect from the issues presented in this litigation renders McCool's report irrelevant and unhelpful. *See Bridger v. Union Ry. Co.*, 355 F.2d 382, 387 (6th Cir. 1966)

3

("[T]he subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman.").

### 2. McCool's report lacks scientific principles or methods.

McCool claims that he used "Qualitative Methods" to develop his conclusions but he utterly fails to explain his "methods." Plaintiffs have the burden of proving that their expert testimony is relevant and reliable under *Daubert*. Here, the Plaintiffs fail to meet that burden because McCool fails to prove that his analysis is proper, reliable and valid under *Daubert*.

Again, there is no explanation as to the technique or theory that Dr. McCool uses. To be sure, McCool gives an extensive definition of a "qualitative method," he just doesn't identify which one he used, if any. McCool simply assumes that one must accept his qualitative method and its application here. Not true. "*Daubert* commands that in court, science must do the speaking, not merely the scientist." *Cavallo v. Star Enter.,* 892 F. Supp. 756, 761 (E.D Va. 1995), *aff'd in relevant part,* 100 F.3d 1150 (4th Cir. 1996), *cert. denied,* 522 U.S. 1044 (1998). Moreover, the proponent of expert evidence has the burden of showing that the testimony satisfies *Daubert*'s standards by a "preponderance of the evidence." *Bourjaily v. United States,* 483 U.S. 171, 172-73 (1987); *see also, Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000) (citation omitted).

First, McCool concludes that Ohio voting law design features tend to reduce turnout by increasing voter costs. As support for this sweeping conclusion, McCool merely compares one "efficient vote-by-mail system" with Ohio's absentee ballot system. McCool Rep. at PageID# 404-405, ¶15. McCool uses one source—not multiple, overlapping sources as described in his methodology.

McCool builds on this barebones analysis by claiming that Ohio's voting law design features have a greater effect on Ohio voters with "lower income levels, less education, and

4

problems with access to the electoral system." *Id*. at PageID# 415, ¶ 34.  McCool relies on a one-page description of income, education, and access *generally*. *Id*. at PageID# 403-404, ¶¶ 12-14.  For each category, he cites *one* Ohio statistic.  McCool generally states that income, education, and access all impact voting, but McCool does not analyze *at all* how these categories change with in-person or absentee voting, pre- or post-pandemic—much less by using qualitative methodology.  By means of providing some comparison, McCool merely states that "[v]oter costs increase when these variables present obstacles to accessing the electoral process, especially when there are sudden changes to electoral procedures." *Id*. at PageID# 404, ¶14.  Without providing his first-hand experience or expert opinions through overlapping resources on *how* these *Ohio* voters with lower income levels, less education, and access problems are impacted specifically by the historical signature matching process or the extended deadlines for submission of ballot applications and ballots, then McCool has not demonstrated application of qualitative methodology.

Second, McCool concludes that "the deadlines in the Ohio election code do not reflect the realities of contemporary mail service." *Id*. at PageID# 410-411, ¶27.  This conclusion cannot be supported by qualitative methodology which is meant "to analyze 'how people experience aspects of their lives, how individuals and/or groups behave, how organizations function, and how interactions shape relationships.'" *Id*. at PageID# 400-401.  Rather, McCool re-reports recent news sources.  This is not analysis.  These are not McCool's opinions. *See Id*. at PageID# 408, 415-416, ¶¶ 22, 34.  Thus, McCool connected tangential dots in a manner which does not meet McCool's own methodological standards.

Third, McCool's conclusion that Ohio's voting laws are not justified by voter fraud is based on false assumptions—not qualitative methodology.  McCool's logic is as follows: Ohio

5

has "virtually no" actual convictions of voter fraud, thus voter fraud "is extremely rare" in Ohio, and therefore there is no legitimate reason for Ohio's signature-matching practices. Even a cursory review of this logic reveals its holes. To support this jump, McCool relies on *only* the Heritage Foundation's compendium of voter fraud convictions. *Id*. at PageID# 411-412, ¶¶ 28-29. This conclusion is not the product of qualitative methods but just McCool's own subjective beliefs, but simply McCool's own subjective beliefs.

