IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF OHIO, A. PHILIP RANDOLPH INSTITUTE OF OHIO, GEORGE W. MANGENI, and CAROLYN E. CAMPBELL, <br><br>**Plaintiffs,**<br><br>v.<br><br>FRANK LAROSE, in his official capacity as Secretary of State of Ohio,<br><br>**Defendant.** | CASE NO.  20-cv-3843-MHW-KAJ<br><br>JUDGE MICHAEL WATSON<br><br>MAGISTRATE JUDGE KIMBERLY JOLSON |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF DANIEL MCCOOL, ALEXANDER STREET, AND LINTON MOHAMMED**

## I.     INTRODUCTION

Defendant Ohio Secretary of State Frank LaRose has moved to exclude the expert reports and testimony of all three Plaintiffs' experts, Daniel McCool, Alexander Street, and Linton Mohammed, under the authority of *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and its progeny. Defendant alleges that Plaintiffs' experts are not qualified to opine on Ohio's electorate, that their opinions are irrelevant, that their opinions are not grounded in valid scientific methodology, and that their opinions are legal conclusions. But where the judge is the factfinder, as here, this Motion fails as a matter of law because there is no opportunity for expert testimony to mislead a jury, which is the harm against which *Daubert* is designed to protect. Defendant's arguments go instead to weight, rather than admissibility, and they fall short there as well. The Plaintiffs' experts have the appropriate qualifications to opine on the subjects of their testimony and their testimony satisfies the standards for expert testimony.

## II.    ARGUMENT

### A. Defendant mischaracterizes the legal standard for admissibility of expert testimony.

Defendant's summary of the *Daubert* standard omits two important qualifications, which, when considered, require that the Motion be denied.

#### 1. Daubert is largely irrelevant when the judge is the factfinder

The Supreme Court decided *Daubert* in the context of toxic tort litigation, where the Court was most concerned that juries would be misled by experts offering novel, untested theories, or even "junk science." *See Daubert*, 509 U.S. at 595–97. The Court in *Daubert*, thus, found that district courts had to act as "gatekeepers" to shield juries from misleading or unreliable expert testimony by assessing the reliability of the expert's principles and methodologies used to reach the expert opinion or conclusion. But the Sixth Circuit has held that

the "gatekeeper" doctrine which "was designed to protect juries … is largely irrelevant in the context of a bench trial" because the court can accord the testimony the weight it deserves. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).

Furthermore, even assuming a motion in limine to exclude expert testimony were appropriate, at this time it is premature. Motions *in limine* are to be "confined to very specific evidentiary issues of an extremely prejudicial nature." *Lumenate Techs., LP v. Baker*, No. 1:14-cv-125, 2016 WL 3906237, at *2 (S.D. Ohio July 19, 2016) (quoting *Brown v. Oakland Cnty.*, No. 14-cv-13159, 2015 WL 5317194, at *2 (E.D. Mich. Sept. 10, 2015)). This Court has cautioned that when "the evidence is not plainly inadmissible on all potential grounds, the Court's 'evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.'" *Id.* (citation omitted). To date neither Dr. Mohammed nor Dr. McCool has testified, and defense counsel objected vociferously when Plaintiff's counsel asked Dr. Street a few questions at his deposition and refused to allow Dr. Street to answer fully many of her questions. Street Tr. 100:20-22, 101:13-17. To the extent that their opinions have been established through their expert reports, Dr. Mohammed, Dr. McCool, and Dr. Street's opinions are clearly admissible under Rule 702.

> **2. The *Daubert* standard for admissibility of expert testimony under FRCP Rule 702 focuses on relevancy and reliability, not factual disputes or the weight that the fact-finder should accord the expert evidence.**

To the degree that Defendant's motion challenges the factual foundations of Plaintiffs' experts' opinions, including Defendant's assertion that data sets considered were flawed, nothing in *Daubert* or its progeny changed the fundamental rule that the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility. The Sixth Circuit has concluded that "weaknesses in the factual basis of an expert witness' opinion . . . bear on

3

the weight of the evidence rather than on its admissibility." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993)) (internal quotations omitted); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807, 809 (3d Cir. 1997) (reversing trial judge's exclusion of expert based on "insufficient factual foundation" and cautioning that the "trial judge must be careful not to mistake credibility questions for admissibility questions").

