**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS OF OHIO, A. PHILIP RANDOLPH INSTITUTE OF OHIO, GEORGE W. MANGENI, and CAROLYN E. CAMPBELL,** | |
| **Plaintiffs,** | CASE NO.  20-cv-3843-MHW-KAJ |
| | JUDGE MICHAEL WATSON |
| **v.** | |
| **FRANK LAROSE, in his official capacity as Secretary of State of Ohio,** | MAGISTRATE JUDGE KIMBERLY JOLSON |
| **Defendant,** | |
| **DONALD J. TRUMP FOR PRESIDENT, INC., THE OHIO REPUBLICAN PARTY, THE REPUBLICAN NATIONAL COMMITTEE, and THE NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE,** | |
| **Intervenor-Defendants.** | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

In an electoral season transformed by COVID-19—one in which Defendant Secretary of State Frank LaRose has admitted that mail-in voting will play a pivotal role and that delays in the U.S. Postal Service will significantly impact election mailings—the pre-existing problems with Ohio's system for matching signatures on absentee ballot applications and ballots will surge to historic proportions.  It is in this context that Ohio's signature-matching processes are unconstitutional.

Contrary to the suggestions of Defendant LaRose and the Republican Intervenor-Defendants (collectively, "Defendants"), Plaintiffs do not seek a preliminary injunction here to address issues that have existed for many years or, in Defendants' view, been resolved by the Sixth Circuit.  Rather, Plaintiffs seek two narrowly tailored items of relief to ensure that Ohio's signature-matching system is constitutionally sufficient for the world we find ourselves in today. They first seek a clarification that Defendant LaRose's recent Directive 2020-11 requires local boards of elections to notify voters by phone and email if their absentee ballot applications are rejected on the grounds of signature mismatch.  Second, they seek to extend the period in which Ohio boards of elections must permit voters to cure purported mismatched signatures on absentee ballots, so that those ballots have time to travel through the U.S. mail and be counted. This relief will ensure that when mistakes happen in signature matching—which they inevitably will, and at significantly higher rates in the 2020 General Election—affected voters will not be disenfranchised.

Defendants' oppositions do not refute this serious risk of disenfranchisement.  Instead, Defendants attack Plaintiffs' standing, but do not counter the evidence Plaintiffs have been and will be injured by Ohio's unconstitutional signature-matching procedures.  They assert (wrongly) that Plaintiffs' claims are foreclosed by a case decided four years ago, which did not address

Plaintiffs' specific claims concerning the signature-matching procedures at issue here and could not possibly have contemplated the ramifications of the COVID-19 pandemic that give rise to this as-applied challenge.  They point to a nebulous "burden" that Plaintiffs' narrow relief would supposedly create for boards of elections, but submit no evidence that such a burden actually exists.  And they blame the victims, arguing that any Ohioan not able to cure a purportedly mismatched signature simply should have cast a ballot sooner, ignoring that Ohio's process leaves some voters who have complied with the state's schedule with *no* practical opportunity to cure a mismatch.  What Defendants do not offer is a cogent, substantive defense of Ohio's signature-matching system in the upcoming election, because there is none.  This Court should do what Defendant LaRose refuses and guarantee Ohioans a constitutionally sufficient notice-and-cure period for purportedly mismatched signatures on mail-in ballots and ballot applications in the November General Election.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS.

Defendants cannot meaningfully dispute that Plaintiffs have suffered harm as a result of Ohio's constitutionally infirm signature-matching processes for absentee ballots and applications.  Nonetheless, they erroneously assert that Plaintiffs lack standing, based on a flawed reading of the relevant legal standard and selective citation of the facts.

Determination of standing involves two levels of inquiry: *first*, whether the plaintiff has shown that a "case or controversy" exists, either by proving actual injury or injury in fact likely to be redressed by a favorable decision; and *second*, whether the plaintiff is the proper proponent of the rights on which the action is based.  *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987) (citations omitted).  A plaintiff must prove standing in order to succeed on the merits at trial; however, at the preliminary injunction

stage, the question is whether the plaintiff is *likely* to succeed in proving standing. *See U.S. Student Ass'n Foundation v. Land*, 585 F. Supp. 2d 925, 942 (E.D. Mich. 2008). Moreover, if a court is satisfied that even one plaintiff among several has standing to request a preliminary injunction, it must then consider the merits of the injunction. *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007). Because all four Plaintiffs have demonstrated a substantial likelihood of proving standing, the Court should consider the merits of the requested injunction.

A.    **LWVO and APRI Have Each Shown Actual and Imminent Injury that Is Fairly Traceable to Defendant LaRose.**

An organizational plaintiff may establish standing by showing that it sustained "an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable decision from the court." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). An organization has sustained such an injury when it is forced to divert its resources to address impediments to its mission caused by a defendant. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Here, Defendant LaRose's actions have forced the League of Women Voters of Ohio ("LWVO") and the A. Philip Randolph Institute of Ohio ("APRI") (collectively, "Organizational Plaintiffs") to devote key resources to preventing the disenfranchisement of Ohio voters above and beyond their normal voter education and registration efforts. *See, e.g.*, Miller Dep. (Doc. 40-4), at 47:4–48:15; Washington Dep. (Doc. 40-1), at 43:1–6, 45:6–25, 53:4–20. While the provisions in question were enacted in 2014, the pandemic has significantly exacerbated the already-present defects of the law. Miller Dep. at 24:4–18. The fact that these defects have only recently become so pressing as to take priority over Plaintiffs' other activities does not change the fact that the defects have caused a diversion of resources.

Defendant LaRose is incorrect that the standing of the organizational plaintiffs in *Northeast Ohio Coalition for the Homeless v. Husted* ("*NEOCH*"), 837 F.3d 612 (6th Cir. 2016), turned on the fact that the law being challenged was new.  *See* Def.'s Br. (Doc. 41), at 16.  In fact, the critical issue there was whether NEOCH was forced to undertake new *activities* in response to the defendant's actions.  *NEOCH*, 837 F.3d at 624.  Like NEOCH, Organizational Plaintiffs have had to engage in significant and specific new *work* as a result of Defendant LaRose's actions, ranging from developing and implementing extra training programs for field volunteers in tracking applications, ballots, and cures, Miller Dep., at 47:4–48:15; to creating and publishing new digital and print materials, *id.* at 45:1–12; to updating their websites to instruct voters, *id.* at 52:13–25; to establishing new phone banks to advise voters of the hurdles and delays caused by signature matching, Washington Dep., at 47:12–48:14, 53:4–20; Washington Decl. (Doc. 24-4) ¶ 14.  These obstacles are directly traceable to Defendant LaRose's failure to adjust Ohio's signature-matching scheme to ensure that the system can handle the scale of absentee voting and the slower mail delivery—that even he anticipates—in the upcoming election.

Defendant LaRose attempts to shift the blame for his flawed system onto the pandemic.  But that is a red herring.  The constitutional injury is the application of Defendant LaRose's rules in the context of this public-health crisis.  In fact, the Sixth Circuit recently found existing election-related signature requirements to constitute a burden, as applied during the pandemic.  *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553, at *4 (6th Cir. May 5, 2020).  *Esshaki* is in line with other federal courts that have also recently found various election laws to constitute an

undue burden during the pandemic.[1]  *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020)—on which Defendant LaRose relies for the proposition that the pandemic, not he, is responsible for Plaintiffs' injuries—is not to the contrary.  Indeed, the Sixth Circuit differentiated that case from *Esshaki*, noting that Ohio's stay-at-home order specifically exempted the types of First Amendment activity that plaintiffs claimed would prevent them from obtaining the requisite number of signatures to place initiatives on the ballot.  *Id.* at 809.  In this case, on the other hand, Defendant LaRose has already admitted that the two effects of the COVID-19 pandemic that Plaintiffs argue support their requested relief—a significantly increased reliance on mail-in voting and delays in U.S. Postal Service delivery times—will inevitably occur in the coming election  *See* Pls.' Br. (Doc. 24), at 5, 12.

