**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**League of Women Voters**
**of Ohio, *et al.*,**

       **Plaintiffs,**                    **Case No. 2:20-cv-3843**

       **v.**                            **Judge Michael H. Watson**

**Frank LaRose,**                        **Magistrate Judge Jolson**

       **Defendant.**

## OPINION AND ORDER

League of Women Voters of Ohio ("LOWV"), A. Philip Randolph Institute of

Ohio ("APRI"), George W. Mangeni ("Mangeni"), and Carolyn E. Campbell

("Campbell") (collectively "Plaintiffs") sue Ohio Secretary of State Frank LaRose

("Defendant" or "Secretary LaRose") and seek a preliminary injunction that:

> (1) enjoins [Secretary LaRose] from enforcing provisions of Ohio law
> that require election officials to conduct signature matching on
> absentee ballots without providing adequate time to cure a
> purportedly mismatched signature before the date by which Ohio
> boards of elections must complete the canvass of returns; and
>
> (2) enjoins Defendant LaRose from permitting county boards of
> elections from conducting signature matching on absentee ballot
> applications, or, in the alternative, to direct Defendant LaRose to
> confirm that Directive 2020-11, issued by Defendant LaRose on
> July 6, 2020, requires boards of elections to promptly contact
> voters by telephone and email in sufficient time to correct absentee
> ballot applications rejected on the basis of signature mismatch.

Mot. 1–2, ECF No. 24.  Donald J. Trump for President, Inc., the Ohio Republican

Party, the Republican National Committee, and the National Republican

Congressional Committee (collectively "Intervenors") moved for, and were granted, leave to intervene as Defendants. Order, ECF No. 35. For the following reasons, Plaintiffs' motion for a preliminary injunction is **DENIED**.

## I.    FACTS[1]

Ohio offers several different ways to cast a ballot, including absentee voting, early in-person voting, and in-person voting on election day. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 625 (6th Cir. 2016). Absentee voting is available to any Ohio voter, regardless of whether that individual is willing and able to vote in-person on election day. *Id.* at 624; R.C. § 3509.02.

### A. Absentee Ballot Application Process

In order to receive an absentee ballot, an Ohio voter must submit a written application to the director of elections of her county. R.C. § 3509.03(A). Voters were able to submit applications for the November 2020 election as early as January 1, 2020, and they may submit applications as late as a few days before the election. R.C. § 3509.03(D).[2]

This application does not have to be on a specified form—it must simply contain the elector's name, signature, address at which the voter is registered,

---

[1] Both Plaintiffs and Defendant have attached evidence to their preliminary injunction briefs. The background facts, primarily describing Ohio's electoral process, are largely agreed upon. If the Court relies upon a disputed fact, it will make note of that in this Opinion and Order.

[2] Applications may be submitted "not later than twelve noon on the third day before the day of the election at which the ballots are to be voted, or not later than six p.m. on the last Friday before the day of the election at which the ballots are to be voted if the application is delivered in person to the office of the board." *Id.*

date of birth, some form of identification[3], a statement of the election for which the voter wishes to receive a ballot, a statement that the voter is a qualified elector, and the voter's address (if the ballot is to be mailed).  R.C. § 3509.03(B).  There are several ways for voters to obtain an application, a few of which the Court will highlight.  An elector can contact her county board of elections or call Defendant's office to request an application.  Grandjean Decl. ¶¶ 11–12, ECF No. 41-2.  For the November 3, 2020 presidential election, Defendant mailed personalized absentee ballot applications to every registered voter in Ohio.  *Id.* ¶ 15.  Defendant's website also gives voters several different ways to request an absentee ballot: 1) complete an absentee ballot request online, download it, then mail it in; 2) have an application mailed to the voter's residence; or 3) the website explains to voters how they can make their own application and mail it in. https://www.ohiosos.gov/elections/voters/how-to-request-your-absentee-ballot/ (last visited September 20, 2020).  Voters can also obtain an application from the websites of the LOWV and the Ohio Democratic and Republican parties.[4]

An application can be submitted by mailing it to the board of elections for the county in which the voter resides or dropping it off at that board of elections'

---

[3] This can be the elector's driver's license number, last four digits of her social security number, or a copy of the elector's current and valid photo I.D., military I.D., or a copy of a current utility bill, bank statement, government check, paycheck, or other government document (other than voter registration) that shows the elector's name and address.
[4] https://www.lwvohio.org/register-to-vote (last visited September 20, 2020); https://ohiodems.org/vote/ (last visited September 20, 2020); https://slate.ohiogop.org/vote-by-mail/ (last visited September 20, 2020).

office either in person or via a secure drop box.  R.C. § 3509.03(D); Sec'y of State Directive 2020-16 at 1.

If an application is submitted by a qualified elector that "contains all of the required information," an absentee ballot is sent to the voter.  R.C. § 3509.04.  If an application is received "that does not contain all of the required information," the director of the county board of elections "promptly shall notify the applicant of the additional information required to be provided by the applicant to complete that application."  R.C. § 3509.04(A).  Defendant issued a directive requiring boards of elections to "utilize telephone numbers and email addresses to complete this process as quickly as possible."  Sec'y of State Directive 2020-11 at 12, available at https://www.ohiosos.gov/elections/elections-officials/rules/ (last visited September 20, 2020).  Voters can now also potentially learn of a problem with their application by using an online tracking system Defendant has set up. Grandjean Decl. ¶ 21, ECF No. 41-2; Sec'y of State, Track Your Ballot, https://www.ohiosos.gov/elections/voters/toolkit/ballot-tracking/ (last visited September 20, 2020).

**B. Submitting an Absentee Ballot**

In order to cast a vote, after a voter receives an absentee ballot she must "cause the ballot to be marked," place it and seal it within "the identification envelope received from the director of elections for that purpose," "cause the statement of voter on the outside of the identification envelope to be completed and signed, under penalty of election falsification," and then mail the envelope to

the director from whom it was received, personally deliver the envelope, or direct a family member to deliver it. R.C. § 3509.05(A).[5] "[B]allots shall be delivered to the director not later than the close of the polls on the day of an election." *Id.* If a ballot is mailed, it must be postmarked prior to election day and "delivered to the director prior to the eleventh day after the election." R.C. § 3509.05(B)(1).