Without a basis in sound methodological principles, McCool's report is resultingly inconsistent with Plaintiffs' Amended Complaint. McCool's report is focused on the temporary, emergency response to the COVID-19 pandemic, yet qualitative methods are "particularly useful to study phenomena that occur over long periods of time, due to the large number of variables and factors that change over time." *Id*. at PageID# 401, ¶7. Similarly, McCool's report speaks to the impact of Ohio's adapted voting rules and their effect on particular subsets of society, yet qualitative analysis is "'color-blind' in that the application of this methodology is not limited to any particular social or ethnic group." *Id*.; *but see* Part III "Unequal Impact." McCool opines that society generally suffers from lack of access to high-speed internet (*Id*. at PageID# 404, ¶14), yet Plaintiffs pray for "the Secretary afford Ohio voters the option of submitting an application for an absentee ballot online using an electronic signature." Am. Comp., Doc. 25, PageID #521, ¶ 85.

### 3. McCool's report is just a summary of news articles followed by speculative conclusions.

Expert testimony that is drawn from research of others can be excluded if the court is not given sufficient information to determine if it is valid and supports the expert's opinion. *See Best v. Lowe's Home Cntr.*, 563 F.3d 171 (6th Cir. 2009). "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to

6

consider other possible causes, lack of testing, and subjectivity." *Id.* at 177.  Again, it is the proffering party's burden to show that the expert's methodologies are valid and reliable. *Pride*, 218 F.3d at 578.

Here, McCool draws on news sources and little else to form his opinions regarding voting laws in Ohio and many other states.  Without any experience or connection with Ohio, McCool paraphrases news articles about Ohio.[1]  As a result, McCool's opinion amounts to nothing more than a layperson's understanding of Ohio's election system and the postal service.  Indeed, McCool's report, with regard to Ohio, begins with a narration of the Ohio Election Official Manual.  McCool Rep. at PageID# 404-405, ¶¶ 15-16.  Then, McCool spends five pages of his report reviewing recent news articles on the Postal Service and the delays it currently faces.  *Id.* at PageID# 405-410, ¶¶ 18-26.  McCool does not expound upon these news articles or utilize any "qualitative analysis".  *See Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 974 (D. Nev. 2016) ("The McCool Report . . . confirms what common sense dictates: travel is a large burden to those with less money.").  McCool's opinions and conclusions do not require any expertise.  "[W]hat's going on here is not science at all, but litigation." *Daubert,* 43 F.3d at 1318. See also *Smelser,* 105 F.3d at 305 and *Berry,* 25 F.3d at 1352.

McCool also peppers his own report with speculative, unsupported conclusions. *See Id*. at PageID# 405, ¶17 ("It also requires a lengthy back-and-forth through the U.S. mail system that *may* consume so much time that it is difficult for the voter to actually complete the process in time for his/her ballot to count"); *Id*. at PageID# 406, ¶19 ("The issues regarding Postal Service

---

[1] McCool's reliance on these news articles creates double and triple hearsay issues.  *See* Rule 703 (providing acceptable bases for expert reports); *see also Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 576 (E.D.N.Y. 2013) ("[P]laintiffs do not explain how Dr. Morse could legitimately introduce these reports at trial, inasmuch as Rule 703 clarifies that the expert generally may not disclose otherwise inadmissible evidence.").

delivery times *may* be greatly exacerbated by this pandemic—precisely at a time when the Postal Service is unprepared to handle a sudden increase in demand."); *Id*. at PageID# 407, ¶21 ("The new postmaster general, Louis DeJoy, implemented new procedures that *may* slow down mail delivery even further."); ¶ 21 ("The problems facing the Postal Service are sufficiently severe that there is a concern that a dramatic increase in mailed ballots for the 2020 general election *could* significantly slow delivery"); *Id*. "(This *could* portend problems for the general election."); *Id*. at PageID# 410-411, ¶27 ("This mismatch could be exacerbated by the pandemic and a sudden and dramatic increase in the number of Ohio voters who switch to absentee voting for the 2020 general election."); *Id*. at PageID# 415, ¶34 ("Design features of the system that increase voter costs, such as the complex method of absentee voting and the signature match curing process employed in Ohio, *tend* to reduce turnout.") (emphasis added).