Under the relevant Sixth Circuit law relating to exclusion of expert testimony, the general rule is as follows: "rejection of expert testimony is the exception, rather than the rule." *Scrap Metal*, 527 F.3d at 530 (internal citations omitted). Understood in light of the relevant law, Defendant's motion to exclude does not pass muster.

Here, there is no reason to give any of the experts' testimony any less weight because of the factual foundations. Their reports clearly identify and articulate the underpinnings of their expert conclusions and identify for the readers the limitations upon those conclusions given the factual record. As Dr. Street testified: "So good practice in social sciences is to draw inferences based on the available evidence while explaining clearly to the reader the limits of those inferences. And that's what I am trying to do when I say that is a baseline." Street Tr. 63:14-18; *see also* Street Tr. 60:14-61:4, 61:20-63:1; (explaining the concept of baseline).

  **B. The reports and testimony of Plaintiffs' experts are admissible and Defendant's motion to exclude should be denied.**

    **1. Defendant's complaints against Dr. McCool's report, even if merited, would go only to the weight of the evidence.**

To be clear, *Daubert* is about the admissibility of an expert's testimony, not the weight that testimony should carry with the trier of fact. Defendant filed this motion to exclude testimony that would be helpful to the Court's consideration of Ohio's electoral design,

4

specifically whether the design provides sufficient notice and cure to Ohio voters who have had their absentee applications and absentee ballots rejected because of signature mismatch.

Defendant would have the Court exclude Dr. McCool's testimony because his research experience is "narrow" and focuses on "Native American" voting rights. Def.'s Br. at 3 (Doc. 43). Not only does Defendant vastly understate Dr. McCool's credentials, Defendant's argument goes to the weight that should be accorded to Dr. McCool's testimony, as opposed to its admissibility. The Sixth Circuit has clearly stated that where the fact-finder can "determine for itself the weight and credibility to be given to the expert's testimony, an argument opposing admissibility of the testimony on the grounds that it is outside the witness's area of expertise must fail." *Benton v. Ford Motor Co.*, 492 F.Supp.2d 874, 877 (S.D. Ohio 2007) (citing *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir.1998)).

Dr. McCool is a Professor Emeritus of Political Science at the University of Utah. He has written extensively on voting rights including in his journal article "Social Science Expert Witness Testimony in Voting Rights Cases," which discusses the different types of statistical and demographic analyses used in Voting Rights Act Section 2 cases. Doc 24-7, at 32. He has written chapters in books detailing the history and passage of the Voting Rights Act, covering minority vote dilution in different jurisdictions in the United States, and focusing on Black and Latino representation in majority-minority districts. *Id.* at 33. He has served as an expert witness in seventeen voting rights cases including six cases filed this year concerning voting by mail during the pandemic in Minnesota, Montana, Pennsylvania, and Nevada. In 2019, he served as an expert witness in a case challenging Arizona's mail-in ballot return deadline and its disproportionate impact on Latino voters. *Id.* at 36. In all of these cases, the courts, without question, admitted Dr.

5

McCool's expert testimony on the voting costs to voters imposed by different states' vote-by-mail systems. *See id.*

Defendant complains that Dr. McCool is unqualified because he has no prior Ohio-specific research experience. Def.'s Br. at 3 (Doc. 43). This argument is highly unpersuasive, especially as applied to a voting rights expert who has testified regarding election procedures in many states. Dr. McCool has experience in researching and analyzing election administration across the country and has been admitted as an expert on election administration. *See* Doc 24-7 at 36, 37. One need not to have previously conducted Ohio-specific research to be able to opine on the efficacy of Ohio's vote-by-mail system during the time of a pandemic and Postal Service delays. In *Clay v. Ford Motor Co.*, a case involving a products liability claim in the automobile accident context, the Sixth Circuit affirmed a lower court's decision to admit the expert testimony of a consultant who had never worked in automobile manufacturing, never tested the automobile in question, and never published an article about automobile stability indicia—the topic he opined on. 215 F.3d 663, 668 (6th Cir. 2000). And, as discussed above, Defendant's assertions that Dr. McCool's opinions are outside his area of expertise go to the weight of the evidence rather than their admissibility.