Because Defendant LaRose's actions have forced LWVO and APRI to divert significant additional resources to prevent the disenfranchisement of Ohio voters, they have demonstrated

---

[1]  *See, e.g.*, *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (upholding consent decree that suspended certain absentee balloting requirements because "many more voters are likely to want to vote without going to the polls and will thus only vote if they can vote by mail" in light of the pandemic, and finding "[t]he burden imposed by these requirements in the midst of a pandemic is significant"); *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 20-cv-00024, 2020 WL 4927524, at *9 (W.D. Va. Aug. 21, 2020) (holding that while "'[i]n ordinary times, Virginia's witness signature requirement [for absentee ballots] may not be a significant burden on the right to vote' . . . [it] remains both too restrictive and not restrictive enough to effectively prevent voter fraud") (citations and internal quotation marks omitted); *Thomas v. Andino*, No. 3:20-CV-01552-JMC, 2020 WL 2617329, at *23 (D.S.C. May 25, 2020) (enjoining one of the absentee ballot requirements for the 2020 primary election because, "[c]onsidering the ramifications of the injunction during a pandemic, the public interest is served"); *Garbett v. Herbert*, No. 20-cv-00245, 2020 WL 2064101, at *12 (D. Utah Apr. 29, 2020) (finding severe burden on ballot access rights); *Libertarian Party of Ill. v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (finding the ballot access requirements a "nearly insurmountable hurdle" in light of the pandemic); *Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516, 526 (2020) (holding that the minimum signature requirement, though modest in "ordinary times," is a "severe burden" in light of the pandemic); *see also League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at *2 (W.D. Va. May 5, 2020) (finding that Virginia's witness signature requirement for absentee voting was an undue burden on Virginians' fundamental right to vote in light of the pandemic).

an actual injury fairly traceable to Defendant.

**B.     LWVO and APRI Each Have Associational Standing.**

LWVO and APRI also have associational standing to sue on behalf of their membership. "[A]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tenn. Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017). An organization establishing standing in this way must allege that at least one identified member has suffered or would suffer harm unless *all* members would be harmed. *Id.*

Defendant LaRose's assertion that Plaintiffs have failed to identify any harmed members, Def.'s Br. at 18, entirely ignores Jennifer Miller's deposition testimony in which she clearly listed several LWVO members who had experienced signature mismatch rejections. *See* Miller Dep., at 34:6–35:7, 36:22. Defendant LaRose also makes the incredible argument that APRI cannot possibly have standing because "[n]o APRI member plans to return his or her ballot late in the absentee voting period." Def.'s Br. at 19. Obviously, no voter *plans* to return his or her ballot late. However, the current signature-matching processes necessitate significant time and reliance on an overstretched and delayed postal service. Thus, even for voters who adhere to Defendant LaRose's announced schedule for absentee ballots, the process can cause their ballots to be delayed. Defendant LaRose himself has even acknowledged these delays. Pls.' Br. at 12.

Moreover, even if LWVO and APRI had not already identified individual members for purposes of standing, representative standing is still viable because the harm is inevitable. As Chief Judge Cole of the Sixth Circuit noted in his dissenting opinion in *Fair Elections Ohio*:

In *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004)

> . . . [a]lthough the election had not yet occurred and the organizations "ha[d] not identified specific voters" who might suffer such harm, we observed that "this is understandable" because such issues "cannot be specifically identified in advance," but "[i]t is inevitable, however, that there will be such mistakes."

*Fair Elections Ohio*, 770 F.3d at 463. Judge Cole's logic applies here. Although LWVO and APRI may not have the prescience to identify which of their members will have their signatures rejected, it is sufficient for associational standing to show that some members will inevitably be disenfranchised.

**C.    Mr. Mangeni and Ms. Campbell Have Each Shown Actual and Imminent Injury that Is Fairly Traceable to Defendant LaRose.**

Plaintiffs George Mangeni and Carolyn Campbell are two Ohio voters whose good-faith attempts to vote by mail were thwarted by Ohio's flawed absentee ballot procedures. As a result, their votes were never counted. Nevertheless, Defendant LaRose dismisses this harm, blaming it on Plaintiffs themselves or circumstances outside his control. Def.'s Br. at 11–12.

Defendant LaRose broadly asserts that Mr. Mangeni "lacks standing because he is not an absentee voter by mail," *id.* at 10, yet in the very next sentence Defendant LaRose concedes that Mr. Mangeni did, in fact, vote by mail in the most recent election, *id.* Of course, it is not for Defendant LaRose to determine forever more whether or not any given voter "is an absentee voter by mail"—that determination is made by voters themselves in each election, depending on the circumstances or the voter's needs at the time. Mr. Mangeni may prefer to vote in person, as many voters do, but he testified that he may vote by absentee ballot again in the future, Mangeni Decl. (Doc. 24-5) ¶ 12, and like all Ohio voters he has the right to make that decision with confidence that his choice will not affect the likelihood that his vote is counted. Indeed, while Mr. Mangeni testified that he *planned* to vote in person in November, Mangeni Dep. (Doc. 40-3), at 34:12–16, he did not rule out voting by mail in the future. And we cannot know whether the COVID-19 situation in two months will even allow most Ohioans to vote in person, so Ohio's

signature-matching scheme could cause Mr. Mangeni the same injury again.[2]

Moreover, Mr. Mangeni's experience having his ballot rejected in the primary election has deprived him of the ability to vote by mail in the future with confidence that his mail-in ballot will be counted. Mangeni Decl. ¶ 12. Pressuring Mr. Mangeni to vote in person at risk to his health during a pandemic is a harm that would clearly be redressed if Defendant fixed Ohio's flawed signature-matching processes.[3]

With respect to Ms. Campbell, Defendant LaRose mischaracterizes her harm as her "failure to cast a vote," Def.'s Br. at 11, but fails to mention the critical fact that the Cuyahoga County Board of Elections mailed her absentee ballot *too late* for her to be able to submit it on time. *See* Campbell Decl. (Doc. 24-4) ¶ 10. Ms. Campbell did not receive her ballot until April 29, 2020, one day after the election, and *two* days after the deadline to postmark her ballot.

---

[2] To the extent that Defendants argue that Mr. Mangeni's claim is now moot, because he could not know in advance of voting by mail whether his vote would be counted in a future election, the U.S. Supreme Court has squarely rejected that type of argument. *See, e.g.*, *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007) (noting that a claim may be brought under the "capable of repetition, yet evading review" doctrine when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again").