### C. Signature Matching Requirements

For each identification envelope that is delivered to a board of elections, "election officials shall compare the signature of the elector on the outside of the identification envelope with the signature of that elector on the elector's registration form and verify that the absent voter's ballot is eligible to be counted." R.C. § 3509.06(D)(1). Any precinct official may challenge whether a ballot should be counted on "the ground that the signature on the envelope is not the same as the signature on the registration form." R.C. § 3509.06(D)(2)(a). If elections officials find that the signature on the identification envelope does not conform to the information contained in the statewide voter registration database for that voter, "the election officials shall mail a written notice to the voter, informing the voter of the nature of the defect." R.C. § 3509.06(D)(3)(b). This notice contains a Form 11-S that is completed by the voter.

---

[5] Delivery can be completed by "the spouse of the elector, the father, mother, father-in-law, mother-in-law, grandfather, grandmother, brother, or sister of the whole or half blood, or the son, daughter, adopting parent, adopted child, stepparent, stepchild, uncle, aunt, nephew, or niece of the elector." *Id.*

The time within which the notice must be sent depends on when the defective identification envelope was received. Ohio Election Official Manual at 5-31.[6] Notice must be sent within two business days for ballots received by the third Saturday prior to an election, within one calendar day for ballots received between the third Monday and last Friday before an election, and on the same day for ballots received between the Saturday prior to an election and the sixth day following an election. *Id.* In addition to the statutory requirement that notice of a defect be mailed, Defendant has also directed boards of elections to notify voters of a defect via email and telephone as "quickly as possible." Sec'y of State Directive 2020-11 at 13.[7]

If the voter corrects the signature no later than the seventh day after election day and the ballot is not successfully challenged for a different reason, the voter's ballot will be counted.[8] R.C. § 3509.06(D)(3)(b). If the signature is not corrected within seven days after the election, the ballot will not be counted. R.C. § 3509.07.[9]

---

[6] Available at https://www.sos.state.oh.us/elections/elections-officials/rules/ (last visited September 24, 2020).
[7] Available at https://www.sos.state.oh.us/elections/elections-officials/rules/ (last visited September 24, 2020).
[8] Even if a voter applies for an absentee ballot, she is not required to vote by absentee ballot. She may still decide to appear at her polling location on election day and cast a provisional ballot. R.C. § 3509.09(B).
[9] If the Form 11-S is post-marked by the seventh day after the election and received by the tenth day after the election, it will be accepted. Grandjean Decl. 6–7, ECF No. 41-2.

The other facts relied on by the parties will be discussed in the Court's analysis of Plaintiffs' claims.

### D. COVID-19

The global COVID-19 pandemic has affected nearly every aspect of American life, including voting.  The 2020 Primary Election in Ohio, which took place during heightened state-imposed restrictions to control the spread of COVID-19, saw 85.2%[10] of voters cast mail-in absentee ballots compared to only 8.6%[11] in Ohio's 2016 Primary Election.  Plaintiffs extrapolate out from this increase, without additional supporting evidence, that the number of absentee voters for the 2020 General Election should "at least double" from 2016's General Election.  Mot. 5, ECF No. 24.  Defendant does not offer a competing view, but he has admitted in public appearances that the number of absentee voters will be higher in the 2020 General Election than previous years.  *Is mail-in voting safe? Yes, and Ohio's system is among the best in the country, LaRose says*, WTOL-11, https://www.wtol.com/article/news/special-reports/88-

---

[10] https://www.sos.state.oh.us/elections/election-results-and-data/2020/ (last visited September 20, 2020) (1,562,716 domestic absentee ballots cast versus 1,834,465 total ballots cast).

[11] https://www.sos.state.oh.us/elections/election-results-and-data/2016-official-elections-results/ (last visited September 20, 2020) (285,045 domestic absentee ballots cast versus 3,302,832 total ballots cast).

counties/is-mail-in-voting-safe/512-904800d1-1758-4ac8-a739-9c3556b44733

(last visited September 20, 2020).

## II.    STANDARD OF REVIEW

Plaintiffs seek injunctive relief pursuant to Federal Rule of Civil Procedure

65.  In order to be entitled to a preliminary injunction, Plaintiffs "must establish

that [they are] likely to succeed on the merits, that [they are] likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities

tips in [their] favor, and that an injunction is in the public interest."  *Winter v.*

*NRDC, Inc.*, 555 U.S. 7, 20 (2008).  "When evaluating these factors for an

alleged constitutional violation, 'the likelihood of success on the merits often will

be the determinative factor.'"  *Thompson I*, 959 F.3d 804, 807 (6th Cir. 2020) (per

curiam) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

But the factors are not prerequisites; rather, they must be balanced in weighing

the equities involved.  *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir.

2004).

## III.    ANALYSIS

Plaintiffs bring three different claims against Defendant: 1) Ohio's signature

matching procedures violate the freedom of association clause of the First

Amendment and the equal protection clause of the Fourteenth Amendment;

2) Ohio's inconsistent signature matching practices violate voters' equal

protection rights; and 3) Ohio's failure to provide voters adequate notice and

opportunity to cure signature mismatches violates the voters' procedural due

process rights under the Fourteenth Amendment.  Before the Court can consider the merits of these claims, however, it must address whether Plaintiffs have standing to sue.

### A. Standing

"Article III imposes three standing requirements for plaintiffs in federal court: an injury-in-fact, causation, and redressability."  *Mays v. LaRose*, 951 F.3d 775, 781 (6th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The Court only needs to determine that one party has standing in order to consider identical claims brought by other parties.  *NE Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 623–24 (6th Cir. 2016) ("NEOCH").

The LOWV and APRI ("Organizational Plaintiffs") have argued that they have standing to sue on behalf of their members or on their own behalf because of an injury they have suffered from Defendant's actions.  Because "each element of Article III standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation," Organizational Plaintiffs must show a "substantial likelihood of standing."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citations omitted); *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4

(6th Cir. 2018) ("Put simply, '[a] party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction.'")

### 1. Injury-in-fact

#### a. Direct Harm to the Organizational Plaintiffs

Organizational Plaintiffs argue they have standing because they have been forced "to devote key resources to preventing the disenfranchisement of Ohio voters above and beyond their normal voter education and registration efforts." Reply 3, ECF No. 50.  While the signature-matching requirements at issue are not new, Organizational Plaintiffs claim that "the pandemic has significantly exacerbated the already-present defects of the law."  *Id.* (citing Miller Dep. at 24:4–18, ECF No. 40-4).