### 4. McCool makes improper legal conclusions.

McCool is unqualified to draw legal conclusions—rather, that is the province of this Court. "Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984). The Court's "special legal knowledge" renders such evidence superfluous. *Id.* Expert testimony that is so "carefully couched in the precise language used in case law" is "particularly suspect" because it indicates either "a keen awareness by [the expert] of the direction in which he had to head, or else careful coaching prior to his testimony." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

This litigation centers on Plaintiffs' claims that Ohio voters *will* experience disenfranchisement, resulting in violations of their First and Fourteenth Amendments due to Ohio's signature matching and cure processes for absentee ballots. It would be inappropriate for any witness, including McCool, to then testify regarding what Ohio voting statutes or rules

require, the applicability of those statutes or rules, or to express any legal conclusions.  Yet, that is exactly what McCool has done.

The Sixth Circuit law "plainly prohibits" testimony regarding the law of the forum. *Payne v. A.O. Smith Corp.*, 627 F.Supp. 226, 228 (S.D. Ohio 1985) (citing *Zipkin*, 729 F.2d at 386).  It is the Court, and not the parties or their experts or witnesses, that determines the applicable law.  *See id*.  Moreover, it is this Court's duty to apply the law, to evaluate the evidence, and to render a decision.  A witness' legal conclusions are not helpful to the Court, and such testimony would merely waste time at trial.  *See Torres v. Oakland*, 758 F.2d 147, 150 (6th Cir. 1985); *see also* Fed. R. Evid. 703 and 403.  Experts and witnesses are not permitted to arrogate the Court's duty.  *See*, *Woods v. Lecureaux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

Here, McCool's improper legal conclusions that Ohio law does not require verification of a signature on an absentee ballot application (McCool Rep. at PageID# 404-405, ¶15); and that electoral features such as signature matching and inadequate curing procedures do not substantiate Ohio voting laws (*Id*. at PageID#415, ¶33) should be left for this Court to decide.  Therefore, this Court should exclude McCool's expert report.

  **B.**  **Alexander Street.**

    **1. Street's report is infected with inaccurate, unsupported and unreliable assumptions.**

Expert witnesses must show that all factual or data based assumptions in their work are scientifically valid and accurate.  *Nelson,* 243 F.3d at 254 (Court upheld the exclusion of expert testimony where the expert failed to prove that his assumptions were scientifically valid.).  The premise of Street's report is that signature matching on absentee ballots and absentee ballot applications is inherently "error prone" because Ohio elections officials are "untrained, under-resourced and time pressured lay people."  Street's basis for assuming that all Ohio elections

9

officials are "untrained, under-resourced and time pressured" is (1) they are not formally trained forensic document examiners; (2) he did not see any evidence of "formal training"; and (3) they do not have access to microscopes that would "enhance the precision of their work." Street Rep., Doc. 24-8, PageID # 451.  Street conducted no investigation and he compiled no evidence of the experience and training of Ohio elections officials.  He simply concluded that all non-forensic document examiners are "untrained, under-resourced and time pressured lay people." *Id*. at PageID#452, ¶5.  Common sense tells us that Street's assumption about every single Ohio elections official is an illogical, unreliable leap.