Defendant contends that Dr. McCool's "Qualitative Methods," fail to meet the reliability and validity standards under *Daubert* and its progeny. But in *Kumho Tire Co., Ltd. V. Carmichael*, the Supreme Court reiterated that the inquiry for determining the reliability and validity of a particular method is whether it is the "subject of peer review or publication" or generally accepted in the scientific community. 526 U.S. 137, 145 (1999) (internal citations omitted). In *Kumho Tire,* the Supreme Court held that a lower court did not abuse its discretion in excluding expert evidence where "there was no indication in the record" that others in the tire

industry used the expert's two-step test to determine whether tires were defective and no references in the record to peer-reviewed articles that validated such a method. *Id.* at 157. For that reason, the Supreme Court concluded that the expert's methodology did not meet the standard under Rule 702. *Id.* at 158. In contrast, Dr. McCool's methodology, which is known as "qualitative methodology," (and is in fact explained in an entire section of his report) is used to analyze "how people experience aspects of their lives, how individuals and/or groups behave, how organizations function, and how interactions shape relationships." Doc. 24-7, ¶ 5. Dr. McCool cites to peer reviewed political science literature that validates this methodology, *id.*, ¶¶ 5–8, and in particular states that there are "many methodology textbooks that focus on qualitative methods," *id.*, ¶ 8. Further, Dr. McCool has used qualitative methods in his own numerous peer reviewed journal and university press publications. *See id.* at 31-34. Again, even if Defendant were correct that this methodology was somehow not reliable, Defendant's assertions would go only to weight and not admissibility.

      Defendant launches a volley of unmerited attacks on Dr. McCool's factual predicates and conclusions—such as his conclusion that the current cure periods provided under Ohio law are not sufficient to account for postal service delays or that he includes only one citation to conclude that voter fraud is rare. Def.'s Br. at 5–6 (Doc. 43). But, as Dr. McCool states in his report, the basis for his opinion is his own independent analysis of the Heritage Foundation database of voter fraud, previous court cases, and several referenced publications. *See* Doc 24-7, ¶¶ 28-32. Again, Defendant's disagreements over Dr. McCool's data and conclusions are factual issues to be weighed by the fact-finder—the Court. These complaints do not support Defendant's position that the report should be excluded.

Defendant asserts that Dr. McCool cannot rely on newspaper articles to form his conclusions because these are hearsay. Def.'s Br. at 6–7 (Doc. 43). But this too is incorrect. Rule 703 of the Federal Rules of Evidence permits an expert to base an opinions on "facts or data in the case that the expert has been made aware of" and not just facts or data that the expert has "personally observed." Fed. R. Evid. 703; *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) ("Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion."). For an expert, the primary question is whether the expert would use the source in his work outside of court. *See Baumholser v. Amax Coal Co.*, 630 F.2d 550, 553 (7th Cir. 1980). Dr. McCool's qualitative methods approach calls for an examination of all available sources, including news media. *See* Doc 24-7, ¶ 5.("This is the same methodology I have used in nearly all my academic work, as well as all of my previous expert witness reports. I employ this methodology by using data and information gleaned from multiple and overlapping sources."). Dr. McCool relies on newspaper articles on the Postal Service, in particular, reporting recent changes in procedures that may delay delivery of absentee materials. Naturally, Dr. McCool relied on these articles—as well as the letter sent by the postmaster general to Defendant regarding the insufficient times allocated for delivery under Ohio's absentee voting laws—to conclude that Postal Service delays increase voter costs associated with curing applications and ballots rejected for signature discrepancies. Doc. 24-7, ¶¶ 16–18. Again, Defendant's allegation that Dr. McCool's conclusions are "speculative" and "unsupported" go to the weight of the evidence as opposed to its admissibility, rendering these issues inappropriate for a *Daubert* motion.