[3] Intervenors also mistakenly argue that Mr. Mangeni's injury is attributable solely to Franklin County's failure to follow Ohio's rules on notice and cure, and that Defendant LaRose is therefore not responsible for that injury. *See* Intervenors' Br. (Doc. 44), at 11. The Sixth Circuit has squarely rejected this argument. *See Harkless v. Brunner*, 545 F.3d 445, 450–51 (6th Cir. 2008) (noting that Ohio had "designated the Secretary as its chief election officer," and pointing out that "[s]ignificantly, Ohio law empowers the Secretary to '[c]ompel the observance by election officers in the several counties of the requirements of the election laws,' . . . and to 'investigate the administration of election laws, frauds, and irregularities in elections in any county'" (citing Ohio Rev. Code § 3501.05)); *see also League of Women Voters v. Blackwell*, 432 F. Supp. 2d 723 (N.D. Ohio 2005) (describing as "misplaced" the Secretary of State's argument that local control of Ohio elections meant he was not the proper target for injunctive relief, and finding that because he is "the chief elections officer of the state of Ohio . . . . he is a proper defendant here") (overruled in part on other grounds by *League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008)).

Campbell Dep., at 17:11–19:4.[4]  This delay was indisputably caused by the Board's erroneous rejection of her absentee ballot application and its failure to promptly notify her.

        Defendant LaRose is incorrect that Ms. Campbell can be sure not to encounter any of the same issues in November.  *See* Def.'s Br. at 11.  Although she has updated the signature on file with the Board, Plaintiffs have demonstrated that signature matching has a significantly high rate of error, and she has every reason to be concerned that her signature could be rejected again. Defendant LaRose's suggestion that it would be Ms. Campbell's fault if she were to "wait until late in the absentee period to submit her ballot," *id.* at 11, only demonstrates the likelihood of future harm.

        Finally, Defendant LaRose's attacks on Ms. Campbell's voting eligibility are baseless and inappropriate.  *See id.* at 13.  Ms. Campbell clearly satisfies all the requirements to vote in Ohio, and Defendant LaRose's suggestion that she is "likely" ineligible should be rejected.  *See id.*  Under Ohio law, a voter's residence is the place "in which the person's habitation is fixed and to which, whenever the person is absent, the person has the intention of returning."  Ohio Rev. Code Ann. § 3503.02(A).  Defendant's own website advises voters that their residence is "the location that *you consider* to be a permanent, not a temporary, residence[.]"[5]  Ohio law further provides that "[a] person shall not be considered to have lost the person's residence who leaves the person's home and goes into another state or county of this state, for temporary

---

[4]   Ms. Campbell testified that she thought the deadline to postmark her ballot was April 30, 2020.  *See id.* at 21:6.  This is incorrect: the deadline was April 27, 2020.  Ohio Secretary of State, *2020 Elections Calendar*, https://www.ohiosos.gov/publications/ 2020-elections-calendar/ (last accessed Sept. 14, 2020).  However, her mistaken belief is immaterial, since she did not receive her ballot until April 29, by which point it was already too late.

[5]   Ohio Secretary of State, *Voter Eligibility & Residency Requirements*, https://www.sos.state. oh.us/elections/voters/voter-eligibility-residency-reqs/ (last accessed Sept. 14, 2020) (emphasis added).

purposes only, with the intention of returning." Ohio Rev. Code Ann. § 3503.02(B).

Like many Ohioans, Ms. Campbell splits her time between multiple addresses—in her case due to the demands of her job providing defense services to the U.S. government, which requires her to be in Indiana Monday through Thursday. Second Campbell Decl. ¶ 4; Campbell Dep., at 9:6–7. Prior to the pandemic, Ms. Campbell worked remotely from her residence in Ohio on Fridays. Campbell Dep., at 31:18–32:10. Ms. Campbell has clearly testified that she considers her Ohio residence to be her permanent residence, and that she has the intention to return there. *Id.* at 25:10–14; Second Campbell Decl. ¶¶ 1, 3. In fact, she regularly *does* return to her Ohio residence, at least once a month on average, and often more. Second Campbell Decl. ¶ 5. Moreover, she has never voted in Indiana (or any other state besides Ohio), Campbell Dep., at 47:1–2, and she does not intend to make Indiana her permanent residence, *id.* at 47:3–6.

Defendant LaRose makes much of the fact that Ms. Campbell has split her time between Ohio and Indiana for work for the past five years. Def.'s Br. at 12. But Ohio law is clear that a voter only loses her residence in Ohio if she "*continuously* resides outside this state for a period of four years or more[.]" Ohio Rev. Code Ann. § 3503.02(F) (emphasis added). Ms. Campbell plainly has not continuously resided outside Ohio for four years or more. She regularly returns to her Ohio residence where she works remotely one day a week and helps care for her elderly mother. Campbell Dep., at 26:1–7, 31:18–32:10; Second Campbell Decl. ¶ 4. In fact, Defendant's draconian interpretation of Ohio law would render ineligible any voter who has owned a home in another state and regularly spends time there, or any student who attends boarding school or university out of state, for four years or more.

Defendant LaRose lists multiple facts about Ms. Campbell's time in Indiana, but *none* of these is relevant to a determination of voter residence under Ohio law. *See* Def.'s Br. at 12; *cf.*

-10-

Ohio Rev. Code § 3505.02 *et seq.*  Nonetheless, Ms. Campbell has submitted a sworn declaration elaborating on her connections to Ohio, including that: she tithes to and attends church in Ohio, Second Campbell Decl. ¶ 6; she belongs to a local Eagles Club in Ohio, *id.* ¶ 7; her car is registered in Ohio and has Ohio plates, *id.* ¶ 8; her car's insurance is registered in Ohio, *id.* ¶ 9; her AAA roadside membership is in Ohio, *id.* ¶ 10; and she has three bank accounts and at least one credit card registered with her Ohio address, *id.* ¶ 11.

Ohio law is clear: a voter remains eligible to vote in Ohio if she maintains a permanent residence in the state, even if she regularly spends time in another state.

**D.    Plaintiffs' Requested Relief Would Redress Their Harms.**

Notably, Defendant LaRose does not dispute that Plaintiffs' requested relief would redress their harms.  Nor could he, as the requested order would ensure that Ohio voters are notified more promptly of any perceived signature mismatches on their absentee ballot applications, an improvement from the current system that plainly would have helped Plaintiffs avoid the harms they have already suffered.  This change would also redress the injury to the Organizational Plaintiffs by relieving them of the obligation to instruct and warn their members and voters of the significant likelihood that they will not be notified of signature mismatches in time to cure their application and receive a ballot.[6]  Moreover, the order would ensure that voters are given sufficient time to cure signature mismatches on both applications and ballots.  This is critical because—as Defendant LaRose fails to acknowledge—the delays to the application-and-ballot process caused by his signature-match scheme, *even when followed correctly*, is what

---

[6]    Intervenors' suggestion that Plaintiffs' requested relief would incentivize LWVO and APRI to devote *more* resources than they otherwise would have is nonsensical.  *See* Intervenors' Br. at 13.  Intervenors do not explain how a change in the law that makes it simpler and easier for voters to vote would require more instruction and education.

resulted in the harm here.

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

At the preliminary injunction phase, a plaintiff "need not prove his case in full" and must

only "raise[] questions going to the merits so serious, substantial, difficult, and doubtful as to

make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio*

*Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (internal quotation marks

omitted).  Plaintiffs have cleared that bar and have demonstrated that there are "serious" and

"substantial" doubts about Ohio's notice-and-cure procedures for mismatched signatures on both

absentee ballot applications and absentee ballots as applied in current pandemic conditions.

### A.  The Secretary of State Has Conceded That Directive 2020-11 Applies to Mismatched Signatures on Ballot Applications, and Must Be Directed to Issue a Clarification to Boards of Elections to that Effect.