Defendant acknowledges that diversion of resources can be a sufficient injury[12], but he argues that the Sixth Circuit's decision in *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014), controls here and necessitates a finding that Organizational Plaintiffs lack standing.  Def. Opp. 15, ECF No. 41.  In *Fair Elections*, the "[p]laintiffs alleged that treating late-jailed electors differently than late-hospitalized electors violate[d] the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, § 2 of the Voting Rights Act, and

---

[12] Def. Opp. 13, ECF No. 41; *see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) ("The Supreme Court and [the Sixth Circuit] have found that a drain on an organization's resources . . . constitutes a concrete and demonstrable injury for standing purposes.").

the Seventeenth Amendment." *Fair Elections*, 770 F.3d at 459.  The district court found that one of the organizational plaintiffs in that case had standing "because it would be 'required to divert its resources to retraining its volunteers and informing its members and constituents of the risks attendant with getting arrested during the weekend prior to the election.'" *Id.*  The Sixth Circuit disagreed, finding in part that "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already." *Id.* at 459–60.

In *NEOCH*, a later election case in which the Sixth Circuit did find organizational standing, the Court distinguished the facts from those found in *Fair Elections* by saying "[w]hereas the *Fair Election* [sic] plaintiff merely exhausted 'efforts and expense [in] advis[ing] others how to comport with' *existing* law, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of [the change in election law]." *NEOCH*, 837 F.3d at 624 (citations omitted).  Defendant uses this language as part of its argument that Organizational Plaintiffs' challenge to the signature-matching requirements that have existed for a long time is insufficient to confer standing.  Def. Opp. 17, ECF No. 41.

But Organizational Plaintiffs are more like the plaintiff in *NEOCH* than in *Fair Elections*.  Instead of simply "advising voters how to 'comport' with the law," as occurred in *Fair Elections*, Organizational Plaintiffs have put forward credible evidence that they intend to "redirect [their] focus" for this election, which "will

require more volunteers, time, and expenditures." *NEOCH*, 837 F.3d at 624; Miller Dep. 47:4–48:15, ECF No. 40-4 (testifying that the LOWV "ended up doing so many extra trainings this spring" based, at least in part, on the increase in absentee voting and issues that arose in the 2020 primary); *id.* at 24:4–18 (explaining that absentee voting went from being somewhat uncommon to being used by approximately eighty percent of voters, so the LOWV realized it needed to be a priority); Washington Dep. 45:6–46:7, ECF No. 40-1 (describing numerous ways in which APRI has changed its get-out-the-vote strategy based on increased absentee voting); *id.* at 53:4–20 (stating that explaining the signature-matching requirements to voters will "be another burden on us in diverting our resources").

This case falls somewhere in between *Fair Elections* and *NEOCH*. Although there is not a change in law, there is a significant change in circumstances that requires diverting resources and retraining volunteers. Organizational Plaintiffs have demonstrated a substantial likelihood of satisfying the injury-in-fact requirement based on harm they will incur from Defendant's actions in enforcing the signature-matching requirements and cure period.

### b. *Associational Standing*

The Organizational Plaintiffs also argue that they have standing to sue on behalf of their membership. Reply 6, ECF No. 50. Defendant counters that Organizational Plaintiffs have failed to identify a specific member who will suffer a concrete harm, and "[i]t's purely speculative that [the LOWV's] members will vote

absentee by mail and that their absentee ballots will be rejected in the three days between the deadline to cure and the deadline for receiving absentee ballots. Def. Opp. 18, ECF No. 41.

While Defendant is correct that no one can know in advance who will be affected by the signature-matching requirements, the LOWV did identify several members whose ballots or applications were rejected in the past due to signature mismatches. Miller Dep. 34:4–35:11, ECF No. 40-4. Additionally, in an analogous case, the Sixth Circuit found associational standing even where the plaintiffs could not identify specific voters who would be affected by Ohio's handling of voters who sought to vote at a polling place that is deemed incorrect by an election worker. *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004). The Court found standing because it was "inevitable" that such mistakes would be made and the issues raised were "not speculative or remote; they are real and imminent." *Id.*; *see also Block Communs., Inc. v. FCC*, 808 F. App'x 332, 336 (6th Cir. 2020) ("The Sixth Circuit has previously found standing absent definitive evidence if the injury is impossible to prove or could not be 'specifically identified in advance.'") The same is true here. While Organizational Plaintiffs may not be able to identify in advance who will be affected, they have met their burden of demonstrating that some members inevitably will be affected.

### 2. Causation

Defendant also argues, briefly, that Organizational Plaintiffs cannot establish that any injury they are suffering is fairly traceable to Defendant. Def. Opp. 16–17, ECF No. 41. In support, Defendant argues that the Sixth Circuit and other courts "have made clear that pandemic-created injuries do not automatically translate into unconstitutional state-created injuries. *Id.* at 17 (citing *Thompson I*, 959 F.3d 804). That principle is true, as the Court will discuss further in its analysis of Plaintiffs' claims. Further, this argument has some logical appeal because even Plaintiffs describe some of their injury as resulting from increased absentee voting or safety concerns surrounding COVID-19. But in recent election cases involving COVID-19, the Sixth Circuit has not raised standing concerns—even when the only allegedly unconstitutional effects are because of COVID-19—let alone found that those plaintiffs' injuries were not fairly traceable to the government defendant. *See generally Thompson*, *supra*; *Esshaki v. Whitmer*, 813 F. App'x 170 (6th Cir. 2020). Absent further guidance from the Sixth Circuit or argument from Defendant on how those cases are distinguishable, Defendant's causation argument is insufficient to defeat standing.

### 3. Redressability

Defendant and Intervenors also argue (again, briefly) that Organizational Plaintiffs' alleged injuries are not redressable via this lawsuit. Int. Opp. 13, ECF No. 44 (arguing that "[r]equiring Ohio to adjust its cure procedures will not

change APRI and LWV's incentive to inform their voters about Ohio's signature-matching regime"); Def. Opp. 19, ECF No. 41 (asserting that "the requested injunction will make the organizations divert more resources for education and outreach, especially now that the election is fast approaching").  These arguments, however, lack any legal or factual support.  Defendant had the opportunity to depose corporate representatives of both Organizational Plaintiffs, and yet Defendant and Intervenor have not cited any testimony supporting their theory that an injunction would not redress Organizational Plaintiffs' injuries.  And in any event, Organizational Plaintiffs' associational claims would certainly be redressed by this lawsuit even if their claims on their own behalf would not.