Street's Bayesian analysis is irrelevant because it is based on yet another inaccurate assumption.  Street concludes that forensic document examiners make less errors than laypeople in assessing whether a signature is *genuine. Id*. at PageID#454.  Street uses this point to infer that Ohio elections officials commit frequent errors in evaluating whether a signature on an absentee ballot application is *genuine*.  Street's inference is wrong and irrelevant to the issues presented here.  Ohio elections officials reject absentee ballot applications because the signature on the application does not match the voter's signature on file with the board of elections.  There is no determination of the genuineness of the signature on the application.  Indeed, every voter whose application is rejected for signature mismatch has the same opportunity to cure the mismatch.  This may require the voter to submit a new application or submit their updated signature on a Secretary of State Form 260.  *See* Ohio Rev. Code §§ 3509.03; 3501.05(AA).  If Ohio had *no* cure period at all, then perhaps Street's point would be relevant.  But, of course, Ohio permits liberal curing of signature mismatches.  Accordingly, the varying rates of misidentifying genuine signatures versus non-genuine signatures between forensic document examiners and lay people is simply irrelevant.

### 2. Street relies on incomplete and faulty data.

Plaintiffs fail to show that the size or composition of Dr. Street's samples of county data on the rejection rate of absentee ballot applications is appropriately representative of the entire State of Ohio. Courts must consider and evaluate the underlying facts and data relied upon by an expert in determining whether the expert's opinion is reliable. *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.,* 125 F.3d 1176, 1182 (8th Cir. 1997). Expert opinions that are premised on faulty and incomplete data, as well as faulty methodology, are properly excluded under Fed. R. Evid. 702. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Pugliano v. United States,* 315 F.Supp. 2d 197, 199 (D. Conn. 2004) *quoting Heller v. Shaw Indus.,* 167 F.3d 146, 155 (3rd Cir. 1997). "In deciding whether a step in an expert's analysis is reliable, the court must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand." *Id.*, *citing Amorgianos v. AMTRAK,* 303 F.3d 256, 267 (2nd Cir. 2002). "A district court is not required to admit expert testimony that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 254 (6th Cir. 2001), quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Street readily admitted the he only used the county data that was given to him in a spreadsheet, as opposed to "unhelpful" PDFs, because it was *easy*. Street Rep. at PageID#462, ¶28. So, at best, Street simply reported on the rate of absentee ballot rejections in the seven or eight counties that submitted their data in spreadsheets. *Id*. at PageID# 463-464. And even that data is internally inconsistent. Some of the counties included rates of rejections for "signature

issues" while others reported on different instances such as "no signature" or "signature discrepancy" as opposed to "signature missing." *Id*. at PageID#462-464. And he reported on different counties for different election years. *Id*. Street made no attempt to reconcile this data, or even analyze whether the integrity of the data was so faulty that it was not appropriate for analysis. Instead, Street conceded that the data did not paint a representative picture. He stated, "since it is not possible to assess whether the available data are representative of the rest of the state, I cannot provide a precise estimate or a measure of the uncertainty corresponding with such an estimate." *Id*. at PageID# 465, ¶ 30. Indeed, Street only concludes that "substantial numbers of Ohio electors" are affected. *Id*. at PageID# 476. Street's conclusions regarding absentee ballot application rejections are simply unreliable in making any inferences regarding statewide rates of rejections, and therefore, they are irrelevant to the issues in this lawsuit.

Shockingly, and with no evidence whatsoever, Street claims that "thousands" of Ohio voters suffer disenfranchisement because they do not receive a rejection notice or do not receive it in time to cure. *Id*. at PageID#470, ¶39. Street admits, to the contrary, that he could not track how many voters whose ballot applications were rejected cured the application or chose to vote in person. *Id.* at PageID#801; Street Dep. at 71:12-72:10, Doc. 40-5 at PageID#801. Street never even attempted to calculate how many voters tried to cure but were not timely or failed to cure for some other reason. *Id.* at 104:18-22, PageID#809.