Finally, Defendant claims, with no support, that Dr. McCool's report expresses legal conclusions. Def.'s Br. at 9 (Doc. 43). Again, this is simply not true. Dr. McCool does not

interpret Ohio law or standards—he analyzes the costs to Ohio voters of having to complete a multi-step absentee application request and absentee ballot return process, factoring in the time and effort it would take to cure signature mismatch rejections, and adding to the mix Postal Service delays and a pandemic. The case Defendant cites, *Payne v. A.O. Smith Corp.*, involved a motion in limine on whether to exclude expert testimony on the consumer product safety rules. 627 F. Supp. 226, 228 (S.D. Ohio 1983). In particular, the expert in that case was asked to identify the factual elements in performing a safety analysis under the rules, the weight assigned to each element, the method of determining when a recall should be conducted, and whether the defendants' product should have been recalled. The court concluded that this analysis amounted to an analysis of the legal standards of safety and the rules that governed safety. Unlike the expert in *Payne*, here, Dr. McCool examined two entirely factual questions—the voter costs associated with the cure process for ballots rejected due to signature mismatch and whether Postal Service delays increase these voter costs. Doc. 24-7, ¶¶ 1–2.

## 2. Defendant's assertions against Dr. Street's report and testimony go to the weight of the expert evidence, not its admissibility.

Defendant takes issue with Dr. Street's factual and data-based assumptions—for example, complaining that his Bayesian analysis is irrelevant and that his data set which samples data on absentee ballot applications is unrepresentative of statewide error rates. Def.'s Br. at 10–13 (Doc. 43). Again, these complaints are all factual disputes that go to the weight of Dr. Street's evidence, and, as such, are inappropriate for a *Daubert* motion.

Defendant asserts that Dr. Street's Bayesian analysis is irrelevant because it is based on the assumption that laypersons make more errors than do experts when conducting signature matching. *Id.* at 10. First of all, that representation is wrong. As Dr. Street repeatedly explained to Defense counsel in his deposition, his Bayesian analysis is not based on the assumption that

9

lay people in particular make mistakes in signature matching. Street Tr. 22:5-25 ("And we know, based on this public research, that both experts and laypeople, but even experts do make errors when they're trying to judge."); Street Tr. 41:11-42 ("[I]n the calculation on Page 7 just between Paragraphs 18 and 19, that is based on estimate -- on accuracy levels for the experts."), Street Tr. 44:12-15 ("The purpose for which I'm using [the studies comparing lay people to experts] is to get an -- an estimate of how accurate these experts are when they're assessing the validity -- validity of signatures."); Street Tr. 45:1-12 ("The purpose is to say even if you're an expert, how good are people at validating signatures. And the – the answer is that they sometimes wrongly reject valid signatures."). He assumes that *everyone* makes mistakes in signature matching, including experts. *Id*. He uses the expert error rate as the basis for his Bayesian calculation and not the layperson error rate. *Id*. Thus, his Bayesian analysis shows that even if clerks and other election officials were performing at expert levels under ideal conditions, they would make mistakes that would result in erroneously flagging a signature as non-matching. *Id*.

Defendant also contends that Dr. Street does not identify the scientific methods he used to analyze the data he compiled on absentee application rejections. But this is not true. Dr. Street meticulously documents and footnotes his approach to absentee ballot applications rejections. He cites his source of information: "[m]y main sources for this analysis are the responses of county election officials to public records requests submitted by counsel for the plaintiffs." Doc 24-8, ¶ 27. He then identifies how we determined which subset was amendable to analysis: "I decided that the best strategy was to limit my analysis to the counties that reported data in a format amenable to statistical analysis, i.e., those that provided individual-level data using a spreadsheet format (not including the unhelpful pdf-format copies of a spreadsheet)." *Id*. at ¶ 28. He then presents his results, identifying the county at issue, the year of the election, and whether

10

individual county level data distinguished between "no signature" and "signature mismatch." *See id.* at Table 2.