Defendant LaRose suggests that resolving Plaintiffs' first request for relief—an

injunction against signature matching on absentee ballot applications—is "easy" because the

statutory requirement that boards of elections must verify that an application contains "the

elector's signature" implicitly requires the boards to do such matching.  Def.'s Br. at 2.  Of

course, Defendant LaRose's mere assertion that words absent from a statute are implied in it

does not make it so.[7]

---

[7] Defendant LaRose is incorrect that "the plain language of [Ohio] law" requires boards to conduct signature matching on applications.  Def.'s Br. at 2.  The language of Ohio Rev. Code § 3509.03(B)(2) that Defendant LaRose cites does not require that boards match a signature on a ballot application to a voter's prior signature; it merely requires boards to confirm that an application is signed.  The Ohio legislature could have required boards to match signatures on applications to the voter registration records, but it did not do so.  The legislature *did*, however, enact a specific requirement that boards "compare" signatures on ballot envelopes.  Ohio Rev. Code § 3509.06(D)(1).  The language requiring officials to "compare" signatures on ballots and the absence of that language with respect to ballot applications suggests that the legislature in fact did *not* intend to require matching on ballot applications.  *See, e.g.*, *State ex rel. Rocco v. Cuyahoga Cty. Bd. of Elections*, 88 N.E.3d 924, 926 (Ohio 2017) ("By using different words to

Regardless of whether Defendant LaRose's statutory interpretation is right or wrong, he is right that Plaintiffs' request for relief is "easy," albeit for a different reason: he essentially concedes the relief Plaintiffs request.  As Plaintiffs noted in their opening brief, *see* Pls.' Br. at 38, they seek—as an alternative to an injunction against signature matching on ballot applications—an order directing Defendant LaRose to confirm that the enhanced notice provision of Directive 2020-11 applies to signature mismatches on absentee ballot applications.[8] Defendant LaRose now maintains that Directive 2020-11 "direct[s] boards of elections to notify a voter by telephone and email" if "any piece of information is missing, *including the voter's signature as it appears on the registration record*."  Def.'s Br. at 5 (citing Grandjean Decl. (Doc. 41-2) ¶ 20) (emphasis added).

Defendant LaRose could easily resolve this issue—and indeed moot the portion of this motion pertaining to absentee ballot applications—by issuing a revised directive confirming for the boards of elections that Directive 2020-11 requires them to notify voters by phone and email of signature mismatches on ballot applications.  However, should he choose not to do so, Plaintiffs reiterate their request that the Court issue an order directing him to make that clarification, for the reasons set forth in their opening brief and further below.[9]

---

describe these separate requirements, the drafters intended different meanings."); *NACCO Indus., Inc. v. Tracy,* 681 N.E.2d 900, 902 (Ohio 1997) ("Congress is generally presumed to act intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").

[8]   Directive 2020-11, issued in July 2020, requires boards to contact voters by telephone and email to advise them when "required information" is "missing" from their absentee ballot applications, but the directive is silent as to whether a mismatched signature in fact constitutes "missing information."  *See* Pls.' Br. at 16–17 (citing Directive 2020-11, § 6).

[9]   Plaintiffs' responses in Section II.B below (concerning the cure deadline for cast ballots) apply with equal force to their request for relief concerning ballot applications.

**B.**  ***NEOCH* Does Not Foreclose Plaintiffs' Claims Regarding Ohio's Current Procedures for Providing Notice and Opportunity to Cure Mismatched Signatures on Absentee Ballots, As Applied to During the COVID-19 Pandemic, and Plaintiffs Are Likely to Succeed on Those Claims.**

Defendants fundamentally mischaracterize Plaintiffs' claims with respect to Ohio's deficient notice-and-cure period for purported signature mismatches on absentee ballots as being the same as those "litigated four years ago" in *NEOCH*. Def.'s Br. at 1. Plaintiffs' motion presents an as-applied challenge that could not have been brought four years ago—or even one year ago—and is in no way foreclosed by *NEOCH*. In particular, Plaintiffs ask the Court to preliminarily enjoin the notice-and-cure procedures associated with signature matching on ballots *as applied* in the upcoming November 2020 General Election. As all parties acknowledge, this election will be significantly impacted by the COVID-19 pandemic and will entail much higher rates of voting by mail and delays in the U.S. Postal Service's delivery of election mailings than prior elections under the current statutory scheme. These changes in circumstances, which have only become apparent since the difficulties Ohio experienced in the 2020 Primary Election, necessitate the preliminary injunction Plaintiffs seek here. *See, e.g.,* Am. Complaint (Doc. 25) ¶¶ 1, 8, 18 25, 30, 32, 34, 35; Miller Decl. (Doc. 24-2), ¶ 22–24; Washington Decl. (Doc. 24-3) ¶ 11.

*NEOCH* involved a *facial* challenge to two newly enacted Ohio statutes, S.B. 205 and S.B. 216, which made a number of changes to Ohio's election laws. Among other things, the statutes (1) required boards of elections to reject absentee ballots when voter's submitted ballot envelopes with minor discrepancies in the birthdate and address fields, (2) limited the types of assistance that poll workers could provide voters, and (3) reduced the number of days for voters to cure *any* deficiencies in absentee ballots (including but not limited to signature mismatches) from ten days to seven days. *See NEOCH*, 837 F. 3d at 619–20. Plaintiffs in that case claimed

that these provisions violated the Voting Rights Act, as well as the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The district court entered judgment for the plaintiffs on the Equal Protection and one of the Voting Rights Act claims, and enjoined enforcement of the challenged provisions. *Ne. Ohio Coal. for the Homeless v. Husted* (*"NEOCH I"*), No. 2:06-CV-896, 2016 WL 3166251, at *55 (S.D. Ohio June 7, 2016). The Sixth Circuit agreed that the requirement that the birthdates and address information voters provided on absentee ballots match voter records exactly constituted an undue burden on the right to vote, *NEOCH*, 837 F.3d at 634, but overturned the district court's injunction with respect to poll-worker assistance and the reduced cure period. *Id.* at 635.

Defendants are wrong that *NEOCH* controls the outcome of this motion or, more broadly, this case. While plaintiffs in *NEOCH* challenged the change in cure period enacted by S.B. 205, they did not challenge notice-and-cure for signature matching in particular. The district court never considered evidence on what procedures Ohio's boards of elections implemented to conduct signature matching and how those varying procedures disenfranchise voters. *See generally NEOCH* Trial Transcripts (Doc. 41-5, 41-6, 41-7, 41-8, 42). Neither the district court nor the Sixth Circuit addressed whether difficulties posed specifically by signature matching rendered Ohio's shortened notice-and-cure period constitutionally deficient. *See NEOCH*, 837 F.3d at 635; *NEOCH I*, 2016 WL 3166251, at *18. The *NEOCH* challenge was furthermore a *pre-enforcement* challenge of a new statute, not, as here, an *as-applied* challenge to the cure period in light of the changed circumstances relating to the worst pandemic of the last century.[10]

---

[10] Plaintiffs did not cite to or discuss *NEOCH* in their opening brief because the issue they raise here was not before the Sixth Circuit there. The *NEOCH* court opined on the facial validity of a change in the cure period for any absentee ballot defect. It was not asked to and did not consider the issue of signature matching at all, nor did it consider how COVID-19, and the accompanying increase in voting by mail and delays in the U.S. Postal Service, bears on the cure period—all of

COVID-19 has transformed our society over the past six months, and many concerns that may have once seemed "trivial" now loom large. When the Court considers Plaintiffs' claims in the context of the world as it currently exists, not as it existed four years ago, it is clear that the Sixth Circuit's holding in *NEOCH* that the shortening of the cure period by three days was not facially unconstitutional does not dictate—or even meaningfully influence—the result in this case.[11]

Defendants' oppositions rely on their assertion that *NEOCH* forecloses Plaintiffs' requested relief (which it does not) and fail to provide meaningful answers to Plaintiffs' challenge to Ohio's signature-matching system as applied in the 2020 General Election. Plaintiffs have shown that they are likely to succeed on their claims that Ohio's signature-matching procedures (1) impermissibly burden Plaintiffs' right to vote, (2) deny Plaintiffs' right to procedural due process, and (3) deny Plaintiffs' right to equal protection of the laws.