For all these reasons, Organizational Plaintiffs have demonstrated a substantial likelihood of standing.

### B. Likelihood of Success on the Merits

The Court considers first whether Plaintiffs are likely to succeed on any of their three claims.

### 1. Plaintiffs' First and Fourteenth Amendment Claims

Plaintiffs contend that Ohio's signature-matching requirements unconstitutionally burden their right to vote.  Voting is a fundamental and precious right, and "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  However, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the

democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (internal quotation marks and citation omitted). "To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes . . . affects—at least to some degree— the individual's right to vote . . . ." *Id.* "Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* Indeed, voting regulations do not automatically trigger strict scrutiny even when they impact the right to vote because, as the Supreme Court has instructed, "states 'may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

The parties agree that Plaintiffs' undue burden claim must be evaluated under the *Anderson-Burdick* framework. Under *Anderson-Burdick*,

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).

The Court must therefore determine the nature of the burden the signature-matching requirements place on voters when setting the standard of review to apply. If the requirements are "reasonable nondiscriminatory restrictions," the Court will apply rational basis review and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). If, however, the signature-matching requirements are "severe restrictions, such as exclusion or virtual exclusion from the ballot, strict scrutiny applies." *Thompson I*, 959 F.3d at 808 (citing *Burdick*, 504 U.S. at 434). If the signature-matching requirements fall somewhere between a "reasonable nondiscriminatory restriction" and a "severe restriction," the Court must weigh the burden imposed against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks omitted).

 *a. Nature of the Burden*

### i. Notice and cure process for absentee ballots

Plaintiffs contend first that "Ohio's signature-match scheme completely disenfranchises voters whose absentee ballots are erroneously rejected because of signature mismatches but who are not provided sufficient notice or time to cure

their ballots before the deadline."[13]  Mot. 21, ECF No. 24.  Defendant and Intervenors counter that this claim is effectively barred by the Sixth Circuit's decision in *NEOCH*.  In that case, the Sixth Circuit analyzed newly enacted statutes that, among other things, reduced Ohio's cure period for absentee ballots from ten to seven days.  837 F.3d at 635.  The Court saw "no evidence of the magnitude of the burden" caused by the shortened cure period and noted one board official's testimony "that few voters even used the final three cure-period days."  *Id.*  Based on this, the Sixth Circuit found that the cure period was a "minimal burden on voting [that was] easily outweighed by Ohio's interest in reducing the administrative strain felt by boards of elections before they begin to canvass election returns."  *Id.*

The Court disagrees that *NEOCH* ends the analysis in this case for two reasons.  First, it is not clear that *NEOCH* foreclosed any future claim that the seven-day cure period was an undue burden on voting.  Instead, the Sixth Circuit concluded that the record in that case was insufficient to support more than a trivial burden.  *Id.*  In other words, it was a failure of proof, not a failure of the claim as a matter of law.

Second, Plaintiffs' claim here is broader in at least two ways than the claim presented in *NEOCH*.  *NEOCH* was a facial challenge to the shortened cure

---

[13] Plaintiffs explicitly state that the question of whether "Ohio has a legitimate interest in conducting signature matching in general . . . is not the subject of this litigation and not before this Court."  Mot. 26, ECF No. 24.

period. In this case, Plaintiffs assert that the "short cure period is particularly burdensome in light of the serious delays in delivery time the U.S. Postal Service is currently experiencing." Mot. 22, ECF No. 24. Also, the *NEOCH* plaintiffs' claims were limited to the impact of shortening the notice period from ten days to seven days, whereas Plaintiffs in this case challenge Ohio's signature-matching procedures and the inability to cure perceived defects with ballot signatures before the end of the cure period.

Having found that Plaintiffs' claims are not barred by *NEOCH*, the Court considers first the nature of the burden on Plaintiffs' voting rights. Plaintiffs provide some evidence that Ohio's signature-matching procedures and cure period burden the right to vote. First, Plaintiffs argue that delays in mail delivery could result in no practical way to cure, even for voters who receive timely notice of an allegedly mismatched signature. In support, Plaintiffs point to a letter Defendant wrote to Ohio's congressional delegation on April 23, 2020, which indicated that first-class mail may take up to nine days to deliver.[14] Because correcting a deficient absentee ballot requires multiple mail deliveries (i.e. submission of the ballot, mailing the voter a Form 11-S, and the return of the ballot), Plaintiffs estimate a voter could have to submit their ballot twenty days

---

[14] Letter to Ohio Congressional Delegation, April 23, 2020,
https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf.

before the election to cure a potential signature mismatch.[15]  Mot. 23, ECF No.

24.  This may be impossible, Plaintiffs contend, because boards of elections do

not mail ballots until twenty-eight days before the election, meaning voters may

not receive them until nineteen days before the election.  Reply 18, ECF No. 50.

But it is not just Plaintiffs saying this.  General Counsel and Executive Vice

President of the United States Postal Service Thomas J. Marshall wrote to

Defendant on July 30, 2020, and said:

> Under our reading of your state's election laws, as in effect on July 27, 2020, certain state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe noted above.  As a result, to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted.
> . . . .
> If a voter submits a request at or near the deadline, and the ballot is transmitted to the voter by mail, there is a significant risk that the ballot will not reach the voter before the state's postmark deadline of November 2, and accordingly that the voter will not be able to use the ballot to cast his or her vote.

Patashnik Decl., Ex. 14, ECF No. 24-1.  While this letter did not separately

address the time it would take to mail cured absentee ballots, it supports

Plaintiffs' contention that some voters will not be able to complete the process of

submitting a valid absentee ballot before Ohio's deadlines.

---

[15] The Ohio Election Official Manual assumes that point-to-point delivery of First-Class Mail is 2 to 5 days."  Ohio Election Official Manual at 5-22, available at https://www.sos.state.oh.us/elections/elections-officials/rules/ (last visited September 24, 2020).