Also, Street does not identify the scientific methods, if any, that he used to analyze the data that he did compile. "A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence both rests on a reliable foundation and is relevant to the task at hand." *Newell Rubbermaid, Inc., v. Raymond Corp.,* 676 F.3d 521, 527 (6th Cir. 2012) quoting *Daubert,* 509 U.S. at 597. "One key consideration is whether the reasoning or

12

methodology underlying the testimony is scientifically valid. The inquiry is a flexible one, and the focus…must be solely on principles and methodology, not on the conclusions they generate." *Id.* (Internal citations and quotations omitted). *See McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1246 (11th Cir. 2005) *citing Amorgianos,* 303 F.3d at 267 ("The *Daubert* requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.").

Street alleges that he used the "same techniques of analysis, data collection and statistical testing that I use in my scholarly research." *Id*. at PageID#452. But he never identifies what techniques he actually used in analyzing the data. On the face of Street's report, it appears that he just "eyeballed" the data and determined that the rates of absentee ballot application rejections are "substantial." *Id.* at PageID#476. Such an imprecise analysis lacks the scientific imprimatur necessary for this Court to properly rely on its conclusions.

Street employed the same non-scientific data collection and "analysis" to his conclusions regarding the timing of absentee ballot applications. He again used scant data from only three counties and made no inquiries as to whether that data can be used reliably to identify statewide patterns. *Id*. at PageID#467-469. So, at best, Street has presented data on when *three* Ohio counties received absentee ballot applications in one federal election. *Id.* Street's data on this point is unreliable and illustrative of nothing relevant. More importantly, Street's conclusion belies an "expert" purpose. Expert testimony is not needed to prove that voters who wait until the deadline to vote by mail may not have time to cure defects in their absentee ballot applications or absentee ballots. This Court should disregard Street's report and testimony as unreliable and irrelevant to the issues presented in this case.

      **C.**      **Mohammed's report is irrelevant.**

Plaintiffs state that "whether or not Ohio has a legitimate interest in conducting signature matching in general" is "a question that is not the subject of this litigation and not before this Court." Pls. Mot. for PI at PageID#157. Accordingly, the declaration of Plaintiffs' expert Linton Mohammed, which challenges the efficacy of signature matching in general, is irrelevant to the very narrow issues before the Court on the motion for preliminary injunction. *See* Mohammed Rep., Doc. 24-6. It does not relate at all to whether Ohio law permits boards of elections to use signature matching on absentee-ballot applications or to the notice-and-cure period for absentee ballots, the only two issues here. This Court should therefore disregard the expert report of Linton Mohammed.

      **D.**      **McCool, Street and Mohammed are "experts for hire" who prepared their reports solely for this litigation.**

The Sixth Circuit has long recognized that "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 434 (6th Cir. 2007); *Turpin,* 959 F.2d at 1352; *Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation."). A district court can also analyze more rigorously the admissibility of an expert's testimony if the expert's opinion was prepared solely for litigation. *Johnson,* 484 F.3d at 434. "If a proposed expert is a "quintessential expert for hire," then it seems well within a trial judge's discretion to apply the *Daubert* factors with greater rigor…Such an expert is not to be accorded a presumption of *un*reliability, but the party proffering the expert must show some objective proof…supporting the reliability of the expert's

14

testimony." *Id.* at 435 *citing Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d 1311 (9th Cir. 1995)(*"Daubert II"*).

There is no question that Plaintiffs employed McCool, Street and Mohammed to prepare their reports for this litigation, yet they have offered no objective proof to support the reliability of their experts as *Johnson* requires. The Court should disregard the Plaintiffs' expert reports for this additional reason.

### III.     CONCLUSION

For the foregoing reasons, this Court should disregard the expert reports and testimonies of Alexander Street, Daniel McCool, and Linton Mohammed.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069762)*
*Counsel of Record*
LIDIA MOWAD (0097973)
ANN YACKSHAW (0090623)
BRANDI SESKES (0077648)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.pfeiffer@ohioattorneygeneral.gov
Lidia.Mowad@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov
Brandi.Seskes@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

*/s/Julie M.Pfeiffer*
JULIE M. PFEIFFER (0069762)*
Assistant Attorney General