Defendant asserts that Dr. Street's data set concerning absentee application rejections is incomplete. Def.'s Br. at 11 (Doc. 43). But that is Defendant's fault. Neither the Ohio Secretary of State's office, nor many county boards, track absentee application rejections according to the reason for rejection. [1] Nor does the Secretary of State's office provide any uniform guidance to counties on how they should track this data. Dr. Street recognized these deficiencies in his report to alert the Court that his conclusions were based on data kept by different counties in an

---

[1] As Dr. Street wrote in his report, "State and county officials in Ohio provide uniform information on absentee ballot rejections but not, to my knowledge, on absentee ballot *application* rejections. By studying data on the application stage, I am revealing what I believe was a previously invisible layer of the issue. The data show that, much like an iceberg, this previously hidden layer is much bigger than the layer which was already visible. My main sources for this analysis are the responses of county election officials to public records requests submitted by counsel for the plaintiffs, who asked for the number of absentee ballot and absentee ballot application rejections in recent years. Unfortunately, the election officials of Ohio's 88 counties responded in wildly different ways. Some wrote short notes to the effect that they did not have the information. Some appear to have ignored parts of the request and have provided data only on the electors who successfully registered to vote absentee (i.e., they provided no information about rejections at the application stage). Others provided pdf files, some hundreds of pages long, showing the names and addresses of voters whose applications had been rejected. Some sent digital scans of individual absentee ballot applications (with some details redacted). Even those counties that did report relevant evidence often did so using different categories, e.g., some only reported a generic category of "signature issue" while others distinguished between "no signature" and "signature mismatch." Some provided evidence on which voters were able to resolve the issue to receive an absentee ballot, and when that happened, while others did not. Some counties provided information only for the 2020 federal primary election, while others provided information going back to the 2018 and/or 2016 general elections. Some provided information in different formats or at different levels of detail for each election. In many cases, the data were provided without explanation of the abbreviations or categories used in the files, or without details on exactly which classes of applicants they covered (e.g., it was not always clear if the officials had opted only to show information on rejected applicants who had *not* been able to resolve the issue). Given the often opaque, inconsistent and incomplete nature of the evidence, I decided that the best strategy was to limit my analysis to the counties that reported data in a format amenable to statistical analysis."

inconsistent manner, and therefore, as discussed above, employed data according to the format in which the county provided it.

### 3. Dr. Linton Mohammed's report is relevant and should be admitted.

Defendant's objection to Dr. Mohammed's report is that it is irrelevant to the two "very narrow" issues before the Court in this case. Def.'s Br. at 14 (Doc. 43). The test for Rule 702 relevance as interpreted in *Daubert* is a "liberal one"— evidence or testimony should "assist the trier of fact to understand the evidence or to determine a fact at issue . . . . Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 509 U.S. 579, 591 (1993) (internal quotations omitted).

But Dr. Mohammed's expert report goes to the heart of Plaintiffs' Preliminary Injunction Motion. It illustrates exactly why Ohio voters need to be provided with adequate notice and opportunity to cure when their application or ballot is perceived to have a signature mismatch: these perceived mismatches are so frequently wrong. His report demonstrates that Ohio election officials are likely to reject a voter's absentee application and absentee ballot envelope based on an incorrect determination that the signatures on these materials do not match the signature on file for the voter. Doc. 24-6, ¶ 30. Dr. Mohammed's opinion that Ohio election officials are more likely than not to misinterpret the range of variation in an individual's signature because they are not trained to focus on "holistic features of signatures, such as alignment, slant, pen lifts, rhythm, the size of writing, the slope or slant of the letters . . ." is relevant because it sheds light on why election officials are likely to make mistakes. *Id.* at ¶ 49. Dr. Mohammed's conclusions are also relevant because they shed light on Plaintiffs' claim that counties apply inconsistent standards for signature matching on absentee applications and ballots leading to arbitrary results where some voters' votes may not be counted depending on the county in which they live.