### 1. Ohio's Signature-Matching Processes Impose a Substantial Burden on Plaintiffs' Right to Vote that Is Not Justified by Any State Interest.

Defendants' treatment of Plaintiffs' *Anderson-Burdick* claim understates the burden of Ohio's signature-matching system on individuals' right to vote during the 2020 General Election and overstates the extent to which any state interest justifies Ohio's current system. The actual burden of Ohio's current notice-and-cure processes on Ohioans' fundamental right to vote—in the context of an election that will largely be conducted by mail—dwarfs the minimal state

which form the core of Plaintiffs' claims. Plaintiffs here do not challenge the constitutionality of a seven-day cure period as opposed to a ten-day cure period for all absentee ballot defects, as was decided in *NEOCH*. Instead, they seek to ensure that, whatever the cure period Defendant LaRose implements, that period is sufficient to address the high error rates in signature matching and the confounding delays brought on by the global pandemic.

[11] As discussed above, the Sixth Circuit's decision *Esshaki* is in line with many other federal courts that have recently found various election-related signature requirements to constitute undue burdens during the pandemic. Defendant LaRose is wrong that *Thomson v. Dewine* controls the outcome in this case. *See Section* I.A and footnote 1.

interests at play.[12]

> **a)** **Ohio's Signature-Matching Processes, As Applied to the 2020 General Election, Impose a Substantial Burden on Plaintiffs' and Ohioans' Right to Vote.**

Defendants' oppositions fail to refute Plaintiffs' evidence and common-sense arguments as to why the COVID-19 pandemic will exacerbate problems with Ohio's notice-and-cure processes for purportedly mismatched signatures on absentee ballots and why the State, as a result, will disenfranchise many voters. As Plaintiffs noted in their opening brief, Defendant LaRose has already acknowledged that voting by mail will play an outsized role in the upcoming election. *See* Pls.' Br. at 5 (quoting Defendant LaRose that "we need to have a lot of Ohioans take advantage of early voting and vote by mail").[13] The fact that the number of Ohioans voting by mail in this election will be orders of magnitude higher than the number that typically vote by mail in a general election means the number of mismatched signatures on absentee ballots not cured by the deadline will, all things being equal, likely increase by a corresponding factor.

---

[12] *See, e.g.*, *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 20-cv-00024, 2020 WL 4927524, at *9 (W.D. Va. Aug. 21, 2020) (holding that while "'[i]n ordinary times, Virginia's witness signature requirement [for absentee ballots] may not be a significant burden on the right to vote' . . . [it] remains 'both too restrictive and not restrictive enough to effectively prevent voter fraud'") (citations omitted); *see also Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (upholding a consent decree that suspended certain absentee balloting requirements because "many more voters are likely to want to vote without going to the polls and will thus only vote if they can vote by mail" in light of the pandemic, and finding "[t]he burden imposed by these requirements in the midst of a pandemic is significant"); *Ocasio et al. v Comision Estatal de Elecciones*, CV 20-1432, slip op. at 9 (D.P.R. Sept. 14, 2020) (finding that, in light of COVID-19, to make it easier for at-risk populations to vote by mail, "[t]he balance of hardships and public interest support injunctive relief"); *Memphis A. Philip Randolph Inst. v. Hargett*, No, 3:20-CV-00374, 2020 WL 5412126, at *33 (M.D. Tenn. Sept. 9, 2020) (granting a preliminary injunction of the statutory requirement that first-time voters must vote in-person, in light of COVID-19).

[13] Indeed, in the 2016 General Election only 21.2% of Ohio voters casting ballots voted by mail, while five times that proportion (85.3% of voters) did so during the 2020 Primary Election—the first Ohio election conducted during the COVID-19 pandemic. Pls.' Br. at 4–5.

But all things are not equal in this election, and well-documented delays in U.S. Postal Service delivery times will exacerbate the situation even further.  Defendant LaRose has himself stated that "[i]nstead of first-class mail taking 1-3 days for delivery, we have heard wide reports of it taking as long as 7-9 days."  *See id.* at 12.  If mail takes nine days to reach its destination, voters may have to submit a ballot up to *twenty days* before the election in order to have *any* opportunity to cure a purportedly mismatched signature by seven days after the election.[14]  But Defendant LaRose acknowledges that Ohio boards of elections do not even begin to mail ballots until *twenty-eight days* before the election, Def.'s Br. at 5, and with current mailing delays, voters may not receive those ballots until *nineteen days* before the election.  Thus, under the current notice-and-cure period, many Ohioans voting by mail—even if they mail their ballot shortly after receiving it—will have no practical opportunity to cure a purportedly mismatched signature in the upcoming election.  And that assumes voters mail their ballots immediately, but voters have the right to wait until close to Election Day to cast their ballots, so that they can be fully informed when they do so.  *See Ohio Democratic Party v. LaRose*,  Franklin C.P., No. 20-CV-005634, slip op at 18 (Sept. 15, 2020) (noting that voters who cast their ballots by mail immediately upon receiving them "would miss almost the entire last month of the campaigns" during which time "Presidential and Vice-Presidential debates are scheduled, along with local candidate nights (by ZOOM sometimes), and other educational opportunities will be presented").  Voters who have not made up their mind on every election on their ballot until close to Election

---

[14]   The process for voters to cure a mismatched signature on an absentee ballot has typically required that the voter: (1) mail an absentee ballot, (2) receive a Form 11-S from the board of elections in the mail, and (3) complete and return Form 11-S—a process that could take twenty-seven days to complete under current conditions.  Even if a board were able to eliminate the second mailing, as Directive 2020-11 directs, by reaching the voter by email or telephone, the process would still take eighteen days.

Day are also constitutionally entitled to have their vote counted.

Defendants do not (and cannot) explain why, given the foreseeable perfect storm of mail-in voting and delays in postal delivery time, Ohio may constitutionally continue to rely on a system that will no longer afford many Ohio mail-in voters an opportunity to cure a purportedly mismatched signature. Instead, Defendants blame the victims and assert that any Ohio voters' inability to cure a purportedly mismatched signature before the seven-day deadline will be caused by "their own failure to take timely steps" to return their ballot. Intervenors' Br. (Doc. 44), at 25. This position completely ignores the realities of the COVID-19 pandemic and the expected delays in U.S. Postal Service delivery time that Defendant LaRose has himself acknowledged. *See* Pls.' Br. at 12. These realities also refute Intervenors' attempts to differentiate the many cases in which courts *have* found similar notice-and-cure provisions for mismatched signatures to be unconstitutional. Intervenors argue that much of this case law is inapposite because it deals with "a statutory scheme that provided no cure opportunity whatsoever." Intervenors' Br. at 22. But that is *exactly* what Ohioans who vote by mail will face in this election; even if they are notified of a purportedly mismatched signature, many will not be afforded a practical opportunity to cure it. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320–21 (11th Cir. 2019) (upholding preliminary injunction of Florida's signature-match system because "voters whose signatures were deemed a mismatch might not learn that their vote would not be counted until it was too late to do anything about it").