Plaintiffs also introduce evidence that Mangeni and Campbell were unable to cast their ballots in the 2020 Primary Election because of Ohio's signature-matching process.  Mangeni attempted to vote in the 2020 Primary Election via mail-in ballot.  Mangeni Decl. ¶ 8, ECF No. 24-5.  He never received a notice from the Franklin County Board of Elections that there was an issue with his ballot; however, he was later informed by LOWV that public records show Mangeni's ballot had been rejected due to signature mismatch.  *Id.* ¶¶ 9–10.

Campbell also applied to vote by mail for the 2020 primary.  Campbell Decl. ¶ 6, ECF No. 24-4.  After applying to vote by mail on or around February 19, 2020, Campbell's application was rejected on or around March 5, 2020, because of a signature mismatch.  *Id.* ¶ 7.  Campbell corrected her information and her application was accepted on April 23, 2020.[16]  *Id.* ¶¶ 8–9.  A new ballot was mailed to Campbell on April 24, 2020, which she received on the 29th.  *Id.* ¶¶ 9–10.  Campbell then returned her completed ballot on or about April 30, 2020.  *Id.* ¶ 10.  This ballot was not counted, *id.* ¶ 11, presumably because it was not timely submitted.

### ii. Rejection of absentee ballot applications

Plaintiffs also argue that "Ohio's signature-match regime constitutes absolute disenfranchisement for those voters whose absentee ballot *applications* are erroneously rejected for signature mismatch and who are either not notified in

---

[16] Campbell's declaration does not account for why her application was rejected on March 5, 2020, but not corrected and accepted until April 23, 2020.

sufficient time to cure or not notified at all." Mot. 23, ECF No. 24. Plaintiffs

contend that "[n]o state law or regulation compels or expressly permits county

election officials to conduct a signature match analysis for applications for

absentee ballots" and "[t]here are no state laws or regulations that require that

counties inform voters whose applications are rejected on account of signature

mismatch, set a timeframe for notice to those voters, or lay out how voters can

cure any perceived signature mismatch on an absentee ballot application." *Id.*

Defendant disagrees with Plaintiffs' reading of the law. Defendant states

that "the boards must notify voters 'promptly' when the voters' applications do not

contain all of the required information, Ohio Rev. Code § 3509.04(A), including

'[t]he elector's signature,' Ohio Rev. Code § 3509.03(B)(2)." Def. Opp. 22, ECF

No. 41. An elector's "signature" is defined as the "mark of that elector as it

appears on the elector's voter registration record." R.C. § 3501.011(C).

Therefore, if the signature on the application does not match the signature in the

county's voter registration system, the application would not contain all of the

required information.

The Court agrees with Defendant's interpretation of the statute and finds

that local boards are required to notify voters promptly if there is a signature

mismatch on their absentee ballot application. But even if the Court did not come

to that conclusion, Plaintiffs have failed to provide any evidence supporting their

argument that some voters are not notified when their absentee ballot application

is denied because of a signature mismatch.

What they *have* provided is evidence that thousands of absentee ballot applications have been rejected since the 2016 General Election because of signature mismatches, but they have not connected this to any evidence that these individuals were not notified of the signature mismatch or provided sufficient time to cure.[17]  Specifically, Plaintiffs cite to one of their experts who analyzed three federal elections in Ohio and was able to document "10,038 cases in which an absentee ballot application was rejected for 'signature issues,' and [] was only able to confirm that 2,581 of those applicants (26%) were able to resolve the issue and receive an absentee ballot, or, in some cases, cast a provisional ballot at the polling place."  Street Report[18] ¶ 30, ECF No. 24-8.[19] This expert believes it is likely that many more applications were rejected in counties for which he did not have data, but he could not precisely estimate how many other applications would have been rejected because of the lack of available information.[20]  *Id.*  But again, this does not break down how many of these voters received notice of the signature mismatch.

---

[17] In fact, as discussed above, Campbell *was* notified of a signature mismatch with her application in the 2020 Primary Election.

[18] Defendant has moved to exclude the reports and testimony of Plaintiffs' experts.  Mot. to Exclude, ECF No. 43.  In the interest of timely addressing Plaintiffs' urgent motion for a preliminary injunction, the Court does not address the motion to exclude in full at this time.  However, the Court has reviewed Defendant's arguments regarding the experts' qualifications and the usefulness of their testimony and only includes citation to Plaintiffs' experts here as the Court finds appropriate at this time.

[19] In the instances where Dr. Street could distinguish between "no signature" and "signature mismatch," 55% of the rejected applications had a missing signature.  *Id.*

[20] Plaintiffs also point to a December 2019 Associated Press news article stating that twenty-one counties (out of eighty-eight in Ohio) rejected more than 6,500 ballot

In his opposition, Defendant critiques Plaintiffs' claim by pointing out that they "have produced precisely zero evidence that boards do not notify voters when ballot applications are rejected for a mismatched signature." Def. Opp. 23, ECF No. 41. Defendant then discusses seven specific counties that responded to Plaintiffs' public records request by explaining how they *do* provide notice to voters whose absentee ballot applications have a signature mismatch. *Id.* On reply, Plaintiffs do not point to specific boards of elections that do not notify voters whose applications were rejected due to signature mismatch.[21]

### iii. Analysis of the nature of the burden

Based on the evidence put forward by Plaintiffs, they have demonstrated some burden on the right to vote based on Ohio's signature-matching procedures. But this burden must be considered along with "the alternative voting opportunities that Ohio provides." *Mays v. LaRose*, 951 F.3d 775, 786 (6th Cir. 2020). In *Mays*, the Sixth Circuit considered the burden imposed on individuals who planned to vote in-person on election day but were arrested shortly before election day and therefore unable to vote. *Id.* Despite the fact that

---

applications for the 2018 General Election. Available at, https://apnews.com/article/ddfed70e98d79cf0bee49eb1d9fd85b9 (last visited September 24, 2020). That same article included a note that "[t]he few counties that tracked what happened to applications after they were rejected said issues were largely addressed before or on Election Day."