12

### 4. Plaintiffs' experts are not "experts for hire."

Defendant cites to three Sixth Circuit cases as support for the proposition that the three experts Plaintiffs have retained prepared their opinions solely for litigation. Def.'s Br. at 14 (Doc. 43). Without explaining further as to why Defendant believes that the reports and testimony of these three experts do not flow "naturally from the expert's line of scientific research or technical work," Defendant argues that the Court should disregard their reports. *Id.* at 15.

In *Johnson v. Manitowoc Boom Trucks, Inc.*, the plaintiff who was severely injured when using a crane manufactured by the defendant, hired a mechanical engineer expert to opine on the product defects. 484 F.3d 426, 434 (6th Cir. 2007). First, the holding of that case is not applicable here. There, the Sixth Circuit found that the presumption of an expert for hire would only attach if plaintiffs failed to provide "objective proof that the research comports with the dictates of good science." *Id.* at 435. Here, all three experts have declared that they followed the mandates of their discipline and that they use in their peer reviewed research. Second, the Sixth Circuit found that even if the presumption were to attach, "such an expert is not be accorded a presumption of unreliability, but the party proffering the expert must show some objective proof—such as the expert's extensive familiarity with the particular type of machine in question, as in *Bah*—supporting the reliability of the expert's testimony." *Id* .at 435. In the absence of the first step, there is no need for the court to reach this second step. *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, was a pre-*Daubert* case, that involved the plaintiff's appeal of a summary judgement grant in defendants' favor because the trial court concluded that the plaintiff failed to show a causal connection between the mother's use of a prescription drug and the minor child's birth defects. 959 F.2d 1349, 1351 (6th Cir. 1992). That application is clearly distinguishable from the present case as it was based on the presumed unreliability of animal testing and the

13

failure of plaintiffs to fully explain the animal tests conducted. *Id*. In *Mike's Train House Inc. v. Lionel, L.L.C.*, the plaintiff, a model train manufacturer, was awarded $40 million in damages in trade secret misappropriation and unjust enrichment claim against another company. The Sixth Circuit reversed finding that the trial court had erred in admitting the testimony of an expert who relied on another expert's report and conclusions which were not admitted into evidence.

These cases are not applicable to the current matter. They were decided in the context of jury trials and involved product defects, torts, and trade secrets. As discussed in detail above, Drs. McCool, Street, and Mohammed have extensively written and presented on the issues they provide opinions on. And other courts have admitted their testimony and found them to be credible.

### III.  CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to exclude Plaintiffs' experts and admit their reports and testimony.

Respectfully submitted,

/s/  Freda J. Levenson
Freda J. Levenson (0045916)
Trial Counsel
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 472-2220
flevenson@acluohio.org

T. Alora Thomas-Lundborg*
Dale Ho*
Jonathan Topaz*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: 212-519-7866
Tel: 212-549-2693
athomas@aclu.org

dale.ho@aclu.org
jtopaz@aclu.org

Ezra Rosenberg*
Pooja Chaudhuri*
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

C. William Phillips*
Joshua B. Picker*
John F. Nelson*
Katherine P. Onyshko*
Jeremy Patashnik*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 841-1000
cphillips@cov.com
jpicker@cov.com
jnelson@cov.com
konyshko@cov.com
jpatashnik@cov.com

*Pro Hac Vice

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2020, I filed a copy of the foregoing Motion for Leave to Exceed Page Limitation using the Court's Electronic Filing System, and that counsel for all parties received electronic notice through that system.

/s/ *Freda J. Levenson*
Freda J. Levenson