Defendant LaRose argues that the "full panoply of voting alternatives" technically available to Ohio voters means that the evident deficiencies with the notice-and-cure procedures for the upcoming election pose a minimal burden on Plaintiffs' right to vote. Def.'s Br. at 21. This argument is similarly unavailing and ignores reality. In light of the pandemic, many

Ohioans—including older voters and voters with pre-existing medical conditions—have no practical choice but to vote by mail.  Such voters will reasonably consider voting in person, either on Election Day or during Ohio's early voting period, an unacceptable risk to their safety.  "Curbside voting" similarly does not eliminate the health concerns that voting by mail fully mitigates, and besides, is only available to voters with access to a private car.  Defendant LaRose himself has strenuously encouraged Ohioans to take advantage of the option to vote by mail in the upcoming General Election.  Pls.' Br. at 5.  Voters should not have to choose between their health and their fundamental right to vote, but Defendant LaRose's position would force voters to do just that.

Finally, Defendants seek to minimize the harm that Plaintiffs and voters will suffer in the upcoming election by narrowing this preliminary injunction motion to address only whether the cure period is set at seven or ten days after the election.  To that end, Defendants make much of the fact that none of the Plaintiffs attempted, but were unable, to cure a mismatch specifically during that three-day gap.  *See* Def.'s Br. at 26; Intervenors' Br. at 21.  But Plaintiffs are not obligated to identify an individual who falls neatly into this category, and the issue that Plaintiffs have identified with Ohio's signature-matching system is broader than whether the cure period ends at seven or ten days.  The issue is that Ohio's signature-matching procedures consistently disenfranchise voters, and the problems with those procedures will be significantly exacerbated by the increase in the mail-in voting and delays in the U.S. Postal Service that will inevitably occur during the upcoming election.  Extending the cure period—whether by a single day, three days, or a longer period—will mitigate these problems and redress, at least in part, the harm that Ohio's current system imposes on Plaintiffs and on Ohio's voters.  What is more, Defendants have submitted no evidence that a modest extension to the cure period will create *any burden* for

Ohio boards of elections.  *See* Section II.B.1.b.

> **b)** **Defendants Assert No State Interest Justifying the Burden that Ohio's Current Signature-Matching Processes Will Impose on Voters During the 2020 General Election.**

In their attempt to identify a state interest justifying the burden imposed on voters by Ohio's current signature-matching system, Defendants make conclusory assertions about voter fraud and the need to ensure orderly elections.  But neither justification explains why the state has an interest in failing to provide adequate notice and sufficient opportunity to cure purportedly mismatched signatures.

Defendants cannot assert that voter fraud would be more likely to occur if the requested injunction is granted.  As Defendants recognize, Plaintiffs acknowledge that preventing voter fraud may be a sufficient state interest that justifies signature matching *in general*.  *See* Pls.' Br. at 25.  Rather, Plaintiffs claim that Ohio has no interest in conducting a signature-matching system that fails to provide voters adequate notice and opportunity to cure purported mismatches.  Extending the notice-and-cure period does not at all diminish Ohio's ability to stop voter fraud and protect the integrity of its elections.  To the contrary, allowing more voters the opportunity to cure a mismatched signature would *increase* the integrity of elections and the public's trust in the electoral process because more Ohioans would participate with full confidence that their votes would be counted.

Defendant LaRose's asserted state interest in promoting orderly election administration, *see* Def.'s Br. at 29, also does not withstand scrutiny.  Defendant LaRose simultaneously tells this Court that, on the one hand, the current signature-matching system imposes a minimal burden on mail-in voters because "very few voters" would take advantage of an extended notice-and-cure period, *id.* at 24, and on the other hand, extending the cure period would be an impermissible strain on boards' administrative resources, *id.* at 29–30.  Defendant LaRose

cannot have it both ways. Either (1) very few voters will need the extended notice-and-cure period in the upcoming election, in which case extending that period will cause minimal burden on boards of elections, or (2) many voters will need that period, in which case the current procedure is a significant collective burden on Ohioans' right to vote. And if, as Plaintiffs argue, the latter situation plays out in November, "[t]here is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Secretary of State's] office and other state and local offices involved in elections." *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016).

Moreover, there is no evidence that extending the notice-and-cure period beyond seven days would burden boards of elections at all. Indeed, the Sixth Circuit in *NEOCH* noted that "none of the board officials who testified indicated that the ten-day cure period inconvenienced them." *NEOCH*, 837 F.3d 612 at 635; *see also NEOCH* Bench Trial Tr., Vol. 2, (Doc 41-5), at 1065 (testimony of a former Cuyahoga County Board of Elections Member, stating that "Cuyahoga County has the largest jurisdiction and [a ten-day cure period] was really no burden on us," and that, "from an elections administration perspective, there was no reason to not allow those votes to be counted if they could be fixed on days eight, nine and ten after the election").

None of the evidence submitted by Defendant LaRose supports the proposition that boards of elections would be burdened by extending the cure period beyond seven days for the 2020 General Election. David Payne, the Deputy Director of the Franklin County Board of Elections, simply declared that the Board needs a "finite end" to the cure period, but he did not state when that end must occur. Payne Decl. (Doc. 41-3) ¶ 58. A declaration submitted by the Manager of the Ballot Preparation and Tabulation Department of the Cuyahoga County Board of Elections is similarly silent with respect to any burden that extending the cure period would

create for his board. *See* Cleary Decl. (Doc. 41-4). Mr. Payne also acknowledged that Franklin County likely would not start the official canvass period until fifteen days following the election, the last day permitted under law. Payne Decl. ¶ 38. Even if, as Defendant LaRose contends, boards require a "three-day buffer" between the end of the cure period and the beginning of the canvass period, *see* Def.'s Br. at 30—a proposition that is not supported by any evidence—there could still be at least *five additional days* for Franklin County to allow for purportedly mismatched signatures to be cured. Defendant LaRose has failed to establish that Plaintiffs' requested relief would cause him or Ohio boards of elections any burden at all, let alone a significant enough burden to justify taking away Ohioans' right to cast a ballot in the upcoming election.

### 2. Ohio's Signature-Matching Processes Deny Plaintiffs Procedural Due Process.

Plaintiffs have also demonstrated a likelihood of success on their claim that Ohio's signature-matching system for absentee ballots denies them procedural due process. Intervenors are wrong that the Sixth Circuit has foreclosed all procedural due process claims for voting-rights violations,[15] and all three *Mathews* factors weigh in Plaintiffs' favor.