[21] The closest the Court could find to this type of evidence was Plaintiffs referring to the declaration of one of their attorneys, which stated that "some boards of elections do not maintain records of their efforts to notify voters of rejected absentee ballot applications." Patashnik Decl. ¶ 18, ECF No. 24-1. But this is a lack of evidence, not affirmative evidence, and Plaintiffs are the party required to put forward evidence of the alleged burden on voting.

the plaintiffs' arrests in *Mays* effectively prevented them from voting, the Sixth Circuit agreed with this Court that strict scrutiny was inappropriate because "Plaintiffs could have avoided all that uncertainty by taking advantage of the opportunities Ohio provides to vote early." *Id.* at 787. Therefore, the plaintiffs in *Mays* were "not totally denied a chance to vote by Ohio's absentee ballot deadlines," and strict scrutiny was inappropriate. *Id.*; *see also Thompson I*, 959 F.3d at 809 ("At bottom, a severe burden excludes or virtually excludes electors or initiatives from the ballot.")

The burden imposed on voters by Ohio's signature-matching requirements is certainly less than that imposed on jailed voters in *Mays*. Electors wishing to vote absentee have multiple ways of being notified that there is a problem with the signature on their application or ballot, an opportunity to cure, and the option of voting provisionally on election day if it appears that they will not be able to successfully vote absentee. Electors could also choose to simply not attempt to vote absentee in the first place and instead vote early or on election day in person. While this is some burden on the right to vote, it is not severe (or "substantial" as Plaintiffs refer to it). *See Mays*, 951 F.3d at 786 ("Plaintiffs' choice to not participate in the opportunities Ohio provides to vote . . . was, at least in part, the cause of their inability to vote.").

Plaintiffs suggest that, because of the COVID-19 pandemic, some Ohioans, particularly older individuals or those with pre-existing medical conditions, "have no practical choice but to vote by mail." Reply 19–20, ECF No.

50. The Sixth Circuit addressed a similar argument in *Thompson* and said "we must remember, First Amendment violations require state action. . . . So we cannot hold private citizens' decisions to stay home for their own safety against the State." 959 F.3d at 810. The same is true here.

Voters are not virtually excluded from voting because of Ohio's signature-matching requirements. But the requirements are not "so minimal as to warrant rational-basis review," which is appropriate if the restrictions "'in no way' limit[]" access to voting.[22] *Schmitt v. LaRose*, 933 F.3d 628, 641 (6th Cir. 2019) (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016)). The Court therefore finds that Ohio's signature-matching requirements are a moderate burden.

### b. The State's Interests

Next, under *Anderson-Burdick*, the Court must consider Defendant's justifications for Ohio's signature-matching requirements. Defendant advances two main interests served by the signature-matching process. First, Defendant asserts that verifying voters' signatures helps to combat fraud. Def. Opp. 27–29, ECF No. 41.

---

[22] Arguably, the burden here could be considered minimal based on Sixth Circuit precedent. In *Mays*, the Court stated that Ohio's generally applicable deadline to submit absentee ballots, despite "eliminat[ing] opportunities to vote for electors who fail to register before the deadline," imposes only a minimal burden. *Mays*, 951 F.3d at 792. Nevertheless, the Court finds a moderate burden here given the present circumstances.

Next, Defendant asserts that Ohio's signature-matching process promotes orderly election administration.  Def. Opp. 29–30, ECF No. 41.  Defendant uses the declaration of David Payne, the Deputy Director of the Franklin County Board of Elections, to illustrate all of the tasks that a board of elections must complete in the days and weeks following election day in order to accomplish the official canvass of votes (i.e. the final tally of all ballots cast in the election).  Payne Decl. ¶¶ 33–58, ECF No. 41-3.  It is unnecessary to recite here all of the tasks boards must accomplish in order to complete the canvass, but a small sample includes: conducting the unofficial canvass beginning immediately after the polls close; processing provisional ballots, which requires the boards to verify the eligibility of the persons who cast a provisional ballot;[23] counting late-received absentee ballots; issuing a Form 11-S to any voter who did not include all of the required information on her absentee ballot identification envelope (the form must be sent out on the same day the ballot was received); and sending a bipartisan team to assist any voter who requests assistance completing a Form 11-S.  *Id.*

Plaintiffs "acknowledge that the State has an interest in verifying voters' identify [sic] in order to combat voter fraud."  Mot. 25, ECF No. 24.  But Plaintiffs also contend:

> Ohio has no interest in a signature-matching  scheme that lacks
> adequate  notice  and  an  opportunity  to  cure  for  two  reasons:  (1)

---

[23] In Franklin County, the board assigns approximately twenty-six staff members to process provisional ballots after a presidential election.  Payne Decl. ¶ 37, ECF No. 41-3.  These staff members work seven days a week, at least eight hours per day, for two weeks to be able to process the provisional ballots.  *Id.*

absentee ballot fraud is exceedingly rare, and (2) the current scheme, wherein the state has set unreasonable deadlines that will not allow for notice and opportunity to cure, is irrational and thus not sufficiently tailored to justify the disenfranchisement that signature matching errors can cause.

*Id.*

### c. Weighing the burden on the right to vote against the State's interest

Finally, the Court must weigh the burden imposed against the State's interest. As both parties agree, the State has a valid interest in combatting fraud and even the appearance of fraud. While Plaintiffs and Intervenors[24] cite drastically different research regarding the threat election fraud actually poses, there is no question that combatting fraud and promoting confidence in elections is a substantial interest of the State. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.").

Furthermore, the Sixth Circuit has previously found that "Ohio's interest in orderly election administration is weighty enough to justify" a moderate burden (albeit a different burden than the one imposed here). *Mays*, 951 F.3d 792; *see also NEOCH*, 837 F.3d at 635 ("[b]uilding in a three-day buffer between the cure period and the official canvass is a common-sense solution" to deal with the logistical issues facing boards of elections); *Anderson*, 460 U.S. at 788 (each

---

[24] Defendant asserts that absentee-voter fraud is not common in Ohio but argues that "Ohio need not wait for fraud to become widespread or threaten the integrity of elections before it acts. *Id.* at 28 (citing *NEOCH*, 837 F.3d at 635 ("[A] state certainly need not wait for an election issue to arise before enacting provisions to avoid it.")).

provision of states' complex election codes "inevitably affects -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions."); *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) ("If the State had enacted a generally applicable, nondiscriminatory voting regulation . . . its 'important regulatory interests' would likely be sufficient to justify the restriction."). Therefore, the Court finds that the State of Ohio's interests in its signature-matching process outweigh the burdens that process imposes.