---

[15] The Sixth Circuit did not foreclose all procedural due process claims for voting-rights violations in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 479 (6th Cir. 2008). *See* Intervenors' Br. at 27–28. While the Sixth Circuit in that case allowed plaintiffs' substantive due process claim to proceed and denied their procedural due process claim, it did not adopt a categorical position that *no* procedural due process claim could ever succeed in a voting rights case. Rather, it noted the "brevity" of plaintiffs' brief on procedural due process and the fact that their brief "subsume[d] procedural due process into the substantive due process analysis," dismissing the procedural due process claim on those grounds. *Id.* In an opinion from two weeks ago, after Plaintiffs submitted their opening brief on this motion, a district court in the Sixth Circuit held that *League of Women Voters* does foreclose all procedural due process claims in voting rights cases. *See Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *11 (M.D. Tenn. Aug. 28, 2020). But that position is an outlier that has not been followed by other courts in the Sixth Circuit. For example, in *NEOCH*, a case that was

First, on the liberty interest at stake, Defendants ignore that "the interest in voting by absentee ballot implicates the fundamental right to vote," and therefore, "lends it more than modest weight." *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270–71 (11th Cir. 2019). This is true even in a normal election and takes on new urgency in an election largely conducted by mail. Whether mail-in voting is "the sole available voting method," *see Self Advocacy Sols. N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *8 (D.N.D. June 3, 2020), or merely the predominant method by which Ohioans will choose to vote given the realities of the COVID-19 pandemic, Defendant La Rose cannot deny that the right to vote by mail is of the utmost significance for many voters in this election.[16]

Second, on the risk of erroneous deprivation, Defendants ignore the analysis of Plaintiffs' expert that "for every one invalid ballot that is correctly rejected for signature mismatch, an additional 32 valid ballots are wrongly rejected due to errors by the non-experts trying to verify signatures." Street Report (Doc. 24-8) ¶ 19. Defendants instead argue that the "out-of-state" signature-match cases Plaintiffs cited featured notice-and-cure systems that "offered no statewide

_____

decided after *League of Women Voters* and that Defendants cite throughout their briefs, the Sixth Circuit specifically held that the district court did not err in addressing (though denying) the plaintiffs' procedural due process claim on the merits because plaintiffs had failed to show that their injury was caused by "the lack of process given when a ballot is rejected." *NEOCH*, 837 F.3d at 637; *see also Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 846 (S.D. Ohio 2012) (noting that a procedural due process claim failed "because, in the Court's view, the harm that Plaintiffs allege is . . . not the lack of process").[15] Indeed, "the vast majority of courts addressing this issue" have held that "the State 'must afford appropriate due process protections to the use of [mail-in] absentee ballots.'" *Frederick v. Lawson*, No. 119-CV-01959, 2020 WL 4882696, at *12 (S.D. Ind. Aug. 20, 2020) (quoting *Democracy N.C. v. N.C. Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *53 (M.D.N.C. Aug. 4, 2020)).

[16]   While Intervenors correctly note that the court in *Martin v. Kemp* stated that "the right to apply for and vote via absentee ballot is not constitutionally on par with the fundamental right to vote," they omit the second half of the court's sentence, which cautions that "once the state creates an absentee voting regime, they must administer it in accordance with the Constitution." 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018). Of course, a state must administer its absentee voting system in accordance with the due process clause of the Fourteenth Amendment.

cure procedure," Def.'s Br. at 33; Intervenors' Br. at 29, ignoring the fact that many Ohio voters

in the upcoming election will be afforded no practical cure period, given the absentee vote

schedule and also the expected U.S. Postal Service delivery times, *see* Section II.B.1.a.

Finally, on the state's interest, Defendant LaRose simply reasserts the same interests he

asserted in response to the *Anderson-Burdick* claim: "thwarting fraud" and "easing the burdens

faced by boards of elections." Def.'s Br. at 34–35. For the reasons stated above, neither interest

justifies the harm to a protected liberty interest that Ohio's current notice-and-cure system

inflicts on Plaintiffs and Ohio voters. *See* Section II.B.1.b.

### 3. Ohio's Signature-Matching Processes Violate Plaintiffs' Equal Protection Rights.

Plaintiffs assert that Defendant LaRose violates the Equal Protection Clause by

permitting boards of elections to apply their own arbitrary signature-matching procedures.[17]

Defendant LaRose's core response to this claim is that Plaintiffs fail to introduce evidence

showing "differential treatment at all" in the county boards' procedures. Def.'s Br. at 35. This

argument is misguided for at least three reasons.

*First*, Defendant LaRose does not and cannot dispute that Ohio lacks statewide standards

for signature matching.[18] This lack of statewide standards and the accompanying burden it

places on voters is sufficient on its own to make out an equal protection claim. *See* Pls.' Br. at

---

[17]  It is true that, in voting rights cases in the Sixth Circuit, the *Anderson-Burdick* framework supplies the type of *scrutiny* applicable to Equal Protection Clause claims. *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020). However, Plaintiffs remain free to assert the gravamen of an equal protection claim, *i.e.*, that the state's differential treatment violates the constitution. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (applying *Anderson-Burdick* to equal protection claim).

[18]  While Directive 2020-11 addressed notice for absentee ballots in the 2020 General Election, as discussed above, it did not clearly institute a statewide standard for ballot applications.

32–33 (citing *Bush v. Gore*, 531 U.S. 98, 106–07 (2000) and collecting cases).

*Second*, while Defendant LaRose demands "concrete proof" of differential treatment, he ignores that a party "is not required to prove his case in full" on a motion for preliminary injunction. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Plaintiffs' evidentiary burden here is even less given that Defendant LaRose controls whether statewide data concerning signature-matching procedures exist yet chooses not to maintain much of those data. In fact, in response to Plaintiffs' public records request, Defendant LaRose's office represented that it does not maintain many relevant records, including those reflecting the number of absentee ballot applications returned by Ohio voters with a signature mismatch, contact information of those voters, the number of applications that were cured, trainings in signature-matching techniques, or communications with voters regarding signature-mismatch issues. *See* Patashnik Decl. (Doc. 24-1), Ex. 3, at 7–8, 11. Given that Defendant LaRose's own office does not keep this data and has resisted Plaintiffs' early efforts at discovery, it cannot fault Plaintiffs for any lack of statistical proof.

Nor do the cases Defendant LaRose cites as having provided "concrete evidence of differential treatment" undermine the equal protection claim here. These cases either did not actually feature such "concrete evidence" at all, or featured situations in which the defendant kept data of the relevant metrics,[19] and they cannot be used to hold Plaintiffs to an unreasonable

---

[19] While Defendant LaRose claims that the equal protection claim in *League of Women Voters*, 548 F.3d 463, "involved facts establishing that differential treatment burdened the plaintiffs' right to vote," he fails to mention that the "facts" in that case were merely allegations at the motion-to-dismiss stage, and, moreover, many were qualitative in nature. If the mere allegation that "[p]oll workers received inadequate training, causing them to provide incorrect instructions and leading to the discounting of votes" gave rise to a cognizable equal protection claim in *League of Women Voters*, surely the actual evidence Plaintiffs submit of differential procedures for signature matching also gives rise to such a claim. Defendant LaRose says that in *Hunter v. Hamilton County Board of Elections* the "plaintiffs showed" that some ballots cast at the board

evidentiary standard.

*Third*, Plaintiffs have, in fact, provided ample evidence of differential treatment. They already described in detail that the county boards of elections (1) follow different procedures for determining whether signatures match, (2) rely on different levels of internal review of signature mismatch decisions, and (3) provide different means of notice to voters of signature mismatches.[20] *See* Pls.' Br. at 16 n.19.