For these reasons, the Court finds that Plaintiffs are unlikely to succeed on their claim that Defendant's signature-matching processes are an undue burden on Plaintiffs' rights in violation of the First and Fourteenth Amendments to the Constitution.

### 2. Procedural Due Process

Plaintiffs next argue that Ohio's signature-matching process denies Plaintiffs procedural due process. Mot. 27–31, ECF No. 24. Plaintiffs assert that their right to vote and their right to vote by absentee ballot are clearly defined liberty interests; therefore, the Court should balance the following three *Mathews* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendant suggests that the Court need not conduct a separate analysis under *Mathews* because "[t]he *Anderson-Burdick* balancing test was designed to determine whether challenged laws satisfy due process."[25]  Def. Opp. 31, ECF No. 41 (citing *Obama for Am.*, 697 F.3d at 429–30 (stating that the Supreme Court has created "a single standard for evaluating challenges to voting restrictions"—*Anderson-Burdick*)).

Sixth Circuit case law does not provide a definitive answer as to whether procedural due process claims are viable in voting rights cases outside the *Anderson-Burdick* framework.  *Obama for America* seems to suggest that they are not, but that case did not specifically address procedural due process claims when making its broad pronouncement that voting restrictions should all be evaluated under a single standard.  Furthermore, the Sixth Circuit in *NEOCH* reviewed the district court's denial of a procedural due process claim in a voting rights case without suggesting that such a claim lacks viability outside *Anderson-*

---

[25] Intervenors argue that the Sixth Circuit does not recognize procedural due process challenges under *Mathews*.  Int. Opp. 27, ECF No. 44 (citing *League of Women Voters v. Brunner*, 548 F.3d 463, 479 (6th Cir. 2008)).  *Brunner* did not categorically bar procedural due process claims for voting rights cases, however.  Instead, the Court found that the procedural due process claim as alleged in the plaintiffs' complaint failed.  *Id.*  The Court also relied on the "brevity of argument" in the plaintiffs' brief, which subsumed the plaintiffs' procedural due process arguments into the substantive due process analysis.  *Id.*

*Burdick. NEOCH*, 837 F.3d at 637.  Therefore, the Court will proceed to analyze

Plaintiffs' procedural due process claim under *Mathews*.

Under the first prong of the *Mathews* test, the Court considers the private

interest that will be affected.  Plaintiffs argue that the interest at stake is the

"fundamental right to vote."  The Court disagrees.  The private interest that will be

affected by the State's signature-matching process is the right to vote via

absentee ballot.  And while the Court agrees that this "implicates the right to

vote," *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270–71 (11th Cir.

2019), this right must be understood within the broader context of the other

opportunities voters in Ohio have to exercise their fundamental right to vote.  As

discussed above, Ohio voters have multiple options to exercise their right to vote

even if their ballot is rejected due to signature mismatch (e.g. curing the

absentee ballot or voting provisionally).

Next, the Court considers the "risk of erroneous deprivation" of the liberty

interest at stake.  One of Plaintiff's experts, Dr. Street, has opined that "there is

only a 3% probability that an absentee ballot which has been rejected for

signature mismatch actually features an invalid signature.  There is a 97%

probability that the ballot has been wrongly rejected."[26]  Street Report ¶ 19, ECF

---

[26] Meanwhile, Defendant has provided evidence that the total number of voters whose absentee ballots are rejected due to a mismatched signature is quite low.  Def. Opp. 7, ECF No. 41.  According to Deputy Assistant Secretary of State and State Elections Director Amanda M. Grandjean, in the 2016 General Election, only 335 absentee ballots were rejected due to a non-matching signature out of 1,206,416 absentee ballots cast.

No. 24-8.  The Court need not wade into Dr. Street's statistical analysis at this point of the litigation to determine whether this estimate is useful or valid, because it misses the broader point.  Even if it is true that the error rate in matching signatures is that high, as discussed above, Plaintiffs have failed to demonstrate that voters are unable to effectively use Ohio's cure process when their ballots have been rejected.  There is only an erroneous deprivation of the right to vote absentee if Plaintiffs do not receive notice and an opportunity to cure.

Finally, the Court must consider the Government's interest in the procedural requirements, which it has already done above as part of the *Anderson-Burdick* analysis.  The State has a substantial interest in preventing election fraud (however uncommon that may be), promoting confidence in elections, and administering an orderly election.

Balancing the three *Mathews* factors, the Court finds Plaintiffs are not likely to succeed on the merits of their procedural due process claim.

### 3.  Equal Protection

Plaintiffs' final claim is that "[t]he ad hoc procedures adopted by county boards of elections for signature matching on absentee ballot applications and

---

Grandjean Decl. ¶ 42, ECF No. 41-2.  For the 2018 General Election it was 234 ballots rejected out of 949,104 cast, and for the 2020 primary it was 217 rejected out of 1,565,792 cast.  *Id.* ¶¶ 42–43.  Of those three elections, the 2016 General Election had the worst rejection rate due to mismatched signature, and it occurred in less than .03% of absentee ballots submitted.

absentee ballots, a result of the State's failure to impose uniform standards,

violate the equal protection rights of Plaintiffs and Ohio voters." Mot. 32, ECF

No. 24. "[W]hen a state regulation is found to treat voters differently in a way that

burdens the fundamental right to vote, the *Anderson-Burdick* standard applies."

*Obama for America*, 697 F.3d at 430 (citing *Hunter v. Hamilton Cty. Bd. of*

*Elections*, 635 F.3d 219, 238 (6th Cir. 2011)).

Therefore, the Court must again begin with a determination of the

character and magnitude of the asserted injury. Plaintiffs point to the different

procedures boards of elections use to review signatures, which include, among

other things:

> (1) the number and position of election officials who review signatures
> to determine whether they match, (2) the criteria (if any) for what
> constitutes a matched or mismatched signature, and (3) the extent to
> which the boards of elections store more than one signature sample
> for each voter and whether they use such additional samples to
> compare a voter's signature from a ballot or ballot application.

*See* Patashnik Decl. ¶ 10, ECF No. 24-1; *see also* Mot. 33 n.31, ECF No. 24.