Furthermore, the very evidence Defendant LaRose submits in opposition to this motion demonstrates these differential procedures. Even though the declarations from the Cuyahoga County Board of Elections and the Franklin County Board of Elections were intended to illustrate similarities, they in fact reveal material differences:

- In Cuyahoga County, "[e]very absentee ballot application is reviewed by a bipartisan team of staff members," and if a match cannot be determined, up to three pairs of supervisors review the ballot. Cleary Decl. (Doc. 41-4) ¶ 2. In Franklin County, only a single staff member compares a voter's signature to the board's voter records, followed by a single supervisor, and lastly a final review by that supervisor and a manager of a different political party. Payne Decl. (Doc. 41-3) ¶¶ 5–7.

- In Cuyahoga County, if the reviewers determine the signature does not match, they issues a rejection letter, accompanied by a Secretary of State Form 260 that a voter may use to update their signature. Cleary Decl. ¶¶ 2, 4. Franklin County sends the voter a letter merely "advising the elector to correct his or her signature"; it does not

---

of elections were counted, while others cast at polling locations were rejected, but he fails to note that the board of elections itself had held meetings after the November 2010 election at which it kept records of this differential treatment, and those transcripts were in the record. *See* 635 F.3d 219, 225 (6th Cir. 2011). Lastly, *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012), involved an issue—ballots cast in the wrong precinct—that had been litigated repeatedly, was the subject of a consent decree, and for which the Secretary of State required boards of elections to track the data. *Id.* at 598; *see also* Brief of Plaintiff-Appellees, *Northeast Ohio Coalition for the Homeless v Husted*, 2012 WL 3886810, at n.11 (noting that the Secretary required boards to report the number of NEOCH ballots counted starting in 2011).

[20] Defendant LaRose claims that he eliminated any differences among counties in their notice procedures through Directive 2020-11. Def.'s Br. at 35. But, as discussed above, Directive 2020-11 put in place phone and email notification requirements for cast ballots but did not expressly do so for ballot applications. County boards of elections thus remain free to notify voters of application mismatches however they see fit, or not at all.

appear to send a Form 260 to facilitate a permanent correction. Payne Decl. ¶ 8.

- Cuyahoga County interprets Defendant LaRose's directive for the 2020 General Election as "instruct[ing] the Board to contact an elector via telephone or email in order to notify the elector that his/her *application* has been rejected." Cleary Decl. ¶ 9 (emphasis added). Franklin County says that it provides notice of an application rejection by U.S. Mail; it mentions phone and email outreach only as part of its procedure for signature matching on ballots. *Compare* Payne Decl. ¶ 8 (board sends a letter where it rejects application) *with id.* ¶ 9–12 ("For the 2020 Presidential General Election, the Secretary of State instructed the Board to contact an elector via telephone or email . . .").

- In Cuyahoga County, staff members "are directed to accept the signature on the application if they are able to identify at least one matching letter or character between the signature on the application and the signature in the county's voter registration records." Cleary Decl. ¶ 5. Franklin County's declarant does not describe any similar procedure. *See generally* Payne Decl.

Plaintiffs thus present ample evidence—especially on the relaxed preliminary injunction evidentiary standard—that Ohio's procedures for signature matching violate the Equal Protection Clause.[21] The Court should enter a preliminary injunction on that basis as well.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION.

The balance of equities weighs in favor of granting a preliminary injunction. On one side of the equation, Plaintiffs' and Ohioans' fundamental right to vote is threatened by Ohio's deficient notice-and-cure system for the upcoming General Election. Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws." *Reynolds v. Sims*, 377 U.S. 533, 560 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356,

---

[21] While the Intervenors cite *NEOCH* for its acknowledgement that boards of elections may legitimately have different procedures, Intervenors' Br. at 30–31, *NEOCH* does not bless the procedures here. Rather, the requirement in *Bush v. Gore* remains that the state treat like votes the same, and even the *NEOCH* court acknowledged that the State must have "uniform statewide standards." *NEOCH*, 837 F.3d at 636. In this case, Defendant LaRose has issued absolutely no guidance on what it means for signatures to match, and the guidance he has issued as to notice applies only to ballots and not to ballot applications.

370 (1886) (noting that the right to vote "is preservative of all rights").

On the other side of the equation, Defendants point to concerns over "the alteration of election processes in the weeks leading up to election." Def.'s Br. at 39 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)).   But Plaintiffs are requesting minimal, if any, alterations to Ohio election processes, and *Purcell*—which is premised on the proposition that changes in voting procedure close to an election can cause voter confusion, *Purcell*, 549 U.S. at 4–5—does not preclude the incredibly narrow relief that Plaintiffs seek.

*First,* with respect to absentee ballot applications, Plaintiffs are not asking for any "alteration of election processes" at all.  Plaintiffs merely ask—given Defendant LaRose's concession that Directive 2020-11 requires boards to contact voters promptly by email or telephone in the case of a purported signature mismatch on absentee ballot applications—that Defendant LaRose issue an instruction to the boards making that position clear.

*Second,* with respect to absentee ballots, Plaintiffs are not asking for any *new* procedures or election infrastructure to be put in place.  Plaintiffs are only asking that existing procedures be extended to allow voters sufficient time to cure purportedly mismatched signatures, given the influx of mail-in voting and delays expected in U.S. Postal Service.  Extending those existing procedures creates no risk of voter confusion and does not implicate *Purcell*.  If Defendant LaRose is correct that very few voters will be disenfranchised by the seven-day cure period in the upcoming General Election, then this injunction would impose essentially no burden on his office or the boards of elections at all.  And if Defendant LaRose is wrong, and many voters *will* be disenfranchised by the seven-day cure deadline in the upcoming election, that speaks to the pressing necessity for this injunction.  *See Fish*, 840 F.3d at 755; *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10 ("[A]ny fiscal or administrative burden is miniscule when compared to the

palpable threat of disenfranchisement . . . .").

Finally, Defendant LaRose contends that an injunction would deny the Ohio General Assembly's "prerogative" to set election procedures. Def.'s Br. at 38. But the legislature cannot establish constitutionally deficient procedures, and if Ohio's notice-and-cure procedures for signature mismatches unconstitutionally infringe on Ohioans' right to vote in the 2020 General Election (which they do), it is this Court's job to say so. Indeed, courts routinely strike down or enjoin election laws when those laws run afoul of the U.S. Constitution. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012); *League of Women Voters of Ohio*, 548 F.3d at 478; *Fish*, 840 F.3d at 755; *see also* footnotes 1 & 12. Because Ohio's notice-and-cure period for purportedly mismatched signatures is constitutionally deficient as applied during the 2020 General Election, the same result is required here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction.

DATED: September 15, 2020                    Respectfully submitted,

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
*Trial Counsel*
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
flevenson@acluohio.org

T. Alora Thomas-Lundborg*
Dale Ho*
Jonathan Topaz*
American Civil Liberties Union
125 Broad Street
New York, NY 10004

Tel: (212) 519-7866
Tel: (212) 549-2693
athomas@aclu.org
dale.ho@aclu.org
jtopaz@aclu.org

Ezra Rosenberg*
Pooja Chaudhuri*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

C. William Phillips*
Joshua B. Picker*
John F. Nelson*
Katherine P. Onyshko*
Jeremy Patashnik*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 841-1000
cphillips@cov.com
jpicker@cov.com
jnelson@cov.com
konyshko@cov.com
jpatashnik@cov.com

*Pro Hac Vice

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2020, I filed a copy of Plaintiffs' Reply in Further

Support of Motion for Preliminary Injunction using the Court's Electronic Filing System, and

that counsel for all parties received electronic notice through that system.

/s/ <i>Freda J. Levenson</i>
Freda J. Levenson