Defendant disagrees with Plaintiffs that there is any differential treatment in

the notice and cure procedures between counties. Def. Opp. 35, ECF No. 41. In

support, Defendant says that, with one exception, the public records responses

upon which Plaintiffs rely to show differential treatment were all completed prior

to July 6, 2020, when Defendant "explicitly instructed the boards how to notify

voters of absentee-ballot and application errors, including signature mismatches."

*Id.* at 35–36 (citing Sec'y of State Directive 2020-11, available at

https://www.ohiosos.gov/elections/elections-officials/rules/ (last visited

September 20, 2020)).  But more fundamentally, Defendant contends that

Plaintiffs have not shown that any differences in the signature-matching

procedures used by various counties have any effect on the ability to vote.  *Id.* at

36–37.  According to Defendant:

> Plaintiffs have offered only limited statewide numbers on rejection
> rates that do not establish that the different processes of or training
> on signature matching have any discernable effect.  Put another way,
> Plaintiffs have not shown any factual likelihood that a signature that
> would match in Butler County would ultimately be rejected in Knox
> County.

*Id.* at 37.

Plaintiffs disagree with Defendant's focus on the lack of evidence of

different results between counties, as opposed to different procedures, for three

reasons.  First, Plaintiffs argue that the "lack of statewide standards and the

accompanying burden it places on voters is sufficient on its own to make out an

equal protection claim."  Reply 25, ECF No. 50.  Second, Plaintiffs assert that

they are not required to prove their case in full at this stage of the litigation, and

"Plaintiffs' evidentiary burden here is even less given that Defendant LaRose

controls whether statewide data concerning signature-matching procedures exist

yet chooses not to maintain much of those [sic] data."  *Id.* at 26.  Third, Plaintiffs

contend that they have "provided ample evidence of differential treatment," which

they say is the way in which county boards of elections "(1) follow different

procedures for determining whether signatures match, (2) rely on different levels

of internal review of signature mismatch decisions, and (3) provide different means of notice to voters of signature mismatches." *Id.* at 27.

The Court agrees with Defendant. In order to make out an equal protection claim, Plaintiffs are required to show not just some difference in the way boards of elections carry out their duties, but that this difference "burdens the fundamental right to vote." *Obama for America*, 697 F.3d at 430. In order to do that, Plaintiffs must put forward some evidence that the way in which counties are matching signatures impacts the way in which ballots are ultimately accepted or rejected. *See NEOCH*, 837 F.3d at 635 ("A plaintiff may state an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live."). The "central question" is "whether Ohio lacks 'adequate statewide standards for determining what is a legal vote.'" *Id.* (quoting *Bush v. Gore*, 531 U.S. 98, 110 (2000) (per curiam)). "Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected." *Id.* at 636. Plaintiffs challenge the differences in how signature-matching standards are applied, but they fail to show that these differences result in voters in one county being treated more favorably than in another.

For this reason, the Court finds a minimal burden on the right to vote based on differences in how counties match ballot signatures. The State's regulatory interests are sufficient to justify this minimal burden. *See Burdick*, 504

U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).  Therefore, Plaintiffs are unlikely to succeed on their equal protection claim.

### 4.  Summary

For all these reasons, Plaintiffs are unlikely to prevail on the merits of any of their claims, which is the most important part of the Court's analysis. Nevertheless, the Court will briefly address the remaining preliminary injunction factors.

### C. Irreparable Harm

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson v. DeWine ("Thompson II")*, No. 20-3526, __ F.3d __, 2020 U.S. App. LEXIS 29602, at *14 (6th Cir. Sept. 16, 2020) (per curiam) (quoting *Maryland v. King*, 567 U.S. 1301 (2012)).  Therefore, because the Court has found Defendant is likely to prevail on the merits, issuing an injunction "would cause the State irreparable harm if we blocked it from enforcing its constitutional [voting] laws." *Id.*

### D. Balance of the Equities

"When analyzing the balance of equities, '[the Supreme] Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'"  *Kishore v. Whitmer*, No. 20-1661, __ F.3d __, 2020 U.S. App. LEXIS, at *11 (6th Cir. Aug. 24, 2020) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207

(2020)); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam) ("[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."); *SEIU Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored." (citing *Purcell*, *supra*)). While there is still a month to go before the election, issuing an injunction now would create a major rule change for both Defendant and local boards of elections to adjust to while pre-election activities are ramping up.  The State has been accepting absentee ballot applications for months, and the ballots themselves will soon be mailed.

Additionally, the Court believes that changing the rules regarding verification of signatures on ballots at this time would be particularly damaging. Some public officials have unfortunately regularly cast doubt on the security and legitimacy of voting by mail.  A federal court enjoining part of the State's procedure for maintaining the security of mail-in voting in the weeks leading up to the election could further undermine public confidence in elections.

### E. Public Interest

"It's in the public interest that we give effect to the will of the people 'by enforcing the laws they and their representatives enact.'"  *Thompson II*, 2020 U.S. App. LEXIS 29602, at *15 (quoting *Thompson I*, 959 F.3d at 812).[27]

## IV.   CONCLUSION

As this Court has said, "[t]he Constitution does not require the best plan, just a lawful one."  *League of Women Voters v. LaRose*, No. 2:20-cv-1638, 2020 U.S. Dist. LEXIS 91631, at *32 (S.D. Ohio Apr. 3, 2020).  Plaintiffs have not shown that they are likely to succeed in their argument that the State of Ohio's signature-matching process is not only imperfect, but unconstitutional.  For the above reasons, Plaintiffs' motion for a preliminary injunction, ECF No. 24, is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[27] The Court's analysis of the final three factors should make it evident why likelihood of success is often the determinative factor in cases involving alleged constitutional violations.  *See Obama for Am.*, 697 F.3d at 436.  If the Court had found Plaintiffs were likely to succeed on the merits, the Sixth Circuit's analysis of the remaining factors from *Obama for America* may have been more applicable.  That case suggests irreparable harm would have favored Plaintiffs if they were likely to succeed on the merits, because [w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Id.*  Similarly, the balance of equities and the public interest also may have weighed in Plaintiffs' favor because "the public has a 'strong interest in exercising the 'fundamental political right' to vote,'" *id.* (quoting *Purcell*, 549 U.S. at 4), and "[t]hat interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."  *Id.* at 437 (quoting *Hunter*, 635 F.3d at 244).